UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

|  |  |
|---|---|
| In re:<br><br>MBMG HOLDING, LLC, *et al.*,[1]<br><br>   Debtors. | Chapter 11 Cases<br><br>Case No. 24-_____<br><br>(Joint Administration Pending) |

**DEBTORS' EMERGENCY MOTION FOR INTERIM
AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING, (II)
AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV)
GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

**(Emergency Hearing Requested)**

**Statement of Exigent Circumstances**

The Debtors respectfully request the Court to conduct an emergency hearing on this Motion within two business days of the Petition Date (as defined herein), consistent with Local Rule 9013-1(F). The Debtors must have immediate access to Cash Collateral and, thereafter, postpetition financing to assure continuity of care to their patients, while simultaneously preventing direct, immediate, and substantial harm to the Debtors' estates. The Debtors respectfully request that the Court waive the provisions of Local Rule 9075-1(B), which requires an affirmative statement that a bona fide effort was made to resolve the issues raised in this Motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.

In support of this motion (this "Motion"), the above-captioned debtors and debtors-in-

possession (collectively, the "Debtors") rely on the *Declaration of Nicholas K. Campbell in*

---

[1] The address of the Debtors is 7500 S.W. 8th Street, Ste. 400, Miami, Florida 33144. The last four digits of the Debtors' federal tax identification numbers are: (i) Care Center Medical Group, LLC (9052); (ii) Care Center Network, LLC (5784); (iii) CCMC Physician Holdings, Inc. (4532); (iv) Clinical Care Pharmacy, LLC (2103); (v) Florida Family Primary Care Center, LLC (5005); (vi) Florida Family Primary Care Center of Pasco, LLC (8570); (vii) Florida Family Primary Care Centers of Orlando, LLC (3086); (viii) Florida Family Primary Care Centers of Pinellas, LLC (7075); (ix) Florida Family Primary Care Centers of Tampa, LLC (0631); (x) MB Medical Operations, LLC (8450); (xi) MB Medical Transport, LLC (3476); (xii) MBMG Holding, LLC (3880); (xiii) MBMG Intermediate Holding, LLC (9320); (xiv) Miami Beach Medical Centers, Inc. (3933); (xv) Miami Beach Medical Consultants, LLC (2737); and (xvi) Miami Medical & Wellness Center, LLC (2474).

*Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") filed concurrently herewith and respectfully state as follows:

## RELIEF REQUESTED

1.      By this Motion, the Debtors seek entry of interim and final orders, substantially in the form attached hereto as **Exhibit A** (the "Interim Order" [2] and "Final Order"[3] and, collectively, the "DIP Orders"):

(a)      authorizing debtor, MB Medical Operations, LLC, in its capacity as borrower (the "Borrower"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (in their capacities as guarantors, the "Guarantors"), on a joint and several basis, the Borrower's obligations in connection with debtor in possession financing, pursuant to that *Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement*, dated as of October 13, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement") and the other DIP Documents (as defined herein), comprising a postpetition senior secured priming and super-priority debtor-in-possession delayed-draw term loan facility (the "DIP Credit Facility") entered into by KKR Loan Administration Services LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the lenders party thereto from time to time, (the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties"), pursuant to the terms and conditions of the DIP Orders and the other DIP Documents, in an aggregate principal amount not to exceed at any time outstanding of $10,000,000.00 (the "Total DIP Commitment"), of which up to $4,000,000.00 of the Total DIP Commitment may be funded upon or following entry of the Interim Order (the "Interim Commitment") in accordance with the DIP Documents and the Interim Order;

(b)      authorizing the Debtors to obtain from the DIP Lenders, upon or following entry of the Final Order, total advances in an amount not to exceed the Total DIP Commitment in accordance with the DIP Documents and the Final Order;

(c)      authorizing the Debtors to execute and deliver the DIP Documents, and to perform such other acts as may be necessary or desirable in connection with the DIP Documents and the transactions contemplated thereby;

---

[2]  Capitalized terms used but not defined herein have the meanings given to them in the Interim Order.

[3]  The Debtors will file a proposed Final Order prior to a final hearing on the Motion.

(d)     subject to the Carve-Out, granting to the DIP Agent, on account of the DIP Facility and all obligations owing thereunder and under the DIP Documents (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "<u>DIP Obligations</u>"), allowed super-priority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b), 507(a)(2), 507(b), and 507(d) of the Bankruptcy Code, in each of the Chapter 11 Cases and any Successor Cases;

(e)     subject to the Carve-Out, granting to the DIP Agent automatically perfected priming security interests in and liens on all of the DIP Collateral, including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the priorities set forth in the Interim Order;

(f)     authorizing and directing the Debtors to pay the fees, expenses and other amounts payable under the DIP Documents including, without limitation, the reasonable fees and disbursements of the DIP Agent's and DIP Lenders' attorneys, advisors, accountants and other consultants, including without limitation Proskauer Rose LLP, all to the extent provided in, and in accordance with, the DIP Documents;

(g)     authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral, on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition First Lien Secured Parties for any Diminution of their interests in the Prepetition Collateral, including the Cash Collateral;

(h)     waiving, subject to entry of a Final Order approving such waiver, all rights of the Debtors to surcharge collateral of the DIP Secured Parties and the Prepetition First Lien Secured Parties pursuant to section 506(c) of the Bankruptcy Code;

(i)     waiving, subject to entry of a Final Order approving such waiver, the application of the "equities of the case" exception under section 552(b) of the Bankruptcy Code as to the DIP Secured Parties and the Prepetition First Lien Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral and DIP Collateral, as applicable;

(j)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

(k)     authorizing the DIP Agent, at the direction of the Required Lenders (as defined in the DIP Credit Agreement) (or as otherwise provided in the DIP

Documents), to (1) terminate the funding obligations under the DIP Documents in accordance with their terms; (2) declare the DIP Obligations to be immediately due and payable in full in cash, to the extent permitted by the terms thereof; and (3) subject to the Interim Order, be granted relief from the automatic stay to foreclose on the DIP Liens, in each case without further order of the Court; and

(l)      scheduling a final hearing (the "<u>Final Hearing</u>") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing; and granting related relief.

## <u>JURISDICTION</u>

2.      This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

3.      Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief sought in this Motion are sections 105, 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506, 507, and 552 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), rules 2002, 4001, 6003, 6004, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and rules 2002-1, 4001-1, 4001-2, 4001-3, and 9013-1 of the Local Bankruptcy Rules for the Southern District of Florida (the "<u>Local Rules</u>").

## <u>STATEMENT OF MATERIAL TERMS</u>

5.      The following chart contains a summary of the material terms[4] of the proposed DIP Facility and Interim Order in accordance with Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B), Local Rules 4001-2 and 4001-3, and the *Guidelines for Motions Seeking Authority to Use Cash Collateral and Motions Seeking Approval of Postpetition Financing* (the "<u>Guidelines</u>"):

---

[4]  The summaries contained in this Motion are qualified in their entirety by the provisions of the DIP Documents and the Interim Order.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control, with the Interim Order controlling in the event of any inconsistency between the Interim Order and the other DIP Documents.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Parties to the DIP Credit Agreement**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Borrower**: MB Medical Operations, LLC, as debtor-in-possession in these chapter 11 cases (the "<u>Borrower</u>" or "<u>MB Medical</u>").<br><br>**Guarantor(s)**: The Debtors identified in the DIP Credit Agreement as "Guarantors."<br><br>**DIP Agent**: KKR Loan Administration Services LLC<br><br>**DIP Lenders**: The lenders from time-to-time party to the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, Preamble. |
| **Term**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The DIP Loans are due in full, and the Total DIP Commitment terminates on, the earliest to occur of the following:<br><br>(a)      unless the Final Order shall have been entered on or before the date that is thirty (30) days after the entry of the Interim Order;<br><br>(b)      the date upon which the consummation of a sale of all or substantially all of the assets of the Debtors occurs;<br><br>(c)      the termination of the Asset Purchase Agreement for any reason without the prior written consent of the Required Lenders (as defined in the DIP Credit Agreement);<br><br>(d)      the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Cases (as defined in the DIP Credit Agreement) that is confirmed pursuant to an order entered by the bankruptcy court;<br><br>(e)      entry of an order by the bankruptcy court approving (A) a motion seeking conversion or dismissal of any or all of the Cases (as defined in the DIP Credit Agreement) or (B) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business<br><br>(c)      December 12, 2024; and<br><br>(d)      acceleration by the DIP Agent following an Event of Default.<br><br>*See* DIP Credit Agreement, definition of "Maturity Date." |
| **Commitments**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Extensions of credit in the maximum principal amount of $10,000,000.00.<br><br>DIP Credit Agreement, Schedule 1; *Interim Order, ¶ (i), pg. 2.* |
| **Conditions of Borrowing** | The DIP Documents include standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of each DIP Lenders to make DIP Loans under the DIP Facility. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | *See* DIP Credit Agreement, Section 8, pgs. 41-44. |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Loans will bear interest at a rate per annum equal to the sum of Term SOFR (as defined in the DIP Credit Agreement) plus 8.00%, payable monthly on the last business day of each month in kind in arrears, by capitalizing such interest and adding it to the outstanding principal balance of the DIP Loans on such interest payment date.<br><br>*See* DIP Credit Agreement, Section 2.08, pgs. 30-31. |
| **Use of DIP Facility and Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(ii) | As set forth more fully in the DIP Documents, the Debtors shall use advances of credit under the DIP Facility for working capital and other general corporate purposes, including for bankruptcy-related costs and expenses, all to the extent provided in, and in accordance with, the Approved Budget, the Orders and the DIP Documents.<br><br>*See* Interim DIP Order ¶ 9; DIP Credit Agreement Section 10.10, pg. 55. |
| **Limitations on Use of DIP Facility and Cash Collateral** | Except as otherwise permitted in the Interim Order and the Approved Budget, the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral and the Carve-Out may not be used in connection with: (a) preventing, hindering, or delaying the DIP Secured Parties or the Prepetition First Lien Secured Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral outside the ordinary course of business without the prior written consent of the Required Lenders; (c) outside the ordinary course of business, using or seeking to use any insurance proceeds constituting DIP Collateral without the prior written consent of the Required Lenders; (d) incurring any indebtedness (other than as expressly permitted by the DIP Credit Agreement) without the prior written consent of the Required Lenders; (e) seeking to amend or modify any of the rights granted to the DIP Secured Parties, the Prepetition First Lien Secured Parties or the Prepetition Unsecured Note Parties under this Interim Order, the DIP Documents, the Prepetition First Lien Credit Documents or the Prepetition Unsecured Promissory Note Documents, without the DIP Agent's consent in its sole discretion; (f) objecting to or challenging in any way the DIP Liens, the DIP Obligations, the Prepetition First Liens, the Prepetition First Lien Obligations, the Prepetition Unsecured Note Obligations, the DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the DIP Secured Parties, the Prepetition First Lien Secured Parties, or the Prepetition Unsecured Note Parties, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the DIP Secured Parties, the Prepetition First Lien Secured Parties, the Prepetition Unsecured Note Parties, or any of their respective affiliates, successors and assigns and the partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals; (h) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition First Liens, the Prepetition First Lien Obligations, the Prepetition Unsecured Note Obligations or any other rights or interests of the DIP Secured Parties, the Prepetition First Lien Secured Parties, or the Prepetition Unsecured Note Parties; or (i) seeking to subordinate, recharacterize, |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | disallow or avoid the DIP Obligations, the Prepetition First Lien Obligations or the Prepetition Unsecured Note Obligations.<br><br>Notwithstanding the foregoing, no more than $25,000.00 of the proceeds of the DIP Facility, the DIP Collateral or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by an official committee of unsecured creditors, if appointed, to investigate the foregoing matters with respect to the Prepetition First Liens or the Prepetition First Lien Obligations within the Challenge Period. *See* Interim Order, ¶ 42. |
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties have an interest in Cash Collateral.<br><br>*See* Interim Order, ¶ G(i) – (ix). |
| **Agency or Commitment Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | None. |
| **Budget**<br><br>Bankruptcy Rule 4001 (c)(1)(B) | The use of cash and proceeds from the DIP Facility is subject to the Approved Budget, the initial form of which is attached to the Interim Order as <u>Exhibit B</u>.<br><br>*See* Interim Order, ¶ 17. |
| **Reporting Information**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Documents requires customary financial and other informational reporting by the Borrower to the DIP Agents.<br><br>*See* Interim Order, ¶¶ 18 and 19. |
| **Budget/Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The Debtors are required to comply with the Approved Budget, subject to "Permitted Variances" in cash disbursements of 10.0% and $25,000 per line item in the Approved Budget.<br><br>*See* Interim Order at ¶ 18. |
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B) | It shall be a Termination Event if the Debtors fail to adhere to the milestones set forth in ¶ 30 to the Interim Order.<br><br>*See* Interim Order, ¶ 30. |
| **Liens and Priorities** | The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(c)(l)(B)(i) | lien or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve-Out, and shall otherwise be junior only to the Prepetition Permitted Liens.<br><br>*See* Interim Order, ¶ 6. |
| **Carve-Out**<br><br>Bankruptcy Rule 4001(c)(1)(B), Guidelines §II(B)(6) | The Interim Order provides a "Carve-Out" of certain statutory fees and allowed professional fees of the Debtors and any official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 328 or 1103 of the Bankruptcy Code.<br><br>*See* Interim Order, ¶ 35. |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The Interim Order provides for a challenge period as follows: sixty (60) calendar days from the formation of the Committee and (ii) seventy-five (75) calendar days from the entry of the Petition Date, and (b) with respect to any other party-in-interest (other than the Debtors) with requisite standing, sixty (60) calendar days from the entry of the Interim Order (the "Challenge Period"); *provided*, that any trustee that is appointed in any Case or in any Successor Case prior to the expiration of the Challenge Period shall have sixty (60) days from the earlier of (A) the date the Chapter 11 Cases are converted to chapter 7, or (b) a chapter 11 trustee is appointed in the Chapter 11 Cases.<br><br>*See* Interim Order, ¶ 44. |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Subject to the challenge rights set forth in the Interim Order and pursuant to sections 361, 363(e), 364(d) and 507 of the Bankruptcy Code, the Prepetition First Lien Secured Parties are entitled to adequate protection of their respective interests in all Prepetition Collateral against any Diminution in Value of such respective interests in the Prepetition Collateral:<br><br>***Adequate Protection Liens***:  As adequate protection of: (a) the interests of the Prepetition First Lien Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors grant to the Prepetition First Lien Secured Parties, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on all of the Debtors' assets, including, without limitation, the DIP Collateral (such liens, the "Prepetition First Lien Secured Parties Adequate Protection Liens").  The Prepetition First Lien Secured Parties Adequate Protection Liens shall be junior and subordinate to the DIP Liens.<br><br>***Adequate Protection Superpriority Claims***: As further adequate protection of the interests of: (a) the Prepetition First Lien Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Agent, on behalf of itself and the other Prepetition First Lien Secured Parties, is to be granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed super-priority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "Prepetition First Lien Secured Parties Adequate Protection Superpriority Claim").<br><br>Except as set forth in the Interim Order, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c) (subject to entry of a Final Order), 546(d), 726, 1113 and 1114 of the Bankruptcy Code; *provided, however,* that the Adequate Protection Superpriority Claims shall be junior to the Carve-Out and the DIP Superpriority Claim. |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The Interim Order contain events of default that are usual and customary for debtor-in-possession financings and the use of cash collateral, including without limitation, failure to satisfy the Transaction Milestones.<br><br>*See* Interim Order, ¶ 29. |
| **Remedies Notice Period** | Any automatic stay otherwise applicable to the DIP Agent, DIP Lenders, and the Prepetition First Lien Secured Parties will be modified so that five (5) business days after the Termination Declaration Date (such five (5) business day period, the "Remedies Notice Period") the DIP Agent and the Prepetition First Lien Agent shall be entitled to immediately exercise its rights and remedies in accordance with the DIP Documents, the Prepetition First Lien Credit Agreement and/or the Interim Order, as the case may be, and shall be permitted to satisfy the DIP Obligations, the DIP Superpriority Claim, the DIP Liens, the Prepetition First Lien Secured Parties Adequate Protection Liens, and the Prepetition First Lien Secured Parties Adequate Protection Superpriority Claim, as applicable, in each case subject to the Carve-Out During the Remedies Notice Period, the Debtors shall continue to have the right to use Cash Collateral in accordance with the terms of this Interim Order, solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the Estates.<br><br>*See* Interim Order, ¶ 32. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The Interim Order provides for a customary waiver/modification of applicability of nonbankruptcy law to the perfection or enforcement of liens.<br><br>*See* Interim Order, ¶ 21. |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold harmless the DIP Agent and the DIP Lenders in accordance with the terms and conditions of the DIP Orders.<br><br>*See* Interim Order, ¶ 39. |
| **Limitations of Rights of Parties Under Section 506(c) of the Bankruptcy Code** | Subject to entry of a Final Order granting the waiver set forth in paragraph 47 of the Interim Order, no costs or expenses of administration which have been or may be incurred in the Cases or any Successor Case at any time shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, the DIP Agent, the DIP Lenders or the Prepetition First Lien Secured Parties pursuant to Bankruptcy Code sections 506(c) or 105(a), or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lender and the Prepetition Secured Parties, |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | as applicable, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agents, the DIP Lenders or the Prepetition Secured Parties. *See* Interim Order, ¶ 47. |
| **Granting of Lien on Claims/Causes of Action** | Subject to entry of the Final Order, the DIP Liens shall attach to and encumber proceeds of claims and causes of action available to the Debtors or their estates through the exercise of the powers granted by Sections 544, 545, 547, 548, 550 (other than with respect to any applicability to section 549) and 553 of the Bankruptcy Code ("Avoidance Actions") or proceeds thereof.<br><br>*See* Interim Order, ¶ 5. |

## **BACKGROUND**

6.      On the date hereof (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.

7.      The Debtors are operating their businesses and managing their affairs as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

8.      The Debtors operate a leading independent primary care and integrated physician group focused on value-based, multi-specialty healthcare services.  The Debtors deliver high-quality health and wellness services to approximately 35,000 patients across 26 primary care centers in Florida, with half of those centers being in Miami-Dade County.  The Debtors' patient population consists primarily of high-risk, underserved and dual-eligible populations (i.e., eligible for both Medicare and Medicaid), many of whom live in economically disadvantaged and minority communities.

9.      For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the First Day Declaration.

## THE DEBTORS' PREPETITION CAPITAL STRUCTURE

**A.    Prepetition First Lien Facility**

10.    Pursuant to that certain Credit Agreement, dated as of December 14, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "<u>Prepetition First Lien Credit Agreement</u>", and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, otherwise modified prior to the Petition Date, the "<u>Prepetition First Lien Credit Documents</u>"), among (a) MB Medical, (b) Holdings, (c) the other Debtors who are Subsidiary Guarantors thereunder pursuant to certain of the Prepetition First Lien Credit Documents (collectively with MB Medical and Holdings, the "<u>Prepetition Obligors</u>"),[5] (d) KKR Loan Administration Services LLC, as administrative agent and collateral agent (in such capacities, together with any successor thereto, the "<u>Prepetition First Lien Agent</u>"), and (d) the lenders party thereto from time to time (the "<u>Prepetition First Lien Lenders</u>," and together with the Prepetition First Lien Agent, collectively, the "<u>Prepetition First Lien Secured Parties</u>"), the Prepetition First Lien Lenders provided secured term loans and revolving loans to the Prepetition Obligors (the "<u>Prepetition First Lien Facility</u>").

11.    As of the Petition Date, the Prepetition Obligors were indebted and jointly and severally liable to the Prepetition First Lien Secured Parties in the aggregate principal amount outstanding under the Prepetition First Lien Facility of not less than $221,408,762.67 (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other

---

[5] The Prepetition Obligors exclude Debtors MBMG Holding, LLC; CCMC Physician Holdings, Inc.; Miami Beach Medical Consultants, LLC; Miami Medical & Wellness Center, LLC; and, Miami Beach Medical Centers, Inc.

charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Obligors' obligations in connection with the Prepetition First Lien Facility pursuant to the Prepetition First Lien Credit Documents, the "Prepetition First Lien Obligations")

12.     Debtors Miami Beach Medical Consultants, LLC, Miami Medical & Wellness Center, LLC and Miami Beach Medical Centers, Inc. (collectively, the "APE Debtors") are parties to one or more PC Agreements (as defined in the Prepetition First Lien Credit Agreement) with MB Medical, a subset of which (including but not limited to the Management Services Agreements entered into between MB Medial and each APE Debtor) include a grant of a security interest to MB Medical in substantially all of the assets of the APE Debtors.  MB Medical (as "secured party") perfected the security interests by filing UCC-1 financing statements naming each APE Debtor as "debtor" and entering into tri-party deposit account control agreements with each APE Debtor and the applicable depository bank (collectively, the "APE DACAs"), among other things.  Pursuant to the Prepetition First Lien Documents, MB Medical collaterally assigned the PC Agreements (including the Management Services Agreements and the APE DACAs) to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties pursuant to one or more Collateral Assignment of Contracts agreements.  In addition, the UCC-1 financing statements in favor of MB Medical (as "secured party") and naming each APE Debtor as "debtor" therein were assigned to the Prepetition First Lien Agent by recording UCC-3 assignments of such UCC-1 financing statements in favor of the Prepetition First Lien Agent.  Pursuant to the Collateral Assignment of Contracts agreements, following the occurrence of an Event of Default (as defined in the Prepetition First Lien Credit Agreement), which, for the avoidance of doubt, has occurred and is continuing as of the Petition Date, the Prepetition First Lien Agent shall have all rights and

benefits of MB Medical under the PC Agreements without modifying or discharging any of the Prepetition First Lien Obligations.  By virtue of the Prepetition First Lien Agent having such rights and benefits, the APE Debtors have effectively granted to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties a perfected security interest in and continuing lien on all of their right, title and interest in substantially all of their assets.

13.    The Prepetition First Lien Obligations are secured by first priority, duly perfected and enforceable liens on and security interests in substantially all assets of the Prepetition Obligors and, effectively (as described above), the APE Debtors.

**B.    Prepetition Unsecured Promissory Note**

14.    Pursuant to that certain Second Amended and Restated Unsecured Promissory Note, dated as of October 2, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "Prepetition Unsecured Promissory Note", and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, otherwise modified prior to the Petition Date, the "Prepetition Unsecured Promissory Note Documents"), among (a) MB Medical, (b) the Grantors (as defined in the Prepetition Unsecured Promissory Note) from time to time party thereto pursuant to the Guaranty (as defined in the Prepetition Unsecured Promissory Note), (c)  KKR Credit Advisors (US) LLC, as holder representative (in such capacity, together with any successor thereto, the "Prepetition Unsecured Holder Representative"), and (d) the lenders party thereto from time to time (the "Prepetition Unsecured Holders," and together with the Prepetition Unsecured Holder Representative, the "Prepetition Unsecured Note Parties"), the Prepetition Unsecured Holders provided unsecured delayed draw term loans to MB Medical (the "Prepetition Unsecured Note Facility").

15.    As of the Petition Date, MB Medical and Grantors were indebted and jointly and severally liable to the Prepetition Unsecured Note Parties in the aggregate principal amount outstanding under the Prepetition Unsecured Note Facility of not less than $28,297,807.69 (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations in connection with the Prepetition Unsecured Note Facility pursuant to the Prepetition Unsecured Promissory Note Documents, the "Prepetition Unsecured Note Obligations").

## C.    Prepetition Second Lien Facility

16.    Pursuant to the Second Amended and Restated Promissory Note and Security Agreement, dated as of November 6, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien Promissory Note," and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien Credit Documents"), among (i) MB Medical, (ii) the Grantors (as defined in the Prepetition Second Lien Promissory Note) from time to time party thereto pursuant to the Guaranty (as defined in the Prepetition Second Lien Promissory Note), (iii) MBMG Finco, LLC ("Finco") and (iv) FS KKR Capital Corp. ("FS KKR" and together with Finco, the "Prepetition Second Lien Secured Parties"; the Prepetition Second Lien Secured Parties and the Prepetition First Lien Secured Parties, collectively, the "Prepetition Secured Parties").  Pursuant

to the Prepetition Second Lien Credit Documents, the Prepetition Second Lien Secured Parties provided junior priority secured loans to the Debtors (the "Prepetition Second Lien Facility").

17.    As of the Petition Date, the outstanding principal balance under the Prepetition Second Lien Credit Documents is no less than $194,700,000.00, plus interest, costs and other charges.

18.    The Prepetition Second Lien Facility is purportedly secured by a security interest in the Prepetition Collateral that is subordinate to the Prepetition First Liens (the "Prepetition Second Liens," and together with the Prepetition First Liens, the "Prepetition Liens").

**D.    Subordination and Intercreditor Agreements.**

19.    The Prepetition First Lien Agent and the Prepetition Second Lien Secured Parties are parties to that certain Subordination and Intercreditor Agreement, dated as of July 5, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Intercreditor Agreement").    The Intercreditor Agreement, as acknowledged by the Prepetition Obligors, governs the respective rights, obligations and priorities of the Prepetition First Lien Secured Parties and the Prepetition Secured Lien Secured Parties with respect to the matters referred to therein.

20.    The Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties and the Prepetition Unsecured Note Parties are parties to that certain Intercreditor and Turnover Agreement, dated as of November 17, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "Turnover Agreement").    The Turnover Agreement, as acknowledged by the Prepetition Obligors, governs the respective rights, obligations and priorities of the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties and the Prepetition Unsecured Note Parties with respect to the matters referred to therein.

**E.    Other Liabilities.**

21.    In the ordinary course, the Debtors incur trade debt with certain vendors and suppliers in connection with the operation of their business.  In addition, the Debtors have other potential and contingent liabilities related to, among other things, ongoing litigation, certain of which is described in the First Day Declaration.

**THE DEBTORS' NEED FOR**
**DIP FINANCING AND CASH COLLATERAL**

22.    The Debtors require immediate use of Cash Collateral and access to the DIP Facility to operate during these Chapter 11 Cases while the Debtors seek to consummate a going concern private sale of substantially all assets of the Debtors to Conviva Medical Center Management, LLC (the "Purchaser"), an affiliate of Humana, Inc. (the "Sale"), which, if approved, will assure continuity of care to approximately 35,000 patients for whom the Debtors provide services.  The Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their operating and working capital costs and the projected costs of these Chapter 11 Cases absent funding.  To sustain the Debtors' operations through the proposed sale, and subject to receiving the rights and protections set forth in the DIP Orders, the Prepetition First Lien Lenders have consented to the use of Cash Collateral and the Sale, and the DIP Lenders have agreed to provide debtor-in-possession financing to the Debtors, without which the Debtors would likely be forced to liquidate and cease business operations.

23.    Specifically, the Debtors require use of Cash Collateral and the DIP Facility to, among other things, fund working capital, meet payroll obligations, pay suppliers, cover overhead costs, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business, subject to the Approved Budget.  The ability to make these payments when due is essential to the continued operation of the Debtors' business during

the pendency of these Chapter 11 Cases.  If the Debtors cannot use Cash Collateral and access the DIP Facility, based on the Debtors' financial forecasts and the Approved Budget, the Debtors will not be able to operate their business in the ordinary course until the hearing on the Final Order.  In turn, this would negatively impact the Debtors' revenue, jeopardize the continuity of care for the Debtors' patients, and harm the value of the Debtors' estates to the detriment of all stakeholders. Based on the Debtors' financial forecasts and the Approved Budget, the liquidity provided by the DIP Facility should allow the Debtors sufficient liquidity to pursue a value maximizing Sale.

24.     Therefore, absent immediate authority to use Cash Collateral and access to the DIP Facility, the Debtors could (a) face a severe interruption of their businesses; (b) lose the support of key constituencies, including the Debtors' patients, workforce and key suppliers; and (c) be forced to significantly modify, or shut down entirely, their operations.  To avoid those outcomes, it is imperative that the Debtors have access to Cash Collateral and the DIP Facility from the outset of these cases in order to signal to the Debtors' patients, employees, vendors, and suppliers, that despite the filing of these Chapter 11 Cases the outlook for the Debtors and their stakeholders is strong, and that they have the liquidity necessary to meet their obligations in the ordinary course until the Sale is approved and consummated.

25.     Absent access to Cash Collateral and the funds available from the DIP Facility, the Debtors could face a value-destructive interruption to their business and, simultaneously, eliminate their best chance for consummating an orderly sale, to the detriment of their patients.  For all these reasons, access to Cash Collateral and the proposed DIP Facility is a necessity.

## **BASIS FOR RELIEF REQUESTED**

**A.      The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents**

**(i)      Standards for Approval Under Sections 364(c) and 364(d)(1) of the Bankruptcy Code**

26.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

27.     In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties if (i) the debtor obtains the consent of such parties or (ii) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

28.     In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider factors including whether:

> I.     unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> II.     the credit transactions are necessary to preserve assets of the estate;
>
> III.     the terms of the credit agreement are fair, reasonable, and adequate;

IV.    the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

V.    the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr.  E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

29.    For the reasons discussed below, the Debtors satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

**(ii)    The Terms of the DIP Facility Are the Best Available Under the Circumstances, and DIP Financing on a Junior Secured or Unsecured Basis is Not Available**

30.    In demonstrating that credit was not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort.  *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr.  S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D.  Del. 1984) (holding the debtor satisfied its burden to show an inability to obtain credit on other terms through its time and effort spent trying to obtain credit on

alternative terms and conditions); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa 1987).

31.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

**(iii)     The DIP Facility Is Necessary to Preserve the Value of the Debtors' Estates**

32.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The DIP Facility, if approved, will provide working capital critical to fund the Debtors' day-to-day operations and administration of the Chapter 11 Cases while the Debtors attempt to maximize the value of their estates through the Sale and assure continuity of service to their patients.

33.     The Debtors' preexisting cash balances and cash generated from operations are not sufficient to fund business operations and the administration of these Chapter 11 Cases. A cash infusion is necessary to the continued operation of the Debtors' businesses, the provision of services to the Debtors' patients, and the maintenance of the Debtors' valuable business relationships. The Debtors' ability to maintain their patient census, and to satisfy other working capital and operational needs and otherwise finance their operations is essential to the Debtors' continued viability.

34.     In short, the ability of the Debtors to sustain their operations, consummate the Sale and exit these Chapter 11 Cases is dependent upon obtaining adequate postpetition financing and, absent the relief sought in the Interim Order, the Debtors and their estates will be immediately and irreparably harmed.    Accordingly, use of Cash Collateral and access to the DIP Facility is necessary to preserve the Debtors' estates.

**(iv)     The Terms of the DIP Facility are Fair, Reasonable and Appropriate Under the Circumstances**

35.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the proposed lender.  *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (stating that approval of the DIP facility transaction requires terms that are "fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr.  W.D. Mo. 2003); *see also Unsecured Creditors' Comm.  Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See* Transcript of Record at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr.  S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

36.     The material terms of the DIP Facility are fair, reasonable, and appropriate under the circumstances.

37.     The Debtors are over-leveraged.  They cannot attract financing on a subordinated basis.  The Prepetition First Lien Secured Parties are unwilling to subordinate their liens and claims

to the priming liens of a third-party lender. The DIP Facility provides the Debtors the assurance of much needed liquidity without the risk, delay, expense and uncertainty of a contested hearing to consider approval of a superpriority, priming DIP loan.

### (v)   Entry into the DIP Documents Reflects the Debtors' Reasonable Business Judgment

38.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. See *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); *Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *Grp. of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

39.     Bankruptcy courts typically defer to a debtor's business judgment on the decision to borrow money unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974. In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

40.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their sound business judgment.  Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support the administration of their Chapter 11 Cases and their ongoing operations while seeking approval of the Sale.  The Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**(vi)     The Proposed Adequate Protection Is Appropriate**

41.     To the extent a secured creditor's interests in collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that the Debtors provide adequate protection to such creditor where a debtor-in-possession financing facility primes the liens of such secured creditor.   While section 361 of the Bankruptcy Code provides a non-exclusive list of possible forms of adequate protection—including periodic cash payments, additional liens, replacement liens and other forms of relief—the Court must determine what constitutes adequate protection on a case-by-case basis.  *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr.  D. Del.  Feb. 18, 1992); *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985).  The focus of the adequate-protection requirement is to protect a secured creditor from the diminution in the value of its interest in the collateral during the period of use.  *See Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted); *In re Beker Indus.*

*Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

42.     Here, Prepetition First Lien Secured Parties have consented to the use of Cash Collateral subject to receiving the benefit of the proposed adequate protection, which consists of Adequate Protection Liens, Adequate Protection Superpriority Claims, and other consideration. The proposed adequate protection was bargained for at arm's length, and includes terms that are commonplace in consensual DIP financing and cash collateral arrangements and otherwise necessary to secure the Prepetition First Lien Secured Parties' consent, the absence of which would likely force the Debtors to shutter operations and discontinue patient care. Accordingly, the Debtors submit that their provision of adequate protection to the Prepetition Secured Parties is (a) fair and reasonable and (b) in the best interests of the Debtors and their estates.

43.     The Debtors believe that the interest and expenses to be paid under the DIP Facility are consistent with the market and are reasonable and appropriate, particularly in light of the credit profile of the Debtors, the nature and extent of the collateral securing the facility, the state of the Debtors' industry, and the relevant risks associated with lending in the postpetition financing context. The Debtors considered the costs described above when determining, in their sound business judgment, that the DIP Facility constitutes the best, and only, actionable terms on which the Debtors could obtain the postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates. Accordingly, the Court should authorize the Debtors to pay the interest and expenses provided under the DIP Loan Documents in connection with the DIP Facility.

**(vii)    The Debtors Should Be Authorized to Use Cash Collateral**

44.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

45.     The Debtors have an urgent need for the immediate use of the Prepetition Collateral, including Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Documents and the DIP Orders.  The Debtors need Cash Collateral to pay operating expenses, including essential vendors and employees, in order to ensure a continued supply of goods and services essential to the Debtors' business.  Indeed, absent such relief, the Debtors' business will be brought to a halt, with damaging consequences for the Debtors and their estates, patients and creditors.

46.     The Debtors believe that the terms and conditions of their use of Cash Collateral (including the provision of adequate protection described above and provided in the DIP Orders) are appropriate and reasonable and, as described above, that such adequate protection is necessary and appropriate under the circumstances.  As described above, the Debtors propose to use Cash Collateral to fund the orderly administration of the Chapter 11 Cases to consummate the Sale designed to maximize the value of the Debtors' estates.  The Prepetition Secured Parties consent to the use of Cash Collateral in light of the adequate protection provided, which, as noted above, the Debtors believe is necessary and sufficient.  For the reasons set forth herein, the Debtors submit that they should be authorized to use Cash Collateral on the terms set forth in the DIP Documents.

**(viii)    Approval of Interim Relief is Appropriate**

47.     Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than

fourteen (14) days after the service of such motion.  Upon request, however, the Court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).

48.     The Debtors have an urgent and immediate need to use Cash Collateral and access to the DIP Facility on an interim basis.  The Debtors require access to $4,000,000.00 of cash in the form of DIP financing, in addition to the use of Cash Collateral, to meet sustain their and the Company's operations through the week ending November 1, 2024, and avoid irreparable harm pending a final hearing.  Absent immediate access to the DIP Facility and Cash Collateral at this pivotal stage, among other things, the Debtors could (a) face a detrimental interruption of their business; (b) lose the support of key constituencies, including the Debtors' patients, workforce, vendors, and patients on which the success of the chapter 11 cases depend; and (c) be forced to significantly modify, or shut down entirely, their operations, each of which could detrimentally affect the Debtors' ability to maximize the value of the estates.

49.     Moreover, immediate access to both the DIP Facility and Cash Collateral is the stabilizing assumption upon which the Approved Budget, attached as Exhibit B to the Interim Order, is based.  Without such access, the Debtors could lose the confidence and cooperation of patients, employees and key business partners, including creditors and vendors.  In short, without immediate access to both the DIP Facility and Cash Collateral, the Debtors would in all likelihood face a liquidity crisis and run out of cash more quickly than the Approved Budget projects and the erosion of confidence concerning the Debtors' ongoing operations would be significant and irreparably harm the Debtors' estates.

50.     The Debtors' ability to preserve and maximize the value of their estates and the business's continuing viability depend heavily upon the interim relief sought in this Motion.

**(ix)     Request for a Final Hearing**

51.     The DIP Documents include a maturity date that will occur within 30 days after entry of the Interim Order unless a Final Order approving the Motion has been entered.  As such, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 30 days following the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

## REQUEST FOR WAIVER OF STAY

52.     To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors, in order to pay critical expenses during the interim period that, if unpaid, would result in the erosion of the Debtors' business and enterprise value.  Accordingly, ample cause exists to justify the finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## RESERVATION OF RIGHTS

53.     Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against any of the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) an impairment or waiver of any Debtor's or any other party in interest's right to dispute any claim against, or interest in, any Debtor, its property,

or its estate on any grounds; (c) a promise or requirement to pay any claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an implication or admission that any particular claim is of a type specified or defined in the Motion, or any order granting the relief requested by the Motion; (f) an implication, admission, or finding as to the validity, enforceability, or perfection of any interest or encumbrance on the property of any Debtor or its estate; (g) an impairment or waiver of any claims or causes of action which may exist against any entity; or (h) a waiver of any Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## <u>NOTICE</u>

54.    The Debtors have provided notice of this Motion to (a) the Office of the United States Trustee for the Southern District of Florida; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Prepetition Secured Parties; (d) counsel to the DIP Lenders; (e) the United States Attorney's Office for the Southern District of Florida; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; and (h) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the proposed Interim Order, substantially in the form attached hereto as **<u>Exhibit A</u>** and, following a noticed hearing on the relief sought, enter the Final Order granting the relief requested in this Motion, and (ii) grant such other and further relief as may be just and proper.

Dated: October 13, 2024                              Respectfully submitted,

                                                                    BERGER SINGERMAN LLP
                                                                    *Proposed Counsel for the Debtors and*
                                                                    *Debtors-in-Possession*

1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By:    */s/  Jordi Guso*
       Paul Steven Singerman
       Florida Bar No. 378860
       singerman@bergersingerman.com
       Jordi Guso
       Florida Bar No. 863580
       jguso@bergersingerman.com
       Clay B. Roberts
       Florida Bar No. 116058
       croberts@bergersingerman.com

**<u>Exhibit A</u>**

**Interim Order With Exhibits**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| MBMG HOLDING, LLC, *et al.*[1] | Case No. 24-_____ |
| Debtors. | (Jointly Administered) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO
OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS
AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV)
GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

---

[1]   The address of the Debtors is 7500 S.W. 8th Street, Ste. 400, Miami, Florida 33144.  The last four digits of the Debtors' federal tax identification numbers are: (i) Care Center Medical Group, LLC (9052); (ii) Care Center Network, LLC (5784); (iii) CCMC Physician Holdings, Inc. (4532); (iv) Clinical Care Pharmacy, LLC (2103); (v) Florida Family Primary Care Center, LLC (5005); (vi) Florida Family Primary Care Center of Pasco, LLC (8570); (vii) Florida Family Primary Care Centers of Orlando, LLC (3086); (viii) Florida Family Primary Care Centers of Pinellas, LLC (7075); (ix) Florida Family Primary Care Centers of Tampa, LLC (0631); (x) MB Medical Operations, LLC (8450); (xi) MB Medical Transport, LLC (3476); (xii) MBMG Holding, LLC (3880); (xiii) MBMG Intermediate Holding, LLC (9320); (xiv) Miami Beach Medical Centers, Inc. (3933); (xv) Miami Beach Medical Consultants, LLC (2737); and (xvi) Miami Medical & Wellness Center, LLC (2474).

**THIS MATTER** came before the Court on October __, 2024 (the "Interim Hearing") upon the motion dated October 13, 2024 [ECF No.____] (the "Motion") of MB Medical Operations, LLC ("MB Medical") and its affiliated debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), seeking entry of an interim order (this "Interim Order")[2] and a Final Order (as defined herein) pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, 507 and 552 of chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, 4001-3, 9013-1(F)-(H) and 9075-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of Florida (as amended, the "Local Bankruptcy Rules"), *inter alia*:

(i)      authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis under a delayed-draw term loan facility (the "DIP Facility" and the loans thereunder, the "DIP Loans") consisting of (a) $4,000,000 available upon entry of the Interim Order (the "Interim Amount"), and (b) an additional $6,000,000 available upon entry of the Final Order (the "Final Amount"), pursuant to the terms and conditions of this Interim Order and that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement, dated as of October 13, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), to be entered into by and among MB Medical, as borrower, MBMG Holding, LLC ("Holdings"), as a guarantor, the other Credit Parties party thereto from time to time, as guarantors, KKR Loan Administration Services LLC, as

---

[2]    Capitalized terms used in this Interim Order but not defined herein shall have the meanings given to them in the DIP Credit Agreement.

- 2 -

administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the lenders party thereto from time to time, (the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties"), attached hereto as **Exhibit A**;

(ii)    approving the terms of and authorizing the Debtors to execute and deliver the DIP Credit Agreement and any other agreements, instruments and documents related thereto (the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)    authorizing the Debtors to enter into the DIP Facility and to incur all obligations owing thereunder and under the DIP Documents to the DIP Secured Parties (collectively, the "DIP Obligations"), and granting the DIP Agent and DIP Lenders allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined below), subject to the Carve-Out (as defined herein);

(iv)    granting to the DIP Agent (on behalf of the DIP Secured Parties) automatically perfected security interests in and superpriority liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date) and any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (as defined below) (together, "Cash Collateral"), which liens shall be subject to the priorities set forth herein;

(v)    authorizing and directing the Debtors to use proceeds of the DIP Facility to (a) pay amounts payable and reimbursable under the DIP Documents or this Interim Order as such become due, including, without limitation, the fees and disbursements of the Lender Professionals (as

- 3 -

defined below); and (b) provide financing for working capital and other general corporate purposes, including for bankruptcy-related costs and expenses, all to the extent provided in, and in accordance with, the Approved Budget, this Interim Order and the DIP Documents;

(vi)    authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral, on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition First Lien Secured Parties for any Diminution (each, as defined below) of their interests in the Prepetition Collateral, including the Cash Collateral, as and to the extent authorized herein;

(vii)    approving the stipulations by the Debtors herein;

(viii)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(ix)    authorizing the DIP Agent, at the direction of the Required Lenders (or as otherwise provided in the DIP Documents), to (1) terminate the funding obligations under the DIP Documents in accordance with their terms and to the extent permitted by this Interim Order; (2) declare the DIP Obligations to be immediately due and payable in full in cash, to the extent permitted by the terms thereof; and (3) subject to this Interim Order, be granted relief from the automatic stay to foreclose on the DIP Liens; and

(x)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

The Bankruptcy Court having considered the Motion, the exhibits attached thereto, the First Day Declaration, the DIP Documents, and the evidence submitted and argument made at the Interim Hearing; and notice of the Interim Hearing having been provided in accordance with

- 4 -

Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Bankruptcy Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Bankruptcy Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates (as defined below) pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their Estates and all parties-in-interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and the Bankruptcy Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

Based upon the record established at the interim hearing, the Bankruptcy Court makes the following findings of fact and conclusions of law:[3]

A.    **<u>Disposition.</u>**  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall

---

[3]    The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

- 5 -

become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.    **Petition Date**.  On October 13, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

C.    **Debtors in Possession**.  The Debtors are operating their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been appointed.

D.    **Jurisdiction and Venue**.  This Bankruptcy Court has jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and the Local Bankruptcy Rules.

E.    **Committee**.  As of the date hereof, no statutory committee has been appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

F.    **Notice**.  Upon the record presented to the Bankruptcy Court at the Interim Hearing, and under the exigent circumstances established at the Interim Hearing, notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and 4001(c)(1) to (a) the Office of the U.S. Trustee for the Southern District of Florida (the "U.S. Trustee"); (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent and Prepetition

First Lien Agent (as defined below), Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Charles A. Dale III, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: Vincent Indelicato and Matthew R. Koch, and Trenam Law, 101 E Kennedy Boulevard, Suite 2700, Tampa, FL 33602, Attn: Lara Roeske Fernandez; (d) counsel to the Prepetition Second Lien Secured Parties (as defined below), Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Nicole L. Greenblatt; (e) the United States Attorney's Office for the Southern District of Florida; (f) the Internal Revenue Service; (g) the state attorneys general for states in which the Debtors conduct business; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002, (collectively, the "Notice Parties"), which notice was appropriate under the circumstances and sufficient for the Motion.  No other or further notice of, or hearing regarding, the entry of this Interim Order and the relief set forth herein is necessary or required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending a Final Hearing.

G.    **Debtors' Stipulations**.    Subject to Paragraph 44 hereof, each stipulation, admission, and agreement contained in this Interim Order, including, without limitation, the Debtors' Stipulations (as defined below), shall be binding upon the Debtors, their respective bankruptcy estates (the "Estates") and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes.  The Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined herein) as of the Petition Date.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as expressly set forth in Paragraph 44 herein, the Debtors, on their own behalf and on behalf of their Estates, admit,

- 7 -

stipulate, acknowledge, and agree as follows (Paragraphs G(i) through G(x) below are referred to, collectively, as the "Debtors' Stipulations"):

(i)     *Prepetition First Lien Facility*.  Pursuant to that certain Credit Agreement, dated as of December 14, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "Prepetition First Lien Credit Agreement", and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, otherwise modified prior to the Petition Date, the "Prepetition First Lien Credit Documents"), among (a) MB Medical, (b) MBMG Intermediate Holding, LLC ("Intermediate Holdings"), (c) the other Debtors who are Subsidiary Guarantors thereunder pursuant to certain of the Prepetition First Lien Credit Documents (collectively with MB Medical and Intermediate Holdings, the "Prepetition Obligors"),[4] (d) KKR Loan Administration Services LLC, as administrative agent and collateral agent (in such capacities, together with any successor thereto, the "Prepetition First Lien Agent"), and (e) the lenders party thereto from time to time (the "Prepetition First Lien Lenders," and together with the Prepetition First Lien Agent, collectively, the "Prepetition First Lien Secured Parties"), the Prepetition First Lien Lenders provided secured term loans and revolving loans to the Prepetition Obligors (the "Prepetition First Lien Facility").

(ii)     *Prepetition First Lien Obligations*.  As of the Petition Date, the Prepetition Obligors were indebted and jointly and severally liable to the Prepetition First Lien Secured Parties in the aggregate principal amount outstanding under the Prepetition First Lien Facility of not less than $221,408,762.67 (together with accrued and unpaid interest, any fees, expenses and

---

[4]     The Prepetition Obligors exclude Debtors MBMG Holding, LLC; CCMC Physician Holdings, Inc.; Miami Beach Medical Consultants, LLC; Miami Medical & Wellness Center, LLC; and Miami Beach Medical Centers, Inc.

disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Obligors' obligations in connection with the Prepetition First Lien Facility pursuant to the Prepetition First Lien Credit Documents, the "Prepetition First Lien Obligations").  Debtors Miami Beach Medical Consultants, LLC, Miami Medical & Wellness Center, LLC and Miami Beach Medical Centers, Inc. (collectively, the "APE Debtors") are parties to one or more PC Agreements (as defined in the Prepetition First Lien Credit Agreement) with MB Medical, a subset of which (including but not limited to the Management Services Agreements entered into between MB Medical and each APE Debtor) include a grant of a security interest to MB Medical in substantially all of the assets of the APE Debtors to secure the payment of amounts owing to MB Medical by each APE Debtor pursuant to the applicable PC Agreement.  MB Medical (as "secured party") perfected the security interests by filing UCC-1 financing statements naming each APE Debtor as "debtor" and entering into tri-party deposit account control agreements with each APE Debtor and the applicable depository bank (collectively, the "APE DACAs"), among other things.  Pursuant to the Prepetition First Lien Documents, MB Medical collaterally assigned the PC Agreements (including the Management Services Agreements and the APE DACAs) to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties pursuant to one or more Collateral Assignment of Contracts agreements.  In addition, the UCC-1 financing statements in favor of MB Medical (as "secured party") and naming each APE Debtor as "debtor" therein were assigned to the Prepetition First Lien Agent by recording UCC-3 assignments of such UCC-1

- 9 -

13262344-16

financing statements in favor of the Prepetition First Lien Agent.  Pursuant to the Collateral

Assignment of Contracts agreements, following the occurrence of an Event of Default (as

defined in the Prepetition First Lien Credit Agreement), which, for the avoidance of doubt, has

occurred and is continuing as of the Petition Date, the Prepetition First Lien Agent shall have all

rights and benefits of MB Medical under the PC Agreements without modifying or discharging

any of the Prepetition First Lien Obligations.  By virtue of the Prepetition First Lien Agent having

such rights and benefits, the APE Debtors have effectively granted to the Prepetition First Lien

Agent for the benefit of the Prepetition First Lien Secured Parties a perfected security interest in

and continuing lien on all of their right, title and interest in substantially all of their assets.

(iii)    *Prepetition First Liens and Prepetition Collateral.*  As more fully set forth

in the Prepetition First Lien Credit Documents, prior to the Petition Date, the Prepetition

Obligors and, effectively (as described above), the APE Debtors granted to the Prepetition First

Lien Agent, for the benefit of the Prepetition First Lien Secured Parties, a security interest in and

continuing lien (the "Prepetition First Liens") on all of their right, title and interest in

substantially all of their assets (the "Prepetition Collateral").

(iv)    *Validity, Extent, Perfection and Priority of Prepetition First Liens and*

*Prepetition First Lien Obligations.*  As of the Petition Date: (a) the Prepetition First Liens on the

Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected

and were granted to, or for the benefit of, the Prepetition First Lien Secured Parties for fair

consideration and reasonably equivalent value; (b) the Prepetition First Liens were senior in

priority over any and all other liens on the Prepetition Collateral, subject only to certain liens

senior by operation of law and otherwise permitted by the Prepetition First Lien Credit

Documents (solely to the extent any such permitted liens were valid, properly perfected, non-

- 10 -

avoidable and senior in priority to the Prepetition First Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, in each case as expressly identified on Schedule II to the DIP Credit Agreement, the "Prepetition Permitted Liens")[5]; (c) the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Obligors enforceable in accordance with the terms of the applicable Prepetition First Lien Credit Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition First Liens or Prepetition First Lien Obligations exist, and no portion of the Prepetition First Liens or Prepetition First Lien Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition First Lien Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors and employees arising out of, based upon or related to the Prepetition First Lien Facility; (f) the Debtors have waived, discharged, and released any right to, and are forever barred from bringing any, challenge to any of the Prepetition First Lien Obligations, the priority of the Prepetition First Lien Secured Parties' obligations thereunder, and the legality, validity,

---

[5]    For the avoidance of doubt, no reference to Prepetition Permitted Liens shall refer to or include the Prepetition Liens.

13262344-16

extent, and priority of the Prepetition First Liens; and (g) the Prepetition First Lien Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(v)    *Subordination and Intercreditor Agreement*.  The Prepetition First Lien Agent and the Prepetition Second Lien Secured Parties (as defined below) are parties to that certain Intercreditor and Subordination Agreement, dated as of July 5, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "Intercreditor Agreement").  The Intercreditor Agreement, as acknowledged by the Prepetition Obligors, governs the respective rights, obligations and priorities of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties with respect to the matters referred to therein.  The Intercreditor Agreement shall continue to govern the rights of the respective parties thereto.

(vi)    *Prepetition Unsecured Promissory Note*.  Pursuant to that certain Second Amended and Restated Unsecured Promissory Note, dated as of October 2, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "Prepetition Unsecured Promissory Note", and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, otherwise modified prior to the Petition Date, the "Prepetition Unsecured Promissory Note Documents"), among (a) MB Medical, (b) the Grantors (as defined in the Prepetition Unsecured Promissory Note) from time to time party thereto pursuant to the Guaranty (as defined in the Prepetition Unsecured Promissory Note), (c) KKR Credit Advisors (US) LLC, as holder representative (in such capacity, together with any successor thereto, the "Prepetition Unsecured Holder Representative"), and (d) the lenders party

- 12 -

thereto from time to time (the "Prepetition Unsecured Holders," and together with the Prepetition Unsecured Holder Representative, the "Prepetition Unsecured Note Parties"), the Prepetition Unsecured Holders provided unsecured delayed draw term loans to MB Medical (the "Prepetition Unsecured Note Facility").

(vii) *Prepetition Unsecured Note Obligations*.  As of the Petition Date, MB Medical and the Grantors (as defined in the Prepetition Unsecured Promissory Note) were indebted and jointly and severally liable to the Prepetition Unsecured Note Parties in the aggregate principal amount outstanding under the Prepetition Unsecured Note Facility of not less than $28,297,807.69 (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations in connection with the Prepetition Unsecured Note Facility pursuant to the Prepetition Unsecured Promissory Note Documents, the "Prepetition Unsecured Note Obligations").

(viii) *Validity of Prepetition Unsecured Note Obligations.*  As of the Petition Date: (a) the Prepetition Unsecured Note Obligations constitute legal, valid, binding, and non-avoidable obligations of MB Medical and the Grantors (as defined in the Prepetition Unsecured Promissory Note) enforceable in accordance with the terms of the applicable Prepetition Unsecured Promissory Note Documents; (b) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition Unsecured Note Obligations exist, and no portion of the Prepetition

- 13 -

Unsecured Note Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Unsecured Note Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors and employees arising out of, based upon or related to the Prepetition Unsecured Note Facility; and (d) the Debtors have waived, discharged, and released any right to, and are forever barred from bringing any, challenge to any of the Prepetition Unsecured Note Obligations; and (e) the Prepetition Unsecured Note Obligations constitute allowed, unsecured claims within the meaning of section 502 of the Bankruptcy Code.

(ix)    *Intercreditor and Turnover Agreement*.  The Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties and the Prepetition Unsecured Note Parties are parties to that certain Intercreditor and Turnover Agreement, dated as of November 17, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "Turnover Agreement").  The Turnover Agreement, as acknowledged by the Prepetition Obligors, governs the respective rights, obligations and priorities of the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties and the Prepetition Unsecured Note Parties with respect to the matters referred to therein.  The Turnover Agreement shall continue to govern the rights of the respective parties thereto.

13262344-16

(x)    *No control*.    None of the DIP Secured Parties, the Prepetition First Lien Secured Parties, the Prepetition Unsecured Note Parties or the affiliates of any of the foregoing controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted, or is a control person or insider (as defined in the Bankruptcy Code) of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Liens (as defined below), the DIP Obligations, the DIP Documents, the Prepetition First Lien Facility, the Prepetition Second Lien Facility (as defined below), the Prepetition Unsecured Note Facility, the Prepetition First Liens, the Prepetition Second Liens (as defined below), the Prepetition First Lien Obligations, the Prepetition Second Lien Obligations (as defined below), the Prepetition Unsecured Note Obligations, the Prepetition First Lien Credit Documents, Prepetition Second Lien Credit Documents (as defined below), the Prepetition Unsecured Promissory Note Documents, or the transactions contemplated hereunder or thereunder.

H.    **Prepetition Second Lien Facility**.    Without acknowledging the validity, enforceability, or the allowance of such claims and liens, the Debtors make reference to that certain Second Amended and Restated Promissory Note and Security Agreement, dated as of November 6, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien Promissory Note," and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien Credit Documents") among (i) MB Medical, (ii) the Grantors (as defined in the Prepetition Second

- 15 -

Lien Promissory Note) from time to time party thereto pursuant to the Guaranty (as defined in the Prepetition Second Lien Promissory Note), (iii) MBMG Finco, LLC ("Finco") and (iv) FS KKR Capital Corp. ("FS KKR" and together with Finco, the "Prepetition Second Lien Secured Parties"; the Prepetition Second Lien Secured Parties and the Prepetition First Lien Secured Parties, collectively, the "Prepetition Secured Parties").  Pursuant to the Prepetition Second Lien Credit Documents, the Prepetition Second Lien Secured Parties provided junior priority secured loans to the Debtors (the "Prepetition Second Lien Facility" and the obligations thereunder, the "Prepetition Second Lien Obligations").  The Prepetition Second Lien Facility is purportedly secured by a security interest in the Prepetition Collateral that is subordinate to the Prepetition First Liens (the "Prepetition Second Liens," and together with the Prepetition First Liens, the "Prepetition Liens").

I.      **Releases**.  Subject to Paragraph 44 hereof, the Debtors, on behalf of themselves and their respective Estates (including any successor trustee or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through or under the Debtors or their Estates), hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit each of the Prepetition First Lien Secured Parties, Prepetition Unsecured Note Parties and each of their respective affiliates (including, without limitation, FS KKR) and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (collectively, the "Released Parties") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, allegations, suits, controversies, proceedings,

- 16 -

actions and causes of action arising prior to the Petition Date (collectively, the "Released Claims") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the Prepetition First Lien Credit Documents, the Prepetition Second Lien Credit Documents, the Prepetition Unsecured Promissory Note Documents, the obligations owing and the financial obligations made under the Prepetition First Lien Credit Documents, the Prepetition Second Lien Credit Documents, and the Prepetition Unsecured Promissory Note Documents, the negotiation thereof and of the transactions reflected thereby and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.  The Debtors further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition First Lien Obligations, the Prepetition Second Lien Obligations, or the Prepetition Unsecured Note Obligations that the Debtors may now have or may claim to have against the Released Parties, arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to this Court entering this Interim Order relating to the Debtors' lending relationship with the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, or the Prepetition Unsecured Note Parties.

(i)      *Cash Collateral*.  All of the Debtors' cash and cash equivalents, including cash on deposit in any account or accounts as of the Petition Date, securities or other property, wherever located, whether subject to control agreements or otherwise, whether as original

collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition First Lien Secured Parties.

> **J.**     **Findings Regarding Postpetition Financing**

> > (i)    *Request for Postpetition Financing*.  The Debtors seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Documents, and (b) use Cash Collateral on the terms described herein to administer their Chapter 11 Cases and fund their operations in accordance with the Approved Budget (as defined herein) (subject to the Permitted Variances (as defined below)).  The stated objective of the Debtors' Chapter 11 Cases is to facilitate a going concern sale (the "<u>Sale</u>") of substantially all of their assets to Conviva Medical Center Management, LLC (the "<u>Purchaser</u>"), an affiliate of Humana, Inc. ("<u>Humana</u>") pursuant to the terms of a written Asset Purchase Agreement entered into by the Debtors and the Purchaser on or shortly before the Petition Date (the "<u>Asset Purchase Agreement</u>").  At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to a proposed final order (the "<u>Final Order</u>" and collectively with this Interim Order, the "<u>DIP Orders</u>"), which shall be in form and substance acceptable to the DIP Agent and Required Lenders.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

> > (ii)    *Priming of the Prepetition Liens*.  The priming of (1) the Prepetition First Liens on the Prepetition Collateral and (2) the Prepetition Second Liens on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses to the benefit of their Estates and creditors and for the stated purpose of securing approval for and consummating the Sale contemplated by the Asset Purchase

- 18 -

Agreement.  The Prepetition First Lien Secured Parties shall receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any diminution in the value ("Diminution") of their interests in the Prepetition Collateral (including Cash Collateral).

(iii)  *Need for Postpetition Financing and Use of Cash Collateral.*  To sustain their operations through approval and consummation of the proposed Sale, the Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facility and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, (i) pay the fees, costs and expenses incurred in connection with the Chapter 11 Cases, (ii) fund the Carve-Out (as defined below), (iii) permit the orderly continuation and operation of their businesses and thereafter fund the orderly winddown of their businesses and monetization of any remaining assets, (iv) maintain relationships with patients, vendors and suppliers, (v) make payroll, and (vi) satisfy other working capital and operational needs, all to the extent provided in, and in accordance with, the Approved Budget, this Interim Order and the DIP Documents. The incurrence of new debt under the DIP Documents and use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors. Immediate and irreparable harm will be caused to the Debtors and their Estates if immediate financing is not obtained and permission to use Cash Collateral is not granted.  The terms of the proposed financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  The adequate protection provided in this Interim Order and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code.

(iv)  *No Credit Available on More Favorable Terms*.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, capital structure, and the circumstances of these Chapter 11 Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility.  Further, the Prepetition Secured Parties are adequately protected to the extent required by the Bankruptcy Code and/or have consented to the Debtors incurring debtor-in-possession financing, the priming of the Prepetition Liens and the use of Cash Collateral, on the terms and subject to the conditions set forth in the DIP Documents and this Interim Order.  The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors could not reasonably obtain:   (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their Estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their Estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Secured Parties: (1) perfected priming security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims and liens, and (3) the other protections set forth in this Interim Order.

(v)  *Use of Cash Collateral and Proceeds of the DIP Facility*.  As a condition to the Debtors' entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Prepetition Collateral, including Cash Collateral, and to induce the Prepetition First Lien Secured Parties to give their consent to the proposed Sale, the Debtors

- 20 -

have agreed that Cash Collateral and the proceeds of the DIP Facility shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved Budget (as defined herein).

(vi)    *Application of Proceeds of Collateral*.  As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and authorization to use Cash Collateral, and to induce the Prepetition First Lien Secured Parties to give their consent to the proposed Sale, the Debtors have agreed that, as of and commencing on the date of entry of this Interim Order, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the DIP Documents.

K.    **Adequate Protection**.  In exchange for their consent to (i) the priming of the Prepetition Liens by the DIP Liens, and (ii) the use of Cash Collateral to the extent set forth in this Interim Order, the Prepetition First Lien Secured Parties shall receive adequate protection to the extent of any Diminution of their interests in the Prepetition Collateral, as more fully set forth in this Interim Order.

L.    **Sections 506(c) and 552(b)**.  In light of (i) the DIP Secured Parties' agreement that its liens and superpriority claims shall be subject to the Carve-Out and (ii) the Prepetition First Lien Secured Parties' agreement that, with respect to the Prepetition Collateral, their respective liens and claims, including any adequate protection liens and claims, shall be subject to the Carve-Out and subordinate to the DIP Liens, subject to entry of a Final Order (a) the DIP Secured Parties and the Prepetition First Lien Secured Parties are each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) the DIP Secured Parties and the Prepetition First Lien Secured Parties are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

- 21 -

M.  **Good Faith of the DIP Secured Parties**.

(i)  *Willingness to Provide Financing*.  The DIP Secured Parties have committed to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and those set forth in the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Bankruptcy Court that the DIP Facility is essential to the Debtors' Estates, that the DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Secured Parties' superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)  *Business Judgment and Good Faith Pursuant to Section 364(e)*.  Based on the Motion, the *Declaration of Nicholas K. Campbell in Support of Chapter 11 Petitions and First Day Pleadings*, and the record presented to the Bankruptcy Court at the Interim Hearing, (i) the terms of the financing embodied in the DIP Facility, including the fees, expenses and other charges paid and to be paid thereunder or in connection therewith, (ii) the adequate protection authorized by the Interim Order and DIP Documents, and (iii) the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Documents, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and represent the best financing (and terms) available under the circumstances and are appropriate for secured financings to debtors in possession.

- 22 -

(iii)  *Good Faith Pursuant to Section 364(e).*  The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition First Lien Secured Parties with the assistance and counsel of their respective advisors.  Use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Secured Parties and the Prepetition First Lien Secured Parties within the meaning of section 364(e) of the Bankruptcy Code.

(iv)  *Consent to DIP Facility and Use of Cash Collateral.*  Absent an order of this Court and the provision of adequate protection, the consent of the Prepetition Secured Parties is required for the Debtors' use of Cash Collateral and other Prepetition Collateral.  The Prepetition Secured Parties have consented to the proposed Sale and, in furtherance thereof, the Debtors' use of Cash Collateral and the other Prepetition Collateral and the Debtors' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

N.    **<u>Good Cause</u>**.  Good cause has been shown for immediate entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors, the Estates and their stakeholders.  Among other things, the relief granted herein will minimize disruption of the Debtors' business and permit the Debtors to meet payroll, continue providing services to patients and satisfy other expenses necessary to maximize the value of the Estates.  The terms of the Debtors' DIP Facility, use of Cash Collateral and proposed adequate protection arrangements, as set forth in this Interim Order, are fair and reasonable under the circumstances, and reflect the Debtors' exercise of prudent business judgment.

O.     **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Bankruptcy Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Bankruptcy Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.     DIP Financing Approved.  On an interim basis, entry into the DIP Facility is authorized and approved, and the use of Cash Collateral is authorized, in each case, subject to the terms and conditions set forth in this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

## DIP Facility Authorization

2.     Authorization of the DIP Financing.  The Debtors, acting through their Chief Restructuring Officer or any other officer, are expressly and immediately authorized and empowered to execute and deliver the DIP Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to execute, deliver and perform under all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, any principal, interest, fees, expenses, and other

- 24 -

amounts described in the DIP Documents and this Interim Order, as such amounts become due and owing, without need to obtain further Court approval (except as otherwise provided herein or in the DIP Documents) subject to and in accordance with the terms hereof and thereof, including, without limitation, the reasonable and documented fees and disbursements of Proskauer Rose LLP and local counsel, as the DIP Professionals (as defined below), in accordance with this Interim Order, the Approved Budget, and the DIP Documents, whether or not such professional fees and disbursements arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order, the Approved Budget, and the DIP Documents. Upon execution and delivery, the DIP Documents shall represent legal, valid and binding obligations of the Debtors, enforceable against each of the Debtors and their Estates in accordance with their terms.  Each officer of a Debtor acting individually is hereby authorized to execute and deliver each of the DIP Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents.

3.     <u>Authorization to Borrow</u>.  To prevent immediate and irreparable harm to the Debtors' Estates, subject to the terms and conditions set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to borrow the Interim Amount, subject to any limitations on, or conditions to, borrowing under the DIP Documents, which borrowings shall be used solely for purposes permitted under the DIP Documents, including, without limitation, to

provide working capital for the Debtors and to pay fees, costs, charges and expenses, in each case, in accordance with this Interim Order, the DIP Documents and the Approved Budget.

4.      DIP Obligations.    The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations.  All DIP Obligations shall be enforceable against the Debtors, their Estates and any successors thereto, including without limitation, any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  Upon entry of this Interim Order, the DIP Obligations will include all loans, guarantees, reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Secured Parties, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses and other amounts under the DIP Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall become due and payable, without notice or demand, on the Termination Date (as defined below).  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Lien) to the DIP Secured Parties, and including in connection with any adequate protection provided hereunder, shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization,  subordination  (whether  equitable,  contractual,  or  otherwise),  claim,

- 26 -

counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

5.     <u>DIP Collateral</u>.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Lenders), is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition priming security interests in and liens (collectively, the "<u>DIP Liens</u>") on the DIP Collateral.  "<u>DIP Collateral</u>" means, collectively, all property of the estate under section 541 of the Bankruptcy Code, including all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all contracts and leases, *provided that* to the extent that the grant of a DIP Lien is prohibited or restricted by the terms of any contract or lease, then the DIP Liens shall attach to

- 27 -

13262344-16

and be perfected in the proceeds of such contracts or leases; (c) subject to entry of a Final Order providing for such relief, the proceeds of any cause of action brought pursuant to chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) proceeds from the Debtors' exercise of rights under section 506(c) and 550 of the Bankruptcy Code; (e) all Prepetition Collateral, (f) all property of the Debtors that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date, and (g) all proceeds from the sale, assignment, or other disposition of (i) any commercial real estate leases and (ii) subject to the terms of the Asset Purchase Agreement (solely to the extent approved by a Sale Order (as defined below) on a final basis), the Debtors' right to select, identify, and designate which commercial leases may be assumed and assigned under section 365 of the Bankruptcy Code.  Notwithstanding the foregoing, DIP Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases) solely to the extent that the grant of a DIP Lien is prohibited or restricted by the terms of such real property lease or applicable nonbankruptcy law to attach to any such real property lease.

6.      <u>DIP Liens</u>.   The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any DIP Collateral, except the DIP Liens shall be subject to the Carve-Out, and shall otherwise be junior only to the Prepetition Permitted Liens.  Other than as expressly set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon

- 28 -

the dismissal of any of the Chapter 11 Cases or Successor Cases.  The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any Estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

7.     <u>DIP Superpriority Claims</u>.  Subject to the Carve-Out, upon entry of this Interim Order, the DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (collectively, the "<u>DIP Superpriority Claims</u>") for all DIP Obligations: (a) except as expressly set forth herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their Estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their Estates, and any successor trustee or other estate representative to the extent permitted by law.  Notwithstanding the foregoing, the DIP Superpriority Claims shall be junior to the Carve-Out.

8.     <u>No Obligation to Extend Credit</u>.  The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent and each DIP Lender in accordance with the terms of the DIP Documents.

9.      Use of Proceeds of DIP Facility.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, and in compliance with the Approved Budget (subject to the Permitted Variances) and the terms and conditions in this Interim Order and the DIP Documents.

10.      No Monitoring Obligation.  The DIP Secured Parties shall have no obligation or responsibility to monitor the Debtors' use of the DIP Facility, and the DIP Secured Parties may rely upon the Debtors' representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Documents and in compliance with the Approved Budget (subject to the Permitted Variances).

**Authorization to Use Cash Collateral**

11.      Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the expiration of the Remedies Notice Period (as defined below) following the Termination Date. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted by this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances).  For the avoidance of doubt, the Debtors' use of Cash Collateral following any DIP Repayment (as defined below) shall continue to be subject to compliance with this Interim Order and the Approved Budget (subject to the Permitted Variances).

13262344-16

12.    <u>Consent of Prepetition Secured Parties.</u>  The Prepetition Secured Parties hereby consent to (a) the provisions of this Interim Order (including the Debtors' entry into the DIP Facility on an interim basis), (b) the granting of the DIP Liens and DIP Superpriority Claims on the terms and subject to the conditions set forth herein, (c) the Approved Budget, and (d) subject to the entry of a sale order in form and substance acceptable to the DIP Agent and Prepetition First Lien Agent (the "<u>Sale Order</u>"), the proposed Sale.

13.    <u>Adequate Protection for Prepetition First Lien Secured Parties</u>.  As adequate protection for any Diminution of the Prepetition First Lien Secured Parties' interest in the Prepetition Collateral resulting from the subordination of the Prepetition First Liens to the DIP Liens, the Carve-Out and the Debtors' use of Cash Collateral (including certain Post-Sale Reserves (as defined below)), the Prepetition First Lien Agent shall receive, for the benefit of the Prepetition First Lien Secured Parties,

> (a) continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the DIP Liens and Prepetition Permitted Liens (the "<u>Replacement Liens</u>") and which (x) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (y) shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code;

13262344-16

(b) superpriority administrative expense claims in each of the Chapter 11 Cases (the "Adequate Protection Superpriority Claims"), junior and subordinate only to the Carve-Out and the DIP Obligations (including the DIP Superpriority Claims), pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code;

(c) (x) monthly reimbursement payments of the Prepetition First Lien Secured Parties' reasonable fees, costs and expenses, including the professional fees and expenses of Proskauer Rose LLP and local counsel, without the need for the filing of formal fee applications, including as to any amounts arising before or after the Petition Date, and (y) payment in kind of monthly interest, calculated at the non-default rate under the Prepetition First Lien Credit Agreement and added to the principal amounts of the Prepetition First Lien Secured Parties' allowed secured claims;

(d) on the first Friday following consummation of a Sale pursuant to a Sale Order that results in the occurrence of the Maturity Date and the funding of the Winddown Reserve (as defined below), and on the Friday of every week thereafter, payments of the gross proceeds of accounts receivable collected by the Debtors, without deduction or setoff by any account debtor, which the Debtors shall use commercially reasonable, good faith efforts to pursue and collect on a timely basis;

- 32 -

(e)  promptly following the entry of a Sale Order, a collateral assignment and grant of all of the Debtors' rights, title, interest, remedies, privileges, and claims in and to (but, for the avoidance of doubt, excluding any and all obligations and liabilities under) the Asset Purchase Agreement and all other agreements, instruments and other documents related thereto or executed in connection therewith, including, without limitation, all rights to receive payment of the Holdback Amount and Deposit (each, as defined in the Asset Purchase Agreement), as well as all other payments from the Buyer (as defined in the Asset Purchase Agreement), in form and substance acceptable to the Prepetition First Lien Agent; and

(f) upon closing of the Sale, and subject only to payment in full in cash of the DIP Obligations and the funding of the Carve-Out and Post-Sale Reserves (as defined below) in accordance with this Order, the Debtors shall pay all cash proceeds of the Sale to the Prepetition First Lien Agent for application to the Prepetition First Lien Obligations.

14.    <u>Post-Sale Reserves</u>.

(i)    Following consummation of a Sale pursuant to a Sale Order, and subject to all applicable Milestones having been satisfied (or waived in writing in the sole discretion of the DIP Agent), the Debtors shall establish (or shall cause to be established) one or more cash reserves in one or more segregated accounts and in an aggregate amount to be agreed upon, in writing, by the Required Lenders in their sole discretion, which reserves shall be funded solely from the net cash proceeds of such Sale (and not from proceeds of the DIP Facility) to fund the following expenses: (a) amounts under any key employee incentive plan or key employee retention plan approved by final order of the Bankruptcy Court (the "<u>KEIP/KERP Reserve</u>"), (b) allowed,

- 33 -

undisputed, and accrued and unpaid (as of the date of the closing of such Sale) chapter 11 administrative expense claims (the "Admin Claim Reserve"), (c) costs associated with any restructuring, sale, success, or other transaction fee under the engagement letters of Oppenheimer & Co. Inc. ("Oppenheimer"), the Debtors' investment banker, payable pursuant to a final order of the Bankruptcy Court (the "Transaction Fee Reserve"), subject to the Specified Reserved Holdback (as defined below), and (d) costs not to exceed $2,000,000 in the aggregate associated with the orderly winddown of the Debtors' businesses and administration of the Debtors' Estates pursuant to an Acceptable Plan (the "Winddown Reserve" and together with the KEIP/KERP Reserve, Admin Claim Reserve, and Transaction Fee Reserve, the "Post-Sale Reserves"); *provided that* $500,000 of the Winddown Reserve shall be funded from the net cash proceeds of the Sale and $1,500,000 of the Winddown Reserve shall be funded from the first proceeds of the Debtors' accounts receivable (and not in any case from proceeds of the DIP Facility); *provided further that* twelve and one-half percent (12.5%) of the amount funded to the Transaction Fee Reserve shall be distributed to Oppenheimer pursuant to a final order permitting payment thereof only upon payment of the Holdback Amount (as defined in the Asset Purchase Agreement) in accordance with a Sale Order and the Asset Purchase Agreement (such cumulative amount, the "Specified Reserve Holdback"), notwithstanding any distributions approved by any other order of the Bankruptcy Court including, without limitation, an order confirming any plan of reorganization or liquidation; *provided further that* the Specified Reserve Holdback shall be reduced *pro rata* for any reduction to the Holdback Amount made in accordance with a Sale Order and the Asset Purchase Agreement, and any amount so deducted from the Specified Reserve Holdback shall be distributed to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties promptly upon payment of the Holdback Amount in accordance with a Sale Order and the

- 34 -

Asset Purchase Agreement. Any amounts remaining in the Post-Sale Reserves after payment of the related obligations in accordance with this Paragraph 14(i) shall be paid to the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties.

(ii)    Notwithstanding anything herein to the contrary, no Post-Sale Reserve shall be established or funded to the extent (a) any of the Milestones (as defined below) are not satisfied (or waived in writing by the DIP Agent in its sole discretion) on or prior to consummation of such Sale pursuant to a Sale Order, (b) the Debtors or any other party files a plan of reorganization or plan of liquidation that is not an Acceptable Plan, or (c) the Debtors are not in compliance with the Approved Budget (subject to the Permitted Variances) and the terms and conditions in this Interim Order and the DIP Documents, which non-compliance has not been waived in writing by the DIP Agent in its sole discretion.

15.    <u>Adequate Protection Reservation</u>.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties hereunder is insufficient to compensate for any Diminution of their interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition First Lien Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition First Lien Secured Parties are adequately protected, and this Interim Order shall not prejudice or limit the rights of the Prepetition First Lien Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

**Provisions Common to DIP Financing and Use of Cash Collateral**

16.    _Amendment of the DIP Documents_.    The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Order without the prior written consent of the Required Lenders, which they may grant in their sole discretion.  No such consent shall be implied by any action, inaction or acquiescence of the DIP Secured Parties. After obtaining the prior written consent of the Required Lenders, the Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Documents in accordance with the provisions thereof, _provided that_ any such amendment, modification, supplement or waiver is not materially adverse to the Debtors' bankruptcy estates.

17.    _Approved Budget_.

(i)    Attached to this Interim Order as **Exhibit B** is a 9-week budget approved by the Required Lenders, which sets forth, among other things, projected cash receipts and cash disbursements (the "_Approved Budget_").  By no later than 5:00 P.M. (Eastern Time) on the Thursday of the first full calendar week after the Petition Date, and by no later than 5:00 P.M. (Eastern Time) on the Thursday of every week thereafter, the weekly budget shall be updated and delivered to the DIP Agent for informational purposes only, which, for the avoidance of doubt, shall not amend, supplement or otherwise modify the Approved Budget in any respect.  Any amendments, supplements, or modifications to, or extensions of, the Approved Budget or an Approved Variance Report (as defined below) shall be subject to the prior written approval of the DIP Agent in its sole discretion prior to the implementation thereof.  Until any such amendment, supplement, modification or extension has been approved by the DIP Agent, the Debtors shall be subject to and be governed by the terms of the Approved Budget then in effect.

- 36 -

(ii)    The Approved Budget is approved on an interim basis.  The proceeds of the DIP Facility and Cash Collateral under this Interim Order shall be used by the Debtors in accordance with the Approved Budget, this Interim Order and the DIP Documents.

(iii)    Other than with respect to the Carve-Out, and except as provided in Paragraphs 32 and 33, none of the DIP Secured Parties' and the Prepetition First Lien Secured Parties' consent to, or acknowledgement of, the Approved Budget shall be construed as consent to use the proceeds of the DIP Facility beyond the Termination Date (as defined below) or the Maturity Date, as applicable, or the use of Cash Collateral beyond the expiration of the Remedies Notice Period (as defined below) following the Termination Date, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(iv)    Notwithstanding anything to the contrary herein, the Debtors shall pay the fees, costs and expenses of the DIP Professionals (as defined below) in accordance with the DIP Documents, the Approved Budget and this Interim Order.

18.    <u>Budget Reporting</u>.  The Debtors shall at all times comply with the Approved Budget, subject to the Permitted Variances (as defined below).  By no later than 5:00 P.M. (Eastern Time) on Thursday after the second full calendar week following the Petition Date (the "<u>First Testing Date</u>"), and no later than 5:00 PM ET on each Thursday thereafter (together with the First Testing Date, each a "<u>Testing Date</u>"), the Debtors shall deliver to the DIP Agent a variance report for the applicable Testing Period (as defined below) in form and detail acceptable to the DIP Agent (an "<u>Approved Variance Report</u>") showing comparisons of (a) actual cash receipts for such Testing Period compared to the projected cash receipts of the Debtors for such Testing Period as set forth in the Approved Budget and (b) actual cash disbursements on a line by line basis (which, as to professional fees, shall include only Berger Singerman LLP and Meru, LLC) of the Debtors for

- 37 -

such Testing Period compared to the projected cash disbursements on a line by line basis (which, as to professional fees, shall include only Berger Singerman LLP and Meru, LLC) for such Testing Period as set forth in the Approved Budget.  The term "Testing Period" means (i) with respect to receipts, the cumulative period beginning on the Petition Date and ending on the Saturday immediately prior to the applicable Testing Date, and (ii) with respect to disbursements, the weekly period beginning on Sunday and ending on the Saturday immediately prior to the applicable Testing Date.  Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the Permitted Variances (as defined below) and shall provide a written explanation for such variances.  "Permitted Variances" shall be 10.0% and $25,000 and shall be determined, as of any Testing Date, as follows: the Debtors shall certify in each Approved Variance Report the difference of (x) the Debtors' actual cash disbursements within the Approved Budget (which, as to professional fees, shall include only Berger Singerman LLP and Meru, LLC) on a line by line basis for the applicable Testing Period, *minus* (y) to the extent such amount is greater than $0, the amount projected in the Approved Budget for each such line item.  To the extent that the Debtors' actual cash disbursements for any line item within the Approved Budget for the Testing Period exceeds the projected cash disbursements for any corresponding line item within Approved Budget for the applicable Testing Period by more than 10.0% and $25,000 for any Testing Period, an Event of Default (as defined below) shall have occurred.

19.    <u>Additional Reporting</u>.  The Debtors shall deliver to the DIP Agent each of the reports and other information set forth in Section 10.01 of the DIP Credit Agreement within the timeframe set forth therein, in form and detail acceptable to the DIP Agent.  The Debtors shall also make the Debtors' senior management available for weekly telephonic or virtual meetings to update the DIP Agent, the DIP Lenders and the DIP Professionals at such times to be mutually

- 38 -

agreed on all matters affecting the Debtors and the Chapter 11 Cases, including with respect to the Sale.

20.     <u>Modification of Automatic Stay</u>.  The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Secured Parties and the Prepetition First Lien Secured Parties to accomplish the transactions contemplated by this Interim Order.

21.     <u>Perfection of DIP Liens and Replacement Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Replacement Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or the Replacement Liens or to entitle the DIP Secured Parties or the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent and the Prepetition First Lien Agent are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and/or the Replacement Liens, and all such financing statements, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Replacement Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent and the Prepetition First Lien Agent

- 39 -

all such financing statements, mortgages, notices and other documents as each may reasonably request. The DIP Agent and the Prepetition First Lien Agent may each, in its discretion, file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments. To the extent that the Prepetition First Lien Agent is, with respect to the DIP Collateral, the secured party under any security agreement, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements or any other Prepetition First Lien Credit Documents or is listed as loss payee, lenders' loss payee or additional insured under any of the Debtors' insurance policies, the DIP Agent (for the benefit of the DIP Lenders) shall also be deemed to be the secured party under such documents or to be the loss payee or additional insured, as applicable. The Prepetition First Lien Agent shall act as agent for the DIP Secured Parties solely for purposes of perfecting the DIP Secured Parties' DIP Liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party (including any deposit account control agreement), and all of the Prepetition Secured Parties' respective rights in such DIP Collateral shall inure to the benefit of and be exercisable exclusively by the DIP Agent until the DIP Obligations have been indefeasibly repaid in full in cash; *provided that* the DIP Agent may, in its sole discretion, require the Debtors and the Prepetition Secured Parties to (and the Debtors and the Prepetition Secured Parties shall) use commercially reasonable efforts to provide the DIP Agent with such possession or control as is necessary to perfect the DIP Obligations and DIP Liens. Notwithstanding the foregoing, in the event any of the Chapter 11 Cases or Successor Cases are dismissed prior to the indefeasible payment in full of the DIP Obligations, such order dismissing

- 40 -

any Chapter 11 Cases or Successor Cases shall not be effective for five (5) business days to permit the DIP Agent and the Prepetition Secured Parties to enter into any agreements or file any documents (including credit agreements, financing statements, or other notices or documents) evidencing the DIP Obligations and the perfection and priority of the DIP Liens and Replacement Liens, and during such period, the Debtors shall comply with all reasonable requests of the DIP Agent and the Prepetition Secured Parties to ensure the perfection of the DIP Liens and the Replacement Liens, as applicable.

22.      [Reserved].

23.      Access to Books and Records.  The Debtors will (i) maintain books, records, and accounts to the extent and as required by the DIP Documents, (ii) cooperate with, consult with, and provide to the DIP Agent all such information and documents that any or all of the Debtors are obligated to provide under the DIP Documents or the provisions of this Interim Order or as otherwise reasonably requested by the DIP Agent, (iii) during normal business hours, upon reasonable advance notice, permit consultants, advisors and other representatives (including third party representatives) of the DIP Agent to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to engage in discussions with their respective senior management and independent public accountants to the extent required by the DIP Documents or the Prepetition First Lien Credit Documents, and (iv) permit the DIP Agent, and the Prepetition First Lien Agent, and their respective consultants, advisors and other representatives, to consult with the Debtors' management and advisors on matters concerning the Debtors'

13262344-16

businesses, financial condition, operations and assets, as provided for in the DIP Documents or this Interim Order.

24.    <u>Proceeds of Subsequent Financing</u>.    If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' Estates, and such facilities are secured by any DIP Collateral, then all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be distributed in accordance with this Interim Order and the DIP Documents.    For the avoidance of doubt, if the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Cases, or any Successor Cases, shall obtain credit or incur debt (other than the DIP Facility) pursuant to Bankruptcy Code section 364(d) at any time prior to the indefeasible repayment in full of the Prepetition First Lien Obligations, the Prepetition First Lien Secured Parties' rights to object to the Debtors' use of Cash Collateral and assert a lack of adequate protection shall be fully preserved.

25.    <u>Cash Management</u>.    The Debtors shall maintain their cash management system consistent with the terms and conditions of the Cash Management Order (as defined below) and the DIP Documents.    Unless authorized by the Interim Order or otherwise agreed to in writing by the DIP Agent and the Prepetition First Lien Agent, the Debtors shall not maintain any deposit accounts except those identified in any interim and/or final order granting the Debtors

- 42 -

authorization to continue their cash management systems and certain related relief (as amended, supplemented or otherwise modified, the "Cash Management Order"), which order (and any amendments, supplements or modifications thereto) shall be in form and substance acceptable to the DIP Agent.   Subject to Paragraphs 32, 33, and 35, the Debtors and the financial institutions where the Debtors maintain deposit accounts (as identified in the Cash Management Order), are authorized and directed to remit, without offset or deduction, funds in any such deposit accounts upon receipt of any direction to that effect from the DIP Agent (on behalf of the DIP Lenders) in accordance with the DIP Documents and this Interim Order.

26.     Maintenance of DIP Collateral.  Until the indefeasible payment in full in cash of all DIP Obligations and all Prepetition First Lien Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Documents and the Prepetition First Lien Credit Documents, as applicable; and (b) maintain the cash management system consistent with the terms and conditions of the Cash Management Order and the DIP Documents.

27.     Disposition of DIP Collateral.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or Prepetition Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent and the Required Lenders, or pursuant to a Sale Order.

28.     Termination Date.  On the Termination Date (as defined below), all DIP Obligations shall be immediately due and payable and, all commitments to extend credit under the DIP Facility will terminate.

29.     Events of Default.  Until the DIP Obligations are indefeasibly paid in full in cash and all commitments thereunder are terminated (the "DIP Repayment"), the occurrence of

- 43 -

any of the following events, unless waived by the Required Lenders in writing (which may be by email) and in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "Events of Default"): (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants or obligations under this Interim Order, including, without limitation, failure to make any payment under this Interim Order when due or comply with any Milestones or the Approved Budget (subject to the Permitted Variances); or (b) the occurrence and continuation of any Events of Default under, and as defined in, the DIP Credit Agreement or an event of default under any other DIP Documents.

30.     Milestones. As a condition to the DIP Facility and the use of Cash Collateral, and notwithstanding any DIP Repayment, the Debtors shall comply with the following milestones (the "Milestones"), unless extended or waived in writing in DIP Agent's sole discretion:

    (i)    no later than three (3) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order. For the avoidance of doubt, any changes to the Interim Order shall be subject to the prior written consent of the DIP Lenders and the DIP Agent in their sole discretion;

    (ii)    no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order. For the avoidance of doubt, any changes to the Final Order shall be subject to the prior written consent of the DIP Lenders and the DIP Agent in their sole discretion;

    (iii)    no later than forty-five (45) days after the Petition Date, the Debtors shall have filed with the Bankruptcy Court an Acceptable Plan;

    (iv)    no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered a Sale Order, which order shall be acceptable to the DIP Agent and the Required Lenders in their sole discretion, approving the sale of all or substantially all of the Debtors' assets;

    (v)    no later than sixty (60) days after the Petition Date, the Sale approved by the Bankruptcy Court pursuant to the Sale Order shall have been consummated; and

(vi)    no later than one hundred and fifty (150) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order confirming an Acceptable Plan.

For the avoidance of doubt, unless waived or extended in writing by the DIP Agent in its sole discretion, the failure of the Debtors to meet the Milestones by the applicable specified deadlines set forth therefor shall constitute an immediate Event of Default under the DIP Documents and this Interim Order.

31.    <u>Rights and Remedies Upon Event of Default.</u>    Upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court, other than, subject to the terms of this Interim Order:  (a) the DIP Agent (at the direction of the Required Lenders or as otherwise provided in the DIP Documents) may send a written notice to the counsel to the Debtors, counsel to the Committee (if appointed), and the U.S. Trustee (any such notice shall be referred to herein as a "<u>Termination Declaration</u>") declaring (1) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (2) the commitment of each DIP Lender to make DIP Loans to be terminated, whereupon such commitments and obligations shall be terminated to the extent any such commitment remains under the DIP Facility, (3) the termination of the DIP Facility and the DIP Documents as to any future liability or obligations of the DIP Secured Parties, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred following the delivery of the Carve-Out Trigger Notice to the Borrower; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents; and (c) the DIP Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral.  The earliest date on which a Termination Declaration is delivered by the DIP Agent in

- 45 -

accordance with this Paragraph 31 shall be referred to herein as the "Termination Date". Subject to Paragraph 32, following a Termination Date, neither the DIP Secured Parties nor the Prepetition First Lien Secured Parties shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility. The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee (if appointed), and the U.S. Trustee. After the DIP Repayment, the Prepetition First Lien Agent shall be entitled to make a Termination Declaration with respect to the foregoing subclause (a)(4) or subclause (c) in accordance with the same procedures set forth herein.

32.     Emergency Hearing. The Debtors and the Committee (if any) may seek an emergency hearing during the five (5) calendar days following the date a Termination Declaration is delivered (such five (5) calendar day period, the "Remedies Notice Period") for the sole purpose of determining whether an Event of Default has in fact occurred or is continuing, and the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Secured Parties or, if applicable, the Prepetition First Lien Secured Parties. During the Remedies Notice Period, the Debtors shall continue to have the right to use Cash Collateral in accordance with the terms of this Interim Order, solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the Estates.

33.     Certain Rights and Remedies Following Termination Date. Following a Termination Date and either upon the expiration of the Remedies Notice Period or pursuant to an order of the Bankruptcy Court (which may further authorize the remedies set forth in this Paragraph or any other appropriate remedy as then determined by the Bankruptcy Court) upon an

- 46 -

emergency motion by the DIP Agent (at the direction of the Required Lenders) to be heard on no

less than three (3) business days' notice (and the Debtors and the Committee (if any) and any other

party-in-interest shall not object to such shortened notice) (the "Termination Enforcement Order"),

the DIP Agent shall be entitled to exercise all rights and remedies in accordance with the DIP

Documents, this Interim Order and applicable law and shall be permitted to satisfy the relevant

DIP Obligations and DIP Superpriority Claims, subject to the Carve-Out.  Following expiration of

the Remedies Notice Period or upon entry of the Termination Enforcement Order (except as

otherwise order by the Bankruptcy Court), the Debtors are hereby authorized and directed to, with

the exclusion of the Carve-Out, remit to the DIP Agent (for the benefit of the DIP Lenders) one-

hundred percent (100%) of all collections, remittances, and proceeds of the DIP Collateral in

accordance with the DIP Documents and this Interim Order.  In furtherance of the foregoing,

(a) each bank or other financial institution with an account of any Debtor is hereby authorized and

instructed to (i) comply at all times with any instructions originated by the DIP Agent to such bank

or financial institution directing the disposition of cash, securities, investment property and other

items from time to time credited to such account, without further consent of any Debtor, including

without limitation, any instruction to send to the DIP Agent by wire transfer or in such other

manner as the DIP Agent directs, all cash, securities, investment property and other items held by

such bank or financial institution, and (ii) waive any right of set off, banker's lien or other similar

lien, security interest or encumbrance, (b) the DIP Agent (at the direction of the Required Lenders

or as otherwise provided in the DIP Documents) may compel the Debtors to seek authority to,

(i) sell or otherwise dispose of all or any portion of the DIP Collateral (or any other property of the

Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds of which

are DIP collateral) pursuant to section 363 (or any other applicable provision) of the Bankruptcy

Code on terms and conditions pursuant to sections 363, 365 and other applicable provisions of the Bankruptcy Code, (ii) assume and assign any lease or executory contract included in the DIP Collateral to the DIP Agent's designees in accordance with and subject to section 365 of the Bankruptcy Code, (c) the DIP Agent (at the direction of the Required Lenders) may direct the Debtors to (and the Debtors shall comply with such direction to) dispose or liquidate the DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds of which are DIP Collateral) via one or more sales of such DIP Collateral or property and/or the monetization of other DIP Collateral or property with the Required Lenders having sole authority over the price of any such DIP Collateral or property to be disposed of, (d) the DIP Agent may (at the direction of the Required Lenders), or may direct the Debtors to (and the Debtors shall comply with such direction to), collect accounts receivable, without setoff by any account debtor, and (e) the DIP Agent (for the benefit of the DIP Lenders) shall be authorized to succeed to any of the Debtors' rights and interests under any licenses for the use of any intellectual property in order to complete the production and sale of any inventory.  The Debtors shall take all action that is reasonably necessary to cooperate with the DIP Secured Parties in the exercise of their rights and remedies and to facilitate the realization of the DIP Collateral by the DIP Secured Parties.

34.    <u>Access to DIP Collateral</u>.  Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Secured Parties under this Interim Order, the DIP Documents and applicable law, after the occurrence of a Termination Date and the entry of a Termination Enforcement Order, and subject to Paragraph 33, for the purpose of exercising any remedy with respect to any of the DIP Collateral, the DIP Agent (or any of its employees, agents, consultants, contractors, or other professionals) (collectively, the "<u>Enforcement</u>

- 48 -

Agents") shall have the right (to be exercised at the direction of the Required Lenders), at the sole cost and expense of the Debtors, to: (i) enter upon, occupy, and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by the Debtors, (ii) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process), and (iii) exercise any rights of the Debtors to access any DIP Collateral (including inventory) held by any third party; *provided*, *however*, the Enforcement Agent may only be permitted to do so in accordance with (a) existing rights under applicable non-bankruptcy law, including, without limitation, applicable leases, (b) any prepetition (and, if applicable, post-petition) written landlord waivers or consents, or (c) further order of this Court on motion and notice appropriate under the circumstances; and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents, equipment or any other similar assets of the Debtors, or assets which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses; *provided*, *however*, the Enforcement Agents may use such assets to the extent permitted by applicable non-bankruptcy law.  The Enforcement Agents will be responsible for the payment of any applicable fees, rentals, royalties, or other amounts owing to such lessor, licensor or owner of such property (other than the Debtors) on a *per diem* basis and solely for the period of time that the Enforcement Agents actually occupy any real property or use the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals, or other amounts owing for any period prior to the date that the Enforcement Agents actually occupy or use such assets or properties); *provided, further*, that nothing herein shall relieve the Debtors of their obligations pursuant to section 365(d)(3) of the Bankruptcy Code for the payment of rent that accrues through and including any assumption

- 49 -

and/or rejection of any lease. Nothing contained herein shall require the Enforcement Agents to assume any lease as a condition to the rights afforded in this Paragraph.

35. <u>Carve-Out</u>. Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition First Liens, the Prepetition Second Liens, the Replacement Liens and the Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out.

(i) "<u>Carve-Out</u>" means, collectively, the following fees and expenses: (a) all statutory fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the Carve-Out Trigger Notice (as defined below)); (b) reasonable fees and expenses incurred by a trustee, if any, under section 726(b) of the Bankruptcy Code in an amount not exceeding $25,000 (without regard to the Carve-Out Trigger Notice (as defined below)); (c) subject to the Approved Budget, to the extent allowed at any time, whether by interim or final compensation order, procedural order or otherwise, all unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors) (the "<u>Allowed Debtor Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "<u>Debtor Professionals</u>") and unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of any Committee (as defined below)) (the "<u>Allowed Committee Professional Fees</u>" and together with the Allowed Debtor Professional Fees, collectively, the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by any statutory committees appointed in the Chapter 11 Cases (each, a "<u>Committee</u>") pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time

- 50 -

before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (these clauses (a) through (c), the "Pre-Carve-Out Amounts"); and (d) Allowed Professional Fees in an aggregate amount not to exceed (I) $250,000 for the Debtor Professionals and (II) $50,000 for the Committee Professionals, incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice (excluding any restructuring, sale, success, or other transaction fee earned or payable to any Professional Person), to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (d) being the "Post-Carve-Out Trigger Notice Cap").  For the avoidance of doubt, other than the Carve-Out, no other amounts owed by any of the Debtors to any party (including any amounts set forth in the Approved Budget) as of the date the Carve-Out Trigger Notice is delivered shall be payable from the Prepetition Collateral or DIP Collateral.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee and lead counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  No portion of the Carve-Out, any Cash Collateral, any other DIP Collateral, or any proceeds of the DIP Facility, including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out, shall be used for the payment of Allowed Professional Fees, disbursements, costs or expenses incurred by any person, including, without limitation, any Committee, in connection with challenging the DIP Secured Parties' or the Prepetition First Lien Secured Parties' liens or claims, preventing, hindering or delaying any of the DIP Secured Parties'

or the Prepetition First Lien Secured Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral, or initiating or prosecuting any claim or action against any DIP Secured Party or Prepetition First Lien Secured Party; *provided that*, notwithstanding anything herein to the contrary, proceeds from the DIP Facility and/or Cash Collateral not to exceed $25,000 in the aggregate (the "Investigation Budget Cap") may be used on account of Allowed Professional Fees incurred by Committee Professionals (if any) during the Challenge Period in connection with the investigation of avoidance actions or any other claims or causes of action (but not the prosecution of such actions) on account of the Prepetition First Lien Facility and Prepetition First Lien Secured Parties (but not the DIP Facility or the DIP Secured Parties) (the "Investigation").

(ii)     Carve-Out Reserve.  Prior to the delivery of the Carve Out Trigger Notice, on a weekly basis, the Debtors shall fund a reserve (the "Carve-Out Reserve") from the DIP Credit Facility or cash on hand into a segregated escrow account (the "Funded Reserve Account") held by Berger Singerman LLP in trust for the benefit of Professional Persons in an amount equal to the sum of the aggregate unpaid amount of the total budgeted weekly fees of Professional Persons for the current week set forth in the Approved Budget.  In addition, on the day on which a Carve-Out Trigger Notice is delivered pursuant to Paragraph 35(i) (the "Carve-Out Trigger Notice Date"), the Carve-Out Trigger Notice shall (i) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund the Carve-Out Reserve in an amount equal to the Carve-Out, and (ii) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans in an amount equal to the Post-Carve Out Trigger Notice Cap (the "Trigger Borrowing Request") to be funded into the Funded Reserve Account, in each case to the extent not previously funded to the Funded Reserve Account; *provided that* in no event shall any DIP Lender be required to fund any amount in excess of its then-outstanding

- 52 -

Commitment. Funds transferred to the Funded Reserve Account shall not be subject to any liens or claims granted to the DIP Lenders herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute Cash Collateral or assets of the Debtors' Estates; *provided that*, notwithstanding anything to the contrary herein, in the DIP Credit Agreement or in the other DIP Documents, the DIP Collateral shall include the DIP Agent's reversionary interest in funds held in the Funded Reserve Account, if any, after all Allowed Professional Fees are satisfied in full. On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Documents to the contrary, including with respect to the existence of an Event of Default (as defined in the DIP Credit Agreement), the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Obligations following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding Commitment shall make available to the DIP Agent such DIP Lender's share with respect to the Trigger Borrowing Request in accordance with the DIP Documents, *provided that* in no event shall any DIP Lender be required to fund any amount in excess of its then-outstanding Commitment. To the extent that the Funded Reserve Account is actually funded, the Carve-Out shall be reduced by such funded amount dollar-for-dollar. The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the local bankruptcy rules of the Bankruptcy Court, and any interim or final orders of the Bankruptcy Court. Any amounts remaining in the Funded Reserve Account after payment of the Carve-Out shall be paid to the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall

be paid to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, the DIP Agent and the Prepetition First Lien Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserve has been fully funded, but shall have a security interest in any residual interest in the Carve-Out Reserve.

(iii)    No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.  None of the DIP Secured Parties or Prepetition First Lien Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate any of the DIP Secured Parties or Prepetition First Lien Secured Parties in any way to compensate, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their Estates have sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any party to object to the allowance and payment of any such fees and expenses.

36.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.  The DIP Secured Parties and the Prepetition First Lien Secured Parties have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in

- 54 -

accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Bankruptcy Court or any other court, the DIP Secured Parties and Prepetition First Lien Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.

37.    <u>Approval of DIP Fees</u>.  In consideration for the DIP Facility and the consent to the use of Cash Collateral in accordance with the terms of this Interim Order, the DIP Secured Parties shall be paid all fees, expenses and other amounts payable under the DIP Documents, as such become due and all reasonable and documented costs and expenses of the DIP Secured Parties as provided in the Approved Budget, including legal fees, financial advisor fees, and other similar fees, costs and expenses of the DIP Secured Parties, incurred in connection with the DIP Facility and the Chapter 11 Cases, including, without limitation, the reasonable and documented fees and expenses of (a) counsel to the DIP Secured Parties and (b) specialty or local counsel to the DIP Secured Parties in each relevant jurisdiction, in each case without regard to whether or not the transactions contemplated hereby are consummated (all such fees, together, the "<u>DIP Fees</u>").  The DIP Fees shall be fully earned and payable upon entry of this Interim Order, without the need for any further order of this Court.  The DIP Fees shall be part of the DIP Obligations.  Any and all DIP Fees paid prior to the Petition Date by any of the Debtors to the DIP Secured Parties in connection with or with respect to the DIP Facility in each case are hereby approved in full.

38.    <u>Lender Professionals' Fees</u>.  Professionals for the DIP Secured Parties (the "<u>DIP Professionals</u>") and professionals for the Prepetition First Lien Secured Parties ("<u>Prepetition</u>

- 55 -

Professionals," and together with the DIP Professionals, the "Lender Professionals") shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, this Court. The Lender Professionals shall submit copies of summary invoices to the Debtors, which invoices shall be forwarded by the Debtors to the U.S. Trustee and counsel for any Committee; *provided that* such invoices shall include sufficient detail to allow the U.S. Trustee to perform a review of fees and expenses incurred. The summary invoices shall provide only the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable party and/or professionals, and shall be subject to all applicable privilege and work product doctrines. If the Debtors, U.S. Trustee or any Committee object to the reasonableness of the fees and expenses of any Lender Professional and cannot resolve such objection within ten (10) days after receipt of such invoices, then the Debtors, U.S. Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professional an objection (the "Fee Objection"), and any failure by any such party to file a Fee Objection within such ten (10) day period shall constitute a waiver of any right of such party to object to the applicable invoice. Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of the Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection. The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.

39.    <u>Indemnification</u>.  The Debtors shall indemnify and hold harmless the DIP Secured Parties, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees past, present, and future, and their respective heirs, predecessors, successors and assigns in accordance with, and subject to, the terms and conditions of the DIP Documents except to the extent of such party's actual fraud or willful misconduct as determined in a final order by a court of competent jurisdiction.

40.    <u>Right to Credit Bid</u>.  In connection with any sale or other disposition of the DIP Collateral or Prepetition Collateral including any sales occurring under or pursuant to section 363 of the Bankruptcy Code, any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors (any of the foregoing sales or dispositions, a "<u>Collateral Sale</u>"), the DIP Agent (at the direction of the Required Lenders) and the Prepetition First Lien Agent (at the direction of the Required Lenders (as defined in the Prepetition First Lien Credit Agreement, the "<u>Required Prepetition First Lien Lenders</u>")) shall be authorized to the fullest extent under section 363(k) of the Bankruptcy Code to credit bid on a dollar-for-dollar basis any or all of outstanding DIP Obligations and Prepetition First Lien Obligations, as applicable, up to the full amount of the DIP Obligations and Prepetition First Lien Obligations, respectively, including any accrued interest, expenses, and fees in a Collateral Sale of any DIP Collateral or Prepetition Collateral (including any deposit in connection with such Collateral Sale), whether such Collateral Sale is effectuated through section 363 or 1129 of the Bankruptcy Code, or by a chapter 7 trustee, or otherwise, without the need for further court authorization.  Subject to the terms of the Asset Purchase Agreement (solely to the extent approved

- 57 -

by a Sale Order on a final basis), the DIP Agent (at the direction of the Required Lenders) and the Prepetition First Lien Agent (at the direction of the Required Prepetition First Lien Lenders) shall each have the absolute right to assign, transfer, sell, or otherwise dispose of their respective rights to credit bid to any acquisition vehicle formed in connection with such bid or other designee.

41.    <u>Proofs of Claim</u>.  None of the DIP Secured Parties, the Prepetition First Lien Secured Parties or the Prepetition Unsecured Note Parties will be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim arising under the DIP Documents, the Prepetition First Lien Credit Documents, or the Prepetition Unsecured Promissory Note Documents.  The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the DIP Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition Unsecured Note Parties with regard to all claims arising under the DIP Documents, the Prepetition First Lien Credit Documents, and the Prepetition Unsecured Promissory Note Documents and, as a result, the DIP Obligations, Prepetition First Lien Obligations and Prepetition Unsecured Note Obligations shall be deemed allowed for all purposes in accordance with section 502(a) of the Bankruptcy Code.

42.    <u>Limitations on Use of DIP Proceeds, Cash Collateral and Carve-Out</u>. Except as otherwise permitted in this Interim Order and the Approved Budget, the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral and the Carve-Out may not be used in connection with: (a) preventing, hindering, or delaying the DIP Secured Parties or the Prepetition First Lien Secured Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral outside the ordinary course of business without the prior written consent of the Required Lenders; (c) outside the ordinary course of business, using or seeking to

- 58 -

use any insurance proceeds constituting DIP Collateral without the prior written consent of the Required Lenders; (d) incurring any indebtedness (other than as expressly permitted by the DIP Credit Agreement) without the prior written consent of the Required Lenders; (e) seeking to amend or modify any of the rights granted to the DIP Secured Parties, the Prepetition First Lien Secured Parties or the Prepetition Unsecured Note Parties under this Interim Order, the DIP Documents, the Prepetition First Lien Credit Documents or the Prepetition Unsecured Promissory Note Documents, without the DIP Agent's consent in its sole discretion; (f) objecting to or challenging in any way the DIP Liens, the DIP Obligations, the Prepetition First Liens, the Prepetition First Lien Obligations, the Prepetition Unsecured Note Obligations, the DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the DIP Secured Parties, the Prepetition First Lien Secured Parties, or the Prepetition Unsecured Note Parties, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the DIP Secured Parties, the Prepetition First Lien Secured Parties, the Prepetition Unsecured Note Parties, or any of their respective affiliates, successors and assigns and the partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals; (h) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition First Liens, the Prepetition First Lien Obligations, the Prepetition Unsecured Note Obligations or any other rights or interests of the DIP Secured Parties, the Prepetition First Lien Secured Parties, or the Prepetition Unsecured Note Parties; or (i) seeking to

- 59 -

13262344-16

subordinate, recharacterize, disallow or avoid the DIP Obligations, the Prepetition First Lien Obligations or the Prepetition Unsecured Note Obligations.

43.    <u>Turn Over.</u>  Prior to the DIP Repayment, any party who holds a lien or security interest in DIP Collateral that is junior and/or subordinate to the DIP Liens or a claim that is subordinate to the DIP Superpriority Claims (including any of the Prepetition First Lien Secured Parties) that receives or is paid the proceeds of any DIP Collateral or receives any other payment or consideration from the Debtors or any other source (including under any chapter 11 plan) other than as expressly permitted in the DIP Documents and this Interim Order (including the Approved Budget), such party shall be deemed to have received, and shall hold, such proceeds or payments in trust for the DIP Secured Parties and shall immediately turn over such amounts to the DIP Agent for distribution to the DIP Lenders to repay the DIP Obligations in accordance with the DIP Documents and this Interim Order until indefeasibly paid in full in cash.

44.    <u>Effect of Stipulations on Third Parties</u>.  The Debtors' Stipulations contained in Paragraph G and releases in Paragraph I hereof shall be binding in all circumstances upon the Debtors upon entry of this Interim Order and upon their Estates upon entry of the Final Order.  The Debtors' Stipulations shall be binding upon each other creditor and party-in-interest, including any Committee, except to the extent such party in interest *first* obtains standing (including any chapter 11 trustee or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), by no later than the date that is the later of (i) sixty (60) calendar days after the Petition Date and (ii) solely with respect to any claims and causes of action asserted by a Committee, sixty (60) calendar days after formation of the Committee (such time period shall be referred to as the "<u>Challenge Period</u>," and the date that is the next calendar day after the termination of the Challenge

Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a contested matter, adversary proceeding, or other matter challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations (each, a "Challenge"), such Challenge is fully and finally adjudicated, (i) and (ii) shall be referred to as the "Challenge Period Termination Date") and *second*, obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge").   Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), and without further notice, notion, or application to, order of, or hearing before this Court, (i) any and all payments made to or for the benefit of the Prepetition First Lien Secured Parties or otherwise authorized by this Interim Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition First Lien Obligations shall be deemed to be fully allowed secured claims within the meaning of section 506 of the Bankruptcy Code and all of the Prepetition Unsecured Note Obligations shall be deemed to be fully allowed unsecured claims within the meaning of section 502 of the Bankruptcy Code, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee.   Notwithstanding the foregoing, to the extent any

- 61 -

Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge; *provided that* all other stipulations (other than those subject to a successful Challenge) shall remain binding on any Committee or other party-in-interest.  Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' Estates.  The failure of any party-in-interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph 44 or to require or permit an extension of the Challenge Period Termination Date.  To the extent any such Challenge is timely and properly commenced, the Prepetition First Lien Agent and any other Prepetition First Lien Secured Party shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred in defending themselves and the other Prepetition First Lien Secured Parties in any such proceeding as adequate protection.

45.     <u>No Third-Party Rights</u>.  Except as explicitly provided for herein or in any of the DIP Documents, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.

- 62 -

46.    <u>No Lender Liability</u>.  In determining to make any loan (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents or taking any other act permitted under this Interim Order and the DIP Documents, none of the DIP Secured Parties or the Prepetition First Lien Secured Parties shall (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the *United States Comprehensive Environmental Response, Compensation and Liability Act*, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition First Lien Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

47.    <u>Section 506(c) Claims</u>.  Subject to entry of a Final Order and as a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Documents (and the consent of the DIP Secured Parties to the payment of the Carve-Out to the extent provided herein and the consent of the Prepetition Secured Parties of the priming of the Prepetition Liens by the DIP Facility and the use of Cash Collateral) (a) no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties or the Prepetition First Lien Secured Parties with respect to the DIP Collateral or the Prepetition Collateral, in each case

- 63 -

pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Secured Parties or the Prepetition First Lien Secured Parties, as applicable and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties or the Prepetition First Lien Secured Parties.

48.    <u>No Marshaling</u>.    The DIP Secured Parties and the Prepetition First Lien Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

49.    <u>Section 552(b)</u>.  Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition First Lien Secured Parties, as applicable, with respect to proceeds, products, offspring or profits of any of the DIP Collateral or Prepetition Collateral, as applicable.

50.    <u>Exculpation</u>. Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or Prepetition First Lien Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors, including with respect to the operation of their businesses, in connection with their restructuring efforts or administration of these Chapter 11 Cases.  In addition, (a) the DIP Secured Parties shall not in any way or manner be liable or responsible for: (i) the safe-keeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any Diminution thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

13262344-16

51.    <u>Release of DIP Secured Parties</u>.  Upon entry of this Interim Order, the Debtors, on their own behalf and their Estates, forever and irrevocably: (i) release, discharge, and acquit each of the DIP Secured Parties and each of their former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Documents; and (ii) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations.

52.    <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (for the benefit of the DIP Lenders), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

53.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Secured Parties or Prepetition First Lien Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition First Lien Credit Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

13262344-16

54.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, the Prepetition Unsecured Note Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

55.    <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations and Prepetition First Lien Obligations have been indefeasibly paid in full in cash, and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the Required Lenders or Required Prepetition First Lien Lenders, (i) any modification, stay, vacatur or amendment to this Interim Order; (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases or Successor Cases, equal or superior to the DIP Superpriority Claims or Adequate Protection Superpriority Claims, other than the Carve-Out and the Prepetition Permitted Liens; (iii) any order allowing use of Cash Collateral resulting from DIP Collateral or Prepetition Collateral; (iv) without the prior written consent of the Required Lenders, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in

- 66 -

the DIP Documents; or (v) without the prior written consent of the Prepetition First Lien Agent, any lien on any of the Prepetition Collateral with priority equal or superior to the Prepetition First Liens or Replacement Liens.

56.    <u>Discharge</u>.  Except as otherwise agreed in writing by the DIP Agent (acting at the direction of the Required Lenders) and the Prepetition First Lien Agent (acting at the direction of the Required Prepetition First Lien Lenders), the DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (and DIP Repayment in the case of DIP Obligations), on or before the effective date of such confirmed plan of reorganization.  If any of the Debtors propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment (including by credit bid) of the DIP Obligations, and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "<u>Prohibited Plan or Sale</u>") without the prior written consent of the DIP Agent (acting at the direction of the Required Lenders) and the Prepetition First Lien Agent (acting at the direction of the Required Prepetition First Lien Lenders), the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP Documents.

57.    <u>Joint and Several</u>.  The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder.

- 67 -

58.    <u>Survival</u>.    The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Bankruptcy Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.    The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Secured Parties and the Prepetition First Lien Secured Parties pursuant to this Interim Order and the DIP Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated; and (ii) in respect of the Prepetition First Lien Facility, all of the Prepetition First Lien Obligations pursuant to the Prepetition First Lien Credit Documents and this Interim Order, have been indefeasibly paid in full in cash.    The terms and provisions concerning the indemnification of the DIP Secured Parties shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations.    In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition First Lien Secured Parties notwithstanding the repayment in full or

- 68 -

termination of the DIP Obligations until such time as the Prepetition First Lien Obligations have been indefeasibly paid in full.

59.    <u>Final Hearing</u>.  The Final Hearing on the Motion shall be held on _____, 2024, at__:__ _.m., prevailing Eastern Time; *provided that* the Final Hearing may be adjourned or otherwise postponed upon the Debtors filing a notice of such adjournment in consultation with the DIP Secured Parties.  The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court.  Any objections or responses to entry of the Final Order shall be filed on or before ___:00 __.m., prevailing Eastern Time, on _____, 2024.

60.    <u>Necessary Action</u>.  The Debtors are authorized to take any and all such actions and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Order and the transactions contemplated hereby.

61.    <u>Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof.    Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules, any applicable Local Bankruptcy Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

62.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition First Lien

- 69 -

Secured Parties, the Prepetition Second Lien Secured Parties, the Prepetition Unsecured Note Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

63.     _Headings_. The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

64.     _Priority of Terms_.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Documents, the Motion, or the Cash Management Order, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as set forth in" any of the DIP Documents, the Prepetition First Lien Credit Agreement, or other agreement or document, the terms and provisions of this Interim Order shall govern.

65.     _Retention of Jurisdiction_.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

# # #

Submitted by:
Paul Steven Singerman, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email: singerman@bergersingerman.com

*(Attorney Singerman is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

- 70 -

13262344-16

# **EXHIBIT A**

(DIP Credit Agreement)

**EXECUTION VERSION**

SENIOR SECURED SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT
AGREEMENT

AMONG

MBMG HOLDING, LLC, a Debtor and Debtor in Possession under Chapter 11 of the Bankruptcy Code,
as Holdings and as a Guarantor,

MBMG INTERMEDIATE HOLDING, LLC, a Debtor and Debtor in Possession under Chapter 11 of the
Bankruptcy Code, as Intermediate Holdings and as a Guarantor,

MB MEDICAL OPERATIONS, LLC, a Debtor and Debtor in Possession under Chapter 11 of the
Bankruptcy Code, as the Borrower,

CERTAIN SUBSIDIARIES OF MB MEDICAL OPERATIONS, LLC FROM TIME TO TIME PARTY
HERETO, each a Debtor and Debtor in Possession under Chapter 11 of the Bankruptcy Code, and each as
a Subsidiary Guarantor

THE LENDERS FROM TIME TO TIME PARTY HERETO,

AND

KKR LOAN ADMINISTRATION SERVICES LLC,

AS ADMINISTRATIVE AGENT

_____

DATED AS OF OCTOBER 13, 2024,

_____

KKR CAPITAL MARKETS LLC,

AS SOLE LEAD ARRANGER AND SOLE BOOKRUNNER

_____

KKR CREDIT ADVISORS (US) LLC,

AS STRUCTURING ADVISOR

# TABLE OF CONTENTS

Page

SECTION 1.    Definitions and Accounting Terms ...................................................................1
    1.01    Defined Terms .............................................................................................1
    1.02    Rates ..........................................................................................................27
    1.03    Divisions ....................................................................................................28

SECTION 2.    Amount and Terms of Term Loans .................................................................28
    2.01    The Term Loans .........................................................................................28
    2.02    [Reserved] ..................................................................................................28
    2.03    Notice of Borrowing ..................................................................................29
    2.04    Disbursement of Funds ..............................................................................29
    2.05    Notes ..........................................................................................................29
    2.06    Conversions ...............................................................................................30
    2.07    Pro Rata Borrowings ..................................................................................30
    2.08    Interest .......................................................................................................30
    2.09    Interest Periods ..........................................................................................31
    2.10    Increased Costs, Illegality .........................................................................31
    2.11    Compensation ............................................................................................33
    2.12    Change of Lending Office ..........................................................................33
    2.13    Priority and Liens ......................................................................................33
    2.14    Benchmark Replacement Setting ...............................................................34

SECTION 3.    [Reserved] ..................................................................................................35

SECTION 4.    [Reserved] ..................................................................................................35

SECTION 5.    [Reserved] ..................................................................................................36

SECTION 6.    Prepayments; Payments; Taxes ...................................................................36
    6.01    Voluntary Prepayments .............................................................................36
    6.02    Mandatory Repayments .............................................................................36
    6.03    Method and Place of Payment ...................................................................37
    6.04    Net Payments .............................................................................................38

SECTION 7.    Conditions Precedent to Interim Term Loans on or Following the Interim Order
                   Availability Date ........................................................................................40
    7.01    Credit Agreement; Notes ...........................................................................41
    7.02    AML, KYC .................................................................................................41
    7.03    Closing Certificate ....................................................................................41
    7.04    No Default; Representations and Warranties .............................................41
    7.05    [Reserved] ..................................................................................................41
    7.06    Approved Budget .......................................................................................41
    7.07    Petition Date ..............................................................................................41
    7.08    Interim Order .............................................................................................41
    7.09    First Day Orders ........................................................................................41

TABLE OF CONTENTS
(continued)

Page

7.10    No Trustee ........................................................................................................41
7.11    Perfected Liens ...............................................................................................41
7.12    [Reserved] .......................................................................................................41
7.13    [Reserved] .......................................................................................................42
7.14    Notice of Borrowing ........................................................................................42
7.15    Fees, etc ...........................................................................................................42
7.16    [Reserved] .......................................................................................................42
7.17    Insurance ..........................................................................................................42
7.18    Corporate Power and Authority .......................................................................42
7.19    Asset Purchase Agreement ..............................................................................42
7.20    Requirements of Law .......................................................................................42
7.21    Cash Management Order ..................................................................................42
7.22    Case Milestones ...............................................................................................42

SECTION 8.    Conditions Precedent to Borrowing Final Order Term Loans on or Following the
Final Order Availability Date. ..........................................................................43
8.01    No Default; Representations and Warranties ...................................................43
8.02    Notice of Borrowing ........................................................................................43
8.03    Closing Certificate ...........................................................................................43
8.04    Second Day Orders ..........................................................................................43
8.05    Final Order .......................................................................................................43
8.06    Continued Perfected Lien .................................................................................43
8.07    Fees, etc ...........................................................................................................43
8.08    Requirements of Law .......................................................................................43
8.09    Cash Management Order ..................................................................................44
8.10    Case Milestones ...............................................................................................44
8.11    Asset Purchase Agreement ..............................................................................44

SECTION 9.    Representations, Warranties and Agreements .................................................44
9.01    Company Status ...............................................................................................44
9.02    Power and Authority ........................................................................................44
9.03    No Violation .....................................................................................................45
9.04    [Reserved] .......................................................................................................45
9.05    No Material Adverse Change ...........................................................................45
9.06    Litigation ..........................................................................................................45
9.07    True and Complete Written Disclosure ...........................................................45
9.08    Margin Regulations ..........................................................................................46
9.09    Taxes ................................................................................................................46
9.10    Compliance with ERISA ..................................................................................46
9.11    [Reserved] .......................................................................................................47
9.12    Properties .........................................................................................................47
9.13    [Reserved] .......................................................................................................47

TABLE OF CONTENTS
(continued)

Page

9.14    Compliance with Statutes, etc..................................................................47
9.15    Investment Company Act .......................................................................47
9.16    Environmental Matters ..........................................................................47
9.17    Employment and Labor Relations ..........................................................47
9.18    Intellectual Property...............................................................................48
9.19    Anti-Terrorism Laws .............................................................................48
9.20    Anti-Corruption Laws ...........................................................................49
9.21    Health Care Laws ..................................................................................49
9.22    Status of Obligations; Perfection and Priority of Security Interests..................50
9.23    Approved Budget....................................................................................50
9.24    Prepetition Permitted Liens....................................................................50

SECTION 10.    Affirmative Covenants...................................................................50
10.01    Information Covenants ..........................................................................51
10.02    Books, Records and Inspections ............................................................52
10.03    Maintenance of Property; Insurance ......................................................52
10.04    Existence; Franchises.............................................................................53
10.05    Compliance with Statutes, etc ...............................................................53
10.06    Compliance with Environmental Laws ..................................................53
10.07    ERISA ...................................................................................................53
10.08    Payment of Taxes..................................................................................53
10.09    Lines of Business ..................................................................................53
10.10    Use of Proceeds ....................................................................................53
10.11    Additional Security; Further Assurances; etc ........................................54
10.12    [Reserved]..............................................................................................54
10.13    Fiscal Year ............................................................................................54
10.14    [Reserved] .............................................................................................54
10.15    Compliance with Health Care Laws. .....................................................54
10.16    Cash Management...................................................................................55
10.17    Lender Calls ..........................................................................................56
10.18    Milestones .............................................................................................56
10.19    DIP Proceeds Account ..........................................................................56
10.20    First and Second Day Orders .................................................................56
10.21    Bankruptcy Notices ..............................................................................56
10.22    Bankruptcy Related Matters ..................................................................57
10.23    Compliance with Orders .......................................................................58

SECTION 11.    Negative Covenants.......................................................................58
11.01    Liens .....................................................................................................58
11.02    Consolidation, Merger or Sale of Assets, etc.........................................61
11.03    Dividends ..............................................................................................61
11.04    Indebtedness..........................................................................................61

TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| 11.05 | Investments | 62 |
| 11.06 | Transactions with Affiliates | 64 |
| 11.07 | [Reserved] | 65 |
| 11.08 | Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements, etc | 65 |
| 11.09 | Limitation on Certain Restrictions on Subsidiaries | 65 |
| 11.10 | Passive Holdco | 66 |
| 11.11 | Prepayments of Junior Financings | 67 |
| 11.12 | Additional Bankruptcy Matters | 67 |
| 11.13 | Disbursements | 68 |
| SECTION 12. | Events of Default. | 68 |
| 12.01 | Payments | 69 |
| 12.02 | Representations, etc | 69 |
| 12.03 | Covenants | 69 |
| 12.04 | Default Under Other Material Debt Agreements | 69 |
| 12.05 | Default Under Asset Purchase Agreement | 69 |
| 12.06 | ERISA | 69 |
| 12.07 | Orders | 70 |
| 12.08 | Guaranties | 70 |
| 12.09 | Judgments | 70 |
| 12.10 | Change of Control | 70 |
| 12.11 | Subordination | 70 |
| 12.12 | Case Events | 71 |
| SECTION 13. | The Administrative Agent; The Administrative Agent | 75 |
| 13.01 | Appointment | 75 |
| 13.02 | Nature of Duties | 75 |
| 13.03 | Lack of Reliance on the Administrative Agent | 76 |
| 13.04 | Certain Rights of the Administrative Agent | 77 |
| 13.05 | Reliance | 77 |
| 13.06 | Indemnification | 77 |
| 13.07 | Each Agent in its Individual Capacity | 78 |
| 13.08 | Holders | 78 |
| 13.09 | Resignation by the Administrative Agent | 78 |
| 13.10 | DIP Collateral Matters | 78 |
| 13.11 | Delivery of Information | 79 |
| 13.12 | Delegation of Duties | 79 |
| 13.13 | No Reliance on Administrative Agent's Customer Identification Program; Certifications From Banks and Participants; US PATRIOT Act | 79 |
| 13.14 | Erroneous Payment Provisions | 80 |

TABLE OF CONTENTS
(continued)

Page

SECTION 14.  Miscellaneous ......................................................................................83
   14.01  Payment of Expenses, etc ..........................................................................83
   14.02  Right of Setoff ............................................................................................85
   14.03  Notices .........................................................................................................85
   14.04  Benefit of Agreement; Assignments; Participations..................................86
   14.05  No Waiver; Remedies Cumulative .............................................................88
   14.06  Payments Pro Rata ......................................................................................88
   14.07  Calculations; Computations .......................................................................88
   14.08  GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER
          OF JURY TRIAL.........................................................................................89
   14.09  Counterparts ................................................................................................90
   14.10  [Reserved] ...................................................................................................91
   14.11  Headings Descriptive ..................................................................................91
   14.12  Amendment or Waiver; etc .........................................................................91
   14.13  Survival .......................................................................................................92
   14.14  Domicile of Term Loans.............................................................................92
   14.15  Register ........................................................................................................92
   14.16  Confidentiality ............................................................................................93
   14.17  Patriot Act ...................................................................................................94
   14.18  Interest Rate Limitation ..............................................................................94
   14.19  Entire Agreement ........................................................................................94
   14.20  Release .........................................................................................................94
   14.21  Acknowledgement and Consent to Bail-In of EEA Financial Institutions ....................95
   14.22  Orders...........................................................................................................95
   14.23  Acknowledgement Regarding Any Supported QFCs ..................................95

SECTION 15.  Guaranty...............................................................................................96
   15.01  Guaranty.......................................................................................................96
   15.02  No Subrogation ...........................................................................................97
   15.03  Amendments, etc. ........................................................................................97
   15.04  Waivers ........................................................................................................98
   15.05  Payments ......................................................................................................99

SCHEDULE I          Commitments
SCHEDULE II         Prepetition Permitted Liens

EXHIBIT A-1         Form of Notice of Borrowing
EXHIBIT A-2         Form of Notice of Conversion/Continuation
EXHIBIT B-1         [Reserved]
EXHIBIT C           Form of Tax Certificate
EXHIBIT D           [Reserved]
EXHIBIT E           Form of Compliance Certificate
EXHIBIT F           Form of Assignment and Assumption Agreement
EXHIBIT G           [Reserved]
EXHIBIT H           Form of Closing Certificate
EXHIBIT I           Interim Order

SENIOR SECURED SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of October 13, 2024, among MBMG Holding, LLC, a Delaware limited liability company ("**Holdings**"), MBMG Intermediate Holding, LLC, a Delaware limited liability company ("**Intermediate Holdings**"), MB MEDICAL OPERATIONS, LLC, a Delaware limited liability company ("**Borrower**"), each Subsidiary Guarantor party hereto from time to time, the Lenders party hereto from time to time and KKR Loan Administration Services LLC, as Administrative Agent.  All capitalized terms used herein and defined in <u>Section 1.01</u> are used herein as therein defined.

<u>W I T N E S S E T H</u>:

WHEREAS, on October 13, 2024 (the "**Petition Date**"), the Borrower, Holdings, Intermediate Holdings and the other Guarantors each filed voluntary petitions with the Bankruptcy Court commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each a "**Case**" and collectively, the "**Cases**") and have continued in the possession of their assets and in the management of their business as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, the Borrower has requested that the Lenders provide it with a super-priority senior secured priming debtor-in-possession delayed draw term loan facility in an aggregate principal amount equal to $10,000,000, subject to the conditions set forth herein, the proceeds of which facility will be used in accordance with <u>Section 10.10</u> herewith.  The Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein;

WHEREAS, the Borrower desires to secure all of its obligations under the Credit Documents by granting to the Administrative Agent, for the benefit of the Secured Creditors, a security interest in and Lien upon substantially all of its property, as provided herein and in the Orders;

WHEREAS, subject to the terms hereof, the Guarantors party hereto shall guaranty all of the Borrower's obligations under this Agreement and shall grant to the Administrative Agent, for the benefit of the Secured Creditors, a security interest in and Lien upon substantially all of its property, in each case, as provided herein and in the Orders;

WHEREAS, the respective priorities of the obligations under this Agreement and the other Credit Document Obligations with respect to the DIP Collateral shall be as set forth in the Interim Order and the Final Order, in each case upon entry thereof by the Bankruptcy Court;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows.

NOW, THEREFORE, IT IS AGREED:

SECTION 1.    <u>Definitions and Accounting Terms</u>.

1.01    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**Acceptable Confirmation Order**" shall mean an order of the Bankruptcy Court confirming an Acceptable Plan that is in form and substance satisfactory to the Required Lenders and the Credit Parties in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their sole discretion).

"**Acceptable Plan**" shall mean a Liquidation Plan that is satisfactory to the Required Lenders (and, with respect to those provisions thereof that affect the rights, obligations, liabilities and duties

of the Administrative Agent, to the Administrative Agent) in its sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders (and, with respect to those provisions thereof that affect the rights, obligations, liabilities and duties of the Administrative Agent, to the Administrative Agent) in their sole discretion).

"**Accounting Change**" shall have the meaning provided in Section 14.07(a).

"**Administrative Agent**" shall mean KKR Loan Administration Services LLC, in its capacity as administrative agent for the Lenders hereunder and under the other Credit Documents and in its capacity as collateral agent for the Secured Creditors pursuant to this Agreement, and shall include any successor to the Administrative Agent appointed pursuant to Section 13.09.

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under direct or indirect common Control with, such Person.

"**Agreement**" shall mean this Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement, as it may be modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"**Anti-Corruption Laws**" shall mean any and all laws relating to bribery or corruption, including without limitation the United States Foreign Corrupt Practices Act of 1977.

"**Anti-Terrorism Laws**" shall mean any and all applicable laws relating to terrorism or trade sanctions programs and embargoes.

"**Applicable Margin**" shall mean, with respect to any Term Loan, the applicable rate *per annum* equal to (x) in respect of Base Rate Loans, 7.00% and (y) in respect of SOFR Loans, 8.00%; provided, that all of such rate shall be paid in kind by capitalizing such interest and adding it to the outstanding principal balance of the Term Loan on the applicable interest payment date (such interest, the "**PIK Interest**") (and such capitalized PIK Interest shall then constitute outstanding principal in respect of the applicable Term Loan and shall be treated as such for all purposes of this Agreement and the other Credit Documents, including, without limitation, with respect to the accrual of interest thereon at the interest rates applicable thereto pursuant to the terms of this Agreement).

"**Approved Budget**" shall have the meaning specified in the Orders.

"**Approved Fund**" shall mean, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Asset Purchase Agreement**" shall mean an asset purchase agreement in form and substance satisfactory to the Administrative Agent and Required Lenders, by and between MB Medical Operations, LLC, a Delaware limited liability company, MB Medical Transport, LLC, a Delaware limited liability company, Care Center Network, LLC, a Florida limited liability company, Clinical Care Pharmacy, LLC, a Florida limited liability company, Care Center Medical Group, LLC, a Florida limited liability company, Florida Family Primary Care Center, LLC, a Florida limited liability company, Florida Family Primary Care Centers of Tampa, LLC, a Florida limited liability company, Florida Family Primary Care Centers of Pasco, LLC, a Florida limited liability company, Florida Family Primary Care Centers of Pinellas, LLC, a Florida limited liability company, Florida Family Primary Care Centers of Orlando, LLC, a Florida limited liability company, CCMC Physician Holdings, Inc., a Florida limited liability company, Miami Medical & Wellness Center LLC, a Florida limited liability company, Miami Beach Medical Centers, Inc., a Florida

corporation f/k/a Rodolfo Dumenigo, M.D., P.A., a Florida professional association, Miami Beach Medical Consultants, LLC d/b/a Clinical Care Medical Centers, a Florida limited liability company, as sellers, and Conviva Medical Center Management, LLC, a Delaware limited liability company, as buyer.

"**Asset Sale**" shall mean, other than the Sale, any sale, transfer or other disposition by (i) Holdings or any of its Subsidiaries to any Person (including by way of redemption by such Person) other than to Holdings or a Subsidiary of Holdings and (ii) any Non-Wholly Owned Subsidiary of Holdings to any Person other than Holdings or a Subsidiary of Holdings, in each case, of any asset (including, without limitation, any Equity Interests or other securities of another Person).

"**Assignment and Assumption Agreement**" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit F or such other form approved by the Administrative Agent.

"**Authorized Officer**" shall mean any officer of any Credit Party that has or have customary incumbency certificates on file with the Administrative Agent or has been authorized by the requisite corporate, limited liability company, partnership and/or other action on the part of any Credit Party; provided, that the chief financial officer, the treasurer, the principal accounting officer or an officer with similar responsibilities of Holdings, Intermediate Holdings or the Borrower shall deliver the financial information and officer's certificates pursuant to this Agreement or any other Credit Document.

"**Available Tenor**" shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (b) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.14.

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" shall mean (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto.

"**Bankruptcy Court**" shall mean the United States Bankruptcy Court for Southern District of Florida, or any other court having jurisdiction over the Cases from time to time.

"**Base Rate**" shall mean, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the per annum rate publicly quoted from time to time by The Wall Street Journal as the "Prime Rate" in the United States and (c) to the extent ascertainable, Term SOFR on such day for an Interest Period of one (1) month plus 1.00% (or, if such day is not a Business Day, the

immediately preceding Business Day).  Any change in the Base Rate due to a change in the "**prime rate**", the Federal Funds Rate or Term SOFR shall be effective on the day of such change in the "**prime rate,**" the Federal Funds Rate or Term SOFR, respectively.

"**Base Rate Loan**" shall mean each Term Loan designated or deemed designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"**Benchmark**" shall mean, initially, Term SOFR; provided that if a Benchmark Transition Event has occurred with respect to Term SOFR or the then-current Benchmark, then "Benchmark" shall mean the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.14.

"**Benchmark Replacement**" shall mean with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(a) Daily Simple SOFR; or

(b) the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for U.S. Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Credit Documents.

"**Benchmark Replacement Adjustment**" shall mean , with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero), that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. Dollar denominated syndicated credit facilities at such time.

"**Benchmark Replacement Date**" shall mean the earliest to occur of the following events with respect to the then-current Benchmark:

(a) in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b) in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been

determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; <u>provided</u> that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein solely to the extent such event applies to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" shall mean the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark solely to the extent that a public statement or publication of information set forth above has occurred with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Unavailability Period**" shall mean the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.14 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.14.

"**Beneficial Ownership Regulation**" shall mean 31 C.F.R. § 1010.230.

"**Blocked Person**" shall have the meaning provided in Section 9.19(b).

"**Borrower**" shall have the meaning provided in the preamble to this Agreement.

"**Borrowing**" shall mean the borrowing of one Type of Term Loan from all the Lenders having Commitments on a given date (or resulting from a conversion or conversions on such date) having in the case of SOFR Loans the same Interest Period.

"**Business Day**" shall mean (i) for all purposes other than as covered by clause (ii) below, any day except Saturday, Sunday and any day which shall be in New York, NY, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, SOFR Loans, any day which is a Business Day described in clause (i) above and which is also not a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**Capital Expenditures**" shall mean, with respect to any Person, all expenditures by such Person which are capitalized in accordance with GAAP and, without duplication, the amount of Capitalized Lease Obligations incurred by such Person; provided, that that the term "Capital Expenditures" shall not include, without duplication, (i) expenditures made in connection with the replacement, substitution, restoration or repair of assets to the extent financed with (x) insurance proceeds paid on account of the loss of or damage to the assets being replaced, restored or repaired or (y) awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, (ii) the purchase price of equipment that is purchased substantially concurrently with the trade-in of existing equipment to the extent that the gross amount of such purchase price is the same as the credit granted by the seller of such equipment for the equipment being traded in at such time, (iii) the purchase of plant, property or equipment to the extent financed with the proceeds of Asset Sales that are not required to be applied to prepay Term Loans pursuant to Section 6.02(e) only to the extent of such proceeds, (iv) expenditures that are accounted for as capital expenditures by Holdings, Intermediate Holdings, the Borrower or any other Credit Party and that actually are paid for or reimbursed by a Person other than Holdings, Intermediate Holdings, the Borrower or such other Credit Party, (v) expenditures that are paid with proceeds of Holdings common Equity Interests (or common Equity Interests of any direct or indirect parent thereof), (vi) the book value of any asset owned by the Borrower or any of its Subsidiaries prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of such Person reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period; provided that (x) any expenditure necessary in order to permit such asset to be reused shall be included as a capital expenditure during the period in which such expenditure actually is made and (y) such book value shall have been included in capital expenditures when such asset was originally acquired, (vii) any capitalized interest expense reflected as additions to property, plant or equipment in the consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower, and their Subsidiaries, (viii) any non-cash compensation or other non-cash costs reflected as additions to property, plant or equipment in the consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and their Subsidiaries or (ix) expenditures made as consideration in connection with an Investment permitted hereby, or made by the Person being acquired prior to the closing date of such Investment (in each case, other than future payments required to be made in respect of purchase money financing or Capitalized Lease Obligations of the Person being acquired, or future payments required to be made in respect of purchase money financing or Capitalized Lease Obligations otherwise assumed, in connection with such Investment permitted hereby).

"**Capitalized Lease Obligation**" shall mean, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP in all material respects.

"**Capitalized Leases**" shall mean all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the Capitalized Lease Obligation with respect thereto; provided, further, that any lease that would be characterized as an operating lease in accordance with GAAP as in effect on December 14, 2018 (whether or not such operating lease was in effect on such date) shall continue to be accounted for as an operating lease (and not as a Capitalized Lease) for purposes of this Agreement regardless of any change in GAAP following December 14, 2018 that would otherwise require such lease to be recharacterized (on a prospective or retroactive basis or otherwise) as a Capitalized Lease.

"**Carve-Out**" shall have the meaning specified in the Interim Order or the Final Order, as applicable.

"**Case**" shall have the meaning given to such term in the preliminary statements hereto.

"**Cash Equivalents**" shall mean, as to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than 12 months from the date of acquisition, (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 12 months from the date of acquisition thereof and, at the time of the acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (iii) Dollar denominated time deposits, certificates of deposit and bankers acceptances of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than six months from the date of acquisition by such Person, (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (iii) above, (v) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P 1 or the equivalent thereof by Moody's and in each case maturing not more than six months after the date of acquisition by such Person, (vi) cash, denominated in Dollars, or, solely with respect to a Foreign Subsidiary, any other lawful currency used by such Person in the Ordinary Course of Business, (vii) solely in the case of and with respect to a Foreign Subsidiary, Investments of a kind or type similar to Cash Equivalents described above (replacing United States, or any state, province, territory, agency, instrumentality or municipality thereof with the corresponding Governmental Authorities of the foreign jurisdiction in which such Foreign Subsidiary is organized and using comparable ratings, if any, customary in such foreign jurisdiction) and (viii) Investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (vii) above.

"**Cash Management Order**" shall mean an order entered by the Bankruptcy Court, in form and substance acceptable to the Administrative Agent, governing the Debtors' cash management system.

"**CEA**" shall mean the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same has been amended and may hereafter be amended from time to time, 42 U.S.C. § 9601 <u>et seq</u>.

"**CFTC**" shall mean the Commodity Futures Trading Commission.

"**CHAMPVA**" shall mean, collectively, the Civilian Health and Medical Program of the Department of Veterans Affairs, a program of medical benefits covering retirees and dependents of former members of the armed services administered by the United States Department of Veterans Affairs, and all laws, rules, regulations, manuals, orders, or requirements pertaining to such program.

"**Change of Control**" shall mean (i) Holdings shall at any time cease to own directly 100% of the Equity Interest of Intermediate Holdings, (ii) Intermediate Holdings shall at any time cease to own directly 100% of the Equity Interests of the Borrower, or (iii) the Permitted Holders shall at any time and for any reason fail to beneficially own, directly or indirectly, greater than 50% on a fully diluted basis of the voting interests in the Equity Interests of Holdings, in each case, other than as a result of any exercise of the voting proxy or the foreclosure on the Equity Interests in respect of any Credit Party by the Administrative Agent in accordance with the applicable provisions of the Credit Documents following an Event of Default arising under <u>Section 12.03(b)</u>.

"**CIP Regulations**" shall have the meaning provided in <u>Section 13.13(a)</u>.

"**Claims**" shall have the meaning provided in the definition of "Environmental Claims".

"**Closing Date**" shall mean October 13, 2024, which is the date this Agreement became effective upon the execution hereof by the parties signatory hereto.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Commitment**" shall mean, for each Lender, the commitment of such Lender to make Term Loans hereunder as set forth on <u>Schedule I</u> or in the Assignment and Assumption pursuant to which such Lender assumed its Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to <u>Section 2.07</u> and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption, as shall be evidenced in the Register maintained by the Administrative Agent pursuant to <u>Section 14.15</u>.

"**Compliance Certificate**" shall mean a certificate of an Authorized Officer of the Borrower delivered pursuant to <u>Section 10.01(e)</u>.

"**Conforming Changes**" shall mean, with respect to the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.11 and other technical, administrative or operational matters) that the Administrative Agent decides (in consultation with the Borrower) may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists,

in such other manner of administration as the Administrative Agent decides (in consultation with the Borrower) is reasonably necessary in connection with the administration of this Agreement and the other Credit Documents).

"**Contingent Obligation**" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, Dividends or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the Ordinary Course of Business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controls**", "**Controlled**" and "**Controlling**" have meanings correlative thereto.; provided, however, that none of the Administrative Agent, Lenders or any of their respective Affiliates shall be considered an Affiliate of Holdings or any Subsidiary thereof.

"**Controlled Investment Affiliate**" shall mean, as to any Person, any other Person which (i) directly or indirectly is in Control of, is Controlled by, or is under common Control with, such Person and is organized by such Person (or any Person Controlling such Person) primarily for making equity or debt investments or (ii) is obligated pursuant to a commitment agreement to invest its capital as directed by such Person. For the avoidance of doubt, MBMG Co-Investment Vehicle, L.P. is a "Controlled Investment Affiliate" of the Sponsor as of the Closing Date.

"**Covered Entity**" shall mean (i) the Borrower, each Guarantor, their respective Subsidiaries, and (ii) each Affiliate that, directly or indirectly, is in control of a Person described in clause (i) above.

"**Covered Party**" shall have the meaning provided in Section 14.23(a).

"**Credit Document Obligations**" shall mean (a) the due and punctual payment by the Borrower of (i) the principal of and interest at the applicable rate or rates provided in this Agreement on the Term Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations of the Borrower under or pursuant to this Agreement and each of the other Credit Documents, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise, (b) the due and punctual payment and performance of all other obligations of the Borrower under or pursuant to each of the Credit Documents and (c) the due and punctual payment and performance of all the obligations of each other Credit Party under or pursuant to this Agreement and each of the other Credit Documents.

For the avoidance of doubt and notwithstanding anything to the contrary, the "Credit Document Obligations" shall include the "Guaranteed Obligations".

"**Credit Documents**" shall mean, collectively, the following (as the same may be amended, amended and restated, modified, supplemented, renewed, restated or replaced from time to time): this Agreement, each Order, each Note, each security, collateral or pledge document entered into in respect of the Obligations (if any), and each subordination agreement relating to the Obligations (if any).

"**Credit Event**" shall mean the making of any Term Loan.

"**Credit Party**" shall mean Holdings, Intermediate Holdings, the Borrower and each Subsidiary Guarantor and the "Credit Parties" shall mean all of them, collectively.

"**Daily Simple SOFR**" shall mean, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent (in consultation with the Borrower) in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent (in consultation with the Borrower) may establish another convention in its reasonable discretion.

"**Debtor**" shall mean Holdings, Intermediate Holdings, the Borrower, and any Subsidiary thereof that shall be a debtor in the Cases.

"**Declined Proceeds**" shall have the meaning provided in Section 6.02(k).

"**Default**" shall mean any event, act or condition set forth in Section 12 which with notice or lapse of time, or both, would unless cured or waived constitute an Event of Default.

"**Defaulting Lender**" shall mean any Lender with respect to which a Lender Default is in effect.

"**Deposit Account**" shall mean a "deposit account" (as defined in Article 9 of the UCC).

"**Determination Day**" shall have the meaning specified in the definition of "Term SOFR".

"**DIP Collateral**" shall have the meaning provided in Section 2.13(a).

"**DIP Proceeds Account**" shall mean a deposit account of the Borrower with Capital One, National Association, with an account number ending with the last four digits of 6886.

"**DIP Superpriority Claims**" shall have the meaning specified in the Interim Order or the Final Order, as applicable.

"**Dividend**" shall mean, with respect to any Person, that such Person has declared or paid a dividend, distribution or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than common Equity Interests of such Person) or cash to its stockholders, partners or members in their capacity as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any shares of any class of its Equity Interests or any other Equity Interests outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its Equity Interests).

"**Dollars**" and the sign "**$**" shall each mean freely transferable lawful money of the United States.

"**Domestic Subsidiary**" of any Person shall mean any Subsidiary of such Person incorporated or organized in the United States or any State thereof or the District of Columbia.

"**EEA Financial Institution**" shall mean (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" shall mean any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligibility Date**" shall mean, with respect to each Credit Party and each Swap, the date on which this Agreement or any Credit Document becomes effective with respect to such Swap (for the avoidance of doubt, the Eligibility Date shall be the effective date of such Swap if this Agreement or any Credit Document is then in effect with respect to such Credit Party, and otherwise it shall be the effective date of this Agreement and/or such Credit Document(s) to which such Credit Party is a party).

"**Eligible Contract Participant**" shall mean an "eligible contract participant" as defined in the CEA and regulations thereunder.

"**Eligible Transferee**" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), but in any event excluding Holdings and its Subsidiaries and Affiliates. For the avoidance of doubt, "Eligible Transferees" shall not include (i) any natural person, (ii) the Borrower or any Affiliate thereof, (iii) any Defaulting Lender or any Affiliate thereof, (iv) the Sponsor or any Affiliate thereof, or (v) the Subordinated Lender.

"**Environmental Claims**" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of non-compliance or violation, investigations or proceedings (hereafter, "**Claims**") pursuant to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law, including, without limitation, (a) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence of Hazardous Materials.

"**Environmental Law**" shall mean any Federal, state, foreign or local statute, law, rule, regulation, ordinance, code, and rule of common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to protection of the environment or employee health and safety from Hazardous Materials, including, without limitation, CERCLA; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Safe

11

Drinking Water Act, 42 U.S.C. § 3803 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Emergency Planning and the Community Right-to-Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Hazardous Material Transportation Act, 49 U.S.C. § 1801 et seq.; to the extent relating to exposure to Hazardous Materials, the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; and any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"**Equity Interests**" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated) equity of such Person, including any common stock, preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" shall mean all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control and all other entities which, together with the Borrower, Intermediate Holdings and/or Holdings, are treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"**Erroneous Payment**" has the meaning provided in Section 13.14(a).

"**Erroneous Payment Deficiency Assignment**" has the meaning provided in Section 13.14(d)(i).

"**Erroneous Payment Impacted Class**" has the meaning provided it in Section 13.14(d)(i).

"**Erroneous Payment Return Deficiency**" has the meaning provided in Section 13.14(d)(i).

"**Erroneous Payment Subrogation Rights**" has the meaning provided in Section 13.14(e).

"**EU Bail-In Legislation Schedule**" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Event of Default**" shall have the meaning provided in Section 12.

"**Excluded Taxes**" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (i) any Tax imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (A) imposed on a Recipient pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of such Recipient is located or any subdivision thereof or therein, or (B) as a result of a present or former connection between the Administrative Agent or such Recipient and the jurisdiction imposing such Tax (other than any such connection arising solely from the Recipient's having executed, enforced, delivered, performed its obligations, become a party to or received any payment under this Agreement or any other Credit Document), (ii) U.S. federal withholding Taxes imposed on amounts payable to a Recipient pursuant to a law in effect at the time such Recipient becomes a party to this agreement or changes its applicable lending office, except in each case to the extent that amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Recipient's failure to comply with Section 6.04(b) and (iv) any withholding Taxes imposed under FATCA.

"**Fair Market Value**" shall mean with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as determined in good faith by the Borrower.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version to the extent such version is substantively comparable and not materially more onerous to comply with), any current or future regulations, published guidance or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**FCPA**" shall mean the United States Foreign Corrupt Practices Act of 1977 (Pub. L. No. 95213, §§ 101.104), as amended.

"**Federal Funds Rate**" shall mean, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System of the United States on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as reasonably determined by the Administrative Agent.

"**Fees**" shall mean all amounts payable pursuant to or referred to in the Credit Documents.

"**Final Order**" shall mean, an order of the Bankruptcy Court approving the Term Loans, this Agreement and the other Credit Documents on a final basis, which order shall be (a) in form and substance acceptable to the Administrative Agent and the Required Lenders, and (b) in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal.

"**Final Order Availability Amount**" shall mean an aggregate amount equal to $6,000,000.

"**Final Order Availability Date**" shall mean the date of the first Borrowing on which the conditions precedent set forth in Section 8 have been satisfied or waived, which date shall be after the Final Order Entry Date.

"**Final Order Entry Date**" shall mean the date on which the Final Order is entered by the Bankruptcy Court.

"**First Day Orders**" shall mean all orders entered by the Bankruptcy Court on or, within five (5) Business Days of, the Petition Date, or based on motions filed on or about the Petition Date which, for the avoidance of doubt, shall include a Cash Management Order and shall not include, for the purposes of this definition, an Acceptable Confirmation Order.

"**Floor**" shall mean a rate of interest equal to 1.00%.

"**Foreign Pension Plan**" shall mean any defined benefit plan or other similar program established or maintained outside the United States by Holdings, Intermediate Holdings, the Borrower or any one or

more of their Subsidiaries primarily for the benefit of employees of Holdings, Intermediate Holdings, the Borrower or such Subsidiaries residing outside the United States, and which is not subject to ERISA or the Code.

"**Foreign Subsidiary**" of any Person shall mean any Subsidiary of such Person that is not a Domestic Subsidiary.

"**Fund**" shall mean any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Governmental Third Party Payor**" shall mean any "federal health care program" as defined in 42 U.S.C. § 1320a-7b(f), which includes (as applicable) Medicare, Medicaid, TRICARE and CHAMPVA, any "state health care program" as defined in 42 U.S.C. § 1320a-7(h), and any other person or entity which presently or in the future maintains Governmental Third Party Payor Programs.

"**Governmental Third Party Payor Programs**" shall mean all governmental third party payor programs in which Borrower or any Subsidiary of Borrower participates or is enrolled (including, without limitation, Medicare, Medicaid, TRICARE, CHAMPVA or any other federal or state health care programs).

"**Guaranteed Creditors**" shall mean and include each of the Administrative Agent, the Administrative Agent, the Lenders.

"**Guaranteed Obligations**" shall mean the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the principal and interest on each Note issued by, and all Term Loans made to, the Borrower under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), indebtedness and liabilities (including, without limitation, indemnities, fees and interest (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed claim in any such proceeding) thereon) of the Borrower to the Lenders and the Administrative Agent now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other Credit Document to which the Borrower is a party and the due performance and compliance by the Borrower with all the terms, conditions and agreements contained in this Agreement and in each such other Credit Document.

"**Guarantor**" shall mean Holdings, Intermediate Holdings and each Subsidiary Guarantor.

14

"**Guaranty**" shall mean the guaranty of the Guarantors pursuant to Section 15.

"**Hazardous Materials**" shall mean (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or other definitions of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, the exposure to, or Release of which is prohibited, limited or regulated by any Governmental Authority due to its toxic or hazardous properties or characteristics.

"**Health Care Laws**" shall mean (i) any (A) healthcare Law applicable to the business of the Borrower and each of its Subsidiaries, or (B) any Health Care Permit, in the case of each of clauses (A) and (B), relating to the regulation of the medical industry or to the provision or payment for items or services rendered, provided, dispensed or furnished by doctors or other medical professionals; (ii) the civil False Claims Act (31 USC §3729 et seq.) and similar state Laws; (iii) Laws relating to the use, storage, sale, marketing and prescribing of drugs; (iv) Laws relating to the use of x-rays and other diagnostic imaging techniques; (v) the anti-kickback law (42 USC §1320a-7b(b)) and similar state laws prohibiting remuneration in exchange for referrals; and (vi) HIPAA.

"**Health Care Permits**" shall mean all material permits, licenses, certificates, accreditations and approvals or authorizations, as applicable, related to the rendering of professional and medical services issued or granted by a Governmental Authority with jurisdiction over any Health Care Laws.

"**HIPAA**" shall mean the following, as the same may be amended, modified or supplemented from time to time, any successor statute thereto, and together with any and all rules or regulations promulgated from time to time thereunder; (i) the Health Insurance Portability and Accountability Act of 1996; (ii) the Health Information Technology for Economic and Clinical Health Act (Title XIII of the American Recovery and Reinvestment Act of 2009); and (iii) applicable state privacy, security and/or data breach laws pertaining to the use and/or disclosure of healthcare records.

"**Holdings**" shall have the meaning provided in the preamble to this Agreement.

"**Indebtedness**" shall mean, as to any Person, without duplication, (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (other than (1) any earn-out obligation until such obligation is overdue for more than 30 days and (2) accruals for payroll and other liabilities accrued in the ordinary course of business), (ii) (x) the maximum amount available to be drawn or paid under all letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations issued for the account of such Person and (y) all unpaid drawings and unreimbursed payments in respect of such letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations, (iii) all indebtedness of the types described in clause (i), (ii), (iv), (v), (vi) or (vii) of this definition secured by any Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the Fair Market Value of the property to which such Lien relates), (iv) all Capitalized Lease Obligations of such Person, (v) all obligations of such Person to pay a specified purchase price for goods or services, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (vi) all Contingent Obligations of such Person and (vii) all obligations under interest rate or other similar hedging agreement. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is directly liable therefor as a result of

15

such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. Notwithstanding the foregoing, Indebtedness shall not include trade payables, accrued expenses and deferred tax and other credits incurred by any Person in accordance with customary practices and in the Ordinary Course of Business of such Person, except to the extent such items are reflected on the balance sheet as indebtedness pursuant to GAAP, or any working capital adjustment, deferred compensation, non-compete or similar obligation.

"**Indemnified Person**" shall have the meaning provided in Section 14.01(a).

"**Indemnified Taxes**" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Intellectual Property**" shall mean property constituting a patent, copyright, trademark (or any application in respect of the foregoing), service mark, copyright, copyright application, trade name, mask work, trade secrets, or design right.

"**Intercompany Loans**" shall have the meaning provided in Section 11.05(viii).

"**Interest Determination Date**" shall mean, with respect to any Term Loan, the second Business Day prior to the commencement of any Interest Period relating to such Term Loan.

"**Interest Period**" shall have the meaning provided in Section 2.09.

"**Interim Availability Amount**" shall mean $4,000,000.

"**Interim Order**" shall mean an interim order of the Bankruptcy Court approving the Term Loans, this Agreement and the other Credit Documents on an interim basis, which order shall be substantially in the form of Exhibit I hereto or otherwise in form and substance satisfactory to the Administrative Agent and the Required Lenders.

"**Interim Order Availability Date**" shall mean the date of the first Borrowing on which the conditions precedent set forth in Section 7 have been satisfied or waived, which date shall be after the Interim Order Entry Date.

"**Interim Order Entry Date**" shall mean the date on which the Interim Order is entered by the Bankruptcy Court.

"**Interim Term Loan**" shall have the meaning provided in Section 2.01.

"**Intermediate Holdings**" shall have the meaning provided in the preamble to this Agreement.

"**Investments**" shall have the meaning provided in Section 11.05.

"**Junior Financing**" shall mean any Indebtedness for borrowed money of Holdings and its Subsidiaries consisting of one or more of the following: (i) Subordinated Debt, (ii) any Indebtedness evidenced by the Subordinated Note or any other Subordinated Note Document, (iii) Indebtedness that is secured on a junior lien basis to the Liens securing the Obligations and (iv) unsecured Indebtedness for borrowed money (excluding intercompany indebtedness permitted under Section 11.04).

"**Junior Financing Documentation**" shall mean any documentation governing any Junior Financing.

"**KCA**" shall mean KKR Credit Advisors (US) LLC.

"**Law**" shall mean laws, common law, statutes, judgments, decrees, rules, constitutions, treaties, conventions, regulations, codes, ordinances, orders, and enforceable policies, guidelines or similar requirements of all Governmental Authorities.

"**Leaseholds**" of any Person shall mean all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"**Lender**" shall mean each Person that becomes a "Lender" hereunder on the Closing Date or pursuant to Section 14.04 in each case as evidenced in the Register. For the purpose of any Credit Document which provides for the granting of a security interest or other Lien to the Administrative Agent for the benefit of Lenders as security for the Obligations, "**Lenders**" shall include any Affiliate of a Lender to which such Obligation is owed.

"**Lender Default**" shall mean, as to any Lender, (i) the wrongful refusal (which has not been retracted) of such Lender or the failure of such Lender to make available its portion of any Borrowing, (ii) such Lender having been deemed insolvent or having become the subject of a bankruptcy or insolvency proceeding or a takeover by a regulatory authority, or (iii) such Lender having notified the Administrative Agent and/or any Credit Party (x) that it does not intend to comply with its obligations under Section 2.01 or in circumstances where such non-compliance would constitute a breach of such Lender's obligations under the respective Section or (y) of the events described in preceding clause (ii).

"**Licensed Personnel**" shall mean any Person employed, engaged by or otherwise providing medical services for or on behalf of Borrower or a Subsidiary of Borrower.

"**Lien**" shall mean any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any lease (for the avoidance of doubt, excluding any operating lease) having substantially the same effect as any of the foregoing).

"**Liquidation Plan**" shall mean a plan of liquidation in any or all of the Cases of the Debtors.

"**Margin Stock**" shall have the meaning provided in Regulation U.

"**Material Adverse Change**" shall mean, since the Petition Date, any material adverse change, individually or in the aggregate, to (i) the operations, business, assets, financial condition, or customer relations of the Credit Parties, taken as a whole (other than as a result of the filing of the Cases or the assertion of prepetition claims against the Credit Parties), (ii) the ability of the Borrower or the other Credit Parties to perform their respective obligations under this Agreement or any other Credit Document or (iii) the validity or enforceability of this Agreement or any of the other Credit Document or the rights or remedies of the Administrative Agent and the Lenders hereunder or thereunder.

"**Maturity Date**" shall mean the earliest to occur of (i) December 12, 2024, (ii) the consummation of a sale of all or substantially all of the assets of the Debtors, (iii) the termination of the Asset Purchase Agreement for any reason without the prior written consent of the Required Lenders, (iv) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be

no later than the "effective date" thereof) of a plan of reorganization or liquidation filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (v) entry of an order by the Bankruptcy Court approving (A) a motion seeking conversion or dismissal of any or all of the  Cases or (B) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business and (vi) the date of acceleration of all or any portion of the Term Loans and the termination of the Commitments in respect thereof upon the occurrence of an Event of Default.

"**Maximum Rate**" shall have the meaning provided in Section 14.18.

"**Medicaid**" shall mean, collectively, the health care assistance program established by Title XIX of the Social Security Act (42 U.S.C. 1396 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders or requirements pertaining to such program, including (a) all federal and state statutes affecting such program; (b) all state statutes and plans for medical assistance enacted in connection with such program and federal rules and regulations promulgated in connection with such program; and (c) all applicable provisions of all regulations of all Governmental Authorities promulgated in connection with such program, in each case as the same may be amended, supplemented, or otherwise modified from time to time.

"**Medicare**" shall mean, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders or requirements pertaining to such program, including (a) all federal statutes (whether set forth in Title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.) or elsewhere) affecting such program; (b) all applicable provisions of all regulations of all Governmental Authorities promulgated in connection with such program, in each case as the same may be amended, supplemented, or otherwise modified from time to time.

"**Milestones**" shall have the meaning provided in Section 10.18.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Multiemployer Plan**" shall mean any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA to which a Credit Party makes, is making or is obligated to make contributions or has made or been obligated to make contributions during the preceding five years if a Credit Party has liability thereunder or to which the Credit Party has any liability (contingent or otherwise), including any liability on account of any ERISA Affiliate.

"**Net Cash Proceeds**" shall mean for any event requiring a repayment of Term Loans pursuant to Section 6.02, as the case may be, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such event, net of (i) reasonable transaction costs (including, as applicable, any underwriting, brokerage or other customary commissions and reasonable legal, advisory and other fees and expenses) associated therewith, and any Taxes payable in respect thereof or in connection with the repatriation of such proceeds, received from any such event, in each case to the extent required to be paid in connection with such transaction and in accordance with the Approved Budget (subject to the Permitted Variances) and (ii) the amount of such gross cash proceeds required to be used to permanently repay any Indebtedness which is secured by Prepetition Permitted Liens and which is secured by the respective assets which were sold or otherwise disposed of.

"**Net Sale Proceeds**" shall mean for any sale or other disposition of assets, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or

otherwise, but only as and when received) received from such sale or other disposition of assets, net of (i) reasonable transaction costs (including, without limitation, any underwriting, brokerage or other customary selling commissions, reasonable legal, advisory and other fees and expenses (including title and recording expenses), associated therewith and sales, VAT, transfer, and other Taxes arising therefrom), in each case to the extent required to be paid in connection with such transaction and in accordance with the Approved Budget (subject to the Permitted Variances), (ii) the amount of such gross cash proceeds required to be used to permanently repay any Indebtedness which is secured by Prepetition Permitted Liens and which is secured by the respective assets which were sold or otherwise disposed of and (iii) the estimated income taxes which will be payable by Holdings' consolidated group or any Subsidiary of Holdings with respect to the fiscal year of Holdings in which the sale or other disposition occurs as a result of such sale or other disposition or in connection with the repatriation of such proceeds; provided, however, that such gross proceeds shall not include any portion of such gross cash proceeds which Holdings determines in good faith should be reserved for indemnities, escrows or other contingent liabilities and post-closing adjustments, it being understood and agreed that on the day that all such post-closing adjustments have been determined, the amount (if any) by which the reserved amount in respect of such sale or disposition exceeds the actual post-closing adjustments payable by Holdings or any of its Subsidiaries shall constitute Net Sale Proceeds on such date received by Holdings and/or any of its Subsidiaries from such sale or other disposition.

"**Non-Defaulting Lender**" shall mean and include each Lender, other than a Defaulting Lender.

"**Non-Wholly Owned Subsidiary**" shall mean, as to any Person, each Subsidiary of such Person which is not a Wholly-Owned Subsidiary of such Person.

"**Note**" shall mean each Term Note.

"**Notice of Borrowing**" shall means a notice of borrowing in the form of Exhibit A-1.

"**Notice of Conversion/Continuation**" shall have the meaning provided in Section 2.06.

"**Notice Office**" shall mean the office of the Administrative Agent located at 30 Hudson Yards, New York, New York 10001, Telephone: (415) 315-6500, Attn: John Knox and General Counsel, Email: John.knox@kkr.com; KKR.Agency@alterdomus.com; KKRCreditLegal@kkr.com; klasops@kkr.com or such other office or person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"**Obligations**" shall mean all amounts owing to the Administrative Agent or any Lender pursuant to the terms of this Agreement or any other Credit Document (including all interest which accrues after the commencement of any case or proceeding in bankruptcy after the insolvency of, or for the reorganization of Holdings or any of its Subsidiaries, whether or not allowed in such case or proceeding).

"**OFAC**" shall mean the U.S. Department of Treasury Office of Foreign Assets Control.

"**Order**" and "**Orders**" shall mean the Interim Order and the Final Order, as applicable, based on which such order is then in effect.

"**Ordinary Course of Business**" shall mean, with respect to each Credit Party, the ordinary course of such Credit Party's business as conducted on the Closing Date or any business that is reasonably related, similar, complementary, incidental, corollary, ancillary to or a reasonable extension, development or expansion of its business.

"**Other Taxes**" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes imposed with respect to an assignment.

"**Participant Register**" shall have the meaning provided in <u>Section 14.04(e)</u>.

"**Payment in Full**" or "**Paid in Full**" shall mean, with respect to the Credit Document Obligations, (i) termination of the Commitments of all of the Lenders and (ii) payment in full in cash of all Credit Document Obligations under the Credit Documents (other than contingent indemnification obligations and other obligations not then payable which expressly survive termination and as to which no claim has been asserted).

"**Payment Office**" shall mean the office of the Administrative Agent located at 30 Hudson Yards, New York, New York 10001, Telephone: (415) 315-6500, Attn: John Knox and General Counsel, Email: John.knox@kkr.com; KKR.Agency@alterdomus.com; or such other office or account as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"**Payment Recipient**" has the meaning provided in <u>Section 13.14(a)</u>.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Permitted Holders**" shall mean (a) the Sponsor, (b) all Controlled Investment Affiliates of the Sponsor, and (c) all other equity holders (including, without limitation, rollover investors and co-investors) of Holdings or any direct or indirect parent thereof on the Closing Date and their respective Affiliates; <u>provided</u> that the Sponsor and the Controlled Investment Affiliates of the Sponsor beneficially own, directly or indirectly, more than 50% of the voting interests in Holdings' membership interests held by the Permitted Holders as a group.

"**Permitted Liens**" shall have the meaning provided in <u>Section 11.01</u>.

"**Permitted Variance**" shall have the meaning specified in the Orders.

"**Person**" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any Governmental Authority.

"**Petition Date**" shall have the meaning given to such term in the preliminary statements hereto.

"**Plan**" shall mean any "employee benefit plan" as defined in Section 3(3) of ERISA which is subject to Title IV of ERISA, and which is contributed to by a Credit Party or any such plan to which a Credit Party is required to contribute or has any liability (contingent or otherwise), including any contingent or other liability on account of any ERISA Affiliate (other than a Multiemployer Plan).

"**Post-Sale Reserves**" shall have the meaning specified in the Interim Order or the Final Order, as applicable.

"**Prepetition Administrative Agent**" shall have the meaning assigned to the term "Administrative Agent" in the Prepetition First Lien Credit Agreement.

"**Prepetition Debt**" shall mean any and all Indebtedness of the Credit Parties incurred prior to the Petition Date and outstanding as of the Petition Date.

"**Prepetition First Lien Credit Agreement**" shall mean that certain Credit Agreement, dated as of December 14, 2020, as amended by that certain Amendment No. 1 to Credit Agreement, dated as of June 1, 2021, that certain Limited Waiver, Amendment No. 2 to Credit Agreement and Amendment No. 1 to Agreement Among Lenders, dated as of July 5, 2022, that certain Letter Agreement dated as of October 31, 2022, that certain Limited Waiver and Amendment No. 3 to Credit Agreement, dated as of March 30, 2023, that certain Amendment No. 4 to Credit Agreement dated as of November 6, 2023, that certain Limited Waiver and Amendment No. 5 to Credit Agreement dated as of November 17, 2023, and as further amended, amended and restated, modified, restated and/or supplemented from time to time, by and among Intermediate Holdings, the Borrower, the lenders from time to time party thereto, and KKR Loan Administration Services LLC, as administrative agent and collateral agent.

"**Prepetition First Lien Lenders**" shall have the meaning assigned to the term "Lenders" in the Prepetition First Lien Credit Agreement.

"**Prepetition First Lien Liens**" shall mean the Liens securing the Prepetition First Lien Obligations.

"**Prepetition First Lien Obligations**" shall mean the "Credit Document Obligations" under and as defined in the Prepetition First Lien Credit Agreement.

"**Prepetition Liens**" shall have the meaning specified in the Orders.

"**Prepetition Payments**" shall mean any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Debt or other obligations or claims (including trade payables and payments in respect of reclamation and/or Section 503(b)(9) claims) of the Credit Parties outstanding immediately prior to the Petition Date.

"**Prepetition Permitted Liens**" shall have the meaning specified in the Orders and as set forth on Schedule II hereto.

"**Prepetition Secured Obligations**" shall mean the (i) "Credit Document Obligations" under and as defined in the Prepetition First Lien Credit Agreement and (ii) "Obligations" under and as defined in the Subordinated Note.

"**Private Third Party Payor**" shall mean private insurers, health maintenance organizations, managed care plans and any other person or entity which presently or in the future maintains Private Third Party Payor Programs.

"**Private Third Party Payor Programs**" shall mean all non-governmental third party payor programs in which the Borrower or any Subsidiary participates.

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"**QFC Credit Support**" shall have the meaning provided in <u>Section 14.23</u>.

"**Real Property**" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, excluding Leaseholds.

"**Recipient**" shall mean (a) the Administrative Agent and (b) any Lender, as applicable.

"**Register**" shall have the meaning provided in <u>Section 14.14</u>.

"**Regulation D**" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"**Regulation T**" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Regulation U**" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Release**" shall mean any disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping or migrating into any land or water or air, or otherwise into the environment.

"**Released Claims**" shall have the meaning provided in <u>Section 13.02(c)</u>.

"**Releasees**" shall have the meaning provided in <u>Section 13.02(c)</u>.

"**Relevant Governmental Body**" shall mean the Federal Reserve Board and/or the Federal Reserve Bank of New York or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**Reorganization Plan**" shall mean a plan of reorganization in any or all of the Cases of the Debtors.

"**Reportable Event**" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived by PBGC Regulation Sections.

"**Required Lenders**" shall mean, at any time, Non-Defaulting Lenders the sum of whose outstanding Term Loans represents at least 50.1% of the sum of all outstanding Term Loans and unused Commitments of Non-Defaulting Lenders; <u>provided</u> that KCA (or any Affiliate) shall comprise and be considered part of Required Lenders so long as KCA (together with its Affiliates) holds at least 50.1% of the Term Loans and Commitments held by KCA and its Affiliates on the Closing Date.

"**Required Prepayment Date**" shall have the meaning provided in <u>Section 6.02(k)</u>.

"**Resolution Authority**" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Return**" shall mean, with respect to any Investment, the amount of any dividend, distribution, interest, fee, premium, income, profit (from a disposition or otherwise) and any other amount received or realized in respect thereof in excess of the original amount of such Investment.

"**RGA Affiliate**" shall have the meaning provided in <u>Section 14.04(b)</u>.

"**S&P**" shall mean Standard & Poor's Financial Services, LLC.

"**Sale**" shall mean a sale of all or substantially all of the assets of the Credit Parties pursuant to Section 363 of the Bankruptcy Code pursuant to the Asset Purchase Agreement.

"**Sale Order**" shall have the meaning provided in <u>Section 10.18(c)</u>.

"**Sanctioned Country**" shall mean a country or region that is the subject of a comprehensive sanctions program maintained under any Anti-Terrorism Law.

"**Sanctioned Person**" shall mean any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group, regime, entity or thing (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law.

"**Sanctions**" shall mean all economic sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by OFAC, or any other relevant Governmental Authority.

"**SEC**" shall have the meaning provided in <u>Section 10.01(g)</u>.

"**Secured Creditors**" shall mean (i) each Lender, (ii) the Administrative Agent, (iii) the beneficiaries of each indemnification obligation undertaken by any Credit Party under any Credit Document and (iv) any other holders of the Credit Document Obligations.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**SOFR**" shall mean a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**SOFR Loan**" shall mean each Term Loan designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"**Sole Lead Arranger**" shall mean KKR Capital Markets LLC in its capacity as sole lead arranger hereunder.

"**Sponsor**" shall mean Sun Capital Partners VII, L.P., a Cayman Islands exempted limited partnership, and any similar fund controlled or managed by or under common control or management with such Person.

"**Subordinated Debt**" shall mean any unsecured Indebtedness of a Credit Party incurred from time to time that is subordinated in right of payment to the Obligations on terms and conditions reasonably acceptable to the Administrative Agent and that (i) is only guaranteed by a Credit Party, if any, (ii) is not subject to scheduled amortization, redemption, sinking fund or similar payment, does not have a final maturity and does not require any cash interest or other cash payments, in each case, on or before the date that is six months after the Maturity Date and (iii) contains customary subordination and turnover provisions and shall not have any cross default (but may have cross acceleration) provisions, as the same may be modified, amended or supplemented from time to time pursuant to the terms hereof and thereof.

"**Subordinated Lender**" shall mean MBMG Finco, LLC and FS KKR Capital Corp. (or any permitted assignees of the foregoing as set forth in the Subordinated Note and subject to the limitations in the Subordination Agreement).

"**Subordinated Note**" shall mean that certain Amended and Restated Promissory Note and Security Agreement, dated as of November 6, 2023, by the Borrower in favor of the Subordinated Lender (as amended and restated by that certain Amended and Restated Promissory Note and Security Agreement, dated as of the March 30, 2023, as amended and restated by that certain Second Amended and Restated Promissory Note and Security Agreement, dated as of November 6, 2023, and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time as permitted by this Agreement and the Subordination Agreement).

"**Subordinated Note Documents**" shall mean the Subordinated Note, the Guaranty (as defined in the Subordinated Note), and all other documents, instruments and agreements executed by the Credit Parties in favor of the Subordinated Lender pursuant thereto, whether heretofore executed, executed concurrently therewith or executed at any time and from time to time thereafter, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time (subject to any restrictions set forth in this Agreement or in the Subordination Agreement).

"**Subordinated Provisions**" shall have the meaning provided in Section 12.11.

"**Subordination Agreement**" shall mean that certain Intercreditor and Subordination Agreement, dated as of July 5, 2022, by and between the Administrative Agent and the Subordinated Lender, and acknowledged by each of the Credit Parties (as amended by that certain Joinder No. 1 to Intercreditor and Subordination Agreement, dated as of March 30, 2023 and as further amended, restated, amended and restated, supplemented or otherwise modified from time as set forth therein).

"**Subsidiary**" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person directly or indirectly has more than a 50% voting equity interest at the time. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of Holdings and any predecessors of such Subsidiary or Subsidiaries.

"**Subsidiary Guarantor**" shall mean each Subsidiary of the Borrower (other than (i) Subsidiaries acquired after the Closing Date, to the extent a guarantee is prohibited or restricted by contracts existing on the date of such acquisition (but in each case not created in contemplation thereof) (ii) [reserved], (iii) [reserved], (iv) any Subsidiary with respect to which a guarantee could result in a material adverse tax consequence, (v) any joint venture, (vi) [reserved], (vii) any captive insurance companies, (viii) any not-for-profit Subsidiary, (ix) [reserved], (x) Subsidiaries to the extent the Borrower and the Administrative Agent reasonably determine that the cost and/or burden of obtaining a guaranty outweigh the benefit to the Lenders and (xi) any Subsidiaries for which a guarantee is prohibited by law or regulation or requires consent or approval of, or a license or authorization from, a Governmental Authority or third party (unless such consent, approval, license or authorization has been received, it being understood that there shall be no obligation to obtain such consent, approval, license or authorization)) unless and until such time as the respective Subsidiary is released from all of its obligations under Section 15 hereof in accordance with the terms and provisions thereof.

"**Sun Capital Manager**" shall mean Sun Capital Partners Management VII, LLC, a Delaware limited liability company.

"**Supported QFC**" shall have the meaning provided in <u>Section 14.23</u>.

"**Swap**" shall mean any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder, other than (a) a swap entered into, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (b) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

"**Tax Certificate**" shall have the meaning provided in <u>Section 6.04(b)(ii)</u>.

"**Taxes**" (or "**Tax**" as the context may require) shall mean all present or future taxes, fees, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments or other charges imposed by any Taxing Authority, including any interest, penalties or additions to tax attributable thereto.

"**Taxing Authority**" shall mean any Governmental Authority with the authority to impose Tax.

"**Term Loan**" and "**Term Loans**" shall mean the term loans made to the Borrower pursuant to <u>Section 2.01</u>.

"**Term Note**" shall have the meaning provided in <u>Section 2.05(a)</u>.

"**Term SOFR**" shall mean, with respect to any Interest Period, (1) the forward-looking term rate based on SOFR for a tenor comparable to the applicable Interest Period on the day (such day, the "**Determination Day**") that is two (2) Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; <u>provided</u>, however, that if as of 5:00 p.m. (New York City time) on any Determination Day Term SOFR for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to Term SOFR has not occurred, then Term SOFR will be Term SOFR for such tenor published by the Term SOFR Administrator on the Business Day first preceding such Determination Day so long as such Business Day is not more than three (3) Business Days prior to such Determination Day plus (2) the Term SOFR Adjustment; <u>provided</u>, <u>further</u>, that if Term SOFR determined as provided above (including giving effect to the Term SOFR Adjustment) shall ever be less than the Floor, then Term SOFR (including the Term SOFR Adjustment) shall be deemed to be the Floor.

"**Term SOFR Adjustment**" shall mean, for any calculation with respect to a Base Rate Loan or a SOFR Loan, a percentage per annum as set forth below for the applicable type of such Term Loan and (if applicable) Interest Period therefor:

Base Rate Loans:

| 0.10% |
| --- |

SOFR Loans:

| Interest Period | Percentage |
| --- | --- |
| One month | 0.10% |

"**Term SOFR Administrator**" shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"**Third Party Payor Programs**" shall mean, collectively, the Governmental Third Party Payor Programs and the Private Third Party Payor Programs.

"**Threshold Amount**" shall mean $100,000.

"**Total Commitment**" shall mean, at any time, the sum of the Commitments of the Lenders at such time.

"**Transaction**" shall mean, collectively, (i) the execution, delivery and performance by each Credit Party of the Credit Documents to which it is a party, (ii) the Cases, (iii) the incurrence of Term Loans and the use of proceeds thereof and (iv) the payment of all fees and expenses in connection with the foregoing.

"**TRICARE**" shall mean, collectively, a program of medical benefits covering former and active members of the uniformed services and certain of their dependents, financed and administered by the United States Departments of Defense, Health and Human Services and Transportation, which program was formerly known as CHAMPUS (Civilian Health and Medical Program of the Uniformed Services), and all laws, rules, regulations, manuals, orders and administrative, reimbursement or other guidelines of all Governmental Authorities promulgated in connection with such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"**Turnover Agreement**" shall mean that certain Intercreditor and Turnover Agreement, dated as of November 17, 2023, by and among the Administrative Agent, the Prepetition Administrative Agent, the Lenders party thereto, the Prepetition Lenders party thereto, the Subordinated Lenders, each Unsecured Holder and acknowledged by the Credit Parties.

"**Type**" shall mean the type of Term Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan or a SOFR Loan.

"**UCC**" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"**UK Financial Institution**" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unadjusted Benchmark Replacement**" shall mean the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"**Unfunded Current Liability**" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits liabilities under Section 4001(a)(16) associated with any Plan, exceeds the fair market value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions) determined in accordance with the actuarial assumptions used for funding the Plan pursuant to Section 412 of the Code or Section 430 of the Code.

"**United States**" and "**U.S.**" shall each mean the United States of America.

"**Unsecured Holder**" shall have the meaning given to such term in the Turnover Agreement.

"**Unsecured Note**" certain Unsecured Promissory Note, dated as of November 17, 2023, as amended and restated pursuant to that certain Amended and Restated Unsecured Promissory Note, dated as of August 13, 2024, and that certain Second Amended and Restated Unsecured Promissory Note, dated as of October 2, 2024, and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**US Patriot Act**" shall have the meaning provided in <u>Section 14.17</u>.

"**US Special Resolution Regimes**" shall have the meaning provided in <u>Section 14.23</u>.

"**Waivable Mandatory Prepayment**" shall have the meaning provided in <u>Section 6.02(k)</u>.

"**Wholly-Owned Domestic Subsidiary**" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Domestic Subsidiary.

"**Wholly-Owned Foreign Subsidiary**" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Foreign Subsidiary.

"**Wholly-Owned Subsidiary**" shall mean, as to any Person, (i) any corporation 100% of whose Equity Interests are at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time (other than, in the case of a Foreign Subsidiary of the Borrower with respect to the preceding clauses (i) and (ii), director's qualifying shares and/or other nominal amount of shares required to be held by other Persons or individuals under applicable law).

"**Write-Down and Conversion Powers**" shall mean (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.02     <u>Rates</u>. The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to Base Rate or Term SOFR or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, Base Rate, Term SOFR, any component definition thereof or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes, in each case, except to the extent otherwise expressly provided herein and in the other Credit Documents, and except to the extent arising from the gross negligence or willful misconduct of, or a material breach of the Credit Documents by, the Administrative Agent, as determined in a final and non-appealable judgment of a court of competent

jurisdiction.  The Administrative Agent may select information sources or services in its sole discretion to ascertain Base Rate, Term SOFR, any component definition thereof, or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service absent a finding of gross negligence on the part of the Administrative Agent in selecting such information source or service as determined in a final and non-appealable judgment of a court of competent jurisdiction.

1.03    Divisions.  For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 2.    Amount and Terms of Term Loans.

2.01    The Term Loans.  Subject to the terms and conditions set forth in Sections 7 and 8 hereof, as applicable, and in the Orders, each Lender agrees, severally and not jointly, to make Term Loans in dollars to the Borrower in draws as follows:  (i) one or more draws on or following the Interim Order Availability Date and prior to the Final Order Availability Date, not to exceed in the aggregate the Interim Availability Amount (the "**Interim Term Loans**") and (ii) one or more draws on or after the Final Order Availability Date (the "**Final Order Term Loans**" and together with the Interim Term Loan, the "**Term Loans**"), not to exceed in the aggregate the Final Availability Amount (it being understood and agreed that in no event shall the aggregate principal amount of any Term Loans funded by any Lender hereunder exceed such Lender's Commitment).  For the avoidance of doubt, any Commitments shall be reduced dollar for dollar immediately after the funding of any Term Loans thereunder.  Each Term Loan Borrowing shall consist of Term Loans of the same Type made on the same day by the Lenders ratably according to their respective Commitments; provided that (x) the Borrowing of any Interim Term Loans shall, in the aggregate, be in an amount up to the lesser of (A) the full amount authorized by the Bankruptcy Court in the Interim Order and (B) the Interim Order Availability Amount, *minus*, in each case, the aggregate principal amount of Interim Order Term Loans previously funded to the Borrower and (y) each Borrowing of Final Order Term Loans shall, in the aggregate, be in an amount up to the lesser of (A) the full amount authorized by the Bankruptcy Court in the Final Order and (B) the Final Order Availability Amount, *minus*, in each case, the aggregate principal amount of Final Order Term Loans previously funded to the Borrower.  Amounts paid or prepaid in respect of the Term Loans may not be reborrowed. For the avoidance of doubt, the Term Loans funded on or following the Interim Order Availability Date and, once funded, on or following the Final Order Availability Date, shall each constitute a single class of Term Loans.  The Commitments (x) shall be automatically and permanently reduced immediately after each Borrowing of any Interim Term Loan by the amount of such Borrowing and (y) shall be automatically and permanently reduced immediately after each Borrowing of any Final Order Term Loans by the amount of such Borrowing. Any unused Commitments shall terminate on the Maturity Date.  In no event shall the Borrower request any Borrowing of Term Loans for any purpose not permitted by Section 10.10 and in no event shall the Lenders be obligated to fund any Term Loans to the extent such funding (or the amount of such funding) is not expressly contemplated by the Approved Budget.

2.02    [Reserved].

2.03    Notice of Borrowing.    Whenever the Borrower desires to incur Term Loans hereunder, the Borrower shall give the Administrative Agent at the Notice Office notice as required by Section 7.14 or Section 8.02, as applicable.  Each such notice, except as otherwise expressly provided in Section 2.10, shall be revocable and shall be in writing in the form of Exhibit A-1, appropriately completed to specify: (i) the aggregate principal amount of the Term Loans to be incurred pursuant to such Borrowing, (ii) the date of such Borrowing (which shall be a Business Day), (iii) [reserved], (iv) whether the Term Loans being incurred pursuant to such Borrowing are to be initially maintained as Base Rate Loans or, to the extent permitted hereunder, SOFR Loans and, if SOFR Loans, the initial Interest Period to be applicable thereto and (v) the wiring instructions.  The Administrative Agent shall promptly give each Lender which is required to make Term Loans specified in the respective Notice of Borrowing, notice of such proposed Borrowing, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.

2.04    Disbursement of Funds.    No later than 3:00 P.M. (New York City time) on the date specified in each Notice of Borrowing, each Lender with a Commitment will make available its pro rata portion (determined in accordance with Section 2.07) of each such Borrowing requested to be made on such date.  All such amounts will be made available in Dollars and in immediately available funds at the Payment Office, and the Administrative Agent will make available to the Borrower the aggregate of the amounts so made available by the Lenders.  Unless the Administrative Agent shall have been notified by any Lender prior to the date of Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's portion of any Borrowing to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrower a corresponding amount.  If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent.  The Administrative Agent also shall be entitled to recover on demand from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the overnight Federal Funds Rate for the first three days and at the interest rate otherwise applicable to such Term Loans for each day thereafter and (ii) if recovered from the Borrower, the rate of interest applicable to the respective Borrowing, as determined pursuant to Section 2.08. Nothing in this Section 2.04 shall be deemed to relieve any Lender from its obligation to make Term Loans hereunder or to prejudice any rights which the Borrower may have against any Lender as a result of any failure by such Lender to make Term Loans hereunder.

2.05    Notes.

(a)    The Borrower's obligation to pay the principal of, and interest on, the Term Loans made by each Lender shall be evidenced in the Register and shall, if requested by such Lender, also be evidenced by a promissory note duly executed and delivered by the Borrower substantially in the form of Exhibit B-1 to the Prepetition First Lien Credit Agreement (each, a "**Term Note**" and, collectively, the "**Term Notes**").

(b)    Notwithstanding anything to the contrary contained above in this Section 2.05 or elsewhere in this Agreement, Notes shall only be delivered to Lenders which at any time specifically request in writing the delivery of such Notes.  No failure of any Lender to request or obtain a Note evidencing its Term Loans to the Borrower shall affect or in any manner impair the obligations of the Borrower to pay the Term Loans (and all related Obligations) incurred by the Borrower which would otherwise be evidenced thereby in

accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the various Credit Documents. At any time when any Lender requests in writing the delivery of a Note to evidence any of its Term Loans, the Borrower shall promptly execute and deliver to the respective Lender the requested Note in the appropriate amount or amounts to evidence such Term Loans.

2.06    Conversions.  The Borrower shall have the option to convert, on any Business Day, all or a portion of the outstanding principal amount of Term Loans made pursuant to one or more Borrowings of one or more Types of Term Loans into a Borrowing of another Type of Term Loan; provided that, (i) except as otherwise provided in Section 2.10(b), SOFR Loans may be converted into Base Rate Loans only on the last day of an Interest Period applicable to the Term Loans being converted and (ii) unless the Required Lenders otherwise agree, Base Rate Loans may only be converted into SOFR Loans if no Event of Default is in existence on the date of the conversion.  Each such conversion shall be effected by the Borrower by giving the Administrative Agent at the Notice Office prior to 12:00 P.M. (New York City time) at least (x) in the case of conversions of Base Rate Loans into SOFR Loans, three Business Days' prior notice and (y) in the case of conversions of SOFR Loans into Base Rate Loans, one day prior to the date of the proposed conversion (or, in each case, such later notice as the Administrative Agent may agree in its sole discretion) (each, a "**Notice of Conversion/Continuation**"), in each case in the form of Exhibit A-2, appropriately completed to specify the Term Loans to be so converted, the Borrowing or Borrowings pursuant to which such Term Loans were incurred and, if to be converted into SOFR Loans, the Interest Period to be initially applicable thereto.

2.07    Pro Rata Borrowings.  All Borrowings of Term Loans under this Agreement shall be incurred from the Lenders pro rata on the basis of their Commitments.  It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Term Loans hereunder and that each Lender shall be obligated to make the Term Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Term Loans hereunder.

2.08    Interest.

(a)    The Borrower agrees to pay interest in respect of the unpaid principal amount of each Base Rate Loan from the date of Borrowing thereof until the earlier of (i) the payment in full of such principal amount and (ii) the conversion of such Base Rate Loan to a SOFR Loan pursuant to Section 2.06, 2.09 or 2.10, as applicable, at a rate per annum which shall be equal to the sum of the relevant Applicable Margin plus the Base Rate.

(b)    The Borrower agrees to pay interest in respect of the unpaid principal amount of each SOFR Loan from the date of Borrowing thereof until the earlier of (i) the payment in full of such principal amount and (ii) the conversion of such SOFR Loan to a Base Rate Loan pursuant to Section 2.06, 2.09 or 2.10, as applicable, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the relevant Applicable Margin plus Term SOFR for such interest period.

(c)    Automatically upon the occurrence of any Event of Default, upon notice to the Borrower from the Administrative Agent (at the direction of the Required Lenders), principal and, to the extent permitted by law, overdue interest in respect of each Term Loan, and all other amounts due in respect of each Term Loan shall, in each case, bear interest at a rate per annum equal to the rate which is 2% in excess of the rate then borne by such Term Loans.  Interest that accrues under this Section 2.08(c) shall be payable on written demand.

(d)    Accrued (and theretofore unpaid) interest on each Term Loan shall be payable (x) in kind, in arrears by capitalizing such interest on the last Business Day of each fiscal month of the Borrower and adding it to principal balance of each Term Loan, (y) on the date of any repayment or prepayment in full of all

30

outstanding Terms Loans, and (z) at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.  Any interest to be capitalized pursuant to the definition of Applicable Margin shall be capitalized on the day on which interest shall be payable on such Term Loan pursuant to this Section 2.08 and added to the then outstanding principal amount of the Term Loan and, thereafter, shall bear interest as provided hereunder as if it had originally been part of the outstanding principal of the Term Loan.

(e)      Upon each Interest Determination Date, the Administrative Agent shall determine Term SOFR for each Interest Period applicable to the respective SOFR Loans and shall promptly notify the Borrower and the applicable Lenders thereof.  Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

2.09    Interest Periods.    At the time the Borrower gives any Notice of Borrowing or Notice of Conversion/Continuation in respect of the making of, or conversion into, any SOFR Loan (in the case of the initial Interest Period applicable thereto) or prior to 12:00 P.M. (New York City time) on the third Business Day prior to the expiration of an Interest Period applicable to such SOFR Loan (in the case of any subsequent Interest Period), the Borrower shall elect a one-month interest period (each, an "**Interest Period**") applicable to such SOFR Loan; provided that (in each case):

(i)      the initial Interest Period for any SOFR Loan shall commence on the date of Borrowing of such SOFR Loan (including the date of any conversion thereto from a Base Rate Loan) and each Interest Period occurring thereafter in respect of such SOFR Loan shall commence on the day on which the next preceding Interest Period applicable thereto expires;

(ii)      each Interest Period shall end on the numerically corresponding day in the calendar month that is one thereafter; provided that if any Interest Period for a SOFR Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(iii)      if any Interest Period for a SOFR Loan would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided, however, that if any Interest Period for a SOFR Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(iv)      unless the Required Lenders otherwise agree, no Interest Period may be selected at any time when an Event of Default is then in existence; and

(v)      no Interest Period in respect of any Borrowing of any Term Loans shall be selected which extends beyond the Maturity Date.

2.10    Increased Costs, Illegality.

(a)      In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clause (i) below, may be made only by the Administrative Agent):

(i)      on any Interest Determination Date that, by reason of any changes arising after the date of this Agreement affecting the secured overnight financing market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of "Term SOFR"; or

(ii)      at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any SOFR Loan because of (x) any change since the Closing Date in

any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, such as, but not limited to: (A) a change in law which subjects any Lender to any Taxes (other than Indemnified Taxes or Excluded Taxes) in respect of payments of the principal of or interest on the Term Loans or the Notes or any other amounts payable hereunder or (B) a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of Term SOFR and/or (y) other circumstances arising since the Closing Date affecting such Lender, the overnight secured financing market or the position of such Lender in such market (including that Term SOFR with respect to such SOFR Loan does not adequately and fairly reflect the cost to such Lender of funding such SOFR Loan); or

(iii)      at any time, that the making or continuance of any SOFR Loan has been made (x) unlawful by any law or governmental rule, regulation or order, (y) impossible by compliance by any Lender in good faith with any governmental request (whether or not having force of law) or (z) impracticable as a result of a contingency occurring after the Closing Date which materially and adversely affects the overnight secured financing market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give notice (by telephone promptly confirmed in writing) to the Borrower and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders).  Thereafter (x) in the case of clause (i) above, SOFR Loans shall no longer be available until such time as the Administrative Agent notify the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist, and any Notice of Borrowing or Notice of Conversion/Continuation given by the Borrower with respect to SOFR Loans which have not yet been incurred (including by way of conversion) shall be deemed rescinded by the Borrower, (y) in the case of clause (ii) above, the Borrower agrees to pay to such Lender, upon such Lender's written request therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent manifest error, be final and conclusive and binding on all the parties hereto) and (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by law.

(b)      At any time that any SOFR Loan is affected by the circumstances described in Section 2.10(a)(ii), the Borrower may, and in the case of a SOFR Loan affected by the circumstances described in Section 2.10(a)(iii), the Borrower shall, either (x) if the affected SOFR Loan is then being made initially or pursuant to a conversion, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date that the Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 2.10(a)(ii) or (iii) or (y) if the affected SOFR Loan is then outstanding, upon at least three Business Days' written notice to the Administrative Agent, require the affected Lender to convert such SOFR Loan into a Base Rate Loan; provided that, if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 2.10(b).

(c)      If any Lender determines that after the Closing Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by the NAIC or any Governmental Authority, central bank or comparable agency, will have the effect of increasing the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's Commitments hereunder or

its obligations hereunder, then the Borrower agrees to pay to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital (except for Indemnified Taxes or Excluded Taxes). In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable; <u>provided</u> that such Lender's determination of compensation owing under this <u>Section 2.10(c)</u> shall, absent manifest error, be final and conclusive and binding on all the parties hereto. Each Lender, upon determining that any additional amounts will be payable pursuant to this <u>Section 2.10(c)</u>, will give prompt written notice thereof to the Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts, although the failure to give any such notice shall not release or diminish the Borrower's obligation to pay additional amounts pursuant to this <u>Section 2.10(c)</u> upon the subsequent receipt of such notice. Failure or delay on the part of any Lender to demand compensation pursuant to this <u>Section 2.10</u> shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that the Borrower shall not be required to compensate a Lender pursuant to this <u>Section 2.10</u> for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrower of the change or changes specified in this <u>Section 2.10</u> giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the change giving rise to such increased costs or reductions is retroactive, then the 180 day period referred to above shall be extended to include the period of retroactive effect thereof).

(d)    Subject to the final proviso in clause (c) above, failure or delay on the part of any Lender to demand compensation pursuant to this <u>Section 2.10</u> shall not constitute a waiver of such Lender's right to demand such compensation.

2.11    <u>Compensation</u>. The Borrower agrees to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its SOFR Loans but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender or the Administrative Agent) a Borrowing of, or conversion from or into, SOFR Loans does not occur on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn by the Borrower or deemed withdrawn pursuant to <u>Section 2.10(a)</u>); (ii) if any prepayment or repayment (including any prepayment or repayment made pursuant to <u>Section 6.01</u>, <u>Section 6.02</u> or as a result of an acceleration of the Term Loans pursuant to <u>Section 12</u>) or conversion of any of its SOFR Loans occurs on a date which is not the last day of an Interest Period with respect thereto; (iii) if any prepayment of any of its SOFR Loans is not made on any date specified in a notice of prepayment given by the Borrower; or (iv) as a consequence of (x) any other default by the Borrower to repay SOFR Loans when required by the terms of this Agreement or any Note held by such Lender or (y) any election made pursuant to <u>Section 2.10(b)</u>.

2.12    <u>Change of Lending Office</u>. Each Lender agrees that on the occurrence of any event giving rise to the operation of <u>Section 2.10(a)(ii)</u> or <u>(iii)</u>, <u>Section 2.10(c)</u>, or <u>Section 6.04</u> with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Term Loans affected by such event; <u>provided</u> that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section. Nothing in this <u>Section 2.12</u> shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in <u>Sections 2.10</u>, and <u>6.04</u>.

2.13    <u>Priority and Liens</u>.

(a)      Each of the Credit Parties hereby covenants and agrees that upon the entry of, and subject to the terms of, the Interim Order (and when applicable, the Final Order) (including and without prejudice to, without limitation, in each case, any rights or liens or perfected security interests (and the priorities thereof) granted under the Interim Order or Final Order under any other provision of 364 of the Bankruptcy Code or any other applicable provisions of the of the Bankruptcy Code) and subject to the Carve-Out in all respects, the Credit Document Obligations: (i) pursuant to Section 364(c)(1) and 364(d) of the Bankruptcy Code, shall at all times constitute allowed DIP Superpriority Claims in the Cases, which DIP Superpriority Claims in respect of this Agreement and the other Credit Documents shall rank *pari passu* with each other; and (ii) pursuant to Section 364(c)(3) and 364(d) of the Bankruptcy Code, shall be secured by a valid, binding, enforceable, non-avoidable, and automatically perfected first priority (subject to the Carve-Out and Permitted Prepetition Liens) Lien upon all assets (other than avoidance actions under chapter 5 of the Bankruptcy Code) of each Debtor of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, real property, books and records, and all proceeds, rents, profits, and offspring of the foregoing, including but not limited to (x) all assets constituting Collateral (as defined in the Prepetition First Lien Credit Agreement), (y) all assets of the Debtors that, as of the Petition Date, were not otherwise subject to a security interest, including any assets constituting Excluded Property (as defined in the Prepetition First Lien Credit Agreement), (z) subject to entry of the Final Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code and the proceeds thereof (the assets described in clauses (x), (y), and (z) above, the "**DIP Collateral**").

(b)      The relative priorities of the Liens described in this Section 2.13 with respect to the DIP Collateral shall be as set forth in the Interim Order (and, when entered, the Final Order). In accordance with the Interim Order (or, once entered, the Final Order), all of the Liens described in this Section 2.13 shall be effective and perfected upon entry of the Interim Order, without the necessity of the execution, recordation of filings by the Debtors of security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent, of, or over, any DIP Collateral, as set forth in the Interim Order.

(c)      Each Credit Party that is a Debtor hereby confirms and acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens in favor of the Administrative Agent on behalf of and for the benefit of the Secured Creditors in all of the DIP Collateral, now existing or hereafter acquired, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, assignment or similar instrument.

2.14    Benchmark Replacement Setting.

(a)    Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Credit Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document so long

as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(b)    <u>Benchmark Replacement Conforming Changes</u>. In connection with the implementation and administration of a Benchmark Replacement, the Administrative Agent will have the right (in consultation with the Borrower) to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.

(c)    <u>Notices; Standards for Decisions and Determinations</u>. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement, and (ii) the effectiveness of any Conforming Changes.  The Administrative Agent will promptly notify the Borrower of the removal or reinstatement of any tenor of a Benchmark pursuant to <u>Section 2.14(d)</u>.    Any determination, decision or election that may be made by the Administrative Agent (including in consultation with the Borrower) or, if applicable, or any Lender (or group of Lenders) pursuant to this <u>Section 2.14</u>, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consultation with or consent from any other party to this Agreement or any other Credit Document, except, in each case, as expressly required pursuant to this <u>Section 2.14</u> (or any of the definitions used herein).

(d)    <u>Unavailability of Tenor of Benchmark</u>. Notwithstanding anything to the contrary herein or in any other Credit Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the administrator of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable, non-representative, non-compliant or non-aligned tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)    <u>Benchmark Unavailability Period</u>.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a Borrowing of SOFR Loans, conversion to or continuation of affected SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, (i) the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans at the end of the applicable Interest Period.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate.

SECTION 3.    [Reserved].

SECTION 4.    [Reserved].

SECTION 5.    [Reserved].

SECTION 6.    Prepayments; Payments; Taxes.

6.01    Voluntary Prepayments.  The Borrower shall have the right to prepay the Term Loans, in whole or in part at any time and from time to time on the following terms and conditions:  (i) in the case of Term Loans, the Borrower shall give the Administrative Agent prior to 3:00 P.M. (New York City time) at the Notice Office (x) at least one Business Days' prior written notice of its intent to prepay Base Rate Loans and (y) at least three Business Days' prior written notice of its intent to prepay SOFR Loans, which notice (in each case) may be conditioned on the occurrence of a specified transaction and revoked if such transaction does not occur and shall specify the amount of such prepayment and the Types of Term Loans to be prepaid and, in the case of SOFR Loans, the specific Borrowing or Borrowings pursuant to which such SOFR Loans were made, and which notice the Administrative Agent shall promptly transmit to each of the Lenders; (ii) (x) each partial prepayment of Term Loans pursuant to this Section 6.01 shall be in an aggregate principal amount of at least $250,000 (or such lesser amount as is acceptable to the Administrative Agent in any given case), and (y) [reserved]; (iii) each prepayment pursuant to this Section 6.01 in respect of any Term Loans made pursuant to a Borrowing shall be applied pro rata among such Loans; and (iv) each voluntary prepayment of Term Loans pursuant to this Section 6.01 shall be applied to the then outstanding Term Loans on a pro rata basis.

6.02    Mandatory Repayments.

(a)    [Reserved].

(b)    [Reserved]:

(c)    On the date on which Holdings or any of its Subsidiaries receives any cash proceeds from the Sale or any other sale of all or substantially all of the assets of the Credit Parties, 100% of the Net Cash Proceeds of such transaction, simultaneously with the consummation thereof, shall be applied on such date as a mandatory repayment in accordance with the requirement of Section 6.02(h) and (i), after funding the Carve-Out and the Post-Sale Reserves, in each case in accordance with the Approved Budget and the Orders.

(d)    On each date upon which Holdings or any of its Subsidiaries receives any cash proceeds from any issuance or incurrence by Holdings or any of its Subsidiaries of Indebtedness (other than Indebtedness permitted by Section 11.04), an amount equal to 100% of the Net Cash Proceeds of the respective incurrence of Indebtedness shall be applied on such date as a mandatory repayment in accordance with the requirements of Sections 6.02(h) and (i).

(e)    Within five Business Days after Holdings or any of its Subsidiaries receives any cash proceeds from any Asset Sale, an amount equal to 100% of the Net Sale Proceeds therefrom shall be applied on such date as a mandatory repayment in accordance with the requirements of Sections 6.02(h) and (i); provided, however, that (i) no mandatory repayment pursuant to this Section 6.02(e) shall be required with respect to Asset Sales (x) in which Holdings and its Subsidiaries receive cash proceeds therefrom in an amount less than $25,000, so long as such Asset Sale is approved by an order of the Bankruptcy Court that is in form and substance acceptable to the Required Lenders and the amount excluded pursuant to this clause (x) does not exceed $50,000 in any fiscal year or (y) of goods or services in the Ordinary Course of Business.

(f)    [Reserved].

(g)    [Reserved].

(h)      Subject to the Orders, (i) each amount required to be repaid pursuant to Sections 6.02(c), (d) and (e), (ii) proceeds of DIP Collateral received by the Debtors outside the Ordinary Course of Business and (iii) on the Maturity Date, in each case, any payment or other distribution (whether from the proceeds of DIP Collateral or any other source, whether in the form of cash, securities or otherwise and whether made by the Borrower or any Guarantor or in connection with any exercise of remedies by the Administrative Agent or any Lender) made or applied in respect of any of the Credit Document Obligations shall be applied, after giving effect to the Carve-Out and any other payments required pursuant to the Orders:  first, to pay all documented out-of-pocket expenses of the Lenders and the Administrative Agent (including, without limitation, fees and expenses of counsel and external advisors); second, to pay an amount equal to all accrued and unpaid interest owing to the Lenders; third, to repay any principal amounts outstanding in respect of the Term Loans (including any amounts, other interest, that have been added to the principal balance); fourth, all other amounts owing to the Lenders and the Administrative Agent; and fifth, the balance, if any, after all of the Obligations have been paid in full, to the Borrower subject in all respects to the rights, liens and claims of the Prepetition Administrative Agent for the benefit of the Prepetition First Lien Lenders.

(i)      With respect to each repayment of Loans required by this Section 6.02, the Borrower may designate the Types of Term Loans which are to be repaid and, in the case of SOFR Loans, the specific Borrowing or Borrowings pursuant to which such SOFR Loans were made; provided that each repayment of any Term Loans made pursuant to a Borrowing shall be applied pro rata among such Term Loans. In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its reasonable discretion.

(j)      In addition to any other mandatory repayments pursuant to this Section 6.02, all then outstanding Term Loans shall be repaid in full on the Maturity Date.

(k)      Anything contained herein to the contrary notwithstanding, in the event the Borrower is required to make any mandatory prepayment (a "**Waivable Mandatory Prepayment**") of the Term Loans in accordance with clauses (e) through (g) above, not later than 3:00 p.m., New York City time, three Business Days prior to the date (the "**Required Prepayment Date**") on which the Borrower elects (or is otherwise required) to make such Waivable Mandatory Prepayment, the Borrower shall notify the Administrative Agent of the amount of such prepayment, and Administrative Agent will promptly thereafter notify each Lender of the amount of such Lender's pro rata share of such Waivable Mandatory Prepayment and such Lender's option to refuse such amount.  Each such Lender may exercise such option by giving written notice to the Administrative Agent of its election to do so not later than 3:00 p.m., New York City time, the second Business Day prior to the Required Prepayment Date (it being understood that any Lender which does not notify the Administrative Agent of its election to exercise such option on or before the first Business Day prior to the Required Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option).  On the Required Prepayment Date, the Borrower shall pay to the Administrative Agent the amount of the Waivable Mandatory Prepayment less the amount of the Declined Proceeds, which amount shall be applied by the Administrative Agent to prepay the Term Loans of those Lenders that have elected to accept such Waivable Mandatory Prepayment (which prepayment shall be applied to the principal of the Term Loans in accordance with Section 6.02(h)). The portion of the Waivable Mandatory Prepayment otherwise payable to those Lenders that have elected to decline such Waivable Mandatory Prepayment (such declined amounts, the "**Declined Proceeds**") shall be retained by the Borrower and used for any purpose not prohibited by this Agreement.

6.03      Method and Place of Payment.  Except as otherwise specifically provided herein, all payments under this Agreement and under any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 2:00 P.M. (New York City time) on the date when due and shall be made in Dollars in immediately available funds at the Payment Office. Any payments received by

the Administrative Agent after such time may be deemed to have been received on the next Business Day and any applicable interest or fee shall continue to accrue. Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

6.04    Net Payments.

(a)    Any and all payments by or on account of any obligation of the Borrower under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 6.04(a)), the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made. Without duplication for any amounts paid pursuant to the foregoing sentence of this Section 6.04(a) or Section 6.04(c), the Borrower shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 6.04(a)) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(b)    Each Recipient that is a United States Person (as such term is defined in Section 7701(a)(30) of the Code), shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Recipient becomes a Recipient under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), an executed Internal Revenue Service Form W-9 certifying that such Recipient is exempt from U.S. federal backup withholding tax. Each Recipient that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes agrees, to the extent it is legally entitled to do so, to deliver to the Borrower and the Administrative Agent on or prior to the Closing Date or, in the case of a Recipient that is an assignee or transferee of an interest under this Agreement pursuant to Section 14.04(b) (unless the respective Recipient was already a Recipient hereunder immediately prior to such assignment or transfer), on the date of such assignment or transfer to such Recipient, (i) two accurate and complete signed copies of Internal Revenue Service W-8BEN-E or Form W-8BEN (with respect to a complete exemption under an income tax treaty) (or successor forms), certifying to such Recipient's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments to be made under this Agreement and under any Credit Document, (ii) two accurate and complete signed copies of Internal Revenue Service W-8ECI, as applicable, (iii) if the Recipient is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and cannot deliver either Internal Revenue Service Form W-8ECI, Form W-8BEN-E or Form W-8BEN (with respect to a complete exemption under an income tax treaty) (or any successor forms) pursuant to clause (i) above, (x) a certificate substantially in the form of Exhibit C (any such certificate, a "**Tax Certificate**") and (y) two accurate and complete signed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E (with respect to the portfolio interest exemption) (or successor form) certifying to such Recipient's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments of interest to be made under this Agreement and under any Credit Document, or (iv) if

38

the Recipient is not the beneficial owner (for example, where the Recipient is a partnership or a participating Lender granting a participation), two accurate and complete signed copies of Internal Revenue Service Form W-8IMY, accompanied by Internal Revenue Service Forms W-8ECI, W-8BEN, W-8BEN-E, a certificate substantially in the form of Exhibit C, Internal Revenue Service Form W-9, and/or other certification documents from each beneficial owner, as applicable.  If a payment to a Recipient under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of the previous sentence, "**FATCA**" shall include any amendments made to FATCA after the date of this Agreement.  In addition, each Recipient agrees that from time to time after the Closing Date, when a lapse in time or change in circumstances renders the previous certification obsolete or inaccurate in any material respect, such Recipient will deliver to the Borrower and the Administrative Agent two new accurate and complete signed copies of Internal Revenue Service Form W-9, Internal Revenue Service Form W-8ECI, Internal Revenue Service Form W-8BEN-E or Internal Revenue Service Form W-8BEN (with respect to the benefits of any income tax treaty), Internal Revenue Service Form W-8IMY (together with appropriate forms, certifications, and supporting statements), or Internal Revenue Service Form W-8BEN-E or Internal Revenue Service Form W-8BEN (with respect to the portfolio interest exemption) and a Tax Certificate, as the case may be, and such other forms as may be required in order to confirm or establish the entitlement of such Recipient to a continued exemption from or reduction in United States withholding tax with respect to payments under this Agreement and any Credit Document, or such Recipient shall immediately notify the Borrower and the Administrative Agent of its inability to deliver any such Form or Certificate, in which case such Recipient shall not be required to deliver any such Form or Certificate pursuant to this Section 6.04(b).  Notwithstanding anything to the contrary contained in Section 6.04(a), the Borrower shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or similar Taxes imposed by the United States (or any political subdivision or Taxing Authority thereof or therein) from interest, fees or other amounts payable hereunder for the account of any Recipient which is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes to the extent that such Recipient has not provided to the Borrower U.S. Internal Revenue Service Forms that establish a complete exemption from such deduction or withholding.

(c)    The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)    Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), and (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable out of pocket expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes each Agent to (at its option) set off and apply any and all amounts at any time owing to such Lender under any Credit Document or

otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).  Failure or delay on the part of the Administrative Agent to demand compensation pursuant to this Section 6.04(d) shall not constitute a waiver of such Agent's right to demand such compensation.

(e)     As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)     If any Recipient or the Administrative Agent determines, in its Permitted Discretion, that it has received a refund in respect of any Indemnified Taxes as to which indemnification or additional amounts have been paid to it by a Credit Party pursuant to this Section 6.04, it shall promptly remit an amount equal to such refund as soon as practicable after it is determined that such refund pertains to Indemnified Taxes (but only to the extent of indemnity payments made, or additional amounts paid, by a Credit Party under this Section 6.04 with respect to the Indemnified Taxes giving rise to such refund plus any interest included in such refund by the relevant Taxing Authority attributable thereto) to the Borrower, net of all reasonable out-of-pocket expenses (including any Taxes) of the Recipient or Administrative Agent, as the case may be and without interest (other than any interest paid by the relevant Taxing Authority with respect to such refund); provided that the Borrower, upon the request of the Recipient or Administrative Agent, as the case may be, agrees promptly to return an amount equal to such refund (plus any applicable interest, additions to tax or penalties) to such party in the event such party is required to repay such refund to the relevant Taxing Authority.  Such Recipient or Administrative Agent, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Taxing Authority (provided that such Recipient or Administrative Agent may delete any information therein that such Recipient or Agent deems confidential). Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  Nothing herein contained shall oblige any Recipient or Agent to make available its Tax returns or disclose any information relating to its Tax affairs or any computations in respect thereof or require any Recipient or Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

(g)     Each party's obligations under this Section 6.04 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

SECTION 7.    Conditions Precedent to Interim Term Loans on or Following the Interim Order Availability Date.  The obligation of each Lender to make one or more Interim Term Loans on or following the Interim Order Availability Date and prior to the Final Order Availability Date, in an aggregate amount not to exceed the lesser of (x) the amount approved by the Bankruptcy Court in the Interim Order and (y) the Interim Availability Amount, *minus*, in each case, the aggregate principal amount of Interim Order Term Loans previously funded to the Borrower, is subject at the time of the making of such Term Loans solely to the satisfaction or waiver by the Administrative Agent and each Lender of the following conditions precedent:

7.01    Credit Agreement; Notes.  (i) Holdings, Intermediate Holdings,  the Borrower and each other Guarantor shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same to the Administrative Agent, and (ii) there shall have been delivered to the Administrative Agent for the account of each of the Lenders that has requested executed copies of the appropriate Term Note executed by the Borrower.

7.02    AML, KYC.  The Administrative Agent shall have received at least three business days prior to the Closing Date (to the extent requested by Administrative Agent at least 10 business days prior to the Closing Date), all documentation and other information required by regulatory authorities concerning the Credit Parties under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act and, if applicable, the Beneficial Ownership Regulation.

7.03    Closing Certificate.   The Administrative Agent shall have received a closing certificate, substantially in the form attached hereto as Exhibit H, duly executed by the chief executive officer or chief financial officer of the Credit Parties, appropriately completed, by which such officer shall certify to the Administrative Agent and the Lenders that all of the conditions precedent to the Interim Term Loan set forth herein have been satisfied.

7.04    No Default; Representations and Warranties.  At the time of such Credit Event and also after giving effect thereto (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein shall be true and correct in all material respects (it being understood and agreed that (x) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (y) any representation or warranty that is qualified as to "materiality," "Material Adverse Change" or similar language shall be true and correct in all respects on such date).

7.05    [Reserved].

7.06    Approved Budget.  The Lenders shall have received the Approved Budget.

7.07    Petition Date.  The Petition Date shall have occurred.

7.08    Interim Order.  (a) The Bankruptcy Court shall have entered the Interim Order within three (3) Business Days after the Petition Date, (b) the Interim Order shall not have been vacated, reversed, modified, amended or stayed, or in the case of any modification or amendment, modified or amended in a manner without the consent of the Administrative Agent and each Lender and (c) the Debtors shall be in compliance in all respects with the Interim Order.

7.09    First Day Orders.  All First Day Orders shall have been entered by the Bankruptcy Court and all such entered First Day Orders shall be satisfactory in form and substance to the Administrative Agent and Lenders, it being understood that drafts approved by counsel to the Administrative Agent and the Lenders on or prior to the Petition Date are reasonably satisfactory.

7.10    No Trustee.  No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

7.11    Perfected Liens.  The Administrative Agent, for the benefit of the Secured Creditors, shall have valid and perfected Liens on all DIP Collateral, to the extent contemplated hereby, and pursuant to the other Credit Documents, including the Interim Order.

7.12    [Reserved].

7.13    [Reserved].

7.14    Notice of Borrowing.  The Credit Parties shall have delivered to the Administrative Agent a Notice of Borrowing in connection with such draw request no later than 11:00 AM (New York City time) (a) one (1) Business Day prior to the requested funding date for the first Interim Term Loan and (b) three (3) Business Days prior to the requested funding date for any subsequent Interim Term Loans (in each case, or such later time as the Administrative Agent may agree to in its sole discretion).

7.15    Fees, etc.  The fees and out-of-pocket expenses of the Administrative Agent and each Lender (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Interim Loan draw) to the extent an invoice has been delivered to the Borrower at least twenty-four (24) hours in advance of the Interim Order Availability Date.

7.16    [Reserved].

7.17    Insurance.  Each Credit Party shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral in such amounts and scope as is reasonably acceptable to the Administrative Agent and each Lender (which shall be deemed satisfied if such insurance as required by the Prepetition First Lien Credit Agreement remains in place).

7.18    Corporate Power and Authority.  Subject to entry of the Interim Order, (i) each Credit Party shall have the corporate power and authority to make, deliver and perform its obligations under this Agreement and the Interim Order, and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Credit Party, or for the validity or enforceability in accordance with its terms against such Credit Party, of this Agreement and the Interim Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect.

7.19    Asset Purchase Agreement.  The Administrative Agent and each Lender shall have received a copy of the fully-executed Asset Purchase Agreement, which shall be in form and substance consistent with the terms hereof and otherwise acceptable to the Administrative Agent and each Lender in its sole and absolute discretion, and such Asset Purchase Agreement shall remain in full force and effect in such form (or as otherwise acceptable to the Administrative Agent and each Lender in its sole and absolute discretion) on the date of each Credit Event in respect of the Interim Term Loans.

7.20    Requirements of Law.  The making of such Term Loan shall not violate any requirement of material law applicable to the Credit Parties, after giving effect to the Orders and any other order of the Bankruptcy Court entered on or prior to the date of such Credit Event, and shall not be enjoined, temporarily, preliminarily or permanently.

7.21    Cash Management Order.  The Cash Management Order acceptable to the Administrative Agent shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, restated, amended and restated, supplemented or otherwise modified without the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld).

7.22    Case Milestones.   All applicable Milestones shall have been satisfied or waived by the Administrative Agent and each Lender in each of their sole discretion.

The Borrowing of the Interim Term Loan shall be deemed to constitute a representation and warranty by each of the Credit Parties on the date thereof as to the matters specified in Sections 7.04, 7.06, 7.07, 7.08, 7.09, 7.10, 7.11, 7.17, 7.18, 7.19, 7.20,  7.21 and 7.22.

SECTION 8.    Conditions Precedent to Borrowing Final Order Term Loans on or Following the Final Order Availability Date.  After the Interim Order Availability Date and the funding of the Interim Term Loans, the obligation of each Lender to make any Final Order Term Loans on or following the Final Order Availability Date in an aggregate amount equal to the lesser of (x) the amount approved by the Bankruptcy Court on a final basis in the Final Order and (y) the Final Order Availability Amount, *minus*, in each case, the aggregate principal amount of the Final Order Term Loans previously funded to the Borrower, is subject at the time of the making of such Term Loans solely to the satisfaction or waiver by the Administrative Agent and each Lender of the following conditions precedent.

8.01    No Default; Representations and Warranties.  At the time of such Credit Event and also after giving effect thereto (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein shall be true and correct in all material respects (it being understood and agreed that (x) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (y) any representation or warranty that is qualified as to "materiality," "Material Adverse Change" or similar language shall be true and correct in all respects on such date).

8.02    Notice of Borrowing.  The Credit Parties shall have delivered to the Administrative Agent a Notice of Borrowing in connection with such draw request no later than 11:00 AM (New York City time) three (3) Business Days prior to the requested funding date for such Final Order Term Loan (or such later time as the Administrative Agent may agree to in its sole discretion).

8.03    Closing Certificate.  On the date of such Credit Event, the Administrative Agent shall have received a closing certificate, substantially in the form attached hereto as Exhibit H, duly executed by the chief executive officer or chief financial officer of the Credit Parties, appropriately completed, by which such officer shall certify to the Administrative Agent and the Lenders that all of the conditions precedent to such Final Order Term Loan have been satisfied

8.04    Second Day Orders.  All "second day" orders approving on a final basis the relief granted under any First Day Orders shall have been entered by the Bankruptcy Court, shall be satisfactory to the Administrative Agent, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as reasonably acceptable to the Administrative Agent.

8.05    Final Order.  (a) The Final Order shall have been entered by the Bankruptcy Court in the Cases, (b) the Final Order shall not have been vacated, reversed, modified, amended or stayed, or in the case of any modification or amendment, modified or amended in a manner without the consent of the Administrative Agent and each Lender and (c) the Debtors shall be in compliance in all respects with the Final Order.

8.06    Continued Perfected Lien.  The Administrative Agent, for the benefit of the Secured Creditors, shall continue to have valid and perfected Liens on all DIP Collateral, to the extent contemplated hereby, and pursuant to the other Credit Documents, including the Orders.

8.07    Fees, etc.  Prior to or substantially concurrently with such Credit Event, the fees and out-of-pocket expenses of the Administrative Agent and each Lender (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Interim Loan draw) to the extent an invoice has been delivered to the Borrower at least 24 hours in advance of such Credit Event.

8.08    Requirements of Law.  The making of such Term Loan shall not violate any requirement of material law applicable to the Credit Parties, after giving effect to the Orders and any other order of the Bankruptcy

Court entered on or prior to the date of such Credit Event, and shall not be enjoined, temporarily, preliminarily or permanently.

8.09    <u>Cash Management Order</u>.  The Cash Management Order acceptable to the Administrative Agent shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, restated, amended and restated, supplemented or otherwise modified without the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld).

8.10    <u>Case Milestones</u>.  On the date of such Credit Event, all applicable Milestones shall have been satisfied or waived by the Administrative Agent and each Lender.

8.11    <u>Asset Purchase Agreement</u>.  The Asset Purchase Agreement shall remain in full force and effect without amendment, modification, supplement, waiver or change (other than such amendments, modifications, supplement, waiver or changes that are acceptable to the Administrative Agent and each Lender in its sole and absolute discretion) on the date of each Credit Event in respect of the Final Term Loans.

The Borrowing of each Final Order Term Loan shall be deemed to constitute a representation and warranty by each of the Credit Parties on the date thereof as to the matters specified in <u>Sections 8.01</u>, <u>8.04</u>, <u>8.05</u>, <u>8.06</u>, <u>8.08</u>, <u>8.09</u>, <u>8.10</u> and <u>8.11</u>.

SECTION 9.    <u>Representations, Warranties and Agreements</u>.

In order to induce the Lenders to enter into this Agreement and to make the Term Loans, each Credit Party makes the following representations and warranties, all of which shall survive the execution and delivery of this Agreement and the Notes.

9.01    <u>Company Status</u>.  Subject to the entry and the terms of the Orders and the other orders of the Bankruptcy Court, as applicable, each of Holdings and each of its Subsidiaries (i) is a duly organized and validly existing Company in good standing under the laws of the jurisdiction of its organization, (ii) has the organizational power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to be so qualified or authorized which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Change.  No certifications by any Governmental Authority are required for operation of the business of Holdings and its Subsidiaries that are not in place, except for such certifications or agreements, the absence of which could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Change.

9.02    <u>Power and Authority</u>.  Each Credit Party and each of their respective Subsidiaries has, subject to the entry and the terms of the Orders and the other orders of the Bankruptcy Court, as applicable, the organizational power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and has taken all necessary company action to authorize the execution, delivery and performance by it of each of such Credit Documents.  Each Credit Party has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except (i) to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law) or (ii) as may be limited by the effect of foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries and intercompany Indebtedness owned by Foreign Subsidiaries.

9.03    No Violation.  Subject to the entry of the Orders and subject to the terms thereof, neither the execution, delivery or performance by any Credit Party or any Subsidiary of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (i) will contravene in any material respect any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Authority, (ii) will conflict with or result in any breach of any of the terms (other than any such indenture, agreement, or instrument governing Prepetition Debt), covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to this Agreement or the Orders) upon any of the property or assets of any Credit Party or any of its Subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Credit Party or any of its Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject (including, without limitation, any Subordinated Debt) in each case, under this clause (ii), except as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change, or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Credit Party or any of its Subsidiaries.

9.04    [Reserved].

9.05    No Material Adverse Change.  Subject to the entry of the Orders and subject to the terms thereof, after giving effect to the Transaction, since the Closing Date, nothing has occurred that has had, or would reasonably be expected to have, a Material Adverse Change

9.06    Litigation.  Except for the Cases and any litigation that is stayed by operation of the Bankruptcy Code, there are no actions, suits or proceedings pending or, to the knowledge of Holdings, Intermediate Holdings and the Borrower, threatened in writing (including, without limitation, with respect to the Transactions) that, in each case has had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Change.

9.07    True and Complete Written Disclosure.  None of the written reports, or other written information (other than the projections, estimates, forwarding looking statements, budgets and information of a general economic or industry nature and, in the case of financial statements, limited to the knowledge of the Borrower) about the Credit Parties or their Subsidiaries furnished by or on behalf of any Credit Party or any of its Subsidiaries to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Credit Document (as modified or supplemented by other information so furnished), when taken as a whole, contains any material misstatement of material fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made (after giving effect to all supplements and updates thereto), not materially misleading in light of the circumstances at such time; provided that, with respect to projected financial information (and other forward looking information), the Credit Parties represent only that such projected financial information was prepared in good faith based upon assumptions believed to be reasonable at the time of delivery; it being acknowledged and agreed by the Administrative Agent and the Lenders that (a) such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount, (b) the financial and business projections furnished to the Administrative Agent or the Lenders are subject to significant uncertainties and contingencies, which may be beyond the control of Holdings and its Subsidiaries, (c) no assurances are given by Holdings or any of its Subsidiaries that the results forecasted in the projections will be realized, and (d) the actual results may differ from the forecasted results in such projections and such differences may be material.

9.08    Margin Regulations.  No part of any Credit Event (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock. Neither the making of any Term Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

9.09    Taxes.  Except with respect to Taxes the payment of which are stayed by the Cases, each of Holdings and each of its Subsidiaries (i) has timely filed or caused to be filed all material Tax returns and reports required to have been filed, (ii) has paid all Taxes and assessments payable by it which have become due, other than those that are being contested in good faith and adequately disclosed and fully provided for by reserves on the financial statements of Holdings and its Subsidiaries in accordance with GAAP and (iii) no Credit Party has any knowledge of any material deficiency or additional assessment raised in writing that is not provided for on its books or financial statements, in each case of clauses (i) through (iii) which would not reasonably be expected to result in a Material Adverse Change.

9.10    Compliance with ERISA.

(a)    Except as could not reasonably be expected to have a Material Adverse Change: each Plan is in compliance with its terms and with all applicable laws, including without limitation ERISA and the Code; each Plan which is intended to be qualified under Section 401(a) of the Code has received a determination letter or opinion letter from the Internal Revenue Service to the effect that it meets the requirements of Section 401(a) of the Code; all contributions required to be made by a Credit Party or any ERISA Affiliate with respect to a Plan or Multiemployer Plan have been timely made; and there have been no nonexempt prohibited transaction described in Section 406 of ERISA or Section 4975 of the Code.

(b)    Except as could not reasonably be expected to have a Material Adverse Change, no (i) Reportable Event has occurred within the last five (5) years and (ii) Multiemployer Plan is insolvent or has an accumulated funding deficiency as defined in Section 302(a)(2) of ERISA and Section 412(a) of the Code, whether or not waived.

(c)    Except as would not have a Material Adverse Change: (i) the Credit Parties or ERISA Affiliates have met all applicable minimum funding requirements under Section 302 of ERISA or Section 412 of the Code in respect of each Plan, and each Plan is in compliance with Sections 412, 430 and 436 of the Code or Sections 206(g), 302 and 303 of ERISA, without regard to waivers and variances;  (ii) no Credit Party or ERISA Affiliate has filed a notice of intent to terminate a Plan under Section 4041 of ERISA; (iii) no Credit Party or any ERISA Affiliate has withdrawn from a Plan that is subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (iv) no Credit Party or any ERISA Affiliate has completely or partially withdrawn as defined under Sections 4203 or 4205 of ERISA from any Multiemployer Plan; (v) no filing of a notice of insolvency or termination has been made under Section 4041A of ERISA with respect to any Multiemployer Plan; and (vi) no Credit Party or any ERISA Affiliate has incurred any liability under Title IV of ERISA other than for the payment of premiums to the PBGC and there are no premium payments to the PBGC which have become due which are unpaid.

(d)    Except as could not reasonably be expected to have a Material Adverse Change, no proceedings have been instituted to terminate or appoint a trustee to administer any Plan or Multiemployer Plan which is subject to Title IV of ERISA by the PBGC. Except as could not reasonably be expected to have a Material Adverse Change, no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan or, to the knowledge of a Credit Party, any Multiemployer Plan (other than routine claims for benefits) is pending, expected or, to the knowledge of a Credit Party, threatened.

(e)     Except as could not reasonably be expected to have a Material Adverse Change, no Lien imposed under the Code or ERISA on the assets of a Credit Party or any ERISA Affiliate exists, or is likely to arise on account of any Plan or Multiemployer Plan.

(f)     Except as would not have a Material Adverse Change: each Foreign Pension Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities; all contributions required to be made by a Credit Party or any ERISA Affiliate before the Closing Date with respect to a Foreign Pension Plan have been timely made;  and no Credit Party or any ERISA Affiliate has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan.

9.11     [Reserved].

9.12     Properties.  As of the Closing Date, none of Holdings or any of its Subsidiaries owns any Real Property. Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Change, each of Holdings and each of its Subsidiaries has good and marketable title to all material properties (and to all buildings, fixtures and improvements located thereon) owned by it, if any (except as sold or otherwise disposed of since the date of such balance sheet in the Ordinary Course of Business or as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens.

9.13     [Reserved].

9.14     Compliance with Statutes, etc.  Each of Holdings and each of its Subsidiaries is in material compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property, except such non-compliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change and other than such violations arising as a result of the commencement of the Cases.

9.15     Investment Company Act.  Neither Holdings nor any of its Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

9.16     Environmental Matters.  Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change: (a) each of Holdings and each of its Subsidiaries is in compliance with all applicable Environmental Laws and the requirements of any permits issued under such Environmental Laws; (b) there are no pending or, to the knowledge of Holdings, Intermediate Holdings and the Borrower, threatened Environmental Claims against Holdings or any of its Subsidiaries; and (c) neither Holdings nor any of its Subsidiaries has generated, treated, stored, transported or Released any Hazardous Materials on or from, any Real Property owned, leased or operated by Holdings or any of its Subsidiaries, in each case where such generation, treatment, storage, transportation or Release has violated any Environmental Law or would be reasonably expected to give rise to an Environmental Claim against Holdings or any of its Subsidiaries.

9.17     Employment and Labor Relations.  Neither Holdings nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Change.  There is (i) no unfair labor practice complaint pending against Holdings or any of its Subsidiaries or, to the knowledge of Holdings, Intermediate Holdings and the Borrower, threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against Holdings or any of its Subsidiaries or, to the knowledge of Holdings, Intermediate Holdings and the Borrower, threatened against any of them, (ii) no strike, labor dispute, slowdown or stoppage pending against Holdings or any of its

Subsidiaries or, to the knowledge of Holdings, Intermediate Holdings and the Borrower, threatened against Holdings or any of its Subsidiaries, (iii) no union representation question exists with respect to the employees of Holdings or any of its Subsidiaries, (iv) no equal employment opportunity charges or other claims of employment discrimination are pending or, to the knowledge of Holdings, Intermediate Holdings and the Borrower, threatened against Holdings or any of its Subsidiaries and (v) no wage and hour department investigation has been made of Holdings or any of its Subsidiaries in the last three years, except (with respect to any matter specified in clauses (i) – (v) above, either individually or in the aggregate) such as would not reasonably be expected to have a Material Adverse Change.

9.18    <u>Intellectual Property</u>.  Each of Holdings and each of its Subsidiaries owns or has the right to use all Intellectual Property, whether owned or licensed, and whether or not written (including, but not limited to, rights in computer programs, databases and formulas), or rights with respect to the foregoing, necessary for the present conduct of its business, without any known conflict with the Intellectual Property rights of others which, or the failure to own or have which, as the case may be, could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Change.

9.19    <u>Anti-Terrorism Laws</u>.

(a)    None of the Credit Parties nor any of their directors, officers, or employees, nor to the knowledge of the Credit Parties, any Affiliates, agents, representatives, or other Persons acting for or on behalf of any Credit Parties is in material violation of any Anti-Terrorism Law or engages or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any Anti-Terrorism Laws.

(b)    None of the Credit Parties nor any of their directors, officers, or employees, nor, to the knowledge of the Credit Parties, any Affiliates of any Credit Parties, or their respective agents, representatives, or other Persons acting or benefiting in any capacity in connection with the Term Loans or other transactions hereunder is any of the following (each, a "**Blocked Person**"):

(i)    a Person that is blocked pursuant to any of the OFAC Sanctions Programs, including a Person named on OFAC's list of Specially Designated Nationals and Blocked Persons;

(ii)    a Person that is owned or controlled by, or that is acting for or on behalf of, any Person described in (i), above; or

(iii)    a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law.

(c)    None of the Credit Parties, nor, to the knowledge of the Credit Parties, any of their Affiliates, unless authorized by the U.S. Government (A) conducts any material business or engages in making or receiving any material contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any material transaction relating to, any property or interests in property blocked pursuant to any OFAC Sanctions Programs.

(d)    Without limiting or contradicting (or being limited or contradicted by) the foregoing, (x) no Covered Entity is a Sanctioned Person and (y) no Covered Entity, either in its own right or, to the knowledge of the Credit Parties, through any third party, (A) has any of its material assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in material violation of any Anti-Terrorism Law; (B) does material business in or with, or derives any of its material income from Investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; or (C) engages in any material dealings or transactions prohibited by any Anti-Terrorism Law.

9.20     Anti-Corruption Laws.   Holdings, Intermediate Holdings, the Borrower and their respective Subsidiaries and Affiliates have conducted their businesses in material compliance with applicable Anti-Corruption Laws.

9.21     Health Care Laws.   Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change, the Borrower and each of its Subsidiaries (i) are in compliance with all Health Care Laws and the requirements of Third Party Payor Programs applicable to it and its business or operations; and (ii) have in effect all Health Care Permits and all such Health Care Permits are in full force and effect and there exists no default under, or violation of, any such Health Care Permit. Neither the Borrower nor any of its Subsidiaries have received written notice that any Governmental Authority is limiting, suspending, terminating, adversely amending or revoking any such Health Care Permit, except where such a limitation, suspension, termination, amendment or revocation as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change. No action, demand or investigation by any Governmental Authority and no suit, action or proceeding by any other person, in each case with respect to the Borrower or any of its Subsidiaries, is pending or, to the knowledge of the Borrower or any of its Subsidiaries, threatened in writing, except for such an action, demand or investigation as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change.

(b)      Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change, all reports, documents, claims, notices or approvals required to be filed, obtained, maintained or furnished pursuant to any Health Care Law to any Governmental Authority by the Borrower or any of its Subsidiaries (i) have been so filed, obtained, maintained or furnished in compliance with such Health Care Law; and (ii) were complete and correct on the date filed (or were corrected in or supplemented by a timely subsequent filing).

(c)      Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change, (i) neither Borrower nor any of its Subsidiaries has made an untrue statement of fact or fraudulent statement to any Governmental Authority, failed to disclose a fact required to be disclosed to any Governmental Authority, or committed an act, made a statement, or failed to make a statement that, at the time such disclosure was made, would reasonably be expected to be in violation of any Health Care Law; and (ii) neither Borrower nor any of its Subsidiaries has made any untrue statement of fact regarding claims incurred but not reported.

(d)      Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change, each of the Borrower and its Subsidiaries (including any contracting doctor on behalf of any of the foregoing) has the requisite provider or supplier number, enrollment or other Health Care Permit to bill under Medicare, the Florida Medicaid program, and Private Third Party Payor Programs, in each case, to the extent the Borrower or its Subsidiaries, or Licensed Personnel on behalf of the foregoing is enrolled in or bills such programs and/or payors. Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change, there is no investigation, audit, claim, review, or other action by a Governmental Authority (A) pending against the Borrower or any of its Subsidiaries, or, (B) to the knowledge of the Borrower, threatened against the Borrower or any of its Subsidiaries, which, in the case of either (A) or (B), would reasonably be expected to result in (1) a revocation, suspending, termination, probation, restriction, limitation or non-renewal of any Governmental Third Party Payor provider or supplier number, enrollment or Health Care Permit, or any Private Third Party Payor provider or supplier number(s), enrollment or Health Care Permit, or any Private Third Party Payor provider or supplier number(s), enrollment(s) or Health Care Permit(s); (2) the Borrower's or any of its Subsidiaries' exclusion from any Governmental Third Party Payor Program; or (3) the Borrower's or any of its Subsidiaries' exclusion from Private Third Party Payor Program.

(e)       Neither the Borrower nor any of its Subsidiaries, or owner, officer, manager, or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in the Borrower or, to the knowledge of the Borrower, any Licensed Personnel of the Borrower, any Subsidiary of the Borrower has been (or has received written notice threatening to be): (i) excluded from participation in a Governmental Third Party Payor Program pursuant to 42 U.S.C. §1320a-7 and related regulations or (ii) "suspended" or "debarred" from selling products to the U.S. government or its agencies pursuant to the Federal Acquisition Regulation relating to debarment and suspension applicable to federal government agencies generally (42 C.F.R. Subpart 9.4), or other applicable laws or regulations.

(f)       To the extent that and for so long as the Borrower or any of its Subsidiaries is deemed to be a "covered entity" or "business associate" within the meaning of HIPAA, the Borrower and its Subsidiaries (i) have undertaken all necessary surveys, audits, inventories, reviews, analyses and/or assessments (including any necessary risk assessments) of all areas of the Borrower's or such Subsidiary's business and operations as required by HIPAA; (ii) have developed HIPAA policies and procedures and training; and (iii) have implemented those provisions of such HIPAA policies and procedures in all respects such that the Borrower or such Subsidiary complies with HIPAA, except with respect to any failure to comply with any of the foregoing which would not, individually or in the aggregate, be reasonably expected to result in a Material Adverse Change.

(g)       Except as could not reasonably be expected to have a Material Adverse Change, to the knowledge of the Borrower, each of the Licensed Personnel holds all licenses and other Health Care Permits that are required to provide the professional services provided by such Person, and each such license and other Health Care Permit is in full force and effect and, to the knowledge of any Borrower, no revocation, suspension or cancellation of any such license or other Health Care Permit is pending or threatened in writing.

(h)       The Borrower has established a compliance plan, in compliance in all respects with all Health Care Laws applicable to them, their assets, business or operations, respectively, except with respect to any failure to comply which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Change.

9.22    <u>Status of Obligations; Perfection and Priority of Security Interests</u>. Subject to entry of the Interim Order (and the Final Order, as applicable), the Credit Document Obligations shall have the status and priority set forth in <u>Section 2.13</u> and, for the avoidance of doubt, are subject to the Carve-Out in all respects.

9.23    <u>Approved Budget</u>.

The Approved Budget has been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time made, it being understood that projections as to future events are not to be viewed as facts and actual results may vary materially from such forecasts.

9.24    <u>Prepetition Permitted Liens</u>.

All Prepetition Permitted Liens are specified as such on Schedule II hereto.  None of the Permitted Liens (other than Prepetition Permitted Liens and except as otherwise set forth in the Orders) is senior to or *pari passu* with the Liens securing the Obligations.

SECTION 10.    <u>Affirmative Covenants</u>.

Each of the Credit Parties hereby covenants and agrees that on and after the Closing Date and until all Loan Obligations are Paid in Full:

10.01    Information Covenants.  The Credit Parties will furnish to the Administrative Agent:

(a)    Monthly Reports.  Within 30 days after the end of each of the first two fiscal months of each fiscal quarter of Intermediate Holdings (or such later time as agreed to by the Administrative Agent in its sole discretion) the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month and the related consolidated statements of income or operations and cash flows for such fiscal month and, beginning with the fiscal month ending August 31, 2024, for the elapsed portion of the fiscal year ended with the last day of such fiscal month, in each case (commencing with the first full fiscal month to have elapsed at least one year after the first full fiscal month after the Closing Date) setting forth comparative figures for the corresponding fiscal month in the prior fiscal year, all of which shall fairly present in all material respects in accordance with GAAP the financial condition of Intermediate Holdings and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes.

(b)    Quarterly Financial Statements.  Within 45 days (or such later time as agreed to by the Administrative Agent in its sole discretion) after the close of, commencing with the fiscal quarter ended September 30, 2024, each quarterly accounting period in each fiscal year, (i) the consolidated balance sheet of Intermediate Holdings and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of income or operations and cash flows for such quarterly accounting period, in each case (commencing with the first full fiscal quarter to have elapsed at least one year after the first full fiscal quarter after the Closing Date) setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year, all of which shall fairly present in all material respects in accordance with GAAP the financial condition of Intermediate Holdings and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes and (ii) a customary management's discussion and analysis of the important operational and financial developments during such quarterly accounting period.

(c)    [Reserved].

(d)    [Reserved].

(e)    Compliance Certificates.  Concurrently with the delivery of the financial statements provided for in Section 10.01(b), a Compliance Certificate from a financial officer of the Borrower in the form of Exhibit E certifying to the effect that no Event of Default exists or, if any Event of Default does exist, specifying the nature and extent thereof, as the case may be.

(f)    Notice of Event of Default, Litigation and Material Adverse Change.  Promptly, provide notice of (i) the occurrence of any event which constitutes an Event of Default or (ii) any litigation, governmental investigation, proceeding, Environmental Claim or other event, change or circumstance that has had, or would reasonably be expected to have, a Material Adverse Change.

(g)    Other Reports and Filings.  Promptly after the filing, delivery or receipt thereof, copies of all financial information, proxy materials, reports, notices and other material communications if any, which Holdings or any of its Subsidiaries shall publicly file with the Securities and Exchange Commission or any successor thereto (the "SEC").

(h)    Other Information.  From time to time, such other information or documents (financial or otherwise) with respect to Holdings or any of its Subsidiaries as the Administrative Agent may reasonably request (excluding information that (x) is subject to confidentiality obligations in favor of third parties or attorney-client privilege, constituting attorney work product or otherwise prohibited by law from disclosure or (y) constitutes non-financial trade secrets or non-financial proprietary information).

Notwithstanding the foregoing, the obligations in clauses (a), (b) and (c) of this <u>Section 10.01</u> may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (A) the applicable financial statements of any direct or indirect parent of the Borrower that holds all of the Equity Interests of the Borrower or (B) the Borrower's or such parent's Form 10-K or 10-Q, as applicable, filed with the SEC; <u>provided</u> that, with respect to each of clauses (A) and (B), (i) to the extent such information relates to a parent of the Borrower and such parent has operations or holds assets or liabilities other than in connection with its ownership with the Borrower and its Subsidiaries, such information includes an internally prepared management summary of consolidating information that explains in reasonable detail the differences between the information relating to such parent and its Subsidiaries on a consolidated basis, on the one hand, and the information relating to the Borrower and the Subsidiaries on a consolidated basis, on the other hand. Any financial statements required to be delivered pursuant to <u>Sections 10.01(a)</u>, <u>(b)</u> or <u>(c)</u> shall not be required to contain purchase accounting adjustments relating to the Transaction or any other acquisition or Investment to the extent it is not practicable to include any such adjustments in such financial statements.

10.02    <u>Books, Records and Inspections</u>.  Holdings will, and will cause each of its Subsidiaries to, (a) keep proper books, records and accounts in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to their business and activities, (b) cooperate, consult with, and provide to the Administrative Agent all such information as required or as reasonably requested by the Administrative Agent or any Lender, and (c) permit during normal business hours, upon reasonable notice, representatives of the Administrative Agent to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Credit Parties' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective senior management and independent public accountants as often as may reasonably be desired; provided that no disclosure of information by the Credit Parties to the Administrative Agent or the Lenders shall be required to the extent that such disclosure would result in the breach of any confidentiality obligations to which the Credit Parties are subject or if such disclosure would compromise attorney-client privilege or require the disclosure of attorney work product.

10.03    <u>Maintenance of Property; Insurance</u>.  Holdings will, and will cause each of its Subsidiaries to, (i) except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Change, keep all tangible property necessary to the business of Holdings and its Subsidiaries in good working order and condition, ordinary wear and tear, casualty and condemnation excepted and subject to the occurrence of casualty events, natural catastrophe and other covered occurrences or events that may cause damage to, or partial or complete loss of, the property and (ii) maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed or with a captive insurance company, insurance with respect to its properties and business against loss or damage, of such types and in such amounts as reasonably determined in good faith by the management of the Borrower as appropriate for the business of the Borrower and its Subsidiaries (after giving effect to any self-insurance reasonable and customary for similarly situated Persons as reasonably determined in good faith by the management of the Borrower as appropriate for the business of the Borrower and its Subsidiaries), and will furnish to the Lenders, upon reasonable written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried. The Borrower shall use commercially reasonable efforts to ensure that each such policy of insurance (other than business interruption insurance (if any), director and officer insurance and worker's compensation insurance) shall, unless otherwise agreed by the Administrative Agent, as appropriate, (i) in the case of each liability insurance policy, name the Administrative Agent, on behalf of the Secured Creditors, as an additional insured thereunder as its interests may appear and/or (ii) in the case of each casualty insurance policy, contain a loss payable clause or

endorsement that names the Administrative Agent, on behalf of the Secured Creditors, as the loss payee thereunder (in the case of property insurance with respect to the DIP Collateral).

10.04    Existence; Franchises.  Holdings will, and will cause each of its Subsidiaries to, do or cause to be done, all things necessary to preserve and keep in full force and effect its existence and its material rights, franchises, licenses, permits, copyrights, trademarks, and patents, the failure to preserve or keep which, as the case may be, could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Change; provided, however, that nothing in this Section 10.04 shall prevent (i) sales of assets and other transactions by Holdings or any of its Subsidiaries in accordance with Section 11.02 or (ii) the withdrawal by Holdings or any of its Subsidiaries of its qualification as a foreign Company in any jurisdiction if such withdrawal could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change.

10.05    Compliance with Statutes, etc.  Holdings will, will cause each of its Subsidiaries to, except as otherwise excused by the Bankruptcy Code with respect to any Credit Party that is a debtor in the Cases, comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property (including, without limitation, OFAC, FCPA, Anti-Corruption Laws, Anti-Terrorism Laws and other sanctions related laws and regulations), except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change.

10.06    Compliance with Environmental Laws.  Holdings will comply, and will cause each of its Subsidiaries to comply, with all Environmental Laws (including with respect to permits required or issued thereunder) applicable to its ownership, lease or use of its Real Property now or hereafter owned, leased or operated by Holdings or any of its Subsidiaries, except such noncompliance as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change.

10.07    ERISA.  No Credit Party and no ERISA Affiliate thereof shall cause or suffer to exist (a) any event that would reasonably be expected to result in the imposition of a Lien on any asset of a Credit Party or a Subsidiary with respect to any Plan or Multiemployer Plan or (b) any other Reportable Event, in each case under the foregoing clauses (a) and (b), that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Change.

10.08    Payment of Taxes.  Except with respect to Taxes the payment of which are stayed by the Cases, and subject to the Approved Budget (including Permitted Variances), Holdings will, and will cause each of its Subsidiaries to pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a Lien or charge upon any properties of Holdings or any of its Subsidiaries not otherwise permitted under Section 11.01(i), in each case other than Taxes being contested in good faith and for which adequate reserve have been established in accordance with GAAP.

10.09    Lines of Business.  Holdings will not, and will not permit any of its Subsidiaries to engage directly or indirectly in any line of business other than the businesses engaged in by Holdings and its Subsidiaries as of the Closing Date, or that are reasonably related thereto and activities necessary to conduct the foregoing.

10.10    Use of Proceeds.

(a)    All proceeds of the Term Loans will be used by the Borrower strictly in accordance with the Approved Budget (subject to the Permitted Variances) and the Orders, for (a) working capital and general

corporate purposes of the Credit Parties, (b) for bankruptcy-related costs and expenses, and (c) for costs and expenses related to this Agreement and the other Credit Documents.

(b)        [Reserved].

(c)        [Reserved].

(d)        [Reserved].

(e)        No Term Loan (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any Term Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate or be inconsistent in any material respect with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

10.11    Additional Security; Further Assurances; etc.  Holdings will, and will cause each of the other Credit Parties to, at the expense of the Credit Parties, make, execute, endorse, acknowledge, file and/or deliver to the Administrative Agent from time to time such vouchers, invoices, schedules, financing statements and other assurances or instruments and take such further steps relating to the DIP Collateral covered by any of the Credit Documents as the Administrative Agent may reasonably require in accordance with the terms hereof. Furthermore, Holdings will, and will cause the other Credit Parties that are Subsidiaries of Holdings to, deliver to the Administrative Agent such related documents as may be reasonably requested by the Administrative Agent or the Administrative Agent to assure itself that this Section 10.11 has been complied with.

10.12    [Reserved].

10.13    Fiscal Year.  Holdings will, and will cause each of its Subsidiaries to, maintain December 31 as its fiscal year end; provided, however, that the Borrower may, upon written notice to the Administrative Agent, change such fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

10.14    [Reserved].

10.15    Compliance with Health Care Laws.

(a)        Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change, the Borrower and its Subsidiaries shall: (i) comply in all respects with all Health Care Laws applicable to them, their assets, business or operations, respectively; (ii) comply, maintain and renew all required Health Care Permits; (iii) timely file, or cause to be filed, all required Health Care Permit filings in accordance with Health Care Laws; (iv) pay in a timely fashion all undisputed amounts, taxes, fees and assessments due and payable in connection with the required Health Care Permit filings; and (v) keep and maintain all records required to be maintained under applicable Health Care Laws for the period of time in which they are required to be maintained.

(b)        Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change, the Borrower and its Subsidiaries shall maintain corporate and health care regulatory compliance programs which are commercially reasonable and standard in their specific business which addresses the applicable requirements of Health Care Laws. The Borrower and its Subsidiaries, as applicable, shall modify such compliance programs from time to time, as they or their respective advisors deem necessary to ensure continuing material compliance with applicable Health Care Laws.

(c)    Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Change, the Borrower shall notify the Agent within ten (10) Business Days following the occurrence of any of the following facts, events, notices, or circumstances, and as permitted by applicable Health Care Law together with such supporting data and information as shall be reasonably necessary to fully explain to the Agent the scope and nature of the fact, event, notice or circumstance, and shall provide to the Agent as soon as practicable following Agent's request, such additional information as Agent shall reasonably request regarding such disclosure:

(i)    Notice of any material civil or criminal investigation or audit, or proceeding pending or to the knowledge of the Borrower, threatened in writing, by any federal, state, local Governmental Authority, Governmental Third Party Payor or Private Third Party Payor relating to any actual or alleged material violation by the Borrower or any Subsidiary of the Borrower, of any Health Care Laws or that alleges systemic, deliberate, widespread or material false or fraudulent claims submission by the Borrower or any Subsidiary;

(ii)    Notice that the Borrower, an owner, officer, manager or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in Borrower or any Subsidiary thereof: (A) has had a material civil monetary penalty assessed against him or her pursuant to 42 U.S.C. §1320a-7a or is the subject of a proceeding seeking to assess such penalty; (B) has been excluded from participation in a Governmental Third Party Payor Program or is the subject of a proceeding seeking to assess such penalty; (C) has been convicted (as that term is defined in 42 C.F.R. §1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; or (D) has been named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§3729-3731 or qui tam action brought pursuant to 31 U.S.C. §§3729 et seq.;

(iii)    Copies of any written recommendation from any Governmental Authority that the Borrower or any of its Subsidiaries should have any of its material Health Care Permits suspended, revoked, or limited in any way;

(iv)    Notice of any claim to recover any alleged overpayments to Borrower or a Subsidiary of Borrower in excess of $500,000;

(v)    Voluntary disclosure by the Borrower or a Subsidiary of the Borrower to the Office of Inspector General of the United States Department of Health and Human Services (or any other Governmental Authority or Agent of a Governmental Authority designated to receive such disclosures) or any state's Medicaid program of a potential overpayment matter involving the submission of claims to such payor in any amount greater than $500,000; and

(vi)    Any revocation, suspension, termination, material limitation, denial or non-renewal of the enrollment or participation status or eligibility to accept assignments or rights to reimbursement of the Borrower or its Subsidiaries with respect to any Governmental Third Party Payor Program or any Private Third Party Payor Program; and

(vii)    Notice of any Third Party Payor Program reimbursement payment contract or process that results or is reasonably expected to result in any claim against the Borrower or its Subsidiaries (including an account of overpayments, settlement payments, appeals, repayment requests) in excess of $500,000.

10.16    <u>Cash Management</u>. Holdings shall, and shall cause each of its Subsidiary to, maintain its cash management system in a manner reasonably acceptable to the Administrative Agent (which shall be deemed satisfied if the cash management system is substantially the same as the cash management system in

existence on the Petition Date, with such modifications as permitted under the Cash Management Order, as entered).

10.17    Lender Calls. Each Credit Party shall require its senior management to participate in a weekly call with the Lenders and their advisors at times to be mutually agreed to discuss the Approved Budget (including Permitted Variances), the Cases, the Sale, as applicable, and the financial condition, performance and business affairs of the Credit Parties, and any other matters reasonably requested by the advisors or attorneys to the Lenders.

10.18    Milestones.  Holdings will, and will cause each of its Subsidiaries to, comply with the requirements set forth in this Section 10.18 (the "**Milestones**"):

(a)    no later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order. For the avoidance of doubt, any changes to the Interim Order shall be subject to the prior written consent of the Lenders and the Administrative Agent in their sole discretion;

(b)    no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order.  For the avoidance of doubt, any changes to the Final Order shall be subject to the prior written consent of the Lenders and the Administrative Agent in their sole discretion;

(c)    no later than forty-five (45) days after the Petition Date, the Debtors shall have filed with the Bankruptcy Court an Acceptable Plan;

(d)    no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered a sale order, which order shall be acceptable to the Administrative Agent and the Required Lenders in their sole discretion, approving, the sale of all or substantially all of the Debtors' assets (the "**Sale Order**"); and

(e)    no later than sixty (60) days after the Petition Date, the Sale approved by the Bankruptcy Court pursuant to the Sale Order shall have been consummated.

Any Milestone may be extended with the consent of the Administrative Agent in its sole discretion.

10.19    DIP Proceeds Account.  Holdings will, and will cause each of its Subsidiaries to, subsequent to each Credit Event, except as otherwise agreed by Administrative Agent or as disbursed in accordance with the then Approved Budget (including Permitted Variances), hold the proceeds of the Term Loans in the DIP Proceeds Account.

10.20    First and Second Day Orders.  Holdings shall, and shall cause each of its Subsidiaries to, cause all proposed First Day Orders and "second day orders" submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement and acceptable to the Required Lenders, it being understood and agreed that the forms of orders approved by the Required Lenders prior to the Petition Date are in accordance with and permitted by the terms of this Agreement in all respects and are acceptable.

10.21    Bankruptcy Notices.  Holdings will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent):

(a)    reasonably in advance of the earlier of (x) filing with the Bankruptcy Court or (y) delivering to any statutory committee appointed in the Cases or the United States Trustee for the Southern District of Florida (the "**U.S. Trustee**"), as the case may be, drafts of all material motions, proposed orders and other pleadings related to the Term Loans and the Credit Documents, any other financing or use of cash collateral, any DIP Collateral, cash management, adequate protection, any Reorganization Plan or Liquidation Plan and/or any

disclosure statement related thereto, which shall all be in form and substance satisfactory to the Administrative Agent and each Lender;

(b)       by the earlier of (x) two (2) Business Days prior to being filed (and if impracticable, then as soon as possible and in no event later than as promptly practicable before being filed) on behalf of any of the Debtors with the Bankruptcy Court or (y) at the same time as such documents are provided by any of the Debtors to any statutory committee appointed in the Cases or the U.S. Trustee, a draft of any request to approve any compromise and settlement of claims or for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code or Bankruptcy Rule 9019 (to the extent not covered by clause (a) above);

(c)       as soon as practicable after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrower or any other Debtor with the Bankruptcy Court in the Cases (except to the extent such documents are available on the website maintained by the Debtors' claims and noticing agent and except to the extent such disclosure would result in the breach of any confidentiality obligations to which the Debtors are subject); and

(d)       promptly, such additional information concerning the Debtors, the Sale or the DIP Collateral as the Administrative Agent or any Lender may reasonably request.

10.22    <u>Bankruptcy Related Matters</u>.  Holdings will, and will cause each of its Subsidiaries to:

(a)       cause all proposed (i) orders related to or affecting the Term Loans and other Obligations and the Credit Documents (including, without limitation, the proposed First Day Orders and "second day" orders), any others seeking authorization of any financing or use of cash collateral, any sale or other disposition of DIP Collateral outside the ordinary course of business, cash management, adequate protection, any Reorganization Plan or Liquidation Plan and/or any disclosure statement related thereto, (ii) orders seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, (iii) orders authorizing additional payments to critical vendors and (iv) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Bankruptcy Court (in the case of each of the foregoing clause (iii), other than the relief sought pursuant to the proposed First Day Orders and "second day" orders), in each case, proposed by the Debtors to be in accordance with and permitted by the terms of this Agreement and acceptable to the Required Lenders (and (i) with respect to any provision that affects the rights, obligations, liabilities or duties of the Administrative Agent and (ii) with respect to any orders described in clauses (i)-(iv) above, acceptable to the Required Lenders in their sole discretion) in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders (and with respect to any provision that affects the rights, obligations, liabilities or duties of the Administrative Agent) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are acceptable in all respects;

(b)       comply in all material respects with each order entered by the Bankruptcy Court in connection with the Cases;

(c)       comply in all material respects with their obligations under the Bankruptcy Code, the Bankruptcy Rules, the Interim Order and the Final Order, as applicable, and any other order of the Bankruptcy Court;

(d)       (i) to the extent reasonably practicable, deliver to counsel to the Administrative Agent promptly as soon as available, but no later than one (1) Business Day prior to filing, drafts of all material pleadings, motions, applications, orders, financial information and other documents that are proposed to be (x) filed by or on behalf of the Credit Parties with the Bankruptcy Court in the Cases, or (y) distributed by or on behalf of the Credit Parties to any statutory committee appointed or appearing in the Cases or any other party in interest; *provided*, that in the case of any emergency pleading or document for which, despite the Debtors' reasonable best efforts, such advance notice is impracticable, the Credit Parties shall instead

deliver such documents substantially concurrently with such filing or distribution, as applicable, and (ii) consult in good faith with the Required Lenders' advisors regarding the form and substance of any such documents (except that with respect to any emergency pleading or document for which, despite the Debtors' best efforts, such advance notice is impracticable, the Debtors shall be required to furnish such documents as soon as reasonably practicable and in no event later than substantially concurrently with such filings or deliveries thereof, as applicable); and

(e)     except as otherwise permitted by an Acceptable Plan or as provided in the Asset Purchase Agreement, provide prior written notice as soon as reasonably practicable to the Administrative Agent prior to any assumption or rejection of any Debtor's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected, if such assumption or rejection materially adversely impacts the DIP Collateral, any Liens thereon or any DIP Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of DIP Collateral or the priority of any such Liens or DIP Superpriority Claims), if the Administrative Agent (at the direction of the Required Lenders) informs the Borrower in writing within three (3) Business Days of receipt of the notice from the Borrower that it objects to such assumption or rejection, as applicable.

10.23    <u>Compliance with Orders</u>.  Holdings will, and will cause each of its Subsidiaries to, comply with (a) the Approved Budget (subject to any Permitted Variances) and (b) all of the requirements and obligations set forth in the Orders and any other orders entered in the Cases to the extent relevant to the interests of the Lenders.

SECTION 11.    <u>Negative Covenants</u>.

       Each of the Credit Parties hereby covenants and agrees that on and after the Closing Date and until all Loan Obligations are Paid in Full:

11.01    <u>Liens</u>.  Holdings will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of Holdings or any of its Subsidiaries, whether now owned or hereafter acquired; <u>provided</u> that the provisions of this <u>Section 11.01</u> shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "**Permitted Liens**"):

(i)     Liens for Taxes, assessments or governmental charges or levies not yet delinquent or Liens for Taxes, assessments or governmental charges or levies being contested in good faith and by appropriate actions or proceedings for which adequate reserves have been established in accordance with GAAP;

(ii)     Liens in respect of property or assets of Holdings or any of its Subsidiaries imposed by law or contract, which were incurred in the Ordinary Course of Business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, shipper's, materialmen's and mechanics' liens and other similar Liens arising in the Ordinary Course of Business, and (x) which do not in the aggregate materially detract from the value of Holdings' or such Subsidiary's property or assets or materially impair the use thereof in the operation of the business of Holdings or such Subsidiary or (y) which are being contested in good faith by appropriate actions or proceedings, which actions or proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(iii)    Prepetition Permitted Liens;

(iv)    (x) Liens created by or pursuant to this Agreement and the Orders and (y) Prepetition Liens;

(v)      (x) licenses, sublicenses, leases or subleases (which shall be non-exclusive in the case of Intellectual Property) granted by Holdings or any of its Subsidiaries to other Persons that, in the reasonable good faith judgment of Holdings, are not materially interfering with, or are not material to, the conduct of the business of Holdings or any of its Subsidiaries and (y) any interest or title of a lessor, sublessor or licensor under any lease or license agreement permitted by this Agreement to which the Borrower or any of its Subsidiaries is a party;

(vi)     Liens upon assets of the Borrower or any of its Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 11.04(iv); provided that (x) such Liens only serve to secure the payment of Indebtedness (and related fees and expenses) arising under such Capitalized Lease Obligation and (y) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any asset of Holdings or any other asset of Intermediate Holdings, the Borrower or any Subsidiary of the Borrower;

(vii)    Liens placed upon property, equipment or machinery acquired after the Closing Date and used in the Ordinary Course of Business of the Borrower or any of its Subsidiaries and placed at the time of the acquisition thereof by the Borrower or such Subsidiary or within 90 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such property, equipment or machinery or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; provided that (x) the Indebtedness secured by such Liens is permitted by Section 11.04(iv) and (y) in all events, the Lien encumbering the equipment or machinery so acquired does not encumber any other asset of Holdings or any of its Subsidiaries;

(viii)   easements, rights-of-way, restrictions, encroachments and other similar charges or encumbrances, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of Holdings or any of its Subsidiaries;

(ix)     Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the Ordinary Course of Business;

(x)      Liens arising out of the existence of judgments or awards that do not result in an Event of Default under Section 12.09 in respect of which Holdings or any of its Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review, for which adequate reserves have been established in accordance with GAAP, and in respect of which there shall have been secured a subsisting stay of execution pending such appeal or proceedings;

(xi)     statutory and common law landlords' liens under leases to which the Borrower or any of its Subsidiaries is a party;

(xii)    Liens (other than Liens imposed under ERISA) incurred in the Ordinary Course of Business in connection with workers compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, leases and contracts in the Ordinary Course of Business, statutory obligations, surety bonds, performance bonds and other obligations of a like nature incurred in the Ordinary Course of Business and consistent with past practices (exclusive of obligations in respect of the payment for borrowed money);

(xiii)   [reserved];

(xiv)    [reserved];

(xv)    Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by the Borrower or any of its Subsidiaries in the Ordinary Course of Business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(xvi)    Liens (x) incurred in the Ordinary Course of Business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets, and (y) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(xvii)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by Holdings or any Subsidiary, in each case granted in the Ordinary Course of Business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management and operating account arrangements;

(xviii)    Liens on cash deposits of a Credit Party pledged to secure performance bonds, surety bonds, appeal bonds or customs bonds; provided that the aggregate amount of all cash subject to all Liens permitted by this clause (xviii) shall not at any time exceed the amounts permitted under Section 11.04(ix);

(xix)    ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(xx)    Liens arising from precautionary UCC financing statement filings;

(xxi)    Liens that are customary contractual rights of set-off (i) relating to the establishment of depository relations with banks or other financial institutions in the Ordinary Course of Business, (ii) relating to pooled deposit or sweep accounts of Holdings or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the Ordinary Course of Business of Holdings or any of its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of Holdings or any of its Subsidiaries in the Ordinary Course of Business;

(xxii)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto and Liens arising out of deposits of cash and Cash Equivalents, security deductibles; self-insurance, co-payment, co-insurance, retentions and similar obligations to providers of insurance in the Ordinary Course of Business;

(xxiii)    [reserved];

(xxiv)    additional Liens securing Indebtedness or other obligations in an aggregate principal amount at the time of incurrence of any such Indebtedness or other obligations not exceeding $50,000;

(xxv)    Liens securing Indebtedness or other obligations permitted pursuant to Section 11.04(xix) in an aggregate principal amount not exceeding $50,000, determined at the time of incurrence of Indebtedness or other obligations secured by such Lien;

(xxvi)    [reserved]; and

(xxvii)    Liens granted as adequate protection on account of certain Prepetition Secured Obligations pursuant to the Orders.

The expansion of Liens by virtue of accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, amortization of original issue discount and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Liens for purposes of this <u>Section 11.01</u>.

11.02    <u>Consolidation, Merger or Sale of Assets, etc</u>.  Holdings will not, and will not permit any of its Subsidiaries to, wind up, liquidate or dissolve its affairs or enter into any transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its property or assets, or enter into any sale-leaseback transactions with respect to Real Property, except that Borrower and its Subsidiaries may (A) sell inventory in the Ordinary Course of Business, (B) sell or dispose of obsolete equipment, and (C) sell other property on terms acceptable to the Required Lenders in their sole discretion;

<u>provided</u>, that notwithstanding anything to the contrary in this Agreement, no Subsidiary that is not a Credit Party shall own or hold any rights, or be a licensee in respect of any exclusive license, in any Intellectual Property or other asset which is material to the business of the Credit Parties (taken as a whole), as reasonably determined by the Borrower in consultation with the Administrative Agent.

To the extent the Required Lenders waive the provisions of this <u>Section 11.02</u> with respect to the sale of any DIP Collateral, or any DIP Collateral is sold as permitted by this <u>Section 11.02</u> (other than to Holdings, Intermediate Holdings, the Borrower or a Subsidiary Guarantor thereof), such DIP Collateral shall be sold free and clear of the Liens created by this Agreement (<u>provided</u> that such Lien shall continue as to any proceeds of such sale to the extent such assets constituted DIP Collateral), and the Administrative Agent shall be required to take any appropriate actions in order to evidence the foregoing.

11.03    <u>Dividends</u>.  Holdings will not, and will not permit any of its Subsidiaries to, authorize, declare or pay any Dividends with respect to Holdings or any of its Subsidiaries.

11.04    <u>Indebtedness</u>.  Holdings will not, and will not permit any of its Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness, except:

(i)    Indebtedness (x) incurred pursuant to this Agreement and the other Credit Documents or (y) constituting Prepetition Secured Obligations;

(ii)    [reserved];

(iii)    [reserved];

(iv)    Indebtedness of the Borrower and its Subsidiaries evidenced by Capitalized Lease Obligations and purchase money Indebtedness described in <u>Section 11.01(vii)</u> not to exceed $50,000 at any time outstanding;

(v)    Indebtedness constituting Intercompany Loans to the extent permitted by <u>Section 11.05(viii)</u>;

(vi)    [reserved];

(vii)    [reserved];

(viii)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the Ordinary Course of Business, so long as such Indebtedness is extinguished within four Business Days of the earlier of its incurrence or Borrower becoming aware thereof;

(ix)    [reserved];

(x)       [reserved];

(xi)      Indebtedness of the Borrower or any of its Subsidiaries which may be deemed to exist in connection with agreements providing for indemnification, purchase price adjustments and similar obligations in connection with the acquisition or disposition of assets in accordance with the requirements of this Agreement, so long as any such obligations are those of the Person making the respective acquisition or sale, and are not guaranteed by any other Person except as permitted by Section 11.10;

(xii)     additional unsecured Indebtedness incurred by the Borrower and its Subsidiary Guarantors in an aggregate principal amount not to exceed $50,000;

(xiii)    [reserved];

(xiv)     [reserved];

(xv)      Indebtedness representing deferred compensation, deferred compensation plans or other similar arrangements to employees of the Borrower (or any direct parent of the Borrower) and their Subsidiaries, in each case, incurred in the Ordinary Course of Business;

(xvi)     Indebtedness representing any taxes, assessments or governmental charges to the extent that payment thereof shall not at any time be required to be made hereby and for which the Borrower has maintained adequate reserves with respect thereto in accordance with GAAP;

(xvii)    Indebtedness incurred pursuant to the Unsecured Note in an aggregate principal amount not to exceed $40,000,000 (as such principal amount may be increased by interest paid in kind as additional principal), so long as such Indebtedness is unsecured and subject to the Turnover Agreement;

(xviii)   [reserved];

(xix)     so long as in the Ordinary Course of Business, Indebtedness in respect of: (a) credit cards; (b) credit card processing services; (c) debit cards and stored value cards; (d) commercial cards; (e) ACH transactions; and (f) cash management and treasury management services and products, including without limitation controlled disbursement accounts or services, lockboxes, automated clearinghouse transactions, overdrafts, interstate depository network services; and

(xx)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xix) above.

The accrual of interest, the accretion of accreted value, the payment of interest in the form of additional Indebtedness, accretion or amortization of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Indebtedness for purposes of this Section 11.04. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a consolidated balance sheet of the Borrower dated such date prepared in accordance with GAAP.

11.05    Investments. Holdings will not, and will not permit any of its Subsidiaries to lend money or credit or make advances to any Person (excluding in each case intercompany transfer pricing and accounts receivable), or purchase or acquire any stock, obligations or securities of, or any other Equity Interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, (each of the foregoing an "**Investment**" and, collectively, "**Investments**") (it being

understood and agreed that for purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made (which, in the case of any Investment constituting the contribution of an asset or property, shall be based on the Borrower's good faith estimate of the fair market value of such asset or property at the time such Investment is made)), without adjustment for subsequent changes in the value of such Investment (including any write-downs or write-offs thereof), net of any Returns with respect to such Investment), except that the following shall be permitted:

(i)      the Borrower and its Subsidiaries may acquire and hold accounts receivables owing to any of them;

(ii)     Holdings and its Subsidiaries may acquire and hold cash and Cash Equivalents;

(iii)    [reserved];

(iv)     the Borrower and its Subsidiaries may acquire and own Investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the Ordinary Course of Business;

(v)      the Borrower and its Subsidiaries may make loans and advances to their officers and employees for moving, relocation and travel expenses and other similar expenditures, in each case in the Ordinary Course of Business in an aggregate amount not to exceed $50,000 at any time (determined without regard to any write-downs or write-offs of such loans and advances), in each case made with the consent of the Board of Directors and/or any special committees with respect to the Case or such matters;

(vi)     Holdings and its Subsidiaries may acquire and hold obligations of their officers and employees in connection with such officers' and employees' acquisition of shares of Holdings (or parent company) common Equity Interests (so long as no cash is actually advanced by Holdings or any of its Subsidiaries in connection with the acquisition of such obligations);

(vii)    [reserved];

(viii)   any Credit Party may make Investments in and intercompany loans and advances to any other Credit Party (the "**Intercompany Loans**"); <u>provided</u> that any Intercompany Loans made to any Subsidiary Guarantor pursuant to this clause (viii) shall cease to be permitted by this clause (viii) if such Subsidiary Guarantor ceases to constitute a Subsidiary Guarantor;

(ix)     [reserved];

(x)      Holdings and its Subsidiaries may own the Equity Interests of their respective Subsidiaries created or acquired in accordance with the terms of this Agreement (so long as all amounts invested in such Subsidiaries are independently justified under another provision of this <u>Section 11.05</u>);

(xi)     [reserved];

(xii)    [reserved];

(xiii)   [reserved];

(xiv)    the Borrower and its Subsidiaries may make advances in the form of a prepayment of expenses or lease, utility and other similar deposits to vendors, suppliers and trade creditors, so long as such expenses were incurred in the Ordinary Course of Business of the Borrower or such Subsidiary;

(xv)    additional loans, advances and other Investments to or in a Person not to exceed an aggregate amount of $50,000;

(xvi)    [reserved];

(xvii)    (i) reasonable earnest money deposits made in connection with the acquisitions of property and assets not prohibited hereunder and (ii) deposits made in the Ordinary Course of Business securing contractual obligations to the extent constituting a Lien permitted hereunder;

(xviii)   Holdings, Intermediate Holdings, the Borrower and the Subsidiary Guarantors may each guarantee obligations or Indebtedness of Holdings, Intermediate Holdings, the Borrower and the Subsidiary Guarantors permitted by Section 11.04;

(xix)    advances of payroll payments to employees in the Ordinary Course of Business;

(xx)    [reserved]; and

(xxi)    securities acquired in connection with the satisfaction or enforcement of indebtedness or claims due or owing or as security for any such indebtedness or claim, so long as the same are pledged to the Administrative Agent to secure the Obligations.

11.06    Transactions with Affiliates.  Holdings will not, and will not permit any of its Subsidiaries to, enter into any transaction or series of related transactions with any Affiliate of Holdings or any of its Subsidiaries, other than in the Ordinary Course of Business and on terms and conditions substantially as favorable to Holdings or such Subsidiary as would reasonably be obtained by Holdings or such Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that the following in any event shall be permitted:

(i)    Dividends may be paid to the extent provided in Section 11.03;

(ii)    loans may be made and other transactions may be entered into by Holdings and its Subsidiaries to the extent permitted by Sections 11.02, 11.04 and 11.05;

(iii)    customary fees, indemnities and reimbursements may be paid to (a) non-officer directors and (b) officers and other advisors (other than the Sponsor and its Affiliates) of Holdings and its Subsidiaries;

(iv)    Holdings may issue Holdings common Equity Interests;

(v)    Holdings and its Subsidiaries may enter into, and may make payments under, employment agreements, employee benefits plans, stock option plans, indemnification provisions and other similar compensatory arrangements with officers, employees and directors of Holdings and its Subsidiaries in the Ordinary Course of Business.

(vi)    [reserved];

(vii)    [reserved];

(viii)   [reserved];

(ix)    transactions among Credit Parties on customary terms and in the Ordinary Course of Business (including, without limitation, the Investments set forth in Section 11.05);

(x)    [reserved];

64

(xi)     [reserved];

(xii)    affiliate transactions authorized or approved pursuant to (x) the Interim Order, and, when applicable, the Final Order, or any First Day Order or (y) any other order entered by the Bankruptcy Court without the objection of the Required Lenders; provided, for the avoidance of doubt, that such objection need not be filed with the Bankruptcy Court;

(xiii)   [reserved];

(xiv)    [reserved];

(xv)     [reserved];

(xvi)    consummation of the Transaction;

(xvii)   [reserved];

(xviii)  employment and severance arrangements between Holdings, Intermediate Holdings, the Borrower and their Subsidiaries and their respective directors, officers, employees, members of management, or consultants in the ordinary course of business and transactions pursuant to equity or equity-based plans and employee benefit plans and arrangements;

(xix)    [reserved]; and

(xx)     the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, future, present or former directors, officers, employees, members of management, and consultants of Holdings, Intermediate Holdings, the Borrower and their Subsidiaries or any direct or indirect parent of Holdings in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries.

Notwithstanding anything to the contrary contained herein, in no event shall Holdings or any of its Subsidiaries pay any management, consulting or similar fee to any of the Sponsor or any of its Affiliates, including any payments for financial advisory, financing, underwriting or placement services or in respect of other investment banking activities (including in connection with acquisitions or divestitures) or any reimbursement for indemnities and expenses.

11.07    [Reserved].

11.08    Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements, etc. Holdings will not, and will not permit any of its Subsidiaries to:

(i)      amend, modify, supplement or change its certificate or articles of incorporation (including by the filing or modification of any certificate or articles of designation), certificate of formation, registration statement, limited liability company agreement, partnership agreement or by-laws (or the equivalent organizational documents), as applicable, without the prior written consent of the Administrative Agent.

(ii)     amend, modify, supplement or otherwise change, or waive, any provision of the Asset Purchase Agreement, any Junior Financing Documentation or any real property lease or other material contract, unless such amendment, modification, supplement or change is approved in advance by the Administrative Agent.

11.09    Limitation on Certain Restrictions on Subsidiaries.  Holdings will not, and will not permit any of its Subsidiaries to create or otherwise cause or suffer to exist or become effective any encumbrance or

restriction on the ability of any such Subsidiary to (a) pay dividends or make any other distributions in respect of its Equity Interests or participation in its profits owned by Holdings or any of its Subsidiaries, or pay any Indebtedness owed to Holdings or any of its Subsidiaries, (b) make loans or advances to Holdings or any of its Subsidiaries or (c) transfer any of its properties or assets to Holdings or any of its Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) this Agreement and the other Credit Documents, (iii) customary provisions restricting subletting or assignment of any lease governing any leasehold interest of Holdings or any of its Subsidiaries, (iv) customary provisions restricting assignment of any licensing agreement (in which Holdings or any of its Subsidiaries is the licensee) or other contract entered into by Holdings or any of its Subsidiaries in the Ordinary Course of Business, (v) restrictions on the transfer of any asset pending the close of the sale of such asset, (vi) restrictions which, in the reasonable opinion of the Borrower, are not more restrictive (taken as a whole) than the restrictions hereof; and (vii) restrictions on the transfer of any asset subject to a Lien permitted by Section 11.01(vi), (vii), (xv), (xvi) and (xxiv).

11.10    Passive Holdco. In the case of each of Holdings and Intermediate Holdings, conduct, transact or otherwise engage in any material business or operations other than the following (and activities incidental thereto): (i) its ownership of the Equity Interests of the Borrower and, indirectly, the Subsidiaries of Borrower, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations, including the giving of guarantees or (where permitted) the granting of Liens on its assets, with respect to the Credit Documents, the Subordinated Note Documents and any agreement contemplated in connection with a transaction otherwise permitted under this Section 11.10, (iv) any public offering of its common stock or any other issuance of its Equity Interests, (v) any transaction that Holdings or Intermediate Holdings, as applicable, is expressly permitted to enter into or consummate under this Article XI (other than this Section 11.10) and any transaction between (x) Holdings or Intermediate Holdings, as applicable, and (y) the Borrower or any Subsidiary expressly permitted under this Article XI (other than this Section 11.10), (vi) incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, (vii) making Investments in the Borrower, (viii) guaranteeing the obligations of its Subsidiaries (including the Borrower) and granting a security interest in its assets related thereto (to the extent such obligations are permitted to be secured by Liens on assets granted by such Subsidiaries in accordance with the provisions of this Agreement, in each case solely to the extent such obligations of such Subsidiaries are not prohibited hereunder, and the performance of obligations in respect of Indebtedness of the type permitted under Section 11.04 and Liens of the type permitted under Section 11.01, including incurrence of Indebtedness of Holdings or Intermediate Holdings, as applicable, representing deferred compensation to members, employees, consultants, independent or contractors of Holdings (or any direct or indirect parent thereof) or Intermediate Holdings, as applicable, and unsecured Indebtedness consisting of promissory notes issued by any Credit Party to future, present or former officers, directors, employees, members of management, and consultants (or their respective estates, executors, administrators, heirs, family members, legatees, distributees, spouses, former spouses, domestic partners and former domestic partners) of Holdings (or any direct or indirect parent thereof) or Intermediate Holdings, as applicable, the Borrower or other Subsidiaries of Holdings to finance the retirement, acquisition, repurchase, purchase or redemption of Equity Interests of Holdings or any direct or indirect parent thereof, (ix) participating in tax, accounting and other administrative matters as a member of the consolidated, combined, unitary or similar group that includes Holdings, Intermediate Holdings and the Borrower, (x) holding any cash, Cash Equivalents or other property received in connection with Dividends or distributions received from, and Investments in Holdings or Intermediate Holdings, as applicable, made by, its Subsidiaries, contributions to its capital or in exchange for the issuance of Equity Interests (including the redemption in whole or in part of any of its Equity Interests in exchange for another class of Equity Interests or rights to acquire its Equity Interests or with proceeds from substantially concurrent equity contributions or issuances of new shares of its Equity Interests) and Investments received in respect of any of the foregoing pending application thereof by Holdings or Intermediate Holdings, as applicable, (xi)

providing indemnification and contribution to directors, officers, employees, members of management, and consultants and the making of any loan to any directors, officers, employees, members of management, and consultants, (xii) making Investments in assets that are Cash Equivalents at the time any such Investment is made, (xiii) activities incidental to the consummation of the Transaction, and (xiv) organizational activities incidental to acquisitions consummated by the Borrower or any Subsidiary, including the formation of acquisition vehicle entities and intercompany loans and/or investments incidental to such acquisitions in each case consummated substantially contemporaneously with the consummation of the applicable acquisitions.

11.11    Prepayments of Junior Financings.  Holdings will not, and will not permit any of its Subsidiaries to prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity or scheduled repayment or prepayment date thereof in any manner any Junior Financing, except as permitted by the terms and conditions set forth in the Orders.

11.12    Additional Bankruptcy Matters.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, do any of the following:

(a)    use any portion or proceeds of the Term Loans or the DIP Collateral, or disbursements set forth in the then Approved Budget, for payments or purposes that would violate the terms of the Interim Order or the Final Order;

(b)    incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is *pari passu* with or senior to the claim of the Secured Creditors against any Credit Party, except for the Carve-Out or as otherwise expressly permitted by the Orders;

(c)    assert, join, investigate, support or prosecute any claim or cause of action against any of the Secured Creditors (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Credit Documents against any of the Secured Creditors;

(d)    assert, file or seek, or consent to the filing or the assertion of or joinder in, or use any portion of the proceeds of the Term Loans, Obligations, the DIP Collateral, the Carve-Out or cash collateral to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers or documents, defense (including offsets and counterclaims of any nature or kind), or other contested matter (including any of the foregoing the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration, or similar relief):

(i)    avoiding, re-characterizing, recovering, reducing, subordinating (except pursuant to the Orders), disallowing, or otherwise challenging (under Sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or other applicable law), in each case, in whole or in part, the Obligations, the Liens securing the Obligations, the Prepetition First Lien Obligations or the Prepetition First Lien Liens; or reversing, modifying, amending, staying or vacating the Orders, without the prior written consent of the Administrative Agent;

(ii)    granting priority for any administrative expense, secured claim or unsecured claim against any Credit Party (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Administrative Agent and the Lenders in respect of the Obligations, and/or the Prepetition Administrative Agent and the Prepetition First Lien Lenders in respect of the Prepetition First Lien Obligations, in each case except as provided under the Carve-Out or to the extent expressly permitted under the Orders;

67

(iii)    granting or imposing, under Section 364(c) or 364(d) of the Bankruptcy Code or otherwise, any additional financing under such sections or any Lien equal or superior to the priority of the Liens securing the Obligations, except to the extent expressly permitted under the Orders; or

(iv)    permitting the use of cash collateral as defined in Section 363 of the Bankruptcy Code, except as expressly permitted by the Orders or this Agreement

(e)    seek, without the prior written consent of the Administrative Agent, at the direction of Required Lenders, any order granting authority (i) to take any action that is prohibited by the terms of this Agreement, the Interim Order, the Final Order or the other Credit Documents or (ii) to refrain from taking any action that is required to be taken by the terms of this Agreement, the Interim Order, the Final Order or any of the other Credit Documents;

(f)    amend, modify or compromise any term or amount owed under a real property lease or material contract without the consent of the Administrative Agent (not to be unreasonably withheld, delayed or conditioned);

(g)    except as expressly provided or permitted in the then Approved Budget, make any payment or distribution to any non-Debtor Affiliate or insider of any Debtor outside of the ordinary course of business;

(h)    seek or consent to any order (i) dismissing any of the Cases under Sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; (ii) converting any of the Cases to cases under Chapter 7 of the Bankruptcy Code; (iii) appointing a Chapter 11 trustee in any of the Cases; (iv) appointing an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases; or (v) granting a change of venue with respect to any Case or any related adversary proceeding;

(i)    make any payments or transfer any property on account of claims asserted by any vendors of any Credit Party for reclamation in accordance with Section 2-702 of any applicable UCC and Section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court upon prior notice to the Administrative Agent;

(j)    return any inventory or other property to any vendor pursuant to Section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with Section 546(g) of the Bankruptcy Code upon prior notice to the Administrative Agent; or

(k)    make payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except, in each case, in amounts and on terms and conditions that (I) are approved by order of the Bankruptcy Court after notice and hearing, (II) are within the limits of the Approved Budget (subject to any Permitted Variances), and (III) as approved in writing by the Administrative Agent.

11.13    <u>Disbursements</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, make any disbursements other than those set forth in the Approved Budget (subject to Permitted Variances or as otherwise permitted in accordance with the terms of the Orders).

Notwithstanding anything in this <u>Section 11</u> to the contrary, in no event shall Holdings or any of its Subsidiaries avail itself of any exception or "basket" applicable to any of the covenants set forth in this <u>Section 11</u>, in each case, unless the taking of such action is otherwise made in accordance with, and not in contravention of, the Approved Budget, subject to the Permitted Variances.

SECTION 12.    Events of Default. Upon the occurrence of any of the following specified events (each, an "**Event of Default**"):

68

12.01    Payments.  The Borrower shall (i) default in the payment when due of any principal, interest or other Obligations, including without limitation on the Maturity Date; or

12.02    Representations, etc.  Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate delivered to the Administrative Agent, the Administrative Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect (or, to the extent qualified by materiality or Material Adverse Change, in all respects) on the date as of which made or deemed made; or

12.03    Covenants.  Holdings or any of its Subsidiaries shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in: any of Section 10.01, Section 10.02, Section 10.04 (solely with respect to the existence of Borrower), Section 10.10, Section 10.16, Section 10.17, Section 10.18, Section 10.19, Section 10.20, Section 10.21, Section 10.22, Section 10.23 or Section 11; or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement (other than those set forth in Sections 12.01, 12.02 and 12.03(i)) or any other Credit Document and such default under this Section 12.03(ii) shall continue unremedied for a period of 10 days after written notice from Administrative Agent to the Borrower of such default; or

12.04    Default Under Other Material Debt Agreements.  Holdings or any of its Subsidiaries shall (i)(x) default in any payment of any Indebtedness (other than the Obligations) with an aggregate outstanding principal amount in excess of the Threshold Amount beyond the period of grace, if any, provided in an instrument or agreement under which such Indebtedness was created or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations) with an aggregate outstanding principal amount in excess of the Threshold Amount or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, in each case the effect of which default or other event or condition is to cause or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined after all grace periods have run and applicable required notice has been given), any such Indebtedness to become due prior to its stated maturity, or (ii) any Indebtedness (other than the Obligations) with an aggregate outstanding principal amount in excess of the Threshold Amount of Holdings or any of its Subsidiaries shall be declared to be (or shall become) due and payable, or required to be prepaid (other than by (1) a regularly scheduled required prepayment or (2) a mandatory prepayment (unless such required prepayment or mandatory prepayment results from a default thereunder or an event of the type that constitutes an Event of Default)), prior to the stated maturity thereof; provided that the above clause (i)(y) shall not apply to secured Indebtedness that becomes subject to a mandatory prepayment or mandatory offer to purchase or redeem as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder; provided, further, that, in any event, such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments, acceleration of the Term Loans or the exercise of other remedies pursuant to this Agreement; or

12.05    Default Under Asset Purchase Agreement. Holdings or any of its Subsidiaries shall default in the observance or performance of any agreement, covenant or condition relating to the Asset Purchase Agreement following the giving of notice and the passage of time, and which default the Purchaser has asserted by written notice.

12.06    ERISA.  Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof under Section 412 of the Code or Section 302 of ERISA or a waiver of such standard or extension of any amortization period is granted under Section 412 of the Code or Section 303 or 304 of ERISA; a Reportable Event shall have occurred; any determination that any Plan or Multiemployer Plan is considered at-risk or in endangered or critical status as defined in Sections 303, 304 and 305 of ERISA or

Sections 430, 431, and 432 of the Code; any Plan or Multiemployer Plan which is subject to Title IV of ERISA shall have had or it is reasonably likely to have a trustee appointed to administer such Plan or Multiemployer Plan; any Plan or Multiemployer Plan which is subject to Title IV of ERISA is, shall have been terminated or to be the subject of termination proceedings under ERISA; any Plan shall have an Unfunded Current Liability; a contribution required to be made with respect to a Plan, a Multiemployer Plan or a Foreign Pension Plan has not been timely made; a Credit Party has any liability under ERISA or any of Sections 4971 through 5000 of the Code or to or on account of a Plan, a Multiemployer Plan or any other "plan" as defined in Section 3(3) of ERISA; a Credit Party has incurred or is likely to incur liabilities pursuant to Foreign Pension Plans; or a "default," within the meaning of Section 4219(c)(5) of ERISA, shall occur with respect to any Multiemployer Plan; and there shall result from any such event or events described in this <u>Section 12.06</u> above a Material Adverse Change; or

12.07    <u>Orders</u>.  Any material provision of the Orders or a Credit Document shall fail or cease to be in full force and effect (except as a result of a release in accordance with the terms thereof), or shall fail or cease to give the Administrative Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges created hereby or thereby (including, without limitation, a perfected security interest in, and Lien on, all of the DIP Collateral, in favor of the Administrative Agent, superior to and prior to the rights of all third Persons (except as permitted by <u>Section 11.01</u>), and subject to no other Liens (except as permitted by <u>Section 11.01</u>), or the Borrower or any of its Affiliates or any Person acting on their behalf shall allege the invalidity of such Orders or a Credit Document; or

12.08    <u>Guaranties</u>.  (x) Any material provision of any Guaranty or any provision thereof shall cease to be in full force or effect as to any Guarantor (except as a result of a release of any Subsidiary Guarantor in accordance with the terms thereof), or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm such Guarantor's obligations under the Guaranty to which it is a party or any Guarantor shall default in the due performance or observance of any material term, covenant or agreement on its part to be performed or observed pursuant to the Guaranty to which it is a party, or the Borrower or any of its Affiliates or any Person acting on their behalf shall allege the invalidity of such Guaranty, or (y) any material portion of any material Credit Documents (other than those addressed by <u>Sections 12.07</u> and <u>12.08(x)</u>) shall for any reason fail to constitute the valid and binding agreement of any Credit Party or any of their Subsidiaries party thereto, or any Credit Party shall so assert, in each case, unless such Credit Document terminates pursuant to the terms and conditions thereof and not as a result of any breach or default thereunder by any Credit Party thereto; or

12.09    <u>Judgments</u>.  One or more judgments or decrees after the Petition Date shall be entered against Holdings or any Subsidiary of Holdings involving in the aggregate for Holdings and its Subsidiaries a liability (not paid or to the extent not covered by indemnity or insurance) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 60 consecutive days, and the aggregate amount of all such judgments outstanding at any one time equals the Threshold Amount; or

12.10    <u>Change of Control</u>.  A Change of Control shall occur; or

12.11    <u>Subordination</u>.  (i) The subordination provisions of the documents evidencing or governing any Subordinated Debt (the "**Subordinated Provisions**") in excess of the Threshold Amount or the Subordination Agreement shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of such Subordinated Debt or the Subordinated Note (as applicable); or (ii) the Borrower or any other Credit Party shall in writing disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordinated Provisions or the Subordination Agreement, (B) that the Subordinated Provisions exist for the benefit of the Administrative Agent, the Administrative Agent and the Lenders or (C) that all payments of principal of or premium and interest on

the applicable Subordinated Debt or Subordinated Note (as applicable), or realized from the liquidation of any property of any Credit Party, shall be subject to any of the Subordinated Provisions or Subordination Agreement (as applicable); or

12.12    <u>Case Events</u>.  There occurs any of the following in the Cases:

(i)      the bringing of a motion or taking of any action by any of the Credit Parties or any Subsidiary or any person with authority to act on behalf of or through any Credit Party or any Subsidiary, (A) to grant any Lien other than Liens permitted pursuant to <u>Section 11.01</u> upon or affecting any DIP Collateral or (B) to use cash collateral of the Administrative Agent and the other Secured Creditors under section 363(c) of the Bankruptcy Code without the prior written consent of the Required Lenders, except as provided in the Interim Order or Final Order;

(ii)     the entry of an order in any of the Cases confirming a Reorganization Plan that is not an Acceptable Plan, or the filing of any Reorganization Plan or Liquidation Plan or disclosure statement attendant thereto, or any amendment, modification or supplement to such plan or disclosure statement that has not been consented to in writing by the Administrative Agent;

(iii)    the entry of an Interim Order or Final Order in form or substance that is not acceptable to the Administrative Agent in its sole discretion;

(iv)     any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of an Order, as entered by the Bankruptcy Consent, without the prior written consent of the Administrative Agent and each Lender,

(v)      the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Interim Order or the Final Order in any respect without the written consent of the Administrative Agent and Lenders, the filing of a motion by the Debtors for reconsideration with respect to the Interim Order or the Final Order, or the Interim Order or the Final Order shall otherwise not be in full force and effect;

(vi)     the payment of, or application by any Debtor for authority to pay, any Prepetition Debt or other prepetition claim without the prior written consent of the Administrative Agent and the Required Lenders, other than in amount set forth in the Approved Budget, subject to any Permitted Variances;

(vii)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against, the Administrative Agent, any Lender, any other Secured Creditors or any of the DIP Collateral;

(viii)   (A) the appointment of a trustee, receiver or an examiner (other than a fee examiner) in the Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Credit Parties, or (B) the sale without the Required Lenders' consent of all or substantially all of the Debtors' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed Reorganization Plan in the Cases or otherwise that does not result in Payment in Full in cash of all of the Credit Document Obligations under this Agreement at the closing of such sale or initial payment of the purchase price or effectiveness of such Reorganization Plan, as applicable;

(ix)    the dismissal of any Case, or the conversion of any Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code, or any Credit Party shall file a motion or other pleading seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise, in each case, without the prior written consent of the Administrative Agent and the Required Lenders;

(x)    any Credit Party shall file a motion seeking, or shall support a request of any party for, relief from or modification of the automatic stay (A) to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on any DIP Collateral, (B) approving any settlement or other stipulation not approved by the Required Lenders (which approval shall not be unreasonably withheld) with any creditor of any Credit Party providing for payments as adequate protection or otherwise to such secured creditor or (C) with respect to any Lien on or the granting of any Lien on any DIP Collateral to any federal, state or local environmental or regulatory agency or authority;

(xi)    the commencement by any Credit Party or Subsidiary of a suit or an action against the Administrative Agent, any Lender or any other Secured Creditor, where such suit or action asserts or seeks a claim or any legal or equitable remedy that would (x) have the effect of invalidating, subordinating or challenging any or all of the Credit Document Obligations, the Prepetition Secured Obligations, or Liens of the Administrative Agent (on behalf of the Secured Creditors) to any other claim, or (y) have a Material Adverse Effect on the rights and remedies of the Administrative Agent or the collectability of all or any portion of the Credit Document Obligations and the Prepetition Secured Obligations (other than a challenge as to whether an Event of Default has, in fact, occurred and is continuing);

(xii)    the entry of an order in the Cases avoiding recovery of any portion of the payments made on account of the Credit Document Obligations owing under this Agreement;

(xiii)    the entry of an order in the Cases terminating the exclusive right of any Credit Party to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code;

(xiv)    any Credit Party shall make a request for, or there shall occur a, reversal, modification, amendment, stay, reconsideration or vacatur of a Order, as entered by the Bankruptcy Court, without the prior written consent of the Administrative Agent and each Lender;

(xv)    there shall arise or be granted by the Bankruptcy Court (I) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 of the Bankruptcy Code or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out and the Credit Document Obligations) or (II) any Lien on the DIP Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except, in each case, as expressly provided in the Credit Documents or in the Orders then in effect;

(xvi)    the Interim Order (prior to the Final Order Entry Date) or, on and after entry thereof, the Final Order, in each case shall cease to create a valid and perfected Lien on the DIP Collateral or to be in full force and effect, or shall have been reversed, modified or amended in a manner materially adverse to the Secured Creditors, or vacated, in each case without prior written consent of the Required Lenders;

(xvii)    an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Credit Parties;

72

(xviii)   any Credit Party shall challenge or support a challenge of any payments made to the Administrative Agent, any Lender, or any Secured Creditors with respect to the Credit Document Obligations or Prepetition Secured Obligations, without the consent of the Required Lenders and, if required hereunder, any other Secured Creditors, the filing of any motion by the Credit Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any Prepetition Agent, or the Prepetition Lenders, that is inconsistent with an Order;

(xix)    without the Required Lenders' consent, the entry of any order by the Bankruptcy Court (other than the Orders, the First Day Orders, and the "second day" orders) granting, or the filing by any Credit Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the Orders, the First Day Orders, the "second day" orders, and motions seeking entry thereof or permitted amendments or modifications of any of the foregoing) seeking, authority to use any cash proceeds of any of the DIP Collateral without the consent of the Administrative Agent (at the direction of the Required Lenders) or to obtain any financing under Section 364 of the Bankruptcy Code other than the Credit Documents;

(xx)    without the Required Lenders' consent, the filing by any Credit Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court seeking authority to consummate a sale of material assets constituting DIP Collateral outside the ordinary course of business and not permitted hereunder;

(xxi)    any Credit Party shall make, or make an application for authority to pay, any Prepetition Payment other than with the consent of the Administrative Agent and the Required Lenders, other than amounts set forth in the then Approved Budget (including Permitted Variances);

(xxii)   without the Required Lenders' consent, any Credit Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (A) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP Collateral, whether senior, equal or subordinate to the Administrative Agent's liens and security interests, other than Liens permitted by Section 11.01; or (B) to modify or affect any of the rights of the Administrative Agent, the Lenders or the Secured Creditors under the Orders or the Credit Documents and related documents by any plan of reorganization confirmed in the Cases or subsequent order entered in the Cases;

(xxiii)  any Credit Party shall fail to be in compliance in all respects with the Interim Order and/or the Final Order (as applicable);

(xxiv)   the filing of any motion or application by any Credit Party (other than a motion or application for financing provided by a third party which seeks authority to indefeasibly pay all of the Obligations and Prepetition Secured Obligations in full in cash upon entry of the order approving such financing) in any of the Cases for the approval of (or an order is entered by the Bankruptcy Court approving) (A) any additional post-petition financing under section 364(c) or (d) of the Bankruptcy Code, or (B) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Cases which is *pari passu* with or senior to the Obligations or the Liens granted with respect to the Obligations, excluding liens arising under the Orders;

(xxv)    the commencement of any action by the Debtors or other authorized person (other than an action permitted by the Orders) against any of the Administrative Agent or any

Lender or any of their agents and employees, to subordinate or avoid any Liens granted in connection with the Orders;

(xxvi)   (1) any Credit Party files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any Order, or to disallow the DIP Obligations, in whole or in part, or (2) any material provision of the Orders or any other order of the Bankruptcy Court approving the Credit Parties' use of Cash Collateral (as defined in the Orders), shall for any reason cease to be valid and binding (without the prior written consent of the Administrative Agent and each Lender);

(xxvii)  the filing with the Bankruptcy Court of a motion seeking approval of a sale under section 363 of the Bankruptcy Code (other than approval of a sale pursuant to the terms of the Asset Purchase Agreement) or a plan of reorganization or liquidation in any of the Cases that, in either case, does not provide for indefeasible payment in full in cash to the Administrative Agent and the Lenders of the Term Loans and all other amounts outstanding under the Orders on closing of such sale or the effective date of such plan;

(xxviii) the appointment in any of the Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(xxix)  the granting of relief from the automatic stay by the Bankruptcy Court with respect to any portion of the DIP Collateral (other than with respect to the Administrative Agent);

(xxx)   the liens or super-priority claims granted with respect to the Credit Document Obligations or the Prepetition Secured Obligations cease to be valid, perfected and enforceable in any respect; or

(xxxi)  the filing of any plan of reorganization or liquidation or disclosure statement attendant thereto, or any amendment, modification or supplement to such plan or disclosure statement, by any Credit Party, other than a plan or disclosure statement (or any amendment, modification or supplement thereto) that has been consented to by the Administrative Agent.

then, and in any such event, and at any time thereafter, if any Event of Default under this Section 12 shall then be continuing, subject to three (3) Business Days' notice to the Credit Parties during which the Credit Parties may seek an emergency hearing before the Bankruptcy Court (at which hearing the sole issue shall be whether or not an Event of Default has occurred or is continuing), the Administrative Agent may (and at the direction of the Required Lenders, shall) take all or any of the following actions without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against any Credit Party: (i) declare the Total Commitment terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately without any other notice of any kind; (ii) declare the principal of and any accrued interest in respect of all Term Loans and all other Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; (iii) declare a termination reduction or restriction on the ability of the Credit Parties to use any cash collateral; (iv) subject to the terms of the Interim Order or the Final Order, as applicable, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Credit Documents or applicable law or equity, including (and, in the Administrative Agent's discretion, direct any or all of the Credit Parties (or file a motion in the name of the Credit Parties)) (A) to enforce the terms and provisions of the Credit Documents, (B) to collect accounts receivables, without setoff by any account debtor,

including direct the Credit Parties to collect such account receivables, (C) to sell or otherwise dispose of any or all of the DIP Collateral on terms and conditions reasonably acceptable Administrative Agent and the Lenders pursuant to sections 363, 365 and other applicable provisions of the Bankruptcy Code (and without limiting the foregoing, direct the Credit Parties (or file a motion in the name of the Credit Parties) to assume and assign any lease or executory contract included in the DIP Collateral to the Administrative Agent's designees in accordance with and subject to section 365 of the Bankruptcy Code) and (D) enter into the premises of any Credit Party in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process); *provided* that the Credit Parties shall take all action that is reasonably necessary to cooperate with the Administrative Agent in the Administrative Agent's exercise of its rights and remedies and facilitate the realization upon the DIP Collateral by the Administrative Agent; (v) enforce, as the Administrative Agent, all of the Liens and security interests created pursuant to this Agreement and the other Credit Documents; (vi) enforce each Guaranty under Section 15; and (vii) apply any cash collateral held by the Administrative Agent or the Administrative Agent to the repayment of the Obligations.

SECTION 13.   The Administrative Agent; The Administrative Agent.

13.01   Appointment.  The Lenders hereby irrevocably designate and appoint KKR Loan Administration Services LLC as Administrative Agent to act as specified herein and in the other Credit Documents. Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize, the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of each Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto.  The Administrative Agent may perform any of their respective duties hereunder by or through its officers, directors, agents, employees or affiliates.

13.02   Nature of Duties.

(a)     The Administrative Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents.  Neither the Administrative Agent nor any of its officers, directors, agents, employees or affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by its own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a non-appealable final decision).  The duties of each Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Lender or the holder of any Note; and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.

(b)     Notwithstanding any other provision of this Agreement or any provision of any other Credit Document, the Sole Lead Arranger is named as such for recognition purposes only, and in its capacity as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Credit Documents or the transactions contemplated hereby and thereby; it being understood and agreed that the Sole Lead Arranger shall be entitled to all indemnification and reimbursement rights in favor of the Administrative Agent as, and to the extent, provided for under Sections 13.06 and 14.01.  Without limitation of the foregoing, the Sole Lead Arranger shall not, solely by reason of this Agreement or any other Credit Documents, have any fiduciary relationship in respect of any Lender or any other Person.

(c)     Each Lender unconditionally and irrevocably acquits and fully forever releases and discharges each Agent and all its affiliates, members, partners, subsidiaries, officers, employees, agents, attorneys,

principals, directors and shareholders and its respective heirs, legal representatives, successors and assigns (collectively, the "**Releasees**") on the date each interest payment on the Term Loans is made by the Borrower from any and all claims, demands, causes of action, obligations, remedies, suits, damages and liabilities of any nature whatsoever, whether now known, suspected or claimed, whether arising under common law, in equity or under statute, which such party hereto ever had or now has against any of the Releasees and which has arisen at any time prior to the date of such interest payment out of this Agreement, the other Credit Documents or any other related documents, instruments, agreements or matters or the enforcement or attempted or threatened enforcement by any of the Releasees of any of their respective rights, remedies or recourse related thereto (collectively, the "**Released Claims**") (but in each case referred to in this clause (c), excluding any claims, demands, causes of actions, obligations, remedies, suits, damages or liabilities to the extent same occurred by reason of the gross negligence or willful misconduct of the Releasee to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)). Each Lender covenants and agrees never to commence, voluntarily aid in any way, prosecute or cause to be commenced or prosecuted against any of the Releasees any action or other proceeding based upon any of the Released Claims.

13.03    Lack of Reliance on the Administrative Agent.

(a)    Each Lender from time to time party to this Agreement (i) confirms that it has received a copy of this Agreement and the other Credit Documents, together with copies of the financial statements referred to therein, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to become a Lender under this Agreement, (ii) agrees that it has made and will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Credit Documents and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Term Loans or at any time or times thereafter; provided that, upon the reasonable request of a Lender, each Agent shall provide to such Lender any documents or reports delivered to such Agent by the Credit Parties pursuant to the terms of this Agreement or any other Credit Document unless such Agent is restricted from doing so due to confidentiality requirements of Section 14.16, (iii) acknowledges and agrees that no fiduciary or advisory relationship between the Administrative Agent and any Lender is intended to be or has been created in respect of any of the transactions contemplated by this Agreement, (iv) acknowledges and agrees that each Agent, on the one hand, and each Lender on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, and no Lender relies on, any fiduciary duty on the Administrative Agent's part, (v) acknowledges and agrees that each Lender is capable of evaluating and understanding, and each such Lender understands and accepts, the terms, risks and conditions of the transactions contemplated by this Agreement, (vi) acknowledges and agrees that each Agent or any of their respective Affiliates may have received fees or other compensation from any Credit Party or any Affiliate of any Credit Party in connection with this Agreement which may or may not be publicly disclosed and such fees or compensation do not affect any Lender's independent credit decision to enter into the transactions contemplated by this Agreement, (vii) acknowledges and agrees that notwithstanding that no fiduciary or similar relationship exists between the Administrative Agent and any Lender, each such Lender hereby waives, to the fullest extent permitted by law, any claims it may have against the Administrative Agent or their Affiliates for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that the Administrative Agent and their Affiliates shall have no liability (whether direct or indirect) to any Lender in respect of such a fiduciary duty claim or to any Person asserting a fiduciary duty claim on behalf of or in right of any Lender, including any such Lender's affiliates, members, partners, subsidiaries, officers, employees, agents, attorneys, principals, directors and shareholders and respective heirs, legal representatives, successors and assigns and creditors, in each case subject to and

without limiting the terms of <u>Section 13.02(a)</u>, and (viii) agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Credit Documents are required to be performed by it as a Lender.  The Administrative Agent shall not be responsible to any Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Credit Document or the financial condition of Holdings or any of its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, or the financial condition of Holdings or any of its Subsidiaries or the existence or possible existence of any Default or Event of Default.

(b)      To the full extent permitted by applicable law, each party hereto and each Indemnified Person shall not assert, and hereby waives, any claim against any other party hereto or any other Indemnified Person, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document, any other agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby or any Term Loan or the use of the proceeds thereof; <u>provided, however</u>, that the foregoing provisions shall not relieve the Borrower of its indemnification obligations as provided in <u>Section 14.01(a)</u> to the extent any Indemnified Person is found liable for any such damages.  No party hereto and no Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Person results from such Person's gross negligence, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a non-appealable final decision); <u>provided</u>, <u>however</u>, that the foregoing provisions shall not relieve the Borrower of its indemnification obligations as provided in <u>Section 14.01(a)</u> to the extent any Indemnified Person is found liable for any such damages.

13.04    <u>Certain Rights of the Administrative Agent</u>.  If the Administrative Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, such Agent shall be entitled to refrain from such act or taking such action unless and until such Agent shall have received instructions from the Required Lenders; and such Agent shall not incur liability to any Lender by reason of so refraining.

13.05    <u>Reliance</u>.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype, facsimile or e-mail message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent reasonably believed to be the proper Person.

13.06    <u>Indemnification</u>.  To the extent each Agent (or any affiliate thereof) is not reimbursed and indemnified by the Borrower subject to <u>Section 14.01</u>, the Lenders will reimburse and indemnify each Agent (and any affiliate thereof) in proportion to their respective "percentage" as used in determining the Required Lenders for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature or in any way relating to or arising out of this Agreement or any other Credit Document; <u>provided</u> that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).  For the avoidance of doubt, this <u>Section 13.06</u> shall not apply to Taxes, except any Taxes that represent liabilities arising from any non-Tax claims.

13.07    Each Agent in its Individual Capacity.  With respect to its obligation to make Term Loans under this Agreement each Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the terms "**Lender**," "**Required Lenders**," "**holders of Notes**" or any similar terms shall, unless the context clearly indicates otherwise, include the Administrative Agent in their respective individual capacities.  The Administrative Agent and their affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement which may or may not be publicly disclosed and otherwise without having to account for the same to the Lenders.

13.08    Holders.  Each Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent.  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

13.09    Resignation by the Administrative Agent.

(a)    Each Agent may resign from the performance of all its respective functions and duties hereunder and/or under the other Credit Documents at any time by giving 30 days' prior written notice to the Lenders and the Borrower.  Such resignation shall take effect upon the appointment of a successor Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation by the Administrative Agent, the Required Lenders, with the prior consent of the Borrower, which shall not be unreasonably withheld or delayed, shall appoint a successor Agent hereunder or thereunder to fulfill the same role as the resigning Agent.

(c)    If no successor Agent has been appointed pursuant to clause (b) above by the 30th day after the date such notice of resignation was given by such Agent, the applicable Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the applicable Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Agent as provided above.

(d)    Upon a resignation of the Administrative Agent pursuant to this Section 13.09, such Agent shall remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this Section 13 (and the analogous provisions of the other Credit Documents) shall continue in effect for the benefit of such Agent for all of its actions and inactions while serving as the applicable Agent.

13.10    DIP Collateral Matters.

(a)    Each Lender authorizes and directs the Administrative Agent to enter into the Orders and any other Credit Document after the date hereof for the benefit of the Lenders and the other Secured Creditors.  The Administrative Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any DIP Collateral or Credit Document which may be necessary to perfect and maintain perfected the security interest in and liens upon the DIP Collateral granted pursuant to this Agreement.

(b)    The Lenders hereby authorize the Administrative Agent, at its option and in its discretion, to (1) release any Lien granted to or held by the Administrative Agent upon any DIP Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations (other than inchoate indemnification obligations) at any time arising under or in respect of this Agreement or the Credit Documents or the transactions contemplated hereby or thereby, (ii) constituting property being sold or otherwise disposed of (to Persons other than Holdings and its Subsidiaries) upon the sale or other disposition thereof in compliance with Section 11.02, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by Section 14.12) or (iv) as otherwise may be expressly provided in the relevant Credit Documents, and (2) release any Guarantor from its obligations under the applicable Guaranty if such Person ceases to be a Subsidiary Guarantor as a result of a transaction permitted under the Credit Documents or is otherwise permitted to be released from the applicable Guaranty pursuant to the Credit Documents.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of DIP Collateral or Guarantors from its obligations under the Guaranty pursuant to this Section 13.10.

(c)    The Administrative Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the DIP Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Administrative Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Administrative Agent in this Section 13.10 or in any of the Credit Documents, it being understood and agreed that in respect of the DIP Collateral, or any act, omission or event related thereto, the Administrative Agent may act in any manner it may deem appropriate, in its sole discretion, given the Administrative Agent's own interest in the DIP Collateral as one of the Lenders and that the Administrative Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

13.11    <u>Delivery of Information</u>.  The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (i) as specifically provided in this Agreement or any other Credit Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

13.12    <u>Delegation of Duties</u>.  The Administrative Agent may perform any and all of their duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more sub agents appointed by the Administrative Agent. Each Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective officers, directors, employees, representatives, agents, sub-agents or advisors thereof. The Administrative Agent shall not be responsible for the negligence or misconduct of any respective subagents except to the extent that a court of competent jurisdiction determines in a final non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub agents.

13.13    <u>No Reliance on Administrative Agent's Customer Identification Program; Certifications From Banks and Participants; US PATRIOT Act</u>.

(a)    Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Administrative Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the US PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 CFR § 103.121, as hereafter amended or replaced ("**CIP Regulations**"), or any other Laws relating to the prevention of money laundering or the equivalent on any applicable jurisdiction, including any programs involving any of the following items relating to or in connection with any of the Credit Parties, their Affiliates or their agents, the Credit Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the US PATRIOT Act. Each Lender, Affiliate, participant or assignee subject to Section 326 of the US PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations or any equivalent provisions in any applicable jurisdiction.

(b)    Each Lender or assignee or participant of a Lender that is not incorporated under the laws of the United States or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the US PATRIOT Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to each Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the US PATRIOT Act and the applicable regulations: (1) within ten days after the Closing Date, and (2) as such other times as are required under the US PATRIOT Act.

(c)    The US PATRIOT Act requires all financial institutions to obtain, verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution. Consequently, each Agent or Lender may from time to time request, and each Credit Party shall provide to such agents or Lender, the Borrower's name, address, tax identification number and/or such other identifying information as shall be necessary for Lender to comply with the US PATRIOT Act and any other Sanctions.

13.14   Erroneous Payment Provisions.

        (a)    If the Administrative Agent (x) notifies a Lender or Secured Creditor, or any Person who has received funds on behalf of a Lender or Secured Creditor (any such Lender, Secured Creditor or other recipient on their behalf (and each of their respective successors and assigns), a "**Payment Recipient**") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from the Administrative Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Creditor or other Payment Recipient on its behalf)  (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof) (*provided*, that, without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this clause (a) with respect to an Erroneous Payment unless such demand is made within fifteen (15) days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient), such Erroneous Payment shall at all times remain the property of the Administrative Agent pending its return or repayment as contemplated below in this Section 13.14 and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Creditor

shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter (or such later date as the Administrative Agent may, in its sole discretion, specify in writing), return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)       Without limiting immediately preceding clause (a), each Lender, Secured Creditor or any Person who has received funds on behalf of a Lender or Secured Creditor (and each of their respective successors and assigns), agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Creditor, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)       it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) and (y), an error and mistake shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)      such Lender or Secured Creditor shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 13.14(b).

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this Section 13.14(b) shall not have any effect on a Payment Recipient's obligations pursuant to Section 13.14(a) or on whether or not an Erroneous Payment has been made.

(c)       Each Lender or Secured Creditor hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Creditor under any Credit Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Creditor under any Credit Document with respect to any payment of principal, interest, fees or other amounts, against any amount that the Administrative Agent has demanded to be returned under immediately preceding clause (a).

(d)     (i) In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor in accordance with immediately preceding <u>clause (a)</u>, from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "**Erroneous Payment Return Deficiency**"), upon the Administrative Agent's notice to such Lender at any time, then effective immediately (with the consideration therefor being acknowledged by the parties hereto), (A) such Lender shall be deemed to have assigned its Term Loans (but not its Commitments) with respect to which such Erroneous Payment was made (the "**Erroneous Payment Impacted Class**") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Term Loans (but not Commitments) of the Erroneous Payment Impacted Class, the "**Erroneous Payment Deficiency Assignment**") (on a cashless basis and such amount calculated at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance)), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an approved electronic platform as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Term Loans to the Borrower or the Administrative Agent, (B) the Administrative Agent as the assignee Lender shall be deemed to have acquired the Erroneous Payment Deficiency Assignment, (C) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification and confidentiality provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender and (D) the Administrative Agent will reflect in the Register its ownership interest in the Term Loans subject to the Erroneous Payment Deficiency Assignment. For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement.

(ii)  Subject to <u>Section 14.04</u> (but excluding, in all events, any assignment consent or approval requirements (other than assignment consent or approval requirements of the Borrower), the Administrative Agent may, in its discretion, sell any Term Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Term Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). In addition, an Erroneous Payment Return Deficiency owing by the applicable Lender (x) shall be reduced by the proceeds of prepayments or repayments of principal and interest, or other distribution in respect of principal and interest, received by the Administrative Agent on or with respect to any such Term Loans acquired from such Lender pursuant to an Erroneous Payment Deficiency Assignment (to the extent that any such Term Loans are then owned by the Administrative Agent) and (y) may, in the sole discretion of the Administrative Agent, be reduced by any amount specified by the Administrative Agent in writing to the applicable Lender from time to time.

(e)     The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment

Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender or Secured Creditor, to the rights and interests of such Lender or Secured Creditor, as the case may be) under the Credit Documents with respect to such amount (the "**Erroneous Payment Subrogation Rights**") (*provided* that the Credit Parties' Obligations under the Credit Documents in respect of the Erroneous Payment Subrogation Rights shall not be duplicative of such Obligations in respect of Term Loans that have been assigned to the Administrative Agent under an Erroneous Payment Deficiency Assignment) and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Credit Party; *provided* that this Section 13.14 shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; *provided*, *further*, that for the avoidance of doubt, immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from, or on behalf of, the Borrower or any other Credit Party for the purpose of making such Erroneous Payment.

(f)        To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

(g)        Each party's obligations, agreements and waivers under this Section 13.14 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Credit Document.

SECTION 14.    Miscellaneous.

14.01    Payment of Expenses, etc.

(a)    The Borrower hereby agrees to: (i) pay all reasonable and documented (with supporting documentation) out-of-pocket costs and expenses of the Administrative Agent (limited to, in respect of legal fees, the reasonable and documented fees and disbursements of Proskauer Rose LLP) in connection with the preparation, execution, delivery and administration of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto, (ii) after the occurrence of an Event of Default, the Administrative Agent in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings (limited to, in respect of legal fees, the reasonable and documented (with supporting documentation) fees and disbursements of one counsel to the Administrative Agent, the Administrative Agent, and the Lenders, collectively, (x) one local counsel to the Secured Creditors taken as a whole in each relevant material jurisdiction and (y) one regulatory counsel for the Secured Creditors taken as a whole and, solely in the case of any conflict, one additional counsel for all similarly situated Secured Creditors and (iii) indemnify the Administrative Agent, the Administrative Agent and each Lender, and each of their respective principals, shareholders, controlling persons, members, legal counsel, independent auditors, professions, experts, officers, directors, employees, representatives, agents, affiliates, managed funds, accounts, trustees and investment advisors (each, an "**Indemnified Person**")

from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), actual losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of entering into and/or performance of this Agreement or any other Credit Document or the use of the proceeds of any Term Loans hereunder or the consummation of the Transaction or any other transactions contemplated herein or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents, including without limitation, (a) any investigation, litigation or other proceeding (whether or not the Administrative Agent, the Administrative Agent or any Lender is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Credit Party) in connection therewith or (b) the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any Real Property at any time owned, leased or operated by Holdings or any of its Subsidiaries, the generation, storage, transportation, handling or disposal of Hazardous Materials by Holdings or any of its Subsidiaries at any location, whether or not owned, leased or operated by Holdings or any of its Subsidiaries, the non-compliance by Holdings or any of its Subsidiaries with any Environmental Law (including applicable permits thereunder) applicable to any Real Property, or any Environmental Claim asserted against Holdings, any of its Subsidiaries or any Real Property at any time owned, leased or operated by Holdings or any of its Subsidiaries, including, in each case, limited to, in respect of legal fees, the reasonable and documented fees and disbursements of one counsel in connection with any such investigation, litigation or other proceeding **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, (IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNIFIED PERSON**; provided that such indemnity shall not, as to any Indemnified Person, be available to the extent that such losses, claims, damages, liabilities or related expenses (A) are determined by a court of competent jurisdiction by final non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of any Indemnified Person, (B) result from a claim brought by any Credit Party or any Subsidiary thereof against an Indemnified Person for material breach of such Indemnified Person's obligations or of their related parties hereunder or under any other Credit Document, if such Credit Party or such Subsidiary has obtained a final non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction, (C) arise from claims of any Indemnified Person solely against one or more other Indemnified Persons (other than claims against the Administrative Agent, the Administrative Agent, Sole Lead Arranger or other similar Persons, in their respective capacities as such) that do not involve or have not resulted from an act or omission by any Credit Party or any Subsidiary or (D) relate to any settlement agreements entered into by an Indemnified Person without the prior written consent of the Borrower (not to be unreasonably withheld, conditioned, denied or delayed).   This Section 14.01 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim. To the extent that the undertaking to indemnify, pay or hold harmless the Administrative Agent, the Administrative Agent or any Lender set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

(b)      To the full extent permitted by applicable law, no party hereto shall assert, and hereby waives (to the extent permitted by applicable law), any claim against any other party hereto, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Term Loan or the use of the proceeds thereof; provided, however, that the foregoing provisions shall not relieve the Borrower of its indemnification obligations as provided in Section 14.01(a) to the extent any Indemnified Person is found liable for any such damages. No Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or

other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Indemnified Person results from such Indemnified Person's gross negligence, bad faith or willful misconduct (as determined by a court of competent jurisdiction in a non-appealable final decision).

14.02   <u>Right of Setoff</u>.   In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and each Lender (upon the prior written consent of the Required Lenders) is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits and any other Indebtedness at any time held or owing by the Administrative Agent or such Lender or any Affiliate, branch or agency thereof (including, without limitation, by branches and agencies of the Administrative Agent or such Lender wherever located) to or for the credit or the account of Holdings or any of its Subsidiaries against and on account of the Obligations and liabilities of the Credit Parties then due and owing to the Administrative Agent or such Lender under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to <u>Section 14.04(b)</u>, and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not the Administrative Agent or such Lender shall have made any demand hereunder. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

14.03   <u>Notices</u>.   Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including via email, facsimile and other electronic communication) and mailed, emailed, faxed or otherwise delivered, if to any Credit Party, at:

> Holdings, Intermediate Holdings, the Borrower and their Subsidiaries:
> MB Medical Operations, LLC
> 7500 S.W. 8th Street
> Miami, Florida 33144
> Attention:       Nicholas K. Campbell, Chief Restructuring Officer
>                  Brian Bonaviri, Assistant Chief Restructuring Officer
> Email:           nick@wearemeru.com
> Email:           Brian.Bonaviri@wearemeru.com
>
> with a copy to (which shall not constitute notice):
>
> Berger Singerman LLP
> 1450 Brickell Avenue
> Suite 1900
> Miami, FL 33155
> Attention:       Paul Steven Singerman
>                  Jordi Guso
> Email:           singerman@bergersingerman.com
> Email:           jguso@bergersingerman.com

If to the Administrative Agent or the Administrative Agent, at the Notice Office; or, as to any Credit Party, the Administrative Agent or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent.  All such

notices and communications shall, when mailed (certified return receipt required), emailed, faxed or sent by overnight courier, be effective when deposited in the mails, delivered to the email service provider or overnight courier, as the case may be, or sent by fax or email, except that notices and communications to the Administrative Agent, the Administrative Agent and any Credit Party shall not be effective until received by the Administrative Agent, the Administrative Agent or the Borrower or any Credit Party, as the case may be.

14.04    Benefit of Agreement; Assignments; Participations.

(a)      This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective permitted successors and assigns of the parties hereto; provided that no Credit Party may assign or transfer any of its rights, obligations or interest hereunder without the prior written consent of the Lenders (other than in connection with a transaction expressly permitted hereunder); provided further that, although any Lender may transfer, assign or grant participations in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments or Obligations hereunder except as provided in Section 14.04(b)) and the transferee, assignee or participant, as the case may be, shall not constitute a "Lender" hereunder; provided, however, that no Lender shall transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i) extend the final scheduled maturity of any Term Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 14.07(a) shall not constitute a reduction in the rate of interest or Fees payable hereunder), or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Total Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Term Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement (other than in connection with a transaction expressly permitted hereunder) or (iii) release all or substantially all of the DIP Collateral under this Agreement (except as expressly provided in the Credit Documents) supporting the Term Loans hereunder in which such participant is participating.  In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.

(b)      Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its Commitments and related outstanding Obligations hereunder to (A) any Affiliate or Approved Fund of such Lender or (B) to one or more other Lenders, or (y) assign all, or if less than all, a portion equal to at least $500,000 (or such lesser amount agreed in writing by the Borrower and the Administrative Agent) in the aggregate for the assigning Lender of such Commitments and related outstanding Obligations hereunder to one or more Eligible Transferees, each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement; provided that (i) at such time, Schedule I shall be deemed modified to reflect the Commitments and/or outstanding Term Loans, as the case may be, of such new Lender and of the existing Lenders, (ii) upon the surrender of the relevant Notes by the assigning Lender (or, upon such assigning Lender's indemnifying the Borrower for any lost Note pursuant to a customary indemnification agreement) new Notes will be issued, at the Borrower's expense, to such new Lender and to the assigning Lender upon the

reasonable written request of such new Lender or assigning Lender, such new Notes to be in conformity with the requirements of Section 2.05 (with appropriate modifications) to the extent needed to reflect the revised Commitments and/or outstanding Term Loans, as the case may be, (iii) the consent of the Administrative Agent (not to be unreasonably withheld, delayed, denied or conditioned) and, so long as no Event of Default under Sections 12.01 then exists, the Borrower, shall be required in connection with any such assignment pursuant to clause (y) above (such consent, in any case, not to be unreasonably withheld, delayed, denied or conditioned) (provided that the consent of the Borrower or Administrative Agent shall not be required for assignments to any Person in its capacity (I) as trustee or custodian holding assets for the satisfaction of obligations of a Lender that is an Affiliate or Approved Fund of KCA (each such Lender, an "**RGA Affiliate**") to any counterparty to a reinsurance arrangement or (II) as counterparty to a reinsurance arrangement with an RGA Affiliate), (iv) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $3,500 and (v) no such transfer or assignment will be effective until recorded by the Administrative Agent on the Register. To the extent of any assignment pursuant to this Section 14.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and outstanding Term Loans. At the time of each assignment pursuant to this Section 14.04(b) to a Person which is not already a Lender hereunder, the respective assignee Lender shall, to the extent legally entitled to do so, provide to the Borrower the appropriate Internal Revenue Service Forms (and, if applicable, a Tax Certificate) described in Section 6.04(b).

(c)    Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Term Loans and Notes hereunder to a Federal Reserve Bank in support of borrowings made by such Lender from such Federal Reserve Bank and, with prior notification to the Administrative Agent (but without the consent of the Administrative Agent or the Borrower), any Lender which is a fund may pledge all or any portion of its Term Loans and Notes to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be. No pledge pursuant to this clause (c) shall release the applicable Lender from any of its obligations hereunder.

(d)    Any Lender which assigns all of its Commitments and/or Term Loans hereunder in accordance with Section 14.04(b) shall cease to constitute a "Lender" hereunder, except with respect to indemnification provisions under this Agreement which shall survive as to such assigning Lender in accordance with the terms hereof.

(e)    The Borrower agrees that each participant shall be entitled to the benefits of Section 6.04 (subject to the requirements and limitations therein, including the requirements under Sections 6.04(b)-(e) (it being understood that the documentation required under Sections 6.04(b)-(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 14.04; provided that such participant (A) agrees to be subject to the provisions of Sections 2.12 and 6.04 and the definition of "Excluded Taxes" as if it were an assignee under Section 14.04; and (B) shall not be entitled to receive any greater payment under Section 6.04, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a change in Law that occurs after the participant acquired the applicable participation. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Term Loans or other obligations under the Credit Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under

Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

14.05    No Waiver; Remedies Cumulative. No failure or delay on the part of the Administrative Agent, the Administrative Agent or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrower or any other Credit Party and the Administrative Agent, the Administrative Agent or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Administrative Agent or any Lender would otherwise have. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Administrative Agent or any Lender to any other or further action in any circumstances without notice or demand.

14.06    Payments Pro Rata.

(a)    Except as otherwise expressly provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders entitled thereto (other than (i) if a Lender that has expressly consented in writing to waive its pro rata share of any such payment, in which case such amounts shall be reallocated on a pro rata basis among the other Lenders or (ii) if all Lenders shall have expressly consented in writing to waive their pro rata share of such payment, such payment shall be returned to the Borrower) pro rata based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)    Except as otherwise provided herein, each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise) by or on behalf of a Credit Party, which is applicable to the payment of the principal of, or interest on, the Term Loans, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered from such Lenders, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(c)    Notwithstanding anything to the contrary contained herein, the provisions of the preceding Sections 14.06(a) and (b) shall be subject to the express provisions of this Agreement which require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders.

14.07    Calculations; Computations.

(a)    The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with GAAP in effect from time to time in all material respects consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by Holdings

or Intermediate Holdings to the Lenders); <u>provided</u> that, notwithstanding anything to the contrary contained herein, all such financial statements shall be prepared, and all financial covenants contained in any Credit Document shall be calculated, in each case, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any similar accounting principle) permitted a Person to value its financial liabilities at the fair value thereof. In the event of any change in GAAP (any such change, for the purpose of this <u>Section 14.07</u>, an "**Accounting Change**") that occurs after the date of this Agreement, then the Credit Parties and the Administrative Agent, on behalf of the Lenders, agree to enter into good faith negotiations in order to amend such provisions of this Agreement so as to equitably reflect any such Accounting Change with the desired result that the criteria for evaluating the financial condition of Holdings and its Subsidiaries shall be the same after such Accounting Change as if such Accounting Change had not been made, and until such time as such an amendment shall have been executed and delivered by the Credit Parties and Required Lenders, (i) all financial covenants, standards and terms in this Agreement shall be calculated and/or construed as if such Accounting Change had not been made, and (ii) Holdings or Intermediate Holdings shall prepare footnotes to the financial statements required to be delivered pursuant to <u>Sections 10.01(a)</u> and <u>(b)</u> hereunder that show the differences between the financial statements delivered (which reflect such Accounting Change) and the basis for calculating financial covenant compliance (without reflecting such Accounting Change).

(b)     [Reserved].

(c)     [Reserved].

(d)     [Reserved].

(e)     Interest on a Capitalized Lease shall be deemed to accrue at an interest rate reasonably determined by an Authorized Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease in accordance with GAAP. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, Term SOFR, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Borrower may designate.

(f)     [Reserved]:

(g)     All computations of interest and Fees hereunder shall be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or Fees are payable, except that interest computed by reference to Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year).

14.08    <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL</u>.

(a)     THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN ANY CREDIT DOCUMENT, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK. FOR SO LONG AS THE CASES ARE PENDING IN THE BANKRUPTCY COURT, ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT SHALL BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT. AFTER THE CASES ARE CLOSED AND NO LONGER PENDING BEFORE THE BANKRUPTCY COURT, ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK (OR (X) IN THE CASE OF ANY

CREDIT DOCUMENT, PROCEEDINGS MAY ALSO BE BROUGHT BY THE ADMINISTRATIVE AGENT IN THE STATE OR OTHER JURISDICTION IN WHICH THE RESPECTIVE DIP COLLATERAL IS LOCATED OR ANY OTHER RELEVANT JURISDICTION) AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, EACH PARTY HERETO HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  EACH PARTY HERETO HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER ANY CREDIT PARTY, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORE-MENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER ANY CREDIT PARTY. EACH PARTY HERETO FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS AS SPECIFIED IN <u>SECTION 14.03</u>, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.

(b)    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

14.09    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.  Delivery of an executed counterpart hereof by facsimile or electronic transmission shall be as effective as delivery of any original executed counterpart hereof.  The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation amendments or other modifications, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, or any other similar and applicable state laws based on the Uniform Electronic Transactions Act (e.g., www.docusign.com).

14.10    [Reserved].

14.11    <u>Headings Descriptive</u>. The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

14.12    <u>Amendment or Waiver; etc.</u>

(a)    Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be amended, modified, changed, waived, discharged or terminated unless such amendment, modification, change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of the Borrower may be released from, the Guaranty and this Agreement in accordance with the provisions hereof and thereof without the written consent of the other Credit Parties party thereto or the Required Lenders); <u>provided</u> that in connection with the following the Required Lenders' consent shall not be required but no such change, waiver, discharge or termination shall, without the written consent of each Non-Defaulting Lender (with Obligations being directly affected in the case of following clause (i)),

(i) extend the final scheduled maturity of any Term Loan or Note, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with the waiver of applicability of any post-default increase in interest rates), or reduce (or forgive) the principal amount thereof,

(ii) release, or subordinate Administrative Agent's lien in respect of, all or substantially all of the DIP Collateral, authorize any Credit Party to sell or otherwise dispose of all or substantially all of the DIP Collateral, or release any Guarantor from all or any portion of its Guaranteed Obligations,

(iii) amend, modify or waive any provision of this <u>Section 14.12(a)</u> (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Term Loans on the Closing Date),

(iv) reduce the voting threshold specified in the definitions of "Required Lenders" (it being understood that, additional extensions of credit pursuant to this Agreement shall be included in the determination of the Required Lenders on substantially the same basis as the extensions of Term Loans are included on the Closing Date)

(v) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or release any Credit Party of its payment obligations under any Credit Document;

(vi) amend, waive or otherwise modify either of <u>Section 6.02(h)</u>, <u>Section 12.12</u>, <u>Section 14.06</u> or the definitions of the terms used in such Sections insofar as the definitions affect the substance of such Sections;

<u>provided further</u>, that in connection with the following, the Required Lenders' consent shall not be required but that no such amendment, modification, change, waiver, discharge or termination shall:

(1) increase the Commitments of any Lender over the amount thereof then in effect without the written consent of such Lender,

(2) [reserved],

(3) without the written consent of the Administrative Agent, amend, modify or waive any provision of <u>Section 13</u> or any other provision of this Agreement or any other Credit Document as same relates to the rights or obligations of the Administrative Agent, or

(4) without the written consent of the Administrative Agent, amend, modify or waive any provision relating to the rights or obligations of the Administrative Agent,

(b)      [Reserved].

(c)      Notwithstanding the foregoing, (x) any provision of this Agreement may be amended by an agreement in writing entered into by Borrower, the Required Lenders and the Administrative Agent if (i) by the terms of such agreement the Commitment of each Lender not consenting to the amendment provided for therein shall terminate upon the effectiveness of such amendment and (ii) at the time such amendment becomes effective, each Lender not consenting thereto receives payment (including pursuant to an assignment to a replacement Lender in accordance with <u>Section 14.04</u>) in full of the principal of and interest accrued on each Term Loan made by it and all other amounts owing to it or accrued for its account under this Agreement and (y) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Credit Documents with the Term Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

(d)      Notwithstanding the foregoing, technical and conforming modifications to the Credit Documents may be made with the written consent of the Borrower and the Administrative Agent to the extent necessary to cure any ambiguity, omission, defect or inconsistency, without any further action by any other party.

14.13    <u>Survival</u>.  All indemnities set forth herein including, without limitation, in <u>Sections 2.01</u>, <u>2.11</u>, <u>6.04</u>, <u>13.06</u> and <u>14.01</u> shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Obligations.

14.14    <u>Domicile of Term Loans</u>.  Each Lender may transfer and carry its Term Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender.  Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Term Loans pursuant to this <u>Section 14.14</u> would, at the time of such transfer, result in increased costs under <u>Section 2.10</u>, <u>2.11</u> or <u>6.04</u> from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay such increased costs.

14.15    <u>Register</u>.  The Borrower hereby designates the Administrative Agent to serve as its agent, solely for purposes of this <u>Section 14.15</u>, to maintain a register (the "**Register**") at one of its offices in the United States on which it will record the names and addresses of each Lender, the Commitments from time to time of each of the Lenders, the Term Loans made by (and stated interest owing to) each of the Lenders and each repayment in respect of the principal (and stated interest) amount of the Term Loans of each Lender.  The parties hereto agree and intend that the Obligations shall be treated as being in "registered form" for the purposes of the Code (including Code Sections 163(f), 871(h)(2), 881(c)(2), and 4701), and the Register shall be maintained in accordance with such intention. With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and interest on, any Term Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register

maintained by the Administrative Agent with respect to ownership of such Commitments and Term Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Term Loans shall remain owing to the transferor.  The registration of assignment or transfer of all or part of any Commitments and Term Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 14.04(b).  Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Term Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note (if any) evidencing such Term Loan, and thereupon one or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender.  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this Section 14.15 other than as a result of the Administrative Agent's bad faith, gross negligence or willful misconduct.  Each Lender shall be entitled to review the Register solely relating to such information that pertains specifically to such Lender and shall have no right to view any information that pertains to any other Lender.

14.16    Confidentiality.

(a)    Subject to the provisions of clause (b) of this Section 14.16, each of the Administrative Agent, the Administrative Agent and each Lender agrees that it will keep confidential (using no less than a reasonable standard of care) and not disclose without the prior consent of Holdings (other than to its affiliates and managed funds or accounts, and its and their shareholders, employees, principles, trustees, representatives, controlling persons, members, directors, officers, investors, professionals, experts, auditors, advisors or counsel to another Lender, on a need to know basis; provided such Persons shall be subject to the provisions of this Section 14.16 to the same extent as such Lender) any information with respect to Holdings or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document; provided that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this Section 14.16(a), (ii) as may be and to the extent required or appropriate in any report, statement or testimony submitted to any municipal, state or Federal regulatory body or self-regulatory authority (such as the National Association of Insurance Commissioners) having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors; provided, however, that such Lender shall provide Holdings prompt notice thereof (other than with respect to any request of a regulatory authority or a self-regulatory authority having or asserting jurisdiction over such person), (iii) as may be and to the extent required or appropriate in respect to any summons or subpoena or in connection with any litigation; provided, however, that such Lender shall provide Holdings prompt notice thereof (to the extent permitted by such summons or subpoena), (iv) in order to comply with any law, order, regulation (including, without limitation, in connection with filings, submissions and any other similar documentation required or customary to comply with SEC filing requirements), compulsory legal process, proceeding or ruling applicable to such Lender; provided, however, that such Lender shall provide Holdings prompt notice thereof (to the extent permitted by such law, order, regulation or ruling), (v) to the Administrative Agent or the Administrative Agent, (vi) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) has agreed in writing to be bound by the provisions of this Section 14.16, (vii) to any prospective or actual assignee, transferee or participant in connection with any contemplated permitted assignment, transfer or participation of any of the Notes or Commitments or any interest therein by such

Lender; provided that such prospective transferee has agreed in writing to be bound by the confidentiality provisions contained in this Section 14.16, (vii) to (A) any bank or financial institution and (B) S&P, Moody's, Fitch Ratings and/or other ratings agencies, in each case, as such Lender deems necessary in connection with such Lender's obtaining financing and (viii) with the prior written consent of the Borrower (not to be unreasonably withheld, conditioned, denied or delayed); provided, however, that such financial institution or ratings agency shall be informed of the confidentiality of such information.

(b)     Each Credit Party hereby acknowledges and agrees that each Lender may share with any of its affiliates, managed funds and accounts, and such affiliates, managed funds and accounts may share with such Lender, any information related to Holdings or any of its Subsidiaries (including, without limitation, any non-public customer information regarding the creditworthiness of Holdings and its Subsidiaries), in each case on a need to know basis; provided such Persons shall be subject to the provisions of this Section 14.16 to the same extent as such Lender.

(c)     Each of the Administrative Agent, the Administrative Agent and the Lenders acknowledges that (x) any information with respect to Holdings or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document may include material non-public information concerning Holdings or one or more of its Subsidiaries, as the case may be, (y) it has developed compliance procedures regarding the use of material non-public information, and (z) it will handle such material non-public information in accordance with applicable laws, including federal and state securities laws.

14.17   Patriot Act.  Each Lender subject to the USA PATRIOT ACT (Title 111 of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**US Patriot Act**") hereby notifies each Credit Party that pursuant to the requirements of the US Patriot Act, it is required to obtain, verify and record information that identifies the Credit Parties and other information that will allow such Lender to identify the Credit Parties in accordance with the Act.

14.18   Interest Rate Limitation.   Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "**Maximum Rate**").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Term Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

14.19   Entire Agreement.   THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

14.20   Release.  The Administrative Agent, the Secured Creditors and the Lenders hereby agree that the Liens granted to the Administrative Agent by the Credit Parties on any DIP Collateral shall be automatically released (i) in full, upon the termination of this Agreement and the payment of all Obligations hereunder (except for contingent obligations in respect of which a claim has not yet been made), and (ii) if the release of such Lien is approved, authorized or ratified in writing by the Administrative Agent and such other percentage of the Lenders whose consent may be required in accordance with this Agreement. Any such

release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Credit Parties in respect of) all interests retained by the Credit Parties, including the proceeds of any sale, all of which shall continue to constitute part of the DIP Collateral except to the extent otherwise released in accordance with the provisions of the Credit Documents. The Lenders hereby authorize the Administrative Agent to execute and deliver any instruments, documents, and agreements necessary or desirable or reasonably requested by the Borrower to evidence and confirm the release of any DIP Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender.

14.21    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>.    Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by, (a) the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution and (b) the effects of any Bail-In Action on any such liability, including, if applicable: (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

14.22    <u>Orders</u>. This Agreement is subject to the terms and provisions of the applicable Order. In the event of a conflict between the terms hereof and the terms of the applicable Order, the terms of such applicable Order shall govern and control.

14.23    <u>Acknowledgement Regarding Any Supported QFCs.</u>    To the extent that the Credit Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**US Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a US Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the US Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a US Special Resolution Regime, Default Rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised

under the US Special Resolution Regime if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)        As used in this Section 14.23 the following terms have the following meanings:

"**Covered Entity**" shall mean any of the following:

(i)        a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)        a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)        a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

SECTION 15.   Guaranty.

15.01    Guaranty.  In order to induce the Administrative Agent, the Administrative Agent and the Lenders to enter into this Agreement and to extend credit hereunder and in recognition of the direct benefits to be received by the Credit Parties from the proceeds of the Term Loans, each Guarantor hereby agrees with the Guaranteed Creditors as follows (the "**Guaranty**"):   Each Guarantor hereby unconditionally and irrevocably, as a primary obligor and not only a surety, guarantees to the Administrative Agent and each Lender, the prompt and complete payment and performance by the Borrower when due (whether at the stated maturity, by acceleration or otherwise) of all obligations (monetary (including post-petition interest, whether allowed or not) or otherwise) of the Borrower under this Agreement all in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.  The guarantee contained in this Section 15 is a primary and original obligation of each Guarantor, is not merely the creation of a surety relationship, and is an absolute, unconditional, and continuing guaranty of payment and performance which will remain in full force and effect without respect to future changes in conditions.

(b)        Notwithstanding any provision of this Agreement to the contrary, the maximum liability of each Guarantor under this Agreement will in no event exceed the amount that can be guaranteed by the Guarantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution established herein).

(c)        Each Guarantor agrees that the Obligations may at any time and from time to time exceed the amount of the liability of the Guarantor under this Agreement without impairing the guaranty contained in this Section 15 or affecting the rights and remedies of the Administrative Agent and each Lender under this Agreement.

(d)        The guaranty contained in this Section 15 will remain in full force and effect until irrevocable payment in full of the Obligations.

No payment made by the Borrower, any other guarantor, or any other person or received or collected by the Administrative Agent or any Lender from the Borrower, any other guarantor, or any other person by

virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations will be deemed to modify, reduce, release, or otherwise affect the liability of any Guarantor under this Agreement, and each Guarantor will, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Obligations or any payment received or collected from such Guarantor in respect of the Obligations), remain liable for the Obligations up to the maximum liability of such Guarantor under this Agreement until payment in full in cash of the Obligations.

15.02    No Subrogation.    Notwithstanding any payment made by any Guarantor in respect of this Agreement or any set-off or application of funds of any Guarantor by the Lenders, no Guarantor is or will be entitled to be subrogated to any of the rights of any Lender against the Borrower or any collateral security or guaranty or right of offset held by any Lender for the payment of the Obligations, and no Guarantor may seek (and no Guarantor is or will be entitled to seek) any contribution or reimbursement from the Borrower in respect of payments made by any Guarantor under this Agreement until payment in full in cash of the Obligations.  If any amount is paid to any Guarantor on account of those subrogation rights at any time before payment in full in cash of the Obligations to the Administrative Agent, for the benefit of the Lenders, then such Guarantor shall hold that amount in trust for the Administrative Agent, for the benefit of the Lenders, segregated from other funds of such Guarantor, and shall, promptly upon receipt by such Guarantor, turn that amount over to the Administrative Agent in the exact form received by such Guarantor (duly endorsed by such Guarantor to the Administrative Agent, if required), to be applied against the Obligations, whether matured or unmatured, in such order as the Administrative Agent determines, unless otherwise specified in this Agreement.

15.03    Amendments, etc..

(a)    Each Guarantor will remain obligated under this Agreement notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, (i) any demand for payment of any of the Obligations made by the Administrative Agent or any Lender may be rescinded by the Administrative Agent or such Lender and any of the Obligations may be continued; (ii) the Obligations, or the liability of any other person upon or for any part thereof, or any collateral security or guaranty therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered, or released by the Administrative Agent or the Lenders; and (iii) this Agreement and any other documents executed and delivered in connection therewith may be amended, modified, supplemented, or terminated, in whole or in part, as the Administrative Agent and the Lenders may deem advisable from time to time in accordance with this Agreement.  The Administrative Agent and the Lenders do not and will not have any obligation to protect, secure, perfect, or insure any lien at any time held by it as security for the Obligations or for this guaranty or any property subject thereto.

(b)    The Administrative Agent and each Lender may, from time to time, each in its respective sole discretion and without notice to any Guarantor, take any or all of the following actions: (i) retain or obtain a security interest in any property to secure any of the Obligations or any obligation under this Agreement; (ii) retain or obtain the primary or secondary obligation of any obligor or obligors, in addition to the Credit Parties, with respect to any of the Obligations; (iii) extend or renew any of the Obligations for one or more periods (whether or not longer than the original period), alter or exchange any of the Obligations, or release or compromise any obligation of any Guarantor under this Agreement or any obligation of any nature of any other obligor with respect to any of the Obligations; (iv) release any guaranty or right of offset or its security interest in, or surrender, release, or permit any substitution or exchange for, all or any part of any property securing any of the Obligations or any obligation under this Agreement, or extend or renew for one or more periods (whether or not longer than the original period) or release, compromise, alter, or exchange any obligations of any nature of any obligor with respect to any such

property; and (v) resort to any Guarantor for payment of any of the Obligations when due, whether or not the Administrative Agent or any Lender has resorted to any property securing any of the Obligations or have proceeded against any other obligor primarily or secondarily obligated with respect to any of the Obligations.

15.04    <u>Waivers</u>.

(a)    Each Guarantor waives, until the Obligations are payment in full in cash, to the furthest extent permitted by applicable law, any and all notice of the creation, renewal, extension, or accrual of any of the Obligations and notice of or proof of reliance by the Administrative Agent and the Lenders upon the guaranty contained in this <u>Section 15</u> or acceptance of the guaranty contained in this <u>Section 15</u>. The Obligations, and any of them, will conclusively be deemed to have been created, contracted, or incurred, or renewed, extended, amended, or waived, in reliance upon the guaranty contained in this <u>Section 15</u>, and all dealings between the Borrower and the Guarantors, on the one hand, and the Administrative Agent and each Lender, on the other hand, likewise will be conclusively presumed to have been had or consummated in reliance upon the guaranty contained in this guaranty. To the furthest extent permitted by applicable law, each Guarantor waives, until the Obligations are payment in full in cash, to the furthest extent permitted by applicable law, (i) diligence, presentment, protest, demand for payment, and notice of default, dishonor, or nonpayment and all other notices whatsoever to or upon the Borrower or any Guarantor with respect to the Obligations; (ii) notice of the existence or creation or non-payment of all or any of the Obligations; and (iii) all diligence in collection or protection of or realization upon any Obligations or any security for or guaranty of any Obligations. Without limiting the generality of any other waiver or other provision set forth in the guaranty contained in this <u>Section 15</u>, each Guarantor waives all rights and defenses that such Guarantor may have if all or part of the Obligations are secured by real property to the furthest extent permitted by applicable law.

(b)    The waivers set forth in this guaranty mean, among other things:

(i)    that the Administrative Agent and the Lenders may collect from any Guarantor without first foreclosing on any real or personal property collateral that may be pledged by any other Guarantor, the Borrower, or any other guarantor;

(ii)    that if the Administrative Agent or any Lender forecloses on any real property collateral that may be pledged by the Guarantors, the Borrower, or any other guarantor:

(A)    the amount of the Obligations or any obligations of any guarantor in respect thereof may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and

(B)    the Administrative Agent and the Lenders may collect from any Guarantor even if the Administrative Agent or the Lenders, by foreclosing on the real property collateral, has destroyed any right any Guarantor may have to collect from the Borrower or any other guarantor.

(c)    Each waiver set forth in this guaranty is an unconditional and irrevocable waiver of any rights and defenses any Guarantor may have if all or part of the Guaranteed Obligations are secured by real property to the furthest extent permitted under applicable law.

(d)    Without limiting the generality of any other waiver or other provision set forth in this guaranty, to the maximum extent permitted by applicable law, each Guarantor waives all rights and defenses arising out of an election of remedies by the Administrative Agent and the Lenders, even though

that election of remedies, such as a nonjudicial foreclosure with respect to security for the Obligations, has destroyed such Guarantor's rights of subrogation and reimbursement against the Borrower by the operation of applicable law.

15.05    <u>Payments</u>.  Each Guarantor hereby guarantees that payments under this Agreement will be paid to the Administrative Agent and the Lenders without set-off or counterclaim in United States dollars.

*        *        *

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the day and year first above written.

**MBMG HOLDING, LLC**,
as Holdings

By: _Nicholas K. Campbell_
Name:  Nicholas K. Campbell
Title:    Chief Restructuring Officer

**MBMG INTERMEDIATE HOLDING, LLC**,
as Intermediate Holdings

By: _Nicholas K. Campbell_
Name:  Nicholas K. Campbell
Title:    Chief Restructuring Officer

**MB MEDICAL OPERATIONS, LLC**,
as the Borrower

By: _Nicholas K. Campbell_
Name:  Nicholas K. Campbell
Title:    Chief Restructuring Officer

**CARE CENTER MEDICAL GROUP, LLC**
**CARE CENTER NETWORK, LLC**
**CCMC PHYSICIAN HOLDINGS, INC.**
**CLINICAL CARE PHARMACY, LLC**
**FLORIDA FAMILY PRIMARY CARE CENTER, LLC**
**FLORIDA FAMILY PRIMARY CARE CENTERS OF ORLANDO, LLC**
**FLORIDA FAMILY PRIMARY CARE CENTER OF PASCO, LLC**
**FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC**
**FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC**
**MB MEDICAL TRANSPORT, LLC**
**MIAMI BEACH MEDICAL CENTERS, INC.**
**MIAMI BEACH MEDICAL CONSULTANTS, LLC**
**MIAMI MEDICAL & WELLNESS CENTER, LLC**
each, as a Subsidiary Guarantor

By: _Nicholas K. Campbell_
Name:  Nicholas K. Campbell
Title:    Chief Restructuring Officer

**KKR LOAN ADMINISTRATION SERVICES LLC**,
as Administrative Agent

By: _____
Name:  John Knox
Title:    Authorized Signatory

**FS KKR CAPITAL CORP**, as a Lender

By: _Kevin O'Neill_

Name:  Kevin O'Neill
Title:  Authorized Signatory

**KKR LENDING PARTNERS III LP**, as a Lender

By: _Kevin O'Neill_

Name:  Kevin O'Neill
Title:  Authorized Signatory

**LINCOLN INVESTMENT SOLUTIONS, INC.**, as a Lender

By: _Kevin O'Neill_

Name:  Kevin O'Neill
Title:  Authorized Signatory

**RGA AMERICAS REINSURANCE COMPANY, LTD**, as a Lender

By: _Kevin O'Neill_

Name:  Kevin O'Neill
Title:  Authorized Signatory

**AURORA NATIONAL LIFE ASSURANCE COMPANY**, as a Lender

By: _Kevin O'Neill_

Name:  Kevin O'Neill
Title:  Authorized Signatory

**RGA REINSURANCE COMPANY**, as a Lender

By: _Kevin O'Neill_____
Name:  Kevin O'Neill
Title:  Authorized Signatory

**KKR-UWF DIRECT LENDING PARTNERSHIP
L.P.**, as a Lender

By: _Kevin O'Neill_____
Name:  Kevin O'Neill
Title:  Authorized Signatory

**KKR -VRS CREDIT PARTNERS L.P.**, as a Lender

By: _Kevin O'Neill_____
Name:  Kevin O'Neill
Title:  Authorized Signatory

**SCHEDULE I**

<u>COMMITMENT</u>

| Lender | Commitment | Percent of Total Commitment |
|---|---|---|
| FS KKR Capital Corp | $6,593,082.00 | 65.930820000% |
| KKR Lending Partners III LP | $2,015,530.00 | 20.155300000% |
| Lincoln Investment Solutions, Inc. | $336,594.00 | 3.365940000% |
| RGA Americas Reinsurance Company, Ltd | $268,737.00 | 2.687370000% |
| Aurora National Life Assurance Company | $167,961.00 | 1.679610000% |
| RGA Reinsurance Company | $235,145.00 | 2.351450000% |
| KKR-UWF Direct Lending Partnership L.P. | $134,369.00 | 1.343690000% |
| KKR -VRS Credit Partners L.P. | $248,582.00 | 2.485820000% |
| **Total** | **$10,000,000.00** | **100.00%** |

**SCHEDULE II**

<u>PREPETITION PERMITTED LIENS</u>

[See attached]

# Schedule of Permitted Liens

| DEBTOR | STATE | Secured Party | Date Filed | Expiration Date | File Number | Description |
|---|---|---|---|---|---|---|
| Rodolfo Dumengo, M.D., P.A.<br>1200 Alton Road<br>Miami Beach, FL 33139 | FL | CHG-Meridian USA Corp.<br>21800 Oxnard Street, Ste. 400<br>Woodland Hills, CA 91367 | 2/18/2021 | 2/18/2026 | 20210621070769 | All equipment and other goods, including without limitation, computer and other information technology equipment and medical equipment, together with all replacements and substitutions. |
| MB Medical Operations, LLC<br>1400 NW 107th Ave., Ste. 500<br>Miami, FL 33172 | FL | Highland Capital Corporation<br>370 Pascack Road<br>Town of Washington, NJ 07676 | 7/29/2022 | 7/29/2027 | 20220247121 | Three Alpinion Ecube Ultrasounds, together with all replacements, upgrades, replaceable parts, repairs, additions, substitutions, accessors, proceeds there from, and insurance proceeds if any (collectively referred to as Equipment). |
| MB Medical Operations, LLC<br>1400 NW 107th Ave., Ste. 500<br>Miami, FL 33172 | DE | Oneview Finance<br>10 Waterview Blvd.<br>Parsippany, NJ 07054 | 6/10/2024 | 6/10/2029 | 2024388212 | All items of equipment (and other related assets, including the assets described below) financed and encumbered pursuant to an agreement between Debtor named above and Oneview Finance (which entity subsequently sold such equipment, etc. to Secured Party named above) |
| Louis Hernandez Abreu<br>12615 W Dixie Hwy., Bldg A,<br>North Miami, FL 33161<br><br>MB Medical Operations, LLC<br>1400 NW 107th Ave., Ste. 500<br>Miami, FL 33172<br><br>LHA Design Smiles, Inc.<br>1303 S. Semoran Blvd.<br>Orlando, FL 32807 | FL | Patterson Dental Supply Inc.<br>1031 Mendota Heights Road<br>St. Paul, MN 55120 | 3/28/2023 | 3/28/2028 | 20230832907 | Dental equipment more particularly described on the invoices attached to UCC-1 as Schedule A |
| MB Medical Operations, LLC<br>1400 N.W. 107th Ave., Ste. 500<br>Miami, FL 33172<br><br>Louis Hernandez Abreu<br>12615 W. Dixie Hwy., Bldg. A<br>North Miami, FL 33161 | DE | Patterson Dental Supply Inc.<br>1031 Mendota Heights Road<br>St. Paul, MN 55120 | 2/7/2023 | 2/7/2028 | 20230991082 | Dental equipment more particularly described on the invoices attached to UCC-1 as Schedule A |
| MB Medical Operations, LLC<br>1400 N.W. 107th Ave., Ste. 500<br>Miami, FL 33172<br><br>Louis Hernandez Abreu<br>12615 W. Dixie Hwy., Bldg. A<br>North Miami, FL 33161<br><br>LHA Design Smiles, Inc.<br>1303 S. Semoran Blvd.<br>Orlando, FL 32807 | DE | Patterson Dental Supply Inc.<br>1031 Mendota Heights Road<br>St. Paul, MN 55120 | 3/23/2023 | 3/23/2028 | 20232227600 | Dental equipment more particularly described on the invoices attached to UCC-1 as Schedule A |

1

# Schedule of Permitted Liens

| DEBTOR | STATE | Secured Party | Date Filed | Expiration Date | File Number | Description |
|---|---|---|---|---|---|---|
| MB Medical Operations, LLC<br>1400 NW 107th Ave., Ste. 500<br>Miami, FL 33172 | DE | Patterson Dental Supply Inc.<br>1031 Mendota Heights Road<br>St. Paul, MN 55120 | 3/27/2023 | 3/27/2028 | 20232313327 | Dental equipment more particularly described on the invoices attached to UCC-1 as Schedule A |
| Louis Hernandez Abreu<br>12615 W. Dixie Hwy., Bldg. A<br>North Miami, FL 33161 | | | | | | |
| LHA Design Smiles, Inc.<br>1303 S. Semoran Blvd.<br>Orlando, FL 32807 | | | | | | |
| MB Medical Operations, LLC<br>1400 NW 107th Ave., Ste. 500<br>Miami, FL 33172 | FL | Patterson Dental Supply Inc.<br>1031 Mendota Heights Road<br>St. Paul, MN 55120 | 1/30/2023 | 1/30/2028 | 202300262590 | Dental equipment more particularly described on the invoices attached to UCC-1 as Schedule A |
| Senior Dental Care, LLC<br>1400 NW 107th Ave., Ste. 500<br>Miami, FL 33172 | | | | | | |
| Richard Charles Lage III<br>1400 NW 107th Ave., Ste. 500<br>Miami, FL 33172 | | | | | | |

2

EXHIBIT A-1

<u>FORM OF NOTICE OF BORROWING</u>

[_____], 20[__]

KKR Loan Administration Services LLC, as
Administrative Agent (the "<u>Administrative Agent</u>") for
the Lenders party to the Credit Agreement referred to
below
30 Hudson Yards
New York, New York 10001
Attention: John Knox & General Counsel
Phone: (415) 315-6500
Email: John.knox@kkr.com; KKR.Agency@alterdomus.com; KKRCreditLegal@kkr.com;
klasops@kkr.com

Ladies and Gentlemen:

   The undersigned refers to the Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of October 13, 2024 (as amended, restated, amended and restated, modified and/or supplemented from time to time, the "<u>Credit Agreement</u>," the capitalized terms defined therein being used herein as therein defined), by and among MB Medical Operations, LLC, a Delaware limited liability company, MBMG Intermediate Holding, LLC, a Delaware limited liability company, MBMG Holding, LLC, a Delaware limited liability company, each Subsidiary Guarantor party thereto from time to time, the Lenders from time to time party thereto and KKR Loan Administration Services LLC, as the Administrative Agent, and hereby gives you notice pursuant to the Credit Agreement, that the undersigned hereby requests a Borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such Borrowing:

  (i)  The aggregate principal amount of Term Loans to be incurred pursuant to such Borrowing is $_____.

  (ii)  The Business Day of the Borrowing is _____.

  (iii)  The Loans being incurred pursuant to such Borrowing are to be initially maintained as [Base Rate] [SOFR] Loans. [The duration of the Interest Period for the SOFR Loans applicable to such Borrowing shall be one month.]

  (iv)  Wire instructions: [_____]

     **MB MEDICAL OPERATIONS, LLC**

    By: _____
     Name:
     Title:

EXHIBIT A-2

FORM OF NOTICE OF CONVERSION/CONTINUATION

KKR Loan Administration Services LLC, as
Administrative Agent (the "Administrative Agent") for
the Lenders party to the Credit Agreement referred to
below
30 Hudson Yards
New York, New York 10001
Attention: John Knox & General Counsel
Phone: (415) 315-6500
Email: John.knox@kkr.com; KKR.Agency@alterdomus.com; KKRCreditLegal@kkr.com;
klasops@kkr.com

[_____ __], 20[__]

Re: MB Medical Operations, LLC, (the "Borrower")

Reference is made to the Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of October 13, 2024 (as amended, restated, amended and restated, modified and/or supplemented from time to time, the "Credit Agreement,"), by and among MB Medical Operations, LLC, a Delaware limited liability company, MBMG Intermediate Holding, LLC, a Delaware limited liability company, MBMG Holding, LLC, a Delaware limited liability company, each Subsidiary Guarantor party thereto from time to time, the Lenders from time to time party thereto and KKR Loan Administration Services LLC, as the Administrative Agent. Capitalized terms used herein and not otherwise defined herein are used herein as defined in the Credit Agreement.

The Borrower hereby gives the Administrative Agent notice pursuant to Section 2.06 of the Credit Agreement of its request for the following[1]:

       (i)      a continuation, on _____, ___, as SOFR Loans having an Interest Period of one month of the Term Loan in an aggregate outstanding principal amount of $_____, having an Interest Period ending on the proposed date for such continuation;

       (ii)     a conversion, on _____ , ___ to SOFR Loans having an Interest Period of one month of the Term Loan in an aggregate outstanding principal amount of $_____ ; and

       (iii)    a conversion, on _____ , ___ to Base Rate Loans, of the Term Loan in an aggregate outstanding principal amount of $_____.

**MB MEDICAL OPERATIONS, LLC**

By: _____
      Name:
      Title:

---

[1] (i) Except as otherwise provided in Section 2.10(b) of the Credit Agreement, SOFR Loans may be converted into Base Rate Loans only on the last day of an Interest Period applicable to the Loans being converted, and

(ii) unless the Required Lenders otherwise agree, Base Rate Loans may only be converted into SOFR Loans if no Event of Default is in existence on the date of the conversion.

**EXHIBIT B-1**

[Reserved]

**EXHIBIT B-2**

[Reserved]

**EXHIBIT C**

### FORM OF TAX CERTIFICATE[2]

       Reference is hereby made to the Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of October 13, 2024 (as amended, restated, amended and restated, modified and/or supplemented from time to time, the "Credit Agreement,"), by and among MB Medical Operations, LLC, a Delaware limited liability company, MBMG Intermediate Holding, LLC, a Delaware limited liability company, MBMG Holding, LLC, a Delaware limited liability company, each Subsidiary Guarantor party thereto from time to time, the Lenders from time to time party thereto and KKR Loan Administration Services LLC, as the Administrative Agent (together with any permitted successor administrative agent, the "Administrative Agent") (as amended, restated, amended and restated, modified and/or supplemented from time to time, the "Credit Agreement"). Capitalized terms used herein that are not defined herein shall have the respective meanings ascribed to them in the Credit Agreement. Pursuant to the provisions of Section 6.04(b) of the Credit Agreement, the undersigned Recipient or Participant, as applicable, certifies that:

       (1)     it is the sole record and beneficial owner of the rights and obligations under the Credit Agreement in respect of which it is providing this certificate,

       (2)     it is not a bank within the meaning of Section 881(c)(3)(A) of the Code,

       (3)     it is not a 10-percent shareholder of any Credit Party within the meaning of Section 871(h)(3)(B) or Section 881(c)(3)(B) of the Code, and

       (4)     it is not a controlled foreign corporation receiving interest from a related person as described in Section 881(c)(3)(C) of the Code.

---

[2] If the undersigned is an intermediary, a foreign partnership or other flow-through entity, the following adjustments shall be made:

A.  The following representations shall be provided as applied to the partners or members claiming the portfolio interest exemption:

- beneficial ownership under Paragraph 1;
- the status in Paragraph 3;
- the status in Paragraph 4.

B.  The following representation shall be provided as applied to the undersigned as well as the partners or members claiming the portfolio interest exemption:

- the status in Paragraph 2.

C.  The following representation shall be provided by the undersigned, but not the partners or members claiming the portfolio interest exemption:

- record ownership under Paragraph 1.

    D.  The undersigned shall provide an Internal Revenue Service Form W-8IMY (with underlying W-8BENs, W-8BEN-Es, W-9s or other applicable forms from each of its partners or members).

    E.  Appropriate adjustments shall be made in the case of tiered intermediaries or tiered partnerships or flow-through entities

[Signature Page to Follow]

**EXHIBIT C**

IN WITNESS WHEREOF, the undersigned has duly executed this certificate.

**[NAME OF LENDER]**

By: _____
     Name:
     Title:

Date: _____, _____

**EXHIBIT D**

[Reserved]

**EXHIBIT E**

FORM OF COMPLIANCE CERTIFICATE

**[_____], 20__**

Reference is made to the Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of October 13, 2024 (as amended, restated, amended and restated, modified and/or supplemented from time to time, the "Credit Agreement,"), by and among MB Medical Operations, LLC, a Delaware limited liability company, MBMG Intermediate Holding, LLC, a Delaware limited liability company, MBMG Holding, LLC, a Delaware limited liability company, each Subsidiary Guarantor party thereto from time to time, the Lenders from time to time party thereto and KKR Loan Administration Services LLC, as the Administrative Agent.  Capitalized terms used herein (including any of the Schedules attached hereto) have the respective meanings assigned thereto in the Credit Agreement unless otherwise defined herein. Pursuant to Section 10.01(e) of the Credit Agreement, the undersigned, solely in his/her capacity as a financial officer of the Borrower, certifies as follows:

1.      The financial statements required by Section 10.01(b) for the period covered hereby (the "**Financial Statements**") have been or are concurrently delivered herewith to the Administrative Agent.

2.      [To my knowledge, except as otherwise disclosed to the Administrative Agent pursuant to the Credit Agreement, no Event of Default exists] [If unable to provide the foregoing certification, describe the nature and extent thereof: [_____]]

[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned, solely in his/her capacity as a financial officer of the Borrower, and not in his or her personal or individual capacity and without personal liability, has executed this certificate for and on behalf of the Borrower, and has caused this certificate to be delivered as of the date first set forth above.

**MB MEDICAL OPERATIONS, LLC**

By: _____
    Name:
    Title:

EXHIBIT F

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT[1]

This Assignment and Assumption Agreement (this "<u>Assignment</u>"), is dated as of the Effective Date set forth below and is entered into by and between [the][each] Assignor identified in item [1][2] below ([the] [each, an] "<u>Assignor</u>") and [the] [each] Assignee identified in item 2 below ([the] [each, an] "<u>Assignee</u>").  [It is understood and agreed that the rights and obligations of such [Assignees][and Assignors] hereunder are several and not joint.]  Capitalized terms used herein but not defined herein shall have the respective meanings given to them in the Credit Agreement identified below (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "<u>Credit Agreement</u>").  The Standard Terms and Conditions for Assignment and Assumption Agreement set forth in Annex I hereto (the "<u>Standard Terms and Conditions</u>") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the] [each] Assignee, and [the] [each] Assignee hereby irrevocably purchases and assumes from [the][each] Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of [the][each] Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the [respective] Assignor's outstanding rights and obligations identified below ([the] [each, an] "<u>Assigned Interest</u>").  [Each] [Such] sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment, without representation or warranty by [the][any] Assignor.

[1. Assignor:                      _____

2. Assignee:                     _____][2]

[1][3]. Credit Agreement:       Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of October 13, 2024, by and among MB Medical Operations, LLC, a Delaware limited liability company, MBMG Intermediate Holding, LLC, a Delaware limited liability company, MBMG Holding, LLC, a Delaware limited liability company, each Subsidiary Guarantor party thereto from time to time, the Lenders from time to time party thereto and KKR Loan Administration Services LLC, as the Administrative

---

[1]    This Form of Assignment and Assumption Agreement should be used by Lenders for an assignment to a single Assignee or to funds managed by the same or related investment managers.

[2]    If the form is used for a single Assignor and Assignee, items 1 and 2 should list the Assignor and the Assignee, respectively.  In the case of an assignment to funds managed by the same or related investment managers, or an assignment by multiple Assignors, the Assignors and the Assignee(s) should be listed in the table under bracketed item 2 below.

Agent (as amended, restated, amended and restated, modified and/or supplemented from time to time).

[2. Assigned Interest:[3]

| Assignor | Assignee | Aggregate Amount of Term Loans and/or Commitments | Amount of Term Loans and/or Commitments Assigned |
|----------|----------|---------------------------------------------------|--------------------------------------------------|
| [Name of Assignor] | [Name of Assignee] | _____ | _____ |
| [Name of Assignor] | [Name of Assignee] | _____ | _____ |

[4. Assigned Interest:[4]

| Aggregate Amount of Loans and/or Commitments | Amount of Loan and/or Commitments Assigned |
|----------------------------------------------|--------------------------------------------|
| $_____ | $_____ |

Effective Date _____, _____, _____.

**Assignor[s] Information**

Payment Instructions:       _____

_____

_____

_____

Reference:_____

**Assignee[s] Information**

Payment Instructions:       _____

_____

_____

_____

Reference:_____

---

[3]    Insert this chart if this Form of Assignment and Assumption Agreement is being used for assignments to funds managed by the same or related investment managers or for an assignment by multiple Assignors. Insert additional rows as needed.

[4]    Insert this chart if this Form of Assignment and Assumption Agreement is being used by a single Assignor for an assignment to a single Assignee.

Notice Instructions:   _____

  _____

  _____

  _____

  Reference:_____

Notice Instructions:   _____

  _____

  _____

  _____

  Reference:_____

[Remainder of page intentionally blank; signatures on following page]

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR:

  [NAME OF ASSIGNOR]


By:_____
    Name:
    Title:

ASSIGNEE

  [NAME OF ASSIGNEE][1]


By:_____
    Name:
    Title:

---

[1]  Add additional signature blocks, as needed, if this Form of Assignment and Assumption Agreement is being used by funds managed by the same or related investment managers.

[Consented to and] Accepted:

ADMINISTRATIVE AGENT:

**KKR LOAN ADMINISTRATION SERVICES LLC**

By:_____
    Name:
    Title:[1]

[BORROWER:

**MB MEDICAL OPERATIONS, LLC**

By:_____
    Name:
    Title:][2]

---

[1]    Insert in accordance with Section 14.04(b) of the Credit Agreement.

[2]    Insert in accordance with Section 14.04(b) of the Credit Agreement.

*[Assignment and Assumption Agreement]*

CREDIT AGREEMENT

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ASSUMPTION AGREEMENT

1.     Representations and Warranties.

1.1.     Assignor.  [The] [Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the] [its] Assigned Interest, (ii) [the] [its] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any other Credit Document or any other instrument or document delivered pursuant thereto (other than this Assignment) or any collateral thereunder, (iii) the financial condition of Holdings, any of its Subsidiaries or affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by Holdings, any of its Subsidiaries or affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2.     Assignee.  [The] [Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it confirms that it is (x) (A) a Lender, or the parent company and/or an affiliate of a Lender which is at least 50% owned by such Lender or its parent company, (B) a parent company and/or an affiliate of [the][each] Assignor which is at least 50% owned by [the][each] Assignor or its parent company (provided that any fund that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an affiliate of such other Lender for the purposes of this clause (B)), (C) a fund that invests in bank loans and is managed by the same investment advisor as a Lender, by an affiliate of such investment advisor or by a Lender or (D) an Eligible Transferee; (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of [the][its] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 10.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase [the][its] Assigned Interest on the basis of which it has made such analysis and decision and (v) if it is organized under the laws of a jurisdiction outside the United States, it has attached to this Assignment any tax documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by it; (b) agrees that it will, independently and without reliance upon the Administrative Agent, [the][each] Assignor, or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (c) appoints and authorizes the Administrative Agent (or any sub-agents appointed in accordance with Section 13.12 of the Credit Agreement) to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Credit Documents as are delegated to or otherwise conferred upon the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto; and (d) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

*[Assignment and Assumption Agreement]*

2.      <u>Payment</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the] [each] Assigned Interest (including payments of principal, interest, fees, commissions and other amounts) to [the][each] Assignor for amounts which have accrued to but excluding the Effective Date and to [the] [each] Assignee for amounts which have accrued from and after the Effective Date.

3.      <u>Effect of Assignment</u>.  Upon the delivery of a fully executed original hereof to the Administrative Agent, as of the Effective Date, (i) [the][each] Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment, have the rights and obligations of a Lender thereunder and under the other Credit Documents and (ii) [the][each] Assignor shall, to the extent provided in this Assignment, relinquish its rights and be released from its obligations under the Credit Agreement and the other Credit Documents.

4.      <u>General Provisions</u>.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of the Assignment.  The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Assignment and the transactions contemplated hereby (including without limitation amendments or other modifications, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, or any other similar and applicable state laws based on the Uniform Electronic Transactions Act (e.g., www.docusign.com).  THIS ASSIGNMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

*     *     *

**EXHIBIT G**

[Reserved]

**EXHIBIT H**

## FORM OF CLOSING CERTIFICATE

## MB MEDICAL OPERATIONS, LLC

**Date: _____**

THIS CLOSING CERTIFICATE (this "**Certificate**") is delivered in accordance with the terms of that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement, dated as of October 13, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Credit Agreement**"), by and among MB Medical Operations, LLC, a Delaware limited liability company, MBMG Intermediate Holding, LLC, a Delaware limited liability company, MBMG Holding, LLC, a Delaware limited liability company, each Subsidiary Guarantor party thereto from time to time, the Lenders from time to time party thereto and KKR Loan Administration Services LLC, as the Administrative Agent, in connection with cases [to be] filed by the Credit Parties in the United States Bankruptcy Court for the Southern District of Florida pursuant to chapter 11 of title 11 of the United States Code on the Petition Date. Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement. To the extent the provisions set forth in this Certificate conflict with any provisions in the Credit Agreement, the Credit Agreement shall govern.

The undersigned, as the [chief executive officer, president or chief financial officer] of each Credit Party, hereby certifies to the Administrative Agent and each Lender, on behalf of such Credit Party, and not in any individual capacity, that (i) he/she is authorized to execute this Certificate and (ii) as of the date hereof, each of the conditions precedent set forth below and in the Credit Agreement has been satisfied (or waived in writing by the Administrative Agent and each Lender in its sole and absolute discretion):

[Conditions Precedent to the Interim Term Loan][10]

1.   Credit Parties have timely delivered to the Administrative Agent the Approved Budget.
2.   Credit Parties have delivered to the Administrative Agent a Notice of Borrowing no later than 11:00 AM (New York City time) [one (1) Business Day prior to the requested funding date for the requested Interim Term Loan][11] [three (3) Business Days prior to the requested funding date for the requested Interim Term Loan][12] (or such later time as the Administrative Agent may agree to in its sole discretion).
3.   The Interim Order has been entered by the Bankruptcy Court within three (3) Business Days after the Petition Date and has not been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in a manner without the consent of the Administrative Agent and each Lender and the Credit Parties are in compliance in all respects with the Interim Order.
4.   All First Day Orders have been entered by the Bankruptcy Court in form and substance to the Administrative Agent and Lenders, it being understood that drafts approved by counsel to the Administrative Agent and the Lenders on or prior to the Petition Date are reasonably satisfactory.
5.   All fees and out-of-pocket expenses of the Administrative Agent and each Lender (including, without limitation, reasonable fees and expenses of their counsel and external advisors) have

---

[10] The following list should be included in the Closing Certificate delivered for the Interim DIP Loan.

[11] Include for the draw request for the first Interim Term Loan.

[12] Include for the draw request for any subsequent Interim Term Loans.

been paid in full (or will be paid in connection with such Interim Term Loan draw) to the extent an invoice has been delivered to the Borrower at least twenty-four (24) hours in advance of the Interim Order Availability Date.

6.    Credit Parties have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral in such amounts and scope as is reasonably acceptable to the Administrative Agent and each Lender (which shall be deemed satisfied if such insurance as required by the Prepetition First Lien Credit Agreement remains in place).

7.    At the time of and also after giving effect to the Interim Term Loan (i) there exists no Default or Event of Default and (ii) all representations and warranties contained in the Credit Agreement shall be true and correct in all material respects (it being understood and agreed that (x) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (y) any representation or warranty that is qualified as to "materiality," "Material Adverse Change" or similar language shall be true and correct in all respects on such date).

8.    Subject to entry of the Interim Order, (i) each Credit Party has the corporate power and authority to make, deliver and perform its obligations under the Credit Agreement and the Interim Order, and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) is required in connection with the execution, delivery or performance by each Credit Party, or for the validity or enforceability in accordance with its terms against such Credit Party, of the Credit Agreement and the Interim Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect.

9.    The Administrative Agent and each Lender have received a copy of the fully-executed Asset Purchase Agreement, which is in form and substance consistent with the terms of the Credit Agreement and otherwise acceptable to the Administrative Agent and each Lender in their sole and absolute discretion.

10.    All applicable Case Milestones have been satisfied or waived by the Administrative Agent and each Lender in each of their sole discretion.

[Conditions Precedent to Final Order Term Loans][13]

1.    Credit Parties have delivered to the Administrative Agent a Notice of Borrowing no later than 11:00 AM (New York City time) three (3) business days prior to the requested funding date for such Final Order Term Loan (or such later time as the Administrative Agent may agree to in its sole discretion).

2.    At the time of and also after giving effect to the Final Order Term Loans (i) there exists no Default or Event of Default and (ii) all representations and warranties contained in the Credit Agreement are true and correct in all material respects (it being understood and agreed that (x) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (y) any representation or warranty that is qualified as to "materiality," "Material Adverse Change" or similar language shall be true and correct in all respects on such date).

3.    Prior to or substantially concurrently with the making of such Final Order Term Loan, all fees and out-of-pocket expenses of the Administrative Agent and each Lender (including, without limitation, reasonable fees and expenses of their counsel and external advisors) have been paid

---

[13] The following list should be included in the Closing Certificate delivered for any Final DIP Loan.

in full (or will be paid in connection with such Final Order Term Loan draw) to the extent an invoice has been delivered to the Borrower at least 24 hours in advance.

4.      All applicable Case Milestones have been satisfied or waived by the Administrative Agent and each Lender.

5.      (a) The Final Order has been entered by the Bankruptcy Court in the Cases, (b) the Final Order has not been vacated, reversed, modified, amended or stayed, or in the case of any modification or amendment, modified or amended in a manner without the consent of the Administrative Agent and each Lender and (c) the Debtors are in compliance in all respects with the Final Order.

[*Signature page follows*]

**EXHIBIT H**

IN WITNESS WHEREOF, each of the undersigned has duly executed and delivered this Certificate as of the date first set forth above.

<u>**CREDIT PARTIES**</u>:

**MB MEDICAL OPERATIONS, LLC**, a Delaware limited liability company

By: _____
Name:
Title:

[_____], a [_____]

By: _____
Name:
Title:

**EXHIBIT I**

<u>INTERIM ORDER</u>

[See attached.]

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| MBMG HOLDING, LLC, *et al.*[1] | Case No. 24-_____ |
| Debtors. | (Jointly Administered) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO
OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS
AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV)
GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

---

[1]     The address of the Debtors is 7500 S.W. 8th Street, Ste. 400, Miami, Florida 33144.  The last four digits of the Debtors' federal tax identification numbers are: (i) Care Center Medical Group, LLC (9052); (ii) Care Center Network, LLC (5784); (iii) CCMC Physician Holdings, Inc. (4532); (iv) Clinical Care Pharmacy, LLC (2103); (v) Florida Family Primary Care Center, LLC (5005); (vi) Florida Family Primary Care Center of Pasco, LLC (8570); (vii) Florida Family Primary Care Centers of Orlando, LLC (3086); (viii) Florida Family Primary Care Centers of Pinellas, LLC (7075); (ix) Florida Family Primary Care Centers of Tampa, LLC (0631); (x) MB Medical Operations, LLC (8450); (xi) MB Medical Transport, LLC (3476); (xii) MBMG Holding, LLC (3880); (xiii) MBMG Intermediate Holding, LLC (9320); (xiv) Miami Beach Medical Centers, Inc. (3933); (xv) Miami Beach Medical Consultants, LLC (2737); and (xvi) Miami Medical & Wellness Center, LLC (2474).

13262344-16

**THIS MATTER** came before the Court on October __, 2024 (the "Interim Hearing") upon the motion dated October 13, 2024 [ECF No.____] (the "Motion") of MB Medical Operations, LLC ("MB Medical") and its affiliated debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), seeking entry of an interim order (this "Interim Order")[2] and a Final Order (as defined herein) pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, 507 and 552 of chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, 4001-3, 9013-1(F)-(H) and 9075-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of Florida (as amended, the "Local Bankruptcy Rules"), *inter alia*:

(i)        authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis under a delayed-draw term loan facility (the "DIP Facility" and the loans thereunder, the "DIP Loans") consisting of (a) $4,000,000 available upon entry of the Interim Order (the "Interim Amount"), and (b) an additional $6,000,000 available upon entry of the Final Order (the "Final Amount"), pursuant to the terms and conditions of this Interim Order and that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement, dated as of October 13, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), to be entered into by and among MB Medical, as borrower, MBMG Holding, LLC ("Holdings"), as a guarantor, the other Credit Parties party thereto from time to time, as guarantors, KKR Loan Administration Services LLC, as

---

[2]        Capitalized terms used in this Interim Order but not defined herein shall have the meanings given to them in the DIP Credit Agreement.

13262344-16

administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the lenders party thereto from time to time, (the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties"), attached hereto as **Exhibit A**;

(ii)    approving the terms of and authorizing the Debtors to execute and deliver the DIP Credit Agreement and any other agreements, instruments and documents related thereto (the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)    authorizing the Debtors to enter into the DIP Facility and to incur all obligations owing thereunder and under the DIP Documents to the DIP Secured Parties (collectively, the "DIP Obligations"), and granting the DIP Agent and DIP Lenders allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined below), subject to the Carve-Out (as defined herein);

(iv)    granting to the DIP Agent (on behalf of the DIP Secured Parties) automatically perfected security interests in and superpriority liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date) and any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (as defined below) (together, "Cash Collateral"), which liens shall be subject to the priorities set forth herein;

(v)    authorizing and directing the Debtors to use proceeds of the DIP Facility to (a) pay amounts payable and reimbursable under the DIP Documents or this Interim Order as such become due, including, without limitation, the fees and disbursements of the Lender Professionals (as

- 3 -

defined below); and (b) provide financing for working capital and other general corporate purposes, including for bankruptcy-related costs and expenses, all to the extent provided in, and in accordance with, the Approved Budget, this Interim Order and the DIP Documents;

(vi)    authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral, on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition First Lien Secured Parties for any Diminution (each, as defined below) of their interests in the Prepetition Collateral, including the Cash Collateral, as and to the extent authorized herein;

(vii)    approving the stipulations by the Debtors herein;

(viii)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(ix)    authorizing the DIP Agent, at the direction of the Required Lenders (or as otherwise provided in the DIP Documents), to (1) terminate the funding obligations under the DIP Documents in accordance with their terms and to the extent permitted by this Interim Order; (2) declare the DIP Obligations to be immediately due and payable in full in cash, to the extent permitted by the terms thereof; and (3) subject to this Interim Order, be granted relief from the automatic stay to foreclose on the DIP Liens; and

(x)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

The Bankruptcy Court having considered the Motion, the exhibits attached thereto, the First Day Declaration, the DIP Documents, and the evidence submitted and argument made at the Interim Hearing; and notice of the Interim Hearing having been provided in accordance with

- 4 -

Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Bankruptcy Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Bankruptcy Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates (as defined below) pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their Estates and all parties-in-interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and the Bankruptcy Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

Based upon the record established at the interim hearing, the Bankruptcy Court makes the following findings of fact and conclusions of law:[3]

A.    **Disposition.**  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall

---

[3]    The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

13262344-16

become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.     **Petition Date**.  On October 13, 2024 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

C.     **Debtors in Possession**.  The Debtors are operating their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been appointed.

D.     **Jurisdiction and Venue**.  This Bankruptcy Court has jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and the Local Bankruptcy Rules.

E.     **Committee**.  As of the date hereof, no statutory committee has been appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "<u>Committee</u>").

F.     **Notice**.  Upon the record presented to the Bankruptcy Court at the Interim Hearing, and under the exigent circumstances established at the Interim Hearing, notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and 4001(c)(1) to (a) the Office of the U.S. Trustee for the Southern District of Florida (the "<u>U.S. Trustee</u>"); (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent and Prepetition

First Lien Agent (as defined below), Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Charles A. Dale III, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: Vincent Indelicato and Matthew R. Koch, and Trenam Law, 101 E Kennedy Boulevard, Suite 2700, Tampa, FL 33602, Attn: Lara Roeske Fernandez; (d) counsel to the Prepetition Second Lien Secured Parties (as defined below), Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Nicole L. Greenblatt; (e) the United States Attorney's Office for the Southern District of Florida; (f) the Internal Revenue Service; (g) the state attorneys general for states in which the Debtors conduct business; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002, (collectively, the "Notice Parties"), which notice was appropriate under the circumstances and sufficient for the Motion.  No other or further notice of, or hearing regarding, the entry of this Interim Order and the relief set forth herein is necessary or required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending a Final Hearing.

G. **Debtors' Stipulations**.  Subject to Paragraph 44 hereof, each stipulation, admission, and agreement contained in this Interim Order, including, without limitation, the Debtors' Stipulations (as defined below), shall be binding upon the Debtors, their respective bankruptcy estates (the "Estates") and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes.  The Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined herein) as of the Petition Date.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as expressly set forth in Paragraph 44 herein, the Debtors, on their own behalf and on behalf of their Estates, admit,

13262344-16

stipulate, acknowledge, and agree as follows (Paragraphs G(i) through G(x) below are referred to, collectively, as the "Debtors' Stipulations"):

(i)     *Prepetition First Lien Facility*.  Pursuant to that certain Credit Agreement, dated as of December 14, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "Prepetition First Lien Credit Agreement", and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, otherwise modified prior to the Petition Date, the "Prepetition First Lien Credit Documents"), among (a) MB Medical, (b) MBMG Intermediate Holding, LLC ("Intermediate Holdings"), (c) the other Debtors who are Subsidiary Guarantors thereunder pursuant to certain of the Prepetition First Lien Credit Documents (collectively with MB Medical and Intermediate Holdings, the "Prepetition Obligors"),[4] (d) KKR Loan Administration Services LLC, as administrative agent and collateral agent (in such capacities, together with any successor thereto, the "Prepetition First Lien Agent"), and (e) the lenders party thereto from time to time (the "Prepetition First Lien Lenders," and together with the Prepetition First Lien Agent, collectively, the "Prepetition First Lien Secured Parties"), the Prepetition First Lien Lenders provided secured term loans and revolving loans to the Prepetition Obligors (the "Prepetition First Lien Facility").

(ii)    *Prepetition First Lien Obligations*.  As of the Petition Date, the Prepetition Obligors were indebted and jointly and severally liable to the Prepetition First Lien Secured Parties in the aggregate principal amount outstanding under the Prepetition First Lien Facility of not less than $221,408,762.67 (together with accrued and unpaid interest, any fees, expenses and

---

[4]     The Prepetition Obligors exclude Debtors MBMG Holding, LLC; CCMC Physician Holdings, Inc.; Miami Beach Medical Consultants, LLC; Miami Medical & Wellness Center, LLC; and Miami Beach Medical Centers, Inc.

- 8 -

disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Obligors' obligations in connection with the Prepetition First Lien Facility pursuant to the Prepetition First Lien Credit Documents, the "Prepetition First Lien Obligations"). Debtors Miami Beach Medical Consultants, LLC, Miami Medical & Wellness Center, LLC and Miami Beach Medical Centers, Inc. (collectively, the "APE Debtors") are parties to one or more PC Agreements (as defined in the Prepetition First Lien Credit Agreement) with MB Medical, a subset of which (including but not limited to the Management Services Agreements entered into between MB Medical and each APE Debtor) include a grant of a security interest to MB Medical in substantially all of the assets of the APE Debtors to secure the payment of amounts owing to MB Medical by each APE Debtor pursuant to the applicable PC Agreement. MB Medical (as "secured party") perfected the security interests by filing UCC-1 financing statements naming each APE Debtor as "debtor" and entering into tri-party deposit account control agreements with each APE Debtor and the applicable depository bank (collectively, the "APE DACAs"), among other things. Pursuant to the Prepetition First Lien Documents, MB Medical collaterally assigned the PC Agreements (including the Management Services Agreements and the APE DACAs) to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties pursuant to one or more Collateral Assignment of Contracts agreements. In addition, the UCC-1 financing statements in favor of MB Medical (as "secured party") and naming each APE Debtor as "debtor" therein were assigned to the Prepetition First Lien Agent by recording UCC-3 assignments of such UCC-1

13262344-16

financing statements in favor of the Prepetition First Lien Agent.  Pursuant to the Collateral Assignment of Contracts agreements, following the occurrence of an Event of Default (as defined in the Prepetition First Lien Credit Agreement), which, for the avoidance of doubt, has occurred and is continuing as of the Petition Date, the Prepetition First Lien Agent shall have all rights and benefits of MB Medical under the PC Agreements without modifying or discharging any of the Prepetition First Lien Obligations.  By virtue of the Prepetition First Lien Agent having such rights and benefits, the APE Debtors have effectively granted to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties a perfected security interest in and continuing lien on all of their right, title and interest in substantially all of their assets.

(iii)    *Prepetition First Liens and Prepetition Collateral.*  As more fully set forth in the Prepetition First Lien Credit Documents, prior to the Petition Date, the Prepetition Obligors and, effectively (as described above), the APE Debtors granted to the Prepetition First Lien Agent, for the benefit of the Prepetition First Lien Secured Parties, a security interest in and continuing lien (the "Prepetition First Liens") on all of their right, title and interest in substantially all of their assets (the "Prepetition Collateral").

(iv)    *Validity, Extent, Perfection and Priority of Prepetition First Liens and Prepetition First Lien Obligations.*  As of the Petition Date: (a) the Prepetition First Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition First Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens senior by operation of law and otherwise permitted by the Prepetition First Lien Credit Documents (solely to the extent any such permitted liens were valid, properly perfected, non-

- 10 -

avoidable and senior in priority to the Prepetition First Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, in each case as expressly identified on Schedule II to the DIP Credit Agreement, the "Prepetition Permitted Liens")[5]; (c) the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Obligors enforceable in accordance with the terms of the applicable Prepetition First Lien Credit Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition First Liens or Prepetition First Lien Obligations exist, and no portion of the Prepetition First Liens or Prepetition First Lien Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition First Lien Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors and employees arising out of, based upon or related to the Prepetition First Lien Facility; (f) the Debtors have waived, discharged, and released any right to, and are forever barred from bringing any, challenge to any of the Prepetition First Lien Obligations, the priority of the Prepetition First Lien Secured Parties' obligations thereunder, and the legality, validity,

---

[5]   For the avoidance of doubt, no reference to Prepetition Permitted Liens shall refer to or include the Prepetition Liens.

extent, and priority of the Prepetition First Liens; and (g) the Prepetition First Lien Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(v)    *Subordination and Intercreditor Agreement*.  The Prepetition First Lien Agent and the Prepetition Second Lien Secured Parties (as defined below) are parties to that certain Intercreditor and Subordination Agreement, dated as of July 5, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "Intercreditor Agreement").   The Intercreditor Agreement, as acknowledged by the Prepetition Obligors, governs the respective rights, obligations and priorities of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties with respect to the matters referred to therein.  The Intercreditor Agreement shall continue to govern the rights of the respective parties thereto.

(vi)    *Prepetition Unsecured Promissory Note*.  Pursuant to that certain Second Amended and Restated Unsecured Promissory Note, dated as of October 2, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "Prepetition Unsecured Promissory Note", and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, otherwise modified prior to the Petition Date, the "Prepetition Unsecured Promissory Note Documents"), among (a) MB Medical, (b) the Grantors (as defined in the Prepetition Unsecured Promissory Note) from time to time party thereto pursuant to the Guaranty (as defined in the Prepetition Unsecured Promissory Note), (c) KKR Credit Advisors (US) LLC, as holder representative (in such capacity, together with any successor thereto, the "Prepetition Unsecured Holder Representative"), and (d) the lenders party

- 12 -

thereto from time to time (the "<u>Prepetition Unsecured Holders</u>," and together with the Prepetition Unsecured Holder Representative, the "<u>Prepetition Unsecured Note Parties</u>"), the Prepetition Unsecured Holders provided unsecured delayed draw term loans to MB Medical (the "<u>Prepetition Unsecured Note Facility</u>").

(vii) *Prepetition Unsecured Note Obligations*.  As of the Petition Date, MB Medical and the Grantors (as defined in the Prepetition Unsecured Promissory Note) were indebted and jointly and severally liable to the Prepetition Unsecured Note Parties in the aggregate principal amount outstanding under the Prepetition Unsecured Note Facility of not less than $28,297,807.69 (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations in connection with the Prepetition Unsecured Note Facility pursuant to the Prepetition Unsecured Promissory Note Documents, the "<u>Prepetition Unsecured Note Obligations</u>").

(viii) *Validity of Prepetition Unsecured Note Obligations.*  As of the Petition Date: (a) the Prepetition Unsecured Note Obligations constitute legal, valid, binding, and non-avoidable obligations of MB Medical and the Grantors (as defined in the Prepetition Unsecured Promissory Note) enforceable in accordance with the terms of the applicable Prepetition Unsecured Promissory Note Documents; (b) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition Unsecured Note Obligations exist, and no portion of the Prepetition

- 13 -

Unsecured Note Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Unsecured Note Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors and employees arising out of, based upon or related to the Prepetition Unsecured Note Facility; and (d) the Debtors have waived, discharged, and released any right to, and are forever barred from bringing any, challenge to any of the Prepetition Unsecured Note Obligations; and (e) the Prepetition Unsecured Note Obligations constitute allowed, unsecured claims within the meaning of section 502 of the Bankruptcy Code.

(ix)    *Intercreditor and Turnover Agreement*.  The Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties and the Prepetition Unsecured Note Parties are parties to that certain Intercreditor and Turnover Agreement, dated as of November 17, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "Turnover Agreement").  The Turnover Agreement, as acknowledged by the Prepetition Obligors, governs the respective rights, obligations and priorities of the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties and the Prepetition Unsecured Note Parties with respect to the matters referred to therein.  The Turnover Agreement shall continue to govern the rights of the respective parties thereto.

- 14 -

13262344-16

(x)    *No control*.  None of the DIP Secured Parties, the Prepetition First Lien Secured Parties, the Prepetition Unsecured Note Parties or the affiliates of any of the foregoing controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted, or is a control person or insider (as defined in the Bankruptcy Code) of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Liens (as defined below), the DIP Obligations, the DIP Documents, the Prepetition First Lien Facility, the Prepetition Second Lien Facility (as defined below), the Prepetition Unsecured Note Facility, the Prepetition First Liens, the Prepetition Second Liens (as defined below), the Prepetition First Lien Obligations, the Prepetition Second Lien Obligations (as defined below), the Prepetition Unsecured Note Obligations, the Prepetition First Lien Credit Documents, Prepetition Second Lien Credit Documents (as defined below), the Prepetition Unsecured Promissory Note Documents, or the transactions contemplated hereunder or thereunder.

H.    **Prepetition Second Lien Facility**.    Without acknowledging the validity, enforceability, or the allowance of such claims and liens, the Debtors make reference to that certain Second Amended and Restated Promissory Note and Security Agreement, dated as of November 6, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien Promissory Note," and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien Credit Documents") among (i) MB Medical, (ii) the Grantors (as defined in the Prepetition Second

- 15 -

Lien Promissory Note) from time to time party thereto pursuant to the Guaranty (as defined in the Prepetition Second Lien Promissory Note), (iii) MBMG Finco, LLC ("Finco") and (iv) FS KKR Capital Corp. ("FS KKR" and together with Finco, the "Prepetition Second Lien Secured Parties"; the Prepetition Second Lien Secured Parties and the Prepetition First Lien Secured Parties, collectively, the "Prepetition Secured Parties").  Pursuant to the Prepetition Second Lien Credit Documents, the Prepetition Second Lien Secured Parties provided junior priority secured loans to the Debtors (the "Prepetition Second Lien Facility" and the obligations thereunder, the "Prepetition Second Lien Obligations").  The Prepetition Second Lien Facility is purportedly secured by a security interest in the Prepetition Collateral that is subordinate to the Prepetition First Liens (the "Prepetition Second Liens," and together with the Prepetition First Liens, the "Prepetition Liens").

I.    **Releases**.  Subject to Paragraph 44 hereof, the Debtors, on behalf of themselves and their respective Estates (including any successor trustee or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through or under the Debtors or their Estates), hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit each of the Prepetition First Lien Secured Parties, Prepetition Unsecured Note Parties and each of their respective affiliates (including, without limitation, FS KKR) and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (collectively, the "Released Parties") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, allegations, suits, controversies, proceedings,

- 16 -

actions and causes of action arising prior to the Petition Date (collectively, the "Released Claims") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the Prepetition First Lien Credit Documents, the Prepetition Second Lien Credit Documents, the Prepetition Unsecured Promissory Note Documents, the obligations owing and the financial obligations made under the Prepetition First Lien Credit Documents, the Prepetition Second Lien Credit Documents, and the Prepetition Unsecured Promissory Note Documents, the negotiation thereof and of the transactions reflected thereby and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.  The Debtors further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition First Lien Obligations, the Prepetition Second Lien Obligations, or the Prepetition Unsecured Note Obligations that the Debtors may now have or may claim to have against the Released Parties, arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to this Court entering this Interim Order relating to the Debtors' lending relationship with the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, or the Prepetition Unsecured Note Parties.

(i)    *Cash Collateral*.  All of the Debtors' cash and cash equivalents, including cash on deposit in any account or accounts as of the Petition Date, securities or other property, wherever located, whether subject to control agreements or otherwise, whether as original

- 17 -

collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition First Lien Secured Parties.

J.    **Findings Regarding Postpetition Financing**

(i)    *Request for Postpetition Financing*.  The Debtors seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Documents, and (b) use Cash Collateral on the terms described herein to administer their Chapter 11 Cases and fund their operations in accordance with the Approved Budget (as defined herein) (subject to the Permitted Variances (as defined below)).  The stated objective of the Debtors' Chapter 11 Cases is to facilitate a going concern sale (the "Sale") of substantially all of their assets to Conviva Medical Center Management, LLC (the "Purchaser"), an affiliate of Humana, Inc. ("Humana") pursuant to the terms of a written Asset Purchase Agreement entered into by the Debtors and the Purchaser on or shortly before the Petition Date (the "Asset Purchase Agreement").  At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to a proposed final order (the "Final Order" and collectively with this Interim Order, the "DIP Orders"), which shall be in form and substance acceptable to the DIP Agent and Required Lenders.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)    *Priming of the Prepetition Liens*.  The priming of (1) the Prepetition First Liens on the Prepetition Collateral and (2) the Prepetition Second Liens on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses to the benefit of their Estates and creditors and for the stated purpose of securing approval for and consummating the Sale contemplated by the Asset Purchase

- 18 -

Agreement.  The Prepetition First Lien Secured Parties shall receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any diminution in the value ("Diminution") of their interests in the Prepetition Collateral (including Cash Collateral).

(iii)   *Need for Postpetition Financing and Use of Cash Collateral*.  To sustain their operations through approval and consummation of the proposed Sale, the Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facility and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, (i) pay the fees, costs and expenses incurred in connection with the Chapter 11 Cases, (ii) fund the Carve-Out (as defined below), (iii) permit the orderly continuation and operation of their businesses and thereafter fund the orderly winddown of their businesses and monetization of any remaining assets, (iv) maintain relationships with patients, vendors and suppliers, (v) make payroll, and (vi) satisfy other working capital and operational needs, all to the extent provided in, and in accordance with, the Approved Budget, this Interim Order and the DIP Documents. The incurrence of new debt under the DIP Documents and use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors. Immediate and irreparable harm will be caused to the Debtors and their Estates if immediate financing is not obtained and permission to use Cash Collateral is not granted.  The terms of the proposed financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  The adequate protection provided in this Interim Order and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code.

13262344-16

(iv)  *No Credit Available on More Favorable Terms*.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, capital structure, and the circumstances of these Chapter 11 Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility.  Further, the Prepetition Secured Parties are adequately protected to the extent required by the Bankruptcy Code and/or have consented to the Debtors incurring debtor-in-possession financing, the priming of the Prepetition Liens and the use of Cash Collateral, on the terms and subject to the conditions set forth in the DIP Documents and this Interim Order.  The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors could not reasonably obtain:   (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their Estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their Estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Secured Parties: (1) perfected priming security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims and liens, and (3) the other protections set forth in this Interim Order.

(v)  *Use of Cash Collateral and Proceeds of the DIP Facility*.  As a condition to the Debtors' entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Prepetition Collateral, including Cash Collateral, and to induce the Prepetition First Lien Secured Parties to give their consent to the proposed Sale, the Debtors

- 20 -

have agreed that Cash Collateral and the proceeds of the DIP Facility shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved Budget (as defined herein).

          (vi)  *Application of Proceeds of Collateral*.  As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and authorization to use Cash Collateral, and to induce the Prepetition First Lien Secured Parties to give their consent to the proposed Sale, the Debtors have agreed that, as of and commencing on the date of entry of this Interim Order, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the DIP Documents.

      K.    **Adequate Protection**.  In exchange for their consent to (i) the priming of the Prepetition Liens by the DIP Liens, and (ii) the use of Cash Collateral to the extent set forth in this Interim Order, the Prepetition First Lien Secured Parties shall receive adequate protection to the extent of any Diminution of their interests in the Prepetition Collateral, as more fully set forth in this Interim Order.

      L.    **Sections 506(c) and 552(b)**.  In light of (i) the DIP Secured Parties' agreement that its liens and superpriority claims shall be subject to the Carve-Out and (ii) the Prepetition First Lien Secured Parties' agreement that, with respect to the Prepetition Collateral, their respective liens and claims, including any adequate protection liens and claims, shall be subject to the Carve-Out and subordinate to the DIP Liens, subject to entry of a Final Order (a) the DIP Secured Parties and the Prepetition First Lien Secured Parties are each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) the DIP Secured Parties and the Prepetition First Lien Secured Parties are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

- 21 -

M.    **Good Faith of the DIP Secured Parties**.

(i)    *Willingness to Provide Financing*.  The DIP Secured Parties have committed to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and those set forth in the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Bankruptcy Court that the DIP Facility is essential to the Debtors' Estates, that the DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Secured Parties' superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)    *Business Judgment and Good Faith Pursuant to Section 364(e)*.  Based on the Motion, the *Declaration of Nicholas K. Campbell in Support of Chapter 11 Petitions and First Day Pleadings*, and the record presented to the Bankruptcy Court at the Interim Hearing, (i) the terms of the financing embodied in the DIP Facility, including the fees, expenses and other charges paid and to be paid thereunder or in connection therewith, (ii) the adequate protection authorized by the Interim Order and DIP Documents, and (iii) the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Documents, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and represent the best financing (and terms) available under the circumstances and are appropriate for secured financings to debtors in possession.

13262344-16

(iii)   *Good Faith Pursuant to Section 364(e)*.   The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition First Lien Secured Parties with the assistance and counsel of their respective advisors.   Use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Secured Parties and the Prepetition First Lien Secured Parties within the meaning of section 364(e) of the Bankruptcy Code.

(iv)   *Consent to DIP Facility and Use of Cash Collateral*.   Absent an order of this Court and the provision of adequate protection, the consent of the Prepetition Secured Parties is required for the Debtors' use of Cash Collateral and other Prepetition Collateral.   The Prepetition Secured Parties have consented to the proposed Sale and, in furtherance thereof, the Debtors' use of Cash Collateral and the other Prepetition Collateral and the Debtors' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

N.   **Good Cause**.   Good cause has been shown for immediate entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors, the Estates and their stakeholders.   Among other things, the relief granted herein will minimize disruption of the Debtors' business and permit the Debtors to meet payroll, continue providing services to patients and satisfy other expenses necessary to maximize the value of the Estates.   The terms of the Debtors' DIP Facility, use of Cash Collateral and proposed adequate protection arrangements, as set forth in this Interim Order, are fair and reasonable under the circumstances, and reflect the Debtors' exercise of prudent business judgment.

- 23 -

O.   **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Bankruptcy Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Bankruptcy Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.   <u>DIP Financing Approved</u>.  On an interim basis, entry into the DIP Facility is authorized and approved, and the use of Cash Collateral is authorized, in each case, subject to the terms and conditions set forth in this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

**DIP Facility Authorization**

2.   <u>Authorization of the DIP Financing</u>.  The Debtors, acting through their Chief Restructuring Officer or any other officer, are expressly and immediately authorized and empowered to execute and deliver the DIP Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to execute, deliver and perform under all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, any principal, interest, fees, expenses, and other

- 24 -

amounts described in the DIP Documents and this Interim Order, as such amounts become due and owing, without need to obtain further Court approval (except as otherwise provided herein or in the DIP Documents) subject to and in accordance with the terms hereof and thereof, including, without limitation, the reasonable and documented fees and disbursements of Proskauer Rose LLP and local counsel, as the DIP Professionals (as defined below), in accordance with this Interim Order, the Approved Budget, and the DIP Documents, whether or not such professional fees and disbursements arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order, the Approved Budget, and the DIP Documents. Upon execution and delivery, the DIP Documents shall represent legal, valid and binding obligations of the Debtors, enforceable against each of the Debtors and their Estates in accordance with their terms.  Each officer of a Debtor acting individually is hereby authorized to execute and deliver each of the DIP Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents.

3.      <u>Authorization to Borrow</u>.  To prevent immediate and irreparable harm to the Debtors' Estates, subject to the terms and conditions set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to borrow the Interim Amount, subject to any limitations on, or conditions to, borrowing under the DIP Documents, which borrowings shall be used solely for purposes permitted under the DIP Documents, including, without limitation, to

provide working capital for the Debtors and to pay fees, costs, charges and expenses, in each case, in accordance with this Interim Order, the DIP Documents and the Approved Budget.

4.    <u>DIP Obligations</u>.    The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations.  All DIP Obligations shall be enforceable against the Debtors, their Estates and any successors thereto, including without limitation, any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").  Upon entry of this Interim Order, the DIP Obligations will include all loans, guarantees, reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Secured Parties, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses and other amounts under the DIP Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall become due and payable, without notice or demand, on the Termination Date (as defined below).  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Lien) to the DIP Secured Parties, and including in connection with any adequate protection provided hereunder, shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), claim,

- 26 -

13262344-16

counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

5.    <u>DIP Collateral</u>.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Lenders), is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition priming security interests in and liens (collectively, the "<u>DIP Liens</u>") on the DIP Collateral.  "<u>DIP Collateral</u>" means, collectively, all property of the estate under section 541 of the Bankruptcy Code, including all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all contracts and leases, *provided that* to the extent that the grant of a DIP Lien is prohibited or restricted by the terms of any contract or lease, then the DIP Liens shall attach to

- 27 -

and be perfected in the proceeds of such contracts or leases; (c) subject to entry of a Final Order providing for such relief, the proceeds of any cause of action brought pursuant to chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) proceeds from the Debtors' exercise of rights under section 506(c) and 550 of the Bankruptcy Code; (e) all Prepetition Collateral, (f) all property of the Debtors that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date, and (g) all proceeds from the sale, assignment, or other disposition of (i) any commercial real estate leases and (ii) subject to the terms of the Asset Purchase Agreement (solely to the extent approved by a Sale Order (as defined below) on a final basis), the Debtors' right to select, identify, and designate which commercial leases may be assumed and assigned under section 365 of the Bankruptcy Code.  Notwithstanding the foregoing, DIP Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases) solely to the extent that the grant of a DIP Lien is prohibited or restricted by the terms of such real property lease or applicable nonbankruptcy law to attach to any such real property lease.

6.    <u>DIP Liens</u>.    The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any DIP Collateral, except the DIP Liens shall be subject to the Carve-Out, and shall otherwise be junior only to the Prepetition Permitted Liens.  Other than as expressly set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon

the dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any Estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

7. <u>DIP Superpriority Claims</u>. Subject to the Carve-Out, upon entry of this Interim Order, the DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (collectively, the "<u>DIP Superpriority Claims</u>") for all DIP Obligations: (a) except as expressly set forth herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their Estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their Estates, and any successor trustee or other estate representative to the extent permitted by law. Notwithstanding the foregoing, the DIP Superpriority Claims shall be junior to the Carve-Out.

8. <u>No Obligation to Extend Credit</u>. The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent and each DIP Lender in accordance with the terms of the DIP Documents.

13262344-16

9.     Use of Proceeds of DIP Facility.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, and in compliance with the Approved Budget (subject to the Permitted Variances) and the terms and conditions in this Interim Order and the DIP Documents.

10.     No Monitoring Obligation.  The DIP Secured Parties shall have no obligation or responsibility to monitor the Debtors' use of the DIP Facility, and the DIP Secured Parties may rely upon the Debtors' representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Documents and in compliance with the Approved Budget (subject to the Permitted Variances).

**Authorization to Use Cash Collateral**

11.     Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the expiration of the Remedies Notice Period (as defined below) following the Termination Date. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted by this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances).  For the avoidance of doubt, the Debtors' use of Cash Collateral following any DIP Repayment (as defined below) shall continue to be subject to compliance with this Interim Order and the Approved Budget (subject to the Permitted Variances).

12.     <u>Consent of Prepetition Secured Parties.</u>  The Prepetition Secured Parties hereby consent to (a) the provisions of this Interim Order (including the Debtors' entry into the DIP Facility on an interim basis), (b) the granting of the DIP Liens and DIP Superpriority Claims on the terms and subject to the conditions set forth herein, (c) the Approved Budget, and (d) subject to the entry of a sale order in form and substance acceptable to the DIP Agent and Prepetition First Lien Agent (the "<u>Sale Order</u>"), the proposed Sale.

13.     <u>Adequate Protection for Prepetition First Lien Secured Parties</u>.  As adequate protection for any Diminution of the Prepetition First Lien Secured Parties' interest in the Prepetition Collateral resulting from the subordination of the Prepetition First Liens to the DIP Liens, the Carve-Out and the Debtors' use of Cash Collateral (including certain Post-Sale Reserves (as defined below)), the Prepetition First Lien Agent shall receive, for the benefit of the Prepetition First Lien Secured Parties,

(a) continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the DIP Liens and Prepetition Permitted Liens (the "<u>Replacement Liens</u>") and which (x) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (y) shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code;

13262344-16

(b) superpriority administrative expense claims in each of the Chapter 11 Cases (the "Adequate Protection Superpriority Claims"), junior and subordinate only to the Carve-Out and the DIP Obligations (including the DIP Superpriority Claims), pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code;

(c) (x) monthly reimbursement payments of the Prepetition First Lien Secured Parties' reasonable fees, costs and expenses, including the professional fees and expenses of Proskauer Rose LLP and local counsel, without the need for the filing of formal fee applications, including as to any amounts arising before or after the Petition Date, and (y) payment in kind of monthly interest, calculated at the non-default rate under the Prepetition First Lien Credit Agreement and added to the principal amounts of the Prepetition First Lien Secured Parties' allowed secured claims;

(d) on the first Friday following consummation of a Sale pursuant to a Sale Order that results in the occurrence of the Maturity Date and the funding of the Winddown Reserve (as defined below), and on the Friday of every week thereafter, payments of the gross proceeds of accounts receivable collected by the Debtors, without deduction or setoff by any account debtor, which the Debtors shall use commercially reasonable, good faith efforts to pursue and collect on a timely basis;

- 32 -

(e)  promptly following the entry of a Sale Order, a collateral assignment and grant of all of the Debtors' rights, title, interest, remedies, privileges, and claims in and to (but, for the avoidance of doubt, excluding any and all obligations and liabilities under) the Asset Purchase Agreement and all other agreements, instruments and other documents related thereto or executed in connection therewith, including, without limitation, all rights to receive payment of the Holdback Amount and Deposit (each, as defined in the Asset Purchase Agreement), as well as all other payments from the Buyer (as defined in the Asset Purchase Agreement), in form and substance acceptable to the Prepetition First Lien Agent; and

(f) upon closing of the Sale, and subject only to payment in full in cash of the DIP Obligations and the funding of the Carve-Out and Post-Sale Reserves (as defined below) in accordance with this Order, the Debtors shall pay all cash proceeds of the Sale to the Prepetition First Lien Agent for application to the Prepetition First Lien Obligations.

14.    <u>Post-Sale Reserves</u>.

(i)      Following consummation of a Sale pursuant to a Sale Order, and subject to all applicable Milestones having been satisfied (or waived in writing in the sole discretion of the DIP Agent), the Debtors shall establish (or shall cause to be established) one or more cash reserves in one or more segregated accounts and in an aggregate amount to be agreed upon, in writing, by the Required Lenders in their sole discretion, which reserves shall be funded solely from the net cash proceeds of such Sale (and not from proceeds of the DIP Facility) to fund the following expenses: (a) amounts under any key employee incentive plan or key employee retention plan approved by final order of the Bankruptcy Court (the "<u>KEIP/KERP Reserve</u>"), (b) allowed,

- 33 -

undisputed, and accrued and unpaid (as of the date of the closing of such Sale) chapter 11 administrative expense claims (the "Admin Claim Reserve"), (c) costs associated with any restructuring, sale, success, or other transaction fee under the engagement letters of Oppenheimer & Co. Inc. ("Oppenheimer"), the Debtors' investment banker, payable pursuant to a final order of the Bankruptcy Court (the "Transaction Fee Reserve"), subject to the Specified Reserved Holdback (as defined below), and (d) costs not to exceed $2,000,000 in the aggregate associated with the orderly winddown of the Debtors' businesses and administration of the Debtors' Estates pursuant to an Acceptable Plan (the "Winddown Reserve" and together with the KEIP/KERP Reserve, Admin Claim Reserve, and Transaction Fee Reserve, the "Post-Sale Reserves"); *provided that* $500,000 of the Winddown Reserve shall be funded from the net cash proceeds of the Sale and $1,500,000 of the Winddown Reserve shall be funded from the first proceeds of the Debtors' accounts receivable (and not in any case from proceeds of the DIP Facility); *provided further that* twelve and one-half percent (12.5%) of the amount funded to the Transaction Fee Reserve shall be distributed to Oppenheimer pursuant to a final order permitting payment thereof only upon payment of the Holdback Amount (as defined in the Asset Purchase Agreement) in accordance with a Sale Order and the Asset Purchase Agreement (such cumulative amount, the "Specified Reserve Holdback"), notwithstanding any distributions approved by any other order of the Bankruptcy Court including, without limitation, an order confirming any plan of reorganization or liquidation; *provided further that* the Specified Reserve Holdback shall be reduced *pro rata* for any reduction to the Holdback Amount made in accordance with a Sale Order and the Asset Purchase Agreement, and any amount so deducted from the Specified Reserve Holdback shall be distributed to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties promptly upon payment of the Holdback Amount in accordance with a Sale Order and the

- 34 -

Asset Purchase Agreement.  Any amounts remaining in the Post-Sale Reserves after payment of the related obligations in accordance with this Paragraph 14(i) shall be paid to the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties.

(ii)    Notwithstanding anything herein to the contrary, no Post-Sale Reserve shall be established or funded to the extent (a) any of the Milestones (as defined below) are not satisfied (or waived in writing by the DIP Agent in its sole discretion) on or prior to consummation of such Sale pursuant to a Sale Order, (b) the Debtors or any other party files a plan of reorganization or plan of liquidation that is not an Acceptable Plan, or (c) the Debtors are not in compliance with the Approved Budget (subject to the Permitted Variances) and the terms and conditions in this Interim Order and the DIP Documents, which non-compliance has not been waived in writing by the DIP Agent in its sole discretion.

15.    <u>Adequate Protection Reservation</u>.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties hereunder is insufficient to compensate for any Diminution of their interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition First Lien Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition First Lien Secured Parties are adequately protected, and this Interim Order shall not prejudice or limit the rights of the Prepetition First Lien Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

13262344-16

**Provisions Common to DIP Financing and Use of Cash Collateral**

16.    <u>Amendment of the DIP Documents</u>.   The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Order without the prior written consent of the Required Lenders, which they may grant in their sole discretion.  No such consent shall be implied by any action, inaction or acquiescence of the DIP Secured Parties. After obtaining the prior written consent of the Required Lenders, the Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Documents in accordance with the provisions thereof, *provided that* any such amendment, modification, supplement or waiver is not materially adverse to the Debtors' bankruptcy estates.

17.    <u>Approved Budget</u>.

(i)    Attached to this Interim Order as **<u>Exhibit B</u>** is a 9-week budget approved by the Required Lenders, which sets forth, among other things, projected cash receipts and cash disbursements (the "<u>Approved Budget</u>").  By no later than 5:00 P.M. (Eastern Time) on the Thursday of the first full calendar week after the Petition Date, and by no later than 5:00 P.M. (Eastern Time) on the Thursday of every week thereafter, the weekly budget shall be updated and delivered to the DIP Agent for informational purposes only, which, for the avoidance of doubt, shall not amend, supplement or otherwise modify the Approved Budget in any respect.  Any amendments, supplements, or modifications to, or extensions of, the Approved Budget or an Approved Variance Report (as defined below) shall be subject to the prior written approval of the DIP Agent in its sole discretion prior to the implementation thereof.  Until any such amendment, supplement, modification or extension has been approved by the DIP Agent, the Debtors shall be subject to and be governed by the terms of the Approved Budget then in effect.

- 36 -

13262344-16

(ii)     The Approved Budget is approved on an interim basis.  The proceeds of the DIP Facility and Cash Collateral under this Interim Order shall be used by the Debtors in accordance with the Approved Budget, this Interim Order and the DIP Documents.

(iii)     Other than with respect to the Carve-Out, and except as provided in Paragraphs 32 and 33, none of the DIP Secured Parties' and the Prepetition First Lien Secured Parties' consent to, or acknowledgement of, the Approved Budget shall be construed as consent to use the proceeds of the DIP Facility beyond the Termination Date (as defined below) or the Maturity Date, as applicable, or the use of Cash Collateral beyond the expiration of the Remedies Notice Period (as defined below) following the Termination Date, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(iv)     Notwithstanding anything to the contrary herein, the Debtors shall pay the fees, costs and expenses of the DIP Professionals (as defined below) in accordance with the DIP Documents, the Approved Budget and this Interim Order.

18.     <u>Budget Reporting</u>.  The Debtors shall at all times comply with the Approved Budget, subject to the Permitted Variances (as defined below).  By no later than 5:00 P.M. (Eastern Time) on Thursday after the second full calendar week following the Petition Date (the "<u>First Testing Date</u>"), and no later than 5:00 PM ET on each Thursday thereafter (together with the First Testing Date, each a "<u>Testing Date</u>"), the Debtors shall deliver to the DIP Agent a variance report for the applicable Testing Period (as defined below) in form and detail acceptable to the DIP Agent (an "<u>Approved Variance Report</u>") showing comparisons of (a) actual cash receipts for such Testing Period compared to the projected cash receipts of the Debtors for such Testing Period as set forth in the Approved Budget and (b) actual cash disbursements on a line by line basis (which, as to professional fees, shall include only Berger Singerman LLP and Meru, LLC) of the Debtors for

- 37 -

such Testing Period compared to the projected cash disbursements on a line by line basis (which, as to professional fees, shall include only Berger Singerman LLP and Meru, LLC) for such Testing Period as set forth in the Approved Budget.  The term "Testing Period" means (i) with respect to receipts, the cumulative period beginning on the Petition Date and ending on the Saturday immediately prior to the applicable Testing Date, and (ii) with respect to disbursements, the weekly period beginning on Sunday and ending on the Saturday immediately prior to the applicable Testing Date.  Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the Permitted Variances (as defined below) and shall provide a written explanation for such variances.  "Permitted Variances" shall be 10.0% and $25,000 and shall be determined, as of any Testing Date, as follows: the Debtors shall certify in each Approved Variance Report the difference of (x) the Debtors' actual cash disbursements within the Approved Budget (which, as to professional fees, shall include only Berger Singerman LLP and Meru, LLC) on a line by line basis for the applicable Testing Period, *minus* (y) to the extent such amount is greater than $0, the amount projected in the Approved Budget for each such line item.  To the extent that the Debtors' actual cash disbursements for any line item within the Approved Budget for the Testing Period exceeds the projected cash disbursements for any corresponding line item within Approved Budget for the applicable Testing Period by more than 10.0% and $25,000 for any Testing Period, an Event of Default (as defined below) shall have occurred.

19.    Additional Reporting.  The Debtors shall deliver to the DIP Agent each of the reports and other information set forth in Section 10.01 of the DIP Credit Agreement within the timeframe set forth therein, in form and detail acceptable to the DIP Agent.  The Debtors shall also make the Debtors' senior management available for weekly telephonic or virtual meetings to update the DIP Agent, the DIP Lenders and the DIP Professionals at such times to be mutually

- 38 -

agreed on all matters affecting the Debtors and the Chapter 11 Cases, including with respect to the Sale.

20.     <u>Modification of Automatic Stay</u>.  The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Secured Parties and the Prepetition First Lien Secured Parties to accomplish the transactions contemplated by this Interim Order.

21.     <u>Perfection of DIP Liens and Replacement Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Replacement Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or the Replacement Liens or to entitle the DIP Secured Parties or the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent and the Prepetition First Lien Agent are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and/or the Replacement Liens, and all such financing statements, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Replacement Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent and the Prepetition First Lien Agent

- 39 -

all such financing statements, mortgages, notices and other documents as each may reasonably request. The DIP Agent and the Prepetition First Lien Agent may each, in its discretion, file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments. To the extent that the Prepetition First Lien Agent is, with respect to the DIP Collateral, the secured party under any security agreement, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements or any other Prepetition First Lien Credit Documents or is listed as loss payee, lenders' loss payee or additional insured under any of the Debtors' insurance policies, the DIP Agent (for the benefit of the DIP Lenders) shall also be deemed to be the secured party under such documents or to be the loss payee or additional insured, as applicable. The Prepetition First Lien Agent shall act as agent for the DIP Secured Parties solely for purposes of perfecting the DIP Secured Parties' DIP Liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party (including any deposit account control agreement), and all of the Prepetition Secured Parties' respective rights in such DIP Collateral shall inure to the benefit of and be exercisable exclusively by the DIP Agent until the DIP Obligations have been indefeasibly repaid in full in cash; *provided that* the DIP Agent may, in its sole discretion, require the Debtors and the Prepetition Secured Parties to (and the Debtors and the Prepetition Secured Parties shall) use commercially reasonable efforts to provide the DIP Agent with such possession or control as is necessary to perfect the DIP Obligations and DIP Liens. Notwithstanding the foregoing, in the event any of the Chapter 11 Cases or Successor Cases are dismissed prior to the indefeasible payment in full of the DIP Obligations, such order dismissing

- 40 -

any Chapter 11 Cases or Successor Cases shall not be effective for five (5) business days to permit the DIP Agent and the Prepetition Secured Parties to enter into any agreements or file any documents (including credit agreements, financing statements, or other notices or documents) evidencing the DIP Obligations and the perfection and priority of the DIP Liens and Replacement Liens, and during such period, the Debtors shall comply with all reasonable requests of the DIP Agent and the Prepetition Secured Parties to ensure the perfection of the DIP Liens and the Replacement Liens, as applicable.

22.    [Reserved].

23.    Access to Books and Records.  The Debtors will (i) maintain books, records, and accounts to the extent and as required by the DIP Documents, (ii) cooperate with, consult with, and provide to the DIP Agent all such information and documents that any or all of the Debtors are obligated to provide under the DIP Documents or the provisions of this Interim Order or as otherwise reasonably requested by the DIP Agent, (iii) during normal business hours, upon reasonable advance notice, permit consultants, advisors and other representatives (including third party representatives) of the DIP Agent to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to engage in discussions with their respective senior management and independent public accountants to the extent required by the DIP Documents or the Prepetition First Lien Credit Documents, and (iv) permit the DIP Agent, and the Prepetition First Lien Agent, and their respective consultants, advisors and other representatives, to consult with the Debtors' management and advisors on matters concerning the Debtors'

13262344-16

businesses, financial condition, operations and assets, as provided for in the DIP Documents or this Interim Order.

24.     <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' Estates, and such facilities are secured by any DIP Collateral, then all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be distributed in accordance with this Interim Order and the DIP Documents.  For the avoidance of doubt, if the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Cases, or any Successor Cases, shall obtain credit or incur debt (other than the DIP Facility) pursuant to Bankruptcy Code section 364(d) at any time prior to the indefeasible repayment in full of the Prepetition First Lien Obligations, the Prepetition First Lien Secured Parties' rights to object to the Debtors' use of Cash Collateral and assert a lack of adequate protection shall be fully preserved.

25.     <u>Cash Management</u>.  The Debtors shall maintain their cash management system consistent with the terms and conditions of the Cash Management Order (as defined below) and the DIP Documents.  Unless authorized by the Interim Order or otherwise agreed to in writing by the DIP Agent and the Prepetition First Lien Agent, the Debtors shall not maintain any deposit accounts except those identified in any interim and/or final order granting the Debtors

- 42 -

authorization to continue their cash management systems and certain related relief (as amended, supplemented or otherwise modified, the "Cash Management Order"), which order (and any amendments, supplements or modifications thereto) shall be in form and substance acceptable to the DIP Agent.   Subject to Paragraphs 32, 33, and 35, the Debtors and the financial institutions where the Debtors maintain deposit accounts (as identified in the Cash Management Order), are authorized and directed to remit, without offset or deduction, funds in any such deposit accounts upon receipt of any direction to that effect from the DIP Agent (on behalf of the DIP Lenders) in accordance with the DIP Documents and this Interim Order.

26.    Maintenance of DIP Collateral.  Until the indefeasible payment in full in cash of all DIP Obligations and all Prepetition First Lien Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Documents and the Prepetition First Lien Credit Documents, as applicable; and (b) maintain the cash management system consistent with the terms and conditions of the Cash Management Order and the DIP Documents.

27.    Disposition of DIP Collateral.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or Prepetition Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent and the Required Lenders, or pursuant to a Sale Order.

28.    Termination Date.  On the Termination Date (as defined below), all DIP Obligations shall be immediately due and payable and, all commitments to extend credit under the DIP Facility will terminate.

29.    Events of Default.  Until the DIP Obligations are indefeasibly paid in full in cash and all commitments thereunder are terminated (the "DIP Repayment"), the occurrence of

- 43 -

any of the following events, unless waived by the Required Lenders in writing (which may be by email) and in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "Events of Default"): (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants or obligations under this Interim Order, including, without limitation, failure to make any payment under this Interim Order when due or comply with any Milestones or the Approved Budget (subject to the Permitted Variances); or (b) the occurrence and continuation of any Events of Default under, and as defined in, the DIP Credit Agreement or an event of default under any other DIP Documents.

30.     Milestones. As a condition to the DIP Facility and the use of Cash Collateral, and notwithstanding any DIP Repayment, the Debtors shall comply with the following milestones (the "Milestones"), unless extended or waived in writing in DIP Agent's sole discretion:

(i)     no later than three (3) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order.  For the avoidance of doubt, any changes to the Interim Order shall be subject to the prior written consent of the DIP Lenders and the DIP Agent in their sole discretion;

(ii)    no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order.  For the avoidance of doubt, any changes to the Final Order shall be subject to the prior written consent of the DIP Lenders and the DIP Agent in their sole discretion;

(iii)   no later than forty-five (45) days after the Petition Date, the Debtors shall have filed with the Bankruptcy Court an Acceptable Plan;

(iv)    no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered a Sale Order, which order shall be acceptable to the DIP Agent and the Required Lenders in their sole discretion, approving the sale of all or substantially all of the Debtors' assets;

(v)     no later than sixty (60) days after the Petition Date, the Sale approved by the Bankruptcy Court pursuant to the Sale Order shall have been consummated; and

(vi)    no later than one hundred and fifty (150) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order confirming an Acceptable Plan.

For the avoidance of doubt, unless waived or extended in writing by the DIP Agent in its sole discretion, the failure of the Debtors to meet the Milestones by the applicable specified deadlines set forth therefor shall constitute an immediate Event of Default under the DIP Documents and this Interim Order.

31.    <u>Rights and Remedies Upon Event of Default.</u>  Upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court, other than, subject to the terms of this Interim Order:  (a) the DIP Agent (at the direction of the Required Lenders or as otherwise provided in the DIP Documents) may send a written notice to the counsel to the Debtors, counsel to the Committee (if appointed), and the U.S. Trustee (any such notice shall be referred to herein as a "<u>Termination Declaration</u>") declaring (1) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (2) the commitment of each DIP Lender to make DIP Loans to be terminated, whereupon such commitments and obligations shall be terminated to the extent any such commitment remains under the DIP Facility, (3) the termination of the DIP Facility and the DIP Documents as to any future liability or obligations of the DIP Secured Parties, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred following the delivery of the Carve-Out Trigger Notice to the Borrower; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents; and (c) the DIP Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral.  The earliest date on which a Termination Declaration is delivered by the DIP Agent in

- 45 -

accordance with this Paragraph 31 shall be referred to herein as the "Termination Date".  Subject to Paragraph 32, following a Termination Date, neither the DIP Secured Parties nor the Prepetition First Lien Secured Parties shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility.  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee (if appointed), and the U.S. Trustee.  After the DIP Repayment, the Prepetition First Lien Agent shall be entitled to make a Termination Declaration with respect to the foregoing subclause (a)(4) or subclause (c) in accordance with the same procedures set forth herein.

32.    Emergency Hearing.  The Debtors and the Committee (if any) may seek an emergency hearing during the five (5) calendar days following the date a Termination Declaration is delivered (such five (5) calendar day period, the "Remedies Notice Period") for the sole purpose of determining whether an Event of Default has in fact occurred or is continuing, and the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Secured Parties or, if applicable, the Prepetition First Lien Secured Parties.  During the Remedies Notice Period, the Debtors shall continue to have the right to use Cash Collateral in accordance with the terms of this Interim Order, solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the Estates.

33.    Certain Rights and Remedies Following Termination Date.  Following a Termination Date and either upon the expiration of the Remedies Notice Period or pursuant to an order of the Bankruptcy Court (which may further authorize the remedies set forth in this Paragraph or any other appropriate remedy as then determined by the Bankruptcy Court) upon an

emergency motion by the DIP Agent (at the direction of the Required Lenders) to be heard on no less than three (3) business days' notice (and the Debtors and the Committee (if any) and any other party-in-interest shall not object to such shortened notice) (the "Termination Enforcement Order"), the DIP Agent shall be entitled to exercise all rights and remedies in accordance with the DIP Documents, this Interim Order and applicable law and shall be permitted to satisfy the relevant DIP Obligations and DIP Superpriority Claims, subject to the Carve-Out.  Following expiration of the Remedies Notice Period or upon entry of the Termination Enforcement Order (except as otherwise order by the Bankruptcy Court), the Debtors are hereby authorized and directed to, with the exclusion of the Carve-Out, remit to the DIP Agent (for the benefit of the DIP Lenders) one-hundred percent (100%) of all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Documents and this Interim Order.  In furtherance of the foregoing, (a) each bank or other financial institution with an account of any Debtor is hereby authorized and instructed to (i) comply at all times with any instructions originated by the DIP Agent to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including without limitation, any instruction to send to the DIP Agent by wire transfer or in such other manner as the DIP Agent directs, all cash, securities, investment property and other items held by such bank or financial institution, and (ii) waive any right of set off, banker's lien or other similar lien, security interest or encumbrance, (b) the DIP Agent (at the direction of the Required Lenders or as otherwise provided in the DIP Documents) may compel the Debtors to seek authority to, (i) sell or otherwise dispose of all or any portion of the DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds of which are DIP collateral) pursuant to section 363 (or any other applicable provision) of the Bankruptcy

- 47 -

Code on terms and conditions pursuant to sections 363, 365 and other applicable provisions of the Bankruptcy Code, (ii) assume and assign any lease or executory contract included in the DIP Collateral to the DIP Agent's designees in accordance with and subject to section 365 of the Bankruptcy Code, (c) the DIP Agent (at the direction of the Required Lenders) may direct the Debtors to (and the Debtors shall comply with such direction to) dispose or liquidate the DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds of which are DIP Collateral) via one or more sales of such DIP Collateral or property and/or the monetization of other DIP Collateral or property with the Required Lenders having sole authority over the price of any such DIP Collateral or property to be disposed of, (d) the DIP Agent may (at the direction of the Required Lenders), or may direct the Debtors to (and the Debtors shall comply with such direction to), collect accounts receivable, without setoff by any account debtor, and (e) the DIP Agent (for the benefit of the DIP Lenders) shall be authorized to succeed to any of the Debtors' rights and interests under any licenses for the use of any intellectual property in order to complete the production and sale of any inventory.  The Debtors shall take all action that is reasonably necessary to cooperate with the DIP Secured Parties in the exercise of their rights and remedies and to facilitate the realization of the DIP Collateral by the DIP Secured Parties.

34.     <u>Access to DIP Collateral</u>.  Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Secured Parties under this Interim Order, the DIP Documents and applicable law, after the occurrence of a Termination Date and the entry of a Termination Enforcement Order, and subject to Paragraph 33, for the purpose of exercising any remedy with respect to any of the DIP Collateral, the DIP Agent (or any of its employees, agents, consultants, contractors, or other professionals) (collectively, the "<u>Enforcement

13262344-16

Agents") shall have the right (to be exercised at the direction of the Required Lenders), at the sole cost and expense of the Debtors, to: (i) enter upon, occupy, and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by the Debtors, (ii) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process), and (iii) exercise any rights of the Debtors to access any DIP Collateral (including inventory) held by any third party; *provided*, *however*, the Enforcement Agent may only be permitted to do so in accordance with (a) existing rights under applicable non-bankruptcy law, including, without limitation, applicable leases, (b) any prepetition (and, if applicable, post-petition) written landlord waivers or consents, or (c) further order of this Court on motion and notice appropriate under the circumstances; and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents, equipment or any other similar assets of the Debtors, or assets which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses; *provided*, *however*, the Enforcement Agents may use such assets to the extent permitted by applicable non-bankruptcy law. The Enforcement Agents will be responsible for the payment of any applicable fees, rentals, royalties, or other amounts owing to such lessor, licensor or owner of such property (other than the Debtors) on a *per diem* basis and solely for the period of time that the Enforcement Agents actually occupy any real property or use the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals, or other amounts owing for any period prior to the date that the Enforcement Agents actually occupy or use such assets or properties); *provided, further*, that nothing herein shall relieve the Debtors of their obligations pursuant to section 365(d)(3) of the Bankruptcy Code for the payment of rent that accrues through and including any assumption

- 49 -

and/or rejection of any lease.  Nothing contained herein shall require the Enforcement Agents to assume any lease as a condition to the rights afforded in this Paragraph.

35.    <u>Carve-Out</u>.  Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition First Liens, the Prepetition Second Liens, the Replacement Liens and the Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out.

(i)    "<u>Carve-Out</u>" means, collectively, the following fees and expenses: (a) all statutory fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the Carve-Out Trigger Notice (as defined below)); (b) reasonable fees and expenses incurred by a trustee, if any, under section 726(b) of the Bankruptcy Code in an amount not exceeding $25,000 (without regard to the Carve-Out Trigger Notice (as defined below)); (c) subject to the Approved Budget, to the extent allowed at any time, whether by interim or final compensation order, procedural order or otherwise, all unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors) (the "<u>Allowed Debtor Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "<u>Debtor Professionals</u>") and unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of any Committee (as defined below)) (the "<u>Allowed Committee Professional Fees</u>" and together with the Allowed Debtor Professional Fees, collectively, the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by any statutory committees appointed in the Chapter 11 Cases (each, a "<u>Committee</u>") pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time

- 50 -

before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (these clauses (a) through (c), the "Pre-Carve-Out Amounts"); and (d) Allowed Professional Fees in an aggregate amount not to exceed (I) $250,000 for the Debtor Professionals and (II) $50,000 for the Committee Professionals, incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice (excluding any restructuring, sale, success, or other transaction fee earned or payable to any Professional Person), to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (d) being the "Post-Carve-Out Trigger Notice Cap").  For the avoidance of doubt, other than the Carve-Out, no other amounts owed by any of the Debtors to any party (including any amounts set forth in the Approved Budget) as of the date the Carve-Out Trigger Notice is delivered shall be payable from the Prepetition Collateral or DIP Collateral.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee and lead counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  No portion of the Carve-Out, any Cash Collateral, any other DIP Collateral, or any proceeds of the DIP Facility, including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out, shall be used for the payment of Allowed Professional Fees, disbursements, costs or expenses incurred by any person, including, without limitation, any Committee, in connection with challenging the DIP Secured Parties' or the Prepetition First Lien Secured Parties' liens or claims, preventing, hindering or delaying any of the DIP Secured Parties'

or the Prepetition First Lien Secured Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral, or initiating or prosecuting any claim or action against any DIP Secured Party or Prepetition First Lien Secured Party; *provided that*, notwithstanding anything herein to the contrary, proceeds from the DIP Facility and/or Cash Collateral not to exceed $25,000 in the aggregate (the "<u>Investigation Budget Cap</u>") may be used on account of Allowed Professional Fees incurred by Committee Professionals (if any) during the Challenge Period in connection with the investigation of avoidance actions or any other claims or causes of action (but not the prosecution of such actions) on account of the Prepetition First Lien Facility and Prepetition First Lien Secured Parties (but not the DIP Facility or the DIP Secured Parties) (the "<u>Investigation</u>").

(ii)    <u>Carve-Out Reserve</u>.  Prior to the delivery of the Carve Out Trigger Notice, on a weekly basis, the Debtors shall fund a reserve (the "<u>Carve-Out Reserve</u>") from the DIP Credit Facility or cash on hand into a segregated escrow account (the "<u>Funded Reserve Account</u>") held by Berger Singerman LLP in trust for the benefit of Professional Persons in an amount equal to the sum of the aggregate unpaid amount of the total budgeted weekly fees of Professional Persons for the current week set forth in the Approved Budget.  In addition, on the day on which a Carve-Out Trigger Notice is delivered pursuant to Paragraph 35(i) (the "<u>Carve-Out Trigger Notice Date</u>"), the Carve-Out Trigger Notice shall (i) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund the Carve-Out Reserve in an amount equal to the Carve-Out, and (ii) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans in an amount equal to the Post-Carve Out Trigger Notice Cap (the "<u>Trigger Borrowing Request</u>") to be funded into the Funded Reserve Account, in each case to the extent not previously funded to the Funded Reserve Account; *provided that* in no event shall any DIP Lender be required to fund any amount in excess of its then-outstanding

- 52 -

Commitment.  Funds transferred to the Funded Reserve Account shall not be subject to any liens or claims granted to the DIP Lenders herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute Cash Collateral or assets of the Debtors' Estates; *provided that*, notwithstanding anything to the contrary herein, in the DIP Credit Agreement or in the other DIP Documents, the DIP Collateral shall include the DIP Agent's reversionary interest in funds held in the Funded Reserve Account, if any, after all Allowed Professional Fees are satisfied in full.  On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Documents to the contrary, including with respect to the existence of an Event of Default (as defined in the DIP Credit Agreement), the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Obligations following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding Commitment shall make available to the DIP Agent such DIP Lender's share with respect to the Trigger Borrowing Request in accordance with the DIP Documents, *provided that* in no event shall any DIP Lender be required to fund any amount in excess of its then-outstanding Commitment.  To the extent that the Funded Reserve Account is actually funded, the Carve-Out shall be reduced by such funded amount dollar-for-dollar.  The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the local bankruptcy rules of the Bankruptcy Court, and any interim or final orders of the Bankruptcy Court.  Any amounts remaining in the Funded Reserve Account after payment of the Carve-Out shall be paid to the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall

be paid to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties. Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, the DIP Agent and the Prepetition First Lien Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserve has been fully funded, but shall have a security interest in any residual interest in the Carve-Out Reserve.

(iii)    No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees. None of the DIP Secured Parties or Prepetition First Lien Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate any of the DIP Secured Parties or Prepetition First Lien Secured Parties in any way to compensate, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their Estates have sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any party to object to the allowance and payment of any such fees and expenses.

36.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order. The DIP Secured Parties and the Prepetition First Lien Secured Parties have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in

accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Bankruptcy Court or any other court, the DIP Secured Parties and Prepetition First Lien Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code. Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.

37.    Approval of DIP Fees. In consideration for the DIP Facility and the consent to the use of Cash Collateral in accordance with the terms of this Interim Order, the DIP Secured Parties shall be paid all fees, expenses and other amounts payable under the DIP Documents, as such become due and all reasonable and documented costs and expenses of the DIP Secured Parties as provided in the Approved Budget, including legal fees, financial advisor fees, and other similar fees, costs and expenses of the DIP Secured Parties, incurred in connection with the DIP Facility and the Chapter 11 Cases, including, without limitation, the reasonable and documented fees and expenses of (a) counsel to the DIP Secured Parties and (b) specialty or local counsel to the DIP Secured Parties in each relevant jurisdiction, in each case without regard to whether or not the transactions contemplated hereby are consummated (all such fees, together, the "DIP Fees"). The DIP Fees shall be fully earned and payable upon entry of this Interim Order, without the need for any further order of this Court. The DIP Fees shall be part of the DIP Obligations. Any and all DIP Fees paid prior to the Petition Date by any of the Debtors to the DIP Secured Parties in connection with or with respect to the DIP Facility in each case are hereby approved in full.

38.    Lender Professionals' Fees. Professionals for the DIP Secured Parties (the "DIP Professionals") and professionals for the Prepetition First Lien Secured Parties ("Prepetition

13262344-16

Professionals," and together with the DIP Professionals, the "Lender Professionals") shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, this Court. The Lender Professionals shall submit copies of summary invoices to the Debtors, which invoices shall be forwarded by the Debtors to the U.S. Trustee and counsel for any Committee; *provided that* such invoices shall include sufficient detail to allow the U.S. Trustee to perform a review of fees and expenses incurred. The summary invoices shall provide only the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable party and/or professionals, and shall be subject to all applicable privilege and work product doctrines. If the Debtors, U.S. Trustee or any Committee object to the reasonableness of the fees and expenses of any Lender Professional and cannot resolve such objection within ten (10) days after receipt of such invoices, then the Debtors, U.S. Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professional an objection (the "Fee Objection"), and any failure by any such party to file a Fee Objection within such ten (10) day period shall constitute a waiver of any right of such party to object to the applicable invoice. Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of the Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection. The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.

13262344-16

39.    <u>Indemnification</u>.  The Debtors shall indemnify and hold harmless the DIP Secured Parties, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees past, present, and future, and their respective heirs, predecessors, successors and assigns in accordance with, and subject to, the terms and conditions of the DIP Documents except to the extent of such party's actual fraud or willful misconduct as determined in a final order by a court of competent jurisdiction.

40.    <u>Right to Credit Bid</u>.  In connection with any sale or other disposition of the DIP Collateral or Prepetition Collateral including any sales occurring under or pursuant to section 363 of the Bankruptcy Code, any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors (any of the foregoing sales or dispositions, a "<u>Collateral Sale</u>"), the DIP Agent (at the direction of the Required Lenders) and the Prepetition First Lien Agent (at the direction of the Required Lenders (as defined in the Prepetition First Lien Credit Agreement, the "<u>Required Prepetition First Lien Lenders</u>")) shall be authorized to the fullest extent under section 363(k) of the Bankruptcy Code to credit bid on a dollar-for-dollar basis any or all of outstanding DIP Obligations and Prepetition First Lien Obligations, as applicable, up to the full amount of the DIP Obligations and Prepetition First Lien Obligations, respectively, including any accrued interest, expenses, and fees in a Collateral Sale of any DIP Collateral or Prepetition Collateral (including any deposit in connection with such Collateral Sale), whether such Collateral Sale is effectuated through section 363 or 1129 of the Bankruptcy Code, or by a chapter 7 trustee, or otherwise, without the need for further court authorization.  Subject to the terms of the Asset Purchase Agreement (solely to the extent approved

- 57 -

by a Sale Order on a final basis), the DIP Agent (at the direction of the Required Lenders) and the Prepetition First Lien Agent (at the direction of the Required Prepetition First Lien Lenders) shall each have the absolute right to assign, transfer, sell, or otherwise dispose of their respective rights to credit bid to any acquisition vehicle formed in connection with such bid or other designee.

41.    <u>Proofs of Claim</u>.  None of the DIP Secured Parties, the Prepetition First Lien Secured Parties or the Prepetition Unsecured Note Parties will be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim arising under the DIP Documents, the Prepetition First Lien Credit Documents, or the Prepetition Unsecured Promissory Note Documents.  The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the DIP Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition Unsecured Note Parties with regard to all claims arising under the DIP Documents, the Prepetition First Lien Credit Documents, and the Prepetition Unsecured Promissory Note Documents and, as a result, the DIP Obligations, Prepetition First Lien Obligations and Prepetition Unsecured Note Obligations shall be deemed allowed for all purposes in accordance with section 502(a) of the Bankruptcy Code.

42.    <u>Limitations on Use of DIP Proceeds, Cash Collateral and Carve-Out</u>. Except as otherwise permitted in this Interim Order and the Approved Budget, the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral and the Carve-Out may not be used in connection with: (a) preventing, hindering, or delaying the DIP Secured Parties or the Prepetition First Lien Secured Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral outside the ordinary course of business without the prior written consent of the Required Lenders; (c) outside the ordinary course of business, using or seeking to

- 58 -

use any insurance proceeds constituting DIP Collateral without the prior written consent of the Required Lenders; (d) incurring any indebtedness (other than as expressly permitted by the DIP Credit Agreement) without the prior written consent of the Required Lenders; (e) seeking to amend or modify any of the rights granted to the DIP Secured Parties, the Prepetition First Lien Secured Parties or the Prepetition Unsecured Note Parties under this Interim Order, the DIP Documents, the Prepetition First Lien Credit Documents or the Prepetition Unsecured Promissory Note Documents, without the DIP Agent's consent in its sole discretion; (f) objecting to or challenging in any way the DIP Liens, the DIP Obligations, the Prepetition First Liens, the Prepetition First Lien Obligations, the Prepetition Unsecured Note Obligations, the DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the DIP Secured Parties, the Prepetition First Lien Secured Parties, or the Prepetition Unsecured Note Parties, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the DIP Secured Parties, the Prepetition First Lien Secured Parties, the Prepetition Unsecured Note Parties, or any of their respective affiliates, successors and assigns and the partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals; (h) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition First Liens, the Prepetition First Lien Obligations, the Prepetition Unsecured Note Obligations or any other rights or interests of the DIP Secured Parties, the Prepetition First Lien Secured Parties, or the Prepetition Unsecured Note Parties; or (i) seeking to

13262344-16

subordinate, recharacterize, disallow or avoid the DIP Obligations, the Prepetition First Lien Obligations or the Prepetition Unsecured Note Obligations.

43.    <u>Turn Over.</u>  Prior to the DIP Repayment, any party who holds a lien or security interest in DIP Collateral that is junior and/or subordinate to the DIP Liens or a claim that is subordinate to the DIP Superpriority Claims (including any of the Prepetition First Lien Secured Parties) that receives or is paid the proceeds of any DIP Collateral or receives any other payment or consideration from the Debtors or any other source (including under any chapter 11 plan) other than as expressly permitted in the DIP Documents and this Interim Order (including the Approved Budget), such party shall be deemed to have received, and shall hold, such proceeds or payments in trust for the DIP Secured Parties and shall immediately turn over such amounts to the DIP Agent for distribution to the DIP Lenders to repay the DIP Obligations in accordance with the DIP Documents and this Interim Order until indefeasibly paid in full in cash.

44.    <u>Effect of Stipulations on Third Parties</u>.  The Debtors' Stipulations contained in Paragraph G and releases in Paragraph I hereof shall be binding in all circumstances upon the Debtors upon entry of this Interim Order and upon their Estates upon entry of the Final Order.  The Debtors' Stipulations shall be binding upon each other creditor and party-in-interest, including any Committee, except to the extent such party in interest *first* obtains standing (including any chapter 11 trustee or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), by no later than the date that is the later of (i) sixty (60) calendar days after the Petition Date and (ii) solely with respect to any claims and causes of action asserted by a Committee, sixty (60) calendar days after formation of the Committee (such time period shall be referred to as the "<u>Challenge Period</u>," and the date that is the next calendar day after the termination of the Challenge

- 60 -

Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a contested matter, adversary proceeding, or other matter challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations (each, a "Challenge"), such Challenge is fully and finally adjudicated, (i) and (ii) shall be referred to as the "Challenge Period Termination Date") and *second*, obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge").  Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), and without further notice, notion, or application to, order of, or hearing before this Court, (i) any and all payments made to or for the benefit of the Prepetition First Lien Secured Parties or otherwise authorized by this Interim Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition First Lien Obligations shall be deemed to be fully allowed secured claims within the meaning of section 506 of the Bankruptcy Code and all of the Prepetition Unsecured Note Obligations shall be deemed to be fully allowed unsecured claims within the meaning of section 502 of the Bankruptcy Code, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee.  Notwithstanding the foregoing, to the extent any

13262344-16

Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge; *provided that* all other stipulations (other than those subject to a successful Challenge) shall remain binding on any Committee or other party-in-interest.  Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' Estates.  The failure of any party-in-interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph 44 or to require or permit an extension of the Challenge Period Termination Date.  To the extent any such Challenge is timely and properly commenced, the Prepetition First Lien Agent and any other Prepetition First Lien Secured Party shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred in defending themselves and the other Prepetition First Lien Secured Parties in any such proceeding as adequate protection.

45.    <u>No Third-Party Rights</u>.  Except as explicitly provided for herein or in any of the DIP Documents, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.

46.    <u>No Lender Liability</u>.  In determining to make any loan (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents or taking any other act permitted under this Interim Order and the DIP Documents, none of the DIP Secured Parties or the Prepetition First Lien Secured Parties shall (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the *United States Comprehensive Environmental Response, Compensation and Liability Act*, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition First Lien Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

47.    <u>Section 506(c) Claims</u>.  Subject to entry of a Final Order and as a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Documents (and the consent of the DIP Secured Parties to the payment of the Carve-Out to the extent provided herein and the consent of the Prepetition Secured Parties of the priming of the Prepetition Liens by the DIP Facility and the use of Cash Collateral) (a) no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties or the Prepetition First Lien Secured Parties with respect to the DIP Collateral or the Prepetition Collateral, in each case

- 63 -

pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Secured Parties or the Prepetition First Lien Secured Parties, as applicable and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties or the Prepetition First Lien Secured Parties.

48.    <u>No Marshaling</u>.    The DIP Secured Parties and the Prepetition First Lien Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

49.    <u>Section 552(b)</u>.  Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition First Lien Secured Parties, as applicable, with respect to proceeds, products, offspring or profits of any of the DIP Collateral or Prepetition Collateral, as applicable.

50.    <u>Exculpation</u>. Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or Prepetition First Lien Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors, including with respect to the operation of their businesses, in connection with their restructuring efforts or administration of these Chapter 11 Cases.  In addition, (a) the DIP Secured Parties shall not in any way or manner be liable or responsible for: (i) the safe-keeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any Diminution thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

- 64 -

51.    <u>Release of DIP Secured Parties</u>.  Upon entry of this Interim Order, the Debtors, on their own behalf and their Estates, forever and irrevocably: (i) release, discharge, and acquit each of the DIP Secured Parties and each of their former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Documents; and (ii) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations.

52.    <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (for the benefit of the DIP Lenders), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

53.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Secured Parties or Prepetition First Lien Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition First Lien Credit Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

13262344-16

54.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, the Prepetition Unsecured Note Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

55.    <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations and Prepetition First Lien Obligations have been indefeasibly paid in full in cash, and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the Required Lenders or Required Prepetition First Lien Lenders, (i) any modification, stay, vacatur or amendment to this Interim Order; (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases or Successor Cases, equal or superior to the DIP Superpriority Claims or Adequate Protection Superpriority Claims, other than the Carve-Out and the Prepetition Permitted Liens; (iii) any order allowing use of Cash Collateral resulting from DIP Collateral or Prepetition Collateral; (iv) without the prior written consent of the Required Lenders, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in

the DIP Documents; or (v) without the prior written consent of the Prepetition First Lien Agent, any lien on any of the Prepetition Collateral with priority equal or superior to the Prepetition First Liens or Replacement Liens.

56.     Discharge.  Except as otherwise agreed in writing by the DIP Agent (acting at the direction of the Required Lenders) and the Prepetition First Lien Agent (acting at the direction of the Required Prepetition First Lien Lenders), the DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (and DIP Repayment in the case of DIP Obligations), on or before the effective date of such confirmed plan of reorganization.  If any of the Debtors propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment (including by credit bid) of the DIP Obligations, and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "Prohibited Plan or Sale") without the prior written consent of the DIP Agent (acting at the direction of the Required Lenders) and the Prepetition First Lien Agent (acting at the direction of the Required Prepetition First Lien Lenders), the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP Documents.

57.     Joint and Several.  The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder.

- 67 -

13262344-16

58. <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Bankruptcy Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Secured Parties and the Prepetition First Lien Secured Parties pursuant to this Interim Order and the DIP Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated; and (ii) in respect of the Prepetition First Lien Facility, all of the Prepetition First Lien Obligations pursuant to the Prepetition First Lien Credit Documents and this Interim Order, have been indefeasibly paid in full in cash.  The terms and provisions concerning the indemnification of the DIP Secured Parties shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations.  In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition First Lien Secured Parties notwithstanding the repayment in full or

- 68 -

13262344-16

termination of the DIP Obligations until such time as the Prepetition First Lien Obligations have been indefeasibly paid in full.

59.    <u>Final Hearing</u>.  The Final Hearing on the Motion shall be held on _____, 2024, at__:__ _.m., prevailing Eastern Time; *provided that* the Final Hearing may be adjourned or otherwise postponed upon the Debtors filing a notice of such adjournment in consultation with the DIP Secured Parties.  The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court.  Any objections or responses to entry of the Final Order shall be filed on or before ___:00 __.m., prevailing Eastern Time, on _____, 2024.

60.    <u>Necessary Action</u>.  The Debtors are authorized to take any and all such actions and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Order and the transactions contemplated hereby.

61.    <u>Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof.   Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules, any applicable Local Bankruptcy Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

62.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition First Lien

- 69 -

Secured Parties, the Prepetition Second Lien Secured Parties, the Prepetition Unsecured Note Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

63.     <u>Headings</u>. The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

64.     <u>Priority of Terms</u>.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Documents, the Motion, or the Cash Management Order, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as set forth in" any of the DIP Documents, the Prepetition First Lien Credit Agreement, or other agreement or document, the terms and provisions of this Interim Order shall govern.

65.     <u>Retention of Jurisdiction</u>.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

# # #

<u>Submitted by</u>:
Paul Steven Singerman, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email: singerman@bergersingerman.com

*(Attorney Singerman is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

- 70 -

13262344-16

# **EXHIBIT B**

(Approved Budget)

# Clinical Care Medical Centers

DIP Budget

($ in 000s)

10/13/24

| | Fcst. 1 10/18 | Fcst. 2 10/25 | Fcst. 3 11/1 | Fcst. 4 11/8 | Fcst. 5 11/15 | Fcst. 6 11/22 | Fcst. 7 11/29 | Fcst. 8 12/6 | Fcst. 9 12/13 | Fcst. 9 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total Receipts** | $ 1,004 | $ 70 | $ 1,324 | $ 1,949 | $ 2,197 | $ 43 | $ 127 | $ 579 | $ 3,832 | $ 11,125 |
| **Operating Disbursements** | | | | | | | | | | |
| Payroll | $ 2,385 | $ 250 | $ 2,385 | $ 170 | $ 2,385 | $ 170 | $ 2,465 | $ 170 | $ 2,370 | $ 12,749 |
| Specialist Fees | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 990 |
| Rent | - | - | 645 | - | - | - | - | 645 | - | 1,290 |
| Utilities and Facilities Expenses | - | 100 | 50 | 139 | 50 | 50 | 50 | 50 | 50 | 539 |
| Transportation | 100 | 270 | 300 | 42 | 42 | 42 | 42 | 300 | 62 | 1,199 |
| Other Operating Disbursements | 225 | 817 | 548 | 548 | 548 | 548 | 471 | 533 | 508 | 4,747 |
| **Total Operating Disbursements** | $ 2,820 | $ 1,547 | $ 4,038 | $ 1,009 | $ 3,135 | $ 920 | $ 3,137 | $ 1,808 | $ 3,099 | $ 21,514 |
| **Operating Cash Flow** | $ (1,816) | $ (1,478) | $ (2,714) | $ 940 | $ (938) | $ (877) | $ (3,010) | $ (1,228) | $ 732 | $ (10,389) |
| **Non-Operating Disbursements** | | | | | | | | | | |
| Professional Fees | | | | | | | | | | |
| MERU | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 990 |
| Berger Singerman | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 1,485 |
| Lender Professionals (Proskauer) | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 1,050 |
| Claims Agent | 70 | 70 | 40 | 40 | 20 | 20 | 20 | 20 | 20 | 320 |
| Patient Care Ombudsman | - | - | - | 44 | 44 | 44 | 44 | 44 | 44 | 264 |
| UCC Fees | - | - | - | 83 | 83 | 83 | 83 | 83 | 83 | 495 |
| Tail Insurance | - | - | - | - | - | - | - | - | 1,000 | 1,000 |
| **Total Non-Operating Disbursements** | $ 462 | $ 462 | $ 432 | $ 558 | $ 538 | $ 538 | $ 538 | $ 538 | $ 1,538 | $ 5,604 |
| **Total Disbursements** | $ 3,281 | $ 2,009 | $ 4,470 | $ 1,567 | $ 3,673 | $ 1,458 | $ 3,676 | $ 2,346 | $ 4,638 | $ 27,118 |
| **Net Cash Flow** | $ (2,278) | $ (1,939) | $ (3,146) | $ 382 | $ (1,477) | $ (1,415) | $ (3,548) | $ (1,766) | $ (806) | $ (15,993) |
| Beginning Book Cash Balance | $ 7,939 | $ 5,661 | $ 3,722 | $ 4,576 | $ 4,958 | $ 3,482 | $ 4,066 | $ 2,518 | $ 2,752 | $ 7,939 |
| (+/-) Net Cash Flow | (2,278) | (1,939) | (3,146) | 382 | (1,477) | (1,415) | (3,548) | (1,766) | (806) | (15,993) |
| (+) DIP Borrowings | - | - | 4,000 | - | - | 2,000 | 2,000 | 2,000 | - | 10,000 |
| **Ending Book Cash Balance** | $ 5,661 | $ 3,722 | $ 4,576 | $ 4,958 | $ 3,482 | $ 4,066 | $ 2,518 | $ 2,752 | $ 1,946 | $ 1,946 |