UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br><br>MBMG HOLDING, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11 Cases<br><br>Case No. 24-_____<br><br>(Joint Administration Pending) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE PRIVATE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS AND INTERESTS EXCEPT FOR PERMITTED LIENS AND ASSUMED LIABILITIES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their proposed undersigned counsel, file this motion (the "Sale Motion"), seeking the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Sale Order"): (i) authorizing the Debtors to consummate that certain *Asset Purchase Agreement*, dated as of October 12, 2024 (as may be amended or otherwise modified from time to time and including all related instruments, documents, exhibits, schedules, and agreements thereto, collectively, the "Purchase Agreement"), substantially in the form attached hereto as **Exhibit B**, by and among

---

[1] The address of the Debtors is 7500 S.W. 8th Street, Ste. 400, Miami, Florida 33144. The last four digits of the Debtors' federal tax identification numbers are: (i) Care Center Medical Group, LLC (9052); (ii) Care Center Network, LLC (5784); (iii) CCMC Physician Holdings, Inc. (4532); (iv) Clinical Care Pharmacy, LLC (2103); (v) Florida Family Primary Care Center, LLC (5005); (vi) Florida Family Primary Care Center of Pasco, LLC (8570); (vii) Florida Family Primary Care Centers of Orlando, LLC (3086); (viii) Florida Family Primary Care Centers of Pinellas, LLC (7075); (ix) Florida Family Primary Care Centers of Tampa, LLC (0631); (x) MB Medical Operations, LLC (8450); (xi) MB Medical Transport, LLC (3476); (xii) MBMG Holding, LLC (3880); (xiii) MBMG Intermediate Holding, LLC (9320); (xiv) Miami Beach Medical Centers, Inc. (3933); (xv) Miami Beach Medical Consultants, LLC (2737); and (xvi) Miami Medical & Wellness Center, LLC (2474).

(a) 14 of the Debtors[2] (each, a "Seller" and collectively, "Sellers") and (b) Conviva Medical Center Management, LLC, a Delaware limited liability company that is a controlled affiliate of Humana Inc. ("Buyer"), for the private going concern sale of substantially all of the assets of the Sellers (*i.e.*, the Purchased Assets)[3] outside of the ordinary course of business pursuant to the terms of the Purchase Agreement and the Sale Order (the "Sale"); (ii) authorizing the Sale free and clear of all Liens and interests (collectively, the "Liens and Interests") other than Assumed Liabilities and Permitted Liens that the Buyer has agreed to assume or permit under the Purchase Agreement or as otherwise set forth in the Purchase Agreement; (iii) authorizing the assumption and assignment to the Buyer of certain of the Sellers' executory contracts and unexpired leases (collectively, the "Assumed Contracts");[4] and (iv) granting related relief.[5]  In support of this Sale Motion, the Debtors rely on the (i) *Declaration of Nicholas K. Campbell in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") and (ii) *Declaration of Don Ritucci in Support of Debtors' Motion for Entry of an Order (I) Approving Asset Purchase Agreement and Authorizing the Private Sale of Substantially All Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens*

---

[2] The Sellers are the following Debtors: (i) MB Medical Operations, LLC, (ii) MB Medical Transport, LLC, (iii) Care Center Network, LLC, (iv) Care Center Medical Group, LLC, (v) Clinical Care Pharmacy, LLC, (vi) Florida Family Primary Care Center, LLC, (vii) Florida Family Primary Care Centers of Orlando, LLC, (viii) Florida Family Primary Care Centers of Tampa, LLC, (ix) Florida Family Primary Care Centers of Pasco, LLC, (x) Florida Family Primary Care Centers of Pinellas, LLC, (xi) CCMC Physician Holdings, Inc., (xii) Miami Medical & Wellness Center LLC, (xiii) Miami Beach Medical Centers, Inc. f/k/a Rodolfo Dumenigo, M.D., P.A., and (xiv) Miami Beach Medical Consultants, LLC.

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

[4] Attached hereto as **Exhibit C** is the proposed form of the notice (as defined herein, the Assumption Notice) of potential assumption and assignment of the Desired 365 Contracts (*i.e.*, the 365 Contracts that the Buyer has indicated an intent for the Sellers to assume and assign to the Buyer as a part of the Sale).

[5]  The Debtors reserve the right, as applicable, (i) to file one or more revised forms of the proposed Purchase Agreement and Sale Order prior to the Sale Hearing, and (ii) to make, subject to the Court's approval, revisions to the forms of the Purchase Agreement and Sale Order at the Sale Hearing.

2

*and Interests Except for Permitted Liens and Assumed Liabilities, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "Ritucci Declaration"), each of which is filed concurrently herewith and incorporated herein, and respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Sale Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

2.      Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 102, 105, 363, 365, 503 and 507 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), rules 2002, 6004, 6006, 9006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and rules 2002-1(C)(2) and 6004-1 of the Local Bankruptcy Rules for the Southern District of Florida (the "Local Rules").

## PROCEDURAL BACKGROUND

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

5.      The Debtors continue to operate their businesses and manage their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      As of the date of this Sale Motion, no trustee, examiner or statutory committee has been appointed in the Chapter 11 Cases.

7.      For a detailed description of the Debtors, the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses

13256219-26

and capital structure, the Debtors respectfully refer the Court and parties-in-interest to the First Day Declaration.

### THE DEBTORS' BACKGROUND AND PRE-PETITION MARKETING AND SALE EFFORTS LEADING TO THE PURCHASE AGREEMENT

8.      As set forth in greater detail in the First Day Declaration, the Debtors are an independent primary care and integrated physician group focused on value-based, multi-specialty services. The Debtors deliver high-quality health and wellness services to approximately 35,000 patients across 26 primary care centers in Florida, with half of those centers being in Miami-Dade County. The Debtors' patient population consists primarily of high-risk, underserved and dual-eligible populations (*i.e.*, eligible for both Medicare and Medicaid), many of whom live in economically disadvantaged and minority communities.

9.      The Debtors have faced significant hurdles resulting from industry and regulatory headwinds (including reimbursement pressures and rising healthcare costs). The Debtors' revenue model—which is the model utilized across the Medical Advantage primary care capitated provider industry—was substantially impaired by recent industry and regulatory changes, including changes to the Medicare risk adjustment and to Medicaid disenrollment models. These industry and regulatory changes, combined with the Debtors' highly leveraged pre-petition debt load have significantly challenged the Debtors' business and depleted their liquidity.

10.      Since affiliates of Sun Capital ("Sun Capital") acquired the Debtors in 2020, the Debtors have accumulated more than $448 million of secured funded debt from (1) their senior secured lenders, affiliates of Kohlberg Kravis Roberts & Co. L.P. ("KKR"), and (2) their junior secured lenders, Sun Capital. This funded debt is more than double the debt burden created upon Sun Capital's 2020 purchase. Consistent with their secured creditors' rights to trigger a sale, the

4

Debtors' commenced their pre-petition sale process by engaging the investment bank Oppenheimer & Co. Inc. ("Oppenheimer") on September 13, 2023.

11.     For more than a year, the Debtors have been engaged in an extensive and wide-ranging marketing process in an effort to sell the Debtors' business and protect the Debtors' patient population of approximately 35,000 primarily elderly and low-income patients, as well as to maximize the value for the benefit of all of the Debtors' stakeholders.

12.     As further explained below, this year-long public marketing and sales process occurred in two separate stages. In the first stage, a more traditional marketing effort did not generate substantial interest. However, the second stage, structured as a distressed business sale, culminated in the Purchase Agreement attached hereto as **Exhibit B**, providing for the going concern sale of substantially all the Debtors' assets (*i.e.*, the Purchased Assets) subject to exclusions for, among other things, cash and accounts receivable. The Sale provides for a purchase price ($45 million) and terms acceptable to the Debtors' secured creditors holding nearly ten times (10x) that amount in the form of secured debt. Further, the Sale will eliminate the risk that tens of thousands of vulnerable patients will face disruptions in their healthcare. The Buyer is a controlled affiliate of Humana Inc., and Humana Inc. and its affiliates, including CarePlus Health Plans, cover a larger percentage of the Debtors' patients than any other payor.

13.     The Sale is supported by the Debtors' pre-petition secured lenders, KKR and Sun Capital, even though the Purchase Price ($45 million) is only a tenth of their secured debt ($448 million). KKR has also agreed to fund, from the proceeds of its collateral or otherwise, bridge capital, debtor-in-possession ("DIP") and sale expenses, including, *inter alia*, key employee retention and incentive plan payments, and certain wind down and post-sale expenses, all subject to the agreed upon respective budgets.

14.     In consideration of the foregoing, and as described in the Ritucci Declaration, the Debtors, with the financial and other support of their secured creditors, in the exercise of their reasonable business judgment, have determined that the most effective way to ensure continuity of care to their vulnerable patient population and maximize the value of the Debtors' estates for the benefit of their stakeholders, is to seek bankruptcy protection and to sell the Purchased Assets through the Sale to the Buyer pursuant to section 363 of the Bankruptcy Code. In order to satisfy the timing and milestone requirements of Purchase Agreement and the *Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement* (the "DIP Credit Agreement"), with the lenders party thereto which are referred to as the "DIP Lenders," the Debtors must advance the private Sale expeditiously. Absent the Sale on the terms proposed, the DIP Lenders would not have been willing to extend financing under the DIP Credit Agreement, and the Debtors would likely have been forced into liquidation.

15.     Mr. Ritucci is the Managing Director and Head of Healthcare Mergers & Acquisitions at Oppenheimer, a leading global full-service brokerage and investment bank and has more than 26 years of investment banking experience focused on the healthcare industry. Ritucci Declaration, ¶¶ 1, 2. In the Ritucci Declaration, Mr. Ritucci explains in detail the extensive pre-petition strategic review and marketing process conducted by the Debtors. Over a year ago, on September 13, 2023, the Debtors initially retained Oppenheimer as their investment bank to manage their sale process. *Id.* at ¶ 7.  This initial engagement ended without a successful sale process, and the Debtors terminated Oppenheimer's engagement on March 21, 2024. *Id*. The Debtors' re-engaged Oppenheimer on June 28, 2024, to conduct a distressed sale process. *Id.*

16.     During its initial engagement, Oppenheimer contacted 115 potential acquirors and the Debtors executed confidentiality agreements with 53 separate parties. *Id.* at ¶¶ 7-8.

13256219-26

Oppenheimer assisted the Debtors in creating an executive summary which it disseminated to the 53 potential acquirors. *Id.* at ¶ 8. During the distress sale process, Oppenheimer contacted seven potential acquirors, including participants in the first sale process. *Id.* at ¶ 7. Overall, Oppenheimer held a multitude of calls with 78 potential acquirors from September, 2023, through August, 2024, and facilitated the Debtors' response to numerous diligence requests. *Id.* at ¶ 8.

17.    Oppenheimer's initial engagement resulted in the Debtors receiving five indications of interest (all of which were declined) and the subsequent engagement resulted in the Debtor receiving two indications of interest, including the indication that led to the Purchase Agreement. *Id.* at ¶ 9.

18.    Oppenheimer's marketing efforts on the Debtors' behalf resulted in the negotiation of the Purchase Agreement with the Buyer and Mr. Ritucci believes that, based on his direct involvement in the Debtors' sale and marketing processes and his knowledge of the other potential purchasers' interest in the Debtors' assets, the terms and conditions in the Purchase Agreement represent the highest and otherwise best offer from a financial point of view received to date for the Purchased Assets. *Id.* at ¶ 10.

19.    To date, no other executable bids have exceeded the financial benefits to the Debtors that would result under the transaction with the Buyer. *Id.* at ¶ 11.

20.    As reflected in the Ritucci Declaration, the Debtors' senior secured and unsecured lenders, KKR, and its junior secured lender, Sun Capital, support the Purchase Agreement and the proposed Sale, notwithstanding that the Purchase Price will only satisfy a fraction of KKR's secured debt (and notwithstanding that the sale will not yield any proceeds for Sun Capital). *Id.* at ¶ 12.

21.     Given the extensive pre-bankruptcy marketing and sale efforts conducted by Oppenheimer with the most likely acquirors for over a year, the Debtors do not believe that additional marketing of the Debtors' assets, additional time soliciting bids or otherwise extending the sale process are worthwhile or would result in a higher or better offer than the offer from the Buyer represented by the Purchase Agreement (and almost certainly not one that would satisfy KKR's senior secured debt in full). Additional time marketing the Debtors' assets could cause the Buyer to reconsider its interest in pursuing the only executable transaction secured by the Debtors after extensive prepetition efforts and result in the discontinuation of medical services to the Debtors' significant patient population. *Id.* at ¶ 13.

22.     Accordingly, the Debtors believe that the proposed Purchase Agreement represents the highest and best offer from a financial point of view available to the Debtors with respect to a sale of the Purchased Assets. *Id.* at ¶ 14.

23.     Given the extensive pre-petition marketing process, the Debtors' secured creditors support this Sale without further marketing or a scheduled auction. A tenfold increase in the Sale's purchase price isn't remotely feasible. Moreover, the expedited timeline and milestones agreed to by the parties minimize both the execution risk of the transaction contemplated by the Purchase Agreement and the DIP funding needs associated with the bankruptcy process. The proposed Sale has the added benefit of ensuring continuous high-quality care for the approximately 35,000 mostly elderly, economically disadvantaged, and therefore, vulnerable patients.

24.     Informed by their pre-petition efforts, the Debtors believe that re-starting their marketing process anew during the Chapter 11 Cases (for a third time within an approximately one-year period) cannot yield benefits to any constituent that may not consent to the Sale, and

threatens to sacrifice the Sale for no discernable purpose. Such a third marketing process would necessarily be time consuming and require the estates to unnecessarily incur substantial administrative expenses exceeding the Debtors' ability to pay, and risk the substantial benefits the Sale will create for the Debtors' constituents, all without any obtainable benefit to anyone not already affirmatively consenting to the Sale.

25.    While the Debtors are in a precarious financial state, their pre-petition efforts have culminated in a market-tested, value-maximizing transaction that will preserve their business as a going concern. If the Debtors are to succeed with these efforts, it is imperative that the Sale move quickly to maintain stability and to achieve the intended swift and orderly transition. Given the vast breadth of the pre-petition marketing and sale process, and that there does not appear to be any other potential purchaser that would be willing or able to purchase the Purchased Assets for more than the Buyer (and certainly not more than the $448 million in secured debt owed to KKR and Sun Capital), it is highly unlikely that any competitive bidder will emerge. As a result, the Debtors' estates will derive a material benefit from the speed and certainty of closing the Sale of the Purchased Assets as proposed.

## **THE PROPOSED SALE**

26.    As set forth in the Purchase Agreement, the proposed Sale includes substantially all of the assets for each of the Sellers (*i.e.*, the Purchased Assets), except for the assets which are excluded from the Sale by the Purchase Agreement (*i.e.*, the Excluded Assets). The Purchased Assets include, among others:[6] (i) all assets, properties and rights reflected and/or described on Exhibit A to the Purchase Agreement, together with all other assets owned, used or held for use

---

[6]   For ease of reading, the Debtors' have limited the use in this paragraph of the defined terms that appear in the Purchase Agreement (*e.g.*, certain defined terms are presented in the lower case). Accordingly, the brief summary in this paragraph is qualified in its entirety by the explicit terms of the Purchase Agreement.

13256219-26

by the Sellers in connection with the Debtors' business; (ii) all inventories and supplies, including all medical supplies; (iii) all tangible personal property, including all medical equipment, furniture, fixtures, computers (including software and hardware), devices, supplies, spare parts, and other tangible personal property; (iv) all vehicles owned by the Debtors; (v) all leasehold interests in personal property, including any prepaid rent, security deposits and options to renew or purchase in connection therewith; (vi) all rights of the Sellers in, to, and under all contracts that constitute, on or after the Closing, the Assumed Contracts; (vii) all rights of the Sellers in, to, and under contracts listed on Schedule 2.1(a)(vii) to the Purchase Agreement and other non-365 Contracts which the Buyer timely designates as Assumed Contracts following execution of the Purchase Agreement; (viii) intellectual property used in or related to the Debtors' business; (ix) all the all software that is owned by, licensed to, or otherwise used by the Sellers in any manner in connection with the Debtors' business; (x) all information technology assets; (xi) all permits to the extent transferable; (xii) all data and information, including all personal information, used or processed in the conduct of the Debtors' business or by or on behalf of the Sellers; (xiii) certain causes of action against third parties (but *not* Avoidance Actions, which is defined in the Purchase Agreement to include "all claims and causes of action arising under Sections 542 through 553 of the Bankruptcy Code or any analogous state law," and the Buyer releases and agrees not to sue the Sellers' directors and officers and members of the special committee ("Special Committee") of the Board of Managers Sun MBMG GP, LLC, the Debtors' indirect parent); (xiv) certain deposits, prepaid expenses and rights to refunds relating to the Purchased Assets as more fully described in the Purchase Agreement; (xv) all the Sellers' right, title and interest in and to certain leased real property as set forth in the Purchase Agreement; (xvi) the goodwill, going concern, customer intangibles, and workforce in place of

10

the Debtors' business; (xvii) all claims, demands and rights to indemnification, insurance, or similar recovery from any third parties to the extent applicable to the Purchased Assets or Assumed Liabilities; (xviii) the devices that have been, or are, used in the Debtors' business; and (xix) all pharmaceutical drugs; and (xx) all other assets, property and rights owned or otherwise used in or necessary for the operation of the Debtors' business, other than the Excluded Assets, which Excluded Assets include cash, accounts receivable and avoidance actions.  *See* Purchase Agreement, § 2.1(a).

27.    Pursuant to the Purchase Agreement, the Buyer has agreed to purchase the Purchased Assets for Forty-Five Million Dollars ($45,000,000), subject to adjustments described in the Purchase Agreement (the "Total Consideration"). *See* Purchase Agreement, § 2.4(a). The portion of the Total Consideration that the Buyer shall pay the Sellers at the Closing shall be (i) the Total Consideration, *less* (ii) the Deposit (*i.e.*, $2,250,000), *less* (iii) the Holdback Amount (*i.e.* $5,625,000)[7] (the "Closing Payment"). *Id.* at § 2.4(a)-(d).

28.    The Debtors believe that the terms of the Purchase Agreement are typical, customary and reasonable under the circumstances, and as explained herein, should be entered into in the exercise of the Debtors' business judgment.  The Purchase Agreement was negotiated in good faith and at arms'- length by the Debtors and the Buyer. The following chart summarizes key provisions of the Purchase Agreement but is qualified in its entirety by reference to the Purchase Agreement attached hereto as **Exhibit B**:[8]

---

[7]  A portion of the Holdback Amount may be retained by the Buyer 18 months after the Closing Date as detailed in the Purchase Agreement, § 2.4(d).

[8]  Again, for ease of reading, the Debtors' have limited the use in this chart of the defined terms that appear in the Purchase Agreement (*e.g.*, certain defined terms are presented in the lower case).  Accordingly, the brief summary in this chart is qualified in its entirety by the explicit terms of the Purchase Agreement.

13256219-26

## MATERIAL TERMS OF THE PURCHASE AGREEMENT

| Term | Summary Description |
|---|---|
| **Parties**<br><br>(APA, Preamble) | <u>Sellers</u>: (i) MB Medical Operations, LLC, (ii) MB Medical Transport, LLC, (iii) Care Center Network, LLC, (iv) Care Center Medical Group, LLC, (v) Clinical Care Pharmacy, LLC, (vi) Florida Family Primary Care Center, LLC, (vii) Florida Family Primary Care Centers of Orlando, LLC, (viii) Florida Family Primary Care Centers of Tampa, LLC, (ix) Florida Family Primary Care Centers of Pasco, LLC, (x) Florida Family Primary Care Centers of Pinellas, LLC, (xi) CCMC Physician Holdings, Inc., (xii) Miami Medical & Wellness Center LLC, (xiii) Miami Beach Medical Centers, Inc. f/k/a Rodolfo Dumenigo, M.D., P.A., and (xiv) Miami Beach Medical Consultants, LLC.<br><br><u>Sellers' Representative</u>: MB Medical Operations, LLC (one of the Debtors)<br><br><u>Buyer</u>: Conviva Medical Center Management, LLC |
| **Sale to Insider** | No. |
| **Purchase Price**<br><br>(APA, § 2.4(a)-(d)) | Pursuant to the Purchase Agreement, the Buyer has agreed to purchase the Purchased Assets for $45,000,000 (the "Total Consideration").<br><br>At the Closing, the Buyer will pay the Sellers a portion of the Total Consideration totaling $37,125,000, determined using the following calculations: (i) the Total Consideration (*i.e.*, $45,000,000), *less* (ii) the Deposit (*i.e.*, $2,250,000), *less* (iii) the Holdback Amount (*i.e.*, $5,625,000).<br><br>Within one business day of the execution of the Purchase Agreement, the Buyer will provide the Deposit (*i.e.*, $2,250,000) to the Sellers which will be deposited into an escrow account. At the Closing, the Deposit will be credited and applied towards the payment of the Total Consideration. If the Sellers terminate the Purchase Agreement prior to the Closing due to a default by the Buyer pursuant to Section 10.1(d) of the Purchase Agreement, the Deposit will be nonrefundable and paid to the Sellers. If the Purchase Agreement is terminated for any other reason prior to the Closing, then the Deposit will be returned to the Buyer.<br><br>On the first business day immediately following 18 months after the Closing, the Buyer will pay to the Sellers' Representative (or its assigns) the Holdback Amount (*i.e.*, $5,625,000), *less* the sum of the following: (i) the aggregate amount of the Holdback Amount retained by the Buyer to satisfy the indemnification obligations of the Sellers under Section 8.1, or otherwise under, the Purchase Agreement and (ii) the aggregate amount which is subject to claims for indemnification made by the Buyer in accordance with the provisions of Section 8.1 of, or otherwise under, the Purchase Agreement which have not been satisfied by the retention of the Holdback Amount by the Buyer (pending resolution of such claims). The Sellers and the Buyer agree that the Buyer is entitled to retain all or a portion of the Holdback Amount to satisfy, in whole or in part, any obligations of the Sellers pursuant Section 8.1 of, or otherwise pursuant to, the Purchase Agreement or the indemnity provisions of the Transition Services Agreement (defined below). |
| **Purchased Assets** | As set forth in the Purchase Agreement and described herein, the proposed Sale includes substantially all of the assets for each of the Sellers (*i.e.*, the Purchased |

| | |
|---|---|
| (APA, § 2.1(a)(i)-(xx)) | Assets), except for the assets which are excluded from the Sale by the Purchase Agreement (*i.e.*, the Excluded Assets).<br><br>Such purchased assets include, among others: (i) all assets, properties and rights reflected and/or described on Exhibit A to the Purchase Agreement, together with all other assets owned, used or held for use by the Sellers in connection with the Debtors' business; (ii) all inventories and supplies, including all medical supplies; (iii) all tangible personal property, including all medical equipment, furniture, fixtures, computers (including software and hardware), devices, supplies, spare parts, and other tangible personal property; (iv) all vehicles owned by the Debtors; (v) all leasehold interests in personal property, including any prepaid rent, security deposits and options to renew or purchase in connection therewith; (vi) all rights of the Sellers in, to, and under all contracts that constitute, on or after the Closing, the Assumed Contracts; (vii) all rights of the Sellers in, to, and under contracts listed on Schedule 2.1(a)(vii) to the Purchase Agreement and other non-365 Contracts which the Buyer timely designates as Assumed Contracts following execution of the Purchase Agreement; (viii) all intellectual property used in or related to the Debtors' business; (ix) all software that is owned by, licensed to, or otherwise used by the Sellers in any manner in connection with the Debtors' business; (x) all information technology assets; (xi) all permits to the extent transferable; (xii) all data and information, including all personal information, used or processed in the conduct of the Debtors' business or by or on behalf of the Sellers; (xii) certain causes of action against third parties (but *not* any Avoidance Actions, which is defined in the Purchase Agreement to include "all claims and causes of action arising under sections 542 through 553 of the Bankruptcy Code or any analogous state law, and the Buyer releases and agrees not to sue the Sellers' directors and officers and members of the Special Committee); (xiv) certain deposits, prepaid expenses and rights to refunds relating to the Purchased Assets as more fully described in the Purchase Agreement; (xv) all the Sellers' right, title and interest in and to certain leased real property as set forth in the Purchase Agreement; (xvi) the goodwill, going concern, customer intangibles, and workforce in place of the Debtors' business; (xvii) all claims, demands and rights to indemnification, insurance, or similar recovery from any third parties to the extent applicable to the Purchased Assets or Assumed Liabilities; (xviii) the devices that have been, or are, used in the Debtors' business; (xix) all pharmaceutical drugs; and (xx) all other assets, property and rights owned or otherwise used in or necessary for the operation of the Debtors' business, other than the Excluded Assets, which Excluded Assets include cash, accounts receivable and avoidance actions. |
| **Excluded Assets**<br><br>(APA, § 2.1(b)(i)-(xxiv)) | The Purchase Agreement includes 24 separate categories of excluded assets, including: (i) all cash and cash equivalents; (ii) accounts receivable, and other payments to be made by any third party payors to the Sellers, for services provided prior to the Closing Date (including pursuant to Assumed Contracts); (iii) all bank accounts of the Sellers; (iv) all equity interests in any Seller or equity interests held by any Seller; (v) each Seller's Medicare and Medicaid provider numbers and all associated National Provider Identifier (NPI) numbers related to owners, employees and independent contractors of the Sellers; (vi) all insurance policies of the Sellers (other than certain claims and rights detailed in the Purchase Agreement); (vii) all tax returns of the Sellers and any other tax assets of the Sellers or related to the Debtors' business, the Purchased Assets or the Assumed Liabilities for the Pre-Closing Period or the portion of a Straddle Period ending on the Closing Date; (viii) all employee-related benefit plans and any trusts or other assets related thereto; (ix) all payroll records, personnel files and other personal records; (x) all contracts that (i) are not Assumed Contracts or |

| | |
|---|---|
| | (ii) are Assumed Contracts but are not assumable and assignable pursuant to the terms thereof or as a matter of applicable law (including any Assumed Contract with respect to which any consent requirement in favor of the counter-party thereto is not satisfied and may not be overridden pursuant to section 365 of the Bankruptcy Code) (collectively, as defined in the Purchase Agreement, the "Excluded Contracts"); (xi) each 365 Contract that, as of the Closing, is not designated as a Desired 365 Contract; (xii) furniture and leasehold improvements located at leased real property not included as Assumed Contracts, excluding certain devices; (xiii) all vehicles leased by the Sellers; (xiv) all rights arising in connection with any proceeding to the extent related to any Excluded Asset or that are not applicable to the Purchased Assets; (xv) the corporate seals, organizational documents, minute books, stock books, books of account or other records having to do with the corporate organization of the Sellers, all employee-related or employee benefit-related files or records, books and records related to other Excluded Assets and any other books and records which the Sellers are prohibited from disclosing or transferring to the Buyer under applicable law and is required by applicable law to retain; (xvi) all rights which accrue or will accrue to the Sellers under the Purchase Agreement or any other ancillary agreement; (xvii) all privileges and protections pertaining to communications between the Sellers and their professionals, including attorneys; (xviii) certain permits; (xix) all deposits, prepaid expenses and rights to refund relating to insurance; (xx) all Avoidance Actions; (xxi) all COVID-19 Funds and CHOPD AAPs; (xxii) certain claims described on Schedule 2.1(a)(xii) of the Purchase Agreement; (xxiii) all devices that are not transferred devices; and (xxiv) certain other assets listed on Schedule 2.1(b)(xxiv) of the Purchase Agreement. |
| **Assumed Contracts**<br><br>(APA, § 2.1(a)(vi); 2.3(a)-(b); Art. I (Definitions)) | All prepetition executory contacts and leases of non-residential real property that the Sellers assume and assign to the Buyer.<br><br>For additional information, please see the section of this Motion discussing the "Assumption and Assignment Procedures". Motion, ¶ 52. |
| **Sale of Avoidance Actions**<br><br>(APA, § 2.1(b)(xx)) | The Buyer is not purchasing Avoidance Actions.<br><br>Avoidance Actions represent Excluded Assets under § 2.1(b)(xx) of the Purchase Agreement. |
| **Sale of Other Causes of Action**<br><br>(APA, § 2.1(a)(xiii); 11.16) | The Buyer releases and agrees not to sue the Sellers' directors and officers and members of the Special Committee as more fully described in the Purchase Agreement, §§ 2.1(a)(xiii) and 11.16. |
| **Assumed Liabilities**<br><br>(APA, § 2.2(a)) | As further described in detail in the Purchase Agreement, the Assumed Liabilities include, but are not limited to, all: the obligations of the Sellers (with respect to the Debtors' business) with respect to (i) paid time off accrued though Closing with respect to employees that accept employment with the Buyer or an affiliate of the Buyer (as defined in the Purchase Agreement, "PTO") as listed on Schedule 2.2(a) of the Purchase Agreement and (ii) under the Assumed Contracts, but only to the extent such obligations (a) are cure costs owed in connection with assumption and assignment of such Assumed Contracts and allocated to the Buyer under Section 7.5 of the Purchase Agreement, (b) are applicable to and accrue with respect to periods subsequent to the Closing and (c) are accompanied by a correlated duty of performance or payment on the part of the other parties thereto. |

| | |
|---|---|
| **Excluded Liabilities**<br><br>(APA, § 2.2(b)) | All liabilities of the Sellers and the Debtors' business that are not Assumed Liabilities. |
| **Sale Free and Clear of Liens and interests**<br><br>(APA, Art. I (Definitions) "Sale Order"; § 2.1(a); 3.8(a), 3.8(c)(iv)) | The Purchase Agreement contemplates that the sale of the Purchased Assets from the Sellers to the Buyer will be free and clear of all Liens (other than Assumed Liabilities and Permitted Liens). |
| **Health Care Matters**<br><br>(APA, § 3.10(a)-(m)) | The Purchase Agreement contains representations and warranties by the Sellers that the Company, as well as the Company's directors, members, employees, agents, officers, managers, agents, or to the Sellers' knowledge, independent contractors, (i) are in compliance with applicable federal, state, and local healthcare related laws, regulations, and standards, as well as applicable private commercial healthcare related agreements, including, but not limited to relevant third party payor agreements, (ii) maintain appropriate permits, licenses, and certifications, and (iii) have disclosed any past qui tam litigation, government related audits or investigations, or allegations of inappropriate healthcare related behavior. |
| **Closing**<br><br>(APA, § 2.5)<br><br>(DIP Credit Agreement, § 10.18(d)) | Pursuant to Section 10.18(d) of the DIP Credit Agreement, (i) the Bankruptcy Court must enter the Sale Order not later than 45 days after the Petition Date, and (ii) the Debtors must consummate the Sale with the Buyer not later than 60 days after the Petition Date. |
| **Conditions Precedent to Closing to Obligations of the Seller and the Buyer**<br><br>(APA, §§ 9.1, 9.2) | The Debtors believe that the Purchase Agreement contains standard conditions precedent to Closing to the obligations of the Buyer (§ 9.1) and the Sellers (§ 9.2) for transactions of this type, similar size and complexity. |
| **Termination Events**<br><br>(APA, § 10.1) | Under certain circumstances, the Purchase Agreement may be terminated by:<br><br>(a) mutual written consent of the Sellers' Representative and the Buyer,<br><br>(b) either the Buyer or the Sellers: (i) if Closing has not occurred on or before December 27, 2024 (the "Outside Date"), provided, if the Sale Order has not been entered as of the initial Outside Date, then the Outside Date shall automatically be extended to the earlier of (A) three Business Days after the date on which all conditions to Closing of the Purchase Agreement (except those conditions that are to be satisfied at Closing) have been satisfied (or waived by the Party entitled to the benefit of the same), or (B) January 26, 2025 (the "Extended Outside Date"), (ii) if any Governmental Authority shall have issued an Order or taken any other action permanently enjoining, restraining or otherwise prohibiting the Closing and such Order or other action shall have become final and non-appealable, (iii) if the Sellers enter into a definitive agreement providing for a Superior Proposal that would make the consummation of the transaction contemplated by the Purchase Agreement or the satisfaction of any conditions therein impossible, (iv) the Sale Order ceases to be in full force |

| | and effect, (v) if the Bankruptcy Court does not issue the Sale Order in accordance with the Purchase Agreement, |
| --- | --- |
| | (c) by the Buyer (i) if the Closing has not occurred on or before Extended Outside Date, (ii) if any of the Sellers representations or warranties are not true and correct such that certain condition to Closing would not be satisfied and the breach is not cured, (iii) if certain other conditions in have been satisfied or waived and the Sellers fail to consummate those transactions by the date the Closing should have occurred, (iv) if the Bankruptcy Cases have been converted to Chapter 7 or dismissed, and (v) if the Sale Order has not been entered by January 31, 2025, (vi) if any creditor or the Sellers' Affiliates obtains stay relief to foreclose on, or otherwise take possession of, a material portion of the Purchased Asset; or (vii) if 20% or greater of the physicians and advance practice providers on Schedule 10.1(c)(vii) of the Purchase Agreement have terminated their employment, have been terminated from employment, or have failed to enter into an employment agreement with the Buyer or one of its affiliates, |
| | (d) by the Sellers (i) if any Buyer representations or warranties are not true and correct such that certain condition to Closing would not be satisfied and the breach is not cured, or (ii) if certain other conditions have been satisfied or waived and the Buyer fails to consummate those transactions by the date the Closing should have occurred. |
| **Releases** (APA, § 11.16) | The Debtors are not releasing any parties in connection with the Purchase Agreement and the Sale. As of the Closing, the Buyer is releasing current directors and officers of the Debtors and members of the Special Committee as more fully described in the Purchase Agreement, § 11.16. |
| **Relief from Bankruptcy Rules 6004(h) and 6006(d)** ¶¶ 60-62 | As noted in this Sale Motion, the Debtors are requesting relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d). |
| **Transition Services Agreement** (APA, Exhibit B) | In connection with the Purchase Agreement, the Sellers have agreed to provide, at the Buyer's sole expense, services regarding transition of the Sellers' business to the Buyer for a period of up to 90 days after the Closing under the Purchase Agreement, pursuant to a Transition Services Agreement attached as Exhibit B to the Purchase Agreement (the "Transition Services Agreement"). |

## **RELIEF REQUESTED**

29.     By this Sale Motion, the Debtors seek the entry of the Sale Order, substantially in

the form attached hereto as **Exhibit A**: (i) authorizing the Debtors to consummate the Purchase

Agreement and authorizing the private Sale outside the ordinary course of business; (ii)

authorizing the Sale free and clear of all Liens and Interests (other than Assumed Liabilities and

Permitted Liens that the Buyer has agreed to permit under the Purchase Agreement or as

16

otherwise set forth in the Purchase Agreement); (iii) authorizing the assumption and assignment

of the Assumed Contracts on the terms set forth in the Purchase Agreement, the Sale Order, and

further orders entered by the Bankruptcy Court; and (iv) granting other related relief.

## THE REQUESTED RELIEF SHOULD BE GRANTED

A.   **The Sale of the Purchased Assets is Appropriate Under Section 363(b)(1) of the Bankruptcy Code**.

30.   Section 363(b)(1) of the Bankruptcy Code authorizes a trustee to sell property of

the estate "outside of the ordinary course of business" so long as the trustee can demonstrate a

sound business justification for the transaction. *See, e.g., In re Royal Palm 160, LLC,* 600 B.R.

119, 129 (S.D. Fla. 2019) (courts will approve a debtor's proposed sale under section 363 where

the debtor has used reasonable business judgment); *In re Diplomat Const., Inc*., 481 B.R. 215,

218 (Bankr. N.D. Ga. 2012) (chapter 7) ("The business judgment test is the prevailing rubric to

evaluate the proposed transaction under § 363(b)(1)"). In the context of a proposed sale under §

363, a debtor's exercise of its business judgment is entitled to "great judicial deference." *See 160

Royal Palm*, 600 B.R. at 126 (citation omitted).  Pursuant to Bankruptcy Rule 6004(f)(1), sales of

property may be by private sale or public auction.

31.   A debtor's showing of a sound business purpose need not be unduly exhaustive,

rather a debtor is "simply required to justify the proposed disposition with sound business

reasons." *In re Baldwin United Corp*., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not

there are sufficient business reasons to justify a section 363 transaction also depends upon the

facts and circumstances of each case. *In re Lionel Corp*., 722 F.2d 1063, 1069-1071 (2d Cir.

1983); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 155 (D. Del. 1999) (approving

funding of employee incentive and severance program and holding that the business purpose

13256219-26

requirement was fulfilled, because stabilizing turnover rate and increasing morale were necessary to successful reorganization).[9]

32.    Once a debtor articulates a valid business justification, its decision to sell property out of the ordinary course of business enjoys a strong "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res. Inc*., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith* v. *Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Therefore, any party objecting to a debtor's proposed asset sale must make a showing of "bad faith, self-interest, or gross negligence," as courts are loath to interfere with corporate decisions absent such a showing.  *See id*. at 656.

33.    It is well settled that the sale of assets outside of the ordinary course of business by means of a private sale can, and in appropriate cases should, be approved.  *See, e.g., In re Royal Palm 160, LLC,* 600 B.R. at 127 (affirming bankruptcy court order authorizing the debtor to proceed with a private sale of real property and finding no abuse of discretion in allowing the withdrawal of public auction procedures by the debtor in favor of a private sale); In *re Sound Shore Med. Ctr. of Westchester*, 13-22840 (RDD), 2009 WL 10798032, at *2 (Bankr. S.D.N.Y. July 30, 2009) (finding that a private sale of a debtor's assets was appropriate "in light of the facts and circumstances surrounding the Sale Transaction and the Debtors' chapter 11 cases because … the Debtors engaged in extensive prepetition marketing efforts which were fair, proper, complete, and reasonably calculated to result in the best value received for the Acquired

---

[9] Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether: (i) the debtor has provided adequate and reasonable notice to interested persons; (ii) the sale price is fair and reasonable; and (iii) the purchaser is proceeding in good faith. *See, e.g., In re Watertech Holdings, LLC*, 619 B.R. 324, 335 (Bankr. D.S.C. 2020); *In re General Motors Corp*., 407 B.R. 463, 493-494 (Bankr. S.D.N.Y. 2009); *see also In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991).

Assets"); *In re TPOP, LLC,* 13-11831 (BLS), 2014 WL 1317559, at *2 (Bankr. D. Del. Mar. 20, 2014) (approving a private sale of a debtor's assets and finding that the debtor "articulated good and sufficient business reasons justifying the Sale, including … the fact that the Debtor's months-long prepetition marketing process to seek a buyer for the assets did not yield an alternative transaction other than the proposed Sale demonstrates that the Asset Purchase Agreement constitutes the highest and best offer for the Included Assets"); *In re Aberdeen Land II, LLC,* No. 3:13-bk-04103-JAF, 2012 WL 13341909 (Bankr. M.D. Fla. Nov. 29, 2012) (approving private sale of real property pursuant to settlement agreement); *In re Ocean Blue Leasehold Prop. LLC,* No. 07–17999–BKC–AJC (Bankr. S.D. Fla. July 3, 2008) [ECF No. 385 (authorizing private sale of substantially all of the debtors' real and personal property as contemplated by Chapter 11 plan)]; *Morris* v. *Puleo (In re Performance Materials, Inc.),* 309 B.R. 819 (Bankr. M.D. Fla. 2004) (court issued declaration of rights arising from private sale of cause of action, and specifically noted that sales by bankruptcy trustees must be authorized by the court and can by "private sale or an auction"); *Penn Mut. Life Ins. Co.* v. *Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship),* 134 B.R. 165, 174 (Bankr. D. Md. 1991) (finding that "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

34.     Two recent cases where Delaware bankruptcy court cases approved private sales are instructive.  In *In re Sherman/Grayson Hospital, LLC,* Case No. 23-10810 (JKS) (Bankr. D. Del. Aug. 29, 2023) (D.E. 161), following a three-year pre-petition marketing effort by the debtor (a hospital), the debtor entered Chapter 11 and filed a motion to approve a private sale of substantially all of its assets to the only interested buyer identified in the pre-petition marketing effort. Given the extensive pre-petition marketing process, no post-petition marketing or auction

was required or scheduled, and the court approved the private sale free and clear of liens and interests without requiring a post-petition marketing period or an auction, free and clear of liens and interests.

35.     Similarly, in *In re Boxed Inc., et al.,* Case No, 23-10397 (BLS) (Bankr. D. Del. May 1, 2023) (D.E. 189), following a four-month pre-petition marketing effort by the debtors which resulted in no offers to purchase the debtors' business, the debtors entered Chapter 11 and filed a motion to approve a private sale of its primary line of business to a designee of its first lien lenders via a credit bid. Given the extensive pre-petition marketing process, no post-petition marketing was conducted and no auction was set, and the court approved the private sale on an accelerated time frame, entering a sale order just 30 days after the petition date and authorizing the private sale of the debtors' assets free and clear of liens and interests and approving the first lien lenders' credit bid.

36.     As described herein and in the First Day Declaration and the Ritucci Declaration, the Debtors conducted an extensive year-long public pre-petition marketing and sale process, resulting in a purchase price of $45 million and terms acceptable to the Debtors' secured creditors. The Sale prevents the Debtors' tens of thousands of vulnerable patients from facing a disruption in their care. Senior secured creditor KKR has also agreed to fund, from the proceeds of its collateral or otherwise, bridge capital, DIP and sale expenses, including key employee retention and incentive plan payments, and certain wind down and post-sale expenses, all subject to agreed budgets. Accordingly, the Debtors submit that just like the debtors in *Sherman/Grayson Hospital* and *Boxed*, the extensive pre-petition marketing efforts by the Debtors and their professionals, combined with the operational and financial needs to obtain

13256219-26

approval of the sale and expeditiously transition the Debtors' business to the Buyer, justify the relief requested in this Sale Motion.

37.     In addition, the Debtors have provided more than the twenty-one (21) days of notice required by Bankruptcy Rule 2002 for a sale of assets pursuant to section 363 of the Bankruptcy Code.  This Sale Motion is being filed contemporaneously with the commencement of these Chapter 11 Cases and by separate motion filed concurrently herewith, the Debtors are requesting the Court to enter the Scheduling Order (defined herein) seeking a Sale Hearing more than twenty-one (21) days after the Petition Date.  As such, the Debtors submit that compliance with the Bankruptcy Rules is satisfied and proper notice of the proposed Sale will be provided.

38.     Furthermore, section 105(a) of the Bankruptcy Code provides a bankruptcy court with considerable discretion in the administration of bankruptcy cases. *See In re City of Detroit, Michigan*, 519 B.R. 673, 679 (Bank. E.D. Mich. 2014). Specifically, section 105(a) states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." *See* 11 U.S.C. § 105(a). Based upon a careful review of its terms, the Debtors believe that the proposed Sale will maximize the value of the Purchased Assets for the benefit and is in the best interests of the Debtors, the Debtors' estates, their creditors and other parties in interest.

**B.     The Debtors Have Demonstrated a Sound Business Justification for the Sale**.

39.     A sound business reason for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See, e.g.*, *Watertech Holdings*, 619 B.R. at 336; *In re Rovig Minerals, Inc*., Case No. 19-5133, 2020 WL 2770052 at *3 (Bankr. W.D. La. May 26, 2020); *In re Art and Architecture Books of the 21st Century,* 2:13-bk-14135-RK, 2015 WL 3492900, at *7 (Bankr. C.D. Cal. May 29, 2015); *In re THQ Inc*., No. 12-13398 MFW, 2013 WL

13256219-26

428623, at *7 (Bankr. D. Del. Jan 24, 2013); *see also In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *Lionel Corp.*, 722 F.2d at 1063; *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (recognizing that paramount goal of any proposed sale of property of estate is to maximize value); *In re Lykes Bros. Steamship Co., Inc.*, 207 B.R. 282, 284 (Bankr. M.D. Fla. 1997) (noting that one of the "fundamental principles" of Chapter 11 is the "desire to maximize the value of the estate for the benefit of all creditors.").

40.     As described herein, as well as in the First Day Declaration and the Ritucci Declaration, a strong business justification exists for the sale of the Purchased Assets. An orderly but expeditious private sale of the Purchased Assets is critical to ensure continuity of care to the Debtors' approximately 35,000 patients, and the Debtors also seek to continue to provide employment to their employees and to provide an enterprise which will be a trading partner to many of its contract counter-parties and vendors, and of course to maximize the value of its enterprise for their creditors. *See* First Day Declaration, ¶ 79. The Debtors' secured creditors support the Sale with a $45 million purchase price. Furthermore, the Sale prevents the Debtors' tens of thousands of vulnerable patients from facing a disruption in their care.

41.     As described in detail in the Ritucci Declaration, extensive pre-petition marketing and sale efforts were undertaken to achieve the Purchase Agreement with the Buyer. Ritucci Declaration, ¶¶ 7-14. The proposed Purchase Agreement represents the highest and best offer from a financial point of view available to the Debtors with respect to a sale of the Purchased Assets. *Id.* at ¶ 14. A prompt sale is also required by the express terms of the DIP Credit Agreement and the Purchase Agreement, and the Debtors' scant financial resources. Pursuing entry into and performance of the Purchase Agreement represents a reasonable exercise of the Debtors' business judgment and best advances the interests of all parties.

C.    **The Sale Represents a Fair and Reasonable Purchase Price for the Purchased Assets**.

42.    The Total Consideration paid for the Purchased Assets under the Purchase Agreement is fair and reasonable. The purchase offer by the Buyer is an offer to purchase the Purchased Assets for a price that the Debtors, with the advice of their advisors, already have determined to be fair and reasonable, and the highest and best they will likely receive given the extensive pre-petition marketing process they conducted and as described in the Ritucci Declaration. The Debtors' senior and junior secured lenders support the Sale. In addition, the Purchase Agreement provides for the Buyer's assumption of the Assumed Liabilities including PTO for Transferred Employees.  Furthermore, the Purchase Agreement is the end product of extensive arm's-length negotiations between the parties.

D.    **The Sale Should be Approved Free and Clear of Liens, Interests and Encumbrances**.

43.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of Liens and Interests if any one of the following conditions is satisfied:

    (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    (2)    such entity consents;

    (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)    such interest is in bona fide dispute; *or*

    (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5) (emphasis supplied); *In re Gulf States Steel, Inc. of Ala.,* 285 B.R. 497, 506 (Bankr. N.D. Ala. 2002) (noting that Bankruptcy Code section 363(f) is written in the

disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

44.     Pursuant to the Purchase Agreement, the Purchased Assets are to be sold free and clear of any and all Liens and Interests in accordance with section 363(f) of the Bankruptcy Code, with any such Liens and Interests to attach to the proceeds of the applicable sale. Purchase Agreement, § 3.8.  The Sale satisfies the criteria set forth in Bankruptcy Code section 363(f). The Debtors believe that, at a minimum, it satisfies the second prong of section 363(f) because the proposed Sale of the Purchased Assets free and clear of all Liens and Interests (except for Permitted Liens and the Assumed Liabilities) will be consummated with the consent of the Debtors' pre-petition lenders, including KKR, their senior secured lender, and Sun Capital, their junior secured lender, as contemplated by section 363(f)(2).

**E.     The Sale is Proposed in Good Faith.**

45.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Bankruptcy Code section 363(m) provides, in pertinent part:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only according finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely." *In re Polaroid Corp.*, No. 01-10864 PJW, 2004 WL 253479, at *1 (D. Del. Feb 9, 2004). Thus, Bankruptcy Code section 363(m) protects the buyer of assets sold pursuant to Bankruptcy Code section 363 from the risk that it will lose its interest in the

24

purchased assets if the order allowing the sale is reversed on appeal. By its terms, Bankruptcy Code section 363(m) applies to sales of interests in assets such as the Purchased Assets.

46.    The private Sale has been proposed in good faith.  As set forth in the First Day Declaration and the Ritucci Declaration, the Debtors and the Buyer have entered into the Purchase Agreement after extensive, arms'-length, negotiations undertaken in good faith, without collusion or fraud of any kind. Ritucci Declaration, ¶ 15. The Debtors and the Buyer retained separate counsel and other professional advisors to represent their respective interests in the negotiation of the Purchase Agreement, as well as to represent them throughout the Sale. *Id.* Moreover, the Debtors undertook an extensive pre-petition marketing process and, in conjunction with their advisors, concluded that the Total Consideration being provided was the highest and best return for the Purchased Assets. *Id.* at ¶ 13-14. To the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct that would cause or permit the Purchase Agreement to be set aside under section 363(m) of the Bankruptcy Code.

47.    The Debtors have presented the proposed Sale to the Buyer openly and in good faith. The Buyer's identity and any connection with the Debtors has been fully disclosed in this Sale Motion and other pleadings filed with the Bankruptcy Court. The Debtors have fully disclosed and requested the Bankruptcy Court's approval of all of the terms and conditions of the proposed Sale. Sufficient and adequate notice of this Sale Motion has been provided to interested parties. Accordingly, the Debtors seek a finding that the Buyer is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

48.    The Debtors reserve the right to introduce evidence at the Sale Hearing regarding the arm's-length, good faith nature of the negotiation of the Purchase Agreement. Indeed, the Debtors will demonstrate at the Sale Hearing that the Purchase Agreement with the Buyer

represents the highest or otherwise best bid available to the Debtors for the Purchased Assets following a robust pre-petition marketing process.  Accordingly, the Sale to the Buyer has been proposed and fully disclosed in good faith and represents the sound business judgment of the Debtors, and, as such, the Debtors respectfully request the Court to authorize the Debtors to consummate the Purchase Agreement.

**F.    The Assumption and Assignment of the Assumed Contracts Should be Approved.**

**(i)    Assumption and Assignment of the Assumed Contracts is Within the Debtors' Business Judgment.**

49.    Pursuant to the Purchase Agreement, the Debtors are required to assume and assign the Assumed Contracts to the Buyer. *See e.g.,* Purchase Agreement, § 2.3. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). A bankruptcy court reviews a debtor's decision to assume or reject an executory contact under the deferential business judgment standard. *See, e.g., Mission Product Holdings, Inc*. v. *Temponology, LLC*, 587 U.S. 370, 374 (2019) (stating that the bankruptcy court will generally approve the debtor's decision whether to assume or reject "under the deferential 'business judgment' rule"). This standard presupposes that a debtor will  assume or reject an executory contract where doing so will benefit the debtor's estate. *See Mission Product Holdings,* 587 U.S. at 373-74; *In re Herrera-Edwards,* 580 B.R. 565, 572 (M.D. Fla. 2017); *In re Prime Motor Inns*, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991).

50.    The assumption of the Assumed Contracts in connection with the proposed Sale represents an exercise of the Debtors' sound business judgment because the Assumed Contracts are necessary to operate the Debtors' business comprising the Purchased Assets, and as such, are essential to obtaining the highest or otherwise best offer for the Purchased Assets. Given that

consummation of the going-concern Sale involving the Purchased Assets is critical to the Debtors' efforts to maximize value for their estates and creditors, to preserve continued care for their patients, the Debtors' assumption of the Assumed Contracts represents an exercise of sound business judgment and should be approved by the Court.

51.     The consummation of the Sale, which will involve the assignment of the Assumed Contracts, will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. *See L.R.S.C. Co.* v. *Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also Leonard* v. *General Motors Corp. (In re Headquarters Dodge, Inc.*), 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets). Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.

**(ii)     The Assumption and Assignment Procedures.**

52.     In connection with the assumption and assignment of the Assumed Contracts, the Debtors propose the following procedures (collectively, the "Assumption and Assignment Procedures"):[10]

---

[10]    This section represents a summary of certain key assumption and assignment procedures set forth in the Purchase Agreement, including but not limited to Section 2.3. To the extent of any conflict between this summary and the Purchase Agreement, the terms of the Purchase Agreement shall control. The Debtors note that the Purchase Agreement provides, at the end of § 2.3(d), "The provisions for giving notice, deadlines for non-debtor counterparties and other interested parties to assert objections, and process for resolution of objections, shall be set forth in the Sale Motion, the Sale Order and/or the Assumption Notice, and the Parties hereto explicitly incorporate by reference herein the relevant provisions of the Sale Motion, Sale Order and Assumption Notice".

a.    <u>Potential Assumption and Assignment</u>.  No later than three (3) business days following the later of the date the Debtors file their initial Schedules of Assets and Liabilities (the "<u>Bankruptcy Schedules</u>") and the entry of the proposed Scheduling Order (defined below in para. 58) by the Court scheduling the hearing to consider approval of the Sale Motion, the Debtors will (i) file with the Court an initial notice which shall have attached to it the initial list of the "Desired 365 Contracts" (*i.e.*, the potential universe of prepetition executory contracts and leases of non-residential real property which the Buyer may seek to have the Debtors assume and assign to it as a part if the Sale which represents the initial <u>Schedule 2.3(a)</u> of the Purchase Agreement), and which shall include <u>*all*</u> known agreements (as defined in the Purchase Agreement, the "365 Contracts") appearing on the initial Schedule G of the Bankruptcy Schedules (the "<u>Assumption Notice</u>"), substantially in the form attached hereto as **Exhibit C**, and (ii)  serve such initial Assumption Notice via first class mail on each counterparty to the Desired 365 Contracts listed thereon.  *See* Purchase Agreement, § 2.3(d).  If the Buyer subsequently amends Schedule 2.3(a) to add additional 365 Contracts to it (*e.g.*, newly discovered 365 Contracts), the Debtors will serve a supplemental Assumption Notice on the non-Debtor counterparties for such newly-added Desired 365 Contracts. *See id.*  Subject to the terms of the Purchase Agreement, the Buyer shall have the right to amend Schedule 2.3(a) up until either, as applicable, the Final Determination Date (*i.e.,* 60 days after the Closing Date) or the Extended Final Determination Date (if so elected by Buyer) (*i.e.,* 90 days after the Closing Date). *See id.* at § 2.3(b)(ii).

b.    <u>Objection Period</u>.  Each Assumption Notice shall provide for, among other things, (i) the Cure Costs the Debtors believe must be paid to cure all defaults outstanding under the applicable Desired 365 Contracts, and (ii) the deadline for filing and serving any objections (a "<u>Contract Objection</u>") to the possible assumption and assignment of such Assumed Contracts (including the proposed amount of the Cure Costs), and that any Contract Objection must be in writing, filed with the Court, and actually received by the Objection Notice Parties (as such term is defined in the Assumption Notice) no later than the Sale Objection Deadline (or such applicable later deadline), as to be noted in each Assumption Notice.  *See* Purchase Agreement, § 2.3(d) and Assumption Notice.

c.    <u>Objection Procedures</u>. If a Desired 365 Contract counterparty files a Contract Objection in a manner consistent with the stated requirements, and the Debtors and the contract counterparty are unable to consensually resolve the dispute, the amount to be paid or reserved with respect to such objection will be determined at the hearing on the Sale Motion, or at a hearing scheduled after the hearing on the Sale Motion.

d.    <u>Assumed Contracts</u>.  Not later than three (3) Business Days prior to the Closing Date (the "<u>Initial Determination Date</u>"), the Buyer shall provide written notice to the Sellers' Representative (each, a "<u>Initial Designation Notice</u>") of the Buyer's election to designate the initial set of Desired 365 Contracts that the Buyer wishes, as of the Closing Date, to be Assumed Contracts. At any point up until, as applicable, either the Final Determination Date or the Extended Final Determination Date (if so elected by the Buyer) (each, a "<u>Subsequent Determination Date</u>" and together with the Initial Determination Date, collectively, the "<u>Determination Dates</u>"), the Buyer may provide written notice to the Sellers' Representative (each, a "<u>Subsequent Designation Notice</u>" and together with the Initial Designation Notice, collectively, the "<u>Designation Notices</u>") of the Buyer's election to designate one or more remaining Desired 365 Contract(s) that the Buyer wishes, after the Closing Date, to be Assumed Contracts; provided, however, the Buyer shall reimburse the Sellers, pursuant to the terms of the Transition Services Agreement, for the administrative expense obligations under section 503 of the Bankruptcy Code arising on and after the Closing Date with respect to all of the remaining Desired 365 Contracts that were not otherwise Assumed Contracts as of the Closing Date (collectively, the "<u>Buyer's Desired 365 Contract Initial Period Reimbursement Obligations</u>"), for the period commencing upon the Closing Date and ending with respect to each such Desired 365 Contract when it becomes an Assumed Contract or is removed from Schedule 2.3(a). At any point on or after the Closing Date (until, as applicable, either the Final Designation Date or the Extended Final Designation Date (if so elected by the Buyer)), the Buyer may provide written notice to the Sellers' Representative to remove (such removal to be effective either upon the Sellers' Representative's receipt of such notice, or as of a future date that the Buyer may specify in its notice) a Desired 365 Contract from Schedule 2.3(a), and the Buyer's obligations to reimburse the Sellers for the Buyer's Desired 365 Contract Initial Period Reimbursement Obligations with respect to such Desired 365 Contract removed from Schedule 2.3(a) shall terminate as provided in the Buyer's notice.  On and after the Determination Date, any Desired 365 Contract that is not an Assumed Contract automatically shall be an Excluded Contract and Excluded Asset;  provided, however, that if one or more Desired 365 Contract(s) are subject to dispute as to assumption or assignment (including a Cure Cost dispute) of such Desired 365 Contract(s) that has not been resolved to the mutual satisfaction of the Buyer and the Sellers prior to any of the Determination Dates, then the respective Determination Date shall be extended (but only with respect to such Desired 365 Contract(s)) to no later than the earliest to occur of: (A) the date on which such dispute has been resolved in writing to the mutual satisfaction of the Buyer and the Sellers, (B) the date on which such Desired 365 Contract is deemed rejected by operation of section 365 of the Bankruptcy Code, and (C) the date upon which such dispute is determined

29

by a final order of the Bankruptcy Court (the "Extended Contract Period"), and for the avoidance of doubt, the Buyer's Desired 365 Contract Initial Period Reimbursement Obligations (and to the extent applicable if so elected by the Buyer, the Buyer's obligation to pay the Buyer's Desired 365 Contract Final Period Reimbursement Obligations) shall apply during the Extended Contract Period with respect to such Desired 365 Contracts subject to dispute. The Buyer may deliver a Subsequent Designation Notice upon expiration of the Extended Contract Period of the Buyer's election to designate any Desired 365 Contracts (that were subject to the Extended Contract Period) that the Buyer wishes to be Assumed Contracts. If a Subsequent Designation Notice with respect to any such Desired 365 Contract(s) is not delivered by the Buyer by the date which is three (3) Business Days following the expiration of such Extended Contract Period, such Desired 365 Contract(s) shall be automatically deemed Excluded Contract(s) and Excluded Asset(s).

53.     As reflected by the Assumption and Assignment Procedures, and as set forth in the Purchase Agreement, § 2.3, the Debtors propose to file with the Court and immediately serve on each non-Debtor counterparty of *every single one* of the Debtors' pre-petition executory contracts and leases appearing on Schedule G of the Debtors' Bankruptcy Schedules, shortly after the Court enters the proposed Scheduling Order, the Assumption Notice, in substantially the form attached hereto as **Exhibit C**, indicating the Debtors' calculation of the Cure Costs for each Desired 365 Contract. The non-Debtor counterparties will have the opportunity to file objections to the proposed assumption and assignment of the Desired 365 Contracts to the Buyer as set forth in the Assumption Notice and any supplement thereto. The Debtors' assumption and assignment of any Desired 365 Contract will be contingent upon payment or reserve of Cure Costs and effective only upon the closing of the Sale. If a non-Debtor counterparty to a Desired 365 Contract does not file an objection one or before the deadline set forth in the Assumption Notice, the Debtors request that such parties be deemed to have given any required consent to the assumption of the Desired 365 Contract by the Sellers and assignment to the Buyer.

(iii)     **The Buyer Can Demonstrate Adequate Assurance of Future Performance.**

54.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See In re Color Spot Holdings, Inc.*, Case No. 18-11272 (LSS), 2018 WL 3996938, at *2 (D. Del. Aug. 21, 2018) (citation omitted). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re MF Global Inc*., No. 11-2790, 2011 WL 6792758, at *2 (Bankr. S.D.N.Y. Dec. 20, 2011) (adequate assurance of future performance found where when prospective assignee of lease would be conducting operations at the location as a going-concern, hired some of the debtors' employees, and possessed greater financial health than the debtors).

55.     Based on information received from the Buyer, the Debtors believe that the Buyer has the financial capability to satisfy any and all obligations they will incur in connection with the Assumed Contracts. As a part of the Sale process, the Debtors will provide adequate assurance information to all non-Debtor counterparties to any proposed Assumed Contract, and, upon reasonable request, the Debtors will furnish additional adequate assurance information to non-Debtor counterparties. In turn, the non-Debtor counterparties will have an opportunity to file with the Court and serve on the Debtors and other parties an objection to any proposed assumption and assignment in advance of the Sale Hearing.

56.     Additionally, the Debtors may present additional facts at the Sale Hearing to show

13256219-26

the financial credibility of the Buyer (an affiliate of Humana Inc., a Fortune 50® company), its experience in the industry and its willingness and ability to perform under the Assumed Contracts. Because the Sale Hearing will provide the Court with an opportunity to evaluate the ability of the Purchaser to provide adequate assurance of future performance under the Assumed Contracts, as required by Bankruptcy Code section 365(b)(1)(C), the Debtors submit that the Court should authorize the assumption and assignment of the Assumed Contracts by the Debtors, effective upon the Closing of the Sale.

57.    Based on the foregoing, the Debtors' assumption and assignment of the proposed Assumed Contracts satisfies the requirements under section 365 of the Bankruptcy Code and should be approved.

**G.    The Debtors' Noticing Procedures Provide More than Adequate Notice of the Sale, the Objection Deadline, and the Possible Assumption/Assignment of the Assumed Contracts.**

58.    Concurrently with the filing of this Motion, the Debtors are filing a separate motion seeking the entry of a proposed scheduling order with respect to the Sale (the "Scheduling Order").  The Debtors submit that the proposed Scheduling Order, and its service by the Debtors on interested parties will provide more than sufficient and adequate notice of the Sale, the Sale Hearing, and the deadline to file objections.  As such, the Debtors submit that service of the Scheduling Order, as buttressed by the service of this Sale Motion (with the Purchase Agreement attached to it) meets the requirements of the Bankruptcy Rules and the Local Rules.

59.    Additionally, the Debtors will file and serve the Assumption Notice on the non-Debtor counterparties to *all* of the Debtors' known prepetition executory contracts and leases of non-residential real property within a few days of the entry by the Court of the Scheduling Order, thereby providing such counterparties with proper, timely, adequate and sufficient notice of, and

a reasonable opportunity to object or otherwise be heard regarding, this Sale Motion, the potential assumption and assignment of their prepetition executory contract(s) or unexpired lease(s) of real property and the Debtors' proposed Cure Costs, on the terms set forth in the Purchase Agreement.

## H.    Request for Waiver Under Bankruptcy Rules 6004(h) and 6006(d).

60.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."[11]

61.    To preserve the value of the Purchased Assets and limit the costs of administering and preserving such assets, and to comply with milestones under the DIP Credit Agreement, it is critical that the Debtors close the Sale as soon as possible after all closing conditions have been achieved or waived. Accordingly, the Debtors respectfully request that the Sale Order be effective immediately by the Court waiving the fourteen (14) day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

62.    Based upon the foregoing, the Debtors submit that the relief requested herein is necessary and appropriate, is in the best interests of the Debtors and their estates, and should be granted in all respects.

---

[11] The primary purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* 10 COLLIER ON BANKRUPTCY ¶ 6004.11 (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2011) ("COLLIER"); *see also In re Fisherman's Pier, Inc.*, 460 F.Supp.3d 1345, 1354 (S.D. Fla. 2020); Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, COLLIER suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." *See* COLLIER at ¶ 6004.11. Furthermore, COLLIER provides that if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *See id.*

**WHEREFORE**, the Debtors respectfully request the Court to: (a) grant this Sale Motion, (b) enter the Sale Order, (c) approve the Purchase Agreement and authorize the private Sale of the Purchased Assets outside the ordinary course of business, (d) authorize the sale of assets free and clear of all Liens and Interests (other than Assumed Liabilities and Permitted Liens), (e) authorize the assumption and assignment of the Assumed Contracts, and (f) grant such other and further relief as the Court deems just and proper.

Dated:  October 13, 2024

Respectfully submitted,

BERGER SINGERMAN LLP
*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By:    */s/ Christopher Andrew Jarvinen*
      Paul Steven Singerman
      Florida Bar No. 378860
      singerman@bergersingerman.com
      Christopher Andrew Jarvinen
      Florida Bar No. 021745
      cjarvinen@bergersingerman.com
      Samuel J. Capuano
      Florida Bar No. 90946
      scapuano@bergersingerman.com

## EXHIBIT A

**(Sale Order)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

MBMG HOLDING, LLC, *et al.*,[1]

    Debtors.

Chapter 11 Cases

Case No. 24-_____

(Joint Administration Pending)

**ORDER GRANTING DEBTORS' MOTION FOR
ENTRY OF AN ORDER (I) APPROVING ASSET PURCHASE
AGREEMENT AND AUTHORIZING THE PRIVATE SALE OF SUBSTANTIALLY
ALL OF THE ASSETS OF THE DEBTORS OUTSIDE THE ORDINARY COURSE
OF BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE
AND CLEAR OF ALL LIENS AND INTERESTS EXCEPT FOR
PERMITTED LIENS AND ASSUMED LIABILITIES, (III) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

---

[1] The address of the Debtors is 7500 S.W. 8th Street, Ste. 400, Miami, Florida 33144.  The last four digits of the Debtors' federal tax identification numbers are: (i) Care Center Medical Group, LLC (9052); (ii) Care Center Network, LLC (5784); (iii) CCMC Physician Holdings, Inc. (4532); (iv) Clinical Care Pharmacy, LLC (2103); (v) Florida Family Primary Care Center, LLC (5005); (vi) Florida Family Primary Care Center of Pasco, LLC (8570); (vii) Florida Family Primary Care Centers of Orlando, LLC (3086); (viii) Florida Family Primary Care Centers of Pinellas, LLC (7075); (ix) Florida Family Primary Care Centers of Tampa, LLC (0631); (x) MB Medical Operations, LLC (8450); (xi) MB Medical Transport, LLC (3476); (xii) MBMG Holding, LLC (3880); (xiii) MBMG Intermediate Holding, LLC (9320); (xiv) Miami Beach Medical Centers, Inc. (3933); (xv) Miami Beach Medical Consultants, LLC (2737); and (xvi) Miami Medical & Wellness Center, LLC (2474).

13266268-11

**THIS MATTER** having come before the Court for a hearing on November [•], 2024 at [•] [a.m./p.m.] in Miami, Florida (the "Hearing") upon the *Debtors' Motion for Entry of an Order (I) Approving Asset Purchase Agreement and Authorizing the Private Sale of Substantially All of the Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens and Interests Except for Permitted Liens and Assumed Liabilities, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [ECF No. [•]] (the "Sale Motion")[2] filed by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by the authority granted to the Debtors by chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"). The Sale Motion requests the entry of an order (this "Order"): (i) authorizing the Debtors to consummate that certain *Asset Purchase Agreement*, dated October 12, 2024 (as may be amended or otherwise modified from time to time and including all related instruments, documents, exhibits, schedules, and agreements thereto, collectively, the "Purchase Agreement"), substantially in the form attached as Exhibit B to the Sale Motion between and among (a) 14 of the above-captioned debtors and debtors-in-possession (each, a "Seller" and collectively, the "Sellers"),[3] and (b) Conviva Medical Center Management, LLC, a Delaware limited liability company (the "Buyer"), and authorizing, pursuant to this Order, the private going concern sale ("Sale") of substantially all of the assets of the Sellers (*i.e.*, the Purchased Assets) outside of the

---

[2]    Any capitalized term not explicitly defined herein shall have the meaning ascribed to it, as applicable, in (i) the Sale Motion, or (ii) the Purchase Agreement (as defined herein).

[3]    The Sellers are the following Debtors: (i) MB Medical Operations, LLC, (ii) MB Medical Transport, LLC, (iii) Care Center Network, LLC, (iv) Care Center Medical Group, LLC, (v) Clinical Care Pharmacy, LLC, (vi) Florida Family Primary Care Center, LLC, (vii) Florida Family Primary Care Centers of Orlando, LLC, (viii) Florida Family Primary Care Centers of Tampa, LLC, (ix) Florida Family Primary Care Centers of Pasco, LLC, (x) Florida Family Primary Care Centers of Pinellas, LLC, (xi) CCMC Physician Holdings, Inc., (xii) Miami Medical & Wellness Center LLC, (xiii) Miami Beach Medical Centers, Inc. f/k/a Rodolfo Dumenigo, M.D., P.A., and (xiv) Miami Beach Medical Consultants, LLC.

ordinary course of business pursuant to the terms of the Purchase Agreement and the other transactions contemplated by the Purchase Agreement (collectively, the "Transactions"); (ii) authorizing the Sale of the Purchased Assets to the Buyer free and clear of all Liens and Interests (as defined in the Sale Motion) other than Assumed Liabilities and Permitted Liens that the Buyer has agreed to assume or permit under the Purchase Agreement or as otherwise set forth in the Purchase Agreement; (iii) authorizing the assumption and assignment of the Assumed Contracts; and (iv) granting related relief, all as more fully set forth in the Sale Motion; and this Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334; and venue being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and the Sale Motion and the relief requested therein being a core proceeding in accordance with 28 U.S.C. § 157(b); and the appearance of all interested parties to the Sale Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and all other pleadings and proceedings in these Chapter 11 Cases; and this Court having found that the relief requested in the Sale Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Sale and the Sale Motion and opportunity for a hearing on the Sale Motion, including the Scheduling Order and the Assumption Notice, were appropriate and no other or further notice need be provided; and this Court having reviewed the Sale Motion and all related pleadings, and having heard the statements in support of the relief requested in the Sale Motion at the Sale Hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court and at the Sale Hearing, including the testimony of [_____] and the exhibits contained in the *Exhibit Register* [ECF No. ____], each of which

3

was admitted into evidence without objection; and after due deliberation and sufficient cause appearing therefor, does for the reasons stated in the Sale Motion and on the record of the Sale Hearing, all of which are expressly incorporated herein in their entirety:

**IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:**

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      This Court has jurisdiction over this matter and over the property of the Debtors' estates, including the Purchased Assets to be sold, transferred, or conveyed pursuant to the Purchase Agreement, pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2).  Venue of these bankruptcy cases and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of this Order as set forth herein and the closing of all Transactions contemplated hereby without regard to any stay or delay in its implementation.

4

E. The statutory and rule-based predicates for the relief requested in the Sale Motion and for the approvals and authorizations herein are (i) sections 102, 105, 363, 365, 503 and 507 of the Bankruptcy Code, (ii) Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008 and 9014 and (iii) Local Rules 2002-1(C)(2) and 6004-1.

F. Proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise be heard regarding: the Sale Motion, the Sale Hearing, and the Transactions contemplated by the Purchase Agreement, including, without limitation, the Sale of the Purchased Assets free and clear of the Liens and Interests, have been provided in accordance with sections 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9006, 9007, 9008, and 9014, the Local Rules of the Court, the procedural due process requirements of the United States Constitution, and in accordance with the Debtors' fiduciary duties. The Debtors also gave due and proper notice of the potential assumption and assignment of each Desired 365 Contract available to be assumed and assigned by the Debtors to the Buyer to each non-debtor counter party under each such Desired 365 Contract (collectively, the "Non-Debtor Counterparties") as reflected on the *Notice of Assumption and Cure Costs with Respect to Executory Contracts or Unexpired Leases Potentially to be Assumed and Assigned in Connection with the Sale of Debtors' Assets*, filed on [_____] [ECF No. [____]] (the "Assumption Notice"), and in connection with any Previously Omitted Contract Notice that may be provided as contemplated by the Purchase Agreement. Such notice was good, sufficient, and appropriate under the particular circumstances, and the counterparties to the Assumed Contracts are hereby deemed to consent to the relief granted herein unless otherwise provided in this Order. No other or further notice of, opportunity to object to, or other opportunity to be heard regarding the Sale, Sale Motion, the Sale Hearing, the

5

assumption and assignment of the Assumed Contracts, the Assumption Notice, or of the entry of this Order is necessary or shall be required.

G.      As evidenced by the affidavits of service filed with the Court [Docket Nos. __, __], proper, timely, adequate, and sufficient notice of, the Sale and a reasonable opportunity to object or otherwise to be heard regarding: the Sale Motion, the Sale Hearing, and the Transactions, including the Sale, have been provided in accordance with sections 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9006, 9007, 9008, and 9014, the Local Rules of the Court, and the procedural due process requirements of the United States Constitution.  The Debtors also gave due and proper notice of the potential assumption, sale, and assignment of the Assumed Contracts to each the non-debtor party under the Assumed Contracts. Such notice was good and sufficient and appropriate under the particular circumstances.

H.      A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities, including, without limitation, (i) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest, or encumbrance of record against all or any portion of the Purchased Assets, (ii) the Office of the United States Trustee for the Southern District of Florida, (iii) counsel to the Buyer, (iv) counsel to the DIP Lenders, (v) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002, (vi) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that to the Debtors' knowledge, as a result of the sale of the Purchased Assets, may reasonably have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or any known interest in the relief requested in the Sale Motion, including the Attorney General for the State of Florida, (vii) the Debtors' patient population, and (viii) all counterparties to any executory contract

6

or unexpired lease currently known to exist by the Debtors, including but not limited to, all Non-Debtor Counterparties to Assumed Contracts assumed and assigned pursuant to this Order. No other or further notice of, opportunity to object to, or other opportunity to be heard regarding the Sale, the Sale Motion, the Sale Hearing, the assumption and assignment of the Assumed Contracts, the Assumption Notice or of the entry of this Order is necessary or shall be required.

I.      The Purchased Assets are property of the Debtors' estates and good title thereto is vested in the Debtors' estates. Except as may be otherwise set forth in the Purchase Agreement, the Debtors are the sole and lawful owners of the Purchased Assets, and no other person has any ownership right, title, or interest therein.

J.      The Debtors' pre-bankruptcy marketing and sale efforts with respect to the Purchased Assets as described in the Ritucci Declaration were extensive, reasonable and appropriate, and resulted in the execution of the Purchase Agreement with the Buyer. Further post-bankruptcy marketing and sale efforts are not necessary or reasonable under the circumstances.

K.      The Debtors, in a reasonable exercise of their business judgment, have demonstrated a sufficient basis and the existence of reasonable, appropriate and compelling circumstances requiring them to enter into the Purchase Agreement, to transfer the Purchased Assets and to assume and to assign the Assumed Contracts to the Buyer under sections 363 and 365 of the Bankruptcy Code, and such actions are entirely fair and appropriate exercises of the Debtors' reasonable business judgment and in the best interests of the Debtors, their estates and their stakeholders. The Special Committee[4] of the board of managers of Sun MBMG GP, LLC, which is the general partner of the parent company of the Debtors, MBMG Ultimate Holding, L.P.,

---

[4] As such term is defined in the *Declaration of Nicholas K. Campbell in Support of Chapter 11 Petitions and First Day Pleadings* [ECF No. ___] (the "First Day Declaration"). *See* First Day Declaration, ¶ ____.

13266268-11

has been delegated all sale-related and restructuring transaction matters relating to each of the Debtors. The Special Committee has approved the Sale and the Purchase Agreement. The Special Committee includes independent director Elizabeth Abrams who has complied with all of her fiduciary duties, and approval of the Sale to the Buyer is a proper exercise of the Debtors' fiduciary duties.

L.      The Debtors, the Buyer, and their respective professionals have acted in good faith in all respects in connection with the pre-bankruptcy sale and marketing efforts and the post-bankruptcy sale process, and such processes were free of any fraud, collusion, or unfair dealing. As demonstrated by (i) the testimony and/or other evidence proffered or adduced at the Sale Hearing or submitted by affidavit or declaration at or prior to the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, through extensive prepetition marketing efforts, the Debtors (a) afforded all potentially interested buyers a full, fair, and reasonable opportunity to submit their highest or otherwise best offer to purchase the Purchased Assets, (b) provided all interested buyers, upon request, sufficient information to enable them to make an informed judgment on whether to submit an offer to buy the Purchased Assets, and (c) considered all indications of interest.

M.      The Purchase Agreement was not entered into, and the Sale is not being consummated for the purpose of, hindering, delaying, or defrauding present or future creditors of the Debtors.  The Debtors and the Buyer were each represented by separate and independent advisors throughout the negotiation of the terms of the Purchase Agreement.  All payments and other consideration to be made by the Buyer in connection with the Transactions have been disclosed.  Neither the Debtors nor the Buyer are proposing to consummate the Sale fraudulently, for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims

whether under the Bankruptcy Code, under the laws of the United States, any state, territory, possession thereof, the District of Colombia or otherwise.

N.     (i) The Debtors and their advisors conducted a fair and extensive pre-bankruptcy sale and marketing process that was (a) non-collusive, (b) substantively and procedurally fair to all parties in interest, (c) provided a full, fair, and reasonable opportunity for any potentially interested party to make an offer to purchase the Purchased Assets, and (d) resulted in a fair process; (ii) the pre-bankruptcy sale and marketing process conducted by the Debtors obtained the highest or otherwise best value for the Purchased Assets for the Debtors and their estates as reflected in the Purchase Agreement, and any other transaction would not have yielded as favorable an economic result; (iii) the Buyer has put forth the highest or otherwise best offer for the Purchased Assets; (iv) the Purchase Price received by the Debtors for the Purchased Assets, after considering all of the relevant facts and circumstances of the Sale as a whole, is fair; and (v) the pre-bankruptcy sale and marketing process obtained the highest or best value for the Purchased Assets for the Debtors and their estates.

O.     The offer of the Buyer, upon the terms and conditions set forth in the Purchase Agreement, including the form and total consideration to be realized by the Debtors pursuant to the Purchase Agreement, (i) is the highest or best offer received by the Debtors and their estates, (ii) is fair and reasonable, (iii) is in the best interests of the Debtors' stakeholders and estates, (iv) constitutes full and fair consideration and reasonably equivalent value for the Purchased Assets, and (v) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practically available alternative.  Unless the Sale is concluded expeditiously as provided for in the Sale Motion and pursuant to the Purchase Agreement, recoveries of creditors will be diminished.

13266268-11

P.        The Buyer is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code and decisions thereunder.  The Buyer is a buyer in "good faith," as that term is used in the Bankruptcy Code and relevant decisions and is entitled to the protections of section 363(m) and (n) of the Bankruptcy Code with respect to the Purchased Assets.  The pre-bankruptcy sale and marketing process and the post-bankruptcy sale process engaged in by the Debtors and the Buyer, including, without limitation, the negotiation and execution of the Purchase Agreement, was in good faith, based upon arm's length bargaining, without collusion or fraud of any kind and was substantively and procedurally fair to all parties in interest in all respects.  Neither the Debtors nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of, or implicate, section 363(n) of the Bankruptcy Code to the Purchase Agreement or to the consummation of the Sale and transfer of the Purchased Assets and the Assumed Contracts to the Buyer.  The Buyer is purchasing the Purchased Assets (including the Assumed Contracts) in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is, therefore, entitled to the protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that: (i) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets; (ii) the Buyer fully complied with all of the provisions of the Bankruptcy Code; (iii) there was no fraud, collusion, or unfair dealing in connection with the pre-bankruptcy sale and marketing process and the sale of the Purchased Assets; (iv) the Buyer has fully disclosed all of its connections with the Debtors; (v) all consideration to be paid or provided to the Debtors by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (vi) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (vii)

10

13266268-11

the negotiations and execution of the Purchase Agreement and any other agreements or instruments related thereto were in good faith and free from any collusion, fraud, or unfair dealing. The protections afforded by Bankruptcy Code section 363(m) are integral to the Sale, and the Buyer would not consummate the Sale without such protections.

Q.    The Debtors have full corporate power and authority to execute the Purchase Agreement (and all other documents contemplated thereby) and to consummate the Transactions contemplated therein, and the sale or transfer of the Purchased Assets has been duly and validly authorized by all necessary corporate actions on the part of the Debtors' estates. No consents or approvals, other than this Order and as may be expressly provided for in the Purchase Agreement, are required by the Debtors' estates to consummate such Transactions.

R.    The Debtors have advanced sound business reasons for entering into the Purchase Agreement and transferring, or assuming and assigning (with respect to the Assumed Contracts), the Purchased Assets, as more fully set forth in the Sale Motion and the Purchase Agreement and as demonstrated at the Sale Hearing, and it is entirely fair to all parties in interest, and a reasonable exercise by the Debtors of the Debtors' business judgment to transfer, or assume and assign (with respect to the Assumed Contracts), the Purchased Assets to the Buyer and to consummate the Transactions contemplated by the Purchase Agreement with the Buyer. The Sale and the Purchase Price were negotiated in good faith and are entirely fair and the product of good faith negotiations among the parties. Notwithstanding any requirement for approval or consent by any person, the transfer of the Purchased Assets to the Buyer under this Purchase Agreement and this Order and the assumption and assignment of the Assumed Contracts represent a legal, valid, and effective transfer of the Purchased Assets to the Buyer, with all right, title, and interest of the Debtors to the Purchased Assets free and clear of any Liens and Interests. The Buyer shall not assume or become

13266268-11

liable for any Liens and Interests relating to the Purchased Assets being sold by the Debtors other than for Assumed Liabilities and Permitted Liens and except as otherwise provided herein.

S.      Except with respect to Assumed Liabilities and  the Permitted Liens that the Buyer has agreed to permit to survive the Closing pursuant to the express terms of the Purchase Agreement, the Liens shall attach to the consideration to be received by the Debtors (if any) in the same priority and subject to the same defenses and avoidability, if any, as before the closing of the Transactions (the "Closing"), and the Buyer would not enter into the Purchase Agreement to purchase the Purchased Assets or proceed to the Closing other than free and clear of Liens and Interests.

T.      The transfer of the Purchased Assets to the Buyer free and clear of any Liens and Interests relating to the Purchased Assets will not result in any undue burden or prejudice to any holders of any Liens, because all such Liens or Interests of any kind or nature whatsoever shall attach to the net proceeds (if any) of the sale of the Purchased Assets received by the Debtors in the order of their priority, with the same validity, force, and effect as existed prior to Closing as against the Purchased Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto. All persons having Liens or Interests of any kind or nature whatsoever against or in any of the Debtors and/or the Purchased Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Liens (subject to Assumed Liabilities and the Permitted Liens that the Buyer has agreed to permit to survive the Closing pursuant to the express terms of the Purchase Agreement) against the Buyer Parties (as defined below), any of their respective assets, property, successors or assigns, or the Purchased Assets.

U.      The Debtors may sell the Purchased Assets free and clear of any Liens and Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in

12

section 363(f) of the Bankruptcy Code has been satisfied. The (i) holders of Liens and (ii) the Non-Debtor Counterparties to the 365 Contracts, who did not object, or who withdrew their objections, to the sale of the Purchased Assets (including Assumed Contracts) and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Except as set forth below, any objections to the Sale Motion, including objections by the non-Debtor Counterparties to the Desired 365 Contracts, have been overruled or resolved. Those holders of Liens who did object, if any, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, if any, attach to the proceeds, if any, of the Sale of the Purchased Assets ultimately attributable to the property against or in which they claim or may claim any Liens, with such Liens being subject to treatment as prescribed in an order of this Court, including an order confirming any chapter 11 plan.

V. The Buyer would not have entered into the Purchase Agreement and would not consummate the Transactions contemplated thereby, thus adversely affecting the Debtors and their estates and their creditors, (i) if the sale of the Purchased Assets was not free and clear of all Liens and Interests, including, without limitation, any rights, Liens, or claims based on any successor or transferee liability, or (ii) if the Buyer would, or in the future could, be liable for any Liens and Interests, including, without limitation, any rights, Liens, or Claims based on any successor or transferee liability. The Buyer will not consummate the Transactions unless this Court expressly orders that none of the Buyer, its affiliates, or their respective lenders or financing sources, and each of their respective present or contemplated members or shareholders (the "Buyer Parties"), will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Liens and Interests

13

(other than Assumed Liabilities and Permitted Liens), including rights or claims based on any successor or transferee liability.

W.       Not selling the Purchased Assets free and clear of all Liens and Interests would adversely impact the Debtors' estates, and the sale of Purchased Assets other than one free and clear of all Liens and Interests would be of substantially less value to the Debtors' estates.

X.       The sale of the Purchased Assets outside of a plan of reorganization pursuant to the Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan or reorganization of the Debtors. The Sale does not constitute a *sub rosa* chapter 11 plan.

Y.       The Debtors and the Buyer have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including subsections 365(b)(1)(A), (B) and 365(f), in connection with the Sale and the assumption and assignment of the Assumed Contracts. The Buyer has demonstrated adequate assurance of future performance with respect to the Assumed Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code.

Z.       The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order is integral to the Purchase Agreement and is in the best interests of the Debtors, their estates, their stakeholders and other parties in interest, and represents the exercise by the Debtors of their sound and prudent business judgment on behalf of the Debtors' estates.

AA.      The Assumed Contracts are assignable to the Buyer notwithstanding any provisions contained therein to the contrary.

BB.      The notice and opportunity to object provided to all parties in interest, as described herein fairly and reasonably protects the rights of all parties in interest.

14

CC.     The Debtors and the Buyer will be acting in good faith, pursuant to section 363(m) of the Bankruptcy Code, in closing the Transactions contemplated by the Purchase Agreement at any time on or after the entry of this Order and cause has been shown as to why this Order should not be subject to any stay, including, without limitation, as provided by Bankruptcy Rules 6004(h) and 6006(d) and any applicable Local Rule.

DD.     The Transactions contemplated under the Purchase Agreement do not amount to a consolidation, merger, or *de facto* merger of the Buyer, on the one hand, and the Debtors and/or the Debtors' estates, on the other, there is not substantial continuity between the Buyer or the Buyer Parties, on the one hand, and the Debtors and/or the Debtors' estates, on the other, there is no continuity of enterprise between the Debtors and/or the Debtors' estates and the Buyer or the Buyer Parties, neither are the Buyer or the Buyer Parties an alter ego or a mere continuation of the Debtors or the Debtors' estates, and the Buyer and the Buyer Parties are not successors to the Debtors or the Debtors' estates.

EE.     The total consideration provided by the Buyer for the Purchased Assets constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) entirely fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, entirely fair consideration, and fair value under any other applicable laws, including the laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets.

FF.     Time is of the essence in consummating the Sale.  In order to maximize the value of the Purchased Assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Purchase Agreement and the DIP Credit Agreement.  Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004 and 6006.

13266268-11

GG.    At and effective as of the Closing, the Buyer shall assume sole responsibility for paying and satisfying the Assumed Liabilities, including all liabilities and obligations of the Sellers related to or arising after the Closing under the Assumed Contracts. For the avoidance of doubt, nothing in this Order (including, without limitation, any provisions in this Order regarding the sale, transfer or conveyance of the Purchased Assets free and clear of Liens, except for Permitted Liens and Assumed Liabilities) nor in the Purchase Agreement shall be construed to mean that the Buyer is not assuming from the Debtors and thereafter becoming solely responsible for the payment, performance and discharge of the Assumed Liabilities.

HH.    After the Closing, the Debtors shall have no liability whatsoever with respect to the Assumed Liabilities.  The Buyer and the Buyer Parties shall have no obligations with respect to any Liens and Interests of the Debtors.

**NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The relief requested in the Sale Motion is **GRANTED** as set forth herein and the Purchase Agreement is approved, subject to the terms and conditions contained herein.  The relief requested in the Sale Motion is granted as set forth herein and the Purchase Agreement is approved, subject to the terms and conditions contained herein. The Sale Motion complies with all aspects of Bankruptcy Rules 2002, 6004 and 9014 and Local Rules 2002-1(C)(2) and 6004-1.

2.    Except as otherwise set forth herein, all objections, responses, reservations of rights, and requests for continuance concerning the Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing.  To the extent any such objection, response, reservation of rights, or request for continuance was not otherwise withdrawn, waived, or settled, such are hereby overruled and denied on the merits with prejudice.

16

3.      The sale of the Purchased Assets, the terms and conditions of the Purchase Agreement (including all schedules and exhibits affixed thereto), and the Transactions contemplated thereby be, and hereby are, authorized and approved.

4.      The sale of the Purchased Assets and the consideration provided under the Purchase Agreement are fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

5.      Notice of the Sale Hearing was fair, equitable, proper, and sufficient under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, and 6006, the Local Rules, and no other or further notice is required.

6.      The Debtors, in transferring the Purchased Assets pursuant to this Order and section 363 of the Bankruptcy Code, are deemed, under section 1107(a) of the Bankruptcy Code, to have all rights and powers to perform all the functions and duties of a trustee serving in a bankruptcy case, and will transfer the Purchased Assets pursuant to this Order.

7.      Subject to the terms of this Order, the private sale of the Purchased Assets, the terms and conditions of the Purchase Agreement (including all schedules and exhibits affixed thereto), and the Transactions contemplated thereby shall be, and hereby are, authorized and approved in all respects, and shall be enforceable against each of the Parties thereto.

8.      The failure specifically to include any particular provisions of the Purchase Agreement or any of the related documents, ancillary documents, or instruments executed in connection therewith in this Order shall not diminish or impair the effectiveness and force of such provision, document, Purchase Agreement, or instrument, it being the intent of the Court, the

17

Debtors, and the Buyer, that the Purchase Agreement and each related document, ancillary document, or instrument be authorized and approved in its entirety with such amendments, supplements and ancillary documents with respect thereto as may be made by the parties in accordance with the Purchase Agreement and this Order prior to the Closing Date, and each such provision of the Purchase Agreement shall be enforceable by or against each of the Parties thereto.

9.      The Purchase Agreement and any related ancillary document(s), or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided, that any such modification, amendment, or supplement is not material and substantially conforms to, and effectuates, the Purchase Agreement and any related ancillary documents.

10.      The private sale of the Purchased Assets and the consideration provided by the Buyer under the Purchase Agreement are entirely fair and reasonable, represent the highest or otherwise best offer for the Purchased Assets and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law as the result of a fair and extensive marketing and sale process. The Sale of the Purchased Assets to the Buyer is a legal, valid and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent of any entity.

11.      The Buyer is hereby granted and is entitled to all the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code, including with respect to the transfer of the Assumed Contracts as part of the sale of the Purchased Assets pursuant to section 365 of the Bankruptcy Code and this Order.

12.      The Debtors and their employees, professional advisors, and agents shall be, and hereby are, authorized and directed to fully assume, perform under, consummate, and implement

13266268-11

the terms of the Purchase Agreement together with any and all additional instruments and documents that may be necessary or desirable in connection with implementing and effectuating the terms of the Purchase Agreement, this Order, and/or the sale of the Purchased Assets, including, without limitation, the certificates, deeds, assignments, and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to possession, any or all of the Purchased Assets, or Assumed Liabilities as may be necessary or appropriate to the performance of the obligations of the Debtors' estates in accordance with, or as contemplated by, the Purchase Agreement, without any further corporate action or orders of this Court.

13.    The Debtors and each other person or entity having duties or responsibilities under the Purchase Agreement, any agreements or instruments related thereto or this Order, and their respective directors, officers, managers, employees, members, agents, representatives, attorneys, and other retained professionals are authorized and empowered, subject to the terms and conditions contained in the Purchase Agreement and this Order, to carry out all of the provisions of the Purchase Agreement and any related agreements or instruments; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Purchase Agreement and any related agreements or instruments; to take any and all actions contemplated by the Purchase Agreement, any related agreements or instruments, or this Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases, or other agreements or documents, each as applicable, and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary, desirable or appropriate to implement, effectuate, and consummate,

13266268-11

the Purchase Agreement, any related agreements or instruments, and this Order and the Transactions contemplated thereby and hereby, all without further application to, or order of, the Court or further action by their respective directors, officers, managers, employees, members, agents, representatives, and attorneys, and with like effect as if such actions had been taken by unanimous action of the respective directors, officers, managers, employees, members, agents, representatives, and attorneys of such entities. The Debtors' secretary or any assistant secretary or Chief Restructuring Officer or any other authorized individual, on behalf of the Debtors shall be, and hereby is, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable). The Debtors and the Buyer are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable Governmental Entity any and all certificates, agreements, or amendments necessary or appropriate to effectuate the Transactions contemplated by the Purchase Agreement, any related agreements and this Order, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable Governmental Entities or as the Debtors may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the corporate laws of the states of formation of each corporate Debtor and all other applicable business, corporation, trust, and other laws of the applicable Governmental Entities to the fullest extent permitted by law with respect to the implementation and consummation of the Purchase Agreement, any related agreements or instruments and this Order, and the Transactions contemplated thereby and hereby.

20

14.     To the fullest extent permitted by law, effective as of the Closing, (a) the transfer of the Purchased Assets to the Buyer shall constitute a legal, valid, and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent by any Person and shall vest the Buyer with all right, title, and interest of the Debtors in and to the Purchased Assets, including, without limitation, with respect to intellectual property identified in the Purchase Agreement and all tangible and intangible assets, personal property, goodwill, brand and related likenesses constituting Purchased Assets, free and clear of any Liens and Interests pursuant to section 363(f) of the Bankruptcy Code, and (b) the assumption of the Assumed Liabilities shall constitute a legal, valid and effective assumption by the Buyer of all Assumed Liabilities.

15.     The sale of the Purchased Assets is not subject to avoidance pursuant to any statutory or common law fraudulent conveyance or fraudulent transfer theories whether under the Bankruptcy Code, including, without limitation, section 363(n), or under the laws of the United States, any state, territory, or possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

16.     At the Closing, the Debtors shall be, and hereby are, authorized, empowered, and directed, pursuant to sections 105, 363(b), and 365 of the Bankruptcy Code, to transfer any and all such Purchased Assets to the Buyer.  The transfer of the Purchased Assets shall vest the Buyer with all right, title and interest of the Debtors to the Purchased Assets, in each instance, free and clear of any Liens and Interests with all such Liens to attach only to the proceeds of the sale (if any) with the same priority, validity, force, and effect, if any, as they had prior to the Closing Date in or against the Purchased Assets, subject to all claims and defenses the Debtors may possess with respect thereto.  Following the Closing Date, no holder of any Liens or Interests in the Purchased Assets shall interfere with the Buyer's enjoyment of the Purchased Assets based on or related to

13266268-11

such Liens or any actions or omissions that the Debtors may take in the Debtors' bankruptcy cases and no person shall take any action to prevent, interfere with or otherwise enjoin consummation of the Transactions contemplated in or by the Purchase Agreement or this Order and any such action is hereby forever barred, estopped and permanently enjoined by this Order. All Persons that are currently in possession of some or all of the Purchased Assets are hereby directed to surrender possession of such Purchased Assets to Buyer upon the Closing Date or at such later time as Buyer reasonably requests

17.     The provisions of this Order authorizing the sale of the Purchased Assets free and clear of any Liens and Interests shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.  However, the Debtors, the Buyer, and each of their respective officers, employees, attorneys, other retained professionals, and agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Buyer deem necessary, desirable or appropriate to implement and effectuate the terms of the Purchase Agreement and this Order, including amendments to the Purchase Agreement.

18.     On or before the Closing Date, each of the Debtors and the Debtors' creditors, as the case may be, are authorized to execute such documents and to take all other actions as may be necessary to release, effective as of the Closing, any Liens and Interests (subject to the Permitted Liens) of any kind against the Purchased Assets, if any, as may have been recorded or may otherwise exist.  If any Person that has filed financing statements or other documents or agreements evidencing any Liens in or against the Purchased Assets (subject to the Permitted Liens that the Buyer has agreed to permit to survive the Closing pursuant to the express terms of the Purchase

Agreement) shall not have delivered to the Debtors prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases or agreements of similar import of all such Liens that the Person has with respect to the Purchased Assets, effective as of the Closing, the Debtors and the Buyer are hereby authorized to execute such statements, instruments, releases, and other documents on behalf of such Person with respect to such Purchased Assets prior to the Closing, and the Debtors and the Buyer are authorized to file such documents after Closing. The Debtors and the Buyer are hereby authorized, but not required, to (i) file, register or otherwise record a certified copy of this Order in the applicable jurisdiction, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all such Liens and Interests (subject to the Permitted Liens) against the Buyer and the applicable Purchased Assets and (ii) seek in this Court or any other court to compel appropriate parties to execute termination statements, instructions of satisfaction and releases of all such Liens and Interests (other than Permitted Liens) with respect to the Purchased Assets.  Notwithstanding the foregoing, the provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of Liens and Interests (other than Permitted Liens) shall be self-executing, and none of the Debtors, Debtors' former or current creditors or the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

19.    The Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, approval, certificate of occupancy, authorization, operating permit, registration, plan and the like of any Governmental Entity relating to the Purchased Assets or held by the Debtors' estates, but solely with respect to those that are able to be transferred prior to the Closing Date and

do not require further consent or authorization by a Government Entity to effect such transfer and maintain the related authorization.  To the greatest extent available under applicable law, all such licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and the like of any Governmental Entity are deemed to have been, and hereby are, deemed to be transferred to the Buyer, as of the Closing Date.  Furthermore, for licenses, permits and authorizations unable to be transferred prior to the Closing Date and/or that do require further consent or authorization by a Government Entity, the business covered by the Purchased Assets shall continue operating under all such existing licenses, permits and authorizations of the Debtors in accordance with any agreements or arrangements, which may include, but not be limited to, a transition services agreement between the parties, as may be permitted by the applicable and appropriate regulatory authority and mutually acceptable to the Debtors and the Buyer, with the advice of regulatory counsel, until such licenses, permits and authorizations have been transferred and changed to the name of the Buyer by the appropriate Government Entity, including but not limited to local occupational licenses, and any other licenses needed to operate such business uninterrupted.  To the extent the Buyer cannot operate under any such license, permit, approval, certificate of occupancy, authorization, operating permit, registration, plan and the like of any Governmental Entity relating to the Purchased Assets in accordance with the preceding sentence, and those that are not able to be transferred, such shall remain in effect and with the Debtors while the Buyer, with the assistance from the Debtors in accordance with any agreements or arrangements, which may include, but not be limited to a transition services agreement between the parties,  as may be permitted by the applicable and appropriate regulatory authority and mutually acceptable to the Debtors and the Buyer, with the advice of regulatory

24

counsel, works promptly and diligently to apply for and secure all necessary governmental approvals for new issuances of such and approval to the Buyer.

20.     The Purchased Assets to be acquired by the Buyer under the Purchase Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Buyer.  Upon the occurrence of the Closing, this Order shall be considered and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interest in and to the Purchased Assets under the Purchase Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in and to the Purchased Assets to the Buyer.

21.     Other than the Assumed Liabilities and Permitted Liens or as otherwise set forth in the Purchase Agreement, the Buyer is not assuming nor shall it or any affiliate of the Buyer be in any way liable or responsible, as a successor or otherwise, for any Liabilities of the Debtors in any way whatsoever, including any Liabilities relating to or arising from the Debtors' ownership or use of the Purchased Assets prior to the Closing Date, or any Liabilities calculable by reference to the Debtors or their operations or the Purchased Assets, or relating to continuing or other conditions existing on or prior to the Closing Date, which Liabilities are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against the Buyer or any affiliate of the Buyer.

22.     Except as otherwise expressly provided in the Purchase Agreement, all persons presently or on or after the Closing Date in possession of some or all of the Purchased Assets are directed to surrender possession of the Purchased Assets to the Buyer, as applicable, on the Closing Date or at such time thereafter as the Buyer may request.

13266268-11

23.     Subject to the terms of the Purchase Agreement and the occurrence of the Closing Date, the assumption by the Debtors of the Assumed Contracts, as provided for or contemplated by the Purchase Agreement, the Assumption Notice(s), and the Designation Notice(s), shall be, and hereby is, authorized and approved pursuant to sections 363 and 365 of the Bankruptcy Code and, and the Assumed Contracts shall be assigned to the Buyer free and clear of all Liens and Interests and the Debtors shall execute and deliver to the Buyer such documents or other instruments as may be reasonably requested by the Buyer to assign and transfer the Assumed Contracts to the Buyer.

24.     Any party to a personal services contract that has not objected to the assignment thereof is deemed to consent to such assignment pursuant to section 365(c) of the Bankruptcy Code to the extent that such contract is an Assumed Contract.  Furthermore, all parties to the Assumed Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, and shall not charge the Debtors or the Buyer for, any instruments, applications, consents or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the sale of the Purchased Assets.

25.     The Assumed Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtors and assigned to the Buyer at the Closing, pursuant to sections 363 and 365 of the Bankruptcy Code, subject only to the payment of the Cure Costs (if any) solely to the extent set forth in the Assumption Notice.

26.     Upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title, and interest in and to

each Assumed Contract.   The Debtors shall reasonably cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing.

27.     Pursuant to sections 365(b)(l)(A) and (B) of the Bankruptcy Code, and except as otherwise provided in this Order, on and after the Closing Date, the Debtors shall pay or cause to be paid to the Non-Debtor Counterparties of Assumed Contracts the requisite Cure Costs, if any, set forth on the Assumption Notice, except to the extent that (i) the Non-Debtor Counterparty is listed on **Exhibit A** hereto, (ii) a Cure Cost was amended on the record of the Sale Hearing with the mutual consent of the Sellers and the Buyer, (iii) a different cure amount is agreed as between and among the Non-Debtor Counterparties, the Sellers and the Buyer, or (iv) as to be determined by Court order, provided however, the Debtors' obligation to pay their share of any such amount determined by Court order will be limited to the amount of the Cure Costs set forth on the Assumption Notice.   The Cure Costs (if any) are binding on all Non-Debtor Counterparties and are hereby fixed at the amounts (including any amount listed as $0.00) set forth on the Assumption Notice, as set forth on the record of the Sale Hearing, as otherwise agreed in writing between the Non-Debtor Counterparties, the Sellers and the Buyer, or as determined by Court order (provided however, the Debtors' obligation to pay their share of any such amount determined by Court order will be limited to the amount of the Cure Costs set forth on the Assumption Notice), as the case may be, and the Non-Debtor Counterparties are forever barred from asserting any other claims, including but not limited to the propriety or effectiveness of the assumption and assignment of the Assumed Contract against the Debtors, the Buyer or the property of any of them in respect of the Assumed Contract.

28.     All defaults or other obligations under the Assumed Contracts (monetary or otherwise) arising prior to the Closing Date (without giving effect to any acceleration clauses,

13266268-11

assignment fees, increases, advertising rates, or any other default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Costs (if any) on the Assumption Notice or as otherwise determined as provided herein and the counterparties to the Assumed Contracts shall be forever barred and estopped from asserting or claiming against the Debtors or the Buyer that any amounts are due or other defaults exist under such Assumed Contract as of the date of the assignment of such Assumed Contract.

29.    Any provision in any Assumed Contract that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable, and all Assumed Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Costs, if any.  No sections or provisions of any Assumed Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the Non-Debtor Counterparties shall have any force and effect with respect to the Sale and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code, and no assignment of any Assumed Contract pursuant to the terms of the Purchase Agreement shall in any respect constitute a default under any Assumed Contract.  The Non-Debtor Counterparty shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Buyer shall enjoy all of the Debtors' rights and benefits under each such Assumed Contract as of the applicable date of assumption without the necessity of obtaining such Non-Debtor Counterparty's written consent to the assumption or assignment thereof.

28

30.     The Debtors and the Buyer have satisfied all requirements under sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under all of the Assumed Contracts.

31.     The Debtors and their estates shall have no liability for any claims accruing from and after the Closing under any of the Assumed Contracts, pursuant to and in accordance with section 365(k) of the Bankruptcy Code.

32.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Assumed Contracts are forever barred, estopped and permanently enjoined from raising or asserting against the Debtors or the Buyer any claim or cause of action of any kind or nature relating to any assignment fee, Cure Costs, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of the Closing Date or arising by reason of the Closing Date, except for any amounts that are Assumed Liabilities.

33.     Not later than three (3) Business Days prior to the Closing Date (the "Initial Determination Date"), the Buyer shall provide written notice to Sellers' Representative (each, a "Initial Designation Notice") of the Buyer's election to designate the initial set of Desired 365 Contracts that the Buyer wishes, as of the Closing Date, to be Assumed Contracts. Notwithstanding anything to the contrary herein, at any point up until, as applicable, either the Final Determination Date or the Extended Final Determination Date (if so elected by the Buyer) (each, a "Subsequent Determination Date" and together with the Initial Determination Date, collectively, the "Determination Dates"), the Buyer may provide written notice to the Sellers' Representative (each, a "Subsequent Designation Notice" and together with the Initial Designation Notice, collectively, the "Designation Notices") of the Buyer's election to designate one or more remaining Desired

29

365 Contract(s) appearing on **Exhibit B** hereto that the Buyer wishes, after the Closing Date, to be Assumed Contracts; provided, however, the Buyer shall reimburse the Debtors, pursuant to the terms of the Transition Services Agreement, for the administrative expense obligations under section 503 of the Bankruptcy Code arising on and after the Closing Date with respect to all of the remaining Desired 365 Contracts that were not otherwise Assumed Contracts as of the Closing Date (collectively, the "Buyer's Desired 365 Contract Initial Period Reimbursement Obligations"), for the period commencing upon the Closing Date and ending with respect to each such Desired 365 Contract when it becomes an Assumed Contract or is removed from **Exhibit B** hereto. At any point on or after the Closing Date (until, as applicable, either the Final Designation Date or the Extended Final Designation Date (if so elected by the Buyer)), the Buyer may provide written notice to the Debtors to remove (such removal to be effective either upon Sellers' Representative's receipt of such notice, or as of a future date that the Buyer may specify in its notice) a Desired 365 Contract from **Exhibit B** hereto, and the Buyer's obligations to reimburse the Debtors for the Buyer's Desired 365 Contract Initial Period Reimbursement Obligations with respect to such Desired 365 Contract removed from **Exhibit B** hereto shall terminate as provided in the Buyer's notice. On and after the Determination Date, any Desired 365 Contract that is not an Assumed Contract automatically shall be an Excluded Contract and an Excluded Asset; provided, however, that if one or more Desired 365 Contract(s) are subject to dispute as to assumption or assignment (including a Cure Cost dispute) of such Desired 365 Contract(s) that has not been resolved to the mutual satisfaction of the Buyer and Sellers prior to any of the Determination Dates, then the respective Determination Date shall be extended (but only with respect to such Desired 365 Contract(s)) to no later than the earliest to occur of: (A) the date on which such dispute has been resolved in writing to the mutual satisfaction of the Buyer and Sellers, (B) the date on which such

30

Desired 365 Contract is deemed rejected by operation of section 365 of the Bankruptcy Code, and (C) the date upon which such dispute is determined by a final order of this Court (the "Extended Contract Period"), and for the avoidance of doubt, the Buyer's Desired 365 Contract Initial Period Reimbursement Obligations (and to the extent applicable if so elected by the Buyer, the Buyer's obligation to pay the Buyer's Desired 365 Contract Final Period Reimbursement Obligations) shall apply during the Extended Contract Period with respect to such Desired 365 Contracts subject to dispute.  The Buyer may deliver a Subsequent Designation Notice upon expiration of the Extended Contract Period of the Buyer's election to designate any Desired 365 Contracts (that were subject to the Extended Contract Period) that the Buyer wishes to be Assumed Contracts.  If a Subsequent Designation Notice with respect to any such Desired 365 Contract(s) is not delivered by the Buyer by the date which is three (3) Business Days following the expiration of such Extended Contract Period, such Desired 365 Contract(s) shall be automatically deemed Excluded Contract(s) and Excluded Asset(s).

34.     In the event that the Sale does not close, none of the Assumed Contracts shall be assumed by virtue of this Order and shall remain subject to further administration in the Debtors' bankruptcy cases.

35.     The failure of the Buyer to enforce at any time one or more terms or provisions of any of the Assumed Contracts shall not be a waiver of such terms or provisions, or of the Buyer's rights to enforce every term and condition of the Assumed Contracts

36.     Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Purchase Agreement and this Order.  This Order and the Purchase Agreement shall be binding upon and govern the acts of all such federal,

31

state, and local governmental agencies and departments, including any filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets.

37.     To the extent permitted by section 525 of the Bankruptcy Code, no Governmental Entity may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of the Debtors' bankruptcy cases or the consummation of the Transactions contemplated by the Purchase Agreement.

38.     Other than the Assumed Liabilities, the Buyer has not assumed and is otherwise not obligated for any of the Debtors' liabilities, and the Buyer has not purchased any of the Debtors' assets expressly excluded from the Purchased Assets, as provided for in section 2.1(b) of the Purchase Agreement.  Consequently, all persons, Governmental Entities and Units (as defined in sections 101(27) and 101(41) of the Bankruptcy Code) and all holders of Liens (other than subject to the Permitted Liens) based upon or arising out of liabilities retained by the Debtors may not take any action against any of the Buyer Parties or the Purchased Assets to recover on account of any liabilities of the Debtors (other than on account of the Assumed Liabilities).  All persons holding or asserting any Liens in the Excluded Assets may not assert or prosecute such Liens or any cause of action against the Buyer or the Purchased Assets for any liability associated with the Excluded Assets or any other Excluded Liability (as defined in the Purchase Agreement).

39.     The Buyer is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Buyer shall not assume, or be deemed to assume, or in any way be

13266268-11

responsible for, any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor liability, or similar liability. Neither the transfer of the Purchased Assets to the Buyer, nor the fact that the Buyer is using any of the Purchased Assets previously owned by the Debtors, will cause the Buyer Parties or any of their affiliates, to be deemed a successor in any respect to the Debtors' business within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

40. Further, except as otherwise provided in the Purchase Agreement, the transfer of title and possession of the Purchased Assets shall be free and clear of any Liens and Interests pursuant to any successor or successor-in-interest liability theory, and, for the avoidance of doubt, the Buyer and the Buyer Parties, and each of their affiliates, transferees, successors and assigns and each of their respective members, partners, officers, directors, principals, advisors and shareholders shall have no liability whatsoever for any Liens and Interests, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether liquidated or unliquidated, whether asserted derivatively or vicariously, whether asserted based on the Buyer's status as a transferee, successor, or otherwise, of any kind, nature, or character whatsoever, including Liens and Interests based on, relating to, and/or arising under, without limitation: (i) any employment or labor agreement; (ii) any pension, welfare, compensation or other employee plan, agreements, practices, and programs, including, without limitation, any pension or employee plan of or related to any of the Debtors or any Debtors' affiliates or predecessors or any current or former employees of any of the foregoing; (iii) the Debtors' business

33

operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, any claims, rights, or causes of action that might arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Notification Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") (including, but not limited to, (i) claims asserted by any individual who is not or was not (or whose alleged COBRA "qualifying event" is not or was not in connection with) a covered employee whose last employment prior to his or her alleged COBRA "qualifying event" was associated with the Purchased Assets (as defined in the Purchase Agreement), and/or (ii) excise taxes, penalties, and fees with respect to such individuals for periods on or after Closing), (j) the Multiemployer Pension Plan Amendments Act of 1980; (k) state and local discrimination laws, (l) state and local unemployment compensation laws or any other similar state and local laws, (m) state workers' compensation laws, and/or (n) any other state, local, or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment, or termination of employment with any or all Debtors or any of their predecessors; (vi) any antitrust laws; (vii) any product liability or similar laws, whether state, federal, or otherwise; (viii) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (ix) Perishable Agricultural Commodities Act;

34

(x) any bulk sales or similar laws; (xi) any federal, state, or local tax statutes, rules, regulations, or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (xii) any common law doctrine of *de facto* merger, successor, transferee, or vicarious liability, substantial continuity liability, successor-in-interest liability theory, and/or any other theory of or related to successor liability.

41.    Except as otherwise provided in the Purchase Agreement, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons including, but not limited to, the Debtors, all debt holders, equity security holders, the Debtors' employees or former employees, Governmental Entities, lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding a Lien and Interest of any kind or nature whatsoever against, in, or with respect to any of the Debtors or the Purchased Assets, arising under or out of, in connection with, or in any way relating to the Debtors, the Purchased Assets, the operation of the Debtors' businesses prior to the Closing Date, or the transfer of the Purchased Assets to the Buyer in accordance with the Purchase Agreement and this Order, shall be forever barred, estopped and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Lien and Interest, including assertion of any right of setoff or subrogation, recoupment of any kind and enforcement, attachment, or collection of any judgment, award, decree, or order, against the Buyer Parties or any of their respective affiliates, transferees, successors or assigns thereof and each of their respective current and former members, officers, directors, attorneys, employees, partners, affiliates, financial advisors, and representatives (each of the foregoing in their individual capacity), with respect to the Purchased Assets. No Person shall assert or pursue against Buyer or its Affiliates, successors or assigns any such Claim.

42.     Without limiting the generality of the foregoing, the Buyer shall not assume or be obligated to pay, perform or otherwise discharge any workers' compensation Liabilities of the Debtors arising pursuant to state law or otherwise, and this Order is intended to be all inclusive and shall encompass, but not be limited to, workers' compensation Claims or suits of any type, whether now known or unknown, whenever incurred or filed, which have occurred or which arise from work-related injuries, diseases, death, exposures, intentional torts, acts of discrimination, or other incidents, acts, or injuries prior to the Closing Date, including, but not limited to, any and all workers' compensation Claims filed or to be filed, or any reopening of such Claims, by or on behalf of any of the Debtors' current or former employees, persons on laid-off, inactive or retired status, or their respective dependents, heirs or assigns, as well as any and all premiums, assessments, or other obligations of any nature whatsoever of the Debtors relating in any way to workers' compensation liability.

43.     Subject to the terms of the Purchase Agreement, the Purchase Agreement and any related agreements and/or instruments may be waived, modified, amended, or supplemented by agreement of the Debtors and the Buyer, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not materially adverse to the Debtors' estates and substantially conforms to, and effectuates, the Purchase Agreement and any related agreements and/or instruments and this Order.

44.     Upon the commencement of the Debtors' bankruptcy cases, and to the extent necessary and applicable, the Debtors' Chief Restructuring Officer, not in his individual capacity but solely in his capacity as the Chief Restructuring Officer of the Debtors, shall be deemed admitted as a member of and entitled to manage each of the Limited Liability Company (such entities, collectively, the "Debtor LLCs").  To the extent that the commencement of the Debtors'

36

bankruptcy cases caused any Debtor LLCs to dissolve under applicable non-bankruptcy law, such dissolution is hereby revoked as if it never occurred, and the Chief Restructuring Officer, not in his individual capacity but solely in his capacity as the Chief Restructuring Officer of the Debtors and on behalf of the Debtors, shall be deemed a member of the Debtor LLCs, with the power and authority to transfer the Purchased Assets to the Buyer.  The Chief Restructuring Officer shall not bear any personal liability, including but not limited to with respect to legal, financial or tax, matters with respect to acting in the limited capacity as set forth in this paragraph.

45.    No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the sale and the Transactions contemplated by the Purchase Agreement.

46.    The Debtors are authorized to transfer personally identifiable information, as defined in section 101(41)(A) of the Bankruptcy Code, as a part of the Sale.

47.    This Order and the Purchase Agreement shall be binding upon, enforceable against, and govern the acts of all persons including, without limitation, the Debtors and their estates, the Buyer Parties, their respective affiliates, transferees, successors, and permitted assigns, including, without limitation, any Chapter 11 trustee hereinafter appointed for the Debtors' estates, any statutory committee appointed in the Debtors' bankruptcy cases or any trustee appointed in a Chapter 7 case if the cases of the Debtors are converted from Chapter 11 to a case under Chapter 7 of the Bankruptcy Code, all creditors and patients of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with sections 105 and 349 of

the Bankruptcy Code) that this Order and the rights granted to the Buyer hereunder shall remain effective and, notwithstanding such conversion or dismissal, shall remain binding on all parties in interest. For the avoidance of doubt, the Debtors' inability to satisfy in full all administrative expense claims of the Debtors' estates shall not be a basis for termination, rejection or avoidance (as applicable) of the Purchase Agreement or the Sale.

48.     This Order (i) shall be effective as a determination that, as of the Closing, all Claims, except as assumed as Assumed Liability or permitted as a Permitted Lien by the Buyer under the Purchase Agreement, have been unconditionally released, discharged and terminated as to the Buyer Parties and the Purchased Assets and the conveyances and transfers described herein have been effected, and (ii) is and shall be binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Buyer is the assignee and owner of the Purchased Assets, and ownership of the Purchased Assets is free and clear of any Liens and Interests or any Person who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "Recording Officers").  All Recording Officers are authorized to strike recorded encumbrances, claims, liens, and other interests against the Purchased Assets owned by the Debtors recorded prior to the date of this Order.  A certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded encumbrances, Claims, Liens, pledges, and other interests against the Purchased Assets owned by the Debtors recorded prior to the date of this Order.  All Recording Officers are

hereby authorized to accept for filing any and all of the documents and instruments necessary, advisable or appropriate, and appropriate to consummate the transactions contemplated by the Purchase Agreement.

49.     Subject to the DIP Order (as defined below), nothing in any other order of this Court or contained in any plan of reorganization or liquidation that may be confirmed in the cases of the Debtors, or in any subsequent or converted cases of the Debtors to cases under Chapter 7 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Order.

50.     Notwithstanding Bankruptcy Rules 6004, 6006, and 7062, this Order shall be effective and enforceable immediately upon its entry and its provisions shall be self-executing. The Debtors and the Buyer are free to close under the Purchase Agreement at any time, subject to the express terms of the Purchase Agreement.  If the Debtors and the Buyer close under the Purchase Agreement, the Debtors and the Buyer shall be deemed to be acting in "good faith" and the Buyer shall be entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the Transactions under and pursuant to the Purchase Agreement.

51.     The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to implement the terms and conditions of the Purchase Agreement and the provisions of this Order.

52.     Notwithstanding any provision in this Order, the determination of any disputed Cure Costs (unless such Cure Costs were resolved at or prior to the Sale Hearing) or adequate assurance of future performance as to only those parties listed on **Exhibit A** hereto (collectively, the "Objecting Parties"), shall be reserved for further proceedings; provided, however, nothing herein shall alter or amend any scheduled hearing on Cure Costs although any such hearing may

13266268-11

be continued with the consent of the Debtors or the Buyer; provided, further that unless a Non-Debtor Counterparty is an Objecting Party listed on **Exhibit A** hereto, all the Non-Debtor Counterparties shall be fully and finally bound by the Cure Cost listed on the Assumption Notice and any challenge to such Cure Cost is deemed waived and released.  Pending such further determinations, no assets associated with the Objecting Parties' contracts and leases shall be deemed sold or assigned to the Buyer. Until such time as a contract or lease of an Objecting Party is assumed and assigned to the Buyer, such Objecting Party's contract or lease may be rejected, including, without limitation, following the Court's determination of the Cure Costs relating thereto.  Furthermore, nothing in this Order shall prejudice the right of any party to object to the assumption and assignment of any Contract in the event that the Debtors breach their obligations under the Contract after the date hereof and prior to the assumption and assignment of the Assumed Contract; provided, however, that the counter party to any such Contract must give notice in writing by email to counsel to the Debtors, Paul Steven Singerman, Esq., singerman@bergersingerman.com, Jordi Guso, Esq., jguso@bergersingerman.com, Christopher Andrew Jarvinen, Esq., cjarvinen@bergersingerman.com and Samuel J. Capuano, Esq., scapuano@bergersingerman.com), and counsel to the Buyer, Laurence Frazen, Esq. (larry.frazen@bclplaw.com) and Michael Goldberg, Esq. (michael.goldberg@akerman.com), of the breach within three (3) business days of such counter party having knowledge of the occurrence of the breach.

53.     The provisions of this Order shall be binding on and inure to the benefit of all successors and assignees of the Debtors and the Buyer.

54.     The Debtors are authorized to enforce their rights under any confidentiality agreements they entered into with (i) other potential interested buyers with respect to the Purchased

Assets for the benefit of the Buyer or (ii) any other interested parties with respect to these bankruptcy cases or pre-petition information that is otherwise confidential for the benefit of other protected parties in interest, in each case for the term of each respective confidentiality agreement.

55.    Notwithstanding anything to the contrary contained herein, (i) any payment made or to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any postpetition financing facility approved by, or any order regarding the use of cash collateral entered by, the Court in these chapter 11 cases, including, without limitation, the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* and any final order entered with respect thereto (as applicable, the "DIP Order"), and (ii) to the extent there is any inconsistency between the terms of the DIP Order and any action taken or proposed to be taken hereunder, the DIP Order and the Approved Budget (as defined in the DIP Order) shall control. For the avoidance of doubt, the Debtors are not authorized to make payments pursuant to this Order except as permitted by the Approved Budget (as defined in the DIP Order).

56.    Notwithstanding anything to the contrary in this Order or in the Purchase Agreement (or in any document contemplated thereby):

    a.    on the first Friday following closing of the Sale, and on the Friday of every week thereafter, the Prepetition First Lien Agent (as defined in the DIP Order) shall receive as adequate protection payment of the gross proceeds of accounts receivable collected by the Debtors, without deduction or setoff by any account debtor, which

41

the Debtors shall use commercially reasonable, good faith efforts to pursue and collect on a timely basis;

b.   promptly following the entry of this Order, the Debtors shall collaterally assign and grant to the Prepetition First Lien Agent all of the Debtors' rights, title, interest, remedies, privileges, and claims in and to (but, for the avoidance of doubt, excluding any and all obligations and liabilities under) the Purchase Agreement and all other agreements, instruments and other documents related thereto or executed in connection therewith, including, without limitation, all rights to receive payment of the Holdback Amount and Deposit (each, as defined in the Purchase Agreement), as well as all other payments from the Buyer, which collateral assignment and grant shall be in form and substance acceptable to the Prepetition First Lien Agent; and

c.   upon closing of the Sale, and subject only to payment in full in cash of the DIP Obligations (as defined in the DIP Order) and the funding of the Carve-Out and Post-Sale Reserves (each, as defined in the DIP Order) in accordance with the DIP Order, the Debtors shall pay all cash proceeds of the Sale to the Prepetition First Lien Agent for application to the Prepetition First Lien Obligations (as defined in the DIP Order).

57.    In the event there is any inconsistency between the Sale Motion or this Order, this Order shall govern. In the event there is any inconsistency between the terms of this Order and the terms of the Purchase Agreement, the terms of this Order shall govern.

58.    This Court shall retain exclusive jurisdiction to enforce the terms and provisions of this Order and the Purchase Agreement in all respects and to decide any disputes concerning this Order, the Purchase Agreement, or the rights and duties of the parties hereunder or thereunder or

13266268-11

any issues relating to the Purchase Agreement and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Purchased Assets and any Assumed Contracts, and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of any Liens and Interests and any actions, efforts and/or conduct designed to deprive the Buyer of the Purchased Assets, including any and all tangible and intangible assets, personal property, goodwill, brand and related likenesses acquired under the Purchase Agreement; provided, however, that, in the event the Court abstains from exercising or declines to exercise such jurisdiction with respect to the Purchase Agreement or this Order, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

59.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

60.    The provisions of this Order are non-severable and mutually dependent.

61.    Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the Local Rules, this Order will not be stayed after the entry hereof, but will be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and will not apply.

#   #   #

43

**<u>Submitted by:</u>**
Christopher Andrew Jarvinen, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Tel. (305) 755-9500
Fax (305) 714-4340
Email:  cjarvinen@bergersingerman.com

*(Attorney Jarvinen is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

**EXHIBIT B**

**(Purchase Agreement)**

**Execution Copy**

ASSET PURCHASE AGREEMENT

by and among

MB MEDICAL OPERATIONS, LLC,

MB MEDICAL TRANSPORT, LLC,

CARE CENTER NETWORK, LLC,

CARE CENTER MEDICAL GROUP, LLC,

CLINICAL CARE PHARMACY, LLC,

FLORIDA FAMILY PRIMARY CARE CENTER, LLC,

FLORIDA FAMILY PRIMARY CARE CENTERS OF ORLANDO, LLC,

FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC,

FLORIDA FAMILY PRIMARY CARE CENTERS OF PASCO, LLC,

FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC,

CCMC PHYSICIAN HOLDINGS, INC.,

MIAMI MEDICAL & WELLNESS CENTER LLC,

MIAMI BEACH MEDICAL CENTERS, INC. F/K/A RODOLFO DUMENIGO, M.D., P.A.,

MIAMI BEACH MEDICAL CONSULTANTS, LLC,

MB MEDICAL OPERATIONS, LLC, AS THE SELLERS' REPRESENTATIVE,

and

CONVIVA MEDICAL CENTER MANAGEMENT, LLC

Dated as of October 12, 2024

**Table of Contents**

ARTICLE I. DEFINITIONS ..................................................................................................2

ARTICLE II. PURCHASE AND SALE ...............................................................................18

    2.1    Transfer of Assets; Retained Assets .......................................................18
    2.2    Assumption of Liabilities...........................................................................22
    2.3    Desired 365 Contracts ................................................................................24
    2.4    Consideration ...............................................................................................28
    2.5    Closing ...........................................................................................................29
    2.6    Deliveries of Sellers at Closing ................................................................30
    2.7    Deliveries of Buyer at Closing .................................................................31
    2.8    Withholding .................................................................................................31
    2.9    Allocation .....................................................................................................31

ARTICLE III. REPRESENTATIONS AND WARRANTIES REGARDING THE
             SELLERS .............................................................................................32

    3.1    Status; Power and Authority .....................................................................32
    3.2    Enforceability ...............................................................................................33
    3.3    No Violation; Consents and Approvals ...................................................33
    3.4    Financial Statements; Records...................................................................34
    3.5    Absence of Certain Developments ...........................................................34
    3.6    Litigation ......................................................................................................36
    3.7    Environmental Matters...............................................................................36
    3.8    Title to Purchased Assets; Real Property ...............................................37
    3.9    Compliance with Laws ...............................................................................38
    3.10    Health Care Matters ...................................................................................38
    3.11    Labor and Employment Matters...............................................................44
    3.12    Employee Benefit Plans..............................................................................45
    3.13    Tax Matters ..................................................................................................46
    3.14    Insurance ......................................................................................................48
    3.15    Related Party Transactions and Interests................................................48
    3.16    Material Contracts.......................................................................................48
    3.17    Intellectual Property...................................................................................51
    3.18    Privacy and Security Compliance ............................................................53
    3.19    No Brokers ....................................................................................................54
    3.20    Certain Business Relationships .................................................................54
    3.21    Absence of Unlawful Payments ...............................................................54
    3.22    Devices ..........................................................................................................55
    3.23    PPP Loan.......................................................................................................55
    3.24    COVID-19......................................................................................................55
    3.25    CHOPD Incident..........................................................................................55

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF BUYER .....................................55

    4.1    Status.................................................................................................................56
    4.2    Power and Authority..........................................................................................56
    4.3    Enforceability....................................................................................................56
    4.4    No Violation; Consents and Approvals ...............................................................56
    4.5    Brokers.............................................................................................................56
    4.6    Litigation..........................................................................................................56
    4.7    Sufficient Funds; Adequate Assurances...............................................................56
    4.8    Acknowledgements; "As Is" "Where Is" Transaction.............................................57

ARTICLE V. PRE-CLOSING COVENANTS ...........................................................................57

    5.1    Conduct of Business..........................................................................................58
    5.2    Access to Information.........................................................................................59
    5.3    Pending Audits and Appeals Pre-Closing Access to Information.............................60
    5.4    Notification.......................................................................................................61
    5.5    Efforts to Close.................................................................................................61
    5.6    Bankruptcy Court Approval................................................................................62
    5.7    Bankruptcy Matters...........................................................................................62
    5.8    Desired 365 Contracts.......................................................................................63
    5.9    Employee Census...............................................................................................63

ARTICLE VI. RESTRICTIVE COVENANTS ..........................................................................63

    6.1    Non-Competition, Non-Solicitation and Confidentiality Covenants.......................63
    6.2    Confidentiality...................................................................................................64

ARTICLE VII. ADDITIONAL COVENANTS OF THE PARTIES .............................................65

    7.1    Public Announcements; Confidentiality...............................................................65
    7.2    Taxes................................................................................................................66
    7.3    Further Assurances.............................................................................................67
    7.4    Assumed Contracts............................................................................................67
    7.5    Cure Costs; Accrued Liabilities...........................................................................68
    7.6    Obligations with Respect to Employees...............................................................68
    7.7    Use of Names....................................................................................................70
    7.8    Certain Payments..............................................................................................70
    7.9    Insurance..........................................................................................................71
    7.10    Enrollment Termination; Preservation of Records; Treatment of Medical
            Records............................................................................................................71
    7.11    Post-Closing ACO Participation..........................................................................72
    7.12    Third Party Payor Deficits..................................................................................72
    7.13    Accounts Receivable; Payments Received. ...........................................................72
    7.14    Personally Identifiable Information......................................................................73

ii

ARTICLE VIII. INDEMNIFICATION ........................................................................73

| | | |
|---|---|---|
| 8.1 | Indemnification by Sellers | 73 |
| 8.2 | Indemnification by Buyer | 74 |
| 8.3 | Notice of Claim | 74 |
| 8.4 | Claims of Third Persons | 74 |
| 8.5 | Limitations on Indemnity | 76 |
| 8.6 | Set-Off Rights | 77 |
| 8.7 | Exclusive Remedy | 77 |

ARTICLE IX. CONDITIONS TO CLOSING ...............................................................78

| | | |
|---|---|---|
| 9.1 | Conditions to Obligation of Buyer | 78 |
| 9.2 | Conditions to Obligation of Seller | 79 |
| 9.3 | Frustration of Closing Conditions | 80 |
| 9.4 | Waiver of Conditions | 80 |

ARTICLE X. TERMINATION .....................................................................................80

| | | |
|---|---|---|
| 10.1 | Termination | 80 |
| 10.2 | Effect of Termination | 82 |

ARTICLE XI. MISCELLANEOUS PROVISIONS .......................................................82

| | | |
|---|---|---|
| 11.1 | Notices | 82 |
| 11.2 | Entire Agreement | 84 |
| 11.3 | Amendment and Modification | 84 |
| 11.4 | Assignment; Binding Agreement | 84 |
| 11.5 | Counterparts | 85 |
| 11.6 | Section Headings; Interpretation | 85 |
| 11.7 | Expenses | 85 |
| 11.8 | Disclosure Schedules | 85 |
| 11.9 | Remedies Cumulative | 86 |
| 11.10 | Governing Law; Submission to Jurisdiction and Venue; WAIVER OF JURY TRIAL | 86 |
| 11.11 | No Third Party Beneficiaries or Other Rights | 86 |
| 11.12 | Severability | 87 |
| 11.13 | No Waiver | 87 |
| 11.14 | Appointment of Sellers' Representative | 87 |
| 11.15 | No Requirement to Refer | 88 |
| 11.16 | Releases | 88 |

13208185-55
13208185-58

**EXHIBITS**

| | |
|---|---|
| **Exhibit A** | Tangible Asset List |
| **Exhibit B** | Form of Transition Services Agreement |
| **Exhibit C** | Forms of Intellectual Property Assignments |
| **Exhibit D** | Form of Physician Employment Agreement |

13208185-55
13208185-58

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of October 12, 2024, by and among MB Medical Operations, LLC, a Delaware limited liability company ("MBMO"), MB Medical Transport, LLC, a Delaware limited liability company ("MBMT"), Care Center Network, LLC, a Florida limited liability company ("CCN"), Clinical Care Pharmacy, LLC, a Florida limited liability company ("CCP"), Care Center Medical Group, LLC, a Florida limited liability company ("CCMG"), Florida Family Primary Care Center, LLC, a Florida limited liability company ("FFPCC"), Florida Family Primary Care Centers of Tampa, LLC, a Florida limited liability company ("FFPCCT"), Florida Family Primary Care Centers of Pasco, LLC, a Florida limited liability company ("FFPCCP"), Florida Family Primary Care Centers of Pinellas, LLC, a Florida limited liability company ("FFPCCPL"), Florida Family Primary Care Centers of Orlando, LLC, a Florida limited liability company ("FFPCCO"), CCMC Physician Holdings, Inc., a Florida limited liability company ("CCMC Holdings"), Miami Medical & Wellness Center LLC, a Florida limited liability company ("MMWC"), Miami Beach Medical Centers, Inc., a Florida corporation f/k/a Rodolfo Dumenigo, M.D., P.A., a Florida professional association ("RD"), Miami Beach Medical Consultants, LLC d/b/a Clinical Care Medical Centers, a Florida limited liability company ("MBMC" and collectively with MBMO, MBMT, CCN, CCP, CCMG, FFPCC, FFPCCT, FFPCCP, FFPCCPL, FFPCCO, CCMC Holdings, MMWC, and RD, the "Sellers", and each, a "Seller"), MB Medical Operations, LLC, a Delaware limited liability company, as the representative of the Sellers (the "Sellers' Representative"), and Conviva Medical Center Management, LLC, a Delaware limited liability company ("Buyer"). Sellers, Sellers' Representative, and Buyer are hereinafter collectively referred to as the "Parties" and each, individually, as a "Party." Capitalized terms not otherwise defined in this Agreement are defined in Article I.

## RECITALS

WHEREAS, the Sellers are engaged, in a clinic setting, in the performance of professional medical services, diagnostic, therapeutic and ancillary services, nursing and other clinical services, outpatient managed care and fee-for-service healthcare services, dental services, optometry services, chiropractic services, psychiatry services, podiatry services, pharmacy services, acupuncture services, neurology services, wellness (hair, nail, and food) services, transportation services, dermatology services, radiology services, massage therapy and PRP injection services, home services, pediatric services, and all other services incidental to the operation of a primary care medicine, family medicine, urgent care, specialty medicine, and/or internal medicine medical practice (the "Business");

WHEREAS, the Sellers intend to file a voluntary petition in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") not later than October 13, 2024;

WHEREAS, on and subject to the terms of this Agreement, Buyer desires to, among other things, acquire the Purchased Assets (as defined herein) and assume the Assumed Liabilities (as defined herein) from the Sellers, and the Sellers desire to, among other things, sell or assign to Buyer the Purchased Assets and the Assumed Liabilities, all pursuant to Section 363(f) of the Bankruptcy Code (as defined herein) and with the approval of the Bankruptcy Court;

1

WHEREAS, the Persons identified on Schedule 2.6(a)(ix), each of whom will receive substantial benefit from the consummation of the transactions contemplated by this Agreement, are expected to enter into Employment Agreements (as defined herein); and

NOW, THEREFORE, in consideration of the recitals and the mutual covenants, representations, warranties, conditions, and agreements hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

<div align="center">

**ARTICLE I.**
**DEFINITIONS**
</div>

The following words shall have the meaning given them in this Article I.

"365 Contracts" means the executory Contracts and Real Property Leases, appearing on the Bankruptcy schedules, to which one or more Sellers is a party, in each case, within the meaning of Section 365 of the Bankruptcy Code pertaining to the Purchased Assets or Assumed Liabilities.

"ACO" means an accountable care organization participating in any accountable care organization program developed by CMMI, including any accountable care organization under the MSSP, any accountable care organization participating in ACO Reach, or any Next Gen ACO.

"ACO Reach" means the CMMI developed accountable care organization innovation model Realizing Equity, Access, and Community Health, renamed from the former CMMI accountable care organization Global and Professional Direct Contracting Model.

"Advance Receivables" has the meaning set forth in Section 7.13(a).

"Affiliate" means with respect to any Person, any other Person which is controlling, controlled by, or under common control with, directly or indirectly through any Person, the Person referred to, and, if the Person referred to is a natural person, such Person's spouse and children (including those by adoption). The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise; provided that the term "Affiliate" shall not, for the avoidance of doubt, include KKR & Co. Inc., or Sun Capital Partners, Inc. or their respective affiliates (other than MBMO and its subsidiaries), or any of their respective affiliates' predecessors, successors, assigns, subsidiaries, managed accounts or funds, including the managed accounts or funds of subsidiaries, current or former officers, directors, managers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors or other professionals.

"Agreement" means this Agreement as executed on the date hereof and as amended or supplemented in accordance with the terms hereof, including all Schedules and Exhibits hereto.

<div align="center">2</div>

"<u>AI</u>" means any artificial or augmented intelligence, machine learning, deep learning, or self-improving, platform, engine, or system; predictive analytics; or any other software, algorithm, hardware, or other tool that makes decisions based on rules or statistics learned from example data.

"<u>Ancillary Agreements</u>" means each of the Transition Services Agreement and each of the other agreements and certificates to be delivered hereunder or thereunder by any Party or other party thereto. For the avoidance of doubt, the Employment Agreements are not Ancillary Agreements.

"<u>Assumed Contracts</u>" has the meaning set forth in <u>Section 2.1(a)(vi)</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.2(a)</u>.

"<u>Assumption Notice</u>" has the meaning set forth in <u>Section 2.3(d)</u>.

"<u>Avoidance Actions</u>" means all claims and causes of action arising under Sections 542 through 553 of the Bankruptcy Code or any analogous state law.

"<u>Bankruptcy and Equity Exceptions</u>" means applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting or relating to creditors' rights generally and general equitable principles.

"<u>Bankruptcy Cases</u>" means the chapter 11 proceedings to be filed by Sellers in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Schedules</u>" mean the Schedules of Assets and Liabilities, as may be amended from time to time, filed by the Sellers with the Bankruptcy Court.

"<u>Business</u>" has the meaning set forth in the Recitals.

"<u>Business Day</u>" means any day which is not a Saturday, Sunday or federal legal holiday in the United States of America.

"<u>Buyer</u>" has the meaning set forth in the preamble.

"<u>Buyer Closing Certificate</u>" has the meaning set forth in <u>Section 9.2(c)</u>.

"<u>Buyer Closing Notice</u>" has the meaning set forth in <u>Section 10.1(c)(iii)</u>.

"<u>Buyer Indemnified Persons</u>" has the meaning set forth in <u>Section 8.1</u>.

"<u>Buyer Releasing Parties</u>" has the meaning set forth in <u>Section 11.16</u>.

"Buyer's Desired 365 Contract Initial Period Reimbursement Obligations" has the meaning set forth in Section 2.3(b)(iii).

"Buyer's Desired 365 Contract Final Period Reimbursement Obligations" has the meaning set forth in Section 2.3(b)(i).

"Buyer's Prorated Responsibilities" has the meaning set forth in Section 7.8(b).

"Cap" has the meaning set forth in Section 8.5(c).

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act of 2020, as signed into law by the President of the United States on March 27, 2020, together with all rules and regulations and guidance issued by any Governmental Authority with respect thereto and all amendments thereto.

"CCMC Holdings" has the meaning set forth in the preamble.

"CCMG" has the meaning set forth in the preamble.

"CHOPD Incident" means the Change Healthcare / Optum cyber incident, which began on February 21, 2024, and resulted in delays in the submission or processing of Medicare claims payments by certain providers and suppliers.

"CHOPD AAPs" means any accelerated or advance payments related to the CHOPD Incident issued by CMS, including any applications, certifications or acknowledgments related thereto, received or made by any Seller.

"CHOPD Relief Program" means the CHOPD AAPs made available by CMS on March 9, 2024, to certain eligible Part A providers and Part B suppliers experiencing claims disruptions as a result of the CHOPD Incident, including any current or future guidance and rules published by CMS or any other Governmental Authority administering the same.

"Claim Notice" has the meaning set forth in Section 8.3.

"Closing" has the meaning set forth in Section 2.5.

"Closing Date" has the meaning set forth in Section 2.5.

"Closing Payment" has the meaning set forth in Section 2.4(b).

"CMMI" means the Center for Medicare & Medicaid Innovation at CMS.

"CMS" means the Centers for Medicare and Medicaid Services, or any successor Governmental Authority exercising similar authority.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

4

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Confidential Information" has the meaning set forth in Section 6.2(a).

"Contingent Workers" has the meaning set forth in Section 3.11(a).

"Contract" means any contract, agreement, understanding, lease, sublease or sub-sublease of any tier, license, indenture, mortgage, deed of trust, Lien, franchise, evidence of Indebtedness, binding commitment, instrument, open purchase order or offer, written or oral, express or implied.

"Compensation Payments" has the meaning set forth in Section 7.6(a).

"Coverage Period" has the meaning set forth in Section 7.9.

"COVID-19" means the novel coronavirus disease, COVID-19 virus (SARS-COV-2) (or any mutation or variation thereof or related health condition, or any related or associated epidemics, pandemics or disease outbreaks).

"COVID-19 Funds" means any loan, exclusion, forgiveness, advance, grant, subsidy, or other payment or application for assistance or stimulus, received or made by any Seller under or pursuant to any COVID-19 Relief Program, including any PPP Loan, Economic Stabilization Fund loan, or other U.S. Small Business Administration loan, as well as any funds received in connection with any Accelerated Payment Program or Advance Payment Program administered by CMS or from the Public Health and Social Services Emergency Fund established under the CARES Act.

"COVID-19 Relief Program" means any program authorized or promulgated by a Governmental Authority in response to or in connection with COVID-19, including the CARES Act and subsequent or related legislation or amendments, any current or future regulations or official interpretations thereof, and any current or future guidance and rules published by the U.S. Small Business Administration or any other Governmental Authority administering the same.

"Cure Costs" means all monetary Liabilities, including pre-petition monetary Liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary and other defaults under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code at the time of a Seller's assumption thereof and assignment of the Assumed Contracts to Buyer as determined by the Bankruptcy Court or as agreed upon between Buyer and the non-Seller counter-party to any such Assumed Contract as provided hereunder.

"Defense Notice" has the meaning set forth in Section 8.4(a).

"Deficit Settlement Amount" has the meaning set forth in Section 7.12.

"Deposit" has the meaning set forth in Section 2.4(c).

"Deposit Agreement" has the meaning set forth in Section 2.4(c).

"Designation Notices" has the meaning set forth in Section 2.3(b)(iii).

"Desired 365 Contract" has the meaning set forth in Section 2.3(a).

"Determination Dates" has the meaning set forth in Section 2.3(b)(iii).

"Devices" means cellphones, tablets, iPads, laptop computers, desktop computers, printers, fax machines, copy machines, and any other electronic device that may process or store "protected health information" (as defined in 45 C.F.R. § 160.103) possessed by the Sellers in connection with the Business or that have otherwise been used at any time and in any manner in connection with the Business by the Sellers' personnel.

"DIP Facility" has the meaning set forth in Section 5.7(c).

"Direct Compensation" shall mean annualized gross cash compensation paid by Sellers to or on behalf of an employee, excluding the value of fringe benefits and Plan premiums but including cash bonuses and Plan contributions.

"Disclosing Party" has the meaning set forth in Section 5.4.

"Disclosure Schedules" means the disclosure schedules delivered by the Sellers to Buyer on the date hereof regarding certain exceptions to the representations and warranties in Article III hereof.

"Employee Withholding Documents" has the meaning set forth in Section 7.6(c).

"Employment Agreements" has the meaning set forth in Section 2.6(a)(ix).

"Environmental Law" means all Laws relating to the use, refinement, handling, management, presence, treatment, removal, storage, production, manufacture, transportation or disposal, emissions, discharges, releases, or threatened releases of Hazardous Substances, or otherwise relating to pollution or protection of human health (including occupational health and safety) or the environment (including ambient air, surface water, ground water, land surface, or subsurface strata).

"Equity Interests" means (a) any partnership interests, (b) any membership or limited liability company interests or units, (c) any shares of capital stock, (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, the issuing entity, (e) any subscriptions, calls, warrants, options, or commitments of any kind or character relating to, or entitling any Person or entity to purchase or otherwise acquire membership or limited liability company interests or units, capital stock, or any other equity securities, (f) any securities convertible into or exercisable or exchangeable for partnership interests, membership or limited liability company interests or units, capital stock, or any other equity securities and (g) any other interest classified as an equity security of a Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that would have ever been considered a single employer with any Seller under Section 414 of the Code or Section 4001(b) of ERISA or part of the same "controlled group" as such Seller for purposes of Section 302(d)(3) of ERISA.

6

"Escrow Agent" means JP Morgan Chase Bank, N.A.

"Excluded Assets" has the meaning set forth in Section 2.1(b).

"Excluded Contracts" has the meaning set forth in Section 2.1(b)(x).

"Excluded Devices" has the meaning set forth in Section 2.1(b)(xxiii).

"Excluded Liabilities" has the meaning set forth in Section 2.2(b).

"Express Representations" has the meaning set forth in Section 4.8(b).

"Extended Contract Period" has the meaning set forth in Section 2.3(b)(iii).

"Extended Final Determination Date" means the date ninety (90) days after the Closing Date.

"Extended Outside Date" has the meaning set forth in Section 10.1(b)(i).

"Extension Budget" has the meaning set forth in Section 2.3(b)(i).

"Extension Notice" has the meaning provided in Section 2.3(b)(i)

"Extension Option" has the meaning provided in Section 2.3(b)(i).

"Extension Period" has the meaning set forth in Section 2.3(b)(i).

"FFPCC" has the meaning set forth in the preamble.

"FFPCCO" has the meaning set forth in the preamble.

"FFPCCP" has the meaning set forth in the preamble.

"FFPCCPL" has the meaning set forth in the preamble.

"Final Determination Date" means the date sixty (60) days after the Closing Date.

"Financial Statements" has the meaning set forth in Section 3.4(a).

"Fraud" means actual and intentional common law fraud as defined under the Law of the State of Delaware (which, for the avoidance of doubt, does not include constructive fraud or other claims based on constructive knowledge, negligent misrepresentation, recklessness or similar theories) with respect to the representations and warranties set forth in this Agreement.

"Funds Flow" has the meaning set forth in Section 2.7(a).

"GAAP" means United States generally accepted accounting principles, applied in a consistent manner.

7

"Governmental Consents" has the meaning set forth in Section 2.6(a)(ii).

"Government Program" is any Medicare, Medicaid or TRICARE program, any other federal or state health program (as defined in 42 U.S.C. § 1320a-7b(f)) or other similar federal, state or local reimbursement or governmental program for which the federal, state or local government pays, in whole or in part, directly or indirectly, for the provision of healthcare services or goods.

"Governmental Authority" means any foreign, federal, state, provincial or local governmental or regulatory commission, board, bureau, agency, court or regulatory or administrative body or other similar body exercising governmental power or authority, or the agent of any Governmental Authority including those entities who contract with a Governmental Authority to administer federal health care programs such as Medicare, Medicaid and Tricare.

"Hazardous Substances" means any pollutants, contaminants, hazardous substances, hazardous wastes, hazardous materials, toxic substances, radioactive substances or materials, or any terms of similar import or effect under any Environmental Law, or substances or materials for which standards of care are imposed by any Environmental Law, including medical or infectious wastes, lead-based paint or asbestos containing materials or substances, urea formaldehyde, or petroleum or petroleum-based or petroleum-derived substances.

"Health Care Fraud Laws" means the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b), the Stark Law (42 U.S.C. § 1395nn), the Federal False Claims Act (31 U.S.C. §§ 3729, et seq.), the Federal Civil Monetary Penalties Law (42 U.S.C. § 1320a-7a), the Federal Program Fraud Civil Remedies Act (31 U.S.C. § 3801 et seq.), the Federal Health Care Fraud Law (18 U.S.C. § 1347), the Beneficiary Inducement Statute, 42 U.S.C. § 1320a-7a(a)(5), the Civil False Claims Act, as amended, 31 U.S.C. §§ 3729 et seq.; the Criminal False Claims Act, 18 U.S.C. § 287; the False Statements Relating to Health Care Matters Act, 18 U.S.C. § 1035; the Health Care Fraud Act, 18 U.S.C. § 1347, the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58; the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a and 1320a-7b;  and any similar state fraud and abuse, self-referral, false claims or false statement Laws, and each of their respective implementing regulations.

"Health Care Laws" means all Laws that govern, regulate, restrict or relate to the practice of medicine, osteopathy, nursing, laboratory services, dental services, optometric services, institutional and professional licensure, permitting, prescribing, dispensing or administration of devices, medicines or controlled substances, medical waste, medical documentation, medical record retention, accountable care organizations, risk-bearing entities, including managed care organizations, management services organizations, independent practice associations, and provider network organizations, telehealth, clinical trials, unprofessional conduct, fee-splitting, referrals, billing, coding and submission of claims, managed care or value-based care, payment or reimbursement for healthcare items or services, healthcare information, fraudulent, abusive or unlawful practices connected in any way with the provision of healthcare items or services or the billing for or claims for reimbursement for such items or services, claims processing, "incident-to" billing, quality of care, standards of care, safety, mandated reporting, advertising and marketing, medical necessity, medical privacy and security, patient confidentiality, confidentiality of health records or Personal Information, informed consent, hiring of employees or acquisition of

8

services or supplies from Persons or entities excluded from participation in any Government Program, or other healthcare related matters, including HIPAA and state Privacy Laws, the Health Care Fraud Laws, the Information Blocking Rules, 45 C.F.R. Part 171, Laws governing Third Party Payors, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh (the Medicare statute); Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (the Medicaid statute); Title XXI of the Social Security Act; Patient Protection and Affordable Care Act, Public Law 111-148 and 111-152; the Exclusion Laws, 42 U.S.C. § 1320a-7; Laws governing the use, dispensing, and disposal of controlled substances and other pharmaceuticals, including the Federal Controlled Substances Act, 21 U.S.C. § 801 et seq.; the Physician Payment Sunshine Act, 42 U.S.C. § 1320a-7h; the Clinical Laboratory Improvements Amendments; the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq. and the regulations promulgated thereunder; Medical Waste Tracking Act of 1988; state Laws concerning matters similar to those above; state laws regarding the corporate practice of a licensed profession and interpretations, 42 U.S.C. § 6992, et seq., all applicable regulations promulgated thereunder, rules, ordinances, and orders, and any similar state and local statutes, regulations, rules, ordinances, orders or other Laws that address the subject matter of the foregoing; provided that Health Care Laws shall not include Environmental Laws.

"Healthcare Providers" means those persons required to be licensed, registered or certified under the Law to render, and who are providing, professional services on behalf of any of the Sellers in connection with the Business, whether employed or contracted.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 and their implementing regulations at 45 C.F.R. Parts 160 through 164.

"Holdback Amount" has the meaning set forth in Section 2.4(d).

"Indebtedness" means, without duplication: (a) all indebtedness for borrowed money, including, without limitation, all amounts, if any, payable under or pursuant to each of the instruments listed on Schedule 1.1; (b) any obligation evidenced by a note, bond (excluding any surety bonds), debenture, mortgage, indenture, deed of trust or similar instrument; (c) that portion of obligations with respect to capital leases that is properly classified as a Liability on a balance sheet in conformity with GAAP; (d) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money (for the avoidance of doubt, excluding any trade accounts payable to any Person); (e) guaranties securing indebtedness for borrowed money; (f) all amounts under outstanding letters of credit (to the extent drawn); (g) any amounts owed or payable to any Seller, any Affiliate of any Seller or Shareholder (including Sun Capital Partners, Inc. and its affiliates); (h) all obligations issued or assumed as the deferred purchase price of property or services, all conditional sale obligations and all obligations under any title retention agreement, including all obligations resulting from any holdback, earn-out, performance bonus or other contingent payment arrangement related to or arising out of any prior acquisition, business combination or similar transaction, together with the employer's share of employment Taxes with respect thereto including such amounts as are set forth on Schedule 1.1; (i) any unpaid dividends (whether or not declared) to which any equityholder is entitled; (j) any obligation in the nature of a guarantee, indemnity, or grant of a Lien with respect to any of the foregoing; (k) any loan or advance under, guaranteed, amended, or made available in connection with any COVID-19 Relief Program, including the total outstanding amount of any accelerated or

9

advance payments under any Accelerated Payment Program or Advance Payment Program administered by CMS or from the Public Health and Social Services Emergency Fund established under the CARES Act; (l) any amounts owed as a deficit or similar obligation to any Third Party Payor; (m) any amounts owed as a deficit or similar obligation to any Affiliate of Buyer; (n) all amounts payable with respect to any accrued and unpaid sick, vacation and personal leave in respect of any employees of Sellers as of the Closing, and (o) all interest, any premiums payable or any other costs or charges (including any prepayment penalties, termination fees, breakage costs, make-whole and expense reimbursements) on any instruments or obligations described in clauses (a) through (n) hereof, all as the same may be payable upon the complete and final payoff thereof, regardless of whether such payoff occurs prior to, simultaneous with or following the Closing.

"Indemnified Losses" has the meaning set forth in Section 8.1.

"Indemnified Party" has the meaning set forth in Section 8.3.

"Indemnifying Party" has the meaning set forth in Section 8.3.

"Information Requirements" has the meaning set forth in Section 3.18(a).

"Initial Designation Notices" has the meaning set forth in Section 2.3(b)(iii).

"Initial Determination Date" has the meaning set forth in Section 2.3(b)(iii).

"Insurance Policies" has the meaning set forth in Section 3.14.

"Intellectual Property" means any and all of the following in any jurisdiction throughout the world: (a) Names (as defined herein), trademarks, service marks, domain names, social media account usernames, collective marks, certification marks, trade dress, trade names, logos, slogans and corporate names, including all registrations and applications for registration thereof, and the goodwill connected with the use of and symbolized by the foregoing (collectively, "Trademarks"); (b) copyrights, copyright-protectable works and copyright-protected works, including all registrations and applications for registration thereof, and works of authorship, whether or not copyrightable, and moral rights (collectively. "Copyrights"), including all such rights relating to Software, code, websites, source code, object code, data, data bases and documentation thereof; (c) trade secrets, confidential know-how and other confidential information (including ideas, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), data, databases, processes and techniques, drawings, specifications, designs, plans, proposals, financial and marketing plans and customer and supplier lists and information) (collectively, "Trade Secrets"); (d) patents, patent applications, patent disclosures and inventions, including any continuations, divisionals, continuations-in-part, renewals and reissues for any of the foregoing (collectively, "Patents"); (e) all other intellectual property rights similar to the foregoing; and (f) all copies of, drafts of, derivative works therefrom, and tangible embodiments thereof (all in whatever form or medium).

"Financial Statements" has the meaning set forth in Section 3.4(a).

"IRS" means the United States Internal Revenue Service.

"IT Assets" has the meaning set forth in Section 3.17(g).

"Key Personnel" means any officer of any Seller or any employee or Contingent Worker of any Seller whose Direct Compensation for services to the Sellers and the Business taken as a whole exceeds $125,000.

"Labor Laws" means, collectively, to the extent applicable to any Seller, any federal, national, state, local, and foreign Laws governing labor and/or employment and employment-related matters, including all such Laws relating to wages, employee classification, other compensation and benefits (including any applicable federal, state or local laws concerning COVID-19 related paid sick leave or other benefits), family and medical leave and other leaves of absence, the provision of meal and rest periods/breaks, hours, vacation, severance, restrictive covenants, background checks and screening, immigration, the WARN Act, collective bargaining, discrimination, harassment, retaliation, civil rights, safety and health (including the federal Occupational Safety and Health Act and any applicable state or local laws concerning COVID-19-related health and safety issues), and workers' compensation.

"Law" or "Laws" means any international, federal, state, local, municipal or foreign, Order, constitution, law, ordinance, rule, regulation, statute, or treaty, including, Health Care Laws, Labor Laws and/or Privacy Laws

"Leased Real Property" has the meaning set forth in Section 3.8(c).

"Liability" or "Liabilities" means any liability, debt, obligation, deficiency, penalty, assessment, fine, claim, cause of action or other loss, fee, cost or expense of any kind or nature whatsoever, whether asserted or unasserted, absolute or contingent, known or unknown, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due and regardless of when asserted, including service fund liabilities, deficits, and any reversals, challenges, nullifications or other negations of any payments or items (including medical risk adjustment, HEDIS bonus, surpluses or similar payments or items) that were or are made to the Sellers in respect of the Business, the Purchased Assets or otherwise for any periods prior to the Closing.

"Lien" means any lien, charge, mortgage, deed of trust, pledge, security interest, negative pledge, easement, encroachment, bailment (in the nature of a pledge or for purposes of security), claim, option, right of first refusal or first offer, right of way, license, deed of restriction, lease, restriction on transfer of any asset or other encumbrance of any kind or nature whatsoever in or on any asset, property or property interest.

"Losses" has the meaning set forth in Section 8.1.

"Made Available" means, with respect to any document or material, a copy of such document or material has been posted in the online data room labeled "Condor" located on Datasite as of October 11, 2024.

11

"Material Adverse Effect" means any change, effect, development or event that (i) has or would reasonably be expected to have a material adverse effect on the Business, assets, Liabilities, employee relationships, earnings or results of operations, or condition (financial or otherwise) of the Business or (ii) prevents or impedes Sellers from effecting the transactions contemplated hereby; provided, however, that no change, effect, development or event caused by or resulting from any of the following, either alone or in combination, shall constitute or be taken into account in determining whether there has been or will be a Material Adverse Effect: (a) any change, effect, development or event affecting the economy of the United States generally, including changes in the credit, debt, capital or financial markets (including changes in interest or exchange rates) or the economy of any region or country in which any of the Sellers conducts the Business; (b) any change, effect, development or event affecting the industries in which the any of the Sellers conducts the Business; (c) any change, effect, development or event arising in connection with acts of God, disasters, emergencies, calamities, epidemics, pandemics, disease outbreaks or similar events, or global, national or regional political or social actions or conditions, including hostilities, military actions, political instability, acts of terrorism or war or any escalation or material worsening of any such hostilities, military actions, political instability, acts of terrorism or war; (d) any failure of the Sellers to meet any internal or published projections, forecasts or revenue or earnings predictions for any period (it being understood that the facts or occurrences giving rise to such failure may be taken into account in determining whether there has been or will be, a Material Adverse Effect); (e) any action expressly required to be taken by any of the Sellers under the terms of this Agreement; (f) any change, effect, development or event that results from any action taken at the express written request of Buyer or with Buyer's written consent; (g) any change in Law or GAAP or interpretation thereof, unless, in the cases of clauses (a), (b), (c) or (g) above, such changes have or would reasonably be expected to have a disproportionate impact on the Sellers with respect to the Business relative to other Persons who operate in the same industries (in which case, only the incremental disproportionate impact shall be taken into account in determining whether there has been a Material Adverse Effect).

"Material Consents" has the meaning set forth in Section 2.6(a)(iii).

"Material Third Party Payor" has the meaning set forth in Section 3.20.

"Member Transfer" has the meaning set forth in Section 7.12.

"Members" has the meaning set forth in Section 3.10(j).

"MSSP" means the CMMI Medicare Shared Savings Program accountable care organization.

"Names" means all of any Seller's right, title, and interest in and to the names set forth in Schedule 1.2 and any derivative or variation thereof.

"Next Gen ACO" means the CMMI model Next Generation ACO.

"OIG" has the meaning set forth in Section 3.10(f).

"Order" means any order, judgment, injunction, decree, ruling, decision, binding determination, verdict, sentence, subpoena, writ, or award issued, made, entered, rendered, or otherwise put into effect by or under the authority of any Governmental Authority or arbitrator (whether public or private).

"Ordinary Course of Business" means, with respect to the Business, the ordinary course of commercial operations customarily engaged in by the Sellers consistent with the past customs and practices of the Sellers or as may be considered ordinary course in light of the Bankruptcy Cases and specifically does not include (unless any such matter is as a result of the Bankruptcy Cases in ordinary course) (a) any activity (i) involving the purchase or sale of the material assets of Sellers, the Business, any of their material assets or of any business unit thereof, (ii) involving assumption, adoption, or material modification of any Plan other than the adoption of any amendments required by applicable Law, or (iii) that requires approval by the directors or managers, or stockholders or members, of Sellers, or (b) the incurrence of any Liability for any tort or any breach or violation of or default under any Contract or Law.

"Organizational Documents" means (a) with respect to a corporation, the certificate or articles of incorporation and bylaws; (b) with respect to any other entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of such entity and any operating agreement, partnership agreement or similar governing agreement; and (c) any amendment to any of the foregoing.

"Outside Date" has the meaning set forth in Section 10.1(b)(i).

"Party" or "Parties" has the meaning set forth in the preamble.

"Patient Records" means all records including "health information" as defined under 45 C.F.R. §160.103 (such as medical records, patient billing records, and other patient-related documentation maintained by Seller).

"Permits" means all licenses, certificates, accreditations, clearances, permits, franchises, approvals, authorizations, registrations, certificates of need, consents or Orders of, or filings with, or notifications to, any Governmental Authority.

"Permitted Lien" means (a) Liens for Taxes or other governmental charges (i) not yet due and payable or (ii) the amount or validity of which is being contested in good faith by appropriate proceedings by the Sellers and, in each case, for which appropriate reserves have been established in accordance with GAAP; (b) mechanics', carriers', workers', repairers' and similar statutory Liens arising or incurred in the Ordinary Course of Business, which are not delinquent and which would not and do not, individually or in the aggregate, materially impair the marketability, value or use and enjoyment of the asset subject to such Lien; (c) zoning, entitlement, building and other land use regulations imposed by any Governmental Authority having jurisdiction over Leased Real Property which are not violated by the current use and operation of the Leased Real Property, and which do not have or would not reasonably be expected to have a Material Adverse Effect; (d) covenants, conditions, restrictions, easements and other similar matters of record affecting title to the Leased Real Property which do not materially impair or interfere with the occupancy or use of the Leased Real Property for the purposes for which it is currently used or proposed to be used in

13

connection with the Business, and which do not have or would not reasonably be expected to have a Material Adverse Effect; and (e) Liens arising under worker's compensation, unemployment insurance, social security, retirement and similar legislation in the Ordinary Course of Business.

"Person" means any individual, partnership, limited partnership, limited liability company, corporation, trust, business trust, joint venture, employee stock ownership trust, real estate investment trust, estate, association, or other legal entity, including any Governmental Authority.

"Personal Information" means any data or information defined as personal information, personal data, personally identifiable information, individually identifiable health information, protected health information, sensitive information, or under other similar or analogous terms under any Information Requirements or any Health Care Laws, Privacy Laws or any other applicable Laws including but not limited to Section 101(41A) of the Bankruptcy Code (11 U.S.C. §101(41A)).

"Plan" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA and each other employee benefit, welfare, supplemental unemployment benefit, bonus, pension, profit sharing, executive compensation, deferred compensation, incentive compensation, stock or equity compensation, stock or equity purchase, stock or equity option, stock or equity appreciation, phantom stock or equity option, employment, consulting, severance, retention, Code Section 125 cafeteria, fringe, health or other medical, dental, life, disability or other insurance plan, program, agreement or arrangement, in each case whether or not reduced to writing and whether funded or unfunded, whether or not tax-qualified and whether or not subject to ERISA, which is or has been sponsored, maintained or contributed to or required to be contributed to by each Seller for the benefit of its employees or former employees, officers, directors, managers, independent contractor, or consultants and their dependents or beneficiaries or under which any Seller or any of its ERISA Affiliates has or may have any Liability, contingent or otherwise.

"Policies" has the meaning set forth in Section 7.9.

"Post-Closing Period" means any taxable period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"Pre-Closing Period" means any taxable period ending on or before the Closing Date.

"Pre-Closing Receivables" has the meaning set forth in Section 7.13(a).

"Pre-Closing Restructuring" has the meaning set forth in Section 3.1(b).

"Previously Omitted Contract" has the meaning set forth in Section 2.3(j)(i).

"Previously Omitted Contract Notice" has the meaning set forth in Section 2.3(j)(ii).

"Privacy Laws" means, to the extent applicable, any Laws governing, regulating or protecting the privacy, security, use, disclosure, maintenance, transmission, Processing, or breach of Personal Information, including: (a) HIPAA, (b) the Information Blocking Rules at 45 CFR Part 171, (c) state data breach notification laws, state health information privacy laws, state laws

governing the use of electronic communications, (*e.g.*, email, text messaging, telephone, paging and faxing), state laws governing the use of information collected online, state laws requiring privacy disclosures to consumers, state laws vesting individuals with rights in or regarding data about such individuals and the use of such data, and state laws regarding the privacy, safeguarding or security of data, including encryption, (d) the Federal Trade Commission Act, (e) the Controlling the Assault of Non-Solicited Pornography and Marketing Act (CAN SPAM Act), (f) the Telephone Consumer Protection Act (TCPA), (g) the Telecommunications Act of 1996, as amended, (h) the Children's Online Privacy Protection Act (COPPA), (i) the General Data Protection Regulation (EU) 2016/679, (j) the Personal Information Protection and Electronic Documents Act (PIPEDA), (k) Canada's Anti-Spam Legislation (CASL), (l) the California Consumer Privacy Act of 2018, as amended by the California Privacy Rights Act (CCPA), (m) the Florida Digital Bill of Rights; and (n) the Payment Card Industry Data Security Standards (PCI DSS).

"Proceeding" means any claim, action, suit, charge, complaint, litigation, arbitration or mediation, appeal, hearing, inquiry, investigation, audit, proceeding (including any civil, criminal administrative or appellate proceeding) prosecution or hearing.

"Process" means collect, process, use, analyze, disclose, distribute, make available, transfer, transmit, store, retain, host, manage, control, secure, dispose of, or otherwise handle. "Processing" and "Processed" shall have analogous meanings.

"Property Tax" or "Property Taxes" means all real estate, ad valorem, personal property and any other similar Taxes imposed by any Tax Authority with respect to the Purchased Assets.

"Prorated Expenses" has the meaning set forth in Section 7.8(b).

"Purchase Price Allocation" has the meaning set forth in Section 2.9.

"Purchased Assets" has the meaning set forth in Section 2.1(a).

"Real Property Leases" has the meaning set forth in Section 3.8(c).

"Release Party" has the meaning set forth in Section 11.16.

"Related Party" has the meaning set forth in Section 3.15.

"Restricted Period" has the meaning set forth in Section 6.1(b).

"Sale Motion" has the meaning set forth in Section 5.7.

"Sale Order" means an Order entered by the Bankruptcy Court which contains usual and customary findings of fact and conclusions of law by the Bankruptcy Court, is in form and substance acceptable to Buyer and Sellers, and that, among other things: (a) approves, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement and the Transition Services Agreement, (ii) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Liens and interests (other than the Assumed Liabilities and Permitted Liens), and (iii) the performance by Sellers of their

15

obligations under this Agreement, (b) authorizes and empowers Sellers to assume and assign to Buyer the Desired 365 Contracts, and determine all related Cure Cost, if any, (c) finds that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grant Buyer the protections of Section 363(m) of the Bankruptcy Code, (d) finds that Buyer is not a successor of each Seller, (e) enjoins all Persons holding Liens, claims, and other interests, including rights or claims based on any successor or transferee liability from asserting them against Buyer, (f) finds that this Agreement was negotiated, proposed and entered into without collusion, in good faith and from arm's length bargaining positions, (g) finds that Sellers and Buyer have not engaged in any conduct that would cause or permit this Agreement to be avoided under Section 363(n) of the Bankruptcy Code, (h) finds that this Agreement and the transactions contemplated hereby, are binding upon, and are not subject to rejection or avoidance by, any chapter 7 or chapter 11 trustee of any Seller, (i) finds that fair and reasonably equivalent value was received in connection with this Agreement, (j) authorizes each of Buyer and each Seller to execute and file termination statements, instruments of satisfaction, releases and similar documents with respect to all Liens that any Person has with respect to the assets transferred pursuant to this Agreement, (k) orders that Buyer is receiving good and marketable title to all Purchased Assets and (l) finds that notice was properly given to all holders of any Lien or interest, and to all counterparties to Desired 365 Contracts.

"Schedules" means all of the schedules attached hereto, dated as of the date of this Agreement, delivered in connection with this Agreement, including the Disclosure Schedules.

"Security Incident" has the meaning set forth in Section 3.18(c).

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Closing Certificate" has the meaning set forth in Section 9.1(d).

"Seller Closing Notice" has the meaning set forth in Section 10.1(d)(ii).

"Seller Indemnified Persons" has the meaning set forth in Section 8.2.

"Seller Information" means all data and information, including all Personal Information, used or processed in the conduct of the Business or by or on behalf of the Sellers.

"Seller Intellectual Property" has the meaning set forth in Section 3.17(c).

"Seller Software" means all Software that is owned by, licensed to, or otherwise used by Sellers in any manner in connection with the Business.

"Sellers' Knowledge" or "Knowledge of the Sellers" means the actual knowledge of Paul McBride, Claudio Kapusta, or Doug Johnson after reasonable due inquiry of their respective direct reports, or, if such reasonable due inquiry has not been made, such knowledge that each such Person would be expected to have after such reasonable due inquiry. The words "know," "knowing" and "known" shall be construed accordingly.

"Sellers' Prorated Responsibilities" has the meaning set forth in Section 7.8(b).

16

"Sellers' Representative" has the meaning set forth in the preamble.

"Shareholder" means any former or current equityholder of a Seller.

"Software" means all computer software, firmware, programs, data libraries and databases, in any form, including source code, object code, apps, extensions including make files, Gerber files, user interfaces, development tools, library functions, compilers, Internet websites, web content and links, all versions, updates, corrections, enhancements, replacements, and modifications thereof, and all documentation related thereto.

"Special Committee" means the special committee of the Board of Managers of Sun MBMG GP, LLC, of which Elizabeth Abrams is presently the sole member.

"Standard Procedure" has the meaning set forth in Section 7.6(c).

"Straddle Period" means any Tax year or period beginning on or before the Closing Date and ending after the Closing Date.

"Subsequent Designation Notices" has the meaning set forth in Section 2.3(b)(iii).

"Subsequent Determination Date" has the meaning set forth in Section 2.3(b)(iii).

"Subsidiary" or "Subsidiaries" of any Person means any corporation, partnership, limited liability company or other legal entity in which such Person (either alone or through or together with any other Subsidiary), owns, directly or indirectly, any portion of the Equity Interests.

"Superior Proposal" means any bona fide proposal or offer to or from a Person other than Buyer or its representatives with respect to (a) any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring involving the Purchased Assets, or (b) any other direct or indirect acquisition involving any of the Purchased Assets, that, in each case, Sellers determine in their business judgment would, if consummated, result in a transaction superior to the transactions contemplated hereunder.

"Tax Authority" means any Governmental Authority responsible for the administration, collection or imposition of any Tax.

"Tax Returns" means all returns, reports, estimates, claims for refund, information statements, elections, statements of foreign bank and financial accounts, and other returns relating to or filed in connection with any Taxes, including any schedule or attachment thereto, and including any amendment thereof. Any one of the foregoing Tax Returns shall be referred to sometimes as a "Tax Return."

"Taxes" means all taxes, charges, fees, levies, or other like assessments, including all federal, possession, province, state, city, county, and foreign (or governmental unit, agency, or political subdivision of any of the foregoing) corporate, income, license, withholding, profits, employment (including Social Security, unemployment insurance, employment insurance, employer health and employee income tax withholding), franchise, gross receipts, sales,

<center>17</center>

harmonized sales, goods and services, use, transfer, stamp, environmental, alternative minimum, occupation, real or personal property, escheat, abandoned or unclaimed property, net worth, capital gains, severance, premium, windfall profits, customs, duties, ad valorem, value added, and excise taxes, any Pension Benefit Guaranty Corporation premiums, government pension plan premiums and contributions, or compensation premiums and contributions, and any other governmental charges of the same or similar nature to any of the foregoing; including any interest, penalty, or addition to any of the foregoing, whether disputed or not, and including any obligations to indemnify or otherwise assume or succeed to the Tax Liability of any other Person whether by Contract or otherwise.  Any one of the foregoing Taxes shall be referred to sometimes as a "Tax."

"Third Party Payor" means a Government Program, non-governmental insurance program, managed care organization, preferred provider organization, health maintenance organization, or other third-party payor, including any other organization contracting with commercial payors on behalf of any Seller, that arranges and/ or pays for the provision of healthcare items or services.

"Third Person" has the meaning set forth in Section 8.4(a).

"Third Person Claim" has the meaning set forth in Section 8.4.

"Total Consideration" has the meaning set forth in Section 2.4(a).

"Transfer Date" means the date upon which a Transferred Employee becomes an employee of Buyer or an Affiliate of Buyer, pursuant to an Employment Agreement or pursuant to the terms of the Transition Services Agreement.

"Transfer Taxes" has the meaning set forth in Section 7.2(a).

"Transferred Devices" has the meaning set forth in Section 3.22.

"Transferred Employee" means any employee of any Seller who accepts an offer of employment from Buyer or an Affiliate of Buyer and commences employment with Buyer or an Affiliate of Buyer, pursuant to an Employment Agreement or pursuant to the terms of the Transition Services Agreement.

"Transition Services Agreement" means that certain Transition Services Agreement by and among Buyer and the Sellers, in substantially the form attached hereto as Exhibit B.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act and any similar applicable state, local or foreign law or regulation.

## ARTICLE II.
## PURCHASE AND SALE

2.1     Transfer of Assets; Retained Assets.

(a)     Purchased Assets. Upon the terms and subject to the satisfaction or, if permissible, waiver, of the conditions of this Agreement, at and as of the Closing, Sellers shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept

18

from Sellers, free and clear of any Liens (other than Permitted Liens), all right, title and interest in and to all the assets, properties and rights, real, personal or mixed, tangible or intangible, wherever located, which are owned, and, to the extent of Sellers' transferable rights therein, used or held for use by the Sellers or the Business as of the Closing (the "Purchased Assets"), including the following (in each case other than the Excluded Assets):

(i)      all assets, properties and rights reflected and/or described on the Exhibit A, together with all other assets owned, used or held for use by Sellers in connection with the Business, whether or not fully depreciated, written off or never reflected on Exhibit A and all other assets acquired by Sellers and used or held for use by Sellers in connection with the Business since the date of Exhibit A up to the Closing Date (except to the extent disposed of since the date thereof);

(ii)      all inventories and supplies of any kind, including all medical supplies, packaging supplies, spare parts, whether stored at any Seller's location or stored at a third party location associated with or necessary to use the assets listed on Exhibit A;

(iii)      all tangible personal property, including all medical equipment, furniture, fixtures, computers (including Software and hardware), Devices, supplies, spare parts, and other tangible personal property, together with any express or implied warranty by the manufacturers, sellers or lessors of any item or component part thereof and all maintenance records and other documents relating thereto, including those items set forth on Schedule 2.1(a)(iii);

(iv)      all vehicles owned by Sellers;

(v)      all leasehold interests in personal property, including any prepaid rent, security deposits and options to renew or purchase in connection therewith, including those items set forth on Schedule 2.1(a)(v);

(vi)      all rights of Sellers in, to, and under all Contracts that constitute, on or after the Closing, Desired 365 Contracts that are subject to the Designation Notices and assumed and assigned to Buyer (the "Assumed Contracts");

(vii)      all rights of Sellers in, to, and under the Contracts listed on Schedule 2.1(a)(vii) and any other non-365 Contracts which Buyer timely designates as Assumed Contracts following the date hereof;

(viii)      all Intellectual Property used in or related to the Business, including all Seller Intellectual Property, including the Names, along with all income, royalties, damages and payments due or payable as of the Closing Date or thereafter with respect thereto (including damages and payments for past, present or future infringements or misappropriations thereof, the right to sue and recover for past, present or future infringements or misappropriations thereof and any and all corresponding rights that now or hereafter may be secured throughout the world, and all copies and tangible embodiments thereof); and Intellectual Property application and prosecution files, including such files owned by Sellers in the custody of Sellers' outside counsel;

19

(ix)        all Seller Software;

(x)        all IT Assets used or held for use in the conduct of the Business or by or on behalf of any Seller;

(xi)        all Permits, to the extent transferable;

(xii)        all Seller Information, and all databases and other repositories containing such data and information, and all records, including all Patient Records, data, know-how, Software, and media content;

(xiii)        except for the Avoidance Actions, all claims, causes of action, choses in action, judgments, and demands against third parties, whether known or unknown; provided Buyer covenants not to commence or maintain any proceedings or otherwise assert or enforce any claim described on Schedule 2.1(a)(xiii) hereto; provided, further, that this provision shall not affect Buyer's rights to enforce claims not acquired from Sellers, to the extent such claims are excluded from the release provided for in Section 11.16 hereto;

(xiv)        all deposits, prepaid expenses and rights to refunds relating to the Purchased Assets, including those listed on Schedule 2.1(a)(xiv); provided that the aggregate value thereof with respect to Assumed Contracts for which Buyer will receive benefit after Closing shall be added to the Total Consideration and paid to Sellers (to the extent then determinable) at Closing or thereafter when the benefit thereof to Buyer becomes determinable (e.g., when a Desired 365 Contract becomes an Assumed Contract);

(xv)        all Sellers' right, title and interest in and to the Leased Real Property that becomes included as among the Assumed Contracts;

(xvi)        the goodwill, going concern, customer intangibles, and workforce in place of the Business;

(xvii)        all claims, demands and rights to indemnification, insurance, or similar recovery from any third parties to the extent applicable to the Purchased Assets or Assumed Liabilities;

(xviii)        the Transferred Devices;

(xix)        all pharmaceutical drugs; and

(xx)        all other assets, property and rights owned or otherwise used in or necessary for the operation of the Business, other than the Excluded Assets.

(b)        Excluded Assets. Buyer acknowledges and agrees that it is not purchasing or acquiring, and Sellers are not selling or assigning, the following assets, properties and rights of the Sellers (the "Excluded Assets") and in no event shall such assets be deemed to be Purchased Assets:

(i)        all cash and cash equivalents,

(ii)        accounts receivable, and other payments to be made by any Third Party Payors to Sellers for services provided prior to Closing Date (including pursuant to Assumed Contracts);

(iii)        all bank accounts of Sellers;

(iv)        all Equity Interests in any Seller or Equity Interests held by any Seller;

(v)        each Seller's Medicare and Medicaid provider numbers and all associated National Provider Identifier (NPI) numbers related to owners, employees and independent contractors of Sellers;

(vi)        all insurance policies of Sellers (other than those claims and rights conferred pursuant to Section 2.1(a)(xvi));

(vii)        all Tax Returns of the Sellers and any other Tax assets of the Sellers or related to the Business, the Purchased Assets or the Assumed Liabilities for Pre-Closing Periods or the portion of a Straddle Period ending on the Closing Date (determined in accordance with Section 7.2(b)), including all rights to refunds or credits of Taxes attributable to Pre-Closing Periods or the portion of a Straddle Period ending on the Closing Date (determined in accordance with Section 7.2(b)) to the extent such Taxes were paid by, on behalf of, or for the benefit of Sellers;

(viii)        all Plans and any trusts or other assets related thereto;

(ix)        all payroll records, personnel files and other personnel records;

(x)        all Contracts that (i) are not Assumed Contracts or (ii) are Assumed Contracts but are not assumable and assignable pursuant to the terms thereof or as a matter of applicable Law (including any Assumed Contract with respect to which any consent requirement in favor of the counter-party thereto is not satisfied and may not be overridden pursuant to Section 365 of the Bankruptcy Code) (collectively, "Excluded Contracts");

(xi)        each 365 Contract that, as of the Closing, is not designated as a Desired 365 Contract;

(xii)        all furniture and leasehold improvements located at the Leased Real Property not included as Assumed Contracts (excluding, for the avoidance of doubt, any Devices located at such Leased Real Property);

(xiii)        all vehicles leased by Sellers;

21

(xiv)    all rights arising in connection with any Proceeding to the extent related to any Excluded Asset or that are not applicable to the Purchased Assets;

(xv)    the corporate seals, organizational documents, minute books, stock books, books of account or other records having to do with the corporate organization of Sellers, all employee-related or employee benefit-related files or records, books and records related to other Excluded Assets and any other books and records which Sellers are prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;

(xvi)    all rights which accrue or will accrue to Sellers under this Agreement or any other Ancillary Agreement;

(xvii)    all privileges and protections pertaining to communications between Sellers and their professionals, including attorneys;

(xviii)    except as provided in Section 2.1(a)(xi), any other Permits;

(xix)    all deposits, prepaid expenses and rights to refund relating to insurance, including captive insurance;

(xx)    all Avoidance Actions;

(xxi)    all COVID-19 Funds and CHOPD AAPs;

(xxii)    all claims described on Schedule 2.1(a)(xiii);

(xxiii)    all Devices that are not Transferred Devices (the "Excluded Devices"), which shall include, but not be limited to, the Excluded Devices set forth on Schedule 2.1(b)(xxiii).; and

(xxiv)    all other assets listed on Schedule 2.1(b)(xxiv).

2.2    Assumption of Liabilities.

(a)    Upon the terms and subject to the conditions of this Agreement, at and as of the Closing, Buyer shall assume and be responsible for only the following Liabilities (the "Assumed Liabilities"): the obligations of Sellers (with respect to the Business) with respect to (i) paid time off accrued through and following Closing by any of Sellers' employees who become Transferred Employees ("PTO") and (ii) under the Assumed Contracts, but only to the extent such obligations (A) are Cure Costs owed in connection with assumption and assignment of such Assumed Contracts and allocated to Buyer under Section 7.5, (B) are applicable to and accrue with respect to periods subsequent to the Closing and (C) are accompanied by a correlated duty of performance or payment on the part of the other parties thereto.

(b)    Except as expressly provided in Section 2.2(a), Buyer does not hereby and will not assume or become liable for and shall not be obligated to pay or satisfy any obligation,

22

debt or Liability whatsoever, whether fixed, contingent or otherwise, of the Business or Sellers or any other person or entity, including any Indebtedness or other claim, Liability, obligation or Tax arising out of the ownership or use of the Purchased Assets prior to the Closing or circumstances or occurrences or the operations of the Business or transactions contemplated by this Agreement prior to the Closing and whether or not disclosed on the Schedules attached hereto, and regardless of when or by whom asserted (collectively, the "Excluded Liabilities"). The Excluded Liabilities shall remain the responsibility and obligation of Sellers after Closing, and Sellers shall be responsible for treatment of such Liabilities as provided by the Bankruptcy Code.

(c)    In the event that the legal interest in any of the Purchased Assets or Assumed Liabilities to be sold, assigned, transferred or conveyed pursuant to this Agreement, or any claim, right or benefit arising thereunder or resulting therefrom cannot be sold, assigned, transferred or conveyed hereunder as of the Closing Date because any waiting or notice period has not expired or any consents or approvals required for such transfer have not been obtained or waived, then the legal interest in such Purchased Assets or Assumed Liabilities, as the case may be, shall not be sold, assigned, transferred or conveyed unless and until such waiting or notice period shall have expired or until approval, consent or waiver thereof is obtained.  Sellers, at their expense, and Buyer shall use commercially reasonable efforts to cooperate in obtaining such consents or approvals as may be necessary to complete such transfers as soon as practicable. Sellers hereby acknowledge that the failure of Sellers to obtain any required consents or approvals prior to Closing shall (i) not have any effect for purposes of Buyer's right to indemnification, and (ii) not in any way limit Buyer's exercise of its rights hereunder.  Nothing in this Agreement shall be construed as an attempt to assign to Buyer any legal interest in any of the Purchased Assets or Assumed Liabilities which, as a matter of Law or by the terms of any legally binding Contract, engagement or commitment to which any Seller is subject, is not assignable without the consent of any other party, unless such consent shall have been given. Pending the assignments, conveyances and transfers referred to in this paragraph, Sellers shall hold, to the extent Sellers are reasonably able to do so and subject to the procedures related to the Bankruptcy Cases, any such non-assigned Purchased Assets or Assumed Liabilities for the benefit and at the risk of Buyer and shall cooperate with Buyer, without the payment of any additional consideration by Buyer or incurrence of any direct expense by Sellers, in any lawful and reasonable arrangements designed to provide the benefits of ownership thereof to Buyer.  For the avoidance of doubt, the benefits (including any surplus or HEDIS bonus amount earned post-Closing) of any Contract (including those included as Purchased Assets) during the period post-Closing until such time as such Contract is assigned to Buyer as a Desired 365 Contract designated to be an Assumed Contract or, in the case of an  Desired 365 Contract that is covered by the term of the Transition Services Agreement  until the same becomes an Excluded Contract, shall be Buyer's, and Sellers' shall cause or direct all such benefits to be transferred to Buyer promptly following payment thereof by Buyer to Sellers.

(d)    As part of the Sale Motion (or, as necessary in one or more separate motions), Sellers shall request that by providing twenty-one (21) days' notice of its intent to assume and assign any Desired 365 Contract, the Bankruptcy Court shall deem any non-debtor party to such Desired 365 Contract that does not file an objection with the Bankruptcy Court during the applicable notice period to have given any required consent to the assumption of the Desired 365 Contract by Sellers and assignment to Buyer if, and to the extent that, pursuant to the Sale

Order or other order of the Bankruptcy Court, Sellers are authorized to assume and assign the Desired 365 Contract to Buyer and Buyer is authorized to accept such Desired 365 Contract pursuant to Section 365 of the Bankruptcy Code.

2.3    <u>Desired 365 Contracts; Extension Date</u>.

(a)    <u>Schedule 2.3(a)</u> sets forth a complete list of all 365 Contracts that Buyer presently intends to assume at the Closing (the "<u>Desired 365 Contracts</u>"). Upon or after Closing, and subject to the terms and conditions hereof and the Sale Order, Sellers will assume and assign the Assumed Contracts to Buyer, and Buyer will assume only those Assumed Liabilities pursuant thereto as specifically provided in this Agreement.

(b)    <u>Desired 365 Contracts and Assumed Contracts</u>:

(i)    Buyer shall have the right and option to extend the Final Determination Date for a period of up to an additional thirty (30) days but not longer than the Extended Final Determination Date (the "<u>Extension Option</u>"). Within ten (10) days after the Closing Date, Sellers shall notify Buyer in writing of Sellers' good faith and reasonably accurate estimate of the Buyer's Desired 365 Contract Final Period Reimbursement Obligations (as defined below), which amounts shall be subject to Buyer's good faith review and reasonable approval, which if Buyer exercises the Extension Option, would cover the entire period between sixty-one (61) days and ninety (90) days after the Closing Date (the "<u>Extension Budget</u>"), including Sellers' incremental obligations under such remaining Desired 365 Contracts, related overhead, together with all other incremental expenses (including professional fees and disbursements) related to, or arising from, maintaining the Sellers' bankruptcy estates during the Extension Period (as defined below). Within fifteen (15) Business Days after receiving the Extension Budget, Buyer may exercise the Extension Option by giving written notice (the "<u>Extension Notice</u>") to Sellers' Representative, which notice, among other things, shall specify the number of days Buyer has chosen to be covered by the Extension Option (the "<u>Extension Period</u>"). By giving the Extension Notice to the Sellers' Representative, Buyer is obligated to reimburse the Sellers (with respect to all amounts billed monthly and for amounts not billed monthly, the pro rata amount of any expenses accruing and attributable to the number of days Buyer specifies in the Extension Notice) for the amounts reflected in the Extension Budget (the "<u>Buyer's Desired 365 Contract Final Period Reimbursement Obligations</u>").

(ii)    <u>Desired 365 Contracts</u>.  At any time after the date of this Agreement up until, as applicable, either the Final Determination Date or the Extended Final Determination Date (if so elected by Buyer), Buyer shall have the right to update <u>Schedule 2.3(a)</u> by providing written notice to Sellers' Representative either: (a) designating a 365 Contract as a Desired 365 Contract, or (b) removing a Desired 365 Contract from <u>Schedule 2.3(a)</u>; and

(iii)    <u>Assumed Contracts</u>.  Not later than three (3) Business Days prior to the Closing Date (the "<u>Initial Determination Date</u>"), Buyer shall provide

24

written notice to Sellers' Representative (each, a "Initial Designation Notice") of Buyer's election to designate the initial set of Desired 365 Contracts that Buyer wishes, as of the Closing Date, to be Assumed Contracts. At any point up until, as applicable, either the Final Determination Date or the Extended Final Determination Date (if so elected by Buyer) (each, a "Subsequent Determination Date" and together with the Initial Determination Date, collectively, the "Determination Dates"), Buyer may provide written notice to Sellers' Representative (each, a "Subsequent Designation Notice" and together with the Initial Designation Notice, collectively, the "Designation Notices") of Buyer's election to designate one or more remaining Desired 365 Contract(s) that Buyer wishes, after the Closing Date, to be Assumed Contracts; provided, however, Buyer shall reimburse the Sellers, pursuant to the terms of the Transition Services Agreement, for the administrative expense obligations under section 503 of the Bankruptcy Code arising on and after the Closing Date with respect to all of the remaining Desired 365 Contracts that were not otherwise Assumed Contracts as of the Closing Date (collectively, the "Buyer's Desired 365 Contract Initial Period Reimbursement Obligations"), for the period commencing upon the Closing Date and ending with respect to each such Desired 365 Contract when it becomes an Assumed Contract or is removed from Schedule 2.3(a). At any point on or after the Closing Date (until, as applicable, either the Final Designation Date or the Extended Final Designation Date (if so elected by Buyer)), Buyer may provide written notice to Sellers' Representative to remove (such removal to be effective either upon Sellers' Representative's receipt of such notice, or as of a future date that Buyer may specify in its notice) a Desired 365 Contract from Schedule 2.3(a), and Buyer's obligations to reimburse the Sellers for Buyer's Desired 365 Contract Initial Period Reimbursement Obligations with respect to such Desired 365 Contract removed from Schedule 2.3(a) shall terminate as provided in Buyer's notice.  On and after the Determination Date, any Desired 365 Contract that is not an Assumed Contract automatically shall be an Excluded Contract and Excluded Asset;  provided, however, that if one or more Desired 365 Contract(s) are subject to dispute as to assumption or assignment (including a Cure Cost dispute) of such Desired 365 Contract(s) that has not been resolved to the mutual satisfaction of Buyer and Sellers prior to any of the Determination Dates, then the respective Determination Date shall be extended (but only with respect to such Desired 365 Contract(s)) to no later than the earliest to occur of: (A) the date on which such dispute has been resolved in writing to the mutual satisfaction of Buyer and Sellers, (B) the date on which such Desired 365 Contract is deemed rejected by operation of section 365 of the Bankruptcy Code, and (C) the date upon which such dispute is determined by a final order of the Bankruptcy Court (the "Extended Contract Period"), and for the avoidance of doubt, the Buyer's Desired 365 Contract Initial Period Reimbursement Obligations (and to the extent applicable if so elected by Buyer, Buyer's obligation to pay the  Buyer's Desired 365 Contract Final Period Reimbursement Obligations) shall apply during the Extended Contract Period with respect to such Desired 365 Contracts subject to dispute.  Buyer may deliver a Subsequent Designation Notice upon expiration of the Extended Contract Period of Buyer's election to designate any Desired 365 Contracts (that were subject to the

<center>25</center>

Extended Contract Period) that Buyer wishes to be Assumed Contracts.  If a Subsequent Designation Notice with respect to any such Desired 365 Contract(s) is not delivered by Buyer by the date which is three (3) Business Days following the expiration of such Extended Contract Period, such Desired 365 Contract(s) shall be automatically deemed Excluded Contract(s) and Excluded Asset(s).

(c)    To the extent that Buyer makes a designation with respect to any 365 Contracts pursuant to Section 2.3(b)(i) or Section 2.3(b)(iii), the applicable Exhibits and Schedules to this Agreement will be deemed to have automatically been updated (without action of any Party or Person) to reflect such designation.

(d)    Promptly following the execution of this Agreement (and in no event later than three (3) Business Days after the later of the filing of the initial Bankruptcy Schedules or the entry of the order by the Bankruptcy Court scheduling the hearing to consider approval of the Sale Motion), Sellers shall (i) file an initial list of the Desired 365 Contracts which shall include all known 365 Contracts appearing on the initial Schedule G of Bankruptcy Schedules (the "Assumption Notice") with the Bankruptcy Court and (ii)  serve such initial Assumption Notice via first class mail on each counterparty to a Desired 365 Contract listed thereon. To the extent available, the data for each Desired 365 Contract included in the Assumption Notice will be derived from the Bankruptcy Schedules.  If and when Buyer designates additional 365 Contracts (e.g., Previously Omitted Contracts) as Desired 365 Contracts pursuant to the terms of Section 2.3(b)(i) or 2.3(j) hereof by written notice to Sellers' Representative, then Sellers shall supplement the Assumption Notice and serve such supplemental Assumption Notice via first class mail on each counterparty to such additional Desired 365 Contract listed thereon. The original Assumption Notice, and any supplemental Assumption Notice, shall identify the Desired 365 Contracts, the Seller party/ies thereto, the mailing address for serving the Assumption Notice on each counterparty, and set forth a good faith estimate of the amount of the Cure Costs, if any, applicable to each such Desired 365 Contract. Not later than one (1) Business Days following each of the Initial Determination Date and any Subsequent Determination Date, Sellers shall file with the Bankruptcy Court an amended and restated Assumption Notice, which notice shall set forth only the Assumed Contracts (and exclude all other 365 Contracts and Desired 365 Contacts).  The provisions for giving notice, deadlines for non-debtor counterparties and other interested parties to assert objections, and process for resolution of objections, shall be set forth in the Sale Motion, the Sale Order and/or the Assumption Notice, and the Parties hereto explicitly incorporate by reference herein the relevant provisions of the Sale Motion, Sale Order and Assumption Notice.

(e)    At the Closing, the Sellers shall, pursuant to the Sale Order, assign, or cause to be assigned, to Buyer, each of the Assumed Contracts that is capable of being assumed and assigned (and as to which all Cure Costs have been resolved) as of such date and are listed on the Initial Designation Notice. After the Closing, the Sellers shall, pursuant to the Sale Order, assign, or cause to be assigned, to Buyer, each of the Assumed Contracts that is capable of being assumed and assigned (and as to which all Cure Costs have been resolved) as of such date and listed on a Subsequent Designation Notice.  After the Closing, and with respect to Desired 365 Contracts that are subject to an Extended Contract Period as to which Buyer has provided the required Designation Notice pursuant to Section 2.3(b)(iii), and the dispute regarding the assumption and assignment of such Desired 365 Contract shall have been resolved pursuant to Section

26

2.3(b)(iii)(A) or (C) or otherwise, the Sellers shall assign, or cause to be assigned, to Buyer, each such Desired 365 Contract, provided that such assumption and assignment has been approved by the Bankruptcy Court, and therefore, such Desired 365 Contract may qualify to become an Assumed Contract capable of being assumed and assigned as of such date.

(f)    Subject to the designation rights in Section 2.3(b), all 365 Contracts and Desired 365 Contracts which are not Assumed Contracts shall automatically be deemed Excluded Contracts and Excluded Assets.

(g)    The Parties acknowledge and agree that Buyer's exercise of its rights in Section 2.3(b) will not increase or reduce the Total Consideration as a result of the exercise of such rights, nor will there be any delay to the Closing, and Buyer shall have no claim against Sellers in respect of any unassigned 365 Contract; provided that Buyer's exercise of its rights in Section 2.3(b) may increase or decrease (as applicable) the Total Consideration solely to the extent of the Assumed Liabilities.

(h)    Buyer will cooperate with the Sellers in communicating with third parties to Desired 365 Contracts as may be reasonably necessary to assist the Sellers in establishing that Buyer has satisfied the requirement of adequate assurance of future performance contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the applicable Desired 365 Contracts. With respect to Cure Costs that are disputed, the Parties shall cooperate and diligently pursue resolution of such disputes.

(i)    Upon payment of the aforesaid Cure Costs, all defaults under the Assumed Contracts (monetary or otherwise) and all actual or pecuniary losses that have or may have resulted from such defaults shall be deemed cured, including without limitation any Tax, rental obligation, common area maintenance, percentage rent, base rent or utility payments, whether or not such obligation became due, or accrued, after the effective date of the assignment of such Assumed Contracts, as the case may be.

(j)    Previously Omitted Contracts.

(i)    If prior to or following the date (but no later than, as applicable, the Determination Date or the Extended Final Determination Date (if so elected by Buyer)) which is thirty (30) days following the date of this Agreement, it is discovered by any Party that a 365 Contract should have been a Desired 363 Contract listed on Schedule 2.3(a), but was not listed on Schedule 2.3(a), and has not been rejected by the Sellers (any such 365 Contract, a "Previously Omitted Contract"), the discovering Party shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify the other Parties in writing of such Previously Omitted Contract and then the Sellers shall, promptly following such notification (but in no event later than two (2) Business Days following such notification), notify Buyer of Sellers' good faith estimate of all Cure Costs (if any) for such Previously Omitted Contract. Subject to the terms hereof, Buyer may thereafter (a) designate in writing to Sellers the 365 Contract as a Desired 365 Contract and (b) deliver a Designation Notice to Sellers, no later than the earlier of (x) the Determination Date or the expiration of the Extended Contract Period, as applicable, and (y) five (5) Business Days following notification of such Previously Omitted Contract by the Seller, and if authorized by either the Sale Order or other Bankruptcy Court order

27

applicable thereto, such contract shall be an Assumed Contract under this Agreement. All Previously Omitted Contracts with respect to which Buyer fails timely to deliver a Designation Notice, shall be an Excluded Contract and Excluded Asset.

(ii)     If Buyer delivers a Designation Notice to Sellers, the Sellers shall serve a notice (the "Previously Omitted Contract Notice") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and the Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.3(j)(ii). The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten (10) Business Days to object, in writing to the Sellers and Buyer, to the Cure Costs or the assumption and assignment of its 365 Contract. The Previously Omitted Contract Notice shall, to the extent relevant, be in the form of the Assumption Notice and revised as per the terms of this Section 2.3(j)(ii). If the counterparties, the Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, the Sellers shall seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption and an assignment, or assignment, of such Previously Omitted Contract. If no objection is served on the Sellers and Buyer, the Sellers shall seek to obtain an order of the Bankruptcy Court fixing the Cure Costs and approving the assumption and assignment, or assignment, of the Previously Omitted Contract. Subject to the terms of this Agreement, as applicable, Buyer and Sellers shall be responsible for all Cure Costs relating to such Previously Omitted Contracts and for any obligations or Liabilities relating to such Previously Omitted Contracts arising during the Extended Contract Period.

2.4     Consideration.

(a)     The consideration that Buyer shall pay Sellers for the Purchased Assets, the obligations of Sellers under Article VI, and the other rights of Buyer hereunder shall be Forty-Five Million Dollars ($45,000,000), subject to adjustment solely as expressly provided in this Agreement (the "Total Consideration").

(b)     The portion of the Total Consideration that Buyer shall pay Sellers at the Closing (in accordance with Section 2.7) shall be (i) the Total Consideration, *less* (ii) the Deposit, *less* (iii) the Holdback Amount (the "Closing Payment"). The Closing Payment shall be paid to the Sellers' Representative by Buyer, and the Sellers' Representative shall promptly thereafter distribute such payment to the applicable Sellers.

(c)     Within one (1) Business Day of the execution and delivery of this Agreement, Buyer will deposit with the Escrow Agent an amount equal to Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) (the "Deposit") by wire transfer of immediately available funds, which the Escrow Agent shall hold subject to the terms of an escrow agreement in a form mutually agreed to by the Parties ("Deposit Agreement"). Subject to the terms of this Section 2.4(c) at the Closing, the Deposit shall be credited and applied toward payment of the Total Consideration. If Sellers terminate this Agreement prior to Closing pursuant to Section 10.1(d) (a "Buyer Default Termination"), then the Deposit shall become nonrefundable and paid to Sellers. If this Agreement is terminated prior to Closing for any reason other than a Buyer Default Termination, then the Deposit shall be returned to Buyer. When the Deposit becomes payable to Buyer or Sellers' Representative pursuant to this Agreement, Buyer and Sellers'

28

Representative shall deliver to the Escrow Agent joint written instructions directing the Escrow Agent to release the Deposit to Buyer or Sellers' Representative, as applicable, in accordance with the terms of the Deposit Agreement. The Parties agree that the payment of the Deposit to Sellers as a result of a Buyer Default Termination is not a penalty but is liquidated damages in a reasonable amount that will compensate Sellers for a Buyer Default Termination, which amount would otherwise be impossible to calculate with precision, and that the receipt and retention of Deposit shall be Sellers' sole and exclusive remedy with respect to a Buyer Default Termination.

(d)    On the Business Day immediately following the date that is eighteen (18) months after the Closing Date, Buyer shall pay to Sellers' Representative, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in the Funds Flow, an amount equal to (A) Five Million Six Hundred Twenty Five Thousand Dollars ($5,625,000) (the "Holdback Amount"), less (B) the sum of (I) the aggregate amount of the Holdback Amount retained by Buyer to satisfy the resolved indemnification obligations of the Sellers under Section 8.1 or otherwise pursuant to this Agreement and (II) the aggregate amount which is subject to claims for indemnification made by Buyer in accordance with the provisions of Section 8.1 which are pending resolution and have not been satisfied by the retention of the Holdback Amount by Buyer, it being agreed that Buyer is and shall be entitled to retain all or a portion of the Holdback Amount to satisfy, in whole or in part, any obligations of the Sellers pursuant to and in accordance with Section 8.1 or otherwise pursuant to this Agreement that become resolved in accordance herewith. In the event that the amount paid by Buyer pursuant to the previous sentence shall be reduced pursuant to subsection (B)(II) thereof with respect to a claim for indemnification made by Buyer, promptly (and in any event within five (5) Business Days) following the final resolution of such claim, Buyer shall pay to Sellers' Representative an amount (if greater than zero) equal to (x) the Holdback Amount, less (y) the sum of (I) the aggregate amount previously paid to Sellers' Representative pursuant to this Section 2.4(d), (II) the aggregate amount of the Holdback Amount retained by Buyer to satisfy the indemnification obligations of Sellers under Section 8.1 or otherwise pursuant to this Agreement, and (III) the aggregate amount which is subject to claims for indemnification made by Buyer in accordance with the provisions of Section 8.1 or otherwise pursuant to this Agreement which have not been satisfied by the retention of the Holdback Amount by Buyer.

(e)    The parties agree that the Total Consideration represents the fair market value of the Purchased Assets in an arm's length transaction and has not been determined in a manner that takes into account the volume or value of any referrals or business otherwise generated or anticipated to be generated between the parties or any of their Affiliates.

2.5    Closing.  Unless this Agreement shall have been terminated in accordance with Section 10.1 or if the Parties agree otherwise, the Parties shall consummate the transactions contemplated by this Agreement (the "Closing"), as promptly as practicable but in no event later than three Business Days after the date on which all conditions set forth in Article IX (except those conditions that are to be satisfied at Closing) have been satisfied (or waived by the Party entitled to the benefit of the same), provided that Closing shall not occur later than December 12, 2024 if, at least three (3) Business Days prior to such date, all conditions set forth in Article IX (except those conditions that are to be satisfied at Closing) have been satisfied (or waived by the Party entitled to the benefit of the same). Closing shall occur by electronic deliveries, or at such other

29

place, date and time as Buyer and the Sellers' Representative shall mutually agree in writing (the date on which the Closing occurs, the "Closing Date"); provided, that the Parties agree that the Closing may be effected by mail or overnight delivery or electronic means.

2.6     Deliveries of Sellers at Closing.

(a)     At the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(i)     Intellectual Property assignments, substantially in the forms of Exhibit C hereto, with respect to the Intellectual Property constituting Purchased Assets;

(ii)     to the extent not obviated by the Sale Order, all waivers, consents, Governmental Authority authorizations or approvals or other documents to effectively transfer the Purchased Assets and all waivers, consents, authorizations and approvals relating to Sellers required to be obtained from any Governmental Authority as a result of the transactions that are the subject of this Agreement, as listed and described on Schedule 2.6(a)(ii) (collectively, the "Governmental Consents");

(iii)     to the extent not obviated by the Sale Order, all waivers, consents, authorizations and approvals relating to Sellers required to be obtained from third parties as a result of the transactions that are the subject of this Agreement under Assumed Contracts, as listed and described on Schedule 2.6(a)(iii) (collectively, the "Third Party Consents", and together with the Governmental Consents, the "Material Consents");

(iv)     the Transition Services Agreement, duly executed by the Sellers;

(v)     a copy, certified by the Secretary or other officer of each Seller to be true, complete and correct as of the Closing Date, of the Organizational Documents of each Seller and copies of resolutions of the shareholders or members (as may be required by applicable Law and the Organizational Documents) and board of directors or managers of each Seller authorizing and approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby;

(vi)     a certificate of good standing, or equivalent certificate, for each Seller, dated within five (5) Business Days of the Closing Date, issued by the appropriate Governmental Authority;

(vii)     all business records and books of account of Sellers related to the Business or the Purchased Assets;

(viii)     a properly executed and completed IRS Form W-9 from each Seller; and

(ix)     employment agreements in substantially in the form attached as Exhibit D (for physicians) or otherwise in form and substance reasonably acceptable to Buyer (for non-physicians), duly executed by at each of the individuals listed on Schedule 2.6(a)(ix) (the "Employment Agreements");

30

(x) an amendment to that certain Master Services Agreement, dated as of June 12, 2017, by and between MBMO and Clearwater Compliance LLC, in form and substance reasonably acceptable to Buyer;

(xi) evidence reasonably satisfactory to Buyer that the optometry, chiropractic, nail and hair care services and other similar spa and wellness type services offered at Sellers' wellness centers, massage therapy and platlet-rich-plasma injection services have ceased to be provided by Sellers and were terminated in compliance with applicable law; and

(xii) evidence reasonably satisfactory to Buyer that Sellers have ceased any practice of providing gift cards exceeding Fifteen Dollars ($15.00) per gift card or Seventy Five Dollars ($75.00) worth of gift cards, in the aggregate, to prospective patients.

2.7    <u>Deliveries of Buyer at Closing</u>.  At the Closing, Buyer shall deliver or cause to be delivered:

(a) to the Sellers' Representative (for subsequent distribution to the applicable Sellers) by wire transfer of immediately available funds an aggregate of the Closing Payment to the account designated by the Sellers' Representative not less than five (5) Business Days prior to the Closing Date and as set forth on the funds flow statement prepared by Buyer (the "<u>Funds Flow</u>"); and

(b) to Sellers, the Transition Services Agreement, duly executed by Buyer.

2.8    <u>Withholding</u>.  Notwithstanding any provision hereof to the contrary, Buyer shall be entitled to deduct and withhold from any consideration or other amounts otherwise payable under the terms of this Agreement such amounts as it is permitted to deduct and withhold pursuant to any provision of Law, including those related to or regarding Taxes.  To the extent that amounts are so withheld by Buyer under any provision of this Agreement, such withheld amounts (i) shall be remitted by Buyer to the applicable Governmental Authority in accordance with applicable Law and (ii) shall be treated for all purposes of this Agreement as having been paid to the recipient in respect of which such deduction and withholding was made. Buyer shall use commercially reasonable efforts to provide at least five (5) days written notice to Sellers' Representative prior to withholding any Taxes from any payment hereunder.

2.9    <u>Allocation</u>.  Within sixty (60) days after the Closing Date, Buyer shall prepare and deliver to the Sellers' Representative an allocation of the Total Consideration and Assumed Liabilities (and any other amounts properly included in consideration for Tax purposes, collectively, the "<u>Tax Consideration</u>") among (1) first, each Seller as applicable, (2) second, among the asset classes attributable to each Seller in accordance with Code Section 1060, the Treasury Regulations promulgated thereunder, and any comparable Laws in other jurisdictions, in a commercially reasonable methodology (the "<u>Purchase Price Allocation</u>"). Sellers' Representative shall have ten (10) Business Days to review and comment. If Sellers' Representative does not notify Buyer in writing of any objections within ten (10) Business Days or if Sellers' Representative and Buyer resolve all such objections, each Party agrees that it will (i) be bound by the Purchase Price Allocation, (ii) report for Tax purposes the transactions

31

consummated pursuant to this Agreement in a manner consistent with the Purchase Price Allocation (including the filing of IRS Form 8594), and (iii) not take a position for Tax purposes that is inconsistent with the Purchase Price Allocation on any Tax Return or in any proceeding before any Tax Authority except with the prior written consent of the other Parties. Sellers' Representative shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as Buyer may reasonably request to prepare the Purchase Price Allocation. If the Sellers' Representative timely objects in writing to Buyer's draft Purchase Price Allocation and the Parties are unable to timely resolve Sellers' Representative's comments thereto, then each Party may file separate allocations of the Tax Consideration among the Purchased Assets and neither Party shall be bound by the other Party's allocation of the Tax Consideration. In the event that the Purchase Price Allocation is disputed by any Tax Authority in writing, the Party receiving notice of such dispute will promptly notify the other Parties, provided that the failure of the Party receiving such notice of dispute to promptly notify the other Parties shall not constitute a breach of this provision unless any such other Party is actually prejudiced by such failure.

<div align="center">

**ARTICLE III.**
**REPRESENTATIONS AND WARRANTIES REGARDING THE SELLERS**

</div>

Each Seller hereby represents and warrants to Buyer as follows:

3.1     <u>Status; Power and Authority</u>.

(a)     <u>Status</u>.  <u>Section 3.1(a) of the Disclosure Schedules</u> sets forth a true, complete and correct list of each Seller and other Person that owns or holds any assets used or held for use in connection with the Business (including any Purchased Assets).  Each Seller is duly organized, validly existing, and in good standing under the Laws of the state in which it was organized or incorporated, as applicable.  Each Seller has all requisite corporate or limited liability company power and authority, as applicable, to conduct the Business as it is now being conducted.  No Seller is required to be registered, licensed or qualified to do business in any other jurisdiction in order to conduct the Business.  Each Seller has Made Available to Buyer true, complete and correct copies of the Organizational Documents for each Seller.  No Seller is or has been in breach or violation of or default under any provision of their Organizational Documents.

(b)     <u>Pre-Closing Restructuring</u>. Prior to the date hereof, Jose D. Suarez, M.D. transferred 100% of the ownership of CCMC Holdings to MBMO such that CCMC Holdings is a direct subsidiary of MBMO and is wholly owned by MBMO (the "<u>Pre-Closing Restructuring</u>"). The Pre-Closing Restructuring has been properly effected in all respects in accordance with all applicable Law and the Organizational Documents of the applicable Sellers. All required filings to be made with respect to the transactions undertaken in connection with the Pre-Closing Restructuring have in all respects been duly and properly completed and timely filed with the applicable Governmental Authority. Buyer has been provided or made available copies of all documents entered into in connection with the Pre-Closing Restructuring, including any filings with any Governmental Authority effecting or governing the Pre-Closing Restructuring, and no such documents have been amended, revoked, or otherwise altered since so provided or made available, and no provision of any Restructuring Document has been breached or waived.

<div align="center">32</div>

(c)    Power and Authority.  Subject to entry of the Sale Order, each Seller has full legal capacity and all requisite corporate or limited liability company power and authority to execute and deliver this Agreement and the Ancillary Agreements to which any of them is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.  All corporate or limited liability company acts or proceedings and approvals or consents required to be taken or obtained by each Seller to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party and the performance of such Seller's obligations hereunder and thereunder have been properly taken or obtained, including the approval of this Agreement and the Ancillary Agreements, and the transactions contemplated hereby and thereby, by the board of managers or board of directors, as applicable, and the shareholders or members, as applicable, of each Seller in accordance with applicable Laws. There is no equityholder agreement, voting trust or other agreement, arrangement, or understanding that may affect the exercise of voting or any other rights or obligations with respect to the Equity Interests, assets, or the Business, including any rights of first refusal, preemptive rights, or other purchase rights. No Seller was ever a party to the Primary Care Provider Agreement between Simply Healthcare Plans, Inc. and Viva Health, as this Contract was not assumed by any Seller in connection with Asset Purchase Agreement, effective March 1, 2017, whereby MB Medical Operations purchased substantially all of the assets of Viva Health LLC. The right of first refusal contained in the Primary Care Provider Agreement between Simply Healthcare Plans, Inc. and Viva Health is not applicable to the transactions contemplated by this Agreement.

3.2    Enforceability.  This Agreement and each of the Ancillary Agreements to which any of them is a party has been duly authorized, executed and delivered by each Seller.  Upon entry of the Sale Order, assuming the due and valid authorization, execution, and delivery of this Agreement and the Ancillary Agreements to which any of them is a party by Buyer, this Agreement and such Ancillary Agreements constitute the legal, valid, and binding obligation of each Seller, enforceable against such Seller in accordance with its terms, except as enforceability may be limited by the Bankruptcy and Equity Exceptions.

3.3    No Violation; Consents and Approvals.  Subject to entry of the Sale Order, except as set forth on Section 3.3 of the Disclosure Schedules, the execution and delivery of this Agreement and the Ancillary Agreements to which any of them is a party by each Seller, and the consummation by such Seller of the transactions contemplated hereby and thereby will not (a) violate any Law applicable to, binding upon or enforceable against such Seller, (b) violate, conflict with or result in a breach of any provision of the Organizational Documents of any Seller, (c) result in any breach of, or constitute a default (or an event which would, with the passage of time or the giving of notice or both, constitute a default) under, or give rise to a right of payment under or the right to terminate, amend, modify, abandon or accelerate, any Contract to which such Seller is a party or by which it or its assets is bound, or (d) result in the creation or imposition of any Lien upon any of the Purchased Assets. Except (x) to the extent excused or made unenforceable as a result of the filing of the Bankruptcy Cases, (y) for the entry and effectiveness of the Sale Order in respect of the Sellers, or (z) as set forth in Section 3.3 of the Disclosure Schedules, the execution, delivery and performance by each Seller of this Agreement and the Ancillary Agreements to which any of them is a party by each Seller, and the consummation by such Seller of the transactions contemplated hereby and thereby, do not require any consents, notices, waivers, authorizations or

approvals of, or filings with, any (i) Governmental Authorities or (ii) other third Persons, except with respect to this clause (ii) as would not reasonably be expected to have a material impact on the Business.

      3.4    <u>Financial Statements; Records</u>.

      (a)    Attached hereto as <u>Section 3.4(a) of the Disclosure Schedules</u> are (a) the audited consolidated balance sheet of the Sellers as of December 31, 2021, and December 31, 2022 and the related consolidated statements of income, partners' equity and cash flows of the Sellers for each twelve (12) month periods then ended, and the unaudited consolidated balance sheet of the Sellers as of December 31, 2023 and the related consolidated statement of income, partners' equity and cash flows of the Sellers for the twelve (12) month period then ended (collectively, the "<u>Financial Statements</u>"), and (b) the unaudited consolidated balance sheet of the Sellers as of August 31, 2024 and the related consolidated statements of profit and loss, cash flows and shareholders' equity of the Sellers for the eight (8) month period then ended (the "<u>Interim Financial Statements</u>"). The Financial Statements and the Interim Financial Statements (i) are derived from and consistent with the information contained in each Seller's books and records, and are true, correct, and complete in all material respects, (ii) present fairly in all material respects the financial condition of each Seller as of such dates and the results of operations, cash flows and shareholders' equity of each Seller for such periods, (iii) have been prepared in accordance with GAAP applied on a consistent basis, subject in the case of the Interim Financial Statements to normal year-end adjustments and the absence of footnotes (none of which will be material individually or in the aggregate), and (iv) do not include any untrue statement of a material fact required to be stated or reflected therein or omit to state or reflect any material fact necessary to make any statements therein not misleading.

      (b)    True, correct, and complete copies of the books of account, minute books, bank accounts, and other corporate records of Sellers have been Made Available to Buyer, and such books and records have been maintained in accordance with the Ordinary Course of Business.

      3.5    <u>Absence of Certain Developments</u>.  Except as otherwise set forth on <u>Section 3.5 of the Disclosure Schedules</u>, Since December 31, 2023, (a) the Business has been conducted in the Ordinary Course of Business and the Sellers have not entered into any transaction related to the Purchased Assets (including any transfer or sale of assets) out of the Ordinary Course of Business, (b) the Sellers have owned and operated the Purchased Assets in the Ordinary Course of Business, and (c) there has been no fact, event, or development that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on any of the Sellers. Except as otherwise set forth on <u>Section 3.5 of the Disclosure Schedules</u>, since December 31, 2023, there has not been:

      (a)    any Lien granted on any portion of a Seller's properties or assets, or any portion of its properties or assets suffered to be subject to any Lien, except for Permitted Liens;

      (b)    the incurrence of any Indebtedness or of any other material Liabilities of the Sellers, other than Liabilities (other than any Indebtedness) incurred in the Ordinary Course of Business;

<div align="center">34</div>

(c)        any loans or advances by a Seller to, or guarantees for the benefit of, any Persons (except to employees in the Ordinary Course of Business and in an amount not to exceed $50,000 in the aggregate);

(d)        any cancellation of any Indebtedness or claim held by a Seller (other than any inter-Seller Indebtedness as set forth Section 3.5(d) of the Disclosure Schedules);

(e)        (i) any change in the Direct Compensation payable, or to become payable, to any Key Personnel, (ii) any change in the Direct Compensation payable, or to become payable, to any employee who is not Key Personnel, other than normal increases in the Ordinary Course of Business that do not exceed a total of five percent (5%) for such employee when combined with all increases to such employee in 2024, or (iii) any material modification of any bonus payment or arrangement made to or with any Key Personnel or any establishment or creation of any employment, deferred compensation, or severance arrangement or Plan with respect to any Key Personnel or the material amendment of any of the foregoing;

(f)        any (i) voluntary or involuntary separation from employment of any Key Personnel, (ii) material loss of personnel of a Seller, or (iii) material change in the terms and conditions of the employment or retention of any Key Personnel;

(g)        any (i) material change in accounting methods or practices of the Business or the Sellers taken as a whole or (ii) any change to any collection, pricing, discount, rebate, payment or cash management policy or practice of the Business or any of the Sellers, including any failure to timely pay accounts and trade payables when due in the ordinary course of business consistent with past practice (except for any such change required by reason of a change in Law);

(h)        any material loss of, or any material change in relationship with, any significant group of Healthcare Professionals, Third-Party Payor, or supplier of the Business or the Sellers;

(i)        any amendment or modification to, waiver of rights under, or termination of any Material Contract;

(j)        any material Contract, agreement or arrangement entered into by a Seller or the Business relating to any royalty or similar payment based on the revenues, profits or sales volume of such Seller or the Business;

(k)        any (i) filing of any Tax Returns required to be filed inconsistent with its past practices, (ii) making, changing or rescission of any material Tax election, (iii) settlement or compromise of any material Tax liability, (D) entry into any closing agreement within the meaning of Code Section 7121 (or any similar provision of state, local, or foreign Law), (iv) amendment of any material Tax Return, (v) filing related to a voluntary Tax disclosure, Tax amnesty, or other similar filing, (vi) surrender or abandonment any right to claim a material Tax refund, offset, or other reduction in Tax Liability, or (vii) consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of Taxes;

(l)    any notice received by a Seller from any Governmental Authority with respect to any material violations or alleged material violations of applicable Laws or any violation of Health Care Fraud Laws by such Seller, or any of its respective officers, directors, partners, employees or Contingent Workers;

(m)    any notice received from any Third Party Payor of any audit or investigation or any demand for repayment from any Third Party Payor;

(n)    any settlement agreement with respect to third party disputes or Proceedings or any waiver or compromise of any rights of Sellers or the Business with respect thereto;

(o)    any plan or agreement of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other material reorganization of any Seller; or

(p)    any commitment (contingent or otherwise) to do any of the foregoing.

3.6    Litigation.  Except as set forth on Section 3.6 of the Disclosure Schedules, since January 1, 2021 (a) there are and have been no Proceedings pending or, to Sellers' Knowledge, threatened, against any Seller or the Business at law or in equity, including, without limitation, any Proceeding challenging, enjoining, or preventing this Agreement or the consummation of the transactions contemplated hereby, and (b) no Seller (with respect to the Business) is or has been subject to any outstanding Order that relates to such Seller or the Business.  Section 3.6 of the Disclosure Schedules sets forth a list of all Proceedings involving any of the Sellers, the Business or any Purchased Assets since January 1, 2021.  Since January 1, 2021, no officer, director, or manager of any Seller or the Business has been: (i) subject to voluntary or involuntary petition under the federal bankruptcy laws or any state insolvency law or the appointment of a receiver, fiscal agent or similar officer by a court for his or her business or property or that of any partnership of which he or she was a general partner or any corporation or business association of which he or she was an executive officer; (ii) charged in, convicted in, or the subject of a criminal Proceeding (excluding traffic violations and other minor offenses) or been otherwise accused of any act of moral turpitude; (iii) the subject of any Order (not subsequently reversed, suspended or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him or her from, or otherwise imposing limits or conditions on his or her ability to engage in any securities, investment advisory, banking, insurance or other type of business or acting as an officer or director of a public Seller; or (iv) found by a court of competent jurisdiction in a civil Proceeding or by the Securities and Exchange Commission to have violated any federal or state commodities, securities or unfair trade practices law, which judgment or finding has not been subsequently reversed, suspended, or vacated.

3.7    Environmental Matters.

(a)    To Sellers' Knowledge, the Sellers are, and during the past three (3) years have been, in compliance with all Environmental Laws in all material respects.

(b)    Sellers have provided to Buyer true, accurate and complete copies of all reports or assessments in its possession, custody or control relating to the environmental condition

36

of the Leased Real Property or improvements thereon or compliance by Sellers with applicable Environmental Laws.

       3.8      <u>Title to Purchased Assets; Real Property</u>.

       (a)      Sellers have, and subject to the entry and effectiveness of the Sale Order in respect of the Purchased Assets of the Sellers, at the Closing, Buyer will have, good and valid title to each of the Purchased Assets (except for those Purchased Assets that are leased or licensed to any Seller, as to which any Seller has, and at the Closing, Buyer will have, valid licensed or leasehold interests), free and clear of all Liens, other than (i) Permitted Liens and (ii) Liens granted thereon by Buyer.

       (b)      Other than the Excluded Assets, the Purchased Assets constitute all of the assets used in or held for use in the Business and are sufficient for Buyer to conduct the Business from and after the Closing Date without interruption and in the Ordinary Course of Business as it has been conducted by the Sellers prior to the Closing Date.

       (c)      No Seller owns or has ever owned any real property. The real property leased by each Seller (the "<u>Leased Real Property</u>") pursuant to the leases described on <u>Section 3.8(c) of the Disclosure Schedules</u> (the "<u>Real Property Leases</u>") constitutes all of the real property leased by the Sellers, and all the real property utilized by Sellers in the conduct of the Business.  Except as set forth on <u>Section 3.8(c) of the Disclosure Schedules</u>:

       (i)      Each Real Property Lease is in full force and effect and is a legal, binding and enforceable obligation of the Seller party thereto, and, to Sellers' Knowledge, each of the other parties thereto.

       (ii)      The Sellers have Made Available to Buyer true, complete and accurate copies of each Real Property Lease (together with all amendments, modifications, annexes, exhibits and schedules thereto).

       (iii)      No Seller has assigned any Real Property Lease nor subleased nor licensed any or all of the Leased Real Property.

       (iv)      Each Seller's interest in and to the Leased Real Properties is free and clear of all Liens other than Permitted Liens, and none of the Sellers has mortgaged, assigned, pledged or encumbered any of the Real Property Leases.

       (v)      No notices of termination or cancellation of any Real Property Lease have been given or received by any Seller, and no notices of breach of any of the Real Property Leases have been given or received by any Seller that remains uncured.

       (vi)      No Seller is in default under any Real Property Lease, and, to Sellers' Knowledge, no other party to any Real Property Lease is in default thereunder and there exists no condition that, with notice or the passage of time or both, would be reasonably likely to constitute a default of any party thereunder.

<div align="center">37</div>

(vii)    To the Knowledge of the Sellers, none of the Leased Real Property is subject to any current or proposed governmental condemnation, expropriation or taking.

(viii)    There are no brokerage or leasing commissions due or payable to any party with respect to or on account of any of the Real Property Leases.

3.9    <u>Compliance with Laws</u>.

(a)    Each Seller and the Business is and has been in compliance with all applicable Laws in all material respects.  During the past four (4) years, no Seller has been cited, fined, or otherwise notified in writing by any Governmental Authority of any failure to comply with any Laws that has not been paid or cured. Neither the execution of this Agreement nor the Closing does or will constitute or result in any default, breach or violation by any Seller under any applicable Law.

(b)    Each Seller, and each of their respective directors, managers, officers, employees and, to the Sellers' Knowledge, Healthcare Providers, holds all Permits necessary for the ownership, lease, operations and use of the Purchased Assets or required to conduct the Business, and each such Permit, and any pending or applied for Permits, is listed on <u>Section 3.9(b) of the Disclosure Schedules</u>. Each Seller, and its directors, managers, officers, employees and Healthcare Providers, is in compliance in all material respects with all such Permits, all of which are valid and in full force and effect. During the past four (4) years, no Seller nor any director, manager, or officer has received (i) any written or, to the Sellers' Knowledge, verbal notice from any Governmental Authority alleging the violation of, or failure to comply with, any term or requirement of any of such Permits, or regarding the revocation, withdrawal, suspension, cancellation, termination or modification of any of such Permits; or (ii) any written or, to the Sellers' Knowledge, verbal notice of any event, inquiry, investigation or action before any Governmental Authority threatening the validity of any such Permit.  No such event, inquiry, investigation or action before any Governmental Authority is pending or, to the Sellers' Knowledge, threatened against any Seller.  The Sellers have Made Available to Buyer true and complete copies of all material Permits.

(c)    Except as set forth in <u>Section 3.9(b)of the Disclosure Schedules</u>, neither the execution of this Agreement nor the Closing does or will constitute or result in a default under or violation of any such Permit.

3.10    <u>Health Care Matters</u>. Except as set forth on <u>Section 3.10 of the Disclosure Schedules</u>:

(a)    Except as set forth on <u>Section 3.10(a) of the Disclosure Schedules</u>, each Seller, in connection with the conduct and operation of the Business, is, and at all times during the past four (4) years has been, in compliance in all material respects with all Health Care Laws and in compliance with all Health Care Fraud Laws that are applicable to the conduct and operation of the Business by it or to which any Purchased Asset is subject and with all of its respective Permits that are related to the Business, and, except as set forth on <u>Section 3.10(a) of the Disclosure</u>

38

Schedules, no Seller nor any of Sellers' employees or contractors has received during the past four (4) years any notice or communication from any Governmental Authority or Government Program, or any contractors or agents acting on behalf of any Third Party Payor that alleges noncompliance with any Health Care Laws in any material respect by any Seller or its employees or contractors in connection with the conduct or operation of the Business. There is no pending or, to Sellers' Knowledge, threatened Proceeding by or before any Governmental Authority or Third Party Payor alleging a violation of Health Care Laws in any material respect or any violation of any Health Care Fraud Laws by any Seller or Sellers' current or former directors, members, employees, agents, officers, managers, agents, or to Sellers' Knowledge, independent contractors, in connection with the conduct or operation of the Business. Without limiting the generality of the foregoing, during the past four (4) years, with respect to the Business: (i) no Seller nor, to Sellers' Knowledge, any of Sellers' directors, managers, members, officers, employees or agents have engaged in any activity or entered into any Contracts or other arrangements in connection with the conduct or operation of the Business which are prohibited under the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and/or the regulations promulgated thereunder, or applicable state or local fraud and abuse statutes or regulations; (ii) no Seller nor, to Sellers' Knowledge, any of Sellers' directors, managers, members, officers, employees, or agents acting on its behalf in connection with the conduct or operation of the Business has a "financial relationship," as that term is defined by the Stark Law or applicable state or local Stark-type statutes or regulations, with a physician or an immediate family member of a physician if such physician refers patients to any Seller unless such financial relationship meets an exception to the Stark Law and applicable state or local self-referral statutes or regulations; and (iii) each Seller has at all times materially complied with and satisfied all applicable Laws regarding protecting the privacy and security of Personal Information, including all applicable requirements under HIPAA and state Privacy Laws, except as set forth on Section 3.10(a) of the Disclosure Schedules. Each of the services and items provided to patients by any Seller (including its employees and contractors) in connection with the Business have at all times been provided in compliance in all material respects with Laws and in a competent manner, consistent with applicable professional standards, including all applicable quality standards and regulatory requirements of the Drug Enforcement Administration, state medical and other professional boards and other applicable Governmental Authorities.

(b)     During the past four (4) years, all claims submitted to any Third Party Payor by (or on behalf of), and the coding and billing practices of (or on behalf of), each Seller in connection with the conduct or operation of the Business have been timely, materially accurate and filed in material compliance with all Health Care Laws, applicable Third-Party Payor Contracts and published Third Party Payor billing guidelines. Except for refunds to carriers and patients in the Ordinary Course of Business that, individually or in the aggregate, are not material to the Business, Sellers and their agents have not billed or received any payment in excess of amounts allowed by any applicable Health Care Law, contract or published billing guideline in connection with the conduct or operation of the Business. Sellers and their agents have paid or caused to be paid all known and undisputed refunds, penalties, overpayments, fees or other financial assessments which have become due to any Third Party Payor or patient in connection with the Business within the timeframes set forth and in accordance with applicable Laws. Except as set forth on Section 3.10(b) of the Disclosure Schedules, there is no pending or, to Sellers' Knowledge, threatened Proceeding by any Person with respect to any billing practices or reimbursement claims by any Seller in connection with the conduct or operation of the Business,

nor any facts, events, circumstances or conditions that could reasonably be expected to give rise to such Proceeding in connection with the conduct or operation of the Business. Except as set forth on Section 3.10(b) of the Disclosure Schedules, Sellers and their agents are not and during the past four (4) years have not been, in each case in connection with the Business, the subject of any focused reviews, Recovery Audit Contractor or other Medicare Program Integrity contractor audits, or Medicaid Integrity Program audits. In the past four (4) years, no Seller has been audited or otherwise examined by any Third Party Payor in connection with the Business or otherwise received any notice or request for repayment or refund from any Government Program or Third Party Payor program in connection with the Business other than in the Ordinary Course of Business.

(c)    Each Seller is qualified for participation in the Medicare, Medicaid and TRICARE programs and other Government Programs and Third Party Payors from which it receives reimbursement in connection with the Business and has, and, at all times for the past four (4) years has held, a current and valid provider or supplier contract with such programs. Except as set forth on Section 3.10(c) of the Disclosure Schedules, with respect to each contract with a Third Party Payor to which each Seller is a party in connection with the Business, either directly or indirectly (e.g., through participation of such Seller in a physician hospital organization party to a contract with a Third Party Payor), such Seller and its agents are, and, for the past four (4) years have been, in compliance in all material respects with all applicable Laws, including conditions of payment and participation, rules, regulations, program memoranda and applicable manuals of Third Party Payors, instructions, FAQs and guidance, and are not in breach of or default under any such Contract. Except as set forth on Section 3.10(c) of the Disclosure Schedules, no event has occurred, is pending or, to Sellers' Knowledge, has been threatened, which, after the giving of notice, lapse of time or otherwise, would constitute a breach or default by any Seller under any such contract. All such contracts are in compliance in all material respects with all applicable Health Care Laws and Laws, including federal and state antitrust Laws. Except as set forth on Section 3.10(c) of the Disclosure Schedules, none of the Sellers or any of their respective agents have received any written or oral notice that there is any investigation, audit, claim, review, inquiry or proceeding pending or threatened against any of them that would reasonably be expected to result in a revocation, suspension, termination, probation, restriction, limitation or non-renewal of any participation in any Third Party Payor program in connection with the Business. Sellers have Made Available to Buyer complete and correct copies of (i) all audit or inspection reports received by Sellers or their agents from any Governmental Authority or Third Party Payor in connection with the Business during the past four (4) years and all written responses thereto and (ii) all correspondence and documents relating to any audits, investigations, inquiries, requests, reviews, or overpayment demands provided to Sellers or their agents in connection with the Business in the past four (4) years by any Governmental Authority or Third Party Payor. Except as set forth on Section 3.10(c) of the Disclosure Schedules, for the past four (4) years, no Third Party Payor has imposed an individual fine, penalty or other sanction on any Seller or terminated its relationship with any Seller in connection with the Business. The current provider numbers of each Seller with each Third Party Payor (to the extent related to the Business) are set forth on Section 3.10(c) of the Disclosure Schedules.

(d)    Except as set forth on Section 3.10(d) of the Disclosure Schedules, the Business as currently conducted by the Sellers does not require any insurance license, clinic

license, laboratory license, pharmacy, radiology, facility license, or other professional license under any Health Care Laws or Law.

(e)     Each Healthcare Provider is and at all times during the past four (4) years has been duly licensed, certified, and/or registered as required by applicable Health Care Laws to practice his or her profession in each state in which he or she practices in connection with the Business, and is validly registered (to the extent required) with the United States Drug Enforcement Administration under Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801, et seq. (commonly known as the Controlled Substances Act) and with any comparable state controlled substances registration requirements, to the extent that any such registration is required or used in connection with the Business. To Sellers' Knowledge, no event has occurred, and no fact, circumstance or condition exists, that has resulted or reasonably may result in the denial, loss, restriction, revocation or rescission of any such professional license or registration of any Healthcare Provider. No Healthcare Provider is subject to a pending disciplinary proceeding, inquiry, monitoring or investigation under the bylaws or rules of procedure of any Seller, the Drug Enforcement Administration, or any other federal or state professional board or agency charged with regulating the professional activities of such Healthcare Provider or under any other Health Care Laws or Laws related to such Healthcare Provider's role with Sellers. All disciplinary Proceedings, imposition of restrictions or conditions, revocation or non-renewal of rights and privileges for reasons requiring reporting by any Seller to local, state, federal or quasi-public authorities have been effected or will be timely effected as required. There is no Proceeding pending or, to Sellers' Knowledge, threatened with respect to denial, suspension or revocation of medical staff privileges or licensure of any Healthcare Provider.

(f)     Except as set forth on Section 3.10(f) of the Disclosure Schedules, no Seller or any of their directors, officers, owners, equityholders, employees, contractors, shareholders, members, managers or agents (in each case in connection with the Business) have at any time in the past four (4) years been convicted of, charged with or, to Sellers' Knowledge, investigated for a Government Program or Third Party Payor program related offense, or convicted of, charged with or investigated for a violation of any Health Care Law or Laws related to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of an investigation of controlled substances, or has been debarred, excluded, suspended, or otherwise prohibited from or deemed ineligible for participation in Medicare, Medicaid, TRICARE, or other Government Program, been subject to any order or consent decree of, or criminal or civil fine or penalty relating to any Government Program imposed by, any Governmental Authority, been subject to any sanction pursuant to 42 U.S.C. § 1320a-7a or § 1320a-8, been convicted of a crime described in 42 U.S.C. § 1320a-7b, or been listed on the General Services Administration's published list of parties excluded from federal procurement programs and non-procurement programs or the Office of the Inspector General of the U.S. Department of Health and Human Services ("OIG") List of Excluded Individuals/Entities. No Seller has arranged or contracted with (by employment or otherwise) any individual or entity that is excluded, debarred, or otherwise prohibited from participation in a Government Program for the provision of items or services for which payment may be made under such Government Program, including the General Services Administration's published list of parties excluded from federal procurement programs and non-procurement programs or the OIG List of Excluded Individuals/Entities. No exclusion, suspension,

13208185-55
13208185-58

or debarment actions relating to the Business are pending or, to Sellers' Knowledge, threatened against any Seller or any of Sellers' directors, officers, owners, employees, contractors, shareholders, members, managers or agents. Except as set forth on <u>Section 3.10(f) of the Disclosure Schedules</u>, no Seller or any of Sellers' directors, officers, owners, equityholders, employees, contractors, shareholders, members, managers, or agents have at any time (i) engaged in any activities that are prohibited by or are cause for civil or criminal penalties or mandatory or permissive exclusion under any Health Care Laws or Laws pertaining to billing, coding, fee-splitting, kickbacks, false claims, claims processing, marketing, or referrals; or (ii) adopted any board resolution at the request of any Governmental Authority that restricts the conduct of the Business or that impacts the management or operation of the Business in any adverse manner, in each case, pursuant to Health Care Laws.

(g)     Except as disclosed on <u>Section 3.10(g) of the Disclosure Schedules</u>, no Seller is, and in the past four (4) years no Seller has, in connection with the Business (i) been the subject of any investigation by a Governmental Authority; (ii) been a defendant in any qui tam, False Claims Act proceeding or similar Proceeding; (iii) been served with or received any search warrant, subpoena, civil investigative demand or other written or oral contact or notice from any Governmental Authority regarding any alleged or actual violation of or noncompliance with any Health Care Laws; (iv) received any written (or to Sellers' Knowledge, oral) complaints from any employee, independent contractor, vendor, physician, patient or other Person alleging that such Seller has violated, or is currently in violation of, any Health Care Laws; or (v) made any voluntary disclosure to OIG, CMS, or any Medicare Administrative Contractor, Medicaid program or other Governmental Authority relating to any Government Program. Except as disclosed on <u>Section 3.10(g) of the Disclosure Schedules</u>, in the past four (4) years, no Seller nor any Healthcare Provider employed or contracted thereby (a) has entered into any written agreement or settlement with any Governmental Authority with respect to noncompliance with or violation of any Health Care Laws, has been charged with, convicted of, or entered a plea of guilty or *nolo contendere* to any criminal or civil offense relating to the delivery of any item or service by a Governmental Authority or Third Party Payor program or any other violation of Health Care Laws; (b) is or has been a party to a corporate integrity agreement with OIG, monitoring agreement, consent decree, order or any similar agreement with any Governmental Authority; (c) has been subject to ongoing reporting obligations pursuant to any settlement agreement or compliance programs, plans, or agreements entered into with OIG or any Governmental Authority; or (d) has been assessed a civil money penalty under Section 1128A of the Social Security Act or any regulations promulgated thereunder or any other fine or penalty by any other Governmental Authority in connection with the violation of any Health Care Laws. Except as disclosed on <u>Section 3.10(g) of the Disclosure Schedules</u>, for the past four (4) years, each Seller has at all times maintained and conducted the Business in compliance in all material respects with a Compliance Program. Sellers have Made Available to Buyer a correct and complete copy of each Seller's current Compliance Program related to the Business. For the purposes of this <u>Section 3.10(g)</u>, the term "Compliance Program" refers to programs that are in compliance in all material respects with applicable compliance program guidance issued by OIG. Each Seller has provided at-hire and annual training to staff to oversee the functioning of its Compliance Program.

(h)     Each Seller has, and at all times during the past four (4) years has, obligated by Contract all Persons whose relationship with such Seller in connection with the Business

42

involves the processing of Personal Information on behalf of such Seller to comply with all applicable Privacy Laws and to restrict the use of Personal Information to those authorized or required under the applicable servicing, outsourcing or similar arrangement and entered into a business associate agreement with each Person who is or was a "business associate" or a "subcontractor" (as defined in 45 C.F.R. § 160.103) in connection with the conduct and operation of the Business. All such business associate agreements comply with 45 C.F.R. §§ 164.314(a)(2) and 164.504(e)(2); and to Sellers' Knowledge, no such Persons are in breach of such contractual obligations.

(i)     Each Seller has been duly granted and possesses, and during the past four (4) years has held, all Permits under all Health Care Laws and Laws necessary for the conduct and operation of the Business except where such failure to hold a Permit would not reasonably be expected to be adverse to the operations of the Business in any material respect. Section 3.10(i) of the Disclosure Schedules sets forth a complete and accurate list of each Permit held by any Seller that is related to the Business, together with the license number, issuance and expiration dates, and Governmental Authority or other Person responsible for issuing such Permit. Except as disclosed on Section 3.10(i) of the Disclosure Schedules, (i) all such Permits are valid, in good standing and in full force and effect, (ii) no Seller is in breach or violation of, or default under, any such Permit, and (iii) no basis exists that, with notice or lapse of time or both, would constitute any such breach, violation or default. No Seller has engaged in any activity that would be reasonably likely to cause a future loss, limitation, restriction, revocation or suspension of any Permit that affects or is otherwise related to the Business. No Proceeding by any Governmental Authority is pending or, to Sellers' Knowledge, threatened seeking to revoke, terminate, suspend, cancel, limit, or otherwise adversely modify any Permit that affects or is otherwise related to the Business. Except as set forth on Section 3.10(i) of the Disclosure Schedules, for the past four (4) years, no Seller has been in default or violation of any Permit that affects or is otherwise related to the Business in any material respect. For the avoidance of doubt, only the transferrable Permits included in Section 3.10(i) of the Disclosure Schedules are included in the Purchased Assets.

(j)     Section 3.10(j) of the Disclosure Schedules sets forth the true, correct and complete list of each Third Party Payor of the Business and the approximate number of patients related to such Third Party Payors who have been attributed to any Seller or any employee of any Seller as of the first date of the calendar month during which Closing occurs (as to each Third Party Payor, the "Members").

(k)     Except as set forth on Section 3.10(k) of the Disclosure Schedules, to Sellers' Knowledge, no amounts are owed by any Seller as a deficit or similar obligation to any Third Party Payor.

(l)     The Sellers have maintained the confidentiality of all Patient Records as required by and in conformance, in all material respects, with all applicable state and federal Laws. No Seller has transferred any Patient Records to any individual or entity against the request of any patient prohibiting Seller from transferring his/her patient information or records. Each Seller has maintained applicable Patient Records in a complete, accurate, and organized manner in material accordance with applicable Law and the conditions for participation, rules and regulations, billing policies and guidelines of any Third Party Payor. Each Seller shall, concurrently with the Closing,

43

transfer custody of all Patient Records to Buyer's designee, in accordance with applicable state and federal Laws.

(m)    No Seller provides, or has ever provided, laser, weight loss, medical cannabis, or other similar services.

3.11    Labor and Employment Matters.

(a)    Section 3.11(a) of the Disclosure Schedules sets forth a complete and accurate list of (i) all employees of each Seller as of the date hereof identifying for each such employee: his/her name, position/title, date of hire, rate of compensation, any target bonus amounts for 2024, any bonus amounts paid in 2024, accrued and unpaid sick, vacation and personal leave, whether classified as exempt or non-exempt for wage and hour purposes, average scheduled hours per week, the Seller by which he/she is employed, work location, any visa or work permit status and the date of expiration, if applicable, and status (active or on-leave), and (ii) all individual persons who are independent contractors, consultants, leased employees or other service providers or agents engaged by a Seller with respect to the operation of the Business and classified and treated as other than an employee of such Seller or compensated other than through wages paid by such Seller through its payroll and reported on a form W-2 ("Contingent Workers"), identifying for each the Seller by which he/she is so engaged, his/her role or services for such Seller and fee/compensation arrangement.

(b)    Each Seller currently classifies, and, during the past five (5) years has properly classified, each of its employees as exempt or non-exempt for the purposes of the Fair Labor Standards Act and state, local and foreign wage and hour Laws, and is, and, during the past five (5) years has been, otherwise in compliance with such Laws in all material respects.  To the extent that any Contingent Workers are engaged by such Seller, such Seller currently classifies and treats, and, during the past five (5) years has properly classified and treated, them as Contingent Workers (as distinguished from Form W-2 employees) in accordance with applicable Law and for the purpose of all employee benefit plans and perquisites.

(c)    Neither the Business nor any Seller is a party to or bound by any collective bargaining agreement or other Contract, or any duty to bargain, with a trade union, works council or other labor organization. To Sellers' Knowledge, there is currently no (and since January 1, 2021, there has been no) union organizing effort, or demand for recognition as collective bargaining representative, by or on behalf of any labor organization in respect of any employees of the Business or any Seller. Neither the Business nor any Seller has experienced any strike, lockout, work stoppage, slowdown, picketing, handbilling, material grievance, claim of unfair labor practices, or other labor dispute since January 1, 2021, and none are pending or, to Sellers' Knowledge, threatened. Neither the Business nor any Seller has committed any material unfair labor practice since January 1, 2021.

(d)    Except as set forth on Section 3.11(d) of the Disclosure Schedules, each employee of each Seller is employed on an at-will basis and may be terminated by such Seller at any time, without cause or prior notice, and without payment of severance or other penalty.

44

(e)    No Seller has experienced a "plant closing," "business closing," or "mass layoff" or similar group employment loss or event as defined in the WARN Act. Except as set forth on Section 3.11(e) of the Disclosure Schedules, no Key Personnel have announced an intention to terminate their employment with a Seller or their service to the Business other than to accept employment with Buyer.

3.12    Employee Benefit Plans.

(a)    Section 3.12(a) of the Disclosure Schedules sets forth a list of all Plans (collectively, the "Plans"). No Plan or other benefit arrangement covers any employee or former employee outside of the United States, and the Sellers have never been obligated to contribute to any such plan. The Sellers have Made Available to Buyer true and complete copies of (i) plan documents, summaries, amendments and related trust agreements, (ii) all material correspondence with all Governmental Authorities with respect to each Plan since January 1, 2021, (iii) the latest financial statements for the Plans, (iv) a copy of the most recent determination, opinion, or advisory letter for each plan intended to be qualified under Section 401(a) of the Code, and (v) Form 5500 for the three (3) most recent plan years, including all schedules thereto, all financial statements with attached opinions of independent accountants, and all actuarial reports.

(b)    No Seller nor any entity that would have ever been considered an ERISA Affiliate currently maintains or has ever maintained, or is required currently or has ever been required to contribute to or otherwise participate in, (i) any defined benefit pension plan or any plan, program or arrangement subject to the funding requirements of Section 412 of the Code or Section 302 or Title IV of ERISA, (ii) any Multiemployer Plan (as defined in Section 3(37) of ERISA), (iii) any "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA), or (iv) any "multiple employer plan" (within the meaning of Section 413 of the Code or Section 201(a) of ERISA). No Plan provides health care or other benefits to any employees of the Business or any Seller after their employment is terminated (other than as required by COBRA or similar state law).

(c)    Except as provided in the Seller's KERP and KEIP plan letter agreements, neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, could (either alone or in conjunction with any other event): (i) entitle any current or former director, officer, employee, independent contractor or consultant of the Sellers to severance pay or any other payment; (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation (including stock-based compensation) due to any such individual; (iii) increase the amount payable under or result in any other material obligation pursuant to any Plan; or (iv) result in any "parachute payment" as defined in Section 280G(b)(2) of the Code.

(d)    Each Plan that constitutes in any part a nonqualified deferred compensation plan within the meaning of Section 409A of the Code has been operated and maintained in all material respects in operational and documentary compliance with Section 409A of the Code and applicable guidance thereunder. No payment to be made under any Plan is, or to Sellers' Knowledge, will be, subject to the penalties of Section 409A(a)(1) of the Code. No Seller has any obligation to gross up, indemnify or otherwise reimburse any individual for any Taxes, interest or penalties incurred pursuant to Sections 409A or 4999 of the Code. With respect to any outstanding

45

equity interest in any Seller that is or was intended to be treated as a "profits interest" within the meaning of IRS Revenue Procedures 93-27 and 2001-43, (A) such equity interest has been treated as a "profits interest" from the date such equity interest was issued and has been outstanding for more than two (2) years, and (B) such Seller issued the holder of such equity interest an IRS Schedule K-1 for all periods from the date of issuance treating such equity interest as fully vested. Sellers have received, from each service provider or former service provider who holds an equity interest that is subject to a substantial risk of forfeiture as of the date hereof, if any, a copy of the election(s) made under Section 83(b) of the Code with respect to all such equity interests, and, to the Sellers' Knowledge, such elections were validly made and filed with the IRS in a timely fashion.

3.13    <u>Tax Matters</u>.  Except as set forth on <u>Section 3.13 of the Disclosure Schedules</u>:

(a)    Each Seller has filed all material Tax Returns that are required to be filed by such Seller and all such Tax Returns are correct and complete.  Without limiting the foregoing, none of such Tax Returns contains any position that is, or would be, subject to penalties under Section 6662 of the Code (or any corresponding provisions of state, local or non-U.S. Law).

(b)    All material Taxes owed by any Seller (whether or not shown on any Tax Returns) have been fully paid.

(c)    Each Seller has complied, in all material respects, with all applicable Laws, rules and regulations relating to the payment and withholding of Taxes (including withholding of Taxes pursuant to Sections 1441, 1442, 1445, 1446, 1471 and 3402 of the Code or similar provisions of state, local or non-U.S. Law) and has duly withheld and has paid over to the appropriate Tax Authority all material amounts required to be so withheld and paid over on or prior to the due date thereof under all applicable Laws.

(d)    There are no Liens for Taxes (other than Permitted Liens) on any Purchased Asset.

(e)    No Tax audits or administrative or judicial Tax proceedings are pending or being conducted with respect to any Seller or the Purchased Assets. No Seller has received from any Tax Authority (including jurisdictions where such Seller has not filed a Tax Return) any written (or, to Sellers' Knowledge, other) (i)  notice indicating an intent to open an audit or other review; (ii) request for information related to Tax matters; or (iii) notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any Tax Authority against such Seller.

(f)    No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(g)    No written (or, to Sellers' Knowledge, other) claim has been made by any Tax Authority in a jurisdiction where any Seller does not file Tax Returns that any Seller is or may be subject to the payment, collection or remittance of any material Tax of that jurisdiction or is otherwise subject to taxation by that jurisdiction in respect of material Taxes.

(h)      No Seller is currently a party to or bound by any Tax allocation, Tax sharing, Tax reimbursement, Tax indemnity or similar agreement or arrangement, other than under any arrangement entered into in the Ordinary Course of Business and not primarily related to Taxes. None of the Purchased Assets or Assumed Liabilities is bound by any closing agreement within the meaning of Code Section 7121 (or any similar provision of state, local, or foreign Law).

(i)      None of the Purchased Assets is an interest in any joint venture, partnership or other arrangement or contract that could be treated as a fiscally transparent entity for income Tax purposes.

(j)      Buyer will not be required to include any item of material income in, or exclude any item of material deduction from, taxable income for any Post-Closing Period as a result of any prepaid amount or advanced payment received, or deferred revenue accrued, on or prior to the Closing Date.

(k)      None of the Purchased Assets is a "United States real property interest" within the meaning of Section 897(c)(1) of the Code.

(l)      The tax classification for federal income Tax purposes for each Seller is set forth on Section 3.13(l) of the Disclosure Schedules.

(m)      The provisions of Section 197(f)(9) of the Code and the Treasury Regulations will not prevent any intangible assets of the Sellers from qualifying as "amortizable section 197 intangibles" within the meaning of Section 197 of the Code in the hands of Buyer.

(n)      None of the Sellers has claimed any employee retention Tax credits pursuant to any provision of the CARES Act or other similar provision of applicable Law.

(o)      Each Seller has properly (i) collected and remitted all material sales, use, value added, goods and services, and similar material Taxes with respect to material sales made or services provided to its customers, or with respect to material purchases of goods or services from its vendors and other third parties, and (ii) for all material sales or services that are exempt from sales, use, value added, goods and services, or similar Taxes, or that were made without charging or remitting any such Taxes, received and retained all Tax exemption certificates and other documentation required by Law for purposes of qualifying such  material sale or service as exempt.

(p)      None of the Assumed Liabilities is an obligation under an agreement, Contract, arrangement or plan that has resulted or would result, in a payment that would not be fully deductible as a result of a change in control of any of the Sellers.

(q)      None of the Sellers has ever (i) had a permanent establishment in any country other than the country under the Law of which it is organized, as defined in any applicable treaty or convention between such country and the jurisdiction of the entity's incorporation or formation or (ii) engaged in activities in any jurisdiction other than the jurisdiction under the Law of which it is organized that would subject it to Tax.

(r)    Section 3.13(r) of the Disclosure Schedules lists all Tax holidays, abatements, incentives and similar grants made or awarded to any Seller by any Governmental Authority.  All Contracts, memoranda and other documentation related to such items have been provided to Buyer.

(s)    No Seller has ever owned an interest in any entity that is a "controlled foreign corporation" within the meaning of Section 957(a) of the Code or a "passive foreign investment company" within the meaning of Section 1297 of the Code.

(t)    No Seller (i) is or ever has been a member of an "affiliated group" within the meaning of Section 1504 of the Code (or any similar provision of state, local, or foreign Law), and (ii) has any current or potential Liability for the Taxes of any Person pursuant to Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, foreign Law), as a transferee or successor, by contract or otherwise.

3.14    Insurance. Section 3.14 of the Disclosure Schedules lists each material insurance policy or program providing coverage to or for the benefit of the Sellers or with respect to the properties, assets, Liabilities or business of the Sellers (the "Insurance Policies"), including the name of the insurer and policy number and remaining policy limits for the past year. The Sellers have provided true, correct, and complete copies of the Insurance Policies, together with all applicable endorsements, amendments, declarations and certifications thereto, to Buyer.  The Insurance Policies are in full force and effect, all premiums and other amounts due and payable thereunder have been timely paid, and, to Sellers' Knowledge, no Seller is in breach or default thereunder nor has any Seller failed to give any notice or present any claim under any Insurance Policy in due and timely fashion.  The Insurance Policies are in amounts and provide coverages as required by applicable Governmental Authorities, applicable Laws and any Contract to which a Seller is a party or by which any of their assets or properties is bound, and are of the type and in amounts customarily carried by Persons conducting businesses similar to the business of the Sellers, as currently conducted.

3.15    Related Party Transactions and Interests. Except as set forth on Section 3.15 of the Disclosure Schedules, none of the Sellers is a party to any Contract with any Related Party, and no Related Party has any financial interest in any property (including any Purchased Assets) used, or Liabilities (including any Assumed Liabilities) owed, in connection with the Business or by the Sellers.  For purposes of this Agreement, "Related Party" means (i) any Affiliate of any Seller; (ii) any shareholder, member, director, manager, officer, or employee of any Seller (including Sun Capital Partners, Inc. or its affiliates); or (iii) any Affiliate or family member of any Person identified in the preceding clause (ii).  Except as set forth on Section 3.15 of the Disclosure Schedules, no Related Party owns any direct or indirect interest in or subleases any property (real, personal or mixed), tangible or intangible, used in the Business, or owns any direct or indirect interest in any business or entity that competes, directly or indirectly, with the Business or that serves or seeks to serve, a similar client base to that of the Business.  All current arrangements between or among the Sellers and any Related Parties have been conducted in compliance with applicable Law in all material respects.

3.16    Material Contracts.

48

(a)        Section 3.16(a) of the Disclosure Schedules sets forth a list of all Contracts, including all amendments and supplements thereto, to which any Seller is a party or by which the Business, such Seller or any of the Purchased Assets, or Assumed Liabilities is bound, or that provides for a material benefit or obligation to the Business or the Sellers (whether or not any Seller is a party) and that meets any of the descriptions set forth below (all Contracts required to be listed on Section 3.16(a) of the Disclosure Schedules, whether or not so listed, collectively referred to herein as the "Material Contracts"):

(i)        all Contracts relating to any business acquisition (A) by a Seller within the last four (4) years or (B) with respect to which any earn out, contingent payment Liability or other deferred purchase price obligation of the Business or any Seller remains outstanding;

(ii)        all Contracts with Key Personnel and Healthcare Providers that are paid in excess of $100,000 in the aggregate per year;

(iii)        all Contracts providing for remuneration to a physician (or such physician's immediate family member, each as defined the by Stark Law) who refers designated health services (as defined by the Stark Law) to any of the Sellers;

(iv)        all Contracts for the employment of any employee of any Seller, or the engagement of any non-employee service provider of any Seller that cannot be terminated by such Seller at will at any time, without cause or prior notice, and without payment of severance or other penalty;

(v)        all Contracts with a dollar amount in excess of $50,000 per year providing for guaranty of any obligation (including any commitment (contingent or otherwise) to grant any such guaranties);

(vi)        all Contracts under which any Seller is lessee of, or holds or operates, any personal property (including medical equipment) owned by any other party, for which the annual rental payments exceed $50,000 (including any commitment (contingent or otherwise) to make any such payments);

(vii)        all Contracts with any Governmental Authority or any Third Party Payor;

(viii)        all Software licenses that Sellers pay in excess of $50,000 per year to use and is material to the operation of the Business, taken as a whole (other than "off the shelf" Software);

(ix)        all Contracts relating to the incurrence of any Indebtedness exceeding $50,000 (including any commitment (contingent or otherwise) to incur any such Indebtedness) or granting or suffering any Lien (including any commitment (contingent or otherwise) to grant or suffer any such Lien), including borrowing of money or to mortgaging, pledging or otherwise placing a Lien on any of the assets of a Seller or guaranty of any obligation for Indebtedness;

49

(x)        all Contracts containing covenants limiting the freedom of any Seller or its Affiliates to acquire or compete with any Person, engage in any line of business, or compete in any geographic region or with any third party, or pursuant to which any Seller has granted a right of first refusal, right of first negotiation, most favored nation pricing or other similar terms, preferred pricing, exclusive sales, distribution, marketing or other exclusive rights;

(xi)        all Contracts evidencing loans or, advances to or from, or investments in, any Person other than a Seller (including (A) loans or advances to employees and (B) any commitment (contingent or otherwise) to make any such loan or investment);

(xii)        all Contracts granting any Lien or restricting the granting of any Lien or other disposition;

(xiii)        all Contracts which involve (A) a sharing of profits with a third party in which the profit shared exceeds $50,000 (other than direct payments for goods or services), or (B) any joint venture, partnership or similar Contract;

(xiv)        all Contracts relating to (A) during the twenty-four (24) months prior to Closing offering of patient incentives other than for meals and transportation, services offered at Sellers' wellness center locations (other than for meals and entertainment), or patient discount programs, or (B) offering of transportation or meals in excess of $50,000 per year;

(xv)        any Contract (A) providing for the payment of any cash or other benefits upon, or (B) which requires the consent of the other party thereto or may be terminated as a result of, the sale or change of control of a Seller or a substantial portion of its assets;

(xvi)        all Contracts under which any Seller is obligated to indemnify or hold harmless, or is entitled to indemnification from, any other Person, other than Contracts entered into in the Ordinary Course of Business the primary purposes of which is not to provide such indemnity;

(xvii)        any Contract not made in the Ordinary Course of Business;

(xviii)        any Contract with any employee leasing or staffing company pursuant to which such employee leasing or staffing company's employees provide services to any Seller;

(xix)        any Contract with an employee or other service provider that (A) provides for annual cash compensation (including incentive compensation opportunities) in excess of $100,000, or (B) provides for severance benefits, change-in-control payments, retention bonuses, or other similar payments; and

<div align="center">50</div>

(xx)      all Contracts not otherwise identified above that involve consideration in excess of $50,000 in the 2023 or 2024 fiscal year.

(b)      Except to the extent excused or made unenforceable as a result of the filing of the Bankruptcy Cases, and except as set forth on Section 3.16(b) of the Disclosure Schedules, to the Knowledge of the Sellers, (i) each Assumed Contract is a legal, valid and binding obligation of the Seller that is a party to such Assumed Contract, is enforceable against such Seller in accordance with its terms, is a legal, valid and binding obligation of each other party to such Assumed Contract and is enforceable against such other party thereto in accordance with its terms, subject to bankruptcy laws and general equitable principles, (ii) other than a monetary default curable upon payment of any Cure Cost, no Seller that is a party to any Assumed Contract or, to the Knowledge of the Sellers, any other party to an Assumed Contract is in default or breach of an Assumed Contract, (iii) no Seller that is a party to any Assumed Contract has received any written notice of termination or cancellation with respect to any Assumed Contract and (iv) with respect to the Assumed Contracts, upon entry of the Sale Order and payment of all Cure Costs, each Seller will not be in breach or default of its obligations thereunder.

(c)      Section 3.16(c) of the Disclosure Schedules lists all Cure Costs.

3.17    Intellectual Property.

(a)      Section 3.17(a) of the Disclosure Schedules contains a list of all (i) Patents owned by any Seller, (ii) registrations for Trademarks and applications therefor owned by any Seller, (iii) unregistered Trademarks used by any Seller which are material to the operation of the Business, (iv) Internet domain name registrations owned by any Seller, and (v) registrations for Copyrights and applications therefor owned by any Seller, setting forth as to each such item, as applicable, the item or title, the application or registration number and the jurisdiction in which such item is registered or pending.  Each item of Intellectual Property that is registered, issued, or applied-for is valid, subsisting, and enforceable under applicable Laws.

(b)      The Sellers collectively own and possess all right, title and interest in and to, or possess the valid and enforceable license or other right to use, all Intellectual Property which is or has ever been Seller Intellectual Property. All such Seller Intellectual Property is included in the Purchased Assets.

(c)      Each item of Intellectual Property owned or purported to be owned by the Sellers, licensed to Sellers, or used or held for use in the Business as conducted or as proposed to be conducted by the Sellers ("Seller Intellectual Property") will be owned, licensed, and/or available for use by Buyer on identical terms following the Closing as such items were owned, licensed and available for use to Sellers prior to the Closing. All licenses and other Contracts under which any Seller obtains rights in or to any Seller Intellectual Property not owned or purported to be owned by the Sellers (other than "off the shelf" Software), are listed in Section 3.17(c) of the Disclosure Schedules.

(d)      One or more of the Sellers owns the entire and unencumbered right, title and interest in and to, or has obtained the perpetual and irrevocable right to use in the Business, all Intellectual Property at any time invented, made, developed, authored, or created by any

51

employee, contractor, or consultant of each Seller in the course of his or her employment or services for such Seller.

(e)    To Sellers' Knowledge, no third party is infringing, misappropriating or violating, or has infringed, misappropriated or violated, any Intellectual Property owned or purported to be owned by Sellers.  Sellers have not made or threatened to make any claim or allegation concerning the foregoing against any Person regarding such Intellectual Property.  The Sellers, the Business, the Intellectual Property owned or purported to be owned by Sellers, and the products, services, and other offerings of the Sellers, do not infringe, misappropriate or violate, and have not infringed, misappropriated or violated, any other Person's Intellectual Property.  The Sellers have not received any written claim or allegation with respect to any such infringement, misappropriation, or violation.   The Sellers have not received any written or, to Sellers' Knowledge, oral notice or claim setting forth any challenge to the ownership, use, validity or enforceability of any the Sellers' rights in any Intellectual Property.

(f)    Sellers have taken reasonable security measures to protect the secrecy, confidentiality and value of all material Trade Secrets of the Sellers.  Without limitation of the foregoing, no Trade Secret of the Sellers has been disclosed by the Sellers to a third party other than pursuant to a written non-disclosure agreement consistent with customary practices in the industry.  To the Knowledge of the Sellers, there has not been any breach by any third party of any confidentiality obligation to any Seller.

(g)    The computers, devices, equipment, networks, systems, and other information technology infrastructure used in, enabling, or relating to the Processing of data or information, including all Software operating on or in connection with such systems, devices, or equipment, used or held for use in the conduct of the Business or by or on behalf of Sellers, including all computers, servers, storage devices, workstations, routers, hubs, switches, sensors, and other devices, equipment, networks, or systems (collectively, the "IT Assets") used by the Sellers are sufficient in all material respects for current needs of the Sellers in the operation of the Business. There have been no failures, crashes, security breaches or other adverse events affecting the IT Assets in a manner that materially impacts the Business. The IT Assets and Seller Software do not contain any material defects, bugs or errors or any Software designed to disable any other Software or any computer or system automatically, with the passage of time, under the positive control of any Person or otherwise, or any Software enabling unauthorized access to or operation of or other disruption, impairment, modification, recordation, misuse, transmission, disablement or destruction of any other Software or any computer or system, including any Trojan horses, spyware, adware, malware, or other malicious code and is free from any such viruses, disabling codes, and devices.  The Sellers provide for the back-up and recovery of material data, and have implemented commercially reasonable disaster recovery plans, procedures and facilities and, as applicable, have taken all steps to implement such plans and procedures. The Sellers have at all times obtained and maintained all licenses (in sufficient quantities and under sufficient terms) necessary or required for the Sellers to make valid and non-infringing use of all Software or other Intellectual Property owned by any other Person used or held for use by the Sellers or in connection with the Business. The Sellers own or have the right to exploit, and after Closing, Buyer will continue to own or have the right to exploit, each item of the Seller Software in the same manner and to the same extent as it was used immediately prior to the Closing.  The Sellers have taken

reasonable security measures to protect the integrity and security of the IT Assets and the information stored therein from unauthorized use, access, or modification by third parties.

(h)     Except as set forth on <u>Section 3.17(h) of the Disclosure Schedules</u>, the Sellers do not access, procure, obtain, generate, use, or rely on any AI in connection with the Business, and no Seller Intellectual Property or IT Assets or Seller Software incorporates, is based upon, or is derived from any AI systems. No confidential Seller Intellectual Property or confidential information of the Business has been provided or made available to any AI system of any third party, and no Seller Intellectual Property was generated using any AI.

3.18    <u>Privacy and Security Compliance</u>.

(a)     The Sellers are and at all times have been in compliance in all material respects with the applicable requirements of all Health Care Laws and other Laws, all policies of the Sellers, all permissions, consents and authorizations, and all obligations of any Contract (including under any HIPAA "business associate" agreement), in each case applicable to the privacy and security of Seller Information and the Processing thereof by or on behalf of the Sellers ("<u>Information Requirements</u>").Without limiting the foregoing, the Sellers have at all times obligated by Contract all Persons whose relationship with such any Seller involves the processing of Seller Information on behalf of such Seller to comply with all applicable Information Requirements.

(b)     The Sellers maintain and have maintained in place (i) a written security program including reasonable and appropriate security measures covering all Seller Information and IT Assets that are intended to protect the security, confidentiality, integrity, and availability of all Seller Information, and (ii) written policies regarding the privacy of Seller Information, including all Personal Information, each in accordance with all Information Requirements. The Sellers have made available to Buyer complete and current copies of all such programs and policies and any other policies and procedures regarding data privacy or security or the Processing of Seller Information.

(c)     The Sellers have maintained commercially reasonable administrative, technical and physical safeguards to protect Seller Information from unauthorized access or disclosure that comply with all applicable Information Requirements.  Without limiting the foregoing, the Sellers have taken commercially reasonable actions to protect against the occurrence of any Breach of Unsecured Protected Health Information (as such term is defined at 45 C.F.R. § 164.402) or any suspected or actual breach of security, violation of any security policy, or unauthorized access, acquisition, use, loss, denial or loss of use, destruction, compromise, or disclosure of any Seller Information or IT Assets ("<u>Security Incident</u>").  The Sellers have not experienced any such Security Incident. No Seller or any third party acting at the direction or authorization of the Sellers has paid any form of compensation to any perpetrator of any actual or threatened security incident or cyber-attack, including a ransomware attack or denial-of-service attack.  The Sellers have not notified and there have been no facts or circumstances that would require the Sellers to notify, any other Person of any actual or perceived Security Incident or any violation of any Information Requirements, and no Seller is currently planning to conduct any such notification or investigating whether any such notification is required.

53

(d)     The Sellers have obtained and maintained all consents, permissions, and authorizations required under all Information Requirements with respect to the Processing of all Seller Information by or on behalf of any Seller. The Sellers have and have maintained the valid right (including pursuant to the Information Requirements) to Process all Seller Information for the purpose such Seller Information is and has been used or otherwise Processed in the conduct of the Business or by or on behalf of the Sellers.  No Seller has sold, rented, or otherwise made available to any Person any Personal Information collected or maintained in connection with the conduct and operation of the Business for remuneration or other consideration. The consummation of the transactions will not (i) violate or cause Sellers to violate any Information Requirements or require the Sellers to provide any notice to, or seek any consents, permissions, or authorizations from, any other Person pursuant to any Information Requirement, or (ii) require or obligate Buyer to provide any notice to, or seek or obtain any consents, permissions, or authorizations from, any Person to continue the Processing of the Seller Information in the same manner as the Sellers used and processed all Seller Information prior to such transactions.

(e)     None of the Sellers has received any notice or complaint (written or otherwise), nor, to Sellers' Knowledge, has any notice or complaint (written or otherwise) been made by any other Person, regarding the improper Processing of Seller Information by or on behalf of any of the Sellers.  None of the Sellers has received any written (or, to Sellers' Knowledge, oral) notice or communication from any Governmental Authority or other Person with respect to any allegation that any of the Sellers is not in compliance with any applicable Information Requirement.

3.19    No Brokers.  Except as set forth in <u>Section 3.19 of the Disclosure Schedules</u>, None of the Sellers has incurred or will incur any obligation for any finder's or broker's or agent's fees or commissions or similar compensation in connection with the transactions contemplated by this Agreement and the Ancillary Agreements to which he, she or it is a party for which the Business, such Seller may be liable.

3.20    Certain Business Relationships. <u>Section 3.20 of the Disclosure Schedules</u> lists the ten (10) largest Third Party Payor of the Business taken as a whole by revenue for each of the twelve (12) month periods ended December 31, 2022 and December 31, 2023 and the eight (8)-month period ended August 31, 2024 (each, a "<u>Material Third Party Payor</u>").  Within the past twelve (12) months, no Material Third Party Payor (i) has canceled or terminated in writing, or, to Sellers' Knowledge, threatened to cancel or terminate, its relationship with any Seller, or (ii) materially reduced the rates paid under its Contract with any Seller.  Except as set forth on <u>Section 3.20 of the Disclosure Schedules</u>, no Seller is involved in any material dispute or controversy with any of its Material Third Party Payors.

3.21    Absence of Unlawful Payments.  To the Knowledge of the Sellers, no Seller, nor any of its directors, officers or, employees or other representative of any Seller or any authorized Person acting directly or indirectly on behalf of any Seller, has (a) made, paid or received any unlawful bribes, kickbacks or other similar payments to or from any Person (including any customer or supplier) or Governmental Authority, or (b) made or paid any unlawful contributions, directly or indirectly, to a domestic or foreign political party or candidate.

3.22    Devices.    Section 3.22 of the Disclosure Schedules contains an accurate and complete list of all of the Devices that have been used at any time and in any manner in connection with the Business that are, as of the Closing, operational and in use or were operational or in use at any point during the twelve (12) month period prior to the Closing.  Those Devised listed on Section 3.22 of the Disclosure Schedules that remain operational and are currently in use as of the Closing shall be referred to as "Transferred Devices". Prior to the Closing, ownership of all Transferred Devices will be duly and properly transferred to Sellers, and all such Transferred Devices are "Devices" and "Purchased Assets" as defined in this Agreement. With respect to any other Devices, all such Devices were previously decommissioned and any "protected health information" (as defined in 45 C.F.R. § 160.103) stored on such Devices was permanently and irretrievably deleted or destroyed in accordance with applicable Laws, including Healthcare Laws.

3.23    PPP Loan.  Except as set forth in Section 3.23 of the Disclosure Schedules, no Seller has received any PPP Loan from any person or entity. Each PPP Loan set forth in Section 3.23 of the Disclosure Schedules has been forgiven in full in accordance with the terms of the CARES Act.

3.24    COVID-19 .    Section 3.24(a) of the Disclosure Schedules sets forth a list of all COVID-19 Funds that any Seller has received or for which any Seller has applied pursuant to any COVID-19 Relief Programs, as well as the aggregate amount of repayments and outstanding liabilities with respect to each such loan, application or other payment. To the Knowledge of the Sellers, each Seller, as applicable, has met all applicable conditions and was eligible to participate in, has complied with, and is not in violation of, all such COVID-19 Relief Programs. Each Seller, as applicable, has utilized any COVID-19 Funds in accordance with all applicable Laws and maintains appropriate accounting records associated with such funds. Each Seller, as applicable, has made true, correct, and complete certifications with respect to all such COVID-19 Relief Programs and all documents ancillary thereto and has complied with all Laws, including all Laws relating to the COVID-19 Relief Programs. Each Seller, as applicable, has provided Buyer with true, correct, and complete copies of all documents relating to such COVID-19 Relief Programs, including such Seller's applications therefor and any certifications delivered in connection therewith.

3.25    CHOPD Incident.  Section 3.25 of the Disclosure Schedules sets forth a list of all CHOPD AAPs that any Seller has received or for which any Seller has applied pursuant to any CHOPD Relief Program, as well as the aggregate amount of repayments and outstanding liabilities with respect to each such loan, application or other payment. Each Seller, as applicable, has met all applicable conditions and was eligible to participate in, has complied with, and is not in violation of, any CHOPD Relief Program. Each Seller, as applicable, has utilized any CHOPD AAPs in accordance with all applicable Laws and maintains appropriate accounting records associated with such funds. Each Seller, as applicable, has made true, correct, and complete certifications with respect to all such CHOPD AAP Relief Programs and has complied with all Laws related thereto.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller as follows:

55

4.1     Status.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware.

4.2     Power and Authority.  Buyer has all requisite limited liability company power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.  All limited liability company acts or proceedings required to be taken by Buyer to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party and the performance of Buyer's obligations hereunder and thereunder have been properly taken.

4.3     Enforceability.  This Agreement has been duly authorized, executed, and delivered by Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by each Seller, this Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against it in accordance with its terms, except as the same may be limited by applicable Bankruptcy and Equity Exceptions.

4.4     No Violation; Consents and Approvals.   The execution and delivery of this Agreement and the Ancillary Agreements to which it is a party by Buyer and the consummation by it of the transactions contemplated hereby and thereby will not, except as set forth in the Schedule listing Assumed Contracts, (a) violate any provision of the Organizational Documents of Buyer, (b) violate any material Law applicable to, binding upon, or enforceable against Buyer, (c) result in any material breach of, or constitute a material default (or an event which would, with the passage of time or the giving of notice or both, constitute a material default) under, or give rise to a right of payment under or the right to terminate, amend, modify, abandon, or accelerate, any Contract to which Buyer is a party or bound, (d) result in the creation or imposition of any Lien upon any of the material property or material assets of Buyer, or (e) require the consent or approval of any Governmental Authority or any other Person. The current policies of Buyer or its Affiliates with respect to the treatment of "Personally Identifiable Information", as such term is defined in Section 101(41A) of the Bankruptcy Code (11 U.S.C. §101(41A)), comply, in all material respects, with applicable Law.

4.5     Brokers.  Except as set forth on Schedule 4.5, Buyer has not incurred any obligation for any finder's or broker's or agent's fees or commissions or similar compensation in connection with the transactions contemplated by this Agreement and the Ancillary Agreements to which it is a party.

4.6     Litigation.   There are no Proceedings pending or, to the knowledge of Buyer, expressly threatened in writing against either of Buyer or any of its Affiliates, at Law or in equity, or before or by any Governmental Authority which reasonably would be expected to affect the legality, validity, or enforceability of this Agreement or the consummation of the transactions contemplated by this Agreement.

4.7     Sufficient Funds; Adequate Assurances.  Buyer has and will have at the Closing immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby.  There is no financing or similar

contingency upon Buyer's obligations hereunder. As of the Closing, Buyer shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts and the related Assumed Liabilities.

4.8   <u>Acknowledgements; "As Is" "Where Is" Transaction</u> .

(a)   BUYER ACKNOWLEDGES THAT IT HAS RECEIVED FROM SELLERS CERTAIN PROJECTIONS, FORECASTS, AND PROSPECTIVE OR THIRD-PARTY INFORMATION RELATING TO SELLERS, THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES. BUYER ACKNOWLEDGES THAT (I) THERE ARE UNCERTAINTIES INHERENT IN ATTEMPTING TO MAKE SUCH PROJECTIONS AND FORECASTS AND IN SUCH INFORMATION; (II) BUYER IS FAMILIAR WITH SUCH UNCERTAINTIES AND IS TAKING RESPONSIBILITY FOR MAKING ITS OWN EVALUATION OF THE ADEQUACY AND ACCURACY OF SUCH PROJECTIONS, FORECASTS, AND INFORMATION SO FURNISHED; AND (III) NONE OF THE SELLERS NOR ANY OTHER PERSON MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO SUCH PROJECTIONS AND FORECASTS. THE FOREGOING REPRESENTATIONS ASSUME THE ABSENCE OF FRAUD.

(b)   BUYER FURTHER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY SELLERS TO BUYER IN ARTICLE IV (AS QUALIFIED BY THE DISCLOSURE SCHEDULES) OR IN THE DOCUMENTS DELIVERED BY SELLERS TO BUYER IN ACCORDANCE WITH SECTION 3.1(b) AT THE CLOSING (COLLECTIVELY, THE "<u>EXPRESS REPRESENTATIONS</u>") ARE THE SOLE AND EXCLUSIVE REPRESENTATIONS, WARRANTIES AND STATEMENTS OF ANY KIND MADE TO BUYER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND THAT ALL OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE EXPRESSED OR IMPLIED, WHETHER IN WRITTEN, ELECTRONIC OR ORAL FORM, ARE EXPRESSLY DISCLAIMED, INCLUDING WITH RESPECT TO (I) ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS, AND (II) WITH RESPECT TO THE BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, AND PROSPECTS OF SELLERS OR THE BUSINESS OF THE SELLERS, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF. THE FOREGOING REPRESENTATIONS ASSUME THE ABSENCE OF FRAUD.

(c)   UPON THE CLOSING DATE, SUBJECT TO THE EXPRESS REPRESENTATIONS, BUYER WILL ACCEPT THE PURCHASED ASSETS "AS IS," "WHERE IS," AND "WITH ALL FAULTS." THE FOREGOING REPRESENTATIONS ASSUME THE ABSENCE OF FRAUD.

## ARTICLE V.
## PRE-CLOSING COVENANTS

57

5.1    <u>Conduct of Business</u>. Except as set forth on <u>Schedule 5.1</u>, as contemplated by this Agreement, as required by Law, as prohibited or restricted by the Bankruptcy Code, to the extent Sellers do not have adequate funding therefor in the Bankruptcy Cases, as prohibited by any debtor-in-possession financing in the Bankruptcy Cases, or as Buyer may otherwise consent to in writing (which consent shall be in Buyer's sole discretion), from the date hereof through the Closing:

(a)    Sellers shall:

(i)    use commercially reasonable efforts to conduct its Business only in the Ordinary Course of Business;

(ii)    preserve and maintain all of its Permits;

(iii)    maintain the items of tangible personal property related to the Business and the Leased Real Property in the same condition as they were on October 8, 2024 and make all necessary repairs to restore all such tangible personal property and Leased Real Property to the same condition as existed on October 8, 2024, subject in all cases to reasonable wear and tear and disposal consistent with the Ordinary Course of Business;

(iv)    use commercially reasonable efforts to maintain relationships with its current payors, lenders, lessors, vendors and employees;

(v)    reasonably defend and protect its properties and assets from infringement or usurpation;

(vi)    perform all of its material obligations under all Assumed Contracts;

(vii)    maintain its books and records in accordance with past practice;

(viii)    comply in all material respects with all applicable Laws;

(ix)    reduce any service or Healthcare Professional service offering; or

(x)    agree to do any of the foregoing; and

(b)    Sellers shall not:

(i)    sell, lease, transfer, or assign any of its material Purchased Assets, other than in the Ordinary Course of Business;

(ii)    make any material increase to the base compensation of any of its directors, managers, Employees, or officers, except in the Ordinary Course of Business, except as disclosed on <u>Schedule 5.1(b)(ii)</u>, or except as may be required by any Law or Contract or the Company's KERP and KEIP plan letter agreements;

(iii)        enter into or adopt any agreement, arrangement, plan or policy that would constitute a Plan except as disclosed on Schedule 5.1(b)(iii);

(iv)        enter into any employment Contract (except as disclosed on Schedule 5.1(b)(iv)) that (A) provides for annual cash compensation (including incentive compensation opportunities) or (B) provides for severance benefits, change in control payments, retention bonuses, or other similar payments; and

(v)        enter into any collective bargaining agreement or other Contract with any trade union, works council or other labor organization or recognize any trade union, works council or other labor organization as the collective bargaining representative of any employees;

(vi)        terminate any Assumed Contract (other than upon any expiration of the term of any Assumed Contract), amend any Assumed Contract or enter into any Contract that would be an Assumed Contract if such Contract was in effect on the date hereof;

(vii)        subject any of the Purchased Assets to any Liens, except for Permitted Liens;

(viii)        commence, settle or propose to settle any Proceedings (except as disclosed on Schedule 5.1(b)(viii) and other than the Bankruptcy Cases that will be filed);

(ix)        (A) file any material Tax Returns required to be filed inconsistent with its past practices, (B) make, change or rescind any material Tax election, (C) settle or compromise any material Tax liability, (D) enter into any closing agreement within the meaning of Code Section 7121 (or any similar provision of state, local, or foreign Law), (E) amend any material Tax Return, (F) make any voluntary Tax disclosure, Tax amnesty, or other similar filing, (G) surrender or abandon any right to claim a material Tax refund, offset, or other reduction in Tax Liability, or (H) consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of Taxes;

(x)        take any other actions that would require disclosure pursuant to Section 3.5; or

(xi)        agree to do any of the foregoing.

(c)        The provisions of this Section 5.1 are not intended to be, nor will they be construed as, an endeavor on the part of Sellers or Buyer to implement the transactions contemplated hereunder prior to the Closing (and satisfaction of the conditions in Article IX), and the Parties agree that Buyer will not prior to the Closing be entitled to exercise any control over the business or affairs of Sellers.

5.2        Access to Information.

59

(a) From and after the date hereof until the earlier of the Closing Date or the termination of this Agreement in accordance with its terms, upon reasonable notice, and subject to restrictions contained in any confidentiality agreements to which Sellers are subject, Sellers shall provide to Buyer and its authorized representatives during regular business hours reasonable access to all books and records of and documents and other information regarding Sellers (in a manner so as to not unreasonably interfere with the normal business operations of Sellers); provided, however, notwithstanding the foregoing or any other provision of this Agreement, during the Pre-Closing Period no Seller shall be required to provide access or disclose information where such access or disclosure would, on the advice of Sellers' outside counsel, reasonably be expected to, (i) violate or jeopardize the attorney-client privilege or attorney work-product privilege or (ii) violate any applicable Laws; provided, further, in the case of both clauses (i) and (ii), Sellers shall provide to Buyer such access and information to the maximum extent reasonably possible so that no such violation or waiver shall occur, including by providing redacted copies or entering into joint defense agreements (to the extent related to a pending or threatened Action) or by obtaining the consent of the applicable third parties to permit disclosure. For the avoidance of all doubt, nothing in this Section 5.1(a) shall be deemed to give rise to a contingency, condition or similar right regarding Buyer's satisfaction with any information of any kind to which Buyer is given access prior to the Closing Date.

(b) From the Closing Date until the three (3) year anniversary of the Closing Date, Buyer shall give the Sellers and the Sellers' Representative (and their designees) reasonable access during normal business hours to the books and records exclusively pertaining to the Purchased Assets and Assumed Liabilities (in a manner so as to not unreasonably interfere with the normal business operations of Sellers), and shall make available to the Sellers and the Sellers' Representative the employees of Buyer or its Affiliates whose assistance Buyer reasonably determines is necessary to assist the Sellers or the Sellers' Representative in connection with the Sellers' or such Sellers' Representatives' inquiries for the sole purposes of (i) the preparation or amendment of Tax Returns, or (ii) as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Cases. Buyer shall, and shall cause each of its controlled Affiliates to, cooperate with the Sellers as may reasonably be requested by the Sellers for such purposes. For the avoidance of doubt, nothing in this Section 5.2(b) shall require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege or attorney work-product privilege, (ii) such action could reasonably be expected to result in violation of applicable Law or Order, (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations; or (iv) such action is in connection with a conversion of the Bankruptcy Cases or to assist a Chapter 7 trustee.

5.3    Pending Audits and Appeals Pre-Closing Access to Information. During the Pre-Closing Period, no Seller shall enter into any settlement or repayment agreement or otherwise agree in principle with the U.S. Department of Justice, OIG or CMS regarding a resolution of any material negative findings resulting from audits by any Governmental Authority, in each case without providing Buyer a copy of the proposed settlement agreement and/or notice of such discussions and an opportunity to communicate with the Sellers or their counsel regarding and prior to entering into such settlement agreement and/or such discussions. The Sellers must promptly notify Buyer of any correspondence with the U.S. Department of Justice, OIG or CMS

regarding any material negative findings or the resolution of any material negative findings resulting from audits of the Sellers by any Governmental Authority.

5.4    Notification. During the Pre-Closing Period, the Sellers or Buyer, as the case may be (either such Party(ies), the "Disclosing Party"), shall promptly notify the other Parties in writing if the Disclosing Party becomes aware of (i) any fact or condition that causes or constitutes a breach of any of the representations and warranties of the Disclosing Party made as of the date of this Agreement, or (ii) the occurrence after the date of this Agreement of any fact or condition that would or be reasonably likely to cause or constitute a breach of any such representation or warranty had that representation or warranty been made as of the time of the occurrence of, or the Disclosing Party's discovery of, such fact or condition. If any such fact or condition requires any change to the schedules prepared by a Disclosing Party, such Disclosing Party shall promptly deliver to the other Parties a supplement to such schedules specifying such change. In addition, between the date of this Agreement and the Closing, the Sellers or Buyer, as the case may be, shall promptly notify the other Parties of the occurrence of any breach of any covenant by such party in this Agreement or of the occurrence of any event that may make the satisfaction of any conditions in Article IX impossible or unlikely.  No disclosure pursuant to this Section 5.4 will prevent or cure any breach of any representation or warranty or covenant set forth in this Agreement.

5.5    Efforts to Close. From and after the date hereof until the earlier of the Closing Date or the termination of this Agreement

(a)    Subject to the terms of this Agreement, each of Buyer and each Seller shall use their respective commercially reasonable efforts to cause the conditions to Closing to be satisfied and for the Closing to occur as promptly as practicable.

(b)    In the event any Proceeding by any Governmental Authority or other Person is commenced which challenges the validity or legality of the transactions contemplated hereby or seeks damages in connection therewith, the Parties agree to cooperate and use reasonable efforts to defend against such Proceeding and, if an injunction or other order is issued in any such action, suit or other proceeding, the Parties agree to take reasonable actions to have such injunction or other order lifted, in order to expeditiously consummate the consummation of the transactions contemplated by this Agreement prior to the Outside Date; provided, however, nothing in this Section 5.5(b) shall be deemed to extend or otherwise affect the Outside Date or the Parties' rights in connection therewith.

(c)    The Parties acknowledge that certain consents to and notices in respect of the transactions contemplated by this Agreement may be required from or to parties to contracts, leases, licenses or other agreements to which any Seller is a party (including the Assumed Contracts set forth on Section 3.3 of the Disclosure Schedules). During the period between the date hereof and the Closing Date, Sellers will use their commercially reasonable efforts, and Buyer will reasonably cooperate with Sellers, to obtain such consents.

(d)    Throughout the term of the Transition Services Agreement, the Sellers shall cooperate with Buyer and render to Buyer such assistance as Buyer may reasonably request in obtaining any such consents and approvals to transfer or submit a change of ownership of any Permit.

61

5.6     <u>Bankruptcy Court Approval</u>.

(a)     Sellers and Buyer each acknowledges that this Agreement and the sale of the Purchased Assets to Buyer and the assumption of the Assumed Liabilities by Buyer are subject to Bankruptcy Court approval. Buyer acknowledges that (i) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and (ii) Buyer must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to each Assumed Contract.

(b)     Buyer agrees that it will take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer of the Assumed Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(c)     Sellers will give Buyer reasonable advance notice and proposed drafts of all pleadings, motions, Orders, notices, other papers, hearings, and other Proceedings related to this Agreement and the transactions contemplated hereby, and will provide Buyer and its counsel with a reasonable opportunity to review such papers prior to filing with the Bankruptcy Court unless such advance notice is impossible or impracticable under the circumstances, in which case the Sellers will deliver copies of such papers substantially simultaneously with the filing with the Bankruptcy Court.

5.7     <u>Bankruptcy Matters</u>.

(a)     Promptly following the execution of this Agreement (and in no event later than two Business Days thereafter), Sellers will make a motion (the "<u>Sale Motion</u>") for a Sale Order from the Bankruptcy Court.  The Sellers shall give notice under the Bankruptcy Code of the request for the relief specified in the Sale Motion to all creditors and parties in interest entitled to notice thereof pursuant to the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court, and any applicable orders of the Bankruptcy Court, including all Persons that have asserted Liens on any of Sellers' assets, and all non-debtor parties to the Desired 365 Contracts of the Sellers and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings in the Bankruptcy Court relating to this Agreement, the transactions and the Sale Motion.

(b)     If requested by Sellers or the Bankruptcy Court, Buyer shall provide adequate assurance of future performance (satisfactory to the Bankruptcy Court) to the counterparties to the Assumed Contracts and, if Buyer fails to provide such adequate assurances to the satisfaction of the Bankruptcy Court, resulting in the exclusion of any one or more 365 Contracts from the Purchased Assets, such exclusion shall not result in any reduction of the Total Consideration or give rise to any right of Buyer to terminate this Agreement pursuant to <u>Section</u>

10.1 or otherwise. Following the filing of the Sale Motion, Sellers shall use commercially reasonable efforts to obtain approval of the Sale Order. As provided in Section 9.1(g) and Section 9.2(e), both Buyer's and Sellers' obligations to consummate the transactions contemplated in this Agreement are conditioned upon the Bankruptcy Court's entry of the Sale Order.

(c)       Sellers shall make a motion for approval of a debtor-in-possession loan facility from KKR Loan Administration Services, LLC (as agent) upon the terms and conditions set forth in the Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement of even date herewith (the "DIP Facility"). Upon approval of the DIP Facility by the Bankruptcy Court, Sellers shall comply with the terms and conditions of the DIP Facility.

5.8       Desired 365 Contracts. Sellers acknowledge that prior to the date hereof, the parties were not able to finalize Schedule 2.3(a) and Section 3.16(c) of the Disclosure Schedules setting forth a complete and accurate list of the Desired 365 Contracts, including certain Desired 365 Contracts Buyer presently intends to assume as of the Closing, and all Cure Costs (subject to adjustments as permitted by this Agreement).  As such, Sellers hereby agree that they will work in good faith with Buyer to update Schedule 2.3(a) and Section 3.16(c) of the Disclosure Schedules as promptly as practicable (and in no event more than five (5) Business Days) following the date of this Agreement.

5.9       Employee Census. Sellers hereby agree that they will work in good faith with Buyer to update Section 3.11(a) of the Disclosure Schedules as promptly as practicable (and in no event more than five (5) Business Days) following the date of this Agreement and periodically thereafter through the Closing Date to ensure that Section 3.11(a) of the Disclosure Schedules reflects an accurate employee census as of the date of this Agreement, the Closing Date, and any other date on which such Disclosure Schedule is delivered to Buyer.

## ARTICLE VI.
## RESTRICTIVE COVENANTS

In consideration of the Total Consideration and the consummation of the transactions contemplated hereby, each Seller hereby agrees:

6.1       Non-Competition, Non-Solicitation and Confidentiality Covenants.

(a)       Each Seller hereby expressly acknowledges (i) Buyer's substantial investment in the Purchased Assets, and (ii) that each of them will receive substantial benefit from the consummation of the transactions hereunder. Each Seller further acknowledges and agrees that the covenants, restrictions, and obligations contained in this Section 6.1 are a material inducement to Buyer to enter into this Agreement, and Buyer is doing so in reliance upon Sellers agreeing to be bound by such covenants, restrictions, and obligations. Accordingly, Sellers hereby covenant and agree to be bound and abide by the restrictions set forth in this this Section 6.1.

(b)       From the Closing Date through the date that is two (2) years thereafter (the "Restricted Period"), no Seller will (and each will cause its subsidiaries not to), directly or indirectly (including via financial interests held by Sellers or their respective subsidiaries), either as an employer, consultant, agent, employee, independent contractor, principal, partner, member,

stockholder, or in any other capacity, engage or participate in, consult with, or provide financial assistance to any person or entity (including, for the avoidance of doubt, any management services organization, ACO or similar organization) engaged in the Business or any other services or activities that are in competition with the Business.

(c)    During the Restricted Period, no Seller will (and each will cause its subsidiaries not to), either for its own account or for or in association with any other person, firm, corporation, or other entity, either directly or indirectly, as an employer, consultant, agent, employee, independent contractor, principal, partner, member, stockholder, or in any other capacity: (i) call on or solicit, or attempt to call on or solicit, or provide Business services to, any of the patients, customers, providers, vendors, payors, or other business relationships of the Business (as operated by Sellers prior to the Closing, and as operated by Buyer and Buyer's Affiliates following the Closing, regardless of where the assets of the Business are held or the operations of the Business are conducted), or cause, induce, or encourage (or attempt to cause, induce, or encourage) any such person or entity to reduce or cease doing business with Sellers prior to the Closing or with Buyer or Buyer's Affiliates following the Closing, regardless of where the assets of the Business are held or the operations of the Business are conducted); or (ii) induce, or attempt to induce, any employee or independent contractor of Buyer or any Affiliate of Buyer, who was employed or engaged by any Seller prior to the Closing, to terminate his or her employment or engagement or hire away, attempt to hire away, or otherwise employ or engage any employee or independent contractor of Buyer or any Affiliate of Buyer, who was employed or engaged by any Seller prior to the Closing.

For the avoidance of doubt, each Seller's performance of its obligations under the Transition Services Agreement shall not be deemed to be a breach (or contribute to a breach) of the covenants set forth in this Section 6.1 or Section 6.2, below.

6.2    Confidentiality.

(a)    Each Seller expressly acknowledges that each has knowledge of certain business methods, Trade Secrets, and other proprietary information relating to the Business ("Confidential Information"), which Confidential Information constitutes a Purchased Asset which Buyer is purchasing hereunder.  Each Seller expressly acknowledges and agrees that the Confidential Information is proprietary and confidential, and if any of the Confidential Information was imparted to, or became known by, any persons or entities engaging in a business in any way competitive with that of Buyer or any Affiliate of Buyer, or was otherwise disclosed to any person other than Buyer or its Affiliates, such disclosure would result in hardship, loss, irreparable injury and damage to Buyer or such Affiliate of Buyer, the measurement of which would be difficult, if not impossible, to determine.  Accordingly, each Seller expressly agrees that Buyer has a legitimate interest in protecting the Confidential Information and its business goodwill, that it is necessary for Buyer to protect its businesses and the businesses of its Affiliates from such hardship, loss, irreparable injury, and damage, that the following covenants are a reasonable means by which to accomplish those purposes and that violation of any of the protective covenants contained herein shall constitute a breach of trust (in addition to a breach of this Agreement) and is grounds for appropriate legal action for damages, enforcement, and/or injunction.  Notwithstanding the foregoing, the non-disclosure obligations set forth in this Section 6.2 shall not apply to any information that becomes publicly available through no fault of a Seller (other than if such

availability results from a breach by a Seller of this Agreement or any other relevant agreement or obligation of confidentiality).

(b)        The Confidential Information includes: (i) lists containing the names of patients, customers, employees, Healthcare Providers, principals, and suppliers of the Business; (ii) the past, present, and prospective methods, procedures, and techniques utilized in identifying prospective referral sources, patients, customers, and suppliers and in soliciting the business thereof; (iii) the methods, procedures, and techniques used in the operation of the Business, including the methods, procedures, and techniques utilized in marketing, pricing, applying, and delivering occupational health and urgent care products and services; and (iv) compilations of information, records, and processes which are used in the operation of the Business.

(c)        Each Seller acknowledges that the Confidential Information gives Buyer and the Business an advantage over their competitors and that the same is not available to, or known by, Buyer's competitors or the general public.  Each Seller acknowledges that they and their predecessors have devoted, and Buyer will devote, substantial time, money, and effort in the development of the Confidential Information and in maintaining the proprietary and confidential nature thereof.  Each Seller agrees to use their best efforts and to exercise utmost diligence to protect and safeguard (and to cause their Affiliates to protect and safeguard) any of the Confidential Information that is known to any Seller or any of Sellers' Affiliates that at any time is in a Seller's or any Sellers' Affiliates' possession.  Except as required by law or a court order, each Seller agrees that it will not (and each will cause their Affiliates not to) disclose, disseminate, or distribute, or induce any other person to disclose, disseminate, or distribute, any Confidential Information, directly or indirectly, either for any Seller's or any of Sellers' Affiliates' own benefit or for the benefit of any other person or entity, whether or not acquired, learned, obtained, or developed by any Seller or any of Sellers' Affiliates alone or in conjunction with others, and no Seller will use or cause to be used (and each Seller will cause their Affiliates not to use or cause to be used) any Confidential Information in any way.  Each Seller acknowledges and agrees that all Confidential Information, whether prepared by a Seller or otherwise, shall remain the exclusive property of Buyer after the Closing.

(d)        Each Seller agrees that the breach or attempted breach of any Seller's obligations under this Section 6.2 would cause irreparable injury to Buyer and that any remedy at law would be inadequate.  Each Seller therefore agrees, in addition to any other relief, that Buyer and its Affiliates will be entitled to injunctive and other equitable relief in case of any such breach or attempted breach.  Each Seller expressly waives any requirement that such Person could assert for the securing or posting of any bond in connection with the obtaining of such injunctive or other equitable relief.

(e)        Each of the covenants in Section 6.1 and this Section 6.2 may be enforced by Buyer's successors and permitted assignees.

## ARTICLE VII.
## ADDITIONAL COVENANTS OF THE PARTIES

7.1        Public Announcements; Confidentiality. Buyer and the Sellers' Representative shall consult with each other and shall mutually agree in writing (such agreement not to be

unreasonably withheld or delayed) upon the content and timing of any press release or other public statements with respect to the transactions contemplated by this Agreement and none of the Parties shall issue any such press release or make any public statement with respect to the transactions contemplated by this Agreement prior to such consultation and agreement, except as may be required by any applicable Law, any Governmental Authority or the rules or regulations of any stock exchange; provided, however, that, to the extent practicable and permitted by applicable Law, each Party shall give reasonable prior notice to the other Parties of the content and timing of any such press release or other public statement required by applicable Law, any Governmental Authority or the rules or regulations of any stock exchange; provided further, however, that the foregoing restrictions on press releases and public statements shall not apply to any disclosure made in the Bankruptcy Cases that are required in connection with the filing of the Bankruptcy Cases or appropriate in the furtherance of such filing, of filings thereafter made in the Bankruptcy Cases, or of the transactions contemplated herein (including the Sale Motion). Notwithstanding the foregoing, except as may be required by any applicable Law, any Governmental Authority or the rules or regulations of any stock exchange, any press release or public statements with respect to the transactions contemplated by this Agreement may not contain any information concerning the Total Consideration or any component thereof or any of the other terms of this Agreement.

      7.2   Taxes.

      (a)    All transfer, documentary, sales, use, stamp, registration, and other similar Taxes and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with consummation of the transactions contemplated by this Agreement ("Transfer Taxes") shall be paid by equally by Sellers (on one hand) and Buyer (on the other hand) when due, and Sellers will, at their own expense, file, or cause to be filed, all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and if required by applicable Law, Buyer will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation. Buyer and Sellers further agree, upon request, to use their best efforts to obtain any certificate or other document from any Tax Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (with respect to the transactions contemplated hereby).

      (b)    All Taxes with respect to any Pre-Closing Period are the responsibility of and shall be paid by Sellers. Property Taxes relating to any Straddle Period shall be pro-rated between Sellers (on one hand) and Buyer (on the other hand). Sellers shall be responsible for that portion of the Straddle Period ending on the Closing Date and Buyer shall be responsible for that portion of the Straddle Period beginning on the day immediately after the Closing Date. Sellers shall pay to Buyer its allocable portion of the Straddle Period Property Tax no later than seven (7) Business Days prior to the date such Taxes are paid and, at least five (5) days prior to the commencement of such seven (7) Business Day period, Buyer shall provide Sellers with written notice of the amount of such aforementioned Taxes. For purposes of this Section 7.2(b), the Property Taxes allocable to the portion of a Straddle Period ending on the Closing Date shall be the amount of such Tax for the entire Tax period multiplied by a fraction, the numerator of which is the number of days in the Tax period ending on and including the Closing Date and the denominator of which is the number of days in the entire Tax period. All other Taxes relating to

a Straddle Period (if any) shall be paid by Sellers as if the applicable taxable period ended on and including the Closing Date.

(c)     From and after the Closing Date, to the extent reasonably requested by the other party, and at such party's expense, Sellers and Buyer shall assist and cooperate with each other in the preparation and filing of any Tax Return and shall assist and cooperate with the other party in preparing for any disputes, audits or other litigation relating to Taxes for which the other party is responsible pursuant to this Agreement. Any Tax audit or other Tax proceeding shall be deemed to be a Third Person Claim subject to the procedures set forth in Section 7.4 of this Agreement.

(d)     After the Closing Date, no Seller shall settle or resolve a proposed Tax adjustment that relates to a Pre-Closing Period or the portion of any Straddle Period ending on the Closing Date if it would increase the Tax Liability of Buyer in any Post-Closing Period without the prior written consent of Buyer, which consent shall not be unreasonably withheld or delayed.

7.3     Further Assurances.  From and after the Closing and with respect to Sellers, until the effective date of their Bankruptcy Court confirmed Plan of Liquidation, the Parties shall do such acts and execute such documents and instruments as may be reasonably required to make effective the transactions contemplated hereby. Without limiting the foregoing, Sellers shall, to the extent Sellers are reasonably able to do so in light of the Bankruptcy Cases: (i) to the extent not included in the Purchased Assets, provide Buyer with all passwords, login information, and other credentials (x) necessary for Buyer to access any of the Patient Records, Confidential Information, Seller Information or other Purchased Assets, wherever the same may be stored, or (y) for any Purchased Assets, (ii) cooperate with and take all actions requested by Buyer with respect to the removal of the same from systems or devices that are not Purchased Assets hereunder, and (iii) take all actions requested by Buyer to effectuate and document the transfer to Buyer (or its designee) of domain name registrations and social media accounts included in the Purchased Assets. Following the Closing, and with respect to Sellers, until the effective date of their Bankruptcy Court confirmed Plan of Liquidation in the event that through inadvertence, mistake or otherwise, Buyer or any Seller discovers that any Purchased Asset was retained by any Seller or any of any Seller's Affiliates, and, as a result, was not transferred, assigned, conveyed and delivered to Buyer at Closing as provided in this Agreement, Sellers shall, and shall cause their applicable Affiliates to, transfer, assign, convey and deliver such Purchased Asset to Buyer for no additional consideration (and at Sellers' sole but reasonable cost and expense), and shall execute such further documents and instruments necessary to give effect to and evidence such transfer, assignment, conveyance and delivery to Buyer. For income tax purposes, the parties shall treat any such transfer as having occurred at the Closing, except to the extent otherwise required by Law. Further, Sellers will, at the reasonable request of Buyer, from and after the date of this Agreement and until the effective Date of their Bankruptcy Court confirmed Plan of Liquidation, take all actions necessary to enforce their rights, and fulfill their obligations, under any settlement agreement with respect to third party disputes or Proceedings, including any settlement agreement referenced or otherwise identified in Sections 3.5 and 3.6 of the Disclosure Schedules.

7.4     Assumed Contracts.

(a)      With respect to each Assumed Contract, Buyer will deliver information it believes to be sufficient to demonstrate Buyer's adequate assurance of the future performance by Buyer of each such Assumed Contract as required under Section 365 of the Bankruptcy Code, which information Sellers will be permitted to disseminate to any third party that is a party to any 365 Contract. Buyer will cooperate with the Sellers in communicating with third parties to Assumed Contracts as may be reasonably necessary to assist the Sellers in establishing that Buyer has satisfied the requirement of adequate assurance of future performance contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the applicable Assumed Contracts. In the event Buyer cannot demonstrate adequate assurance of future performance with respect to an Assumed Contract, at Buyer's election, such Assumed Contract shall become an Excluded Contract.

(b)      Without limiting the provisions of Section 7.4(a), Buyer acknowledges that no Seller nor any Subsidiary of any Seller will have any duty to maintain any bonds, letters of credit, guarantees, cash deposits or insurance to secure performance or payment under any Assumed Contracts after the Closing or otherwise with respect to the Business.

7.5      Cure Costs; Accrued Liabilities.  On the Closing Date, with respect to Cure Costs not disputed as of the Closing Date, and as and when finally agreed to by Buyer, Buyer shall pay all Cure Costs for the current billing period (no longer than one month) relating to the Assumed Contracts, and Sellers pay all Cure Costs for past due (or more than one month) amounts. With respect to Cure Costs relating to Assumed Contracts that are disputed as of the Closing Date, the Parties shall cooperate and diligently pursue resolution of such disputes. Upon the resolution of any disputed Cure Costs relating to Assumed Contracts following the Closing, Buyer shall pay such Cure Costs as soon as reasonably practicable following such resolution. Upon payment of the Cure Costs, all defaults under the Assumed Contracts (monetary or otherwise) and all actual or pecuniary losses that have or may have resulted from such defaults shall be deemed cured. Notwithstanding anything herein to the contrary, if there is a dispute as to the amount of Cure Costs with respect to an Assumed Contract that is not resolved to the reasonable satisfaction of Buyer, Buyer shall have the right to redesignate such contract as an Excluded Contract.

7.6      Obligations with Respect to Employees. Except as otherwise provided in the Transition Services Agreement, Sellers and Buyer agree as follows with respect to employee and employee benefit matters relating to employees of Sellers:

(a)      Compensation Payments. The Sellers shall continue to provide all employee benefits and fringe benefits including continued participation in the Plans to all Transferred Employees through the Transfer Date for the applicable Transferred Employee and shall cause to be taken whatever steps are necessary to pay to Transferred Employees, at Sellers' sole expense, all accrued compensation and benefits arising and payable under the Plans or any employment or consulting Contract, or relating to payroll, compensation, vacation, sick leave, workers' compensation, unemployment benefits, retirement or pension benefits, profit sharing plans, healthcare plans or benefits, bonus or commission arrangements, severance or other termination pay or benefits, and any other employer plans or benefits or similar Liabilities of any Seller to any current or former employee, contractor or other similar Person, in each case to the extent allocable to services performed on or prior to the Transfer Date for the applicable Transferred Employee in accordance with the applicable Laws, and Sellers, at their sole expense, shall timely pay all

68

employment or other withholding Taxes with respect to such payments to the appropriate taxing authority (collectively, the "Compensation Payments"). Such Compensation Payments shall be made, for each Transferred Employee, on the Transfer Date or the next regularly scheduled payroll following the Transfer Date, in each case, in accordance with applicable Laws. The Sellers shall take all steps required to fully vest any Transferred Employee in any accounts under a Plan intended to qualify under Section 401(a) of the Code. The intent of this Section 7.6(a) is to ensure that Buyer and its Affiliates will have no Liability, responsibility or obligation whatsoever at any time in the future with respect to any of Sellers' employees, consultants or other similar Persons with respect to periods up to and including the applicable Transfer Date, including under any Plan and with respect to the Compensation Payments, and any such Liability shall be an Excluded Liability.

(b)    COBRA.  Sellers shall be responsible for the continuation of health plan coverage, in accordance with the requirements of COBRA and Sections 601 through 608 of ERISA or any similar state law, for any (i) Transferred Employee or qualified beneficiary thereof under a Business health plan who (A) is already receiving COBRA benefits as of the Closing Date, (B) does not become a Transferred Employee, or (C) loses health coverage prior to the Closing Date or in connection with the transactions contemplated in this Agreement.

(c)    Buyer and each Seller agree to comply with the Standard Procedure described in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320 (the "Standard Procedure").  With respect to Transferred Employees, Sellers shall, in accordance with the Standard Procedure, retain all responsibility for preparing and filing Forms W-2, Wage and Tax Statement; Forms W-3, Transmittal of Income and Tax Statements; Forms 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, Forms 941, Employer's Quarterly Federal Tax Return; and Forms W-4, Employee's Withholding Allowance Certificate including any state and local equivalents (collectively, the "Employee Withholding Documents") with regard to wages paid through the day before the applicable Transfer Date. Buyer shall assume all responsibility for preparing and filing the Employee Withholding Documents with regard to wages paid to Transferred Employees on and after the applicable Transfer Date. Buyer and the Sellers shall cooperate in good faith to the extent necessary to permit each Party to comply with the Standard Procedure.

(d)    Nothing in this Agreement, whether express or implied, is intended to, or shall, (i) constitute the establishment or adoption of or an amendment to any employee benefit plan for purposes of ERISA or otherwise be treated as an amendment or modification of any Plan or other benefit plan, agreement or arrangement of Buyer, (ii) limit the right of Buyer, its Affiliates or the Sellers to amend, terminate or otherwise modify any Plan or other benefit plan, agreement or arrangement of Buyer following the Closing Date, or (iii) create any third party beneficiary or other right (x) in any Person, including any current or former employee of the Sellers or their Affiliates, any participant in any Plan or other benefit plan, agreement or arrangement (or any dependent or beneficiary thereof) of Buyer or (y) to continued employment with Buyer or the Sellers.  Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Buyer or their Affiliates to terminate, reassign, promote or demote any of the Transferred Employees after the applicable Transfer Date or to change adversely or favorably the title, powers,

duties, responsibilities, functions, locations, or terms or conditions of employment of such employees.

(e)     Sellers shall timely provide all notices required by the WARN Act in connection with the termination of Sellers' employees resulting from or relating to the transactions contemplated by this Agreement.

(f)     Buyer agrees that it will promptly pay all Employees who will not be Transferred Employees a lump sum payment equal to sixty (60) days of each such Employee's base salary, with such payment to be computed and paid upon the effective date of termination of employment of each such Employee.

7.7     Use of Names.  Immediately after the Closing Date, Sellers, in such manner as is reasonably requested by Buyer, shall change their names to some names other than "MB Medical Operations", "MB Medical Transport", "Care Center Network, LLC", "Clinical Care Pharmacy", "Care Center Medical Group", "Florida Family Primary Care Center", Florida Family Primary Care Centers of Tampa", "Florida Family Primary Care Centers of Pasco", "Florida Family Primary Care Centers of Pinellas, LLC", "Florida Family Primary Care Centers of Orlando", "CCMC Physician Holdings", "Miami Medical & Wellness Center LLC", "Miami Beach Medical Consultants", "Clinical Care Medical Centers", or any variations or abbreviations thereof and file appropriate notification of its change of name in all jurisdictions where such notification is required.  Sellers will take all steps as may be appropriate to insure to Buyer the continued right to use the names ""MB Medical Operations", "MB Medical Transport", "Care Center Network, LLC", "Clinical Care Pharmacy", "Care Center Medical Group", "Florida Family Primary Care Center", "Florida Family Primary Care Centers of Tampa", "Florida Family Primary Care Centers of Pasco", "Florida Family Primary Care Centers of Pinellas, LLC", "Florida Family Primary Care Centers of Orlando", "CCMC Physician Holdings", "Miami Medical & Wellness Center LLC", "Miami Beach Medical Consultants", "Clinical Care Medical Centers", and all variants thereof in connection with Buyer's operation of the Business.

7.8     Certain Payments.

(a)     The Parties acknowledge that Sellers' bank accounts and all amounts deposited therein or being transferred into or out of the same as payments, collections, or otherwise, will be Excluded Assets and will be retained by Sellers after Closing; provided that any amounts deposited into Sellers' bank accounts that relate to a Post-Closing Period shall be transferred to Buyer pursuant to the following sentence.  In the event any Seller or Buyer receives any payment after Closing that constitute Purchased Assets (in the case of Sellers' receipt) or Excluded Assets (in the case of Buyer's receipt), such Party shall hold such amounts in trust for the Party entitled thereto and promptly (and in any event within thirty (30) days of receipt thereof) transfer or deliver to such Party entitled thereto any cash, checks, electronic funds transfers or other such forms of payment received with respect to such Purchased Assets or Excluded Assets, as the case may be.

(b)     Except as otherwise expressly provided herein, (i) the Sellers shall be responsible for all Prorated Expenses incurred in the operation of the Business prior to the Closing (the "<u>Sellers' Prorated Responsibilities</u>"), and (ii) Buyer shall be responsible for

70

all Prorated Expenses incurred in the operation of the Business after the Closing (the "Buyer's Prorated Responsibilities"); provided that in no event shall Buyer's Prorated Responsibilities include any Excluded Liabilities.  "Prorated Expenses" shall mean expenses arising from the conduct of the business and operations of the Purchased Assets and the Business (other than Taxes subject to proration pursuant to Section 7.2 hereof), water charges, sewer, rents, real estate, fuel and utility charges, license fees, assessments and other fees, prepaid and deferred expenses, and other expenses relating to the Purchased Assets, Transferred Employees and/or the Business. In the event Buyer and the Sellers are prohibited by a vendor from paying a partial invoice for the Prorated Expenses, Buyer shall submit payment in full for such invoice to the vendor, and the Sellers agree to reimburse Buyer for the Sellers' pro rata share of the invoice within seven (7) Business Days of Seller's receipt of notice and proof of payment from Buyer that such invoice has been paid by Buyer.  In the event that either Buyer or a Seller pays any Prorated Expenses that are Sellers' Prorated Responsibilities or Buyer's Prorated Responsibilities, respectively, the other party shall promptly reimburse such amount within seven (7) Business Days of receipt of notice and proof of payment from Buyer or such Seller that such invoice has been paid by Buyer or such Seller, as applicable.

7.9     Insurance.  Prior to the Closing, each Seller has, at the Sellers' expense, obtained, maintained, and fully paid for irrevocable, fully-earned "tail" insurance policies for the professional liability policies listed in Section 3.14 of the Disclosure Schedules with a coverage period of not less than the lesser of the current statute of limitation in the State of Florida applicable thereto or two (2) years from the Closing Date (the "Coverage Period") from an insurance carrier or carriers with the same or better credit rating as such Seller's current insurance carrier or carriers with respect to professional liability insurance and shall cause Buyer to be made an additional insured in respect of such policies (the "Policies").   Following the Closing, each Seller shall maintain such Policies in effect for the duration of their respective policy periods and shall not (nor shall they allow any Seller to) cancel, terminate, modify or waive such Policies or the rights of any insured thereunder without the prior written consent of Buyer and shall provide Buyer on an annual basis evidence that such insurance is maintained in full force.  Sellers shall provide Buyer and all Buyer Indemnified Parties with the right to access the benefit of insurance policies (including the Insurance Policies and the tail policy procured pursuant to Section 7.9) of Sellers and its Affiliates which provide insurance coverage with respect to any Purchased Assets or Assumed Liabilities for claims arising out of occurrences or wrongful acts occurring prior to the Closing Date, including medical malpractice, and in all such events, Sellers shall, jointly and severally, be responsible for any deductible payment and shall promptly assign the proceeds under such Policies to the applicable Buyer Indemnified Party(ies) to the extent of the Losses incurred by Buyer Indemnified Party(ies). Following the Closing Date until the expiration of such insurance policies, Sellers shall, and shall cause their Affiliates to cooperate with and assist Buyer in issuing notices of claims under such insurance policies, presenting such claims for payment, and collecting insurance proceeds related thereto.  Each Seller shall take all action necessary or desirable to be in full compliance with the terms and conditions of the Policies at all times, including reporting any claims for events that could reasonably be determined to be a "covered event" in accordance with the reporting requirements of the Policies.

7.10    Enrollment Termination; Preservation of Records; Treatment of Medical Records.

71

(a)    Each Seller shall make available to Buyer a copy of (i) all books and records relating to the Business as conducted and the Purchased Assets owned prior to the Closing Date, and (ii) all Contracts and books and records relating thereto entered into prior to the Closing Date.

(b)    Upon Closing, Buyer shall assume possession and custody of the Patient Records.  Thereafter, upon any Seller's request and subject to any requirements or restrictions related to disclosure of medical records under applicable Law, Buyer will permit the Sellers or their representatives to have access to the Patient Records where such access is required in connection with a governmental audit or investigation, medical staff or credentialing matter, quality assurance review or investigation, or in connection with any Seller's defense of a medical malpractice claim.  Buyer shall provide access to the Patient Records during normal business hours and as soon as practicable after request, and the Sellers and their representatives shall have the right to inspect and copy the Patient Records at the Sellers' sole expense.  Sellers shall (and shall cause their representatives to) comply with all applicable Laws in connection with its access to such Patient Records.  To the extent that any further authorization or activity is required from any Seller in relation to the transfer of ownership of medical records subject to this Section 7.10(b), such Seller will cooperate with Buyer in providing such necessary authorization or activity.  Except as expressly set forth in this Section 7.10(b), Buyer shall bear no costs and provide no administrative or other support to the Sellers with respect to the Sellers' access to such records, nor shall Buyer have any obligation to assist in any response to a request for the disclosure of the Patient Records.

7.11    Post-Closing ACO Participation. During the period beginning on the Closing Date and ending two (2) years thereafter, Sellers will not apply to participate or participate in any capacity (including use of Seller's taxpayer identification number), in any ACO, including any MSSP, Next Gen ACO, or ACO Reach model.

7.12    Third Party Payor Deficits. Following the Closing, in the event that any Seller has a deficit or similar obligation to any Third Party Payor and such Third Party Payor requires that such deficit or obligation be satisfied in order to permit the Members associated with such Third Party Payor to be moved to a contract of Buyer's (or one of its Affiliates) with such Third Party Payor (a "Member Transfer"), Sellers agree that the contractual reserve under accounts receivable for such amounts can be utilized at Buyer's request to pay for all such Deficit Settlement Amounts, and Buyer (or one of its Affiliates) shall be entitled to settle any amounts necessary to permit such Member Transfer.

7.13    Accounts Receivable; Payments Received.

(a)    Sellers shall retain sole ownership and right to collect and retain all amounts outstanding as of Closing, including amounts attributable to services, goods or materials rendered, sold or provided by Sellers to the patients or other recipients of goods or services of the Company, in each case with respect to service dates prior to Closing, whether or not under Assumed Contracts, or otherwise relating to the Business (the "Pre-Closing Receivables"). For the avoidance of doubt, Pre-Closing Receivables include, but are not limited to capitation, surplus, rebate, and quality payments provided with respect to service dates prior to Closing.  The Parties further acknowledge and agree that the Pre-Closing Receivables remain encumbered by liens securing Sellers' institutional debt.  To the extent that any Pre-Closing Receivables constitute retainer

72

amounts, payment for ongoing services, advance payments, or deposits ("Advance Receivables") that may not yet be due and payable at Closing, Sellers shall remain entitled to the sole ownership of and payment for all such Advance Receivables, to the extent the same relate solely to services rendered, sold or provided by Sellers prior to the Closing.

   (b) After the Closing, all collections realized by Buyer in respect to Pre-Closing Receivables shall be allocated to Sellers. Sellers and Buyer each agree that after the Closing they will hold in trust for the other, and will promptly (and in any event within thirty (30) days of receipt thereof) transfer and deliver to the other party from time to time, as and when received by them and in the exact form received by them, any cash, checks (with appropriate endorsement where necessary to permit collection), or other property that they may receive on or after the Closing which properly belongs to the other party (as determined in accordance with the provisions of this Agreement).

   (c) For the avoidance of doubt, nothing herein shall require Buyer to take any actions, other than those expressly set forth in this Section 7.13, with respect to the Pre-Closing Receivables.

   (d) The provision of this Section 7.13 shall survive the Closing.

  7.14 Personally Identifiable Information. The privacy policies of the Buyer and/or its Affiliates as of the date hereof are at least as protective, in all material respects, as the privacy policies of the Sellers as of the date hereof.

## ARTICLE VIII.
## INDEMNIFICATION

  8.1 Indemnification by Sellers. Subject to the limitations set forth in Section 8.5 below, each Seller, jointly and severally, shall hold Buyer and its Affiliates and the members, shareholders, directors, officers, partners, employees, successors, assigns, representatives and agents of each of them in their capacities as such (collectively, the "Buyer Indemnified Persons"), harmless and indemnify and keep indemnified (and shall pay and compensate for, regardless of whether such matters arise from Third Person Claims or direct claims) each of them from and against, and each Seller waives any claim for contribution or indemnity from any of the Buyer Indemnified Persons, with respect to, any and all claims, losses, damages, Liabilities, fines, fees, penalties, expenses or costs ("Losses"), including reasonable attorneys' fees and expenses incurred in connection with Losses and/or enforcement of this Agreement (in all, "Indemnified Losses") suffered, incurred or to be incurred by any of them resulting from or arising out of or in respect of:

   (a) any Fraud;

   (b) the non-fulfillment, non-performance, violation or breach of any agreement, covenant or other obligation of Sellers made or incurred under or pursuant to this Agreement or any document delivered pursuant hereto (including the Ancillary Agreements);

   (c) the ownership, use or possession of the Excluded Assets;

13208185-55
13208185-58

(d)     any Excluded Liabilities;

(e)     (i) Sellers' Taxes or its Liability, if any (for example, by reason of transferee Liability or application of Treasury regulation Section 1.1502-6) for Taxes of others, including any Affiliate of Sellers and all Indemnified Losses payable with respect to such Taxes for any Tax period, and (ii) Taxes and all Indemnified Losses payable with respect to such Taxes claimed or assessed against the Business, the Purchased Assets, or Buyer (A) for any Pre-Closing Period and the portion of the Straddle Period ending on the Closing Date determined in accordance with Section 7.2(b), and (B) as a result of the transactions contemplated by this Agreement (other than Taxes required to be paid by Buyer with respect to a Post-Closing Period as a result of its ownership of the Purchased Assets or operation of the Business); and

(f)     any matters identified on Schedule 8.1(f).

8.2     Indemnification by Buyer.  Subject to the limitations set forth in Section 8.5 below, Buyer shall, jointly and severally, hold Sellers and their Affiliates, successors, legal representatives, assigns and agents of each of them in their capacities as such (collectively, the "Seller Indemnified Persons") harmless and indemnify each of them from and against any and all Indemnified Losses incurred or to be incurred by any of them, resulting from or arising out of or in respect of (a) Fraud and (b) the non-fulfillment, non-performance, violation or breach of any agreement, covenant or other obligation of Buyer made or incurred under this Agreement or any Ancillary Agreement to which Buyer is a party.

8.3     Notice of Claim.  In the event that Buyer seeks indemnification on behalf of a Buyer Indemnified Person, or a Seller or Sellers' Representative seeks indemnification on behalf of a Seller Indemnified Person, such Party seeking indemnification (the "Indemnified Party") shall give reasonably prompt written notice to the indemnifying Party (the "Indemnifying Party") specifying the facts constituting the basis for such claim, to the extent then known, and the amount, to the extent known, of the claim asserted; provided, however, that the right of a Person to be indemnified hereunder shall not be adversely affected by a failure to give such notice unless, and then only to the extent that, an Indemnifying Party is actually and materially prejudiced thereby.  Subject to the terms hereof, (a) if a Seller is the Indemnifying Party, then, within thirty (30) days of receipt of a notice pursuant to this Section 8.3 (a "Claim Notice"), it shall pay the amount of any valid claim from the Holdback Amount or deliver written notice to the Indemnified Party disputing such claim in whole or in part, (b) if Buyer is the Indemnifying Party, then within thirty (30) days of receipt of a Claim Notice it shall either pay the amount of any valid claim or deliver written notice to the Indemnified Party disputing such claim in whole or in part.  In cases where the Indemnifying Party disputes a claim hereunder, the Indemnified Party shall promptly consult with the Indemnifying Party in an effort to resolve the dispute.  If any such dispute cannot be resolved by the Indemnified Party and the Indemnifying Party within thirty (30) days, the Indemnified Party may seek to enforce its rights under this Article VIII as set forth in this Agreement.

8.4     Claims of Third Persons.

(a)     If an Indemnified Party is entitled to indemnification hereunder because of a claim asserted by any claimant other than a Buyer Indemnified Person or a Seller Indemnified Person hereunder (a "Third Person"), the Indemnified Party shall give the Indemnifying Party

74

reasonably prompt notice thereof after such assertion is actually known to the Indemnified Party; provided, however, that the right of a Person to be indemnified hereunder in respect of claims made by a Third Person shall not be adversely affected by a failure to give such notice unless, and then only to the extent that, an Indemnifying Party is actually and materially prejudiced thereby. Except as otherwise provided in this Section 8.4, the Indemnifying Party shall then have the right, upon written notice to the Indemnified Party (a "Defense Notice") within fifteen (15) days after receipt from the Indemnified Party of notice of such claim, and using counsel reasonably satisfactory to the Indemnified Party, to control, investigate, contest, or settle the claim alleged by such Third Person (a "Third Person Claim"); provided that such written notice shall only be deemed to be a "Defense Notice" hereunder, and the Indemnifying Party shall only be entitled to control, investigate, contest or settle such Third Person Claim, if, in such written notice, the Indemnifying Party has unconditionally acknowledged to the Indemnified Party in writing its obligation to indemnify and to keep indemnified in full the Persons to be indemnified hereunder with respect to such Third Person Claim and to discharge in full any reasonable cost or expense arising out of such investigation, contest or settlement (including, if Sellers are the Indemnifying Party, by agreed offset against the Holdback Amount). The Indemnified Party may thereafter participate in (but not control) the defense of any such Third Person Claim with its own counsel at its own expense, unless separate representation is necessary to avoid a conflict of interest, in which case such representation shall be at the expense of the Indemnifying Party. Unless and until the Indemnifying Party provides the Defense Notice, the Indemnified Party shall have the right, at its option, to assume and control defense of the matter and to look to the Indemnifying Party for the full amount of the reasonable costs of defense. In the event that the Indemnifying Party shall fail to give the Defense Notice within said fifteen (15) day period, (i) the Indemnified Party shall be entitled to have the control over said defense and settlement of the subject claim and shall conduct the defense of the Third Party Claim in a commercially reasonable manner, (ii) the Indemnifying Party will cooperate with and make available to the Indemnified Party such assistance and materials as the Indemnified Party may reasonably request, (iii) the Indemnifying Party shall have the right, at its expense, to participate in the defense assisted by counsel of its own choosing, and (iv) the Indemnifying Party, if it is required to provide indemnification under this Agreement, will be liable for all costs and settlement amounts paid or incurred in connection therewith. If the Indemnifying Party thereafter seeks to question the manner in which the Indemnified Party defended such Third Person Claim or the amount or nature of any such settlement, the Indemnifying Party shall have the burden to prove by clear and convincing evidence that conduct of the Indemnified Party in the defense and/or settlement of such Third Person Claim constituted gross negligence or willful misconduct. The Parties shall use commercially reasonable efforts to make available to each other the relevant information in their possession relating to any such Third Person Claim and shall cooperate in the defense thereof.

(b)    In the event that the Indemnifying Party delivers a Defense Notice with respect to such Third Person Claim within fifteen (15) days after receipt thereof and thereby elects to control the defense of the subject claim, (i) the Indemnifying Party shall be entitled to have control over said defense and, subject to the provisions set forth below, settlement of the subject claim, (ii) the Indemnified Party will cooperate with and make available to the Indemnifying Party such assistance and materials as the Indemnifying Party may reasonably request, (iii) the Indemnified Party shall have the right, at its expense, to participate in the defense assisted by counsel of its own choosing and (iv) the Indemnifying Party must conduct the defense of the Third

75

Person Claim actively and diligently after assuming control of the defense in order to be allowed to maintain control of the defense. Further, the Indemnifying Party will not settle the subject claim or consent to the entry of any judgment without the prior written consent of the Indemnified Party unless (x) there is no finding of responsibility or Liability on the party of the Indemnified Party, or obligation of the Indemnified Party for any damages or other amount, or any Lien on any property of the Indemnified Party, or any sanction or injunction of, restriction upon the conduct of any business by, or other equitable relief upon the Indemnified Party and (y) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party, in which cases the consent of the Indemnified Party shall not be required. The Indemnified Party shall have no Liability with respect to any compromise or settlement of such Third Person Claims effected without its consent when such consent is required hereunder.

(c)     Notwithstanding anything to the contrary contained in this Section 8.4, the Indemnifying Party shall not be entitled to control, but may participate in, and the Indemnified Party shall be entitled to have sole control, including the right to select defense counsel, over the defense or settlement of any claim (i) that seeks a temporary restraining order, a preliminary or permanent injunction or specific performance against the Indemnified Party, (ii) that involves criminal allegations against the Indemnified Party, (iii) that, if unsuccessful, would set a precedent that would materially interfere with, or have a material and adverse impact on the business or financial condition of the Indemnified Party, (iv) that involves any Material Supplier, or Material Third Party Payor, or (v) that imposes Liability on the part of the Indemnified Party for which the Indemnified Party is not entitled to indemnification hereunder. In such event, the Indemnifying Party will still be subject to its obligations hereunder, and the Indemnified Party will not settle the subject claim without the prior written consent of the Indemnifying Party, which consent will not be unreasonably withheld, conditioned or delayed.

8.5     Limitations on Indemnity.

(a)     The representations and warranties of the Parties contained in this Agreement and in any certificate delivered pursuant to this Agreement shall terminate upon the Closing, and neither Party shall assert a claim thereunder for indemnity or otherwise. Each covenant and agreement of any of the Parties set forth in this Agreement shall survive until such covenant and agreement has been fully performed. Claims for Fraud shall not expire.

(b)     Except with respect to any claim based on Fraud, the only recourse for claims by any Buyer Indemnified Person is the Holdback Amount. In no event shall Sellers have any obligation to indemnify the Buyer Indemnified Persons in respect of Indemnified Losses in an aggregate amount in excess of the Holdback Amount.

(c)     The aggregate liability for any and all Indemnified Parties applicable to Buyer, on the one hand, or Sellers, on the other hand, under Section 8.1 or Section 8.2 shall not exceed the aggregate amount equal to the Holdback Amount (the "Cap"); provided, that the Cap shall not apply to any claim based on Fraud.

(d)     In no event shall Buyer have any obligation to indemnify the Seller Indemnified Persons in respect of Indemnified Losses pursuant to Section 8.2(b) in an aggregate amount in excess of the Holdback Amount.

(e)      None of the Sellers shall have any claim for contribution from or against Buyer as a result of any indemnification or other payments made by Sellers to any of the Buyer Indemnified Persons pursuant to this Agreement.

(f)      Except for <u>Section 8.5(b)</u>, none of the limitations in this <u>Article VIII</u> shall apply to any claim for indemnification that arises or is delayed as a result of Fraud.

(g)      For all Tax and other purposes, all indemnification payments under this <u>Article VIII</u> shall be treated by the Parties as adjustments to the Total Consideration to the extent permitted by applicable Law.

(h)      The amount of any Indemnified Losses for which indemnification is provided under this <u>Article VIII</u> shall be net of any amounts actually recovered under Sellers' tail policies and applicable to such Indemnified Losses, net of reasonable expenses incurred by the Indemnified Party in obtaining such recovery (including any premium increases or other costs associated with any such claim).  Buyer will use its commercially reasonably efforts to promptly seek full recovery under the insurance policies referenced in the foregoing sentence; <u>provided</u>, <u>however</u>, that the Indemnified Party shall have no obligation to first submit or to collect upon any applicable insurance coverage as a precondition to making a claim for indemnification hereunder or obtaining indemnification for Indemnified Losses therefor, and the Parties hereto agree, without limiting any other rights any Indemnifying Party may have against Buyer, not to delay in any manner the payment to Buyer or any Buyer Indemnified Person of such indemnification based on Buyer's non-fulfillment of the foregoing obligation at the time any such claim is made.  To the extent that any insurance payment is actually recovered by an Indemnified Party after the related indemnification payment has been made pursuant to this Agreement; the Indemnified Party will pay over to the Indemnifying Party the amounts of such insurance payments promptly after they are actually recovered.

8.6      <u>Set-Off Rights</u>.  Without prejudice or limitation to any other remedies available to Buyer, in the event that Buyer or any Buyer Indemnified Person is entitled to any amounts hereunder or indemnification pursuant to this Agreement, Buyer may set-off such amount solely against the Holdback Amount. In the event any Buyer Indemnified Party has made a good faith claim for indemnification hereunder and any Seller disputes its obligation to make such indemnification, Buyer may nonetheless withhold the amount of such Buyer Indemnified Person claimed indemnification from the Holdback Amount until such dispute is resolved and such withholding shall not be deemed a default by Buyer hereunder.

8.7      <u>Exclusive Remedy</u>. Except for claims based on Fraud and the rights of the Parties to seek injunctive relief or specific performance as provided in this Agreement, the Parties acknowledge and agree that following the Closing the indemnities provided for in this <u>Article VIII</u> are the sole and exclusive remedies of the Indemnified Parties for any breach of this Agreement or with respect only to the Sellers' obligations under any Ancillary Agreements or any other agreements or documents relating to this Agreement (other with respect to any Employment Agreement; provided, however, Buyer may recover indemnity claims under the Transition Services Agreement exclusively from the Holdback Amount), regardless of the legal theory under which the claim, Losses or Liability may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise. In furtherance of the foregoing, each Party

<p style="text-align:center">77</p>

hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the transactions contemplated by this Agreement it may have against the other Parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this <u>Article VIII</u>. For the avoidance of doubt, nothing contained in this Agreement shall limit or restrict any Person who is a party to any other Ancillary Agreement from obtaining damages or any other legal or equitable relief in connection with any breach of such Ancillary Agreement pursuant to the terms thereof.

## ARTICLE IX.
## CONDITIONS TO CLOSING

9.1    <u>Conditions to Obligation of Buyer</u>. The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer in its sole discretion) of the following conditions:

(a)    Each of the representations and warranties of the Sellers in <u>Article III</u> of this Agreement that does not contain an express materiality or "Material Adverse Effect" qualification must have been true, complete and correct in all respects as of the date of this Agreement, and must be true, complete and correct in all material respects as of the Closing, as if made at the Closing. Each of the representations and warranties of the Sellers in <u>Article III</u> of this Agreement that does contain an express materiality or "Material Adverse Effect" qualification must have been true, correct, and complete in all respects as of the date of this Agreement and as if made at the Closing.

(b)    Sellers shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Sellers, on or prior to the Closing Date.

(c)    There must not have been any Material Adverse Effect since the date of this Agreement (for the avoidance of doubt, the Bankruptcy Cases, and any actions resulting from the Bankruptcy Cases, shall not be considered as, or as contributing to, a Material Adverse Effect).

(d)    Buyer shall have received a certificate of each Seller, dated as of the Closing Date and signed by an authorized officer of such Seller, to the effect that the conditions set forth in <u>Sections 9.1(a)</u>, <u>9.1(b)</u>, and <u>9.1(c)</u> have been satisfied (the "<u>Seller Closing Certificate</u>").

(e)    All Material Consents shall have been obtained (including, in the case of consents to assignment of Assumed Contracts, by virtue of the effect of the Sale Order rendering certain consents to be unnecessary) or made, as applicable.

(f)    No Proceeding or Order of any Governmental Authority restraining, enjoining or otherwise preventing or delaying the consummation of this Agreement or the transactions contemplated hereby shall be outstanding, and no Proceeding, whether at law or in equity, or before or by any Governmental Authority, shall be pending or threatened, wherein an unfavorable outcome would (i) prevent the performance of this Agreement or the consummation

78

of the transactions contemplated hereby or declare unlawful any of the transactions contemplated hereby, or (ii) cause any of the transactions contemplated hereby to be rescinded following consummation.

(g)     The Bankruptcy Court shall have entered the Sale Order in accordance with Section 5.7, and the Sale Order shall be unstayed and in full force and effect as of the Closing Date.

(h)     Sellers have made or are prepared to immediately make all of the deliveries required by Section 2.6.

9.2     Conditions to Obligation of Seller. The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Sellers' Representative, in its sole discretion) of the following conditions:

(a)     Each of the representations and warranties of Buyer in Article IV that does not contain an express materiality or "Material Adverse Effect" qualification must have been true, complete and correct in all respects as of the date of this Agreement, and must be true, complete and correct in all material respects as of the Closing, as if made at the Closing. Each of the representations and warranties of Buyer in Article IV that does contain an express materiality or "Material Adverse Effect" qualification must have been true, complete and correct in all respects as of the date of this Agreement and as if made at the Closing.

(b)     Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)     Sellers' Representative shall have received a certificate dated as of the Closing Date by an authorized officer of Buyer to the effect that the conditions set forth in Sections 9.2(a) and 9.2(b) have been satisfied (the "Buyer Closing Certificate").

(d)     No Proceeding or Order of any Governmental Authority restraining, enjoining or otherwise preventing or delaying the consummation of this Agreement or the transactions contemplated hereby shall be outstanding, and no Action, whether at law or in equity, or before or by any Governmental Authority, shall be pending or threatened, wherein an unfavorable outcome would (i) prevent the performance of this Agreement or the consummation of the transactions contemplated hereby or declare unlawful any of the transactions contemplated hereby, or (ii) cause any of the transactions contemplated hereby to be rescinded following consummation.

(e)     The Bankruptcy Court shall have entered the Sale Order in accordance with Section 5.7, and the Sale Order shall be unstayed and in full force and effect as of the Closing Date.

(f)     Buyer has made or is prepared to immediately make all of the deliveries required by Sections 2.7.

9.3     _Frustration of Closing Conditions_. No Party may rely on or assert the failure of any condition set forth in this Article IX, as the case may be, if such failure results from or was caused primarily by such Party's failure to comply with any provision of this Agreement.

9.4     _Waiver of Conditions_. All conditions set forth in this Article IX will be deemed to have been satisfied or waived from and after the Closing.

# ARTICLE X.
# TERMINATION

10.1     _Termination_. This Agreement may be terminated, and the transactions contemplated herein may be abandoned, prior to the Closing solely as follows; provided that any Party desiring to terminate this Agreement pursuant to this Section 10.1 shall give written notice of such termination to the other Parties to this Agreement:

(a)     by the mutual written consent of Sellers' Representative and Buyer;

(b)     by either Buyer or Sellers:

(i)     if the Closing shall not have occurred on or before December 27, 2024 (the "Outside Date"); provided, if the Sale Order has not been entered as of the initial Outside Date, then the Outside Date shall automatically be extended to the earlier of (A) three Business Days after the date on which all conditions set forth in Article IX (except those conditions that are to be satisfied at Closing) have been satisfied (or waived by the Party entitled to the benefit of the same), or (B) January 26, 2025 (the "Extended Outside Date"); provided, further, that a Party may not terminate this Agreement pursuant to this Section 10.1(b)(i) if such Party is in material breach of any of its representations, warranties, covenants or agreements contained herein and such material breach is the primary cause that the Closing has not occurred by the Outside Date or Extended Outside Date (as the case may be);

(ii)     if any Governmental Authority shall have issued an Order or taken any other action permanently enjoining, restraining or otherwise prohibiting the Closing and such Order or other action shall have become final and nonappealable; provided, that the Party seeking to terminate this Agreement pursuant to Section 10.1(b)(i) shall have used reasonable efforts to remove such Order, injunction, restraint or prohibition, and such Order, injunction, restraint or prohibition shall not have been principally caused by the breach by such Party of its covenants or agreements under this Agreement;

(iii)     if Sellers enter into a definitive agreement providing for a Superior Proposal or other transaction that would make the consummation of the transaction contemplated by this Agreement or the satisfaction of any conditions herein impossible; or

(iv)     if, after its entry, the Sale Order ceases to be in full force and effect;

(v)     subject to and in accordance with the terms of Section 5.7, if the Bankruptcy Court does not issue the Sale Order in accordance with Section 5.7;

80

(c)    by Buyer:

(i)    if the Closing shall not have occurred on or before Extended Outside Date;

(ii)    if any of the representations or warranties of Sellers set forth in Article III shall not be true and correct such that the condition to Closing set forth in Section 9.1(a) would not be satisfied and the breach or breaches causing such representations or warranties not to be true and correct is not cured within 30 days after written notice thereof is delivered from Buyer to Sellers' Representative; provided, that Buyer shall not have the right to terminate this Agreement pursuant to this Section 10.1(c)(ii) if Buyer is then in material violation or breach of any of its covenants, obligations, representations or warranties set forth in this Agreement and such violation or breach would give rise to the failure of a condition set forth in Section 9.2(a) or Section 9.2(b);

(iii)    if all of the conditions set forth in Section 9.2 (not including conditions which are to be satisfied by actions taken at the Closing; provided that such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Sellers' Representative, Buyer has given notice to Sellers' Representative in writing that Buyer is prepared to consummate the transactions contemplated by this Agreement (a "Buyer Closing Notice"), and Sellers fail to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to Section 2.5, or, if later, on the Business Day immediately following the date of delivery of such Buyer Closing Notice;

(iv)    if the Bankruptcy Cases are converted to cases under chapter 7 of the Bankruptcy Code, a trustee or examiner with expanded powers is appointed pursuant to the Bankruptcy Code, or the Bankruptcy Court enters an order dismissing the Bankruptcy Cases;

(v)    if the Sale Order is not entered by January 23, 2025;

(vi)    if any creditor of any Seller or any of Sellers' Affiliates obtains relief from the stay to foreclose on, or otherwise take possession of, a material portion of the Purchased Assets;

(vii)    if, at any time prior to or at Closing, twenty percent (20%) or greater of the physicians and advanced practice providers set forth on Schedule 10.1(c)(vii) have terminated their employment, have been terminated from employment, or have failed to enter into an employment agreement with Buyer or one of its Affiliates; or

(d)    by Sellers:

(i)    if any of the representations or warranties of Buyer set forth in Article IV shall not be true and correct such that the condition to Closing set forth in Section 9.2(a) would not be satisfied and the breach or breaches causing such representations or warranties not to be true and correct is not cured within 30 days after written notice thereof

81

is delivered from Sellers to Buyer; <u>provided</u>, that Sellers shall not have the right to terminate this Agreement pursuant to this <u>Section 10.1(d)</u> if Sellers are then in material violation or breach of any of its covenants, obligations, representations or warranties set forth in this Agreement; or

(ii)    if all of the conditions set forth in <u>Section 9.1</u> (not including conditions which are to be satisfied by actions taken at the Closing; provided that such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Buyer, Sellers have given notice to Buyer in writing that Sellers are prepared to consummate the transactions contemplated by this Agreement (a "<u>Seller Closing Notice</u>"), and Buyer fails to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to <u>Section 2.5</u>, or, if later, on the Business Day immediately following the date of delivery of such Seller Closing Notice.

10.2    <u>Effect of Termination</u>. In the event of the termination of this Agreement pursuant to <u>Section 10.1</u>, this entire Agreement shall forthwith become void (and there shall be no liability or obligation on the part of Buyer, Sellers or their officers, directors or equityholders) with the exception of (i) the provisions of <u>Section 2.4(c)</u>, <u>Section 10.1</u>, this <u>Section 10.2</u> and <u>Article XI</u>, together with all applicable defined terms set forth in <u>Article I</u>, each of which provisions shall survive such termination and remain valid and binding obligations of the Parties and (ii) any Liability of any Party for any willful and material breach of this Agreement prior to such termination. For the avoidance of doubt, the Confidentiality Agreement shall survive any termination of this Agreement in accordance with its terms, and nothing in this <u>Article X</u> shall be construed to discharge or relieve any party to the Confidentiality Agreement of its obligations thereunder. In the event of termination pursuant to <u>Section 10.1</u>, the terminating Party must give written notice thereof, specifying the provision pursuant to which the Agreement is being terminated, to the other Party, and this Agreement will terminate (subject to this <u>Section 10.2</u>) and the purchase of the Purchased Assets hereunder will be abandoned without further action by Buyer or Seller.

## ARTICLE XI.
## MISCELLANEOUS PROVISIONS

11.1    <u>Notices</u>.  All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given and made upon being delivered by international overnight courier, or electronic mail (with confirmation of receipt by non-automated reply e-mail from the recipient) to the Party for whom it is intended, <u>provided</u> that if notice is given by electronic mail, a copy thereof is deposited, postage prepaid, certified or registered mail, return receipt requested, bearing the address shown in this <u>Section 11.1</u> for, or such other address as may be designated in writing hereafter by, such Party:

If to Buyer:

Conviva Medical Center Management, LLC
c/o Humana Inc.
500 West Main Street
Louisville, Kentucky 40202
Attention:      Joseph M. Ruschell, Associate Vice President, Assistant
                 General Counsel and Corporate Secretary
Email:         jruschell1@humana.com

With a copy to:

Bryan Cave Leighton Paisner LLP
One Metropolitan Square, Suite 3600
211 North Broadway
St. Louis, Missouri 63102
Attention:  Kristin M. Yemm and Joel N. Lander
E-mail:  kristin.yemm@bclplaw.com
           Joel.lander@bclplaw.com


If to Sellers:

Nicholas Campbell
1175 Peachtree St NE
Suite 1000
Atlanta, GA 30361
Email Address: nick@wearemeru.com


With a copy to:

83

Berger Singerman LLP
1450 Brickell Avenue
Suite 1900
Miami, FL 33131
Attention: Paul Singerman
Email Address: Singerman@bergersingerman.com

If to the Sellers' Representative:

MB Medical Operations, LLC
1175 Peachtree St NE
Suite 1000
Atlanta, GA 30361
Attention: Nicholas Campbell
Email Address: nick@wearemeru.com

With a copy to:

Berger Singerman LLP
1450 Brickell Avenue
Suite 1900
Miami, FL 33131
Attention: Paul Singerman
Email Address: Singerman@bergersingerman.com

11.2    <u>Entire Agreement</u>.  This Agreement and the Schedules and Exhibits hereto, together with the Ancillary Agreements, embody the entire agreement and understanding of the Parties with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings relative to such subject matter.  No representation, promise, inducement, or statement of intention has been made by any party hereto which is not embodied in this Agreement, or in the Exhibits or Schedules attached hereto or the written statements, certificates, or other documents delivered pursuant hereto.

11.3    <u>Amendment and Modification</u>.  To the extent permitted by applicable Law, this Agreement shall be amended, modified or supplemented only by a written agreement executed by Buyer and the Sellers' Representative.

11.4    <u>Assignment; Binding Agreement</u>.  This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, shares, or obligations hereunder shall be transferred, delegated, or assigned (by operation of Law or otherwise) by any Buyer without the prior written consent of the Sellers' Representative or any Seller without the prior written consent of Buyer; <u>provided</u>, <u>however</u>, that (i) Buyer shall have the right to transfer and assign its rights hereunder to any entity which is controlled directly or indirectly by Humana Inc. and (ii) concurrently with or after the Closing, Buyer may assign any or all of its rights hereunder without any consent or approval of any other party to this Agreement.

84

11.5    <u>Counterparts</u>.  This Agreement may be executed simultaneously in multiple counterparts (including by PDF or similar method), each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

11.6    <u>Section Headings; Interpretation</u>.  The Article and Section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of the Agreement.  Each reference in this Agreement to an Article, Section, Schedule or Exhibit, unless otherwise indicated, shall mean an Article or a Section of this Agreement, an Exhibit attached to this Agreement, or a schedule contained in the Schedules, as the case may be. References herein to "days," unless otherwise indicated, are to consecutive calendar days.  Words in the singular shall be held to include the plural and vice versa.  Words of one gender shall be held to include both genders.  The word "including" and words of similar import shall mean "including without limitation" unless otherwise specified.  The word "or" shall not be exclusive unless otherwise specified.  Provisions shall apply, when appropriate, to successive events and transactions. Each Party hereto has participated substantially in the negotiation and drafting of this Agreement and each Party agrees that any ambiguity herein should not be construed against the draftsman.

11.7    <u>Expenses</u>.  Buyer shall pay the fees and expenses of their counsel, accountants, experts, other representatives and all other expenses incurred by any of them incident or relating to the negotiation, preparation and execution of this Agreement and the transactions contemplated hereby, and the performance by them of their obligations hereunder.  Sellers, and not Buyer, shall be responsible for all fees and expenses of Sellers incurred by any of them incident or relating to the negotiation, preparation and execution of this Agreement and the transactions contemplated hereby, and the performance by them of their obligations hereunder (including their fees and expenses of counsel, accountants, experts and other representatives).

11.8    <u>Disclosure Schedules</u>.

(a)    Disclosure of any item in any Section of the Disclosure Schedules referenced by a particular section in this Agreement shall be deemed to have been disclosed with respect to any other Section in this Agreement only if the relevance of such disclosure to such other Section(s) is apparent on its face, including by way of a reference or cross-reference thereto.

(b)    From time to time up to the Closing Date, Sellers may supplement or amend the Disclosure Schedules with respect to any matter (i) first existing or occurring after the date hereof which, if existing or occurring at or prior to such date, would have been required to be set forth in the Schedules, or (ii) that is necessary to correct any information in such Schedule that is inaccurate on account of the occurrence of an event described in subsection (i). No supplement or amendment to the Schedules shall (i) have any effect for purposes of the Buyer's right to indemnification or in determining satisfaction of the conditions set forth in <u>Section 9.1(a)</u> of this Agreement, or (ii) in any way limit the Buyer's exercise of its rights hereunder.

(c)    The Parties acknowledge and agree that Buyer shall have the right to update and amend in all respects <u>Section 3.22 of the Disclosure Schedules</u> regarding Devices prior to Closing.

13208185-55
13208185-58

11.9    <u>Remedies Cumulative</u>.    Except as otherwise provided herein, all rights and remedies of the Parties under this Agreement are cumulative and without prejudice to any other rights or remedies under Law.

11.10    <u>Governing Law; Submission to Jurisdiction and Venue; WAIVER OF JURY TRIAL</u>.

(a)    This Agreement, and all suits, actions and Proceedings that may be based upon, arise out of, or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), shall be governed solely by and construed in accordance with the internal laws of the State of Delaware, without regard to its choice of law rules or conflict-of-law principles; *provided, however*, that the provisions of <u>Section 6.1</u> of this Agreement shall be governed solely by and construed in accordance with the internal laws of the State of Florida, without regard to its choice of law rules or conflict-of-law principles.

(b)    ANY SUIT, ACTION OR PROCEEDING RELATING TO, ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE BROUGHT OR OTHERWISE COMMENCED IN THE BANKRUPTCY COURT PROVIDED THAT THE BANKRUPTCY CASES REMAIN PENDING OR THE BANKRUPTCY COURT HAS RETAINED JURISDICTION, AND OTHERWISE IN THE STATE COURT OF THE STATE OF DELAWARE LOCATED IN THE CITY OF WILMINGTON AND COUNTY OF NEW CASTLE. EACH PARTY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURT IN CONNECTION WITH ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT UNDER THIS SECTION. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO PERSONAL JURISDICTION AND THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURT AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH PARTY HEREBY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY PROCEEDING IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT.

11.11    <u>No Third Party Beneficiaries or Other Rights</u>.    Nothing herein shall grant to or create in any person not a party hereto, or any such person's dependents or heirs, any right to any benefits hereunder, and no such party shall be entitled to sue any Party to this Agreement with respect thereto.  The representations and warranties contained in this Agreement are made for purposes of this Agreement only and shall not be construed to confer any additional rights on the

Parties under applicable securities Laws.  The Parties agree that no provision of this Agreement shall create any third party beneficiary rights in any person or organization (including employees or former employees of the Sellers, unions or other representatives of such employees or former employees, or trustees, administrators, participants, or beneficiaries of any Plan) with respect to any benefits that may be provided, directly or indirectly, under any Plan.

11.12    Severability.  If any other provision of this Agreement shall be determined to be contrary to Law and unenforceable by any court of law, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby are not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

11.13    No Waiver.  Any failure by any of the Parties hereto to comply with any of the obligations, agreements or conditions set forth herein may be waived by the other Party or Parties; provided, however, that any such waiver shall not be deemed a waiver of any other obligation, agreement or condition.

11.14    Appointment of Sellers' Representative.

(a)    The Sellers hereby agree and acknowledge that MB Medical Operations, LLC, a Delaware limited liability company, shall act as an agent of the Sellers and is granted such powers as are delegated under this Agreement, which shall include the power (i) to act as the attorney-in-fact for each Seller and in connection with any right or obligation of the Sellers in general pursuant to this Agreement or the Ancillary Agreements, all as deemed necessary and appropriate with the advice of counsel, (ii) to give and receive notices and communications on behalf of the Sellers under this Agreement or any other Ancillary Agreement, (iii) to waive provisions of any such agreements and to amend any such agreements, (iv) to resolve any dispute arising hereunder on behalf of each Seller, (v) to conduct, control and cooperate with respect to the defense of the litigation on behalf of each Seller, (vi) to agree to, negotiate, enter into settlements and compromises of, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such claims on behalf of each Seller, (vii) to collect and disburse funds, and (viii) to take all actions on behalf of each Seller necessary or appropriate in the judgment of the Sellers' Representative for the accomplishment of the foregoing and to otherwise act on behalf of each of the Sellers with respect to any Ancillary Agreement and the transactions contemplated hereby and thereby, each of which the Sellers has received, reviewed and approved in their execution form.

(b)    A decision, act, consent or instruction of the Sellers' Representative in accordance with Section 11.14(a) shall constitute a decision of all Sellers shall be final, binding and conclusive upon each Seller, and Buyer may rely upon any decision, act, consent or instruction of the Sellers' Representative as being the decision, act, consent or instruction of each and every Seller.

13208185-55
13208185-58

(c)     The Sellers' Representative shall not be liable to the Sellers for any act done or omitted as the Sellers' Representative while acting in accordance with this Agreement and in good faith and in the exercise of reasonable judgment, and any act done or omitted pursuant to the written advice of counsel shall be conclusive evidence of such good faith.

(d)     The Sellers' Representative may resign by delivering written notice to the Sellers with a copy to Buyer, at least thirty (30) days prior to the effective date of such resignation. A majority of the Sellers may terminate the appointment of the Sellers' Representative, by delivering written notice thereto, with a copy to Buyer, which notice shall designate the effective date of such termination not earlier than five (5) Business Days after Buyer's receipt of such notice. In the event of such resignation or termination, a successor Sellers' Representative shall be appointed by a majority of the Sellers and written notice of such appointment shall be delivered to Buyer.  After the appointment (or deemed appointment) of a Person as a successor Sellers' Representative, all references to such Sellers' Representative shall be deemed to include such successor.

11.15   <u>No Requirement to Refer</u>.  Nothing in this Agreement will be construed to induce, encourage, solicit, or reimburse the referral or anticipated referral of any patients or business, including any patients or business funded in whole or part by a Government Program, or to limit the freedom of any patient of Sellers or any of their Affiliates to choose the hospital, healthcare facility, or physician from whom such patient will receive medical services.  No payment made under this Agreement will be in return for the referral or anticipated referral of patients or business, including those paid in whole or part by a Government Program.  The parties acknowledge that none of the benefits granted to Sellers hereunder are conditioned on any requirement that any such person or entity make referrals to, be in a position to make or influence referrals to, or otherwise generate business for Buyer or any of its Affiliates.

11.16   <u>Releases</u>.  Subject to and effective as of the Closing, Buyer, on behalf of itself and its Affiliates, administrators, successors, assigns, and representatives (the "<u>Buyer Releasing Parties</u>"), hereby fully releases, discharges, and covenants not to sue any current director or officer of any Seller or the members of the Special Committee, in each case, solely with respect to such individual's role as a director, officer, or member of the Special Committee (each, a "<u>Release Party</u>"), as applicable, from any and all disputes, claims, controversies, demands, damages, rights, obligations, judgments, causes of action, and liabilities, whether or not known, suspected or claimed, arising directly or indirectly from (a) the operation of the Business prior to Closing, or (b) the transactions contemplated by this Agreement; <u>provided</u>, that nothing contained in this Agreement shall release, waive, discharge, relinquish or otherwise affect the rights or obligations of any Buyer Releasing Party, with respect to (i) claims involving Fraud; (ii) any other claims that Buyer Releasing Party ever had, now has, or may have against any Release Party arising out of any commercial business activities or relationships unrelated to the transactions contemplated by this Agreement; and (iii) any claims that any Buyer Releasing Party may have against any officer of the Company for any loss or damage a Buyer Releasing Party may incur after Closing by reason of continuing conduct that commenced during his or her role as an employee of any Seller.

*[Remainder of page left intentionally blank; signature page follows]*

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed as of the date first above written.

**BUYER:**                                **CONVIVA MEDICAL CENTER MANAGEMENT, LLC**

By: _Renee J. Buckingham_

Name: Renee J. Buckingham

Title: President

**SELLERS:**

**MB MEDICAL OPERATIONS, LLC**

By: *Paul M. McBride, II*
1EB3F84008E342A...
Name: Paul McBride
Title: President and Chief Executive Officer

**MB MEDICAL TRANSPORT, LLC**

By: *Paul M. McBride, II*
1EB3F84008E342A...
Name: Paul McBride
Title: President and Chief Executive Officer

**CARE CENTER NETWORK, LLC**

By: *Paul M. McBride, II*
1EB3F84008E342A...
Name: Paul McBride
Title: President and Chief Executive Officer

**CLINICAL CARE PHARMACY, LLC**

By: *Paul M. McBride, II*
1EB3F84008E342A...
Name: Paul McBride
Title: President and Chief Executive Officer

**CLINICAL CARE MEDICAL GROUP, LLC**

By: *Paul M. McBride, II*
1EB3F84008E342A...
Name: Paul McBride
Title: President and Chief Executive Officer

**FLORIDA FAMILY PRIMARY CARE CENTER, LLC**

By: *Paul M. McBride, II*
1EB3F84008E342A...
Name: Paul McBride
Title: President and Chief Executive Officer

**FLORIDA FAMILY PRIMARY CARE CENTERS OF PASCO, LLC**

By: _Paul M. McBride, II_ _____
       1EB3F84008E342A...
Name: Paul McBride
Title: President and Chief Executive Officer

**FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC**

By: _Paul M. McBride, II_ _____
       1EB3F84008E342A...
Name: Paul McBride
Title: President and Chief Executive Officer

**FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC**

By: _Paul M. McBride, II_ _____
       1EB3F84008E342A...
Name: Paul McBride
Title: President and Chief Executive Officer

**FLORIDA FAMILY PRIMARY CARE CENTERS OF ORLANDO, LLC**

By: _Paul M. McBride, II_ _____
       1EB3F84008E342A...
Name: Paul McBride
Title: President and Chief Executive Officer

**CCMC PHYSICIAN HOLDINGS, INC.**

By: _Paul M. McBride, II_ _____
       1EB3F84008E342A...
Name: Paul McBride
Title: President and Chief Executive Officer

**MIAMI MEDICAL & WELLNESS CENTER LLC**

By: _Paul M. McBride, II_ _____
       1EB3F84008E342A...
Name: Paul McBride
Title: President and Chief Executive Officer

13312744-1

**MIAMI BEACH MEDICAL CENTERS, INC. F/K/A RODOLFO DUMENIGO, M.D., P.A.**

By: _Paul M. McBride, II_

Name: Paul McBride

Title: President and Chief Executive Officer

**MIAMI BEACH MEDICAL CONSULTANTS, LLC**

By: _Paul M. McBride, II_

Name: Paul McBride

Title: President and Chief Executive Officer

**SELLERS' REPRESENTATIVE:**

**MB MEDICAL OPERATIONS, LLC**

By: _Paul M. McBride, II_

Name: Paul McBride

Title: President and Chief Executive Officer

13312744-1

**Exhibit A**

**<u>Tangible Asset List</u>**

**Exhibit A | Tangible Asset List**

| Category | Address | Asset | Purchase Price | Accumulated Depreciation | NBV | Acquisition/In Service Date | Depreciation Method | Legal Entity |
|---|---|---|---|---|---|---|---|---|
| Autos | 7500 SW 8th St | IH Motion Mobility - Chairlifts | $1,401 | | $1,401 | 3/31/2016 Straight-line | | MR Medical Transport LLC |
| Autos | 151 NW 11TH ST | IN Motion Mobility - Chairlifts | $1,327 | | $1,327 | 4/1/2016 Straight-line | | MR Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Von 2020 - VIN 5550 | $66,808 | $53,190 | $13,618 | 8/24/2020 Straight-line | | MR Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Von 2020 - VIN 22449 | $34,421 | $19,505 | $14,916 | 11/30/2021 Straight-line | | MR Medical Transport LLC |
| Autos | 7500 SW 8th St | Miami Banners, In Motion Mobility (wrapping lift) | $14,781 | | $14,781 | 11/30/2021 Straight-line | | MR Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes - VIN 07256 - Maintenance Von | $57,840 | $31,812 | $26,028 | 12/31/2021 Straight-line | | MR Medical Transport LLC |
| Autos | 7500 SW 8th St | 2020 Ford Transit - VIN 08723 - Huntington | $53,167 | $30,782 | $23,385 | 12/31/2021 Straight-line | | MR Medical Transport LLC |
| Autos | 7500 SW 8th St | 2019 Ford Transit - VIN 74041 - Huntington | $50,417 | $27,730 | $22,688 | 12/31/2021 Straight-line | | MR Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T081329 | $88,227 | $47,054 | $41,173 | 1/31/2022 Straight-line | | MR Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T081329 | $88,227 | $47,072 | $41,188 | 1/31/2022 Straight-line | | MR Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T077729 | $88,213 | $47,047 | $41,166 | 1/31/2022 Straight-line | | MR Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T076465 | $88,227 | $47,054 | $41,173 | 1/31/2022 Straight-line | | MR Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T080183 | $88,227 | $47,055 | $41,173 | 1/31/2022 Straight-line | | MR Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T082182 | $88,227 | $47,047 | $41,144 | 1/31/2022 Straight-line | | MR Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T079355 | $88,213 | $47,047 | $41,166 | 1/31/2022 Straight-line | | MR Medical Transport LLC |
| Autos | 1200 ALTON RD | MIAMI BANNERS & SIGNS - VIN 4047 and VIN 8733 | $4,494 | $2,172 | $2,322 | 2/10/2022 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | In Motion Mobility - wheel chair installations (received Jun 2021) | $10,165 | $5,601 | $4,564 | 6/1/2022 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | In Motion Mobility - wheel chair installations | $10,165 | $4,574 | $5,591 | 6/1/2022 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | WDDPEBCC8P7F31598 - 251 Mercedes | $86,247 | | $86,247 | 9/11/2023 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | 1G7AF74PH1903518 - 2017 GMC | $11,840 | | $11,840 | 9/11/2023 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | 3H1AF74PH1901042 - 2017 Nissan | $8,600 | | $8,600 | 9/11/2023 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | In Motion Mobility - Lifts | $20,330 | $8,810 | $11,520 | 11/30/2023 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 7500 SW 8th St | South Dade Kia VIN 22116 - KIA Soul for Pharmacy | $24,836 | | $24,836 | 2/1/2023 Straight-line | | MR Medical Transport LLC |
| Autos | 1200 ALTON RD | VIN 2GE/2021.2 2018 Chevy Express 2500 Passenger | $19,450 | $12,004 | $12,004 | 2/1/2023 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | MIAMI BANNERS & SIGNS | $4,173 | $7,915 | | 2/10/2022 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | Williams Lehman/ATV | $131,459 | $19,162 | -$3,742 | 7/31/2015 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 7500 SW 8th St | LEXUS TRUCK | | | | 11/5/2011 Straight-line | | MR Medical Operations, LLC |
| Autos | 1200 ALTON RD | TOYOTA TRUCK | | | | 11/5/2011 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | TOYOTA TRUCK | | | | 4/9/2018 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | TOYOTA TRUCK | | | | 12/19/2012 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | TOYOTA VAN | | | | 1/30/2013 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | TOYOTA VAN | | | | 8/22/2013 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | TOYOTA VAN - removed Dec 23 | | | | 9/20/2013 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | TOYOTA TRUCK - removed Dec 23 | | | | 4/24/2014 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | TOYOTA TRUCK - removed Dec 23 | | | | 2/10/2014 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | TOYOTA TRUCK | | | | 2/10/2015 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | MIAMI BANNERS & SIGNS | | | | 3/10/2014 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | mobility works | | | | 2/10/2014 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | mobility works | | | | 6/18/2015 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 1200 ALTON RD | mobility works | | | | 7/31/2015 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Autos | 551 E 49TH ST | 2013 FORD E-350 VAN VIN 1DDA34298 | | | | 7/31/2015 Straight-line | | Miami Medical & Wellness Center, LLC |
| Autos | 551 E 49TH ST | 2013 FORD E-350 VAN VIN-20DA00855 | | | | 4/16/2014 Straight-line | | Miami Medical & Wellness Center, LLC |
| Computer Equipment | 551 NW 42ND AVE | LEUEINE CAMERA | $2,844 | | $2,844 | 7/31/2018 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION - PCs | $4,320 | | $4,320 | 4/19/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | SHI INTERNATIONAL CORP - Laptops | $7,551 | $764 | $6,787 | 4/24/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION - COMPUTERS FOR UPGRADE & EXPANSION | $12,567 | $1,077 | $5,354 | 4/24/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT & PC CONNECTION - WESTCHESTER | $26,286 | $5,358 | $20,928 | 8/26/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION - 25 COMPUTER PURCHASE | $16,767 | $3,418 | $13,349 | 8/26/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION - COMPUTER FOR LAKELAND | $16,265 | $3,162 | $12,583 | 8/31/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, INC - 10 LENOVO THINKCENTRE | $10,544 | $2,241 | $8,103 | 11/6/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | CC ACQUISITION | $2,747 | $2,747 | | 9/11/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | HP SWITCHES, FFPC 5 LAPTOPS AND MRI EQUIPMENT | $8,635 | | $8,635 | 1/21/2021 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT, DVVY, DELL PC CONNECTIONS (Nov/Dec) | $14,090 | $2,603 | $36,260 | 3/25/2021 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION SALES CORP | $98,043 | $29,413 | $68,630 | 3/25/2021 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION SALES CORP | $25,674 | $8,130 | $17,544 | 4/19/2021 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA | $5,582 | $1,822 | $3,560 | 4/30/2021 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION SALES CORP - Computers for CCH and Price | $27,371 | $9,124 | $18,247 | 5/20/2021 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, INC - AND DVVY | $18,651 | $6,061 | $348,774 | 6/29/2021 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, INC | $16,377 | $6,078 | $10,499 | 7/24/2021 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION, DVVY (POWER, INSIGHT DIRECT (AIG) Total | $84,653 | $32,241 | $52,079 | 8/31/2021 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, CDW | $32,478 | $13,141 | $33,136 | 9/30/2021 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTIONS SALES CORP - PCs for CC | $20,501 | $8,200 | $12,301 | 10/31/2021 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT, DVVY, DELL PC CONNECTIONS (Octob | $79,295 | $33,345 | $45,940 | 12/31/2021 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT, DVVY, PC CONNECTIONS (total November) | $83,479 | $36,174 | $47,305 | 11/22/2021 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION SALES CORP, DVVY | $53,145 | $29,610 | $23,535 | 2/28/2022 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION SALES CORP | $29,800 | | $29,800 | 4/19/2022 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | TELEPHONE SOLUTIONS SECURITY CAMERAS AUTOMVD | $241 | | $241 | 2/27/2017 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Computer Equipment | 7500 SW 8th St | NORTH MIAMI ACTIVITY CENTER | $1,505 | $1,505 | | 10/1/2014 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, INC PC CONNECTION SALES CORP/ DELL | $6,573 | | $6,573 | 1/31/2018 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 11259 Biscayne Blvd | INSIGHT DIRECT USA, INC - DVVY | $23,337 | | $33,337 | 1/31/2018 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, INC - PC CONNECTION THINKCENTRE - DORAL | $10,337 | $21,577 | | 2/28/2018 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DA DEPARTMENT COMPUTERS | $1,922 | $1,922 | | 8/18/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DORAL PHONES | $1,247 | $1,247 | | 3/31/2018 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DORAL EQUIPMENT | $34,182 | $1,182 | | 3/31/2018 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | LAPTOPS FOR NEW ADMINISTRATION | $1,833 | $1,833 | | 3/31/2018 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, DVVY, DELL BUSINESS | $58,986 | $285,510 | | 5/31/2018 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, DELL BUSINESS PC CONNECTION | $29,479 | $14,740 | | 3/15/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, DVVY | $84,626 | $43,730 | | 3/15/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS PC CONNECTION | $51,963 | $24,250 | $27,714 | 5/31/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | INSIGHT DIRECT USA, INC, PC CONNECTION SALES CORP/ DELL | $50,445 | $28,222 | $32,523 | 4/15/2020 Straight-line | | Rosdib Durnrign, M.D. P.A. |
| Computer Equipment | 11259 Biscayne Blvd | PC CONNECTION | $38,767 | $21,074 | $17,493 | 5/31/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS | $13,291 | $3,987 | $9,304 | 8/18/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS PC CONNECTION | $1,922 | $1,922 | | 8/18/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS PC CONNECTION | $3,083 | $3,002 | | 10/13/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS PC CONNECTION | $1,901 | $1,901 | | 11/3/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS PC CONNECTION | $15,343 | $9,718 | $6,716 | 2/28/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS PC CONNECTION | $1,230 | $1,012 | | 3/13/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS PC CONNECTION | $3,083 | $1,182 | $1,901 | 3/15/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS PC CONNECTION | $38,880 | $20,484 | $18,396 | 8/18/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS PC CONNECTION | $13,291 | $3,987 | $9,304 | 8/18/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS PC CONNECTION INSIGHT | $2,083 | $1,082 | $1,002 | 3/13/2020 Straight-line | | MR Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS | $2,994 | $798 | $2,196 | 5/31/2020 Straight-line | | MR Medical Operations, LLC |

| Class | Location | Description | Amount | Amount | Date | Entity |
|---|---|---|---|---|---|---|
| Computer Equipment | 7500 SHERIN ST | DELL BUSINESS - PC CONNECTION INSIGHT | $2,624 | $654 | $1,948 | 6/13/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | DELL BUSINESS - PC CONNECTION INSIGHT | $48,600 | $31,340 | $32,260 | 7/31/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | DELL BUSINESS - CRAVY ENTERPRISES (CONFERENCE ROOM ITEM | $33,217 | $7,197 | $24,620 | 8/31/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | DELL BUSINESS INSIGHT DPVY | $20,195 | $5,474 | | 9/30/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | DELL BUSINESS INSIGHT | $18,963 | $3,477 | $15,486 | 10/31/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | DELL BUSINESS | $2,614 | $456 | $2,178 | 11/20/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | PC CONNECTION | $33,061 | | | 11/20/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | DELL BUSINESS | $2,581 | $344 | $2,237 | 12/31/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | DELL BUSINESS | $217 | $217 | | 1/31/2024 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | DELL BUSINESS | $2,603 | $2,386 | | 4/9/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | DELL BUSINESS | $2,550 | $85 | $2,445 | 9/13/2022 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | PC connection | $2,612 | | $2,568 | 10/13/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | PC connection | $44 | $44 | | 10/13/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 2459 HIGHWAY 98 N | LAKELAND COMPUTER EQUIP | $4,772 | | $0 | 7/31/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 2459 HIGHWAY 98 N | LAKELAND COMPUTER EQUIP | $4,658 | | $0 | 3/31/2018 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 2459 HIGHWAY 98 N | LAKELAND TVS | $2,188 | | $0 | 3/31/2018 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 201 1st ST S. | LEXTECH ACTIVITY CENTER EQUIPMENT | $1,823 | | $0 | 3/31/2018 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 201 1st ST S. | WINTERHAVEN STARTUP COMPUTER EQUIP | $4,864 | | $0 | 3/31/2018 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 201 1st ST S. | WINTERHAVEN SECURITY CAMERA | $1,480 | | $0 | 10/31/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 201 1st ST S. | PC CONNECTION - WINTERHAVEN live in AUG | $39,464 | | $0 | 10/31/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 201 1st ST S. | INSIGHT DIRECT USA, INC. - WINTERHAVEN LIVE IN AUG | $24,526 | $15,108 | | 11/20/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7291 West Atlantic Blvd. | TELESPHERE SOLUTIONS (SECURITY CAMERAS HIALEAH | $722 | $10,148 | | 11/20/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7444 E Tampa Bay Blvd, Tampa, FL 33619 | DELRAY STARTUP TECHNOLOGY EQUIPMENT | $4,895 | | $0 | 12/31/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7303 SOUTH FEDERAL HWY. | INSIGHT DIRECT USA, INC. - PC CONNECTION SALES CORP | $59,371 | $44,665 | | 11/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7303 SOUTH FEDERAL HWY. | HOLLYWOOD SECURITY CAMERAS | $1,718 | | $0 | 11/20/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7303 SOUTH FEDERAL HWY. | HOLLYWOOD STARTUP TECHNOLOGY EQUIPMENT | $33,956 | | $0 | 4/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | MDWM | $37,790 | | $0 | 4/20/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | WESTCHESTER SUITE 106 COMPUTER EQUIP | $33,362 | | $0 | 6/30/2018 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | WESTCHESTER SUITE 120 COMPUTER CAMERAS | $1,537 | | $0 | 10/31/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | SUITE 101 WESTCHESTER THERAPY COMPUTERS | $975 | | $975 | 10/31/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | ARUBA ACCESS POINTS FOR ALL LOCATIONS | $1,431 | | $411 | 11/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | COMPUTERS FOR ROOM 207 WESTCHESTER | $1,383 | | $698 | 11/8/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | ITSMAT LAPTOPS | $3,182 | | | 11/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | LENOVO EQUIPMENT COMPUTERS | $3,182 | | | 11/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | INSIGHT DIRECT USA, INC. - LENOVO THINKCENTRE - WESTCH | $51,048 | $7,505 | $2,279 | 1/6/2020 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | PC CONNECTION - POWER EDGE SERVER | $12,550 | | | 12/20/2021 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 6411 BIRD RD | TRANSFER FROM MVP HIAEAI 27TH PC CONNECTION | $24,216 | $10,090 | $14,126 | 9/30/2021 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 6411 BIRD RD | TELESPHERE SOLUTIONS (SECURITY CAMERAS BIRD RD | $481 | $481 | | 8/11/2021 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 6411 BIRD RD | HIAEAI BIRD RD ACTIVITY CENTER COMPUTER EQUIPMENT | $2,147 | | | 12/15/2020 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 6411 BIRD RD | BIRD RD SECURITY CAMERAS | $3,143 | $3,143 | | 2/27/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | | JE GUI TRIP (VIP - Dec 2021) | $378,913 | | $27,620 | 8/1/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | | Desktop, server, monitors | $8,456 | | $1,783 | 7/28/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | | FPPCC Locations (furnipus) | $7,871 | | $6,623 | 7/28/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | DELL BUSINESS DVVY (IPADS) | $9,424 | | $797 | 3/31/2018 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | DELL BUSINESS DVVY (IPADS) | $11,938 | | $611 | 8/14/2014 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | DELL BUSINESS DVVY (IPADS) | $7,132 | | $698 | 11/30/2011 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | MEDICAL SOFTWARE | $16,842 | | $11,361 | 11/30/2011 Straight-line | Rocello Durrango, M.D.P.A |
| Computer Equipment | 1200 ALTON RD | MEDICAL SOFTWARE | $3,558 | | $0 | 9/15/2016 Straight-line | Rocello Durrango, M.D.P.A |
| Computer Equipment | 1200 ALTON RD | DELL COMPUTER | $1,277 | | $0 | 2/22/2013 Straight-line | Rocello Durrango, M.D.P.A |
| Computer Equipment | 1200 ALTON RD | DELL COMPUTER | $4,630 | | $0 | 3/31/2024 Straight-line | Rocello Durrango, M.D.P.A |
| Computer Equipment | 1200 ALTON RD | DELL COMPUTER | $3,865 | | $0 | 7/17/2015 Straight-line | Rocello Durrango, M.D.P.A |
| Computer Equipment | 1200 ALTON RD | DELL COMPUTER | $378 | | $0 | 10/31/2015 Straight-line | Rocello Durrango, M.D.P.A |
| Computer Equipment | 1200 ALTON RD | COMPUTER EQUIPMENT(ROEROROEE?) | $1,434 | | $0 | 10/31/2015 Straight-line | Rocello Durrango, M.D.P.A |
| Computer Equipment | 551 E 49TH ST | COMPUTER EQUIPMENT(ROEROROEE?) | $664 | | $0 | 10/31/2015 Straight-line | Rocello Durrango, M.D.P.A |
| Computer Equipment | 551 E 49TH ST | PATTERSON DENTAL EQUIPMENT | $2,410 | | $0 | 3/3/2014 Straight-line | Rocello Durrango, M.D.P.A |
| Computer Equipment | 551 NW 119th ST. | AUTOMATED BUSINESS MACHINES | $740 | | $0 | 5/14/2014 Straight-line | Rocello Durrango, M.D.P.A |
| Computer Equipment | 551 NW 119th ST. | DELL | $2,036 | | $0 | 3/31/2014 Straight-line | Rocello Durrango, M.D.P.A |
| Computer Equipment | 7500 SHERIN ST | SATKIN WIRELESS | $1,296 | | $0 | 9/15/2016 Straight-line | Clinical Care Pharmacy, LLC |
| Computer Equipment | 7500 SHERIN ST | PAYCHEX M BOARD(PACS) | $11,792 | | $0 | 4/6/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | STAPLES | $3,041 | | $0 | 11/4/2014 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | STAPLES | $131 | | $0 | 4/30/2015 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SHERIN ST | Jose Sanchez Computer | $3,193 | | $0 | 9/15/2016 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7900 SW 8TH ST | TELESPHERE | $490 | | $490 | 9/18/2015 Straight-line | Miami Medical & Wellness Center, LLC |
| Computer Software | 7900 SW 8TH ST | TELESPHERE | | | $0 | 1/1/2021 Straight-line | Miami Medical & Wellness Center, LLC |
| Computer Software | 551 E 49TH ST | TELESPHERE | | | $0 | 9/1/2015 Straight-line | Miami Medical & Wellness Center, LLC |
| Computer Software | 551 E 49TH ST | TELESPHERE | | | $0 | 4/20/2020 Straight-line | Miami Medical & Wellness Center, LLC |
| Computer Software | 7900 SW 8TH ST | TELESPHERE | | | $0 | 5/4/2020 Straight-line | Miami Medical & Wellness Center, LLC |
| Computer Software | 7500 SHERIN ST | Mobilum Westchester Rev Holter (Qwork | $14,453 | $14,453 | | 6/17/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | PC CONNECTION SALES CORP (added to schedule in April | $5,122 | $5,122 | | 11/30/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | Transfer Hostgym from MVP | $58,895 | | $0 | 11/30/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | IPOWER TECHNOLOGIES - ConnectWise Downtpymt (LIVE IN JU | $141,294 | $141,294 | | 4/15/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | IPOWER TECHNOLOGIES - May Total - (LIVE IN JUN | $39,428 | $39,428 | | 7/1/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | PROPHECY HEALTHCARE INC | $11,648 | $11,648 | | 9/30/2019 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | NEXTGEN HEALTHCARE INC (total June) | $869,036 | $869,036 | | 3/30/2019 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | NEXTGEN HEALTHCARE INC | $450,199 | $450,199 | | 8/9/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | CareOptimize | $729,589 | | $0 | 11/29/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | CareOptimize | $35,019 | | $43,533 | 4/19/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | PC CONNECTION SALES CORP | $31,323 | | $3,554 | 8/2/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | PC CONNECTION SALES CORP | $23,220 | | $34,162 | 1/31/2023 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | CALL CENTER CALL SOFTWARE | $1,040 | | $27,920 | 8/2/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | RSA Security Licensing | $19,058 | | | 8/2/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | NEXTGEN HEALTHCARE INC | $78,751 | | $0 | 8/2/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | NEXTGEN HEALTHCARE INC | $1,833 | $1,833 | | 1/31/2023 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | Interelt | $84,284 | $84,284 | | 1/31/2023 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | Interelt | $48,485 | | $10,126 | 8/2/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | CareOptimize PC CONNECTION SALES CORP | $43,000 | $43,000 | | 8/2/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | NEXTGEN HEALTHCARE INC | $81,132 | $81,132 | | 8/2/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | NEXTGEN HEALTHCARE INC | $91,132 | | | 8/2/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | INTERCEPT | $123,000 | $123,000 | | 8/2/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SHERIN ST | INTERCEPT | $45,000 | $45,000 | | 8/2/2022 Straight-line | MB Medical Operations, LLC |

| Category | Address | Description | Cost | | Net | Date | Method | Entity |
|---|---|---|---|---|---|---|---|---|
| Computer Software | 7500 SW 8th St | INTERISOFT | $87,360 | $0 | $87,360 | 1/31/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | INTERISOFT | $85,000 | $0 | $85,000 | 1/31/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | INTERISOFT | $87,360 | $0 | $87,360 | 1/31/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | INTERISOFT | $91,520 | $0 | $91,520 | 1/31/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | AAHEL APR 2022 CONSULTING | $70,932 | $0 | $57,140 | 4/1/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | AAHEL MAY 2022 CONSULTING | $56,254 | $0 | $45,003 | 6/1/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | NEXTGEN HEALTHCARE INC | $27,983 | $0 | $56,842 | 7/1/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | INTERISOFT | $87,360 | $0 | $87,360 | 1/31/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | AAHEL JUNE 2022 CONSULTING | $68,805 | $13,792 | $55,013 | 7/31/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | NEXTGEN HEALTHCARE INC | $20,833 | $11,251 | $9,583 | 8/2/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | INTERISOFT | $91,520 | $16,389 | $9,167 | 8/2/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | INTERISOFT | $5,280 | $20,833 | $91,520 | 7/31/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | NEXTGEN HEALTHCARE INC | $30,000 | $30,000 | $5,280 | 8/2/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | INTERISOFT | $30,000 | $0 | $10,000 | 8/2/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | NEXTGEN HEALTHCARE INC | $30,000 | $19,167 | $4,560 | 8/2/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | NEXTGEN HEALTHCARE INC | $30,000 | $18,333 | $10,833 | 8/2/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | INTERISOFT | $5,040 | $0 | $11,667 | 8/2/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | NEXTGEN HEALTHCARE INC | $30,000 | $0 | $5,040 | 8/9/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | INTERISOFT | $5,280 | $17,500 | $12,500 | 8/2/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | AAHEL | $54,855 | $98,649 | $5,280 | 12/31/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | TECHFIRT | $9,975 | $0 | $43,844 | 2/20/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | NEXTGEN HEALTHCARE INC | $50,500 | $25,250 | $25,250 | 8/22/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | TECHFIRT | $3,816 | $1,590 | $2,226 | 2/20/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | TECHFIRT | $17,917 | $5,843 | $12,074 | 2/20/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | TECHFIRT | $6,500 | $1,806 | $4,694 | 2/20/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | TRANSFER FROM WP AAHEL AND DAMARIDGE | $343,635 | $14,543 | $278,687 | 2/20/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St | 01/14/2020 Core Licensing | $15,917 | $15,917 | $0 | 2/1/2020 | Straight-line | Rozello Durango, M.D. P.A. |
| Computer Software | 7500 SW 8th St | AAHEL CORE IMPLEMENTATION - ONE TIME | $50,000 | $42,778 | $7,222 | 6/1/2022 | Straight-line | Rozello Durango, M.D. P.A. |
| Computer Software | 7500 SW 8th St | Lighthouse | $43,740 | $0 | $43,740 | 3/15/2015 | Straight-line | Rozello Durango, M.D. P.A. |
| Computer Software | 7500 SW 8th St | goverlan | $863 | $0 | $863 | 10/31/2013 | Straight-line | Rozello Durango, M.D. P.A. |
| Computer Software | 7500 SW 8th St | scOPE | $963 | $0 | $963 | 11/1/2015 | Straight-line | Rozello Durango, M.D. P.A. |
| Fitness Equipment | 1200 ALTON RD | MASSAGE CHAIRS FOR LAKELAND | $29,556 | $0 | $29,556 | 9/3/2013 | Straight-line | Rozello Durango, M.D. P.A. |
| Fitness Equipment | 1200 ALTON RD/9611 BIRD RD | DEXOGAME 9' GROUP FITNESS EQUIPMENT | $11,800 | $0 | $0 | 9/3/2013 | Straight-line | Rozello Durango, M.D. P.A. |
| Fitness Equipment | 7500 SW 8th St | FITNESS EQUIPMENT | $0 | $0 | $0 | 3/5/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7500 SW 8th St | FITNESS EQUIPMENT | $0 | $0 | $0 | 60/1/2010 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 151 NW 11TH ST | SCOPE | $0 | $0 | $0 | 2/10/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 151 NW 11TH ST | SCOPE | $0 | $0 | $0 | 2/10/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 151 NW 11TH ST | SCOPE | $0 | $0 | $0 | 2/10/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | SCOPE | $0 | $0 | $0 | 2/11/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | SCOPE | $0 | $0 | $0 | 2/11/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | SCOPE | $0 | $0 | $0 | 2/18/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 551 E 4TH ST | OPTHALMIC EQUIPMENT | $185 | $185 | $0 | 3/5/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | SCOPE | $0 | $0 | $0 | 3/5/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | SCOPE | $0 | $0 | $0 | 3/10/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 551 E 4TH ST | OPTIMETRICS | $0 | $0 | $0 | 3/13/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 151 NW 11TH ST | 2005 TORRIZS XRAY SYSTEM | $0 | $0 | $0 | 3/18/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 151 NW 11TH ST | SCOPE | $0 | $0 | $0 | 4/11/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 551 E 4TH ST | PATTERSON | $0 | $0 | $0 | 5/5/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 551 E 4TH ST | DENTAL EQUIPMENT | $0 | $0 | $0 | 8/28/2014 | Straight-line | Miami Medical & Wellness Center, LLC |
| Fitness Equipment | 7900 SW 8TH ST | TD SOLO LASER | $1,936 | $0 | $0 | 7/6/2016 | Straight-line | Miami Medical & Wellness Center, LLC |
| Fitness Equipment | 7900 SW 8TH ST | MEDICAL EQUIPMENT | $1,386 | $0 | $0 | 8/26/2015 | Straight-line | Miami Medical & Wellness Center, LLC |
| Fitness Equipment | 7900 SW 8TH ST | MEDICAL EQUIPMENT | $185 | $185 | $0 | 7/7/2016 | Straight-line | Miami Medical & Wellness Center, LLC |
| Fitness Equipment | 7900 SW 8TH ST | Midsogon Medical | $1,907 | $4,808 | $0 | 9/18/2019 | Straight-line | Miami Medical & Wellness Center, LLC |
| Fitness Equipment | 7900 SW 8TH ST | Sope el shop | $4,808 | $1,892 | $0 | 2/28/2004 | Straight-line | Miami Medical & Wellness Center, LLC |
| Fitness Equipment | 7900 SW 8TH ST | Medline - hoher digital recorder | $32,372 | $820 | $0 | 2/26/2020 | Straight-line | Miami Medical & Wellness Center, LLC |
| Fitness Equipment | 7900 SW 8TH ST | Exam Table | $89,675 | $9,655 | $45 | 11/4/2017 | Straight-line | Miami Medical & Wellness Center, LLC |
| Fitness Equipment | 7900 SW 8TH ST | Sawali Medical steam table, medical recliner wall storage(rigid) | $10,395 | $1,631 | $739 | 12/31/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 1200 ALTON RD | FURNITURE FOR ALL CENTERS | $5,881 | $3,113 | $114 | 12/31/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 1200 ALTON RD | WINTER CLEARANCE FOR ALL NEW CENTER | $2,736 | $2,651 | $84 | 10/31/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 1200 ALTON RD | CC - AOUATION | $2,563 | $2,563 | $0 | 12/30/2019 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 1200 ALTON RD | ALTON RD CONFERENCE ROOM | $2,493 | $22,315 | $178 | 1/4/2018 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 1200 ALTON RD | EXECUTIVE DESK (GLADYS IRENE JOSE) | $21,644 | $9,613 | $0 | 7/31/2019 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | CUBICLES FOR CALL CENTER | $23,071 | $9,613 | $13,458 | 10/21/2021 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | DIVVY - FURNITURE & WORKSTATION FOR NEW PHARMACY | $13,581 | $3,614 | $9,966 | 11/17/2020 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 2450 HIGHWAY 98 N | OFFICE FURNITURE WAREHOUSE OF MIAMI (DORAL) | $5,615 | $5,615 | $0 | 3/4/2020 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 201 LH 15 S, | OFFICE FURNITURE WAREHOUSE OF MIAMI (DORAL) | $1,464 | $1,419 | $45 | 11/4/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 4726-4729A Hominy Rd., Tampa FL, 33634 | ACTIVITY CENTER CHAIRS FOR WINTERHAVEN | $28,388 | $28,388 | $0 | 8/2/2019 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 1200 ALTON RD | DIVVY / EXECUTIVE CHAIRS EAST HIALEAH, TRANSFER FROM WP | $15,134 | $44,865 | $18,692 | 4/30/2022 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 1200 ALTON RD | DIVVY - EXECUTIVE CHAIRS, DESKS | $2,986 | $44,865 | $10,270 | 3/16/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | WESTCHESTER WORKSTATION CABINETS | $1,977 | $1,977 | $0 | 7/10/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | DES MEDICAL EQUIPMENT AND SERVICES | $1,242 | $1,242 | $0 | 9/1/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | HAYWORTH CHAIRS FOR WESTCHESTER SUITE 201 | $1,647 | $1,647 | $0 | 7/10/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 9611 BIRD RD | CHAIRS FOR WESTCHESTER LOBBY | $2,551 | $2,046 | $505 | 9/28/2011 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | WFYCS COLCHOMA | BIRD ROAD ACTIVITY CENTER CHAIRS | $344,641 | $200,565 | $23,701 | 8/31/2021 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 201 LH 15 S, | JE - GLA TREE UP - 06/30/21 | $21,644 | $0 | $21,644 | | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 1200 ALTON RD | to record disposal of pharmacy F&F sold Aug 22 | $1,479 | $0 | $0 | 7/21/2010 | Straight-line | Rozello Durango, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | GALLERY INTERIORS | $187 | $0 | $0 | 8/2/2013 | Straight-line | Rozello Durango, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | DRAWINGS / PARTINGS | $4,206 | $0 | $0 | 8/2/2013 | Straight-line | Rozello Durango, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | UA3 OFFICE FURNITURE | $4,637 | $0 | $0 | 8/2/2013 | Straight-line | Rozello Durango, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | PARD AND THINGS | $4,205 | $0 | $0 | 9/28/2011 | Straight-line | Rozello Durango, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | WALL UNIT | $1,804 | $0 | $0 | 6/8/2012 | Straight-line | Rozello Durango, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | USA OFFICE FURNITURE | $34,395 | $0 | $0 | 9/19/2012 | Straight-line | Rozello Durango, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | 2 DESKS AND 2 FILED CABINETS | $33,144 | $0 | $0 | 10/5/2012 | Straight-line | Rozello Durango, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | USA OFFICE FURNITURE | $633 | $0 | $0 | 3/8/2013 | Straight-line | Rozello Durango, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | OFFICE DEPOT-METAL CABINET | $3,120 | $0 | $0 | 2/22/2013 | Straight-line | Rozello Durango, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | NET SUPPLIES | $815 | $0 | $0 | 3/24/2013 | Straight-line | Rozello Durango, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | OPTOMETRY RACKS | $1,224 | $0 | $0 | 4/11/2013 | Straight-line | Rozello Durango, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | FDA SACHI/NRI/FURNITURE FOR MD CENTER SACCHI | | | | | Straight-line | Rozello Durango, M.D. P.A. |

The following is a schedule of furniture, fixtures, and leasehold improvements. Due to the small rendering of this page, the tabular data is transcribed below to the extent legible. Columns, left to right, are: Category | Address | Description | Cost | Net Book Value | Depreciation | In-Service Date | Method | Entity.

| Category | Address | Description | Col A | Col B | Col C | Date | Method | Entity |
|---|---|---|---|---|---|---|---|---|
| Furniture & Fixtures | 1200 ALTON RD | beloin rockson | $159 | $159 | $0 | 3/27/2015 | Straight line | Rosido-Dumange, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | furniture & fixtures | $170 | $170 | $0 | 9/10/2015 | Straight line | Rosido-Dumange, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | furniture & fixtures | $245 | $245 | $0 | 9/10/2015 | Straight line | Rosido-Dumange, M.D. P.A. |
| Furniture & Fixtures | 7500 SW 8TH ST | furniture & fixtures | $561 | $219 | $341 | 10/10/2015 | Straight line | Rosido-Dumange, M.D. P.A. |
| Furniture & Fixtures | 9611 BIRD RD | furniture & fixtures | $332 | $332 | $0 | 4/20/2016 | Straight line | Rosido-Dumange, M.D. P.A. |
| Furniture & Fixtures | 7500 SW 8TH ST | SIGN | $4,500 | $370 | $10,144 | 3/17/2017 | Straight line | Rosido-Dumange, M.D. P.A. |
| Furniture & Fixtures | 7500 SW 8TH ST | REFACE EXPERTS | $227 | $227 | $0 | 4/20/2016 | Straight line | Miami Medical & Wellness Center, LLC |
| Furniture & Fixtures | 7500 SW 8TH ST | REFACE EXPERTS | $32 | $32 | $0 | 5/8/2016 | Straight line | Miami Medical & Wellness Center, LLC |
| Furniture & Fixtures | 7500 SW 8TH ST | REFACE EXPERTS | $235 | $235 | $0 | 12/14/2015 | Straight line | Miami Medical & Wellness Center, LLC |
| Leasehold Improvements | 1200 ALTON RD | Leasehold Improvements | $189 | $189 | $0 | 1/15/2016 | Straight line | Miami Medical & Wellness Center, LLC |

*(The remaining rows in this schedule — approximately eighty additional "Leasehold Improvements" line items for addresses including 1200 ALTON RD, 7901 West Atlantic Ave, 12500 Biscayne Blvd, 3301 NE 163 ST, 6250 SW 40th Ave, 2417 Hwy 98 N, 351 SW 42nd AVE and others, each with cost, net book value, depreciation, in-service date, "Straight line" method, and the entity "MB Medical Operations, LLC" — are rendered too small to transcribe reliably and are not reproduced here to avoid fabricating values.)*

| Description | Address | Vendor / Description | Amount | Amount | Date | Entity |
|---|---|---|---|---|---|---|
| Leasehold Improvement | 501 E 4th st | New Hampton Cab @ Hialeah | $4,514 | $1,935 | 8/20/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 501 E 4th st | ACTIVITY CENTER HIALEAH FROM WIP 1023 019 | $8,516 | $2,979 | 9/30/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 501 E 4th st | CONTRACTORS ELECTRICAL SERVICES INC - CAMERAS | $688 | $1,223 | 10/15/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 501 E 4th st | CONTRACTORS ELECTRICAL SERVICES INC - CAMERAS | $845 | $469 | 10/15/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 501 E 4th st | H&A KITCHEN | $5,110 | $2,981 | 12/13/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 501 E 4th st | H&A KITCHEN | $3,500 | $3,500 | 12/13/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 501 E 4th st | HIALEAH DEPOT E 01 11 | $13,782 | $3,137 | 12/31/2017 | MB Medical Operations, LLC |
| Leasehold Improvement | 501 E 4th st | HIALEAH ELEVADOR | $3,924 | $1,503 | 12/31/2017 | MB Medical Operations, LLC |
| Leasehold Improvement | 501 E 4th st | ART DIST HIALEAH | $3,281 | $1,203 | 12/31/2017 | MB Medical Operations, LLC |
| Leasehold Improvement | 501 E 4th st | MOWREY ELEVADOR - HIALEAH DOOR OPERATOR | $2,793 | $1,204 | 12/31/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 501 E 4th st | TWO DOORS SECURITY HUGO ARMINGO ULESMAR YOTA SKY - R | $299,449 | $87,538 | 7/29/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 4726 4726A Hanley Rd., Tampa FL, 33634 | PURE AIR | $6,800 | $1,581 | 2/28/2020 | MB Medical Operations, LLC |
| Leasehold Improvement | 4726 4726A Hanley Rd., Tampa FL, 33634 | RICKYS ELECTRICAL SYSTEMS, PURE AIR, ULESMAR  TRANSFER FR | $577,011 | $123,936 | 5/6/2022 | MB Medical Operations, LLC |
| Leasehold Improvement | 4726 4726A Hanley Rd., Tampa FL, 33634 | PURE AIR | $12,600 | $2,925 | 7/31/2020 | MB Medical Operations, LLC |
| Leasehold Improvement | 4726 4726A Hanley Rd., Tampa FL, 33634 | PURE AIR | $6,480 | $3,466 | 5/6/2022 | MB Medical Operations, LLC |
| Leasehold Improvement | 4726 4726A Hanley Rd., Tampa FL, 33634 | PURE AIR SERVICING, INC | $180 | $180 | 5/6/2022 | MB Medical Operations, LLC |
| Leasehold Improvement | 7291 West Atlantic Blvd. | DELRAY DENTAL ROOM STRUCTURING FOR EQUIPMENT | $4,720 | $2,769 | 3/31/2021 | MB Medical Operations, LLC |
| Leasehold Improvement | 7291 West Atlantic Blvd. | DL WALKER CONSTRUCTION GROUP INC - DELRAY RENOVAND | $9,255 | $3,471 | 5/31/2017 | MB Medical Operations, LLC |
| Leasehold Improvement | 7463 7465 7491 N. University Dr. | RECLASS FROM WIP PERMIT TO UP FRONTS [TAMARAC] | $19,610 | $4,534 | 11/30/2021 | MB Medical Operations, LLC |
| Leasehold Improvement | 7463 7465 7491 N. University Dr. | TRANSFER FROM WIP TAMARAC DENTAL/OPTICAL BUILDOUT | $120,117 | $35,083 | 10/31/2021 | MB Medical Operations, LLC |
| Leasehold Improvement | 7463 7465 7491 N. University Dr. | TRANSFER FROM WIP TAMARAC DENTAL/DENTAL PROJECT | $225,039 | $65,201 | 9/30/2021 | MB Medical Operations, LLC |
| Leasehold Improvement | 7463 Store Road 52, Hudson, FL 34667 | TRANSFER FROM WIP HUDSON MEDICAND | $20,708 | $2,416 | 7/31/2023 | MB Medical Operations, LLC |
| Leasehold Improvement | 7463 Store Road 52, Hudson, FL 34667 | TWO BIRDS SECURITY & IT SOLUTIONS | $18,869 | $5,025 | 11/30/2022 | MB Medical Operations, LLC |
| Leasehold Improvement | 7495 N. UNIVERSITY DR | RICKY'S ELECTRICAL INVOICE | $18,400 | $4,072 | 3/11/2022 | MB Medical Operations, LLC |
| Leasehold Improvement | 7495 N. UNIVERSITY DR | TRANSFER FROM WIP TAMARAC RENOVATIONS | $13,418 | $1,917 | 4/30/2023 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | HOLLYWOOD BUILDOUT | $39,297 | $11,583 | 5/31/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | HOLLYWOOD MONUMENTAL SIGN | $6,851 | $6,681 | 7/31/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | RICKY'S ELECTRICAL SYSTEMS, ULESMAR, HOME DEPOT, DIVVY, | $1,741,899 | $395,084 | 6/30/2022 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | MIAMI FLOORING & DESIGN INC | $3,086 | $1,659 | 9/30/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | DORALTILE | $3,951 | $2,349 | 1/31/2020 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | WESTCHESTER IDA OFFICE | $3,646 | $1,602 | 4/30/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | WESTCHESTER WIP OFFICE | $7,445 | $4,322 | 5/31/2017 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | WESTCHESTER SUITE 104 CALL CENTER - CARDIOLOGY ULTRASC | $16,150 | $3,143 | 8/31/2017 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | WESTCHESTER SUITE 304 CALL CENTER & TELEMARKETING | $24,559 | $10,875 | 8/31/2017 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | WESTCHESTER SUITE 306-308 CLINICAL SPACE | $94,591 | $41,104 | 9/30/2017 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | WESTCHESTER SUITE 310 | $886,382 | $426,826 | 9/30/2017 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | WESTCHESTER SUITE 003 | $40,044 | $24,457 | 5/31/2017 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | TWO BIRDS FOR WESTCHESTER | $38,256 | $4,694 | 12/31/2022 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | WESTCHESTER FRONT DESK INSTALLATION | $2,644 | $1,584 | 1/31/2020 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | WESTCHESTER SUITE 204-209 DOUGLAD MOVE CLINICAL | $98,974 | $48,439 | 3/31/2018 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | OYC BUILD | $54,764 | $22,075 | 7/31/2018 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | AAAF FIRE SPRINKLER PROTECTION LLC - NEW PUMP - MEST6/PA | $25,879 | $13,544 | 6/30/2018 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | 2 BIRD - PURE AIR - VEO [Total Avg] | $39,141 | $13,226 | 1/31/2020 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | AAAF FIRE SPRINKLER PROTECTION LLC - NEW PUMP - MEST6/PA | $6,265 | $1,402 | 6/30/2018 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | AAAF FIRE SPRINKLER PROTECTION LLC - NEW PUMP - MEST6/PA | $9,492 | $5,116 | 6/30/2018 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | TRANSFER FROM WIP WESTCHESTER FIRE SPRINKLER PROJECT | $36,031 | $30,020 | 10/31/2018 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | TRANSFER FROM WIP WESTCHESTER DENTAL | $193,884 | $14,341 | 12/31/2023 | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8th St | CONTRACTORS ELECTRICAL | $7,479 | $1,110 | 6/30/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 SW 107th Ave 27th Ave | AC Unit #2 for Hialeah Activity Center | $7,816 | $3,153 | 7/31/2018 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 SW 107th Ave 27th Ave | AC Unit #2 for Hialeah Activity Center | $4,022 | $1,741 | 8/31/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 SW 107th Ave 27th Ave | Westchester Awning | $3,233 | $1,910 | 1/31/2020 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 BIRD RD | H&A KITCHEN - CABINETS ACTIVITY CENTER | $33,028 | $3,153 | 10/31/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 BIRD RD | HERNANDEZ NATIONAL PAINTING INC - INTERIOR STAIRWELLS | $33,028 | $14,569 | 11/30/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 BIRD RD | FOREVER SIGNS - SCULPTURE | $99,404 | $13,344 | 11/30/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 BIRD RD | 2 BIRD SECURITY - CAMERAS | $977 | $977 | 12/22/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 BIRD RD | 2 BIRD SECURITY - CAMERAS | $1,674 | $607 | 12/22/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 BIRD RD | TRANSFER FROM WIP HIALEAH 27TH | $189,494 | $21,349 | 8/31/2023 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 BIRD RD | BIRD RD ACTIVITY CENTER | $49,082 | $19,106 | 8/31/2020 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 BIRD RD | BIRD RD ACTIVITY CENTER | $1,555,615 | $529,716 | 8/31/2020 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 BIRD RD | DIVVY PURE AIR H&A KITCHEN, WIP [Total Avg] | $222,896 | $479,654 | 6/30/2022 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 BIRD RD | FOREVER SIGNS TRANSFER FROM WIP - ULESMAR | $15,113 | $44,551 | 6/30/2022 | MB Medical Operations, LLC |
| Leasehold Improvement | 611 BIRD RD | RICKY'S ELECTRICAL SYSTEMS INC - CAMERAS COM/CORA/WYF,I | $6,603 | $5,954 | 2/28/2022 | MB Medical Operations, LLC |
| Leasehold Improvement | 551 HW 42nd Ave. | EASTERN AIR CONDITIONING - PALMTO BAY | $14,799 | $2,991 | 7/31/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 551 HW 42nd Ave. | 2 BIRD SECURITY & IT SOLUTIONS LLC - CAMERAS FOR CC | $15,616 | $9,760 | 11/30/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 551 HW 42nd Ave. | Eagle Wireless - 32 Camera ICM | $54,416 | $31,584 | 11/30/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 551 HW 42nd Ave. | VIDAK CUSTOMS LLC - 31 Cameras | $65,426 | $9,973 | 11/30/2019 | MB Medical Operations, LLC |
| Leasehold Improvement | 551 HW 42nd Ave. | Eagle Wireless and Vidak Customs [total Avg] | $257,413 | $173,774 | 8/31/2021 | MB Medical Operations, LLC |
| Leasehold Improvement | 551 HW 42nd Ave. | JE - GUILT TRUE UP - 062021 | $7,157 | $1,644 | 4/30/2023 | MB Medical Operations, LLC |
| Leasehold Improvement | 551 HW 42nd Ave. | INSTALL 3 TON BREAKERS SYSTEM - PURE AIR SERVICES INC | $3,153 | $1,386 | 8/31/2021 | MB Medical Operations, LLC |
| Leasehold Improvement | | Transfer from WIP to LHI from 2023 All Purpose Solutions | $38,445 | $1,541 | 8/31/2024 | MB Medical Operations, LLC |
| Leasehold Improvement | | 360 Degrees | $3,541 | $1,541 | | MB Medical Operations, LLC |
| Leasehold Improvement | | 360 Degrees Design Corp | $3,866 | $3,355 | | MB Medical Operations, LLC |
| Leasehold Improvement | | All Purpose Solutions LLC | $58,566 | $8,566 | | MB Medical Operations, LLC |
| Leasehold Improvement | | ALLEN EDWARDS GENERAL CONTRACTORS | $17,035 | $9,995 | | MB Medical Operations, LLC |
| Leasehold Improvement | | BRUCE & BRUCE INC | $21,202 | $21,202 | | MB Medical Operations, LLC |
| Leasehold Improvement | | CITY OF NORTH MIAMI | $15,377 | $15,377 | | MB Medical Operations, LLC |
| Leasehold Improvement | | COMP AMERICAN EXPRESS 2705S | $97,895 | $97,895 | | MB Medical Operations, LLC |
| Leasehold Improvement | | DIVVY | $34,211 | $34,211 | | MB Medical Operations, LLC |
| Leasehold Improvement | | Flood Risk America, Inc | $34,492 | $34,492 | | MB Medical Operations, LLC |
| Leasehold Improvement | | FOREVER SIGNS | $31,298 | $31,298 | | MB Medical Operations, LLC |
| Leasehold Improvement | | Globe Engineering Inc | $3,931 | $7,000 | | MB Medical Operations, LLC |
| Leasehold Improvement | | GOLD STANDARD BUILDER - PERMIT | $4,774 | $1,957 | | MB Medical Operations, LLC |
| Leasehold Improvement | | GOLD STANDARD BUILDER SERVICES LLC | $24,380 | $24,380 | | MB Medical Operations, LLC |
| Leasehold Improvement | | Heavenly Construction LLC | $3,100 | $3,100 | | MB Medical Operations, LLC |
| Leasehold Improvement | | KEVIN A BURNS | $57,100 | $27,100 | | MB Medical Operations, LLC |
| Leasehold Improvement | | New Air systems | $3,037 | $3,037 | | MB Medical Operations, LLC |
| Leasehold Improvement | 200 ALCHA RD | RED BEAM CONSTRUCTION GROUP | $81,188 | $81,188 | | MB Medical Transport, LLC |
| Leasehold Improvement | 200 ALCHA RD | RICKY'S ELECTRICAL SYSTEMS, INC | $17,033 | $17,033 | | MB Medical Transport, LLC |
| Leasehold Improvement | | RoyalSecurity One Surveyor's, Inc | $4,900 | $4,900 | | MB Medical Transport, LLC |
| Leasehold Improvement | 12615 West Dixie Hwy | THE ARCHITECTS GROUP | $3,331 | $3,331 | | MB Medical Transport, LLC |
| Leasehold Improvement | 12615 West Dixie Hwy | THE ARCHITECTS GROUP GOLD STANDARD | $3,497 | $3,497 | | MB Medical Transport, LLC |
| Leasehold Improvement | 12615 West Dixie Hwy | To Reverse WIP allocated to Douglas Ra architect | $13,062 | $13,062 | | MB Medical Transport, LLC |
| Leasehold Improvement | 12615 West Dixie Hwy | Yoilas Say Group, Inc | | $3,062 | | MB Medical Transport, LLC |
| Leasehold Improvement | 12615 West Dixie Hwy | IH Andon Isaduly - Chairlift | $6,718 | $3,566 | | MB Medical Transport, LLC |
| Leasehold Improvement | 12615 West Dixie Hwy | IH Andon Isaduly - Chairlift | | $3,662 | | MB Medical Transport, LLC |

| Type | Description | Address | Amount | Amount | Amount | Date | Method | Entity |
|---|---|---|---|---|---|---|---|---|
| Leasehold Improvement | Leasehold Improvement 201 1d 513, | | $15,814 | $8,493 | $7,321 | 4/1/2016 | Straight line | MR Medical Transport, LLC |
| Leasehold Improvement | Eagle Wireless - Chopin | | $25,658 | $33,174 | $12,484 | 2/1/2020 | Straight line | MR Medical Transport, LLC |
| Leasehold Improvement | Vidar Customs (Installation) - in service until May | | $19,544 | $19,544 | $2,978 | 4/1/2020 | Straight line | MR Medical Transport, LLC |
| Leasehold Improvement | Vidar Customs (Installation) - in service until May | | $1,922 | $1,922 | $11,641 | 5/1/2020 | Straight line | MR Medical Transport, LLC |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS | 1200 ALTON RD | $1,208 | $1,208 | $0 | 7/31/2011 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS | 1200 ALTON RD | $2,029 | $2,029 | $0 | 7/31/2012 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS(CHACHOR FINCE) | 1200 ALTON RD | $80 | $80 | $0 | 3/31/2012 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS(OTHERN TECH) | 1200 ALTON RD | $558 | $558 | $0 | 4/5/2013 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS(OTHERN TECH) | 1200 ALTON RD | $382 | $382 | $0 | 7/8/2013 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS(EDUARDO VAIQUEZ DRAWING) | 1200 ALTON RD | $1,932 | $1,932 | $0 | 8/23/2013 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS(REISCHFINER TECH) | 1200 ALTON RD | $1,215 | $1,215 | $0 | 9/30/2013 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | COMMANDO LEASEHOLD | 1200 ALTON RD | $294 | $294 | $0 | 10/14/2013 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS(VARO MARR) | 151 NW 11th ST | $294 | $294 | $0 | 10/14/2013 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS(VARO MARR) | 151 NW 11th ST | $5,597 | $5,597 | $0 | 10/15/2013 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS(ODRAK TEE) | 1200 ALTON RD | $559 | $559 | $0 | 10/22/2013 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS(Biscoyne Blvd | 12550 Biscoyne Blvd | $270 | $270 | $0 | 10/22/2013 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS(OTHER AGDILAR) | 12550 Biscoyne Blvd | $325 | $325 | $0 | 12/20/2013 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS(AMO) | 1611 BIRD RD, | $8,645 | $8,645 | $0 | 1/15/2013 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | AMO RESTORATION | 1611 BIRD RD, | $8,895 | $8,895 | $0 | 12/20/2013 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | AMO RESTORATION | 1611 BIRD RD, | $8,038 | $8,038 | $0 | 3/13/2014 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | AMO RESTORATION | 1611 BIRD RD, | $10,555 | $10,555 | $0 | 4/18/2014 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | BUSINESS ISLAND | 1611 BIRD RD, | $11,088 | $11,088 | $0 | 6/5/2014 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | toASEHOLD IMPROVEMENTS | 1611 BIRD RD, | $31,345 | $31,345 | $0 | 9/18/2014 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | toASEHOLD IMPROVEMENTS | 1611 BIRD RD, | $1,897 | $1,727 | $380 | 7/14/2015 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | toASEHOLD IMPROVEMENTS | 1611 BIRD RD, | $6,450 | $6,450 | $171 | 1/15/2016 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | toASEHOLD IMPROVEMENTS | 1611 BIRD RD, | $819 | $819 | $915 | 4/15/2015 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | toASEHOLD IMPROVEMENTS | 1611 BIRD RD, | $6,432 | $6,432 | $120 | 4/30/2016 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | toASEHOLD IMPROVEMENTS | 1611 BIRD RD, | $4,798 | $3,489 | $678 | 6/20/2016 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LH Imp- Bosch Home Improve | 7901 West Atlantic Ave | $5,189 | $3,489 | $1,110 | 10/12/2015 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LH Imp- Econom Renovation | 7901 West Atlantic Ave | $3,855 | $3,855 | $1,334 | 11/20/2015 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LH Imp- Econom Renovation | 1200 ALTON RD | $10,263 | $3,850 | $1,334 | 2/1/2016 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | LH Imp- Andcon Renovation | 1200 ALTON RD | $8,118 | $5,244 | $2,873 | 10/12/2016 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Leasehold Improvement | SOPE | 501 E 4TH ST, | | $87 | $87 | 3/5/2014 | Straight line | Miami Medical & Wellness Center, LLC |
| Leasehold Improvement | SOPE | 501 E 4TH ST, | | $87 | $87 | 3/5/2014 | Straight line | Miami Medical & Wellness Center, LLC |
| Leasehold Improvement | ULTIMATE SHUTTERS | 501 E 4TH ST, | $325 | $325 | $0 | 4/2/2014 | Straight line | Miami Medical & Wellness Center, LLC |
| Leasehold Improvement | ULTIMATE SHUTTERS | 7900 SW 8TH ST | $333 | $333 | $0 | 5/15/2014 | Straight line | Miami Medical & Wellness Center, LLC |
| Leasehold Improvement | ULTIMATE SHUTTERS | 7900 SW 8TH ST | $693 | $693 | $0 | 6/4/2014 | Straight line | Miami Medical & Wellness Center, LLC |
| Leasehold Improvement | ULTIMATE SHUTTERS | 7900 SW 8TH ST | $733 | $733 | $0 | 7/30/2014 | Straight line | Miami Medical & Wellness Center, LLC |
| Leasehold Improvement | LEASEHOLD IMPROVEMENTS | 7900 SW 8TH ST | $893 | $817 | $117 | 3/24/2015 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Medical Equipment | | 12550 Biscoyne Blvd. | $17,272 | $18,083 | $0 | 1/1/1900 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | PATTERSON DENTAL MACHINE - NORTH MIA | 7900 SW8th St | $18,083 | $48,303 | $0 | 2/17/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | PATTERSON DENTAL MACHINE - WESTCHESTER | 12550 Biscoyne Blvd. | $48,303 | $47,360 | $6,880 | 2/17/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | ALPHACHI - USA, H20/RE-CORE ULTRASOUND MACHINE - H HAWAII | 7900 SW8th St | $33,112 | $31,229 | $5,751 | 7/17/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | ALPHACHI USA - 2 ULTRASOUND MACHINE | 1303 South Semoran Blvd | $38,548 | $56,027 | $7,260 | 8/3/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | ATHION SCORE - HOLDER | 7900 SW8th St | $69,380 | $19,431 | $10,337 | 8/3/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | MCKESSON WESTCHESTER - HOLDER | 1303 South Semoran Blvd | $24,688 | $11,282 | $5,037 | 9/11/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | SCOPE-GRIP - DELRAY - CLAN OS | 7900 SW8th St | $30,876 | $20,241 | $6,235 | 4/30/2019 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | FOR A CARE INC - WEIGHT SCALE, PULSE OXIMETER, CELL | 7500 SW8th St | $22,027 | $46,495 | $11,332 | 9/22/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | PATTERSON DENTAL SUPPLY FOR - DELRAY | 1303 South Semoran Blvd & 9855 E Fern 59 | $24,254 | $52,213 | $12,314 | 9/22/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | ALPHACHI USA, INC - E-CUBE 15 - CLINICAL CARE | Pronto box 29 | $29,548 | $22,714 | $4,634 | 10/30/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | ALPHACHI USA, INC - E-CUBE 9 - CLINICAL CARE | 7500 SW8th St | $30,062 | $22,213 | $7,345 | 11/17/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | DIVYL - PHARMACY FLU COMPLETE KIT CARSA HEALTHCARE | ERCHORA CORPORATION | $16,232 | $15,239 | $7,340 | 5/28/2021 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | FORA CARE INC - GATEWAY | 6245 64th St H. (Prehto) cmd 7500 SW8th St (New Corp HQ) | $39,745 | $7,456 | $2,424 | 11/20/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | PHILIPS HEALTHCARE INC - RECVD 12/21/20 | 311 NW 42nd Ave, | $46,037 | $5,453 | $6,555 | 8/31/2021 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | JE - CULT TRUE UP - 06/30/21 | 311 NW 42nd Ave, | $354,847 | $230,651 | $124,196 | 8/31/2021 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | ULTRASOUND MACHINE | 18580 NW 67th AVE # 101 | $22,782 | $22,782 | $0 | 9/30/2021 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | MRI LLC | 201 1d 513, | $4,971 | $4,971 | $0 | 11/1/2021 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | ALPHACHI USA - NEW ULTRASOUND MACHINE | 201 1d 513, | $25,210 | $23,417 | $1,793 | 12/31/2019 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | ALTON CAPITAL EQUIPMENT NEW - DENTAL MCHP (in Service unc | 501 E 4TH ST, | $87,607 | $82,034 | $5,573 | 2/3/2021 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | GENERAL RADIOGRAPHIC & MEDICAL SUPPLY (NM & LIEUN) | 2409 HIGHWAY 98 N | $41,800 | $27,867 | $13,933 | 4/16/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | GENERAL RADIOGRAPHIC, W MEDICAL/ 20 GOLD DOLL OPTHAAM | 2409 HIGHWAY 98 N | $31,774 | $24,580 | $18,802 | 9/18/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | SAILWELL, ALPHION, MCKESSON, transfer from WIP | 2409 HIGHWAY 98 N | $162,064 | $72,929 | $89,135 | 6/30/2022 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | GENERAL RADIOGRAPHIC & MEDICAL SUPPLY (Solid zone) | 1303 SDAORAM BLVD | $67,462 | $32,082 | $32,082 | 4/20/2021 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | Pronto box 29 - Pharmacy | 1303 South Semoran Blvd, & 9855 E Fern 59 | $200,434 | $69,962 | $27,218 | 4/20/2021 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | ERCHORA CORPORATION | 7500 SW8th St | $41,547 | $28,703 | $26,759 | 5/18/2021 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | HENRY SCHEIN, PATTERSON, (Dental chair, compres | 311 NW 42nd Ave, | $84,687 | $52,804 | $53,903 | 6/30/2021 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | GENERAL RADIOGRAPHIC & MEDICAL SUPPLY, PAKARA | 6245 64th ST H. (Prehto) cmd 7500 SW8th St (New Corp HQ) | $68,798 | $40,132 | $28,666 | 9/30/2021 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | GENERAL RADIOGRAPHIC & MEDICAL SUPPLY & SUPPLIES | 311 NW 42nd Ave, | $37,745 | | | 8/31/2021 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | Garcon Hehlo 2sor-DAM ROOM EQUIPMENT & SUPPLIES | 311 NW 42nd Ave, | $385 | $385 | $0 | 4/30/2017 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | Garcon Hehlo 2sor-DAM ROOM EQUIPMENT & SUPPLIES | 201 1d 513, | $1,285 | $1,285 | $0 | 6/28/2022 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | TRANSFER FROM WIP HAMAI LAKES | 201 1d 513, | $73,066 | $15,831 | $57,235 | 6/28/2022 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | GENERAL RADIOGRAPHIC, W MEDICAL, MCKESSON MEDICAL 5 | 2409 HIGHWAY 98 N | $29,410 | $18,156 | $11,274 | 7/14/2020 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | PATTERSON DENTAL SUPPLY INC | 2409 HIGHWAY 98 N | $80,353 | $50,471 | $34,630 | 8/31/2021 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | MEDICAL EQUIPMENT FOR LAKELAND | 6726-6726A Horkley Rd, Tampa FL, 33634 | $17,017 | $6,524 | $10,085 | 4/30/2022 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | GENERAL RADIOGRAPHIC SURGICAL | 6726-6726A Horkley Rd, Tampa FL, 33634 | $19,295 | $15,410 | $3,886 | 1/22/2022 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | ULTRASOUND EQUIPMENT LAKELAND | 6726-6726A Horkley Rd, Tampa FL, 33634 | $15,230 | $15,460 | $5,137 | 3/22/2022 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | CLIMICAL ELK X-RAY MACHINE | 6726-6726A Horkley Rd, Tampa FL, 33634 | $97,089 | $91,351 | $5,736 | 7/31/2017 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | MEDICAL EQUIPMENT-CLEANED STARTUP THERAPY TABLES | 2433 W University Dr | $3,341 | $3,341 | $0 | 12/19/2017 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | SPROCHATER FOR ELE8NE | 7291 West Atlantic Blvd | $1,001 | $1,001 | $0 | 12/19/2017 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | WINTERHAVEN X-RAY MACHINE | 201 1d 513, | $3,099 | $3,099 | $0 | 1/31/2018 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | WINTERHAVEN FRACTION DIT SYSTEM | 201 1d 513, | $12,384 | $12,384 | $0 | 8/2/2018 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | SPROCHATER FOR HALEAH | 501 E 4TH ST, | $1,001 | $1,001 | $0 | 4/4/2018 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | PATTERSON DENTAL MACHINE HALEAH | 501 E 4TH ST, | $15,008 | $15,068 | $0 | 4/4/2018 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | GENERA RADIOGRAPHIC HALEAH, MCKESSON MEDICAL 5 | 6726-6726A Horkley Rd North, Pinellas Park FL, (33738) | $3,270 | $3,270 | $0 | 8/21/2018 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | GENERAL RADIOGRAPHIC | 6726-6726A Horkley Rd, Tampa FL, 33634 | $2,446 | $815 | $1,631 | 10/4/2022 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | MCKESSON MEDICAL SURGICAL | 6726-6726A Horkley Rd, Tampa FL, 33634 | $5,132 | $5,132 | $0 | 10/4/2021 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Medical Equipment | SAILWELL MEDICAL SUPPLIES | 6726-6726A Horkley Rd, Tampa FL, 33634 | $5,137 | $5,137 | $0 | 9/8/2018 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Medical Equipment | MCKESSON MEDICAL SURGICAL | 6726-6726A Horkley Rd, Tampa FL, 33634 | $3,936 | $3,986 | $0 | 7/31/2018 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Medical Equipment | GENERAL RADIOGRAPHIC | 7291 West Atlantic Blvd | $306 | $306 | $0 | 7/31/2018 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Medical Equipment | MEDICAL ELECTRONICS INC. | 7291 West Atlantic Blvd | $5,988 | $5,988 | $0 | 2/4/2016 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Medical Equipment | GALNALOGY EQUIPMENT FROM DELRAY | 7291 West Atlantic Blvd | $8,248 | $5,773 | $2,474 | 2/4/2022 | Straight line | Rosdilo Durmerigo, M.D. P.A. |
| Medical equipment | GYNAOLOGICAL EQUIPMENT FROM DELRAY | 7291 West Atlantic Blvd | $3,099 | $3,099 | $0 | 2/4/2022 | Straight line | MR Medical Operations, LLC |
| Medical Equipment | DELRAY XRAY EQUIPMENT & ROOM | 7291 West Atlantic Blvd | $14,273 | $14,273 | $0 | 2/28/2018 | Straight line | Rosdilo Durmerigo, M.D. P.A. |

| Category | Location | Description | Value 1 | Value 2 | Value 3 | Date / Method | Entity |
|---|---|---|---|---|---|---|---|
| Medical Equipment | 7291 West Atlantic Blvd | DELRAY DIRACTION SYSTEM | $3,099 | $3,099 | $0 | 4/30/2018 Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 8401 SW University Dr, 18300 NW 67th Ave | GENERAL RADIOGRAPHIC | $84,775 | $84,775 | $122,240 | 4/3/2013 Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 7463 Think Road 52, Hudson, FL 34667 | MCKESSON | $2,557 | $725 | $1,833 | 4/3/2013 Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 7463 Think Road 52, Hudson, FL 34667 | mckesson | $2,557 | $0 | $0 | 4/3/2013 Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 7495 N. UNIVERSITY DR | MEDICAL ELECTRONICS | $8,661 | $2,454 | $6,207 | 4/12/2023 Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 7495 N. UNIVERSITY DR | MEDICAL ELECTRONICS | $1,774 | $0 | $0 | 4/12/2023 Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 7495 N. UNIVERSITY DR | MEDICAL ELECTRONICS | $1,774 | $0 | $0 | 4/12/2023 Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 7495 N. UNIVERSITY DR | MEDICAL ELECTRONICS | $1,733 | $0 | $0 | 4/12/2023 Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 7495 N. UNIVERSITY DR | MEDICAL ELECTRONICS | $1,733 | $0 | $0 | 4/12/2023 Straight-line | MB Medical Operations, LLC |
| medical Equipment | 7495 N. UNIVERSITY DR | MEDICAL ELECTRONICS | $1,774 | $0 | $0 | 4/12/2023 Straight-line | MB Medical Operations, LLC |
| medICAL equipment | 7495 N. UNIVERSITY DR | MEDICAL ELECTRONICS | $8,664 | $8,664 | $0 | 4/12/2023 Straight-line | MB Medical Operations, LLC |
| medICAL equipment | 7495 N. UNIVERSITY DR | MEDICAL ELECTRONICS | $3,099 | $3,099 | $0 | 4/12/2023 Straight-line | MB Medical Operations, LLC |
| medICAL equipment | 7495 N. UNIVERSITY DR | MEDICAL ELECTRONICS | $9,742 | $9,742 | $0 | 4/12/2023 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 750 S SOUTH FEDERAL HWY | OPTOMETER EQUIPMENT FOR HOLLYWOOD | $1,798 | $1,798 | $0 | 4/12/2023 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 750 S SOUTH FEDERAL HWY | HOLLYWOOD DENTAL EQUIPMENT | $2,331 | $2,331 | $0 | 4/12/2023 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 750 S SOUTH FEDERAL HWY | HOLLYWOOD TRACTION SYSTEM | $15,401 | $15,401 | $0 | 4/12/2023 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 750 S SOUTH FEDERAL HWY | BACHELLI EHRIEB | $44,687 | $44,687 | $21,399 | 8/7/2017 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 750 S SOUTH FEDERAL HWY | BACHELLI EHRIEB | $23,008 | $23,008 | $6,430 | 7/11/2022 Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 7500 SW 8th ST | DBS MEDICAL EQUIPMENT AND SERVICES EXAM TABLE WEST | $1,347 | $1,347 | $0 | 2/2/2022 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | ALPHADH IDA, INC | $45,223 | $45,223 | $24,873 | 12/31/2022 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | ALPHADH IDA, INC | $2,955 | $2,955 | $2,550 | 11/30/2022 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 151 NW 11TH ST | GOLD CO OHTHALAMIC INSTRUMENT SERV | $45,673 | $8,470 | $3,626 | 11/30/2022 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 1200 ALTON RD | ALPHION USA, INC | $28,503 | $28,503 | $0 | 12/31/2022 Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 7500 SW 8TH ST & 7463 N University Drive | TRAILER FROM WSP WESTCHEER | $1,704 | $15,902 | $10,601 | 9/27/2022 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7000 SW 8th ST | ALPHION USA, INC | $353,424 | $353,424 | $163,775 | 11/30/2022 Straight-line | MB Medical Operations, LLC |
| Medical equipment | Various | GENERAL RADIOGRAPHIC- ORTO TOY STORE MEDICAL - GOLD C | $353,424 | $143,607 | $109,917 | 11/30/2022 Straight-line | MB Medical Operations, LLC |
| Medical equipment | Various | TRAILER FROM WSP MARKOS | $17,746 | $17,746 | $61,176 | 7/31/2024 Straight-line | MB Medical Operations, LLC |
| Medical equipment | Various | PATTERSON DENTAL, ALPINION, BAUSCA | $12,233 | $7,543 | $4,689 | 8/31/2021 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 151 NW 11TH ST | ACCESSION MEDICAL SURGICAL (from JuN) | $7,146 | $4,568 | $2,977 | 10/20/2021 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 151 NW 11TH ST | ACCESSION MEDICAL SURGICAL (from JuN) | $28,102 | $13,573 | $10,533 | 7/20/2020 Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 151 NW 11TH ST | MEDICAL ELECTRONICS, INC. | $127,140 | $92,119 | $123,021 | 7/31/2024 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 151 NW 11TH ST | ACCESSION MEDICAL SURGICAL - in service Aug | $81,495 | $59,321 | $45,773 | 9/11/2020 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | OneView Finance | $67,872 | $58,552 | $23,667 | 12/28/2020 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | Patterson Dental | $5,629 | $4,350 | $1,309 | 8/29/2021 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 55 E 49th St | Choice Health - Dental Equipment | $802,624 | $8,602 | $2,667 | 5/24/2021 Straight-line | MB Medical Operations, LLC |
| Medical equipment |  | MEDICAL ELECTRONICS, INC - DENTAL LASER TD TABLE | $13,469 | $13,591 | $44,634 | 6/24/2011 Straight-line | MB Medical Operations, LLC |
| Medical equipment |  | Opening Balance Sheet - CC Acqusition | $11,275 | $7,516 | $3,758 | 5/24/2021 Straight-line | MB Medical Operations, LLC |
| Medical equipment |  | Medical electronics, Inc - New Therapy!! Equip | $14,936 | $0 | $6,210 | 3/31/2014 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 1200 ALTON RD | Mckesson For Hialeah CC & Sweetwater CC- hotlers | $1,498 | $1,498 | $0 | 6/24/2011 Straight-line | MB Medical Operations, LLC |
| Medical equipment | 1200 ALTON RD | MEDICAL ELECTRONICS, INC | $20,108 | $0 | $0 | 3/17/2011 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | EQUANEDA | $1,704 | $0 | $0 | 6/24/2011 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | DENTAL PATTERSON | $4,674 | $0 | $0 | 8/30/2011 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | DOCTORS TOY STORE | $8,025 | $0 | $0 | 9/1/2011 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | EQANAEDA | $8,662 | $0 | $0 | 9/19/2011 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | OPTOVISION | $3,826 | $0 | $0 | 9/19/2011 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | OPTOVISION | $13,424 | $0 | $0 | 8/30/2011 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST | TRANSYNCTION | $37,235 | $0 | $0 | 9/1/2011 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST | MEDICAL EQUIPMENT | $2,991 | $0 | $0 | 1/1/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST | GE HEALTHCARE | $2,233 | $0 | $0 | 10/4/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST | US OPHTHALMIC | $1,055 | $0 | $0 | 2/7/2014 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST | OPTOVISION | $2,545 | $0 | $0 | 11/3/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST | PATTERSON DENTAL | $33,826 | $8,552 | $0 | 5/8/2014 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | OPTMATRICS | $24,240 | $0 | $0 | 8/29/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | US OPHTHALMIC | $9,578 | $0 | $0 | 8/21/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | COWADO EQUIPMENT | $38,175 | $0 | $0 | 10/22/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | PATTERSON DENTAL | $977 | $0 | $0 | 9/12/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | HENRY SCHEIN INC | $11,128 | $0 | $0 | 10/4/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD | HENRY SCHEIN INC | $2,251 | $0 | $0 | 8/1/2015 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD | AMERICAN MEDICAL SUPPLY | $2,991 | $0 | $0 | 10/4/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | SCOPE | $2,233 | $0 | $0 | 2/7/2014 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | SCOPE | $2,400 | $0 | $0 | 11/1/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1550 Biscayne Blvd | SCOPE | $5,083 | $0 | $0 | 12/31/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1550 Biscayne Blvd | SCOPE | $9,110 | $0 | $0 | 12/31/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD | SCOPE | $749 | $0 | $0 | 11/3/2016 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD | SCOPE | $29,441 | $835 | $0 | 9/19/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD | SCOPE | $38,296 | $0 | $0 | 11/3/2016 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | MEDICAL EQUIPMENT | $135 | $0 | $0 | 11/13/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | PATTERSON DENTAL | $11,255 | $11,255 | $0 | 2/1/2014 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | PHILLIPS | $1,076 | $0 | $0 | 4/30/2013 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | Med Equip- Medical Electronics | $680 | $680 | $0 | 5/8/2017 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 7291 West Atlantic Blvd | Med Equip- Patheon 203339 | $1,118 | $1,118 | $96 | 10/17/2017 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 7291 West Atlantic Blvd | PHILIPS - ULTRASOUND | $1,198 | $1,198 | $160 | 12/19/2017 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD | ROOT CANAL | $1,561 | $0 | $96 | 2/12/2020 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD | NEUROTRONIC | $1,472 | $1,472 | $370 | 4/21/2019 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1550 Biscayne Blvd | DOCTOR'S EQUIPMENT SPECIALISTS | $1,286 | $1,286 | $214 | 5/6/2020 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 1550 Biscayne Blvd | OPTOVISION | $1,125 | $1,125 | $161 | 5/6/2020 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment | 351 NW 42nd Ave #503 | CHAIR WITH FOOT CONTROL | $5,130 | $3,834 | $1,276 | 11/11/2020 Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment |  | DOCTOR'S EQUIPMENT SPECIALIST (2 EXAM TABLES) |  |  |  | Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment |  | DOCTOR'S EQUIPMENT SPECIALIST (2 EXAM TABLES) |  |  |  | Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment |  | DOCTOR'S EQUIPMENT SPECIALIST (45 wash transformer Chioco |  |  |  | Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Medical equipment |  | PATTERSON DENTAL SUPPLY |  |  |  | Straight-line | Rosillo Dumenigo, M.D. P.A. |
| Office Equipment | 7500 SW 8th ST | pc connection |  |  | $0 | 12/20/2023 Straight-line | Rosillo Dumenigo, M.D. P.A. |

| Category | Address | Description | Amount | Amount | Date | Entity |
|---|---|---|---|---|---|---|
| Office Equipment | 750 SOUTH FEDERAL HWY. | BACHELLI ENTRIES | $913 | $913 | 10/17/2017 Straight-line | AB Medical Operations, LLC |
| Office Equipment | 1200 ALTON RD | ENVIPORT INC | $0 | $0 | 4/11/2011 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | TIMECLOCK | $0 | $0 | 4/13/2011 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | BELL APPLIANCE | $0 | $0 | 7/28/2011 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | SECURITY CAMERAS | $0 | $0 | 10/3/2011 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | SECURITY CAMERAS | $0 | $0 | 10/31/2011 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | TWO LASER PRINTER | $0 | $0 | 11/3/2011 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | TV FOR ALTON ROAD CONF ROOM | $0 | $0 | 4/15/2012 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | TELESPHERE TELEPHONE EQUIPMENT | $0 | $0 | 10/1/2012 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | TELESPHERE TELEPHONE EQUIPMENT | $0 | $0 | 10/4/2012 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | EAGLER | ADVANCED SECURITY SYSTEM | $0 | $0 | 3/4/2013 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | FLORIDA BUILDER APPLIANCES | $0 | $0 | 3/7/2013 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | CAMERA | $0 | $0 | 4/30/2013 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | HI TECH SECURITY SYSTEMS | $0 | $0 | 6/30/2013 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | TELESPHERE TELEPHONE EQUIPMENT | $0 | $0 | 8/22/2013 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 151 HW 11th ST. | HI TECH SECURITY SYSTEMS | $0 | $0 | 9/10/2013 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 151 HW 11th ST. | TELESPHERE TELEPHONE EQUIPMENT | $0 | $0 | 9/17/2013 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | TELESPHERE TELEPHONE EQUIPMENT | $0 | $0 | 9/17/2013 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | EAGLER | TELESPHERE TELEPHONE EQUIPMENT | $0 | $0 | 10/29/2013 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 151 HW 11th RD | TELESPHERE TELEPHONE EQUIPMENT | $0 | $0 | 12/10/2013 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 151 HW 11th RD | HI TECH SECURITY SYSTEMS | $0 | $0 | 12/31/2013 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | HI TECH SECURITY SYSTEMS | $0 | $0 | 3/7/2014 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | SEARS | $0 | $0 | 4/11/2014 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 151 HW 11th RD | MONICA VEGA | $0 | $0 | 7/29/2014 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 1200 ALTON RD | home depot | $0 | $0 | 11/30/2013 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Office Equipment | 7900 SW 8TH ST | PBX PHONE SYSTEM | $0 | $0 | 3/3/2014 Straight-line | Miami Medical & Wellness Center, LLC |
| Transport | 1200 ALTON RD | ULTIMATE HOME | $0 | $0 | 1/14/2014 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Transport | 1200 ALTON RD | FERNANDO IZAGUIRRE | $0 | $0 | 2/6/2014 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Transport | 1200 ALTON RD | FERNANDO IZAGUIRRE | $0 | $0 | 2/13/2014 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Transport | 1200 ALTON RD | GENESIS | $0 | $0 | 2/25/2014 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Transport | 1530 Biscayne Blvd | SOUTHERN TECH | $174 | $174 | 5/6/2014 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Transport | 1200 ALTON RD | ULTIMATE HOME | $91 | $91 | 5/9/2014 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Transport | 1200 ALTON RD | IN MOTION MOBILITY(MIAMI) | $2 | $2 | 8/20/2015 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Transport | 1200 ALTON RD | IN MOTION MOBILITY(MIAMI) | $0 | $0 | 9/15/2015 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Transport | 1200 ALTON RD | TELESPHERE(MIAMI) | $8 | $8 | 9/17/2015 Straight-line | Rodolfo Dumenigo, M.D., P.A. |
| Transport | 1200 ALTON RD | TELESPHERE(MIAMI) | $1 | $1 | 9/18/2015 Straight-line | Rodolfo Dumenigo, M.D., P.A. |

**Exhibit B**

**Transition Services Agreement**

<div align="right">**Execution Version**</div>

<div align="center">**Transition Services Agreement**</div>

This Transition Services Agreement (this "**Agreement**"), dated as of [●], 2024 ("**Effective Date**"), is by and among MB Medical Operations, LLC, a Delaware limited liability company ("**MBMO**"), MB Medical Transport, LLC, a Delaware limited liability company ("**MBMT**"), Care Center Network, LLC, a Florida limited liability company ("**CCN**"), Clinical Care Pharmacy, LLC, a Florida limited liability company ("**CCP**"),  Care Center Medical Group, LLC,  a Florida limited liability company ("**CCMG**"),   Florida Family Primary Care Center, LLC, a Florida limited liability company ("**FFPCC**"), Florida Family Primary Care Centers of Tampa, LLC, a Florida limited liability company ("**FFPCCT**"), Florida Family Primary Care Centers of Pasco, LLC, a Florida limited liability company ("**FFPCCP**"), Florida Family Primary Care Centers of Pinellas, LLC, a Florida limited liability company ("**FFPCCPL**"), Florida Family Primary Care Centers of Orlando, LLC, a Florida limited liability company ("**FFPCCO**"), CCMC Physician Holdings, Inc., a Florida limited liability company ("**CCMC Holdings**"), Miami Medical & Wellness Center LLC, a Florida limited liability company ("**MMWC**"), Miami Beach Medical Centers, Inc., a Florida corporation f/k/a Rodolfo Dumenigo, M.D., P.A., a Florida professional association ("**RD**"),Miami Beach Medical Consultants, LLC d/b/a Clinical Care Medical Centers, a Florida limited liability company ("**MBMC**", MBMT" and collectively with MBMO, MBMT, CCN, CCP, CCMG. FFPCC, FFCCT, FFPCCP, FFPCCPL, FFPCCO, CCMC Holdings, MMWC, and RD, the "**Service Providers**", and each, a "**Service Provider**"), and Conviva Medical Center Management, LLC, a Delaware limited liability company ("**Conviva**" and together with Service Providers, the "**Parties**").

WHEREAS, on the Effective Date, Conviva and Service Providers, together with the other parties signatories thereto, have consummated the transactions contemplated by that certain Asset Purchase Agreement (as amended, restated, modified, or supplemented from time to time, the "**Purchase Agreement**"); and

WHEREAS, it is a condition precedent to the closing of the transactions contemplated by the Purchase Agreement that the Parties hereto execute and deliver this Agreement, pursuant to which Service Providers shall provide to Conviva the Services, as more fully described in this Agreement and in accordance with the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements hereinafter set forth, the Parties agree as follows:

<div align="center">**ARTICLE I**
**DEFINITIONS**</div>

**Section 1.01**   Unless otherwise defined herein, all capitalized terms used herein shall have the same meanings as set forth in the Purchase Agreement.

**Section 1.02**   The following capitalized terms used in this Agreement shall have the meanings:

"**Conviva Data**" means all data or information of any of Conviva, its Affiliates or the Business that is collected, generated, calculated, derived, stored by, transmitted to, or otherwise Processed, by or on behalf of Service Providers, any of their Affiliates, or any other person or

entity on Conviva's behalf in connection with this Agreement (including in the receipt or use of any Service) or that is in a Service Provider's or any of Service Providers' Affiliates' possession as of the Effective Date, including any such data or information (a) in a tangible form, regardless of the form or method by which such information is created, stored, maintained, or communicated, (b) maintained or generated by a Service Provider for Conviva, or (c) that constitutes Personal Information.

"**Confidential Information**" means, with respect to a Party, any information that is treated as confidential by that Party, including, without limitation, trade secrets, technology, information pertaining to business operations and strategies, and information (including Personal Information) pertaining to customers, patients, pricing and marketing, including, with respect to Conviva, all Conviva Data; *provided that* Confidential Information shall not include information that: (a) is, or subsequently becomes, generally known by the Receiving Party or the public other than by breach of this Agreement by, or other wrongful act of, the Receiving Party; (b) is in the possession of the Receiving Party prior to being delivered to the Receiving Party by the Disclosing Party (it being agreed that this exception is not applicable to any Confidential Information of the Disclosing Party that is in the possession of the Receiving Party by virtue of consummation of (or diligence and discussions relating to) the transactions contemplated by the Purchase Agreement); (c) is developed by the Receiving Party independently of, and without reference to, any Confidential Information of the Disclosing Party; or (d) is received by the Receiving Party from a third party who is not under any obligation to the Disclosing Party to maintain the confidentiality of such information.

"**Disclosing Party**" means a Party that discloses Confidential Information under this Agreement.

"**Fraud**" means actual and intentional common law fraud as defined under the Law of the State of Delaware (which, for the avoidance of doubt, does not include constructive fraud or other claims based on constructive knowledge, negligent misrepresentation, recklessness or similar theories).

"**Hard Stop Date**" means the date that is ninety (90) days after the Effective Date.

"**Losses**" means all damages, losses, liabilities, Taxes, costs, penalties, fines and expenses (including interest, reasonable attorney's fees, reasonable costs of collection and all reasonable amounts paid in investigation, defense or settlement of any of the foregoing), in each case, whether or not arising out of a third party claim.

"**Personal Information**" means all information in any form or media that identifies, could be used to identify or is otherwise related to an individual person (including any current, prospective, or former customer, patient, end user or employee), in addition to any definition for "personal information" or any similar term provided by applicable Law or by a Service Provider in any of its privacy policies, notices or contracts (e.g., "personal data," "personally identifiable information" or "PII"). Personal Information shall include all Protected Health Information, as defined by HIPAA.

"**Receiving Party**" means a Party that receives or acquires Confidential Information directly or indirectly under this Agreement.

"**Service Provider Personnel**" means all employees and independent contractors engaged by any Service Provider to perform the Services.

"**Severance Pay**" means a lump sum payment to be made by Conviva to fund Service Providers' payments to Transitional Employees equal to the value of the base salary or wage of the respective employee, plus the employer-provided benefits to which such employee would be entitled if not terminated, for a sixty (60) day time period, inclusive of the employer's share of any payroll taxes payable by the employer in connection with such sum (for the avoidance of doubt, taking into account all wages paid by the employer to the applicable Transitional Employee during the applicable calendar year), and with such payment to be computed using the base salary or wage of such employee in effect as of the effective date of termination of employment of such employee. Any Severance Pay becoming due pursuant to this Agreement shall be paid as part of the next occurring usual payroll date for the affected employee (or as soon as practicable after the date of termination).

"**Transferred Patient Records**" means all Patient Records (a) that constitute Purchased Assets, (b) that are subject to a transfer of custodianship to Conviva or its designee pursuant to the Purchase Agreement, or (b) that are collected, generated, calculated, derived, stored by, transmitted to, or otherwise Processed by or on behalf of Service Providers, any of their Affiliates, or any other person or entity on Conviva's behalf on or after the Effective Date during the Term of this Agreement.

"**Transition Date**" means the earlier of (a) the Hard Stop Date, and (b) the date upon which Conviva has successfully integrated the Business and effectively terminated all Services as confirmed in writing by Conviva to Service Providers.

## ARTICLE II
## SERVICES

**Section 2.01  Provision of Services**. During the Term, Service Providers shall use reasonable best efforts to provide to Conviva the following services (each, a "**Service**", and collectively, the "**Services**") (a) the services set forth in **Schedule A** (the "**Service Schedule**"), (b) any Additional Services (included in accordance with **Section 2.02**), and (c) any Omitted Services (included in accordance with **Section 2.02**). Services shall be provided hereunder to the extent Service Providers are able to provide or procure such services based on the existing resources and capabilities of Service Providers at the time the applicable Services are to be performed after giving effect to (a) the closing of the transactions set forth in the Purchase Agreement, and (b) the transition of Purchased Assets and Transitional Employees to Conviva as contemplated by this Agreement and by the Purchase Agreement (collectively, "**Service Providers' Limitations**"); provided, however, Service Providers' Limitation shall not apply, and the Service Providers shall continue to be obligated to provide Services, to the extent that the Service Providers are capable of providing any such Services with their remaining resources. All the Services shall be for the sole use and benefit of Conviva and its Affiliates. Service Providers shall not be required to provide any Service that is prohibited or restricted by applicable Law, *provided that* if Service Providers

3

are not able to provide any such Service that is so prohibited or restricted, Service Providers shall (subject to the Service Providers' Limitations) use commercially reasonable efforts to implement an appropriate alternative arrangement or activity to enable Conviva to receive the benefit of the Service.

**Section 2.02    Additional and Omitted Services**.

(a)    If, during the Term of this Agreement, Conviva determines that it requires access to additional services that are not set forth on the Service Schedule and that are not Omitted Services (addressed in **Section 2.02(b)** below) (such additional services, the "**Additional Services**"), then, at the written request of Conviva, Service Providers shall use reasonable best efforts (subject to the Service Providers' Limitations)  to provide or procure the provision of the Additional Services for a duration reasonably requested by Conviva (but in no event past the Hard Stop Date).

(b)    If, during the Term of this Agreement, Conviva identifies a service that is not included on the Service Schedule and that was provided by or on behalf of the Service Providers to the Business at any time on or within the twelve (12) months preceding the Closing Date (the "**Baseline Period**") (the "**Omitted Services**"), then, at the written request of Conviva, Service Providers shall (subject to the Service Providers' Limitations) use reasonable best efforts to provide or procure the provision of the Omitted Services, on the same terms and conditions that such Omitted Service was provided during the twelve (12) month period preceding the Closing Date, for a duration reasonably requested by Conviva (but in no event past the Hard Stop Date).

(c)    Any Additional Service or Omitted Service provided by Service Providers shall be set forth in the Service Schedule and shall constitute Services under the Agreement and be subject in all respects to the provisions of this Agreement. Service Providers shall invoice (or provide in its Budget) Conviva in accordance with **Section 5.01** for the fees for providing any such Additional Services or Omitted Services, which fees shall be mutually agreed upon by the Parties and shall be equal to the direct and indirect costs and expenses, without markup, incurred by Service Providers to provide such Services.

**Section 2.03    Delegation of Services**. Service Providers shall not delegate or subcontract to any person or entity (other than their Affiliates), or utilize any service provider, contractor, consultant, or other person or entity, in connection with their performance of any Service without Conviva's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed); *provided that*, Service Providers may continue to delegate or subcontract to a person or entity, or continue to utilize any service provider, contractor, consultant, or other person or entity in connection with, their performance of a Service to the extent such Service was delegated or subcontracted to such person or entity, or such service provider, contractor, consultant, or other person or entity was utilized to provide such Service, to the Business during the Baseline Period. Service Providers acknowledge that notwithstanding any delegation or subcontracting to any person or entity of, or utilization of any service provider, contractor, consultant, or other person or entity in connection with, any of their performance under this Agreement, (i) Service Providers shall remain fully responsible and liable (subject to the limitations set forth in this Agreement) for the provision of the Services and any such person or entity's compliance with the terms and conditions of this Agreement (including the standards of performance set forth herein), and (ii)

4

any act or omission (including any breach of this Agreement) by any such person or entity (as if they were a Service Provider hereunder) shall constitute an act or omission (or breach, if applicable) under this Agreement by Service Providers.

**Section 2.04**   Termination of Services. Subject to Section 5.03 and Article X, the obligations of Service Providers under this Agreement to provide Services shall terminate with respect to each Service on the Hard Stop Date. Notwithstanding the foregoing, the Parties acknowledge and agree that Conviva may determine from time to time that it does not require all or any portion of the Services set out on the Service Schedule or that it does not require such Services for the entire period up to the Hard Stop Date. Accordingly, subject to Section 5.03 and Article X, Conviva may terminate any Service, upon at least fifteen (15) days' notice to Service Providers in writing, in which case the only fees for which Conviva shall be liable with respect to the terminated Service(s) shall be any costs or expenses incurred by Service Providers for provision of such Service(s) prior to the effective date of termination, as well as sixty (60) days' Severance Pay which shall be paid by Service Provider to any Transitional Employee whose employment is terminated as a result of such termination of Service and who do not become Transferred Employees. This provision shall apply so that Transitional Employees who do not become Transferred Employees upon termination of the Term of this Agreement shall also receive 60 days' Severance Pay, and this provision and obligation shall survive any termination of this Agreement.

**Section 2.05   Transition Representatives; Transition Plan**. Service Providers and Conviva shall each appoint a transition representative (a "**Transition Representative**") to facilitate communications and performance under this Agreement. Service Providers may treat an act of a Transition Representative of Conviva as being authorized by Conviva without inquiring behind such act or ascertaining whether such Transition Representative had authority to so act, and Conviva may treat an act of a Transition Representative of Service Providers as being authorized by Service Providers without inquiring behind such act or ascertaining whether such Transition Representative had authority to so act. Service Providers and Conviva shall have the right at any time and from time to time to replace their or its respective Transition Representative by giving notice in writing to the other Party, setting forth the name of (a) the Transition Representative to be replaced and (b) the replacement, and certifying that the replacement Transition Representative is authorized to act for the Party giving the notice in all matters relating to this Agreement.

**Section 2.06   Non-Exclusivity**. Nothing herein shall prevent Conviva from obtaining any of the Services, or any other service, from any other person or entity or from providing any Services, or any other service, to itself or its Affiliates using its own facilities, employees, or contractors.

## ARTICLE III
## SERVICE PROVIDERS' RIGHTS AND OBLIGATIONS

**Section 3.01   Service Providers Covenants**. Service Providers, in the provision of Services hereunder, shall (subject to the Service Providers' Limitations):

(a)   reasonably cooperate with Conviva in all matters relating to the provision of the Services;

(b)    provide the Services in accordance with applicable Law and in all cases at a level of quality, with at least the same (and not less than a reasonable) degree of care, skill, performance, and diligence with which, and in the same manner and nature as (if practicable), such Services were provided by Service Providers to the Business during the Baseline Period, including with respect to the volume, quality, timeliness, efficacy, availability, and reliability of such Services (or, if not so previously provided, then no less than the quality, care, skill, performance, and diligence as would be commercially reasonable);

(c)    maintain (subject to Conviva's obligations to pay the Funding Amounts hereunder) (i) sufficient resources and use reasonable best efforts to maintain qualified personnel as are reasonably required to perform its obligations under this Agreement, and (ii) such licenses, permissions, and waivers as are currently held by Service Providers with respect to the Services and comply with all relevant Laws applicable with respect to the provision of the Services to Conviva;

(d)    use good faith efforts to comply with the reasonable direction of Conviva concerning any modification to the manner in which the Services are performed;

(e)    in the event of any breach of this Agreement by Service Providers with respect to any error or defect in the provision of any individual Service, Service Providers shall, at Conviva's request, and at no additional cost to Conviva, correct such error or defect or re-perform such Service in a timely manner as promptly as Conviva reasonably requests;

(f)    during the Term and until the effective date of Service Provider's confirmed bankruptcy liquidation plan (the "Survival Period"), maintain books, accounts, and records relating to the provision of the Services under this Agreement in accordance with its standard historical practices and as otherwise required by Law. During the Term and the Survival Period, upon Conviva's written notice, Service Providers shall allow Conviva or any of its representatives (including independent auditors), during normal business hours and in a manner that shall not materially interfere with Service Providers' operations or the duties of Service Providers' personnel, reasonable access to, or, at Conviva's expense, copies of all such books, accounts, and records, as well as access to Service Providers' personnel performing Services. For the avoidance of doubt, the foregoing includes the right for Conviva and its representatives (including independent auditors) to inspect and audit Service Providers' books and records concerning the fees and other amounts charged under this Agreement and to otherwise confirm Service Providers' compliance with its obligations under this Agreement; and

(g)    not, directly or indirectly, except as part of Service Providers' existing insolvency planning/proceedings and/or permitted under the Purchase Agreement, (i) sell, transfer, dispose of, redeem, acquire or issue any Equity Interests of any Service Provider (or permit any of the foregoing), or (ii) commence or settle any litigation or similar proceeding, or make any claim, against any person or entity in connection with the Services provided after the Effective Date hereunder.

**Section 3.02  Compliance with Conviva Policies; Service Provider Personnel.** Following receipt of Conviva's customary training with respect to its policies generally, Service Providers shall comply with all policies of Conviva and its Affiliates to the extent applicable to

the Services. Subject to Conviva's payment obligations in **Section 5.01** and as provided in Section 2.2(a) of the Purchase Agreement regarding PTO applicable to Transferred Employees, Service Providers are responsible for all Service Provider Personnel and for the payment of their compensation, including, if applicable, withholding of all Taxes, including but not limited to income Taxes, and the payment and withholding of the employer's and employee's share of social security and other payroll Taxes, unemployment insurance, workers' compensation insurance payments, and disability benefits.

**Section 3.03    Consents**. Service Providers, with assistance from Conviva and subject to the Service Providers' Limitations, shall use commercially reasonable efforts to obtain all consents, authorizations, waivers, and approvals from any third person that are necessary for Service Providers to perform the Services or Conviva to receive the Services. Without limiting the foregoing, if Service Providers are not able to obtain any such consent, authorization, waiver, or approval, Service Providers shall promptly notify Conviva and use commercially reasonable efforts to arrange as soon as possible an alternative means of providing such Service that is similar to the benefit provided under or by the relevant Service for which the consent, authorization, waiver, or approval was required and that is reasonably satisfactory to Conviva, at no incremental cost to Conviva. If Service Providers are unable to arrange such an alternative means within ten (10) days after the Effective Date, Conviva may in its sole discretion terminate this Agreement in whole or with respect to any affected Service.

**Section 3.04    Transition of Services**. Service Providers shall, upon Conviva's request (a) provide to Conviva assistance and available documentation reasonably necessary to facilitate an orderly transition and migration of the Services to Conviva (or its designees) so as to allow Conviva to receive the benefit of the Services (or equivalents thereof) without assistance or involvement by Service Providers; and (b) deliver to Conviva copies of such available documents, policies, procedures, records and information that are reasonably necessary for Conviva and/or its Affiliates to reproduce the Services independently and to achieve such transition.

## ARTICLE IV
## CONVIVA RIGHTS AND OBLIGATIONS

**Section 4.01    Conviva Covenants**. Conviva shall:

(a)    reasonably cooperate with Service Providers in all matters relating to the provision of the Services;

(b)    respond promptly to any Service Providers request to provide direction, information, approvals, authorizations, or decisions that are reasonably necessary for Service Providers to perform Services in accordance with the requirements of this Agreement; and

(c)    provide such materials, records, reports, and documents as Service Providers may reasonably request, in order to carry out the Services, in a timely manner.

7

**ARTICLE V**
**COST REIMBURSEMENTS AND PAYMENT TERMS**

**Section 5.01    Invoices, Budgets and Payment.** Conviva hereby agrees to, on a monthly basis (or as otherwise designated by the Parties) and in accordance with this **Section 5.01**, deposit amounts into an account designed by Service Providers (the "**TSA Account**") in order to fund, in advance, the provision of Services (the "**Monthly Pre-Fund**"). At least twenty (20) days prior to the Closing Date, Service Providers shall provide Conviva with an invoice or budget statement (in substantially the form attached hereto as part of Schedule A) designating the total funding required for the first month of the Term (such a statement, a "**Funding Statement**", and such amount, the "**Funding Amount**"), and within twenty (20) days after receipt thereof, and in all events on the Effective Date, Conviva shall deposit the initial month's Funding Amount into the TSA Account. Thereafter, by the tenth (10th) day of each month, Service Providers will provide Conviva with a Funding Statement specifying the Funding Amount required for the following month, and prior to the start of such month, Conviva shall deposit the corresponding Funding Amount into the TSA Account. Each Funding Statement shall reflect (as applicable): (a) the total of service fees (each as set forth on the Schedule A) due to Service Providers for such upcoming month, (b) any rent (including without limitation any "base," "fixed" or "minimum" rent and any other amounts called "additional rent" due with respect to the applicable Facility Terms) that Service Providers expect to incur for the Facilities, as well as the costs of utilities, as contemplated under Article VII, in each case for the upcoming month, (c) the amount of Third Party Costs owed by Conviva with respect to the prior month (as determined in accordance with **Section 5.03**), (d) a credit for any revenue received by Service Providers or their Affiliates on behalf Conviva or its Affiliates, and (e) a credit for any roll-over of amounts remaining in the TSA Account from the Funding Amount of the prior month (taking into account any amounts owed under (a), (b), and (c)). In addition, twenty (20) days prior to expiration of the Term, the Parties shall in good faith finalize any required reconciliation, and promptly remit payment to the appropriate Party prior to expiration of the Term. The Parties acknowledge that the first (1st) and second (2nd) Funding Statements shall be based in part on Service Providers' good faith estimates. Each Party shall promptly notify the other Party of any identified overpayment or underpayment with respect to any Funding Amount, and such amounts shall be remitted to the appropriate Party (or adjusted into the next Funding Amount) within ten (10) Business days following receipt of notice thereof. The Parties shall seek to resolve all disputes concerning Funding Statements expeditiously and in good faith. Within ten (10) Business Days following termination of this Agreement, the Parties shall in good faith finalize any required reconciliation, and promptly (and in any event within thirty (30) days after the effective date of such termination of this Agreement) remit payment to the appropriate Party. Without limiting the foregoing, if at any time after the end of the Term, Service Providers receive any revenues or other amounts that would otherwise be due to Conviva had they been received by Service Providers during the Term, Service Providers shall reasonably promptly remit those amounts to Conviva.

**Section 5.02    Third Party Costs.** Conviva shall, subject to the remainder of this **Section 5.02**, and as part of the Funding Amounts pay Service Providers all reasonable actual third-party costs and expenses that are either (i) included in the Funding Statement, or (ii) not so included in the Funding Statement (e.g., amounts to be incurred for Additional Services) but pre-approved by Conviva which are incurred by Service Providers in connection with providing the Services (such pre-approved costs, "**Third Party Costs**"). Service Providers shall (a) identify in each Funding Statement the Third Party Costs so incurred since the prior Funding Statement, (b) provide with

each Funding Statement reasonable supporting details and documentation as reasonably necessary for Conviva to verify the basis for the Third Party Costs that are included on that Funding Statement, and (c) identify in each Funding Statement the Third Party Costs that Service Providers expect to incur in the following month, for which Conviva must provide approval or disapproval prior to the end of the month.

**Section 5.03    Terminated Services**. Upon termination or expiration of any or all Services pursuant to this Agreement, or upon the termination of this Agreement in its entirety, Service Providers shall have no further obligation to provide the applicable terminated Services and Conviva shall have no obligation to pay any future compensation relating to such terminated Services, except as otherwise expressly set forth in this Agreement or the Purchase Agreement.

**Section 5.04    Taxes**. Service Providers shall cooperate with Conviva in determining the extent to which any Tax is due and owing with respect to the Services and, upon request, provide Conviva any reasonably requested documents required for Tax or other regulatory purposes. Such cooperation shall include Service Providers' provision of such reasonable access to Conviva to Service Providers' personnel, records including Patient Records, data, customer information, and other information as shall be reasonably necessary to so determine such Tax. Conviva shall pay any sales, use, services, and any other similar Taxes assessed on the provision of independent contractor services by Service Providers to Conviva pursuant to this Agreement ("Sales Taxes") *provided that*, for the avoidance of doubt and consistent with Section 3.02 hereof, Sales Taxes shall not include, and Service Providers shall be responsible for and pay, any Taxes based upon or measured by Service Providers' net income or property and, except as otherwise provided herein in connection with the Severance Payments, any other Taxes imposed by Law upon Service Providers and Service Providers' employees due to the employment relationship between Service Providers and Service Providers' employees. If Conviva is required to withhold or deduct any Taxes from any payment in connection with or related to this Agreement, Conviva will not be required to "gross up" the amount of such payment and shall pay to Service Providers the total amount reflected on the invoice less the applicable withholding Taxes. Conviva and Service Providers shall cooperate in good faith to minimize Taxes with respect to the Services to the extent legally permissible. Each Party shall provide and make available to the other Party any resale certificates, treaty certification, and other exemption information reasonably requested by the other Party. The Parties acknowledge and agree that payment of the fees provided for in this Agreement is intended to be the fair market value of the Services provided by Service Providers and is in no way, directly or indirectly, conditioned on the referral or anticipated referral of patients, clinical services or other business between Service Providers, Conviva or one of Conviva's Affiliates.

**Section 5.05    Status of Employees**. Except as provided in **Section 5.06** and **Section 5.07** of this Agreement, (a) whenever any Service Provider utilizes its employees to perform the Services for Conviva pursuant to this Agreement, such employees shall at all times remain subject to the direction and control of such Service Provider, and (b) such Service Provider shall have complete discretion to supervise and manage such employees and any third party contractors providing the Services on behalf of such Service Provider. Except as set forth herein, Conviva and its Affiliates shall have no liability for the salaries, wages, fringe benefits, legally required employer contributions and Tax obligations of the Service Provider Personnel by virtue of the relationships established under this Agreement.

**Section 5.06    Employment of Transitional Employees**

(a)    Except as provided in **Section 5.06(b)**, Service Providers shall continuously employ each of the Transitional Employees, with the same title and job duties as were in effect for such Transitional Employee on the day before the Closing Date, from the Closing Date through the earlier of (i) the day before the applicable Transfer Date, (ii) the effective date of such Transitional Employee's voluntary resignation, if any and (iii) the effective date of termination for Cause of any such Transitional Employee. Except as provided in **Section 5.06(c)** Service Providers shall maintain for each Transitional Employee employed by Service Providers the same compensation, benefits and other terms and conditions of employment that were in effect for such Transitional Employee on the day before the Closing Date.  In addition, Service Providers shall continue to engage any independent contractors that are physicians, nurse practitioners, physician assistants and other medical and/or health professionals who provide clinical services to patients of the Business whose charts and whose records are Purchased Assets pursuant to the Purchase Agreement until such date as the applicable Service provided hereunder is terminated in accordance with the terms hereof.

(b)    Notwithstanding anything to the contrary herein, Service Providers shall not, without Cause or Conviva's written consent, terminate the employment of any Transitional Employee prior to the day before the applicable Transfer Date.  Service Providers shall notify Conviva promptly, and in no event more than three (3) Business Days, after a Transitional Employee resigns, gives notice of resignation or is terminated by Service Providers for Cause. Upon Conviva's written request that a Transitional Employee be removed from service, Service Providers shall, within three (3) Business Days, cause such Transitional Employee to cease providing any Services to Conviva and, as of the date thereof, (i) such Transitional Employee shall cease to be a Transitional Employee, and (ii) Service Providers shall be solely responsible for all compensation, benefits or other costs associated with such Transitional Employee, except that Conviva shall be responsible for the cost of sixty (60) days Severance Pay to be paid to each such Transitional Employee if that individual's employment with Service Providers is terminated as a result of Conviva's request for removal of that employee from service. Service Providers shall not make any change to the title or job duties of any Transitional Employee without Conviva's written consent or written request.  Upon Conviva's written request, Service Providers shall promptly change the title and/or job duties of any Transitional Employee.

(c)    Service Providers shall not, without Conviva's written consent or as required by applicable Law or the terms of a written contract or Plan in effect on the Closing Date, make any change to the compensation, benefits or other terms and conditions of employment of any of the Transitional Employees prior to the applicable Transfer Date. Service Providers shall not terminate any of the Plans prior to the Transfer Date of the last Transferred Employee, as confirmed in writing by Conviva; provided, however, that Service Providers shall promptly terminate any Plan upon Conviva's written request.

(d)    Service Providers shall not employ or engage any individual as a Transitional Employee without Conviva's written consent. Upon Conviva's written request, Service Providers shall promptly employ as a Transitional Employee, in such position and upon such terms and conditions of employment as Conviva shall specify at its discretion, any individual identified by Conviva. Upon Conviva's written request in connection with a Transitional

10

Employee ceasing to be a Transitional Employee, Service Providers shall promptly use their commercial best efforts, or make such greater or lesser effort as Conviva shall specify at its discretion, to recruit and employ a qualified individual to replace such former Transitional Employee as a Transitional Employee upon the same terms and conditions of employment or such other terms and conditions as Conviva shall specify at its discretion. The cost of such recruiting efforts shall be subject to Conviva's prior approval and, to the extent approved by Conviva, shall be included as "Business Expenses" (as defined in Schedule A). Notwithstanding the foregoing, Service Providers shall not employ or engage any individual as a Transitional Employee whose employment in such position would violate applicable law or regulatory requirements.

(e)     As used herein, "Transitional Employees" shall mean (i) the employees of the Service Providers who are identified on (or required to be identified on) Section [3.11(a)] of the Disclosure Schedules to the Purchase Agreement and who remain employees of a Service Provider on the day before the Closing Date and (ii) those individuals who become Transitional Employees as provided in subsection (d).

(f)     As used herein, "Cause" shall mean a Transitional Employee's (i) conviction of (including plea of guilty or no-contest) to any felony, (ii) commission of any act constituting a felony, or fraud or material dishonesty, in connection with employment, (iii) material breach of any contract with a Service Provider that is not cured (if capable of cure) within ten (10) days after written notice of such breach, or (iv) material violation of any applicable written policy of a Service Provider or Conviva that is not cured (if capable of cure) within ten (10) days after written notice of such violation.

(g)     As used herein, the "Transfer Date" shall mean, for any Transitional Employee, the date upon which that Transitional Employee becomes a Transferred Employee.

(h)     Notwithstanding anything to the contrary herein, Service Providers are not obligated to comply with Conviva's requests as provided in this **Section 5.06**, and Service Providers shall not be deemed in breach of this Agreement for failure or refusal to comply with such requests, if compliance with those requests would cause Service Providers to breach any applicable laws or regulations; or with respect to Additional Services requested by Conviva, if providing such Additional Services would breach any pre-existing agreement of Service Providers; provided that Service Providers shall use their commercially reasonably efforts to find an alternative arrangement to comply with such request that does not cause Service Provider to breach an applicable law or regulation (or agreement applicable to requested Additional Services).

(i)     Offers of Employment by Conviva.

(i)     During the Term of this Agreement, Conviva or an Affiliate of Conviva may offer employment to those Transitional Employees as Conviva or its Affiliate may elect at its sole discretion. Conviva shall promptly provide notice to Service Providers of those Transitional Employees who have been offered employment.

(ii)     Not later than the day before the applicable Transfer Date, Service Providers shall terminate the employment of the applicable Transitional Employee if such employee has accepted an offer of employment from Conviva or an Affiliate of Conviva.

11

Any Transitional Employee who accepts an offer of employment from Conviva or an Affiliate of Conviva and commences employment with Conviva or such Affiliate of Conviva shall be hereinafter referred to as a "Transferred Employee" effective as of the date such employee commences employment with Conviva or an Affiliate of Conviva.

(iii)    Those Transitional Employees who fail to accept an offer of employment from Conviva or an Affiliate of Conviva, or who otherwise fail to commence employment with Conviva or an Affiliate of Conviva on the applicable Transfer Date, will not become employees of Conviva or an Affiliate of Conviva, and, for the avoidance of doubt, Conviva and Conviva's Affiliates will have no obligations of any kind with respect to such employees.  Except as expressly set forth herein or in the Purchase Agreement, Conviva and Conviva's Affiliates will not assume or be obligated under any Contracts, commitments or undertakings between any Service Provider and the Transferred Employees.

(iv)    If any Transitional Employee who is on long-term disability or other long-term leave of absence as of the Hard Stop Date is able to return to active employment within thirty (30) days of the Hard Stop Date, Conviva or an Affiliate of Conviva may, at its sole discretion, make such Transitional Employee an offer of employment as provided above and, if accepted, such Transitional Employee will become a Transferred Employee from and after the date that his or her employment with Conviva or an Affiliate of Conviva commences as provided in such offer.

(v)    Service Providers shall cooperate with and provide any commercially reasonable assistance to Conviva, to the extent reasonably requested by Conviva, with respect to the transition of employment of the Transitional Employees to the Conviva on the applicable Transfer Date, including the making of offers of employment by Conviva to Transitional Employees.

(j)    Following the applicable Transfer Date and during the Term, Conviva may provide Service Providers access to certain of the Transferred Employees to assist in the provision of certain of the Services pursuant to the terms of this Agreement.  Service Providers and Conviva will work in good faith to determine the scope, timing and nature of any such access, which shall be provided by Conviva at no charge to the Service Providers.  To the extent that Conviva provides access to any such Transferred Employees, Service Providers shall not be entitled to claim Service Providers' Limitations with respect to the underlying Service solely by reason of the unavailability of such Transferred Employees.  In addition, Conviva shall have no liability under this Agreement or otherwise to Service Providers with respect to the foregoing.

(k)    Nothing in this Agreement, whether express or implied, is intended to, or shall, (i) constitute the establishment or adoption of or an amendment to any employee benefit plan for purposes of ERISA or otherwise be treated as an amendment or modification of any Plan or other benefit plan, agreement or arrangement of Conviva, (ii) limit the right of Conviva or  its Affiliates to amend, terminate or otherwise modify any benefit plan, agreement or arrangement of Conviva for any Transferred Employee following the applicable Transfer Date, or (iii) create any third party beneficiary or other right (x) in any Person, including any current or former employee of the Service Providers or their Affiliates, any participant in any Plan or other benefit plan,

12

agreement or arrangement (or any dependent or beneficiary thereof) of Conviva or (y) to continued employment with Conviva or the Service Providers. Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Conviva or their Affiliates to terminate, reassign, promote or demote any of the Transferred Employees after the applicable Transfer Date or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, or terms or conditions of employment of such employees. For the avoidance of doubt, neither Conviva nor its Affiliates shall assume sponsorship of, or any obligations under, or Liabilities with respect to, or receive any right or interest in any trusts relating to, any assets of or any insurance, administration or other contracts pertaining to any Plan.

(l)        During the Term of this Agreement and if and as permitted by the Bankruptcy Court, Service Providers shall utilize reasonable best efforts, at the request and expense of Conviva, to enforce all existing covenants, obligations and agreements of the Transitional Employees regarding the Business ("Covenants"), including but not limited to Covenants relating to non-competition, non-solicitation, confidentiality and protection of intellectual property, to the extent that such Covenants are not validly assigned to and enforceable by Conviva, and shall not circumvent any Covenant or cause or assist any Transitional Employee to violate any of his/her Covenants. In the event that a court or arbitrator of competent jurisdiction determines that any Covenant purportedly assigned to Conviva has not been validly assigned to or is otherwise unenforceable by Conviva, then during the Term of this Agreement and if and as permitted by the Bankruptcy Court, Service Providers shall, upon Conviva's request and at Conviva's expense (subject to any applicable duty of indemnification by Service Providers), enforce such Covenant, including through litigation, in accordance with all lawful directions of Conviva, and Conviva shall have full power and authority to direct and control the prosecution, defense, settlement and resolution of any such litigation or other enforcement efforts.

(m)        If the provision of Services may require Service Providers to enter into contracts or agreement after the date hereof that do not, by their terms, end upon any Term of this Agreement, Service Providers shall notify Conviva thereof, however, Service Providers shall be under no obligation to enter into any such contract or agreement or provide Services that depend upon obtaining any such contract or agreement.

### Section 5.07    Clinical Operations

(a)        The performance of the Services includes utilizing Transitional Employees or independent contractors that are physicians, nurse practitioners, physician assistants and other medical and/or health professionals employed or engaged, as applicable, by Service Providers who provide clinical services to patients of the Business whose charts and whose records are Purchased Assets pursuant to the Purchase Agreement ("Clinical Transitional Personnel"). Service Providers will ensure that all Clinical Transitional Personnel who provide clinical services to the Business shall remain to the extent applicable to each Clinical Transitional Personnel's profession and job responsibilities: (a) duly licensed and in good standing under the laws of the State of Florida to engage in an unrestricted professional practice of his, her, or their profession; (b) a participating contractor in federal and/or state health care programs, including Medicare and/or Medicaid; (c)

appropriately trained and skilled in his, her, or their profession; (d) up to date with continuing education requirements, as applicable; and (e) in compliance with all applicable Laws.

(b)     Service Providers will be responsible for the credentialing, interviewing, employing, and onboarding of individuals employed or engaged as Clinical Transitional Personnel during the Term and with the coordination of services from other third parties for the operation of the Business.  Service Providers shall utilize reasonable best efforts to ensure that the Clinical Transitional Personnel (i) cooperate with Conviva in the performance of the Services to the Business and the other actions taken by Conviva, and (ii) comply with the terms of all agreements entered into by Service Providers or by Conviva on behalf of the ongoing operations of the Business. The Service Providers will use reasonable best efforts to ensure that all professional actions and services of the Business are rendered in compliance with applicable Law and professional standards of care and ethical standards applicable to the practice of medicine and other healing arts professions; provided, however, that Service Providers shall not be responsible for professional actions of the Business taken at the direction of Conviva or its Affiliates.

(c)     The Clinical Transitional Personnel shall, to the fullest extent permitted by applicable Law, work under the direction and supervision of Conviva or its designated Affiliate during the time that the Clinical Transitional Personnel spend performing clinical duties on Conviva's behalf to the Business and, following receipt of Conviva's customary training with respect to its policies generally, shall follow the policies, procedures and protocols of Conviva and its Affiliates, provided that nothing in this Agreement will be interpreted to preclude or otherwise restrict any Clinical Transitional Personnel's ability to exercise independent professional judgment over any qualitative or quantitative aspects of the delivery of medical care.

## ARTICLE VI
## CONFIDENTIAL INFORMATION

**Section 6.01   Treatment of Confidential Information**. The Receiving Party agrees:

(a)     not to disclose or otherwise make available Confidential Information of the Disclosing Party to any third party without the prior written consent of the Disclosing Party; provided, however, that the Receiving Party may disclose the Confidential Information of the Disclosing Party to its, and its Affiliates' and their officers, employees, consultants, and legal advisors who have a "need to know", who have been apprised of this restriction, and who are themselves bound by nondisclosure obligations at least as restrictive as those set forth in this **Section 6.01**;

(b)     to use the Confidential Information of the Disclosing Party only for the purposes of performing its obligations under the Agreement or, in the case of Conviva, to make use of the Services; and

(c)     to promptly notify the Disclosing Party in the event it becomes aware of any loss or disclosure of any of the Confidential Information of the Disclosing Party.

**Section 6.02   Limited Disclosure**. If the Receiving Party becomes (or if it is reasonably likely that the Receiving Party or its representatives shall become) required or compelled by applicable Laws to disclose any Confidential Information, the Receiving Party shall provide:

14

(a)      prompt written notice of such requirement to the Disclosing Party, to the extent practicable and except as prohibited by Laws, so that the Disclosing Party may seek, at its sole cost and expense, a protective order or other remedy or waive compliance with the terms of this Agreement; and

(b)      reasonable assistance, at the Disclosing Party's sole cost and expense, in opposing such disclosure or seeking a protective order or other limitations on disclosure.

If, after providing such notice and assistance as required herein, the Receiving Party remains required by Laws to disclose any Confidential Information, the Receiving Party shall disclose no more than that portion of the Confidential Information which, on the advice of the Receiving Party's legal counsel, the Receiving Party is legally required to disclose and, upon the Disclosing Party's request, shall use commercially reasonable efforts to obtain assurances from the applicable court or agency that such Confidential Information will be afforded confidential treatment.

**Section 6.03   Destruction**. Following a written request from the Disclosing Party, with respect to its Confidential Information, the Receiving Party promptly (a) shall, and shall cause each of its Affiliates and representatives to return to the Disclosing Party, or destroy, at the Receiving Party's option, all Confidential Information reduced to written form, whether so obtained before or after the execution hereof and (b) provide the Disclosing Party with a certificate of return or destruction that includes the dates and facts of the return or destruction and is signed by an officer of the Receiving Party; *provided that* the Receiving Party and its representatives may retain such documents and records as are stored in automated computer backup systems, as are required to be maintained in order to satisfy any applicable legal or regulatory record retention requirements, but all such documents and records remain subject to the confidentiality obligations herein.

## ARTICLE VII
## FACILITIES MATTERS

**Section 7.01**   Service Providers shall cause the tenant party (the "**Tenant**") to each such lease ("**Overlease**") under which any Service Provider has the right to occupy an applicable facility listed on <u>Schedule B</u> that is a Desired 365 Contract on the Effective Date but has not yet been designated an Assumed Contract or Excluded Contract under the Purchase Agreement (each, a "**Facility**") to use commercially reasonable efforts, at the risk and expense of Conviva, to grant to Conviva or its applicable Affiliates (including for clarity, HUM Provider Holdings, LLC), as identified by Conviva, (a) an irrevocable license from the applicable Tenant to exclusively use, occupy and access the premises demised under such Overlease at certain Facilities (or where such a license is not permitted under the terms of the Overlease, Service Providers shall cause the tenant party (until and unless the applicable landlord objects in writing) to otherwise permit such use, occupation and access), together with (b) use of the furniture, fixtures, workstations, equipment, and other personal property located therein ("**Furniture**"), and (c) access to and use of cafeterias, breakrooms, restrooms, parking areas, entrances, walkways, and accessways, and other common facilities available to Service Providers under the Overlease ("**Common Areas**"), each as of the Effective Date through the Hard Stop Date (such period, the "**Facility Term**"). Service Providers acknowledge that Conviva may at is discretion remove any Purchased Assets (including personal

15

health information but excluding Furniture) from the Facilities, and Service Providers shall not interfere with Conviva's moving and removing the Purchased Assets and otherwise transitioning the Business to Conviva during the Facility Term. Service Providers shall cooperate, at no cost to Service Providers, with Conviva in changing the locks and alarm security codes. Conviva shall turn over all security codes, keys, badges and other security related property to Service Providers at the end of the Facility Term for each Facility.

**Section 7.02**    Conviva shall remove all of its assets prior to the last day of the Facility Term. On the day that Conviva completes the removal of its assets from an applicable Facility, a designated representative of Service Providers and a designated representative of Conviva shall inspect the Facility to confirm that Conviva has (a) vacated the Facility and (b) removed Conviva's assets from the Facility. If Conviva has vacated the Facility in accordance with the foregoing sentence, Service Providers shall provide Conviva with written confirmation of this determination. If Conviva has not vacated the Facility in accordance therewith, Service Providers shall identify in writing the failures of Conviva to comply therewith. Upon Conviva's receipt of the written notice described in the previous sentence, Service Providers will provide Conviva with reasonable access to the Facility to complete Conviva 's obligations, not to exceed ten (10) days, and in all events prior to any expiration or termination of any Overlease. Notwithstanding anything to the contrary, in the event that an Overlease is terminated, Conviva shall vacate the associated Facility in accordance with the terms of such Overlease.

**Section 7.03**    Each Party shall indemnify and hold harmless the other Party in accordance with **Article IX** hereof, provided that the Parties mutually waive all rights and claims against each other for all losses to the extent covered by their respective insurance policies, and waive all rights of subrogation of their respective insurers. The Parties agree that their respective insurance policies are now, or shall be, endorsed such that said waiver of subrogation shall not affect the right of the insured to recover thereunder.

**Section 7.04**    With respect to any utility service only currently paid for by Service Providers (directly to a utility provider, or as a reimbursement to landlord), Service Providers will not cease the current utility services and will use commercially reasonable efforts to continue all utility services in substantially the same manner as provided as of the date of this Agreement and Conviva will pay for such utility services in accordance with **Section 5.01** above. Service Providers shall use reasonable efforts at no cost to Service Providers to enforce any obligations of the landlord under the Overlease applicable to the Facility.

**Section 7.05**    During the Facility Term, Service Providers shall not breach or default under the Overleases or terminate any Overlease other than at the express direction of Conviva.

**Section 7.06**    The license rights to the extent granted pursuant to this **Article VII** shall be in the nature of a license and shall not create a leasehold (or right to grant a sublicense or sub-leasehold to any unaffiliated third party) or other estate or possessory rights in Conviva with respect to the Facilities or Common Areas.

**Section 7.07**    Any rights under this **Article VII** shall be subject and subordinate to the applicable Overlease, all matters to which an Overlease is subject, including without limitation to any mortgage or deed of trust thereon or on the fee simple interest in the building or the land on

16

which the Facilities are located. Each Party shall use commercially reasonable efforts to abide by the other Party's security, access, and confidentiality requirements (to the extent disclosed), shall not disturb the business of the other.

## ARTICLE VIII
## DATA AND INTELLECTUAL PROPERTY

**Section 8.01  Ownership of Data**. Subject to the following sentence, Conviva shall own all right, title, and interest in and to all Conviva Data. Excluding Conviva Data, the applicable Service Provider shall be the sole and exclusive owner of all data of a technical or administrative nature relating solely to (a) the operation of the Services infrastructure or (b) such Service Provider and its Affiliates' Intellectual Property rights to the extent same are not included in the "Purchased Assets" acquired by Conviva pursuant to the Purchase Agreement.

**Section 8.02  Security Measures and Breaches**. Service Providers shall (and shall ensure that its representatives, including Transitional Employees and independent contractors) (a) take all reasonable technical and organizational measures necessary to ensure that the Conviva Data is protected against, and shall be liable for any and all loss, destruction, damage, and unauthorized access, use, modification, disclosure, and other misuse of Conviva Data, including such measures as logically separating Conviva Data from all other data and addressing any new security-related issues, including compliance with applicable Laws related to security and issues in connection with new technologies or threats, (b) ensure that only people with a specific need have access to Conviva Data (and that no other third parties to whom Service Providers or any of their Affiliates are providing services has access to any Conviva Data), and (c) not make any use of or attempt to gain access to any part of Conviva's business systems and communications networks or to any Conviva Data not specifically made available to Service Providers under this Agreement. Promptly upon discovery of an actual or suspected breach of the security of any Conviva Data, including any loss, destruction, damage, or unauthorized activity or access, or any violation of any Privacy and Security Laws ("**Security Incident**"), Service Providers shall (i) provide prompt written notice to Conviva explaining the nature and scope of such Security Incident, (ii) provide Conviva with reasonable assistance in connection with any investigation Conviva deems reasonably necessary (including any forensic investigation) into such Security Incident, and (iii) be responsible for all reasonable costs associated with such Security Incident relating to breach notification, breach remediation, and identity protection services that are required by applicable Law. Conviva shall control all communications and notifications regarding any such Security Incident as it relates to Conviva Data; *provided that* nothing in this Agreement shall be interpreted to prohibit Service Providers from complying with applicable Laws and their own contractual or other legal obligations; provided further that Service Providers shall provide notice to Conviva of any such inability to comply.

**Section 8.03  Treatment of Personal Information**. Service Providers shall (and shall ensure that their representatives, including Transitional Employees and independent contractors) (a) Process Personal Information under this Agreement only at the direction of Conviva, (b) perform the Services in compliance with all applicable Laws related to the privacy, security, or Processing of any Personal Information ("**Privacy and Security Laws**"), (c) not do or omit to do anything in connection with this Agreement that will (or could reasonably be expected to) cause Conviva to be in breach of any applicable Privacy and Security Laws, and (d) not Process Personal

Information in any manner that violates this Agreement or any applicable Privacy and Security Law, or for any purpose other than to the extent necessary to provide the Services, all of the above *provided that* nothing in this **Section 8.03** shall be interpreted to prohibit Service Providers from complying with applicable Laws and their own contractual or other legal obligations; provided further that Service Providers shall provide notice to Conviva of any such inability to comply.

Section 8.04   **Business Associate Agreement**. Service Providers will, or are likely to, create, maintain, receive and/or transmit certain Protected Health Information, as defined by the Health Insurance Portability and Accountability Act of 1996, as amended ("**HIPAA**"), in conjunction with the Services. In conformity with the regulations at 45 C.F.R. Parts 160-164 implementing the privacy and security requirements of HIPAA (the "**Privacy and Security Rules**"), the Parties have entered into a written agreement that meets the applicable requirements of the Privacy and Security Rules, and such written agreement is attached hereto and made a part hereof as **Exhibit 1** (the "**Business Associate Agreement**" or "**BAA**"). The BAA is in addition to the terms and conditions of this Agreement, and to the extent that the terms and condition of the BAA are stricter than, conflict with, or are otherwise inconsistent with this Agreement (except for the BAA), the terms and conditions of the BAA shall prevail.

Section 8.05   **Ownership of Intellectual Property Rights**.

(a)       Except for the Intellectual Property included as "Purchased Assets" and acquired by Conviva pursuant to the Purchase Agreement, each of the Parties shall retain all right, title and interest in and to their respective Intellectual Property in existence prior to the Effective Date. Except as otherwise expressly agreed to in writing for any given Service, Conviva shall exclusively own all right, title, and interest throughout the world in and to all Intellectual Property developed, created, authored, or invented ("**Developed**") by or on behalf of the Service Providers through or in connection with performance of the Services or under this Agreement that relate solely to the Business (collectively "**Developed IP**"), and Service Providers agree to and hereby do irrevocably assign any and all right, title, or interest they may have in Developed IP to Conviva. Service Providers shall promptly execute any documents and promptly take any other actions reasonably requested by Conviva to effectuate the purposes of this **Section 8.05(a)**. Service Providers hereby grant to Conviva a royalty-free, worldwide, non-exclusive, perpetual, irrevocable, freely transferable, and sublicensable license to use, copy, modify and/or apply to register with any registry authorized under any Laws any (i) Service Provider Intellectual Property incorporated into or necessary for the use or operation of any of the Developed IP, such Intellectual Property in connection with the use or operation of any Services or exploiting the Developed IP and (ii) other Intellectual Property that is Developed under this Agreement that does not constitute Developed IP and that is incorporated into or necessary for the use or operation of any Services or any other deliverable or work product delivered by Service Providers to Conviva.

(b)       To the extent Intellectual Property is not included in the "Purchased Assets" acquired by Conviva pursuant to the Purchase Agreement, during the Term of this Agreement, each Party hereby grants on behalf of itself and its Affiliates to the other Part(y)(ies) and its or their Affiliates, a limited, royalty-free, fully paid-up, worldwide, non-sublicensable, non-exclusive, non-transferable license solely during the Term in, to and under all Intellectual Property, software, technology and data owned or controlled by such Party or any of its Affiliates, solely to the extent necessary for, as applicable, the Service Providers to provide the Services and Conviva

18

to receive and use the Services. Any and all goodwill arising from a Party's use of another Party's Trademarks under such license shall inure solely to the Party that owns or controls such Trademark. Following termination or expiration of this Agreement, each Party shall immediately cease using, and for any physical items promptly destroy or return, any Intellectual Property, software, technology or data owned or controlled by the other Party, except any Intellectual Property subject to any right or license granted to such Party hereunder or under the Purchase Agreement.

Section 8.06   **Ownership of Transferred Patient Records**. In addition to the Patient Records included as "Purchased Assets" and acquired by Conviva pursuant to the Purchase Agreement and in no way limiting such acquisition and ownership of Patient Records, effective as of the Effective Date or as generated by Service Providers on Conviva's behalf on or after the Effective Date during the Term of this Agreement, Service Providers hereby transfer custody, possession, and control of the Transferred Patient Records to Conviva. Conviva shall act as the "records owner" of the Transferred Patient Records for purposes of § 456.057 of the Florida Statutes and under any other applicable Laws.

Section 8.07   **Access to Facilities**. Conviva shall allow Service Providers and their subsidiaries reasonable access to the facilities of Conviva necessary for Service Providers to fulfill their obligations under this Agreement. Service Providers shall, and shall cause their subsidiaries to, allow Conviva and its representatives reasonable access to the facilities of Service Providers to the extent necessary for Conviva to fulfill its obligations, and receive the benefit of the Services, under this Agreement. Notwithstanding the other rights of access of the Parties under this Agreement, Service Providers shall afford Conviva, following not less than five (5) business days' prior written notice from Conviva, reasonable access during normal business hours to the facilities, information (including Business data), systems, infrastructure, and personnel of Service Providers as reasonably necessary for Conviva (i) to verify the adequacy of internal controls over information technology, reporting of financial data, and related processes employed in connection with the Services, including in connection with verifying compliance with Section 404 of the Sarbanes-Oxley Act of 2002, or (ii) to transition or migrate a Service provided under this Agreement from Service Providers to Conviva or a service provider engaged for the Service by Conviva; *provided*, *however*, such access shall not unreasonably interfere with any of the business or operations of such Party or its Subsidiaries and shall not require Service Providers to disclose any information that is protected by privilege, trade secret, or similar protection.

## ARTICLE IX
## INDEMNIFICATION; LIMITATION OF LIABILITY

Section 9.01   **Service Providers Indemnification**. Service Providers shall indemnify, defend and hold harmless Conviva from and against any and all Losses in connection with a third party claim relating to, arising out of or resulting from (a) the gross negligence, willful misconduct, or fraud of any Service Provider, (b) any claim that the Services provided by any Service Provider infringe or otherwise violate any Intellectual Property of any third party, (c) any Service Provider's material breach of this Agreement, or (d) any Service Provider's employment or engagement, or termination of employment or engagement, of employees or other service providers, except to the extent that the Losses arise from Conviva's gross negligence, willful misconduct, fraud, or breach of this Agreement.

19

**Section 9.02    Conviva Indemnification**. Conviva shall indemnify, defend, and hold harmless Service Providers from and against any and all Losses in connection with a third party claim relating to, arising out of or resulting from (a) the gross negligence, willful misconduct, or fraud of Conviva, or (b) Conviva's material breach of this Agreement, in each case, except to the extent that the Losses arise from any Service Provider's gross negligence, willful misconduct, fraud, or breach of this Agreement.

**Section 9.03    Notice of Claims**. A Party or Parties entitled to indemnification hereunder (the "**Indemnified Party**") will give the Party or Parties required to provide such indemnification (the "**Indemnifying Party**") prompt written notice of any legal proceeding, claim or demand instituted by any third party (in each case, a "**Claim**") in respect of which the Indemnified Party or Parties are entitled to indemnification hereunder; *provided that* the failure to provide such notice shall not affect the rights of the Indemnified Party or Parties hereunder except in the event and to the extent that the Indemnifying Party or Parties are actually and materially prejudiced by such failure.

**Section 9.04    Defense and Settlement**. The Indemnifying Party or Parties shall have the right, by giving written notice to the Indemnified Party or Parties, at its or their option and expense, to defend against, negotiate, settle, or otherwise deal with any Claim with respect to which it or they are the Indemnifying Party and to have the Indemnified Party or Parties represented by counsel, reasonably satisfactory to the Indemnified Party or Parties, selected by the Indemnifying Party or Parties; *provided that* the Indemnified Party or Parties may participate in any proceeding with counsel of its or their choice and at its or their expense; and, *provided further*, that the Indemnifying Party or Parties may not enter into a settlement of any such Claim without the consent of the Indemnified Party or Parties unless such settlement requires no more than a monetary payment for which the Indemnified Party or Parties are fully indemnified to the extent required hereunder or involves other matters not binding upon or affecting the Indemnified Party or Parties and the Indemnified Party or Parties receive or are otherwise entitled to the benefit of a full release. The Indemnified Party or Parties shall not settle or compromise any Claim for which it or they are entitled to indemnification hereunder without the prior written consent of the Indemnifying Party or Parties, which shall not be unreasonably withheld or delayed. The Parties will cooperate fully with each other in connection with the defense, negotiation or settlement of any Claim.

**Section 9.05    Limitation of Liability**.

(a)    Except for claims based on Fraud and the rights of the Parties to seek injunctive relief or specific performance as provided in this Agreement, the Parties acknowledge and agree that following the termination of the Term of this Agreement the indemnities provided for in this Article IX are the sole and exclusive remedies of the Indemnified Parties for any breach of this Agreement.  In no event shall Service Providers have any obligation to indemnify the Conviva for any Losses under this Agreement in an aggregate amount in excess of or any amount other than the Holdback Amount.

(b)    Without prejudice or limitation to any other remedies available to Conviva, in the event that Conviva as an Indemnified Party is entitled to any amounts hereunder or indemnification pursuant to this Agreement, Conviva may set-off such amount solely against the

Holdback Amount. In the event Conviva as an Indemnified Party has made a good faith claim for indemnification hereunder and any Service Provider disputes its obligation to make such indemnification, Conviva may nonetheless withhold the amount of such claimed indemnification from the Holdback Amount until such dispute is resolved and such withholding shall not be deemed a default by Conviva hereunder.

(c)　　EXCEPT WITH RESPECT TO LIABILITY FOR PAYMENTS IN ACCORDANCE WITH **Article V,** A PARTY'S BREACH OF **Article VI** OR **Article VIII**, (A) IN NO EVENT SHALL EITHER PARTY BE LIABLE, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE, FOR ANY LOSSES ARISING FROM OR RELATED TO THIS AGREEMENT THAT ARE IN THE NATURE OF LOST PROFITS OR INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, SPECULATIVE OR INCIDENTAL DAMAGES, REGARDLESS OF WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND (B) IN NO EVENT SHALL CONVIVA'S LIABILITY OR THE SERVICE PROVIDERS' COLLECTIVE LIABILITY HEREUNDER EXCEED THE AGGREGATE OF ALL AMOUNTS PAID TO SERVICE PROVIDERS DURING THE TERM OF THIS AGREEMENT

## ARTICLE X
## TERMINATION; EFFECT OF TERMINATION

**Section 10.01  Term**. This Agreement shall become effective upon the Effective Date of this Agreement and shall remain in effect until the earlier of (a) expiration or termination of all Services, or (b) the Hard Stop Date (the "**Term**"). Conviva may terminate this Agreement, upon at least thirty (30) days' prior notice to Service Providers in writing, in which case the only fees for which Conviva shall be liable with respect to this Agreement shall be any costs incurred by Service Providers for provision of the Service(s) prior to the effective date of termination, as well as Severance Pay as otherwise expressly set forth in this Agreement.

**Section 10.02  Breach**. Service Providers may terminate this Agreement effective upon written notice to Conviva, if Conviva fails to pay or cause to be paid, when due, any payment required under this Agreement that is not subject of a good faith dispute, if such failure is not remedied within ten (10) Business days after written notice of such failure is given by Service Providers. Conviva may terminate this Agreement if any Service Provider materially breaches this Agreement, and such breach is incapable of cure, or with respect to a breach capable of cure, the applicable Service Provider does not cure such breach within thirty (30) days after receipt of written notice from Conviva of such breach. Service Providers may terminate this Agreement immediately upon written notice to Conviva if Conviva files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law or makes or seeks to make a general assignment for the benefit of its creditors or applies for or consents to the appointment of a trustee, receiver or custodian for it or a substantial part of its property.

**Section 10.03  Effect of Termination**. Upon termination of this Agreement all obligations of the Parties hereto shall terminate, except for the provisions of Article **VI**, **Article VIII**, **Article IX**, Article **X**, and Article **XI**, which will survive any such termination or expiration of this Agreement.

**Section 10.04  Destruction Process; Attestation.** No later than sixty (60) days following the end of the Term, each Service Provider shall permanently and irretrievably delete or destroy or return to Conviva (and shall cause its Affiliates and any of its or their subcontractors to permanently and irretrievably delete or destroy or return to Conviva), as directed by Conviva, all Conviva Data, including all copies thereof, in any form, format, or media, in its possession, custody, or control (and in the possession, custody, or control of its Affiliates any of its or their subcontractors) such that all such Conviva Data has been rendered unusable and inaccessible, in all cases in compliance with all applicable Laws, including Healthcare Laws (the foregoing process shall be referred to as the "**Destruction Process**"), and shall certify in writing to Conviva that all Conviva Data has been so deleted or destroyed using the attestation form attached hereto as **Exhibit 2**.

<div align="center">

**ARTICLE XI**
**MISCELLANEOUS**

</div>

**Section 11.01  Further Assurances**. The Parties shall execute and deliver such other documents and instruments, and take such other actions, as any Party may reasonably request in order to effectuate the transactions contemplated by this Agreement.

**Section 11.02  Independent Contractors**. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the Parties, and, except as set forth in this Agreement, neither Party shall have authority to contract for or bind the other Party in any manner whatsoever. Conviva acknowledges that Service Providers are not in the business of providing the Services to third parties and that Service Providers are entering into this Agreement only in connection with the transactions contemplated under the Purchase Agreement.

**Section 11.03  Notices**. All notices, requests, demands, and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when received if delivered personally; mailed by first class mail, postage prepaid, registered or certified mail, return receipt requested; delivered by Federal Express or other overnight courier service; or sent by facsimile, e-mail, or other online transmission system with written confirmation of delivery, as follows:

If to Conviva:    Conviva Medical Center Management, LLC
c/o Humana Inc.
500 West Main Street
Louisville, Kentucky 40202
Attention: Joseph M. Ruschell, Vice President, Associate General
    Counsel & Corporate Secretary
Email: JRuschell1@humana.com


If to Service Providers:    MB Medical Operations, LLC
1175 Peachtree St NE
Suite 1000

<div align="center">22</div>

Atlanta, GA 30361
Attention: Nicholas Campbell
Email Address: nick@wearemeru.com


With a copy to:
Berger Singerman LLP
1450 Brickell Avenue
Suite 1900
Miami, FL 33131
Attention: Paul Singerman
Email Address: Singerman@bergersingerman.com


**Section 11.04  Governing Law**. This Agreement, the negotiation, terms and performance of this Agreement, the rights of the parties under this Agreement, and all actions arising in whole or in part under or in connection with this Agreement, are to be governed by and construed in accordance with the domestic substantive Laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule that would cause the application of the Laws of any other jurisdiction.

**Section 11.05  Submission to Jurisdiction and Venue; Waiver of Jury Trial.**

(a)      Any suit, action, or proceeding relating to, arising out of or based upon this Agreement, shall be brought or otherwise commenced in the Bankruptcy Court provided that the Bankruptcy Cases remain pending or the Bankruptcy Court has retained jurisdiction, and otherwise in the state court of the state of Delaware located in the city of Wilmington and county of New Castle. Each Party expressly and irrevocably submits to the exclusive jurisdiction of such court in connection with any such suit, action or proceeding. Each Party agrees that service of all process in any such proceeding or other legal action may be made by notice to the applicable Party at its address provided in accordance with **Section 11.03** is sufficient to convey personal jurisdiction over the applicable Party in any such proceeding or other legal action, and otherwise constitutes effective and binding service in every respect. The Parties irrevocably and unconditionally waive any objection to personal jurisdiction and the laying of venue of any suit, action or any proceeding in such court and irrevocably waive and agree not to plead or claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. EACH PARTY HEREBY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY PROCEEDING IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT.

**Section 11.06  Interpretation; Section Headings**. The section headings contained herein are for purposes of convenience only and shall not be deemed to constitute a part of this Agreement or to affect the meaning or interpretation of this Agreement in any way. The word "including" shall mean including without limitation. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty

23

pertains to the existence of the document or other item itself). Words of any gender used in this Agreement shall be held and construed to include any other gender; words in the singular shall be held to include the plural and words in the plural shall be held to include the singular, unless and only to the extent the context indicates otherwise. "Hereunder," "hereof," "hereto," "herein," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Section or other provision hereof. References to documents, instruments or agreements shall be deemed to refer as well to all addenda, appendices, Exhibits, Schedules or amendments thereto. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" mean "to but excluding" and the word "through" means "to and including."

   **Section 11.07  Entire Agreement**. This Agreement (including the Schedules and Exhibits referred to herein) sets forth the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersedes all prior agreements, arrangements, and understandings, whether written or oral, related to the subject matter hereof. No representation, promise, inducement, or statement of intention related to the subject matter hereof has been made by any party hereto which is not embodied in this Agreement, or in the Exhibits or Schedules attached hereto or the written statements, certificates, or other documents delivered pursuant hereto.

   **Section 11.08  Amendment; No Waiver**. This Agreement may be amended, modified, superseded, or canceled, and any of the terms, provisions, covenants, representations, warranties, or conditions hereof may be waived, only by a written instrument executed by all Parties hereto, or, in the case of a waiver, by the Party waiving compliance. The failure of any party at any time or times to require performance of any provision hereof shall in no manner affect the right to enforce the same. No waiver by any Party of any condition, or of the breach of any term, provision, covenant, representation, or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of the breach of any other term, provision, covenant, representation, or warranty.

   **Section 11.09  Severability**. In the event that any one or more of the provisions of this Agreement shall be held or otherwise found to be invalid, illegal, or unenforceable, all other provisions hereof shall be given effect separately therefrom and shall not be affected thereby. Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable. Any term or provision of this Agreement that is invalid, illegal, or unenforceable in any jurisdiction shall not affect the validity or enforceability of the validity or enforceability of the offending term or provision in any other jurisdiction.

   **Section 11.10  Assignment**. None of the Parties may assign, delegate, or otherwise transfer this Agreement or any of its rights or obligations hereunder without the prior written consent of the other Party, except that either Party may, without the other Party's prior written consent, assign, delegate, or transfer any of its rights or obligations to one or more Affiliates or to one or more successors-in-interest in connection with a sale of some or all of the Business.

**Section 11.11 Counterparts**. Separate copies of this Agreement may be signed by the Parties hereto, with the same effect as though all of the Parties had signed one copy of this Agreement. Signatures sent by facsimile or electronic transmission shall be deemed to be originals for all purposes of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**MB MEDICAL OPERATIONS, LLC**

By: _____

Name: _____

Title: _____


**MB MEDICAL TRANSPORT, LLC**

By: _____

Name: _____

Title: _____


**CARE CENTER NETWORK, LLC**

By: _____

Name: _____

Title: _____


**CLINICAL CARE PHARMACY, LLC**

By: _____

Name: _____

Title: _____

**CLINICAL CARE MEDICAL GROUP, LLC**

By: _____

Name: _____

Title: _____

**FLORIDA FAMILY PRIMARY CARE CENTER, LLC**

By: _____

Name: _____

Title: _____

**FLORIDA FAMILY PRIMARY CARE CENTERS OF PASCO, LLC**

By: _____

Name: _____

Title: _____

**FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC**

By: _____

Name: _____

Title: _____

**FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC**

By: _____

Name: _____

Title: _____

**FLORIDA FAMILY PRIMARY CARE CENTERS OF ORLANDO, LLC**

By: _____

Name: _____

Title: _____

**CCMC PHYSICIAN HOLDINGS, INC.**

By: _____

Name: _____

Title: _____


**MIAMI MEDICAL & WELLNESS CENTER LLC**

By: _____

Name: _____

Title: _____


**[RODOLFO DUMENIGO, M.D., P.A.]**

By: _____

Name: _____

Title: _____


**MIAMI BEACH MEDICAL CONSULTANTS, LLC**

By: _____

Name: _____

Title: _____

## Schedule A

**Services; Funding Amount**

See attached.

**Schedule A**
**Services**

Service Providers will provide the Services during the Term of the Agreement for the sole benefit of Conviva and subject to any direction or instructions provided by Conviva. The Services together are generally described as the continued operation of the Business for Conviva's account in substantially the same manner as operated over the 12-month period preceding the Closing Date and shall include all services, functions, and responsibilities reasonably related to all activities, tasks, and operations of the Business routinely performed over the 12-month period preceding the Closing Date as generally described below, and, even if not specifically described in the Agreement or this Exhibit shall include all services, functions and responsibilities which are an inherent or necessary part or subpart of and which are required for the proper performance and provisions of the Services described herein. The provision of all Services is subject to the terms and conditions of the Agreement, including Section 3 thereof.

As part of the transition of the operation of the Business to Conviva, certain general categories of activities are identified herein including the Service Providers' Vendor Contracts (defined in Table 6.0 below) that must be maintained by Service Providers in its performance of the Services.

Without limiting the description of the Services above, Services shall include the following categories of functions and responsibilities.

| # | Support / Function/ Activity | Description of Service | Service Term | Service Fee |
|---|---|---|---|---|
| | | **0.0 GENERAL** | | |
| 0.1 | Operation of Business | Continue to operate the Business, for the benefit of and the account of Conviva, and, unless and except to the extent otherwise directed by Conviva, in substantially the same manner as operated over the 12-month period preceding the Closing Date. | During the Term | All Business Expenses (as defined herein) will continue to be paid by the Service Providers and will be reimbursed by the Conviva as further described in Section 2.0 herein. There are no additional fees for the Services. |

602797137.23

**Schedule A**

**Services**

| # | Support / Function/ Activity | Description of Service | Service Term |
|---|---|---|---|
| | | **1.0  EMPLOYMENT OF TRANSITIONAL EMPLOYEES** | |
| 1.1 | Employment of Transitional Employees | Employ the Transitional Employees as provided in Section 5.05 of the Agreement. | Until the Transfer Date |
| 1.2 | General HR Function for Transitional Employees | With respect to the Transitional Employees, Service Providers shall continue to perform all human resources functions, activities and tasks that are necessary for the ongoing operation of the Business including, without limitation, the following: <br>• Payroll <br>• Benefits & Benefit Administration <br>• HR Policies and Procedures <br>• HR day to day services <br>• Employee support services <br>• Human Capital Management <br>• Recruiting <br>• Onboarding <br>• Goal Management <br>• Talent & Performance Management <br>• Talent Assessment / Skills Management <br>• Development Planning <br>• Timekeeping <br>• Absence Tracking <br>• Feedback <br>• Recognition <br>• Contingent Worker Management <br>• Learning Management <br>• Leaves | Until the Transfer Date |

2

602797137.23

**Schedule A**

**Services**

| # | Support / Function/ Activity | Description of Service | Service Term |
|---|---|---|---|
| | | Such services will include paying or causing the payment of (i) all compensation and benefits of the Transitional Employees; (ii) all other expenses and payments required to be made to or for the benefit of the Transitional Employees pursuant to employment agreements or other applicable agreements with the Service Providers in connection with the Business; (iii) other payroll expenses incurred with respect thereto; and (iv) all Taxes required to be paid in connection therewith (collectively, the "Transitional Employee Payroll Costs"). | |
| 1.3 | Credentialing of Transitional Employees | Service Providers will cooperate with Conviva and ensure that all applicable Transitional Employees cooperate with and provide all required information to Conviva for its credentialing process (e.g., credentialing for employment) for physician and midlevel clinicians. | Until the Transfer Date |
| 1.4 | Licenses | Service Providers will maintain and provide Conviva with all licenses, registrations and certifications (as applicable) for all Transitional Employees providing the Services that are in roles requiring a license, registration, certification or other similar credentialing documentation. | Until the Transfer Date |
| 1.5 | OIG / SAM / AHCA OMPI | Service Providers will provide and submit all information as and when requested by Conviva with respect to employees and vendors as reasonably necessary for Conviva to monitor the General Service Administration System for Award Management (SAM), Office of the Inspector General (OIG), and Florida Agency for Health Care Administration's Office of Medicaid Program Integrity exclusions and sanctions lists. | Until the Transfer Date |
| 1.6 | CAQH ProView | Service Providers will maintain and manage all CAQH ProView accounts and profiles accounts for the Business. Service Providers will ensure that all Service Provider clinician employees providing Services are registered in the CAQH credentialing database and that each profile remains active. Service Providers will provide Conviva with all reasonably requested information, documentation, and access to the CAQH credentialing database and user accounts. | Until the Transfer Date |
| 1.7 | Cooperation | Service Providers acknowledge and agree that Conviva will engage in credentialing efforts for all Transitional Employees in clinical roles, including the nurse practitioners and physician assistants, and will fully cooperate and cause all such Transitional Employees to fully cooperate in such efforts. | Until the Transfer Date |

3

**Schedule A**

**Services**

| # | Support / Function / Activity | Description of Service | Service Term |
|---|---|---|---|
| | | **2.0  FINANCE & ACCOUNTING** | |
| 2.1 | General Finance & Accounting | Service Providers will staff, maintain, operate and systematically support the finance and accounting functions of the Business (including the provision by Service Providers of all necessary technical and non-technical infrastructure) to provide all of back office finance and accounting services as they relate to and support the Business ("Accounting Services"). These Accounting Services will continue to be performed using the same knowledgeable personnel, software and other processes and tools as used prior to Closing and include, but are not limited to: Monthly financial close (revenue, claims, admin, etc.), Treasury functions, FFS accounting, Reconciliations, Tax, Accounts Payable, T&E, Payroll and Benefits accounting, Finance needs around IT and IT related projects, facility/lease accounting. | Until the Transition Date |
| 2.2 | Bank Accounts | Service Providers will collaborate with Conviva in providing data from all payers/payors that support the revenue/claims on financial statements and cash settlements support from payers/payors for surplus. Service Providers will provide all necessary assistance as required to Conviva to transition the Purchased Assets to its own accounts. | Until the Transition Date |
| 2.3 | Cash Reconciliation | Service Providers will provide cash reconciliation reports in the format and at the frequency mutually agreed between Conviva and Service Providers. Service Providers will provide a controlled cash reconciliation process to be established with detailed reporting. | Until the Transition Date |
| 2.4 | Receivables / Billing | Service Providers will continue to invoice and collect for the services provided by the Business ("Billing Services"), including runout of dates of service through EMR migration. Billing Services include without limitation:<br>• Dental Services<br>• Invoicing for all professional services<br>• Collections for all professional services<br>• Accounts Receivables report by Payer (DOS Range: Close Date – Current) | Until the Transition Date |
| 2.5 | Business Expenses | Service Providers will continue to pay all Business Expenses (defined below) incurred in providing the Services and for operating the Business. Transitioned staff and new hires to the centers will continue to have access to corporate credit cards and travel/expensing systems. Service Providers will assist in processing of approvals per existing expense policies.  Service Providers will provide a spreadsheet showing all expenses paid during the month related to the post-Close period by end of day (EOD) on the fifteenth (15th) business day following the month being closed. | Until the Transition Date |

4

**Schedule A**

**Services**

| # | Support / Function / Activity | Description of Service | Service Term |
|---|---|---|---|
| 2.6 | General Ledger | Service Providers will send the general ledger integration file for the prior month's GL data by end of the 15th business day after the Closing Date, but prior to the final business day of the month (i.e. September GL data would be provided by the end of the 15th business day after the Closing Date in October), and after the 1st of each calendar month. Service Providers will provide monthly balance sheet reconciliations by account by the 20th day each calendar month. Service Providers will align all budget reporting with Conviva processes. | Until the Transition Date |
| 2.7 | Revenue Cycle Management | Billing and collections financial management for dental services, including without limitation:<br>• Month end reporting<br>    • Service cash receipts reconciliation<br>    • Provide Conviva access to all financial and accounting information including without limitation, billing, accounts receivable, payables and cash operations. | Until the Transition Date |
| 2.8 | Remittance of Net Receipts to Conviva | As a component of the Services described in this Section 2.0, Service Providers will provide a reconciliation to Conviva by the end of the 20th business day after the 1st of each calendar month of all Business Revenues and Business Expenses for such month, together with a calculation of the Net Receipts. Such reconciliation shall include description of all Pre-Closing payments for Services and shall identify any expenses that are incurred which are not Business Expenses (e.g. pre-closing expenses).<br>No later than five business days after Conviva's request, Service Providers will cause the amount of Net Receipts specified by Conviva in such request to be transferred and distributed to Conviva. As used herein, (a) "Business Revenues" means all funds received by Service Providers from or relating to the operation of the Business or the Purchased Assets including, without limitation, all cash and cash equivalents, accounts receivable, and other payments made for the provision of professional services, treatments, tests procedures and supplies and other items or services rendered to patients of the Business for services provided after the Closing Date or otherwise relating to periods following the Closing Date, including payments with respect to service funds, capitation payments, ACO payments, medical risk adjustments, HEDIS bonus payments, surpluses or similar amounts, in each case from any source, that relate to the period after the Closing Date; (b) "Business Expenses" means, with respect to any period, all actual out-of-pocket costs and payables incurred in the operation of the Business in substantially the same manner as operated over the 12-month period preceding the Closing Date (other than changes contemplated under | Until the Transition Date |

**Schedule A**

**Services**

| # | Support / Function/ Activity | Description of Service | Service Term |
|---|---|---|---|
| | | this Agreement, including such changes as required by Conviva) and paid by Service Providers in the provision of the Services, including all Transitional Employee Payroll Costs, and payments under the Vendor Contracts applicable to the Term for the applicable Vendor Contract but excluding termination fees under such Vendor Contracts, Taxes, other than income taxes (if any) of the Service Providers and payments under any retention agreements; (c) "Net Receipts" means, with respect to any period, (i) all Business Revenues less (ii) all Business Expenses. For the avoidance of doubt, the Business Expenses (w) shall not include and shall not be deemed to incorporate in any manner Excluded Liabilities or any other Service Providers' Liabilities not related to the operation of the Business, (x) shall not include any income taxes of Service Providers or their owners and (y) shall not include any liabilities or expenses arising out of Service Providers' termination of any Vendor Contract. Similarly, Business Revenues shall not include any Pre-Closing payments for Services or other Excluded Assets. | |
| 2.9 | Tax Filings | Provide such assistance and services as required by the Purchase Agreement, including but not limited to: preparation of monthly sales and use tax returns (if applicable), provision of necessary documentation for all relevant sales (i.e. provision of fixed asset data for property tax and tax depreciation purposes), property, franchise, income, and other tax filings, and compilation of information for quarterly estimated tax payments. | Until the Transition Date |
| 2.10 | Taxpayer Identification | Service Providers grant and will provide all necessary cooperation to permit Conviva to use Service Provider's taxpayer identification number(s) ("TIN") for administrative, non-tax, transition purposes and with respect to accounts receivable arising out of professional medical services rendered for periods on and after the Closing Date, including access to payor websites linked to the Service Providers' TIN. | Until the Transition Date |
| 2.12 | Processing of Rent Payment | Service Providers will continue processing of rent payments for the properties included in the Purchased Assets. | Until the Transition Date |

| # | Support / Function/ Activity | Description of Service | Service Term |
|---|---|---|---|
| | | **3.0  INFORMATION TECHNOLOGY (IT)** | |

6

**Schedule A**

**Services**

| # | Support / Function / Activity | Description of Service | Service Term |
|---|---|---|---|
| 3.1 | IT Software, Security and Support | Continued use and access to all software licenses, services & maintenance items by Conviva (and Service Providers in performance of the Services), including by way of example and not as an exhaustive listing:<br><br>• Microsoft 365<br>• Telephony device and application support including Contact Center<br>• IT Help Desk Services (break/fix; end user support) including deskside support where available<br>• Firewalls & Security tools (e.g., EDR, end point encryption, vulnerability scanning, anti-virus)<br>• ISP Management / Cloud Agreements and Licenses<br>• IT Device Support (laptops, desktops, tablets, printers, network infrastructure)<br>• Procurement License Management<br>• Business Continuity / Disaster Recovery<br>• Monitoring of the technology environment and associated applications/services<br>• VPN for Remote Access<br>• Identity and Access Management Services<br>• Data Loss Protection (DLP) protecting email, internet traffic, cloud and end-point<br>• IT Network closet support and monitoring<br>• Mobile Device Management / BYOD support<br>• Accounting Systems<br><br>For the avoidance of doubt, as used herein, "continued use" means continued use by the Business. | Until the Transition Date |
| 3.2 | Telecommunications Infrastructure | Continued use and access by Conviva (and Service Providers in performance of the Services) to all telecommunications services, including by way of example and not as an exhaustive listing:<br><br>• Data circuits<br>• Network hardware (routers/switches/firewalls/fax machines)<br>• Telephone lines including fax lines. If requested, Service Providers agree to port toll-free numbers, local numbers and fax numbers to Conviva's ownership. | Until the Transition Date |

7

**Schedule A**

**Services**

| # | Support / Function/ Activity | Description of Service | Service Term |
|---|---|---|---|
| | | • After-hours answering service routing<br>• Wireless Network<br>• Mobile device plans and support | |
| 3.3 | Other IT Infrastructure, Data Center | Continued use, access and ongoing maintenance and monitoring of all IT databases, data files, data logs, back-up systems and repositories by Conviva and Service Providers in performance of Services. | Until the Transition Date |
| 3.4 | Multifunction Devices | Continued use and access to all leases and related services for all multifunction devices, including copiers. Service Providers shall remove such hardware and devices from the Locations, other Business premises and Facilities at such time as requested by Conviva, but not later than the Transition Date, provided that Service Providers shall permanently destroy all Conviva Data in accordance with HIPAA from such hardware and devices prior to such removal. Following such removal and no later than the Transition Date, Service Providers shall provide Conviva with a certification in the form attached to this Agreement attesting to the permanent destruction of all Conviva Data from such sources (including all Conviva Data remaining on any such hardware and devices). | Until the Transition Date |
| 3.5 | Websites and Digital Properties | Continue to host and provide Conviva with access to all Domain Names, websites, social media location pages and any associated business/provider listings and the general public with access to all public-facing websites, as applicable and at sitelevel if applicable, in each case containing features and functionality substantially similar to those offered prior to Closing, except as otherwise directed by Conviva.  Provide all ongoing maintenance necessary to maintain and permit access to all websites and domains by Conviva. Execute required location level redirects from primary website and applicable digital properties. Enable transfer of ownership of location based social media presence (i.e. Facebook location pages) and transfer of ownership of any associated business/provider listings (i.e. Google business listings). | Until the Transition Date |
| 3.6 | Email Domains / End User Drives | Continued use and access of and to email domain(s), data, addresses, shared mailboxes, distribution lists, calendars and contacts, and all similar email items and functionality for Transitional Employees. Ongoing hosting and maintenance of the same by Service Providers. Service Providers to assist in transition of content created on/after Closing (e.g., Email, OneDrive, SharePoint) that may require Service Providers engagement to support Conviva activity to migrate and/or archive such content out of Service Providers' Collaboration | Until the Transition Date |

8

**Schedule A**

**Services**

| # | Support / Function/ Activity | Description of Service | Service Term |
|---|---|---|---|
| | | platform (e.g., Microsoft 365; G-Suite). | |
| 3.7 | IT Security Operations and Incident Response | Service Providers will continue to provide security operations, incident response and continuance of IT Compliance Support. Service Providers will be responsible for cyber response in the event of a Security Incident, audit, lost or stolen assets, compliance or regulatory issues. In the event of a ransomware Security Incident, Conviva should be notified immediately by phone and email at emosier2@centerwell.com. Remediation of identified security issues or vulnerabilities identified in Service Providers' security assessment/audit where applicable. Service Providers to communicate to the PCO Conviva's IT incident team any outages or other multi-user changes or events which provide full or partial disruption of business operations within 24 hours. | Until the Transition Date |
| 3.8 | End User Computing | Service Providers will provide end user computing services for employees compromising of asset management, device security (encryption, malware and virus protection, patching, security monitoring), end-point management and end-user support. Asset management includes ensuring physical devices remain onsite or in the possession of an identified associate during the transition period. Service Providers will track devices by serial number and manage using Service Providers' existing endpoint management and discovery tools. Service Providers will ensure continued end user access to leased or owned hardware to continue to support operations. Should end user devices be leased, data should be removed at the end of the transition period and provided back to Service Providers. | Until the Transition Date |
| 3.9 | Transition of Patient Records | Facilitate and assist in transfer of patient records to Conviva. | Until the Transition Date |
| 3.10 | EMR, Population Health, and Center Workflow Technology Applications | Service Providers will provide the following during the transition period: | Until the Transition Date |

**Schedule A**

**Services**

| # | Support / Function/ Activity | Description of Service | Service Term |
|---|---|---|---|
| | | <ul><li>Ensure transitional employees maintain access to EMR, Population Health, and other Center workflow technology applications</li><li>Provide technical support of the current EMR including integrated products, e.g. interfaces, devices, etc.</li><li>Adding or removing users as required.</li><li>Training new users as required.</li><li>Make required configuration changes for in-scope facilities.</li><li>Make required changes to any outgoing patient facing messages for in-scope facilities.</li><li>Provide list of access permissions for in-scope users.</li><li>Retain complete record/no deletion of existing data prior to data migration.</li><li>Provide reporting of data for facilities in-scope upon request.</li></ul> | |
| 3.11 | IT | Service Providers should provide IT coordination between Service Providers' leader(s) who oversee network and field service activities and IT coordination for principals who oversee the EMR and clinical software operations and technology. | Until the Transition Date |
| 3.12 | Planned Outages/Continued Cooperation | Service Providers to communicate to the PCO Conviva's IT incident team any planned outages or other multi-user changes or events which provide full or partial disruption of business operations and proactive notification of planned change events (within five (5) business days).<br><br>Service Providers should provide up to ten (10) hours per week of IT coordination between Service Providers' leader(s) who oversee network and field service activities and ten (10) hours per week of IT coordination for principals who oversee the EMR and clinical software operations and technology.<br><br>Service Providers to provide monthly logs of site-specific or user- specific maintenance events and help desk calls as well as reports which detail field service and network management activities and uptime for each center included within the sale. For any locations currently under construction, Service Providers must complete those projects in full and remit all amounts owed to the contracted vendors | Until the Transition Date |

10

602797137.23

**Schedule A**

**Services**

| # | Support / Function/ Activity | Description of Service | Service Term |
|---|---|---|---|
| | | **4.0  DENTAL PAYOR CONTRACTS** | |
| 4.1 | Clearinghouse website(s) | Service Providers will provide Conviva with access to dental clearinghouse website to monitor claims, remittance files, and enrollment. Service Providers will cooperate with Conviva and grant Conviva permission to enroll itself in certain systems or to initiate changes within the Service Providers' current platforms in order to assist with the monitoring, submission, or reconciliation of accounts for periods on or after the Closing Date. | Until the Transition Date |
| 4.2 | Communications | Service Providers will grant Conviva the right to contact payors to obtain payment on claims for services rendered on, or after Closing. | Until the Transition Date |
| 4.3 | Contracting | Service Providers will continue to operate clinics and the Service Providers will continue to provide care under existing Service Provider dental contracts, collaborating with Conviva in transitional services. | Until the Transition Date |

| # | Support / Function/ Activity | Description of Service | Service Term |
|---|---|---|---|
| | | **5.0  SITE MANAGEMENT/SAFTEY/SECURITY** | |
| 5.1 | General day-to-day Site Management | Service Providers will continue all site management activities, tasks and functions for the facilities and the properties included in the Purchased Assets or Business, including, by way of example and not as an exhaustive list:<br>• Medical, pharmaceutical, hazardous and other waste disposal services- Document shredding services<br>• HVAC services<br>• Janitorial services<br>• Pest control services<br>• Mat services<br>• Mail equipment rental service<br>• Mail and other customary office supplies | Until the Transition Date |

11

602797137.23

**Schedule A**

**Services**

| | | | |
|---|---|---|---|
| 5.2 | Facility Permits / Training / Monitoring | • Repairs & maintenance services<br>• Fire extinguisher/sprinkler & smoke detection services<br>• Plumbing services<br>• Signage<br>• Water treatment and filtration services<br>• Water dispenser services<br>• Utilities<br>• Medical device management and support, excluding AEDs<br>• Landscaping (if applicable)<br>• Fire alarm monitoring<br>• Parking agreements (if applicable)<br><br>Service Providers will maintain (and provide copies to Conviva of) all necessary licenses and permits for the operation of the Business including, by way of example and not as an exhaustive list:<br>• Biohazard waste permits<br>• Security (i.e. intrusion alarms and access control systems), sprinkler and fire/smoke detection inspections and permits<br>• Radiation safety/dosimeter monitoring for x-rays<br>• Health Care Clinic Establishment Permits<br>• CLIA Waivers | Until the Transition Date |
| 5.3 | Storage Facilities | Service Providers will maintain all off-site storage facilities used by the Business to store medical records, Business records and/or any other assets of the Business until such time Conviva is able to physically relocate all such records and items. | Until the Transition Date |
| 5.4 | Clinic Leases | Service Providers will grant Conviva the right to utilize Service Providers' clinic licenses for purposes of operating | Until the Transition Date |
| 5.5 | Regulatory inspections (OSHA, EPA, Fire Dept., Health Dept) | Service Providers to promptly notify Humana Safety in the event of any regulatory inspections, letters, inquires, etc., including, AHCA, OSHA, EPA, Fire Marshal, Fire Dept. and Health Dept. Conviva will manage any and all such inspections, in coordination with the Service Providers. | Until the Transition Date |

12

**Schedule A**
**Services**

| # | Support / Function/ Activity | Description of Service | Service Term |
|---|---|---|---|
| | | **6.0  COOPERATION / MISCELLANEOUS** | |
| 6.1 | Vendor Contracts/ Service Provider Relationships | Service Providers will provide Conviva with access to and use of all Vendor Contracts and other arrangements with service providers that support the Business. | Until the Transition Date |
| | | A list of Vendor Contracts and other service providers that support the Business is attached to this Exhibit A as Annex 1 ("Vendor Contracts"). Service Providers shall maintain the Vendor Contracts and service provider relationships in good standing according to their terms and conditions and as necessary and required to properly provide the Services. Service Providers shall cooperate with Conviva as necessary for Conviva to evaluate the service providers for each Vendor Contract and the terms and conditions of the Vendor Contracts in Conviva's efforts to evaluate, in Conviva's sole discretion, whether to transition the service provider relationship to Conviva by novation or otherwise or if transition is not desired to terminate the service provider's relationship with the Business (termination/cancellation of the contractual obligation of Service Providers (if any) with such service provider by Vendor Contract or otherwise is Service Providers' sole responsibility and obligation). | |
| 6.2 | Communications | Service Providers will cooperate to ensure that Conviva or its agents receive all communications relevant to the Business. With respect to each Contract that is intended to be an Purchased Asset but is (i) not assigned to Conviva at Closing, or (ii) the counterparty does not provide information to Conviva on a timely basis and continues to provide information only to Service Provider, Service Providers shall provide Conviva with all information requested by Conviva relating thereto (including with respect to payor contracts, service fund information) until such time as that Contract is assigned to Conviva and/or the counterparty commences providing information directly to Conviva | Until the Transition Date |
| 6.3 | Transition Assistance – General | Service Providers shall provide Conviva with all information reasonably requested by Conviva regarding the Services to support Conviva in assuming responsibility for, and continuing the performance of, the Services in an orderly manner. Service Providers will promptly respond to all such requests. | Until the Transition Date |
| | | Service Providers shall also assist Conviva as reasonably requested by Conviva in conducting the cutover of the Services and supporting Conviva's commencement of the operations of the Business. | |

13

**Schedule A**

**Services**

| # | Support / Function/ Activity | Description of Service | Service Term |
|---|---|---|---|
| 6.4 | Records / Audit | During the Term of this Agreement, Service Providers shall make available upon request, books, records and other data in connection with the Services provided in the instance that Conviva determines to audit. Upon termination of the Agreement, Service Providers shall deliver to Conviva all (a) Purchased Assets retained by Service Providers during performance of the Services and (b) books, records and other data, and information created on behalf of Conviva and its Affiliates in connection with the Services. | Until the Transition Date |
| 6.5 | Educational Affiliation Agreements | Service Providers will permit Conviva to use Educational Affiliation Agreements through the Term of this Agreement. Service Providers will provide an index of the Educational Affiliation Agreements in place as well as contact information to assist Conviva's work to establish corresponding relationships with the same institutions | Until the Transition Date |
| 6.6 | RX Dispensing | Service Providers will continue to support prescription dispensing during the TSA period as they do today, including the maintenance of all applicable licenses necessary to dispense. | Until the Transition Date |

| # | Support / Function/ Activity | Description of Service | Service Term |
|---|---|---|---|
| | | **7.0  OPERATIONS** | |
| 7.1 | Health Plan Credentialing | Service Providers will manage health plan credentialing as managed during the Baseline Period and collaborate with Conviva's credentialing team on all roster updates and move related to the transition (payor credentialing). Service Providers will provide a direct point of contact to review and triage provider credentialing issues in an identified timely manner | Until the Transfer Date |
| 7.2 | Referrals, HIMs | Service Providers will continue to support referrals and HIMs via centralized Florida-based teams as was customary prior to Close. Service Providers will continue to work with the Referral and HIMs team members who work within acquired markets | Until the Transition Date |

14

602797137.23

**Schedule A**

**Services**

| | | | |
|---|---|---|---|
| | | Service Providers will support and enable local sales teams, in accordance with Conviva's policies and procedures and at the direction of Conviva, including:<br><br>• Service Providers will provide sales operations and reporting to enable growth team management and incentive calculation aligned to currently established reporting cadence,<br><br>• Service Providers will continue to provide access to Salesforce, marketing collateral creation tools, and new patient paperwork completion tools, and<br><br>• Service Providers will maintain sites in broker directories, and will take actions related to promotion of centers in these platforms per Conviva's request (i.e. winding down certain relationships and activities). | Until the Transfer Date |
| 7.3 | Sales / Growth | | |
| 7.4 | On-call/After-hours support | Service Providers will continue to support on-call & after-hours, services as supported by the Business prior to Closing, leveraging any providers or Vendors in place prior to Closing | Until the Transition Date |
| 7.5 | Care Management | Continued support of all care management/transitions programs via central support teams and telephonic based teams | Until the Transition Date |

15

602797137.23

**Schedule A**

**Services**

| 7.6 | Key Performance Indicators (KPIs) | Service Providers shall provide Conviva with the following Key Performance Indicators (KPIs), as requested by Conviva: <br> • NPS - net promoter score and sufficient detail to perform service recovery (score, survey comments a old patient data) <br> • 3rd Next Available app <br> • Clinic and provider Membership data by payer - incl. details sales and term data <br> • Phone queue performance (abandonment rates, answer rates, etc.) <br> • Center Queues - data on unsigned notes, referrals, HIMS, etc. <br> • Documentation rates - redocumentation and suspect condition action data <br> • HCCT/Care Management reporting - case load, visit and call activity tracking <br> • Acute Admits per Thousand (APT) <br> • Emergency Room Visits per Thousand (EM VPT) <br> • Screening rates - reporting screening activity for example: EVHO, COPD, substance use/abuse, dementia <br> • Transition of care follow-up percentages <br> • Disease prevalence data | Until the Transition Date |

**Schedule A**
**Services**

**ANNEX 1**

**VENDOR CONTRACTS**
See attached

17

CONFIDENTIAL

# Clinical Care Medical Centers

Estimated TSA Costs Summary (Month 1)
($ in 000s)

10/9/24
DRAFT - SUBJECT TO REVISION

| | Fcst. 1 12/13 | Fcst. 2 12/20 | Fcst. 3 12/27 | Fcst. 4 1/3 | Fcst. Month 1 TSA Period |
|---|---|---|---|---|---|
| **Estimated TSA Costs** | | | | | |
| Estimated Employee TSA Costs, Net of Discontinued Services | 2,467 | - | 2,467 | - | 4,934 |
| Estimated Specialist TSA Costs | 80 | 80 | 80 | 80 | 321 |
| Rent, Net of Rejected Clinic Leases (North Miami West and Orlando) | - | - | - | 583 | 583 |
| Utilities and Facilities Expenses | - | - | - | 200 | 200 |
| Transportation | 50 | 50 | 50 | 50 | 200 |
| Software and Other Technology Fees | 62 | 62 | 62 | 62 | 300 |
| Business Process Outsourcing | 119 | 119 | 119 | 119 | 477 |
| Office Expenses | 88 | 88 | 88 | 88 | 353 |
| Marketing and Advertising | 72 | 72 | 72 | 72 | 287 |
| MSO | 62 | 62 | 62 | 62 | 250 |
| Medical Supplies/Patient Service Costs | 50 | 50 | 50 | 50 | 200 |
| Insurance | 36 | 36 | 36 | 36 | 144 |
| CapEx | 30 | 30 | 30 | 30 | 118 |
| Est. UST Fees | 33 | 33 | 33 | 33 | 133 |
| **Total Estimated TSA Costs** | $ 3,149 | $ 682 | $ 3,149 | $ 1,503 | $ 8,485 |
| | | | | | |
| **Estimated Discontinued Services** | | | | | |
| Estimated Severance – Chiropractor | 35 | - | - | - | 35 |
| Estimated Severance – Optometry | 14 | - | - | - | 14 |
| Estimated Severance – Massage Therapy | 259 | - | - | - | 259 |
| Estimated Severance - PRP | 219 | - | - | - | 219 |
| **Total Estimated Discontinued Services (Severance)** | $ 527 | $ - | $ - | $ - | $ 527 |
| | | | | | |
| **Total Estimated Costs** | $ 3,677 | $ 682 | $ 3,149 | $ 1,503 | $ 9,012 |
| | | | | | |
| Beginning Book Cash Balance | - | 8,323 | 7,641 | 4,491 | - |
| (+/-) Operating Disbursements | (3,677) | (682) | (3,149) | (1,503) | (9,012) |
| (+) TSA Financing | 12,000 | - | - | - | 12,000 |
| **Ending Book Cash Balance** | $ 8,323 | $ 7,641 | $ 4,491 | $ 2,988 | $ 2,988 |

**Notes**

1. Assumes deal close of 12/6
2. Excludes revenue and receipts
3. Funding need assumes that ending cash balance remains at $2M or greater. Excess funds will carry over to fund subsequent TSA period
4. Severance amount shown includes 60 days of pay for 46 FTE who work in the Chiropractor (2), Optometry (2), and Massage Therapy departments (32). Also includes 10 FTE in PRP who may be re-deployed to other
5. Disbursements to specialists excludes 5 specialists in Optometry and Chiropractor areas

CONFIDENTIAL

## Clinical Care Medical Centers

Estimated TSA Costs (Assuming 12/6 Close and 90 Day TSA Period)

($ in 000s)

**10/9/24**

**DRAFT - SUBJECT TO REVISION**

| | Fcst 1 12/13 | Fcst 2 12/20 | Fcst 3 12/27 | Fcst 4 1/3 | Fcst Month 1 TSA Period |
|---|---|---|---|---|---|
| **Estimated Employee TSA Costs** | | | | | |
| Payroll TSA-0.0 General // 1.0 Employment of Transitional Employees | 283 | - | 283 | - | 565 |
| Payroll TSA-2.0 Finance & Accounting | 78 | - | 78 | - | 78 |
| Payroll TSA-3.0 Information Technology (IT) | 52 | - | 52 | - | 103 |
| Payroll TSA-4.0 Site Management/Sydney/Security | 51 | - | 51 | - | 102 |
| Payroll TSA-4.0 Cooperation / Miscellaneous | 38 | - | 38 | - | 76 |
| Payroll TSA-4.0 Medical Coding | 114 | - | 114 | - | 228 |
| Payroll TSA-8.X.X Operations (Acupuncture) | 11 | - | 11 | - | 21 |
| Payroll TSA-8.X.X Operations (Clinical Staff) | 10 | - | 10 | - | 21 |
| Payroll TSA-8.X.X Operations (Clinical Support) | 214 | - | 214 | - | 427 |
| Payroll TSA-8.X.X Operations (Dental) | 85 | - | 85 | - | 171 |
| Payroll TSA-8.X.X Operations (MDO) | 24 | - | 24 | - | 48 |
| Payroll TSA-8.X.X Operations (Pediatrics) | 35 | - | 35 | - | 49 |
| Payroll TSA-8.X.X Operations (Podiatry) | 22 | - | 22 | - | 43 |
| Payroll TSA-8.X.X Operations (Providers) | 519 | - | 519 | - | 1,039 |
| Payroll TSA-8.X.X Operations (Transportation) | 99 | - | 99 | - | 198 |
| Payroll TSA-8.4 Wellness, Inns | 54 | - | 54 | - | 108 |
| Payroll TSA-8.3 Sales / Growth | 82 | - | 82 | - | 163 |
| Payroll TSA-8.4.4 Rcp | 74 | - | 74 | - | 148 |
| Payroll TSA-8.5 On-Call/After-Hours Support | 158 | - | 158 | - | 316 |
| Payroll TSA-8.X.X Operations (Chiropractor) | 275 | - | 275 | - | 549 |
| Payroll TSA-8.X.X Operations (Optometry) | - | - | - | - | - |
| Payroll TSA-8.X.X Operations (Massage Therapy) | 21 | - | 21 | - | 40 |
| Payroll TSA-8.X.X Operations (Cardiology) | 170 | - | 170 | - | 360 |
| Payroll TSA-8.X.X Estimated Self-Insurance Claims | | | | | |
| **Estimated Employee TSA Costs** | $ 2,667 | $ - | $ 2,467 | $ - | $ 4,934 |
| | | | | | |
| **Estimated Specialist TSA Costs** | | | | | |
| 8.X Operations (Specialists - Physician) | 34 | | 34 | 34 | 135 |
| 8.X Operations (Specialists - Psychiatrist) | 4 | | 4 | 4 | 17 |
| 8.X Operations (Specialists - Dermatologist) | 2 | | 2 | 2 | 8 |
| 8.X Operations (Specialists - Podiatrist) | 2 | | 2 | 2 | 7 |
| 8.X Operations (Specialists - Acupuncturist) | 4 | | 4 | 4 | 9 |
| 8.X Operations (Specialists - RN/APRN) | 1 | | 1 | 1 | 16 |
| 8.X Operations (Specialists - PCbH Consultant) | 2 | | 2 | 2 | 3 |
| 8.X Operations (Specialists - Radiology) | 2 | | 2 | 2 | 6 |
| 8.X Operations (Specialists - Home Assistance) | 27 | | 27 | 27 | 109 |
| 8.X Operations (Specialists - Chiropractor) | 0 | | 0 | 0 | 3 |
| 8.X Operations (Specialists - Optometry) | 0 | | 0 | 0 | |
| 8.X Operations (Specialists - Misc) | 3 | | 3 | 3 | 10 |
| **Estimated Specialist TSA Costs** | $ 80 | $ - | $ 80 | $ 80 | $ 321 |
| | | | | | |
| **Non-Employee Costs (Passthrough)** | | | | | |
| Rent / Net of Rejected Clinic Leases (North Miami West and Orlando) | 50 | 50 | 50 | 583 | 583 |
| Utilities and Facilities Expenses | 62 | 62 | 62 | 50 | 200 |
| Transportation | 119 | 119 | 119 | 300 | 485 |
| Software and Other Technology Fees | 88 | 88 | 88 | 119 | 477 |
| Business Process Outsourcing | 72 | 72 | 72 | 88 | 353 |
| Office Expenses | 42 | 42 | 42 | 72 | 287 |
| Marketing and Advertising | 50 | 50 | 50 | 42 | 250 |
| MDO | 36 | 36 | 36 | 50 | 200 |
| Medical Supplies/Patient Service Costs | 30 | 30 | 30 | 36 | 144 |
| Insurance | 33 | 33 | 33 | 30 | 118 |
| CopEX | | | | 33 | 133 |
| Est. U/I Fees | | | | 33 | |
| **Estimated Non-Employee TSA Costs (Passthrough)** | $ 602 | $ 602 | $ 602 | $ 1,425 | $ 3,330 |
| | | | | | |
| **Total Estimated TSA Costs** | $ 3,477 | $ 682 | $ 3,149 | $ 1,503 | $ 9,012 |
| | | | | | |
| **Estimated Discontinued Services (Severance)** | | | | | |
| Estimated Severance - Chiropractor | 35 | | | | 35 |
| Estimated Severance - Optometry | 14 | | | | 14 |
| Estimated Severance - Massage Therapy | 259 | | | | 259 |
| Estimated Severance - PRP | 219 | | | | 219 |
| **Total Estimated Discontinued Services (Severance)** | $ 527 | $ - | $ - | $ - | $ 527 |
| | | | | | |
| Beginning Book Cash Balance | $ 3,477 | $ 682 | $ 3,149 | $ 1,503 | $ 9,012 |
| (+/-) Operating Disbursements | (8,477) | 8,323 | 7,641 | 4,491 | (1,503) |
| (+) TSA Funding | 12,000 | | | | 12,000 |
| (-) Return of Excess funds to Humana | | (462) | (3,149) | (1,503) | |
| **Ending Book Cash Balance** | $ 8,323 | $ 7,641 | $ 4,491 | $ 2,988 | $ 2,988 |

**Notes**

1 Assumes deal close of 12/6
2 Excludes revenues and receipts
3 Funding need assumes that ending cash balance remains at $2M or greater. Excess funds will carry over to fund subsequent TSA period
4 Severance amount shown includes 60 days of pay for 44 FTE who work in the Chiropractor (2), Optometry (2), and Massage Therapy departments (32). Also includes 10 FTE in PRP who may be re-deployed to other area
5 Disbursements to specialists excludes 1 specialist in Optometry and Chiropractor areas

DRAFT - SUBJECT TO FRE 408 AND RELATED PRIVILEGES

## **Schedule B**

### **Facilities**

See attached.

### SCHEDULE B
### FACILITIES

1. 7495 N. University Drive (bays 26 & 27), Tamarac, FL
2. 7455 N. University Drive (bay 7), Tamarac FL
3. 7453 N. University Drive (bay 6), Tamarac FL
4. 9855, 9861, 9863 E. Fern St., Palmetto Bay, FL
5. 4980 W. 10th Ave., Hialeah, FL
6. 9601 and 9611 SW 40th St., Miami, FL[1]
7. 7291 W. Atlantic Ave., Delray Beach, FL
8. 12615/12625 W. Dixie Hwy., North Miami, FL
9. 1303 South Semoran Blvd., Orlando FL
10. 701-709 NW 27th Ave, Miami FL
11. 9540 SW 39th Street, Miami FL
12. 2417, 2419, 2449 & 2459 Hwy 98 N, Lakeland, FL
13. 201 1st St. S, Winter Haven, FL

---

[1] Lease includes Sellers' expansion into adjacent building, which is located at 9601 SW 40th St., Miami, FL.

## **Exhibit 1**

**Business Associate Agreement**

See attached.

## BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement (this "**Agreement**") is made and entered into as of [\_\_\_], 2024 (the "**Effective Date**"), by and between MB Medical Operations, LLC, a Delaware limited liability company ("**MBMO**"), MB Medical Transport, LLC, a Delaware limited liability company ("**MBMT**"), Care Center Network, LLC, a Florida limited liability company ("**CCN**"), Clinical Care Pharmacy, LLC, a Florida limited liability company ("**CCP**"),  Care Center Medical Group, LLC,  a Florida limited liability company ("**CCMG**"),  Florida Family Primary Care Center, LLC, a Florida limited liability company ("**FFPCC**"), Florida Family Primary Care Centers of Tampa, LLC, a Florida limited liability company ("**FFPCCT**"), Florida Family Primary Care Centers of Pasco, LLC, a Florida limited liability company ("**FFPCCP**"), Florida Family Primary Care Centers of Pinellas, LLC, a Florida limited liability company ("**FFPCCPL**"), Florida Family Primary Care Centers of Orlando, LLC, a Florida limited liability company ("**FFPCCO**"), CCMC Physician Holdings, Inc., a Florida limited liability company ("**CCMC Holdings**"), Miami Medical & Wellness Center LLC, a Florida limited liability company ("**MMWC**"), Miami Beach Medical Centers, Inc. f/k/a Rodolfo Dumenigo, M.D., P.A., a Florida professional association ("**RD**"), Miami Beach Medical Consultants, LLC d/b/a Clinical Care Medical Centers, a Florida limited liability company ("**MBMC**" and collectively with MBMO, MBMT, CCN, CCP, CCMG. FFPCC, FFCCT, FFPCCP, FFPCCPL, FFPCCO, CCMC Holdings, MMWC, and RD, the "**Sellers**", or the "**Subcontractors**", and each, a "**Subcontractor,**" or the "**Service Providers**", and each, a "**Service Provider**"), and Conviva Medical Center Management, LLC, a Delaware limited liability company ("**Conviva,**" the "**Buyer,**" or "**Business Associate,**" and together with Service Providers, the "**Parties**").

**WHEREAS**, on the Effective Date, Buyer and Sellers entered into that certain Asset Purchase Agreement (as amended, restated, modified, or supplemented from time to time, the "**Purchase Agreement**") pursuant to which the Buyer will acquire from Sellers certain assets of Sellers' clinics and medical practice ("**Purchased Assets**");

**WHEREAS**, under existing arrangements, Buyer provides services to the Covered Entities (defined below) as a "business associate" as such term is defined under 45 C.F.R. § 160.103;

**WHEREAS**, in connection with the Purchase Agreement, Buyer and Sellers entered into that certain Transition Services Agreement ("**TSA**") whereby Buyer desires Sellers to provide certain transitional services ("**Services**") to Buyer during which a Subcontractor may receive from, and/or create, receive, maintain or transmit on behalf of, Business Associate or the Covered Entities information that constitutes Protected Health Information subject to the terms and conditions of this Agreement; and

**WHEREAS**, the Parties are committed to compliance with the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act of 2009 (at Title XIII, D of the American Recovery and Reinvestment Act of 2009), and their implementing regulations as in effect from time to time (collectively, the "**HIPAA**").

**NOW, THEREFORE**, in the context of the foregoing recitals and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby enter into this Agreement and agree as follows:

## I.    DEFINITIONS

Capitalized terms not otherwise defined in this Agreement shall have the meanings given to them in HIPAA.

A.    "**Breach**" shall have the same meaning as the term "breach" in 45 C.F.R. §164.402.

B.    "**Covered Entities**" shall mean the providers affiliated with Conviva, which are recipients of services from one or more Service Provider(s) as a result of the TSA, and that are covered entities that receive certain of the Purchased Assets and are continuing to serve patients, and any of their respective subsidiaries, or affiliates or parents that are "covered entities," as such term is defined by HIPAA, and, in each case, that are parties to or beneficiaries of or receive the benefit of or participate in the Services.

C.    "**Designated Record Set**" shall mean a "designated record set" as such term is defined in 45 C.F.R. §164.501, containing Protected Health Information that is created, acquired, received, used, maintained or accessed by a Business Associate, its employees, agents or representatives.

D.    "**Electronic Protected Health Information**" shall have the same meaning as the term "electronic protected health information" in 45 C.F.R. §160.103, limited to the information received from, and/or created, received, maintained or transmitted on behalf of, Business Associate or the Covered Entities, by Subcontractor.

E.    "**Individual**" shall have the same meaning as the term "individual" in 45 C.F.R. §160.103 and shall include a person who qualifies as a Personal Representative in accordance with 45 C.F.R. §164.502(g).

F.    "**Protected Health Information**" shall have the same meaning as the term "protected health information" in 45 C.F.R. §160.103, limited to information received from, and/or created, received, maintained or transmitted on behalf of, Business Associate or the Covered Entities, by a Subcontractor.

G.    "**Required by Law**" shall have the same meaning as the term "required by law" in 45 C.F.R. §160.103.

H.    "**Secretary**" means the Secretary of the U.S. Department of Health and Human Services or his/her designee.

I.    "**Security Incident**" shall have the same meaning as the term "security incident" in 45 C.F.R. §164.304.

J.    "**Unsecured Protected Health Information**" shall have the same meaning given to the term "unsecured protected health information" in 45 C.F.R. §164.402.

## II.    OBLIGATIONS OF THE SUBCONTRACTOR

A.    The Subcontractors will not use or further disclose Protected Health Information, other than as permitted or required by this Agreement or as Required by Law.

B.    The Subcontractors will use appropriate safeguards, and comply with Subpart C of 45 C.F.R. Part 164 with respect to Electronic Protected Health Information, to prevent use or disclosure of such Protected Health Information other than as provided for by this Agreement.

C.    The Subcontractors agree to report to the Business Associate any use or disclosure of Protected Health Information not provided for by this Agreement or any successful Security Incident of which they become aware. This Section II.C shall be deemed to constitute notice of the ongoing occurrence of any unsuccessful Security Incidents.

D.      Without unreasonable delay and in no case later than fifteen (15) business days following discovery, unless otherwise required under 45 C.F.R. §164.412, Subcontractors shall notify the Business Associate in writing of any Breach of Unsecured Protected Health Information.  Subcontractors shall provide the Business Associate, to the extent known, the identity of each Individual whose Unsecured Protected Health Information has, or is reasonably believed by Subcontractors to have been affected by the Breach.

E.      In accordance with 45 C.F.R. §§164.502(e)(1)(ii) and 164.308(b)(2), Subcontractors agree to ensure that any other subcontractor that creates, receives, maintains or transmits Protected Health Information on behalf of the Subcontractors agrees to the same restrictions and conditions that apply through this Agreement to Subcontractors with respect to such information.

F.      Subcontractors agree to provide access, at the request of the Business Associate, within a reasonable timeframe requested by the Business Associate, to Protected Health Information in a Designated Record Set in order that Business Associate may facilitate a Covered Entity to meet the requirements under 45 C.F.R. §164.524 and any other applicable federal or state law.

G.      If Subcontractors maintain Protected Health Information in a Designated Record Set, Subcontractors shall within fifteen (15) business days of receipt forward any request to make amendment(s) to Protected Health Information in a Designated Record Set to Business Associate as required by 45 C.F.R. §164.526.

H.      Subcontractors agree to document such disclosures of Protected Health Information and information related to such disclosures as would be required for Business Associate to facilitate a Covered Entity's response to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. §164.528 and to provide such information to Business Associate within the timeframe requested by Business Associate.

I.      In the performance of services, Subcontractors will make reasonable efforts to use, to disclose, and to request only the minimum amount of Protected Health Information reasonably necessary to accomplish the intended purpose of the use, disclosure or request, as Required by Law.

J.      Subcontractors agree to make internal practices, books, and records related to the use and disclosure of Protected Health Information available to the Secretary, in a time and manner designated by the Secretary, for purposes of the Secretary determining compliance with HIPAA.

K.       To the extent Subcontractors are to carry out one of more of a Covered Entity's obligation(s) under Subpart E of 45 C.F.R. Part 164, Subcontractors shall comply with the requirements of Subpart E that apply to the Covered Entity in the performance of such obligation(s).

## III.    PERMITTED USES AND DISCLOSURES BY THE SUBCONTRACTOR

A.      Except as otherwise limited in this Agreement, Subcontractors may:

(1)     Use or disclose Protected Health Information for purposes of performing Services pursuant to the arrangement between the Parties, provided such use or disclosure of Protected Health Information would not violate Subpart E of 45 C.F.R. Part 164 if done by Business Associate, except for the specific uses and disclosures set forth below.

(2)     Use Protected Health Information for the proper management and administration of the Subcontractor or to fulfill any present or future legal responsibilities of the Subcontractor.

(3)     Disclose Protected Health Information for the proper management and administration of the Subcontractor or to fulfill any present or future legal responsibilities of the Subcontractor, provided that such disclosure is either Required by Law or the Subcontractor obtains reasonable assurances from any person to whom Protected Health Information is disclosed that such person will: (a) keep such information confidential; (b) use or further disclose such information only for the purpose for which it was disclosed to such person or as Required by Law; and (c) notify Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

(4)     The Subcontractors may use Protected Health Information to report violations of law to appropriate federal and state authorities, consistent with 45 C.F.R. §164.502(j)(1).

## IV.    OBLIGATIONS OF THE BUYER

A.     The Business Associate will not request Subcontractors to use or disclose Protected Health Information in any manner that would not be permissible under Subpart E of 45 C.F.R. Part 164 if done by Business Associate or is not otherwise authorized or permitted under this Agreement.

B.     Business Associate agrees that it shall only disclose the "minimum necessary" Protected Health Information to Subcontractors as may be required for Subcontractors to perform the Services.

C.     Business Associate shall require that each Covered Entity notify Subcontractors in writing of any limitation(s) in its notice of privacy practices, if applicable, to the extent that such limitation may affect Subcontractors' use or disclosure of Protected Health Information.

D.     Business Associate shall require that each Covered Entity promptly notify Subcontractors in writing of any changes in, or revocation of, permission by an Individual to use or disclose Protected Health Information, to the extent such changes may affect Subcontractors' use or disclosure of Protected Health Information.

E.     Business Associate shall require that each Covered Entity promptly notify Subcontractors in writing of any restriction on use or disclosure of Protected Health Information that the Covered Entity has agreed to in accordance with 45 C.F.R. §164.522, to the extent that such restriction may affect Subcontractors' use or disclosure of Protected Health Information.

## V.    TERMINATION

A.     <u>Term</u>. The term of this Agreement shall be effective as of the Effective Date and shall terminate on the expiration or termination of the TSA. Upon termination of this Agreement for any reason, the Subcontractors shall:

(1)     Retain only that portion of the Protected Health Information which is necessary for Subcontractors to continue their proper management and administration or to carry out their legal responsibilities;

(2)     Within thirty (30) days of termination of this Agreement, destroy the remaining Protected Health Information that Subcontractors still maintain in any form.  Subcontractors shall

certify in writing to Business Associate and the Covered Entities that all Protected Health Information has been destroyed using the attestation form attached hereto as Appendix A;

(3)     Continue to use appropriate safeguards and comply with Subpart C of 45 CFR Part 164 with respect to Electronic Protected Health Information that is retained under Section V.A.(1) to prevent use or disclosure of the Protected Health Information for as long as Subcontractors retain the Protected Health Information;

(4)     Not use or disclose the Protected Health Information retained by Subcontractors other than for the purposes for which such Protected Health Information was retained and subject to the same conditions set out in Section III above under "*Permitted Uses and Disclosures By Subcontractors*" that apply prior to termination; and

(5)     Destroy the Protected Health Information retained by Subcontractors within thirty (30) days following a notification in writing from Business Associate that such Protected Health Information is no longer needed by Business Associate for its proper management and administration or to carry out its legal responsibilities.  Subcontractors shall certify in writing to Business Associate and the Covered Entities that all Protected Health Information has been destroyed using the attestation form attached hereto as Appendix A.

B.     <u>Survival</u>.  The obligations of Subcontractors under this section shall survive the termination of this Agreement.

## VII.    MISCELLANEOUS

A.     <u>Regulatory References</u>.  A reference in this Agreement to a section in HIPAA means that section as amended from time to time; provided that if future amendments change the designation to a section referred to herein, or transfer a substantive regulatory provision referred to herein to a different section, the section references herein will be deemed to be amended accordingly.

B.     <u>Amendment</u>.  The Parties agree to take such action as is reasonably necessary to amend this Agreement from time to time as is necessary for the Business Associate, the Covered Entities, and the Subcontractors to comply with the requirements of HIPAA.

C.     <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by electronic copies, each of which shall be deemed to be an original.

D.     <u>No Third-Party Beneficiaries</u>.  Nothing express or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than the Parties, and their respective successors and assigns, any rights, remedies, obligations or liabilities whatsoever.

E.     <u>Interpretation</u>.  The Parties agree that any ambiguity in this Agreement shall be resolved in favor of a meaning that complies and is consistent with HIPAA.

F.     <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

*[signature page follows]*

**IN WITNESS WHEREOF**, the Parties hereto have duly executed this Agreement as of the Effective Date.

**CONVIVA MEDICAL CENTER MANAGEMENT, LLC**

By: _____

Name: _____

Title: _____


**MB MEDICAL OPERATIONS, LLC**

By: _____

Name: _____

Title: _____


**MB MEDICAL TRANSPORT, LLC**

By: _____

Name: _____

Title: _____


**CARE CENTER NETWORK, LLC**

By: _____

Name: _____

Title: _____

**CLINICAL CARE PHARMACY, LLC**

By: _____

Name: _____

Title: _____


**CLINICAL CARE MEDICAL GROUP, LLC**

By: _____

Name: _____

Title: _____


**FLORIDA FAMILY PRIMARY CARE CENTER, LLC**

By: _____

Name: _____

Title: _____


**FLORIDA FAMILY PRIMARY CARE CENTERS OF PASCO, LLC**

By: _____

Name: _____

Title: _____


*[Signature Page to Business Associate Agreement]*

**FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC**

By: _____

Name: _____

Title: _____

**FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC**

By: _____

Name: _____

Title: _____

**FLORIDA FAMILY PRIMARY CARE CENTERS OF ORLANDO, LLC**

By: _____

Name: _____

Title: _____

**CCMC PHYSICIAN HOLDINGS, INC.**

By: _____

Name: _____

Title: _____

*[Signature Page to Business Associate Agreement]*

**MIAMI MEDICAL & WELLNESS CENTER LLC**

By: _____

Name: _____

Title: _____


**MIAMI BEACH MEDICAL CENTERS, INC. F/K/A RODOLFO DUMENIGO, M.D., P.A.**

By: _____

Name: _____

Title: _____


**MIAMI BEACH MEDICAL CONSULTANTS, LLC**

By: _____

Name: _____

Title: _____

**Appendix A**
**Destruction Attestation**

By signing below, **[_____]** hereby certifies and attests that:

- Except for any Protected Health Information that [_____] is required to retain and maintain under applicable law and/or as it is permitted to retain under this Agreement, it has destroyed all Protected Health Information of the Covered Entities (as defined in the Business Associate Agreement) in its possession or custody, including, without limitation, any and all originals and copies of Protected Health Information that may be maintained by [_____], its employees, or contractors, in hard copy or on or in any server, computer, device, EMR or EHR platform, web-based file sharing or transfer site, document management and storage system, database, electronic application, email, system and network log, telephone log, voicemails, internal and peripheral storage devices (e.g., removable media, thumb drives, flash drives, CDs/DVDs, audiotapes, and other memory storage devices)

[_____]

By: _____
Name:
Title:

## **Exhibit 2**

**Form of Certification**

See attached.

**Exhibit C**

**<u>Intellectual Property Assignments</u>**

## TRADEMARK ASSIGNMENT AGREEMENT

This **TRADEMARK ASSIGNMENT AGREEMENT** ("**Agreement**") is made and entered into as of the [•] day of [•], 2024 by and between MB Medical Operations, LLC, a Delaware limited liability company ("**MBMO**"), MB Medical Transport, LLC, a Delaware limited liability company ("**MBMT**"), Care Center Network, LLC, a Florida limited liability company ("**CCN**"), Clinical Care Pharmacy, LLC, a Florida limited liability company ("**CCP**"), Care Center Medical Group, LLC, a Florida limited liability company ("**CCMG**"), Florida Family Primary Care Center, LLC, a Florida limited liability company ("**FFPCC**"), Florida Family Primary Care Centers of Tampa, LLC, a Florida limited liability company ("**FFPCCT**"), Florida Family Primary Care Centers of Pasco, LLC, a Florida limited liability company ("**FFPCCP**"), Florida Family Primary Care Centers of Pinellas, LLC, a Florida limited liability company ("**FFPCCPL**"), Florida Family Primary Care Centers of Orlando, LLC, a Florida limited liability company ("**FFPCCO**"), CCMC Physician Holdings, Inc., a Florida limited liability company ("**CCMC Holdings**"), Miami Medical & Wellness Center LLC, a Florida limited liability company ("**MMWC**"), Miami Beach Medical Centers, Inc., a Florida corporation f/k/a Rodolfo Dumenigo, M.D., P.A., a Florida professional association ("**RD**"), Miami Beach Medical Consultants, LLC d/b/a Clinical Care Medical Centers, a Florida limited liability company ("**MBMC**" and collectively with MBMO, MBMT, CCN, CCP, CCMG, FFPCC, FFPCCT, FFPCCP, FFPCCPL, FFPCCO, CCMC Holdings, MMWC, and RD, "**Assignors**", and each, an "**Assignor**"), and Humana Inc., a Delaware corporation ( "**Assignee**").

Capitalized terms used but not otherwise defined in this Agreement shall have the meanings given to them in that certain Asset Purchase Agreement, dated as of the [•] day of October, 2024, by and among Assignors, Assignee, and MB Medical Operations, LLC, a Delaware limited liability company, as the representative of Assignors (the "**Purchase Agreement**").

### RECITALS

Pursuant to the Purchase Agreement, Assignors wish to assign to Assignee, and Assignee wishes to acquire from Assignors, all Assigned Trademark Rights.

### AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      **Assignment**.  Assignors hereby sell, assign, convey and transfer to Assignee, and Assignee hereby purchases, acquires, accepts and assumes from Assignors, all worldwide right, title and interest in, to and under the following (collectively, the "**Assigned Trademark Rights**"):

(a)      The trademarks and service marks listed on *Schedule 1* hereto, including any and all listed applications, registrations and common law rights and all the goodwill of the business connected with the use of and symbolized by the foregoing; and

(b)      All rights to request, apply for, file and register the foregoing, and all registrations and applications for any of the foregoing with or by any Governmental Authority in

any jurisdiction throughout the world, and all rights of action arising from any the foregoing, including, without limitation, all claims for damages or equitable remedies by reason of present, past and future infringement or violation of the foregoing, all defenses relating to or arising from any of the foregoing, and all income, royalties and any other payments now and hereafter due and/or payable to any Assignor, as the case may be in respect of the foregoing.

In each case of (a) – (b), to be held and enjoyed by Assignee for its own use and benefit and for its successors and assigns as the same would have been held as fully and entirely by Assignors had this assignment not been made.

**2.**    **Authorization**.  Assignors hereby authorize the Commissioner of Patents and Trademarks (and the equivalent authority in foreign trademark offices, as applicable) to record this Agreement and transfer the Trademarks to Assignee as assignee of the entire right, title and interest therein or otherwise as Assignee may direct, in accordance with this instrument of assignment.

**3.**    **Governing Agreement**.  This Agreement is executed and delivered pursuant to the Purchase Agreement.  In the event of an irreconcilable conflict between the terms and provisions of this Agreement and any term or provision of the Purchase Agreement, the conflicting term or provision of the Purchase Agreement shall govern and control to the extent of such conflict. Nothing contained in this Agreement shall alter, extend, diminish or amplify any of the representations, warranties, covenants or obligations of any Party contained in the Purchase Agreement or the survival thereof.

**4.**    **Amendments**.  This Agreement may not be amended or modified except by an instrument in writing signed by Assignors and Assignee.

**5.**    **Further Assurances**.  From and after the date hereof but subject to the terms and conditions hereof, Assignors and Assignee shall do all such acts and execute all such further documents and instruments as may be reasonably required to memorialize and make effective the transactions contemplated hereby.

**6.**    **Governing Law**.  All matters relating to the interpretation, construction, validity and enforcement of this Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than the State of Delaware.

**7.**    **Counterparts**.  This Agreement may be executed in 2 or more original, facsimile or electronic counterparts, each of which will be deemed an original, both of which when taken together will constitute one and the same instrument.

**[Signature Pages Follow]**

2

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

<div align="center">

**ASSIGNORS:**

**MB MEDICAL OPERATIONS, LLC**

</div>

By: _____

Name: _____

Title: _____

<div align="center">

**MB MEDICAL TRANSPORT, LLC**

</div>

By: _____

Name: _____

Title: _____

<div align="center">

**CARE CENTER NETWORK, LLC**

</div>

By: _____

Name: _____

Title: _____

<div align="center">

**CLINICAL CARE PHARMACY, LLC**

</div>

By: _____

Name: _____

Title: _____

<div align="center">

[Signature Page to Trademark Assignment Agreement]

</div>

615811525

**CLINICAL CARE MEDICAL GROUP, LLC**

By: _____

Name: _____

Title: _____


**FLORIDA FAMILY PRIMARY CARE CENTER, LLC**

By: _____

Name: _____

Title: _____


**FLORIDA FAMILY PRIMARY CARE CENTERS OF PASCO, LLC**

By: _____

Name: _____

Title: _____


**FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC**

By: _____

Name: _____

Title: _____


[Signature Page to Trademark Assignment Agreement]

**FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC**

By: _____

Name: _____

Title: _____


**FLORIDA FAMILY PRIMARY CARE CENTERS OF ORLANDO, LLC**

By: _____

Name: _____

Title: _____


**CCMC PHYSICIAN HOLDINGS, INC.**

By: _____

Name: _____

Title: _____


**MIAMI MEDICAL & WELLNESS CENTER LLC**

By: _____

Name: _____

Title: _____


[Signature Page to Trademark Assignment Agreement]

615811525

**MIAMI BEACH MEDICAL CENTERS, INC.**

By: _____

Name: _____

Title: _____


**MIAMI BEACH MEDICAL CONSULTANTS, LLC**

By: _____

Name: _____

Title: _____

[Signature Page to Trademark Assignment Agreement]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

ASSIGNEE:

**HUMANA INC.**

By: _____

Name: _____

Title: _____

[Signature Page to Trademark Assignment Agreement]

615811525

# SCHEDULE 1

## Trademarks

| Trademark | Location | Serial Number and Date Filed | Registration Number and Date Registered | Registered or Unregistered | Owner of Record |
|---|---|---|---|---|---|
|  | USA | 88/381707 11-Apr-2019 | 5890302 22-Oct-2019 | Registered | MB Medical Operations, LLC |
|  | USA | First used: 2009 | | Unregistered | MB Medical Operations, LLC |
|  | USA | First used: 2017 | | Unregistered | MB Medical Operations, LLC |
|  | USA | First used: 2010 | | Unregistered | MB Medical Operations, LLC |
|  | USA | First used: 2017 | | Unregistered | MB Medical Operations, LLC |
|  | USA | First used: 2017 | | Unregistered | MB Medical Operations, LLC |
|  | USA | First used: 2015 | | Unregistered | MB Medical Operations, LLC |
|  | USA | First used: 2017 | | Unregistered | MB Medical Operations, LLC |
|  | USA | First used: 2017 | | Unregistered | MB Medical Operations, LLC |

Schedule 1

| | | | | | |
|---|---|---|---|---|---|
|  | USA | | | Unregistered | MB Medical Operations, LLC |
| ¿TIENE DOLOR? ¡NO SUFRA MÁS! | USA | | | Unregistered | MB Medical Operations, LLC |
| DO YOU HAVE PAIN? DON'T SUFFER ANYMORE! | USA | | | Unregistered | MB Medical Operations, LLC |
| #1 Caring for your Health and Improving your Quality of Life | USA | | | Unregistered | MB Medical Operations, LLC |
| #1 Cuidando su Salud y Mejorando su Calidad de Vida | USA | | | Unregistered | MB Medical Operations, LLC |
|  Winter Haven Medical Centers by MBMG | USA | First used: 2017 | | Unregistered | MB Medical Operations, LLC |
| Miami Beach Medical Group | USA | | | Unregistered | MB Medical Operations, LLC |
| MBMG | USA | | | Unregistered | MB Medical Operations, LLC |
|  ClinicalCare Medical Centers | USA | | | Unregistered | MB Medical Operations, LLC |
|  ClinicalCare DENTAL | USA | | | Unregistered | MB Medical Operations, LLC |
| Together We Make The Difference | USA | | | Unregistered | MB Medical Operations, LLC |
| Unidos Hacemos La Diferencia | USA | | | Unregistered | MB Medical Operations, LLC |

Schedule 1

| | | USA | | | Unregistered | MB Medical Operations, LLC |
| --- | --- | --- | --- | --- | --- | --- |
|  | | USA | | | Unregistered | MB Medical Operations, LLC |

Schedule 1

**Exhibit D**

**<u>Employment Agreement</u>**

























12

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the [●] day of [●], 2024.

**EMPLOYER:**

**Conviva Physician Group, LLC**

**By:** _____
Name: Dr. William Russell, M.D.
Title:   Authorized Signatory

**EMPLOYEE:**

**By:** _____
        [_____]



## Schedule 1

**Permitted Exceptions to Exclusive Practice**

None.



**Schedule 1.1**

Indebtedness



## Schedule 1.2

Names

- MB Medical Operations
- MB Medical Transport
- Care Center Network
- Clinical Care Pharmacy
- Care Center Medical Group
- Florida Family Primary Care Center
- Florida Family Primary Care Centers of Tampa
- Florida Family Primary Care Centers of Pasco
- Florida Family Primary Care Centers of Pinellas
- Florida Family Primary Care Centers of Orlando
- CCMC Physician Holdings
- Miami Medical & Wellness Center
- Miami Beach Medical Consultants
- Miami Beach Medical Centers
- Rodolfo Dumenigo, M.D., P.A.
- Clinical Care Medical Centers

**<u>Schedule 2.1(a)(iii)</u>**

List of all Tangible Personal Property

See attached.

## 2.1 (a) (iii) | List of Tangible Personal Property

| Category | Address | Item | Purchase Price | Accumulated Depreciation | NBV | Purchase Date | Depreciation Method | Legal Entity |
|---|---|---|---|---|---|---|---|---|
| Autos | 7500 SW 8th St | IH Motion Mobility - Chairlifts | $1,401 | | $1,401 | 3/31/2016 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | IN Motion Mobility - Chairlifts | $1,327 | | $1,327 | 4/1/2016 | Straight-line | MB Medical Transport LLC |
| Autos | 151 NW 11TH ST | Mercedes Van 2020 - VIN 28400 | $53,190 | $53,190 | | 8/24/2020 | Straight-line | MB Medical Transport LLC |
| Autos | 151 NW 11TH ST | Mercedes Van 2020 - VIN 22449 | $66,808 | $53,190 | $13,618 | 8/24/2020 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | Miami Banners, In Motion Mobility (wrapping lift) | $34,421 | $19,903 | $14,518 | 11/30/2021 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | Miami Banners & Signs | $14,790 | $7,685 | | 12/31/2021 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes - VIN 07256) - Maintenance Van | $57,840 | $31,812 | $26,028 | 12/31/2021 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | 2020 Ford Transit - VIN 08723 - Huntington | $55,967 | $30,782 | $25,185 | 12/31/2021 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | 2019 Ford Transit - VIN 7424T - Huntington | $50,417 | $27,730 | $22,688 | 12/31/2021 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T08585 | $88,227 | $47,055 | $41,173 | 1/31/2022 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T08129 | $88,213 | $47,072 | $41,188 | 1/31/2022 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T07734 | $88,213 | $47,047 | $41,166 | 1/31/2022 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T07739 | $88,227 | $47,055 | $41,173 | 1/31/2022 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T07665 | $88,227 | $47,055 | $41,173 | 1/31/2022 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T08083 | $88,227 | $47,047 | $41,173 | 1/31/2022 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T08042 | $88,227 | $47,047 | $41,166 | 1/31/2022 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | Mercedes Vin T09355 | $4,494 | $2,172 | $2,322 | 2/10/2022 | Straight-line | MB Medical Transport LLC |
| Autos | 7500 SW 8th St | MIAMI BANNERS & SIGNS - VIN 4047 and VIN 8733 | $10,145 | $5,352 | $4,543 | 5/4/2022 | Straight-line | Rosillo Durango, M.D. P.A. |
| Autos | 7500 SW 8th St | In Motion Mobility - wheel chair installations | $10,145 | $5,574 | $4,574 | 6/1/2022 | Straight-line | Rosillo Durango, M.D. P.A. |
| Autos | 7500 SW 8th St | In Motion Mobility - wheel chair installations | $8,267 | $4,596 | $3,672 | 6/1/2022 | Straight-line | Rosillo Durango, M.D. P.A. |
| Autos | 7500 SW 8th St | WIDEFIELD/CRP12798 - 2013 Mercedes | $11,840 | $3,640 | | 9/11/2020 | Straight-line | Rosillo Durango, M.D. P.A. |
| Autos | 7500 SW 8th St | GENY ARTH HWD1518- 2017 GMC | $5,630 | $8,810 | $8,810 | 11/30/2020 | Straight-line | Rosillo Durango, M.D. P.A. |
| Autos | 7500 SW 8th St | 3H IAF ARH01318A2- 2017 Falcon | $20,330 | $12,604 | $12,004 | 2/11/2021 | Straight-line | Rosillo Durango, M.D. P.A. |
| Autos | 7500 SW 8th St | In Motion Mobility - Lift | $24,836 | | | 2/17/2021 | Straight-line | Rosillo Durango, M.D. P.A. |
| Autos | 7500 SW 8th St | South Dade Kia VIN 22116 - KIA Soul for Pharmacy | $19,450 | $7,915 | $3,742 | 2/17/2022 | Straight-line | Rosillo Durango, M.D. P.A. |
| Autos | 7500 SW 8th St | Vin 1GAHG39U232916 - 2018 Chevy Express 2500 Passenger | $4,173 | $13,542 | $33,742 | 5/2/2022 | Straight-line | Rosillo Durango, M.D. P.A. |
| Autos | 1200 ALTON RD | MIAMI BANNERS & SIGNS | $331,459 | | | 7/31/2015 | Straight-line | Rosillo Durango, M.D. P.A. |
| Autos | 1200 ALTON RD | MIAMI BANNERS & SIGNS | | | | 2/7/2022 | Straight-line | Rosillo Durango, M.D. P.A. |
| Autos | 1200 ALTON RD | Williams Lift/monthly | $2,884 | $2,884 | | 11/5/2011 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | LEXUS TRUCK | $34,330 | $34,330 | | 11/5/2011 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | TOYOTA TRUCK | $7,551 | $6,475 | $1,077 | 11/9/2011 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | TOYOTA TRUCK | $12,587 | $10,530 | | 4/24/2020 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | TOYOTA TRUCK | $26,396 | $20,958 | $5,358 | 6/10/2020 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | TOYOTA TRUCK | $16,767 | $13,349 | $3,418 | 8/22/2013 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | TOYOTA VAN | $16,265 | $13,018 | $3,247 | 8/22/2013 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | TOYOTA VAN | $10,534 | $8,103 | $2,441 | 11/4/2009 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | CC AC ARTH01318 | $31,041 | | $2,167 | 6/18/2020 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | TOYOTA VAN - removed Dec 23 | $8,435 | $6,332 | $2,303 | 1/21/2021 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | TOYOTA TRUCK - removed Dec 23 | $14,080 | $5,750 | $8,330 | 9/30/2021 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | TOYOTA TRUCK | $98,043 | $68,630 | $29,413 | 3/25/2021 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | WILLISM LIFT/MIAMI | $27,544 | $57,544 | $8,130 | 4/13/2021 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | mobility works | $33,582 | $25,161 | $8,421 | 5/20/2021 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | mobility works | $27,371 | $19,234 | $9,124 | 5/20/2021 | Straight-line | MB Medical Operations, LLC |
| Autos | 1200 ALTON RD | mobility works | $349,174 | $313,861 | | 5/24/2021 | Straight-line | MB Medical Operations, LLC |
| Autos | 501 E 49TH ST | 2011 FORD E-350 VAN VIN-1D0A34298 | $16,377 | $10,499 | $6,078 | 7/24/2021 | Straight-line | MB Medical Operations, LLC |
| Autos | 351 NW 42ND AVE | 2013 FORD E-350 VAN VIN-20DA00855 | $9,718 | $4,543 | | 4/16/2014 | Straight-line | Miami Medical & Wellness Center, LLC |
| Computer Equipment | 7500 SW 8th St | LEISURE CAMERAS | $84,953 | $84,953 | | 7/31/2015 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION - PCs | $27,371 | $27,371 | | 2/7/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | SHI INTERNATIONAL CORP - Laptops | $26,396 | $26,396 | | 8/26/2020 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, INC - SERVERS FOR UPGRADE & EXPANSION | $20,958 | $20,958 | | 8/26/2020 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT & PC CONNECTION - WESTCHESTER | $13,349 | $13,349 | | 8/26/2020 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 721 West Atlantic Blvd | PC CONNECTION - 2D COMP ELEMENTS FOR LAKELAND | $13,018 | $13,018 | | 8/26/2020 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 8417 Hwy FIN H | INSIGHT DIRECT USA, INC - AND DIVVY | $8,103 | $8,103 | | 11/4/2009 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION, DIVVY (POWER, INSIGHT DIRECT (AIO) total | $32,778 | $32,778 | | 8/31/2020 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | CC AC ARTH01318 | $32,241 | | | 6/18/2020 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | HP (METHIS FFPC-2 LAPTOPS AND MRI EQUIPMENT) | $20,501 | $20,501 | | 1/21/2021 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT, DIVVY, DELL PC CONNECTIONS DIVVY Octoba | $37,295 | $37,295 | | 9/30/2021 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, PC CONNECTIONS (total PURCHASES) | $85,479 | $47,305 | | 11/22/2021 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT - DIVVY | $83,145 | $57,544 | | 4/19/2021 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION SALES CORP - DIVVY | $29,800 | $29,800 | | 4/19/2021 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | TELEPHONE SOLUTIONS SECURITY CAMERAS AUTOHOG | $241 | $241 | | 2/27/2017 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | NORTH MIAMI ACTIVITY CENTER TECH EQUIPMENT | $1,930 | $1,930 | | 1/3/2018 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 11259 Biscayne Blvd | INSIGHT DIRECT USA, PC CONNECTION SALES CORP/ DELL | $6,573 | $6,573 | | 1/31/2018 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | INSIGHT DIRECT USA, INC - IHOME | $10,337 | $10,337 | | 5/31/2018 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | GA DEPARTMENT COMPUTERS | $49,998 | $40,597 | | 8/18/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DORAL PHONES | $1,922 | $1,922 | | 3/31/2018 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS | $1,247 | $1,247 | | 3/31/2018 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL EQUIPMENT | $4,634 | $1,182 | | 3/31/2018 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | LAPTOPS FOR NEW ADMINISTRACION | $1,833 | $1,833 | | 3/31/2018 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, DIVVY - DELL BUSINESS | $88,998 | $283,510 | | 3/15/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, DELL BUSINESS PC CONNECTION | $29,479 | $14,740 | | 3/15/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 11259 Biscayne Blvd | INSIGHT DIRECT USA, INC, PC CONNECTION SALES CORP DORAL | $84,636 | $43,723 | | 8/31/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT, DIVVY | $51,963 | $24,250 | $27,714 | 5/31/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, INC, PC CONNECTION SALES CORP/ DELL | $38,767 | $20,645 | $30,522 | 6/13/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | PC CONNECTION, DELL BUSINESS | $37,042 | $14,315 | $21,874 | 7/13/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS, PC CONNECTION | $103,195 | $42,998 | $60,197 | 8/8/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS, PC CONNECTION | $3,220 | $1,232 | $1,972 | 9/13/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS | $3,083 | $1,182 | $1,901 | 10/13/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS, DIVVY | $13,341 | $5,625 | $9,716 | 11/13/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | INSIGHT DIRECT USA, PC CONNECTION SALES CORP, DELL BUSINESS | $3,836 | $1,609 | $2,227 | 12/13/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS, PC CONNECTION | $3,600 | $1,502 | $2,698 | 1/13/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS, PC CONNECTION | $38,865 | $13,882 | $25,083 | 2/13/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS, PC CONNECTION | $13,291 | $3,987 | $9,304 | 3/13/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS, PC CONNECTION, INSIGHT | $8,190 | $5,992 | $8,182 | 4/13/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8th St | DELL BUSINESS | $2,994 | | $2,196 | 5/13/2023 | Straight-line | MB Medical Operations, LLC |

| Category | Address | Description | Amount | Amount | Date | Entity |
|---|---|---|---|---|---|---|
| Computer Equipment | 7500 SW 8TH ST | DELL BUSINESS | $2,624 | $656 | 6/13/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | DELL BUSINESS, PC CONNECTION, INSIGHT | $48,600 | $11,340 | 7/31/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | DELL BUSINESS, CRAW ENTERPRISES (CONFERENCE ROOM ITEM) | $33,217 | $7,197 | 8/31/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | INSIGHT, DIVVY | $43,595 | $24,020 | 9/30/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | INSIGHT, DIVVY | $43,595 | $21,618 | 9/30/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | DELL BUSINESS, INSIGHT | $18,963 | $15,486 | 10/31/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | DELL BUSINESS | $2,614 | $2,178 | 11/30/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | PC CONNECTION | $4,656 | $456 | 11/30/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | DELL BUSINESS | $33,061 | $4,759 | 12/31/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | DELL BUSINESS | $2,581 | $344 | 1/13/2024 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | DELL BUSINESS | $1,737 | $231 | 2/13/2024 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | DELL BUSINESS | $22,603 | $2,386 | 4/13/2024 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | DELL BUSINESS | $2,550 | $85 | 9/13/2022 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | DELL BUSINESS | $2,612 | $2,445 | 2/13/2022 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | pc connection | $44 | $2,568 | 10/13/2022 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 2459 HIGHWAY 98 N | LAKELAND COMPUTER EQUIP | $0 | $44 | 12/20/2023 Straight-line | Rocotillo Durrengo M.D.P.A |
| Computer Equipment | 2459 HIGHWAY 98 N | LAKELAND COMPUTER EQUIP | $4,772 | $4,772 | 3/31/2018 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 2459 HIGHWAY 98 N | LAKELAND TV'S | $4,858 | $4,858 | 3/31/2018 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 2459 HIGHWAY 98 N | LEASE ABSTRACT CENTER EQUIPMENT | $2,188 | $2,188 | 3/31/2018 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 501 WESTHAVEN RD | WINTERHAVEN START UP COMPUTER EQUIP | $1,823 | $1,823 | 10/31/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 501 W 1ST ST, | WINTERHAVEN SECURITY CAMERAS | $4,864 | $4,864 | 10/31/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 501 W 1ST ST, | PC CONNECTION - WINTERHAVEN live in AUG | $1,480 | $1,480 | 11/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 201 1st ST S, | INSIGHT DIRECT USA, INC. - WINTERHAVEN live in AUG | $39,464 | $24,538 | 9/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 201 W 1ST ST, | INSIGHT DIRECT USA, INC - CLINTON COMPUTERS HIALEAH | $24,526 | $16,538 | 11/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7291 West Atlantic Blvd. | TELEVATE CENTER EQUIP | $772 | $772 | 7/31/2022 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7344 7 3rd St | DELRAY STARTUP TECHNOLOGY EQUIPMENT | $4,895 | $4,895 | 7/31/2022 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7344 E Palm River Rd, Tampa, FL, 33619 | INSIGHT DIRECT USA, INC. PC CONNECTION SALES CORP | $90,711 | $59,046 | 8/31/2022 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 750 SOUTH FEDERAL HWY | HOLLYWOOD SECURITY CAMERAS | $1,718 | $1,718 | 11/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 750 SOUTH FEDERAL HWY, | HOLLYWOOD STARTUP TECHNOLOGY EQUIPMENT | $33,956 | $33,956 | 11/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | MIDTOWN | $37,790 | $37,790 | 4/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | WESTCHESTER SUITE 306 COMPUTER EQUIP | $33,362 | $33,362 | 4/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | WESTCHESTER SUITE 120 COMPUTER EQUIP | $1,537 | $1,537 | 4/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | SUITE 101 WESTCHESTER THERAPY COMPUTERS | $975 | $975 | 4/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | WESTCHESTER DIVVY [IPADS] | $1,431 | $1,431 | 2/20/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | ARIBA ANESTHESIA | $3,185 | $611 | 6/30/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | COMPUTERS FOR ROOM 207 WESTCHESTER | $3,182 | $698 | 8/31/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | ITSHAFT LAPTOPS | $3,182 | $0 | 11/8/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | ULTRASOUND DEPARTMENT COMPUTERS | $1,431 | $0 | 11/8/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | INSIGHT DIRECT USA, INC. - LENOVO THINKCENTRE - WESTCTR | $7,505 | $7,505 | 1/6/2002 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 27th Ave | PC CONNECTION - POWER | $13,600 | $2,279 | 12/16/2019 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 27th Ave | TRANSFER FROM HP KAMAK 27TH PC COMPUTER | $67,132 | $0 | 6/30/2020 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 9611 BIRD RD | INSIGHT SOLUTIONS (SECURITY CAMERAS BIRD RD) | $10,090 | $14,326 | 4/30/2008 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 9611 BIRD RD | PC CONNECTION ACTIVITY CENTER COMPUTER EQUIPMENT | $481 | $0 | 2/27/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 9611 BIRD RD | BIRD RD SECURITY CAMERAS | $2,145 | $0 | 3/31/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | PPCC Locations [tampa] | BIRD RD SECURITY CAMERAS | $3,143 | $0 | 3/31/2018 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7500 SW 8TH ST | JE - ILCA PPCC Durango - Dec2021 | $18,913 | $3,143 | 6/6/2021 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | Desktop, server, monitors | $8,456 | $6,623 | 6/30/2022 Straight-line | Rocotillo Durrengo M.D.P.A |
| Computer Equipment | 1200 ALTON RD | DELL BUSINESS [DIVVY] [IPADS] | $7,671 | $787 | 9/11/2020 Straight-line | Rocotillo Durrengo M.D.P.A |
| Computer Equipment | 1200 ALTON RD | DELL BUSINESS [DIVVY] [IPADS] | $39,247 | $611 | 3/31/2024 Straight-line | Rocotillo Durrengo M.D.P.A |
| Computer Equipment | 1200 ALTON RD | DELL BUSINESS [DIVVY] [IPADS] | $11,908 | $698 | 11/8/2021 Straight-line | Rocotillo Durrengo M.D.P.A |
| Computer Equipment | 1200 ALTON RD | DELL BUSINESS [DIVVY] [IPADS] | $11,361 | $11,361 | 4/30/2024 Straight-line | Rocotillo Durrengo M.D.P.A |
| Computer Equipment | 1200 ALTON RD | MEDICAL SOFTWARE | $97,132 | $0 | 12/31/2019 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | MEDICAL SOFTWARE | $16,842 | $0 | 4/30/2008 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | DELL COMPUTER | $5,508 | $0 | 12/31/2019 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | DELL COMPUTER | $1,297 | $0 | 3/31/2019 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | DELL COMPUTER | $740 | $0 | 7/28/2017 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | DELL COMPUTER | $4,630 | $0 | 3/14/2022 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | DELL COMPUTER | $3,141 | $0 | 4/13/2024 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | DELL COMPUTER | $131 | $0 | 11/30/2019 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | COMPUTER EQUIP | $578 | $0 | 3/2/2015 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | COMPUTER EQUIPMENT(TIGERDIRECT) | $1,434 | $0 | 2/22/2013 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | COMPUTER EQUIPMENT(TIGERDIRECT) | $654 | $490 | 7/17/2023 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 1200 ALTON RD | PATTERSON DENTAL EGE SERVERS | $2,410 | $0 | 10/31/2019 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 501 11th ST, | AUTOMATED BUSINESS MACHINES | $740 | $0 | 10/31/2018 Straight-line | MB Medical Operations, LLC |
| Computer Equipment | 7900 SW 8TH ST | DELL | $1,038 | $0 | 12/31/2018 Straight-line | MB Medical Operations, LLC |
| Gamputer Equipment | 501 E 4TH ST, | SATURN WIRELESS | $1,296 | $0 | 3/3/2014 Straight-line | MB Medical Operations, LLC |
| Gamputer Equipment | 7900 SW 8TH ST | PAYCHEX(4 BOKHEROCI) | $11,700 | $0 | 11/1/2014 Straight-line | MB Medical Operations, LLC |
| Gamputer Equipment | 501 E 4TH ST, | STAPLES | $3,141 | $0 | 4/13/2024 Straight-line | MB Medical Operations, LLC |
| Gamputer Equipment | 501 E 4TH ST, | staPLES | $490 | $490 | 9/18/2019 Straight-line | MB Medical Operations, LLC |
| Gamputer Equipment | 501 E 4TH ST, | Jose Sanchez Computer | $14,453 | $14,453 | 9/1/2020 Straight-line | Miami Medical & Wellness Center, LLC |
| Gamputer Software | 7500 SW 8TH ST | TELESPHERE | $5,122 | $3,122 | 1/1/2021 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | TELESPHERE | $689,895 | $689,895 | 8/1/2023 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | TELESPHERE | $141,294 | $141,294 | 4/20/2021 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | TELESPHERE | $39,428 | $39,428 | 5/4/2024 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | Addison Westchester Ferry Hotter [Qwork] | $10,649 | $10,649 | 1/1/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | PC CONNECTION SALES CORP [added to schedule in April] | $869,055 | $869,055 | 4/1/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | Transcription DM WP [IPOWER TECHNOLOGIES [LIVE IN JU] | $403,599 | $403,599 | 6/1/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | IPOWER TECHNOLOGIES - ConnectWise Downtym/HP [LIVE IN JU] | $729,589 | $729,589 | 8/1/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | IPOWER TECHNOLOGIES - May Total - [LIVE IN JUN] | $53,004 | $40,533 | 11/30/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | CareOptimize | $33,017 | $3,184 | 11/30/2020 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | PC CONNECTION SALES CORP | $27,532 | $134,42 | 4/19/2021 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | CareOptimize | $23,020 | $21,930 | 4/19/2021 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | PC CONNECTION SALES CORP | $1,040 | $0 | 8/22/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | RSA Security Licensing | $19,058 | $0 | 1/13/2023 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | NEXTGEN HEALTHCARE INC | $578 | $1,833 | 8/22/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | NEXTGEN HEALTHCARE INC | $1,833 | $84,284 | 8/22/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | Interceft | $84,284 | $45,485 | 8/22/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | Interceft | $45,485 | $45,000 | 8/22/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | CareOptimize PC CONNECTION SALES CORP | $91,132 | $10,124 | 11/30/2020 Straight-line | Clinical Care Pharmacy, LLC |
| Computer Software | 7500 SW 8TH ST | NEXTGEN HEALTHCARE INC | $123,000 | $123,000 | 1/31/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | INTERCEFT | $45,000 | $45,000 | 8/22/2022 Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8TH ST | NEXTGEN HEALTHCARE INC | $0 | $0 | 8/22/2022 Straight-line | MB Medical Operations, LLC |

| Category | Location | Description | Value | | Date | Method | Entity |
|---|---|---|---|---|---|---|---|
| Computer Software | 7500 SW 8th St 59 | INTERSOFT | $87,360 | $87,360 | 1/31/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | INTERSOFT | $85,000 | $85,000 | 1/31/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | INTERSOFT | $87,360 | $87,360 | 1/31/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | INTERSOFT | $91,520 | $91,520 | 1/31/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | AMHEI APR 2022 CONSULTING | $70,932 | $57,140 | 4/1/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | AMHEI MAY 2022 CONSULTING | $56,234 | $45,000 | 6/1/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | HEXIGEN HEALTHCARE INC | $37,983 | $56,234 | 7/1/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | INTERSOFT | $87,360 | $87,360 | 1/31/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | AMHEI JUNE 2022 CONSULTING | $48,883 | $520,833 | 8/2/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | HEXIGEN HEALTHCARE INC | $30,000 | $30,000 | 1/31/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | INTERSOFT | $91,520 | $91,520 | 1/31/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | INTERSOFT | $5,280 | $14,189 / $9,147 | 8/2/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | HEXIGEN HEALTHCARE INC | $30,000 | $30,000 | 1/31/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | INTERSOFT | $4,560 | $10,000 | 8/2/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | HEXIGEN HEALTHCARE INC | $30,000 | $19,167 | 1/31/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | HEXIGEN HEALTHCARE INC | $30,000 | $10,833 | 2/1/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | INTERSOFT | $5,040 | $11,667 | 8/2/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | HEXIGEN HEALTHCARE INC | $30,000 | $5,040 | 2/1/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | INTERSOFT | $5,280 | $17,500 | 1/31/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | AMHEI | $98,649 | $5,280 | 12/31/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | TECXPERT | $7,975 | $43,844 | 2/7/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | HEXIGEN HEALTHCARE INC | $50,500 | $4,000 | 6/1/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | TECXPERT | $3,816 | $25,250 | 2/28/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | TECXPERT | $17,917 | $1,390 | 2/20/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | TRANSFER FROM WIP AMHEI AND DAMBRIDGE | $6,500 | $12,574 | 2/13/2024 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | 01/14/2020 Core Licensing | $343,630 | $1,806 | 2/7/2022 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 7500 SW 8th St 59 | AMHEI CARE IMPLEMENTATION - ONE TIME | $15,917 | $4,694 | 2/1/2023 | Straight-line | MB Medical Operations, LLC |
| Computer Software | 1200 ALTON RD | Lighthealth | $30,000 | $278,867 | 2/1/2024 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Computer Software | 1200 ALTON RD | gixvetean | $63,740 | $443,278 | 6/1/2022 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Computer Software | 9611 BIRD RD | scOPE | $863 | $182,740 | 3/15/2015 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Fitness Equipment | 1200 ALTON RD | MASSAGE CHAIRS FOR LAKELAND | $963 | $0 | 10/18/2023 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Fitness Equipment | 1200 ALTON RD | DEXOGAME IT GROUP FITNESS (EQUIPMENT) | $1,800 | $226,056 | 11/1/2015 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Fitness Equipment | 7900 SW 8TH ST | FITNESS EQUIPMENT | | $0 | 9/3/2013 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | FITNESS EQUIPMENT | | $0 | 3/5/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 151 NW 11TH ST | SCOPE | | $0 | 6/3/2015 | Straight-line | Miami Medical & Wellness Center, LLC |
| Fitness Equipment | 151 NW 11TH ST | SCOPE | $1,936 | $0 | 2/10/2014 | Straight-line | Miami Medical & Wellness Center, LLC |
| Fitness Equipment | 151 NW 11TH ST | SCOPE | $1,386 | $0 | 2/10/2014 | Straight-line | Miami Medical & Wellness Center, LLC |
| Fitness Equipment | 7900 SW 8TH ST | SCOPE | | $0 | 2/10/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | SCOPE | $185 | $0 | 2/11/2034 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 591 E 49TH ST | SCOPE | $13,997 | $0 | 2/11/2034 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 591 E 49TH ST | OPTHALMIC EQUIPMENT | $4,808 | $0 | 2/18/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | SCOPE | $1,892 | $0 | 3/5/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | OPTIMETRICS | $32,522 | $0 | 3/10/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 151 NW 11TH ST | OPTIMETRICS | $185 | $0 | 3/10/2014 | Straight-line | Miami Medical & Wellness Center, LLC |
| Fitness Equipment | 591 E 49TH ST | 2005 TORI25 XRAY SYSTEM | $99,675 | $0 | 3/18/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | SCOPE | $10,395 | $0 | 4/11/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 151 NW 11TH ST | PATTERSON | $63,165 | $0 | 5/5/2014 | Straight-line | Miami Medical & Wellness Center, LLC |
| Fitness Equipment | 591 E 49TH ST | DENTAL EQUIPMENT | $2,756 | $0 | 8/28/2014 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | TQ SOLO LASER | $2,563 | $0 | 7/20/2016 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | MEDICAL EQUIPMENT | $2,493 | $0 | 8/26/2015 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | MEDICAL EQUIPMENT | $21,644 | $0 | 7/20/2016 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | Mckesson Medical | $23,071 | $49,613 | 9/18/2019 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | Scopel vital | $13,841 | $50,614 | 2/25/2020 | Straight-line | MB Medical Operations, LLC |
| Fitness Equipment | 7900 SW 8TH ST | Medline - hother digital recorder | $5,615 | $46,614 | 3/6/2014 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 201 UI 53 S | Exam Table | $1,464 | $45 | 12/31/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 201 UI 53 S | Sexual medical steam table, medical recliner wall (recap) (spital) | $28,388 | $15,000 | 12/31/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 6726 4726A Homley Rd., Tampa FL, 33634 | FURNITURE FOR ALL CENTERS | $15,134 | $44,865 | 9/21/2015 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | WESTCHESTER FURNITURE FOR ALL NEWCENTER | $2,996 | $16,270 | 12/31/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | CC ACADIATION | $1,977 | $739 | 10/31/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | ALTON RD CONFERENCE ROOM | $2,736 | $1,116 | 3/5/2014 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | EXECUTIVE DESK (GLASS?) (WINE JOSE) | $2,563 | $84 | 5/2/2013 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | CUBICLES FOR CALL CENTER | $2,493 | $563 | 1/4/2018 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | DIVVY - FURNITURE & WORKS FOR NEW PHARMACY | $21,644 | $178 | 7/31/2015 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | OFFICE FURNITURE WAREHOUSE OF MIAMI (DORAL) | $23,071 | $13,458 | 10/21/2021 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 2450 HIGHWAY N5 N | OFFICE FURNITURE WAREHOUSE OF MIAMI (DORAL) | $13,801 | $8,256 | 11/17/2020 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 201 UI 53 S | FURNITURE FOR CALL CENTER | $5,615 | $638 | 3/14/2016 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | ACTIVITY CENTER CHAIRS FOR WINTERHAVEN | $1,464 | $45 | 11/4/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | DIVVY - EXECUTIVE CHAIRS AND HALEAH TRANSFER FROM WIP | $28,388 | $18,602 | 9/6/2022 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | DIVVY - EXECUTIVE CHAIRS, DESKS | $15,134 | $44,865 | 4/30/2022 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | WESTCHESTER WORKSTATION CABINETS | $2,996 | $16,270 | 3/14/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | DES MEDICAL EQUIPMENT AND SERVICES- | $1,977 | | 3/16/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | HAYNEEDLE CHAIRS FOR WESTCHESTER SUITE 201 | $1,262 | | 7/10/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 7500 SW 8th St | CHAIRS FOR WESTCHESTER LOBBY | $1,647 | | 7/10/2017 | Straight-line | MB Medical Operations, LLC |
| Furniture & Fixtures | 9611 BIRD RD | BIRD ROAD ACTIVITY CENTER CHAIRS | $1,994 | | 9/26/2011 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | WPCC2 CO, CACLA HOME | JE - GALA TABLE UP - 00/0CK/J | $200,540 | $505 | 9/28/2011 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | To record disposal of pharmacy F&F Sold Aug 22 | $21,644 | $23,701 | 10/5/2012 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | GALLEY INTERIORS | $1,479 | $21,644 | 8/31/2017 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | DRAWN GD PARTNERS | $187 | | 7/21/2015 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | ULA OFFICE FURNITURE | $4,206 | | 8/2/2017 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | PARD AND THINGS | $4,637 | | 9/28/2011 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | PAD AND THINGS | $4,205 | | 8/10/2017 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | PARD AND THINGS | $1,804 | | 9/28/2011 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | WALL UNIT | $4,393 | | 9/19/2012 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | USA OFFICE FURNITURE | $33,144 | | 9/19/2012 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | 2 DESKS AND 2 FILED CABINETS | $4,395 | | 9/19/2012 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | USA OFFICE FURNITURE | $633 | | 10/5/2012 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | OFFICE DEPOT METAL CABINET | $633 | | 3/8/2013 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | NU FURNISHING | $3,120 | | 3/24/2016 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | OPTOMETRY RACKS | $815 | | 4/8/2013 | Straight-line | Rozello Durnenigo, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | FDA SACCHI/FURNITURE FOR MED CENTER SACCHI | $1,224 | | 4/11/2013 | Straight-line | Rozello Durnenigo, M.D. P.A. |

| Asset Class | Address | Description | Amount | Amount | Amount | Date | Method | Entity |
|---|---|---|---|---|---|---|---|---|
| Furniture & Fixtures | 1200 ALTON RD | belon rockson | $159 | $159 | $0 | 3/27/2015 | Straight line | Rosaldo Dumeridge, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | furniture & fixtures | $170 | $170 | $0 | 9/10/2015 | Straight line | Rosaldo Dumeridge, M.D. P.A. |
| Furniture & Fixtures | 1200 ALTON RD | furniture & fixtures | $245 | $245 | $0 | 9/10/2015 | Straight line | Rosaldo Dumeridge, M.D. P.A. |
| Furniture & Fixtures | 7500 SW 8TH ST | furniture & fixtures | $245 | $245 | $0 | 9/10/2015 | Straight line | Rosaldo Dumeridge, M.D. P.A. |
| Furniture & Fixtures | 9613 3RD ST | furniture & fixtures | $186 | $186 | $0 | 10/10/2015 | Straight line | Rosaldo Dumeridge, M.D. P.A. |
| Furniture & Fixtures | 7500 SW 8TH ST | SIGN | $4,500 | $4,500 | $0 | 3/17/2016 | Straight line | Rosaldo Dumeridge, M.D. P.A. |
| Furniture & Fixtures | 7500 SW 9TH ST | REFACE EXPERTS | $227 | $227 | $0 | 4/20/2016 | Straight line | Miami Medical & Wellness Center, LLC |
| Furniture & Fixtures | 7500 SW 9TH ST | REFACE EXPERTS | $32 | $32 | $0 | 5/9/2016 | Straight line | Miami Medical & Wellness Center, LLC |
| Furniture & Fixtures | 7500 SW 9TH ST | REFACE EXPERTS | $235 | $235 | $0 | 12/14/2016 | Straight line | Miami Medical & Wellness Center, LLC |
| Furniture & Fixtures | 7500 SW 9TH ST | REFACE EXPERTS | $189 | $189 | $0 | 1/15/2016 | Straight line | Miami Medical & Wellness Center, LLC |
| Leasehold Improvements | | PAREA BELL CURE BELL/THERAPY AREA RELOCATE EXISTING A/C | $3,653 | $3,653 | $2,159 | 2/22/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvements | | PROMO WASTE - WEBTCR 3RD FL RENOVATION | $1,634 | $1,634 | $644 | 4/28/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7801 West Atlantic Ave | FERGUSON ENTERPRISES (05/06/20) | $561 | $219 | $341 | 4/23/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | | FERGUSON ENTERPRISES (05/06/20) | $332 | $130 | $202 | 4/23/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8TH ST | H&M KITCHEN (05/06/20) | $16,658 | $6,515 | $10,144 | 4/23/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 9TH ST | PROMO WASTE SERVICES (05/13/20) | $426 | $167 | $259 | 4/23/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1550 Biscayne Blvd | FOREVER SIGNS (for brand Sculpture) - C/in Sept 2020 - $16K | $7,649 | $3,019 | $4,630 | 5/16/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 615 SW 40th St | ACTIVITY CENTER | $992 | $384 | $608 | 4/23/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 9613 3RD ST | BANNER SUPPLY # 82189 (05/20) | $2,341 | $894 | $1,447 | 4/23/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 9TH ST | F.P.O HOME DESIGN CENTER #32191 (05/20/20) | $232 | $91 | $141 | 6/23/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1200 ALTON RD | Home Depot Credit Svc #33186 (05/20/20) | $1,004 | $400 | $604 | 6/23/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1200 ALTON RD | Kilworth & Contractor Electrical 3 x #32181 (05/21/20) | $3,079 | $1,204 | $1,875 | 6/23/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1214 ALTON RD | LEAD ENTERPRISES #33185 (05/20) | $3,794 | $1,490 | $2,304 | 6/23/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1214 ALTON RD | KITCHEN/BATH/D MASTER KEFU LAW MARRAN (ABOVE INT'D/Ch | $9,409 | $3,680 | $5,729 | 7/31/2018 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7801 West Atlantic Ave | CMCI PRODUCTIONS - SIGNAGE DREAM | $7,079 | $2,720 | $4,359 | 9/10/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1550 Biscayne Blvd | FOREVER SIGNS - CAMSIS ETERN/REM RITCH IR & BIRD | $14,232 | $5,568 | $8,664 | 7/31/2018 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1200 ALTON RD | H&M KITCHEN - CABINETS FOR H. MIAMI WORKORDER 1132 | $8,329 | $3,173 | $5,155 | 10/7/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1550 Biscayne Blvd | MIDWEST SIGNS - MONSANTS SIGN FOR BIRD | $617 | $241 | $375 | 9/10/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 9TH ST | CC ACQUISITION | $331,077 | $135,495 | $195,583 | 9/11/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1200 ALTON RD | DRAGON.A LLC - Holdtech front entrance renovation | $11,337 | $4,580 | $6,758 | 8/31/2020 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1300 West Flagler St. | H&M KITCHEN - DROER RON TCK 2 (WO 1042690) | $17,000 | $6,885 | $10,234 | 1/20/2021 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1300 West Flagler St. | RICK'S ELECTRICAL SYSTEMS, INC. - 14 CAMERA-CAMERA SWEEN | $5,952 | $2,164 | $3,738 | 1/21/2021 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1550 Biscayne Blvd | H&M KITCHEN - RON TCK 20 (WO) and Sweetwater | $25,618 | $5,386 | $20,231 | 3/20/2021 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1214 ALTON RD | 1214 ALTON RD CLINICAL SUITES | $47,052 | $26,554 | $20,498 | 7/31/2018 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1550 Biscayne Blvd | H&M KITCHEN | $38,479 | $12,506 | $25,973 | 3/20/2021 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1214 ALTON RD | H&M KITCHEN - RON 2 & TWO 3RD SECURITY SOLUTIONS (Total June) | $8,880 | $3,442 | $5,438 | 8/31/2021 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1214 ALTON RD | 1214 ALTON RD SUITE 321 (WO) | $9,287 | $3,059 | $6,228 | 10/31/2017 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1214 ALTON RD | ALTON CONFERENCE ROOM | $31,500 | $21,212 | $10,288 | 4/14/2019 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 124 ALTON RD | H&M KITCHEN | $75,073 | $10,636 | $64,439 | 4/30/2023 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 124 ALTON RD | TRANSFER FROM WIP MIAMI BEACH - ALTON ROAD APTS | $10,340 | $418 | $9,920 | 6/30/2023 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 124 ALTON RD | HOMELY ELEVATOR - ALTON (TRANSFER FROM WIP) | $430 | $430 | $0 | 1/0/2024 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 124 ALTON RD | H&M KITCHEN | $6,450 | $6,000 | $450 | 1/0/2024 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1214 ALTON RD | ASAP FIRE SPRINKLER PROTECTION LLC and H&M KITCHEN | $487 | $44 | $1,043 | 4/24/2024 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1214 ALTON RD | INSTALL STRUCTURE (3TES) and H&M KITCHEN | $2,869 | $2,174 | $9,954 | 8/31/2024 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1214 ALTON RD | ALTON SALON | $2,263 | $970 | $1,293 | 8/31/2019 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1550 Biscayne Blvd | HERNANDEZ COMMERCIAL PAINTING, INC. - EXTERIOR PAINT | $24,335 | $20,341 | $3,998 | 7/31/2019 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1214 ALTON RD | ALTON SALON / FROM WIP 10/31/19 | $1,035 | $444 | $592 | 8/31/2019 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1550 Biscayne Blvd | HERNANDEZ CNISING PAINTING, INC. - EXTERIOR PAINT | $15,721 | $6,550 | $9,172 | 12/28/2019 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1214 ALTON RD | PURE AIR: RICK'Y ELECTRICAL SYSTEMS, INC H&M KITCHEN | $46,300 | $33,102 | $13,118 | 11/28/2019 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1550 Biscayne Blvd | PURE AIR SERVICES INC - dentist office H&M KITCHEN | $250 | $250 | $0 | 7/31/2019 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 1550 Biscayne Blvd | PURE AIR SERVICES INC - activity center TCK#28241 | $3,248 | $1,420 | $1,829 | 7/31/2019 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | | CONTRACTORS ELECTRICAL - TCK#28242 | $1,368 | $592 | $776 | 11/23/2019 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | | DONTRO SYSTEMS, INC. - TCK #28246 | $1,425 | $625 | $800 | 3/31/2019 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | | PURE AIR: RICK'Y ELECTRICAL SYSTEMS, VICO CONTRACTORS | $100,521 | $35,466 | $265,010 | 12/31/2021 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | | TRANSFER FROM WIP MIAMI | $56,623 | $26,124 | $320,024 | 12/31/2021 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | | TRANSFER FROM WIP ORLANDO | $78,941 | $16,446 | $62,495 | 4/30/2022 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | | DORAL - 4TH FLOOR | $30,183 | $15,468 | $30,994 | 6/30/2022 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8TH ST | DORAL DATA SWITCH DATA | $38,454 | $30,186 | $51,400 | 6/30/2022 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8TH ST | RICK'S ELECTRICAL HUGO AWNINGS, HANLET MED CENTER ID | $28,199 | $7,869 | $107,155 | 8/31/2022 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8TH ST | PURE AIR SERVICING | $33,773 | $21,215 | $15,474 | 8/31/2022 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 8TH ST | PURE AIR SERVICING | $18,050 | $6,928 | $11,522 | 8/31/2022 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 9TH ST | TRANSFER FROM WIP ATE SIT (04/02) | $9,900 | $1,302 | $8,493 | 9/30/2022 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 9TH ST | TRANSFER FROM WIP HEALTHGATE: ACCORPORATE VISION-LOT | $861 | $1,307 | $269 | 10/9/2022 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 9TH ST | UNIFIED AUTONANDA - CONFERENCE ROOM | $10,482 | $440 | $301 | 10/31/2022 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 7500 SW 9TH ST | GARCES METRO DOO X-RAY: ROOM WALL PANELS | $90 | $1,547 | $311 | 4/30/2022 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 551 NW 42nd Ave | GARCES METRO X-RAY LIGHTING FOR RECEPTION AR | $2,357 | $1,547 | $1,010 | 4/30/2022 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 551 NW 42nd Ave | GARCES METRO 2 ROOMS SUITE 102 BUILDOUT | $3,248 | $1,247 | $2,001 | 7/31/2022 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 551 NW 42nd Ave | TWO 3RD SECURITY & IT SOLUTIONS LLC | $6,342 | $1,842 | $3,540 | 5/31/2022 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 551 NW 42nd Ave | RICK'S ELECTRICAL, ALTO-ACTIVITY HOME DEPOT, DIVVY | $2,645 | $1,845 | $320,603 | 3/31/2024 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 551 NW 11TH ST | TRANSFER FROM WIP HOMESTEAD TILES | $27,545 | $1,377 | $126,168 | 12/31/2023 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 247 Frew 98 N | 2ND FLOOR HUGO AWNINGS: PURE AIR, DIVVY, H&M I | $40,777 | $2,193 | $28,594 | 7/31/2024 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 247 Frew 98 N | RICK'S ELECTRICAL, HOME DEPOT, H&M | $27,675 | $4,277 | $23,298 | 2/29/2024 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 247 Frew 98 N | TRANSFER FROM WIP NCO-STE 401 COMPLETED H&D 2021 | $7,608 | $2,346 | $5,262 | 8/31/2021 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 247 Frew 98 N | TRANSFER FROM WIP HARDER ROOM STE 470 COMPLETED AUG 2021 | $24,031 | $21,235 | $2,796 | 8/31/2021 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 561 NW 42ND AVE | RECLASS3 FROM RAM TO LH IMPROVEMENTS (PHARMACY WI | $22,470 | $6,928 | $15,541 | 7/31/2017 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 561 NW 42ND AVE | TRANSFER FROM WIP HARDCESS STE 401 COMPLETED SEP 2021 | $5,473 | $35,305 | $19,767 | 8/31/2021 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 561 NW 42ND AVE | OLIVERA CONSTRUCTION - PREP sub-lease | $40,733 | $23,142 | $17,591 | 7/31/2017 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 561 NW 42ND AVE | OLIVERA CONSTRUCTION INC - PREP sub-lease | $17,736 | $8,879 | $9,951 | 7/31/2017 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 201 W 51 ST | ACTIVITY CENTER LAND/STRUCTURE | $34,448 | $25,882 | $23,558 | 2/28/2018 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 2400 Frew 98 N | CYPRESS SIGNS: CENTER SIGNAGE | $77,255 | $7,238 | $84,458 | 12/31/2017 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 201 S 49TH ST | 2280 SECURITY & IT SOLUTIONS INSTALLATION | $125,778 | $5,778 | $1,695 | 3/31/2019 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 201 S 49TH ST | LAKELAND | $23,084 | $16,407 | $7,263 | 7/22/2019 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 201 S 49TH ST | SIGNAGE FOR LAKELAND BUILDING | $3,860 | $5,543 | $0 | 7/31/2017 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 201 S 49TH ST | GARCES (LEJENE X-RAY ROOM BUILDOUT) WALL PANELS | $3,889 | $2,194 | $1,695 | 7/31/2017 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 201 S 49TH ST | ACTIVITY CENTER LAND STRUCTURE | $61,266 | $27,841 | $6,454 | 7/31/2017 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 201 S 49TH ST | LEJENE (SUITE 315) | $5,149 | $3,102 | $2,047 | 2/28/2018 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 201 S 49TH ST | WINTER HAVEN FACILITY UPDATES | $53,904 | $31,662 | $22,238 | 2/28/2018 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 2890 1 SO 2 ST | WINTER HAVEN BUILDING STRUCTURE | $5,778 | $1,800 | $3,978 | 2/28/2018 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 201 S 49TH ST | H & M KITCHEN - CABINETS ACTIVITY CENTER TCK#28149 | $16,407 | $2,773 | $13,634 | 7/22/2019 | Straight line | MB Medical Operations, LLC |
| Leasehold Improvement | 201 E 4TH ST | ABC AWNINGS - FOR H&M/H | $12,805 | $5,543 | $7,263 | 7/26/2019 | Straight line | MB Medical Operations, LLC |

The tabular data on this page is a dense multi-column financial schedule (leasehold improvements, vendor names, locations, amounts, dates, and the counterparty "MR Medical Operations, LLC" / "MR Medical Transport, LLC") rendered at a resolution too low to read the individual values reliably.

The page contains a large, finely-printed financial asset schedule (rotated 90° on the page). The table lists asset categories, item descriptions, addresses, dollar amounts, dates, and owning entities. The columns, left to right, are: Asset Category, Description, Address, Amount, Amount, Amount, Date (placed-in-service / straight-line), and Entity.

| Category | Description | Address | Amount | Amount | Amount | Date | Entity |
|---|---|---|---|---|---|---|---|
| Leasehold Improvement | | 201 W 57 S. | $15,814 | $8,453 | $7,321 | 4/1/2016 Straight-line | MB Medical Transport, LLC |
| Medical Equipment | PATTERSON DENTAL MACHINE - NORTH HIA | 12500 Biscayne Blvd. | $18,083 | $18,083 | $0 | 1/0/1900 Straight-line | MB Medical Operations, LLC |
| Medical Equipment | PATTERSON DENTAL MACHINE - WESTCHESTER | 7500 SW 8th St | $33,112 | $33,112 | $0 | 2/17/2020 Straight-line | MB Medical Operations, LLC |
| Medical Equipment | ALPHATON USA - X CORE CONE MACHINE - HI KAVAKI | 12500 Biscayne Blvd. | $38,548 | $31,059 | $6,880 | 7/16/2020 Straight-line | MB Medical Operations, LLC |

(The remaining rows are printed too small and densely to transcribe reliably. Predominant entities listed in the rightmost column include: MB Medical Operations, LLC; Rosillo Durrengo, M.D. P.A.; Miami Medical & Wellness Center, LLC; and MB Medical Transport, LLC. Predominant categories in the leftmost column are "Leasehold Improvements" and "Medical Equipment.")

| Category | Address | Description | Value 1 | Value 2 | Value 3 | Date | Terms | Entity |
|---|---|---|---|---|---|---|---|---|
| Medical Equipment | 729 West Atlantic Blvd | DELRAY DIRACTION SYSTEM | $3,099 | $3,099 | | 4/30/2018 | Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 5455 T/NLE B R35 University Dr, 16590 NW 67th Ave | GENERA RADIOGRAPHINE | $88,375 | $88,375 | $122,260 | 4/3/2023 | Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 7463 Think Road 52, Hudson, FL 34667 | ACCESSICH | $725 | $725 | $1,833 | 4/3/2023 | Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 7463 Think Road 52, Hudson, FL 34667 | mcision | $2,557 | $2,557 | | 4/3/2023 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7493 N. UNIVERSITY DR | MEDICAL ELECTRONICS | $8,661 | $8,661 | $6,207 | 4/12/2023 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7493 N. UNIVERSITY DR | MEDICAL ELECTRONICS | $2,454 | $2,454 | | 4/12/2023 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7493 N. UNIVERSITY DR | MEDICAL ELECTRONICS | $0 | $0 | $0 | 4/12/2023 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7493 N. UNIVERSITY DR | OPTOMETR EQUIPMENT FOR HOLLYWOOD | $2,868 | $2,868 | $0 | 1/31/2018 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7493 N. UNIVERSITY DR | HOLLYWOOD DENTAL EQUIPMENT | $8,474 | $8,474 | $0 | 1/31/2018 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7493 N. UNIVERSITY DR | HOLLYWOOD TRACTION SYSTEM | $3,099 | $3,099 | $0 | 4/30/2018 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 750 SOUTH FEDERAL HWY. | BACHELI EKRRIS | $9,742 | $9,742 | $0 | 8/31/2020 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 750 SOUTH FEDERAL HWY. | BACHELI EKRRIS | $1,798 | $1,798 | $0 | 10/17/2017 | Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 7500 SW 8th ST | DES MEDICAL EQUIPMENT AND SERVICES EXAM TABLE WEST | $2,331 | $2,331 | $0 | 8/7/2017 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | ALPHICH USA, INC | $15,410 | $15,410 | $58,650 | 7/22/2022 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | ALPHICH USA, INC | $44,687 | $44,687 | $21,399 | 2/2/2023 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | GOLD CONTRA DYNAMIC INSTRUMENT SERV | $1,547 | $1,547 | $4,817 | 12/31/2022 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | ALPHICH USA, INC | $45,223 | $45,223 | $20,331 | 12/31/2022 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST & 7453 N University Drive | TRANSFER FROM WIP WESTCHESER | $2,656 | $2,656 | $24,873 | 11/30/2022 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | ALPHICH USA, INC | $8,470 | $8,470 | $8,506 | 12/31/2022 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | GENERA RADIOGRAPHIC- ORTS TOY STORE MEDICAL - GOLD C | $26,520 | $26,520 | $5,556 | 9/27/2022 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | TRANSFER FROM WIP MAMTCH | $44,824 | $44,824 | $10,601 | 8/31/2020 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | PATTERSON DENTAL, ALPHICH, BALTICA | $253,424 | $253,424 | $63,373 | 8/31/2020 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | MCKESSON MEDICAL SURGICAL (from Juri) | $143,407 | $143,407 | $109,917 | 11/30/2021 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | Various | ACCESSION MEDICAL SURGICAL (from Juri) | $19,782 | $19,782 | $61,174 | 3/17/2021 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | Various | MEDICAL ELECTRONICS, INC | $12,233 | $12,233 | $4,689 | 8/31/2020 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | Various | MCKESSON MEDICAL SURGICAL - in service Aug | $7,146 | $7,146 | $2,977 | 10/20/2021 | Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 151 NW 11TH ST. | OneView Pinace | $28,102 | $28,102 | $20,312 | 7/6/2020 | Straight-line | MB Medical Operations, LLC |
| Medical Equipment | 151 NW 11TH ST. | Patterson Dental | $127,140 | $127,140 | $125,021 | 7/31/2024 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | Choice Health - Dental Equipment | $81,490 | $81,490 | $46,773 | | | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 7500 SW 8th ST | MEDICAL ELECTRONICS, INC - DENTAL LASER TO TABLE | $67,872 | $67,872 | $59,321 | 9/11/2020 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 501 E 49th St | Opening Balance Sheet - CC Aquisition | $6,629 | $6,629 | $8,552 | 2/22/2020 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 501 E 49th St | Medical electronics, Inc - New Theropi!t Equip | $11,469 | $11,469 | $2,867 | 11/28/2020 | Straight-line | MB Medical Operations, LLC |
| Medical equipment | 1200 ALTON RD | Mckesson For Holleech Dr, Hospital | $18,415 | $18,415 | $4,654 | 5/24/2021 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | MEDICAL ELECTRONICS, INC | $11,275 | $11,275 | $3,738 | 5/24/2021 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | MEDICAL ELECTRONICS, INC - for thermpoty step! | $14,936 | $14,936 | $6,210 | 2/8/2021 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | EQUAHEDA | $1,498 | $1,498 | $0 | 3/17/2011 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | DENTAL PATTERSON | $20,108 | $20,108 | $0 | 6/24/2011 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | DOCTOR'S TOY STORE | $3,704 | $3,704 | $0 | 6/24/2011 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | EQAMEDA | $4,674 | $4,674 | $0 | 8/30/2011 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | OPTIVISION | $8,025 | $8,025 | $0 | 9/19/2011 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | OPTIVISION | $8,662 | $8,662 | $0 | 9/19/2011 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | TRANSPHIZON | $13,424 | $13,424 | $0 | 10/4/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST. | MEDICAL EQUIPMENT | $19,555 | $19,555 | $0 | 11/30/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST. | GE HEALTHCARE | $2,545 | $2,545 | $0 | 2/27/2014 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST. | US OPHNANLMIC | $3,826 | $3,826 | $0 | 5/8/2014 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST. | OPTIVISION | $9,578 | $9,578 | $0 | 8/29/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST. | PATTERSON DENTAL | $38,175 | $38,175 | $0 | 8/31/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST. | OPHNANLMIC | $977 | $977 | $0 | 5/30/2014 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST. | US OPHPRNAMIC | $3,826 | $3,826 | $0 | 9/12/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 151 NW 11TH ST. | CYMADCO EQUIPMENT | $37,375 | $37,375 | $0 | 9/12/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | PATTERSON DENTAL | $2,991 | $2,991 | $0 | 10/4/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD. | DOCTOR'S EQUIPMENT(ichiro) | $2,233 | $2,233 | $0 | 10/10/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD. | SCOPE | $1,055 | $1,055 | $0 | 12/31/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD. | SCOPE | $4,240 | $4,240 | $0 | 11/1/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD. | SCOPE | $4,240 | $4,240 | $0 | 12/31/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD. | SCOPE | $10,990 | $10,990 | $0 | 11/1/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD. | HENRY SCHEIN INC | $11,128 | $11,128 | $0 | 4/23/2014 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD. | hANRY SCHEIN INC | $2,171 | $2,171 | $0 | 8/1/2014 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD. | OFFICE EQUIPMENT(ichiro) | $1,306 | $1,306 | $96 | 2/21/2020 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD. | SCOPE | $1,472 | $1,472 | $210 | 8/1/2019 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD. | SCOPE | $1,500 | $1,500 | $214 | 5/6/2020 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD. | SCOPE | $1,125 | $1,125 | $161 | 9/14/2020 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD. | MEDICAL EQUIPMENT | $2,400 | $2,400 | $0 | 11/1/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | PATTERSON DENTAL | $5,085 | $5,085 | $0 | 12/31/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | PHILLIPS | $38,296 | $38,296 | $0 | 12/31/2013 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 9611 BIRD RD. | MedEquip- Medical Electronics | $353 | $353 | $835 | 11/30/2014 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 729 West Atlantic Blvd | MedEquip- Paittesor 205559 | $11,255 | $11,255 | $11,255 | 2/1/2017 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | PHILPS - ULTRASOUND | $31,555 | $31,555 | $11,255 | 2/1/2017 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | ROOT CANAL | $1,076 | $1,076 | $0 | 4/7/2016 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | NEUROTRONIC | $680 | $680 | $480 | 5/8/2017 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | DOCTOR'S EQUIPMENT SPECIALISTS | $1,118 | $1,118 | $118 | 10/31/2019 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | OPTIVISION | $1,198 | $1,198 | $160 | 10/31/2019 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | CHAIR WITH FOOT CONTROL | $1,061 | $1,061 | $96 | 2/12/2020 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | DOCTOR'S EQUIPMENT SPECIALIST (ZEXAM TABLES) | $965 | $965 | $210 | 8/1/2019 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 1200 ALTON RD | DOCTOR'S EQUIPMENT SPECIALIST (ZEXAM TABLES) | $1,286 | $1,286 | $214 | 5/6/2020 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 351 NW 42nd Ave #503 | DOCTOR'S EQUIPMENT SPECIALIST (40 watt transformer Choico | $1,161 | $1,161 | $161 | 9/14/2020 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Medical equipment | 7500 SW 8th ST | PATTERSON DENTAL SUPPLY | $3,834 | $3,834 | $1,276 | 11/11/2020 | Straight-line | Rosdib Dumerigo, M.D. P.A. |
| Office Equipment | 7500 SW 8th ST | pc connection | $0 | $0 | $0 | 12/20/2023 | Straight-line | Rosdib Dumerigo, M.D. P.A. |

| Category | Address | Description | | | Date | Entity |
|---|---|---|---|---|---|---|
| Office Equipment | 780 SOUTH FEDERAL HWY. | BACHELLI ENTRIES | $913 | $913 | 10/17/2017 Straight-line | AB Medical Operations, LLC |
| Office Equipment | 1200 ALTON RD | ENVIPORT INC | $0 | $0 | 4/11/2011 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | ENVIPORT INC | $0 | $0 | 4/13/2011 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | TIMECLOCK | $0 | $0 | 7/28/2011 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | BELL APPLIANCE | $0 | $0 | 10/3/2011 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | SECURITY CAMERAS | $0 | $0 | 10/31/2011 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | SECURITY CAMERAS | $0 | $0 | 11/3/2011 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | TWO LASER PRINTER | $0 | $0 | 4/12/2012 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | TV FOR ALTON ROAD CONF ROOM | $0 | $0 | 10/1/2012 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | TELEPHONE TELEPHONE EQUIPMENT | $0 | $0 | 10/4/2012 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | FLAGLER | ADVANCED SECURITY SYSTEM | $0 | $0 | 3/4/2013 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | FLORIDA BUILDER APPLIANCES | $0 | $0 | 3/19/2013 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | CAMERA | $0 | $0 | 4/30/2013 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | HI TECH SECURITY SYSTEMS | $0 | $0 | 6/30/2013 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | TELEPHONE TELEPHONE EQUIPMENT | $0 | $0 | 8/22/2013 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 151 NW 11TH ST. | HI TECH SECURITY SYSTEMS | $0 | $0 | 9/10/2013 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | TELEPHONE TELEPHONE EQUIPMENT | $0 | $0 | 9/17/2013 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | FLAGLER | TELEPHONE TELEPHONE EQUIPMENT | $0 | $0 | 9/29/2013 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 151 NW 11TH ST. | TELEPHONE TELEPHONE EQUIPMENT | $0 | $0 | 12/10/2013 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | TELEPHONE TELEPHONE EQUIPMENT | $0 | $0 | 12/31/2013 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | HI TECH SECURITY SYSTEMS | $0 | $0 | 3/7/2014 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 1200 ALTON RD | SEARS | $0 | $0 | 4/11/2014 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 151 NW 11TH ST. | MONICA VEGA | $0 | $0 | 7/29/2014 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 151 NW 11TH ST. | home depot | $0 | $0 | 11/30/2014 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Office Equipment | 7600 SW 8TH ST | PBX PHONE SYSTEM | $0 | $0 | 3/3/2004 Straight-line | Miami Medical & Wellness Center, LLC |
| Transport | 1200 ALTON RD | ULTIMATE HOME | $0 | $0 | 1/14/2014 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Transport | 1200 ALTON RD | FERNANDO IZAGUIRRE | $0 | $0 | 2/6/2014 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Transport | 1200 ALTON RD | FERNANDO IZAGUIRRE | $0 | $0 | 2/13/2014 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Transport | 1200 ALTON RD | GENESIS | $0 | $0 | 2/25/2014 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Transport | 1520 Biscayne Blvd | SOUTHERN TECH | $174 | $174 | 5/4/2014 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Transport | 1200 ALTON RD | ULTIMATE HOME | $91 | $91 | 5/9/2014 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Transport | 1200 ALTON RD | IN MOTION MOBILITY(MIBMT) | $2 | $0 | 8/20/2015 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Transport | 1200 ALTON RD | IN MOTION MOBILITY(MIBMT) | $0 | $0 | 9/15/2015 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Transport | 1200 ALTON RD | TELESPHERE(MIBM) | $8 | $0 | 9/17/2015 Straight-line | Rocolfo Dumerigo, M.D.P.A. |
| Transport | 1200 ALTON RD | TELESPHERE(MIBM) | $1 | $0 | 9/18/2015 Straight-line | Rocolfo Dumerigo, M.D.P.A. |

**<u>Schedule 2.1(a)(v)</u>**

Leasehold Interests in Personal Property

See attached.

**2.1(a)(v)  Leasehold Interests in Personal Property**

| Legal Entity | Summary | Name | Address |
|---|---|---|---|
| *No contract* | Computer Equipment Financing | DELL BUSINESS CREDIT | PO BOX 5275 Carol Stream, IL 60197-5275 |
| *No contract* | Dental Equipment Financing | Choice Health Finance | PO BOX 790448 St Louis, MO 63179-0448 |
| *No contract* | Dental Equipment Financing | Oneview Finance | PO BOX 911608 Denver, CO 80291-1608 |
| MB Medical Operations, LLC | Medical Equipment Financing | Balboa Capital | 575 Anton Blvd, 12th Floor Costa Mesa, CA 92626 |
| MB Medical Operations, LLC | Medical Equipment Financing | HIGHLAND CAPITAL CORP | 1 Passaic Ave., Fairfield NJ 07004 |
| MB Medical Operations, LLC | Dental Equipment Financing | Prohealth Capital, | 1111 Old Eagle School Road, Wayne, Pennsylvania 19087 |
| Rodolfo Dumenigo M.D., P.A. | Pharmacy Equipment Financing | CHG-Meridian USA Corp. | 21800 Oxnard St. Suite 400, Woodland Hills, CA 91367 |
| MB Medical Operations, LLC | Dental Equipment Financing | PATTERSON COMPANIES INC - 710354 | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 |
| MB Medical Operations, LLC | Dental Equipment Financing | PATTERSON DENTAL SUPPLY 4784 | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 |
| *No contract* | Postal Machine Lease | PITNEY BOWES GLOBAL FINANCIAL | PO BOX 981022 Boston, MA 02298-1022 |
| *No contract* | Medication dispensing platform | Quiqmeds | 7 Great Valley Parkway, Suite 100, Malvern, PA 19355 |
| *No contract* | Equipment and Financing (Copiers) | TGI Office Automation | PO BOX 41602, Philadelphia, PA |
| *No contract* | Equipment and Financing (Copiers) | Wells Fargo Vendor Fin Serv | PO BOX 105743, Atlanta, GA 30348-5743 |

## Schedule 2.1(a)(vii)

Assumed Contracts

1. Asset and Equity Purchase Agreement, dated August 20, 2020, by and among Clinical Care Associates Inc., Clinical Care Center, Clinical Care, Inc., Clinical Care Services, Inc., Clinical Care Network, Inc., Clinical Care Pharmacy, LLC, Care Center Network, Care Center Medical Group, MB Medical Operations, LLC, Miami Beach Medical Centers, Inc. f/k/a Rodolfo Dumenigo, M.D., P.A., Miami Beach Medical Consultants, LLC d/b/a Clinical Care Medical Centers, MB Medical Transport, LLC, MBMG Holdings, LLC , MBMG, and the other parties thereto.

2. Membership Interest Purchase Agreement, dated April 26, 2021, by and among MB Medical Operations, LLC, Florida Family Primary Care Center, LLC, Octavio A. Bravo, James Eaton, Maria Isabel Gonzalez, Luis G. Venerio Salazar, as amended by that certain First Amendment to Membership Interest Purchase Agreement, dated May 25, 2021

3. Directed Stock Transfer Agreement, dated March 10, 2017, by and among MB Medical Operations, LLC, Viva Health, LLC, and Juan Garces, M.D.

4. Settlement Agreement, dated August 7, 2024, by and between One Plus Healthcare, LLC and CCN

5. Trademark Assignment Agreement, dated January 14, 2020, by and between MBMO and RD with respect to Trademark Registration 5890302.

6. Trademark License Agreement, dated January 17, 2020, by and among MBMO, RD, and MMWC with respect to Trademark Registration 5890302.

7. Any rights in favor of Sellers that may rise under the settlement agreement with respect to RD v. Jose G. Alvarez, M.D., P.A.

8. Any rights in favor of Sellers that may rise under the settlement agreement with respect to CCN v. Las Americas Medical Center, LLC and Leal Medical Center, LLC.

## Schedule 2.1(a)(xiii)

Carved Out Claims

1. Any claims against the current directors and officers of Sellers, in each case, solely with respect to such individual's role as a director, officer, or member of the Special Committee.

2. Any claims against the members of Special Committee, in each case, solely with respect to such individual's role as a director, officer, or member of the Special Committee.

## Schedule 2.1(a)(xiv)

Prepaid Expenses and Rights to Refunds Related to Purchased Assets

See attached.

## CCMC

Prepaids Schedule as of 8/31

| Category | Vendor | Legal Entity | Sum of Prepaid Balance 08/31/24 |
|---|---|---|---|
| Prepaid Software | SALESFORCE.COM INC | MBMO | 205,485.16 |
| Prepaid Insurance | Southeast Series of Lockton Companies, LLC | MBMO | 203,611.90 |
| Prepaid EMR | NEXTGEN HEALTHCARE INC | MBMO | 108,897.86 |
| Prepaid - NNN Insurance (Rent Exp) | GABLES INSURANCE AGENCY CORP | MBMO | 107,228.96 |
| Prepaid Transport (registrations) | MARSH & MCLENNAN AGENCY LLC | MBMT | 82,475.50 |
| Prepaid Insurance | MARSH & MCLENNAN AGENCY LLC | MBMO | 71,784.84 |
| Prepaid Transport (registrations) | Travelers | MBMT | 69,926.35 |
| Prepaid Insurance | AFCO | MBMO | 46,326.96 |
| Prepaid Software | IPOWER TECHNOLOGIES | MBMO | 36,800.34 |
| Prepaid Software | PC CONNECTION SALES CORP | MBMO | 21,715.00 |
| Prepaid Software | SIRIUS COMPUTER SOLUTIONS, INC | MBMO | 21,678.45 |
| Prepaid Insurance | MARSH & MCLENNAN AGENCY LLC | MDPA | 20,443.33 |
| Prepaid Advertising | CMG PRODUCTS | MBMO | 20,000.00 |
| Prepaid Software | VALIDITY INC. | MBMO | 16,050.83 |
| Prepaid Software | Uipath Inc | MBMO | 13,200.00 |
| Prepaid Supplies | MIDMARK CORPORATION | MDPA | 10,663.89 |
| Prepaid R&M | HI TECH SECURITY &COMMUNICATIONS, INC | MBMO | 9,085.73 |
| Prepaid Other | CITY OF MIAMI BEACH | MBMO | 8,533.33 |
| Prepaid Software | INTELLIGENT MEDICAL OBJECTS, INC | MBMO | 6,201.56 |
| Prepaid - NNN Insurance (Rent Exp) | American Bankers Insurance Company of Florida | MBMO | 4,069.33 |
| Prepaid Software | INSIGHT DIRECT USA, INC. | MBMO | 4,000.81 |
| Prepaid Software | NETGAIN SOLUTIONS, INC. | MBMO | 3,874.24 |
| Prepaid Insurance | Miami Metro Medical LLC | MBMO | 3,840.70 |
| Prepaid Licenses/Permits | DADE COUNTY MEDICAL ASSOCIATION | MDPA | 2,000.00 |
| Prepaid Insurance | HARTFORD INSURANCE COMPANY | MDPA | 1,711.00 |
| Prepaid Licenses/Permits | CIRA WELVAERT | MDPA | 1,628.57 |
| Prepaid Software | WOLTERS KLUWER HEALTH | MBMO | 1,538.08 |
| Prepaid R&M | TK ELEVATOR CORPORATION | MBMO | 1,080.09 |
| Prepaid Other | PITNEY BOWES GLOBAL FINANCIAL | MBMO | 962.83 |
| Prepaid Licenses/Permits | JORGE FERNANDEZ-NOVALES | MDPA | 756.58 |
| Prepaid Licenses/Permits | GERMAN SUAREZ MD | MDPA | 727.50 |
| Prepaid Licenses/Permits | FRANCISCO GARCIA RODRIGUEZ | MDPA | 698.67 |
| Prepaid Licenses/Permits | Manuel Silva | MDPA | 592.00 |
| Prepaid R&M | FLORIDA FIRE ALARM INC. | MBMO | 588.50 |
| Prepaid Licenses/Permits | JUAN ALVAREZ | MDPA | 518.00 |
| Prepaid Software | GOODSYNC | MBMO | 424.95 |
| Prepaid Licenses/Permits | Alexis Bravo | MDPA | 345.33 |
| Prepaid Licenses/Permits | Carlos Flores | MDPA | 345.33 |
| Prepaid Licenses/Permits | Dr. Emma Alonso | MDPA | 326.28 |
| Prepaid Licenses/Permits | BEATRIZ URIBAZO | MDPA | 274.17 |
| Prepaid Licenses/Permits | MARIA GARCIA | MDPA | 266.72 |
| Prepaid Licenses/Permits | DAVID E RODRIGUEZ | MDPA | 259.00 |
| Prepaid Licenses/Permits | SALVADOR NUNEZ | MDPA | 197.33 |
| Prepaid Licenses/Permits | ESDRAS LOPEZ-GARCIA | MDPA | 151.11 |
| Prepaid Transport (registrations) | Divvy | MBMT | 149.05 |
| Prepaid Licenses/Permits | REYNALDO ARRIETA | MDPA | 148.00 |
| Prepaid R&M | 50 State Technology, Inc | MBMO | 134.39 |
| Prepaid Licenses/Permits | LUISA PADILLA | MDPA | 123.33 |
| Prepaid Licenses/Permits | MARIA SOTO | MDPA | 123.33 |
| Prepaid Licenses/Permits | OSMEL ALBA OLIVEROS | MDPA | 123.33 |
| Prepaid Licenses/Permits | FERNANDO DE ARMENDI | MDPA | 115.14 |
| Prepaid Insurance | HARTFORD FIRE INSURANCE COMPANY | MBMO | 107.00 |
| Prepaid Licenses/Permits | YUNIOR SILVA BARRERO | MDPA | 98.67 |
| Prepaid Licenses/Permits | CITY OF HOMESTEAD - TR | MBMO | 81.67 |
| Prepaid Licenses/Permits | YANELIS VALDEZ | MDPA | 74.00 |
| Prepaid Licenses/Permits | ABEL MORA | MDPA | 55.50 |
| Prepaid Licenses/Permits | CITY OF MIAMI | MBMO | 53.96 |
| Prepaid Licenses/Permits | DIVVY | MDPA | 49.33 |
| Prepaid Licenses/Permits | CITY OF MIAMI BEACH - 1214 ALTON | MBMO | 42.02 |
| Prepaid Other (Dormant entities) | Prepaid Other (Dormant entities) | CCMG,CCN,LHA | 36,185.11 |
| **Total** | | | **1,148,951** |

# CCMC

Lease Schedule Including Security Deposits (based on Lease Agreements)

| Center | Landlord | Related Party | Address | Suite # | City | County | State | RSF | LCD | LED | CCMC Monthly | Est. Security Deposit 357,213 | Type of Lease | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TAMARAC | EVERGREEN 3, LLC | N | 7453, 7455, 7495 N. University Dr. | | Tamarac | Broward | FL | 4,600 | 5/1/2019 | 3/31/2024 | 11,769 | 22,117 | Commercial Property Lease | Month to month |
| PALM RIVER (Clinic, Therapy) | Haus International Corp LLC | N | 7444 & 7452 E Palm River Rd. | | Tampa | Hillborough | FL | 5,100 | | 6/30/2024 | 5,716 | 5,000 | Commercial Property Lease | Month to month |
| LAKELAND | LAKELAND INVESTMENTS LLC | N | 2417 Hwy 98 N | | Lakeland | Polk | FL | 7,550 | 11/1/2017 | 7/31/2024 | 14,838 | 7,500 | Commercial Property Lease | Month to month |
| HANLEY (Activity) | Alva Properties, Inc | N | 6704 Hanley Rd | | Tampa | Hillborough | FL | 1,580 | | 7/31/2024 | 2,187 | | Commercial Property Lease | |
| PALMETTO BAY | FERN STREET PROPERTIES, LLC | N | 9855,9861,9865 E Fern St. | | Palmetto Bay | Dade | FL | 5,021 | 4/1/2020 | 3/31/2025 | 6,531 | 10,294 | Commercial Property Lease | |
| FLAGLER | TOWER SHOPPING PLAZA, INC | N | 11200 West Flagler St. | 101-107, 110, 201 | Sweetwater | Dade | FL | 9,000 | | 7/31/2025 | 16,809 | 29,291 | Commercial Property Lease | |
| HANLEY (Therapy) | Alva Properties, Inc | N | 6710A Hanley Rd. | | Tampa | Hillborough | FL | 3,124 | | 8/31/2025 | 3,989 | 4,000 | Commercial Property Lease | |
| HIALEAH WEST | CCN Holding of Hialeah, LLC | N | 4980 W 10th Ave. | | Hialeah | Dade | FL | ### | 9/10/2020 | ###### | 23,139 | 42,408 | Commercial Property Lease | |
| HANLEY (Dental) | Alva Properties, Inc | N | 6710B Hanley Rd. | | Tampa | Hillborough | FL | 1,578 | | 1/31/2026 | 2,101 | 2,059 | Commercial Property Lease | |
| HUDSON (Clinic, Therapy) | Peter Pan Developments, LLC | N | 7455,7465 SR-52 | | Hudson | Pasco | FL | 5,035 | 9/1/2021 | 6/30/2026 | 6,325 | 3,600 | Commercial Property Lease | |
| BIRD ROAD | 9611 BIRD ROAD LLC | Y | 9611 SW 40th St. | | Miami | Dade | FL | 7,508 | 8/1/2016 | 7/31/2026 | 20,435 | | Commercial Property Lease | |
| FOWLER/TEMPLE TERRACE | Terrace Walk Plaza | N | 11531 N 56th St. | 103 | Temple Terrace | Hillborough | FL | 3,573 | 4/16/2014 | 7/31/2026 | 8,187 | 33,510 | Commercial Property Lease | |
| HANLEY (Access) | Alva Properties, Inc | N | 6712A Hanley Rd. | | Tampa | Hillborough | FL | 1,385 | | 7/31/2026 | 1,951 | 1,899 | Commercial Property Lease | |
| HANLEY (Clinic) | Alva Properties, Inc | N | 672A A & B Hanley Rd. | | Tampa | Hillborough | FL | 6,000 | | 7/31/2026 | 8,774 | 33,000 | Commercial Property Lease | |
| MIAMI BEACH | 1200 ALTON ROAD, LLC | Y | 1200 Alton Rd. | | Miami Beach | Dade | FL | ### | 12/1/2016 | ###### | 81,575 | | Commercial Property Lease | |
| WESTCHESTER | 7500 SW 8ST LLC | Y | 7500 SW 8th St. | | Miami | Dade | FL | ### | | 12/5/2026 | 82,217 | | Commercial Property Lease | |
| HIALEAH EAST | 531 E 49TH ST LLC | Y | 531 E 49th St. | | Hialeah | Dade | FL | 9,884 | 1/1/2017 | ###### | 24,849 | 10,700 | Commercial Property Lease | |
| HOLLYWOOD | 750 SOUTH FEDERAL HIGHWAY LLC | Y | 750 S. Federal Hwy. | | Hollywood | Broward | FL | 8,500 | | ###### | 23,711 | | Commercial Property Lease | |
| DELRAY | ATLANTIC AVENUE REALTY ASSOCIATES, L.L.C. | N | 7291 W Atlantic Ave. | 8190 -8210 - 8220 | Delray Beach | Palm Beach | FL | 5,280 | 12/1/2017 | ###### | 18,052 | 5,281 | Commercial Property Lease | |
| PLANT CITY (Clinic, Therapy) | CITY PROPERTIES COMPANY, INC | N | 1608 W Oak Ave. | | Plant City | Hillborough | FL | 2,300 | | 6/30/2028 | 2,047 | 3,814 | Commercial Property Lease | |
| MIAMI LAKES | Gardens Office Complex, LLC | N | 18590 Northwest 67th Ave. | 101, 200, 200A, 23 | Miami Lakes | Dade | FL | 6,863 | 5/8/2015 | 9/30/2028 | 20,000 | 18,396 | Commercial Property Lease | |
| PINELLAS | Prestige Park LLC | N | 6245 66th St N. | 104-107 | Pinellas Park | Pinellas | FL | 7,088 | 2/1/2014 | 3/31/2029 | 11,224 | 33,402 | Commercial Property Lease | |
| WINTER HAVEN | 201-205 S 1st ST LLC | Y | 201 1st St S. | | Winter Haven | Polk | FL | ### | 4/20/2021 | 3/31/2031 | 18,291 | | Commercial Property Lease | |
| NORTH MIAMI WEST | 126 WEST DIXIE LLC | Y | 1265-1 1/1625 N. Dixie Hwy. | | North Miami | Dade | FL | ### | 9/1/2021 | 6/30/2031 | 25,489 | | Commercial Property Lease | |
| ORLANDO | 1303 SOUTH SEMORAN LLC | Y | 1303 South Semoran Blvd. | | Orlando | Orange | FL | ### | 10/1/2021 | 9/30/2031 | 34,469 | | Commercial Property Lease | |
| MIAMI 27th | THE HUB RETAIL, LLC | N | 701 NW 27th Ave | | Miami | Dade | FL | 6,700 | 1/1/2022 | 7/31/2032 | 18,445 | 47,666 | Commercial Property Lease | |
| PALM RIVER (Activity, Access) | Palm River Square Associates, LLC | N | 7867 Palm River Rd. | | Tampa | Hillborough | FL | 7,500 | 10/1/2021 | 8/31/2032 | 12,471 | | Commercial Property Lease | |
| NORTH MIAMI EAST | Miami Metro Medical LLC | N | 12550 Biscayne Blvd. | 100-201 | North Miami | Dade | FL | 9,800 | 10/1/2017 | 5/31/2035 | 49,519 | 40,690 | Commercial Property Lease | |
| LE JEUNE | Miami Metro Medical LLC | N | 351 NW 42nd Ave. | 315, 503, 504 | Miami | Dade | FL | 7,453 | 3/1/2017 | 5/31/2035 | 28,824 | | Commercial Property Lease | |
| HOMESTEAD | Miami Metro Medical LLC | N | 151 NW 11th St. | | Homestead | Dade | FL | 5,762 | 3/9/2017 | 5/31/2035 | 18,989 | | Commercial Property Lease | |
| HUDSON (Access) | Courser Square Office Park LLC | N | 7621 US Hwy 19 | 1000 | New Port Richey | Pasco | FL | 1,398 | | | 2,205 | 2,084 | Commercial Property Lease | |
| PLANT CITY (Access) | Marion Simmons | N | 1302 S. Collins St. | | Plant City | Hillborough | FL | 1,752 | 7/1/2018 | MTM | 2,134 | 500 | Commercial Property Lease | Month to month |
| Bird Road Parking | EMILIO ALVAREZ | N | 9540 SW 39th Street | | Miami | Dade | FL | n/a | 7/1/2018 | ###### | 700 | | Parking Lot Lease | Month to month |
| Hialeah Parking | FIRST SPANISH CHURCH OF THE OPEN BIBLE | N | 490 E 50 ST | | Hialeah | Dade | FL | n/a | 10/6/2014 | MTM | 2,000 | | Parking Lot Lease | Month to month |

## Schedule 2.1(b)(xxiii)

Excluded Devices

| Device Name | Serial Number |
|---|---|
| DESKTOP-0U8TU1M | D5BKRF2 |
| AMELCON-LT | 9LNMM33 |
| YELIU-LT | PF1A9DYA |
| DR-CC-CODER | MJ0DRDVK |
| JSUAREZ-MBP | C02G53QXML85 |
| MSHIRAZI-LT | 5BSP9FNR900044W |
| MARPEREZ-LT | KPQF99YR9000YW |

**Schedule 2.1(b)(xxiv)**

Other Excluded Assets

None.

## **Schedule 2.3(a)**

Desired 365 Contracts

See attached.

# CCMC

Subject to Revision

Notes:
* Executory Contracts as of 10.10.2024
* Cure Amounts based on Accounts Payable balance as of 10/10/2024
* Cure Amounts are not inclusive of Commercial Leases that have been exited by CCMC

Total: 1,704,438

| Index # | Legal Entity | Nature of the Debtor's Interest | Counterparty Name | Noticing Address | Executory Contract Title | Cure Costs |
|---|---|---|---|---|---|---|
| 1 | MB Medical Operations, LLC | Commercial Lease | 1200 ALTON ROAD, LLC | 4865 SW 80th St Miami, FL 33143 | Lease by and between Alanar Investments LTD and Rodolfo Dumenigo, M.D., P.A., and the Assignment and Assumption of Lease Agreement by Alanar Investments Ltd. to 1200 Alton Road, LLC | $0.00 |
| 2 | MB Medical Operations, LLC | Commercial Lease | 126 WEST DIXIE LLC | 4865 SW 80th St Miami, FL 33143 | Lease by and between 126 West Dixie LLC, a Florida llc and MB Medical Operations, LLC a Delaware llc | $0.00 |
| 3 | MB Medical Operations, LLC | Commercial Lease | 1303 SOUTH SEMORAN LLC | 4865 SW 80th St Miami, FL 33143 | Lease by and between 1303 South Semoran LLC and MB Medical Operations, LLC | $0.00 |
| 4 | MB Medical Operations, LLC | Commercial Lease | 201-205 S 1st ST LLC | 1400 NW 107th Ave., Suite 500, Miami, Florida 33172 | Lease by and between 201-205 S 1st ST LLC and MB Medical Operations, LLC | $0.00 |
| 5 | MB Medical Operations, LLC | Commercial Lease | 551 E 49 ST LLC | 1200 Alton Road, Miami Beach, FL 33139 | Lease by and between 551 East 49 Street, LLC and MB Medical Operations, LLC | $0.00 |
| 6 | MB Medical Operations, LLC | Commercial Lease | 750 SOUTH FEDERAL HIGHWAY LLC | 1200 Alton Road, Miami Beach, FL 33139 | Lease by and between 750 Federal Highway, LLC and MB Medical Operations, LLC | $0.00 |
| 7 | MB Medical Operations, LLC | Commercial Lease | 7500 SW 8 ST LLC | 1200 Alton Road, Miami Beach, FL 33139 | Execution Version - Lease by and between 7500 SW 8ST, LLC a Florida llc and MB Medical Operations, LLC a Delaware llc | $0.00 |
| 8 | MB Medical Operations, LLC | Commercial Lease | 9611 BIRD ROAD LLC | 1200 Alton Road, Miami Beach, FL 33139 | Lease by and between 9611 Bird Road LLC a Florida llc and MB Medical Operations, LLC a Delaware llc | $0.00 |
| 9 | Miami Beach Medical Consultants, LLC | Payor contracts | Aetna Better Health of Florida | Coventry Health Care of Florida, Inc. Attn. Medicaid Network Management 1340 Concord Terrace Sunrise, FL 33323 and Aetna Law Dept, Medicaid, Mail Code RE6A 151 Farmington Avenue Hartford, CT 06156-0001 | Medicaid/Provier Group Agreement | $0.00 |
| 10 | Miami Beach Medical Consultants, LLC | Payor contracts | Aetna Network Services LLC | 151 Farmington Avenue, Hartford, CT 06156 | Provider Agreement | $0.00 |
| 11 | Miami Beach Medical Consultants, LLC | Payor contracts | Aetna Network Services LLC | 151 Farmington Avenue, Hartford, CT 06156 | Physician Group Agreement | $0.00 |
| 12 | MBMG Ultimate Holding, LP | Insurance | AFCO Premium Credit LLC | 150 N Field Drive, Suite 190, Lake Forest, IL 60045 | Premium Finance Agreement A joint venture of AFCO Credit Corporation and Marsh USA LLC | $0.00 |
| 13 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Aguiar Alvarez, Gilberto | 10512 sw 144 ct | Employment Agreement by and between Gilberto Aguiar Alvarez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 14 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Alba Oliveros, Osmel | 8910 SW 200 St | Employment Agreement by and between Osmel Alba Oliveros, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 15 | MB Medical Operations, LLC | Commercial Lease | Aliva Properties, Inc | 8405 N Edison Ave, Tampa Florida 33604 | Shopping Center Lease between Aliva Properties, Inc. and Florida Family Primary Care Centers of Tampa, LLC | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE          CONFIDENTIAL

CONFIDENTIAL

DRAFT - SUBJECT TO MATERIAL CHANGE

| # | Entity | Agreement Type | Counterparty | Address | Description | Amount |
|---|--------|----------------|--------------|---------|-------------|--------|
| 16 | Florida Family Primary Care Centers of Tampa, LLC | Commercial Lease | Aliva Properties, Inc | 8405 N Edison Ave, Tampa Florida 33604 | Shopping Center Lease between Aliva Properties, Inc. and Florida Family Primary Care Centers of Tampa, LLC | $0.00 |
| 17 | Florida Family Primary Care Centers of Tampa, LLC | Commercial Lease | Aliva Properties, Inc | 8405 N Edison Ave, Tampa Florida 33604 | Shopping Center Lease between Aliva Properties, Inc. and Florida Family Primary Care Centers of Tampa, LLC | $0.00 |
| 18 | Florida Family Primary Care Centers of Tampa, LLC | Commercial Lease | Aliva Properties, Inc | 8405 N Edison Ave, Tampa Florida 33604 | Shopping Center Lease between Aliva Properties, Inc. and Florida Family Primary Care Centers of Tampa, LLC | $0.00 |
| 20 | Miami Medical & Wellness Center, LLC | Employment Agreement | Alonso, Alberto | 4440 Sw 148 Terrace | Employment Agreement by and between Miami Medical & Wellness Center LLC and Alberto B. Alonso, MD | $0.00 |
| 21 | Care Center Network, LLC | Employment Agreement | Alonso, Emma | 2501 SW 37th Ave | EMPLOYMENT AGREEMENT by and between EMMA R. ALONSO, M.D and CLINICAL CARE NETWORK, INC. | $0.00 |
| 22 | MB Medical Operations, LLC | Employment Agreement | Altieri, Dalirma | 10371 SW 60th St, Miami, FL 33173 | Separation Agreement, Including General Release between Dalirma Altieri and MB Medical Operations, LLC d/b/a Clinical Care Medical Centers | $0.00 |
| 23 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Alvarez Pando, Yolanda | 1291 Evergreen Park Cir. | Employment agreement by and between Yolanda Alvarez Pando, MD and Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), d/b/a Miami Beach Medical Group | $0.00 |
| 24 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Alvarez, Juan | 14951 Belaire Drive S | Employment Agreement by and between Juan Alvarez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 25 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Angel Batista, MD | 16253 SW 102 Terr, Miami, FL 33196 | INDEPENDENT CONTRACTOR AGREEMENT | $0.00 |
| 27 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Arredondo Torres, Elsa Lisset | 819 Southwest 6th Avenue | EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of the 24th day of April, 2023 (the "Effective Date"), by and between Elsa Arredondo, APRN ("Employee"), and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS ("Employer"). | $0.00 |
| 28 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Arrieta, Reynaldo E. | 10243 Oasis Palm Dr | Employment Agreement by and between Reynaldo Arrieta, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 29 | MB Medical Operations, LLC | Professional Fees | Atlantis Partners | 800 Corporate Dr # 320, Fort Lauderdale, FL 33334 | Atlantis Statement of Work | $0.00 |
| 30 | MB Medical Transport, LLC | Equipment and Financing (Vehicle P-Automation CDJR Pembroke Pines | 13601 Pines Blvd, Pembroke Pines, FL 33027 | Retail purchase agreement between MB Medical Transport, LLC and Automation CDJR Pembroke Pines | $0.00 |
| 31 | MB Medical Transport, LLC | Equipment and Financing (Vehicle P-Automation CDJR Pembroke Pines | 13601 Pines Blvd, Pembroke Pines, FL 33027 | Retail purchase agreement between MB Medical Transport, LLC and Automation CDJR Pembroke Pines | $0.00 |

CONFIDENTIAL

| # | Entity | Type | Counterparty | Address | Description | Value |
|---|--------|------|--------------|---------|-------------|-------|
| 32 | MB Medical Operations, LLC | Equipment and Financing | Balboa Capital | 575 Anton Blvd, 12th Floor Costa Mesa, CA 92626 | Equipment Financing Agreement, Agreement #8379015-000 between Balboa Capital and MB Medical Operations, LLC | $0.00 |
| 33 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Balladares Ros, Daisel | 14661 Southwest 99th Street | EMPLOYMENT AGREEMENT by and between Daisel Balladares, APRN ("Employee") and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS ("Employer"). | $0.00 |
| 34 | Florida Family Primary Care Center of Pasco, LLC / Florida Family Primary Care Centers of Pinellas, LLC / Florida Family Primary Care Centers of Tampa, LLC | Employment Agreement | Batista, Moraima | 11328 Bloomington Drive | FIRST AMENDMENT TO EMPLOYMENT AGREEMENT by and between FLORIDA FAMILY PRIMARY CARE CENTER OF PASCO, LLC, FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC, and FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC (collectively, the "Company"), and MORAIMA BATISTA, M.D. | $0.00 |
| 35 | MBMG Holding, LLC | Professional Fees | BDO USA, P.C. | 100 SE 2nd Street 17th Floor Miami Tower Miami, FL 33131 | Engagement Letter | $0.00 |
| 36 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Berrios, Rosa Maria | 128 Smiths Ford Road | EMPLOYMENT AGREEMENT (this "Agreement") by and between Rosa Berrios, APRN ("Employee"), and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS ("Employer"). | $0.00 |
| 37 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 38 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 39 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 40 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 41 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 42 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 43 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 44 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 45 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 46 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 47 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 48 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 49 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 50 | MB Medical Transport LLC | Equipment and Financing | Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

| # | Entity | Category | Counterparty | Address | Agreement | Amount |
|---|--------|----------|--------------|---------|-----------|--------|
| 51 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 52 | MB Medical Operations, LLC | Commercial Lease | BJ's Restaurants, inc | c/o Gregory S. Lynds-EVP & Chief Development Officer, 7755 Center Avenue, Suite 300 Huntington Beach, CA 92647 | Access and Parking License Agreement by and between BJ'sRestaurants, inc. a California corporation and MB Medical Operations, LLC a Florida llc | $0.00 |
| 53 | MB Medical Operations, LLC | Meals | Blessed Kitchen LLC | 810 W Colonial Blvd, Orlando, FL | Purchase Agreement with Clinical Care Medical Centers and Blessed Kitchen, LLC | $4,031.08 |
| 54 | MB Medical Operations, LLC | Meals | Blessed Kitchen LLC | 810 W Colonial Blvd, Orlando, FL | Purchase Agreement with Clinical Care Medical Centers and Blessed Kitchen, LLC | See #53 |
| 55 | Miami Medical & Wellness Center, LLC | Employment Agreement | Caceres Muskus, Juan | 6120 Reese Road | Employment agreement by and between Juan Caceres Muskus, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 56 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement (Provider) | Capote Sarmiento, Rafael | 3810 Nw 183rd St | Employment Agreement | $0.00 |
| 57 | MB Medical Operations, LLC | Technology | CareOptimize | 8700 W Flagler St #400, Miami, FL 33174 | Miami Beach Medical Centers Travel Proposal | $0.00 |
| 58 | Miami Beach Medical Consultants, LLC | Payor contracts | Careplus Health Plans, Inc. | 8200 NW 41 Street, Suite 305 Doral, Florida 33166 | Primary Care Agreement | $0.00 |
| 59 | Miami Beach Medical Consultants, LLC | Payor contracts | Careplus Health Plans, Inc. | 8200 NW 41 Street, Suite 305 Doral, Florida 33166 | Primary Care Agreement | $0.00 |
| 60 | Care Center Network, LLC | Payor contracts | Careplus Health Plans, Inc. | 11430 NW 20th Street, Suite 200 Doral, Florida 33172 Attn. Provider Operations Department | Primary Care Agreement | $0.00 |
| 61 | Care Center Medical Group, LLC | Payor contracts | Careplus Health Plans, Inc. | 11430 NW 20th Street, Suite 300 Doral, Florida 33172 Attn. Provider Operations Department | Primary Care Agreement | $0.00 |
| 62 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Carrate, Marianeee | 12740 Sw 101 Terrace | Employment Agreement by and between Marianeee Carrate, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 63 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Castaneda, Carlos D | 3183 Southwest 24th Street | EMPLOYMENT AGREEMENT by and between Carlos Castaneda, PA ("Employee"), and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS | $0.00 |
| 64 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Castellanos Santos, Daili | 1091 Southwest 131st Avenue | Employment Agreement by and between Daili Castellanos Santos, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 65 | MB Medical Operations, LLC | Commercial Lease | CCN Holding of Hialeah, LLC | 7750 SW 117 Ave Suite 306 Miami, FL United States | Block Lease Agreement by and between CCN Holding of Hialeah, LLC and MB Medical Operations, LLC | $0.00 |
| 66 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Celoge, Marie Yolette | 19745 E St Andrews Dr | Employment Agreement by and Between Marie Celoge, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |

CONFIDENTIAL

| # | Debtor | Contract Type | Counterparty | Address | Description | Amount |
|---|---|---|---|---|---|---|
| 67 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Cerra Villalobos, Indira | 3355 W 68 Street | Employment Agreement by and between Indira Cerra Villalobos, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 68 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Charles, Jean Philippe | 15435 SW 175 Street | Employment Agreement by and between Jean Charles, PA, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 69 | Miami Beach Medical Transport, LLC | Insurance | Charter Oak Fire Insurance Company | One Tower Square, Hartford, CT 06183 | Auto Insurance Policy | $0.00 |
| 70 | Miami Beach Medical Transport, LLC | Insurance | Charter Oak Fire Insurance Company | One Tower Square, Hartford, CT 06183 | Auto Insurance Policy | $0.00 |
| 71 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Equipment and Financing | CHG-Meridian USA Corp. | 21800 Oxnard St. Suite 400, Woodland Hills, CA 91367 | Master lease agreement by and between CHG-Meridian USA Corp. and Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 72 | MB Medical Operations, LLC | Employment Agreement | Chin, Sharon | 10607 SW 6 St Pembroke Pines, FL 33025 | Separation Agreement, Including General Release between Sharon Chin and MB Medical Operations, LLC d/b/a Clinical Care Medical Centers | $0.00 |
| 73 | MB Medical Operations, LLC | Commercial Lease | CITY PROPERTIES COMPANY, INC | 110 E. Reynolds Sreet suite 100-A Plant City, Florica 33563 | Lease by and between City Properties Co. and MB Medical Operations, LLC | $2,100.95 |
| 74 | MB Medical Operations, LLC | Technology | Clearwater Compliance LLC | 40 Burton Hills Blvd #200, Nashville, TN 37215 | Statement of Work No. 3 Clearwater ClearAdvantage® Protect Plus Program | $0.00 |
| 75 | MB Medical Operations, LLC | Marketing | CMG Products Corp. | 6071 NW 7 Street, Suite 175, Miami, FL 33126 | Consulting Agreement between MBMG Medical Centers and CMG Products | $0.00 |
| 76 | MB Medical Operations, LLC | Marketing | CMG Products Corp. & ALBITA | 6071 NW 7 Street, Suite 175, Miami, FL 33126 | Endorsement Agreement between Clinical care Medical Centers and ALBITA | $0.00 |
| 77 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Coastal Building Maintenance | 8651 NW 70TH ST, MIAMI, FL 33166 | Janitorial Services Proposal | $1,765.50 |
| 78 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Coastal Building Maintenance | 8651 NW 70TH ST, MIAMI, FL 33166 | Janitorial Services Proposal | See #77 |
| 79 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Condit, Alexis Deanna Bravo | 1024 NW 9 TER | Employment Agreement by and between Alexis Bravo, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. | $0.00 |
| 80 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Conrado, Carlos | 1355 Sw 7 Street | Employment Agreement by and between Carlos Conrado, M.D. and Miami Medical Wellness Center/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 81 | Florida Family Primary Care Center of Pasco, LLC | Commercial Lease | Counsel Square Office Park LLC | c/o Woodside Capital Partners 4200 S. Hulen St., Suite 410 Ft. Worth, Texas 76109 Attn: Tim Larson | Lease by and between Counsel Square Office Park LLC and Florida Family Prianmy Care Center of Pasco, LLC | $0.00 |
| 82 | MB Medical Operations, LLC | Marketing | Creation Image LLC | 7950 NW 53rd ST #221 Miami, FL 33166 | Services Agreement between MB Medical Operations, LLC and Creation Financial DBA BKPO | $37,657.60 |
| 83 | MB Medical Operations, LLC | Telecommunication License Agreem | Crown Castle Fiber, LLC | PO Box 28730, New York, NY 10087-8730 | Order Agreement | $0.00 |
| 84 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Cuan, Alisa | 8414 North Paddock Avenue | Employment Agreement by and between Alisa Cuan, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

| # | Entity | Agreement Type | Counterparty | Address | Description | Amount |
|---|--------|----------------|--------------|---------|-------------|--------|
| 85 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Cuenca, Michael Steven | 12284 Sw 27 Street | EMPLOYMENT AGREEMENT (this "Agreement") by and between Michael Cuenca, M.D. ("Physician"), and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS | $0.00 |
| 86 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Diaz Cardelle, Tatiana | 11620 Southwest 142nd Terrace | Employment Agreement by and between Tatiana Diaz Cardelle, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 87 | Miami Beach Medical Consultants, LLC | Payor contracts | Doctors Healthcare Plans, Inc. | 2020 Ponce De Leon PH 1 Coral Gables, FL 33134-4477 Attn: Network Development | Primary Care Provider Agreement | $0.00 |
| 88 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Emilio Alvarez | 6740 SW 78 Terra South Miami, FL 33143 | Amendment to Lease by and between Emilio Alvarez and MB Medical operations, LLC | $0.00 |
| 89 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Enriquez Dominguez, Lorayne | 11360 Southwest 160th Avenue | Employment Agreement by and between Lorayne Enriquez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 90 | MB Medical Transport, LLC | Transportation | Enterprise Fleet Management, Inc | PO BOX 800089  KANSAS CITY, MO United States | Vehicle Sales Agreement Certificate | $0.00 |
| 91 | MB Medical Transport, LLC | Transportation | Enterprise Fleet Management, Inc | PO BOX 800089  KANSAS CITY, MO United States | Vehicle Sales Agreement Certificate | $0.00 |
| 92 | MB Medical Transport, LLC | Transportation | Enterprise Fleet Management, Inc | PO BOX 800089  KANSAS CITY, MO United States | Vehicle Sales Agreement Certificate | $0.00 |
| 93 | MB Medical Operations, LLC | Commercial Lease | FERN STREET PROPERTIES, LLC | 12961 Deva St. Coral Gables FL 33156 c/o Walter L Lista | Commercial Lease Agreement by and between Fern Street Properties, LLC and MB Medical Operations, LLC | $0.00 |
| 94 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Fernandez Armas, Yaimy | 13590 Southwest 98th Street | Employment Agreement by and between Yaimy Fernandez Armas, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 95 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Fernandez Novales, Jorge | 2850 Sw 134 Ave | Employment Agreement by and between Jorge Fernandez Novales, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 96 | Florida Family Primary Care Centers of Pinellas, LLC / Florida Family Primary Care Centers of Tampa, LLC | Employment Agreement | Figueroa, Yolanda | 4955 Cypress Trace Drive, Tampa, FL 33624 | Employment Agreement by and Between Florida Family Primary Care Center of Pasco, LLC, Florida Family Primary Care Centers of Pinellas, LLC, and Florida Family Primary Care Centers of Tampa, LLC, and Yolanda Figueroa, M.D. | $0.00 |
| 97 | MB Medical Operations, LLC | Other (including Clinical Specialists) | First Spanish Church of the Open Bible | 490 E. 50 Street Hialeah, Florida 33013 | Contract for Parking Spaces between First Spanish Church of the Open Bible, Inc. and Miami Beach Medical Group, Inc. | $2,000.00 |
| 98 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Flores Iglesias, Carlos | 16269 Sw 44Th Street | Employment Agreement by and between Carlos Flores Iglesias, PA, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

| # | Debtor | Category | Counterparty | Address | Agreement | Amount |
|---|---|---|---|---|---|---|
| 99 | Miami Beach Medical Consultants, LLC | Other (including Clinical Specialists) | Florida Behavioral Center, Inc. d/b/a | Florida Behavioral Center Inc. d/b/a Florida Healthcare System 1905 NW 82nd Ave, Doral Florida 33126 8400 NW 33 Street, Suite 201, Doral, Florida 33122 | Staffing Services Agreement between Florida Behavioral Center, Inc and Miami Beach Medical Consultants | $0.00 |
| 101 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Fonseca, Sailin | 4010 Boatman ave | Employment Agreement by and between Sailin Fonseca, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 102 | Miami Beach Medical Consultants, LLC | Vendor Agreements | Foot & Ankle Network, Inc. d/b/a Alivi | 5775 Blue Lagoon Drive, Ste. 450, Miami, FL 33125, Attn: President | Alivi Podiatry Network Provider Agreement | $0.00 |
| 103 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Franco, Manuel | 6301 Collins Avenue | EMPLOYMENT AGREEMENT BETWEEN Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), d/b/a MIAMI BEACH MEDICAL GROUP, a Florida professional association AND MANUEL A. FRANCO, M.D. | $0.00 |
| 104 | Miami Beach Medical Consultants, LLC | Payor contracts | Freedom Health, Inc. | Attn: Provider Relations 4200 West Cyprus St. Suite 1000 Tampa, FL 33607 | Group Participant Agreement | $0.00 |
| 105 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Garcia Rodriguez, Francisco | 5316 Sw 152 Court | Employment Agreement by and between Francisco Garcia Rodriguez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 106 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Garcia, Emelio | 8071 Sw 159Th Ct | Employment Agreement by and between Emelio Garcia, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 107 | MB Medical Operations, LLC | Commercial Lease | Gardens Office Complex, LLC | C/o Horizon Properties 7785 N.W. 146th Street Miami Lakes, FL 33016 | Lease by and between Gardens Office Complex, LLC and MB Medical Operations, LLC | $0.00 |
| 108 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Gomez, Julio Orlando | 5050 W 22 Ct | Employment agreement by and between Julio Gomez, M.D, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 109 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Technology | Greenway Health, LLC | 4301 West Boy Scout Boulevard, Ste 800 Tampa, FL 33607 Attention: Legal Department | LIST OF MIGRATED ASSETS PURCHASE SCHEDULE - SIGNATURE PAGE | $0.00 |
| 110 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Guerra, Rene | 6575 W 4th Ave | Employment Agreement between Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.)d/b/a Miami Beach Medical Group and Rene Guerra, MD | $0.00 |
| 111 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Gumenick Family Investments No. 2 | 1959 West Avenue, Miami Beach, Florida 33139 | Monthly Parking Agreement between Gumenick Family Investments No. 2 Ltd. and Rodolfo Dumenigo MD PA | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

| # | Debtor | Type | Counterparty | Address | Agreement | Amount |
|---|---|---|---|---|---|---|
| 112 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Gutierrez Diaz, Adys I | 3102 West Henry Avenue | EMPLOYMENT AGREEMENT by and between Adys Gutierrez, APRN ("Employee"), and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS | $0.00 |
| 113 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Healthcare Environmental Services | Healthcare Environmental Services, LLC 8496 NW 61 Street, Miami, Florida 33166 Attention: Contract Administrator | HEALTHCARE ENVIRONMENTAL SERVICES DOCUMENT DESTRUCTION SERVICES AGREEMENT | $0.00 |
| 114 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Healthcare Environmental Services | Healthcare Environmental Services, LLC 8496 NW 61 Street, Miami, Florida 33166 Attention: Contract Administrator | HEALTHCARE ENVIRONMENTAL SERVICES DOCUMENT DESTRUCTION SERVICES AGREEMENT | $0.00 |
| 115 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Healthcare Environmental Services | Healthcare Environmental Services, LLC 8496 NW 61 Street, Miami, Florida 33166 Attention: Contract Administrator | HEALTHCARE ENVIRONMENTAL SERVICES DOCUMENT DESTRUCTION SERVICES AGREEMENT | $0.00 |
| 116 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Healthcare Environmental Services | Healthcare Environmental Services, LLC 8496 NW 61 Street, Miami, Florida 33166 Attention: Contract Administrator | HEALTHCARE ENVIRONMENTAL SERVICES DOCUMENT DESTRUCTION SERVICES AGREEMENT | $0.00 |
| 117 | Miami Beach Medical Consultants, LLC | Payor contracts | HealthSun Physicians Network I, LLC | HealthSun Physicians Network I, LLC 3250 Mary Street, Suite 300 Coconut Grove, Florida 33133 Attn: President | Primary Care Physician Network Agreement | $0.00 |
| 118 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Hernandez Perez, Javier | 3105 Oakland Shores Drive | Employment Agreement by and between Javier Hernandez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 119 | MB Medical Operations, LLC | Equipment and Financing | Highland Capital Corp | 1 Passaic Ave, Fairfield NJ 07004 | Equipment Lease Agreement | $0.00 |
| 121 | MB Medical Operations, LLC | Commercial Lease | Horus International Corp LLC | 13231 Byrd Legg Drive Odessa, Florida 33556 | Lease by and between Horus International Coportaion, llc and Clinical Care Medial Centers | $5,826.61 |
| 122 | MBMG Holding, LLC | Professional Fees | Houlihan Lokey Financial Advisors, In. | 3060 Peachtree Road NW, Ste 1500, 15th Floor Atlanta, GA 30305 | Engagement Letter (GW, MIU) | $0.00 |
| 123 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Payor contracts | Humana Insurance Company, Human | Humana Inc. PO Box 1438 Louisville, Kentucky 40201-1438 Attn: Law Department | Independent Practice Association Participation Agreement | $0.00 |
| 124 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Payor contracts | Humana Insurance Company, Human | Humana Inc. PO Box 1438 Louisville, Kentucky 40201-1438 Attn: Law Department | Physician Participation Agreement | $0.00 |
| 125 | Miami Beach Medical Consultants, LLC | Payor contracts | Humana Insurance Company, Human | Humana Inc. 500 West Main Street Louisville, Kentucky 40202 Attn: Law Department | Settlement and Release Agreement | $0.00 |
| 126 | Miami Beach Medical Consultants, LLC | Payor contracts | Humana Pharmacy, Inc. | 500 West Main Street Louisville, Kentucky 40202 Attn: Law Department | Master Over-the-Counter Product Ordering Agreement | $0.00 |
| 127 | Miami Beach Medical Consultants, LLC | Vendor Agreements | iCare Health Solutions, LLC | 7600 Corporate Center Drive, Ste. 200, Miami, FL 33126 | Individual Provider Agreement | $0.00 |
| 128 | MB Medical Operations, LLC | Services Agreement | j2 Cloud Services, LLC | 6922 Hollywood Blvd, Suite 500 Los Angeles, CA 90028 Attn: Legal Department | Services Agreement | $0.00 |
| 129 | MB Medical Operations, LLC | Technology | JAM INFOSYS, LLC d/b/a AANEEL HEALTH SERVICES | 6650 Gunn Hwy Tampa, FL 33556 United States of America | AANEEL HEALTH SERVICES AGREEMENT between Jam Infosys, LLC and Clinical Care Medical Centers | $46,806.08 |
| 130 | MB Medical Operations, LLC | Employment Agreement | JCL Advisory, LLC | 9241 SW 57 Ter, Miami, FL 33173 | Independent Contractor Agreement | $0.00 |

CONFIDENTIAL

| # | Entity | Category | Counterparty | Address | Description | Amount |
|---|---|---|---|---|---|---|
| 131 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | JMO Group, LLC. | 5120 Fallen Leaf Dr, Riverview, FL 33578 | INDEPENDENT CONTRACTOR AGREEMENT | $0.00 |
| 132 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Joshua Manbor | 9595 Collins Ave Apt 408 Miami Beach, FL United States | BUSINESS ASSOCIATE AGREEMENT | $0.00 |
| 133 | MB Medical Operations, LLC | Equipment and Financing | Konica Minolta Payment Services | Konica Minolta Healthcare Americas, Inc. 411 Newark Pompton Turnpike Wayne, NJ 07470-0934 | Master Subscription Agreement between Customer and Konica Minolta Payment Services | $0.00 |
| 134 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Labrada Viera, Osmel | 585 West 25th Street | Employment Agreement | $0.00 |
| 135 | MB Medical Operations, LLC | Commercial Lease | LAKELAND INVESTMENTS LLC | 222 Poinciana Dr. Sunny Isles Beach, Florida 33160 | Lease agreement by and between Lakeland Investments, LLC and MB Medical Operations, LLC | $0.00 |
| 136 | MB Medical Operations, LLC | Dental Contracts (LHA) | LHA Smiles Design, Inc. | 9460 SW 6th Lane Miami, FL 33174 | Dental Services Participation and Management Agreement by and among MB Medical Operations, LLC and its Subsidiaries ("MBMG") and LHA Smiles Design, Inc. | $0.00 |
| 137 | Florida Family Primary Care Center, LLC | Dental Contracts (LHA) | LHA Smiles Design, Inc. | 9460 SW 6th Lane Miami, FL 33174 | Dental Services Participation and Management Agreement by and among MB Medical Operations, LLC and its Subsidiaries ("MBMG") and LHA Smiles Design, Inc. | $0.00 |
| 138 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Life Radiology | 3470 NW 82 AVE, STE 119 Doral, FL 33122 | Letter of Agreement for Radiology Services between Clinical Care and Life Radiology | $0.00 |
| 139 | MB Medical Operations, LLC | Technology | Lightbeam Health Solutions | 222 W Las Colinas Blvd. #2200n, Irving, TX 75039 | Lightbeam Health Solutions Order Form | $53,244.38 |
| 140 | MB Medical Operations, LLC | Commercial Lease | Lillian Loeffler QTIP Trust | 6 Cayuga Road, Fort Lauderdale, Florida 33308 | Lease between MB Medical Operations llc and Lillian Loeffler QTIP Trust | $0.00 |
| 141 | MBMG Ultimate Holding, LP | Professional Fees | LOCKTON COMPANIES LLC/CHARLOTTE | 4725 PIEDMONT ROW DR STE 510 CHARLOTTE,NC 28210 | PREMIUM FINANCE AGREEMENT (24000322) | $0.00 |
| 142 | MBMG Ultimate Holding, LP | Professional Fees | LOCKTON COMPANIES LLC/CHARLOTTE | 4725 PIEDMONT ROW DR STE 510 CHARLOTTE,NC 28210 | PREMIUM FINANCE AGREEMENT (24000322) | $0.00 |
| 143 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Lopez, Esdras | 9805 SW 77 Place | Employment Agreement between Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D, P.A. (now known as Miami Beach Medical Centers, Inc;)and Esdras Lopez, MD | $0.00 |
| 144 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Lugo Rodriguez, Randy | 710 nw 14th ave | Employment Agreement by and between Randy Lugo, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 145 | MB Medical Transport, LLC | Transportation | Lyft Healthcare, Inc. | 185 Berry Street, Suite 5000 San Francisco, CA 94107 | Lyft business agreement by and between MB Medical Transport, LLC and Lyft Healthcare Inc | $411,972.58 |
| 146 | Miami Beach Medical Consultants, LLC | Vendor Agreements | Magellan Healthcare, Inc. | 14100 Magellan Plaza, Maryland Heights, MO 63043 | Network Provider Agreement | $0.00 |
| 147 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | FIRST AMENDMENT TO EMPLOYME Maldonado, Lillian Vazquez | PO Box 772036 Orlando, FL 32877 | Employment Agreement by and between Lillian Vazquez Maldonado, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 148 | MB Medical Operations, LLC | Commercial Lease | Marion Simmons | 507 Sandalwood Drive Plant City, FL 33563 | Commercial lease by and between Marion Simmons and MB Medical Operations | $8,378.66 |

DRAFT - SUBJECT TO MATERIAL CHANGE

| # | Debtor Entity | Category | Counterparty | Address | Description | Amount |
|---|---|---|---|---|---|---|
| 149 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Marper, plic | 7060 NW 75 St Parkland, FL 33067 | INDEPENDENT CONTRACTOR AGREEMENT | $0.00 |
| 150 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Separation Agreement | Martinez-Negron, Melanie | 7444 Palm River Rd Tampa, FL 33619 | Employment Agreement by and between JMO Group, LLC, and Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 151 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Matos, Rafael | 4604 Netherwood Drive | Employment Agreement by and between Rafael Matos, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 152 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | McKesson Medical-Surgical Inc. | 9954 Mayland Drive, Suite 4000, Richmond, Virginia 23233 | Product Supply Agreement | $170,880.34 |
| 153 | Miami Beach Medical Consultants, LLC | Payor contracts | Medica Healthcare Plans, Inc. | 9100 S. Dadeland Blvd., Suite 1250 Miami, FL 33156-7888 | Network Risk Agreement | $0.00 |
| 154 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | $24,453.46 |
| 155 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 156 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 157 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 158 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 159 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 160 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 161 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 162 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Mia Lab Inc. | 2129 West 76 St, Hialeah, FL 33016 | CONTRACT | $25,916.52 |
| 163 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Vendor Agreements | Miami Lab Inc. | 2916 N Miami Avenue Suite 10C Miami, FL 33127 | Contract | $0.00 |
| 164 | MB Medical Operations, LLC | Commercial Lease | Miami Metro Medical LLC | 1200 Alton Road, Miami Beach, FL 33139 | Lease by and between 12550 Biscayne, LLC a Florida llc and MB Medical Operations, LLC a Delaware llc | $0.00 |
| 167 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Mobile Vision Doctors, LLC | 1315 Silk Oak Dr. Hollywood, FL 33021 | Professional Services Agreement between Clinical Care Medical Centers and Mobile vision Doctors, LLC | $0.00 |
| 168 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Vendor Agreements | Mobile Vision Doctors, LLC | Attn: Dr. Ryan C. Verarajio, 1315 Silk Oak Drive, Hollywood, FL 33021; mobilevisiondoctors@gmail.com | Professional Services Agreement between Clinical Care Medical Centers and Mobile vision Doctors, LLC | $0.00 |

CONFIDENTIAL

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

| # | Entity | Contract Type | Counterparty | Address | Description | Amount |
|---|---|---|---|---|---|---|
| 169 | Miami Beach Medical Consultants, LLC | Payor contracts | Molina Healthcare of Florida, Inc. | Molina Healthcare of Florida, Inc. 8300 NW 33rd Street, Ste. 400 Doral, FL 33122 Attention: President | Group Services Agreement | $0.00 |
| 170 | Miami Beach Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Mora, Abel | 8917 Northwest 146th Terrace | EMPLOYMENT AGREEMENT AND PROTOCOL BETWEEN MIAMI MEDICAL &WELLNESS CENTER / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), d/b/a MIAMI BEACH MEDICAL GROUP AND ABEL MORA, APRN | $0.00 |
| 171 | Miami Beach Medical Consultants, LLC | Vendor Agreements | NCH Management Systems, Inc. | 11000 SW 104 St # 161092 Miami, FL 33116 | Provider Agreement | $0.00 |
| 172 | MB Medical Operations, LLC | Technology | NextGen Healthcare Inc. | 18111 Von Karman Ave, Suite 600 Irvine, California 92612 | Supplemental Order Form (PG-2022-255291) | $749,891.64 |
| 173 | MB Medical Operations, LLC | Technology | NextGen Healthcare Inc. | 18111 Von Karman Ave, Suite 600 Irvine, California 92612 | Supplemental Order Form (PG-2022-255291) | See #172 |
| 174 | MB Medical Operations, LLC | Technology | NextGen Healthcare Inc. | 18111 Von Karman Ave, Suite 600 Irvine, California 92612 | Supplemental Order Form (PG-2022-255291) | See #172 |
| 175 | MB Medical Operations, LLC | Employment Agreement | Nunez, Salvador | 8035 Diamond Creek Ln Lakeland, FL 33809 | Separation Agreement, Including General Release between Salvador Nunez and MB Medical Operations, LLC d/b/a Clinical Care Medical Centers | $0.00 |
| 176 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Olympia Heights Methodist Church | 1400 NW 107 Ave, Suite 500 Doral, Fl 33172 | Contract for Parking Spaces between Olympia Heights Methodist Church and MB Medical Operations, LLC | $0.00 |
| 177 | Miami Beach Medical Consultants, LLC | Payor contracts | Optimum Healthcare, Inc. | Attn: Provider Relations 4200 West Cyprus St. Suite 1000 Tampa, FL 33607 | Group Participant Agreement | $0.00 |
| 178 | MB Medical Operations, LLC | Technology | Oracle America, Inc. | 2300 Oracle Way Austin, TX 78741 | Payment Schedule for MB Medical Operations, LLC | $0.00 |
| 179 | Miami Beach Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Otano Ramon, Yanin | 549 Northeast 35th Avenue | Employment Agreement by and between Yanin Otano Sanchez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 180 | Miami Beach Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Padilla Ayala, Luisa | 13607 Fawn Ridge Blvd | Employment Agreement by and between Luisa Padilla Ayala, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 181 | MB Medical Operations, LLC | Commercial Lease | Palm River Square Associates, LLC | 7978 Cooper Creek Boulevard, University Park, Florida 34201 | Lease by and between Palm River Square Associates, llc and MB Medical Operations, llc | $0.00 |
| 182 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4360 | $0.00 |
| 183 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4360 | $0.00 |
| 184 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4560 | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

| # | Debtor | Contract Type | Counterparty | Address | Description | Amount |
|---|---|---|---|---|---|---|
| 185 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4360 | $0.00 |
| 186 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4360 | $0.00 |
| 187 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4360 | $0.00 |
| 188 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4360 | $0.00 |
| 189 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Pebe Florian, Claudia Esther | 2400 sw 113 court | Employment Agreement by and between Claudia Pebe Florian, M.D. ("Physician"), and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D. P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 190 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Perez, Reynaldo | 8440 Sw 8Th St | Employment Agreement by and Between Reynaldo Perez, M.D, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 191 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Pimentel, Haydee | 6726 Hanley Rd Tampa, FL 33634 | Employment Agreement by and between Haydee Pimentel, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 192 | Miami Beach Medical Consultants, LLC | Payor contracts | Preferred Care Partners, INC | 9100 S. Dadeland Blvd., Suite 1250 Miami, FL 33156-7838 | Network Risk Agreement | $0.00 |
| 193 | Florida Family Primary Care Centers of Pinellas, LLC | Commercial Lease | Prestige Park LLC | 3285 East Ruby Hill Drive, Pleasanton, California 94566 | Business Lease between the Prestige Park LLC and Florida Family Primary Care Centers of Pinellas LLC | $0.00 |
| 194 | MB Medical Operations, LLC | Equipment and Financing | Prohealth Capital, | 1111 Old Eagle School Road, Wayne, Pennsylvania 19087 | Finance Agreement by and between MB Medical Operations and ProHealth Capital | $0.00 |
| 195 | Miami Beach Medical Consultants, LLC | Vendor Agreements | QMHC d/b/a Alivi Health | 2221 N University Dr Pembroke Pines, FL 33024 | Provider Agreement | $0.00 |
| 196 | Miami Beach Medical Consultants, LLC | Vendor Agreements | Quality Managed Health Care, Inc. d/ | 5775 Blue Lagoon Drive, Ste. 450, Miami, FL 33125, Attn: President | Alivi Chiro Network Provider Agreement | $0.00 |
| 197 | Miami Beach Medical Consultants, LLC | Vendor Agreements | Quality Managed Health Care, Inc. d/ | 5775 Blue Lagoon Drive, Ste. 450, Miami, FL 33125, Attn: President | Alivi Chiro Network Provider Agreement | $0.00 |
| 198 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Querol Matos, Wilfredo Andres | 16134 Southwest 138th Court | Employment Agreement by and between Wilfredo Querol Matos, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 199 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Rafael Capote, MD | 8812 NW 150 St Miami Lakes, FL 33018 | INDEPENDENT CONTRACTOR AGREEMENT by and between Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.)d/b/a Clinical Care Medical Centers and Rafael Capote, MD | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

CONFIDENTIAL

| | | | | | |
|---|---|---|---|---|---|
| 200 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Ramos Ferreiro, Seidel Idailys | 7542 Armand Circle | Employment Agreement by and between Seidel Ramos Ferreiro, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 201 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Raul Falero MD LLC | 6861 SW 147th Ave Apt ## Miami, FL 33193 | INDEPENDENT CONTRACTOR AGREEMENT by and between Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.)d/b/a Clinical Care Medical Centers and Raul Falero MD LLC | $0.00 |
| 202 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Reyes Leon, Aslien | 11420 Southwest 143th Court | EMPLOYMENT AGREEMENT by and between Aslien Reyes Leon, APRN ("Employee"), and MIAMI MEDICAL & WELLNESS CENTER/ RODOLFO DUMENIGO M.D., P.A., a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS ("Employer"). | $0.00 |
| 203 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Reyes Ortega, Maritza | 6910 Southwest 163rd Place | Employment Agreement by and between Maritza Reyes Ortega, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 204 | MB Medical Operations, LLC | Commercial Lease | RLV Oriole Plaza LP | 1500 Northwestern Highway, Suite 300, Farmington Hills, Michigan 48334 | Lease by and between RLV Oriole Plaza LP a Delaware limited partnership, as Landlord, and MB Medical Operations LLC d/b/a/ Delray Medical Center by MBMG, a Delaware limited liability company, as Tenant, for space B-210 in the above reference shopping center. | $0.00 |
| 205 | MB Medical Operations, LLC | Employment Agreement | Robbins, Jackie S | 9030 Notchwood Court Orlando, FL 32825 | Separation Agreement, Including General Release between Jackie S. Robbins and MB Medical Operations, LLC d/b/a Clinical Care Medical Centers | $0.00 |
| 206 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | FIRST AMENDMENT TO EMPLOYME | Rodriguez Abreu, Ernesto | 8798 Southwest 52nd Street | Employment Agreement by and between Ernesto Rodriguez Abreu, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 207 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Rodriguez Martinez, Geysert | 8899 Southwest 220th Lane | Employment Agreement by and between Geysert Rodriguez Martinez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 208 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Rodriguez Rivera, David Eduardo | 23161 Pachino Way | EMPLOYMENT AGREEMENT BETWEEN Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), d/b/a MIAMI BEACH MEDICAL GROUP/ a Florida Professional Service Corporation AND DAVID EDUARDO RODRIGUEZ RIVERA, MD | $0.00 |
| 209 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Rodriguez Rodriguez, Odarkys | 2126 SW 16 Street | Employment Agreement by and between Odarkys Rodriguez Rodriguez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

| No. | Entity | Type | Counterparty | Description | Address | Amount |
|---|---|---|---|---|---|---|
| 210 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | FIRST AMENDMENT TO EMPLOYMEE | Rodriguez, Jorge Machin | Employment Agreement by and between Jorge Machin Rodriguez, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | 1608 W Oak Ave Plant City,FL 33563 | $0.00 |
| 211 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Rodriguez, Veronica | EMPLOYMENT AGREEMENT (this "Agreement") by and between Veronica Rodriguez, M.D. ("Physician"), and MIAMI MEDICAL & WELLNESS CENTER / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.). | 19274 NW 19th St | $0.00 |
| 212 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Rodriguez, Yoelquis | Employment Agreement by and between Yoelquis Rodriguez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | 7681 W 34 Lane | $0.00 |
| 213 | Care Center Network, LLC | Other (including Clinical Specialists) Romel Figueredo, MD P.A. | | INDEPENDENT CONTRACTOR AGREEMENT by and among Clinical Care Network, Inc., Romel Figueredo, M.D., PA and Romel Figueredo, M.D. | 12854 SW 51 Street Miramar, FL 33027 | $0.00 |
| 214 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Saint Fleur, Samson | Employment Agreement by and between Samson Saint Fleur, PA, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | 2716 Southwest 195th Avenue | $0.00 |
| 215 | MB Medical Operations, LLC | Technology | salesforce.com inc. | Order Form (Q-04150927) | Salesforce Tower 415 Mission Street, 3rd Floor San Francisco, CA 94105 | $0.00 |
| 216 | MB Medical Operations, LLC | Technology | salesforce.com inc. | Order Form (Q-04150927) | Salesforce Tower 415 Mission Street, 3rd Floor San Francisco, CA 94105 | $0.00 |
| 217 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Sanchez Rodriguez, Yandris I | Employment Agreement by and between Yandris Sanchez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | 23813 Southwest 107th Place | $0.00 |
| 218 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Separation Agreement | Santiago, Mario A | Employment Agreement by and Between Mario A. Santiago Flores, M.D., and Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.)d/b/a Miami Beach Medical Group | 5031 Down Court | $0.00 |
| 219 | MB Medical Operations, LLC | Technology | ScribeEMR Inc. | MEDICAL CODING SERVICE AGREEMENT | 500 West Cummings Park, Suite 2950 Woburn, MA 01801 | $22,534.75 |
| 220 | Miami Beach Medical Consultants, LLC | Technology | Scrivas, LLC | ADDENDUM D Addition of Tiered Pricing Structure | 8720 N. Kendall Drive, Suite 204, Miami, FL 33176 | $24,052.32 |
| 221 | Miami Beach Medical Consultants, LLC | Dental Contracts (Senior Dental) | Senior Dental LLC | Participation Agreement by and between Miami Beach Medical Consultants, LLC, Rodolfo Dumenigo, MD, PA and Senior Dental, LLC | 1321 SW 107th Ave Suite 216A Miami, FL 33174 | $0.00 |
| 222 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | FIRST AMENDMENT TO EMPLOYMEE | Silva Barrero, Yunior | Employment Agreement by and between Yunior Silva Barrero, M.D. and Miami Medical Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | 15527 Southwest 16th Street | $0.00 |
| 223 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Silva, Manuel | Employment Agreement by and between Manuel Silva, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | 1924 Southwest 151 Place | $0.00 |
| 224 | Miami Beach Medical Consultants, LLC | Payor contracts | Simply Healthcare Plans, Inc. | Provider Agreement | c/o Legal Department 9250 W. Flagler St, Suite 600 Miami, FL 33174 | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

| # | Debtor Entity | Type | Counterparty | Address | Description | Amount |
|---|---|---|---|---|---|---|
| 225 | Miami Beach Medical Consultants, LLC | Payor contracts | Simply Healthcare Plans, Inc. | c/o Legal Department 9250 W. Flagler St., Suite 600 Miami, FL 33174 | Provider Agreement | $0.00 |
| 226 | MBMG Ultimate Holding, LP | Employment Agreement | Singh, Sanjeev | 19 Dougshine Court Burr Ridge, IL 60527 | Separation Agreement by and among MBMG Holding, LLC MBMG Ultimate Holding, and Sanjeev Singh | $0.00 |
| 227 | Florida Family Primary Care Centers of Tampa, LLC | Payor contracts | Solis Health Plans, Inc | 9250 NW 36th Street, Suite 400 Doral, Florida 33178 | Network Provider Agreement | $0.00 |
| 228 | Miami Beach Medical Consultants, LLC | Payor contracts | Solis Health Plans, Inc | 9250 NW 36th Street, Suite 400 Doral, Florida 33178 | Network Provider Agreement | $0.00 |
| 229 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Consultants, Inc.) | Separation Agreement | Soto, Maria | 1012 Ferndown CT Aiken, SC 29803 | Employment Agreement by and between Maria Soto, M.D., and Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 230 | MB Medical Operations, LLC | Insurance | Starline Group | Chris Perrone StarLine 804 Main Street, Suite 2A Osteville, MA 02655 | Provider Exess Loss Insurance for MB Medical operations, LLC | $0.00 |
| 231 | MBMG Holding, LLC | Other (including Clinical Specialists) | Suarez Professional Services Corp | At the address (or to the e-mail address) shown in the books and records of the Company, With a copy (which shall not serve as notice) to: Johnson, Pope, Bokor, Ruppel & Burns, LLP 490 1st Avenue South, Suite 700 St. Petersburg, FL 33701 Attention: Michael D. Magidson (michaelm@jpfirm.com) | Separation Agreement | $0.00 |
| 232 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Separation Agreement | Suarez, German | 2718 SW 143 PL | Employment Agreement | $0.00 |
| 233 | MBMG Ultimate Holding, LP | Employment Agreement | Suarez, Jose David | 3755 SW 130 Ave Miami, FL United States | Separation Agreement by and among MBMG Holding, LLC MBMG Ultimate Holding, L.P. Suarez Professional Services Corp, Jose David Suarez, M.D. | $0.00 |
| 234 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Sueiro, Martin J | 6910 Southwest 163rd Place | Employment Agreement by and Between Martin Sueiro, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 235 | MB Medical Operations, LLC | Commercial Lease | Summit Medical LLC | c/o Commercial Asset Partners Realty 2511 Seven Springs Blvd. Trinity, FL 34655 | Assignment, Assumption, and First Amendment to Lease Agreement by and between MB Medical Operations, LLC and Summit Medical LLC | $0.00 |
| 236 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Sunshine Communication Services | 159 MADEIRA AVE CORAL GABLES, FL United States | Telephone Answering Services Subscriber Service Agreement | $0.00 |
| 237 | Florida Family Primary Care Centers of Tampa, LLC | Payor contracts | Sunshine State Health Plan, Inc. | 1299 NW 40 Ave Ste C Lauderhill, FL 33313 | Group Agreement | $0.00 |
| 238 | Florida Family Primary Care Centers of Tampa, LLC | Commercial Lease | Terrace Walk Plaza | 11531 N. 56th Street Temple Terrace, Florida 33617 | Lease by and between Terrace Walk Plaza an dFlorida Family Primary Care Centers of Tampa, LLC | $8,081.45 |
| 239 | MB Medical Operations, LLC | Commercial Lease | THE HUB RETAIL, LLC | Attn. Orin Black PO Box 611808 N. Miami, FL 33261-1808 | Lease Agreement MB Medical Operations LLC and Hub Retail LLC | $0.00 |
| 240 | Miami Beach Medical Consultants, LLC | Vendor Agreements | Therapy Health Network LLC d/b/a | A15775 Blue Lagoon Drive, Ste. 450, Miami, FL 33125, Attn: President | Alivi Therapy Network Provider Agreement | $0.00 |
| 241 | MB Medical Operations, LLC | Transportation | Time Park, Inc | P.O. Box 363 Ocoee, FL 34761-4910 | Parking Valet Agreement by and between Clinical Care Medical Operations LLC and Time Park Inc. | $996.15 |
| 242 | MB Medical Operations, LLC | Technology | T-Mobile Financial LLC | EIP Program Customer Relations, P.O. Box 37380, Albuquerque, NM 87176-7380 | EQUIPMENT INSTALLMENT PLAN (EIP) CONTRACT AND DISCLOSURE (Plan ID 201905170124067610) | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

CONFIDENTIAL

DRAFT - SUBJECT TO MATERIAL CHANGE

| # | Entity | Counterparty | Type | Address | Description | Amount |
|---|--------|-------------|------|---------|-------------|--------|
| 243 | MB Medical Operations, LLC | TOWER SHOPPING PLAZA, INC | Commercial Lease | 11954 Narcossee Rd. Suite 2, PMB #429 Orlando, FL 32832 | Lease by and between Tower Shopping Plaza, inc and MB Medical Operations, llc | $0.00 |
| 244 | Florida Family Primary Care Center of Pasco, LLC / Florida Family Primary Care Centers of Pinellas, LLC / Florida Family Primary Care Centers of Tampa, LLC | Trinidad-Torres, Evelyn | Employment Agreement | 16402 Egrey Crossing Ln Lithium FL 33547 | FIRST AMENDMENT TO EMPLOYMENT AGREEMENT (this "Amendment") by and between FLORIDA FAMILY PRIMARY CARE CENTER OF PASCO, LLC, FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC, and FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC (collectively, the "Company"), and Evelyn Trinidad-Torres, MD | $0.00 |
| 245 | MB Medical Transport, LLC | Trip2, LLC | Transportation | 2766 NW 62nd Street, Miami, FL 33147 | Trip2 Software License Agreement between Trip2, LLC and MB Medical Transport LLC | $0.00 |
| 246 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Ugarte, Carolina | Separation Agreement | 17000 NW 67th Ave | Employment Agreement | $0.00 |
| 247 | Florida Family Primary Care Center of Pasco, LLC / Florida Family Primary Care Centers of Pinellas, LLC / Florida Family Primary Care Centers of Tampa, LLC | UnitedHealthcare of Florida, Inc. | Payor contracts | 3000 Bayport Drive, Ste. 1170, Tampa, FL 33607 | Network Risk Agreement | $0.00 |
| 248 | Miami Beach Medical Consultants, LLC | UnitedHealthcare of Florida, Inc. | Payor contracts | 2300 W Plano Pkwy #C1E105 Plano, TX 75075-8427 | Network Risk Agreement | $0.00 |
| 249 | Miami Beach Medical Consultants, LLC | UnitedHealthcare of Florida, Inc. | Payor contracts | 495 N Keller Rd, Suite 200 Maitland, FL 32751 | Network Risk Agreement | $0.00 |
| 250 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Urgell, Jorge | Employment Agreement | 3991 Sw 153Rd Ct | Employment Agreement by and between Jorge Urgell, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 251 | Florida Family Primary Care Center of Pasco, LLC / Florida Family Primary Care Centers of Pinellas, LLC / Florida Family Primary Care Centers of Tampa, LLC | Uribazo, Beatriz | Employment Agreement | 1243 Evergreen Park Cir | FIRST AMENDMENT TO EMPLOYMENT AGREEMENT (this "Amendment") by and between FLORIDA FAMILY PRIMARY CARE CENTER OF PASCO, LLC, FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC, and FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC (collectively, the "Company"), and BEATRIZ URIBAZO, M.D. | $0.00 |
| 252 | MB Medical Operations, LLC | Valdez, Yanelis | Separation Agreement | 6401 Golden Drive | Employment Agreement | $0.00 |
| 253 | Florida Family Primary Care Centers of Pinellas, LLC / Florida Family Primary Care Centers of Tampa, LLC | Vejas, Eduardo | Employment Agreement | 7001 Interbay Blvd | THIS FIRST AMENDMENT TO EMPLOYMENT CARE AGREEMENT by and between FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC, and FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC (collectively, the "Company"), and EDUARDO VEJAS CASTILLERO, M.D. | $0.00 |

| # | Debtor Entity | Type | Counterparty | Address | Description | Amount |
|---|---|---|---|---|---|---|
| 254 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Verges Bonet, Enrique | 5470 W 20th Ave | EMPLOYMENT AGREEMENT BETWEEN MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) d/b/a MIAMI BEACH MEDICAL GROUP/ a Florida professional association AND ENRIQUE VERGES-BONET, M-D. | $0.00 |
| 255 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Vidal, Gretchen | 9020 NW 8 Street | EMPLOYMENT AGREEMENT AND PROTOCOL BETWEEN Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), d/b/a Miami Beach Medical Group and Gretchen Vidal, MSN, FNP, RN-APRN | $0.00 |
| 256 | MB Medical Operations, LLC | Parking Agreement | Villaverde Properties | c/o Horizon Properties 18610 NW 87th Avenue, Suite 204 Miami, FL 33015 | Lease by and between Villaverde Properties and MB Medical Operations, LLC | $0.00 |
| 257 | MB Medical Operations, LLC | Technology | Vonage Business Inc. | 23 Main St. Holmdel, NJ 07733 | ADDENDUM TO VONAGE BUSINESS SERVICE TERMS Sales Order # Q884954 | $61,112.87 |
| 258 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Vydas, Hector | 6710 Hanley Rd Tampa, FL 33634 | Employment Agreement by and between Hector Vydas, MD, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 259 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Waste Management Inc. of Florida | 8801 NW 91st Street Medley, FL 33178 | Service Agreement between Rainbow Health Corp and Waste Management Inc. of Florida | $7,735.10 |
| 260 | Miami Beach Medical Consultants, LLC | Payor contracts | WellCare of Florida, Inc. and WellCare | 8735 Henderson Rd. Tampa, FL 33634 Attn: Network Development | Participating Provider Agreement | $0.00 |
| 261 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Welvaert, Cira | 2495 Southwest 21st Terrace | Employment Agreement by and between Cira Welvaert, M.D. and Miami Medical Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 262 | MB Medical Operations, LLC | Marketing | WOW MKTG | 804 S. Douglas Road Executive Tower, 5th Floor Coral Gables, FL 33134 | WOW MKTG CCMC SOW for marketing services | $35,000.00 |
| 263 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Professional Fees | Whitney Actuarial Consulting, LLC | 18805 Choville Road, Lutz, FL 33558 | Consulting Agreement by and between Whitney Actuarial Consulting, LLC and Rodolfo Dumenigo, M.D., P.A. | $0.00 |
| 264 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Equipment and Financing | Qmedi, Inc. | 7 Great Valley Parkway, Suite 100, Malvern, PA 19355 | Order Form for Clinical Care Medical Centers | $0.00 |
| 265 | MB Medical Operations, LLC | Insurance | IPFS Corporation | 401 E Jackson Street, Ste 1250, Tampa, FL 33602 | Premium Financing Agreement | $0.00 |
| 266 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Rarfente, MD PA | 1461 SW 145 Ave, Miami, FL 33184 | Independent Contractor Agreementby and between Rodolfo Dumenigo, M.D., P.A. and Ramon Rodriguez, M.D. | $0.00 |

CONFIDENTIAL
DRAFT - SUBJECT TO MATERIAL CHANGE

## **Schedule 2.6(a)(ii)**

Governmental Consents

None.

**<u>Schedule 2.6(a)(iii)</u>**

Third Party Consents

None.

## Schedule 2.6(a)(ix)

Employees Entering Employment Agreements





615823381



## Schedule 5.1

Conduct of Business

Sellers shall use commercially reasonable efforts to comply with Section 5.1(a) and Section 5.1(b) subject to any limitations imposed upon the Sellers as a result of the Bankruptcy Cases.

## Schedule 8.1(f)

Special Indemnities

1. 

2. Any Losses or Liabilities related to or arising out of the Pre-Closing Restructuring.

## Schedule 10.1(c)(vii)

Physicians and Advanced Practice Providers



**DISCLOSURE SCHEDULES**

**TO THE**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**MB MEDICAL OPERATIONS, LLC,**

**MB MEDICAL TRANSPORT, LLC,**

**CARE CENTER NETWORK, LLC,**

**CARE CENTER MEDICAL GROUP, LLC,**

**CLINICAL CARE PHARMACY, LLC,**

**FLORIDA FAMILY PRIMARY CARE CENTER, LLC,**

**FLORIDA FAMILY PRIMARY CARE CENTERS OF ORLANDO, LLC,**

**FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC,**

**FLORIDA FAMILY PRIMARY CARE CENTERS OF PASCO, LLC,**

**FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC,**

**CCMC PHYSICIAN HOLDINGS, INC.,**

**MIAMI MEDICAL & WELLNESS CENTER LLC,**

**MIAMI BEACH MEDICAL CENTERS, INC. F/K/A RODOLFO DUMENIGO, M.D., P.A.,**

**MIAMI BEACH MEDICAL CONSULTANTS, LLC,**

**MB MEDICAL OPERATIONS, LLC, AS THE SELLERS' REPRESENTATIVE**

**AND**

**CONVIVA MEDICAL CENTER MANAGEMENT, LLC**

**October 12, 2024**

## DISCLOSURE SCHEDULES

These disclosure schedules (these "Disclosure Schedules") are made and given pursuant to the Asset Purchase Agreement, dated as of October 12, 2024 (the "Agreement"), by and among MB Medical Operations, LLC, a Delaware limited liability company ("MBMO"), MB Medical Transport, LLC, a Delaware limited liability company ("MBMT"), Care Center Network, LLC, a Florida limited liability company ("CCN"), Clinical Care Pharmacy, LLC, a Florida limited liability company ("CCP"), Care Center Medical Group, LLC, a Florida limited liability company ("CCMG"), Florida Family Primary Care Center, LLC, a Florida limited liability company ("FFPCC"), Florida Family Primary Care Centers of Tampa, LLC, a Florida limited liability company ("FFCCT"), Florida Family Primary Care Centers of Pasco, LLC, a Florida limited liability company ("FFPCCP"), Florida Family Primary Care Centers of Pinellas, LLC, a Florida limited liability company ("FFPCCPL"), Florida Family Primary Care Centers of Orlando, LLC, a Florida limited liability company ("FFPCCO"), CCMC Physician Holdings, Inc., a Florida corporation ("CCMC Holdings"), Miami Medical & Wellness Center LLC, a Florida limited liability company ("MMWC"), Miami Beach Medical Centers, Inc., a Florida corporation f/k/a Rodolfo Dumenigo, M.D., P.A., a Florida professional association ("RD"), Miami Beach Medical Consultants, LLC d/b/a Clinical Care Medical Centers, a Florida limited liability company ("MBMC", and collectively with MBMO, MBMT, CCN, CCP, CCMG, FFPCC, FFCCT, FFPCCP, FFPCCPL, FFPCCO, CCMC Holdings, MMWC, and RD, the "Sellers", and each, a "Seller"), MB Medical Operations, LLC, a Delaware limited liability company, as the representative of the Sellers (the "Sellers' Representative"), and Conviva Medical Center Management, LLC, a Delaware limited liability company ("Buyer"). Sellers, Sellers' Representative, and Buyer are hereinafter collectively referred to as the "Parties" and each, individually, as a "Party." Sellers, Sellers' Representative, and Buyer are hereinafter collectively referred to as the "Parties" and each, individually, as a "Party." All capitalized terms used but not defined herein shall have the meanings as defined in the Agreement, unless otherwise provided.

The section numbers below correspond to the section numbers of the representations and warranties in the Agreement. These Disclosure Schedules set forth certain information called for by the Agreement and, as the case may be, qualify the representations and warranties of Sellers contained in the Agreement. These Disclosure Schedules are not intended to constitute, and shall not be construed as constituting, representations, warranties, covenants or agreements of the Sellers. Inclusion of any item in these Disclosure Schedules (a) shall not be deemed an admission in and of itself including, without limitation, an admission of any liability, (b) does not represent a determination that such item is material or establish a standard of materiality, or constitutes or would result in a material adverse effect with respect to the Sellers pursuant to the criteria set forth in the Agreement,, and (2) does not represent a determination that such item did not arise in the ordinary course of the Sellers' business consistent with past practice, or that disclosure of any such information is required under any Applicable Law or by any Governmental Authority.

The Disclosure Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of the Agreement; however, disclosure of any item in any section of these Disclosure Schedules shall be deemed disclosed with respect to any other section in the Agreement only if the relevance of such disclosure to such other section(s) is apparent on its face, including by way of a reference or cross-reference thereto. Any item of information, matter or document disclosed or referenced in, or attached to, the Disclosure Schedules shall not (a) be deemed or interpreted to expand the scope of the representations and warranties, obligations, covenants, conditions or agreements contained in the Agreement, or (b) constitute, or be deemed to constitute, an admission to any third party concerning such item or matter. Disclosure in these Disclosure Schedules of any allegations with respect to any alleged failure to perform, or alleged breach or alleged default of, a contractual or

other duty or obligation is not an admission that such has in fact occurred. The attachments to these Disclosure Schedules form an integral part of these Disclosure Schedules and are incorporated by reference for all purposes as if set forth fully herein.

## Section 3.1(a)
### Sellers

1. MB Medical Operations, LLC
2. MB Medical Transport, LLC
3. Care Center Network, LLC
4. Care Center Medical Group, LLC
5. Clinical Care Pharmacy, LLC
6. Florida Family Primary Care Center, LLC
7. Florida Family Primary Care Centers of Orlando, LLC
8. Florida Family Primary Care Centers of Pasco, LLC
9. Florida Family Primary Care Centers of Pinellas, LLC
10. Florida Family Primary Care Centers of Tampa, LLC
11. CCMC Physician Holdings, Inc.
12. Miami Medical & Wellness Center LLC
13. Miami Beach Medical Centers, Inc. f/k/a Rodolfo Dumenigo, M.D., P.A.
14. Miami Beach Medical Consultants, LLC d/b/a Clinical Care Medical Centers

## Section 3.3
No Violation; Consents and Approvals

(a)    None.

(b)    None.

(c)

Contracts which result in default upon a sale of all or substantially all of a Seller's assets

1.  Master Lease Agreement, dated February 8, 2021, by and between RD and CHG-Meridian USA Corp. (the "**RD CHG Master Lease Agreement**").
2.  Master Subscription Agreement No. 011989, dated December 4, 2019, by and between Miami Beach Medical Group and Konica Minolta Payment Services (the "**Miami Beach Konica Master Subscription Agreement**").
3.  Lease Agreement, dated September 30, 2020, by and between MBMT and Bill Ussery Motors of Cutler Bay, LLC ("**Ussery Motors**"), including the New Vehicle Retail Lease Order, dated September 30, 2020 (VIN #W1Z4EGHY2LT023487) (the "VIN #W1Z4EGHY2LT023487 Lease").
4.  Lease Agreement, dated October 30, 2020, by and between MBMT and Ussery Motors, including the New Vehicle Retail Lease Order, dated October 30, 2020 (VIN #W1Z4EGHY6LT023220).
5.  Lease Agreement, dated December 24, 2020, by and between MBMT and Ussery Motors, including New Vehicle Retail Lease Order, dated December 24, 2020 (VIN #W1Z4EGHY5LT022818).
6.  Lease Agreement, dated December 24, 2020, by and between MBMT and Ussery Motors, including New Vehicle Retail Lease Order, dated December 24, 2020 (VIN #W1Z4EGHY1LT022816).
7.  Lease Agreement, dated December 24, 2020, by and between MBMT and Ussery Motors, including New Vehicle Retail Lease Order, dated December 24, 2020 (VIN #W1Z4EGHY6LT023816).
8.  Lease Agreement, dated July 13, 2021, by and between MBMT and Ussery Motors, including Retail Lease Order, dated July 13, 2021 (VIN # W1Z4DGHY8MT060502).
9.  Lease Agreement, dated July 13, 2021, by and between MBMT and Ussery Motors, including Retail Lease Order, dated July 13, 2021 (VIN #W1Z4DGHY6MT060529).
10. Lease Agreement, dated July 13, 2021, by and between MBMT and Ussery Motors, including Retail Lease Order, dated July 13, 2021 (VIN #W1Z4DGHY7MT060376).
11. Lease Agreement, dated July 13, 2021, by and between MBMT and Ussery Motors, including Retail Lease Order, dated July 13, 2021 (VIN #W1Z4DGHY8MT060872).
12. Lease Agreement, dated July 13, 2021, by and between MBMT and Ussery Motors, including Retail Lease Order, dated July 13, 2021 (VIN #W1Z4DGHY0MT049803).
13. Lease Agreement, dated October 31, 2021, by and between MBMT and Ussery Motors, including Retail Lease Order, dated October 31, 2021 (VIN #W1Z4EGHY8MT073683).
14. Lease Agreement, dated October 31, 2021, by and between MBMT and Ussery Motors, including Retail Lease Order, dated October 31, 2021 (VIN #W1Z4EGHYXMT074463).
15. Lease Agreement, dated June 30, 2020, by and between MBMT and Ussery Motors, including Retail Lease Order, dated June 30, 2020 (VIN #W1Z4EGHY7LT023470).

16. Lease Agreement, dated June 30, 2020, by and between MBMT and Ussery Motors, including Retail Lease Order, dated June 30, 2020 (VIN #W1Z4EGHY0LT023326).

17. Lease Agreement, dated June 30, 2020, by and between MBMT and Ussery Motors, including Retail Lease Order, dated June 30, 2020 (VIN #W1Z4EGHY6LT023217.

18. The Application for Provider Excess Loss Insurance, dated June 4, 2024, by and between MBMO and United States Fire Insurance Company (the "**MBMO United States Fire Application**").

19. Enterprise Order Form, dated April 23, 2022, by and between MBMT and Lyft Healthcare, Inc., as amended by that certain Amendment No. 1 to the 4/29/2022 Enterprise Order Form, dated August 1, 2022 (the "**Lyft Enterprise Order**").

20. Primary Care Agreement, dated March 1, 2008, by and between MBMC, as assignee of Miami Beach Medical Group, LLC and CarePlus Health Plans, Inc. ("**CarePlus**"), as amended by those certain amendments dated: (i) July 1, 2010, (ii) January 1, 2016, (iii) January 1, 2018, (iv) October 1, 2018, (v) January 1, 2019, and (vi) January 1, 2021 (the "**MBMC CarePlus Primary Care Agreement**").

21. Physician Group Medical Services Agreement, dated January 22, 2015, by and between RD and Blue Cross and Blue Shield of Florida, Inc. (the "**RD BCBS Group Services Agreement**").

22. Participation Agreement, effective June 25, 2021, by and between MBMC and Devoted Health, Inc, as amended by that certain First Amendment to Participation Agreement, effective January 1, 2023 the "**MBMC Devoted Participation Agreement**").

23. Management Services Agreement, dated December 6, 2016, by and between MBMO and RD (the "**MBMO RD Management Services Agreement**")

24. Management Services Agreement, dated December 6, 2016, by and between MBMO and MMWC (the "**MBMO MMWC Management Services Agreement**").

25. Management Services Agreement, dated December 6, 2016, by and between MBMO and MBMC (the "**MBMO MBMC Management Services Agreement**").

26. Transport Services Agreement, dated February 1, 2017, by and among MBMT, MBMC, and RD (the "**MBMC RD Transport Services Agreement**").

<u>Contracts requiring consent to or notice of assignment of the Contract</u>:

1. Landlord consent is required for assignment of the following Real Property Leases
   a. Palm River 7444 Lease
   b. Lakeland Lease
   c. Hanley Lease
   d. Flagler 101-107 Lease
   e. Flagler 201-207 Lease
   f. Flagler 110 Lease
   g. Hanley Therapy Lease
   h. Hanley Dental Lease
   i. Hudson Clinic Lease
   j. Temple Terrace Lease
   k. Hanley Access Lease
   l. Hanley Clinic Lease
   m. Miami Beach Lease
   n. Plant City Lease
   o. Miami Lakes 101 Lease
   p. Miami Lakes 231 Lease
   q. Pinellas Lease

r.  Palm River Access Lease
s.  Homestead Lease
t.  Hudson Lease
u.  Plant City Access Lease

2.  Prior notice to the applicable landlord is required for assignment of the following Real Property Leases:

a.  Miami Lakes 200 Lease
b.  Miami Lakes 200A Lease

Intellectual Property Contracts with rights of termination of Intellectual Property licenses upon bankruptcy proceedings:

1.  Trip2 Software License Agreement, dated November 1, 2020, by and between Trip2, LLC and MBMT ("**Trip 2 Software License Agreement**")

(d) None.

## **Section 3.4(a)**
Financial Statements; Records

See Attachment 3.4(a) attached hereto.

### Section 3.5
Absence of Certain Developments

(a)

    1.  None.

(b)

    1.  Credit Agreement, dated as of December 14, 2020, by and among, inter alios, MBMO and KKR Loan Administration Services, as amended, and the other Credit Documents (as defined therein) (the "KKR Credit Agreement").

    2.  Second Amended and Restated Promissory Note and Security Agreement, dated as of November 6, 2023, may by MBMO payable to MBMG Finco, LLC and FS KKR Capital Corp (the "KKR 2nd A&R Security Agreement").

    3.  Unsecured Promissory Note, dated as of November 17, 2023, made by MBMG payable to the Holders (as defined therein), which are represented by KKR Credit Advisors (US) LLC, as amended (the "KKR Unsecured Promissory Note").

(c)

    None.

(d)

    None.

(e)

    (i)   None.

    (ii)  The summary of the KEIP and KERP Plans on Schedule 3.12(a) is hereby incorporated herein by reference.

    (iii)  None.

(f)

    (i)



 (ii) None.

 (iii) None.

(g)

 (i) None.

 (ii) None.

(h)

 None.

(i)

1. Medicare Advantage Network Risk Agreement, dated January 1, 2024, by and between MBMC and UnitedHealthcare Insurance Company, UnitedHealthcare of Florida, and its other affiliates, as amended by that certain Amendment to the Network Risk Agreement, dated June 1, 2024 (the "**MBMC United Network Risk Agreement**").

2. Medicaid Provider/Group Agreement, dated December 18, 2018, by and among MBMC as assignee of FFPCCT, Florida Family Primary Care Centers of Pinellas, LLC, and Florida Family Primary Care Centers of Pasco, LLC, and Coventry Health Care of Florida, Inc., and Aetna company, on behalf of itself and its affiliates, as amended by that certain 1st Amendment to the Aetna Provider Agreement, dated April 1, 2023 and as further amended by that certain Second Amendment to the Medicaid Provider/Group Agreement, dated January 1, 2024 (the "**FFPCCT Aetna Group Agreement**").

3. Provider Agreement, effective July 1, 2021, by and between MBMC and Aetna Network Services, LLC, as amended by that certain Amendment, effective January 1, 2023, as further amended by that certain Amendment, effective January 1, 2023, and as further amended by that certain Amendment, dated May 1, 2024 (the "**MBMC Aetna Provider Agreement**").

(j)

 None.

(k)

 (i) None.

 (ii) None.

 (iii) None.

    (iv)    None.

    (v)    None.

    (vi)    None.

    (vii)    None.

(l)

    1.   Sections 3.10(a), 3.10(b), 3.10(c), 3.10(f) and 3.10(g) are hereby incorporated herein by reference as if fully stated herein.

(m)

    1.   Section 3.10(b) and Section 3.10(c) are hereby incorporated herein by reference as if fully stated herein.

(n)

(o) None.

(p) None.

**Section 3.6**
Litigation

See Attachment 3.6 attached hereto.

**Section 3.8(c)**
Real Property

| Center | Lease Documents | Landlord / Tenant Entities | Address | Suite # | City | State | LCD | LED | CCMC Monthly Rent | Type of Lease |
|---|---|---|---|---|---|---|---|---|---|---|
| TAMARAC | - Lease dated May 23, 2019<br>- Addendum to Lease dated May 1, 2020<br>- Assignment and Assumption of Lease and Consent dated September 10, 2020 (collectively, "**Tamarac 7455 Lease**") | Lillian Loeffler QTIP Trust (formally John M. Loeffler Trust) / MBMO | 7455 N. University Dr. | Bay 7 | Tamarac | FL | 5/1/2019 | 3/31/2025 | $11,769.00 | Commercial Property Lease |
| TAMARAC | - Lease dated May 1, 2020<br>- Assignment and Assumption of Lease and Consent dated September 10, 2020 (collectively, "**Tamarac 7495 Lease**") | Lillian Loeffler QTIP Trust (formerly John M. Loeffler Trust) / MBMO | 7495 N. University Dr. | Bays 26 & 27 | Tamarac | FL | 5/1/2019 | 3/31/2025 | Included in Monthly Rent for Tamarac 7455 Lease | Commercial Property Lease |
| TAMARAC | - Lease dated May 1, 2020<br>- Assignment and Assumption of Lease and Consent dated September 10, 2020 ("**Tamarac 7453 Lease**") | Lillian Loeffler QTIP Trust (formerly John M. Loeffler Trust) / MBMO | 7453 N. University Dr. | Bay 6 | Tamarac | FL | 5/1/2019 | 3/31/2025 | Included in Monthly Rent for Tamarac 7455 Lease | Commercial Property Lease |
| PALM RIVER (Clinic, Therapy) | - Lease dated June 23, 2017<br>-First Amendment to Lease Agreement dated July 1, 2017<br>-Letter notice of landlord assignment dated October 1, 2019<br>-Second Amendment to Lease Agreement dated | Horus International Corporation, LLC / Clinical Care Medical Centers | 7444 E Palm River Rd. | | Tampa | FL | 6/23/2017 | 6/30/2024 (Month-to-Month Holdover) | $5,716.00 | Commercial Property Lease |

13230494-25

| Property | Lease Documents | Entity | Address | City | State | Date | Date | Rent | Lease Type |
|---|---|---|---|---|---|---|---|---|---|
| | April 26, 2022 (collectively, **"Palm River 7444 Lease"**) | | | | | | | | |
| PALM RIVER | - Lease dated September 28, 2018 - First Amendment to Lease Agreement dated September 1, 2019 - Second Amendment to Lease Agreement dated April 26, 2022 (collectively, **"Palm River 7452 Lease"**) | Horus International Corporation, LLC / Clinical Care Medical Centers | 7452 E Palm River Rd. | Tampa | FL | 9/28/2018 | 6/30/2024 (Month-to-Month Holdover) | Included in Monthly Rent for Palm River 7444 Lease | Commercial Property Lease |
| LAKELAND | -Lease dated August 16, 2017 - 1st Amendment dated November 2, 2017 - 2nd Amendment dated October 17, 2019 - 3rd Amendment dated July 7, 2021 (collectively, the **"Lakeland Lease"**) | LAKELAND INVESTMENTS LLC / MBMO | 2417 Hwy 98 N | Lakeland | FL | 11/1/2017 | 7/31/2024 | $14,838.00 | Commercial Property Lease |
| HANLEY (Activity) | - Shopping Center Lease dated November 20, 2017 - Lease Addendum dated July 31, 2018 - Email renewing lease dated March 2, 2021 - Email renewing lease dated April 22, 2022 - Lease Renewal Addendum 2024-2027 executed July 30, 2024 (collectively, **"Hanley Lease"**) | Aliva Properties, Inc / Florida Family Primary Care Centers of Tampa, LLC | 6704 Hanley Rd. | Tampa | FL | 11/20/2017 | 7/31/2027 | $2,187.00 | Commercial Property Lease |
| PALMETTO BAY | - Commercial Lease Agreement dated April 1, 2020, and executed on August 8, 2020 | FERN STREET PROPERTIES, LLC / MBMO | 9855,9861,986 3 E Fern St. | Palmetto Bay | FL | 4/1/2020 | 3/31/2025 | $6,531.00 | Commercial Property Lease |

13230494-25

| Category | Description | Landlord / Tenant | Address | Suite | City | State | Start | End | Rent | Type |
|---|---|---|---|---|---|---|---|---|---|---|
| | - Attachment 1 to Assignment and Assumption of lease and consent dated September 9, 2020 (collectively, **"Palmetto Bay Lease"**) | | | | | | | | | Commercial Property Lease |
| FLAGLER | - Lease Agreement commencing August 1, 2020 - Assignment and Assumption of Lease and Consent dated September 10, 2020 (collectively, **"Flagler 110 Lease"**) | TOWER SHOPPING PLAZA, INC. / MBMO | 11200 West Flagler St. | 110 | Sweetwater | FL | 8/1/2017 | 7/31/2025 | Included in Monthly Rent for Flagler 201-207 Lease | Commercial Property Lease |
| FLAGLER | - Lease Agreement commencing March 1, 2017 - Assignment and Assumption of Lease and Consent dated September 10, 2020 -Addendum to Lease Agreement on March 24, 2022 (collectively, **"Flagler 201-207 Lease"**) | TOWER SHOPPING PLAZA, INC / MBMO | 11200 West Flagler St. | 201-207 | Sweetwater | FL | 3/1/2017 | 7/31/2025 | $16,809.00 | Commercial Property Lease |
| FLAGLER | - Lease Agreement commencing August 1, 2020 - Assignment and Assumption of Lease and Consent dated September 10, 2020 (collectively, **"Flagler 101-107 Lease"**) | TOWER SHOPPING PLAZA, INC. / MBMO | 11200 West Flagler St. | 101-107, | Sweetwater | FL | 8/1/2020 | 7/31/2025 | Included in Monthly Rent for Flagler 201-207 Lease | Commercial Property Lease |
| HANLEY (Therapy) | - Shopping Center Lease dated August 13, 2020 (**"Hanley Therapy Lease"**) | Aliva Properties, Inc / Florida Family | 6710A Hanley Rd. | | Tampa | FL | 8/13/2020 | 7/31/2025 | $3,989.00 | Commercial Property Lease |

1323049425

| Property | Lease Documents | Landlord / Tenant | Address | City | State | Start | End | Amount | Type |
|---|---|---|---|---|---|---|---|---|---|
| HIALEAH WEST | - Lease Agreement, dated as of November 10, 2019 - Amendment, Assignment and Assumption of Lease and Consent, dated as of September 10, 2020 (collectively, **"Hialeah West Lease"**) | Primary Care Centers of Tampa, LLC / CCN Holding of Hialeah, LLC / MBMO | 4980 W 10th Ave. | Hialeah | FL | 9/10/2020 | 9/9/2025 | $23,139.00 | Commercial Property Lease |
| HANLEY (Dental) | - Shopping Center Lease dated January 15, 2021 (**"Hanley Dental Lease"**) | Aliva Properties, Inc / Florida Family Primary Care Centers of Tampa, LLC | 6710B Hanley Rd. | Tampa | FL | 1/15/2021 | 7/31/2026 | $2,101.00 | Commercial Property Lease |
| HUDSON (Clinic, Therapy) | -Lease Agreement signed December 22, 2015 -Assignment, Assumption and First Amendment to Lease Agreement dated October 12, 2021 (collectively, **"Hudson Clinic Lease"**) | Summit Medical, LLC / Florida Family Primary Care Center of Pasco, LLC | 7455 -7463 SR-52 | Hudson | FL | 1/22/2015 | 4/30/2026 | $6,325.00 | Commercial Property Lease |
| BIRD ROAD | - Lease (effective August 1, 2016) - Assignment and Assumption of Lease (effective December 6, 2016) - First Amendment to the Lease (effective June | 9611 BIRD ROAD LLC / MBMO | 9601 + 9611 SW 40th St.[1] | Miami | FL | 8/1/2016 | 11/30/2026 | $20,435.09 | Commercial Property Lease |

[1] Lease includes Sellers' expansion into adjacent building, which is located at 9601 SW 40th St., Miami, FL.

1323049425

1, 2017) (collectively, **"Bird Road Lease"**)

| Property | Documents | Entity | Address | Suite | City | State | Date | Date | Amount | Type |
|---|---|---|---|---|---|---|---|---|---|---|
| FOWLER/TEMPLE TERRACE | - Lease dated April 16, 2014<br>- Amendment to Lease Agreement dated July 15, 2021 (collectively, **"Temple Terrace Lease"**) | J.Aprile Properties, LLC, D. Aprile Properties, LLC, R. Aprile Properties, LLC/ MBMO | 11531 N 56th St. | 103 | Temple Terrace | FL | 4/16/2014 | 7/31/2026 | $8,187.00 | Commercial Property Lease |
| HANLEY (Access) | - Shopping Center Lease dated September 30, 2021 (**"Hanley Access Lease"**) | Aliva Properties, Inc. / MBMO | 6712A Hanley Rd. | | Tampa | FL | 9/30/2021 | 7/31/2026 | $1,951.00 | Commercial Property Lease |
| HANLEY (Clinic) | - Shopping Center Lease dated September 30, 2021, executed October 4, 2021 (**"Hanley Clinic Lease"**) | Aliva Properties, Inc. / MBMO | 6726 A & B Hanley Rd. | | Tampa | FL | 9/30/2021 | 7/31/2027 | $8,774.00 | Commercial Property Lease |
| MIAMI BEACH | - Lease, dated ___ 2016 (stated to be effective August 1, 2016 in the first amendment)<br>- First Amendment of Lease, dated December 6, 2016<br>- Assignment and Assumption of Lease Agreement, dated as of March 8, 2017<br>- Second Amendment of Lease, dated May 1, 2017<br>- [Third Amendment to Lease, dated December 14, 2020]<br>- Fourth Amendment to Lease dated April 1, 2024 (collectively, **"Miami Beach Lease"**) | 1200 ALTON ROAD, LLC / MBMO | 1200, 1214 Alton Rd. | | Miami Beach | FL | 12/1/2016 | 11/30/2026 | $81,575.06 | Commercial Property Lease |

| Property | Landlord/Tenant | Address | Units | City | State | Start | End | Rent | Type | Lease Documents |
|---|---|---|---|---|---|---|---|---|---|---|
| WESTCHESTER | 7500 SW 8ST LLC / MBMO | 7500 SW 8th St. | 101, 102, 103, 104, 106, 201, 206, 207, 208, 303, 304, 306, 307, 308, 309, PH1, PH2 | Miami | FL | 1/6/2016 | 12/5/2026 | $82,217.39 | Commercial Property Lease | - Lease (effective December 6, 2016) - First Amendment to Lease (effective March 1, 2017) - Second Amendment to Lease (effective April 1, 2017) - Third Amendment to Lease (effective July 1, 2017) - Fourth Amendment to Lease (effective August 1, 2017) - Fifth Amendment to Lease (effective October 1, 2017) - [Sixth Amendment] - Seventh Amendment to Lease dated April 1, 2024 (collectively, **"Westchester Lease"**) |
| WESTCHESTER | 7500 SW 8ST LLC / MBMO | 7500 SW 8th St. | 204 | Miami | FL | 8/1/2020 | 12/5/2026 | Included in Monthly Rent for Westchester Lease | Commercial Property Lease | - Lease (effective August 1, 2020) (**"Westchester (204) Lease"**) |
| HIALEAH EAST | 551 E 49 ST LLC / MBMO | 551 E 49th St. | 1-16 | Hialeah | FL | 1/1/2017 | 12/31/2026 | $24,848.96 | Commercial Property Lease | - Lease dated January 1, 2017 - First Amendment dated April 1, 2017 - Second Amendment dated August 1, 2017 - Third Amendment dated October 1, 2017 - Fourth Amendment dated July 1, 2018 - Exclusive Parking Agreement dated April 1, 2019 |

| Location | Lease Documents | Entity | Address | Unit | City | State | Start | End | Amount | Type |
|---|---|---|---|---|---|---|---|---|---|---|
| HOLLYWOOD | -Sixth Amendment dated April 1, 2024 (collectively, **"Hialeah East Lease"**)<br><br>- Lease, dated as of October 19, 2017<br>- First Amendment to Lease dated December 14, 2020<br>- Second Amendment to Lease dated April 1, 2024 (collectively, **"Hollywood Lease"**) | 750 SOUTH FEDERAL HIGHWAY LLC / MBMO | 750 S. Federal Hwy. | | Hollywood | FL | 10/19/2017 | 10/18/2027 | $23,711.45 | Commercial Property Lease |
| DELRAY | - Lease (dated December 4, 2017)<br>- First Amendment to Lease (dated September 1, 2020) (the **"Delray Lease"**) | ATLANTIC AVENUE REALTY ASSOCIATES, L.L.C./ MBMO | 7291 W Atlantic Ave. | B190 -B210 – B220 | Delray Beach | FL | 12/1/2017 | 11/30/2027 | $18,052.00 | Commercial Property Lease |
| PLANT CITY (Clinic, Therapy) | - Lease dated June 16, 2018<br>- Lease renewal email dated April 19, 2023 (collectively, **"Plant City Lease"**) | CITY PROPERTIES CO. / Florida Family Primary Care Centers of Tampa | 1608 W Oak Ave. | | Plant City | FL | 6/16/2018 | 6/30/2028 | $2,047.00 | Commercial Property Lease |
| MIAMI LAKES | - Office Lease, dated as of May 8, 2015<br>- First Amendment to Lease, dated as of June 16, 2020<br>- Assignment and Consent Agreement, dated September 9, 2020<br>-Second Amendment to Lease dated May 22, 2023 (collectively, **"Miami Lakes 101 Lease"**) | Gardens Office Complex, LLC / MBMO | 18590 Northwest 67th Ave. | 101 | Miami Lakes | FL | 5/8/2015 | 9/30/2028 | $20,000.00 | Commercial Property Lease |

13230494-25

| Location | Landlord | Address | Suite | City | State | Start Date | End Date | Rent | Type | Lease Documents |
|---|---|---|---|---|---|---|---|---|---|---|
| MIAMI LAKES | Gardens Office Complex, LLC / MBMO | 18590 Northwest 67th Ave. | 200 | Miami Lakes | FL | 1/22/2017 | 9/30/2028 | Included in Monthly Rent for Miami Lakes 101 Lease | Commercial Property Lease | - Office Lease, dated as of December 22, 2017 - First Amendment to Lease, dated as of February 1, 2018 - Assignment and Consent Agreement, dated September 9, 2020 - Second Amendment to Lease, dated as of March 23, 2021 - Third Amendment to Lease, dated May 22, 2023 (collectively, **"Miami Lakes 200 Lease"**) |
| MIAMI LAKES | Gardens Office Complex, LLC / MBMO | 18590 Northwest 67th Ave. | 200A | Miami Lakes | FL | 4/22/2021 | 9/30/2028 | Included in Monthly Rent for Miami Lakes 101 Lease | Commercial Property Lease | - Office Lease, dated as of April 22, 2021 - First Amendment to Lease, dated as of April 29, 2021 - Second Amendment to Lease dated May 22, 2023 (collectively, **"Miami Lakes 200A Lease"**) |
| MIAMI LAKES | Gardens Office Complex, LLC / MBMO | 18590 Northwest 67th Ave. | 231 | Miami Lakes | FL | 12/1/2015 | 9/30/2028 | Included in Monthly Rent for Miami Lakes 101 Lease | Commercial Property Lease | - Office Lease, dated as of December 1, 2015 - Renewal Notice, dated as of September 27, 2018 - Assignment and Consent Agreement, dated September 9, 2020 - First Amendment to Lease, dated as of January 20, 2022 |

| Property | Lease | Landlord / Entity | Address | Suite | City | State | Start Date | End Date | Amount | Type |
|---|---|---|---|---|---|---|---|---|---|---|
| | - Second Amendment to Lease dated May 22, 2023 (collectively, **"Miami Lakes 231 Lease"**) | | | | | | | | | Commercial Property Lease |
| PINELLAS | - Lease dated January 15, 2014 -First Amendment dated September 26, 2018 -Second Amendment dated January 16, 2024 (collectively, **"Pinellas Lease"**) | Prestige Park LLC / Florida Family Primary Care Centers of Pinellas LLC | 6245 66th St N, Building B | 104-107 | Pinellas Park | FL | 2/1/2014 | 3/31/2029 | $11,223.58 | Commercial Property Lease |
| WINTER HAVEN | - Lease dated April 8, 2020 - First Amendment to Lease dated September 1, 2021 - [Second Amendment] - Third Amendment dated April 1, 2024 (collectively, **"Winter Haven Lease"**) | 201-205 S. 1st Street, LLC / MBMO | 201 1st St S. | 100, 102, 103 | Winter Haven | FL | 4/20/2021 | 3/31/2031 | $18,291.01 | Commercial Property Lease |
| NORTH MIAMI WEST | - Lease dated January 13, 2021 (**"North Miami West Lease"**) | 126 WEST DIXIE LLC / MBMO | 12615 + 12625 W. Dixie Hwy. | | North Miami | FL | 9/1/2021 | 3/31/2031 | $26,489.02 | Commercial Property Lease |
| ORLANDO | - Lease dated January 21, 2020 (**"Orlando Lease"**) | 1303 SOUTH SEMORAN LLC / MBMO | 1303 South Semoran Blvd. | | Orlando | FL | 10/1/2021 | 9/30/2031 | $34,669.15 | Commercial Property Lease |
| MIAMI 27th | - Lease Agreement (dated April 21, 2021) - First Lease Amendment (dated March 24, 2022) (**"Miami 27 Lease"**) | THE HUB RETAIL, LLC / MBMO | 701 NW 27th Ave | | Miami | FL | 1/1/2022 | 7/31/2032 | $18,445.00 | Commercial Property Lease |
| PALM RIVER (Activity, Access) | - Lease dated July 26, 2022 for 7867 Palm River Rd. | Palm River Square Associates, LLC / MBMO | 7867 Palm River Rd. | | Tampa | FL | 7/26/2022 | 8/31/2032 | $12,471.00 | Commercial Property Lease |

**("Palm River Access Lease")**

| Location | Lease | Tenant | Address | Units | City | State | Start | End | Amount | Type |
|---|---|---|---|---|---|---|---|---|---|---|
| NORTH MIAMI EAST | - Lease, dated as of September 29, 2017, by and between Landlord and Tenant (Triple Net Lease) <br> - First Amendment to Lease, dated as of June 1, 2020, by and between landlord and Tenant <br> - Notice to Tenant dated October 16, 2023 (collectively, **"North Miami East Lease"**) | Miami Metro Medical, LLC / MBMO | 12550 Biscayne Blvd. | 100, 101, 102, 200, 201 | North Miami | FL | 10/1/2017 | 10/31/2037 | $49,519.32 | Commercial Property Lease |
| LE JEUNE | - Lease (effective March 1, 2017) <br> - First Amendment to the Lease (effective March 1, 2017) <br> - Second Amendment to the Lease (effective June 1, 2020) <br> - Notice to Tenant dated October 16, 2023 (collectively, **"Le Jeune (503-504) Lease"**) | Miami Metro Medical, LLC / MBMO | 351 NW Le Jeune Rd. | 503, 504 | Miami | FL | 3/1/2017 | 5/31/2035 | $28,824.23 | Commercial Property Lease |
| LE JEUNE | - Lease (effective March 15, 2017) <br> - First Amendment to the Lease (effective June 1, 2020) <br> - Notice to Tenant dated October 16, 2023 (collectively, **"Le Jeune (315) Lease"**) | Miami Metro Medical, LLC / MBMO | 351 NW Le Jeune Rd. | 315 | Miami | FL | 3/15/2017 | 5/31/2035 | Included in Monthly Rent for Le Juene (503-504) Lease | Commercial Property Lease |
| HOMESTEAD | -Lease dated March 9, 2017 | Miami Metro Medical LLC / MBMO | 151 NW 11th St. | E102 W103 | Homestead | FL | 3/9/2017 | 5/31/2035 | $18,988.66 | Commercial Property Lease |

| Name | Lease | Counterparty | Address | Size | City | State | Start | End | Amount | Type |
|---|---|---|---|---|---|---|---|---|---|---|
| HUDSON (Access) | -First Amendment dated June 1, 2020 -Second Amendment dated June 25, 2020 - Notice to Tenant dated October 16, 2023 (collectively, **"Homestead Lease"**) -Lease, dated as of August 17, 2020 (**"Hudson Lease"**) | Counsel Square Office Park LLC / Florida Family Primary Care Center of Pasco, LLC | 7621 Little Rd. | 100D | New Port Richey | FL | 8/17/2020 | 9/30/2023 MONTH-TO-MONTH HOLDOVER | $2,205.00 | Commercial Property Lease |
| PLANT CITY (Access) | -Lease dated July 1, 2018 - First Amendment to Lease/Lease Renewal Option dated June 21, 2021 - Second Amendment to Lease Agreement dated May 18, 2022 (collectively, **"Plant City Access Lease"**) | Marion Simmons / Florida Family Primary Care Centers of Tampa, LLC | 1302 S. Collins St. | | Plant City | FL | 7/1/2018 | 6/30/2023 MONTH-TO-MONTH HOLDOVER | $2,134.00 | Commercial Property Lease |
| PALM HARBOR | -Shopping Center Retail Lease dated December 16, 2021 -1st Amendment to Lease dated April 10, 2023 **Note: This lease has been terminated** | Seabreeze Plaza LLC / MBMO | 30555 US Highway 19 N. | | Palm Harbor | FL | 12/16/2021 | 11/30/2032 | $20,690.29 | Commercial Property Lease |
| FOWLER/TA MPA | -Shopping Center Lease Agreement dated December 9, 2021 **Note: This lease has been terminated** | University Collection / MBMO | 2701 University Square Drive | 100-150 | Tampa | FL | 12/11/2022 | 12/31/2032 | $28,932.43 | Commercial Property Lease |

| Property | Lease | Parties | Address | Unit | City | State | Start | End | Amount | Type |
|---|---|---|---|---|---|---|---|---|---|---|
| MIAMI (Corporate HQ) | - Lease dated January 1, 2018<br>- First Amendment to Lease dated March 4, 2020<br>- Second Amendment to Lease dated June 1, 2020<br>- Fourth Amendment to Lease dated December 14, 2020 (the "**Corporate HQ Lease**") | 107TH AND 14TH LLC / MBMO | 1400 NW 107th Ave. | 301-420-500-501 | Miami | FL | 1/1/2018 | 5/31/2035 | $50,757.63 | Commercial Property Lease |
| Bird Road Parking | -Amendment to Lease dated December 26, 2019<br>-Amendment to Lease dated June 23, 2020<br>-Amendment to Lease dated February 1, 2023 ("**Bird Road Parking Lease**") | EMILIO ALVAREZ / MBMO | 9540 SW 39th Street | | Miami | FL | 7/1/2018 | 12/31/2024 | $700.00 | Parking Lot Lease |
| Hialeah Parking | Exclusive Parking Agreement dated April 1, 2019 ("**Hialeah Parking Lease**") | 551 East 49 Street, LLC/ MBMO | 545 East 49th ST | | Hialeah | FL | 10/6/2014 | MTM 12/31/2027 | $2,000.00 | Parking Lot Lease |
| Hialeah Parking II | Contract for Parking Spaces, dated October 3, 2014 ("**Hialeah Parking II Lease**") | First Spanish Church of the Open Bible Inc./ MBMO | 490 E 50 Street | | Hialeah | FL | 10/3/2014 | MTM | $_____ | Parking Lot Lease |

(v) The following notices of breach of Real Property Leases have been received by Seller:

1. Plaintiff: Seabreeze Plaza LLC
   - Entity Concerned: MBMO
   - Address of Leased Premises: 30555 US Highway 19 N. Palm Harbor, FL
   - Date: 4.10.2024
   - Claim Number / Type: Case No. 23-008642-CI / Breach of Contract
   - Summary of the Issue / Matter: Dispute over lease agreement for a clinic space; MBMO stopped making payments.
   - Legal and/or Equitable Remedies Sought: Equitable Remedies

13230494-25

- Last Development or Next Steps: No new developments as of 6.04.2024; estimated settlement cost around $450,000.

2. Plaintiff: UNIVERSITY COLLECTIONS, LLC
   - Entity Concerned: MB Medical Operations
   - Address of Leased Premises: 2701 University Drive Square Suite 100-150 Tampa, FL
   - Date: 5.21.2024
   - Claim Number / Type: Case No. 24-CA-004029 / Breach of Contract
   - Summary of the Issue / Matter: Dispute over terminated lease agreement.
   - Legal and/or Equitable Remedies Sought: Equitable Remedies: $135,000.00
   - Last Development or Next Steps: Case pending court filing; legal fees as of 7.02.24 = $5,126.

(vi) MBMO broke its lease agreement with 107th and 14th LLC for its Miami Corporate HQ location in June 2024, which has not been settled. MBMO vacated the building in June 2024 and the lease expires on May 31, 2035. MBMO expects the matter to be adjudicated in bankruptcy court.

**Section 3.9(b)**
Permits

**Health Care Provider Licenses:**

- o Each Medical Doctor listed on Section 3.11(a) hereto has a Medical Doctor License issued to each such Medical Doctor by the State of Florida Department of Health Division of Medical Quality Assurance.

- o Each Physician Assistant listed on Section 3.11(a) hereto has a Physician Assistant License issued to each such Physician Assistant by the State of Florida Department of Health Division of Medical Quality Assurance.

- o Each Advanced Practice Medical Nurse listed on Section 11(a) hereto has an Advanced Practice Medical Nurse License issued to each such Advanced Practice Medical Nurse by the State of Florida Department of Health Division of Medical Quality Assurance.

**Medicaid Enrollment Exemptions:**

Pursuant to Florida Statute 400.9905(4)(q), entities that are Medicaid providers are exempt from the requirement of needing a Health Care Clinic License. Each facility has a Medicaid provider number and, as such, is exempt from the requirement of needing a Health Care Clinic License.

**Certificate of Occupancy**

- Certificate of Occupancy Parcel ID # 03 25 16 0000 00200 0014 issued by Pasco County Building Inspection Division on November 9, 2022 for the location at 7455 State Road 52.
- Certificate of Occupancy Parcel Number 494104590010 issued by the City of Tamarac on December 1, 2021, for the location at 7453 N University Drive.
- Certificate of Occupancy Building Permit Number BBC00-2019-00064 issued on December 21, 2021 by the City of North Miami, for the location at 12625 W Dixie Highway.

**Certificate of Use**

- Certificate of Use No: 2022-CU-0134 dated December 8, 2021 issued by the City of Hollywood Planning and Urban Design Division, for the location at 750 S Federal Highway, Hollywood, FL 33020
- Certificate of Use No. 25-4006-001-0896 dated November 29, 2022 by the City of Sweetwater Building Department, for the location at 11200 W Flagler, Suite 110.
- Certificate of Use No. 25-4006-001-0896 dated December 20, 2022 by the City of Sweetwater Building Department, for the location at 11200 W Flagler, Suite 101-107.
- Certificate of Use No. 25-4006-001-0896 dated December 20, 2022 by the City of Sweetwater Building Department, for the location at 11200 W Flagler, Suite 201-207.
- Permanent Certificate of Use Cert No: 2017049366 issued June 12, 2017 by Miami-Dade County Department of Regulatory and Economic Resources for the location located at 9601 SW 40th ST, Miami, FL 33165
- Certificate of Use Cert No. 22095786MU for the location at 701 NW 27 Ave.

## Biomedical Waste

- Biomedical Waste Generator Permit No: 50-64-2486909 issued January 12, 2024 located at 7291 W Atlantic Ave #48, Delray Beach, FL 33446
- Biomedical Waste Permit # 13-64-2771223 for the location at 151 NW 11th ST, Suite E102, Homestead, FL 33030
- Biomedical Waste Generator Permit # 52-64-2692757 for the location at 6245 66th Street N, Pinellas Park, FL 33781.
- Biomedical Waste Generator Permit # 13-64-2771084 for the location at 7500 SW 8th ST, Suite 206, Miami, FL 33144.
- Biomedical Waste Generator Permit # 13-64-2192354 for the location at 9863 E Fern Street, Palmetto Bay, FL 33157.
- Biomedical Waste Generator Permit #13-642771052 for the location at 9863 E Fern Street, Palmetto Bay, FL 33157
- Biomedical Waste Generator Permit # 13-64-1589831 for the location at 7500 SW 8th ST, Suite 101, Miami, FL 33144.
- Biomedical Waste Generator Permit # 13-64-2627154 for the location at 7500 SW 8th ST, Suite 306, Miami, FL 33144.
- Biomedical Waste Generator Permit # 13-64-13111 for the location at 1200 Alton Road, Miami Beach, FL 33139.
- Biomedical Waste Generator Permit # 13-64-1639303 for the location at 9611 Bird Road, Miami, FL 33165.
- Biomedical Waste Generator Permit # 13-64-1523590 for the location at 551 East 49th Street 1-8, Hialeah, FL 33013.
- Biomedical Waste Generator Permit # 13-64-2192364 for the location at 4980 West 10th Ave, Hialeah, FL 33012.
- Biomedical Waste Generator Permit # 13-64-1568963 for the location at 151 NW 11th Street, Suite E102, Homestead, FL 33030.
- Biomedical Waste Generator Permit # 13-64-2627178 for the location at 351 NW 42nd Avenue, Suite 315, Miami, FL 33126.
- Biomedical Waste Generator Permit # 13-64-2188274 for the location at 351 NW 42nd Avenue, Suite 503, Miami, FL 33126.
- Biomedical Waste Generator Permit # 13-64-2192386 for the location at 701 NW 27th Ave, Miami, FL 33125.
- Biomedical Waste Generator Permit # 13-64-2192350 for the location at 18590 NW 67th Ave, Suite 101, Miami Lakes, FL 33015.
- Biomedical Waste Generator Permit # 13-64-1378834 for the location at 12550 Biscayne Blvd, Suite 500, North Miami, FL 33181.
- Biomedical Waste Generator Permit # 13-64-2192361 for the location at 11200 W. Flagler Street, Suite 101-107, Miami, FL 33174.
- Biomedical Waste Generator Permit # 13-64-2771218 for the location at 351 NW 42nd Ave, Suite 503, Miami, FL 33126.
- Biomedical Waste Generator Permit # 13-64-2771107 for the location at 351 NW 42nd Ave, Suite 315, Miami, FL 33126
- Biomedical Waste Generator Permit #13-64-2771089 for the location at 7500 SW 8th ST, Suite 206, Miami, FL 33144
- Biomedical Waste Generator Permit #13-64-2771052 for the location at 1200 Alton Road, Miami Beach, FL 33139-3810

- Biomedical Waste Generator Permit #13-64-1813110 for the location at 9601 SW 40 Street, Miami, FL 33165-4030
- Biomedical Waste Generator Permit #13-64-2770977 for the location at 9863 E Fern Street Palmetto Bay, FL 33157-5413
- Biomedical Waste Generator Permit #13-64-2771041 for the location at 9611 Bird Road, Miami, FL 33165
- Biomedical Waste Generator Permit #29-64-2784394 for the location at 11531 N. 56 Street, #103 Temple Terrace, FL 33617
- Biomedical Waste Generator Permit #29-64-2784399 for the location at 6710 Hanley Road Tampa, FL 33634
- Biomedical Waste Generator Permit #29-64-2424869 for the location at 6704 Hanley Road Tampa, FL 33634
- Biomedical Waste Generator Permit #29-64-2784401 for the location at 6726 Hanley RD Tampa, FL 33634
- Biomedical Waste Generator Permit #13-64-2771047 for the location at 551 East 49th Street, Hialeah, FL 33013-2720
- Biomedical Waste Generator Permit #13-64-2771018 for the location at 4980 West 10th Ave Hialeah, FL 33012-3437
- Biomedical Waste Generator Permit #06-64-2790712 for the location at 750 S. Federal Hwy Hollywood, FL 33020-5424
- Biomedical Waste Generator Permit #13-64-2619932 for the location at 151 NW 11th Street Suite E102 Homestead, FL 33030-4350
- Biomedical Waste Generator Permit #51-64-2686840 for the location at 7455 State Road 52, Hudson, FL 34667
- Biomedical Waste Generator Permit #51-64-2693130 for the location at 7463 State Road 52 Hudson, FL 34667
- Biomedical Waste Generator Permit #53-64-1825280) for the location at 2417 Hwy. 98 N Lakeland, FL 33805-2410
- Biomedical Waste Generator Permit #13-64-2601077 for the location at 351 NW 42nd Avenue Suite 504, Miami, FL 33126-5690
- Biomedical Waste Generator Permit #13-64-2768870 for the location at 701 NW 27th Ave, Miami, FL 33125-3012
- Biomedical Waste Generator Permit #13-64-2771251 for the location at 18590 NW 67th Ave Suite 101 Miami Lakes, FL 33015-3540
- Biomedical Waste Generator Permit #13-64-2771274 for the location at 12550 Biscayne Blvd. Suite 100 North Miami, FL 33181-2536
- Biomedical Waste Generator Permit #13-64-2771267 for the location at 12625 W. Dixie Hwy North Miami, FL 33161-4806
- Biomedical Waste Generator Permit #48-64-2554014 for the location at 1303 S. Semoran Blvd Orlando, FL 32807
- Biomedical Waste Generator Permit #48-64-2554016 for the location at 1303 S. Semoran Blvd Orlando, FL 32807
- Biomedical Waste Generator Permit #13-64-2770977 for the location at 9863 E Fern Street Palmetto Bay, FL 33157-5413
- Biomedical Waste Generator Permit #29-64-2784414 for the location at 7444 Palm River Road Tampa, FL 33619
- Biomedical Waste Generator Permit #29-64-2784396 for the location at 1608 W. Oak Avenue Plant City, FL 33563

- Biomedical Waste Generator Permit #13-64-2771260 for the location at 11200 W. Flagler Street Suite 101-107 Miami, FL 33174-1182
- Biomedical Waste Generator Permit #06-64-2790704 for the location at 7495 N University Drive Tamarac, FL 33321-2971
- Biomedical Waste Generator Permit #53-64-1802362 for the location at 205 1st Street South Winter Haven, FL 33880-3504

## CLIA

- CLIA Omission Letter (File Number 26994862; Application Number 296312) issued September 21, 2023 for the location at 7291 W Atlantic Ave #48, Delray Beach.
- CLIA Omission Letter (File Number 27000129; Application Number 296320) issued November 17, 2023 for the location at 551 E 49th ST, 1st Floor, Hialeah, FL.
- Certificate of Waiver CLIA ID No. 10D2132861 issued to RD by the State of Florida Agency for Health Care Admin, Laboratory Licensing Unit, effective 6/29/2023-6/28/2025.
- Confirmation of Change for CLIA 10D1009031 (File Number 26974901) issued November 29, 2023 for the location at 750 S Federal Highway, Hollywood, FL 33020.
- Certificate of Waiver CLIA ID No. 10D1017757 issued to RD by the State of Florida Agency for Health Care Admin, Laboratory Licensing Unit, effective 10/3/2023-10/2/2025.
- CLIA Omission Letter (File Number 26975702; Application Number 296327) issued November 17, 2023 for the location at 151 NW 11th ST, Suite E102, Homestead, FL.
- Certificate of Waiver CLIA ID No. 10D2279780 issued to MBMC for the location at 7455 State Road 52, Hudson, FL 34667, effective 4/7/23-4/6/25.
- CLIA Omission Letter (File Number 27003055; Application Number 296323) issued November 30, 2023 for the location at 2417 US Highway 98 N, Lakeland, FL.
- Confirmation of Change for CLIA 10D2138178 (File Number 27002891) issued January 11, 2024, for the location at 205 1st St South, Winter Haven, FL 33880.
- Confirmation of Change for CLIA 10D2076947 (File Number 26999910) issued October 31, 2022, for the location at 115 N 56th Street, Unit 103, Temple Terrace, FL 33617.
- Confirmation of Change for CLIA 10D2134032 (File Number 27002753) issued January 11, 2024, for the location at 7444 Palm River Road, Tampa, FL 33619.
- Certificate of Waiver CLIA ID Number 10D2134032 issued to RD for the location at 7444 Palm River Drive, Tampa, FL 33619, effective 7/25/2023-7/24/2025.
- CLIA Omission Letter (File Number 27002753; Application Number 296338) issued October 3, 2023 for the location at 7444 Palm River Drive, Tampa, FL.
- CLIA Omission Letter (File Number 26999911; Application Number 296317) issued October 3, 2023 for the location at 6726 Hanley Road, Tampa, FL.
- CLIA Omission Letter (File Number 27010972; Application Number 296319) issued October 3, 2023 for the location at 6710 Hanley Road, Tampa, FL.
- Certificate of Waiver CLIA ID Number 10D2101998 issued to RD for the location at 11200 W Flagler Street, Suites 101-107, Miami, FL 33174, effective 9/15/2023-9/14/2025.
- CLIA Omission Letter (File Number 26996120; Application Number 296345) issued October 3, 2023 for the location at 1608 W. Oak Ave, Plant City, FL.
- CLIA Omission Letter (File Number 26999830; Application Number 296342) issued October 3, 2023 for the location at 6245 66th Street N, Pinellas Park, FL.
- Certificate of Waiver CLIA ID Number 10D2105555 issued to RD for the location at 9861 E Fern ST, Palmetto Bay, FL 33157, effective 11/30/2023-11/29/2025.

- CLIA Omission Letter (File Number 27010022; Application Number 296337) issued September 20, 2023 for the location at 1303 S Semoran Blvd, Orlando, FL.
- Certificate of Waiver CLIA ID Number 10D2101999 issued to RD for the location at 12615 W Dixie Highway, Miami, FL 33161, effective 9/15/2023-9/14/2025.
- Certificate of Waiver CLIA ID Number 10D2294703 issued to MBMC for the location at 12625 W Dixie Highway, North Miami, FL 33161 effective 11/29/2023-11/28/2025.
- CLIA Closure Letter for CLIA ID Number 10D1060253 issued to CCMC for the location at 12550 Biscayne Blvd, Suite 500, North Miami, FL 33181
- Certificate of Waiver CLIA ID Number 10D2132863 issued to RD for the location at 18590 NW 67th Ave, Suite 101, Hialeah, FL 33015 effective 6/29/2023-6/28/2025.
- Certificate of Waiver CLIA ID Number 10D2105797 issued to RD for the location at 9611 Bird Road, Miami, FL 33165 effective 12/3/2023-12/2/2025.
- Certificate of Waiver CLIA ID Number 10D2132862 issued to RD for the location at 701 NW 27th Ave, Miami, FL 33125 effective 6/29/2023-6/28/2025.
- Confirmation of Change for CLIA 10D2129579 (File Number 27002578) issued May 25, 2023, for the location at 351 NW 42nd Ave, Suite 503, Miami, FL 33126.
- CLIA Certificate of Waiver (#10D0940831) for 1200 Alton Road Miami Beach, FL 33139-3810
- CLIA Certificate of Waiver (#10D2203096) for 7291 W Atlantic Ave #48 Delray Beach, FL 33446-1305
- CLIA Certificate of Waiver (#10D2270425) for 6710 Hanley RD, Tampa, FL 33634
- CLIA Certificate of Waiver (#10D2076951) for 6726 Hanley RD, Tampa, FL 33634
- CLIA Certificate of Waiver (#10D2081807) for 551 East 49th Street, Hialeah, FL 33013-2720
- CLIA Certificate of Waiver (#10D2107151) for 7463 State Road 52, Hudson, FL 34667
- CLIA Certificate of Waiver (#10D2142551) for 2417 Hwy. 98 N Lakeland, FL 33805-2410
- CLIA Certificate of Waiver (#10D2187389) for 12550 Biscayne Blvd. Suite 100, North Miami, FL 33181-2536
- CLIA Certificate of Waiver (#10D2263482) for 1303 S. Semoran Blvd Orlando, FL 32807
- CLIA Certificate of Waiver (#10D2074912) for 6245 66 Street N. Pinellas Park, FL 33781
- CLIA Certificate of Waiver (#10D2151272) for 1608 W. Oak Avenue Plant City, FL 33563
- CLIA Certificate of Waiver (#10D2143570) for 7495 N University Drive Tamarac, FL 33321-2971

**Health Care Clinic Establishment Permits**

- Health Care Clinic Establishment Permit Number 6026959 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 7291 W. Atlantic Ave, Delray Beach, FL 33446
- Health Care Clinic Establishment Permit Number 6026985 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 4980 West 10th Avenue, Hialeah, FL 33012.
- Health Care Clinic Establishment Permit Number 6026968 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 750 S. Federal Highway, Hollywood, FL 33020.
- Health Care Clinic Establishment Permit Number 6026177 issued by the Florida Department of Business & Professional Regulation on July 16, 2023 for the location at 7455 State Road 52, Hudson, FL 34667

- Health Care Clinic Establishment Permit Number 6026979 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 2417 US Highway 98 N, Lakeland, FL 33805
- Health Care Clinic Establishment Permit Number 6026952 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 205 1st Street South, Winter Haven, FL 33880.
- Health Care Clinic Establishment Permit Number 6025976 issued by the Florida Department of Business & Professional Regulation on June 23, 2023 for the location at 11531 N. 56th Street, Suite 103, Temple Terrace, FL 33617.
- Health Care Clinic Establishment Permit Number 6026945 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 7444 E. Palm River Road, Tampa, FL 33619.
- Health Care Clinic Establishment Permit Number 6025972 issued by the Florida Department of Business & Professional Regulation on June 23, 2023 for the location at 7444 E. Palm River Road, Tampa, FL 33619.
- Health Care Clinic Establishment Permit Number 6025974 issued by the Florida Department of Business & Professional Regulation on June 23, 2023 for the location at 6710 Hanley Rd, Tampa, FL 33634.
- Health Care Clinic Establishment Permit Number 6025975 issued by the Florida Department of Business & Professional Regulation on June 23, 2023 for the location at 6726 Hanley Rd, Tampa, FL 33634.
- Health Care Clinic Establishment Permit Number 6026986 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 7495 N. University Drive, Tamarac, FL 33321.
- Health Care Clinic Establishment Permit Number 6026954 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 11200 West Flagler Street, Suite 101, Miami, FL 33174.
- Health Care Clinic Establishment Permit Number 6025979 issued by the Florida Department of Business & Professional Regulation on June 23, 2023 for the location at 1608 W. Oak Ave, Plant City, FL 33563.
- Health Care Clinic Establishment Permit Number 6025973 issued by the Florida Department of Business & Professional Regulation on June 23, 2023 for the location at 6245 66th Street N, Pinellas Park, FL 33781.
- Health Care Clinic Establishment Permit Number 6025974 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 6245 66th Street N, Pinellas Park, FL 33781.
- Health Care Clinic Establishment Permit Number 6026984 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 9861 E Fern Street, Palmetto Bay, FL 33157.
- Health Care Clinic Establishment Permit Number 6026948 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 1303 South Semoran Blvd, Orlando, FL 32807.
- Health Care Clinic Establishment Permit Number 6017244 issued by the Florida Department of Business & Professional Regulation on April 11, 2023 for the location at 12625 W Dixie Highway Bldg B, North Miami, FL 33161.
- Health Care Clinic Establishment Permit Number 6017242 issued by the Florida Department of Business & Professional Regulation on April 24, 2023 for the location at 18590 NW 67th Ave, Suite 101, Miami Lakes, FL 33015.

- Health Care Clinic Establishment Permit Number 6026961 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 1200 Alton Road, Miami, FL 33139.
- Health Care Clinic Establishment Permit Number 6026957 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 9611 Bird Road, Miami, FL 33165.
- Health Care Clinic Establishment Permit Number 6018977 issued by the Florida Department of Business & Professional Regulation on June 12, 2023 for the location at 7500 SW 8th Street, Miami, FL 33144.
- Health Care Clinic Establishment Permit Number 6026949 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 7500 SW 8th Street, Miami, FL 33144.
- Health Care Clinic Establishment Permit Number 6026987 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 701 NW 27th Ave, Miami, FL 33125.
- Health Care Clinic Establishment Permit Number 6026983 issued by the Florida Department of Business & Professional Regulation on October 4, 2023 for the location at 351 NW 42nd Avenue, Suite 503, Miami, FL 33125.
- Health Care Clinic Establishment Permit Number 6028792 issued by the Florida Department of Business & Professional Regulation to LHA Smiles Design, Inc. for the location at 6704 Hanley Road Tampa, FL 6028792
- Health Care Clinic Establishment Permit Number 6026989 issued by the Florida Department of Business & Professional Regulation to Miami Beach Medical Consultants, LLC DBA Clinical Care Medical Centers for the location at 6710 Hanley RD Tampa, FL 33634
- Health Care Clinic Establishment Permit Number 6026992 issued by the Florida Department of Business & Professional Regulation to Miami Beach Medical Consultants, LLC DBA Clinical Care Medical Centers for the location at 6726 Hanley RD Tampa, FL 33634
- Health Care Clinic Establishment Permit Number6026991 issued by the Florida Department of Business & Professional Regulation to Miami Beach Medical Consultants, LLC for the location at 551 East 49th Street (Suite 500) Hialeah, FL 33013-2720
- Health Care Clinic Establishment Permit Number 6026946 issued by the Florida Department of Business & Professional Regulation to Miami Beach Medical Consultants LLC DBA Clinical Care Medical Centers for the location at 7463 State Road 52 Hudson, FL 34667
- Health Care Clinic Establishment Permit Number 6026945 issued by the Florida Department of Business & Professional Regulation to Clinical Care Medical Centers for the location at 7444 Palm River Road, Tampa, FL 33619
- Health Care Clinic Establishment Permit Number 6026971 issued by the Florida Department of Business & Professional Regulation to Miami Beach Medical Consultants, LLC DBA Clinical Care Medical Centers for the location at 151 NW 11th Street Suite E102, Homestead, FL 33030-4350
- Health Care Clinic Establishment Permit Number 6026969 issued by the Florida  Department of Business & Professional Regulation to Miami Beach Medical Consultants, LLC for the location at North Miami East – 100, 12550 Biscayne Blvd. Suite 100, North Miami, FL 33181-2536
- Health Care Clinic Establishment Permit Number 6026978 issued by the Florida Department of Business & Professional Regulation to Miami Beach Medical Consultants, LLC, 18590 NW 67th Ave Suite 101, Miami Lakes, FL 33015-3540

- Health Care Clinic Establishment Permit Number 6026947 issued by the Florida Department of Business & Professional Regulation to Miami Beach Medical Consultants, LLC, DBA Clinical Care Medical Centers, 12615 W. Dixie Hwy, North Miami, FL 33161-4806

## Radiation

- Radiation Permit # 51089000 issued to RD by the Department of Health Bureau of Radiation Control, Radiation Machine Section, for the location at 205 1st Street South, Winter Haven, FL 33880
- Radiation Machine Registration No. JR 48556000 issued to CCMC by the State of Florida Department of Health Bureau of Radiation Control for the location at 12550 Biscayne Blvd #100, Miami, FL 33181.
- Radiation Machine Registration No. JR 23008000 issued to CCMC by the State of Florida Department of Health Bureau of Radiation Control for the location at 1200 Alton Road, Miami Beach, FL 33139.
- Radiation Machine Registration No. JR 49719000 issued to CCMC by the State of Florida Department of Health Bureau of Radiation Control for the location at 9611 SW 40th Street, Miami, FL 33165.
- Radiation Machine Registration No. JR 02978000 issued to MMWC by the State of Florida Department of Health Bureau of Radiation Control for the location at 7500 SW 8th ST, Suite 103, Miami, FL 33144.
- Radiation Machine Registration No. JR 54974000 issued to CCMC by the State of Florida Department of Health Bureau of Radiation Control for the location at 701 NW 27th Ave, Miami, FL 33125.
- Radiation Machine Registration No. JR 48302000 issued to CCMC by the State of Florida Department of Health Bureau of Radiation Control for the location at 1400 NW 107th Ave, Suite 500, Miami, FL 33126.
- Radiation Machine Registration No. JR- 51080000 for the location at 7291 W Atlantic Ave #48, Delray Beach, FL 33446-1305
- Radiation Machine Registration No. JR- 45718000 for the location at 4980 West 10th Ave, Hialeah, FL 33012-3437
- Radiation Machine Registration No. JR- 45716000 for the location at 4980 West 10th Ave, Hialeah, FL 33012-3437
- Radiation Machine Registration No. JR- 52634000 for the location at 4980 West 10th Ave, 2nd Floor, Hialeah, FL 33012-3437
- Radiation Machine Registration No. JR- 39600000 for the location at 750 S. Federal Hwy, Hollywood, FL 33020-5424
- Radiation Machine Registration No. JR- 48524000 for the location at 151 NW 11th Street, Suite E102, Homestead, FL 33030-4350
- Radiation Machine Registration No. JR- 51378000 for the location at 2417 Hwy. 98 N, Lakeland, FL 33805-2410
- Radiation Machine Registration No. JR-52234000 for the location at 11200 W. Flagler street, Suite 201-207, Miami, FL 33174-1182

## FIRE

- Fire Permit # 23126-02188 issued to CCMC for the location at 151 NW 11 ST, Suite 102, Homestead, FL 33030 by the Miami-Dade Fire Rescue Department

- Fire Permit # 22126-00551 for the location at 12550 Biscayne Blvd, North Miami, FL 33181 issued by the Miam-Dade Fire Inspection and Permitting System.
- Annual Operating Permit No. 21126-02417 issued to CCMC by the Miami-Dade Fire Rescue Department for the location at 18590 NW 67 Ave, Suite 101, Miami, FL 33015.
- Fire Permit # 17126-01655 for the location at 9601 SW 40th ST, Miami, FL 33165 issued by the Miam-Dade Fire Inspection and Permitting System.

**Elevator**

- Certificate of Operation Application for 551 East 49th Street, Hialeah, FL 33013

**Defaults/Violations of any Permits due to the transaction:**

1. Alarm Registration with Miami-Dade County
   - Notification of a change of information is required within 10 days of the change.

2. Florida Biomedical Waste Permit
   - A change in ownership or control requires the facility to submit a new application and permit fee.

3. Florida Business Tax Registration
   - Change of ownership requires a new DR-1 application to the Florida Department of Revenue, because if the business is a corporation, limited liability company, or trust, the application requires disclosure of information for each director, officer, managing member, grantor, personal representative, or trustee of the business entity.

4. CLIA Waivers
   - All labs are CLIA waived facilities. For waived facilities, written notification must be submitted on letterhead signed by the laboratory director and must include the laboratory name and address, CLIA number, name of the Laboratory Director, and the effective date of the requested change for the following changes:
     - Status Changes to Certificate of Waiver
     - Demographic Changes to a Certificate of Waiver
     - Name of the Laboratory
     - Address of the Laboratory (Physical Location)
     - Mailing Address
     - Telephone and Fax Numbers
     - Change of Ownership and/or Tax ID (FEIN)

5. Health Care Clinic Establishment Permit
   - Health Care Clinic Establishment Permits are issued by the Florida Department of Business and Professional Regulation. A change in ownership with an associated change in the overseeing physician or other critical information on the application would necessitate the filing of an application noting the change.

6. Local Business Tax Registration

13230494-25

- Each facility will be required to obtain a new local business tax registration since this deal is structured as an asset sale.

7. Radiation Machine Facility Registration
   - Notice of a change to any circumstances or conditions stated in an application for a Radiation Machine Facility Registration, including an application for which such a registration has been issued (e.g., change in name of facility, responsible physician, billing info, etc.), must be provided to the Department of Health Bureau of Radiation Control, Radiation Machine Section.

**Section 3.10(a)**
Health Care Matters



## Section 3.10(b)
Health Care Proceedings











## Section 3.10(c)
### Third Party Payor Matters





10.10.24

Page 3

USA.615809655.2/MYQ
Aetna MCR



10.10.24

Page 4

USA.615809655.2/MYQ
Aetna MCR



10.10.24

615809655.2/MYQ
CarePlus

10.10.24

Page 6

USA.615809655.2/MYQ
CarePlus



10.10.24

Page 7

USA.615809655.2/MYQ
CartPlus



10.10.24

Page 8

USA.615809655.2/MYQ
CaréPlus



10.10.24

Page 10

USA.615809655.2/MYQ
Doctors Health



615809655.2/MYQ
Doctors Health

10.10.24

Page 13

USA.615809655.2/MYQ
HealthSun

10.10.24

Page 14

USA.615809655.2/MYQ
HealthSun

10.10.24

Page 15

USA.6158809655.2/MYQ
HealthSun

10.10.24

Page 16

USA.615800655.2/MVQ
Humana

10.10.24

Page 17

USA.615609655.2/MYQ
Humana



10.10.24

Page 20

USA.615809655.2/MYQ
Molina



10.10.24

Page 21

USA.615809655.2/MYQ
Molina

10.10.24

Page 22

USA.615808655.2YMYQ
PCP-PCN







10.10.24

Page 25

USA.619809865.2.MYQ
Simply

10.10.24

Page 26

USA.61580965S.2/MYQ
Solis

10.10.24

Page 27

USA.615809655.2/MYQ
Solis

10.10.24

615809655.2/MYQ



Solis

615809655.2/MYQ

Solis

USA.615809655.2/MYQ
Solis

10.10.24

Page 31

USA.615808655.2/MYQ
Sunshine



USA.615808655.2/MYQ
UHC



10.10.24

Page 36

USA.615808055.2/MYQ
UHC



**<u>Section 3.10(d)</u>**
Health Care Licenses

Reference is hereby made to Section 3.9(b) as if fully stated herein.

## **Section 3.10(f)**
Health Care Investigations

Reference is hereby made to Section 3.10(a) as if fully stated herein.

## **Section 3.10(g)**
Health Care Actions

Reference is hereby made to Section 3.10(a) as if fully stated herein.

## **Section 3.10(i)**
Permits

Reference is hereby made to Section 3.9(b) as if fully stated herein.

## Section 3.10(j)
Third Party Payors



## Section 3.10(k)
### Third Party Payor Obligations



**<u>Section 3.11(a)</u>**
Employee Census

See Attachment 3.11(a) attached hereto.

## Section 3.11(d)
Labor and Employment Matters







### Section 3.11(e)
Key Personnel Terminations



**Section 3.12(a)**
Employee Benefit Plans

| Plans | Broker and/or Insurer | Description |
|---|---|---|
| Medical insurance | Anchor Benefits (Broker) Cigna HDHP and Core VBP (Plan Options) | Health insurance options provided to full-time employees. Both plans cover in-network preventive care at 100%, prescription drugs, and include an annual limit on your expenses. |
| Health Savings Account (HSA) | WEX | Health Savings Account (HSA) option offered to full-time employees that is associated with a High Deductible Health Plan (HDHP). Employes may contribute up to $4,150 for individuals and $8,300 with dependents. |
| Employee Assistance Program (EAP) | Standard | Employee Assistance Plan (EAP) is a confidential service for full-time employees with access to guidance and resources at no cost for: - Mental health concerns (including substance abuse or addiction), - Adoption, parenting, or caregiving needs, - Financial or legal support, - Familial relationships and friendships, - Coping with day-to-day challenges - Other areas |
| Dental insurance | Guardian Group (Broker) | Dental insurance options provided to full-time employees. Two plans are offered to employees (low and high deductible), with both plans covering in-network preventive care at 100%. |
| Vision insurance | Guardian Group | Vision insurance for full-time employees covering annual exam with coverage for lenses and frames, or contacts in lieu of glasses. |
| Life and AD&D insurance | Standard | Life insurance for full-time employees that pays a benefit if an employee passes away while covered. Accidental Death and Dismemberment (AD&D) insurance is also offered to full-time employees offering additional support if an employee passes away suddenly or is seriously injured due to an accident. |
| Disability insurance | Standard | Disability insurance is offered to full-time employees, which can help replace a portion of an employee's income if they become too ill or injured to work. |
| MB Medical Operations Premium Contribution Plan | N/A | Section 125 cafeteria plan |
| MB Medical Operations, LLC 401k Plan | ADP | 401(k) Retirement Plan to Employees and match the Employees' elective-deferral contributions on a 100% basis up to 3% of compensation and on a 50% basis for the next 2% of compensation |
| Paid Time Off (PTO) | n/a | PTO is earned differently depending on level of seniority. Generally, Employees are awarded 15 days or 120 hours of PTO from their PTO earning start date until they have reached five years of service; 19 days or 152 hours from 5 to 10 years of service; and 22 days or 176 hours for 10 or more years of service. Employees are also generally awarded two days or 16 hours of PTO per calendar year for floating holidays, and Employees can rollover a maximum of 40 hours per year at year end |
| Accident Coverage | Aflac | Covered employees receive a cash benefit to help with expenses (i.e., deductible or copays, transportation, groceries, etc.) if they or a covered family member is injured due to an accident |
| Hospital Indemnity | Aflac | Covered employees receive a cash benefit to help with expenses (i.e., deductible or copays, transportation, groceries, etc.) if they or a covered family member is injured due to an accident |
| Critical Illness | Aflac | Covered employees receive a cash benefit to help with expenses (i.e., deductible or copays, transportation, groceries, etc.) if they or a covered family member is injured due to an accident |

| | |
|---|---|
| PCP and PCP-Aligned Medical Assistant Bonus Plan | n/a |
| Center Managers and Patient Service Representatives Bonus Plan | n/a |
| Dental Bonus Plan | n/a |
| Commissions | n/a |
| MB Medical Operations, LLC sign-on bonuses | n/a |
| MB Medical Operations, LLC change leadership bonuses | n/a |
| MBMG Ultimate Holding, L.P. equity incentive plan and the awards granted thereunder | n/a |



13230494-25

| ███████ | | |
|---|---|---|
| KEIP and KERP Plans | n/a | Retention bonus agreements with key employees. |

**Section 3.13**

Tax Matters

(l)

| Legal Entity | Type of Corporation |
|---|---|
| Care Center Network, LLC | US-DRE |
| Clinical Care Pharmacy, LLC | US-DRE |
| Florida Family Primary Care Centers of Tampa, LLC | US-DRE |
| MB Medical Operations, LLC | US-DRE |
| MB Medical Transport, LLC | US-DRE |
| MBMG Holding, LLC | US-Corp |
| Miami Medical & Wellness Center, LLC<br>Miami Beach Medical Centers, Inc. f/k/a Rodolfo Dumenigo, M.D., P.A.<br>Miami Beach Medical Consultants, LLC | US- C Corp |

(r) None.

## Section 3.14
### Insurance

| Insurance Carrier | Insurance Type | Policy Number | Remaining Policy Limits |
|---|---|---|---|
| Travelers Property Casualty Co. | Inland Marine - Business Auto Physical Damage | QT6608W370095TXS-23 | $365,750 |
| Travelers Property Casualty Co. | Deluxe Property | P6302W265677TXS23 | **Property**<br>Building: $0<br>Contents: $6,481,355<br>Business Income w/Extra Expense: $4,300,000<br>Equipment: Included<br>**TIV: $10,781,355** |
| Allied World Surplus Lines Ins. Co. | General and Professional Liability (Claims Made) | 3131724 | **General and Professional Liability (Claims Made)**<br>Each Claim: $250,000<br>Aggregate: $1,500,000<br>Retro Active Date: 11/30/2001<br><br>**Sub-Limits**<br>Disciplinary proceedings costs, Aggregate Limit: $25,000/$75,000<br>Emergency Evacuation Expenses, Aggregate Limit: $25,000<br>Legal Expense Limit: $10,000<br>Media Expenses, Aggregate Limit: $15,000<br>Sexual Misconduct Liability Loss Limit/Per Claim: $250,000<br>Sexual Misconduct Aggregate Limit: $500,000<br><br>**General Liability (Occurrence)**<br>General Aggregate: $3,000,000<br>Products / Completed: $1,000,000<br>Each Occurrence: $1,000,000<br>Personal And Advertising Injury: $1,000,000<br>Fire Damage Legal Liability Limit: $500,000<br><br>**Employee Benefit Liability (Claims Made)**<br>Each Claim: $1,000,000<br>Annual Aggregate: $3,000,000<br><br>Retro Active Date: 11/30/2001 |
| Travelers Indemnity Company | Auto | BA2W0136712343G | Liability: $2,000,000<br>PIP: Statutory<br>Uninsured/Underinsured Motorist: $1,000,000<br>Comp/Collision: ACV<br>Hired and Non-Owned Auto Liability: $1,000,000<br>Hired Car Physical Damage (Comp / Coll): ACV<br>Rental Reimbursement: 30 Day/ $50 Per Day |
| Charter Oak Fire Insurance Company | Workers Compensation | UB4K2587482343V | Worker's Comp: Statutory<br><br>**Employee Liability**<br>Each Accident: $1,000,000<br>Disease Per Employee: $1,000,000<br>Disease Policy Limit: $1,000,000 |
| Kinsale Insurance Company | Excess Liability | 1001764502 | Per Occurrence: $10,000,000<br>Aggregate: $10,000,000 |
| Certain Underwriters at Lloyd's | Terrorism and Sabotage | UTS256827923 | **Terrorism and Sabotage**<br>Per Occurrence: $10,781,355 |

| | | | Aggregate: $10,781,355<br><br>**Sub-Limits**<br>Business Interruption: $4,300,000<br>Civil or Military Authority: $1,000,000<br><br>**Terrorism and Sabotage Liability**<br>Each Claim $1,000,000<br>Aggregate: $2,000,000<br><br>**Active Shooter and Malicious Attack**<br>Per Occurrence: $1,000,000<br>Aggregate: $1,000,000 |
|---|---|---|---|
| Crum & Forster Specialty Insurance Co | Cyber | CYB107004 | **Cyber**<br>Limit of Liability: $5,000,000<br><br>**Sub-Limits**<br>Ecrime Loss Sublimit of Liability: $100,000<br>Depemdent Business Sublimit of Libility: $500,000<br>Ransomeware/Malware Sublimit of Liability: $100,000 |
| Hartford Insurance Co. of the Midwest | Flood Insurance | 6500428227 | **Flood - (1200 Alton Road)**<br>Building: $0<br>Contents: $500,000 |
| Charter Oak Fire Insurance Company | Workers Compensation | UB9T6389042443V | Workers Compensation: Statutory<br><br>**Employers' Liability**<br>Each Accident: $1,000,000<br>Disease per Employee: $1,000,000<br>Disease Policy Limit: $1,000,000 |
| Markel American Ins. Co. | ERP, Employment Practices, and Fiduciary | MKLM2MML000350 | **ERP (6-Year for D&O/EPL/FID)**<br>Aggregate Limit: $3,000,000<br>Continuity Date: 12/07/2016<br><br>**Employment Practices (Shared with DO & FID)**<br>Aggregate Limit: $3,000,000<br>Continuity Date: 12/07/2016<br><br>**Fiduciary  (Shared with DO & EPLI)**<br>Aggregate Limit: $1,000,000<br>Continuity Date: 12/07/2016 |
| Scottsdale Indemnity Co. | Employment Practices (FFPCC) | EKI3381688 | **ERP Run-Off (FFPCC)**<br>Aggregate Limit: $1,000,000<br>Continuity Date: 6/1/2021 |
| Chubb (Federal Insurance) | Executive Risk | 8264-3623 | $5,000,000 |
| Chubb (Federal Insurance) | Crime | 8248-0958 | $10,000,000 |
| Chubb (Federal Insurance) | Kidnap & Ransom | 8248-0963 | $10,000,000 |
| RSUI (Landmark American Insurance) | Special Committee Policy | LHP707478 | $5,000,000 |
| United States Fire Insurance Company | Provider Excess Loss Schedule of Insurance (Stop Loss) | US2090467 | Each member has an individual limit of $2 million per policy period above the applicable deductible subject to the 90% coinsurance clause. In the event that a member exhausts his or her limit, their coverage ceases, but all other members still have $2 million each. |

| | | | |
|---|---|---|---|
| Endurance American Speciality Insurance Company (Sompo International) | Fourth Director and Officer Policy | ADL30067232600 | Full limit of $5 million is still available. |

**Section 3.15**
Related Party Transactions and Interests



## Section 3.16(a)
Material Contracts

(i)

    (A)

        1.  The Membership Interest Purchase Agreement, dated April 26, 2021, by and among MBMO, Florida Family Primary Care Center, LLC, Octavio A. Bravo, James Eaton, Maria Isabel Gonzalez, Luis G. Venerio Salazar, as amended by that certain First Amendment to Membership Interest Purchase Agreement, dated May 25, 2021 (the "**FFPCC Purchase Agreement**").

    (B)    None.

(ii)

    1.  Schedule 3.16(a)(xix) is hereby incorporated herein by reference.

    2. Independent Contractor Agreement dated October 10, 2022, by and between RD d/b/a Clinical Care Medical Centers and JMO Group, LLC.

    3. Independent Contractor Agreement effective as of August 1, 2021, by and between RD and Rarfente, M.D., PA.

    4. Professional Services Agreement dated January 16, 2023, by and between Clinical Care Medical Centers and Mobile Vision Doctors, LLC.

    5. Separation Agreement by and between MBMG Holding, LLC, MBMG Ultimate Holding, L.P., Suarez Professional Services Corp., and Jose David Suarez, M.D.

    6. Agreement by and between MBMG Holding, LLC and former CFO Michael Sama for a one-time severance payment of $300,000.

    7. Letter of Agreement for Radiology Services dated July 6, 2022 by and between Clinical Care/RD and Life Radiology.

    8. Independent Contractor Agreement, dated November 14, 2022, by and between RD d/b/a Clinical Care Medical Centers and MARPER, PLLC.

(iii)

    None.

(iv)

    1.  Schedule 3.16(a)(xix) is hereby incorporated herein by reference.

(v)

    None.

(vi)

1. See Attachment 3.16(a)(vi) attached hereto.

(vii)

Primary Care Contracts

1. Medicare Advantage Network Risk Agreement, dated February 1, 2019, by and between FFPCCT, FFPCCPL, and FFPCCP, and UnitedHealthcare of Florida, Inc. (the "**FFPCC United Network Risk Agreement**").

2. Network Provider Agreement, undated, by and between FFPCCT and Simply Healthcare Plans, Inc. (the "**FFPCCT Simply Network Provider Agreement**").

3. Primary Care Provider Agreement, effective July 1, 2018, by and between MBMC as assignee of CCNI and MMM of Florida, Inc. f/k/a Health Advantage Florida, Inc. (the "**MMM Provider Agreement**").

4. Specialist Physician Participation Agreement, dated October 28, 2005, by and among Rodolfo Dumenigo, M.D. ("**Dr. Dumenigo**"), Humana Medical Plan, Inc., PCA Health Plans of Florida, Inc., PCA Family Health Plan, Inc., Humana Health Insurance Company of Florida, Inc., Humana Insurance Company, Employers Health Insurance Company, and PCA Life Insurance Company, as amended by that certain Amendment to Speciality Physician Agreement, dated October 28, 2005 (the "**Dumenigo Humana Specialist Participation Agreement**").

5. Physician Participation Agreement, dated July 1, 2010, by and among Dr. Dumenigo Humana Insurance Company, Humana Health Insurance Company of Florida, Inc., and Humana Medical Plan, Inc. (the "**Dumenigo Humana Physician Participation Agreement**").

6. Physician Participation Agreement, dated February 1, 2011, by and among MBMC as assignee of RD, Humana Insurance Company, Humana Health Insurance of Florida, Inc., and Humana Medical Plan, Inc., as amended by that certain Amendment to the Physician Participation Agreement, dated March 1, 2021 (the "**MBMC Humana Physician Participation Agreement**").

7. Physician Participation Agreement, dated on or around May 21, 2010, by and among RD d/b/a Miami Beach Medical Group, Humana Insurance Company, Humana Health Insurance Company of Florida, Inc., Humana Medical Plan, Inc., and their affiliates that underwrite or administer health plans (the "**Miami Beach Medical Group Humana Physician Participation Agreement**").

8. Independent Practice Association Agreement, effective November 1, 2020, by and among RD, Humana Insurance Company, Humana Health Insurance Company of Florida, Inc., Humana Medical Plan, Inc., and their affiliates who underwrite their plans (the "**RD Humana Independent Practice Association Agreement**").

9. Network Provider Agreement, undated, by and between MBMC and Solis Health Plans, Inc. ("**Solis**"), as amended by that certain 1st Amendment to the 5/22/19 Participating Provider Agreement, dated February 1, 2023, as further amended by that certain 2nd Amendment to the 1/1/19 Participating Provider Agreement, dated June 1, 2020, as further amended by that certain 4th Amendment to the 1/1/19 Participating Provider Agreement, dated September 1, 2021, and as further amended by that certain 1st Amendment to the 5/22/19 Participating Provider Agreement, dated February 1, 2023 (the "**MBMC Solis Network Provider Agreement**").

10. Network Provider Agreement, undated, by and between FFPCCT and Solis (the "**Miami Beach Medical Group Solis Network Provider Agreement**").

11. Network Provider Agreement, dated October 1, 2014, by and between CCN and Solis, as amended by that certain 1st Amendment to Network Provider Agreement, dated January 30, 2019 (the "**CCN Solis Network Provider Agreement**").

12. Medical Group Contract, undated, by and between Dr. Dumenigo and UnitedHealthcare Insurance Company on behalf of itself, UnitedHealthcare of Florida, Inc., and its other affiliates.

13. Medical Group Contract, dated September 28, 2023, by and between MBMC and UnitedHealthcare Insurance Company, UnitedHealthcare of Florida, Inc. and its other affiliates.

14. Network Risk Agreement, dated November 1, 2018, by and among FFPCCT, FFPCCPL, and FFPCCP, and UnitedHealthcare of Florida, Inc., as amended by that certain Amendment to the Network Risk Agreement, dated January 1, 2020, as further amended by that certain Amendment to the Network Risk Agreement, dated January 1, 2022, and as further amended by that certain Amendment to the Network Risk Agreement, dated December 1, 2023 (the "**FFPCCT United Network Risk Agreement**").

15. Medicare Advantage Network Risk Agreement, dated February 1, 2019, by and among FFPCCT, FFPCCPL, FFPCCP and United Healthcare of Florida, Inc. (the "**FFPCC United MA Network Risk Agreement**").

16. Medical Group Participation Agreement, effective September 1, 2020, by and between FFPCCP and United Healthcare Insurance Company and its affiliates (the "**FFPCCP United Participation Agreement**").

17. Medical Group Participation Agreement, effective September 1, 2020, by and between FFPCCPL and United Healthcare Insurance Company and its affiliates (the "**FFPCCPL United Participation Agreement**").

18. Medical Group Participation Agreement, effective September 1, 2020, by and between FFPCC and United Healthcare Insurance Company and its affiliates (the "**FFPCC United Participation Agreement**")..

19. The MBMC United Network Risk Agreement.

20. Primary Care Provider Agreement, effective August 1, 2015, by and between MBMC and Simply Healthcare Plans, Inc., as amended by that certain Amendment to Provider Agreement, dated January 1, 2018, as further amended by that certain Amendment to Provider Agreement, dated on or around December 19, 2018, as further amended by that certain Amendment to Provider Agreement, dated January 10, 2019, as further amended by that certain Amendment to Provider Agreement, dated July 5, 2019, as further amended by that certain Amendment to Provider Agreement., dated June 10, 2020, as further amended by that certain Seventh Amendment to Provider Agreement, dated June 18, 2020, and as further amended by that certain Eighth Amendment to Provider Agreement, effective January 1, 2023 (the "**MBMC Simply Provider Agreement**").

21. Network Provider Agreement, undated, by and between FFPCCT and Simply Healthcare Plans, Inc. (the "**FFPCCT Simply Provider Agreement**")

22. Participating Provider Agreement, undated, by and among MBMC, WellCare of Florida, Inc. and WellCare Health Insurance of Arizona, Inc. (the "**MBMC WellCare Provider Agreement**").

23. Medicare Advantage Network Risk Agreement, dated August 1, 2015, by and MBMC and Medica Healthcare Plans, Inc. ("**Medica**") (the "**MBMC Medica Network Risk Agreement**").

24. Medicare Advantage Network Risk Agreement, dated August 1, 2018, by and between CCN and Medica, as amended by that certain Amendment to Medicare Advantage Network Risk Agreement, dated January 1, 2020, including that Offset Agreement, dated August 1, 2018, by and among Medica and CCN and that Offset Agreement, dated August 1, 2018, by and between Medica and CCN (the "**CCN Medica Network Risk Agreement**").

25. Group Services Agreement, dated on or around October 9, 2020, by and between MBMC and Molina Healthcare of Florida, Inc., as amended by that certain Second Amendment to the Provider Services Agreement, dated September 1, 2023 (the "**MBMC Molina Group Services Agreement**").

26. Medicare Advantage Network Risk Agreement, dated September 1, 2015, by and between MBMC and Preferred Care Partners, Inc. ("**Preferred**"), as amended by that certain Amendment to Medicare Advantage Network Risk Agreement, dated July 1, 2019 (the "**MBMC Preferred Network Risk Agreement**").

27. Medicare Advantage Network Risk Agreement, dated August 1, 2018, by and between CCN and Preferred, as amended by that certain Amendment to Network Risk Agreement, dated January 1, 2020 (the "**CCN Preferred Network Risk Agreement**").

28. Participating Provider Agreement, undated, by and between RD and Preferred (the "**RD Preferred Provider Agreement**").

29. Group Agreement, dated August 21, 2014, by and between FFPCCT and Sunshine State Health Plan, Inc., as amended by that certain Provider Agreement Amendment, effective January 1, 2014, as further amended by that certain Amendment Number Two, dated May 1, 2015, as further amended by that certain Amendment to the Provider Agreement, effective January 21, 2016, as further amended by that certain Amendment to Group Agreement, dated January 1, 2020, as further amended by that certain Amendment to Participating Provider Agreement, effective January 1, 2020, as further amended by that certain Amendment to Participating Provider Agreement, dated January 1, 2021, and as further amended by that certain Amendment to Participating Provider Agreement, effective January 1, 2022 (the "**FFPCCT Sunshine Group Agreement**").

30. The FFPCCT Aetna Group Agreement.

31. The MBMC Aetna Provider Agreement.

32. Provider Agreement, effective June 1, 2017, by and between MBMC and Aetna Network Services, LLC (the "**2017 MBMC Aetna Provider Agreement**").

33. Physician Group Agreement, dated October 7, 2009, by and between RD and Aetna Health Inc. (the "**RD Aetna Physician Group Agreement**").

34. Network Agreement, dated May 1, 2009, by and between CCN and CarePlus, as amended by those certain amendments dated: (i) May 1, 2015, (i) September 1, 2016, (ii) September 1, 2017, (iii) January 1, 2018, (iv) January 1, 2019, and (v) September 1, 2021 (the "**CCN CarePlus Network Agreement**").

35. Network Agreement, dated February 1, 2018, by and between CCMG and CarePlus Health Plans, Inc.

36. The MBMC CarePlus Primary Care Agreement.

37. Network Agreement, dated March 1, 2014, by and between MMWC and CarePlus, as amended by those certain amendments dated: (i) March 1, 2014, (ii) January 1, 2016, (iii) January 1, 2017, and (iv) April 1, 2020 (the "**MMWC CarePlus Network Agreement**").

38. Network Participation Agreement, effective September 1, 2021, by and between MBMC and Bright Health Management Inc., as amended by that certain Amendment No. 1 to Network Participation Agreement, effective January 1, 2022.

39. The RD BCBS Group Services Agreement.

40. Provider Group Services Agreement, dated September 24, 2013, by and between RD and Cigna HealthCare of Florida, Inc.

41. Primary Care Provider Services Agreement, dated June 1, 2009, by and among and RD, Vista Healthplan, Inc., Vista Healthplan of South Florida, Vista Insurance Plan (the "**RD Vista Primary Care Provider Services Agreement**").

42. The MBMC Devoted Participation Agreement.

43. Physician Group Medical Services Agreement, dated January 22, 2015, by and between RD and Health Options, Inc. (the "**RD Health Options Physician Group Medical Services Agreement**").

44. Primary Care Physician Network Agreement, dated August 1, 2016, by and between MBMC and HealthSun Physicians Network I, LLC, as amended by that certain Amendment to Agreement, dated December 15, 2015, and as further amended by that certain Amendment to Primary Care Physician Network Agreement, effective Aril 1, 2022 (the "**MBMC HealthSun Primary Care Physician Network Agreement**").

45. Primary Care Provider Agreement, dated September 1, 2023, by and between MBMC and Doctors HealthCare Plans, Inc.

46. Group Participation Agreement, dated June 1, 2023, by and between MBMC and Health, Inc. (the "**MBMC Freedom Group Participation Agreement**").

47. Group Participation Agreement, dated June 1, 2023, by and between MBMC and Optimum Healthcare, Inc. (the "**MBMC Optimum Group Participation Agreement**").

48. Alivi Chiro Network Provider Agreement, dated March 22, 2024, by and between MBMC and Quality Managed Health Care, Inc., d/b/a Ailivi Chiro Network ("Alivi") (the "**MBMC Alivi Network Provider Agreement**").

49. Network Provider Agreement, dated September 22, 2023, by and between MBMC and Magellan Healthcare, Inc. (the "**MBMC Magellan Network Provider Agreement**").

50. Participation Agreement, dated March 10, 2017, by and between Viva Health, LLC and Juan M. Garces, M.D., P.A. (the "**Juan Viva Participation Agreement**").

Dental Contracts

51. Dental Participating Practice Agreement, dated on or around December 16, 2022, by and between LHA Smiles Design, Inc. ("**LHA**") and DentaQuest of Florida, Inc. ("**DentaQuest**").

52. Dental Participating Practice Agreement, dated on or August 24, 2022, by and between Senior Dental, LLC ("**SD**") and DentaQuest.

53. Dental Participating Practice Agreement, dated on or around September 8, 2022, by and between SD and DentaQuest (Provider: Jose Salguerio).

54. Dental Participating Practice Agreement, dated on or around September 8, 2022, by and between SD and DentaQuest (Provider: Lourdes Arguelles).

55. Dental Participating Practice Agreement, dated on or around September 14, 2022, by and between SD and DentaQuest.

56. Dental Participating Practice Agreement, dated on or around September 7, 2022, by and between SD and DentaQuest.

57. Dental Participating Practice Agreement, dated on or around September 30, 2022, by and between SD and DentaQuest.

58. Participating Provider Agreement, dated December 10, 2021, by and between LHA and Envolve Dental of Florida, Inc. ("**Envolve**") (the "**LHA Envolve Participating Provider Agreement**").

59. Participating Provider Agreement, dated July 14, 2023, by and between SD and Envolve (the "**SD Envolve Participating Provider Agreement**").

60. Provider Agreement, dated on or around August 10, 2022, by and between Luis Hernandez Abreu and Liberty Dental Plan of Florida, Inc.

61. Provider Agreement, dated on or around November 12, 2021, by and between Luis Hernandez Abreu and Liberty Dental Plan of Florida, Inc., including that certain Medicare Advantage Program Requirements Addendum, dated on or around November 12, 2021 by and between LHA and Liberty Dental Plan Corporation.

62. Medicare Advantage Program Requirements Addendum, dated on or around November 17, 2022, by and between LHA and Liberty Dental Plan Corporation.

63. Provider Agreement, dated March 8, 2022, by and between Luis Hernandez Abreu and Liberty Dental Plan of Florida, Inc., including that certain Medicare Advantage Program Requirements Addendum, effective April 26, 2022, by and between LHA and Liberty Dental Plan Corporation.

64. Master Dental Provider Agreement, dated December 3, 2021, by and between Luis Hernandez Abreu and Managed Care of North America, Inc., including that certain 2018 Florida Addendum, dated on or around December 3, 2021, by and between LHA and Managed Care of North America, Inc. (the "**Abreu Managed Care Master Dental Provider Agreement**").

65. Network Provider Agreement, dated on or around August 16, 2022, by and between Greta Rubio Rios and the Florida Healthy Kids Corporation.

66. Participating Provider Agreement, effective April 26, 2022, by and between Greta Barban Rodriguez and Solstice Benefits, Inc. ("**Solstice**") (the "**Rodriguez Solstice Participating Provider Agreement**").

67. Participating Provider Agreement, effective February 23, 2022, by and between Luis Hernandez Abreu and Solstice.

68. Participating Provider Agreement, effective August 22, 2022, by and between Zina Haratz and Solstice (the "**Haratz Solstice Participating Provider Agreement**").

69. Addendum to the Dentist Agreement, dated July 2, 2024, by and between Richard C. Lage, DDS and Florida Dental Benefits, Inc. ("**Florida Dental**") (the "**Lage Florida Dental Addendum to the Dentist Agreement**").

70. Addendum to the Dentist Agreement, dated July 2, 2024, by and between Luis Hernandez Abreu and Florida Dental (the "**Abreu Florida Dental Addendum to the Dentist Agreement**").

71. Network Provider Agreement, dated on or around August 16, 2022, by and between Greta Rubio Rios and the Florida Healthy Kids Corporation

Vision Contracts

72. Individual Provider Agreement, dated February 29, 2024, by and between MBMC and iCare Health Solutions, LLC (the "**MBMC iCare Individual Provider Agreement**").

73. Professional Services Agreement, dated January 16, 2023, by and between CCMC and Mobile Vision Doctors, LLC. (the "**CCMC Mobile Vision Professional Services Agreement**")

Acupuncture / Podiatry / Therapy Contracts

74. Alivi Chiro Network Provider Agreement, dated March 22, 2024, by and between MBMC and Quality Managed Health Care, Inc., d/b/a Ailivi Chiro Network (the "**MBMC Alivi Chiro Network Provider Agreement**").
75. Alivi Podiatry Network Provider Agreement, dated March 22, 2024, by and between MBMC and Foot & Ankle Network, Inc. d/b/a Alivi Podiatry Network (the "**MBMC Alivi Podiatry Network Provider Agreement**").
76. Alivi Therapy Network Provider Agreement, dated March 22, 2024, by and between MBMC and Therapy Health Network, LLC, d/b/a Alivi Therapy Network (the "**MBMC Alivi Therapy Network Provider Agreement**").

Pharmacy Provider Contracts

77. Pharmacy Provider Agreement, dated on or around February 22, 2021, by and between MBMC and Humana Pharmacy Solutions, Inc. (the "**Miami Beach Humana Pharmacy Provider Agreement**").

(viii)

1. End User License Agreement, dated September 22, 2023, by and between MBMO and Lightbeam Health Solutions.
2. Aaneel Health Services Agreement, effective as of March 1, 2023, by and between CCMG and JAM Infosys, LLC d/b/a Aaneel Health Services (the "**Aaneel Health Services Agreement**").
3. General Terms and Conditions, by and between NextGen Healthcare Inc. and Miami Beach Medical Group.
4. Order Form, by and between salesforce.com, Inc., and Miami Beach Medical Group.
5. Vonage Business Cloud Quote Acceptance dated February 20, 2019 by and between MBMG and Vonage Business, Inc.
6. ScribeEMR Coding Services Agreement.
7. Oral Arrangement with iPower Technologies ("**iPower**"), pursuant to which iPower provides month to month invoices for products it resells to Sellers, including Office 365 and if Sellers do not use iPower's services, there are no such invoices. YTD 2024 spend is approximately $200,000.

(ix)

1. The KKR Credit Agreement.
2. The KKR 2nd A&R Security Agreement.
3. The KKR Unsecured Promissory Note.

(x)

Primary Care Contracts with Non-Solicitation / Non-Interference Provisions

1. The MMM Provider Agreement.

2. The RD Humana Independent Practice Association Agreement.
3. The MBMC Solis Network Provider Agreement.
4. The Miami Beach Medical Group Solis Network Provider Agreement.
5. The CCN Solis Network Provider Agreement.
6. The FPCCT United Network Risk Agreement.
7. The MBMC United Network Risk Agreement.
8. The MBMC Simply Provider Agreement.
9. The MBMC WellCare Provider Agreement.
10. The MBMC Medica Network Risk Agreement.
11. The CCN Medica Network Risk Agreement.
12. The MBMC Molina Group Services Agreement.
13. The MBMC Preferred Network Risk Agreement.
14. The CCN Preferred Network Risk Agreement.
15. The FFPCCT Sunshine Group Agreement.
16. The RD Aetna Physician Group Agreement.
17. The MBMC Aetna Provider Agreement.
18. The 2017 MBMC Aetna Provider Agreement
19. The CCN CarePlus Network Agreement.
20. The MMWC CarePlus Network Agreement.
21. The RD BCBS Group Services Agreement.
22. The RD Vista Primary Care Provider Services Agreement.
23. The RD Health Options Physician Group Medical Services Agreement.
24. The MBMC HealthSun Primary Care Physician Network Agreement.
25. The MBMC Alivi Network Provider Agreemennt.
26. The Juan Viva Participation Agreement.
27. The FFPCC United MA Network Risk Agreement.
28. The FFPCCT Simply Provider Agreement.
29. The FFPCC United Network Risk Agreement.
30. The FFPCCT Simply Network Provider Agreement.

Primary Care Contracts with Non-Competition Provisions

31. The RD Humana Independent Practice Association Agreement.
32. The MBMC Solis Network Provider Agreement.
33. The Miami Beach Medical Group Solis Network Provider Agreement.
34. The CCN Solis Network Provider Agreement.
35. The FPCCT United Network Risk Agreement.
36. The MBMC United Network Risk Agreement.
37. The MBMC Simply Provider Agreement.
38. The FFPCCT Simply Network Provider Agreement.

Dental Contracts with Non-Solicitation / Non-Interference Provisions

39. The LHA Envolve Participating Provider Agreement.
40. The SD Envolve Participating Provider Agreement.
41. The Abreu Managed Care Master Dental Provider Agreement.
42. The Rodriguez Solstice Participating Provider Agreement.
43. The Haratz Solstice Participating Provider Agreement.
44. The "Lage Florida Dental Addendum to the Dentist Agreement.
45. The "Abreu Florida Dental Addendum to the Dentist Agreement.

Vision Contracts with Non-Solicitation / Non-Interference Provisions

    46. The MBMC iCare Individual Provider Agreement.
    47. The CCMC Mobile Vision Professional Services Agreement.

Acupuncture / Podiatry / Therapy Contracts with Non-Solicitation / Non-Interference and Non-Competition Provisions

    48. The MBMC Alivi Chiro Network Provider Agreement.
    49. The MBMC Alivi Podiatry Network Provider Agreement.
    50. The MBMC Alivi Therapy Network Provider Agreement.

Pharmacy Provider Contracts with Non-Solicitation Provisions

    51. The Miami Beach Humana Pharmacy Provider Agreement.

Medical Services Contracts with Employee Non-Solicitation Provisions

    52. Participation Agreement, dated December 6, 2016, by and between RD and MBMC (the "**RD MBMC Participation Agreement**").
    53. The MBMO RD Management Services Agreement.
    54. The MBMO MMWC Management Services Agreement.
    55. The MBMO MBMC Management Services Agreement.
    56. The MBMC RD Transport Services Agreement.

Medical Services Contracts with Non-Interference Provisions

    57. The RD MBMC Participation Agreement.

Medical Services Agreements with Non-Competition Provisions

    58. The MBMO RD Management Services Agreement.
    59. The MBMO MMWC Management Services Agreement.
    60. The MBMO MBMC Management Services Agreement.
    61. The MBMC RD Transport Services Agreement.

Commercial Contracts with Employment Non-Solicitation Provisions

    62. Services Agreement, dated July 12, 2022, by and between MBMO and Creation Financial d/b/a BKPO (the "**BKPO Services Agreement**").
    63. Janitorial Services Proposal, dated February 22, 2022, by and between MBMO d/b/a CCMC Medical Centers and Coastal Building Maintenance ("**Coastal**").
    64. Janitorial Services Proposal, dated October 21, 2021, by and between RD d/b/a MB Medical Centers and Coastal.
    65. Medical Coding Services Agreement, undated, by and between MBMO d/b/a Clinical Care Medical Centers and ScribeEMR, Inc. (the "**ScribeEMR Coding Services Agreement**").
    66. Valet Parking Agreement, dated October 11, 2022, by and between MBMO and Time Park, Inc.

67. Standard Security Installation & Monitoring Agreement, dated March 30, 2023, by and between MBMO d/b/a Clinical Care Medical Centers and Hi-Tech Security & Communications, Inc.

68. Standard Security Installation & Monitoring Agreement, dated September 1, 2020, by and between RD d/b/a Miami Beach Medical Group and Hi-Tech.

69. Master Service Agreement, dated on or around April 26, 2022, by and between MBMO d/b/a Clinical Care Medical Centers and Ubiquity Global Services, Inc. (the "Ubiquity Service Agreement").

70. Master Services Agreement, dated August 17, 2022, by and between MBMO and Balto Health, LLC (the "**Balto Services Agreement**").

71. Cleaning Service Agreement, dated on or around September 28, 2020, by and between RD d/b/a Miami Beach Medical Group and Vanguard Cleaning Systems of South Florida.

72. Service Agreement, dated March 1, 2023, by and between MBMO and Medix Staffing Solutions, LLC (the "**Medix Service Agreement**").

73. The Aaneel Health Services Agreement.

74. Terms and Conditions to Accompany Order Form, dated September 22, 2023, by and between MBMO and Lightbeam Health Solutions.

75. Master Agreement dated September 23, 2020, by and between RD d/b/a Miami Beach Medical Group and NextGen Healthcare Inc.

76. Global Terms and Conditions, undated, by and between MBMO and QTS (the "**QTS Global Terms**").

77. Subscription Agreement, dated October 26, 2020, by and between MBMO and Business Intelligence & Analytics, LLC (the "**Business Intelligence Subscription Agreemen**t").

78. Data Storage, Records Management, and Service Agreement, dated February 20, 2020, by and between RD d/b/a MBMG Medical Centers and International Data Depository, Inc. (the "**International Data Service Agreement**").

Commercial Contracts with Customer Non-Solicitation Provisions

79. The BKPO Services Agreement.
80. The QTS Global Terms.
81. The Balto Services Agreement.

Commercial Contracts with Non-Competition Provisions

82. The Program Services Agreement, undated, by and between MBMO and SunFireMatrix, Inc.

Commercial Contracts with Exclusivity Provisions

83. Biomedical Waste Service Agreement, dated May 21, 2022, by and between Clinical Care Medical Centers (Semoran) and Healthcare Environmental Services, LLC ("**HES**") (the "**2022 HES Service Agreement**").

84. Biomedical Waste Service Agreement, dated May 3, 2023, by and between MBMO and HES.

85. Biomedical Waste Service Agreement, dated May 3, 2023, by and between MBMO and HES.

86. Biomedical Waste Service Agreement, dated May 8, 2023, by and between MBMO and HES.

87. The Lyft Enterprise Order.

88. The Business Associate Agreement attached to the ScribeEMR Coding Services Agreement.

89. Fuel Service Agreement, dated March 4, 2024, by and between Clinical Care Medical Centers and American Fuel Services, Corp.

(xi)

None.

(xii)

1. The KKR Credit Agreement.
2. The KKR 2nd A&R Security Agreement.
3. The KKR Unsecured Promissory Note.

(xiii)

(A)

1. Provider Participation Agreement, dated October 1, 2021, by and between CCMG and VIP Family Practice, LLC.
2. Provider Participation Agreement, dated October 1, 2021, by and between CCN and Wellcare Medical Clinic.
3. Provider Participation Agreement, dated October 1, 2021, by and between CCN and Mi Casa Medical Center, LLC
4. Provider Participation Agreement, dated October 1, 2022, by and between CCN and Optimal Health Medical Center, Inc.
5. Provider Participation Agreement, dated October 1, 2021, by and between CCN and Primary Medical Physicians, LLC
6. Provider Participation Agreement, dated September 20, 2021, by and between CCN and Prime Health Medical Center, L.L.C.
7. Provider Participation Agreement, dated January 1, 2021, by and between CCN and El Retiro Medical Center Corp.
8. Provider Participation Agreement, dated November 1, 2021, by and between CCN and Gilda Maria de La Calle, MD, PA.
9. Provider Participation Agreement, dated October 1, 2021, by and between CCN and St. Jude Medical Group Corp.
10. Provider Participation Agreement, dated April 1, 2021, by and between CCN and Hilda M. Brito M.D. PA.
11. Provider Participation Agreement, dated February 1, 2024, by and between CCN and Horizon Care Medical Center, Inc.
12. Provider Participation Agreement, dated February 1, 2022, by and between CCN and John V. Williams, M.D., P.A.
13. Provider Participation Agreement, dated October 1, 2021, by and between CCN and V&R Medical Group, Inc.
14. Provider Participation Agreement, dated October 1, 2021, by and between CCMG and Managed Care Insurance Consultants, Inc.

15. Provider Participation Agreement, dated October 1, 2021, by and between CCN and Araceli Yapor, M.D., P.A.

16. Provider Participation Agreement, dated October 1, 2021, by and between CCN and Homeland Health Solutions Inc. d/b/a CareCross Medical Center.

17. Provider Participation Agreement, dated October 1, 2022, by and between CCN and Context Medical Group, Inc.

18. Provider Participation Agreement, dated October 1, 2021, by and between CCN and Fardales Medical Center, Inc.

19. Provider Participation Agreement, dated June 1, 2021, by and between CCN and Garcia Saez Medical Group Corp.

20. Provider Participation Agreement, dated October 1, 2021, by and between CCN and Wisecare of Florida, P.A.

21. Provider Participation Agreement, dated March 17, 2021, by and between CCN and United Medical Group, Inc.

22. Provider Participation Agreement, dated January 1, 2024, by and between CCN and New Health MD of Hialeah LLC.

(B)

1. None.

(xiv)

1. Valet Parking Agreement, dated October 11, 2022, by and between MBMO and Time Park, Inc.

2. Lyft Business Enterprise Order Form, dated April 13, 2022, by and between Lyft Healthcare, Inc. and MBMT.

3. Oral Arrangement with Chebere Appetite, Inc. 2024 Payment YTD: $605,282. Chebere Appetite, Inc. is a meal vendor that delivers daily to South Florida clinics.

4. Oral Arrangement with Best Office Coffee. 2024 Payment YTD: $478,993. Best Office Coffee is a vendor that delivers coffee as needed, primarily on a weekly basis, to various clinics.

5. Oral Arrangement with Holiday Bakery. 2024 Payment YTD: $304,103. Holiday Bakery provides baked goods and delivers daily to select clinics in South Florida.

6. Oral Arrangement with Isla Multi Services. 2024 Payment YTD: $57,711. Isla Multi Services is a Central Florida food vendor that delivers daily to clinics. This relationship has been discontinued.

7. Oral Arrangement with Publix. 2024 Payment YTD: $13,848. This relationship was historically used to purchase breakfast items and gift cards.

8. Oral Arrangement with Ramapi Corporation. 2024 Payment YTD: $147,992. Ramapi Corporation is a Central Florida food vendor that delivers food daily to clinics.

9. Oral Arrangement with Staples. 2024 Payment YTD: $108,035. CCMC has a credit line with Staples for office supplies, which CCMC pays approximately once a week.

(xv)

(A)

1. None.

(B)

<u>Primary Care Contracts that Require the Consent of the Other Party or May Be Terminated as a Result of a Change of Control of Seller or Sale of Substantially All of its Assets</u>

1. The Dumenigo Humana Specialist Participation Agreement.
2. The Dumenigo Humana Physician Participation Agreement.
3. The MBMC Humana Physician Participation Agreement.
4. The Miami Beach Medical Group Humana Physician Participation Agreement.
5. The RD Humana Independent Practice Association Agreement.
6. The MBMC Solis Network Provider Agreement.
7. The Miami Beach Medical Group Solis Network Provider Agreement.
8. The FFPCCT United Network Risk Agreement.
9. The MBMC United Network Risk Agreement.
10. The MBMC WellCare Provider Agreement.
11. The MBMC Medica Network Risk Agreement.
12. The CCN Medica Network Risk Agreement.
13. The MBMC Preferred Network Risk Agreement.
14. The CCN Preferred Network Risk Agreement.
15. The RD Preferred Provider Agreement.
16. The FFPCCT Aetna Group Agreement.
17. The MBMC Aetna Provider Agreement.
18. The 2017 MBMC Aetna Provider Agreement.
19. The RD Aetna Physician Group Agreement.
20. The MBMC CarePlus Primary Care Agreement.
21. The RD BCBS Group Services Agreement.
22. The RD Vista Primary Care Provider Services Agreement.
23. The MBMC Devoted Participation Agreement.
24. The RD Health Options Physician Group Medical Services Agreement.
25. The MBMC Freedom Group Participation Agreement.
26. The MBMC Optimum Group Participation Agreement.
27. The FFPCC United MA Network Risk Agreement.
28. The FFPCCP United Participation Agreement.
29. The FFPCCPL United Participation Agreement.
30. The FFPCC United Participation Agreement.

<u>Pharmacy Provider Contracts that Require the Consent of the Other Party or May Be Terminated as a Result of a Change of Control of Seller or a Sale of Substantially All of its Assets</u>

31. The Miami Beach Humana Pharmacy Provider Agreement.

<u>Medical Services Contracts that Require the Consent of the Other Party or May Be Terminated as a Result of a Change of Control of Seller or a Sale of Substantially All of its Assets</u>

32. The MBMO RD Management Services Agreement.
33. The MBMO MMWC Management Services Agreement.
34. The MBMO MBMC Management Services Agreement.

35. The MBMC RD Transport Services Agreement.

<u>Commercial Contracts that Require the Consent of the Other Party or May Be
Terminated as a Result of a Change of Control of Seller or a Sale of Substantially All of
its Assets</u>

36. The RD CHG Master Lease Agreement.
37. The Miami Beach Konica Master Subscription Agreement.
38. The MBMO Unites States Fire Application.
39. The Lyft Enterprise Order.

(xvi)

1. FFPCC Purchase Agreement.
2. The Asset and Equity Purchase Agreement, dated August 20, 2020, by and among Clinical Care Associates Inc., Clinical Care Center, Clinical Care, Inc., Clinical Care Services, Inc., Clinical Care Network, Inc., Clinical Care Pharmacy, Inc., CCN, Care Center Medical Group, Inc., MB Medical Holdings, LLC, MBMO, RD, MBMC, MBMT, Antonio Diaz, as the representative of the seller, The Diaz Family Trust, dated September 27, 2018, and The Antonio Diaz Irrevocable Trust, dated September 27, 2018 (the "Clinical Care Purchase Agreement").
3. The Asset Purchase Agreement, effective March 1, 2017, and entered into March 10, 2017, by and among MBMO, and Juan M. Garces, M.D., P.A., Complete Medical Dental Services of S. Fla, LLC, Health Professionals Associates, Inc., Professional Health Alliance LLC, Viva Health LLC, Latin Medical Associates, LLC, and Juan M. Garces, M.D. (the "Viva Purchase Agreement").
4. Directed Stock Transfer Agreement, dated October 2, 2023, by and among MMWC, MBMO, CCMC Physician Holdings, Inc., and Jose Suarez, M.D. (the "**CCMC Physician Stock Transfer Agreement**").
5. Directed Transfer Agreement, dated March 10, 2017, effective March 1, 2017, by and among Viva Health LLC, Juan Garces, M.D., and MBMO (the "**Viva Directed Transfer Agreemen**t").
6. US Fire Insurance Company Excess Loss Insurance Policy.

(xvii)

1. FFPCC Purchase Agreement.
2. Clinical Care Purchase Agreement.
3. Viva Purchase Agreement.
4. The CCMC Physician Stock Transfer Agreement.
5. The Viva Directed Transfer Agreement.
6. US Fire Insurance Policy Excess Loss Insurance Policy.

(xviii)

1. Direct Hire Services Agreement, dated on or around December 2, 2020, by and between Miami Beach Medical Group and Howroyd-Wright Employment Agency, Inc. dba AppleOne Employment Services.
2. MB Operation, LLC, dated on or around July 1, 2021, by and between MBMO and Howroyd-Wright Employment Agency, Inc. dba AppleOne Employment Services.
3. Letter, dated November 17, 2022, by and between Clinical Care Medical Centers and Greyhawk Search Partners.

4. Service Agreement, dated March 1, 2023, by and between MBMO and Medix Staffing Solutions, LLC

(xix)
   (A)
      1.   See Attachment 3.16(a)(xix) attached hereto.

   (B)
      2.   See Attachment 3.16(a)(xix) attached hereto.

(xx)

| Name | 2023 Paid | 2024 Paid |
|---|---|---|
| 3WON, LLC | $82,330 | $59,845 |
| Accord Recruiting LLC | $157,500 | $77,600 |
| Advanced Radiologist DBA Aris Mobile X-Ray | $212,170 | $76,030 |
| AFCO Premium Credit LLC | $1,064,075 | $854,615 |
| ALEJANDRO DURAN DC. PA. | $92,880 | $70,680 |
| Aliva Properties, Inc | $240,845 | $173,146 |
| ALL UNIFORM WEAR #12 | $60,339 | $54,711 |
| AMERICAN FUEL SERVICES | $0 | $168,777 |
| Ana Campos | $55,248 | $29,760 |
| Aniceto Dental PA | $0 | $67,200 |
| AT&T | $83,580 | $7,231 |
| AT&T Mobility | $97,805 | $144,212 |
| ATLANTIX PARTNERS | $123,600 | $109,358 |
| Balto Health LLC | $436,481 | $0 |
| Batista-Iturriaga MD LLC | $72,115 | $181,634 |
| Black Oil, Inc. | $849,669 | $209,490 |
| BLALOCK WALTERS, P.A. | $279,917 | $82,553 |
| BMO Harris Bank N.A. | $243,900 | $0 |
| Bradley Dietz | $37,500 | $87,500 |
| BROWARD COUNTY TAX COLLECTOR | $90,729 | $544 |
| CAC Specialty | $0 | $52,500 |
| Carlos I Gonzalez DDS, PA | $115,400 | $77,700 |
| CLEARWATER COMPLIANCE LLC | $135,600 | $102,519 |
| CMG Products Corp. | $2,768,306 | $413,548 |
| Coastal Building Maintenance | $849,269 | $339,038 |
| Comcast Business | $90,585 | $63,090 |
| CompHealth Associates Inc | $0 | $104,000 |
| Convey Health Solutions, Inc | $0 | $50,500 |
| CPM Quality Associates Inc | $70,040 | $49,500 |
| Creation Financial LLC | $318,240 | $304,494 |
| Crown Castle Fiber, LLC | $355,098 | $230,187 |
| Dandy | $342,919 | $544,699 |
| DATASITE LLC | $46,022 | $62,099 |
| David E. Gonzalez | $200,600 | $151,050 |
| Deloitte Consulting LLP | $3,357,808 | |
| Dentals Best Management Team LLC | $50,325 | $0 |
| Easy Health Inc | $557,000 | $0 |
| EMILIO MANTERO-ATIENZA, M.D, PA | $200,600 | |

| | | |
|---|---|---|
| FELIZOLA DENTAL LABORATORY INC | $127,045 | $14,020 |
| Fox Rothschild LLP | $563,201 | |
| FPL | $342,352 | $209,145 |
| FRVC MUSIC INC | $60,670 | $39,410 |
| FTI CONSULTING INC | $347,690 | |
| GABLES INSURANCE AGENCY CORP | $209,434 | $136,026 |
| Garcia Martinez Medical P.A. | $58,060 | $44,040 |
| GAYLE ADAMS | $105,629 | $58,333 |
| GENERAL RADIOGRAPHIC & MEDICAL SUPPLY | -$69,515 | $283,863 |
| GOLD COAST MAINTENANCE, INC | $136,909 | $90,835 |
| GR Dental Care LLC | $184,875 | $156,750 |
| Greenberg Traurig | $441,735 | $25,143 |
| Greta Barban D.D.S P.A | $148,450 | $111,000 |
| HAPPY OR NOT AMERICAS INC | $52,477 | $0 |
| HENRY SCHEIN INC | $91,854 | $273,210 |
| Henry Schein One | $84,216 | $44,172 |
| HI TECH SECURITY &COMMUNICATIONS, INC | $117,283 | $61,942 |
| HOME DEPOT | $130,209 | $82,609 |
| HOULIHAN LOKEY FINANCIAL ADVISORS, INC. | $57,185 | $42,200 |
| INSIGHT DIRECT USA, INC. | $77,511 | $0 |
| IPOWER TECHNOLOGIES | $266,503 | $196,530 |
| ISA Smiles LLC | $0 | $72,750 |
| J. MAYANS MD PA | $191,400 | $143,100 |
| JMO GROUP, LLC | $272,309 | $177,066 |
| JOAQUIN R FERNANDEZ D.P.M.,PA | $69,650 | $50,474 |
| JOE G. TEDDER, TAX COLLECTOR | $61,167 | -$55,275 |
| Jose L. Salgueiro DDS, PA | $173,100 | $132,800 |
| JOSE M CARDENTEY JR | $66,640 | $20,219 |
| KAREN AMAR D.C. P.A. | $54,994 | $44,051 |
| KING & SPALDING | $0 | $150,000 |
| KIRKLAND & ELLIS LLP | $458,853 | $13,736 |
| KPMG LLP | $189,409 | $0 |
| KRCX WRJ Holdings, LLC | $0 | $200,000 |
| LEGON FODIMAN & SUDDUTH, P.A. | $0 | $175,000 |
| Lourdes Arguelles DMD | $102,000 | $72,750 |
| MAR PER, PLLC | $258,551 | $167,500 |
| Marc Anthony Altieri | $107,184 | $66,935 |
| MARSH & MCLENNAN AGENCY LLC | $1,686,396 | $777,926 |
| McGovern Executive Search, LLC | $64,500 | $0 |
| MEDICAL CARE TRANSPORTATION, INC | $90,478 | $91,742 |
| MEDICAL ELECTRONICS, INC | $78,818 | $32,874 |
| Meru LLC | $371,362 | $959,095 |
| Miami-Dade Tax Collector | $1,154,910 | $31,814 |
| Miguel Fernandez Barreras | $67,105 | $0 |
| MOBILE OFFICE MANAGEMENT SERVICES | $59,660 | $44,324 |
| MOBILE VISION DOCTORS LLC | $451,107 | |
| New Horizon Communications | $52,210 | $36,587 |
| Oleva Marketing LLC | $68,380 | $40,950 |
| Olga E. Presas DDS, PA | $48,875 | $53,300 |

| | | |
|---|---|---|
| Paulina Alonso PA | $0 | $70,350 |
| PC CONNECTION SALES CORP | $130,551 | $125,633 |
| Perera Aleman, P.A. | $123,790 | $0 |
| POLINARIO'S PARTY & TENT RENTAL | $65,744 | $25,518 |
| Premium Choice Media LLC | $101,000 | $0 |
| Proskauer Rose LLP | $255,000 | $400,000 |
| PURE AIR SERVICING, INC | $81,875 | $15,015 |
| Quinn Emanuel Urquhart & Sullivan, LLP | $54,309 | $0 |
| Rafael Capote MD LLC | $76,923 | $88,077 |
| RARFENTE, MD, P.A. | $261,345 | $178,600 |
| Raul Andres Perez Falero | $82,650 | $157,200 |
| REMEDY REPACK | $84,414 | $76,732 |
| Richard C. Lage DDS, PA | $130,185 | $93,357 |
| Rolando Velasco | $99,600 | $193,800 |
| Romel Figueredo, MD P.A. | $295,274 | $208,213 |
| Rudish Health Solutions | $250,000 | $0 |
| Science And Arts Of Tampa | $103,560 | $12,732 |
| Scott Randolph Tax Collector | $106,005 | $1,782 |
| SCRIVAS LLC | $220,513 | $198,728 |
| Scrivas, LLC | $220,513 | $198,728 |
| SEGRERA ASSOCIATES | $84,000 | $0 |
| Servi-Dent Inc. | $26,490 | $58,093 |
| SIRIUS COMPUTER SOLUTIONS, INC | $66,764 | $66,725 |
| SKINMD - MIAMI GROUP, PLLC | $97,840 | $84,480 |
| Sonam Bansal DDS LLC | $99,750 | $110,200 |
| Spruce Brook Partners, LLC | $37,500 | $112,500 |
| SUN CAPITAL PARTNERS MANAGEMENT VII LLC | $589,412 | |
| SunFire Matrix, Inc | $51,800 | $0 |
| SUNSHINE COMMUNICATION SERVICES | $114,420 | $0 |
| TECO | $92,633 | $61,509 |
| The Barton Partnership Inc | $272,000 | |
| TRAVELERS | $0 | $164,665 |
| Treya Partners | $288,160 | $0 |
| Ttec Healthcare Solutions | $254,588 | $264,281 |
| Ubiquity Global Services, Inc | $624,452 | $0 |
| Valentus Medical Center | $190,927 | $3,315 |
| VIP Family Practice LLC | $60,857 | $20,480 |
| VITERA | $52,955 | $36,741 |
| WAKELY CONSULTING GROUP | $202,669 | $62,656 |
| WASTE CONNECTIONS OF FLORIDA | $76,507 | $55,162 |
| WASTE MANAGEMENT INC. OF FLORIDA | $105,997 | $72,220 |
| Wells Fargo Equipment Finance, Inc. | $67,037 | $32,151 |
| Westchester General Hospital, Inc. DBA Keralty Hospital | $52,500 | $0 |
| WEX ENTERPRISE EXXONMOBIL CARD | $181,392 | $28,661 |
| WOW MKTG | $605,376 | $795,690 |
| ZH DMD PA | $0 | $88,875 |
| Zina Haratz DDS PA | $156,750 | $15,750 |
| ZRG Partners Holdings Corp | $252,880 | |
| Zumpano Patricios, P.A. | $0 | $56,148 |

**Schedule 2.1(a)(vi)**

| Legal Entity | Sub-Category | Name | Address |
|---|---|---|---|
| MB Medical Operations, LLC | Commercial Property Leases | 107TH AND 14TH LLC | 1400 NW 107 AVE Miami FL 33172 |
| MB Medical Operations, LLC | Commercial Property Leases | 1200 ALTON ROAD, LLC | 1200 ALTON ROAD  MIAMI BEACH FL 33139 |
| MB Medical Operations, LLC | Commercial Property Leases | 126 WEST DIXIE LLC | 1400 NW 107 Ave Suite 500 Miami FL 33172 |
| MB Medical Operations, LLC | Commercial Property Leases | 1303 SOUTH SEMORAN LLC | 4865 SW 80th St, Miami, FL 33143 |
| MB Medical Operations, LLC | Commercial Property Leases | 201-205 S 1st ST LLC | 1400 NW 107 Ave Suite 500 Miami FL 33172 |
| No contract | Commercial Property Leases | 27th Miami Holdings LLC | 7750 SW 117 Ave Suite 306 Miami FL 33183 |
| MB Medical Operations, LLC | Commercial Property Leases | 551 E 49 ST LLC | 1200 ALTON ROAD  MIAMI BEACH FL 33139 |
| MB Medical Operations, LLC | Commercial Property Leases | 750 SOUTH FEDERAL HIGHWAY LLC | 1200 ALTON ROAD  MIAMI BEACH FL 33139 |
| MB Medical Operations, LLC | Commercial Property Leases | 7500 SW 8 ST LLC | 351 NW 42 AVE SUITE 600 MIAMI FL 33126 |
| MB Medical Operations, LLC | Commercial Property Leases | 9611 BIRD ROAD LLC | 1200 ALTON ROAD  MIAMI BEACH FL 33139 |
| Florida Family Primary Care Centers of Tampa, LLC | Commercial Property Leases | Aliva Properties, Inc | 8405 N Edison Ave  Tampa FL 33604 |
| MB Medical Operations, LLC | Commercial Property Leases | ATLANTIC AVENUE REALTY ASSOCIATES, L.L.C. | 17927 Lake Estates Drive  Boca Raton FL 33496 |
| No contract | Commercial Property Leases | CCN Holding of Coral Way, LLC | 7750 SW 117 Ave Suite 306 Miami FL 33183 |
| MB Medical Operations, LLC | Commercial Property Leases | CCN Holding of Hialeah, LLC | 7750 SW 117 Ave Suite 306 Miami FL 33183 |
| MB Medical Transport, LLC | Patient Transportation | ENTERPRISE FLEET MANAGEMENT, INC | PO BOX 800089  KANSAS CITY MO 64180-0089 |
| MB Medical Operations, LLC | Commercial Property Leases | EVERGREEN 3, LLC | 5340 N Federal Hwy Suite 110 Lighthouse Point FL 33064 |
| MB Medical Operations, LLC | Commercial Property Leases | FERN STREET PROPERTIES, LLC | 12961 Deva St. Coral Gables FL 33156 c/o Walter L Lista |
| MB Medical Operations, LLC | Commercial Property Leases | Gardens Office Complex, LLC | 18610 NW 87th Avenue, Suite 204  Hialeah FL 33015 |
| MB Medical Operations, LLC | Equipment | HIGHLAND CAPITAL CORP | 1 Passaic Ave., Fairfield NJ 07004 |
| MB Medical Operations, LLC | Commercial Property Leases | Horus International Corp LLC | 13231 Byrd Legg Drive Odessa, Florida 33556 |
| No contract | Commercial Property Leases | KIMCO REALTY CORPORATION | PO Box 30344, Tampa, FL 33630 |
| No contract | | Kimco Realty OP, LLC | 500 N Broadway Suite 201, Jericho, NY 11753 |
| MB Medical Operations, LLC | Commercial Property Leases | LAKELAND INVESTMENTS LLC | 2435 US HIGHWAY 98 N LAKELAND FL 33805 |
| No contract | | LONG ISLAND APARTMENTS, LLC | 3800 S. OCEAN DRIVE Suite 228, Hollywood, FL 33019 |
| MB Medical Operations, LLC | Commercial Property Leases | Miami Metro Medical LLC | 12191 W Linebaugh Ave Suite 789 Tampa FL 33626 |

| Debtor | Contract Type | Counterparty | Address |
|---|---|---|---|
| MB Medical Operations, LLC | Commercial Property Leases | Palm River Square Associates, LLC | PO Box 713201 Philadelphia PA 19171-3201 |
| MB Medical Operations, LLC | Equipment | PATTERSON COMPANIES INC - 710354 | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 |
| MB Medical Operations, LLC | Equipment | PATTERSON DENTAL SUPPLY 4784 | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 |
| *No contract* | | Peter Pan Developments, LLC | 2701 Coltsgate Road, Suite 300, Charlotte, NC 28211 |
| Florida Family Primary Care Centers of Pinellas LLC | Commercial Property Leases | Prestige Park LLC | 6245 66th St North Pinellas Park FL 33781 |
| *No contract* | | Quiqmeds | 7 Great Valley Parkway, Suite 100, Malvern, PA 19355 |
| | | | Soul Holdings Limited Partnership PO Box 38042 Baltimore MD 21297-8042 |
| MB Medical Operations, LLC | Commercial Property Leases | SEABREEZE PLAZA LLC | 708 SW 7 Ave, Ft Lauderdale, FL 33315 |
| *No contract* | | SNG 1115 INVESTMENTS LLC | 11531 N. 56th Street Temple Terrace, Florida 33617 |
| Florida Family Primary Care Centers of Tampa, LLC | Commercial Property Leases | Terrace Walk Plaza | PO BOX 41602, Philadelphia, PA 19101-1602 |
| *No contract* | | TGI Office Automation | 341 NW South River Dr Miami FL 33128 |
| MB Medical Operations, LLC | Commercial Property Leases | THE HUB RETAIL, LLC | PO Box 164734 Miami FL 33116 |
| MB Medical Operations, LLC | Commercial Property Leases | TOWER SHOPPING PLAZA, INC | PO Box 6112 Bldg ID FCF001 Hicksville NY 11802-6112 |
| MB Medical Operations, LLC | Commercial Property Leases | UNIVERSITY COLLECTION | c/o Horizon Properties 18610 NW 87th Avenue, Suite 204 Miami, FL 33015 |
| MB Medical Operations, LLC | Commercial Property Leases | Villaverde Properties LLC | PO BOX 105743, Atlanta, GA 30348-5743 |
| *No contract* | | Wells Fargo Vendor Fin Serv | |

## 3.16 (a)(xix) Employee contracts over $100k; Contracts that provide severance benefits



| Name | Job Title Description | Annual Salary |
|------|----------------------|---------------|





### **Section 3.16(b)**

Contract Defaults

None.

## **Section 3.16(c)**
### Cure Costs

1. See Attachment 3.16(c) attached hereto.

# CCMC

Subject to Revision

Notes:
* Executory Contracts as of 10.10.2024
* Cure Amounts based on Accounts Payable balance as of 10/10/2024
* Cure Amounts are not inclusive of Commercial Leases that have been exited by CCMC

Total: 1,704,438

| Index # | Legal Entity | Nature of the Debtor's Interest | Counterparty Name | Noticing Address | Executory Contract Title | Cure Costs |
|---|---|---|---|---|---|---|
| 1 | MB Medical Operations, LLC | Commercial Lease | 1200 ALTON ROAD, LLC | 4865 SW 80th St Miami, FL 33143 | Lease by and between Alanar Investments LTD and Rodolfo Dumenigo, M.D., P.A., and the Assignmenta and Assumption of Lease Agreement by Alanar Investments Ltd. to 1200 Alton Road, LLC | $0.00 |
| 2 | MB Medical Operations, LLC | Commercial Lease | 126 WEST DIXIE LLC | 4865 SW 80th St Miami, FL 33143 | Lease by and between 126 West Dixie LLC, a Florida llc and MB Medical Operations, LLC a Delaware llc | $0.00 |
| 3 | MB Medical Operations, LLC | Commercial Lease | 1303 SOUTH SEMORAN LLC | 4865 SW 80th St Miami, FL 33143 | Lease by and between 1303 South Semoran, LLC and MB Medical Operations, LLC | $0.00 |
| 4 | MB Medical Operations, LLC | Commercial Lease | 201-205 S 1st ST LLC | 1400 NW 107th Ave., Suite 500, Miami, Florida 33172 | Lease by and between 201-205 S 1st LLC and MB Medical Operations, LLC | $0.00 |
| 5 | MB Medical Operations, LLC | Commercial Lease | 551 E 49 ST LLC | 1200 Alton Road, Miami Beach, FL 33139 | Lease by and between 551 East 49 Street, LLC and MB Medical Operations, LLC | $0.00 |
| 6 | MB Medical Operations, LLC | Commercial Lease | 750 SOUTH FEDERAL HIGHWAY LLC | 1200 Alton Road, Miami Beach, FL 33139 | Lease by and between 750 Federal Highway, LLC and MB Medical Operations, LLC | $0.00 |
| 7 | MB Medical Operations, LLC | Commercial Lease | 7500 SW 8 ST LLC | 1200 Alton Road, Miami Beach, FL 33139 | Execution Version - Lease by and between 7500 SW 8ST, LLC a Florida llc and MB Medical Operations, LLC a Delaware llc | $0.00 |
| 8 | MB Medical Operations, LLC | Commercial Lease | 9611 BIRD ROAD LLC | 1200 Alton Road, Miami Beach, FL 33139 | Lease by and between 9611 Bird Road LLC a Florida llc and MB Medical Operations, LLC a Delaware llc | $0.00 |
| 9 | Miami Beach Medical Consultants, LLC | Payor contracts | Aetna Better Health of Florida | Coventry Health Care of Florida, Inc. Attn. Medicaid Network Management 1340 Concord Terrace Sunrise, FL 33323 and Aetna Law Dept, Medicaid, Mail Code RE6A 151 Farmington Avenue Hartford, CT 06156-0001 | Medicaid/Provier Group Agreement | $0.00 |
| 10 | Miami Beach Medical Consultants, LLC | Payor contracts | Aetna Network Services LLC | 151 Farmington Avenue, Hartford, CT 06156 | Provider Agreement | $0.00 |
| 11 | Miami Beach Medical Consultants, LLC | Payor contracts | Aetna Network Services LLC | 151 Farmington Avenue, Hartford, CT 06156 | Physician Group Agreement | $0.00 |
| 12 | MBMG Ultimate Holding, LP | Insurance | AFCO Premium Credit LLC | 150 N Field Drive, Suite 190, Lake Forest, IL 60045 | Premium Finance Agreement A joint venture of AFCO Credit Corporation and Marsh USA LLC | $0.00 |
| 13 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Aguiar Alvarez, Gilberto | 10512 sw 144 ct | Employment Agreement by and between Gilberto Aguiar Alvarez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 14 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Alba Oliveros, Osmel | 8910 SW 200 St | Employment Agreement by and between Osmel Alba Oliveros, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 15 | MB Medical Operations, LLC | Commercial Lease | Aliva Properties, Inc | 8405 N Edison Ave, Tampa Florida 33604 | Shopping Center Lease between Aliva Properties, Inc. and Florida Family Primary Care Centers of Tampa, LLC | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

CONFIDENTIAL

| # | Entity | Contract Type | Counterparty | Address | Description | Amount |
|---|--------|---------------|--------------|---------|-------------|--------|
| 16 | Florida Family Primary Care Centers of Tampa, LLC | Commercial Lease | Aliva Properties, Inc | 8405 N Edison Ave, Tampa Florida 33604 | Shopping Center Lease between Aliva Properties, Inc. and Florida Family Primary Care Centers of Tampa, LLC | $0.00 |
| 17 | Florida Family Primary Care Centers of Tampa, LLC | Commercial Lease | Aliva Properties, Inc | 8405 N Edison Ave, Tampa Florida 33604 | Shopping Center Lease between Aliva Properties, Inc. and Florida Family Primary Care Centers of Tampa, LLC | $0.00 |
| 18 | Florida Family Primary Care Centers of Tampa, LLC | Commercial Lease | Aliva Properties, Inc | 8405 N Edison Ave, Tampa Florida 33604 | Shopping Center Lease between Aliva Properties, Inc. and Florida Family Primary Care Centers of Tampa, LLC | $0.00 |
| 20 | Miami Medical & Wellness Center, LLC | Employment Agreement | Alonso, Alberto | 4440 Sw 148 Terrace | Employment Agreement by and between Miami Medical & Wellness Center LLC and Alberto B. Alonso, MD | $0.00 |
| 21 | Care Center Network, LLC | Employment Agreement | Alonso, Emma | 2501 SW 37th Ave | EMPLOYMENT AGREEMENT by and between EMMA R. ALONSO, M.D and CLINICAL CARE NETWORK, INC. | $0.00 |
| 22 | MB Medical Operations, LLC | Employment Agreement | Altieri, Dalirma | 10371 SW 60th St, Miami, FL 33173 | Separation Agreement, Including General Release between Dalima Altieri and MB Medical Operations, LLC d/b/a Clinical Care Medical Centers | $0.00 |
| 23 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Alvarez Pando, Yolanda | 1291 Evergreen Park Cir. | Employment agreement by and between Yolanda Alvarez Pando, MD and Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), d/b/a Miami Beach Medical Group | $0.00 |
| 24 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Alvarez, Juan | 14951 Belaire Drive S | Employment Agreement by and between Juan Alvarez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D. P.A. (now known as Miami Beach Medical Centers, Inc) | $0.00 |
| 25 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Angel Batista, MD | 16253 SW 102 Terr, Miami, FL 33196 | INDEPENDENT CONTRACTOR AGREEMENT | $0.00 |
| 27 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Arredondo Torres, Elsa Lisset | 819 Southwest 6th Avenue | EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of the 24th day of April, 2023 (the "Effective Date"), by and between Elsa Arredondo, APRN ("Employee"), and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS ("Employer"). | $0.00 |
| 28 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Arrieta, Reynaldo E. | 10243 Oasis Palm Dr | Employment Agreement by and between Reynaldo Arrieta, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 29 | MB Medical Operations, LLC | Professional Fees | Atlantis Partners | 800 Corporate Dr # 320, Fort Lauderdale, FL 33334 | Atlantis Statement of Work | $0.00 |
| 30 | MB Medical Transport LLC | Equipment and Financing (Vehicle P-Automation CDJR Pembroke Pines | Atlantis P-Automation CDJR Pembroke Pines | 13601 Pines Blvd, Pembroke Pines, FL 33027 | Retail purchase agreement between MB Medical Transport LLC and Autonation CDJR Pembroke Pines | $0.00 |
| 31 | MB Medical Transport LLC | Equipment and Financing (Vehicle P-Automation CDJR Pembroke Pines | Atlantis P-Automation CDJR Pembroke Pines | 13601 Pines Blvd, Pembroke Pines, FL 33027 | Retail purchase agreement between MB Medical Transport LLC and Autonation CDJR Pembroke Pines | $0.00 |

CONFIDENTIAL

| # | Entity | Contract Type | Counterparty | Description | Address | Value |
|---|---|---|---|---|---|---|
| 32 | MB Medical Operations, LLC | Equipment and Financing | Balboa Capital | Equipment Financing Agreement, Agreement #8379015-000 between Balboa Capital and MB Medical Operations, LLC | 575 Anton Blvd, 12th Floor Costa Mesa, CA 92626 | $0.00 |
| 33 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Balladares Ros, Daisel | EMPLOYMENT AGREEMENT by and between Daisel Balladares, APRN ("Employee") and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS ("Employer"). | 14661 Southwest 99th Street | $0.00 |
| 34 | Florida Family Primary Care Center of Pasco, LLC / Florida Family Primary Care Centers of Pinellas, LLC / Florida Family Primary Care Centers of Tampa, LLC | Employment Agreement | Batista, Moraima | FIRST AMENDMENT TO EMPLOYMENT AGREEMENT by and between FLORIDA FAMILY PRIMARY CARE CENTER OF PASCO, LLC, FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC, and FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC (collectively, the "Company"), and MORAIMA BATISTA, M.D. | 11328 Bloomington Drive | $0.00 |
| 35 | MBMG Holding, LLC | Professional Fees | BDO USA, P.C. | Engagement Letter | 100 SE 2nd Street 17th Floor Miami Tower Miami, FL 33131 | $0.00 |
| 36 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Berrios, Rosa Maria | EMPLOYMENT AGREEMENT (this 'Agreement") by and between Rosa Berrios, APRN ("Employee"), and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS ("Employer"). | 128 Smiths Ford Road | $0.00 |
| 37 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |
| 38 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |
| 39 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |
| 40 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |
| 41 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |
| 42 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |
| 43 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |
| 44 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |
| 45 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |
| 46 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |
| 47 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |
| 48 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |
| 49 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |
| 50 | MB Medical Transport LLC | Equipment and Financing (Mercedes | Bill Ussery Motors of Cutler Bay, LLC | Lease Schedule | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | See #154 |

DRAFT - SUBJECT TO MATERIAL CHANGE

| # | Entity | Type | Counterparty | Address | Description | Amount |
|---|--------|------|--------------|---------|-------------|--------|
| 51 | MB Medical Transport, LLC | Equipment and Financing | (Mercedes Bill Ussery Motors of Cutler Bay, LLC | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | Lease Schedule | See #154 |
| 52 | MB Medical Operations, LLC | Commercial Lease | BJ's Restaurants, inc | c/o Gregory S. Lynds-EVP & Chief Deolopment Officer, 7755 Center Avenue, Suite 300 Huntington Beach, CA 92647 | Access and Parking License Agreement by and between BJ'sRestaurants, inc. a California coporation and MB Medical Operations, LLC a Florida llc | $0.00 |
| 53 | MB Medical Operations, LLC | Meals | Blessed Kitchen LLC | 810 W Colonial Blvd, Orlando, FL | Purchase Agreement with Clinical Care Medical Centers and Blessed Kitchen, LLC | $4,031.08 |
| 54 | MB Medical Operations, LLC | Meals | Blessed Kitchen LLC | 810 W Colonial Blvd, Orlando, FL | Purchase Agreement with Clinical Care Medical Centers and Blessed Kitchen, LLC | See #53 |
| 55 | Miami Medical & Wellness Center, LLC | Employment Agreement | Caceres Muskus, Juan | 6120 Reese Road | Employment agreement by and between Juan Cacares Muskus, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 56 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement (Provider) | Capote Sarmiento, Rafael | 3810 Nw 183rd St | Employment Agreement | $0.00 |
| 57 | MB Medical Operations, LLC | Technology | CareOptimize | 8700 W Flagler St #400, Miami, FL 33174 | Miami Beach Medical Centers Travel Proposal | $0.00 |
| 58 | Miami Beach Medical Consultants, LLC | Payor contracts | Careplus Health Plans, Inc. | 8200 NW 41 Street, Suite 305 Doral, Florida 33166 | Primary Care Agreement | $0.00 |
| 59 | Miami Beach Medical Consultants, LLC | Payor contracts | Careplus Health Plans, Inc. | 8200 NW 41 Street, Suite 305 Doral, Florida 33166 | Primary Care Agreement | $0.00 |
| 60 | Care Center Network, LLC | Payor contracts | Careplus Health Plans, Inc. | 11430 NW 20th Street, Suite 200 Doral, Florida 33172 Attn. Provider Operations Department | Primary Care Agreement | $0.00 |
| 61 | Care Center Medical Group, LLC | Payor contracts | Careplus Health Plans, Inc. | 11430 NW 20th Street, Suite 300 Doral, Florida 33172 Attn. Provider Operations Department | Primary Care Agreement | $0.00 |
| 62 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Carrate, Marianeee | 12740 Sw 101 Terrace | Employment Agreement by and between Marianeee Carrate, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 63 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Castaneda, Carlos D | 3183 Southwest 24th Street | EMPLOYMENT AGREEMENT by and between Carlos Castaneda, PA ("Employee"), and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS | $0.00 |
| 64 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Castelanos Santos, Daili | 1091 Southwest 131st Avenue | Employment Agreement by and between Daili Castellanos Santos, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 65 | MB Medical Operations, LLC | Commercial Lease | CCN Holding of Hialeah, LLC | 7750 SW 117 Ave Suite 306 Miami, FL United States | Block Lease Agreement by and between CCN Holding of Hialeah, LLC and MB Medical Operations, LLC | $0.00 |
| 66 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Celoge, Marie Yolette | 19745 E St Andrews Dr | Employment Agreement by and Between Marie Celoge, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

CONFIDENTIAL

| # | Debtor | Contract Type | Counterparty | Address | Description | Amount |
|---|---|---|---|---|---|---|
| 67 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Cerra Villalobos, Indira | 3355 W 68 Street | Employment Agreement by and between Indira Cerra Villalobos, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 68 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Charles, Jean Philippe | 15435 SW 175 Street | Employment Agreement by and between Jean Charles, PA, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 69 | Miami Beach Medical Transport, LLC | Insurance | Charter Oak Fire Insurance Company | One Tower Square, Hartford, CT 06183 | Auto Insurance Policy | $0.00 |
| 70 | Miami Beach Medical Transport, LLC | Insurance | Charter Oak Fire Insurance Company | One Tower Square, Hartford, CT 06183 | Auto Insurance Policy | $0.00 |
| 71 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Equipment and Financing | CHG-Meridian USA Corp. | 21800 Oxnard St. Suite 400, Woodland Hills, CA 91367 | Master lease agreement by and between CHG-Meridian USA Corp. and Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 72 | MB Medical Operations, LLC | Employment Agreement | Chin, Sharon | 10607 SW 6 St Pembroke Pines, FL 33025 | Separation Agreement, Including General Release between Sharon Chin and MB Medical Operations, LLC d/b/a Clinical Care Medical Centers | $0.00 |
| 73 | MB Medical Operations, LLC | Commercial Lease | CITY PROPERTIES COMPANY, INC | 110 E. Reynolds Sreet suite 100-A Plant City, Florica 33563 | Lease by and between City Properties Co. and MB Medical Operations, LLC | $2,100.95 |
| 74 | MB Medical Operations, LLC | Technology | Clearwater Compliance LLC | 40 Burton Hills Blvd #200, Nashville, TN 37215 | Statement of Work No. 3 Clearwater ClearAdvantage® Protect Plus Program | $0.00 |
| 75 | MB Medical Operations, LLC | Marketing | CMG Products Corp. | 6071 NW 7 Street, Suite 175, Miami, FL 33126 | Consulting Agreement between MBMG Medical Centers and CMG Products | $0.00 |
| 76 | MB Medical Operations, LLC | Marketing | CMG Products Corp. & ALBITA | 6071 NW 7 Street, Suite 175, Miami, FL 33126 | Endorsement Agreement between Clinical care Medical Centers and ALBITA | $0.00 |
| 77 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Coastal Building Maintenance | 8651 NW 70TH ST, MIAMI, FL 33166 | Janitorial Services Proposal | $1,765.50 |
| 78 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Coastal Building Maintenance | 8651 NW 70TH ST, MIAMI, FL 33166 | Janitorial Services Proposal | See #77 |
| 79 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Condit, Alexis Deanna Bravo | 1024 NW 9 TER | Employment Agreement by and between Alexis Bravo, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. | $0.00 |
| 80 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Conrado, Carlos | 1355 Sw 7 Street | Employment Agreement by and between Carlos Conrado, M.D., and Miami Medical Wellness Center/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 81 | Florida Family Primary Care Center of Pasco, LLC | Commercial Lease | Counsel Square Office Park LLC | c/o Woodside Capital Partners 4200 S. Hulen St., Suite 410 Ft. Worth, Texas 76109 Attn: Tim Larson | Lease by and between Counsel Square Office Park LLC and Florida Family Prianmy Care Center of Pasco, LLC. | $0.00 |
| 82 | MB Medical Operations, LLC | Marketing | Creation Image LLC | 7950 NW 53rd ST #221 Miami, FL 33166 | Services Agreement between MB Medical Operations, LLC and Creation Financial DBA BKPO | $37,657.60 |
| 83 | MB Medical Operations, LLC | Telecommunication License Agreem | Crown Castle Fiber, LLC | PO Box 28730, New York, NY 10087-8730 | Order Agreement | $0.00 |
| 84 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Cuan, Alisa | 8414 North Paddock Avenue | Employment Agreement by and between Alisa Cuan, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

| # | Debtor | Contract Type | Counterparty | Address | Description | Amount |
|---|---|---|---|---|---|---|
| 85 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Cuenca, Michael Steven | 12284 Sw 27 Street | EMPLOYMENT AGREEMENT (this "Agreement") by and between Michael Cuenca, M.D. ("Physician"), and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS | $0.00 |
| 86 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Diaz Cardelle, Tatiana | 11620 Southwest 142nd Terrace | Employment Agreement by and between Tatiana Diaz Cardelle, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 87 | Miami Beach Medical Consultants, LLC | Payor contracts | Doctors Healthcare Plans, Inc. | 2020 Ponce De Leon PH 1 Coral Gables, FL 33134-4477 Attn: Network Development | Primary Care Provider Agreement | $0.00 |
| 88 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Emilio Alvarez | 6740 SW 78 Terra South Miami, FL 33143 | Amendment to Lease by and between Emilio Alvarez and MB Medical operations, LLC | $0.00 |
| 89 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Enriquez Dominguez, Lorayne | 11360 Southwest 160th Avenue | Employment Agreement by and between Lorayne Enriquez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 90 | MB Medical Transport, LLC | Transportation | Enterprise Fleet Management, Inc | PO BOX 800089 KANSAS CITY, MO United States | Vehicle Sales Agreement Certificate | $0.00 |
| 91 | MB Medical Transport, LLC | Transportation | Enterprise Fleet Management, Inc | PO BOX 800089 KANSAS CITY, MO United States | Vehicle Sales Agreement Certificate | $0.00 |
| 92 | MB Medical Transport, LLC | Transportation | Enterprise Fleet Management, Inc | PO BOX 800089 KANSAS CITY, MO United States | Vehicle Sales Agreement Certificate | $0.00 |
| 93 | MB Medical Operations, LLC | Commercial Lease | FERN STREET PROPERTIES, LLC | 12961 Deva St. Coral Gables FL 33156 c/o Walter L Lista | Commercial Lease Agreement by and between Fern Street Properties, LLC and MB Medical Operations, LLC | $0.00 |
| 94 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Fernandez Armas, Yaimy | 13590 Southwest 98th Street | Employment Agreement by and between Yaimy Fernandez Armas, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 95 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Fernandez Novales, Jorge | 2850 Sw 134 Ave | Employment Agreement by and between Jorge Fernandez Novales, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 96 | Florida Family Primary Care Centers of Pinellas, LLC / Florida Family Primary Care Centers of Tampa, LLC | Employment Agreement | Figueroa, Yolanda | 4955 Cypress Trace Drive, Tampa, FL 33624 | Employment Agreement by and Between Florida Family Primary Care Center of Pasco, LLC, Florida Family Primary Care Centers of Pinellas, LLC, and Florida Family Primary Care Centers of Tampa, LLC, and Yolanda Figueroa, M.D. | $0.00 |
| 97 | MB Medical Operations, LLC | Other (including Clinical Specialists) | First Spanish Church of the Open Bible, Inc. | 490 E. 50 Street Hialeah, Florida 33013 | Contract for Parking Spaces between First Spanish Church of the Open Bible, Inc. and Miami Beach Medical Group, Inc. | $2,000.00 |
| 98 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Flores Iglesias, Carlos | 16269 Sw 44Th Street | Employment Agreement by and between Carlos Flores Iglesias, PA, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

| # | Debtor | Contract Type | Counterparty | Counterparty Address | Description | Amount |
|---|--------|---------------|--------------|---------------------|-------------|--------|
| 99 | Miami Beach Medical Consultants, LLC | Other (including Clinical Specialists) | Florida Behavioral Center, Inc. d/b/a f Florida Behavioral Center, Inc. d/b/a Florida Healthcare System 1905 NW 82nd Ave, Doral Florida 33126 8400 NW 33 Street, Suite 201, Doral, Florida 33122 | Staffing Services Agreement between Florida Behavioral Center, Inc and Miami Beach Medical Consultants | $0.00 |
| 101 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Fonseca, Sailin | 4010 Boatman ave | Employment Agreement by and between Sailin Fonseca, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 102 | Miami Beach Medical Consultants, LLC | Vendor Agreements | Foot & Ankle Network, Inc. d/b/a Alix 5775 Blue Lagoon Drive, Ste. 450, Miami, FL 33125, Attn: President | Alixi Podiatry Network Provider Agreement | $0.00 |
| 103 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Franco, Manuel | 6301 Collins Avenue | EMPLOYMENT AGREEMENT BETWEEN Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), d/b/a MIAMI BEACH MEDICAL GROUP, a Florida professional association AND MANUEL A. FRANCO, M.D. | $0.00 |
| 104 | Miami Beach Medical Consultants, LLC | Payor contracts | Freedom Health, Inc. | Attn: Provider Relations 4200 West Cyprus St. Suite 1000 Tampa, FL 33607 | Group Participant Agreement | $0.00 |
| 105 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Garcia Rodriguez, Francisco | 5316 Sw 152 Court | Employment Agreement by and between Francisco Garcia Rodriguez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 106 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Garcia, Emelio | 8071 Sw 195Th Ct | Employment Agreement by and between Emelio Garcia, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 107 | MB Medical Operations, LLC | Commercial Lease | Gardens Office Complex, LLC | C/o Horizon Properties 7785 N.W. 146th Street Miami Lakes, FL 33016 | Lease by and between Gardens Office Complex, LLC, and MB Medical Operations, LLC | $0.00 |
| 108 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Gomez, Julio Orlando | 5050 W 22 Ct | Employment agreement by and between Julio Gomez, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 109 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Technology | Greenway Health, LLC | 4301 West Boy Scout Boulevard, Ste 800 Tampa, FL 33607 Attention: Legal Department | LIST OF MIGRATED ASSETS PURCHASE SCHEDULE - SIGNATURE PAGE | $0.00 |
| 110 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Guerra, Rene | 6575 W 4th Ave | Employment Agreement between Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.)d/b/a Miami Beach Medical Group and Rene Guerra, MD | $0.00 |
| 111 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Gumenick Family Investments No. 2 | 1959 West Avenue, Miami Beach, Florida 33139 | Monthly Parking Agreement between Gumenick Family Investments No. 2 Ltd. and Rodolfo Dumenigo MD PA | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

| # | Debtor | Contract Type | Counterparty | Address | Description | Amount |
|---|--------|---------------|--------------|---------|-------------|--------|
| 112 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Gutierrez Diaz, Adys I | 3102 West Henry Avenue | EMPLOYMENT AGREEMENT by and between Adys Gutierrez, APRN ("Employee"), and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS | $0.00 |
| 113 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Healthcare Environmental Services | Healthcare Environmental Services, LLC 8496 NW 61 Street, Miami, Florida 33166 Attention: Contract Administrator | HEALTHCARE ENVIRONMENTAL SERVICES DOCUMENT DESTRUCTION SERVICES AGREEMENT | $0.00 |
| 114 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Healthcare Environmental Services | Healthcare Environmental Services, LLC 8496 NW 61 Street, Miami, Florida 33166 Attention: Contract Administrator | HEALTHCARE ENVIRONMENTAL SERVICES DOCUMENT DESTRUCTION SERVICES AGREEMENT | $0.00 |
| 115 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Healthcare Environmental Services | Healthcare Environmental Services, LLC 8496 NW 61 Street, Miami, Florida 33166 Attention: Contract Administrator | HEALTHCARE ENVIRONMENTAL SERVICES DOCUMENT DESTRUCTION SERVICES AGREEMENT | $0.00 |
| 116 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Healthcare Environmental Services | Healthcare Environmental Services, LLC 8496 NW 61 Street, Miami, Florida 33166 Attention: Contract Administrator | HEALTHCARE ENVIRONMENTAL SERVICES DOCUMENT DESTRUCTION SERVICES AGREEMENT | $0.00 |
| 117 | Miami Beach Medical Consultants, LLC | Payor contracts | HealthSun Physicians Network I, LLC | HealthSun Physicians Network I, LLC 3250 Mary Street, Suite 300 Coconut Grove, Florida 33133 Attn: President | Primary Care Physician Network Agreement | $0.00 |
| 118 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Hernandez Perez, Javier | 3105 Oakland Shores Drive | Employment Agreement by and between Javier Hernandez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 119 | MB Medical Operations, LLC | Equipment and Financing | Highland Capital Corp | 1 Passaic Ave, Fairfield NJ 07004 | Equipment Lease Agreement | $0.00 |
| 121 | MB Medical Operations, LLC | Commercial Lease | Horus International Corp LLC | 13231 Byrd Legg Drive Odessa, Florida 33556 | Lease by and between Horus International Coportaion, llc and Clinical Care Medial Centers | $5,826.61 |
| 122 | MBMG Holding, LLC | Professional Fees | Houlihan Lokey Financial Advisors, Inc | 3060 Peachtree Road NW, Ste 1500, 15th Floor Atlanta, GA 30305 | Engagement Letter (GW, MIU) | $0.00 |
| 123 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Payor contracts | Humana Insurance Company, Human | Humana Inc. PO Box 1438 Louisville, Kentucky 40201-1438 Attn: Law Department | Independent Practice Association Participation Agreement | $0.00 |
| 124 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Payor contracts | Humana Insurance Company, Human | Humana Inc. PO Box 1438 Louisville, Kentucky 40201-1438 Attn: Law Department | Physician Participation Agreement | $0.00 |
| 125 | Miami Beach Medical Consultants, LLC | Payor contracts | Humana Insurance Company, Human | 500 West Main Street Louisville, Kentucky 40202 Attn: Law Department | Settlement and Release Agreement | $0.00 |
| 126 | Miami Beach Medical Consultants, LLC | Payor contracts | Humana Pharmacy, Inc. | 500 West Main Street Louisville, Kentucky 40202 Attn: Law Department | Master Over-the-Counter Product Ordering Agreement | $0.00 |
| 127 | Miami Beach Medical Consultants, LLC | Vendor Agreements | iCare Health Solutions, LLC | 7600 Corporate Center Drive, Ste 200, Miami, FL 33126 | Individual Provider Agreement | $0.00 |
| 128 | MB Medical Operations, LLC | Services Agreement | j2 Cloud Services, LLC | 6922 Hollywood Blvd., Suite 500 Los Angeles, CA 90028 Attn: Legal Department | Services Agreement | $0.00 |
| 129 | MB Medical Operations, LLC | Technology | JAM INFOSYS, LLC d/b/a AANEEL HEALTH SERVICES | 6650 Gunn Hwy Tampa, FL 33556 United States of America | AANEEL HEALTH SERVICES AGREEMENT between Jam Infosys, LLC and Clinical Care Medical Centers | $46,806.08 |
| 130 | MB Medical Operations, LLC | Employment Agreement | JCL Advisory, LLC | 9241 SW 57 Ter, Miami, FL 33173 | Independent Contractor Agreement | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

DRAFT - SUBJECT TO MATERIAL CHANGE

| # | Entity | Category | Counterparty | Address | Description | Amount |
|---|--------|----------|--------------|---------|-------------|--------|
| 131 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | JMO Group, LLC | 5120 Fallen Leaf Dr, Riverview, FL 33578 | INDEPENDENT CONTRACTOR AGREEMENT | $0.00 |
| 132 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Joshua Manbor | 9595 Collins Ave Apt 408 Miami Beach, FL United States | BUSINESS ASSOCIATE AGREEMENT | $0.00 |
| 133 | MB Medical Operations, LLC | Equipment and Financing | Konica Minolta Payment Services | Konica Minolta Healthcare Americas, Inc. 411 Newark Pompton Turnpike Wayne, NJ 07470-0934 | Master Subscription Agreement between Customer and Konica Minolta Payment Services | $0.00 |
| 134 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Labrada Viera, Osmel | 585 West 25th Street | Employment Agreement | $0.00 |
| 135 | MB Medical Operations, LLC | Commercial Lease | LAKELAND INVESTMENTS LLC | 222 Poinciana Dr. Sunny Isles Beach, Florida 33160 | Lease agreement by and between Lakeland Investments, LLC and MB Medical Operations, LLC | $0.00 |
| 136 | MB Medical Operations, LLC | Dental Contracts (LHA) | LHA Smiles Design, Inc. | 9460 SW 6th Lane Miami, FL 33174 | Dental Services Participation and Management Agreement by and among MB Medical Operations, LLC and its Subsidiaries ("MBMG") and LHA Smiles Design, Inc. | $0.00 |
| 137 | Florida Family Primary Care Center, LLC | Dental Contracts (LHA) | LHA Smiles Design, Inc. | 9460 SW 6th Lane Miami, FL 33174 | Dental Services Participation and Management Agreement by and among MB Medical Operations, LLC and its Subsidiaries ("MBMG") and LHA Smiles Design, Inc. | $0.00 |
| 138 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Life Radiology | 3470 NW 82 AVE, STE 119 Doral, FL 33122 | Letter of Agreement for Radiology Services between Clinical Care and Life Radiology | $0.00 |
| 139 | MB Medical Operations, LLC | Technology | Lightbeam Health Solutions | 222 W Las Colinas Blvd. #2200n, Irving, TX 75039 | Lightbeam Health Solutions Order Form | $53,244.38 |
| 140 | MB Medical Operations, LLC | Commercial Lease | Lilian Loeffler QTIP Trust | 6 Cayuga Road, Fort Lauderdale, Florida 33308 | Lease between MB Medical Operations llc and Lillian Loeffler QTIP Trust | $0.00 |
| 141 | MBMG Ultimate Holding, LP | Professional Fees | LOCKTON COMPANIES LLC/CHARLOTTE | 4725 PIEDMONT ROW DR STE 510 CHARLOTTE,NC 28210 | PREMIUM FINANCE AGREEMENT (24000322) | $0.00 |
| 142 | MBMG Ultimate Holding, LP | Professional Fees | LOCKTON COMPANIES LLC/CHARLOTTE | 4725 PIEDMONT ROW DR STE 510 CHARLOTTE,NC 28210 | PREMIUM FINANCE AGREEMENT (24000322) | $0.00 |
| 143 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Lopez, Esdras | 9805 SW 77 Place | Employment Agreement between Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.)and Esdras Lopez, MD | $0.00 |
| 144 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Lugo Rodriguez, Randy | 710 nw 14th ave | Employment Agreement by and between Randy Lugo, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 145 | MB Medical Transport, LLC | Transportation | Lyft Healthcare, Inc. | 185 Berry Street, Suite 5000 San Francisco, CA 94107 | Lyft business agreement by and between MB Medical Transport LLC and Lyft Healthcare Inc | $411,972.58 |
| 146 | Miami Beach Medical Consultants, LLC | Vendor Agreements | Magellan Healthcare, Inc. | 14100 Magellan Plaza, Maryland Heights, MO 63043 | Network Provider Agreement | $0.00 |
| 147 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | FIRST AMENDMENT TO EMPLOYME | Maldonado, Lillian Vazquez | PO Box 772036 Orlando, FL 32877 | Employment Agreement by and between Lilliam Vazquez Maldonado, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 148 | MB Medical Operations, LLC | Commercial Lease | Marion Simmons | 507 Sandalwood Drive Plant City, FL 33563 | Commercial lease by and between Marion Simmons and MB Medical Operations | $8,378.66 |

| # | Entity | Category | Counterparty | Address | Description | Amount |
|---|---|---|---|---|---|---|
| 149 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Marper, plic | 7060 NW 75 St Parkland, FL 33067 | INDEPENDENT CONTRACTOR AGREEMENT | $0.00 |
| 150 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Separation Agreement | Martinez-Negron, Melanie | 7444 Palm River Rd Tampa, FL 33619 | Employment Agreement by and between JMO Group, LLC, and Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 151 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Matos, Rafael | 4604 Netherwood Drive | Employment Agreement by and between Rafael Matos, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 152 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | McKesson Medical-Surgical Inc. | 9954 Mayland Drive, Suite 4000, Richmond, Virginia 23233 | Product Supply Agreement | $170,880.34 |
| 153 | Miami Beach Medical Consultants, LLC | Payor contracts | Medica Healthcare Plans, Inc. | 9100 S. Dadeland Blvd., Suite 1250 Miami, FL 33156-7838 | Network Risk Agreement | $0.00 |
| 154 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay) | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | $24,453.46 |
| 155 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay) | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 156 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay) | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 157 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay) | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 158 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay) | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 159 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay) | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 160 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay) | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 161 | MB Medical Transport, LLC | Equipment and Financing (Mercedes Benz of Cutler Bay) | Mercedez Benz of Cutler Bay | 10701 SW 211th St. Cutler Bay, FL 33189 305/251 0345 | RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION) (VIN W124EGHY1MT080183) | See #154 |
| 162 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Mia Lab Inc. | 2129 West 76 St, Hialeah, FL 33016 | CONTRACT | $25,916.52 |
| 163 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Vendor Agreements | Miami Lab Inc. | 2916 N Miami Avenue Suite 10C Miami, FL 33127 | Contract | $0.00 |
| 164 | MB Medical Operations, LLC | Commercial Lease | Miami Metro Medical LLC | 1200 Alton Road, Miami Beach, FL 33139 | Lease by and between 12550 Biscayne, LLC a Florida llc and MB Medical Operations, LLC a Delaware llc | $0.00 |
| 167 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Mobile Vision Doctors, LLC | 1315 Silk Oak Dr. Hollywood, FL 33021 | Professional Services Agreement between Clinical Care Medical Centers and Mobile vision Doctors, LLC | $0.00 |
| 168 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Vendor Agreements | Mobile Vision Doctors, LLC | Attn: Dr. Ryan C. Venagio, 1315 Silk Oak Drive, Hollywood, FL 33021; mobilevisiondoctors@gmail.com | Professional Services Agreement between Clinical Care Medical Centers and Mobile vision Doctors, LLC | $0.00 |

CONFIDENTIAL

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

| # | Debtor | Category | Counterparty | Address | Description | Amount |
|---|---|---|---|---|---|---|
| 169 | Miami Beach Medical Consultants, LLC | Payor contracts | Molina Healthcare of Florida, Inc. | Molina Healthcare of Florida, Inc. 8300 NW 33rd Street, Ste. 400 Doral, FL 33122 Attention: President | Group Services Agreement | $0.00 |
| 170 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Mora, Abel | 8917 Northwest 146th Terrace | EMPLOYMENT AGREEMENT AND PROTOCOL BETWEEN MIAMI MEDICAL &WELLNESS CENTER / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), d/b/a MIAMI BEACH MEDICAL GROUP AND ABEL MORA, APRN | $0.00 |
| 171 | Miami Beach Medical Consultants, LLC | Vendor Agreements | NCH Management Systems, Inc. | 11000 SW 104 St # 161092 Miami, FL 33116 | Provider Agreement | $0.00 |
| 172 | MB Medical Operations, LLC | Technology | NextGen Healthcare Inc. | 18111 Von Karman Ave, Suite 600 Irvine, California 92612 | Supplemental Order Form (PG-2022-255291) | $749,891.64 |
| 173 | MB Medical Operations, LLC | Technology | NextGen Healthcare Inc. | 18111 Von Karman Ave, Suite 600 Irvine, California 92612 | Supplemental Order Form (PG-2022-255291) | See #172 |
| 174 | MB Medical Operations, LLC | Technology | NextGen Healthcare Inc. | 18111 Von Karman Ave, Suite 600 Irvine, California 92612 | Supplemental Order Form (PG-2022-255291) | See #172 |
| 175 | MB Medical Operations, LLC | Employment Agreement | Nunez, Salvador | 8035 Diamond Creek Ln Lakeland, FL 33809 | Separation Agreement, Including General Release between Salvador Nunez and MB Medical Operations, LLC d/b/a Clinical Care Medical Centers | $0.00 |
| 176 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Olympia Heights Methodist Church | 1400 NW 107 Ave, Suite 500 Doral, Fl 33172 | Contract for Parking Spaces between Olympia Heights Methodist Church and MB Medical Operations, LLC | $0.00 |
| 177 | Miami Beach Medical Consultants, LLC | Payor contracts | Optimum Healthcare, Inc. | Attn: Provider Relations 4200 West Cyprus St. Suite 1000 Tampa, FL 33607 | Group Participant Agreement | $0.00 |
| 178 | MB Medical Operations, LLC | Technology | Oracle America, Inc. | 2300 Oracle Way Austin, TX 78741 | Payment Schedule for MB Medical Operations, LLC | $0.00 |
| 179 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Otano Ramon, Yanin | 549 Northeast 35th Avenue | Employment Agreement by and between Yanin Otano Sanchez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 180 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Padilla Ayala, Luisa | 13607 Fawn Ridge Blvd | Employment Agreement by and between Luisa Padilla Ayala, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 181 | MB Medical Operations, LLC | Commercial Lease | Palm River Square Associates, LLC | 7978 Cooper Creek Boulevard, University Park, Florida 34201 | Lease by and between Palm River Square Associates, llc and MB Medical Operations, llc | $0.00 |
| 182 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4360 | $0.00 |
| 183 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4360 | $0.00 |
| 184 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4560 | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

| # | Entity | Contract Type | Counterparty | Address | Description | Amount |
|---|--------|---------------|--------------|---------|-------------|--------|
| 185 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4360 | $0.00 |
| 186 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4360 | $0.00 |
| 187 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4360 | $0.00 |
| 188 | MB Medical Operations, LLC | Equipment and Financing (Patterson Dental Supply) | Patterson Dental Supply, Inc. | 1031 Mendota Heights Road Attn: Equip Finance St Paul MN 55120 | Installment Sale Contract between Patterson Dental Supply, Inc and Richard Charles Lage/MB Medical Operations, LLC for delivery to 151 NW 11 St. Homestead, FL 33030-4360 | $0.00 |
| 189 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Pebe Florian, Claudia Esther | 2400 sw 113 court | Employment Agreement by and between Claudia Pebe Florian, M.D. ("Physician"), and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 190 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Perez, Reynaldo | 8440 Sw 8Th St | Employment Agreement by and Between Reynaldo Perez, M.D, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 191 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Pimentel, Haydee | 6726 Hanley Rd Tampa, FL 33634 | Employment Agreement by and between Haydee Pimentel, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 192 | Miami Beach Medical Consultants, LLC | Payor contracts | Preferred Care Partners, INC | 9100 S. Dadeland Blvd., Suite 1250 Miami, FL 33156-7838 | Network Risk Agreement | $0.00 |
| 193 | Florida Family Primary Care Centers of Pinellas, LLC | Commercial Lease | Prestige Park LLC | 3285 East Ruby Hill Drive, Pleasanton, California 94566 | Business Lease between the Prestige Park LLC and Florida Family Primary Care Centers of Pinellas LLC | $0.00 |
| 194 | MB Medical Operations, LLC | Equipment and Financing | ProHealth Capital, | 1111 Old Eagle School Road, Wayne, Pennsylvania 19087 | Finance Agreement by and between MB Medical Operations and ProHealth Capital | $0.00 |
| 195 | Miami Beach Medical Consultants, LLC | Vendor Agreements | QMHC d/b/a Alivi Health | 2221 N University Dr Pembroke Pines, FL 33024 | Provider Agreement | $0.00 |
| 196 | Miami Beach Medical Consultants, LLC | Vendor Agreements | Quality Managed Health Care, Inc. d/ | 5775 Blue Lagoon Drive, Ste. 450, Miami, FL 33125, Attn: President | Alivi Chiro Network Provider Agreement | $0.00 |
| 197 | Miami Beach Medical Consultants, LLC | Vendor Agreements | Quality Managed Health Care, Inc. d/ | 5775 Blue Lagoon Drive, Ste. 450, Miami, FL 33125, Attn: President | Alivi Chiro Network Provider Agreement | $0.00 |
| 198 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Querol Matos, Wilfredo Andres | 16134 Southwest 138th Court | Employment Agreement by and between Wilfredo Querol Matos, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 199 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Rafael Capote, MD | 8812 NW 150 St Miami Lakes, FL 33018 | INDEPENDENT CONTRACTOR AGREEMENT by and between Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.)d/b/a Clinical Care Medical Centers and Rafael Capote, MD | $0.00 |

12 of 17

CONFIDENTIAL

| # | Entity | Type | Counterparty | Address | Description | Amount |
|---|--------|------|--------------|---------|-------------|--------|
| 200 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Ramos Ferreiro, Seidel Idailys | 7542 Armand Circle | Employment Agreement by and between Seidel Ramos Ferreiro, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 201 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Raul Falero MD LLC | 6861 SW 147th Ave Apt ## Miami, FL 33193 | INDEPENDENT CONTRACTOR AGREEMENT by and between Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.)d/b/a Clinical Care Medical Centers and Raul Falero MD LLC | $0.00 |
| 202 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Reyes Leon, Aslien | 11420 Southwest 143th Court | EMPLOYMENT AGREEMENT by and between Aslien Reyes Leon, APRN ("Employee"), and MIAMI MEDICAL & WELLNESS CENTER/ RODOLFO DUMENIGO M.D., P.A., a Florida professional service corporation d/b/a CLINICAL CARE MEDICAL CENTERS ("Employer"). | $0.00 |
| 203 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Reyes Ortega, Maritza | 6910 Southwest 163rd Place | Employment Agreement by and between Maritza Reyes Ortega, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 204 | MB Medical Operations, LLC | Commercial Lease | RLV Oriole Plaza LP | 1500 Northwestern Highway, Suite 300, Farmington Hills, Michigan 48334 | Lease by and between RLV Oriole Plaza LP a Delaware limited partnership, as Landlord, and MB Medical Operations LLC d/b/a/ Delray Medical Center by MBMG, a Delaware limited liability company, as Tenant, for space B-210 in the above reference shopping center. | $0.00 |
| 205 | MB Medical Operations, LLC | Employment Agreement | Robbins, Jackie S | 9030 Notchwood Court Orlando, FL 32825 | Separation Agreement, Including General Release between Jackie S. Robbins and MB Medical Operations, LLC d/b/a Clinical Care Medical Centers | $0.00 |
| 206 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | FIRST AMENDMENT TO EMPLOYME | Rodriguez Abreu, Ernesto | 8798 Southwest 52nd Street | Employment Agreement by and between Ernesto Rodriguez Abreu, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 207 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Rodriguez Martinez, Geysert | 8899 Southwest 220th Lane | Employment Agreement by and between Geysert Rodriguez Martinez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 208 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Rodriguez Rivera, David Eduardo | 23161 Pachino Way | EMPLOYMENT AGREEMENT BETWEEN Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), d/b/a MIAMI BEACH MEDICAL GROUP/ a Florida Professional Service Corporation AND DAVID EDUARDO RODRIGUEZ RIVERA, MD | $0.00 |
| 209 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Rodriguez Rodriguez, Odarkys | 2126 SW 16 Street | Employment Agreement by and between Odarkys Rodriguez Rodriguez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |

| # | Entity | Party | Type | Address | Description | Amount |
|---|--------|-------|------|---------|-------------|--------|
| 210 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | FIRST AMENDMENT TO EMPLOYME Rodriguez, Jorge Machin | | 1608 W Oak Ave Plant City,FL 33563 | Employment Agreement by and between Jorge Machin Rodriguez, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 211 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Rodriguez, Veronica | Employment Agreement | 19274 NW 19th St | EMPLOYMENT AGREEMENT (this "Agreement") by and between Veronica Rodriguez, M.D. ("Physician") and MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 212 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Rodriguez, Yoelquis | Employment Agreement | 7681 W 34 Lane | Employment Agreement by and between Yoelquis Rodriguez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 213 | Care Center Network, LLC | Other (including Clinical Specialists) Romel Figueredo, MD P.A. | | 12854 SW 51 Street Miramar, FL 33027 | INDEPENDENT CONTRACTOR AGREEMENT by and among Clinical Care Network, Inc., Romel Figueredo, M.D., PA and Romel Figueredo, M.D. | $0.00 |
| 214 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Saint Fleur, Samson | Employment Agreement | 2716 Southwest 195th Avenue | Employment Agreement by and between Samson Saint Fleur, PA, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 215 | MB Medical Operations, LLC | salesforce.com, inc. | Technology | Salesforce Tower 415 Mission Street, 3rd Floor San Francisco, CA 94105 | Order Form (Q-04150927) | $0.00 |
| 216 | MB Medical Operations, LLC | salesforce.com, inc. | Technology | Salesforce Tower 415 Mission Street, 3rd Floor San Francisco, CA 94105 | Order Form (Q-04150927) | $0.00 |
| 217 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Sanchez Rodriguez, Yandris I | Employment Agreement | 23813 Southwest 107th Place | Employment Agreement by and between Yandris Sanchez, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 218 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Santiago, Mario A | Separation Agreement | 5031 Down Court | Employment Agreement by and Between Mario A. Santiago Flores, M.D., and Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.)d/b/a Miami Beach Medical Group | $0.00 |
| 219 | MB Medical Operations, LLC | ScribeEMR Inc. | Technology | 500 West Cummings Park, Suite 2950 Woburn, MA 01801 | MEDICAL CODING SERVICE AGREEMENT | $22,534.75 |
| 220 | Miami Beach Medical Consultants, LLC | Srivas, LLC | Technology | 8720 N. Kendall Drive, Suite 204, Miami, FL 33176 | ADDENDUM D Addition of Tiered Pricing Structure | $24,052.32 |
| 221 | Miami Beach Medical Consultants, LLC | Senior Dental LLC | Dental Contracts (Senior Dental) | 1321 SW 107th Ave Suite 216A Miami, FL 33174 | Participation Agreement by and between Miami Beach Medical Consultants, LLC, Rodolfo Dumenigo, MD, PA and Senior Dental, LLC | $0.00 |
| 222 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | FIRST AMENDMENT TO EMPLOYME Silva Barrero, Yunior | | 15527 Southwest 16th Street | Employment Agreement by and between Yunior Silva Barrero, M.D. and Miami Medical Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 223 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Silva, Manuel | Employment Agreement | 1924 Southwest 151 Place | Employment Agreement by and between Manuel Silva, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 224 | Miami Beach Medical Consultants, LLC | Simply Healthcare Plans, Inc. | Payor contracts | c/o Legal Department 9250 W. Flagler St., Suite 600 Miami, FL 33174 | Provider Agreement | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

| # | Debtor | Category | Counterparty | Agreement | Address | Amount |
|---|--------|----------|--------------|-----------|---------|--------|
| 225 | Miami Beach Medical Consultants, LLC | Payor contracts | Simply Healthcare Plans, Inc. | Provider Agreement | c/o Legal Department 9250 W. Flagler St., Suite 600 Miami, FL 33174 | $0.00 |
| 226 | MBMG Ultimate Holding, LP | Employment Agreement | Singh, Sanjeev | Separation Agreement by and among MBMG Holding, LLC MBMG Ultimate Holding, and Sanjeev Singh | 19 Doughrie Court Burr Ridge, IL 60527 | $0.00 |
| 227 | Florida Family Primary Care Centers of Tampa, LLC | Payor contracts | Solis Health Plans, Inc | Network Provider Agreement | 9250 NW 36th Street, Suite 400 Doral, Florida 33178 | $0.00 |
| 228 | Miami Beach Medical Consultants, LLC | Payor contracts | Solis Health Plans, Inc | Network Provider Agreement | 9250 NW 36th Street, Suite 400 Doral, Florida 33178 | $0.00 |
| 229 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Separation Agreement | Soto, Maria | Employment Agreement by and between Maria Soto, M.D., and Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | 1012 Ferndown CT Aiken, SC 29803 | $0.00 |
| 230 | MB Medical Operations, LLC | Insurance | Starline Group | Provider Exess Loss Insurance for MB Medical operations, LLC | Chris Perrone StarLine 804 Main Street, Suite 2A Osteville, MA 02655 | $0.00 |
| 231 | MBMG Holding, LLC | Other (including Clinical Specialists) | Suarez Professional Services Corp | Separation Agreement | At the address (or to the e-mail address) shown in the books and records of the Company. With a copy (which shall not serve as notice) to: Johnson, Pope, Bokor, Ruppel & Burns, LLP 490 1st Avenue South, Suite 700 St. Petersburg, FL 33701 Attention: Michael D. Magidson (michaelm@jpfirm.com) | $0.00 |
| 232 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Separation Agreement | Suarez, German | Employment Agreement | 2718 SW 143 PL | $0.00 |
| 233 | MBMG Ultimate Holding, LP | Employment Agreement | Suarez, Jose David | Separation Agreement by and among MBMG Holding, LLC MBMG Ultimate Holding, L.P. Suarez Professional Services Corp, Jose David Suarez, M.D. | 3755 SW 130 Ave Miami, FL United States | $0.00 |
| 234 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Sueiro, Martin I | Employment Agreement by and Between Martin Sueiro, M.D., and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | 6910 Southwest 163rd Place | $0.00 |
| 235 | MB Medical Operations, LLC | Commercial Lease | Summit Medical LLC | Assignment, Assumption, and First Amendment to Lease Agreement by and between MB Medical Operations, LLC and Summit Medical LLC | c/o Commercial Asset Partners Realty 2511 Seven Springs Blvd. Trinity, FL 34655 | $0.00 |
| 236 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Sunshine Communication Services | Telephone Answering Services Subscriber Service Agreement | 159 MADEIRA AVE CORAL GABLES, FL United States | $0.00 |
| 237 | Florida Family Primary Care Centers of Tampa, LLC | Payor contracts | Sunshine State Health Plan, Inc. | Group Agreement | 1299 NW 40 Ave Ste C Lauderhill, FL 33313 | $0.00 |
| 238 | Florida Family Primary Care Centers of Tampa, LLC | Commercial Lease | Terrace Walk Plaza | Lease by and between Terrace Walk Plaza an dFlorida Family Primary Care Centers of Tampa, LLC | 11531 N. 56th Street Temple Terrace, Florida 33617 | $8,081.45 |
| 239 | MB Medical Operations, LLC | Commercial Lease | THE HUB RETAIL, LLC | Lease Agreement MB Medical Operations LLC and Hub Retail LLC | Attn. Orin Black PO Box 611808 N. Miami, FL 33261-1808 | $0.00 |
| 240 | Miami Beach Medical Consultants, LLC | Vendor Agreements | Therapy Health Network LLC d/b/a | Alivi Therapy Network Provider Agreement | A1 5775 Blue Lagoon Drive, Ste. 450, Miami, FL 33125, Attn: President | $0.00 |
| 241 | MB Medical Operations, LLC | Transportation | Time Park, Inc | Parking Valet Agreement by and between Clinical Care Medical Operations LLC and Time Park Inc. | P.O. Box 363 Ocoee, FL 34761-4910 | $996.15 |
| 242 | MB Medical Operations, LLC | Technology | T-Mobile Financial LLC | EQUIPMENT INSTALLMENT PLAN (EIP) CONTRACT AND DISCLOSURE (Plan ID 20190517012A067610) | EIP Program Customer Relations, P.O. Box 37380, Albuquerque, NM 87176-7380 | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

| # | Entity | Type | Counterparty | Address | Description | Amount |
|---|--------|------|--------------|---------|-------------|--------|
| 243 | MB Medical Operations, LLC | Commercial Lease | TOWER SHOPPING PLAZA, INC | 11954 Narcoossee Rd. Suite 2. PMB #429 Orlando, FL 32832 | Lease by and between Tower Shopping Plaza, inc and MB Medical Operations, llc | $0.00 |
| 244 | Florida Family Primary Care Center of Pasco, LLC / Florida Family Primary Care Centers of Pinellas, LLC / Florida Family Primary Care Centers of Tampa, LLC | Employment Agreement | Trinidad-Torres, Evelyn | 16402 Egrey Crossing Ln Lithiam FL 33547 | FIRST AMENDMENT TO EMPLOYMENT AGREEMENT (this "Amendment") by and between FLORIDA FAMILY PRIMARY CARE CENTER OF PASCO, LLC, FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC, and FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC (collectively, the "Company"), and Evelyn Trinidad-Torres, MD | $0.00 |
| 245 | MB Medical Transport, LLC | Transportation | Trip2, LLC | 2766 NW 62nd Street, Miami, FL 33147 | Trip2 Software License Agreement between Trip2, LLC and MB Medical Transport LLC | $0.00 |
| 246 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Separation Agreement | Ugarte, Carolina | 17000 NW 67th Ave | Employment Agreement | $0.00 |
| 247 | Florida Family Primary Care Center of Pasco, LLC / Florida Family Primary Care Centers of Pinellas, LLC / Florida Family Primary Care Centers of Tampa, LLC | Payor contracts | UnitedHealthcare of Florida, Inc. | 3000 Bayport Drive, Ste. 1170, Tampa, FL 33607 | Network Risk Agreement | $0.00 |
| 248 | Miami Beach Medical Consultants, LLC | Payor contracts | UnitedHealthcare of Florida, Inc. | 2300 W Plano Pkwy #C1E105 Plano, TX 75075-8427 | Network Risk Agreement | $0.00 |
| 249 | Miami Beach Medical Consultants, LLC | Payor contracts | UnitedHealthcare of Florida, Inc. | 495 N Keller Rd, Suite 200 Maitland, FL 32751 | Network Risk Agreement | $0.00 |
| 250 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Urgell, Jorge | 3991 Sw 153thd Ct | Employment Agreement by and between Jorge Urgell, APRN, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 251 | Florida Family Primary Care Center of Pasco, LLC / Florida Family Primary Care Centers of Pinellas, LLC / Florida Family Primary Care Centers of Tampa, LLC | Employment Agreement | Uribazo, Beatriz | 1243 Evergreen Park Cir | FIRST AMENDMENT TO EMPLOYMENT AGREEMENT (this "Amendment") by and between FLORIDA FAMILY PRIMARY CARE CENTER OF PASCO, LLC, FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC, and FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC (collectively, the "Company"), and BEATRIZ URIBAZO, M.D. | $0.00 |
| 252 | MB Medical Operations, LLC | Separation Agreement | Valdez, Yanelis | 6401 Golden Drive | Employment Agreement | $0.00 |
| 253 | Florida Family Primary Care Centers of Pinellas, LLC / Florida Family Primary Care Centers of Tampa, LLC | Employment Agreement | Vejas, Eduardo | 7001 Interbay Blvd | THIS FIRST AMENDMENT TO EMPLOYMENT AGREEMENT by and between FLORIDA FAMILY PRIMARY CARE CENTERS OF PINELLAS, LLC, and FLORIDA FAMILY PRIMARY CARE CENTERS OF TAMPA, LLC (collectively, the "Company"), and EDUARDO VEJAS CASTILLERO, M.D. | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

| # | Party | Contract Type | Counterparty | Address | Description | Amount |
|---|---|---|---|---|---|---|
| 254 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Verges Bonet, Enrique | 5470 W 20th Ave | EMPLOYMENT AGREEMENT BETWEEN MIAMI MEDICAL & WELLNESS CENTER/ Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) d/b/a MIAMI BEACH MEDICAL GROUP, a Florida professional association AND ENRIQUE VERGES-BONET, M-D. | $0.00 |
| 255 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Vidal, Gretchen | 9020 NW 8 Street | EMPLOYMENT AGREEMENT AND PROTOCOL BETWEEN Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.), d/b/a Miami Beach Medical Group and Gretchen Vidal, MSN, FNP, RN-APRN | $0.00 |
| 256 | MB Medical Operations, LLC | Parking Agreement | Villaverde Properties | c/o Horizon Properties 18610 NW 87th Avenue, Suite 204 Miami, FL 33015 | Lease by and between Villaverde Properties and MB Medical Operations, LLC | $0.00 |
| 257 | MB Medical Operations, LLC | Technology | Vonage Business Inc. | 23 Main St. Holmdel, NJ 07733 | ADDENDUM TO VONAGE BUSINESS SERVICE TERMS Sales Order # Q884954 | $61,112.87 |
| 258 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Vydas, Hector | 6710 Hanley Rd Tampa, FL 33634 | Employment Agreement by and between Hector Vydas, MD, and Miami Medical & Wellness Center / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 259 | MB Medical Operations, LLC | Other (including Clinical Specialists) | Waste Management Inc. of Florida | 8801 NW 91st Street Medley, FL 33178 | Service Agreement between Rainbow Health Corp and Waste Management Inc. of Florida | $7,735.10 |
| 260 | Miami Beach Medical Consultants, LLC | Payor contracts | WellCare of Florida, Inc. and WellCare | 8735 Henderson Rd. Tampa, FL 33634 Attn: Network Development | Participating Provider Agreement | $0.00 |
| 261 | Miami Medical & Wellness Center, LLC / Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Employment Agreement | Welvaert, Cira | 2495 Southwest 21st Terrace | Employment Agreement by and between Cira Welvaert, M.D, and Miami Medical Wellness Center / Rodolfo Dumenigo, M.D, P.A. (now known as Miami Beach Medical Centers, Inc.) | $0.00 |
| 262 | MB Medical Operations, LLC | Marketing | WOW MKTG | 804 S. Douglas Road Executive Tower, 5th Floor Coral Gables, FL 33134 | WOW MKTG CCMC SOW for marketing services | $35,000.00 |
| 263 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Professional Fees | Whitney Actuarial Consulting, LLC | 18805 Choville Road, Lutz, FL 33558 | Consulting Agreement by and between Whitney Actuarial Consulting, LLC and Rodolfo Dumenigo, M.D., P.A. | $0.00 |
| 264 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Equipment and Financing | Qmedi, Inc. | 7 Great Valley Parkway, Suite 100, Malvern, PA 19355 | Order Form for Clinical Care Medical Centers | $0.00 |
| 265 | MB Medical Operations, LLC | Insurance | IPFS Corporation | 401 E. Jackson Street, Ste 1250, Tampa, FL 33602 | Premium Financing Agreement | $0.00 |
| 266 | Rodolfo Dumenigo, M.D., P.A. (now known as Miami Beach Medical Centers, Inc.) | Other (including Clinical Specialists) | Rarfente, MD PA | 1461 SW 145 Ave, Miami, FL 33184 | Independent Contractor Agreementby and between Rodolfo Dumenigo, M.D., PA, and Ramon Rodriguez, M.D. | $0.00 |

DRAFT - SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

**Section 3.17(a)**
Intellectual Property

(i) None.

(ii)

| Design | Location | Serial Number and Date Filed | Registration Number and Date Registered | Owner |
|---|---|---|---|---|
|  | USA | 88/381707 11-Apr-2019 | 5890302 22-Oct-2019 | MB Medical Operations, LLC |

(iii)

| Design | Location | Serial Number and Date Filed | Owner |
|---|---|---|---|
|  | USA | First used: 2009 | MB Medical Operations, LLC |
|  | USA | First used: 2017 | MB Medical Operations, LLC |
|  | USA | First used: 2010 | MB Medical Operations, LLC |
|  | USA | First used: 2017 | MB Medical Operations, LLC |

1323049425

| Mark | Country | First used | Owner |
|---|---|---|---|
| LOS CENTROS DE ARTRITIS Y DOLOR | USA | First used: 2017 | MB Medical Operations, LLC |
| MBMG Medical Centers | USA | First used: 2015 | MB Medical Operations, LLC |
| MBMG Medical Operations | USA | First used: 2017 | MB Medical Operations, LLC |
| Hollywood Medical Centers by MBMG | USA | First used: 2017 | MB Medical Operations, LLC |
|  | USA |  | MB Medical Operations, LLC |
| ¿TIENE DOLOR? ¡NO SUFRA MÁS! | USA |  | MB Medical Operations, LLC |
| DO YOU HAVE PAIN? DON'T SUFFER ANYMORE! | USA |  | MB Medical Operations, LLC |
| #1 Caring for your Health and Improving your Quality of Life | USA |  | MB Medical Operations, LLC |
| #1 Cuidando su Salud y Mejorando su Calidad de Vida | USA |  | MB Medical Operations, LLC |

1323049425

| Mark | Country | First used | Owner |
| --- | --- | --- | --- |
| Winter Haven Medical Centers by MBMG (logo) | USA | First used: 2017 | MB Medical Operations, LLC |
| Miami Beach Medical Group | USA | | MB Medical Operations, LLC |
| MBMG | USA | | MB Medical Operations, LLC |
| ClinicalCare Medical Centers (logo) | USA | | MB Medical Operations, LLC |
| ClinicalCare DENTAL (logo) | USA | | MB Medical Operations, LLC |
| Together We Make The Difference | USA | | MB Medical Operations, LLC |
| Unidos Hacemos La Diferencia | USA | | MB Medical Operations, LLC |
| ClinicalCare Medical Centers (logo) | USA | | MB Medical Operations, LLC |

1323049425

| | | USA | | MB Medical Operations, LLC |
|---|---|---|---|---|
|  | clinicalcare | USA | Unregistered | MB Medical Operations, LLC registered this username on Instagram |
| | clinicalcarevideos | USA | Unregistered | MB Medical Operations, LLC registered this username on YouTube |
| | https://www.facebook.com/profile.php?id=61552550222628 | USA | Unregistered | MB Medical Operations, LLC manages content on the Account at this URL on Facebook |
| | clinicalcaremedicalcenters | USA | Unregistered | MB Medical Operations, LLC registered this username on LinkedIn |
| | clinicalcare.mc | USA | Unregistered | MB Medical Operations, LLC registered this username on Instagram |

(iv)

| Domain Name | Account No | Expiration Date | Auto Renew | Private | Owner | Domain Lock |
|---|---|---|---|---|---|---|
| carecenternetw.com | 33450436 | 8/22/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | On |
| carecenternetwork.com | 33450436 | 8/19/2026 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| ccmcenters.com | 33450436 | 4/15/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| ccmedicalcenters.com | 33450436 | 4/15/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| ccmedicalgroup.com | 33450436 | 12/15/2024 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| clinicadeldoloryartritis.com | 33450436 | 6/16/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| clinicalcare.network | 33450436 | 11/19/2024 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| clinicalcarecenter.net | 33450436 | 4/15/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| clinicalcaremc.com | 33450436 | 8/19/2026 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| clinicalcaremedicalcenter.com | 33450436 | 8/19/2026 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| clinicalcaremedicalcenters.com | 33450436 | 4/15/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| clinicalcarenetwork.com | 33450436 | 12/5/2024 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| clinicalcarenetwork.net | 33450436 | 12/5/2024 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| clinicalmedicalgroup.com | 33450436 | 12/15/2024 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| clinicalmg.com | 33450436 | 12/15/2024 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| delraybeachmedicalcenters.com | 33450436 | 11/20/2024 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| hollywoodmedicalcenters.com | 33450436 | 11/20/2024 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| i-hedis.com | 33450436 | 11/22/2024 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| ihedis.mobi | 33450436 | 11/22/2024 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| lakelandmedicalcenters.com | 33450436 | 11/20/2024 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| mbhealthanalytics.com | 33450436 | 10/1/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| mbmedicalcenters.com | 33450436 | 10/2/2025 | TRUE | On | MB MEDICAL OPERATIONS, LLC | Off |
| mbmedicalgroup.biz | 33450436 | 9/23/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| mbmedicalgroup.com | 33450436 | 5/31/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| mbmgdoctors.com | 33450436 | 11/2/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| mbmgflorida.com | 33450436 | 11/2/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| mbmggroup.com | 33450436 | 11/2/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| mbmggroup.net | 33450436 | 6/27/2025 | TRUE | On | MB MEDICAL OPERATIONS, LLC | Off |
| mbmgmedical.com | 33450436 | 11/2/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |

| | | | | | | |
|---|---|---|---|---|---|---|
| miamedtwellness.com | 33450436 | 2/14/2026 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| miami-mso.com | 33450436 | 7/21/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| miamibeachhealthanalytics.com | 33450436 | 10/1/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| miamibeachhealthnews.com | 33450436 | 8/21/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| miamibeachhealthnews.org | 33450436 | 8/21/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| miamibeachmedicalgroup.com | 33450436 | 11/8/2027 | TRUE | On | MB MEDICAL OPERATIONS, LLC | Off |
| miamibeachmedicalgroup.info | 33450436 | 4/21/2025 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| miamibeachmedicalgroup.net | 33450436 | 6/6/2025 | TRUE | On | MB MEDICAL OPERATIONS, LLC | Off |
| sradvocates.com | 33450436 | 3/18/2026 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| sradvocates.info | 33450436 | 3/18/2026 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| sradvocates.net | 33450436 | 3/18/2026 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| sradvocates.org | 33450436 | 3/18/2026 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| tuprimero.org | 33450436 | 7/17/2026 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |
| winterhavenmedicalcenters.com | 33450436 | 11/20/2024 | TRUE | Off | MB MEDICAL OPERATIONS, LLC | Off |

(v) None.

**<u>Section 3.17(c)</u>**
Intellectual Property Contracts

None.

## Schedule 3.17(h)

AI Matters

Generally available, standard, unmodified AI features in the following listed programs, extensions and apps may have been used by Sellers from time to time to edit, find, archive and scan documents; in connection with photography and videography; patient schedule management; test result reviews; transcription and accessibility features; grammar and spelling support in drafting/editing text documents; as well as text in visual/video/photography documents, and related technical actions.  In each case no protected health information (PHI) or other personally identifiable information was uploaded or provided to or stored or processed by any such programs, extensions and apps.

- Electronic Health Record (EHR) system transcriptions of healthcare providers and patients' dictation

- Vonage

- Zoom

- MS Authenticator

- MS Teams

- MS Office including Excel, MS Word, Outlook and MS Copilot

- ESET Endpoint Protection

- Absolute

- NextGen Mobile (Ambient Assist)

- Imagen

- Rappid

- Persivia

- ActivTrak

- Terminal Works

- Acrobat

- iPhone (iOS)

- Android phones and tablets

- Google Image/Magic Eraser

## **Section 3.19**
No Brokers

Oppenheimer & Co. Inc.

**Section 3.20**
Certain Business Relationships



13230494-25

## **Section 3.22**
### Devices

See Attachment 3.22 attached hereto.

| Bird Road | Updated By: | | | Date: | | Calibration Completed: | |
|---|---|---|---|---|---|---|---|
| **Specialty** | **Equipment** | **Portable or Permenent** | **Brand** | **Series #** | **Age of Machine** | **Working Condition** | **Comments** |
| Podiatrist | Nail Treatment Laser Machine | Portable | LunulaLaser by Erchonia | FFS-01312 | 2022 | Good | Share with Lejeune, Homestead and Westchester |
| | Nail Treatment Laser Machine | Portable | LunulaLaser by Erchonia | FFS-01146 | 2022 | Good | Share with Lejeune, Homestead and Westchester |
| | Drill | | | | | | |
| | Electrical Podiatry chair | Permanent | | | | | |
| Ortho | Centrifuges | Permanent | Powerspin | LT2101048 | | Good | |
| | Centrifuges | Permanent | Powerspin | LT2101030 | | Good | |
| Psych | None | | | | | | |
| Dermatologist | Hyfrecator AARON | | | | | | |
| Optometry | Manual Refractor | Permanent | Ezer | ERF 360008130959 | | Good | |
| | Prorapter | Permanent | | | | | |
| | Slit lamp.gilras | Permanent | Gilraz LLC | GR35ZX081900039 | | Good | |
| | Tonometer | Permanent | | | | | |
| | Lensumeter | Permanent | Viewlight | LR30VL201306069 | | Good | |
| | Optometry Chair | Permanent | Reliance | 135783 | | Good | |
| Chiro | Stretch bed | | | | | | |
| Dental | Dental Chair | Permanent | Engle300 | 96-540 | | Good | Dental moving to Westchester |
| | Dental Stool | Permanent | | 105-70 | | Good | |
| | Assitant stool | Permanent | | 33877/E0204 | | Good | |
| | Ultrasonic Cleaner | Permanent | | 160102392 | | Good | |
| | Sterilization Autoclave | Permanent | Porter Reliant | UC125 | | Good | |
| | Spix Digital Sensor | Permanent | Sirona | 33067 | | Good | |
| Labatory | 3 Centrifuge | Permanent | Labcorp | 642E | | Good | |
| | Abbott Covid machine | Permanent | Abbott | EQ002002A | | Good | |
| | Urine dipstick machine | Permanent | McKenson | 121120 | | Good | |
| | Otoscope | Permanent | Welßch Allyn | R48282/L15349 | | Good | |
| Primary Care Providers | 2 Spirometry machines | Permanent | MiniSpir / Astra300 | A23-C13135/1147566 | 2018/ 2015 | Broken | |
| | EKG machines | Permanent | Bionet | ET0700117 | | Good | |
| | 2 Holter Monitor | Portable | Midmark IQ Holter | 397260/397749 | | Good | 1 Holter doesnt work, giving to Jorge |
| Cardiologist | EKG Machine | Permanent | Bionet | EP0400263 | | Good | |
| Pharmacy | Quick Meds Dispensing Unit | | | | | | |
| Radiology | Ultrasound Machine | Portable | Alpinion | 02640 | | | |
| | X-Ray Machine | | Del Medical/IKIR | | | | Screen does not show patient name |
| Acupuncture | Electrical stimulator machine | | | | | | |
| Massage Therapy | 1Waterbed | Permanent | | N/A | | GOOD | |
| | 1 Traction table | Permanent | CHATANOGA | 8629 | | GOOD | |
| | 2 Parafin Machine | Permanent | PARAMED | | | GOOD | |
| | 1 Handheld laser machines | Portable | TQ Solo | 2856003714 | | GOOD | |
| | 1 Ems/Ultrasound Combo | Permanent | Combo Care | C11Z10094 | | GOOD | |
| | 1 Ultrasonic Therapy Machine | Permanent | Dynatronics | 130980 | | GOOD | |
| | 4 Tens Muscle Stimulator | Portable | Tens 3000 | | | GOOD | |
| | Vibrator machine | Permanent | VXPOWER | N/A | | GOOD | |
| | Treadmill machine | Permanent | GOPLUS | | | GOOD | |
| | Exercise bike machine | Permanent | | | | GOOD | |
| | Freezer | Permanent | Koolatron | N/A | | GOOD | |
| | Hydrocollator | Permanent | CHATANOGA | | | GOOD | |
| | 1 gel warmer | Permanent | | 091309 A12 | | GOOD | |
| | 3 Massage Therapy Beds | Permanent | | | | GOOD | |
| | 1 gel Warmers | Permanent | Thermasonic | 1116080 | | GOOD | |
| | 4 Bolsters | PORTABLE | | | | GOOD | |
| | 1 Pulley Systems | Permanent | Sieley | N/A | | GOOD | |
| | | Permanent | | | | GOOD | |
| | COLD LASER | Portable | TQ SOLO | 2856003117 | | GOOD | |
| | 1 EMS\Ultrasound Combo | Permanent | Combo Care | 41606000009 | | GOOD | |
| | 1 gel Warmers | Permanent | Thermasonic | 091309CA12 | | GOOD | |
| | | | | | | GOOD | |
| | Finger  Ladder | Permanent | | N/A | | GOOD | |

| Tamarac | Updated By: | | | Date: | | Calibration Completed: | Done on 4/2023 |
|---|---|---|---|---|---|---|---|
| | Equipment | Portable or Permement | Brand | Series # | Age of Machine | Working Condition | Comments |
| Podiatrist | Nail Treatment Laser Machine | Portable | | | | | |
| | Nail Treatment Laser Machine | | | | | | |
| | Drill | | | | | | |
| | Electrical Podiatry chair | Permanent | Midmarr | BP006276 | | Good | |
| Ortho | Centrifuges | N/A | N/A | N/A | N/A | N/A | |
| | Centrifuges | N/A | N/A | N/A | N/A | N/A | |
| Psych | None | N/A | N/A | N/A | N/A | N/A | |
| Dermatologist | | | | | | | |
| | Hyfrecator AARON | None | N/A | N/A | N/A | N/A | |
| Optometry | Manual Refractor | Permanent | Provue | L1NMFI039 | | Good | |
| | Procepter | | | | | | |
| | Slit lamp Microscope | Permanent | Gilras | GR36160928000029C055 | | Good | |
| | Tonometer | | | | | | |
| | Lensometer | Permanent | NJC-4 | | | Good | |
| | Optometry Chair | Permanent | S4Optik | 2041600272 | | Good | |
| Chiro | Stretch bed | | | | | | |
| Dental | 3 Dental Chair | N\A | | | | | |
| | 3 Dental Stool | N/A | | | | | |
| | 3 Assitant Stool | N/A | | | | | |
| | Ultrasonic Cleaner | N/A | | | | | |
| | Sterilization Autoclave | N/A | | | | | |
| | Spix Digital Sensor | N/A | | | | | |
| | X-ray Panoramic | N/A | | | | | |
| Labatory | 3 Centrifuge | Portable | 2 Drucker/1 Mckesson | 180113CT559/210213GG244 | 5 Year | Good | |
| | Abbott Covid machine | Portable | ID Now | 7B97E61C | 1 Year | Good | |
| | Holter Monitor | Portable | | | | | |
| | Urine dipstick machine | Portable | Mckesson | 197T10087A7 | 1 Year | Good | |
| Primary Care Providers | 3 Otoscope | Permanent | | | 1 Years | | |
| | Spirometry machines | 1 Portable | | | | Good | |
| | EKG machines | 1 Portable | | | | | |
| | Dipstick machine | None | N/A | N/A | N/A | N/A | |
| | Centrifuge | None | N/A | N/A | N/A | N/A | |
| Cardiologist | EKG Machine | None | N/A | N/A | N/A | N/A | |
| Pharmacy | Quick Meds Dispensing Unit | None | N/A | N/A | N/A | N/A | |
| Radiology | Ultrasound Machine | Portable | Alpinium | 302108 | 2 Years | Good | |
| | Ultrasound Machine | N/A | N/A | N/A | N/A | N/A | |
| | X-ray Machine | 1 | Americomp | | | New | |
| | X-ray Machine | N/A | N/A | N/A | N/A | N/A | |
| Acupuncture | 2-Electrical stimulator machine | Portable | AWQ-104L | 9253252 | N/A | Good | |
| | | Portable | AWQ-104L | 9243096 | N/A | Good | |
| Massage Therapy | 2 Waterbed | None | N/A | N/A | N/A | N/A | |
| | 1 Traction table | Permanent | Everyway\Xall | 22460728 | 1 Years | Good | |
| | 2 Parafin Machine | Portable | ParaMed | 200706570 | 3 Years | Good | |
| | 1 Handheld laser machines | Portable | TQ Solo | N/A | 3 Years | Good | |
| | 2 EMS/Ultrasound combo | Portable | Richmar/Quattro | SZC1220100112/S2Q190500132 | 1 Month/3 Years | Good | |
| | 3 TENSMuscle Stimulator | Portable | Ten 3000 | N/A | 2 Years | Good | |
| | 1 Vibrator machine | Permanent | N/A | SKI3197 | 1 Year | Good | |
| | Treadmill machine | N/A | N/A | N/A | N/A | N/A | |
| | Exercise bike machine | Permanent | N\A | N/A | N/A | Good | |
| | 1 Freezer | Permanent | Koolatron | W571674 | 3 Years | Good | |
| | 1 Hydrocollator | Permanent | N/A | T56194C | 2 Years | Good | |
| | 2 lotion warmers | Portable | Thermasonic | 092309CAR | 3 Years | Good | |
| | 2 Massage Therapy Beds | Permanent | N/A | N/A | 1 Year | Good | |
| | Gel Warmers | N/A | N/A | N/A | N/A | N/A | |
| | 3 Bolsters | Portable | N/A | N/A | 1 Year | Good | |
| | 1 Pulley Systems | Permanent | Bailey | N/A | | Good | |
| | Shoulder Wheel | Permanent | Alexia | AA224AJG04146 | 1 Year | Good | |
| | Digital Ladder | Permanent | | | 2 Years | Good | |

| Palm River | Updated By: | | | Date: | | Calibration Completed: | Annual Inspection done on 3/01/2024 |
|---|---|---|---|---|---|---|---|
| Specialty | Equipment | Portable or Permanent | Brand | Series # | Age of Machine | Working Condition | Comments |
| Podiatrist | Nail Treatment Laser Machine | N/A | | | | | |
| | Nail Treatment Laser Machine | N/A | | | | | |
| | Drill | N/A | | | | | |
| | 1 Electrical Podiatry chair | Permanent | | RG85-440410000C1 | 2023 | good | |
| Ortho | Centrifuges | Portable | McKesson | 170011531 | unknow | good | |
| | Centrifuges | N/A | | | | | |
| Psych | N/A | N/A | | | | | |
| Dermatologist | Hyfrecator AARON | N/A | | | | | |
| | Manual Refractor | N/A | | | | | |
| Optometry | Phoropter | N/A | | | | | |
| | Slit lamp gilbas | N/A | | | | | |
| | Tonometer | N/A | | | | | |
| | Lensometer | N/A | | | | | |
| | Optometry Chair | N/A | | | | | |
| | Stretch bed | N/A | | | | | |
| Chiro | | N/A | | | | | |
| Dental | Dental Chair | N/A | | | | | |
| | Dental Stool | N/A | | | | | |
| | Assitant Stool | N/A | | | | | |
| | Ultrasonic Cleaner | N/A | | | | | |
| | Sterilization Autoclave | N/A | | | | | |
| | Spix Digital Sensor | N/A | | | | | |
| Labatory | Centrifuge | Permanent | LabCorp | 18111307618 | unknow | good | |
| | Centrifuge | Permanent | Quest | 17081SCK292 | unknow | good | |
| | Centrifuge | Portable | | | | | |
| Primary Care Providers | EKG Machine | Portable | QBS | 202003565563 | unknow | good | |
| | Abbott Covid machine | Portable | Abbott | 442C6B1C | 2021 | good | |
| | Urine dipstick machine | Permanent | McKesson | 19713008E2E | 2022 | good | |
| | Holter | N/A | | | | | |
| | Spirometry | Portable | Orbit | 017-022733-1 | unknow | good | |
| Cardiologist | EKG Machine | N/A | | | | | |
| Pharmacy | Quick Meds Dispensing Unit | N/A | | | | | |
| Radiology | Ultrasound Machine | N/A | unknow | unknow | unknow | good | |
| | Xray Machines | N/A | Paramed | 2007706618 | unknow | good | |
| Acupuncture | Infrared Lamp | N/A | | | | | |
| | Infrared Lamp | N/A | | | | | |
| | Electrical stimulator machine | N/A | | | | | |
| | Electrical stimulator machine | N/A | | | | | |
| | 1 Waterbed | N/A | | | | | |
| | 1 Traction table | Portable | | | | | |
| | 1 Paraffin Machine | Portable | | | | | |
| | 2 Handheld laser machines | N/A | | | | | |
| | EMU Ultrasound Combo | N/A | | | | | |
| | EMU Ultrasound Combo | N/A | | | | | |
| | EMU Ultrasound Combo | N/A | | | | | |
| | EMU Ultrasound Combo | N/A | | | | | |
| Massage Therapy | 1 Tins Muscle Stimulator | Portable | ComboCare | SCT2103001J79 | unknow | good | |
| | Vibrator machine | Portable | Best Choice Products | SKY3197 | Unknow | good | |
| | Vibrator machine | N/A | | | | | |
| | Vibrator machine | N/A | | | | | |
| | Treadmill machine | N/A | | | | | |
| | Exercise bike machine | N/A | | | | | |
| | Freezer | N/A | | | | | |
| | Hydrocollator | N/A | | | | | |
| | 5 Massage Therapy Beds | N/A | | | | | |
| | Gel Warmers | Permanent | Thermasonic | 82-03 | unknow | good | |
| | Gel Warmers | N/A | | | | | |
| | Gel Warmers | N/A | | | | | |
| | Gel Warmers | N/A | | | | | |
| | Gel Warmers | N/A | | | | | |

| 1 Bolsters | portable | unknow | unknow | unknow | good |
| 1 Pulley Systems | Permanent | unknow | unknow | unknow | good |
| 1Shoulder Wheel | Permanent | Finger/shoulder ladder | | 101160 unknow | good |
| Digital Ladder | N/A | | | | |

| Sweetwater | Updated By: Ana Maria Bolivar | | | Date: 7-30-2024 - In Progress | | Calibration Completed: | |
|---|---|---|---|---|---|---|---|
| **Specialty** | **Equipment** | **Portable or Permanent** | **Brand** | **Series #** | **Age of Machine** | **Working Condition** | **Comments** |
| Podiatry | Nail Treatment Laser Machine | Portable | LunulaLaser by Erchonia | FFS-01150 | 2022 | Good | Share with Miami, Miami Lakes, Hialeah West & Tamarac |
| | Drill | | | | | | |
| | Electrical Podiatry chair | Permanent | | RG81440414DC1 | 2 years | Good | |
| Ortho | Centrifuge | Permanent | Mckenson | 172011591 | 1 year | Good | |
| Optometry | Manual Refractor | | | | | | |
| | Phoropter | Permanent | Modop | 120507 | | Good | |
| | Slit lamp ultras | Permanent | | 1511120019 | | Good | |
| | Tonometer | | | | | | |
| | Lensiometer | | | | | | |
| | Optometry Chair | Permanent | | 2041600077 | | Good | |
| Dental | Dental Chair | Permanent | SDS | 500000171714 | | Good | |
| | Dental Chair | Permanent | SDS | 500000171716 | | Good | |
| | Assistant Stool | Permanent | SDS | 29519500053 | | Good | |
| | Assistant Stool | Permanent | SDS | 29519500059 | | Good | |
| | Dental Stool | Permanent | SDS | 96619500051 | | Good | |
| | Dental Stool | Permanent | SDS | | | Good | Needs two screws replaced on backing |
| | Panoramic X-ray | Permanent | Envision | 3312X0356 | | Good | |
| | X-Ray Machine | Permanent | Belmont | EA1800157 | | Good | |
| | Ultrasonic Cleaner | Permanent | TPC | TPCL710PU4908 | | Good | |
| | Sterilization Autoclave | Permanent | Tuttnauer | 17010984 | | Good | |
| | Spix Digital Sensor | Permanent | ACE | 5803 11385 | | Good | |
| Laboratory | EKG Machine | Permanent | Bionet | EW0905386 | | Good | |
| Primary Care Providers | Abbott Covid machine | Permanent | Abbott | 3CO6B 81C | 1 Year | Good | |
| | Holter | Permanent | Midmark | 397880 | | Good | |
| Pharmacy | Quick Meds Dispensing Unit | N/A | | | | | |
| Radiology | Ultrasound Machine | Portable | Mindray | C89-0K000494 | | Good | Uses Birdroad's |
| | Xray Machines | Permanent | Drulici CSI | 35822 | | Good | |
| Acupuncture | Infrared Lamp | Permanent | | | | | |
| | 1 Waterbed | Permanent | | | | Good | |
| | 1 Traction table | Permanent | | T8405 | | Good | |
| | 2 Paraffine Machine | Permanent | | | | Good | |
| | 2 Handheld laser machines | | | | | | |
| | EMS/ Ultrasound Combo | Permanent | | SZLD200400101 | | Good | |
| | EMS/ Ultrasound Combo | Permanent | | SZLD200400102 | | Good | |
| | 3 Tim Muscle Stimulator | | | | | | |
| | Vibrator machine | Permanent | | | | Good | |
| | Treadmill machine | Permanent | | | | | |
| | Exercise bike machine | Permanent | Vacrave | 6.5407LE+11 | 4 Months | Good | |
| | Exercise bike machine | Permanent | Everpeutic | 13808111110717 | | Good | |
| Massage Therapy | Freezer | Permanent | Avanti | A633413350520111100674 | | Good | |
| | Hydrocollator | Permanent | | 361569 | | Good | |
| | 3 Massage Therapy Beds | Permanent | GE Health Products | 1021029 | | Good | Use for ultrasound gel |
| | Gel Warmers | Permanent | Thermasonic | 1263D0GA12 | | Good | |
| | Gel Warmers | Permanent | Thermasonic | 1253D6GA12 | | Good | |
| | Gel Warmers | Permanent | Thermasonic | 281307CA12 | | Good | |
| | 10 Bolsters | | | | | | |
| | 1 Pulley Systems | | | | | | |
| | 1Shoulder Wheel | | | | | | |
| | Digital Ladder | | | | | | |

| Lakeland | | Updated By: | Thais Alvarez | | Date: 7/30/24 | | Calibration Completed: | 7/17/2024 |
|---|---|---|---|---|---|---|---|---|
| **Specialty** | **Equipment** | **Portable or Permanent** | **Brand** | **Series #** | **Age of Machine** | **Working Condition** | **Comments** | |
| Podiatrist | Nail Treatment Laser Machine | none | | | | | | |
| | Nail Treatment Laser Machine | none | | | | | | |
| | Drill | permanent | | | | GOOD | | |
| | Electrical Podiatry chair | permanent | | | | GOOD | | |
| Ortho | Centrifuges | 1 | | | | | | |
| Psych | None | none | | | | | | |
| Dermatologist | Hyfrecator AARON | none | | | | | | |
| Optometry | Manual Refractor | none | | | | | | |
| | Phoropter | none | | | | | | |
| | Slit lamp.gilt-as | none | | | | | | |
| | Tonometer | none | | | | | | |
| | Lensometer | none | | | | | | |
| | Optometry Chair | none | | | | | | |
| Chiro | Stretch bed | none | | | | | | |
| Dental | Dental Chair | 1 | SUMMITDENTALSYSTEMS | SE+11 | n/a | GOOD | | |
| | Dental Stool | 1 | SDS | 1163750100S | n/a | GOOD | | |
| | Assitant Stool | 1 | SDS | 1171750001X | n/a | GOOD | | |
| | Ultrasonic Cleaner | 1 | PATTERSON DENTAL PA4 | 18M5-187383 | n/a | GOOD | | |
| | Sterilization Autoclave | 1 | BRAVO | 122132 | n/a | GOOD | | |
| | Spix Digital Sensor | 1 | SCHOCE33 | 25013577 | n/a | GOOD | | |
| **Labatory** | 2 Centrifuge | 2 Portable | QUEST | 17101C0369 & 17111C0360 | (7 YEARS) 10/11/2017 | GOOD | | |
| | Abbott Covid machine | 1 Portable | ABBOTT | | | GOOD | | |
| | Urine dipstick machine | none | N/A | | | N/A | | |
| **Primary Care Providers** | Otoscope | 3 Permanent | | | | Deficient | | |
| | 2 Spirometry machines | 1 Portable | | | | Deficient | | |
| | EKG machines | 2 Portable | Bionet | 8.80928E+12 | (7 YEARS) 9/29/2017 | Deficient | | |
| | Dipstick machine | 0 | N/A | N/A | N/A | N/A | | |
| | Centrifuge | 2  in Lab Portable | | 17111C0360 | | Deficient | | |
| Cardiologist | EKG Machine | 1 Portable | Bionet | ER-09000223 | 7 years (2017) | Good | | |
| Pharmacy | Quick Meds Dispensing Unit | n/a | | | | | | |
| Radiology | Ultrasound Machine | Portable | | | | Good | | |
| | Ultrasound Machine | | | | | | | |
| | X-ray Machine control console | permanent | sedecal | c-14029 | 2000 | Good | | |
| | x ray tube tower | permanent | continental x ray | 898408 | 1989 | Good | | |
| | x-ray tube | permanent | eureka | A122219 | 1993 | Good | | |
| | x-ray table | permanent | raytheon | 1-02-86-162 | 1986 | Good | | |
| | x-ray wall buky | permanent | bennett x-ray | B-23515 | 1992 | Good | | |
| | x-ray generator | permanent | sedecal | G-14029 | 2000 | Good | | |
| | X-ray collimator | permanent | Linear II | F089140 | 1989 | Good | | |
| Acupuncture | 2-Electrical stimulator machine | nla | | | | | | |
| Massage Therapy | 2 Waterbed | permanent | medical electronics | 116435 | 2017 | good | | |
| | 1 Traction table | none | | | | | | |
| | 2 Parafin Machine | permanent | paramed | 122134 122135 | 2017 | good | | |
| | 2 Handheld laser machines | permanent | painaway | 32PA0738 | 2014 | good | | |
| | 1 EMS/Ultrasound combo | permanent | roscoe medical | 3170500052 | 2019 | good | | |
| | 8 TENS Muscle Stimulator | none | | | | good | | |
| | Vibrator machine | permenent | confidence fitness | 40814737 | 2021 | good | | |
| | Treadmill machine | none | | | | | | |
| | Exercise bike machine | none | | | | | | |
| | Freezer | permanent | Energy | A55777203505171050079 | | good | | |
| | Hydrocollator | permenent | chatatanooga | T4841SC | 2018 | good | | |
| | 1 lotion warmers | permanent | Parker | 285313CA12 | 2018 | good | | |
| | 2 Massage Therapy Beds | permenent | medical electrinics | ms1503022-69 | 2015 | good | | |
| | 5 Gel Warmers | none | | | | | | |
| | 9 Bolsters | none | | | | | | |
| | 2 Pulley Systems | none | | | | | | |
| | Shoulder Wheel | none | | | | | | |
| | Digital Ladder | none | | | | | | |

| Orlando | Updated By: | | | Date: | | Calibration Completed: | |
|---|---|---|---|---|---|---|---|
| Specialty | Equipment | Portable or Permanent | Brand | Series # | Age of Machine | Working Condition | Comments |
| Podiatry | Electrical Podiatry chair | Permanent | No label with brand name | ABU02505701 | 9 Months | Good | |
| Dental | Dental Chair | 3 permanent | Bilivart (s-calibur) | VM0165586 | 8/14/2021 | Good | |
| | Dental Stool | 3 Portable | Crown Seating (C200) | 65645 | 6/17/2022 | Good | |
| | Assitant Stool | 3 Portable | Crown Seating (C206) | 65645 | 6/17/2022 | Good | Yes |
| | Ultrasonic Cleaner | Portable | TPC Dentsonic VF300 | 040250040 | | Good | Not sure the age of machine |
| | Sterilization Autoclave | Portable | Midmark (M11) | V3462776 | 5/5/2022 | Good | |
| | Spo Digital Sence | Portable | Acreon (Sopro Sopix) | 5802 45448 | Apr 22 | Good | |
| Labatory | Centrifuge | Portable | Drucker Diagnostics | 22011HP958 | May 22 | Good | |
| | Centrifuge | Portable | Mckesson | LT2168036 | May 22 | Good | |
| Primary Care Providers | EKG Machine | Portable | CardioCare 2000 | E1410AA0032 | 9 Months | Good | |
| | Abbott Covid machine | Portable | Abbott | 54E34010 | 2 Months | Good | |
| Radiology | Ultrasound Machine | Portable | ECUBE 12 | M65572 | 6/28/2022 | Good | |
| | Xray Machines | Permanent | Romanode | 2202437 | Mar 22 | Good | |
| Massage Therapy | Electrical stimulator machine | 5 Portable | MaxTens3000 | No Protech | 9 Months | Good | |
| | 1 Waterbed | Permanent | Sidmar | 226-54073-Q20-30P | 9 Months | Good | |
| | 1 Traction table | Permanent | Everyway 4 all | ET-800 | 9 Months | Good | |
| | 2 ParaffEm Machine | Permanent | Paramed | 5594-235398997 | 9 Months | Good | |
| | 2 Handheld laser machines | Portable | Multi Radiance Medical | TW 5030 | 9 Months | Good | |
| | EMU Ultrasound Combo | Permanent | Mich mar | DQ7844 | 9 Months | Good | |
| | EMU Ultrasound Combo | Permanent | Mich mar | DQ7844 | 9 Months | Good | |
| | EMU Ultrasound Combo | Permanent | Mich mar | DQ7844 | 9 Months | Good | |
| | Vibrator machine | Permanent | Life Pro | CVV84M | 9 Months | Good | |
| | Treadmill machine | Permanent | Eurquentic | 3201313900830011.00 | 9 Months | Good | |
| | Treadmill machine | Permanent | Eurquentic | 3201313900830011.00 | 9 Months | Good | |
| | Exercise bike machine | Permanent | JeeKee | | 9 Months | Good | No series # |
| | Exercise bike machine | Permanent | JeeKee | | 9 Months | Good | No series # |
| | Freezer | Permanent | Midea | 3855398003110006.00 | 9 Months | Good | |
| | Hydrocollator | Permanent | Chattanooga | T257093 | 9 Months | Good | |
| | 3 Massage Therapy Beds | Permanent | Winco | Model 851 | 9 Months | Good | |
| | Gel Warmers | Permanent | Thermaltonic | 2410071812 | 8 Months | Good | |
| | 5 Bolsters | Portable | | | 9 Months | Good | No Brand name or Series # shown. |
| | 1 Pulley Systems | Permanent | Bailey | | 9 Months | Good | No series # |
| | 3 Shoulder Wheel | Permanent | Cando | 172002430 | 9 Months | Good | |
| | Digital Ladder | Permanent | | | 9 Months | Good | No Brand name or Series # shown. |

| Miami Lakes | Updated By: | | | Date: | | Calibration Completed: | |
|---|---|---|---|---|---|---|---|
| Specialty | Equipment | Portable or Permenent | Brand | Series # | Age of Machine | Working Condition | Comments |
| Podiatrist | Nail Treatment Laser Machine | Portable | LunulaLaser by Erchonia | FFS-01150 | 2022 | Good | Share with Miami, Hialeah West, Sweetwater & Tamarac. |
| | Drill | | | | | Good | |
| | Electrical Podiatry chair | Permanent | MidMark | BP2509 | | Good | |
| Ortho | Centrifuges | Permanent | Mckesson | 172103094 | | Good | |
| Psych | N/A | N/A | | | | | |
| | Hyfrecator AARON | N/A | | | | | |
| | Manual Refractor | N/A | | | | | |
| | Prorapter | Permanent | Soptik | 100-4626 | | | |
| Optometry | Slit lamp gllras | Permanent | Xcel 200 | 220115181 | | | |
| | Tunometer | N/A | | | | | |
| | Lensometer | Permanent | Topcon | 3476518 | | | |
| | Optometry Chair | Permanent | Soptik | 2701800060 | | | |
| Chiro | Stretch bed | N/A | | | | | |
| | 1 Dental Chair | Permanent | Belmont | V02130290 | | | |
| Dental | 1 Dental Stool | Permanent | | N/A | | | |
| | 1 Assitant Stool | Permanent | | N/A | | | |
| | Ultrasonic Cleaner | N/A | | | | | |
| | Sterilization Autoclave | N/A | | | | | |
| | Spia Digital Sensor | N/A | | | | | |
| | 1 Centrifuge | Permanent | Drucken by LabCorp | 2100813GOY36 | | | |
| Labatory | Hyfrecator AARON | Permanent | Conmed | 15H31762 | | | |
| | Autoclave | Permanent | Ritter | RB011721 | | | |
| | Otoscope | Permanent | Mckesson | N/A | | | |
| | Otoscope | Permanent | Adview | M00065295 | | | |
| | EKG Machine | Permanent | | | 1/15/2023 | | |
| | Abbott Covid machine | Permanent | Abbott | 10CAOC1C | | | |
| | Spirometry machines | Permanent | Flow Mir | A23C13652 | | Good | |
| | Holter | N/A | | | | | |
| Pharmacy | Quick Meds Dispensing Unit | N/A | | | | | |
| Radiology | Ultrasound Machine | Portable | | | | | Uses Hialeah West's |
| | Xray Machine | N/A | | | | | |
| Acupuncture | Infrared Lamp | | | | | | |
| | Electrical stimulator machine | | | | | | |
| | 1 Waterbed | Permanent | | 212051385QJ530P | | | |
| | 1 Traction table | Permanent | Everyway All | 21083418 | | | |
| | Paraffinn Machine | Permanent | Paramed | 140731012 | | | |
| | Paraffinn Machine | Permanent | Paramed | 140731013 | | | |
| | Handheld laser machines | Permanent | Multi Radiance | N/A | | | |
| | EMS/ Ultrasound Combo | Permanent | Roscue | 9150900060 | | | |
| | EMS/ Ultrasound Combo | Permanent | Roscue | 520171160069.00 | | | |
| | EMS/ Ultrasound Combo | Permanent | Roscue | 57C120050091 | | | |
| Massage Therapy | EMS/ Ultrasound Combo | Permanent | Roscue | 52C120050093 | | | |
| | 3 Tins Muscle Stimulator | | | | | | |
| | Vibrator machine | Permanent | VX-Power | N/A | | | |
| | Vibrator machine | Permanent | Pinty Fit | N/A | | | |
| | Treadmill machine | Permanent | Xerpeutic | 1201512400101S0.00 | | | |
| | Exercise bike machine | Permanent | Sunny | WA20046168531636 | | | |
| | Exercise bike machine | Permanent | Marcy | ME70905201SP0005823 | | | |
| | Freezer | Permanent | Commercial Cool | 331400335 | | Good | |
| | Hydrocollator | Permanent | Chattanooga | T2398E | | | |
| | 5 Massage Therapy Beds | | | | | | |
| | Gel Warmers | Permanent | | 089309CA1Z | | | |
| | Gel Warmers | Permanent | | 07303CB12 | | | |
| | Gel Warmers | Permanent | | 072303CB12 | | | |
| | 4 Bolsters | Permanent | | N/A | | | |
| | 1 Pulley Systems | Permanent | N/A | N/A | | | |
| | 1Shoulder Wheel | Permanent | Bailey | 52688 | | | |
| | Manual Exercise | Permanent | N/A | 315779 | | | |

| Homestead | Updated By: | | | Date: | | Calibration Completed: | |
|---|---|---|---|---|---|---|---|
| Specialty | Equipment | Portable or Permanent | Brand | Series # | Age of Machine | Working Condition | Comments |
| Podiatrist | Nail Treatment Laser Machine | Portable | LunulaLaser by Erchonia | FFS-01112 | 2022 | Good | Share with Lejeune, Bird Road and Westchester |
| | Nail Treatment Laser Machine | Portable | LunulaLaser by Erchonia | FFS-03146 | 2022 | Good | Share with Lejeune, Bird Road and Westchester |
| | Drill | | | | | Good | |
| | Electrical Podiatry chair | Permanent | | N/A | | Good | |
| Ortho | Centrifuges | Permanent | Mckesson/ Unico | CT2011714 | 2012 | Good | |
| | | | | | | | |
| Psych | N/A | N/A | N/A | N/A | N/A | N/A | |
| | | | | | | | |
| Dermatologist | Hyfrecator AARON | | | | | | |
| Optometry | Manual Refractor | | | | | | |
| | Proroptor | | | | | | |
| | Slit lamp-pbras | | | | | | |
| | Tonometer | | | | | | |
| | Lensometer | | | | | | |
| | Optometry Chair | | | | | | |
| Chiro | Stretch bed | Permanent | N/A | N/A | N/A | YES | |
| | | | | | | | |
| Dental | Dental Chair | Permanent | Belmont | VD2310280 | 2021 | Good | |
| | Dental Stool | Permanent | Crown Seating | 65645 | 2022 | Good | |
| | Assitant Stool | Permanent | Crown Seating | 65645 | 2022 | Good | |
| | Ultrasonic Cleaner | Permanent | Acclean by Henry Shein | 2206058 | 2022 | Good | |
| | Sterilization Autoclave | Permanent | Porter Reliant | 25300428 | N/A | Good | |
| | Spix Digital Sensor | Permanent | Acteon | S802-39599 | 2018 | Good | |
| | Dental Chair | Permanent | Engle | N/A | | Good | |
| | Dental Stool | Permanent | Crown Seating | 22418 | 2015 | No | Broken the height cannot be graduated |
| | Assitant Stool | Permanent | Crown Seating | 22418 | 2015 | No | Broken the height cannot be graduated |
| Labatory | Centrifuge | Permanent | 1 Quest/3Labcorp | 200113FB793/191213EZ569 | | YES | |
| | Centrifuge | Permanent | Quest | 22061JHV004 | | YES | |
| | Centrifuge | Permanent | Quest | 22061JH5995 | | YES | |
| Primary Care Providers | EKG Machine | | Burdick/Cardiocare/Cardiocare | E83000056337E0700118 | | YES | |
| | Abbott Covid machine | Permanent | Abbott Diagnostics | FF601636 | | YES | |
| | Urine dipstick machine | Permanent | Mckesson | 197T1008FE3 | | YES | |
| | Holter | Portable | Drucker Diagnostics | 396762 | | YES | |
| | Holter | Portable | Drucker Diagnostics | 397739 | | YES | |
| Cardiologist | EKG Machine | Permanent | Cardiocare | 119639 | | YES | |
| Pharmacy | Quick Meds Dispensing Unit | Permanent | Quick Meds | 1485 | | | Sometimes is working properly |
| Radiology | Ultrasound Machine | Portable | Alpinion I7 | X0/640 | 2020 | Yes | |
| | Xray Machines | Permanent | TXR 3523 | 30393 | | YES | |
| Acupuncture | Infrared Lamp | Portable | TDP Heat Lamp | KS-9800 | | YES | |
| | Electrical stimulator machine | Portable | Ying Di(APD) | KWD-808I | | YES | |
| Massage Therapy | Infrared Lamp | | | | | | |
| | Electrical stimulator machine | Portable | Roscoe | C1160800027 | | Yes | |
| | Electrical stimulator machine | Portable | Roscoe | C1130100017 | | No | Broken |
| | 1 Waterbed | Permanent | N/A | N/A | | Yes | |
| | 1 Traction table | Permanent | Chatanooga | C-171982 | | Yes | |
| | 2 Paraffon Machine | Portable | Paramed | 200706192/200706630 | | Yes | |
| | 1 Handheld laser machines | Portable | TQ Solo | | | Yes | |
| | EMS/ Ultrasound Combo | | | | | | |
| | EMS/ Ultrasound Combo | | | | | | |
| | EMS/ Ultrasound Combo | | | | | | |
| | EMS/ Ultrasound Combo | | | | | | |
| | 2 Tins Muscle Stimulator | Portable | Tens 3000 | N/A | | Yes | |
| | Vibrator machine | Permanent | Confidence | M5C00301 | 2022 | Yes | |
| | 3 Massage Therapy Beds | N/A | N/A | N/A | N/A | N/A | |
| | Gel Warmers | Portable | Thermalysonic | 127306CK12 | | Yes | |
| | 2 Gel Warmers | Portable | Culus | 04180558/0818091 | | Yes | |
| | Treadmill machine | | | | | | |
| | Exercise bike machine | Permanent | Fit | DD04060213E03 | | Yes | |
| | Freezer | Permanent | Midea | 341-08142204 | | Yes | |
| | 10 Bolsters | Portable | N/A | N/A | N/A | N/A | |
| | 1 Pulley Systems | Permanent | Bailey | N/A | | Yes | |
| | 1Shoulder Wheel | Permanent | Curamotion | TQ-0009250 | | Yes | |
| | Digital Ladder | | | | | | |
| | Hydrocollator | Permanent | Whitehall | N/A | | Yes | |

| Alton Road | Updated By: | | | | Date: | | Calibration Completed: | |
|---|---|---|---|---|---|---|---|---|
| **Specialty** | **Equipment** | **Portable or Permanent** | **Brand** | | **Series #** | **Age of Machine** | **Working Condition** | **Comments** |
| Podiatrist | Nail Treatment Laser Machine | Portable | LunulaLaser by Erchonia | | FP1-01113 | 2022 | Good | Share with N.M. East, Hialeah East & Hollywood. |
| | Nail Treatment Laser Machine | Portable | | | | | | |
| | Drill | | | | | | | |
| | Electrical Podiatry chair | Permanent | | | | | | |
| Ortho | Centrifuges | Permanent | | | | | | |
| | | | | | | | | |
| | Centrifuges | Permanent | | | | | | |
| Psych | None | | N/A | | | | | |
| Dermatologist | Hyfrecator AARON | | Aaron 940 | | N/A | | Good | |
| | Manual Refractor EZER | Permanent | | | | | New | No serial number or brand |
| | Proropter | Permanent | ViewLight | | VL060311065 | | Good | |
| | Slit lamp gilras | Permanent | Topcon | | 102880109 | | | |
| | Tonometer | Permanent | Topcon | | 102880109 | | Good | |
| Optometry | Lensometer | Permanent | | | 106538 | 5+ years | Good | |
| | Chair | Permanent | Equmedix | | | 10+ years | OK | |
| | Humphrey Field Analyzer | Permanent | Zeiss | | 72016454 | 10+ years | Good | |
| | Binocular Indirect Ophthalmoscopes | Permanent | Allpupil/Kleeler | | 1013081 | 10+ years | OK | |
| | Projector | Permanent | Topcon | | 867751 | 10+ years | OK | |
| | Frame Warmer | Permanent | ViewLight | | N/A | | | |
| Chiro | Bed | | In Lane Tables | | | | Good | |
| | Foam Roller | | N/A | | | | Good | |
| | Dental Chair | Permanent | M9 ULTRA CLAVE (MIDMARK) | | 4939497 | 10+ years | Good | |
| | Dental Stool | Permanent | PA4 ULTRASONIC (PATTERSON) | | 3021822 | 3 years | Good | |
| | Assitant Stool | Permanent | PLANMECA PROMAX | | PTL0204455 | 1 year | Good | |
| | Ultrasonic Cleaner | Permanent | ADEC (CHAIR) | | H068640 | 10+ years | Good | |
| Dental | Sterilization Autoclave | Permanent | PROGENY DENTAL | | OF26024 | 10+ years | Good | |
| | Spix Digital Sensor | Permanent | ADEC (CHAIR) | | E139171 | 10+ years | Good | |
| | | | PROGENY DENTAL | | TS270427 | 1 year | Good | |
| | | | ENGLE DENTAL SYSTEMS (CHAIR) | | 70-920 - 65-794 | 1 year | Good | |
| | | | AIR TECHNIQUES | | 810-002267 | 10+ years | Good | |
| | | | VACSTAR DENTAL VACUUM SYSTEM | | 1104365418 | 10+ years | Good | |
| | | | SYCLONE AMALGAM SEPARATOR (CROSSTEX) | | - AM L5Y5 | 10+ years | Good | |
| Radiology | Ultrasound Machine | Permanent | Philips Affiniti 50 | | USB2001773 | | | |
| | X Ray Machine | Permanent | GE | | | 8/1/1997 | Good | |
| | 3-Massage tables | | FRIDGE | | MFR:34HL411968 | 2011 | OK | |
| | 1-Water bed | | BICYCLE | | CA.91708 | 2018 | FAULTY | Weakly |
| | 1-Decompression machine | | MASSAGE CHAIRS | | S/N | 2005 | OK | |
| | 1-Shoulder wheel | | VXPOWER | | VX1000 | 2015 | OK | |
| | 2-Paraffin warmer | | HYDROCOLLATOR | | T1556C | 2017 | OK | |
| | 2-EMS\Ultrasound | | TRACTION BED | | T3288 | 2014 | OK | |
| | 4-Tens | | PARAFIN | | S/N | 2021 | OK | |
| | 1-Stationary bike | | PARAFIN | | S/N | 2021 | OK | |
| | 1-Vibration machine | | LASER | | K-811-300K | 2021 | OK | |
| Therapy | 2-Laser | | LASER | | K-813-300K | 2021 | OK | |
| | 1-Freezer | | WATER BED | | 222854225Q-35 3DP | 2022 | OK | |
| | 1-Hydrocollator | | HEATER | | 61736 | 2007 | OK | |
| | 1-Finger ladder | | HEATER | | 118088 | 2007 | OK | |
| | 1-Pulley | | MICROWAVE | | 3032588 | 2013 | OK | |
| | 2-Gel warmer | | SHOULDER WHELS | | N/A | N/A | OK | |
| | 4-Bolster | | MASSAGE BED | | 851105216 | 2021 | OK | |
| | 20-Towels | | MASSAGE BED | | 851105215 | 2021 | OK | |
| | | | MASSAGE BED | | 851105209 | 2021 | OK | |
| | | | PC | | MJ77P4C | 2018 | OK | |
| | | | PC | | UM IV 6AC01 | 2018 | OK | |
| | | | PRINTER | | JJ-368753 | 2021 | OK | |
| | | | PRINTER | | JJ-368753 | 2021 | OK | |
| | | | ULTRASOUND | | SZ-61200034 | 2009 | KEY AFFECT | |
| | | | ULTRASOUND | | 4121000059 | 2009 | KEY AFFECT | |
| | | | PRINTER LASER | | PHBQQ24356 | 2018 | OK | |
| Acupuncture | 2-Infrared Lamp | Portable | Lhasa | | 18050007043 | | OK | |
| | 2-EMS | Portable | Tens Plus Industrial Company | | 9253352/9243096 | | OK | |
| | EKG | Portable | Contec | | 2.01202E+11 | 2012 | | Broken |
| | EKG | Portable | Contec | | 2012020014 | 2012 | | Broken |
| | Pressure Cuff Machince | Portable | Grahamfield | | 7.17076E+11 | | | Broken |
| Nuclear | Pressure Cuff Machince | Portable | Grahamfield | | 7.17076E+11 | | | Broken |
| | Treadmil | Permanent | Marquette | | N/A | | | |
| | DVD | Portable | Rainford | | 60720555 | | | |
| | Upright Camera | Permanent | Procon | | CD80201700 | | | |
| | Patient Monitor | Permanent | Biomedical Systme Inc | | 940612615 | | | |
| | Pressure Cuff Machine Wall | Permanent | Welchllyn | | 18100515835 | | | Broken |

| Palmetto Bay | Updated By: | | | Date: | | Calibration Completed: | |
|---|---|---|---|---|---|---|---|
| **Specialty** | **Equipment** | **Portable or Permenent** | **Brand** | **Series #** | **Age of Machine** | **Working Condition** | **Comments** |
| Podiatrist | Nail Treatment Laser Machine | | | | | | |
| | Nail Treatment Laser Machine | | | | | | |
| | Drill | Portable | Dremel | 39098 | | Good | Updated 04/23 |
| | Electrical Podiatry chair | | | | | | |
| Ortho | Centrifuges | | | | | | |
| | Centrifuges | Portable | Mckesson | LT2011938 | | Good | Update 10/22 |
| Dermatologist | Hyfrecator AARON | | | | | | |
| Optometry | Manual Refractor | Permenent | Italy | 8100207 | | Good | Update 10/22 |
| | Proroptor | | | | | | |
| | Slit lamp giras | Permenent | Optimetric | 201910009 | | Good | Updated 10/22 |
| | Tonometer | | | | | | |
| | Lensometer | Portable | AC | N/A | | Good | |
| | Optometry Chair | Permenent | SN | | | Good | Updated 10/22 |
| Chiro | Stretch bed | | | | | | |
| Dental | Dental Chair | Permenent | SDS | 116397 | | Good | |
| | Dental Stool | Portable | Victor Vortex | 16758 | | Good | |
| | Assitant Stool | | | | | | |
| | Ultrasonic Cleaner | Portable | Densonic | | | Good | Updated 10/22 |
| | Sterilization Autoclave | Portable | Dritec | 175P0188 | | Good | Updated 10/22 |
| | Spix Digital Sensor | Portable | Optimix | 15017783 | | Good | Updated 10/22 |
| Labatory | Centrifuge | Portable | Lab Corp | 15111347384 | | Good | Updated 10/22 |
| | Centrifuge | Portable | ID NOW | FDA5F41C | | Good | Updated 04/23 |
| | Centrifuge | Portable | Mckesson | 197T1009EE6 | | Good | Updated 02/23 |
| | EKG Machine | Portable | Bionet | 1100056 | | Good | Updated 10/22 |
| Primary Care Providers | Abbott Covid machine | | | | | | |
| | Urine dipstick machine | | | | | | |
| | Holter | | | | | | |
| | Holter | | | | | | |
| Cardiologist | EKG Machine | | | | | | |
| Pharmacy | Quick Meds Dispensing Unit | | | | | | |
| Radiology | Ultrasound Machine | | | | | | Uses Homestead's |
| | Xray Machines | Permenent | Rotanode | 22000BZX0654000 | | Good | |
| Acupuncture | | | | | | | |
| Massage Therapy | EMS/ULT | Portable | Great wall | 51986593745 | | Good | Updated 10/22 |
| | Traction | Permenent | Ever-Trac | 20380508 | 4 years | Good | |
| | EMS/ULT | Permanent | COMBOCARE ROSCOE | SZC1200500147 | 3 years | Good | |
| | TENS Unit | Portable | TENS 3000 | SZS2105105298 | 1 YEAR | Good | |
| | Gel warmer | Permanent | Thermasonic | 005303C812 | 4 years | Good | |
| | Gel warmer | Permanent | Thermasonic | 183310CA12 | 4 years | Good | |
| | Water bed | Permanent | SIDMAR | 117512280J2530P | 5 YEARS | Good | |
| | Paraffin warmer | Permanent | PARAMED | N/A | 3 YEARS | Good | |
| | Paraffin warmer | Permanent | PARAMED | N/A | 3 YEARS | Good | |
| | Laser-Portable | Portable | TQ SOLO | 77SL1643 20 | 3 YEARS | Good | |
| | Pulley | Permanent | N/A | N/A | 3 YEARS | Good | |
| | Finger ladder | Permanent | N/A | N/A | 3 YEARS | Good | |
| | Shoulder Wheel | Permanent | N/A | N/A | 3 YEARS | Good | |
| | Vibration platform | Permanent | Fit Massage | N/A | 1 YEAR | Good | |
| | Tens-portable | Portable | Tens 3000 | SZS2105105298 | 1 YEAR | Good | |
| | Tens-portable | Portable | TENS 3000 | SZS200910022 | 1 YEAR | Good | |
| | Freezer | Permanent | Avanti | A6334413505210010 0480 | 3 Years | Good | |
| | EMS/ULT | Permanent | Richmar | A1717A | 5 YEARS | Good | |
| | Hydrocollator | Permanent | Chattanoga | N/A | 5 YEARS | Good | |

| Lejeune | Updated By: | | | Date | | Calibration Completed! | |
|---|---|---|---|---|---|---|---|
| Specialty | Equipment | Portable or Permanent | Brand | Series # | Age of Machine | Working Condition | Comments |
| Podiatrist | Nail Treatment Laser Machine | Portable | LumiaLaser by Erchonia | FFxD1112 | 2022 | Good | Share with Bird Road, Homestead and Westchester |
| | Nail Treatment Laser Machine | Portable | LumiaLaser by Erchonia | FFS-D3186 | 2022 | Good | Share with Bird Road, Homestead and Westchester |
| | Drill | Permanent | Bed | 2017072S319 | 2019 | Good | |
| | Electrical Podiatry chair | | | | | | |
| Ortho | Centrifuges | Portable | McKesson | 172011505 | | Good | |
| | Manual Refractor | | | | | Needs Repair | |
| Optometry | Pteropter | 1 | | | | | |
| | Slit lamp plus | 1 | | | | | |
| | Tonometer | 1 | | | | | |
| | Lensometer | 1 | | | | | |
| | Optometry Chair | Permanent | Topcon | 223104 | | Good | |
| | Dental Chair | 3 | SDS | | | Good | |
| | Dental Stool | 3 | Brewer | | | Good | |
| Dental | Assitant Stool | 3 | Brewer | | | Good | |
| | Ultrasonic Cleaner | 1 | PA4 Ultrasonic | 1212813E765 | | Good | |
| | Sterilization Autoclave | 2 | Bravo/Porter | | | Good | |
| | Spix Digital Sensor | 1 | | ADG0215 | | Good | |
| | Centrifuge | 1 | LabCorp | 210V13GN804 | | Good | |
| Labatory | Centrifuge | Permanent | Horizon | V20813977 | | Good | |
| | Centrifuge | Portable | Waterpik | 6.46171+11 | | Good | |
| | EKG Machine | Portable | Bionet | E106085 | | Good | |
| | Abbott Covid machine | Portable | Abbott | B608E31C | 2021 | Good | |
| Primary Care Providers | Holter | Portable | Midmark | 397439 | 2019 | Good | |
| | Holter | | | | | | |
| | EKG Machine | Portable | GE Mac 3200 | 550040084 | | Good | |
| Cardiologist | Quick Meds Dispensing Unit | Portable | Zoll AED Plus | 100848E+16 | | Good | |
| Pharmacy | Ultrasound Machine | Portable | Phillips cx 50 | 5GN1600169 | 2016 | Good | Service done 8/2022 |
| Radiology | Xray Machines | Permanent | Fisher FM60 | 10793020 | 1993 | Good | |
| Acupuncture | | | | | | | |
| | Infrared Lamp | | | | | | |
| | Electrical stimulator machine | | | | | | |
| | Electrical stimulator machine | | | | | | |
| | 1 Waterbed | | | | | | |
| | 1 Traction table | | | | | | |
| | 2 Paraffin Machine | | | | | | |
| | 1 Handheld laser machines | | | | | | |
| | EMS/ Ultrasound Combo | | | | | | |
| | EMS/ Ultrasound Combo | | | | | | |
| | EMS/ Ultrasound Combo | | | | | | |
| | EMS/ Ultrasound Combo | | | | | | |
| | 3 Tins Muscle Stimulator | | | | | | |
| Massage Therapy | Vibrator machine | | | | | | |
| | Vibrator machine | | | | | | |
| | Vibrator machine | | | | | | |
| | Treadmill machine | | | | | | |
| | Exercise bike machine | | | | | | |
| | Freezer | | | | | | |
| | Hydrocollator | | | | | | |
| | 5 Massage Therapy Beds | | | | | | |
| | Gel Warmers | | | | | | |
| | Gel Warmers | | | | | | |
| | Gel Warmers | | | | | | |
| | Gel Warmers | | | | | | |
| | 10 Bolsters | | | | | | |
| | 1 Pulley Systems | | | | | | |
| | 1Shoulder Wheel | | | | | | |
| | Digital Ladder | | | | | | |

| Hollywood | Updated By: NR | | | Date:7/31/24 | | Calibration Completed: 05/07/2024 | |
|---|---|---|---|---|---|---|---|
| **Specialty** | **Equipment** | **Portable or Permement** | **Brand** | **Series #** | **Age of Machine** | **Working Condition** | **Comments** |
| Podiatrist | Nail Treatment Laser Machine | Portable | | | | | Not in office untill 08/02/24 |
| | Drill | Portable | | | | | Need to check with provider |
| | Electrical Podiatry chair | Permanent | N/A | N/A | 6 years | Good | Service done 05/07/2024 |
| Ortho | Centrifuges | Portable | McKesson | LT2009423 | 4 years | Good | Service done 05/07/2024 |
| | Centrifuges | Portable | Quest/Horizon | 1804130B622 | 5 years | Good | Service done 05/07/2024 |
| | Hyfrecator AARON | N/A | | | | | |
| Optometry | Manual Refractor | | | | | | Need to check with provider on 08/02/24 |
| | Prorepter | | | | | | Need to check with provider on 08/02/24 |
| | Slit lamp gilras | | | | | | Need to check with provider on 08/02/24 |
| | Tonometer | | | | | | Need to check with provider on 08/02/24 |
| | Lensometer | Portable | NJC-4 | N/A | 4 years | Good | Service done 05/07/2024 |
| | Optometry Chair | Permanent | Reliance | 62020507019 | 6 years | Good | Service done 05/07/2024 |
| Chiro | Stretch bed | Permanent | Excel Medical Products | N/A | 6 years | Good | Service done 05/07/2024 |
| Dental | 2 Dental Chair | Permanent | SDS | J0566409 & 5000002 | 5 years & 4years | Good | Service done 05/07/2024 |
| | 1 Dental Stool | Portable | SDS | 21318501006 | 5 years | Good | |
| | 1 Assitant Stool | Portable | SDS | 242185000 | 5 years | Good | |
| | Ultrasonic Cleaner | N/A | N/A | N/A | N/A | N/A | |
| | Sterilization Autoclave | Permanent | Midmark | V2501072 | 1 year | Good | |
| | Spix Digital Sensor | Portable | Sopix | N/A | 5 years | Good | Not compatible with new system |
| Labatory | 2 Centrifuges | Portable | Quest/Drucker Diagnistics | 210713GR144 | 3 years | Good | Service done 5/7/24 |
| | Abbott Covid machine | Portable | ID Now | EF1E411D | 3 years | Good | |
| | Urine dipstick machine | N/A | N/A | N/A | N/A | N/A | N/A |
| Primary Care Providers | 2 Otoscope Wall Mount | Permanent | WelchAllyn | N/A | 6 | Good | 4 Portable WelchAllen.Service done 05/07/2024 |
| | 1 Spirometry machines | Portable | QRS Diagnostic | SN2016-06 2447-1 | 7 years | Good | |
| | 1 EKG machines | Portable | Bionet | ES0300232 | 4 years | Good | Service done 05/07/2024. |
| | Dipstick machine | N/A | N/A | N/A | N/A | N/A | Service done 05/07/2024. |
| | Centrifuge | Portable | Quest/Drucker Diagnistics | 240113KA360 | 2 years | Good | Service done 05/07/2024. |
| Cardiologist | 1 EKG Machine | Portable | Bionet | | 6 years | | Given to Delray Center |
| Pharmacy | Quick Meds Dispensing Unit | Portable | QuiqMed | 1486 | 2 years | Good | |
| Radiology | Ultrasound Machine | Portable | Alpinion | JO-1504 | | Good | Service done 06/06/2024 |
| | Ultrasound Machine | | | | | | |
| | X-ray Machine | Permanent | Tingle. Model TXR325D | 26386 | > 20 years | Good | Service done 05/07/2024. |
| | X-ray Machine | | | | | | |
| Acupuncture | 2-Electrical stimulator machine | Portable | AWQ-104L | 9253252 | N/A | Good | Not in office untill 08/05/24 |
| | | Portable | AWQ-104L | 9243096 | N/A | Good | Not in office untill 08/05/24 |
| Massage Therapy | 1 Waterbed | Permanent | N/A | N/A | 6 years | Good | |
| | 1 Traction table | Permanent | Chattanoga Group | C-I T2797 | 6 years | Good | Service done 05/07/2024. |
| | 2 Parafin Machine | Portable | Paramed | N/A | 6 years | Good | Service done 05/07/2024. |
| | 1 Handheld laser machines | Portable | TQ Solo | 78SL102218 | 6 years | OK | Started makes some sounds |
| | 2 EMS/Ultrasound combo | Portable | ComboCare/Roscoe Med | SZC117050001428 | 6 years | Good | SZC117050001414. Service done 05/07/2024. |
| | 4 TENSMuscle Stimulator | Portable | | | | | |
| | 1 Vibrator machine | Permanent | iFIT Massage | N/A | 5 | Good | |
| | Treadmill machine | N/A | | | | | |
| | 1 Exercise bike machine | Permanent | Marcy ME-706 | N/A | N/A | Good | |
| | 1 Freezer | | | | | | |
| | 1 Hydrocollator | | | | | | |
| | 2 lotion warmers | | | | | | |
| | 5 Massage Therapy Beds | | | | | | |
| | 2 Gel Warmers | | | | | | |
| | 5 Bolsters | | | | | | |
| | 1 Pulley Systems | | | | | | |
| | 1 Shoulder Wheel | | | | | | |
| | Digital Ladder | N/A | | | | | |

| Delray | Updated By: | | | Date: | | Calibration Completed: | |
|--------|-------------|---|---|-------|---|-------------------------|---|
| Specialty | Equipment | Portable or Permanent | Brand | Series # | Age of Machine | Working Condition | Comments |
| Podiatrist | Nail Treatment Laser Machine | | | | | | N/A |
| | Nail Treatment Laser Machine | | | | | | N/A |
| | Drill | | | | | | N/A |
| | Electrical Podiatry chair | | | | | yes | |
| Ortho | Centrifuges | Permanent for Center | Mckeson | 1720111613 | Less than | yes | |
| | Centrifuges | | | | | | |
| Psych | N/A | | | | | | |
| Dermatologist | Hyfecator AARON | | | | | | N/A |
| | Manual Refractor | | | | | | |
| Optometry | Prorepter | | | | | | |
| | Slit lamp-gibas | | | | | | |
| | Tonometer | | | | | | |
| | Lensometer | | | | | | |
| | Optometry Chair | | | | | | |
| Chiro | Stretch bed | | | | | | N/A |
| Dental | Dental Chair x2 | Permenent | | | | | |
| | Dental Stool | Portable for Center | | | | | |
| | Assitant Stool | Portable for Center | | | | | |
| | Ultrasonic Cleaner | | | | | | |
| | Sterilization Autoclave | | | | | | |
| | Spix Digital Sensor | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Labatory | Centrifuge | Portable for Center | Mckeson | 1720111613 | 2 | YES | |
| | Centrifuge | Portable for Center | Quest | 190213EA959 | 3 | YES | |
| | Centrifuge | Portable for Center | Quest Mini E | 520513-1496 | 3 | YES | |
| Primary Care Providers | EKG Machine | | | | | | |
| | Abbott Covid machine | | | | | | |
| | Urine dipstick machine | N/A | | | | | |
| | Holter | Portable for Center | | | | | |
| | Scale | | | | 2023 | Brand New | |
| | Holter | | | | | | |
| Cardiologist | EKG Machine | Portable for Center | | | | | |
| Pharmacy | Quick Meds Dispensing Unit | N/A | | | | | |
| Radiology | Ultrasound Machine | Ultrasound/ Portable | Alpinion | X02708 | 2 years | yes | |
| | Xray Machines | X-Ray/Permanent | | | | | |
| Acupuncture | Infrared Lamp | Infrared boot/PORTABLE | Lumen | 1P201601 | 3 YEARS | yes | |
| | Infrared Lamp | EMS | GREAT WALL | N/A | 2 years | yes | |
| Massage Therapy | Electrical stimulator machine | | | | | | |
| | Electrical stimulator machine | | | | | | |
| | 1 Waterbed | Traction | EVER-TRAC | 20144386 | 4 years | yes | |
| | 1 Traction table | EMS/ULT | COMBO CARE ROSCO | S2C11200200036 | 4 years | yes | |
| | 2 Paraffion Machine | EMS/ULT | COMBO CARE ROSCO | S2C1191200013 | 4 years | yes | |
| | 2 Handheld laser machines | Gel lotion | THERMASONIC | 256331CA52 | 4 years | yes | |
| | EMS/ Ultrasound Combo | Gel lotion | THERMASONIC | 272307CA12 | 4 years | yes | |
| | EMS/ Ultrasound Combo | Water bed | N/S | N/A | 4 years | yes | |
| | EMS/ Ultrasound Combo | Paraffin warmer | N/S | N/A | 4 years | yes | |
| | EMS/ Ultrasound Combo | Paraffin warmer | N/S | N/A | 4 years | yes | |
| | 3 Tins Muscle Stimulator | Laser-Portable | TQ SOLO | N/A | 4 years | yes | |
| | Vibrator machine | Treadmill | EXERPEUTIC | 1.201331+35i | 2 years | yes | |
| | Vibrator machine | Bike | MARCY | CAA4361 | 2 years | yes | |
| | Vibrator machine | Shoulder Wheel | ALEXIA | AA224AIG04136 | 4 years | yes | |
| | Treadmill machine | Vibration platform | Confidence | MSC00101 | 4 years | yes | |
| | Exercise bike machine | Tens-portable | ADVANCED TENS | N/A | 1 YEAR | yes | |
| | Freezer | Tens-portable | ADVANCED TENS | N/A | 1 YEAR | yes | |
| | Hydrocollator | Freezer | PREMIUM LEVELLA | N/A | 3 YEARS | yes | |
| | | Pulley | BAYLEY | N/A | 3 YEARS | yes | |
| | | Hydrocollator | HYDROCOLLAT | N/A | 5 YEARS | yes | |
| | 5 Massage Therapy Beds | | | | | | |
| | Gel Warmers | | | | | | |
| | Gel Warmers | | | | | | |
| | Gel Warmers | | | | | | |
| | Gel Warmers | | | | | | |
| | 10 Bolsters | | | | | | |
| | 1 Pulley Systems | | | | | | |
| | 1Shoulder Wheel | | | | | | |
| | Digital Ladder | | | | | | |

| Winter Haven | Updated By: | | | Date: | | Calibration Completed: | |
|---|---|---|---|---|---|---|---|
| Specialty | Equipment | Portable or Permanent | Brand | Series # | Age of Machine | Working Condition | Comments |
| Podiatrist | Nail Treatment Laser Machine | | | | | | |
| | Nail Treatment Laser Machine | | | | | | |
| | Drill | | | | | | |
| | Electrical Podiatry chair | Permanent | N/A | N/A | | New | |
| Ortho | | | | | | | we dont have inhouse orthopedic |
| Psych | | | | | | | Psych has no equiment |
| Dermatologist | | n/a | | | | | |
| | | | | | | | we dont have inhouse dermatologist |
| Optometry | | | | | | | |
| | Lensometer | portable | N/A | w2105106hd | NA | N/A | |
| Chiro | | N/A | | | | | we dont have inhouse chiropractor |
| Dental | Dental Chair | Permanent | crown seating | OP1 BP3219 1 OP2BP3336 | 3 yr | GOOD | |
| | Dental Stool | Permanent | crown seating | 2 STOOL 61993 | 3 yr | GOOD | |
| | Assitant Stool | Permanent | Crown seating | 2 ASST.STOOL 61993 | 3 yr | GOOD | |
| | Ultrasonic Cleaner | Permanent | Patterson | 17207180760 | NA | GOOD | |
| | Sterilization Autoclave | Permanent | Tuttnauer EZ11Plus | 20070172 | NA | GOOD | |
| | Spix Digital Sensor | permanent | schick 33 sirona | 25011581 | | GOOD | |
| Labatory | 2nd floor sphigmomanometer 1 | Permanent | McKesson | 20062212575 | | GOOD | |
| | | Permanent | welchallyn | *007320942444427 | | GOOD | |
| | 2nd floor sphigmomanometer 2 | Permanent | McKesson | *210504123950 | | GOOD | |
| | | Permanent | welchallyn | N/A | | GOOD | |
| | 2nd floor sphigmomanometer 3 | Permanent | McKesson | *200622145135 | | GOOD | |
| | | Permanent | welchallyn | N/A | | GOOD | |
| | 2nd floor sphigmomanometer 4 | Permanent | McKesson | N/A | | GOOD | |
| | | Permanent | welchallyn | N/A | | GOOD | |
| | 2nd floor sphigmomanometer 5 | Permanent | McKesson | N/A | | GOOD | |
| | | Permanent | welchallyn | N/A | | GOOD | |
| | 2nd floor sphigmomanometer 6 | Permanent | McKesson | N/A | | GOOD | |
| | | Permanent | welchallyn | N/A | | GOOD | |
| | 1st floor sphigmomanometer 2 | | | | | | |
| | 1st floor sphigmomanometer 3 | | | | | | |
| | 1st floor sphigmomanometer 4 | | | | | | |
| | 1st floor sphigmomanometer 5 | | | | | | |
| | 1st floor sphigmomanometer 6 | | | | | | |
| | 1st floor sphigmomanometer 7 | | | | | | |
| | 1st floor sphigmomanometer 9 | | | | | | |
| | 1st floor sphigmomanometer 8 | | | | | | |
| | Centrifuge | Portable | McKesson | h2015617 | 2 yr | GOOD | |
| | Centrifuge | Portable | labcorp | 201113028S | 2 yr | GOOD | |
| Primary Care Providers | EKG Machine | Portable | bionet | et0700103 | 2 yr | GOOD | |
| | EKG Machine | | | | | | sent to westchester for repair over 1 month ago. Pending status |
| | Abbott Covid machine | Portable | Abbott | 1549941c | | GOOD | |
| | Abbott Covid machine  printer | Portable | abbott | 2011a7200 | | GOOD | |
| | Urine dipstick machine | N/A | | | | | we dont have this machine |
| | Holter | | | | | | |
| Cardiologist | | | | | | | we dont have inhouse cardiologist |
| Pharmacy | Quick Meds Dispensing Unit | N/A | | | | | |
| Radiology | Ultrasound Machine | Permanent | Alpinion | M00617 | 10 month (2022) | GOOD | |
| | Ultrasound stretcher | Permanent | anmedica | s100860617B-022 | 10 month (2022) | GOOD | |
| | Xray flat panel detector | Permanent | caneray | c101ce0n002 | 10 month (2022) | GOOD | |
| | x-ray tube | Permanent | canon electron tubes & devices | 21R302 | 10 month (2022) | GOOD | |
| | Xray collimator | Permanent | ralco | 210R115 | 10 month (2022) | GOOD | |
| | wall buky | Permanent | summit industries, LLC | 21050I | 10 month (2022) | goOD | |
| | radiographic image receptor stand | Permanent | summit industries, LLC | BLD02B-0721 | 10 month (2022) | GOOD | |
| | radiographic table | Permanent | summit industries, LLC | BWA522-0721 | 10 month (2022) | GOOD | |
| | Xray control panel | Permanent | summit industries, LLC | AEC313-0721 | 10 month (2022) | gooD | |
| | Xray Generator | Permanent | Summit industries, LLC | CNC582-0721 | 10 month (2022) | GOOD | |
| Acupuncture | | | | | | | we dont have Acupuncture |
| Massage Therapy | Infrared Lamp | N/A | | | | | |
| | Electrical stimulator machine | N/A | | | | | |
| | Electrical stimulator machine | N/A | | | | | |
| | 1 Waterbed | Permanent | DOLPHIN MED EQUIPMET | 5514078 | | GOOD | |
| | 1 Traction table | Permanent | EVERYWAY  ALL | 210383417 | | GOOD | |
| | 2 Paraffin Machine | Permanent | PARAMED | 1609030I8/1060901000 | | GOOD | |
| | 1 Handheld laser machines | Permanent | PAINAWAY | 32PA114311 | | GOOD | |
| | EMS/ Ultrasound Combo | Permanent | ROSCOE MEDICAL | SZC1200500092 | | GOOD | |
| | EMS/ Ultrasound Combo | Permanent | ROSCOE MEDICAL | SZC1200500146 | | GOOD | |
| | EMS/ Ultrasound Combo | Permanent | ROSCOE MEDICAL | SZC1161100037 | | BROKEN | |
| | 3 TENS Muscle Stimulator | Permanent | TENS 3000 | SZS170729393 | | GOOD | |
| | Vibrator machine | Permanent | CONFIDENCE FITNESS | POUS-00002505 | | GOOD | |
| | Treadmill machine | Permanent | EXERPEUTIC | 1.20133E+14 | Sep-20 | GOOD | |
| | Exercise bike machine | Permanent | SUNNY HEALTH & FITNESS | WA1504616851003 | | GOOD | |
| | Freezer | Permanent | AVANTI | 62298 | | GOOD | |
| | Hydrocollator | Permanent | CHATTANMOGA | 72397BC | | GOOD | |
| | 3 Massage Therapy Beds | Permanent | WINCO | 851105321/5323/5324 | | GOOD | |
| | 4 Gel Warmers | Permanent | THERMASONIC | 070303CB12/266330CA12 | | GOOD | |
| | 4 Rolsters | Permanent | | | | GOOD | |
| | 1 Pulley Systems | Permanent | BAILEY | | | GOOD | |
| | 1Shoulder Wheel | Permanent | ALEXIA | 4CWLTH660C | | GOOD | |
| | 1 Digital Ladder | Permanent | CONDO | 10-1160 | | GOOD | |
| | 1 Portable Massage Chair | Permanent | | | | GOOD | |
| Ultrasound | Stationary | Permanent | Alpinion | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Miami / Specialty | Updated By / Equipment | Portable or Permanent | Brand | Date / Series # | Age of Machine | Calibration Completed / Working Condition | Annual inspection done on 10/2023 / Comments |
|---|---|---|---|---|---|---|---|
| Podiatrist | Nail Treatment Laser Machine | | LumaLaser by Erchonia | PF5-01150 | 2022 | Good | Share with Hialtah West, Miami Lakes, Sweetwater & Tamarac |
| | Nail Treatment Laser Machine | Portable | | | | | |
| | autoclave | N/A | Ritter | A80302012205-10 | | | MH |
| | Electrical Podiatry chair | Portable | | RG-B1-4404EDU | 2022 | | MH |
| Ortho | Centrifuges | Portable | Drucker Diagnotic | 1609BMAC274 | | Good | MH |
| | Centrifuges | N/A | | | | Good | MH |
| | N/A | N/A | | | | | |
| Psych | | | | | | | |
| Dermatologist | Hydrocare AARON | N/A | | | | | |
| | Manual Refractor | Permanent | Elezar | ERI R600R1308900 | | Good | MH |
| | Projector | | | 250213348 | | Good | MH |
| Optometry | Slit lamp gliss | 1 | | | | Good | MH |
| | Tonometer | 1 | | | | Good | MH |
| | Lensometer | 1 | | | | Good | MH |
| | Optometry Chair | Permanent | | 204160D192 | | Good | MH |
| Chiro | Stretch bed | N/A | | | | | |
| | Dental Chair | N/A | | | | | |
| | Dental Stool | N/A | | | | | |
| | Assitant Stool | N/A | | | | | |
| Dental | Ultrasonic Cleaner | N/A | | | | | |
| | Sterilization Autoclave | N/A | | | | | |
| | Spex Digital Sensor | N/A | | | | | |
| | Centrifuge | Portable | Drucker Diagnotics | 153013A002U5 | | Good | MH |
| Labatory | Centrifuge | portable | Drucker Diagnotics | 2206134T517 | | Good | MH |
| | Centrifuge | N/A | | | | | |
| | EKG Machine | Portable | Biocert | EN090389 | | Good | MH |
| | Abbott Cold machine | Portable | Abbott | 50141738C | | Good | MH |
| | Urine dipstick machine | N/A | | | | | |
| | Huiher | N/A | | | | | |
| Primary Care Providers | Huiher | Portable | IQ Holter | 397883 | 2020 | Good | MH |
| | EKG Machine | Portable | | | | | |
| Cardiologist | Quick Meds Dispensing Unit | Permanent | Quid Meds | 232517 | 2021 | Good | MH |
| Pharmacy | Ultrasound Machine | Portable | Alpinion | M01388 | | | |
| Radiology | Xray Machine | Permanent | Carmen Electronic | 2304009 | 2002 | Good | MH |
| Acupuncture | Infrared Lamp | 0 | | | | | |
| | Infrared Lamp | 0 | | | | | |
| | Electrical stimulator machine | | | | | | |
| | Electrical stimulator machine | 1 portable | Maxi Rub (body sport) | | | good | MH |
| | 1 Watershed | 0 portable | | | | | MH |
| | 1 Traction table | 1 portable | Exertrac | | | good | MH |
| | 2 Paraffin Machine | 2 portable | Paramel | | | good | MH |
| | 2 Handheld laser machines | 1 | TQ Solo | | | good | MH |
| | EMG Ultrasound Combo | 1 | Richmar | SLC121070008I | | good | MH |
| | 3 Tins Muscle Stimulator | 2 | | | | good | MH |
| | Vibrator machine | 1 | | | | good | MH |
| Massage Therapy | Vibrator machine | 0 | Confidence Fitness | | | | MH |
| | Treadmill machine | 0 | | | | | MH |
| | Exercise bike machine | 1 | Marcy | | | good | MH |
| | Inversor | 1 | Axari | A634413505c0100 | | good | MH |
| | Hydroculator | 1 | Chattanooga | 726122C | | good | MH |
| | 5 Massage Therapy Beds | 1 | | | | good | MH |
| | Gel Warmers | 1 | Thermasonic | 0563092432 | | good | MH |
| | 10 Rollers | 3 | | | | good | MH |
| | 1 Pulley Systems | 1 | | | | good | MH |
| | 10oulder Wheel | 1 | | | | good | MH |
| | Digital Ladder | 1 | | | | good | MH |

Today | CAN Do | Can Do

| Hanley | Updated By: | | | Date: | | Calibration Completed: | |
|---|---|---|---|---|---|---|---|
| **Specialty** | **Equipment** | **Portable or Permanent** | **Brand** | **Series #** | **Age of Machine** | **Working Condition** | **Comments** |
| Podiatrist | Nail Treatment Laser Machine | N/A | | | | | |
| | Nail Treatment Laser Machine | N/A | | | | | |
| | Drill | Portable | | | | | |
| | Electrical Podiatry chair | PERMANENT | Facial Bed AH-2235 | abi2021113601 | 2022 | good | |
| Ortho | Centrifuges | PERMANENT | Mckesson | b2011547 | 2012 | good | |
| | Centrifuges | N/A | | | | | |
| Psych | | N/A | | | | | |
| Dermatologist | | N/A | | | | | |
| | Hyfrecator AARON | N/A | | | | | |
| | Manual Refractor | N/A | | | | | |
| Optometry | Prorapter | N/A | | | | | |
| | Slit lamp gilrus | N/A | | | | | |
| | Tonometer | N/A | | | | | |
| | Lensometer | N/A | | | | | |
| | Optometry Chair | N/A | | | | | |
| Chiro | Stretch bed | N/A | | | | | |
| | | N/A | | | | | |
| Dental | Dental Chair | | | | | | |
| | Dental Chair | | | | | | |
| | Dental Chair | | | | | | |
| | Dental Chair | | | | | | |
| | Dental Stool | | | | | | |
| | Assitant Stool | | | | | | |
| | Ultrasonic Cleaner | | | | | | |
| | Sterilization Autoclave | | Tuttnauer | 20051093 | 2021 | | |
| | Panaramic | | Planmeca | TPXVV 721338 | 2020 | | |
| | Spix Digital Sensor | | | | | | |
| Labatory | Centrifuge | PERMANENT | Drucker Diagnostics | 220913F628 | 2022 | GOOD | |
| | Centrifuge | PERMANENT | Drucker Diagnostics | 220913F628 | 2022 | GOOD | |
| | Centrifuge | N/A | | | | | |
| Primary Care Providers | EKG Machine | Portable | QRS | 6000-4821 rev a | 2020 | GOOD | |
| | Abbott Covid machine | PERMANENT | ABBOTT | CF27D01D | 2021 | GOOD | |
| | Urine dipstick machine | PERMANENT | Mckesson | 1977100BC22 | UNKNOWN | GOOD | |
| | Holter | N/A | | | | | |
| | Holter | N/A | | | | | |
| Cardiologist | EKG Machine | N/A | | | | | |
| Pharmacy | Quick Meds Dispensing Unit | PERMANENT | QUIIQMEDS | 1482 | 2022 | GOOD | |
| Radiology | Ultrasound Machine | Portable | Alpinion | | | | |
| | Xray Machines | Portable | DynaRad | 01696-0607 | 2007 | GOOD | |
| Acupuncture | Infrared Lamp | N/A | | | | | |
| | Infrared Lamp | N/A | | | | | |
| | Electrical stimulator machine | N/A | | | | | |
| | Electrical stimulator machine | N/A | | | | | |
| Massage Therapy | 1 Waterbed | PERMANENT | MASSAGE TIME PRO | UNKNOWN | UNKNOWN | N/A | |
| | 1 Traction table | N/A | | | | | |
| | 2 Paraffen Machine | PERMANENT | VLPA | 211209000 | 2021 | GOOD | ONLY 1 WORKS 2 IN INVENTORY |
| | 2 Handheld laser machines | PORTABLE | TQ SOLO LASER | 77St3157.20 | 7 | GOOD | only 1 laser in inventory |
| | EMS/ Ultrasound Combo | PERMANENT | COMBOCARE | S2C1210700021 | 2021 | GOOD | |
| | EMS/ Ultrasound Combo | PERMANENT | COMBOCARE | S2C1210300180 | 2021 | GOOD | |
| | EMS/ Ultrasound Combo | N/A | | | | | |
| | EMS/ Ultrasound Combo | N/A | | | | | |
| | 3 Tens Muscle Stimulator | PERMANENT | ROSCOE MEDICAL | S2S210322282 | 2021 | GOOD | ONLY 2 IN INVENTORY |
| | Vibrator machine | PERMANENT | ROSCOE MEDICAL | S2S210322282 | 2021 | GOOD | |
| | Treadmill machine | PERMANENT | EXEPEUTIC | 1.20132E+14 | 2021 | GOOD | |
| | Exercise bike machine | PERMANENT | EEKEE | UNKNOWN | UNKNOWN | GOOD | |
| | Freezer | PERMANENT | MIDEA | 343-D8147206 | 2021 | GOOD | |
| | Hydrocollator | PERMANENT | CHATTANOOGA | 726200C | Apr-22 | GOOD | |
| | 5 Massage Therapy Beds | PERMANENT | UNKNOWN | UNKNOWN | UNKNOWN | GOOD | |
| | Gel Warmers | PERMANENT | THERMASONIC | UNKNOWN | UNKNOWN | GOOD | ONLY 1 IN INVENTORY |
| | Gel Warmers | PERMANENT | THERMASONIC | UNKNOWN | UNKNOWN | GOOD | |
| | 1 Pulley Systems | PERMANENT | BAILEY | UNKNOWN | UNKNOWN | GOOD | |
| | 1Shoulder Wheel | PERMANENT | CANDO | UNKNOWN | UNKNOWN | GOOD | |
| | Digital Ladder | PERMANENT | CANDO | UNKNOWN | UNKNOWN | GOOD | |

| Pasco | Updated By: | | | Date: | | Calibration Completed: | Annual Inspection done on 3/08/2024 |
|---|---|---|---|---|---|---|---|
| Specialty | Equipment | Portable or Permement | Brand | Series # | Age of Machine | Working Condition | Comments |
| Podiatrist | Nail Treatment Laser Machine | none | | | | | |
| | Nail Treatment Laser Machine | none | | | | | |
| | Drill | none | | | | | Maybe provider have with her but not in the office |
| | Electrical Podiatry chair | Permanent | UNKNOW | | New | Good | |
| Ortho | Centrifuges | N/A | | | | | |
| | Centrifuges | N/A | | | | | |
| Psych | None | N/A | | | | | |
| Dermatologist | | N/A | | | | | |
| | Hyfrecator AARON | N/A | | | | | |
| Optometry | Manual Refractor | N/A | | | | | |
| | Proropter | N/A | | | | | |
| | Slit lamp gilras | N/A | | | | | |
| | Tonometer | N/A | | | | | |
| | Lensometer | N/A | | | | | |
| | Optometry Chair | N/A | | | | | |
| Chiro | Stretch bed | N/A | | | | | |
| Dental | Dental Chair | N/A | | | | | |
| | Dental Stool | N/A | | | | | |
| | Assitant Stool | N/A | | | | | |
| | Ultrasonic Cleaner | N/A | | | | | |
| | Sterilization Autoclave | N/A | | | | | |
| | Spix Digital Sensor | N/A | | | | | |
| Labatory | 2Centrifuge | Portable | Quest/Labcorp | Quest 17071.3cj018 | 5 years | Good | Labcorp SN:181113DT676 |
| | Abbott Covid machine | Portable | ABBOTT | 7CDCF41C | 2 years | Good | |
| | Urine dipstick machine | Portable | MCkesson | 197T1008052 | 5 years | Good | |
| Primary Care Providers | Otoscope | Permanent | WELCH aLLYN | | 5 years | Good | |
| | 1 Spirometry machines | Portable | ORBIT | | 5 years | Good | |
| | 1 EKG machines | Portable | QRS | | 5 years | Good | |
| | Dipstick machine | Portable | McKensson | | 5 years | Good | |
| | Centrifuge | Portable | Quest/Labcorp | Quest 17071k3cj018 | 5 years | Good | Labcorp SN:181113DT676 |
| Radiology | Ultrasound Machine | Portable | | | | | TECH HAS THE INFO |
| | Ultrasound Machine | Portable | | | | | TECH HAS THE INFO |
| Acupuncture | X-ray Machine | N/A | | | | | |
| | 2-Electrical stimulator machine | N/A | | | | | |
| Massage Therapy | 1 Waterbed | Permanent | MASSAGE TIME PRO | | 5 years | Good | |
| | 1 Traction table | | | | | | |
| | 1 Parafin Machine | PORTABLE | PARAMED | | 5 years | Good | |
| | 1 Handheld laser machines | Portable | TQ·SOLO | | 5 years | Good | |
| | EMS/Ultrasound combo | Portable | COMBO-CAVE | | 5 years | Good | |
| | 8 TENSMuscle Stimulator | N/A | | | | | |
| | Vibrator machine | Portable | | | | | |
| | Treadmill machine | N/A | | | | | |
| | Exercise bike machine | N/A | | | | | |
| | Freezer | N/A | | | | | |
| | Hydrocollator | N/A | | | | | |
| | 5 lotion warmers | N/A | | | | | |
| | Massage Therapy Beds | Portable | | | 5 years | Good | |
| | 5 Gel Warmers | Portable | | | | | |
| | 1 Bolsters | Portable | | | | | |
| | Pulley Systems | Permanent | | | 5 years | Good | |
| | Shoulder Wheel | N/A | | | | | |
| | Digital Ladder | N/A | | | | | |

| Fowler | Updated By: Karen Gerena | | | Date: July 26, 2024 | | Calibration Completed: | Annual Inspection done on 3/01/2024 |
|---|---|---|---|---|---|---|---|
| Specialty | Equipment | Portable or Permanent | Brand | Series # | Age of Machine | Working Condition | Comments |
| Podiatrist | Nail Treatment Laser Machine | NA | | | | | |
| | Nail Treatment Laser Machine | N/A | | | | | |
| | Drill | N/A | | | | | |
| | Electrical Podiatry chair | N/A | | | | | |
| Ortho | Centrifuges | portable | Mckesson | 172103644 | UNKNOWN | GOOD | |
| | Centrifuges | | | | | | |
| Psych | N/A | | | | | | |
| Dermatologist | Hyfrecator AARON | NA | | | | | |
| | Manual Refractor | NA | | | | | |
| | Proropter | NA | | | | | |
| | Slit lamp plnas | NA | | | | | |
| | Tonometer | NA | | | | | |
| | Lensometer | NA | | | | | |
| Optometry | Optometry Chair | NA | | | | | |
| | Strech bed | NA | | | | | |
| Chiro | Dental Chair | NA | | | | | |
| | Dental Stool | NA | | | | | |
| | Assitant Stool | NA | | | | | |
| | Ultrasonic Cleaner | NA | | | | | |
| | Sterilization Autoclave | NA | | | | | |
| | Spin Digital Sensor | NA | | | | | |
| Dental | Centrifuge | portable | laborig | 18111307679 | | 9-Oct | GOOD |
| | Centrifuge | portable | Quest | 16111318T085 | | 16-Nov | GOOD |
| | Centrifuge | | | | | | |
| Laboratory | EKG Machine | portable | QRS | | 1022253 | 2014 | GOOD |
| | Abbott Covid machine | portable | Abbott | 2T1A711601 | unKNOWN | | GOOD |
| | Urine dipstick machine | portable | Mckesson | 19711008099 | UNKNOWN | | GOOD |
| | Holter | n/a | | | | | |
| Primary Care Providers | Spirometry | portable | Orbitz | | 20131214701 | 2013 | GOOD |
| Cardiologist | EKG Machine | NA | | | | | |
| Pharmacy | Quick Meds Dispensing Unit | NA | | | | | |
| | Ultrasound Machine | Portable | Electrical Safety | 102636 | 5 YEARS OLD | FAIR | INSPECTION DUE 2/2025 |
| Radiology | Ultrasound Machine | Portable | Alpinion | 102057 | 5 YEARS OLD | FAIR | LAST CALIBRATED 6/22/2023 - INSPECTION DUE 7/2024 |
| | Xray Machines | NA | | | | | |
| Acupuncture | Infrared Lamp | NA | | | | | |
| | Infrared Lamp | NA | | | | | |
| | Electrical stimulator machine | NA | | | | | |
| | Electrical stimulator machine | NA | | | | | |
| | 1 Waterbed | N/A | | | | | |
| | 1 Traction table | NA | | | | | |
| | 1 Paraffin Machine | Portable | Paramed | | 200760659 | UNKNOWN | GOOD |
| | 3 Handheld laser machines | NA | | | | | |
| | EMS/ Ultrasound Combo | Portable | Combocare | CSICS210300178 | | 21-Mar | GOOD |
| | EMS/ Ultrasound Combo | | | | | | |
| | EMS/ Ultrasound Combo | | | | | | |
| | EMS/ Ultrasound Combo | | | | | | |
| | 3 Tens Muscle Stimulator | | | | | | |
| | Vibrator machine | NA | | | | | |
| | Vibrator machine | NA | | | | | |
| | Vibrator machine | NA | | | | | |
| | Treadmill machine | NA | | | | | |
| | Exercise bike machine | NA | | | | | |
| | Shoulder Wheel | Permanent | Camden | | 101160 | UNKNOWN | GOOD |
| | Hydroculator | NA | | | | | |
| | 5 Massage Therapy Beds | NA | | | | | |
| Massage Therapy | Gel Warmers | Permanent | Parker Tempisonic | | | | GOOD |

| Plant City | Updated By: | | | Date: | | Calibration Completed: | Annual Inspection done on 1/23/2024 |
|---|---|---|---|---|---|---|---|
| Specialty | Equipment | Portable or Permenent | Brand | Series # | Age of Machine | Working Condition | Comments |
| | N/A | | | | | | |
| | N/A | | | | | | |
| Podiatrist | N/A | | | | | | |
| Ortho | N/A | | | | | | |
| Psych | N/A | | | | | | |
| | N/A | | | | | | |
| Dermatologist | N/A | | | | | | |
| | N/A | | | | | | |
| | N/A | | | | | | |
| | N/A | | | | | | |
| | N/A | | | | | | |
| Optometry | N/A | | | | | | |
| | N/A | | | | | | |
| Chiro | N/A | | | | | | |
| | N/A | | | | | | |
| | N/A | | | | | | |
| | N/A | | | | | | |
| | N/A | | | | | | |
| | N/A | | | | | | |
| Dental | N/A | | | | | | |
| | 2 Centrifuge | Portable | LabCorp | 6420labcorp | Unknow | Good | Serial Num. 181113DT673 |
| Laboratory | Abbott Covid machine | Portable | Abbott | 8BFAF41C | 2 years | Good | |
| | Centrifuge | Portable | Quest | 642Equest | unknow | Good | Serial Num. 180E130K217 |
| | EKG Machine | 3 Otoscope | QRS | 2018-0851-66-3 | Unknow | Good | |
| | Urine dipstick machine | Portable | | | | | |
| Primary Care Providers | 1 Spirometry machines | Portable | Portable | QRS | 2018-03-3062-1 | Unknow | Good |
| Cardiologist | Holter | N/A | | | | | |
| Pharmacy | N/A | | | | | | |
| Radiology | N/A | | | | | | |
| Acupuncture | N/A | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Massage Therapy | | | | | | | |

| Pinellas | Updated By: | | | Date: | | Calibration Completed: | Annual Inspection done on 2/28/2024 |
|---|---|---|---|---|---|---|---|
| Specialty | Equipment | Portable or Permenent | Brand | Series # | Age of Machine | Working Condition | Comments |
| Podiatrist | Nail Treatment Laser Machine | N/A | | | | | |
| | Nail Treatment Laser Machine | N/A | | | | | |
| | Drill | PORTABLE | UNKNOWN | UNKNOWN | UNKNOWN | GOOD | |
| | Electrical Podiatry chair | PERMENENT | UNKNOWN | A802022090101-45 | UNKNOWN | GOOD | |
| Ortho | Centrifuges | N/A | | | | | |
| | Centrifuges | N/A | | | | | |
| Psych | N/A | N/A | | | | | |
| Dermatologist | Hyfrecator AARON | N/A | | | | | |
| | Manual Refractor | N/A | | | | | |
| Optometry | Procopter | N/A | | | | | |
| | Slit lamp gilras | N/A | | | | | |
| | Tonometer | N/A | | | | | |
| | Lensometer | N/A | | | | | |
| | Optometry Chair | N/A | | | | | |
| Chiro | Stretch bed | N/A | | | | | |
| Dental | Dental Chair | N/A | | | | | |
| | Dental Stool | N/A | | | | | |
| | Assitant Stool | N/A | | | | | |
| | Ultrasonic Cleaner | N/A | | | | | |
| | Sterilization Autoclave | N/A | | | | | |
| | Spin Digital Sensor | N/A | | | | | |
| | | | | | | | |
| Labatory | Centrifuge | PERMENENT | Drucker Diagnostics | 18111307674 | UNKNOWN | GOOD | |
| | Centrifuge | PERMENENT | Drucker Diagnostics | 18021303309 | UNKNOWN | GOOD | |
| | Centrifuge | N/A | N/A | N/A | N/A | N/A | |
| Primary Care Providers | EKG Machine | Portable | QRS | 2013-09-3210-1 | UNKNOWN | GOOD | |
| | Abbott Covid machine | Portable | ABBOTT | SA17F51C | 2020 | GOOD | |
| | Urine dipstick machine | N/A | N/A | NA | N/A | N/A | |
| | Holter | N/A | | | | | |
| | Holter | N/A | | | | | |
| Cardiologist | EKG Machine | N/A | | | | | |
| Pharmacy | Quick Meds Dispensing Unit | N/A | | | | | |
| Radiology | Ultrasound Machine | PORTABLE | Alpinion | UNKNOWN | UNKNOWN | GOOD | |
| | Xray Machines | PERMENENT | RALCO | 2112733 | 2021 | GOOD | |
| Acupuncture | Infrared Lamp | N/A | | | | | |
| | Infrared Lamp | N/A | | | | | |
| | Electrical stimulator machine | N/A | | | | | |
| | Electrical stimulator machine | N/A | | | | | |
| Massage Therapy | 1 Waterbed | PORTABLE | MASSAGE TIME PRO | UNKNOWN | 2022 | GOOD | |
| | 1 Traction table | n/a | | | | | |
| | 2 Paraffin Machine | PORTABLE | danamed | 57C1210400011 | UNKNOWN | GOOD | |
| | 2 Handheld laser machines | PORTABLE | TQ SOLO | | UNKNOWN | GOOD | |
| | EMS/ Ultrasound Combo | PORTABLE | RICHMAN | 52C1210400011 | UNKNOWN | GOOD | |
| | EMS/ Ultrasound Combo | PORTABLE | RICHMAN | 52C1210300228 | UNKNOWN | GOOD | |
| | 3 Tins Muscle Stimulator | PORTABLE | TENS | UNKNOWN | UNKNOWN | GOOD | |
| | Vibrator machine | PORTABLE | CONFIDENCE FITNESS | HSM-08VF | 2022 | GOOD | |
| | Vibrator machine | N/A | | | | | |
| | Vibrator machine | N/A | | | | | |
| | Treadmill machine | PORTABLE | EXERPEUTIC | E238026 | 2022 | GOOD | |
| | Exercise bike machine | PORTABLE | SUNNY HEALTH & FITNESS | WA33000046168S0275 | 2022 | GOOD | |
| | Freezer | PORTABLE | KOLLATRON | KCW99-202106-01343 | 2022 | GOOD | |
| | Hydrocollator | Portable | CHATTANOOGA | 724490C | 2022 | GOOD | |
| | 5 Massage Therapy Beds | | | | | GOOD | |
| | Gel Warmers | PORTABLE | THERMASONIC | 82-03 | UNKNOWN | GOOD | |
| | Gel Warmers | PORTABLE | THERMASONIC | UNKNOWN | UNKNOWN | GOOD | |
| | Gel Warmers | N/A | | | | | |
| | Gel Warmers | N/A | | | | | |
| | Gel Warmers | N/A | | | | | |
| | 10 Bolsters | N/A | | | | | |
| | 1 Pulley Systems | PERMENENT | BAILEY | UNKNOWN | UNKNOWN | GOOD | |
| | 1Shoulder Wheel | PERMENENT | CANDO | UNKNOWN | UNKNOWN | GOOD | |
| | Digital Ladder | PERMENENT | CANDO | UNKNOWN | UNKNOWN | GOOD | |

| Hialeah East | Updated By: | | | Date: | | Calibration Completed! | |
| Speciality | Equipment | Portable or Permanent | Brand | Series # | Age of Machine | Working Condition | Comments |
|---|---|---|---|---|---|---|---|
| Podiatrist | Nail Treatment Laser Machine | | Lunula laser by Erchonia | FIS-01113 | 2022 | Good | Share with N.M. East, Miami Beach & Hollywood |
| | Nail Treatment Laser Machine | | | | | | |
| | Drill | | | | | | |
| | Electrical Podiatry chair | Permanent | | | | | |
| Ortho | Centrifuges | Permanent | Hill | HA070522 | | Good | |
| | Centrifuges | Permanent | McKesson | 172011990 | 2012 | Good | |
| | Centrifuges | Permanent | McKesson | 172011907 | 2012 | Good | |
| Psych | N/A | | | | | | |
| Dermatologist | Hyfrecator AARON | | None | | | | |
| | Manual Refractor | | | | | | |
| | Puroptor | | | | | | |
| Optometry | Slit lamp glass | | | | | | |
| | Tonometer | | | | | | |
| | Lensometer | | | | | | |
| | Optometry Chair | | | | | | |
| Chiro | Stretch bed | Permanent | Leander | N/A | | Poor | |
| Dental | Dental Chair | | | | | | |
| | Dental Stool | | | | | | |
| | Assitant Stool | | | | | | |
| | Ultrasonic Cleaner | | | | | | |
| | Sterilization Autoclave | | | | | | |
| | Spa Digital Sensor | | | | | | |
| | Centrifuge | Permanent | Drucken | 19031EA457 | | Good | 1 |
| | Centrifuge | Permanent | Drucken | 2101G4403 | | Good | 1 |
| | Centrifuge | Permanent | Horizon | 19061EM312 | | Good | 1 |
| | EKG Machine | Permanent | Bionet | V0V00288 | | Good | 2 |
| Labatory | Abbott Covid machine | Permanent | Abbott | AA13EB1C | 2022/05 | | |
| | Urine dipstick machine | | McKesson | 19110092 | Mar-16 | Good | |
| | Holter | | Midmark | 392997 | 2011 | Good | 1 |
| | Holter | | Midmark | 397219 | 2019/12 | Good | 1 |
| Cardiologist | EKG Machine | | Bionet | EG0700065 | | Broken | |
| Pharmacy | Quick Meds Dispensing Unit | | Vision | 3483 | 2022/08 | Good | |
| Radiology | Ultrasound Machine | | Algision | 30618 | 2017/06 | Good | 1 |
| | Xray Machines | | Eureka | F264115 | Jun-06 | Poor | Collemator |
| | Xray Machine | | Eureka | A0721320 | Apr-91 | Poor | Xray Tube |
| | Infrared Lamp | | Top | 171000700012.00 | Oct-17 | Good | |
| | Infrared Lamp | | Top | 190300011020 | 2019 | Good | |
| | Electrical stimulator machine | | ADP | 2366488 | None | Good | |
| | Electrical stimulator machine | | ADP | 2385541 | 2018 | Good | |
| Acupuncture | 1 Waterbed | | | None | | Good | |
| | 1 Traction table | | Chattanooga | None | | Good | |
| | 2 Paraffin Machine | | Paramed | None | | Good | |
| | 2 Handheld Laser machines | | TQ Solo | None | | Good | |
| | EMU Ultrasound Combo | | Richmar | SZ212100157 | | Good | |
| | EMU Ultrasound Combo | | Richmar | C11030041 | | Good | |
| | EMU Ultrasound Combo | | Richmar | 1170500073 | | Good | |
| | EMU Ultrasound Combo | | Richmar | SZC112050096 | | Good | |
| | 3 Tens Muscle Stimulator | | Tens 3000 | None | | Good | |
| | Vibrator machine | | BTT massage | None | | Good | |
| | Vibrator machine | | None | None | | Good | |
| Massage Therapy | Vibrator machine | | None | 312532 | | Good | |
| | Treadmill machine | | N/A | 312530 | | Good | |
| | Exercise bike machine | | Marcy | None | | Good | |
| | Freezer | | Premium | None | | Good | |
| | Hydrocollator | | Hydrocollator | 32407 | | Good | |
| | 5 Massage Therapy Beds | | None | None | | Good | |
| | Gel Warmers | | None | 05101001 | | Good | |

| | | | |
|---|---|---|---|
| Gel Warmers | None | 0418052 | |
| Gel Warmers | None | 0418137 | |
| Gel Warmers | None | 1118090 | |
| Gel Warmers | None | 0219217 | |
| 10 Bolsters | None | None | Good |
| 1 Pulley Systems | None | None | Good |
| 1 Shoulder Wheel | Bailey | 074353 | Good |
| Digital Ladder | N/A | N/A | |

| Hialeah West | Updated By: | | | Date: | | Calibration Completed: | |
|---|---|---|---|---|---|---|---|
| **Specialty** | **Equipment** | **Portable or Permenent** | **Brand** | **Series #** | **Age of Machine** | **Working Condition** | **Comments** |
| Podiatrist | Nail Treatment Laser Machine | Portable | LunulaLaser by Erchonia | FF5-01150 | 2022 | Good | Share with Miami, Miami Lakes, Sweetwater & Tamarac. |
| | Nail Treatment Laser Machine | | | | | | |
| | Drill | Portable | Dremell | N/A | | | |
| | Electrical Podiatry chair | | Midmark | V2173458 | | Good | |
| Ortho | Centrifuges | | Regenlab | 190488AJ470 | | Good | |
| | Centrifuges | | Quest dx. | 210413G4441 | | Good | |
| Psych | N/A | | | | | | |
| Dermatologist | Hyfrecator AARON | | Bovie Derm 942 | 13403J19034 | | Good | |
| Optometry | Manual Refractor | | | | | | |
| | Proroptor | | | | | | |
| | Slit lamp gilras | Permenent | Topcon | 4118132 | | Good | |
| | Tonometer | | | | | | |
| | Lensometer | | Topcon | 4118132 | | | |
| | Optometry Chair | | S4 | 3151800224 | | | |
| Chiro | Stretch bed | | | | | | |
| Labatory | 3 Dental Chair | | SDS | 16119201072 | | | |
| | 3 Dental Stool | | N/A | N/A | | | |
| | 3 Assitant Stool | | N/A | N/A | | | |
| | Ultrasonic Cleaner | | TPS | 1815P06120 | | | |
| | Sterilization Autoclave | | Tuttnauer | 18081481 | | | |
| | Spix Digital Sensor | | | | | | |
| | Xrays Machine | | Belmont | EHI3E0185 | | | |
| | Panoramic | | Kavo | IO 1904502 | | | |
| | Hand Piece | | Bufalo | N/A | | | |
| | Cabitron | | Acclean Ultra | A03203BI | | | |
| | Cabitron | | Parkell | 282875 | | | |
| | Centrifuge | | Horizon | 210413G4441 | | Good | |
| | Centrifuge | | | | | | |
| | Centrifuge | | | | | | |
| Primary Care Providers | EKG Machine | permanent | Bionet | ELO100129 | | Good | |
| | Abbott Covid machine | permanent | Abbott | 60T2EG1C | | Good | |
| | 3 Otoscope | Portable | Welch Allyn | N/A | | Good | 3 |
| | Freezer | permanent | Emerson | N/A | | Good | |
| | Holter | Portable | Midmark | 397863 | | Good | |
| | Holter | Portable | Midmark | 397864 | | Good | |
| Cardiologist | EKG Machine | | Schiller | 2904843 | | Good | |
| Pharmacy | Quick Meds Dispensing Unit | | N/A | | | | |
| Radiology | Ultrasound Machine | Portable | GE | | | | |
| | Xray Machines | | | | | | |
| Acupuncture | Infrared Lamp | Portable | Great Wall | 2015Z091334 | | Good | |
| Primary Care Providers | | permanent | Ritter bt Midmark | V2510189 | | Good | 5 |
| | Infrared Lamp | | | | | | |
| | | | Welch Allyn | 7.32094E+11 | | Good | 6 |
| | Electrical stimulator machine | | | | | | |
| | 1 Waterbed | | | | | | |
| | 1 Traction table | | | | | | |
| | 2 Paraffinn Machine | | | | | | |
| | 2 Handheld laser machines | | | | | | |
| | EMS/ Ultrasound Combo | | | | | | |
| | EMS/ Ultrasound Combo | | | | | | |
| | EMS/ Ultrasound Combo | | | | | | |
| | 3 Tins Muscle Stimulator | | | | | | |
| | Vibrator machine | | | | | | |
| | Vibrator machine | | | | | | |
| | Vibrator machine | | | | | | |
| | Treadmill machine | | | | | | |
| | Exercise bike machine | | | | | | |
| | Freezer | | | | | | |
| | Hydrocollator | | | | | | |
| | 5 Massage Therapy Beds | | | | | | |
| | Gel Warmers | | | | | | |
| | Gel Warmers | | | | | | |
| | Gel Warmers | | | | | | |
| | Gel Warmers | | | | | | |
| | 10 Bolsters | | | | | | |
| | 1 Pulley Systems | | | | | | |
| | 1Shoulder Wheel | | | | | | |
| | Digital Ladder | | | | | | |

| North Miami East | Updated By: | | | Date: | | Calibration Completed: | |
| Specialty | Equipment | Portable or Permanent | Brand | Series # | Age of Machine | Working Condition | Comments |
|---|---|---|---|---|---|---|---|
| Podiatrist | Nail Treatment Laser Machine | | Lumilase by Erchonia | FFS-01113 | 2022 | Good | Share with: Miami Beach, Hialeah East & Hollywood |
| | Nail Treatment Laser Machine | | | | | | |
| | Drill | | | | | | |
| | Electrical Podiatry chair | | Hill Adjustable | AA0706524 | | Good | |
| | Electrical Podiatry chair | | Ritter 75 Special Edition | DF1383 | | Good | |
| Ortho | Centrifuges | | Horizon | 20021856225 | 2020 | Good | |
| Psych | Centrifuges | | McKoson | LT20M239 | | Good | |
| Dermatologist | N/A | | | | | | |
| | Hydrocate AARON | | | | | | |
| | Manual Refractor | | | | | | |
| Optometry | Phoropter | | Marco | 30143 | | Good | |
| | Slit lamp atlas | | Ibox | 15091300024 | | Good | |
| | Tonometer | | | 250213256 | | Good | |
| | Lensometer | | Marco | 13885 | | Good | |
| Chiro | Optometry Chair | | | | | | |
| | Stretch bed | | | | | | |
| Dental | Dental Chair | | Eagle Dental Systems | 96540 | | Good | |
| | Dental Chair | | Summit Dental Systems | | | Good | |
| | Dental Chair | | Belmont | 082704-00007 | | Good | |
| | Dental Stool | | SDS | VW21190162 | | Good | |
| | Dental Stool | | Crow Seating | 3071256051 | | Good | |
| | Dental Stool | | Crow Seating | 30570 | | Good | |
| | Asstant Stool | | SDS | 65645 | | Good | |
| | Asstant Stool | | Crow Seating | 8012500059 | | Good | |
| | Ultrasonic Cleaner | | TPC | 65645 | | Good | |
| | Sterilization Autoclave | | Midmark | D500100003 | | Good | |
| | Spix Digital Sensor | | Acteon | V120687 | | Good | |
| | | | | 580241754 | | Good | |
| Labatory | Centrifuge | | Horizon | 16011 3AX840 | | Good | |
| | Centrifuge | | Horizon | 18013 3C7751 | | Good | |
| | Centrifuge | | Ducker | 22031 3M012 | | Good | |
| Primary Care Providers | EKG Machine | | Bionet | ES0200117 | | Not Working | |
| | EKG Machine | | Bionet | EP0900146 | | Good | |
| | Abbott Covid machine | | Alere | D4100001C | | Good | |
| | Urine dipstick machine | | N/A | N/A | | | |
| | Holter | | Midmark | 397782 | 1/16/2020 | Good | |
| | Holter | | Midmark | 397737 | 12/27/2019 | Good | |
| Cardiologist | Holter | | Midmark | 395487 | 2015 | Good | |
| Pharmacy | EKG Machine | | Bionet | ET0600087 | | Good | |
| Radiology | Quick Meds Dispensing Unit | | Jolmar | 1414 | 7/28/2009 | good | |
| | Ultrasound Machine | Permanent | Alpinion | M00041 | 2019 | Good | |
| Acupuncture | Xray Machines | | | | | | |
| | Infrared Lamp | | Interick | 170800113 | 2017 | Good | |
| | Infrared Lamp | | | | | | |
| COM | Electrical stimulator machine | Permanent | Combo Care | | | | |
| | Electrical stimulator machine | Permanent | Combo Care | | | | |
| | 1 Waterbed | Permanent | N/A | | | BAD | |
| | 1 Traction table | Permanent | Chattanooga | T3285 | | Good | |
| | 1 Paraffin Machine | Permanent | Chattanooga | | | | |
| | 2 Handheld laser machines | Permanent | TQ SOLO | | | | |
| | EMV/Ultrasound Combo | Permanent | Combo Care | SZC1170500088 | | Good | |
| | EMV/Ultrasound Combo | Permanent | Combo Care | SZC1170500054 | | Good | |
| | 3 Tins Muscle Stimulator | Permanent | | | | | |
| | Vibrator machine | Permanent | Confidence | MSC00101 | | Good | |
| | Treadmill machine | Permanent | Alexia | AA72A0A04146 | | Good | |
| | Exercise bike machine | Permanent | Reebok | Trainer Rx3.5 | | Good | |
| | Freezer | Permanent | Magicuhler | 2103013085 | | Good | |

| | | | | |
|---|---|---|---|---|
| Hydrocollator | Permanent | | | |
| 5 Massage Therapy Beds | Permanent | Chattanooga | T19900C | Good |
| 5 Massage Therapy Beds | Permanent | Winco | FDW897I0A | Good |
| 5 Massage Therapy Beds | Permanent | Winco | 85110S212 | Good |
| Gel Warmers | Permanent | Ideal Products | 85110S471 | Good |
| Gel Warmers | Permanent | Ideal Products | 318695 | Good |
| Gel Warmers | Permanent | Ideal Products | 1218150 | Good |
| Gel Warmers | Permanent | Thermasonic | 219218 | Good |
| 10 Bolsters | Permanent | | 28430/CA12 | Good |
| 1 Pulley Systems | Permanent | | | |
| 1Shoulder Wheel | Permanent | | | |
| Digital Ladder | Permanent | | | |

| North Miami West | Updated By: | | | Date: | | Calibration Completed: | Annual Inspection done on 12/27/2023 |
|---|---|---|---|---|---|---|---|
| **Specialty** | **Equipment** | **Portable or Permanent** | **Brand** | **Series #** | **Age of Machine** | **Working Condition** | **Comments** |
| Podiatrist | Nail Treatment Laser Machine | | | | | | |
| | Nail Treatment Laser Machine | | | | | | |
| | Drill | | | | | | |
| | Electrical Podiatry chair | | | | | | Being Requested by Chad 9.6.23 |
| Ortho | Centrifuges | | | | | | |
| | Centrifuges | | | | | | |
| Psych | N/A | | | | | | |
| Dermatologist | Hyfrecator AARON | | | | | | |
| Optometry | Manual Refractor | Permanent | Reichert | 13116-9 | n/a | Yes | |
| | Prorcopter | Permanent | Reichert | 13116-9 | n/a | Yes | |
| | Slit lamp gBras | Permanent | TopCon | 6230029 | n/a | Yes | |
| | Tonometer | Permanent | Luxvision/LPK-2600 | 2012-c153 | 2012 | Yes | |
| | Lensometer | Permanent | Marco | 13885 | n/a | Yes | |
| | Optometry Chair | Permanent | | 5987 | n/a | Yes | |
| Chiro | Stretch bed | | | | | | |
| Dental | Dental Chair | | | | | | |
| | Dental Stool | | | | | | |
| | Assitant Stool | | | | | | |
| | Ultrasonic Cleaner | | | | | | |
| | Sterilization Autoclave | | | | | | |
| | Spix Digital Sensor | | | | | | |
| Labatory | Centrifuge | Permanent | HORIZON MINI/LABCORP | 52112-1756 | 2011 | YES | |
| | Centrifuge | Permanent | POWERSPIN LX/MCKESSON | 172108005 | N/A | YES | |
| | Centrifuge | | | | | | |
| Primary Care Providers | EKG Machine | Permanent | BIONET | EIV0600488 | N/A | YES | |
| | Abbott Covid machine | Permanent | ID NOW | 066EE61C | N/A | YES | |
| | Urine dipstick machine | Permanent | CONSULTDX/MCKESSON | 197T000824 | N/A | YES | |
| | Holter | | | | | | |
| | Holter | | | | | | |
| Cardiologist | EKG Machine | | | | | | |
| Pharmacy | Quick Meds Dispensing Unit | | | | | | |
| Radiology | Ultrasound Machine | Permanent | Alpinion | MX0643 | 2022 | YES | |
| | Xray Machines | | | | | | |
| Acupuncture | Infrared Lamp | | | | | | |
| | Infrared Lamp | | | | | | |
| | Electrical stimulator machine | | | | | | |
| Massage Therapy | Electrical stimulator machine | | | | | | |
| | 1 Waterbed | Permanent | SIDMAR HYDROTHERAPY | N/A | N/A | YES | |
| | 1 Traction table | Permanent | EVERYWAY EVER TRAC | ET-800 | N/A | YES | |
| | 1 Paraffon Machine | Permanent | PARAMED | VLPAP3P3Z | N/A | YES | |
| | 1 Handheld laser machines | Permanent | MULTIRADIANCE TQSOLO | N/A | N/A | YES | |
| | 3 EMS/ Ultrasound Combo | Permanent | RICHMAR COMBO CARE | DQ7844 | N/A | YES | |
| | EMS/ Ultrasound Combo | | | | | | |
| | EMS/ Ultrasound Combo | | | | | | |
| | 2 Tins Muscle Stimulator | Permanent | TENS3000 | N/A | N/A | YES | |
| | 2 Vibrator machine | Permanent | CONFIDANCE VIBRATOR | HSM-08VF | N/A | YES | |
| | Vibrator machine | | | | | | |
| | Vibrator machine | | | | | | |
| | Treadmill machine | Permanent | PARADIGM HEALTH WELLNESS | #N001 | 20-Dec | YES | |
| | Exercise bike machine | Permanent | KEEKEE FITNESS | N/A | N/A | YES | |
| | Freezer | Permanent | DAEWOOD CHEST | DCF-25KW | N/A | YES | |
| | Hydrocollator | Permanent | CHATANOOGA | TZ4H57C | N/A | YES | |
| | 3 Massage Therapy Beds | Permanent | WINCO | 851305414 | N/A | YES | |
| | 3 Gel Warmers | Permanent | PARKER THERMASONIC | #8203 | N/A | YES | |
| | Gel Warmers | | | | | | |
| | Gel Warmers | | | | | | |
| | Gel Warmers | | | | | | |
| | Gel Warmers | | | | | | |
| | 3 Bolsters | Permanent | N/A | N/A | N/A | YES | |
| | 1 Pulley Systems | Permanent | NA | NA | N/A | YES | |
| | 1Shoulder Wheel | Permanent | ALEXIA | HCWLTH660E | N/A | YES | |
| | Digital Ladder | NONE | | | | | |

| Westchester | Updated By: | | | Date: | | Calibration Completed: | Inspection Due for April and June |
|---|---|---|---|---|---|---|---|
| **Specialty** | **Equipment** | **Portable or Permanent** | **Brand** | **Series #** | **Age of Machine** | **Working Condition** | **Comments** |
| Podiatrist | Nail Treatment Laser Machine | Portable | LunulaLaser by Erchonia | FFS-01112 | 2022 | Yes | Share with Lejeune, Bird Road and Homestead |
| | Nail Treatment Laser Machine | Portable | LunulaLaser by Erchonia | FFS-01186 | 2022 | Yes | Share with Lejeune, Bird Road and Homestead |
| | Drill | | | | | | |
| | Electrical Podiatry chair | Permanent | | | | | |
| Ortho | Centrifuges | Permanent | | PENDING | | Yes | |
| | Centrifuges | Permanent | | LT2013930 | | Yes | |
| Psych | N/A | | | | | | |
| Dermatologist | Otoscope | Permanent | WELCH aLLYN | 236 | N/A | Yes | |
| | Hyfrecator AARON | Permanent | aaron | 2A0336047 | N/A | Yes | |
| Optometry | Manual Refractor | Permanent | Ezer | ERF 36000R130959 | N/A | Yes | |
| | Procopter | Permanent | | | | Yes | |
| | Slit lamp gilras | Permanent | Gilras LLC | GR352X08E900039 | N/A | Yes | |
| | Tonometer | Permanent | | | | Yes | |
| | Lensometer | Permanent | Viewlight | LR30VL20130060d9 | N/A | Yes | |
| | Optometry Chair | Permanent | Reliance | 335783 | N/A | Yes | |
| Chiro | Stretch bed | | | | | | |
| Dental | Dental Chair | | | | | | |
| | Dental Stool | | | | | | |
| | Assitant Stool | | | | | | |
| | Ultrasonic Cleaner | | | | | | |
| | Sterilization Autoclave | | | | | | |
| | Spix Digital Sensor | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Labatory | 1 Centrifuge / LabCorp | Permanent | | 200113FD60 | N/A | Yes | |
| | 1 Centrifuge / LabCorp | Permanent | | 2613FN313 | N/A | Yes | |
| | 1 Centrifuge / LabCorp | Permanent | | 21011931E274- | N/A | Yes | |
| | 1 Centrifuge/QuestDiagnostics | Permanent | | 131213226 | N/A | Yes | |
| | Abbott Covid machine | Permanent | | F232203C | N/A | Yes | |
| | Abbott Covid machine | Permanent | | 3630D01C | N/A | Yes | |
| | Urine dipstick machine | Permanent | | | N/A | | |
| Primary Care Providers | EKG machine | Permanent | Cardio Bionet | EXK0900134 | N/A | Yes | |
| | EKG machine | Permanent | Cardio Bionet | EXK0600102 | N/A | Yes | |
| | EKG machine | Permanent | Cardio Bionet | ET0700108 | N/A | Yes | |
| | EKG machine | Permanent | Cardio Bionet | ERO500253 | N/A | Yes | |
| | Spirometry machine | Permanent | | A23C11208 | N/A | Yes | |
| | Spirometry machine | Permanent | | | | | |
| | Urine dipstick machine | Permanent | | 19771009B63 | N/A | Yes | |
| | 1 Centrifuge / Quest Diagnostics | Permanent | | 150613A5381 | N/A | Yes | |
| | Otoscope/6 | Permanent | | No serial number | N/A | Yes | |
| | Otoscope | Permanent | WELCH aLLYN | 08289- | N/A | Yes | |
| | Otoscope | Permanent | WELCH aLLYN | 08099- | N/A | Yes | |
| | Otoscope | Permanent | WELCH aLLYN | 09225- | N/A | Yes | |
| | Otoscope | Permanent | WELCH aLLYN | 092j8 | N/A | Yes | |
| | Otoscope | Permanent | WELCH aLLYN | 9138 | N/A | Yes | |
| | Otoscope | Permanent | WELCH aLLYN | 8099 | N/A | Yes | |
| | Otoscope | Permanent | WELCH aLLYN | 767 | N/A | Yes | |
| | Otoscope | Permanent | WELCH aLLYN | 13252 | N/A | Yes | |
| | Otoscope | Permanent | WELCH aLLYN | 07074- | N/A | yes | |
| Cardiologist | Otoscope | Permanent | WELCH aLLYN | 8117 | UNKNOWN | Yes | |
| | EKG Machine | | | EX0400117 | UNKNOWN | Yes | |
| Pharmacy | Quick Meds Dispensing Unit | Permanent | | L2111220000407 | UNKNOWN | Yes | |
| Radiology | Ultrasound Machine | Permanent | Alpinion | K00951 | | Good | |
| | Ultrasound Machine | Portable | Alpinion | J02636 | | Good | |
| | X-ray Machine (Ste. 103) | Permanent | | | | Yes | |
| | X-ray Machine (Ste. 306) | Permanent | | | | No | Install not complete ; pending piece |
| Acupuncture | 2-Electrical stimulator machine | | | | | | |
| | | | | | | | |
| Massage Therapy | 2 Waterbed | Permanent | | | | | |
| | 1 Traction table | Permanent | CHATANOGA | 82591785592 | N/A | Yes | |
| | 2 Parafin Machine | Permanent | | | | | |
| | Handheld laser machines | Portable | TQ SOLO | 775L1357.20 | n/a | yes | |
| | 6 EMS/Ultrasound combo | Permanent | | | | | |
| | | Permanent | | | | | |
| | 8 TENS Muscle Stimulator | Portable | | | | | |
| | 3 Vibrator machine | Permanent | N/A | MS00821713AA | N/A | Good | |
| | Treadmill machine | Permanent | | | N/A | Good | |
| | Lotion warmer | Permanent | Theramasonic | 1138077 | | Good | |
| | Lotion warmer | Permanent | N/A | | | Good | |
| | Lotion warmer | Permanent | N/A | 817226 | N/A | Good | |
| | Lotion warmer | Permanent | Thermasonic | 1113060A12 | N/A | Good | |
| | EMS/Ultrasound | Permanent | COMBOCARE | C1150100094 | N/A | Good | |
| | Exercise bike machine | Permanent | | | | Good | |
| | Freezer | Permanent | | | | Good | |
| | Hydrocollator | Permanent | | | | Good | |
| | Lotion warmer | Permanent | | 03917R | 4 years | Good | |
| | 9 Massage Therapy Beds | Permanent | Medical Electronics | N/A | 5 | Good | |
| | Lotion warmer | Permanent | Thermasonic | | | Good | |
| | 9 Bolsters | Permanent | Medical Electronics | N/A | 6 YEARS | Good | |
| | 2 Pulley Systems | Permanent | | | | Good | |
| | Shoulder Wheel | Permanent | Bailey Manufature | 48894 | N/A | Good | |
| | Digital Ladder | Permanent | | | | Good | |

| Location | Optometry | Portable or Pernament | Brand | Series # | Age of Machine | Working Condition |
|---|---|---|---|---|---|---|
| **Alton Road** | Optometry Chair | Permanent | | | | Good |
| | Phoropter | Permanent | | | | Good |
| | Slit Lamp | Permanent | | | | Good |
| | Tonometer | | | | | |
| | | | | | | |
| **Bird Road** | Optometry Chair | Permanent | | | | Good |
| | Phoropter | Permanent | | | | Good |
| | Slit Lamp | Permanent | | | | Good |
| | Tonometer | Permanent | | | | |
| | | | | | | |
| **Delray Beach** | Optometry Chair | Permanent | | | | Good |
| | Phoropter | Permanent | | | | Good |
| | Slit Lamp | Permanent | | | | Good |
| | Tonometer | Permanent | | | | Good |
| | | | | | | |
| **Hialeah East** | Optometry Chair | Permanent | | | | Good |
| | Phoropter | Permanent | | | | Good |
| | Slit Lamp | Permanent | | | | Good |
| | Tonometer | Permanent | | | | Good |
| **Fowler** | | | | | | |
| | | | | | | |
| **Hanley** | | | | | | |
| | | | | | | |
| **Hollywood** | Optometry Chair | Permanent | | | | Good |
| | Phoropter | Permanent | | | | Good |
| | Slit Lamp | Permanent | | | | Good |
| | Tonometer | Permanent | | | | Good |
| | | | | | | |
| **Homestead** | Optometry Chair | Permanent | | | | Good |
| | Phoropter | Permanent | | | | Good |
| | Slit Lamp | Permanent | | | | Good |
| | Tonometer | Permanent | | | | Good |
| | | | | | | |
| **Lakeland** | None | | | | | |
| | | | | | | |
| **Lejeune** | Optometry Chair | Permanent | | | | Good |
| | Phoropter | Permanent | | | | Good |
| | Slit Lamp | Permanent | | | | Good |
| | Tonometer | Permanent | | | | Good |
| | | | | | | |
| **Miami** | | | | | | |
| | | | | | | |
| **Miami Lakes** | Optometry Chair | Permanent | | | | Good |
| | Phoropter | Permanent | | | | Good |
| | Slit Lamp | Permanent | | | | Good |
| | Tonometer | Permanent | | | | Good |
| | | | | | | |
| **North Miami East** | Optometry Chair | Permanent | | | | Good |
| | Phoropter | Permanent | | | | Good |
| | Slit Lamp | Permanent | | | | Good |
| | Tonometer | Permanent | | | | Good |
| | | | | | | |
| **North Miami West** | None | | | | | |
| **Orlando** | | | | | | |
| | | | | | | |
| **Palm River** | | | | | | |
| **Palmetto Bay** | | | | | | |
| | | | | | | |
| **Hudson** | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Pinellas Park** | | | | | |
| **Plant City** | | | | | |
| **Sweetwater** | | | | | |
| | | | | | |
| **Tamarac** | Optometry Chair | Permanent | | | Good |
| | Phoropter | Permanent | | | Good |
| | Slit Lamp | Permanent | | | Good |
| | Tonometer | Permanent | | | Good |
| | | | | | |
| **West Hialeah** | Optometry Chair | Permanent | | | Good |
| | Phoropter | Permanent | | | Good |
| | Slit Lamp | Permanent | | | Good |
| | Tonometer | Permanent | | | Good |
| | | | | | |
| **Westchester** | Optometry Chair | Permanent | | | Good |
| | Phoropter | Permanent | | | Good |
| | Slit Lamp | Permanent | | | Good |
| | Tonometer | Permanent | | | Good |
| | Lensometer | | | | |
| | | | | | |
| **Winter Haven** | None | | | | |

| Item # | Description | Mfr # | UOM | Price | | |
|--------|-------------|-------|-----|-------|---|---|
| 860737 | ECG, CARDIOCARE 2000 12CHNL 10LEAD | ECG-2000(N) | EA | $1,051.10 | Orlando | 7/19/2023 |
| | Scale for Delray | | | 399 | 8/21/2023 | |
| | EKG for Miami Lakes | | | | 1/15/2023 | Jorge |

Xray in Westchester 1st floor Removed        Spare: Xray Tubes, control and transformer
Jorge lent us for Alron Xray                 CR- Part that processes the casette

| Location | Dental | Portable or Permement | Brand | Series # | Age of Machine | Working Condition |
|---|---|---|---|---|---|---|
| | Dental Chair | | | | | |
| | | | | | | |
| | | | | | | |
| Alton Road | Ultrasonic Cleaner | | | | | Good |
| | Sterilization Autoclaves | | | | | Good |
| | Spix Digital Sensor | | | | | |
| | | | | | | |
| | Ultrasonic Cleaner | | | | | Good |
| Bird Road | Sterilization Autoclaves | | | | | Good |
| | | | | | | |
| | Ultrasonic Cleaner | | | | | Good |
| Delray Beach | Sterilization Autoclaves | | | | | |
| | | | | | | |
| | | | | | | |
| Hialeah East | | | | | | |
| | | | | | | |
| Fowler | | | | | | |
| | Ultrasonic Cleaner | | | | | |
| Hanley | Sterilization Autoclaves | | | | | |
| | | | | | | |
| | Ultrasonic Cleaner | | | | | |
| Hollywood | Sterilization Autoclaves | | | | | |
| | | | | | | |
| | Ultrasonic Cleaner | | | | | |
| Homestead | Sterilization Autoclaves | | | | | |
| | | | | | | |
| | Ultrasonic Cleaner | None | | | | |
| Lakeland | Sterilization Autoclaves | None | | | | |
| | | | | | | |
| Lejeune | Ultrasonic Cleaner | | | | | |
| | Sterilization Autoclaves | | | | | |
| | | | | | | |
| Miami | | | | | | |
| | | | | | | |
| Miami Lakes | | | | | | |
| | | | | | | |
| North Miami East | Ultrasonic Cleaner | | | | | |
| | Sterilization Autoclaves | | | | | |
| | Kavo OP3D 9X11 FOV | | | | | |
| North Miami West | | | | | | |
| Orlando | Ultrasonic Cleaner | Permanent | | | | Good |
| | Sterilization Autoclaves | Permanent | | | | Good |
| Palm River | | | | | | |
| Palmetto Bay | Ultrasonic Cleaner | | | | | |
| | Sterilization Autoclaves | | | | | |
| Hudson | | | | | | |
| Pinellas Park | | | | | | |
| Plant City | | | | | | |
| Sweetwater | | | | | | |
| | Ultrasonic Cleaner | | | | | |
| Tamarac | Sterilization Autoclaves | | | | | |
| | | | | | | |
| | Ultrasonic Cleaner | | | | | |
| West Hialeah | Sterilization Autoclaves | | | | | |
| | | | | | | |
| | Ultrasonic Cleaner | | | | | |
| | Sterilization Autoclaves | | | | | |
| Westchester | Kavo OP3D 9X11 FOV | | | | | |
| | | | | | | |
| | | | | | | |
| | Ultrasonic Cleaner | | | | | |
| Winter Haven | Sterilization Autoclaves | | | | | |

| CCMC IT Inventory - 2024 | | | | | | | | | | | | | | | |
| Locations | | Asset Count By Location | | | | | | | | | | | | | |
| Center Name | Address | Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi | Firewalls | Net Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27 Ave Miami | 701 NW 27th Ave Miami, FL 33125 | 22 | 5 | 3 | 29 | 9 | 6 | 22 | 5 | 4 | 1 | 1 | 4 | 2 | 15 |
| Access Hanley | 6712 Hanley Rd Tampa, FL 33634 | | 5 | | 4 | | | 4 | | 1 | 1 | 1 | 1 | 1 | 5 |
| Access Lakeland | 2449 US HWY 98N LAKELAND FL 33805 | 2 | 1 | | 1 | | 2 | 1 | | 1 | | 1 | 1 | | |
| Access Palm River | 7867 Palm River Rd, Tampa, FL 33619 | 6 | 6 | | 3 | | | 3 | | 1 | 1 | 1 | | | |
| Access Pasco | 7621 Little Road #100 New Port Richey, Fl 34654 | 4 | 1 | | 2 | | 2 | 2 | | 1 | 1 | 1 | 1 | 1 | 3 |
| Access Plant City | 1302 S Collins St Plant City FL 33563 | 2 | | | 2 | | 1 | 2 | | 1 | 1 | 1 | 1 | 1 | 10 |
| Bird Road | 9611 SW 40th St Miami, FL 33165 | 28 | 3 | 1 | 47 | 9 | 10 | 12 | 7 | 3 | 1 | 3 | 5 | 1 | 12 |
| Delray Beach | 7291 W Atlantic Ave, Delray Beach, FL 33446 | 22 | 2 | | 29 | 8 | 7 | 17 | 4 | 1 | 1 | 1 | 5 | 1 | 8 |
| Dental Hanley | 6704 Hanley Rd, Tampa, FL 33634 | 9 | 2 | 2 | 10 | 3 | 3 | 4 | 2 | 1 | 1 | 1 | 5 | 1 | 3 |
| Doral HQ | 1400 NW 107th Ave, Miami, FL 33172 | 93 | 68 | | 222 | 14 | 30 | 73 | 4 | 10 | 1 | 6 | 20 | 1 | 8 |
| Fowler | 11531 N. 56th St #103, Temple Terrace, FL 33617 | 17 | 10 | 2 | 16 | 7 | 2 | 16 | 3 | 2 | 1 | 1 | 2 | 1 | 10 |
| Hanley | 6726 Hanley Rd, Tampa, FL 33634 | 23 | 15 | 5 | 29 | 12 | 2 | 15 | 1 | 2 | 1 | 1 | 1 | 1 | 12 |
| Hanley Office2 | 6710 Hanley Rd, Tampa, FL 33634 | 18 | 7 | 3 | 32 | 14 | 10 | 17 | 1 | 1 | 1 | 1 | 1 | 1 | 10 |
| Hialeah East | 551 E 49th St, Hialeah, FL 33013 | 34 | 3 | 2 | 58 | 14 | 11 | 30 | 5 | 3 | 1 | 2 | 7 | 2 | 29 |
| Hialeah West | 4980 W 10th Ave Hialeah, 33012 | 29 | 4 | 5 | 54 | 15 | 10 | 32 | 9 | 2 | 1 | 2 | 6 | 1 | 16 |
| Hollywood | 750 S Federal Hwy, Hollywood, FL 33020 | 32 | 4 | 3 | 44 | 9 | 8 | 15 | 5 | 2 | 1 | 3 | 3 | 1 | 10 |
| Homestead | 151 NW 11th St E102, Homestead, FL 33030 | 36 | 12 | 5 | 40 | 12 | 13 | 25 | 4 | 1 | 1 | 2 | 4 | 2 | 9 |
| Lakeland | 2417 US HWY 98N LAKELAND FL 33805 | 19 | 3 | 4 | 19 | 7 | 12 | 11 | 6 | 2 | 1 | 2 | 4 | 2 | 15 |
| LeJeune | 351 NW 42nd Ave 503, Miami, FL 33126 | 29 | 3 | 5 | 31 | 7 | 8 | 16 | 7 | 3 | 1 | 2 | 1 | 1 | 6 |
| Medicaid Pasco | 7455 Laredo Dr, Bayonet Point, FL 34667 | 5 | 4 | 1 | 10 | 5 | | 5 | 1 | 1 | 1 | 1 | 1 | 1 | 5 |
| Miami Beach | 1200 Alton Rd Miami Beach, FL 33139 | 46 | 10 | 5 | 46 | 14 | 15 | 20 | 1 | 6 | 1 | 5 | 6 | 2 | 26 |
| Miami Lakes | 18590 NW 67th Ave Miami Lakes, 33015 | 20 | 6 | 3 | 29 | 9 | 6 | 19 | 2 | 3 | 1 | 2 | 4 | 2 | 14 |
| North Miami East | 12550 Biscayne Blvd North Miami, FL 33181 | 29 | 5 | 5 | 29 | 8 | 14 | 19 | 5 | 2 | 1 | 3 | 3 | 1 | 14 |
| North Miami West | 12650 W Dixie Hwy, North Miami, FL 33161 | 22 | 2 | 5 | 47 | 4 | 5 | 25 | 1 | 5 | 1 | 2 | 6 | 1 | 8 |
| North Miami West AC | 12615 W Dixie Hwy 1st Floor, North Miami, FL 33161 | 3 | 1 | | | | | 3 | 1 | 2 | 1 | 1 | | 1 | 14 |
| Orlando | 1303 S Semoran Blvd, Orlando, FL 32807 | 33 | 5 | 3 | 42 | 6 | 8 | 12 | 3 | 5 | 1 | 3 | 2 | 2 | 26 |
| Palm River | 7444 E. Palm River Rd, Tampa FL 33619 | 13 | 12 | 5 | 23 | 9 | 4 | 10 | 3 | 3 | 1 | 1 | 2 | 1 | 7 |
| Palmetto Bay | 9861 E Fern St, Palmetto Bay, FL 33157 | 20 | 8 | 3 | 22 | 9 | 3 | 13 | 3 | 1 | 1 | 2 | 3 | 1 | 14 |
| Pasco | 7463 State Road 52, Hudson FL 34667 | 14 | 4 | 4 | 26 | 8 | 3 | 13 | 1 | 2 | 1 | 1 | 2 | 1 | 12 |
| Pinellas | 6245 66th Street N, Pinellas Park, FL 33781 | 11 | 5 | 3 | 25 | 11 | 5 | 12 | 2 | 2 | 1 | 1 | 2 | 1 | 16 |
| Plant City | 1608 W. Oak Avenue, Plant City, FL 33563 | 11 | 9 | 1 | 15 | 3 | 3 | 8 | 2 | 2 | 1 | 1 | 2 | 1 | 10 |
| QTS Data Center | 11234 NW 20th St, Miami, FL 33172 | 5 | | | | | | | | | | 2 | 1 | | |
| Sweetwater | 11200 W Flagler St, Miami, FL 33174 | 23 | 1 | 3 | 41 | 14 | 6 | 25 | 3 | 1 | 1 | 3 | 5 | 2 | 16 |
| Tamarac | 7495 N University Dr, Tamarac, FL 33321 | 10 | 1 | 3 | 28 | 9 | 6 | 15 | 4 | 2 | 1 | 1 | 1 | 1 | 6 |
| Tamarac Dental | 7455 N University Dr, Tamarac, FL 33321 | 9 | 2 | | | | | | | | 1 | 1 | | 1 | 8 |
| Westchester | 7500 SW 8th St, Miami, FL 33144 | 96 | 35 | 10 | 141 | 49 | 27 | 57 | 16 | 4 | 1 | 3 | 16 | 3 | 26 |
| Winter Haven | 201 1st St S, 1st Floor, Winter Haven, FL 33880 | 36 | 3 | 3 | 55 | 17 | 11 | 39 | 3 | 5 | 1 | 3 | 5 | 2 | 30 |
| WFH | | | 170 | 18 | | | | 56 | | | | | | | |
| TOTAL Assets | | 831 | 437 | 115 | 1251 | 315 | 253 | 612 | 170 | 88 | 37 | 68 | 132 | 45 | |

| Name | Model | Tags | OS | Phone # |
|---|---|---|---|---|
| A0000261 | iPad (6th Gen., Cellular) | iPad | iPadOS 17.4.1 | |
| A0000262 | iPad (6th Gen., Cellular) | iPad | iPadOS 17.5.1 | |
| A0000263 | iPad (9th Gen.) | iPad | iPadOS 17.5.1 | |
| A0000264 | iPad (9th Gen.) | Miami NO-iCloud NextGen iPad | iPadOS 17.5.1 - | |
| A0000265 | iPad (6th Gen., Cellular) | iPad | iPadOS 17.4 - | |
| A0000266 | iPad mini 2 | iPad | iOS 12.5.7 - | |
| A0000268 | iPhone 11 | Available SUPERVISED iCloud_Locked | iOS 16.7.2 | |
| A0000269 | iPad (9th Gen.) | Miami NextGen SUPERVISED iPad | iPadOS 17.4.1 | |
| A0000597 | iPhone 11 | Available SUPERVISED | iOS 17.4.1 | |
| A0000637 | iPhone 11 | Available SUPERVISED | iOS 17.5.1 | |
| A0001044 | iPhone 13 | Available SUPERVISED | iOS 17.4.1 - | |
| A0001045 | iPhone 11 | Available SUPERVISED | iOS 17.4.1 | |
| A0001046 | iPhone 13 | Technology | iOS 17.6 | |
| A0001048 | iPhone 11 | Available SUPERVISED | iOS 17.4.1 | |
| A0001049 | iPhone 11 | SUPERVISED | iOS 17.4.1 | |
| A0001056 | iPhone 13 | recently-added | iOS 17.5.1 - | |
| A0001057 | iPhone 13 | ATT Corporate Executive | iOS 17.4.1 | |
| A0001102 | iPhone 13 | ATT Director SUPERVISED Transportation Westchester | iOS 17.5.1 | |
| Ada Iris Berenguer Almeida | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 | |
| Adonis Botas Ferrera | SM-A146U | Driver Miami_Beach T-Mobile Transportation | Android 14 | |
| Adys Gutierrez Diaz | iPhone 11 | ATT Palm_River Provider | iOS 17.5.1 | |
| Ailin Garate Acosta | iPhone 11 | ATT Center_Manager Operations Tamarac | iOS 17.5.1 | |
| Ailsa Cuan | iPhone 13 | ATT East_Hialeah Provider | iOS 16.1.2 | |
| Ained Collazo Romero | iPhone 11 | ATT Center_Manager Le_Jeune | iOS 17.5.1 | |
| Aisha Beltran Perez | iPhone 13 | ATT Center_Manager NextGen Plant_City SUPERVISED | iOS 17.5.1 | |
| Alberto De La Torre | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 | |
| Alejandro Jerez | iPhone 11 | Corporate Remote SUPERVISED | iOS 17.0.3 | |
| Alejandro Torres | SM-A146U | Driver Miami T-Mobile Transportation | Android 14 | |
| Alex Alayon | iPhone 13 | ATT Administrative Technology Westchester | iOS 17.5 | |
| Alexis Bravo | iPhone 11 | ATT Provider Tamarac | iOS 16.1.1 | |
| Alexis Castellanos Veloz | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 | |
| Alexis Orozco Avila | iPhone 13 | ATT NextGen Remote Support Technology | iOS 17.5.1 | |
| Alfredo Calvo Piloto | SM-A146U | Coordinator Hanley_Medicare T-Mobile Transportation Westchester | Android 14 | |
| Alianys Hernandez - Care Coordinator | iPhone 11 | ATT Care_Coordinator Corporate | iOS 15.3.1 | |
| Alina Borroto | SM-A146U | Driver Sweetwater T-Mobile Transportation | Android 14 | |
| Alma Velazquez | iPhone 13 | ATT Center_Manager Dental Hanley | iOS 17.5.1 | |
| Amaili Moore | iPhone 13 | ATT MA_Hotline Medical_Assistant Tamarac | iOS 17.5.1 | |
| Amaury Rodriguez Diaz | SM-A146U | Driver Le_Jeune T-Mobile Transportation | Android 14 | |
| Aminta Menjivar | iPhone 13 | ATT Lead_MA MA_Hotline Miami_Lakes | iOS 17.5.1 | |
| Amuni "Amy" Beck | iPhone 11 | ATT Administrative Compliance WaH | iOS 16.3 | |
| Amuni "Amy" Beck | iPad Pro 11 (Cellular) | Compliance T-Mobile WaH iPad | iPadOS 16.3.1 | |
| Ana Maria Bolivar | iPhone 13 | ATT Center_Manager Sweetwater | iOS 17.5.1 | |
| Ana Maria Miranda Darriba | iPhone 11 | ATT Miami_Lakes Patient_Concierge | iOS 17.5.1 | |
| Angela Ortiz Espinosa | iPhone 13 | ATT Lead_MA MA_Hotline North_Miami_East | iOS 17.5.1 | |
| Angel Batista | iPhone 13 | ATT Bird_Road Provider SUPERVISED | iOS 17.5.1 | |
| Antonio Martinez | SM-A146U | Driver North_Miami_East T-Mobile Transportation | Android 14 | |
| Ariana Martinez | iPhone 13 | ATT Care_Coordinator West_Hialeah | iOS 17.5.1 | |
| Ariel Martinez | iPhone 11 | Technology | iOS 16.3.1 | |
| Aris Herrera Jr | iPhone 13 | ATT Center_Manager Hollywood | iOS 16.1.2 | |
| Aslien Reyes Leon | iPhone 13 | ATT Fowler Provider | iOS 17.5.1 | |
| Barbara Monzon Orta | iPhone 13 | ATT Corporate Marketing Outreach | iOS 16.1.2 | |
| Barbaro Navarro | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 | |
| Beatriz Espino | iPhone 13 | ATT Case_Manager Hanley_Medicare | iOS 16.1.2 | |
| Beatriz Uribazo | iPhone 11 | ATT Clinical_Ops Lakeland Regional_Manager | iOS 16.3.1 | |
| Belkis Bermudez | iPhone 13 | ATT Marketing Outreach Patient_Concierge Sweetwater | iOS 17.5.1 | |
| Brenda Lezama | iPhone 13 | ATT Compliance Remote | iOS 17.5.1 | |
| Bryan Ulloa | iPhone 13 | ATT Corporate Dental Regional_Manager | iOS 17.4.1 | |
| Carla Daniela McCool | iPhone 13 | ATT Administrative Corporate HR | iOS 16.1.2 | |
| Carlos CastaÃ±eda | iPhone 11 | ATT Clinical_Ops Miami_Beach Provider SUPERVISED | iOS 17.3.1 | |
| Carlos Conrado | iPhone 11 | ATT Clinical_Ops Homestead Provider | iOS 15.3.1 | |
| Carlos Flores Iglesias | iPhone 13 | ATT Clinical_Ops Provider Westchester | iOS 16.1.2 | |
| Carlos Paez Rodriguez | SM-A146U | Driver East_Hialeah T-Mobile Transportation | Android 14 | |
| Carmen Maria Gonzalez Alonso | SM-A146U | Driver Homestead T-Mobile Transportation | Android 14 | |
| Carolina Motino | iPhone 13 | ATT Clinical_Ops Medical_Assistant Pinellas_Park | iOS 16.1.2 | |
| Carolina Ugarte | iPhone 11 | ATT Clinical_Ops Homestead Provider | iOS 15.3.1 | |
| Chad Costello | iPhone 13 | ATT Administrative Executive Real_Estate VP | iOS 17.5.1 | |
| Cindy Baumhardt-Rivera | iPhone 13 | ATT Administrative Corporate Executive Medical_Management VP | iOS 17.5.1 | |
| Cira Welvaert | iPhone 11 | ATT Miami_Beach Provider SUPERVISED | iOS 17.5.1 | |
| Claudelina Rodriguez Rojas | SM-A146U | Driver Homestead T-Mobile Transportation | Android 14 | |
| Claudia Alvare Serrano | iPhone 11 | ATT Care_Coordinator Westchester | iOS 17.5.1 | |
| Claudion Calixte | SM-A146U | Driver North_Miami_West T-Mobile Transportation | Android 14 | |
| Clemente Baez Rivera | iPhone 13 | ATT Marketing Orlando Outreach | iOS 17.5.1 | |
| Corina Tosta | iPhone 13 | ATT Center_Manager Miami_Beach | iOS 16.1.2 | |
| Cristina Doria | iPhone 13 | ATT Administrative Director Medical_Management | iOS 17.5.1 | |
| Cynthia Bell | iPhone 13 | ATT Homestead MA_Hotline | iOS 17.5.1 | |

| Name | Device | Description | OS |
|------|--------|-------------|-----|
| Dairys Arias | iPhone 11 | ATT Pinellas_Park | iOS 15.3.1 |
| Daisel Balladares | iPhone 13 | ATT Clinical_Ops Provider | iOS 17.5.1 |
| Daniela Morales | iPhone 11 | Homestead Operations SUPERVISED Social_Services | iOS 17.5.1 |
| David Barba Perez | iPhone 11 | ATT Care_Coordinator Le_Jeune | iOS 17.5.1 |
| David Rodriguez Rivera | iPhone 11 | ATT Clinical_Ops Hanley_Medicare Provider | iOS 17.5.1 |
| Dayana Perozo | SM-A146U | Driver T-Mobile Tamarac Transportation | Android 14 |
| Deborah Ivette Negron | iPhone 13 | ATT Center_Manager Hudson Operations Tampa | iOS 16.1.2 |
| Debora Melendez | iPhone 11 | ATT Center_Manager Palm_River TERMNATED | iOS 16.2 |
| Delmy BriceÃ±o | iPhone 11 | ATT Administrative Compliance Corporate Remote | iOS 16.3.1 |
| Delmy BriceÃ±o | iPad Pro 11 (Cellular) | ATT Administrative Compliance Corporate Remote iPad | iPadOS 17.5.1 |
| Douglas Johnson | iPhone 13 | ATT Administrative Corporate Executive | iOS 17.5.1 |
| Douglas Johnson LOST PHONE | iPhone 13 | ATT Administrative Executive LOST | iOS 16.1.2 |
| Dr Santiago | iPhone 13 | Orlando recently-added | iOS 16.1.2 |
| Eduardo Sanchez | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 |
| Eduardo Vejas | iPhone 11 | ATT Palm_River Provider | iOS 15.3.1 |
| Elsa Arredondo | iPhone 11 | ATT Clinical_Ops Provider Tamarac | iOS 15.3.1 |
| Emelio Garcia | iPhone 11 | ATT Bird_Road Clinical_Ops Provider SUPERVISED | iOS 17.5.1 |
| Emma Alonso-Barrueco | iPhone 11 | ATT Miami Provider SUPERVISED | iOS 17.4.1 |
| Enma Benitez Acosta | iPhone 11 | ATT Care_Coordinator North_Miami_East | iOS 17.5.1 |
| Enrique Silva Cazanas | SM-A146U | Driver Le_Jeune T-Mobile Transportation | Android 14 |
| Enrique Verges Bonet | iPhone 13 | ATT Clinical_Ops Provider | iOS 16.1.2 |
| Erick MuÃ±oz Delgado | iPhone 11 | ATT Administrative Tampa Technology | iOS 15.3.1 |
| Eric Santiago | iPhone 13 | ATT Administrative Corporate Executive SUPERVISED Technology | iOS 17.5.1 |
| Esteban Scull | SM-A146U | Driver Miami_Beach T-Mobile Transportation | Android 14 |
| Evan Cooper | iPhone 13 | ATT Clinical_Ops Delray_Beach Medical_Assistant | iOS 16.6.1 |
| Evelyn Arroyo | iPhone 13 | ATT Corporate MSO | iOS 17.5.1 |
| Evelyn Trinidad | iPhone 11 | ATT Fowler Provider | iOS 16.1.1 |
| Fabricio Cubillo | iPhone 13 | ATT MA_Hotline Sweetwater | iOS 16.1.2 |
| Fernando Barrueta | SM-A146U | Driver East_Hialeah T-Mobile Transportation | Android 14 |
| Fernando Ramos Ceballos | SM-A146U | Driver Miami_Beach T-Mobile Transportation | Android 14 |
| Flavio Correa | iPhone 11 | ATT Bird_Road Care_Coordinator SUPERVISED | iOS 16.1.1 |
| Flor Jimenez | iPhone 13 | Marketing Outreach Patient_Concierge | iOS 17.5.1 |
| Frances Gonzalez | iPhone 11 | ATT Lakeland Medical_Assistant | iOS 17.5.1 |
| Francisco Freeman De La Cuevas | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 |
| Freddy Torres Alarcon | SM-A146U | Coordinator T-Mobile Transportation Westchester | Android 14 |
| Galaxy A13 5G | SM-A136U | recently-added | Android 13 - |
| Gerald Knouf | iPhone 11 | ATT Clinical_Ops Provider Tampa Temple_Terrace | iOS 16.6 |
| Geysert Rodriguez Martinez | iPhone 11 | ATT Clinical_Ops Provider SUPERVISED | iOS 17.5.1 |
| Gonzalo Vigo Rivero | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 |
| Gretchen Vidal | iPhone 11 | ATT Clinical_Ops Delray_Beach Provider | iOS 15.3.1 |
| Gretel Rubio Rios | iPhone 13 | ATT Dental Hanley | iOS 16.1.2 |
| Greter Pacios - Recursive Nurse | iPhone 13 | ATT | iOS 17.5.1 |
| Gustavo Martinez | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 |
| Hany Perez | iPhone 13 | ATT Corporate | iOS 16.1.2 |
| Heidi Perez | iPhone 13 | ATT credentialing | iOS 16.1.2 |
| Henry Rivera | SM-A146U | Driver Miami_Beach T-Mobile Transportation | Android 14 |
| Heriberto Pino Correa | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 |
| Hotline Plant City | iPhone 13 | ATT Clinical_Ops Medical_Assistant NextGen Plant_City SUPERVISED | iOS 17.5.1 |
| Ileana Morcillo | iPhone 13 | 1099 ATT Clinical_Ops Miami_Beach Provider | iOS 17.1.2 |
| Iliana Carrion Rodriguez | iPhone 13 | ATT Activity_Center Operations Tampa | iOS 17.5.1 |
| Imerio Tellez Zulueta | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 |
| Ina Molina | iPhone 11 | Corporate recently-added | iOS 17.5.1 |
| Indira Cerra Villalobos | iPhone 11 | ATT Clinical_Ops Provider West_Hialeah | iOS 17.5.1 |
| iPad Alton | iPad (9th Gen.) | Miami_Beach NextGen iPad recently-added | iPadOS 17.5.1 |
| iPad Alton-02 | iPad (9th Gen.) | Miami_Beach NextGen iPad recently-added | iPadOS 17.5.1 |
| iPad Alton-03 | iPad (9th Gen.) | Miami_Beach NextGen iPad recently-added | iPadOS 17.5.1 |
| iPad Alton-04 | iPad (9th Gen.) | Miami_Beach NextGen iPad recently-added | iPadOS 17.4 |
| iPad Alton-05 | iPad (9th Gen.) | Miami_Beach NextGen iPad recently-added | iPadOS 17.4.1 |
| iPad BIRD-RD_1 | iPad (8th Gen.) | Bird_Road NextGen iPad | iPadOS 17.5.1 - |
| iPad BIRD-RD_2 | iPad (8th Gen.) | NextGen iPad | iPadOS 17.5.1 - |
| iPad BIRD-RD_3 | iPad (8th Gen.) | ATT Bird_Road iPad | iPadOS 17.5.1 - |
| iPad Bird Road | iPad (8th Gen.) | iPad recently-added | iPadOS 16.5 - |
| iPad - CM - 01 | iPad (9th Gen.) | NextGen iPad recently-added | iPadOS 17.5.1 |
| iPad - CM-02 | iPad (6th Gen., Cellular) | NextGen iPad recently-added | iPadOS 16.4.1 |
| iPad-FW-01 | iPad (9th Gen.) | Fowler iPad recently-added | iPadOS 17.5.1 - |
| iPad-FW-02 | iPad (9th Gen.) | Fowler iPad recently-added | iPadOS 17.5.1 - |
| iPad-FW-03 | iPad (9th Gen.) | Fowler iPad recently-added | iPadOS 17.5.1 - |
| iPad-FW-04 | iPad (9th Gen.) | Fowler iPad recently-added | iPadOS 17.5.1 - |
| iPad Hialeah East | iPad (9th Gen.) | iPad recently-added | iPadOS 16.5 - |
| iPad Hialeah West | iPad (9th Gen.) | iPad recently-added | iPadOS 16.5 - |
| iPad - HLE - 02 | iPad (9th Gen.) | East_Hialeah iPad recently-added | iPadOS 17.5.1 - |
| iPad - HLE - 03 | iPad (9th Gen.) | East_Hialeah iPad recently-added | iPadOS 17.5.1 - |
| iPad - HLE - 04 | iPad (9th Gen.) | East_Hialeah iPad recently-added | iPadOS 17.5.1 - |
| iPad - HLE - 05 | iPad (9th Gen.) | East_Hialeah iPad recently-added | iPadOS 17.5.1 - |
| iPad - HLE - 06 | iPad (9th Gen.) | East_Hialeah iPad recently-added | iPadOS 17.5.1 - |
| iPad - HLW - 02 | iPad (9th Gen.) | West_Hialeah iPad recently-added | iPadOS 17.2 - |

| | | | | |
|---|---|---|---|---|
| iPad - HLW - 03 | iPad (9th Gen.) | West_Hialeah iPad recently-added | iPadOS 17.4.1 | - |
| iPad - HLW - 04 | iPad (9th Gen.) | West_Hialeah iPad recently-added | iPadOS 17.5.1 | - |
| iPad - HLW - 05 | iPad (9th Gen.) | West_Hialeah iPad recently-added | iPadOS 17.5.1 | - |
| iPad - HLW - 06 | iPad (9th Gen.) | West_Hialeah iPad recently-added | iPadOS 17.5.1 | - |
| iPad Hollywood 01 | iPad (9th Gen.) | Hollywood NextGen iPad | iPadOS 17.5.1 | - |
| iPad Hollywood 02 | iPad (9th Gen.) | ATT Hollywood NextGen iPad | iPadOS 17.2 | - |
| iPad Hollywood 03 | iPad (9th Gen.) | ATT Hollywood NextGen iPad | iPadOS 17.5.1 | - |
| iPad Hollywood 04 | iPad (8th Gen.) | Hollywood NextGen T-Mobile iPad | iPadOS 17.5.1 | ▬▬ |
| iPad Homestead-01 | iPad (8th Gen.) | Homestead NextGen recently-added | iPadOS 17.5.1 | - |
| iPad Homestead-02 | iPad (9th Gen.) | Homestead NextGen recently-added | iPadOS 17.5.1 | - |
| iPad Homestead-03 | iPad (9th Gen.) | Homestead NextGen recently-added | iPadOS 17.5.1 | - |
| iPad Homestead-04 | iPad (9th Gen.) | Homestead NextGen recently-added | iPadOS 17.5.1 | - |
| iPad Homestead-05 | iPad (9th Gen.) | Homestead NextGen recently-added | iPadOS 17.5.1 | - |
| iPad-HY-CAID-01 | iPad (9th Gen.) | Hanley_Medicaid iPad recently-added | iPadOS 17.5.1 | - |
| iPad-HY-CAID-02 | iPad (9th Gen.) | Hanley_Medicaid iPad recently-added | iPadOS 17.5.1 | - |
| iPad-HY-CAID-03 | iPad (9th Gen.) | Hanley_Medicaid iPad recently-added | iPadOS 17.5.1 | - |
| iPad-HY-CARE-01 | iPad (9th Gen.) | Hanley_Medicare iPad recently-added | iPadOS 17.5.1 | - |
| iPad-HY-CARE-02 | iPad (9th Gen.) | Hanley_Medicare NextGen iPad recently-added | iPadOS 17.5.1 | - |
| iPad-HY-CARE-03 | iPad (9th Gen.) | Hanley_Medicare NextGen iPad recently-added | iPadOS 17.5.1 | - |
| iPad-HY-CARE-04 | iPad (9th Gen.) | Hanley_Medicare NextGen iPad recently-added | iPadOS 17.3 | - |
| iPad-HY-CARE-05 | iPad (9th Gen.) | Hanley_Medicare NextGen iPad recently-added | iPadOS 17.5.1 | - |
| iPad Lakeland | iPad (9th Gen.) | Lakeland NextGen iPad recently-added | iPadOS 17.5.1 | - |
| iPad Lejeune-01 | iPad (9th Gen.) | Le_Jeune NextGen iPad recently-added | iPadOS 16.5 | - |
| iPad Lejeune-02 | iPad (9th Gen.) | Le_Jeune NextGen iPad recently-added | iPadOS 17.5.1 | - |
| iPad Lejeune-03 | iPad (9th Gen.) | Le_Jeune NextGen iPad recently-added | iPadOS 17.2 | - |
| iPad Lejeune-04 | iPad (9th Gen.) | Le_Jeune NextGen iPad recently-added | iPadOS 17.5.1 | - |
| iPad Lejeune-05 | iPad (9th Gen.) | Le_Jeune NextGen iPad recently-added | iPadOS 17.5.1 | - |
| iPad-LL-01 | iPad (9th Gen.) | Lakeland NextGen iPad recently-added | iPadOS 16.3.1 | - |
| iPad-LL-02 | iPad (9th Gen.) | Lakeland NextGen iPad recently-added | iPadOS 16.3.1 | - |
| iPad-LL-03 | iPad (9th Gen.) | Lakeland NextGen iPad recently-added | iPadOS 17.5.1 | - |
| iPad-LL-04 | iPad (9th Gen.) | Lakeland Nextgen iPad recently-added | iPadOS 17.5.1 | - |
| iPad Miami Lakes-01 | iPad (9th Gen.) | ATT Miami_Lakes NextGen iPad | iPadOS 17.5.1 | ▬▬ |
| iPad Miami Lakes-02 | iPad (9th Gen.) | ATT Miami_Lakes NextGen iPad | iPadOS 17.5.1 | - |
| iPad-ML-XRAY | iPad (9th Gen.) | Miami_Lakes NextGen iPad recently-added | iPadOS 17.5.1 | - |
| iPad NME-01 | iPad (9th Gen.) | NextGen North_Miami_East iPad | iPadOS 17.5.1 | - |
| iPad NME-02 | iPad (9th Gen.) | NextGen North_Miami_East iPad | iPadOS 17.5.1 | - |
| iPad NME-03 | iPad (9th Gen.) | NextGen North_Miami_East iPad | iPadOS 17.5.1 | - |
| iPad NME-04 | iPad (9th Gen.) | NextGen North_Miami_East iPad | iPadOS 17.5.1 | - |
| iPad - NMW- 02 | iPad (9th Gen.) | North_Miami_West iPad recently-added | iPadOS 17.5.1 | - |
| iPad - NMW - 03 | iPad (9th Gen.) | North_Miami_West iPad recently-added | iPadOS 17.5.1 | - |
| iPad North Miami West | iPad (9th Gen.) | iPad recently-added | iPadOS 16.5 | - |
| iPad-ORL-01 | iPad (9th Gen.) | NextGen Orlando iPad recently-added | iPadOS 16.3.1 | - |
| iPad-ORL-02 | iPad (9th Gen.) | NextGen Orlando iPad recently-added | iPadOS 16.3.1 | - |
| iPad-ORL-03 | iPad (9th Gen.) | NextGen Orlando iPad recently-added | iPadOS 16.3.1 | - |
| iPad Orlando | iPad (9th Gen.) | iPad recently-added | iPadOS 16.5 | - |
| iPad Palmetto Bay | iPad (9th Gen.) | NextGen Palmetto_Bay iPad | iPadOS 17.5.1 | ▬▬ |
| iPad Palmetto Bay-02 | iPad (9th Gen.) | NextGen Palmetto_Bay iPad recently-added | iPadOS 17.5.1 | - |
| iPad Palmetto Bay-03 | iPad (9th Gen.) | NextGen Palmetto_Bay iPad recently-added | iPadOS 17.5.1 | - |
| iPad Palm River | iPad (9th Gen.) | iPad recently-added | iPadOS 17.5.1 | - |
| iPad-PL-01 | iPad (9th Gen.) | NextGen Plant_City iPad recently-added | iPadOS 17.5.1 | - |
| iPad-PL-02 | iPad (9th Gen.) | NextGen Plant_City iPad recently-added | iPadOS 17.5.1 | - |
| iPad-PN-01 | iPad (9th Gen.) | NextGen Pinellas_Park iPad recently-added | iPadOS 16.3.1 | - |
| iPad-PN-02 | iPad (9th Gen.) | NextGen Pinellas_Park iPad recently-added | iPadOS 16.3.1 | - |
| iPad-PN-03 | iPad (9th Gen.) | NextGen Pinellas_Park iPad recently-added | iPadOS 16.3.1 | - |
| iPad-PR-01 | iPad (9th Gen.) | NextGen Palm_River iPad recently-added | iPadOS 16.3.1 | - |
| iPad-PR-02 | iPad (9th Gen.) | NextGen Palm_River iPad recently-added | iPadOS 16.3.1 | - |
| iPad-PR-03 | iPad (9th Gen.) | NextGen Palm_River iPad recently-added | iPadOS 16.3.1 | - |
| iPad-PR-04 | iPad (9th Gen.) | NextGen Palm_River iPad recently-added | iPadOS 16.3.1 | - |
| iPad-PR-05 | iPad (9th Gen.) | NextGen Palm_River iPad recently-added | iPadOS 16.3.1 | - |
| iPad-PS-CAID-01 | iPad (9th Gen.) | Hudson NextGen iPad recently-added | iPadOS 16.3.1 | - |
| iPad-PS-CARE-01 | iPad (9th Gen.) | Hudson NextGen iPad recently-added | iPadOS 16.3.1 | - |
| iPad-PS-CARE-02 | iPad (9th Gen.) | Hudson NextGen iPad recently-added | iPadOS 16.3.1 | - |
| iPad-PS-CARE-03 | iPad (9th Gen.) | Hudson NextGen iPad recently-added | iPadOS 16.3.1 | - |
| iPad Sweetwater | iPad (9th Gen.) | Sweetwater iPad | iPadOS 17.5.1 | - |
| iPad Sweetwater - 01 | iPad (9th Gen.) | NextGen Sweetwater iPad recently-added | iPadOS 17.5.1 | ▬▬ |
| iPad Sweetwater - 02 | iPad (9th Gen.) | ATT Winter_Haven iPad | iPadOS 17.5.1 | - |
| iPad Sweetwater - 03 | iPad (9th Gen.) | ATT Temple_Terrace iPad | iPadOS 17.5.1 | ▬▬ |
| iPad-TM-04 | iPad (9th Gen.) | NextGen Tamarac iPad recently-added | iPadOS 17.2 | - |
| iPad-TM-XRAY | iPad (9th Gen.) | NextGen Tamarac iPad recently-added | iPadOS 17.3 | - |
| iPad Westchester-01 | iPad (9th Gen.) | NextGen Westchester iPad recently-added | iPadOS 17.5.1 | ▬▬ |
| iPad Westchester-02 | iPad (9th Gen.) | NextGen Westchester iPad recently-added | iPadOS 17.4 | - |
| iPad Westchester-03 | iPad (9th Gen.) | NextGen Westchester iPad recently-added | iPadOS 17.5.1 | ▬▬ |
| iPad Westchester-04 | iPad (9th Gen.) | NextGen Westchester iPad recently-added | iPadOS 17.5.1 | ▬▬ |
| iPad Westchester-05 | iPad (9th Gen.) | NextGen Westchester iPad recently-added | iPadOS 17.3 | - |
| iPad Westchester-06 | iPad (9th Gen.) | NextGen Westchester iPad recently-added | iPadOS 17.5.1 | - |
| iPad Westchester 07 | iPad (9th Gen.) | iPad recently-added | iPadOS 17.3 | - |

| | | | | |
|---|---|---|---|---|
| iPad Westchester 08 | iPad (9th Gen.) | Westchester iPad recently-added | iPadOS 17.3 | - |
| iPad Westchester 09 | iPad (9th Gen.) | Westchester iPad recently-added | iPadOS 17.3 | - |
| iPad Westchester 10 | iPad (9th Gen.) | Westchester iPad recently-added | iPadOS 17.3 | - |
| iPad-WH-01 | iPad (9th Gen.) | NextGen Winter_Haven iPad recently-added | iPadOS 16.3.1 | - |
| iPad-WH-02 | iPad (9th Gen.) | NextGen Winter_Haven iPad recently-added | iPadOS 16.3.1 | - |
| iPad-WH-03 | iPad (9th Gen.) | NextGen Winter_Haven iPad recently-added | iPadOS 16.3.1 | - |
| iPhone | iPhone 11 | recently-added | iOS 17.3 | - |
| iPhone | iPhone 11 | recently-added | iOS 17.3 | - |
| iPhone | iPhone 11 | recently-added | iOS 17.3 | - |
| iPhone | iPhone 11 | recently-added | iOS 17.3 | - |
| iPhone | iPhone 11 | recently-added | iOS 16.1.1 | |
| iPhone | iPhone 11 | recently-added | iOS 17.3 | - |
| iPhone | iPhone 11 | recently-added | iOS 17.4 | - |
| iPhone | iPhone 11 | recently-added | iOS 15.3.1 | |
| iPhone | iPhone 11 | recently-added | iOS 15.3.1 | |
| iPhone | iPhone 11 | recently-added | iOS 17.5.1 | |
| Iris Acevedo | iPhone 13 | ATT Case_Manager | iOS 17.5.1 | |
| Iris Tamarez | iPhone 13 | ATT Center_Manager Operations Orlando SUPERVISED | iOS 16.3 | |
| Janice Caban | iPhone 13 | ATT Corporate MSO | iOS 16.1.2 | |
| Jan Paul Maldonado De Jesus | iPhone 11 | ATT Center_Manager Palm_River Tampa | iOS 17.4.1 | |
| Javier Hernandez Perez | iPhone 13 | ATT Clinical_Ops Provider Winter_Haven | iOS 16.1.2 | |
| Jazmina Salcedo | iPhone 11 | ATT Administrative Medical_Management | iOS 15.3.1 | |
| JD Suarez | iPhone 12 | Corporate Executive T-Mobile | iOS 17.4.1 | |
| Jean Philippe Charles | iPhone 11 | ATT Clinical_Ops Homestead Provider | iOS 16.3.1 | |
| Jean Saint Hilaire | SM-A146U | Driver North_Miami_East T-Mobile Transportation | Android 14 | |
| Jennifer Botas Palomares | iPhone 11 | Miami_Beach Operations SUPERVISED Social_Services | iOS 17.5.1 | |
| Jessica Melo | iPhone 11 | ATT Center_Manager Operations SUPERVISED Westchester | iOS 17.5.1 | |
| Jesus Arevalo | SM-A146U | Bird_Road Driver T-Mobile Transportation | Android 14 | |
| Jorge Fernandez Novales | iPhone 11 | ATT Clinical_Ops Le_Jeune Provider | iOS 16.3.1 | |
| Jorge Machin Rodriguez | iPhone 13 | ATT Clinical_Ops NextGen Plant_City Provider SUPERVISED Tampa | iOS 17.5.1 | |
| Jorge Reina | iPhone 11 | ATT Care_Coordinator SUPERVISED Westchester | iOS 17.4.1 | |
| Jorge Urgell | iPhone 11 | ATT Clinical_Ops Provider | iOS 17.5.1 | |
| Jose Antonio Bonilla | iPhone 11 | ATT Center_Manager West_Hialeah | iOS 17.5.1 | |
| Joseph Ricardeau | iPhone 11 | ATT North_Miami_West Operations Social_Services | iOS 15.3.1 | |
| Jose Roque Farinas | SM-A146U | Driver North_Miami_East T-Mobile Transportation | Android 14 | |
| Juan Alberto Costafreda Izaguirre | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 | |
| Juan Arroyo | iPhone 11 | ATT Clinical_Ops Hanley_Medicaid Provider | iOS 17.6 | |
| Juan Carlos Alonso | SM-A146U | Dispatcher T-Mobile Transportation Westchester | Android 14 | |
| Juan Carlos Hernandez | SM-A146U | Driver T-Mobile Transportation Westchester recently-added | Android 14 | |
| Juan Felipe Moya Polania | iPhone 13 | ATT Clinical_Ops Fowler Provider Tampa | iOS 16.1.2 | |
| Judith Pena | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 | |
| Julibeth Arellano Osorio | iPhone 13 | ATT Homestead Marketing Outreach SUPERVISED | iOS 17.6 | |
| Julie Borges | iPhone 11 | ATT Operations Social_Services Westchester | iOS 16.3 | |
| Julio Orlando Gomez | iPhone 11 | ATT Miami Provider SUPERVISED | iOS 17.5.1 | |
| Karen Gerena | iPhone 11 | ATT Center_Manager Fowler Tampa | iOS 16.6 | |
| Karla Castillo | iPhone 13 | ATT Clinical_Ops Medical_Assistant SUPERVISED Westchester | iOS 17.5.1 | |
| Katerine Rosendo Alvarez | iPhone 13 | ATT Corporate HR | iOS 16.1.2 | |
| Kenneth Ortiz | iPhone 13 | ATT Center_Manager Palmetto_Bay | iOS 17.5.1 | |
| Keyla Rios Aguayo | iPhone 13 | ATT Hanley_Medicaid Operations Tampa | iOS 16.1.2 | |
| Laura Alvarez | iPhone 13 | ATT Center_Manager | iOS 17.5.1 | |
| Leidys Mesa Corzo | iPad (8th Gen.) | Miami NO-iCloud NextGen iPad | iPadOS 17.5.1 | - |
| Leilani Edouazin | iPhone 13 | ATT Corporate HR | iOS 16.1.2 | |
| Leonel Castro | SM-A146U | Driver T-Mobile Transportation West_Hialeah | Android 14 | |
| Liesys Gonzalez | iPhone 13 | ATT Center_Manager Miami SUPERVISED | iOS 17.5.1 | |
| Liliam Vasquez | iPhone 13 | ATT Clinical_Ops NextGen Plant_City Provider SUPERVISED | iOS 16.3 | |
| Lilibet Alvarez Morfi | iPhone 13 | ATT East_Hialeah MA_Hotline | iOS 17.5.1 | |
| Lorayne Enriquez Dominguez | iPhone 13 | ATT Provider | iOS 16.1.2 | |
| Luisa Padilla Ayala | iPhone 11 | ATT Clinical_Ops Hanley_Medicaid Provider Tampa | iOS 15.3.1 | |
| Luis Hernandez Abreu | iPhone 11 | ATT Clinical_Ops Dental | iOS 17.5.1 | |
| Luis Rios Andino | SM-A146U | Driver East_Hialeah T-Mobile Transportation | Android 14 | |
| Lukas Miranda | iPhone 13 | ATT Administrative Corporate Salesforce Technology | iOS 16.3.1 | |
| Luz Pacheco | iPhone 13 | ATT Clinical_Ops Hanley_Medicare Medical_Assistant | iOS 16.1.2 | |
| MA Hotline Alton Rd | iPhone 13 | ATT MA_Hotline Miami_Beach | iOS 16.1.2 | |
| Manuela Zanetti | iPhone 11 | ATT Case_Manager Corporate Medical_Management | iOS 16.1.1 | |
| Manuel Silva | iPhone 11 | ATT Clinical_Ops Hollywood Provider | iOS 15.3.1 | |
| Marcel Garcia | iPhone 13 | Manager SUPERVISED Transportation Westchester | iOS 17.5.1 | |
| Marco Julio Banzo | SM-A146U | Driver T-Mobile Transportation West_Hialeah | Android 13 | |
| Mardielys Fernandez | iPhone 11 | ATT Clinical_Ops Hanley_Medicare Medical_Assistant Tampa | iOS 17.5.1 | |
| Maria Ailane Perez | iPhone 13 | ATT Administrative Compliance | iOS 17.5.1 | |
| Maria Ailane Perez- Compliance iPad | iPad (6th Gen., Cellular) | Compliance WaH iPad | iPadOS 16.3 | |
| Maria Delgado | iPhone 13 | ATT Hudson Medical_Assistant Tampa | iOS 16.5.1 | |
| Marianela Lopez | iPhone 11 | ATT Bird_Road Case_Manager SUPERVISED | iOS 17.5.1 | |
| Marianne Carrate | iPhone 11 | NextGen Provider Sweetwater recently-added | iOS 16.3.1 | |
| Maria Patricia Acevedo | iPhone 11 | ATT Center_Manager Miami_Lakes | iOS 17.5.1 | |
| Maria Rozas | iPhone 11 | ATT Care_Coordinator East_Hialeah | iOS 17.5.1 | |
| Maria Soto | iPhone 13 | ATT Hudson Provider | iOS 16.1.2 | |

| Name | Device | Description | OS |
|---|---|---|---|
| Maribel Rivero Formoso | SM-A146U | Driver T-Mobile Transportation West_Hialeah | Android 14 |
| Mariela Sarduy Perez | iPhone 11 | ATT Care_Coordinator | iOS 17.5.1 |
| Marie Yolette Celoge | iPhone 13 | ATT Clinical_Ops North_Miami_West Provider | iOS 16.1.2 |
| Mariluz Melendez Martir | iPhone 13 | ATT Operations Orlando Social_Services | iOS 16.1.2 |
| Marilyn Valle | iPhone 11 | ATT Clinical_Ops Fowler Medical_Assistant Tampa | iOS 17.5.1 |
| Mario Capote Veras | iPhone 11 | ATT Case_Manager Medical_Management Westchester | iOS 17.5.1 |
| Maritza Reyes Ortega | iPhone 13 | ATT Clinical_Ops Palmetto_Bay Provider | iOS 17.5.1 |
| Maritza Ruiz | iPhone 13 | ATT Case_Manager | iOS 17.5.1 |
| Mari Vidal | iPhone 13 | ATT Corporate HR | iOS 16.1.2 |
| Marley Ramirez | iPhone 13 | ATT Access North_Miami_East | iOS 16.1.2 |
| Martha Suarez Vargas | iPhone 11 | ATT MA_Hotline Orlando | iOS 15.3.1 |
| Martin Jesus Sueiro | iPhone 13 | ATT Clinical_Ops Provider SUPERVISED Sweetwater | iOS 16.3 |
| Maureen Diaz | iPhone 13 | Fowler Medical_Management SUPERVISED | iOS 16.1.2 |
| Melissa Cifuentes | iPhone 13 | ATT Corporate HR | iOS 16.1.2 |
| Meyzel Cartaya Alegre | SM-A146U | Coordinator Hanley_Medicare T-Mobile Transportation Westchester | Android 14 |
| Michael Cuenca | iPhone 11 | ATT Clinical_Ops Hollywood Provider | iOS 17.5.1 |
| Mike Pilger | iPhone 13 | ATT Dental VP | iOS 16.1.2 |
| Minette Gomez | iPhone 13 | ATT Administrative Corporate HR | iOS 16.1.2 |
| Mo Jalloh - Strategy And Operations Manager | iPhone 13 | recently-added | iOS 16.1.2 |
| Moraima Batista | iPhone 13 | ATT Hanley_Medicare Provider Tampa | iOS 16.1.2 |
| Mori Diaz | iPhone 13 | ATT Administrative Corporate HR | iOS 17.5.1 |
| Munir Khatri | iPhone 13 | ATT Administrative Corporate Executive | iOS 16.1.2 |
| Natalia Ryaboshapka | iPhone 13 | ATT Hollywood MA_Hotline | iOS 17.5.1 |
| Nathalie Ortiz | iPhone 13 | ATT MA_Hotline North_Miami_West | iOS 17.5.1 |
| Nayade Delgado | iPhone 11 | ATT Corporate Regional_Manager SUPERVISED | iOS 17.5.1 |
| Nehal Gheewala - Senior Vice President, Clinical Strategy | iPhone 11 | ATT Administrative Corporate | iOS 16.6.1 |
| Nelvis Benitez | iPhone 13 | ATT Care_Coordinator Miami_Beach | iOS 16.1.2 |
| Nicholas Bowman | iPhone 13 | ATT Administrative Corporate Finance | iOS 17.5.1 |
| Niurka Hernandez | iPhone 11 | ATT Miami_Lakes Operations Social_Services | iOS 15.3.1 |
| Octavio Uribe | SM-A146U | Driver Miami_Beach T-Mobile Transportation | Android 14 |
| Odalmys Rodriguez | iPhone 13 | ATT Case_Manager | iOS 17.2.1 |
| Oliver Driggs | iPhone 13 | ATT Administrative Orlando SUPERVISED Technology | iOS 16.1.2 |
| Oscar Hernandez | SM-A146U | Driver Miami_Lakes T-Mobile Transportation | Android 14 |
| Osmel Labrada | iPhone 13 | APRN Lakeland NextGen Provider SUPERVISED | iOS 17.5.1 |
| Paola Picone | iPhone 11 | ATT Credentialing WaH | iOS 17.5.1 |
| Pedro Cabrera Arias | SM-A146U | Bird_Road Driver T-Mobile Transportation | Android 14 |
| Rachel Perez | iPhone 13 | ATT Center_Manager East_Hialeah | iOS 16.1.2 |
| Rafaela Guilarte | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 |
| Rafael Capote | iPhone 13 | ATT Clinical_Ops Provider | iOS 17.5.1 |
| Rafael Matos | iPhone 11 | ATT Hanley_Medicaid Provider | iOS 15.3.1 |
| Rafael Menendez | SM-A146U | Driver T-Mobile Transportation West_Hialeah | Android 14 |
| Ramon Antonio Rodriguez | iPhone 11 | 1099 ATT Miami_Lakes Provider | iOS 17.5.1 |
| Ramon Hernandez Ortega | SM-A146U | Driver North_Miami_West T-Mobile Transportation | Android 14 |
| Rene Guerra | iPhone 11 | ATT Clinical_Ops Miami_Beach Provider SUPERVISED | iOS 15.3.1 |
| Rennier Crespo Suarez | iPhone 11 | ATT Care_Coordinator | iOS 17.5.1 |
| Reynaldo Arrieta | iPhone 13 | ATT Pinellas_Park Provider | iOS 16.1.2 |
| Reynaldo Perez de La Cruz | iPhone 11 | ATT Clinical_Ops Provider Westchester | iOS 17.5.1 |
| Roberto Reyes | SM-A146U | Coordinator Hanley_Medicare T-Mobile Transportation Westchester | Android 14 |
| Robexy Rodriguez Becerra | SM-A146U | Driver East_Hialeah T-Mobile Transportation | Android 14 |
| Rogertâ€™s Iphone | iPhone 13 | recently-added | iOS 17.5.1 |
| Romel Figueredo | iPhone 13 | 1099 ATT Clinical_Ops Provider West_Hialeah | iOS 17.5.1 |
| Romulo Chacon | T790W | Administrative Corporate T-Mobile Technology | Android 11 |
| Rosa Berrios | iPhone 11 | ATT Clinical_Ops Orlando Provider SUPERVISED | iOS 17.5.1 |
| Rosa Molina | iPhone 13 | ATT Hudson Patient_Concierge Tampa | iOS 17.5.1 |
| Rosa Thais Alvarez | iPhone 11 | Lakeland | iOS 17.4.1 |
| Rossana Jaen | iPhone 11 | ATT Marketing Outreach | iOS 17.5.1 |
| Samson Saint Fleur | iPhone 11 | ATT North_Miami_East Provider | iOS 16.3.1 |
| Sandra Patricia Casas | iPhone 13 | ATT Miami Patient_Concierge Westchester | iOS 17.5.1 |
| Sandy Luciano | iPhone 11 | ATT MA_Hotline West_Hialeah | iOS 17.5.1 |
| Saylys Toledo Canete | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 |
| Sindy Simon | SM-A146U | Dispatcher T-Mobile Transportation Westchester | Android 14 |
| Sujeily Morales | iPhone 11 | ATT Medical_Assistant Winter_Haven | iOS 17.5.1 |
| Surema Canete Sabina | SM-A146U | Driver Sweetwater T-Mobile Transportation | Android 14 |
| Talia Martinez | iPhone 13 | ATT Marketing Outreach Palm_River | iOS 16.1.2 |
| Tamara Tania Veliz | SM-A146U | Dispatcher T-Mobile Transportation Westchester | Android 14 |
| Tania Cepero | iPhone 13 | ATT MA_Hotline Palmetto_Bay | iOS 16.1.2 |
| TaraÂ Walls | iPhone 13 | ATT Center_Manager Delray_Beach NextGen | iOS 16.1.2 |
| Tatiana Diaz Cardelle | iPhone 13 | ATT Clinical_Ops Miami_Lakes Provider | iOS 16.1.2 |
| TERMINATED: Jorge Luis Garcia | iPhone 13 | 1099 ATT Provider SUSPENDED Tamarac | iOS 17.5.1 |
| TERMINATED: Josley Ferrer | iPhone 11 | ATT Care_Coordinator Hollywood TERMINATED | iOS 16.6.1 |
| Tomas Guanche Mantilla | SM-A146U | Driver T-Mobile Transportation West_Hialeah | Android 14 |
| Tomas Santana Velazquez | SM-A146U | Driver North_Miami_East T-Mobile Transportation | Android 14 |
| Vanessa Barreiro | iPhone 11 | Center_Manager Winter_Haven | iOS 17.5.1 |
| Veronica Rodriguez | iPhone 11 | Delray_Beach NextGen Provider SUPERVISED | iOS 17.5.1 |
| Vladimir Cardenas | SM-A146U | Driver T-Mobile Transportation Westchester | Android 14 |
| Yaima Martinez | iPhone 13 | ATT Bird_Road MA_Hotline Medical_Assistant SUPERVISED | iOS 17.5.1 |

| | | | |
|---|---|---|---|
| Yaimy Fernandez | iPhone 11 | NextGen Provider Westchester recently-added | iOS 15.3.1 |
| Yakelin Blanco | iPhone 11 | Operations SUPERVISED Social_Services West_Hialeah | iOS 17.5 |
| Yandris Sanchez Rodriguez | iPhone 11 | ATT Clinical_Ops Le_Jeune Provider | iOS 17.5.1 |
| Yanela Diaz | iPhone 11 | Outreach SUPERVISED Tamarac | iOS 17.4.1 |
| Yanelis Valdez | iPhone 13 | ATT Provider Tampa | iOS 16.1.2 |
| Yanhira Castellano | iPhone 11 | ATT Lakeland | iOS 15.3.1 |
| Yanin Otero Ramon | iPhone 11 | ATT Clinical_Ops Provider Tampa | iOS 17.5.1 |
| Yanoska Villa | iPhone 11 | ATT Hanley_Medicare Marketing Outreach | iOS 17.4.1 |
| Yasmina Peron Buelgas | iPhone 13 | ATT Operations SUPERVISED Social_Services Sweetwater | iOS 16.1.2 |
| Yessenia Navarro | iPhone 11 | recently-added | iOS 15.3.1 |
| Yisel Reyes | iPhone 13 | ATT Center_Manager Clinical_Ops North_Miami_East SUPERVISED | iOS 16.1.2 |
| Yoelquis Rodriguez | iPhone 13 | APRN ATT Clinical_Ops Corporate Provider | iOS 16.7 |
| Yoisy Elder | iPhone 11 | NextGen Remote Technology | iOS 16.6.1 |
| Yolanda Alvarez | iPhone 11 | NextGen Plant_City Provider SUPERVISED | iOS 17.5.1 |
| Yunior Silva Barrero | iPhone 11 | ATT North_Miami_East Provider | iOS 16.1.2 |
| Yvonne Sanchez | iPhone 11 | ATT Care_Coordinator Lakeland | iOS 15.3.1 |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M600 | THINKPAD E570 | iPad (9th Gen.) | ASUS VP228 | CANON R40 | Brother MFC-L2700DW series | YEALINK W60B | iPhone 11 | UAP-AC-HD | MX100 - Serial: Q2JN-CYZA-XCAS | HPE 1920 | Insignia | ALI-NVR3316P | ALI-NS2036R |
| THINKCENTRE M700 | THINKBOOK 15 G2 ITL | iPad (9th Gen.) | ACER RA220HQ | CANON DR-C225 II | HP LaserJet E40040 | Polycom - VVX 450 | iPhone 11 | UAP-AC-HD | | HPE 1920 | FireTV | ALI-NR161F-2 | ALI-NS2036R |
| THINKCENTRE M600 | THINKPAD E14 | iPad (9th Gen.) | Dell E2016HB 20" | CANON DR-C225 II | HP LaserJet M402n | Polycom - VVX 450 | | UAP-AC-HD | | | Philips | | ALI-NS2036R |
| THINKBOOK 15 G2 ITL | HP 250 G8 NOTEBOOK PC | | ACER V226HQL | CANON R40 | HP LaserJet M404-M405 | Polycom - VVX 450 | | | | | Insignia | | ALI-NS2036R |
| THINKCENTRE M720Q | IDEAPAD 3 15ITL6 | | Lenovo ThinkCentre TIO24Gen3 | CANON R40 | HP LaserJet Pro M428f-M429f | Polycom - VVX 450 | | | | | | | ALI-NS2036R |
| THINKCENTRE M720Q | THINKBOOK 15 G2 ITL | | Dell E2016HB 20" | CANON R40 | Ricoh IMC3500 | Polycom - VVX 450 | | | | | | | ALI-NS2036R |
| THINKCENTRE M720Q | | | Dell E2016HB 20" | CANON R40 | | Yealink - SIP-T46S | | | | | | | ALI-FT41-UA |
| THINKCENTRE M720Q | | | LG FLATRON E2350V | CANON DR-C225 II | | Polycom - VVX 450 | | | | | | | ALI-FT41-UA |
| THINKCENTRE M720Q | | | ASUS VP248 | CANON DR-C225 II | | Polycom - VVX 411 | | | | | | | ALI-FT41-UA |
| OPTIPLEX 3030 AIO | | | HP P22V G4 | | | Polycom - VVX 450 | | | | | | | ALI-FT41-UA |
| THINKCENTRE M70Q | | | Lenovo ThinkCentre TIO24Gen3 | | | Polycom - VVX 450 | | | | | | | ALI-FT41-UA |
| THINKCENTRE M820S | | | ACER V226HQL | | | Polycom - VVX 450 | | | | | | | ALI-FT41-UA |
| HP ELITEDESK 800 G3 DM 35W | | | Dell E2016HB 20" | | | Polycom - VVX 450 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | OPTIPLEX 3030 AIO | | | Polycom - VVX 450 | | | | | | | |
| HP ELITEDESK 800 G3 DM PC | | | ACER V226HQL | | | Polycom - VVX 400 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | SAMSUNG S24A336NHN | | | Polycom - VVX 450 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | SAMSUNG S24A336NHN | | | Yealink - SIP-T29G | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | ACER - V196WL | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | AOC | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | ACER V206HQL | | | | | | | | | | |
| | | | Dell E2016HB 20" | | | | | | | | | | |
| | | | ACER V226HQL | | | | | | | | | | |
| | | | Dell E2016HB 20" | | | | | | | | | | |
| | | | Dell E2016HB 20" | | | | | | | | | | |
| | | | Dell E2016HB 20" | | | | | | | | | | |
| | | | ASUS VP248 | | | | | | | | | | |
| | | | HP P22V G4 | | | | | | | | | | |
| | | | AOC | | | | | | | | | | |
| | | | ACER V226HQL | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M600 | 750XDA | | Asus VE248 | Canon Scanner DR-C225 II | HP LaserJet E40040 | Polycom-VVX 611 | iPhone 11 | Aruba | NX100 - Serial:Q12N-UA74-91ZF | HPE OfficeConnect Switch 1920S 48G 4SFP PPoE+ | Insignia | ALI-NVR3316P | ALI-NS2036VR |
| THINKCENTRE M720Q | HP PROBOOK 450 15.6 INCH G9 NOTEBOOK PC | | AOC 22E1H | Canon Scanner DR-C225 II | HP LaserJet Pro M404dn | Polycom-VVX 611 | iPhone 13 | | | | Insignia | | ALI-NS2036VR |
| THINKCENTRE M720Q | | | Asus VE248 | Canon Scanner DR-C225 II | HP LaserJet Pro M404dn | Polycom-VVX 611 | iPhone 13 | | | | Toshiba | | ALI-NS2036VR |
| THINKCENTRE M720Q | | | Lenovo ThinkCentre TIO24Gen3 | Canon Scanner DR-C225 II | HP LaserJet Pro M404dn | Polycom-VVX 611 | | | | | TCL | | ALI-NS2036VR |
| THINKCENTRE M720Q | | | Lenovo ThinkCentre TIO24Gen3 | Canon Scanner DR-C225 II | HP LaserJet Pro M404dn | Polycom-VVX 611 | | | | | | | ALI-NS2036VR |
| THINKCENTRE M720Q | | | Asus VE248 | Canon Scanner DR-C225 II | HP LaserJet Pro MFP M428fdn | Polycom-VVX 611 | | | | | | | ALI-NS2036VR |
| THINKCENTRE M720Q | | | Asus VP228 | CANON R40 | RICOH IM C3000 | Polycom-VVX 611 | | | | | | | |
| THINKCENTRE M720Q | | | ACER V226HQL | | | Polycom-VVX 611 | | | | | | | |
| THINKCENTRE M720Q | | | Asus VE248 | | | Polycom-VVX 611 | | | | | | | |
| THINKCENTRE M720Q | | | Asus VE248 | | | Polycom-VVX 611 | | | | | | | |
| THINKCENTRE M720Q | | | Lenovo ThinkCentre TIO24Gen3 | | | Polycom-VVX 611 | | | | | | | |
| THINKCENTRE M720Q | | | Lenovo ThinkCentre TIO24Gen3 | | | Polycom-VVX 611 | | | | | | | |
| THINKCENTRE M720Q | | | Sceptre IPS 24-in | | | Polycom-VVX 611 | | | | | | | |
| THINKCENTRE M720Q | | | Asus VP228 | | | Polycom-VVX 650 | | | | | | | |
| THINKCENTRE M720Q | | | Asus VE248 | | | Polycom-VVX 611 | | | | | | | |
| THINKCENTRE M70Q | | | Dell E2420h | | | Polycom-VVX 611 | | | | | | | |
| THINKCENTRE M70Q | | | Asus VE248 | | | Polycom-VVX 611 | | | | | | | |
| THINKCENTRE M70Q | | | Asus VE248 | | | Polycom-VVX 611 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Asus VE248 | | | | | | | | | | |
| | | | Asus VP228 | | | | | | | | | | |
| | | | ACER V226HQL | | | | | | | | | | |
| | | | Asus VE248 | | | | | | | | | | |
| | | | Asus VE248 | | | | | | | | | | |
| | | | Sceptre IPS 24-in | | | | | | | | | | |
| | | | Asus VP228 | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP WiFi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M600 | THINKPAD E15 | iPad (9th Gen.) | ASUS - VP228 | Canon Scanner DR-C225 II | HP LaserJet E40040 | Polycom - VVX 411 | iPhone 11 | UAP-AC-HD | MX100 - Serial: Q2JN-N3K2-U9JV | HPE 1920 48G | TCL | | Alii-NVAU-NS2015VR |
| THINKCENTRE M10Q | THINKBOOK 14 G2 ITL | iPad (9th Gen.) | Acer - V206HQL | Canon - R40 | HP LaserJet Pro M402dm | Polycom - VVX 411 | iPhone 11 | UAP-AC-HD | | HPE 1920 48G | TCL | | Alii-NS2015VR |
| THINKCENTRE M73 | SURFACE PRO 8 | iPad (9th Gen.) | Acer - V206HQL | Canon Scanner DR-C225 | HP LaserJet Pro M402dn | Yealink - SIP-T46S | iPhone 11 | | | HPE 1920 48G | Insignia | | Alii-NS2015VR |
| THINKCENTRE M600 | 750XDA | | Acer - V206HQL | Canon Scanner DR-C225 | HP LaserJet Pro M402cn | Yealink - SIP-T46S | iPhone 13 | | | | | | Alii-NS2015VR |
| THINKCENTRE M73 | | | Acer - V206HQL | Canon - R40 | HP LaserJet Pro M402cn | Polycom - VVX 411 | iPhone 13 | | | | | | Alii-NS2015VR |
| THINKCENTRE M73 | | | ACER - V196ML | Canon Scanner DR-C225 | HP LaserJet Pro M404dn | Yealink SIP-T23P | | | | | | | Alii-NS2015VR |
| THINKCENTRE M11Q | | | Acer - V206HQL | Canon Scanner DR-C225 | HP LaserJet Pro MFP M428fdn | Yealink SIP-T23P | | | | | | | Alii-NS2015VR |
| THINKCENTRE M20QS | | | Acer - V206HQL | Canon Scanner DR-C225 II | Ricoh IM 4000 | Yealink SIP-T23P | | | | | | | Alii-NS2015VR |
| THINKCENTRE M72Q | | | Lenovo ThinkCentre TIO24Gen3 | Canon Scanner DR-C225 | | Yealink SIP-T23P | | | | | | | Alii-NS2015VR |
| THINKCENTRE M20Q | | | Acer - V206HQL | Canon R40 | | Yealink SIP-T23P | | | | | | | Alii-NS2015VR |
| THINKCENTRE M20QS | | | HP - LV1911 | Canon Scanner DR-C225 | | Yealink SIP-T46S | | | | | | | |
| THINKCENTRE M20QS | | | Acer - V206HQL | | | Polycom - VVX 401 | | | | | | | |
| THINKCENTRE M50Q | | | Acer - V206HQL | | | Yealink SIP-T27P | | | | | | | |
| THINKCENTRE M73 | | | Acer - KA220HQ | | | Yealink SIP-T28P | | | | | | | |
| THINKCENTRE M50Q | | | Lenovo ThinkCentre TIO24Gen3 | | | Yealink - SIP-T46S | | | | | | | |
| THINKCENTRE M50Q | | | Acer - V206HQL | | | Polycom - VVX 411 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | ACER - V196ML | | | Yealink SIP-T23P | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Dell S1900WXE | | | Yealink SIP-T23P | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer - KA220HQ | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | ASUS - VP228 | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | ACER - V196ML | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer - V227Q | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Lenovo ThinkCentre TIO24Gen3 | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Lenovo ThinkCentre TIO24Gen3 | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Sceptre IPS 24-in | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Lenovo ThinkCentre TIO24Gen3 | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | HP - LV1911 | | | | | | | | | | |
| OPTIPLEX 5090 | | | Acer - V206HQL | | | | | | | | | | |
| OPTIPLEX 5090 | | | Dell E1909Wc 19" | | | | | | | | | | |
| HP ELITE MINI 800 G9 DESKTOP PC | | | Dell E1909Wc 19" | | | | | | | | | | |
| | | | ASUS - VE248 | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | ACER - V196ML | | | | | | | | | | |
| | | | Acer - KA220HQ | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Acer - V226HQ | | | | | | | | | | |
| | | | Acer - KA220HQ | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | ACER - V196ML | | | | | | | | | | |
| | | | Acer - V227Q | | | | | | | | | | |
| | | | ASUS - VE248 | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M720Q | 750XDA | iPad (6th Gen., Cellular) | AOC | CANON DR-C225 II | HP LaserJet M402n | Polycom - VVX 410 | iPhone 11 | UAP-AC-LR MX100 - Serial: Q2JN-FZTM-MHY9 | | HPE 1950 48G | Fire TV | ALU-N | ALU-NS2036R |
| THINKCENTRE M720Q | | iPad (9th Gen.) | ACER V227Q | CANON R40 | HP LaserJet Pro M404-M405 | Polycom - VVX 411 | iPhone 11 | UAP-AC-LR | | | Insignia | | ALU-NS2036R |
| THINKCENTRE M70Q | | iPad (6th Gen., Cellular) | ACER V226HQL | CANON R40 | HP LaserJet Pro M404-M405 | Polycom - VVX 450 | iPhone 13 | | | | Insignia | | ALU-NS2036R |
| THINKCENTRE M720Q | | | HP V22VB | CANON R40 | HP LaserJet Pro M428F-M429F | Polycom - VVX 401 | iPhone 11 | | | | | | ALU-NS2036R |
| THINKCENTRE M70Q | | | Dell 2016H 20" | CANON R40 | HP LaserJet Pro MFP 4101 | Polycom - VVX 450 | | | | | | | ALU-NS2036R |
| HP ELITEDESK 800 G3 DM65W | | | ACER V196WL | CANON R40 | RICOH IMC3500 | Polycom - VVX 411 | | | | | | | ALU-NS2036R |
| HP ELITEDESK 800 G3 DM35W | | | ASUS VE248 | CANON R40 | | Polycom - VVX 401 | | | | | | | |
| HP ELITEDESK 800 G3 DM35W | | | ASUS VP228 | CANON R40 | | Polycom - VVX 450 | | | | | | | |
| HP ELITEDESK 800 G3 DM35W | | | HP V22VB | CANON R40 | | Polycom - VVX 450 | | | | | | | |
| HP ELITEDESK 800 G3 DM35W | | | ACER V227Q | CANON DR-C225 II | | Polycom - VVX 411 | | | | | | | |
| | | | ACER V206HQL | | | Polycom - VVX 400 | | | | | | | |
| | | | DELL P2018H | | | Polycom - VVX 450 | | | | | | | |
| | | | DELL P2018H | | | Polycom - VVX 450 | | | | | | | |
| | | | SAMSUNG S24A338NHN | | | Polycom - VVX 450 | | | | | | | |
| | | | SAMSUNG S24A338NHN | | | Polycom - VVX 450 | | | | | | | |
| | | | ASUS VP228 | | | Polycom - VVX 450 | | | | | | | |
| | | | DELL P2018H | | | Polycom - VVX 411 | | | | | | | |
| | | | ThinkCentre Monitor 24 in | | | Yealink SIP-T23G | | | | | | | |
| | | | DELL P2018H | | | | | | | | | | |
| | | | AOC 22E1H | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | ACER V227Q | | | | | | | | | | |
| | | | ASUS VE248 | | | | | | | | | | |
| | | | ASUS VP228 | | | | | | | | | | |
| | | | HP V22VB | | | | | | | | | | |
| | | | ACER V206HQL | | | | | | | | | | |
| | | | DELL P2018H | | | | | | | | | | |
| | | | DELL P2018H | | | | | | | | | | |
| | | | SAMSUNG S24A338NHN | | | | | | | | | | |
| | | | SAMSUNG S24A338NHN | | | | | | | | | | |
| | | | Lenovo ThinkCentre TIO24Gen3 | | | | | | | | | | |
| | | | DELL P2018H | | | | | | | | | | |
| | | | DELL P2018H | | | | | | | | | | |
| | | | AOC 22E1H | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HP ELITEDESK 800 G3 DM 35W | HP 250 G8 NOTEBOOK PC | | | | | | | | | HPE 1920 24G | | ALI-N | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | HP 250 G7 NOTEBOOK PC | | | | | | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | | | | | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM65W | | | | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | | | | | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 MINI 35W | | | | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP WiFi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M600 | HP 250 G8 NOTEBOOK PC | iPad (9th Gen.) | Acer - V206HQL | CANON R40 | Brother MFC-J5930DW | Yealink SIP-T23G | iPhone 13 | UAP-AC-Pro | MX100- Serial:Q2JN-SNAV-RE3R | HPE 1950 poE 48G | Fire TV | ALI-NVR3316P | ALI-NS2015VR |
| THINKCENTRE M600 | 750XDA | iPad (9th Gen.) | Dell E2211Hb | CANON DR-C225 | HP Color LaserJet Pro MFP M479fdw | Yealink SIP-T27P | SM-A146U | Aruba | | HPE 1950 poE 48G | LG | | ALI-NS2015VR |
| THINKCENTRE M600 | THINKPAD L15 GEN 2 | iPad (9th Gen.) | Acer - V206HQL | CANON R40 | HP LaserJet E40040 | Yealink SIP-T26P | iPhone 13 | | | HPE 1950 poE 48G | Insignia | | ALI-NS2015VR |
| THINKCENTRE M700 | THINKBOOK 15 G2 ITL | iPad (9th Gen.) | Acer - V226HQL | CANON DR-C225 II | HP LaserJet Pro M402n | Yealink SIP-T23G | iPhone 11 | | | | | | ALI-NS2015VR |
| THINKCENTRE M600 | 750XDA | iPad (9th Gen.) | Acer - V206HQL | CANON DR-C225 | HP LaserJet Pro M402n | Yealink SIP-T23G | iPhone 11 | | | | | | ALI-NS2015VR |
| THINKCENTRE M72QQ | | | Acer - V206HQL | CANON DR-C225 II | HP LaserJet Pro M402n | Yealink SIP-T23G | | | | | | | ALI-NS2015VR |
| THINKCENTRE M72QQ | | | Acer - V226HQL | CANON DR-C225 II | HP LaserJet Pro M404dn | Polycom - VVX 450 | | | | | | | ALI-NS2015VR |
| THINKCENTRE M72QQ | | | Acer - V206HQL | CANON R40 | HP LaserJet Pro M404dn | Polycom - VVX 411 | | | | | | | ALI-NS2015VR |
| THINKCENTRE M72QQ | | | Sceptre IPS 24-In | CANON DR-C225 | HP LaserJet Pro M404dn | Polycom - VVX 411 | | | | | | | ALI-NS2015VR |
| THINKCENTRE M70Q | | | Lenovo ThinkCentre TIO24Gen3 | CANON DR-C225 | HP LaserJet Pro MFP M426fdn | Polycom - VVX 411 | | | | | | | ALI-NS2015VR |
| THINKCENTRE M70Q | | | Lenovo ThinkCentre TIO24Gen3 | CANON DR-C225 | HP LaserJet Pro MFP M428fdn | Yealink SIP-T23G | | | | | | | ALI-NS2015VR |
| THINKCENTRE M70Q | | | Acer - V206HQL | | Ricoh IM 4000 | Polycom - VVX 450 | | | | | | | ALI-NS2015VR |
| THINKCENTRE M70Q | | | Acer - V206HQL | CANON R40 | Ricoh IM 4000 | Polycom - VVX 411 | | | | | | | ALI-NS2015VR |
| THINKCENTRE M70Q | | | Acer - V206HQL | | Ricoh IMC 3000 | Polycom - VVX 411 | | | | | | | ALI-NS2015VR |
| THINKCENTRE M70Q | | | Lenovo ThinkCentre TIO24Gen3 | | | Yealink SIP-T23G | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer - V206HQL | | | Yealink SIP-T23G | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer - V206HQL | | | Yealink SIP-T27P | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer - V206HQL | | | Yealink W60B | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Lenovo ThinkCentre TIO24Gen3 | | | Polycom - VVX 411 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | VivoSonic | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer - V206HQL | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer - V206HQL | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | HP V222VB | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer KA220HQ | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer - V206HQL | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | ASUS VP248 | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer - V206HQL | | | | | | | | | | |
| THINKCENTRE M70Q | | | Acer - V206HQL | | | | | | | | | | |
| | | | Acer - V226HQL | | | | | | | | | | |
| | | | Sceptre IPS 24-In | | | | | | | | | | |
| | | | ASUS VP248 | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | ASUS VP248 | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Dell | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Acer - V227Q | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Lenovo ThinkCentre TIO24Gen3 | | | | | | | | | | |
| | | | AOC 22E1H | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | ASUS VP248 | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M73 | THINKPAD L15 GEN 2 | iPad (9th Gen.) | Acer - V226HQL | CANON DR-C225 | HP LaserJet 400 M401n | Polycom - VVX 450 | iPhone 13 | UAP-AC-Pro | MX100 - Serial Q2JN-LVMU-SJ2W | HPE | Fire TV | ALI-NR16DF-2 | ALI-PT60-UA |
| THINKCENTRE M72Q | 750XDA | iPad (9th Gen.) | Acer - V206HQL | CANON DR-C225 II | HP LaserJet M402n | Yealink SIP-T23P | | UAP-AC-Pro | | HPE | Insignia | | ALI-PT60-UA |
| THINKCENTRE M70Q | | iPad (9th Gen.) | HP V222VB | CANON DR-C225 II | HP LaserJet MFP M426fdn | Polycom - VVX 450 | | UAP-AC-Pro | | | Fire TV | | ALI-PT60-UA |
| THINKCENTRE M70Q | | iPad (9th Gen.) | Acer - V206HQL | CANON R40 | HP LaserJet Pro M428f-M429f | Polycom - VVX 411 | | UAP-AC-Pro | | | Fire TV | | ALI-PT60-UA |
| THINKCENTRE M72Q | | | ASUS VP248 | | Ricoh IMC3500 | YEALINK W60B | | UAP-AC-Pro | | | Sceptre | | ALI-PT60-UA |
| HP ELITEBOOK 840 G3 | | | HP V222VB | | | Polycom - VVX 450 | | | | | TCL - Camera | | ALI-PT60-UA |
| HP ELITEDESK 800 G3 DM 35W | | | Sceptre IPS 24-In | | | Polycom - VVX 450 | | | | | | | ALI-PT60-UA |
| HP ELITEDESK 800 G3 DM 35W | | | Acer KA220HQ | | | Polycom - VVX 411 | | | | | | | |
| OPTIPLEX 5090 | | | HP V222VB | | | Polycom - VVX 450 | | | | | | | |
| OPTIPLEX 5090 | | | HP V222VB | | | Yealink SIP-T26P | | | | | | | |
| OPTIPLEX 5090 | | | Acer - V226HQL | | | Yealink SIP-T23G | | | | | | | |
| OPTIPLEX 5090 | | | HP V222VB | | | Yealink SIP-T23G | | | | | | | |
| OPTIPLEX 5090 | | | Acer - V206HQL | | | Polycom - VVX 450 | | | | | | | |
| OPTIPLEX 5090 | | | Acer V196WL | | | Polycom - VVX 411 | | | | | | | |
| OPTIPLEX 5090 | | | Acer - V206HQL | | | Polycom - VVX 450 | | | | | | | |
| HP ELITEDESK 800 G3 DM 65W | | | AOC 22E1H | | | Polycom - VVX 450 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Sceptre IPS 24-In | | | Polycom - VVX 411 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Sceptre IPS 24-In | | | Polycom - VVX 450 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | HP V222VB | | | Polycom - VVX 450 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Samsung S24A336NHN | | | Polycom - VVX 411 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Lenovo ThinkCentre TIO24Gen3 | | | Polycom - VVX 450 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Sceptre IPS 24-In | | | Polycom - VVX 411 | | | | | | | |
| | | | HP V222VB | | | Yealink SIP-T31P | | | | | | | |
| | | | Lenovo ThinkCentre TIO24Gen3 | | | Polycom - VVX 411 | | | | | | | |
| | | | Samsung S24A336NHN | | | Polycom - VVX 411 | | | | | | | |
| | | | Acer KA220HQ | | | | | | | | | | |
| | | | Acer - V226HQL | | | | | | | | | | |
| | | | HP V222VB | | | | | | | | | | |
| | | | Sceptre IPS 24-In | | | | | | | | | | |
| | | | Acer KA220HQ | | | | | | | | | | |
| | | | HP V222VB | | | | | | | | | | |
| | | | Lenovo ThinkCentre TIO24Gen3 | | | | | | | | | | |
| | | | HP V222VB | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Acer V196WL | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Sceptre IPS 24-In | | | | | | | | | | |
| | | | Sceptre IPS 24-In | | | | | | | | | | |
| | | | Samsung S24A336NHN | | | | | | | | | | |
| | | | HP V222VB | | | | | | | | | | |
| | | | Sceptre IPS 24-In | | | | | | | | | | |
| | | | Samsung S24A336NHN | | | | | | | | | | |
| | | | Acer KA220HQ | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M600 | SURFACE PRO 7 | iPad (9th Gen.) | ACER - V196WL | ImageFORMULA P-215II | Brother MFC-L2700DW series | Yealink - SIP-T46S | iPhone 11 | UAP-AC-HD | MX100 - Serial: Q12N-H9GS-SXMM | HPE 1920S 48G PPoE Insignia 42" | | ALI-NVR3316P | ALI-NS2016VR |
| THINKCENTRE M600 | 750XDA | iPad (9th Gen.) | ACER - V196WL | ImageFORMULA DR-C225 II | HP LaserJet Pro M402n | Yealink - SIP-T46S | iPhone 11 | UAP-AC-HD | | HPE 1920S 48G PPoE+ | | | ALI-NS2016VR |
| THINKCENTRE M600 | HP PROBOOK 450 15.6 INCH G10 NOTEBOOK PC | iPad (9th Gen.) | ACER - V196WL | ImageFORMULA DR-C225 II | HP LaserJet Pro M402n | Yealink - SIP-T46S | iPhone 13 | UAP-AC-HD | | | | | ALI-NS2016VR |
| THINKCENTRE M73 | | iPad (9th Gen.) | ACER - V196WL | ImageFORMULA DR-C225 II | HP LaserJet Pro M404dn | Yealink - SIP-T46S | iPhone 13 | | | | | | ALI-NS2016VR |
| THINKCENTRE M73 | | iPad (9th Gen.) | ACER - V196WL | ImageFORMULA DR-C225 II | HP LaserJet Pro M404dn | Yealink - SIP-T46S | iPhone 13 | | | | | | ALI-NS2016VR |
| THINKCENTRE M600 | | | ACER - V196WL | ImageFORMULA DR-C225 II | HP LaserJet Pro MFP M428fdn | Polycom-VVX411 | iPhone 11 | | | | | | ALI-NS2016VR |
| THINKCENTRE M73 | | | ASUS - VE248 | ImageFORMULA DR-C225 II | HP LaserJet Pro MFP M428fdn | Polycom-VVX411 | iPhone 11 | | | | | | |
| THINKCENTRE M71SQ | | | ASUS - VE248 | | Ricoh IMC3500 | Polycom-VVX411 | | | | | | | |
| THINKCENTRE M720Q | | | ASUS - VE248 | | | Polycom-VVX411 | | | | | | | |
| THINKCENTRE M820Q | | | ASUS - VE248 | | | Polycom-VVX411 | | | | | | | |
| THINKCENTRE M820Q | | | ASUS - VE248 | | | Polycom-VVX411 | | | | | | | |
| THINKCENTRE M720Q | | | ASUS - VE248 | | | Polycom-VVX611 | | | | | | | |
| THINKCENTRE M720Q | | | Lenovo ThinkCentre TIO24Gen3 | | | Polycom-VVX611 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Lenovo ThinkCentre TIO24Gen3 | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Lenovo ThinkCentre TIO24Gen3 | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM45W | | | Lenovo ThinkCentre TIO24Gen3 | | | | | | | | | | |
| OPTIPLEX 5090 | | | Acer - V206HQL | | | | | | | | | | |
| OPTIPLEX 5090 | | | Acer - V206HQL | | | | | | | | | | |
| OPTIPLEX 5090 | | | Acer - V206HQL | | | | | | | | | | |
| OPTIPLEX 5090 | | | Acer - V206HQL | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | Acer - V206HQL | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | Acer - V206HQL | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | Acer - V206HQL | | | | | | | | | | |
| OPTIPLEX 5090 | | | Acer - V206HQL | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer - V206HQL | | | | | | | | | | |
| | | | ASUS - VE248 | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP WiFi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M73 | THINKCENTRE M720Q | iPad (9th Gen.) | ACER V226HQL | CANON DR-C225 | HP LaserJet M402dn | XIAMEN YEALINK Network... | iPhone 11 | UAP-AC-HD | M95 - Serial: Q2XN-4TFB-7W2P | HPE 48 | Samsung 32" | ALI-NR16P-2 | ALI-NS2036R |
| THINKCENTRE M600 | THINKPAD E15 | iPad (9th Gen.) | ACER V226HQL | CANON DR-C225 II | HP LaserJet M402dn | Polycom | iPhone 11 | | | HPE 48 | Insignia 42" | ALI-NR16P-2 | ALI-NS2036R |
| LENOVO PRODUCT | THINKPAD E15 | | ACER V226HQL | CANON DR-C225 II | HP LaserJet M402n | Polycom | iPhone 13 | | | | Insignia 60" | | ALI-NS2036R |
| THINKCENTRE M600 | HP 250 G6 NOTEBOOK PC | iPad (9th Gen.) | ACER V226HQL | CANON R40 | HP LaserJet M402n | Polycom | iPhone 11 | | | | Free TV 62" | | ALI-NS2036R |
| THINKCENTRE M600 | THINKBOOK 15 G2 ITL | | ACER V226HQL | CANON DR-C225 | HP LaserJet M402n | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M600 | 7500DA | | ACER V226HQL | CANON DR-C225 II | HP LaserJet M402n | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M73 | SURFACE PRO 8 | | ACER V226HQL | CANON DR-C225 II | HP LaserJet M402n | XIAMEN YEALINK Network... | | | | | | | ALI-NS2036R |
| THINKCENTRE M73 | 7500DA | | ACER V226HQL | CANON DR-C225 | HP LaserJet M402n | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M71SQ | SURFACE PRO 8 | | ACER V226HQL | CANON DR-C225-II | HP LaserJet Pro M404-M405 | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M71SQ | SURFACE PRO 8 | | ACER V226HQL | CANON DR-C225-II | HP LaserJet Pro M404-M405 | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M720Q | HP PROBOOK 450 15.6 INCH G9 NOTEBOOK PC | | ACER V226HQL | CANON DR-C225 | Ricoh IMC3500 | Polycom | | | | | | | |
| THINKCENTRE M720Q | 7500FG | | ACER V226HQL | CANON DR-C225 | | Polycom | | | | | | | |
| THINKCENTRE M720Q | | | ACER V226HQL | | | Polycom | | | | | | | |
| THINKCENTRE M720Q | | | ACER V226HQL | | | Polycom | | | | | | | |
| THINKCENTRE M720Q | | | ACER V226HQL | | | Polycom | | | | | | | |
| THINKCENTRE M720Q | | | ACER V226HQL | | | XIAMEN YEALINK Network... | | 11 | | | | | |
| THINKCENTRE M720Q | | | ACER V226HQL | | | Polycom | | | | | | | |
| THINKCENTRE M70Q | | | ACER V226HQL | | | Polycom | | | | | | | |
| THINKCENTRE M720Q | | | ACER V226HQL | | | Polycom | | | | | | | |
| THINKCENTRE M70Q | | | ACER V226HQL | | | XIAMEN YEALINK Network... | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | ACER V226HQL | | | XIAMEN YEALINK Network... | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | ACER V226HQL | | | | | | | | | | |
| OPTIPLEX 5090 | | | ACER V226HQL | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 65W | | | ACER V226HQL | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 65W | | | ACER V226HQL | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | ACER V226HQL | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | ACER V226HQL | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | ACER V226HQL | | | | | | | | | | |
| OPTIPLEX 5090 | | | ACER V226HQL | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | ACER V226HQL | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | ACER V226HQL | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | ACER V226HQL | | | | | | | | | | |
| | | | ACER V226HQL | | | | | | | | | | |
| | | | ACER V226HQL | | | | | | | | | | |

| Computer | Laptop | Tablet | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP WiFi's | Firewalls | Network Switches | TVs | NVR | WiFi Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M73 | THINKPAD E15 | iPad (9th Gen.) | Lenovo ThinkCentre TIO24Gen3 | imageFORMULA DR-C225 II | BROTHER MFC-6940DW | Polycom VVX411 | iPhone 15 | AP-AC-Pro-Gen2 | MK100, Serial: Q2JN-CNZL-HWAM | HPE OfficeConnect Switch 1820 24G PoE+ | Vizio 43 | | ALI-NVR3116 ALI-NS2016VR |
| THINKCENTRE M693 | THINKPAD E15 | iPad (9th Gen.) | Lenovo ThinkCentre TIO24Gen3 | imageFORMULA DR-C225 II | HP LaserJet Pro M402dn | iPhone 11 | | AP-AC-Pro-Gen2 | | HP 1820-24G PoE+ | Fire TV 43 | | ALI-NVR3116VR |
| THINKCENTRE M693 | 7100DA | iPad (9th Gen.) | Lenovo ThinkCentre TIO24Gen3 | imageFORMULA DR-C225 II | HP LaserJet Pro M402dn | Polycom VVX411 | | AP-AC-Pro-Gen2 | | HP 1820-24G PoE+ | Samsung 43 | | ALI-NVR3116VR |
| THINKCENTRE M73 | | | Lenovo ThinkCentre TIO24Gen3 | imageFORMULA RAS | HP LaserJet Pro M402dn | Polycom VVX411 | iPhone 15 | | | | Samsung 43 | | ALI-NVR3116VR |
| THINKCENTRE M71Q | | | Acer-V206HQL | imageFORMULA P-215II | HP LaserJet Pro M402n | Yealink SIP-T23P | iPhone 13 | | | | TCL 55 | | ALI-NVR3116VR |
| THINKCENTRE M73 | | | Acer-V206HQL | imageFORMULA DR-C225 II | HP LaserJet Pro M402n | Yealink SIP-T23P | iPhone 13 | | | | | | ALI-NVR3116VR |
| THINKCENTRE M600 | | | Acer-V206HQL | imageFORMULA DR-C225 II | HP LaserJet Pro M402dn | Yealink SIP-T23P | | | | | | | ALI-NVR3116VR |
| HP ELITEDESK 800 G3 DM 35W | | | Acer-V206HQL | imageFORMULA DR-C225 II | HP LaserJet Pro M404dn | Polycom VVX450 | | | | | | | ALI-NVR3116VR |
| HP ELITEDESK 800 G3 DM 35W | | | Acer-V206HQL | | HP LaserJet Pro MFP M428fdn | Polycom VVX450 | | | | | | | ALI-NVR3116VR |
| HP ELITEDESK 800 G3 DM 35W | | | HP-LV191 | | INCOM IN-6000 | Polycom VVX450 | | | | | | | ALI-NVR3116VR |
| HP ELITEDESK 800 G3 DM 35W | | | HP-LV191 | | | Polycom VVX450 | | | | | | | ALI-NVR3116VR |
| HP ELITEDESK 800 G3 DM 35W | | | HP-LV191 | | | | | | | | | | |
| OPTIPLEX 5090 | | | HP-LV191 | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | HP-LV191 | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Dell E201wHR 20" | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Dell E201wHR 20" | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Dell E201wHR 20" | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | Lenovo ThinkCentre TIO24Gen3 | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | Lenovo ThinkCentre TIO24Gen3 | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | HP-LV191 | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | Lenovo ThinkCentre TIO24Gen3 | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | ACER - V196HL | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer - RA220HQ | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer - RA220HQ | | | | | | | | | | |
| | | | Acer - RA220HQ | | | | | | | | | | |
| | | | Acer - RA220HQ | | | | | | | | | | |
| | | | Acer - RA220HQ | | | | | | | | | | |
| | | | ASUS - VE248 | | | | | | | | | | |
| | | | ASUS - VE248 | | | | | | | | | | |
| | | | ASUS - VE248 | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |
| | | | Acer - V206HQL | | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Computer workstation | DELL | | ARM3138 | Bird Road | | Exam Room 5 | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M600 | THINKPAD E15 | iPad (9th Gen.) | Sceptre | ImageFORMULA DR-C225 II | HP LaserJet M402n | Polycom-VVX 411 | iPhone 13 | UAP-AC-Pro | M9100 - Serial: Q12N-7911-Z7U6 | HPE 48G | Fire TV 60" | AU-NVR3316P | ALI-NS2036R |
| THINKCENTRE M720Q | THINKPAD E14 | iPad (9th Gen.) | DELL | ImageFORMULA DR-C225 II | HP LaserJet Pro M428f-M429f | Polycom-VVX 411 | iPhone 13 | | | HPE 24G | Fire TV 45" | | ALI-NS2036R |
| THINKCENTRE M720Q | THINKPAD E15 GEN 2 | | Acer | ImageFORMULA DR-C225 II | Ricoh IM C3500 | Polycom-VVX 411 | iPhone 13 | | | | TCL 42" | | ALI-NS2036R |
| THINKCENTRE M70Q | 7501DA | | DELL | ImageFORMULA DR-C225 II | HP LaserJet M402n | Polycom-VVX 411 | | | | | | | ALI-NS2036R |
| THINKCENTRE M720Q | 7501DA | | DELL | ImageFORMULA DR-C225 II | | Polycom-VVX 411 | | | | | | | ALI-NS2036R |
| THINKCENTRE M720Q | SURFACE PRO 8 | | DELL | ImageFORMULA DR-C225 II | | Polycom-VVX 411 | | | | | | | ALI-NS2036R |
| THINKCENTRE M720Q | 7501DA | | Acer | ImageFORMULA DR-C225 II | | Polycom-VVX 411 | | | | | | | ALI-NS2036R |
| THINKCENTRE M720Q | 7501DA | | Acer | ImageFORMULA R40 | | Polycom-VVX 411 | | | | | | | ALI-NS2036R |
| OPTIPLEX 3050 | | | Acer | ImageFORMULA R40 | | Polycom-VVX 411 | | | | | | | ALI-NS2036R |
| VOSTRO 3671 | | | Acer | | | Polycom-VVX 411 | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | Acer | | | Polycom-VVX 411 | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | Acer | | | Polycom-VVX 411 | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | Acer | | | Polycom-VVX 411 | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | Acer | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Acer | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Acer | | | | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | Acer | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M70Q | THINKPAD E15 | | | | | XIAMEN YEALINK Network... | iPhone 11 | UAP-AC-Pro | MX67 - Serial:Q2FY-F96Z-MSSJ | HPE | | DS-7t | HIKVISIONCAM |
| OPTIPLEX 5090 | | | | | | Ubiquiti | | UAP-AC-Pro | | | | | HIKVISIONCAM |
| OPTIPLEX 5090 | | | | | | XIAMEN YEALINK Network... | | | | | | | HIKVISIONCAM |
| | | | | | | Polycom | | | | | | | HIKVISIONCAM |
| | | | | | | | | | | | | | HIKVISIONCAM |
| | | | | | | | | | | | | | HIKVISIONCAM |
| | | | | | | | | | | | | | HIKVISIONCAM |
| | | | | | | | | | | | | | HIKVISIONCAM |
| | | | | | | | | | | | | | HIKVISIONCAM |
| | | | | | | | | | | | | | HIKVISIONCAM |
| | | | | | | | | | | | | | HIKVISIONCAM |
| | | | | | | | | | | | | | HIKVISIONCAM |
| | | | | | | | | | | | | | HIKVISIONCAM |
| | | | | | | | | | | | | | HIKVISIONCAM |
| | | | | | | | | | | | | | HIKVISIONCAM |

| Computers | Laptops | Tablets | Graphics | Monitors | Scanners | Printers | Rack Phones | Cell Phones | AP WiFi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | work Switc | TVs | NVR | VR Cameras |
|-----------|---------|---------|----------|----------|----------|-------------|-------------|-----------|-----------|------------|-----|-----|------------|

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP WiFi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M710Q | SURFACE PRO | | Acer KA230HQ | Cannon-R40 | BROTHER MFC-J5910DW | Polycom | iPhone 13 | AP-AC-Pro-Gen2 | MX100 - Serial: Q2JN-C7Z2-Z9YJ | HPE OfficeConnect Switch 1920S 48G 4SFP PPoE+ | TCL | | ALI-NL8208iR |
| THINKCENTRE M73 | THINKPAD E580 | | Acer QG22 | Cannon dr-c225 | HP Color LaserJet M554 | Yealink | iPhone 11 | AP-AC-Pro-Gen2 | | HPE 1950 48G 2SFP+ 2XGT PoE+ | Insignia | | ALI-NL8208iR |
| THINKCENTRE M73 | THINKPAD E15 | | Acer V196WL | Cannon dr-c225 II | HP Color LaserJet M554 | | iPhone 11 | UAP-HD | | HPE 1950 48G 2SFP+ 2XGT PoE+ | Samsung | | ALI-NL8208iR |
| THINKCENTRE M720Q | LATITUDE 9520 | | Acer V206HQL | | HP Color LaserJet Pro MFP M479fdn | | iPhone 11 | UAP-HD | | HPE OfficeConnect Switch 1920S 48G 4SFP PPoE+ | Vido | | ALI-NL8208iR |
| THINKCENTRE M720Q | THINKPAD E15 | | Acer KC24 | | HP Color LaserJet Pro MFP M479fdn | | | UAP-HD | | HPE OfficeConnect Switch 1920S 48G 4SFP PPoE+ | LG | | ALI-NL8208iR |
| THINKPAD T670 W10DG | 750XDA | | Acer R221Q | | HP Color LaserJet Pro MFP M479fdw | | | UAP-HD | | HPE OfficeConnect Switch 1920S 48G 4SFP PPoE+ | Sceptre | | ALI-NL8208iR |
| THINKCENTRE M720Q | THINKPAD P15 GEN 2i | | Acer V226HQ | | HP Color LaserJet Pro MFP M479fdw | | | UniFi6 AP-Pro | | | | | ALI-NL8208iR |
| THINKCENTRE M720Q | THINKPAD L15 GEN 2 | | AOC 227E | | HP Color LaserJet Pro MFP M479fdw | | | UniFi6 AP-Pro | | | | | |
| THINKCENTRE M720Q | THINKBOOK 15 G2 ITL | | Asus VP22 | | HP LaserJet 15P | | | UniFi6 AP-Pro | | | | | |
| THINKCENTRE M720Q | THINKBOOK 15 G2 ITL | | Asus 24 | | HP LaserJet M406 | | | | | | | | |
| THINKSTATION P340 | 750XDA | | Dell E2221HN | | HP LaserJet Pro 200 color M251nw | | | | | | | | |
| THINKCENTRE M70Q | 750XDA | | Dell 2018H | | HP LaserJet Pro M402n | | | | | | | | |
| THINKCENTRE M710Q | 750XDA | | Dell 24 | | HP LaserJet Pro M402n | | | | | | | | |
| THINKCENTRE M70Q | THINKPAD P15 GEN 2i | | HP P22 | | HP LaserJet Pro M404dn | | | | | | | | |
| THINKCENTRE M8205 | 750XDA | | Lenovo7022 | | HP LaserJet Pro M404dn | | | | | | | | |
| HP ELITEBOOK 800 G3 DM 35W | SURFACE PRO 8 | | Samsung524 | | HP LaserJet Pro MFP M426fdn | | | | | | | | |
| THINKCENTRE M8205 | SURFACE PRO 8 | | Sceptre 24 | | HP LaserJet Pro MFP M426fdn | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | 750XDA | | Viewsonic VA24 | | HP LaserJet Pro MFP M428dw | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | HP PROBOOK 450 15.6 INCH G9 NOTEBOOK PC | | Lenovo L23 | | HP LaserJet Pro MFP M428dw | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | HP PROBOOK 450 15.6 INCH G9 NOTEBOOK PC | | Hp 27 | | HP LaserJet Pro MFP M428dw | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | HP PROBOOK 450 15.6 INCH G9 NOTEBOOK PC | | HP pavilion 27 | | HP LaserJet Pro MFP M428fdn | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | 750XFG | | Samsung35 | | HP LaserJet Pro MFP M428fdn | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | 750XFG | | Lg J10BN | | Ricoh IM4000 | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | 750XFG | | | | Ricoh IM4000 | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | HP ELITE X360 1040 14 INCH G10 2-IN-1 NOTEBOOK PC | | | | Ricoh IM4000 | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | HP ELITE X360 1040 14 INCH G10 2-IN-1 NOTEBOOK PC | | | | Ricoh IM5000 | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | THINKPAD P15 i5 | | | | Ricoh MC4000 | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | SURFACE PRO | | | | Ricoh MC6000 | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | THINKPAD E580 | | | | Ricoh MP 5055 | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | THINKPAD E15 | | | | Ricoh MP 5055 | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | THINKPAD P53 | | | | | | | | | | | | |
| THINKCENTRE M720Q | THINKPAD P15 i5 | | | | | | | | | | | | |
| THINKCENTRE M73 | THINKPAD E15 | | | | | | | | | | | | |
| OPTIPLEX 7060 | THINKPAD E15 | | | | | | | | | | | | |
| THINKCENTRE M710Q | THINKBOOK 14 G2 ITL | | | | | | | | | | | | |
| THINKCENTRE M730 | THINKPAD E14 | | | | | | | | | | | | |
| THINKCENTRE M720Q | THINKPAD E14 | | | | | | | | | | | | |
| THINKCENTRE M720Q | LENOVO THINKBOOK 15P | | | | | | | | | | | | |
| THINKCENTRE M720Q | MACBOOK PRO (16-INCH, 2019) | | | | | | | | | | | | |
| THINKCENTRE M8205 | 750XDA | | | | | | | | | | | | |
| THINKCENTRE M70Q | INSPIRON 3501 | | | | | | | | | | | | |
| THINKCENTRE M70Q | INSPIRON 3501 | | | | | | | | | | | | |
| THINKCENTRE M720Q | THINKBOOK 15 G2 ITL | | | | | | | | | | | | |
| THINKSTATION P340 | 750XDA | | | | | | | | | | | | |
| THINKCENTRE M70Q | 750XDA | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | MACBOOK PRO (13-INCH, 2020, FOUR THUNDERBOLT 3 PORTS) | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | 750XDA | | | | | | | | | | | | |
| THINKCENTRE M8205 | 750XFG | | | | | | | | | | | | |
| THINKCENTRE M8205 | 750XFG | | | | | | | | | | | | |
| THINKCENTRE M8205 | 750XFG | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | HP ELITE X360 1040 14 INCH G10 2-IN-1 NOTEBOOK PC | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | HP ELITE X360 1040 14 INCH G10 2-IN-1 NOTEBOOK PC | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | HP PROBOOK 450 15.6 INCH G9 NOTEBOOK PC | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | MACBOOK PRO (13-INCH, 2020, FOUR THUNDERBOLT 3 PORTS) | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK M8205 | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| OPTIPLEX 5090 | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM65W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| OPTIPLEX 5090 | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| THINKCENTRE M720Q | | | | | | | | | | | | | |
| THINKCENTRE M720Q | | | | | | | | | | | | | |

| Computers | Laptops/Computers | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | THINKCENTRE M73 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | OPTIPLEX 390 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | LATITUDE 5480 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E570 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E570 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E570 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E570 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E590 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E590 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E590 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E590 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E590 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | iPad (9th Gen.) | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A146U | | | | | | |
| | THINKCENTRE M920Q | | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A136U | | | | | | |
| | THINKCENTRE M920Q | | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A146U | | | | | | |
| | XPS 15 9500 | | | | | | SM-A146U | | | | | | |
| | THINKPAD P15S GEN 1 | | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A146U | | | | | | |
| | THINKCENTRE M73 | | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A146U | | | | | | |
| | THINKBOOK 14 G2 ITL | | | | | | SM-A146U | | | | | | |
| | THINKPAD E14 | | | | | | SM-A146U | | | | | | |
| | THINKPAD E14 | | | | | | SM-A146U | | | | | | |
| | THINKPAD E14 | | | | | | SM-A146U | | | | | | |
| | THINKPAD E14 | | | | | | SM-A146U | | | | | | |
| | THINKPAD E14 | | | | | | SM-A146U | | | | | | |
| | HP ELITEDESK 800 G3 DM 35W | | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A146U | | | | | | |
| | MACBOOK PRO (16-INCH, 2019) | | | | | | SM-A146U | | | | | | |
| | HP ELITEDESK 800 G3 DM 35W | | | | | | SM-A146U | | | | | | |
| | THINKPAD E15 | | | | | | SM-A146U | | | | | | |
| | HP ELITEDESK 800 G3 DM 35W | | | | | | SM-A146U | | | | | | |
| | HP 250 G8 NOTEBOOK PC | | | | | | SM-A146U | | | | | | |
| | HP 250 G8 NOTEBOOK PC | | | | | | SM-A146U | | | | | | |
| | HP 250 G8 NOTEBOOK PC | | | | | | SM-A146U | | | | | | |
| | HP 250 G8 NOTEBOOK PC | | | | | | SM-A146U | | | | | | |
| | HP 250 G8 NOTEBOOK PC | | | | | | SM-A146U | | | | | | |
| | 750XDA | | | | | | SM-A146U | | | | | | |
| | 750XDA | | | | | | SM-A146U | | | | | | |
| | 750XDA | | | | | | SM-A146U | | | | | | |
| | HP ELITEDESK 800 G3 DM 35W | | | | | | T790W | | | | | | |
| | HP 250 G8 NOTEBOOK PC | | | | | | | | | | | | |
| | THINKPAD L15 GEN 2 | | | | | | | | | | | | |
| | THINKPAD L15 GEN 2 | | | | | | | | | | | | |
| | 750XDA | | | | | | | | | | | | |
| | 750XDA | | | | | | | | | | | | |
| | THINKBOOK 15 G2 ITL | | | | | | | | | | | | |
| | THINKBOOK 15 G2 ITL | | | | | | | | | | | | |
| | THINKPAD L15 GEN 2 | | | | | | | | | | | | |
| | THINKPAD L15 GEN 2 | | | | | | | | | | | | |
| | THINKPAD L15 GEN 2 | | | | | | | | | | | | |
| | THINKBOOK 15 G2 ITL | | | | | | | | | | | | |
| | THINKBOOK 15 G2 ITL | | | | | | | | | | | | |
| | THINKBOOK 15 G2 ITL | | | | | | | | | | | | |
| | 750XDA | | | | | | | | | | | | |
| | 750XDA | | | | | | | | | | | | |
| | THINKBOOK 15 G2 ITL | | | | | | | | | | | | |
| | THINKBOOK 15 G2 ITL | | | | | | | | | | | | |
| | THINKBOOK 15 G2 ITL | | | | | | | | | | | | |
| | HP ELITEDESK 800 G3 DM 65W | | | | | | | | | | | | |
| | HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | |
| | HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | |
| | THINKBOOK 15 G2 ITL | | | | | | | | | | | | |
| | THINKBOOK 15 G2 ITL | | | | | | | | | | | | |
| | HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | |
| | 750XDA | | | | | | | | | | | | |
| | 750XDA | | | | | | | | | | | | |
| | 750XDA | | | | | | | | | | | | |
| | 750XDA | | | | | | | | | | | | |
| | 750XDA | | | | | | | | | | | | |
| | 750XDA | | | | | | | | | | | | |
| | 750XDA | | | | | | | | | | | | |
| | THINKBOOK 15 G2 ITL | | | | | | | | | | | | |

THINKBOOK 15 G2 ITL
750XDA
750XDA
750XDA
950XDB/951XDB/950XDY
750XDA
750XDA
HP ELITEDESK 800 G3 DM 35W
750XDA
750XDA
750XDA
750XDA
SURFACE PRO 8
THINKBOOK 15 G2 ITL
THINKBOOK 15 G2 ITL
750XDA
750XDA
750XDA
750XDA
YOGA 7 16IAP7
PRECISION 5570
750XDA
750XDA
750XDA
HP ELITEDESK 800 G3 DM 35W
750XDA
750XDA
750XDA
750XDA
750XDA
750XDA
HP PROBOOK 450 15.6 INCH G9 NOTEBOOK PC
HP PROBOOK 450 15.6 INCH G9 NOTEBOOK PC
750XFG
HP PROBOOK 450 15.6 INCH G9 NOTEBOOK PC
HP PROBOOK 450 15.6 INCH G9 NOTEBOOK PC
750XFG
750XDA
HP ELITE X360 1040 14 INCH G10 2-IN-1 NOTEBOOK PC
HP ELITE X360 1040 14 INCH G10 2-IN-1 NOTEBOOK PC
HP 250 G7 NOTEBOOK PC
HP PROBOOK 450 15.6 INCH G10 NOTEBOOK PC
HP PROBOOK 450 15.6 INCH G10 NOTEBOOK PC
HP PROBOOK 450 15.6 INCH G10 NOTEBOOK PC
HP ELITE X360 1040 14 INCH G10 2-IN-1 NOTEBOOK PC
HP PROBOOK 450 15.6 INCH G10 NOTEBOOK PC
950XDB/951XDB/950XDY
HP COMPAQ 6005 PRO SFF
THINKCENTRE M73
THINKPAD E570
SURFACE PRO
SURFACE PRO
THINKPAD E590
THINKBOOK 14 G2 ITL
THINKPAD E14
THINKPAD E15
HP ELITEDESK 800 G3 DM 35W
HP ELITEDESK 800 G3 DM 35W
750XDA
THINKBOOK 15 G2 ITL
750XDA
THINKBOOK 15 G2 ITL
HP ELITEDESK 800 G3 DM 35W
950XDB/951XDB/950XDY
750XDA
750XDA
THINKBOOK 15 G2 ITL
750XDA
750XDA
750XDA
750XDA
SURFACE PRO 8
750XDA
PRECISION 5570
750XDA
HP ELITEDESK 800 G3 DM 35W
750XDA
750XDA
HP PROBOOK 450 15.6 INCH G9 NOTEBOOK PC
HP PROBOOK 450 15.6 INCH G10 NOTEBOOK PC
HP PROBOOK 450 15.6 INCH G10 NOTEBOOK PC
XPS 15 7590

| Computers | Laptops | Tablets | Monitor Brand | Scanners | Printers | Desk Phones | Cell Phones | AP WiFi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M70Q | THINKPAD E15 | iPad (9th Gen.) | Acer 27" | Canon Scanner DR-C225 II | HP LaserJet Pro M404dn | Polycom VVX 450 IP Phone | iPhone 11 | UAP-AC-LR | MX100- Serial: Q2JN-QZ3D-L3VR | Aruba InstantOn 1960 48G | Insignia - 75" Class F30 Series LED 4K UHD Smart Fire TV | ALL-IN160P-2 | ALI-PTNS1-UA |
| THINKCENTRE M70Q | HP ELITEBOOK 840 G3 | iPad (9th Gen.) | Acer 27" | Canon Scanner DR-C225 II | HP LaserJet Pro MFP M428fdn | Polycom VVX 450 IP Phone | iPhone 11 | UAP-AC-LR | | | Insignia - 50" Class F30 Series LED 4K UHD Smart Fire TV | ALI-PTNS1-UA | ALI-PTNS1-UA |
| THINKCENTRE M80S | THINKPAD E15 | iPad (9th Gen.) | Acer 27" | Canon Scanner R40 | HP LaserJet Pro MFP M428fdn | Polycom VVX 450 IP Phone | iPhone 11 | UAP-AC-Pro | | | Insignia - 50" Class F30 Series LED 4K UHD Smart Fire TV | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | THINKBOOK 15 G2 ITL | | Acer 27" | Canon Scanner R40 | HP LaserJet Pro 400 M401n | Polycom VVX 450 IP Phone | iPhone 11 | UAP-AC-HD | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | 750XDA | | Acer 27" | Canon Scanner DR-C225 II | HP LaserJet Pro MFP M428fdn | Polycom VVX 450 IP Phone | iPhone 13 | | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | Canon Scanner DR-C225 II | IRC 3300 Color Laser Multifunction Printer | Polycom VVX 450 IP Phone | | | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | Canon Scanner R40 | | Polycom VVX 450 IP Phone | | | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | Canon Scanner R40 | | Polycom VVX 450 IP Phone | | | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | Canon Scanner DR-C225 II | | Polycom VVX 450 IP Phone | | | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | | | Polycom VVX 450 IP Phone | | | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | | | Polycom VVX 450 IP Phone | | | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | | | Polycom VVX 450 IP Phone | | | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | | | Polycom VVX 450 IP Phone | | | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | | | Polycom VVX 450 IP Phone | | | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | | | Polycom VVX 450 IP Phone | | | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | | | Polycom VVX 450 IP Phone | | | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | | | Polycom VVX 450 IP Phone | | | | | | | ALI-PTNS1-UA |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | | | Grandstream DP750 | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | Acer 27" | | | Poly VoIP VVX 401 | | | | | | | |
| | | | Acer 27" | | | | | | | | | | |
| | | | Acer 27" | | | | | | | | | | |
| | | | Acer 27" | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M600 | THINKPAD E15 | | Planar | | HP Color LaserJet MFP M283fdw | Yealink | | UBN | | HPe 1820 | Vizio | | |
| THINKCENTRE M720Q | | | | | RICOH IM 4000 | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HP ELITEDESK 800 G3 DM 35W | 750XDA | | HP | | | Yeakink | | UBN | MX67 | HPE 1920 | | | |
| HP PRODESK 400 G6 DESKTOP MINI PC | 750XDA | | HP | | | Yeakink | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | 750XDA | | Acer | | | Yeakink | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | 750XFG | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 MINI | THINKPAD E590 | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | HP ELITEBOOK 850 G5 | | | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HP ELITEDESK 800 G3 DM 35W | SURFACE PRO | iPad (9th Gen) | HP | CANON DR C225II | HP LaserJet Pro M402n | YEALINK | iPhone 13 | UAP-AC-Lite | MX100 - Serial: Q2JN-RFCK-5DZB | HPE 1920 48G | Insignia | ALI-N | ALI-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | THINKPAD E15 | | HP | CANON DR C225II | HP Officejet Pro 8710 | YEALINK | iPhone 13 | UAP-AC-Lite | | | Sanyo | | ALI-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | HP 250 G8 NOTEBOOK PC | | HP | CANON R40 | Ricoh IM 4000 | YEALINK | | | | | | | ALI-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | HP 250 G8 NOTEBOOK PC | | HP | | | YEALINK | | | | | | | ALI-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | 750XDA | | HP | | | YEALINK | | | | | | | ALI-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | 750XDA | | HP | | | YEALINK | | | | | | | ALI-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | 750XDA | | SPECTRE | | | YEALINK | | | | | | | ALI-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | 750XDA | | SPECTRE | | | POLYCOM | | | | | | | ALI-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | 750XFG | | SPECTRE | | | | | | | | | | ALI-NS2038R |
| THINKCENTRE M70Q GEN 2 | | | SPECTRE | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | LG | | | | | | | | | | |
| | | | ASUS | | | | | | | | | | |
| | | | DELL | | | | | | | | | | |
| | | | DELL | | | | | | | | | | |
| | | | ACER | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HP PRODESK 600 G3 DM | | | HP | | Ricoh IM 4000 | Yealink | | UAPv2 | MX67 - Serial:Q2FY-YUKE-ZNJL | HPE 1820 | Insignia | ALI-NR160F-2 | ALI-NS2036R |
| HP ELITEDESK 800 G5 DESKTOP MINI | | | HP | | | Yealink | | | | | | | ALI-NS2036R |
| | | | | | | | | | | | | | ALI-NS2036R |
| | | | | | | | | | | | | | ALI-NS2036R |
| | | | | | | | | | | | | | ALI-NS2036R |
| | | | | | | | | | | | | | ALI-NS2036R |
| | | | | | | | | | | | | | ALI-NS2036R |
| | | | | | | | | | | | | | ALI-NS2036R |
| | | | | | | | | | | | | | ALI-NS2036R |
| | | | | | | | | | | | | | ALI-NS2036R |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HP ELITEDESK 800 G3 DM 35W | THINKPAD E580 | iPad (9th Gen.) | Samsung | Canon | HP LaserJet Pro 400 M401n | Polycom | iPhone 11 | UAP | MX100 - Serial: Q2JN-5JGP-AVT7 | HPE 1950 48G | | ALI-N | ALI-NS2036R |
| HP PRODESK 600 G6 DESKTOP MINI PC | THINKBOOK 14 G2 ITL | iPad (9th Gen.) | Samsung | Canon | HP LaserJet Pro M404dn | Polycom | iPhone 13 | UAP | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | HP 250 G8 NOTEBOOK PC | iPad (9th Gen.) | Samsung | Canon | HP LaserJet Pro MFP M428fdw | Polycom | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | THINKBOOK 15 G2 ITL | | Samsung | Canon | HP Officejet Pro 9010 | Polycom | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | THINKBOOK 15 G2 ITL | | Samsung | Canon | Ricoh IM 4000 | Polycom | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | Samsung | Canon | | Polycom | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | Samsung | Canon | | Polycom | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | HP | | | Polycom | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | HP | | | Polycom | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | HP | | | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M70Q GEN 2 | | | HP | | | Yealink | | | | | | | ALI-NS2036R |
| | | | HP | | | Yealink | | | | | | | ALI-NS2036R |
| | | | HP | | | | | | | | | | ALI-NS2036R |
| | | | Lenovo | | | | | | | | | | ALI-NS2036R |
| | | | LG | | | | | | | | | | ALI-NS2036R |
| | | | ViewSonic | | | | | | | | | | ALI-NS2036R |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M73 | THINKPAD P51S | iPad (9th Generation) | ASUS Monitor VP228HE 22" | Canon Scanner R40 | IMC3500 Color Laser Multifunction Printer | Polycom VVX 400 IP Phone | iPhone 13 | UAP-AC-HD | M9100 - Serial: QLJN-93FU-UHRY | HPE OfficeConnect 1950 Series Switch | Insignia | ALI-NVR16P-2 | ALI-NS2204R |
| THINKCENTRE M73 | HP 250 G8 NOTEBOOK PC | iPad (9th Generation) | Dell Monitor E2220H | Canon Scanner R40 | HP LaserJet Pro M606dn | Polycom VVX 400 IP Phone | | UAP-AC-HD | | | | | ALI-NS2204R |
| THINKCENTRE M73 | HP 250 G8 NOTEBOOK PC | | Acer Monitor V226HQL 21.5" | Canon Scanner R40 | | Polycom VVX 400 IP Phone | | | | | | | ALI-NS2204R |
| THINKCENTRE M73 | 7500FG | iPad (9th Generation) | Dell Monitor E2221HN | Canon Scanner R40 | | Polycom VVX 400 IP Phone | | | | | | | ALI-NS2204R |
| HP ELITEDESK 800 G3 DM 35W | THINKBOOK 15 G2 ITL | iPad (9th Generation) | HP Monitor V222xk 21.5" | Canon Scanner DR-C225 | | Polycom VVX 400 IP Phone | | | | | | | ALI-NS2204R |
| HP ELITEDESK 800 G3 DM 35W | HP 250 G7 NOTEBOOK PC | | Acer Monitor V226HQL 21.5" | Canon Scanner R40 | | Polycom VVX 400 IP Phone | | | | | | | ALI-NS2204R |
| HP ELITEDESK 800 G3 DM 35W | THINKBOOK 15 G2 ITL | | Acer Monitor V226HQL 21.5" | Canon Scanner R40 | | Polycom VVX 400 IP Phone | | | | | | | ALI-NS2204R |
| HP 230 G4 NOTEBOOK PC | THINKBOOK 15 G2 ITL | | Acer Monitor V226HQL 21.5" | Canon Scanner R40 | | Polycom VVX 400 IP Phone | | | | | | | ALI-NS2204R |
| HP PRODESK 600 G6 DESKTOP MINI PC | THINKBOOK 15 G2 ITL | | Acer Monitor V226HQL 21.5" | Canon Scanner R40 | | Polycom VVX 400 IP Phone | | | | | | | ALI-NS2204R |
| HP ELITEDESK 800 G3 DM 35W | THINKBOOK 15 G2 ITL | | Acer Monitor V226HQL 21.5" | Canon Scanner R40 | | Polycom VVX 400 IP Phone | | | | | | | ALI-NS2204R |
| HP ELITEDESK 800 G3 DM 35W | THINKBOOK 15 G2 ITL | | Acer Monitor V226HQL 21.5" | Canon Scanner R40 | | Polycom VVX 400 IP Phone | | | | | | | ALI-NS2204R |
| HP ELITEDESK 800 G3 DM 35W | 7500FA | | Acer Monitor V226HQL 21.5" | Canon Scanner R40 | | Polycom VVX 400 IP Phone | | | | | | | |
| HP ELITEDESK 800 G3 DESKTOP MINI | 7500DA | | Acer Monitor V226HQL 21.5" | Canon Scanner R40 | | Polycom VVX 400 IP Phone | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | THINKBOOK 15 G2 ITL | | Acer Monitor V226HQL 21.5" | Canon Scanner R40 | | Polycom VVX 400 IP Phone | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | 7500FG | | Acer Monitor V226HQL 21.5" | | | Poly VoIP VVX 401 | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer Monitor V226HQL 21.5" | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | LG Monitor 24UL43A6 24inch | | | | | | | | | | |
| HP PRODESK 400 G6 DESKTOP MINI PC | | | Acer Monitor V226HQL 21.5" | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer Monitor V226HQL 21.5" | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | Acer Monitor V226HQL 21.5" | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | HP Monitor 24f 21.6" | | | | | | | | | | |
| | | | Acer Monitor K242HQL 23.6" | | | | | | | | | | |
| | | | Acer Monitor V226HQL 21.5" | | | | | | | | | | |
| | | | Acer Monitor V226HQL 21.5" | | | | | | | | | | |
| | | | Acer Monitor V226HQL 21.5" | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | THINKPAD E570 | | Dell | | | Yealink | | UBN | MX67 | HPE 1820 | Insignia | ALI-N | ALI-PT50-UAI |
| | THINKPAD E15 | | Dell | | | Yealink | | | | | | | ALI-PT50-UAI |
| | THINKPAD E15 | | Dell | | | Yealink | | | | | | | ALI-PT50-UAI |
| | SURFACE PRO 8 | | Dell | | | Yealink | | | | | | | ALI-PT50-UAI |
| | THINKBOOK 15 G2 ITL | | | | | Yealink | | | | | | | ALI-PT50-UAI |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M70Q GEN 2 | THINKPAD E15 | iPad (9th Gen.) | Asus | Canon | BROTHER MFC-L8610CDW series | Polycom | iPhone 11 | UAP-AC-HD | M067 - Serial: Q2FY-FB8Y-EMMR | Cisco CBS250-24P-4G Switch | Insignia - 50 | ALI-NR160F-2 | ALI-FTB1-UA |
| THINKCENTRE M70Q GEN 2 | HP 250 G8 NOTEBOOK PC | iPad (9th Gen.) | Asus | Canon | HP LaserJet E40040 | Polycom | | | | | | | ALI-FOB1-AI |
| THINKCENTRE M70Q GEN 2 | HP 250 G8 NOTEBOOK PC | iPad (9th Gen.) | Acer | Canon | HP LaserJet E40040 | Polycom | | | | | | | ALI-FOB1-AI |
| THINKCENTRE M70Q GEN 2 | 750XIDA | | Acer | Canon | HP LaserJet Pro M402n | Polycom | | | | | | | ALI-FTB1-UA |
| THINKCENTRE M70Q GEN 2 | THINKBOOK 15 G2 ITL | | Acer | Canon | HP LaserJet Pro M404dn | Polycom | | | | | | | ALI-FOB1-AI |
| THINKCENTRE M70Q GEN 2 | THINKBOOK 15 G2 ITL | | HP | Canon | HP LaserJet Pro M404dn | Polycom | | | | | | | ALI-FTB1-UA |
| THINKCENTRE M70Q GEN 2 | 750XIDA | | HP | Canon | HP LaserJet Pro M404dn | Polycom | | | | | | | ALI-FTB1-UA |
| THINKCENTRE M70Q GEN 2 | | | HP | Canon | HP LaserJet Pro MFP M428fdn | Polycom | | | | | | | ALI-FTB1-UA |
| THINKCENTRE M70Q GEN 2 | | | HP | Canon | RICOH IMC 3500 | Polycom | | | | | | | ALI-FTB1-UA |
| THINKCENTRE M70Q GEN 2 | | | HP | Canon | RICOH IMC 3500 | Polycom | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | HP | Canon | | Polycom | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | HP | Canon | | Polycom | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | HP | | | Yealink | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | HP | | | Yealink | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | HP | | | Yealink | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | HP | | | | | | | | | | |
| | | | HP | | | | | | | | | | |
| | | | HP | | | | | | | | | | |
| | | | HP | | | | | | | | | | |
| | | | Dell | | | | | | | | | | |
| | | | Spectre | | | | | | | | | | |
| | | | Spectre | | | | | | | | | | |
| | | | Spectre | | | | | | | | | | |
| | | | Spectre | | | | | | | | | | |
| | | | Samsung | | | | | | | | | | |
| | | | Samsung | | | | | | | | | | |
| | | | ViewSonic | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP WiFi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HP PRODESK 400 G6 DESKTOP MINI PC | 7100DA | iPad (9th Gen.) | Acer Monitor V227Q 21.5" | Canon Scanner R40 | HP LaserJet Pro MFP M428fdn | Yealink SIP-T46S IP Phone | iPhone 13 | UAP-AC-HD | NM67 - Serial: CQFY-YN08-BUEF | CBS250-24P-4G | TCL S304 CLASS 3-Series HD LED SMART ROKU TV | DS-7608NI-Q1 / 8P | HIKVISION CAM |
| HP PRODESK 400 G6 DESKTOP MINI PC | 7100FG | iPad (9th Gen.) | Acer Monitor V227Q 21.5" | Canon Scanner R40 | HP LaserJet Pro MFP M428fdn | Yealink SIP-T46S IP Phone | iPhone 13 | | | | TCL S304 CLASS 3-Series HD LED SMART ROKU TV | | HIKVISION CAM |
| HP PRODESK 400 G6 DESKTOP MINI PC | | | HP Monitor 24fw 23.8" | Canon Scanner R40 | HP LaserJet Pro MFP M428fdn | Yealink SIP-T46S IP Phone | | | | | TCL S304 CLASS 3-Series HD LED SMART ROKU TV | | HIKVISION CAM |
| HP PRODESK 400 G6 DESKTOP MINI PC | | | ViewSonic Monitor VA2446MH-LED 22" | | | Polycom VVX 400 IP Phone | | | | | TCL S304 CLASS 3-Series HD LED SMART ROKU TV | | |
| HP PRODESK 400 G6 DESKTOP MINI PC | | | Acer Monitor V227Q 21.5" | | | | | | | | TCL 43" CLASS 4-Series 4K UHD HDR LED SMART ROKU TV | | |
| HP ELITEDESK 800 G3 DM 35W | | | Acer Monitor V227Q 21.5" | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | HP Monitor 24fw 23.8" | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | HP Monitor 24fw 23.8" | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | HP Monitor 24fw 23.8" | | | | | | | | | | |
| | | | HP Monitor 24fw 23.8" | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M70Q GEN 2 | THINKPAD E15 | iPad (9th Gen.) | Dell | Canon | | Yealink | iPhone 13 | UAP-AC-Pro | MX67 - Serial:Q2FY-4W7D-WEB6 | HPE 48G | Insignia | ALIBINVR | ALIBICAM |
| THINKCENTRE M70Q GEN 2 | HP 250 G8 NOTEBOOK PC | | Dell | Canon | | Yealink | | | | | | | ALIBICAM |
| THINKCENTRE M70Q GEN 2 | THINKBOOK 15 G2 ITL | | Dell | Canon | | Yealink | | | | | | | ALIBICAM |
| THINKCENTRE M70Q GEN 2 | 750XDA | | Dell | Canon | | Yealink | | | | | | | ALIBICAM |
| THINKCENTRE M70Q GEN 2 | | | Dell | Canon | | Polycom | | | | | | | ALIBICAM |
| | | | Samsung | | | Polycom | | | | | | | |
| | | | Samsung | | | Polycom | | | | | | | |
| | | | Samsung | | | Polycom | | | | | | | |
| | | | Samsung | | | Polycom | | | | | | | |
| | | | Samsung | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M720Q | THINKPAD E580 | iPad (9th Gen.) | HP | Canon | HP Color LaserJet MFP M283fdw | Yealink | iPhone 13 | UAP | MX100 - Serial: Q2JN-XH3H-27GK | HPE 48G PoE | Insignia | | ALI-N-ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | THINKPAD E15 | iPad (9th Gen.) | HP | Canon | HP LaserJet Pro M404dn | Yealink | | UAP | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | HP 250 G8 NOTEBOOK PC | iPad (9th Gen.) | HP | Canon | RICOH IM4000 | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | 750XDA | iPad (9th Gen.) | HP | Canon | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | HP | Canon | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | HP | Canon | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | HP | Canon | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | HP | Canon | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | Lenovo | | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | Acer | | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | Acer | | | Yealink | | | | | | | ALI-NS2036R |
| THINKCENTRE M70Q GEN 2 | | | Acer | | | Yealink | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | Acer | | | Yealink | | | | | | | |
| OPTIPLEX 5090 | | | Acer | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |
| | | | ViewSonic | | | | | | | | | | |
| | | | ViewSonic | | | | | | | | | | |
| | | | ViewSonic | | | | | | | | | | |
| | | | ViewSonic | | | | | | | | | | |
| | | | LG | | | | | | | | | | |
| | | | Asus | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HP ELITEDESK 800 G3 DM 35W | HP 250 G8 NOTEBOOK PC | | HP | | HP LaserJet Pro MFP M28fdw | Yealink | | UBNT | M667 | HPE1820 | Insignia | ALI-NR160F-2 | ALI-PT50-UAI |
| HP PRODESK 600 G3 DM | | | HP | | RICOH IM 4000 | Yealink | | | | | | | ALI-PT50-UAI |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-PT50-UAI |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HP ELITEDESK 800 G3 DM 35W | HP 250 G8 NOTEBOOK PC | iPad (9th Gen.) | HP | Canon | HP Color LaserJet MFP M283fdw | Yealink | iPhone 11 | UAP | MX100 - Serial: Q2JN-SXD6-HYXB | HPE 1950 48G PoE | Insignia | | ALI-N ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | HP 250 G8 NOTEBOOK PC | iPad (9th Gen.) | HP | Canon | RICOH IM 4000 | Yealink | iPhone 11 | UAP | | | JVC | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | THINKBOOK 15 G2 ITL | | HP | Canon | | Yealink | iPhone 13 | UAP | | | | | ALI-NS2036R |
| HP PRODESK 600 G5 DESKTOP MINI | THINKBOOK 15 G2 ITL | | HP | Canon | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | THINKBOOK 15 G2 ITL | | HP | Canon | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G5 DESKTOP MINI | 750XDA | | HP | Canon | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | THINKBOOK 15 G2 ITL | | HP | Canon | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | 750XDA | | DELL | | | Yealink | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | 750XDA | | DELL | | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | 750XDA | | DELL | | | Yealink | | | | | | | ALI-NS2036R |
| HP PRODESK 600 G5 DESKTOP MINI | | | DELL | | | Yealink | | | | | | | |
| THINKBOOK 15 G2 ITL | | | ACER | | | Yealink | | | | | | | |
| THINKBOOK 15 G2 ITL | | | ACER | | | Yealink | | | | | | | |
| THINKBOOK 15 G2 ITL | | | ACER | | | Yealink | | | | | | | |
| THINKBOOK 15 G2 ITL | | | LG | | | Yealink | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | LG | | | Yealink | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HP ELITEDESK 800 G3 DM 35W | THINKPAD E15 | iPad (9th Gen.) | HP | Canon | HP LaserJet Pro MFP M428fdw | Yealink | iPhone 11 | UAP-AC-Pro | MX100 - Serial: Q2JN-FC5Z-YPZH | HPE1950 48G | | ALI-N | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | HP 250 G8 NOTEBOOK PC | iPad (9th Gen.) | HP | Canon | Ricoh IM 4000 | Yealink | iPhone 11 | UAP-AC-Pro | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | HP 250 G8 NOTEBOOK PC | iPad (9th Gen.) | HP | Canon | HP Officejet Pro 8620 | Yealink | iPhone 11 | UAP-AC-Pro | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | HP 250 G8 NOTEBOOK PC | iPad (9th Gen.) | HP | Canon | Ricoh IM 4000 | Yealink | | | | | | | ALI-NS2036R |
| HP PRODESK 600 G5 DESKTOP MINI | HP PRODESK 600 G5 DESKTOP MINI | iPad (9th Gen.) | HP | Canon | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | HP PROBOOK 450 G6 | | HP | Canon | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | 750XDA | | HP | Canon | | Yealink | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | THINKBOOK 15 G2 ITL | | HP | Canon | | Polycom | | | | | | | |
| THINKBOOK 15 G2 ITL | THINKBOOK 15 G2 ITL | | HP | Canon | | Grandstream | | | | | | | |
| THINKCENTRE M70Q GEN 2 | THINKBOOK 15 G2 ITL | | HP | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | 750XDA | | HP | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | 750XDA | | HP | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | LG | | | | | | | | | | |
| | | | LG | | | | | | | | | | |
| | | | LG | | | | | | | | | | |
| | | | LG | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |
| | | | Samsung | | | | | | | | | | |
| | | | Samsung | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OPTIPLEX 5090 | THINKPAD E14 | iPad (9th Gen.) | Dell | Canon | HP Color LaserJet Pro MFP M479fdn | Yealink | iPhone 13 | UAP-AC-Pro | MX95 - Serial: Q22N-NQ5D-5XYC | HPE 1950 48G 2SFP+ 2XGT PoE+ | Insignia | ALI-NR160F-2 | ALI-NS2036R |
| OPTIPLEX 5090 | THINKBOOK 15 G2 ITL | iPad (9th Gen.) | Dell | Canon | HP LaserJet Pro M402n | Yealink | iPhone 11 | UAP-AC-Pro | | HPE 1950 48G 2SFP+ 2XGT PoE+ | Insignia | ALI-NR160F-2 | ALI-NS2036R |
| OPTIPLEX 5090 | THINKBOOK 15 G2 ITL | iPad (9th Gen.) | Dell | Canon | HP LaserJet Pro M404dn | Yealink | iPhone 11 | UAP-AC-Pro | | HPE 1950 48G 2SFP+ 2XGT PoE+ | | | ALI-NS2036R |
| OPTIPLEX 5090 | THINKBOOK 15 G2 ITL | | Dell | Canon | HP LaserJet Pro M404dn | Yealink | | UAP-AC-Pro | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | 750XFG | | Dell | Canon | HP LaserJet Pro M404dn | Yealink | | UAP-AC-Pro | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | Canon | HP LaserJet Pro M404dn | Yealink | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | Canon | HP LaserJet Pro MFP 4101 | Yealink | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | Lanier IM 4000 | Yealink | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | Yealink | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | Yealink | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | Yealink | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | ALI-NS2036R |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | |
| OPTIPLEX 5090 | | | Dell | | | | | | | | | | |
| | | | Dell | | | | | | | | | | |
| | | | Dell | | | | | | | | | | |
| | | | Dell | | | | | | | | | | |
| | | | Dell | | | | | | | | | | |
| | | | Dell | | | | | | | | | | |
| | | | Dell | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M720Q | THINKPAD E15 | iPad (9th Gen.) | Asus | Canon | HP LaserJet Pro M404dn | Polycom | iPhone 13 | UAP-AC-HD | MX100 - Serial: Q2JN-NNQP-J2P2 | HPE 1950 PoE 48G | Insignia | | ALJ-N ALJ-NS2038R |
| THINKCENTRE M920Q | THINKBOOK 15 G2 ITL | iPad (9th Gen.) | Asus | Canon | HP LaserJet Pro M404dn | Polycom | iPhone 11 | UAP-AC-HD | | HPE 1950 PoE 48G | Insignia | | ALJ-N ALJ-NS2038R |
| THINKCENTRE M920Q | 7500FG | iPad (9th Gen.) | Asus | Canon | HP LaserJet Pro M404dn | Polycom | iPhone 11 | UAP-AC-HD | | HPE 1950 PoE 48G | Insignia | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | Canon | HP LaserJet Pro M404dn | Polycom | | UAP-AC-HD | | | Insignia | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | Canon | HP LaserJet Pro M404dn | Polycom | | UAP-AC-HD | | | Insignia | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | Canon | HP LaserJet Pro M404dn | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | Canon | HP LaserJet Pro M404dn | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | Canon | HP LaserJet Pro M404dn | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | Canon | HP LaserJet Pro MFP M428fdn | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | Canon | Ricoh IMC 3000 | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | Canon | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | Canon | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | Canon | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | Canon | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | ALJ-NS2038R |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | Asus | | | Polycom | | | | | | | |
| | | | Asus | | | Polycom | | | | | | | |
| | | | Asus | | | Polycom | | | | | | | |
| | | | Asus | | | Polycom | | | | | | | |
| | | | Asus | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |
| | | | Acer | | | | | | | | | | |
| | | | Planar | | | | | | | | | | |
| | | | Planar | | | | | | | | | | |
| | | | Lenovo | | | | | | | | | | |
| | | | Lenovo | | | | | | | | | | |
| | | | Dell | | | | | | | | | | |
| | | | Dell | | | | | | | | | | |
| | | | Dell | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M600 | THINKPAD E590 | iPad (9th Gen.) | HP | Canon | HP LaserJet Pro M402dn | Yealink | iPhone 11 | UAP-AC-HD | MX100 - Serial: Q2JN-8FY6-2PF6 | HPE 24Port | Vizio | ALI-NVR3316P | ALI-NS2015VR |
| THINKCENTRE M600 | THINKBOOK 15 G2 ITL | iPad (9th Gen.) | HP | Canon | HP LaserJet Pro M402dn | Yealink | iPhone 11 | UBB | | HPE 48Port | Vizio | ALI-NVR3316P | ALI-NS2015VR |
| THINKCENTRE M600 | 750XDA | | HP | Canon | HP LaserJet Pro M402dn | Yealink | iPhone 11 | | | | Vizio | | ALI-NS2015VR |
| THINKCENTRE M73 | | iPad (9th Gen.) | HP | Canon | HP LaserJet Pro M402dn | Yealink | iPhone 11 | | | | Vizio | | ALI-NS2015VR |
| THINKCENTRE M600 | | | HP | Canon | HP LaserJet Pro M402dn | Yealink | iPhone 11 | | | | | | ALI-NS2015VR |
| THINKCENTRE M600 | | | HP | Canon | HP LaserJet Pro M402dn | Yealink | iPhone 13 | | | | | | |
| THINKCENTRE M720Q | | | HP | Canon | HP LaserJet Pro M402n | Yealink | | | | | | | ALI-NS2018VR |
| THINKCENTRE M920Q | | | HP | | HP LaserJet Pro M402n | Yealink | | | | | | | ALI-NS2018VR |
| THINKCENTRE M920Q | | | HP | | HP LaserJet Pro M402n | Yealink | | | | | | | ALI-NS2018VR |
| THINKCENTRE M920Q | | | HP | | HP LaserJet Pro M404dn | Yealink | | | | | | | ALI-NS2018VR |
| THINKCENTRE M720Q | | | HP | | HP LaserJet Pro MFP M428fdw | Yealink | | | | | | | ALI-NS2018VR |
| THINKCENTRE M920Q | | | HP | | RIOCH IM C3000 | | | | | | | | ALI-NS2018VR |
| HP ELITEDESK 800 G3 DM 35W | | | HP | | | | | | | | | | ALI-NS2018VR |
| HP ELITEDESK 800 G3 DM 35W | | | HP | | | | | | | | | | ALI-NS2018VR |
| OPTIPLEX 5090 | | | HP | | | | | | | | | | ALI-NS2018VR |
| HP ELITEDESK 800 G3 DM 35W | | | HP | | | | | | | | | | |
| OPTIPLEX 5090 | | | HP | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | HP | | | | | | | | | | |
| THINKCENTRE M715Q | | | HP | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | Tvs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M73 | THINKPAD E15 | iPad (9th Gen.) | | | HP LaserJet 400 M401n | XIAMEN YEALINK Network... | iPhone 11 | UAP-AC-HD | MX100 - Serial Q2JN-7FE8-R5U8 | HP1820 | | ALI-NVR5332P | ALI-NS201SVR |
| THINKCENTRE M73 | THINKPAD E15 | iPad (9th Gen.) | | | HP LaserJet E40040 | Polycom | | UAP-AC-HD | | HP1920 | | ALI-NR160F-2 | ALI-NS201SVR |
| THINKCENTRE M73 | THINKPAD E15 | iPad (9th Gen.) | | | HP LaserJet E40040 | YEALINK(XIAMEN) Network... | | UAP-AC-HD | | HP1910 | | | ALI-NS201SVR |
| THINKCENTRE M73 | THINKBOOK 14 G2 ITL | iPad (9th Gen.) | | | HP LaserJet E60055 | XIAMEN YEALINK Network... | | UAP-AC-HD | | HP1820 | | | ALI-NS201SVR |
| THINKCENTRE M73 | THINKPAD E14 | iPad (9th Gen.) | | | HP LaserJet M602dn | Polycom | | UAP-AC-HD | | HP1820 | | | ALI-NS201SVR |
| THINKCENTRE M600 | 750XDA | | | | HP LaserJet M602n | Polycom | | UAP-AC-HD | | | | | ALI-NS201SVR |
| THINKCENTRE M600 | SURFACE PRO 8 | | | | HP LaserJet M602n | Polycom | | UAP-AC-HD | | | | | ALI-NS201SVR |
| THINKCENTRE M73 | 750XDA | | | | HP LaserJet M662n | XIAMEN YEALINK Network... | | UAP-AC-HD | | | | | ALI-NS201IVR |
| THINKCENTRE M73 | HP PROBOOK 450 15.6 INCH G9 NOTEBOOK PC | | | | HP LaserJet M662n | Polycom | | | | | | | ALI-NS201IVR |
| THINKCENTRE M700 | 750XFG | | | | HP LaserJet MFP M426fdn | XIAMEN YEALINK Network... | | | | | | | ALI-NS201IVR |
| THINKCENTRE M71SQ | | | | | HP LaserJet Pro M404-M405 | XIAMEN YEALINK Network... | | | | | | | ALI-NS201IVR |
| THINKCENTRE M73 | | | | | HP LaserJet Pro M428f-M429f | YEALINK(XIAMEN) Network... | | | | | | | ALI-NS201IVR |
| THINKCENTRE M600 | | | | | Ricoh IMC3500 | Polycom | | | | | | | ALI-NS201IVR |
| THINKCENTRE M71SQ | | | | | Ricoh IMC3500 | Polycom | | | | | | | ALI-NS2036IR |
| THINKCENTRE M71SQ | | | | | Ricoh IMC3500 | YEALINK(XIAMEN) Network... | | | | | | | ALI-P760-UA |
| THINKCENTRE M600 | | | | | | Polycom | | | | | | | ALI-P760-UA |
| THINKCENTRE M71SQ | | | | | | XIAMEN YEALINK Network... | | | | | | | ALI-P760-UA |
| THINKCENTRE M73 | | | | | | Polycom | | | | | | | ALI-P760-UA |
| THINKCENTRE M20QQ | | | | | | XIAMEN YEALINK Network... | | | | | | | ALI-P760-UA |
| THINKCENTRE M20QQ | | | | | | Polycom | | | | | | | ALI-P760-UA |
| THINKCENTRE M71SQ | | | | | | Polycom | | | | | | | ALI-P760-UA |
| THINKCENTRE M20QQ | | | | | | Polycom | | | | | | | ALI-P760-UA |
| THINKCENTRE M73 | | | | | | Polycom | | | | | | | ALI-P760-UA |
| THINKCENTRE M71SQ | | | | | | Polycom | | | | | | | ALI-P760-UA |
| THINKCENTRE M20QQ | | | | | | XIAMEN YEALINK Network... | | | | | | | ALI-PB40-VLUAI |
| THINKCENTRE M20QQ | | | | | | YEALINK(XIAMEN) Network... | | | | | | | ALI-PB40-VLUAI |
| THINKCENTRE M20QQ | | | | | | Polycom | | | | | | | |
| THINKCENTRE M20QQ | | | | | | Polycom | | | | | | | |
| THINKCENTRE M20QQ | | | | | | Polycom | | | | | | | |
| THINKCENTRE M20QQ | | | | | | XIAMEN YEALINK Network... | | | | | | | |
| THINKCENTRE M73 | | | | | | | | | | | | | |
| THINKCENTRE M70Q | | | | | | | | | | | | | |
| THINKCENTRE M73 | | | | | | | | | | | | | |
| THINKCENTRE M73 | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| THINKCENTRE M71SQ | | | | | | | | | | | | | |
| OPTIPLEX 5090 | | | | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | | | | | | | | | | | |
| LENOVO PRODUCT | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M73 | THINKBOOK 15 G2 ITL | iPad (9th Gen.) | | | HP Color LaserJet Pro MFP M479fdn | | iPhone 13 | UAP-AC-HD | M95S - Serial: Q2XN-BXXK-9L5P | Aruba 1960 48G | | ALI-NVR5216P | ALI-NS2015VR |
| THINKCENTRE M600 | THINKBOOK 15 G2 ITL | iPad (9th Gen.) | | | HP LaserJet Pro M402dn | | SM-A146U | UAP-AC-HD | | HP 1820-24G | | ALI-NVR3316P | ALI-NS2015VR |
| THINKCENTRE M710Q | 750XDA | | | | HP LaserJet Pro M402dn | | iPhone 11 | UAP-AC-HD | | | | | ALI-NS2015VR |
| THINKCENTRE M73 | | | | | HP LaserJet Pro M402dn | | iPhone 13 | | | | | | ALI-NS2015VR |
| THINKCENTRE M600 | | | | | HP LaserJet Pro M402dn | | iPhone 11 | | | | | | ALI-NS2015VR |
| THINKCENTRE M600 | | | | | HP LaserJet Pro M402n | | | | | | | | ALI-NS2015VR |
| THINKCENTRE M73 | | | | | HP LaserJet Pro M402n | | | | | | | | ALI-NS2036VR |
| THINKCENTRE M600 | | | | | HP LaserJet Pro M402n | | | | | | | | ALI-NS2036VR |
| THINKCENTRE M720Q | | | | | HP LaserJet Pro M402dn | | | | | | | | ALI-NS2036VR |
| THINKCENTRE M920Q | | | | | HP LaserJet Pro MFP M28fdn | | | | | | | | ALI-NS2036VR |
| THINKCENTRE M720Q | | | | | HP LaserJet Pro MFP M28fdn | | | | | | | | ALI-NS2036VR |
| THINKCENTRE M720Q | | | | | RICOH IM 4000 | | | | | | | | ALI-NS2036VR |
| THINKCENTRE M720Q | | | | | | | | | | | | | ALI-NS2036VR |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-NP3012RH |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-NS1014VR |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-NS1014VR |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-NS1014VR |
| HP ELITEDESK 800 | | | | | | | | | | | | | ALI-NS1014VR |
| OPTIPLEX 5090 | | | | | | | | | | | | | ALI-NS1014VR |
| OPTIPLEX 5090 | | | | | | | | | | | | | ALI-NS1014VR |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-NS1014VR |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-NS2036VR |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-NS2036VR |
| HP ELITEDESK M70Q GEN 2 | | | | | | | | | | | | | ALI-NS2036VR |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-NS2036VR |
| THINKCENTRE M70Q GEN 2 | | | | | | | | | | | | | ALI-NS2036VR |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-NS2036VR |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | ALI-NS2036VR |
| THINKCENTRE M900 | | | | | | | | | | | | | |
| THINKCENTRE M900 | | | | | | | | | | | | | |
| THINKCENTRE M900 | | | | | | | | | | | | | |
| THINKCENTRE M900 | | | | | | | | | | | | | |
| THINKCENTRE M720Q | | | | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M600 | THINKPAD P51S | iPad (9th Gen.) | | | BROTHER MFC-L8610CDW series | | iPhone 13 | UAP-AC-LR | MX100 - Serial: Q2JN-CQLF-WDNY | Cisco 24P | | DS-7616NI | HIKVISIONCAM |
| THINKCENTRE M600 | THINKPAD E15 | iPad (9th Gen.) | | | HP LaserJet E40040 | | iPhone 13 | UAP-AC-LR | | Cisco 24P | | | HIKVISIONCAM |
| THINKCENTRE M73 | VOSTRO 3471 | iPad (9th Gen.) | | | HP LaserJet E40040 | | iPhone 13 | | | | | | HIKVISIONCAM |
| THINKCENTRE M600 | 7S0XDA | iPad (9th Gen.) | | | HP LaserJet Pro M402n | | iPhone 13 | | | | | | HIKVISIONCAM |
| THINKCENTRE M71SQ | | iPad Pro 11 (Cellular) | | | HP LaserJet Pro M404dn | | iPhone 11 | | | | | | HIKVISIONCAM |
| THINKCENTRE M720Q | | | | | HP LaserJet Pro M404dn | | iPhone 13 | | | | | | HIKVISIONCAM |
| THINKCENTRE M720Q | | | | | HP LaserJet Pro MFP M428fdn | | iPhone 11 | | | | | | HIKVISIONCAM |
| THINKCENTRE M70Q | | | | | HP LaserJet Pro MFP M428fdn | | iPhone 13 | | | | | | HIKVISIONCAM |
| THINKCENTRE M70Q | | | | | HP LaserJet Pro MFP M428fdn | | iPhone 13 | | | | | | HIKVISIONCAM |
| THINKCENTRE M720Q | | | | | HP LaserJet Pro MFP M521dn | | iPhone 13 | | | | | | HIKVISIONCAM |
| THINKCENTRE M70Q | | | | | RICOH IMC 3500 | | | | | | | | HIKVISIONCAM |
| THINKCENTRE M70Q | | | | | | | | | | | | | HIKVISIONCAM |
| THINKCENTRE M70Q | | | | | | | | | | | | | HIKVISIONCAM |
| THINKCENTRE M600 | | | | | | | | | | | | | HIKVISIONCAM |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | HIKVISIONCAM |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | HIKVISIONCAM |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 65W | | | | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | | | | | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | | | | | | | | |

| Computers | Laptops | Tablets | Monitors | Scanners | Printers | Desk Phones | Cell Phones | AP Wifi's | Firewalls | Network Switches | TVs | NVR | NVR Cameras |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THINKCENTRE M700 | 750XFG | iPad (9th Gen.) | | | DELL MFP E515dw | Polycom | iPhone 13 | UAP-AC-LR | MX100 - Serial: Q2JN-8ZAL-5VD6 | Cisco 48G | | ALI-NVR3316P | ALI-NS2036R |
| THINKCENTRE M600 | | iPad (9th Gen.) | | | HP Color LaserJet MFP E47528 | Polycom | iPhone 11 | | | Cisco 48G | | ALI-NVR3316P | ALI-NS2036R |
| THINKCENTRE M920Q | | iPad (9th Gen.) | | | HP LaserJet Pro M402n | Polycom | iPhone 13 | | | HPE 24G | | | ALI-NS2036R |
| THINKCENTRE M73 | | | | | HP LaserJet Pro MFP M428fdn | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M720Q | | | | | HP LaserJet Pro MFP 4101 | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M73 | | | | | RICOH IM C3500 | Polycom | | | | | | | ALI-NS2036R |
| OPTIPLEX 3060 | | | | | | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M720Q | | | | | | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M720Q | | | | | | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M70Q | | | | | | zte | | | | | | | ALI-NS2036R |
| THINKCENTRE M720Q | | | | | | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M720Q | | | | | | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M70Q | | | | | | Polycom | | | | | | | ALI-NS2036R |
| OPTIPLEX 3030 AIO | | | | | | Polycom | | | | | | | ALI-NS2036R |
| THINKCENTRE M73 | | | | | | Polycom | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | | | | Polycom | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | | | | Polycom | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | | | | Polycom | | | | | | | ALI-NS2036R |
| HP ELITEDESK 800 G3 DM 35W | | | | | | YEALINK(XIAMEN) Network... | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | Polycom | | | | | | | |
| THINKCENTRE M70Q GEN 2 | | | | | | Polycom | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | Polycom | | | | | | | |
| HP ELITEDESK 800 G3 DM 35W | | | | | | Polycom | | | | | | | |
| | | | | | | Polycom | | | | | | | |
| | | | | | | Polycom | | | | | | | |

**Section 3.23**
PPP Loans

| Legal Entity | PPP Loan Lender | Date Issued | Loan Amount | Forgiveness Date | Forgiveness Amount (incl. Interest accrued) |
|---|---|---|---|---|---|
| Florida Family Primary Care Center of Pasco, LLC | International Finance Bank | 4/10/2020 | $99,800 | 12/8/2020 | $100,432 |
| Florida Family Primary Care Center of Pinellas, LLC | International Finance Bank | 4/10/2020 | $126,600 | 12/8/2020 | $127,401 |
| Florida Family Primary Care Center of Tampa, LLC | International Finance Bank | 4/10/2020 | $772,400 | 12/8/2020 | $777,288 |
| Florida Family Primary Care Center, LLC | International Finance Bank | 4/10/2020 | $58,900 | 12/8/2020 | $59,273 |
| Clinical Care Network, Inc. | Popular Bank | 8/20/2020 | $1,419,850 | 2/12/2021 | $1,428,861 |

13230494-25

**Section 3.24**
COVID-19

1. RD received a Provider Relief Fund Payment in the amounts of $2,810 and made the required attestation as to the appropriate use of the funds.
2. Deferral of employer social security tax for MBMO, LLC, which has been fully paid off as of December 31, 2022.
3. Schedule 3.23 is hereby incorporated herein by reference.

**Section 3.25**
CHOPD Incident

None.

## **Section 4.5**
Brokers (Buyer)

None.

**EXHIBIT C**

**Form of Assumption Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| MBMG HOLDING, LLC, *et al.*,[1] | Case No. 24-_____ |
| Debtors. | (Joint Administration Pending) |

**NOTICE OF ASSUMPTION AND CURE COSTS WITH RESPECT
TO EXECUTORY CONTRACTS OR UNEXPIRED LEASES POTENTIALLY TO BE
ASSUMED AND ASSIGNED IN CONNECTION WITH SALE OF DEBTORS' ASSETS**

<div style="border:1px solid">

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO
AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR
MORE OF THE DEBTORS AS SET FORTH ON EXHIBIT A ATTACHED HERETO.**

</div>

PLEASE TAKE NOTICE THAT:

1.     On October [•], 2024, MBMG Holding, LLC, and its affiliated debtors (collectively, the "Debtors")[2] filed the *Debtors' Motion for Entry of an Order (I) Approving Asset Purchase Agreement and Authorizing the Private Sale of Substantially All of the Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens and Interests Except for Permitted Liens and Assumed Liabilities, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [ECF No. [•]] (the "Sale Motion") with the United States Bankruptcy Court for the Southern District of Florida (the "Court") in the above-referenced, jointly-administered chapter 11 bankruptcy cases (the "Chapter 11 Cases").

---

[1] The address of the Debtors is 7500 S.W. 8th Street, Ste. 400, Miami, Florida 33144.  The last four digits of the Debtors' federal tax identification numbers are: (i) Care Center Medical Group, LLC (9052); (ii) Care Center Network, LLC (5784); (iii) CCMC Physician Holdings, Inc. (4532); (iv) Clinical Care Pharmacy, LLC (2103); (v) Florida Family Primary Care Center, LLC (5005); (vi) Florida Family Primary Care Center of Pasco, LLC (8570); (vii) Florida Family Primary Care Centers of Orlando, LLC (3086); (viii) Florida Family Primary Care Centers of Pinellas, LLC (7075); (ix) Florida Family Primary Care Centers of Tampa, LLC (0631); (x) MB Medical Operations, LLC (8450); (xi) MB Medical Transport, LLC (3476); (xii) MBMG Holding, LLC (3880); (xiii) MBMG Intermediate Holding, LLC (9320); (xiv) Miami Beach Medical Centers, Inc. (3933); (xv) Miami Beach Medical Consultants, LLC (2737); and (xvi) Miami Medical & Wellness Center, LLC (2474).

[2]  All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them, as applicable, in the Sale Motion or the Purchase Agreement (as such term is defined in the Sale Motion).

2.       The Sale Motion requests the Court's authorization for, among other relief, the Debtors to enter into, and consummate, a certain *Asset Purchase Agreement*, dated as of October 12, 2024 (the "Purchase Agreement") with Conviva Medical Center Management, LLC (the "Buyer") for the sale (the "Sale") of substantially all of the Debtors' assets (the "Purchased Assets").

3.       Copies of (i) the Sale Motion, (ii) the proposed Purchase Agreement, and (iii) the proposed order approving the Sale (the "Sale Order") can be obtained by contacting (1) the Debtors at either (a) *the Chief Restructuring Officer for the Debtors*, c/o Chief Restructuring Officer, MERU, LLC, 1175 Peachtree St NE, Building 100 Suite 1000, Atlanta, GA 30361 (Attn: Nicholas K. Campbell, nick@wearemeru.com), or (b) *the proposed bankruptcy counsel for the Debtors*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com), Jordi Guso, Esq. (jguso@bergersingerman.com), Christopher Andrew Jarvinen, Esq., (cjarvinen@bergersingerman.com), and Samuel Capuano, Esq. (scapuano@bergersingerman.com), or (2) obtained without charge from the case website maintained by Epiq Corporate Restructuring, LLC, the Debtors' noticing, claims and solicitation agent in connection with the Chapter 11 Cases, at https://dm.epiq11.com/CCMC.

4.       The Debtors hereby provide notice of their intent to potentially assume and assign the prepetition executory contracts or unexpired leases listed on **Exhibit A** hereto (as defined in the Purchase Agreement, the "Desired 365 Contracts") to the Buyer. The inclusion of any executory contract or unexpired lease on **Exhibit A** hereto does not require or guarantee that such executory contract or unexpired lease will actually be assumed or assigned (*i.e.*, be an Assumed Contract under the Purchase Agreement).

5.       Pursuant to the terms of the Purchase Agreement and Buyer's right to add and/or remove from **Exhibit A** Desired 365 Contracts prior to and after the Closing Date (defined below), the Debtors may seek to assume and assign one or more of the Desired 365 Contracts to the Buyer, subject to approval at the hearing to be held before the Court **on November [•], 2024 at [•] [a.m./p.m.] (ET) at the United States Bankruptcy Court, C. Clyde Atkins United States Courthouse, 301 North Miami Avenue, Courtroom __, Miami, Florida 33128** (the "Sale Hearing"). The Sale Hearing may be adjourned without notice other than adjournment in open court or as identified on the agenda, and for the avoidance of any doubt, the Sale Hearing is subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Sale Hearing to a later date, subject to the availability of the Court. On the date of the closing of the transactions contemplated by the Purchase Agreement (the "Closing Date"), or as soon thereafter as is reasonably practicable and in accordance with the terms of the Purchase Agreement and the Sale Order, the Debtors or the Buyer, as applicable, will pay the amount the Debtors' records reflect is owing for prepetition arrearages, if any, as set forth on **Exhibit A** hereto (the "Cure Costs"). The Debtors' records reflect that all postpetition amounts owing under the Desired 365 Contracts have been paid and will continue to be paid until an assumption and assignment, if any, of a Desired 365 Contract, and that, other than the Cure Costs, there are no other defaults under any of the Desired 365 Contracts.

2

6.      Objections, if any, to the Cure Costs or to the assumption and assignment of a **Desired 365 Contract to the Buyer, including with respect to adequate assurance of future performance of the Buyer (collectively, a "Contract Objection"), must: (a) be in writing; (b) state the basis of such objection with specificity, including, if applicable, the Cure Costs asserted to be required; (c) include appropriate documentation thereof; (d) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (e) be filed with the Court on or before 4:00 p.m. (prevailing Eastern Time) on   November [•], 2024 (the "Contract Objection Deadline"); and (e) be served, so as to be received the same day as the objection is filed, upon**: (1) *the Debtors*, c/o (i) the Chief Restructuring Officer, MERU, LLC, 1175 Peachtree St NE, Building 100 Suite 1000, Atlanta, GA 30361 (Attn:   Nicholas K. Campbell, nick@wearemeru.com); and (ii) *proposed bankruptcy counsel for the Debtors*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com), Jordi Guso, Esq. (jguso@bergersingerman.com), Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com) and Samuel Capuano, Esq. (scapuano@bergersingerman.com); (2) *counsel for the Buyer*, Laurence Frazen, Esq. (larry.frazen@bclplaw.com) and Michael Goldberg, Esq. (michael.goldberg@akerman.com); (3) *counsel for the DIP Agent and DIP Lenders* (a) Proskauer Rose LLP, One International Place, Boston, Massachusetts 02110 (Attn: Charles A. Dale, Esq., cdale@proskauer.com) and Proskauer Rose LLP, Eleven Times Square, New York, New York 10036 (Attn: Vincent Indelicato, Esq., vindelicato@proskauer.com and Matthew R. Koch, Esq., mkoch@proskauer.com) and (b) Trenam Law, 101 E Kennedy Boulevard, Suite 2700, Tampa, FL 33602 (Attn: Lara Roeske Fernandez, Esq., LFernandez@trenam.com); (3) *the Office of the United States Trustee*, 51 SW First Avenue, Room 1204, Miami, Florida 33130 (Attn: _____; and (4) counsel to any official committee appointed in the Chapter 11 Cases (collectively, the "Objection Notice Parties").

7.      If a Contract Objection is timely submitted in accordance with paragraph 6, a hearing with respect to the Contract Objection will be held before the Court at the Sale Hearing, or as may be continued by the Debtors and noticed on the agenda filed on the docket, or such date and time as the Court may schedule.  **If no objection is timely received, each non-Debtor counterparty to a Desired 365 Contract will be deemed to have consented to the assumption and assignment of the Desired 365 Contract with the Cure Costs set forth herein and the non-Debtor counterparty will forever will be barred from asserting any other claims related to the Desired 365 Contact against the Debtors or the Buyer or the property of any of them, including but not limited to a claim related to the propriety or effectiveness of the assumption and assignment of the Desired 365 Contract**.

8.      Pursuant to section 365 of the Bankruptcy Code, the Debtors believe there is adequate assurance of future performance that the Cure Costs set forth on **Exhibit A** hereto will be paid in accordance with the terms of the Purchase Agreement and the Sale Order.  There is also adequate assurance of the Buyer's future performance under the executory contract or unexpired lease to be assumed and assigned because of the significant resources of the Buyer.  If necessary, the Debtors will adduce facts at the hearing on any objection demonstrating the financial wherewithal of the Buyer, and its willingness and ability to perform under the Desired 365 Contract to be assumed and assigned to it (*i.e.*, the Assumed Contracts).

9.      If an objection to the Cure Costs is timely filed and received and the parties are unable to consensually resolve the dispute, the amount to be paid under section 365 of the Bankruptcy Code, if any, with respect to such objection will be determined at a hearing to be requested by the Debtors.  At the Buyer's discretion, and provided the Debtors escrow the disputed portion of the Cure Costs, the hearing regarding the Cure Costs may be continued until after the Closing Date and the Desired 365 Contract(s) subjected to such Cure Costs shall, with the consent of the Buyer, be assumed and assigned to the Buyer at or following the closing of the Sale per the procedures set forth in the Purchase Agreement and the Sale Order.

10.      **If no objection is timely received, the Cure Costs set forth in Exhibit A hereto will be controlling, notwithstanding anything to the contrary in any Desired 365 Contract or any other related document, and each non-Debtor counterparty to the Desired 365 Contracts will be deemed to have consented to the Cure Costs for the purposes of the Sale and will be forever barred from asserting any other claims in respect of such Desired 365 Contract or the Cure Costs against the Debtors, the Buyer, or the property of any of them**.  **The failure of any objecting person or entity to timely file its objection will be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, the Sale or the Debtors' consummation of and performance under the Purchase Agreement (including the transfer of the Purchased Assets and the Assumed Contracts free and clear of all claims, liens, encumbrances, and interests), if authorized by the Court.**

11.      **Unless a non-Debtor counterparty to any Desired 365 Contract files a timely Contract Objection to the assumption and assignment of the applicable Desired 365 Contract by the Buyer, then such non-Debtor counterparty shall be deemed to have (i) consented to the assumption and assignment of the applicable Desired 365 Contract to the Buyer with the Cure Costs set forth in the Assumption Notice and (ii) waived and released any and all other rights to object to the Cure Costs or the assumption and assignment of the Desired 365 Contract to the Buyer.**

12.      Prior to and after the Closing Date, the Debtors or the Buyer may (i) amend their decision with respect to the potential assumption and assignment of any Desired 365 Contract that has not already been assumed and assigned by the Debtors to the Buyer as a part of the Sale, including amending the Cure Costs, and (ii) provide a new notice amending the information provided in this notice, including, without limitation, a determination by the Debtors not to assume and assign to the Buyer certain of the prepetition executory contracts or leases.

[Remainder of Page Left Intentionally Blank]

4

Dated:  October __, 2024

Respectfully submitted,

BERGER SINGERMAN LLP
*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By:   */s/ Christopher Andrew Jarvinen*
        Paul Steven Singerman
        Florida Bar No. 378860
        singerman@bergersingerman.com
        Christopher Andrew Jarvinen
        Florida Bar No. 021745
        cjarvinen@bergersingerman.com
        Samuel J. Capuano
        Florida Bar No. 90946
        scapuano@bergersingerman.com

5

## <u>Exhibit "A"</u>

### Desired 365 Contracts and Cure Costs

*[Schedule 2.3(a) to the Purchase Agreement to be placed here]*