Docusign Envelope ID: CFB79464-45C3-4504-9471-2035E136395A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br><br>MBMG HOLDING, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11 Cases<br><br>Case No. 24-_____<br><br>(Joint Administration Pending) |

**DECLARATION OF DON RITUCCI IN SUPPORT
OF DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) APPROVING ASSET PURCHASE AGREEMENT AND
AUTHORIZING THE PRIVATE SALE OF SUBSTANTIALLY ALL
OF THE ASSETS OF THE DEBTORS OUTSIDE THE ORDINARY COURSE
OF BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE
AND CLEAR OF ALL LIENS AND INTERESTS EXCEPT FOR
PERMITTED LIENS AND ASSUMED LIABILITIES, (III) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

I, Don Ritucci, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that:

1. I am a Managing Director and Head of Healthcare Mergers & Acquisitions at Oppenheimer & Co. Inc. ("Oppenheimer"), a leading global full-service brokerage and investment bank with its principal offices located at 85 Broad Street, New York, New York 10004, as well as other locations worldwide.

2. I have more than 26 years of investment banking experience focused on the healthcare industry. Since joining Oppenheimer in 2021, I have provided investment banking

---

[1] The address of the Debtors is 7500 S.W. 8th Street, Ste. 400, Miami, Florida 33144. The last four digits of the Debtors' federal tax identification numbers are: (i) Care Center Medical Group, LLC (9052); (ii) Care Center Network, LLC (5784); (iii) CCMC Physician Holdings, Inc. (4532); (iv) Clinical Care Pharmacy, LLC (2103); (v) Florida Family Primary Care Center, LLC (5005); (vi) Florida Family Primary Care Center of Pasco, LLC (8570); (vii) Florida Family Primary Care Centers of Orlando, LLC (3086); (viii) Florida Family Primary Care Centers of Pinellas, LLC (7075); (ix) Florida Family Primary Care Centers of Tampa, LLC (0631); (x) MB Medical Operations, LLC (8450); (xi) MB Medical Transport, LLC (3476); (xii) MBMG Holding, LLC (3880); (xiii) MBMG Intermediate Holding, LLC (9320); (xiv) Miami Beach Medical Centers, Inc. (3933); (xv) Miami Beach Medical Consultants, LLC (2737); and (xvi) Miami Medical & Wellness Center, LLC (2474).

13244198-12

expertise with a focus on the healthcare industry to both sell-side and buy-side mergers and acquisition transactions. Prior to joining Oppenheimer, I was a Managing Director in the Global Healthcare Group of Jefferies & Company and led its middle market mergers and acquisition effort. From 2011 to 2018, I was a Managing Director at Imperial Capital, where I lead both the healthcare practice and the sponsor coverage practice. Prior to Imperial Capital, I spent 13 years at UBS Investment Bank, where I was a Managing Director, spending time in both the Global Healthcare Group and the Mergers & Acquisitions Group. Prior to UBS, I worked in the Audit and Business Advisory Group at Price Waterhouse, and was a licensed CPA.

3. I have personally led or had material involvement in the execution of over 70 M&A transactions during my career with an aggregate deal value in excess of $70 billion. In addition, I have had material involvement in three Chapter 11 cases and one Chapter 7 case, as well as other out-of-court distressed M&A transactions. Examples of some of the bankruptcy cases where I was involved in a sale process include: (i) *In re IMRIS Inc., et al.,* Case No. 15-11133 (Bankr. D. Del.) (Chapter 11); (ii) *In re CS DIP, LLC (f/k/a Church Street Health Management, LLC), et al.*, Case No. 12-01573 (Bankr. M.D. Tenn.) (Chapter 11); (iii) *In re Integrated Health Services, Inc., et al.,* Case No. 00-00389 (Bankr. D. Del.) (Chapter 11); and (iv) *In re IntegraMed Holding Corp., et al.,* (Case No. 20-11169) (Bankr. D. Del.) (Chapter 7).

4. I submit this declaration (the "Declaration") in support of the relief requested in the *Debtors' Motion for Entry of an Order (I) Approving Asset Purchase Agreement and Authorizing the Private Sale of Substantially All of the Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens and Interests Except for Permitted Liens and Assumed Liabilities, (III) Authorizing the Assumption and Assignment of*

13244198-12

*Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "Motion").[2]

5.  Except as otherwise indicated, all statements in this Declaration are based on (a) my personal knowledge or discussions I have personally had, (b) my review of relevant documents, (c) information provided to me by Oppenheimer employees working under my supervision, (d) information provided to me by, or in discussions with, members of the Debtors' management team or their other advisors, and (e) my views based upon my experience as a restructuring professional. If called to testify, I could, and would, testify to each of the facts set forth herein on foregoing bases.

6.  I am not being specifically compensated for this testimony other than through payments to be received by Oppenheimer as a professional retained by the Debtors.

## THE DEBTORS' PRE-BANKRUPTCY SALE AND MARKETING EFFORTS

7.  Oppenheimer was initially retained as the Debtors' investment bank on September 13, 2023, to, among other things, market the Debtors' assets for sale. Oppenheimer contacted 115 potential acquirors. No Debtor effected a transaction at this time and the Debtors terminated Oppenheimer's engagement on March 21, 2024. The Debtors re-engaged Oppenheimer on June 28, 2024 to conduct a distressed sale process and contacted seven potential acquirors. Both engagements included outreach to prospective strategic and financial acquirors in an effort to market and sell the Debtors' assets.

8.  Oppenheimer held a multitude of calls with 78 potential acquirors from September, 2023, through August, 2024, and facilitated Debtors' response to numerous diligence requests. During the first portion of Oppenheimer's engagement, the Debtors executed confidentiality

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

3

13244198-12

agreements with 53 separate parties. Oppenheimer assisted the Debtors in creating an Executive Summary which it disseminated to the 53 potential acquirors.

9.  The initial engagement resulted in the Debtors receiving five indications of interest (all of which they declined) and the subsequent engagement resulted in the Debtors receiving two indications of interest, including the indication that led to the Purchase Agreement.

10. Oppenheimer's marketing efforts have resulted in the negotiation of an Asset Purchase Agreement ("Purchase Agreement") with Conviva Medical Center Management, LLC, a controlled affiliate of Humana Inc. (the "Buyer"), which Purchase Agreement is attached to the Motion as an exhibit, and which I believe, based on my direct involvement in the Debtors' sale and marketing processes and my knowledge of the other interest in the Debtors' assets, represents the highest and otherwise best offer from a financial point of view received to date for the Purchased Assets.

11. First, to date, no other executable bids have exceeded the financial benefits to the Debtors that would result under the transaction with Buyer.

12. Second, I understand that the Debtors' senior secured and unsecured lenders, affiliates of KKR & Co. Inc. ("KKR"), and the Debtors' junior secured lender, an affiliate of Sun Capital ("Sun Capital"), support the Purchase Agreement and the proposed sale, notwithstanding that the Purchase Price will only satisfy a fraction of KKR's secured debt (and notwithstanding that the sale will not yield any proceeds for Sun Capital).

13. Given the extensive pre-bankruptcy marketing and sale efforts conducted by Oppenheimer with the most likely acquirors for over a year, I do not believe that additional marketing of the Debtors' assets, additional time soliciting bids or otherwise extending the sale process are worthwhile or would result in a higher or better offer from a financial point of view

than the offer from the Buyer represented by the Purchase Agreement (and almost certainly not one that would satisfy KKR's senior secured debt in full). Additional time marketing the Debtors' assets could cause the Buyer to reconsider its interest in pursuing the only executable transaction secured by the Debtors after extensive prepetition efforts and result in the discontinuation of medical services to the Debtors' significant patient population.

14. Accordingly, based on my experience as the Debtors' investment banker, as well as my direct involvement in the Debtors' marketing and sale processes, I believe that the proposed Purchase Agreement represents the highest and best offer from a financial point of view available to the Debtors with respect to a sale of the Purchased Assets.

15. The negotiations for the Purchase Agreement between the Debtors and the Buyer were extensive and arms-length and were undertaken in good faith and without collusion or fraud of any kind. The Debtors and the Buyer retained separate counsel and other professional advisors to represent their respective interests in the negotiation of the Purchase Agreement, as well as to represent them throughout the Sale.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 13, 2024

By: _____
Don Ritucci
Managing Director and Head of Healthcare Mergers
& Acquisitions at Oppenheimer & Co. Inc.

5

13244198-12