UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br><br>MBMG HOLDING, LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11 Cases<br><br>Case No. _____<br><br>(Jointly Administered) |

**DECLARATION OF NICHOLAS K. CAMPBELL IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Nicholas K. Campbell, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer (the "CRO") of MBMG Holding, LLC ("MBMG Holding") and its affiliated debtors and debtors in possession (collectively, the "Debtors," the "Company," or "Clinical Care Medical Centers"), having been appointed on July 15, 2024.  I continue to serve as CRO for the Debtors, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

2.      I am also the Managing Partner and co-founder of Meru, LLC ("MERU"), a restructuring advisory firm. I have over 20 years of experience transforming underperforming and distressed companies through operational and financial restructurings, including through Chapter 11 and out-of-court restructurings.  Prior to co-founding MERU, I was a Senior Director at Alvarez & Marsal in its North American corporate restructuring practice for over 10 years.  I

---

[1]     The address of the Debtors is 7500 S.W. 8th Street, Ste. 400, Miami, Florida 33144.  The last four digits of the Debtors' federal tax identification numbers are: (i) Care Center Medical Group, LLC (9052); (ii) Care Center Network, LLC (5784); (iii) CCMC Physician Holdings, Inc. (4532); (iv) Clinical Care Pharmacy, LLC (2103); (v) Florida Family Primary Care Center, LLC (5005); (vi) Florida Family Primary Care Center of Pasco, LLC (8570); (vii) Florida Family Primary Care Centers of Orlando, LLC (3086); (viii) Florida Family Primary Care Centers of Pinellas, LLC (7075); (ix) Florida Family Primary Care Centers of Tampa, LLC (0631); (x) MB Medical Operations, LLC (8450); (xi) MB Medical Transport, LLC (3476); (xii) MBMG Holding, LLC (3880); (xiii) MBMG Intermediate Holding, LLC (9320); (xiv) Miami Beach Medical Centers, Inc. (3933); (xv) Miami Beach Medical Consultants, LLC (2737); and (xvi) Miami Medical & Wellness Center, LLC (2474).

recently served as the Chief Restructuring Officer in the Chapter 11 bankruptcies of *Achaogen, Inc.*, a biopharmaceutical company, in the U.S. Bankruptcy Court for the District of Delaware, and *Athenex, Inc.*, a biotechnology company, in the U.S. Bankruptcy Court for the Southern District of Texas. In addition to my CRO role with the Company, I am currently advising a public biotechnology company. I have also acted as a financial advisor to multiple other biotechnology companies, a dialysis medical business, and an urgent care provider business.

3.      On or about October 26, 2023, the Debtors retained MERU as its financial advisor. As MERU's lead professional on the engagement and as CRO of the Debtors, I have gained an extensive understanding of the Debtors' day-to-day operations, businesses, and financial affairs.

4.      The Debtors are a leading independent primary care and integrated physician group focused on value-based, multi-specialty healthcare services. The Debtors deliver high-quality health and wellness services to approximately 35,000 patients across 26 primary care centers in Florida, with half of those centers being in Miami-Dade County. The Debtors' patient population consists primarily of high-risk, underserved and dual-eligible populations (*i.e.*, eligible for both Medicare and Medicaid), many of whom live in economically disadvantaged and minority communities.

5.      On the date hereof (the "Petition Date"), the Debtors each commenced a voluntary case under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Court") and continue to operate their business and manage their properties as debtors in possession. The principal purpose of these Chapter 11 Cases is to ensure continuity of care for the Debtors' patient population and to implement a sale with Conviva Medical Center Management, LLC (the

2

"Buyer"), an affiliate of Humana Inc. ("Humana"), pursuant to which the Debtors will sell substantially all of their assets to the Buyer (such proposed transaction, the "Proposed Sale").

6.      To minimize any adverse effects on their estates as a result of the commencement of these Chapter 11 Cases, the Debtors have filed certain motions, applications and other papers seeking various types of "first day" relief (including all attachments and exhibits thereto and any amendments, collectively, the "First Day Filings").[2]   The First Day Filings seek relief aimed, among other things, to establish the foundation for the smooth and efficient entry into Chapter 11 and the administration of these Chapter 11 Cases.  The relief requested in the First Day Filings is paramount to the success of the Debtors' efforts to preserve and maximize the value of their estates and ensure the continuity of the delivery of primary health care services to their approximately 35,000 patients.

7.      Since my appointment as CRO, I and others working under my direction have become familiar with the Debtors' businesses, financial affairs, debt structure, assets, contractual arrangements, operations and strategic challenges.  I have been assisting the Debtors with respect to managing liquidity, seeking additional capital, and analyzing potential strategic alternatives for the Debtors.  Accordingly, I have acquired substantial background and information regarding the Debtors that will assist me in providing effective and efficient services to the Debtors with the issues that may arise in these Chapter 11 Cases.

8.      I submit this declaration ("Declaration") to assist the Court and other parties-in-interest in understanding the Debtors, their business, and the Chapter 11 Cases, as well as to support the Debtors' petitions and the First Day Filings.  Except as otherwise indicated, I have personal knowledge of the matters set forth in this Declaration, and all statements and facts set

---

[2]    Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Filing(s).

forth herein are based upon my personal knowledge, discussions with the Debtors' senior management and the Debtors' professionals, including my colleagues at MERU, my and our team's review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' professionals, or my opinion based upon my experience, knowledge, and information regarding the Debtors' operations and financial condition.  In making my statements based upon my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' professionals and representatives, I have relied upon those professionals and representatives accurately recording, preparing or collecting such documentation and other information.

9.    I am authorized to submit this Declaration on behalf of the Debtors.  I am over the age of eighteen, and if called to testify as a witness in this matter, I could and would competently testify to each of the statements and facts set forth herein.

10.    This Declaration is divided into three parts.  **Part I** provides background information about the Debtors, including their past and current business operations, their corporate and capital structure, and the circumstances leading up to the filing of these Chapter 11 Cases.  **Part II** summarizes the Debtors' primary objectives in these Chapter 11 Cases.  **Part III** sets forth the evidentiary basis for the relief sought in each of the First Day Filings.

## PART I
## BACKGROUND

### A.    OVERVIEW OF BUSINESS OPERATIONS.

11.    *Clinical Care Medical Centers.*  The Debtors provide value-based primary care services to patients in Central and South Florida.  As of the Petition Date, the Debtors have over 800 employees and independent contractors, including over 100 providers (*i.e.*, physicians, nurse practitioners, and physician assistants).  The Company's core mission is to improve the quality of

life of each of its patients through tailored care management with a holistic approach. Throughout the years, the Debtors have developed strong relationships with their patient population, providers, communities, insurance payors, and healthcare partners (including hospitals, external specialty care providers, laboratories and diagnostic centers, behavioral health providers, and pharmacies). The Debtors have a 4.6 Star rating (out of 5 Stars) from the Centers for Medicare & Medicaid Services ("CMS").[3]



**Geographic Footprint**

**26**
Medical Centers

**8**
Florida Counties

Orange
Pasco
Pinellas
Hillsborough
Polk
Palm Beach
Broward
Miami-Dade

12.    The Company firmly believes that simplifying the many complexities of receiving healthcare, and rationalizing the inefficiencies, redundancies, and gaps for patients, is the key to better health outcomes. For example, the Company provides transportation to help patients access medical appointments, improving both their healthcare experience and outcomes. The Company also leverages technology and actively engages with its patients, both clinically and socially, to improve the lives of its patient population.

---

[3]    CMS is an agency within the U.S. Department of Health and Human Services that administers major national healthcare programs, including Medicare and Medicaid. The CMS Star rating for providers, which differs from Star ratings for health plans, focuses on the performance and quality of care provided by individual healthcare providers or groups.

13242847-18

13.    In addition to its primary care services, the Company provides several in-house and ancillary support services to patients, including dental, vision, in-home, telehealth, case management, podiatry, chiropractic, pain management, lab, x-ray, and transportation services, and operates wellness centers that provide meal support and social activities. The Company also refers patients to specialists and other care providers both within and external to the Company. The Company's business model is built around providing coordinated care across the diverse needs of patients, reducing costs and waste, and improving health outcomes and patient experiences.



14.    ***Core Offerings.***    Clinical Care Medical Centers provides the following core offerings for its patient population:

- **Primary Care Program**: Comprehensive in-person and virtual patient care, robust health screening process for new and existing patients, personalized treatment plans, annual wellness and preventative care services, in-house labs, in-house imaging, in-house specialists, in-house exercise and physical activity resources, on-site medication dispensing and/or medication delivery for chronic and acute conditions, complimentary door-to-door transportation to and from primary care facility office within 10 mile radius, and in house resources to support improvement of social determinants of health.

13242847-18

- **Comprehensive Care Management**: Medication management guidance, discharge instruction assistance, health risk assessment, and telephonic patient outreach to ensure continuity of care. This program aims to provide a seamless healthcare experience by addressing various patient needs through coordinated efforts.

- **Urgent Care Hotline and In-Home Care**: The Urgent Care Hotline is staffed seven days a week with an aim to reduce or prevent unplanned emergency room or urgent care visits by performing telephonic triage and telehealth visits. It serves as a critical resource for patients needing immediate medical advice and care. In-Home Care provides dedicated nurse practitioners for homebound patients to prevent or reduce unplanned ER or urgent care visits. These nurses offer same-day urgent visits, post-ER and inpatient observation visits, annual wellness visits, continuity of care, and follow-up visits. They can also perform IV therapy, antibiotic administration, and wound care for senior patients.

- **Holistic and Complex Case Management**: Programs for managing patients who have been identified with educational, social determinants of health, behavioral, chronic conditions, or high risk of unplanned ER visits. The program includes follow-ups to educate patients on the urgent care hotline, disease management, health plan benefits, and community resources.

- **Dental and Vision Services**: The Company contracts to provide comprehensive dental and vision services designed to meet the needs of patients of all ages. Dental care includes routine check-ups, cleanings, fillings, extractions, and advanced procedures such as root canals and crowns. Vision care encompasses eye exams, prescription glasses, contact lenses, and treatment for common eye conditions. The Company's team of experienced dentists and optometrists work collaboratively to ensure optimal oral and visual health, providing personalized care plans and follow-up appointments to maintain and improve overall well-being.

15. The Debtors have historically had low patient attrition due to their commitment to create a greater sense of community engagement through the variety of services described above, which are offered by mostly bilingual staff for the majority of patients who are non-English speaking. Such comprehensive services focus on improving social determinants of health and overall wellbeing.

16.    ***Capitated Revenue Model.***    The Company is in the business of providing "capitated" medical care services to Medicare Advantage and Medicaid members, which entails taking financial responsibility for all medical costs of patients assigned to the Company by health plans, including Medicare Parts A, B, and in most cases, Part D,[4] and supplemental benefits, as defined by CMS and agreements with health plans.    Nearly all of the Company's revenue is "capitated" revenue, meaning the Company receives a pre-negotiated percentage of the premium the health plan receives from CMS.    The amount CMS pays to a health plan is based on three factors: (i) a benchmark rate reflecting geographical differences in healthcare costs (*i.e.*, Miami versus Tallahassee), (ii) the "Medicare Risk Adjustment" score which accounts for the health of the members in the health plan, and (iii) quality bonuses which are based on "Star" ratings (between 1 and 5 Stars) given by CMS, reflecting member health and satisfaction within a health plan.[5]

17.    While there are variations specific to each agreement, the Company generally contracts with health plans, such as Aetna, CarePlus, Centene, Elevance Health, Healthsun, Humana, Optum, Solis, UnitedHealthcare (or their respective affiliates) and others contracted by CMS (for Medicare) and the Florida Agency for Healthcare Administration (for Medicaid), to receive a percentage of the recurring per-member-per-month ("PMPM") revenue. The Debtors then assume the financial responsibility for the healthcare costs of those members incurred at the Debtors' primary care locations, in addition to all third-party medical expenses (*e.g.*, hospital visits, specialist services, surgical services, and prescription drug costs).    The Debtors remain

---

[4]    Medicare Part A provides inpatient hospital coverage; Part B provides outpatient medical coverage; and Part D provides prescription drug coverage.

[5]    The CMS Star rating for health plans is designed to help beneficiaries compare the quality of different Medicare Advantage plans.

"at-risk" for the healthcare costs of the health plan members even if the costs exceed the amount received by the Debtors for a particular month.

18.     The Company's approximately 35,000 patients are accounted for as follows: (i) approximately 18,000 are Medicare Advantage members; (ii) approximately 15,000 are Medicaid members; (iii) approximately 200 patients are non-Medicare/Medicaid; and (iv) approximately 1,800 are served through the Debtors' management services organization ("MSO"), through which the Debtors contract with third-party clinics and physicians to participate in capitated agreements with health plans managed by the Debtors.  The MSO clinics and physicians are managed under similar arrangements as with the Company's core operations.

19.     ***Physicians.***  The Company's physicians and other providers receive the tools and multi-disciplinary support they need to focus on providing high-quality, effective medical care to their patients and their families, rather than time-consuming administrative matters, such as pre-authorizations, referrals, billing, coding, and gathering medical records from third-party providers and data from health plans, which support services are provided by the Debtors. Providers receive continuous training through regular clinical meetings to review the latest findings and developments in primary care medicine.  Providers also receive training and guidance to ensure alignment with the Company's mission of providing effective value-based care, disease detection accuracy, and overall prioritization of patient needs.

## B.    CORPORATE ORGANIZATION

### a.    <u>The Company</u>

20.     The Company was founded in 1997 as Miami Beach Medical Group ("MBMG"). Over the years since its founding, MBMG made several acquisitions.  In December 2016, Gauge Capital purchased a controlling interest in MBMG.  Four years later, in December 2020, a Sun

Capital Partners, Inc. affiliate (such affiliate sometimes being referred to as "Sun Capital") purchased MBMG, with a combination of Sun Capital's own capital contributions and loans from affiliates of KKR & Co. Inc. ("KKR"). After Sun Capital's purchase, it rebranded MBMG as Clinical Care Medical Centers. In June 2021, the Company acquired Florida Family Primary Care Centers, thereby expanding its presence into Central Florida and growing its Medicaid business.

21. The Debtors are led by a management team with extensive experience in the healthcare industry. Mr. Paul McBride, the Debtors' Chief Executive Officer, has nearly 30 years of experience in the healthcare industry, including with senior leadership roles at the four largest health plans in the U.S. (UnitedHealth, Aetna, Anthem, and Cigna). Mr. Claudio Kapusta, the Debtors' Chief Financial Officer, has over 20 years of senior finance experience, including over ten years in the healthcare industry, and previously held senior finance roles at Health Network One, ChenMed, Rincon Capital, E&Y, and Arthur Andersen.

22. The Debtors' corporate headquarters is in Miami, Florida.



13242847-18

23.     The Debtors have approximately 795 employees and 58 independent contractors, of which 143 are providers.  Of the 88 employee-providers, the Debtors employ approximately 25 primary care physicians, 39 nurse practitioners, five physician assistants, four pediatricians, one cardiologist, two chiropractors, eight podiatrists, three acupuncturists, and one optician.

      **b.**     **The Corporate Structure and Governance of the Company**

24.     An organizational chart illustrating the Debtors' corporate structure as of the Petition Date is attached hereto as **Exhibit A**.

25.     The Debtors are principally owned by non-Debtor MBMG Ultimate Holding, L.P., an affiliate of Sun Capital ("Ultimate Holding"), which is the immediate parent entity holding 100% of the equity interests in Debtor MBMG Holding.

26.     Sun MBMG GP, LLC ("Sun MBMG GP") is the general partner of Ultimate Holding.  I understand that there are two managers on the Board of Managers of Sun MBMG GP, which are: Paul McBride and Elizabeth Abrams.  Ms. Abrams is an independent manager. As of the Petition Date, Ms. Abrams is the sole member of the special committee of the Board of Managers of Sun MBMG GP (the "Special Committee").  The Special Committee was created pursuant to that certain Third Amended and Restated Limited Liability Company Agreement of Sun MBMG GP.  The Special Committee has been delegated authority to approve and implement all sale-related and restructuring transaction matters relating to Ultimate Holding and each of the Debtors.[6]

27.     Debtor MBMG Holding holds 100% of the equity interests in MBMG Intermediate Holding, LLC ("Intermediate Holding").

---

[6]     As described further below, the Special Committee was initially formed at the time of the Third Amendment (as defined below) with three members: two appointed by KKR and one by Sun Capital.  On July 24, 2024, one of the KKR designees (an independent manager) resigned from the Special Committee.  On September 27, 2024, the Sun Capital designee on the Special Committee ceased employment with Sun Capital and, Sun Capital determined it to be unnecessary to designate a replacement on the Special Committee.

13242847-18

28.    Debtor Intermediate Holding holds 100% of the equity interests in Debtor MB Medical Operations, LLC ("MBMO").

29.    Debtor MBMO holds 100% of the equity interests in the following Debtors: Care Center Network, LLC, Care Center Medical Group, LLC, CCMC Physician Holdings, Inc., Clinical Care Pharmacy, LLC, Florida Family Primary Care Center, LLC, and MB Medical Transport, LLC.

30.    Debtor CCMC Physician Holdings, Inc. holds 100% of the equity interests in the following Debtors: Miami Beach Medical Centers, Inc. (formerly known as Rodolfo Dumenigo, M.D., P.A.), Miami Beach Medical Consultants, LLC, and Miami Medical & Wellness Center, LLC.

31.    Debtor Florida Family Primary Care Center, LLC holds 100% of the membership interests in the following Debtors: Florida Family Primary Care Center of Pasco, LLC, Florida Family Primary Care Centers of Tampa, LLC, Florida Family Primary Care Centers of Pinellas, LLC, and Florida Family Primary Care Centers of Orlando, LLC.

## C.    THE PREPETITION CAPITAL STRUCTURE OF THE DEBTORS

32.    As of the Petition Date, the Debtors were liable for approximately $479 million in aggregate funded debt obligations under (i) the Revolving Credit Facility, (ii) the First Lien Term Loan, (ii) the Delayed Draw Term Loan Facility, (iii) the Second Lien Notes, and (iv) the Unsecured Note (each as defined below).  MBMO is an obligor under each of the funded debt obligations as either a borrower, issuer, or guarantor.  The table below summarizes the Debtors' debt obligations existing as of the Petition Date:

| Debt Obligations | Estimated Approximate Amount Outstanding as of the Petition Date |
|---|---|
| **Secured Funded Debt** | |
| Revolving Credit Facility | **$17.0 million** |
| First Lien Term Loan | **$201.3 million** |
| Delayed Draw Term Loan Facility | **$33.8 million** |
| Second Lien Notes | **$195.6 million** |
| **Total Secured Funded Debt** | **$447.7 million** |
| **Unsecured Funded Debt** | |
| Unsecured Note | **$31.4 million** |
| **Total Unsecured Funded Debt** | **$31.4 million** |
| **General Unsecured Trade Payables** | **$2.0 million** |
| **Total Prepetition Funded Debt and Trade Payables** | **$481.1 million** |

a.      **The First Lien Credit Facility**

33.     On December 14, 2020, Intermediate Holding, as initial borrower, MBMO, as effective date borrower, KKR Loan Administration Services LLC, as administrative agent and collateral agent (the "First Lien Agent"), and certain lenders thereto (the "Lenders") entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "First Lien Credit Agreement"). Pursuant to the First Lien Credit Agreement, the Lenders agreed to provide MBMO, as borrower, with: (i) a revolving credit facility provided by Capital One, National Association ("Capital One") in the aggregate principal amount of up to $20,000,000 (the "Revolving Credit Facility"); (ii) a term loan in the aggregate principal amount of up to $225,000,000 (the "First Lien Term Loan"); and (iii) a delayed draw term loan facility in the aggregate principal amount of up to $40,000,000 (the "Delayed Draw Term Loan Facility," and together with the Revolving Credit Facility and the First Lien Term Loan, the "First Lien Credit Facility"). The Revolving Credit Facility is scheduled to mature on December 14, 2025. The First Lien Term Loan and Delayed Draw Term Loan Facility are scheduled to mature on December 14, 2027.

13

34.     In connection with the First Lien Credit Facility, the First Lien Agent and the Lenders (including Capital One, as a Lender under the Revolving Credit Facility) entered into, and Intermediate Holdings and MBMO acknowledged, that certain Agreement Among Lenders, dated as of December 14, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "AAL").  Among other things, the AAL provides that the Revolving Credit Facility ranks senior to the First Lien Term Loan and the Delayed Draw Term Loan Facility in the payment "waterfall" with respect to any payments under and proceeds of Collateral (as defined in the First Lien Credit Agreement) securing, the obligations under the First Lien Credit Facility, in each case following a Waterfall Triggering Event (as defined in the AAL). As of the Petition Date, one or more Waterfall Triggering Events have occurred and are continuing and therefore the priority payment "waterfall" set forth in the AAL is in effect.

35.     The First Lien Credit Agreement was amended several times between 2020 and the filing of the Chapter 11 Cases.  The amendments that the Debtors negotiated to the First Lien Credit Agreement have, among other things, allowed the Debtors to (i) acquire Florida Family Care (a primary care physician group),[7] (ii) obtain financial covenant and other relief in favor of the Debtors, and (iii) incur other funded debt (namely, the Second Lien Notes and the obligations under the Unsecured Note).

36.     On July 5, 2022, in connection with a covenant breach under the First Lien Credit Facility, the First Lien Credit Agreement was amended pursuant to that certain Limited Waiver and Amendment No. 2 to Credit Agreement and Amendment No. 1 to Agreement Among

---

[7]     On April 26, 2021, MBMO acquired all of the issued and outstanding membership interests of Florida Family Primary Care Centers, LLC, Florida Family Primary Care Centers of Tampa, LLC, Florida Family Primary Care Centers of Orlando, LLC, Florida Family Primary Care Centers of Pinellas, LLC, and Florida Family Primary Care Center of Pasco, LLC for a total purchase price of $48,186,685.62.

Lenders (the "Second Amendment").  In connection with the Second Amendment, the Second Lien Notes (as defined below) in the amount of $38,000,000 were issued by MBMO to Finco (as defined below).

37.     On March 30, 2023, in connection with a covenant breach under the First Lien Credit Facility, the First Lien Credit Agreement was amended pursuant to that certain Limited Waiver and Amendment No. 3 to Credit Agreement (the "Third Amendment").  The Third Amendment provided for, among other things, utilizing the net cash proceeds of newly issued additional Second Lien Notes in the amount of $100,612,437.86 for (i) a partial paydown of the First Lien Term Loans in the amount of $50,000,000 (plus certain accrued but unpaid interest), (ii) payoff of the BMO Facility (as further described below), and (iii) general corporate and working capital purposes.

38.     The Third Amendment also required the creation of the Special Committee (as described above) pursuant to the Third Amended and Restated Limited Liability Company Agreement of Sun MBMG GP dated March 30, 2023.  The Third Amendment further provides that upon the occurrence of certain events of default set forth in the First Lien Credit Agreement, certain sale provisions therein would be triggered (each, a "Sale Trigger").

39.     The charter of the Special Committee (the "Special Committee Charter") provides that, following the Sale Trigger, the Special Committee shall have the exclusive authority to: (i) control, oversee, approve and consummate a value maximizing sale of the Company pursuant to the terms of the First Lien Credit Agreement; (ii) take all actions necessary to achieve, or to cause the Group Companies[8] to achieve certain sale-related milestones set forth in the First Lien

---

[8]  "Group Companies" is defined in the First Lien Credit Agreement as Sun MBMG GP, Ultimate Holding, MBMG Holding, Intermediate Holding, MBMO and each Subsidiary Guarantor (as defined in the First Lien Credit Agreement).

13242847-18

Credit Agreement; (iii) seek and consummate one or more financing transactions by and on behalf of the Group Companies as the Special Committee reasonably deems appropriate to bring the Credit Parties[9] into compliance with the liquidity covenant set forth in the First Lien Credit Agreement; and (iv) commence a bankruptcy, insolvency, or similar proceeding with respect to any one or more of the Group Companies.

40.     The obligations under the First Lien Credit Facility are secured by security interests in and liens on substantially all of the assets of Intermediate Holding, MBMO, MB Medical Transport, LLC, Care Center Network, LLC, Florida Family Primary Care Center, LLC, Care Center Medical Group, LLC, Clinical Care Pharmacy, LLC, Florida Family Primary Care Center of Pasco, LLC, Florida Family Primary Care Centers of Tampa, LLC, Florida Family Primary Care Centers of Pinellas, LLC, and Florida Family Primary Care Centers of Orlando, LLC (the "First Lien Obligors").  The obligations under the First Lien Credit Agreement are guaranteed by the First Lien Obligors.

41.     On or about August 2, 2024, pursuant to that certain Assignment, Assumption and Mutual Release Agreement, Capital One, the then-holder of all revolving loans and commitments under the Revolving Credit Facility, sold and assigned all of its loans and commitments in respect of the Revolving Credit Facility to certain affiliates of KKR, as assignees.

42.     As of the Petition Date, the Debtors owed approximately $252.1 million under the First Lien Credit Agreement, consisting of approximately $17.0 million under the Revolving Credit Facility, approximately $201.3 million under the First Lien Term Loans, and approximately $33.8 million under the Delay Draw Term Loan.

---

[9]     "Credit Parties" is defined in the First Lien Credit Agreement as Intermediate Holding, MBMO, and each Subsidiary Guarantor (as defined in the First Lien Credit Agreement).

b.    <u>The Second Lien Notes</u>

43.    On July 5, 2022, MBMO issued and sold subordinated secured notes to MBMG Finco, LLC ("<u>Finco</u>"), an affiliate of Sun Capital, in the principal amount of $38,000,000 (the "<u>Second Lien Notes</u>").  The terms of the Second Lien Notes are governed by that certain Promissory Note and Security Agreement, dated as of July 5, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Second Lien Note Agreement</u>"), by and among the MBMO, as issuer, Finco, and the purchasers from time-to-time party thereto (collectively, the "<u>Second Lien Noteholders</u>").  The proceeds of this issuance of Second Lien Notes were utilized to pay down approximately $25,000,000 of First Lien Term Loans (plus accrued and unpaid interest) and for working capital and other general corporate purposes.  The Second Lien Notes are scheduled to mature on June 14, 2028.

44.    On March 30, 2023 (i) MBMO issued and sold an additional $100,612,437.86 of Second Lien Notes to Finco, and (ii) FS KKR Capital Corp. ("<u>KKR Capital</u>") exchanged an equivalent principal amount of $5,000,000 of equity interests in Ultimate Holding for $5,000,000 of Second Lien Notes on a cashless basis.  The funds advanced by Finco were used (i) for working capital and other general corporate purposes, (ii) to pay down approximately $50,000,000 of First Lien Term Loans (plus accrued and unpaid interest) and (iii) to pay off in full a revolving line of credit (the "<u>BMO Facility</u>") extended by BMO Harris Bank N.A. to MBMG Holding in the amount of $35,612,437.86 (inclusive of interest and expenses).  The BMO Facility was guaranteed by Sun Capital Partners VII, L.P., an affiliate of Sun Capital (the "<u>Sun Guarantee</u>"), and the proceeds of the BMO Facility were invested by Debtor MBMG Holding into Intermediate Holding and MBMO from time to time for liquidity and working capital purposes.

17

45.    On November 6, 2023, MBMO issued and sold an additional $10,301,028.30 of Second Lien Notes to Finco.  The funds advanced were used to again pay off in full the re-drawn BMO Facility in the amount of $10,092,000 (inclusive of interest and expenses).  The BMO Facility and the Sun Guarantee were concurrently terminated following such payoff.

46.    The repayment of the Second Lien Notes is secured by, among other things, security interests in and liens on substantially all of the assets of the obligors thereon[10] pursuant to the Second Lien Note Agreement in favor of the Second Lien Noteholders.

47.    As of the Petition Date, the outstanding balance (including capitalized interest and accrued and uncapitalized interest) under the Second Lien Note Agreement is approximately $195.6 million.

c.    **The Unsecured Note**

48.    On November 17, 2023, in connection with certain covenant breaches under the First Lien Credit Facility, the First Lien Credit Agreement was further amended pursuant to that certain Limited Waiver and Amendment No. 5 to Credit Agreement ("Fifth Amendment").  As contemplated by the Fifth Amendment, MBMO and certain noteholders (the "Unsecured Noteholders"), which are comprised entirely of affiliates of KKR, entered into that certain Unsecured Promissory Note (as amended, restated, supplemented or otherwise modified from time to time, the "Unsecured Note"), pursuant to which the Unsecured Noteholders agreed to extend delayed draw term loans with a maximum aggregate principal amount of up to $40,000,000 from time to time to MBMO.  The proceeds of the extensions of credit under the

---

[10]    The obligors on the Second Lien Notes consist of: Intermediate Holding, MBMO, MB Medical Transport, LLC, Care Center Network, LLC, Florida Family Primary Care Center, LLC, Care Center Medical Group, LLC, Clinical Care Pharmacy, LLC, Florida Family Primary Care Center of Pasco, LLC, Florida Family Primary Care Centers of Tampa, LLC, Florida Family Primary Care Centers of Pinellas, LLC, and Florida Family Primary Care Centers of Orlando, LLC.

Unsecured Note were used for liquidity and other general corporate purposes to enable the Debtors to continue operations while evaluating potential transactions, including but not limited to, a sale of the business pursuant to the Initial Marketing Process (as defined below) or an alternative out-of-court or in-court restructuring transaction. The repayment of the obligations under the Unsecured Note is unsecured but, pursuant to the Turnover Agreement (as further described below), ranks senior in right of payment priority to all the Debtors' funded debt obligations, other than the Revolving Credit Facility.

49.     On August 13, 2024, following the expiration of the commitment and availability period under the Unsecured Note, MBMO and the Unsecured Noteholders entered into that certain Amended and Restated Unsecured Promissory Note (the "A&R Unsecured Note"), which extended the commitment and availability period and the maturity date of the Unsecured Note and pursuant to which the Unsecured Noteholders agreed to advance up to $4,500,000 of their remaining commitments under the Unsecured Note to MBMO, as set forth therein.  The proceeds of the extensions of credit under the A&R Unsecured Note were used for liquidity and other general corporate purposes to enable the Debtors to continue operations while engaging in the Second Marketing Process (as defined below), negotiating the Purchase Agreement (as defined below) and preparing for the Chapter 11 Cases.  The obligations under the A&R Unsecured Note are guaranteed by certain guarantors.[11]

50.     On October 2, 2024, MBMO and the Unsecured Noteholders entered into that certain Second Amended and Restated Unsecured Promissory Note (the "Second A&R Unsecured Note"), which extended the commitment and availability period and the maturity date

---

[11]   The guarantors of the A&R Unsecured Note are: Intermediate Holding, MB Medical Transport, LLC, Care Center Network, LLC, Florida Family Primary Care Center, LLC, Care Center Medical Group, LLC, Clinical Care Pharmacy, LLC, Florida Family Primary Care Center of Pasco, LLC, Florida Family Primary Care Centers of Tampa, LLC, Florida Family Primary Care Centers of Pinellas, LLC, and Florida Family Primary Care Centers of Orlando, LLC.

of the Unsecured Note and pursuant to which the Unsecured Noteholders agreed to advance up to $2,000,000 in addition to the $4,500,000 advance pursuant to the A&R Unsecured Note, as set forth therein.  The proceeds of the extensions of credit under the Second A&R Unsecured Note were used for liquidity and other general corporate purposes to enable the Debtors to continue operations while  continuing to negotiate the Sale transaction and finalize the Asset Purchase Agreement and otherwise to facilitate a smooth transition into these Chapter 11 Cases to promote the orderly transition of patient services, among other things.  The obligations under the Second A&R Unsecured Note are guaranteed by both the same guarantors as the A&R Unsecured Note, as well as CCMC Physician Holdings, Inc., Miami Beach Medical Centers, Inc., Miami Beach Medical Consultants, LLC, and Miami Medical & Wellness Center LLC.

51.    As of the Petition Date, the outstanding balance (including capitalized interest and accrued and unpaid/uncapitalized interest) under the Second A&R Unsecured Note is approximately $31.4 million.

d.    **The Intercreditor Agreements**

52.    On July 5, 2022, the First Lien Agent and Finco entered into that certain Intercreditor and Subordination Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Subordination Agreement").  The Subordination Agreement sets forth the relative rights and priorities between the Lenders, the First Lien Agent, and Finco.  On March 30, 2023, KKR Capital joined the Subordination Agreement as a holder of Second Lien Notes.

53.    On November 17, 2023, the First Lien Agent, Finco, and the Unsecured Holders entered into, and certain of the Debtors acknowledged, that certain Intercreditor and Turnover Agreement (as amended, restated, amended and restated, supplemented or otherwise modified

13242847-18

from time to time, the "Turnover Agreement"). The Turnover Agreement sets forth the relative rights and priorities between the Lenders, the First Lien Agent, Finco, the other Second Lien Noteholders, and the Unsecured Noteholders. In particular, the parties to the Turnover Agreement agreed that to the extent the Lenders under the First Lien Term Loan and Delayed Draw Term Loan receive any prepayment or repayment in respect of any such obligations (including any payment in any insolvency or liquidation proceeding or in connection with a sale of Collateral), any such payment shall be turned over and distributed to the Unsecured Noteholders until the obligations under the A&R Unsecured Note are paid in full. The parties further agreed that any such turn over would not (and would not be deemed to) reduce or offset the aggregate amount of obligations in respect of the First Lien Term Loan and the Delayed Draw Term Loan then owing to the Lenders thereunder.

54.     Therefore, taken together, the Subordination Agreement and Turnover Agreement provide, as of the Petition Date, the following payment priority waterfall (in descending order of priority), requiring, among other things, each facility with payment priority to be paid in full prior to any distributions being made to any facility ranking junior in payment priority:

     i.     Revolving Credit Facility (pursuant to the AAL);

     ii.    A&R Unsecured Note (pursuant to the Turnover Agreement);

     iii.   First Lien Term Loan and Delayed Draw Term Loan Facility (pursuant to the Subordination Agreement and the Turnover Agreement); and

     iv.    Second Lien Notes (pursuant to the Subordination Agreement and the Turnover Agreement).

**e.     Unsecured Trade Payables**

55.     In the ordinary course, the Debtors incur trade debt with certain landlords, vendors, suppliers, and taxing authorities in connection with the operation of their business. As

of the Petition Date, the Debtors' outstanding trade payables totaled approximately $2 million in the aggregate.

## D.    EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES

56.    The Debtors have faced significant hurdles resulting from industry and regulatory headwinds (including reimbursement pressures and rising healthcare costs) which, combined with the Debtors' highly leveraged balance sheet, have significantly challenged the Debtors' business and depleted their liquidity.  Notwithstanding these challenges, the Debtors' turnaround management team, recruited in 2022, has implemented an accelerated plan designed to improve overall performance through operational efficiencies and reducing costs.  With the Operational Improvements Plan underway, and the support of their lenders, the Debtors are seeking to implement a sale of substantially all of their  assets to the Buyer pursuant to the Proposed Sale.

57.    As explained below in greater detail, the Debtors exhaustively marketed their assets for more than a year prior to the Petition Date, with no executable transaction materializing other than that proposed by the Buyer.  Given the extent and duration of the Debtors' prepetition marketing efforts, and the support of all of the Debtors' prepetition lenders, the Proposed Sale is the only viable path to minimizing administrative costs and business disruption (including with respect to patient care) that will necessarily result from protracted Chapter 11 Cases with additional postpetition bidding and auction procedures, which would not produce any tangible benefits. The Proposed Sale is the only option for maximizing the value of the Debtors' estates and benefitting all stakeholders, including especially the Debtors' employees and patient population.

### a.    <u>Regulatory Changes and Operational Challenges</u>

58.    The Debtors' revenue model—which is the model utilized across the primary care

capitated provider industry—was substantially impaired by recent industry and regulatory changes.

59. ***Medicare Risk Adjustment.*** The most significant headwind relates to the Medicare risk adjustment model applied to the Debtors' business and industry. As explained above, nearly all of the Debtors' revenue is capitated revenue, meaning the Debtors receive a pre-negotiated percentage of the premium health plans receive from CMS. The Debtors have contracts with health plans under which the health plans receive PMPM revenue and the Debtors receive a percentage of that in exchange for assuming the financial responsibility for the healthcare expenses of their members. In January 2024, CMS instituted Risk Adjustment Model version 28 ("V28") which introduced an amended risk adjustment framework. V28 overhauled the way diseases and medical conditions are classified, coded, and reimbursed within Medicare Advantage plans, reflecting CMS's focus on more accurately identifying and auditing risk-adjustable conditions that align with patients' care, and taking aggressive steps to align Medicare Advantage costs to CMS with traditional Medicare. While the effect of V28 varies by health plan and provider, the changes introduced by V28 along with other announced changes to benefits and funding have adversely impacted the Debtors' capitated revenue, with an overall reduction of the Debtors' revenue of approximately 12% by 2026.

60. ***Medicaid Redetermination.*** Another significant regulatory change relates to Medicaid, from which the Debtors previously derived (directly or indirectly) approximately $100 million in annual revenue. Beginning in March 2020, due to the COVID-19 public health emergency, there was a significant increase in the number of individuals and families seeking Medicaid assistance and redeterminations of Medicaid eligibility were paused for a three-year period to ensure those individuals and families did not lose health coverage. The pause in

redeterminations ended in April 2023, and since then over 25 million people across the United States have been disenrolled from Medicaid as of September 2024.[12]   As a result of these redeterminations and disenrollments, the Debtors' patients and revenue from Medicaid were reduced by more than 50% year-over-year as of July 2024.

61.    ***Increased Medical Expenses.***   The Debtors have also struggled with other changes, including an industry-wide spike in third-party medical costs post-COVID-19 pandemic due to increased healthcare spending trends within the Medicare Advantage patient population. Moreover, there have been significant marketing actions by health plans to expand benefits to levels which are difficult to sustain because such new costs are not being offset by sufficient revenue.  As a result of declining revenues and increasing medical expenses, the Company's cash performance improvements from core operations have been effectively offset by these headwinds.

62.    ***Valuation Decrease.***   Valuations of capitated medical clinic businesses were at a peak when the Company was acquired in 2020.  Valuations are currently depressed given the increased cost of funds in the capital markets, V28, Medicaid redetermination, and other macro factors.  These factors together have created a challenging environment in which to achieve a sale which would satisfy the debt and equity investments in the Company.

63.    ***Debt and Interest Burden.***   The Company's substantial debt and interest burden from its acquisition in 2020 has been difficult to sustain given the industry, regulatory, and expense headwinds described above.  The carrying costs of the Debtors' funded debt is significant and, when taken together with the declining margins and increased expenses resulting

---

[12]    *See* Kaiser Family Foundation, *Medicaid Enrollment and Unwinding Tracker* (Sep. 12, 2024), https://www.kff.org/medicaid/issue-brief/medicaid-enrollment-and-unwinding-tracker/.

13242847-18

from the regulatory and market changes described above, such debt load has become unsustainable, and the Company's liquidity has deteriorated.

64.     Following the Sale Trigger, the Company lacked sufficient liquidity to operate the business during the sale process. The Special Committee approached KKR seeking additional funding, which KKR agreed to provide under the Unsecured Note (*i.e.*, up to $40,000,000) to support the business. As explained further below, while the initial sale process did not yield an executable transaction, KKR continued to fund the business while the Company explored potential sale and restructuring alternatives. In June 2024, the Special Committee elected to re-engage Oppenheimer & Co. Inc. ("Oppenheimer") to pursue a sale transaction. During that time, KKR has continued to fund the business under the A&R Unsecured Note and the Second A&R Unsecured Note while the Company sought a purchaser and negotiated the Proposed Sale.

65.     ***Liquidity Position and Need for Financing.*** As of the Petition Date, the Debtors have approximately $6.9 million in unrestricted cash and cash equivalents which, without postpetition funding, will not be sufficient to meet the Debtors' obligations to fund their fixed costs. The Debtors require access to $10 million in the form of debtor-in-possession financing, in addition to the use of cash collateral, to complete the sale process with the Buyer. KKR is prepared to fund these Chapter 11 Cases to enable the Debtors to consummate the sale to the Buyer and facilitate an orderly transition of medical services to the Debtors' patients.

### b.     Operational Improvements Plan

66.     Beginning in late 2022 and continuing through today, the Debtors have implemented a series of plans aimed at patient retention and growth, improving operational efficiencies, reducing costs, and building scalability into the Debtors' business (the "Operational Improvements Plan").

13242847-18

67.     The *first* operational improvement was a workforce redesign.  Such redesign was aimed at controlling expenses through integration of Company branding, electronic medical records, process automation, analytics, accounting, and outsourcing for process optimization and cost reductions.  Through this operational improvement, the Debtors standardized processes which collect, manage, and analyze organizational data to inform business strategies and operations.

68.     The *second* operational improvement came from a separate workforce redesign, whereby the Company introduced turnaround and technical expertise across all management areas, with a focus on improving patient growth and retention.  With respect to patient growth, there were a series of sales and marketing overhauls.  With respect to patient retention, the Company introduced a service model overhaul, which improved wait times, scheduling, referrals, transportation support, capacity constraints, and budget discipline.  Part of the service model overhaul was the introduction of a measuring and reporting process to highlight improvement opportunities.

69.     The *third* operational improvement relates to enhancing population health capabilities to help frontline clinicians to better identify and manage medical costs and health outcomes.  The Debtors enable and encourage providers to better support polychronic, fragile, and elderly patients with numerous healthcare and social needs.  Overall, the Debtors have improved decision making and care management that has led to better health outcomes, better patient service experiences, and lower medical costs.  As a result, the Company has retained industry-leading sales growth and patient retention.

70.     In addition to the operational improvements above, the Debtors took a number of steps to manage costs and position the business for sustainable success.  These measures include,

but are not limited to, the following: (a) seeking to establish appropriate business scale to meet recent compressed revenue margins; (b) prioritizing the Medicare Advantage line of business through patient engagement and procurement; (c) driving medical cost management initiatives to improve the Debtors' margins; (d) expanding initiatives to optimize direct patient expenses and selling, general and administrative expenses (including by reducing operating expenses, including reducing overhead staff; and significantly reducing all other non-essential spending); (e) improving operating discipline by establishing cost-effective budgets as well as extensive performance management and talent development (including recruitment of industry experts to key operating and senior roles in the Company); and (f) implementing operating management tools (including key performance indicators, dashboards, and related operating measures and controls).

71.    With the Operational Improvements Plan and these Chapter 11 Cases, the Debtors are well positioned to continue their mission of providing access to high-quality health and wellness care to its high-risk and underserved patient population, many of whom live in economically disadvantaged communities, pending the sale of the Debtors' enterprise to the Buyer.    While many healthcare businesses do not adequately serve these patients and communities, the Debtors have built a mission-first business model to uniquely serve these populations and improve health outcomes.

### c.    **Prepetition Sale and Marketing Process**

72.    On September 29, 2023, notice of a Sale Trigger (as described above) was provided by the First Lien Agent to Sun Capital, Sun MBMG GP, Ultimate Holding, MBMG Holding, and Intermediate Holding.

73.     The Special Committee initially retained Oppenheimer as investment banker in September 2023 to, among other things, market the Debtors' assets for sale (the "Initial Marketing Process"). Oppenheimer contacted 115 potential acquirors during the Initial Marketing Process. No transaction was achieved during the Initial Marketing Process and Oppenheimer's services were terminated on March 21, 2024. Oppenheimer was subsequently re-engaged on June 28, 2024, to market the Debtors' assets for sale a second time (the "Second Marketing Process," and together with the Initial Marketing Process, the "Prepetition Marketing Processes"). The Prepetition Marketing Processes spanned a year prior to the Petition Date and included outreach to both prospective strategic and financial acquirors in an effort to market and sell the Debtors' assets.

74.     As part of the Prepetition Marketing Processes, the Debtors executed confidentiality agreements with 53 potential acquirors. Oppenheimer assisted the Debtors in creating an executive summary which it disseminated to the 53 potential acquirors. Oppenheimer held a multitude of calls with 78 potential acquirors from September 2023, through August 2024, and facilitated the Debtors' response to numerous diligence requests.

75.     The Initial Marketing Process resulted in the Debtors receiving five indications of interest and the Second Marketing Process resulted in the Debtors receiving two indications of interest. After extensive marketing efforts, the only viable proposal was that submitted by the Buyer, as memorialized by the *Asset Purchase Agreement* (the "Purchase Agreement") negotiated with the Buyer. Pursuant to the Purchase Agreement, the Buyer will purchase substantially all assets of the Debtors (excluding cash on hand and accounts receivable) for a total purchase price of $45 million (the "Purchase Price"). The Purchase Agreement represents the highest and best offer received to date for the Debtors' assets. Given the vast breadth of the

prepetition marketing and sale process, there does not appear to be any other potential purchaser that would be willing or able to purchase the Debtors' assets for more than the Buyer, and certainly not for more than the $448 million in secured debt owed to KKR and Sun Capital.

76.    Moreover, since its founding, the Debtors have worked closely with Humana and its affiliates, including the Buyer.  For example, MBMG and Care Plus, a Humana affiliate, both were founded in South Florida and have worked together ever since.  The Buyer currently operates primary care centers in several states.  As such, the Buyer knows the Debtors' business and is well-positioned to make the best use of the Debtors' assets and serve the Debtors' patient population without disruption or uncertainty.

77.    Significantly, the Debtors' prepetition senior secured lenders, KKR, as well as its sponsor, Sun Capital, support the sale to the Buyer, notwithstanding that the purchase price will only satisfy a small fraction of the Debtors' prepetition funded debt and will not return any of Sun Capital's investment in the Company.  Indeed, following the sale to the Buyer, the Debtors' prepetition secured lenders will be left with a significant deficiency.

78.    The Debtors' assets have been strenuously marketed over the course of the two Prepetition Marketing Processes and the Debtors submit that there will not be any post-bankruptcy offers which are higher and better than the Proposed Sale to the Buyer.  As a result, the Proposed Sale to the Buyer represents the best offer available to the Debtors to both maximize the value of their assets and ensure continuity of care to its patient population.  KKR, the holder of the Debtors' senior secured debt, has advised that it is unwilling to finance any further marketing process.

**PART II**
**DEBTORS' OBJECTIVES IN THESE CHAPTER 11 CASES**

79.     The primary goal of these Chapter 11 Cases is securing approval of and consummating a going concern sale of substantially all assets of the Debtors to the Buyer pursuant to the Purchase Agreement, which will ensure continuity of care to their approximately 35,000 patients. The Debtors also seek to continue to provide employment to their employees and to provide an enterprise which will be a trading partner to many of its contract counter-parties and vendors, and of course to maximize the value of its enterprise for their creditors.

80.     To sustain the Debtors' operations through approval and consummation of the Proposed Sale to the Buyer, certain of the Debtors' prepetition First Lien Lenders (collectively, the "DIP Lenders") have agreed to provide debtor-in-possession financing (as more fully described below), subject to the rights and protections proposed in connection therewith.  The First Lien Lenders have likewise given their consent to the Proposed Sale conditioned on receiving certain adequate protection and other rights related to the use of cash collateral and entry of an acceptable sale order.  These protections are integral to KKR's continued support of the Debtors' business and these Chapter 11 Cases.

81.     The Buyer intends to purchase substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code in a sale subject to the approval of the Court. Concurrently with the sale to the Buyer, the Debtors intend to file a plan of liquidation under which any remaining assets of the Debtors will be monetized.  Absent the Buyer's agreement to purchase the Debtors' assets, and the DIP Lenders' agreement to provide debtor-in-possession financing in conjunction with the First Lien Lenders' consent to use cash collateral to fund the Chapter 11 Cases and provide working capital needs pending a sale, the Debtors would have been forced to cease all operations, lay off their employees, and terminate all of their operations

and end engagement with their patient communities.  Without the relief requested in the First Day Filings, and later, in the sale motion being filed concurrently herewith (the "Sale Motion")[13], immediate liquidation would be certain.

82.    The Court's approval of the relief requested in the First Day Filings will permit the Debtors to preserve and maximize their enterprise value during the Proposed Sale process for the benefit of their employees, patients, creditors, vendors, and other parties in interest.  The Debtors' immediate objective is to stabilize their operations, continue providing care to their patients, preserve liquidity, minimize any adverse effects that these Chapter 11 Cases might otherwise have on their patients and estates by obtaining the relief requested in the First Day Filings, and to work with interested parties to proceed with a sale of their business for the benefit of the above-mentioned stakeholders.

83.    For these reasons, and the additional reasons discussed in the First Day Filings which are incorporated herein by reference, I respectfully submit that the various relief requested in the First Day Filings is in the best interest of the Debtors and their estates and should be approved by this Court.

**PART III**
**FIRST-DAY FILINGS**

84.    Concurrently with the filing of these Chapter 11 Cases, the Debtors are filing certain First Day Filings.  The Debtors respectfully request that the Court conduct a hearing as soon as practicable after the commencement of the Chapter 11 Cases (the "First Day Hearing") to consider the First Day Filings.

---

[13]    The title of the Sale Motion is as follows: *Debtors' Motion for Entry of an Order (I) Approving Asset Purchase Agreement and Authorizing the Private Sale of Substantially All of the Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens and Interests Except for Permitted Liens and Assumed Liabilities, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief.*

85.     I have reviewed each of the First Day Filings (including the exhibits and schedules attached thereto) and, to the best of my knowledge, I believe that the facts set forth therein are true and correct.  Moreover, I believe that the relief sought in each of the First Day Filings: (a) is essential to enable the Debtors to enter into, and to operate in, Chapter 11 with minimal disruption to operations (including providing care to their patients) or loss of productivity or value; (b) ensures continuity of care to the Debtors' patient population; (c) constitutes a critical element to the Debtors' efforts to preserve value and maximize creditor and stakeholder recoveries; and (d) best serves the Debtors' estates and creditors' and stakeholders' interests.  Further, it is my belief that the relief sought in the First Day Filings is narrowly tailored and necessary to achieve the goals of these Chapter 11 Cases, including the ability of the Debtors to preserve and to maximize value of, as well as to avoid immediate and irreparable harm to, the Debtors' estates.  The facts set forth in each First Day Filing are incorporated herein by reference.

## A.     Debtors' *Ex Parte* Motion for Joint Administration (the "Joint Administration Motion")[14]

86.     Pursuant to the Joint Administration Motion filed concurrently herewith, the Debtors request entry of an order directing consolidation of the Chapter 11 Cases for procedural purposes only.

87.     I believe that it would be more efficient for the administration of these cases if joint administration were authorized.  Joint administration of the Debtors' Chapter 11 Cases will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders. Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative

---

[14]     Defined terms used but not defined in this section shall have the meaning ascribed to them in the Joint Administration Motion.

files and dockets. Consequently, joint administration would reduce costs and facilitate the economical, efficient and convenient administration of the Debtors' estates.

88.     I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes. The Debtors submit that the rights of the creditors and other stakeholders of each of the Debtors will not be adversely affected by joint administration of these cases.  The Debtors filed the Joint Administration Motion on an *ex parte* basis as contemplated by Local Rule 1015-1.  It does not seek substantive consolidation of the Debtors' estates. Accordingly, I believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**B.      Debtors' Emergency Application for Entry of an Order Authorizing the Retention of MERU, LLC to Provide, on an Interim and Final Basis and Effective as of the Petition Date, the Services of (I) Nicholas K. Campbell, as Chief Restructuring Officer, (II) Brian Bonaviri, as Assistant Chief Restructuring Officer, and (III) Additional Staff for the Debtors (the "CRO Retention Application")[15]**

89.     Pursuant to the CRO Retention Application filed concurrently herewith, the Debtors seek approval of an agreement with MERU to provide (i) myself, Nicholas K. Campbell, as the CRO of the Debtors; (ii) Brian Bonaviri, as the Assistant CRO of the Debtors; and (iii) the services of additional staff for the Debtors, as required.

90.     The Debtors understand that MERU and I have significant and extensive experience in providing interim management services in the capacity as CRO. The Debtors further understand that MERU and I have an excellent reputation for providing such services throughout the United States in restructuring matters, and that MERU and I are well-qualified to provide services to the Debtors in these Chapter 11 Cases. The Debtors believe that it is in their

---

[15]   Defined terms used but not defined in this section shall have the meaning ascribed to them in the CRO Retention Application.

best interests, and those of their creditors and other stakeholders, that MERU be retained and that it provides my services as CRO, the services of Mr. Bonaviri, as Assistant CRO, and to provide additional staff, to the Debtors in these Chapter 11 Cases.

91.     Prior to the Petition Date, the Debtors retained MERU in connection with their financial and operational restructuring. Pursuant to that retention, MERU agreed to provide the services of certain support personnel, and also to provide my services as CRO and that of Mr. Bonaviri, as Assistant CRO, effective as of the Petition Date. Since MERU's original engagement, MERU has become familiar with the Debtors' businesses, financial affairs, debt structure, assets, contractual arrangements, operations and strategic challenges. MERU has been assisting the Debtors with respect to managing liquidity, seeking additional capital, and analyzing potential strategic alternatives for the Debtors.  Accordingly, MERU has acquired the necessary background and experience regarding the Debtors that will assist MERU in providing effective and efficient services to the Debtors with the many issues that may arise in the context of the Chapter 11 Cases.

92.     As a result of my prior service as interim management in other restructuring matters, and the prepetition work done for the Debtors by MERU, I believe that the Debtors will suffer immediate and significant harm if they are unable to obtain my services and the services of MERU in these Chapter 11 Cases.  It is, therefore, my belief that only with the granting of an order approving MERU's and my employment will such immediate and irreparable injury be avoided.

93.     For the reasons set forth in the CRO Retention Application and herein, I believe that entry of an order approving the CRO Retention Application is in the best interests of the Debtors, their patients, and all stakeholders.

C.    **Debtors' Emergency Application for Entry of an Order Authorizing Debtors to Employ and Retain Epiq Corporate Restructuring, LLC as Notice, Claims and Solicitation Agent, Effective as of the Petition Date (the "<u>Claims Agent Retention Application</u>")[16]**

94.    Pursuant to the Claims Agent Retention Application filed concurrently herewith, the Debtors seek an order authorizing the Debtors to employ and retain Epiq Corporate Restructuring, LLC ("<u>Epiq</u>") as claims and noticing agent in these Chapter 11 Cases.  I believe that such relief is prudent in light of the thousands of parties in interest to whom certain notices will be sent, including known creditors, potential unknown creditors, and patients.  Accordingly, I believe that the most effective and efficient manner by which to give notice and process claims in the Chapter 11 Cases is to engage Epiq, an independent third party with significant experience in this role, to act as an agent of the Court.

95.    The Debtors and their advisors obtained and reviewed engagement proposals from several other claims and noticing agents to ensure a competitive process.  Epiq is one of the country's leading chapter 11 administrators, with significant experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of the Chapter 11 Cases.  Epiq has substantial experience providing the services the Debtors require in these Chapter 11 Cases, including claims and noticing services, in matters comparable in size and complexity to this matter.

96.    I believe that Epiq's rates are competitive and reasonable given Epiq's services and expertise.  Appointing Epiq as the Debtors' claims and noticing agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Office

---

[16]    Defined terms used but not defined in this section shall have the meaning ascribed to them in the Claims Agent Retention Application.

of the Clerk of the Bankruptcy Court of the administrative burden of processing an overwhelming number of claims.

97.     As part of the overall compensation payable to Epiq under the terms of the Engagement Agreement (as defined in the Claims Agent Retention Application), the Debtors have agreed to certain specifically-enumerated indemnification obligations.  The Debtors and Epiq believe that the indemnification provisions are customary and reasonable for Epiq and comparable firms providing claims, noticing, solicitation and related administrative services.

98.     Accordingly, I believe the Claims Agent Retention Application should be granted in all respects.

**D.     Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File (A) A Consolidated Creditor Matrix and (B) A Consolidated List of the Top Thirty Unsecured Creditors; and (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information for Individual Creditors and Parties in Interest (the "Creditor List Motion")[17]**

99.     Pursuant to the Creditor List Motion filed concurrently herewith, the Debtors request authority to file and maintain a consolidated list of creditors (the "Consolidated Creditor Matrix") in lieu of submitting a separate mailing matrix for each Debtor.  Permitting the Debtors to maintain a consolidated list of their creditors in electronic format only, in lieu of filing a separate creditor matrix for each Debtor, is warranted under the circumstances of these Chapter 11 Cases.  Because the Debtors have thousands of creditors and other parties in interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk of error.

100.    The Debtors, working together with Epiq, the Debtors' proposed claims, noticing and solicitation agent, already have prepared a single, consolidated list of the Debtors' creditors

---

[17]    Defined terms used but not defined in this section shall have the meaning ascribed to them in the Creditor List Motion.

in electronic format.  The Debtors are prepared to make that list available in electronic form to any party in interest who so requests (or in non-electronic form at such requesting party's sole cost and expense) in lieu of submitting a separate mailing matrix for each Debtor to the Court's Clerk's office.

101.    The Debtors also request authority to file a single consolidated list of their 30 largest general unsecured creditors (the "Consolidated Top 30 List") in lieu of filing lists for each Debtor.  A large number of creditors may be shared amongst the Debtors.  The Consolidated Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

102.    Finally, the Debtors request the authority to redact address information of individual creditors—many of whom are Employees—of the Debtors to the extent they appear on the Consolidated Creditor Matrix because such information could be used to perpetrate identity theft.

103.    Accordingly, I believe that the Creditor List Motion should be granted in all respects.

**E.    Debtors' *Ex Parte* Motion for Authorization to File Consolidated Chapter 11 Case Management Summary (the "Consolidated Case Management Motion")[18]**

104.    I am advised that in accordance with Local Rule 2081-1(B), the debtor in possession in a Chapter 11 case is directed to file with the Court and serve all parties of record, within the earlier of three business days after relief is entered, or one business day prior to the date of the first scheduled hearing, a completed local form *Chapter 11 Case Management Summary* (the "Case Management Summary") providing certain information regarding the assets, liabilities and financial affairs of Chapter 11 debtors.

---

[18]    Defined terms used but not defined in this section shall have the meaning ascribed to them in the Consolidate Case Management Motion.

105.    Pursuant to the Consolidated Case Management Motion filed contemporaneously herewith, the Debtors request that the Court authorize them to file a consolidated Case Management Summary, reflecting the assets, liabilities and financial information of each of the Debtors. I believe that the Debtors' request for authority to file a consolidated Case Management Summary is justified, as the filing of a separate Case Management Summary for each of the sixteen Debtors would be, in significant part, duplicative.  In brief, the filing of a consolidated Case Management Summary is more efficient and will provide the Court and parties-in-interest with adequate disclosures regarding the assets and liabilities of each Debtor.

106.    I am advised by counsel that the United States Trustee usually does not oppose the relief requested by this motion.

107.    For the reasons set forth in the Consolidated Case Management Motion and herein, I believe that entry of an order approving the Consolidated Case Management Motion will be in the best interests of the Debtors, their estates and creditors.

**F.    Debtors' Emergency Motion for an Order (I) Authorizing Debtors to Pay Certain Prepetition Employee and Independent Contractor Specialist Obligations and Prepetition Withholding Obligations, (II) Authorizing the Debtors to Maintain Employee Benefit Programs, (III) Authorizing Banks to Honor Related Prepetition Transfers, and (IV) Granting Related Relief (the "Employee Wages Motion")[19]**

108.    Pursuant to the Employee Wages Motion filed concurrently herewith, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to continue their Employee and Independent Contractor Specialist benefits programs and related practices, programs and policies in effect as of the Petition Date with respect to all prepetition Employee Obligations (as defined below); (ii) authorizing those banks maintaining the Debtors' payroll accounts to honor

---

[19]    Defined terms used but not defined in this section shall have the meaning ascribed to them in the Employee Wages Motion.

checks issued to Employees (as defined below) prepetition that have not cleared or been presented as of the Petition Date; and (iii) granting related relief.

109.    As described more fully in the Employee Wages Motion, the Debtors employ approximately 795 full and part time employees, including physicians of various specialties, nurses, opticians, podiatrists, chiropractors, acupuncturists, medical assistants, dental assistants, pharmacy technicians, massage therapists, x-ray and ultrasound technicians, social services representatives, billing specialists, care coordinators and managers, housekeeping staff, maintenance staff, drivers, and office staff (each an "Employee") and approximately 58 independent contractor specialists (each an "Independent Contractor"). Without the Employees' and Independent Contractors' continued, uninterrupted services, the Debtors will be unable to continue to provide essential medical and health care services to their approximately 35,000 patients and to sustain their enterprise. In the ordinary course of their operations, the Debtors incur a number of obligations to, or on account of, their Employees and Independent Contractors, including those related to compensation and benefits (collectively, the "Employee Obligations").

110.    The relief requested in the Employee Wages Motion is essential to the viability of the Debtors' businesses. Any delay in paying Employee and Independent Contractor compensation, deductions, or benefits will fundamentally harm the Debtors' relationships with their Employees and Independent Contractors and irreparably impair morale at the very time when dedication, confidence, and cooperation are most critical. Absent immediate authority to tender the payments described in the Employee Wages Motion, the Debtors operations will be severely impaired. Employee support for the Debtors' sale efforts is crucial, particularly given the Employees' unique knowledge of the Debtors' operations. At this critical stage of the Chapter 11 Cases, the Debtors cannot risk any patient care and operational disruptions that

would inevitably attend any decline in work force morale attributable to the Debtors' failure to pay Employee and Independent Contractors compensation, deductions, and benefits in the ordinary course. Finally, to maintain necessary operational integrity, oversight, and quality control, the Debtors must continue their corporate policies of permitting certain Employees and Independent Contractors to seek reimbursement of business-related expenses by submitting appropriate invoices or vouchers evidencing such out-of-pocket disbursements if and when incurred.

111.    It is critical that the Debtors be permitted to continue the ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date. I believe that the requested relief will enable the Debtors to maintain their current operations without interruption, thereby preserving the value of the business, and, at the same time, maintaining Employee morale. Without the relief requested, the Debtors' ability to preserve the assets of the estates for the benefit of all creditors and stakeholders will be dramatically impaired. Therefore, a grant of the requested relief is in the best interests of the Debtors, their patients, their estates and their creditors.

112.    The Debtors are not seeking relief to pay prepetition Employee Obligations to any individual Employee or Independent Contractor in excess of the cap imposed by section 507(a)(4) of the Bankruptcy Code or to any insider of any of the Debtors. I also believe that the total amount sought to be paid by the Employee Wages Motion is modest compared to the magnitude of the Debtors' overall business. Furthermore, the Debtors have sufficient funds to pay the Employee Obligations in the ordinary course using cash maintained by the Debtors and cash generated through operations as well as through access to the DIP Facility.

113.     Accordingly, I believe the relief requested in the Employee Wages Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

**G.    Debtors' Emergency Motion for an Order Authorizing the Debtors to (I) Continue Administering Insurance Policies; (II) Continue Paying Certain Brokerage Fees; and (III) Satisfy Other Obligations Related Thereto in the Ordinary Course of Business (the "Insurance Motion")[20]**

114.     Pursuant to the Insurance Motion filed concurrently herewith, the Debtors seek entry of an order authorizing, but not directing, the Debtors to continue administering the eighteen (18) insurance policies described in the Insurance Motion (collectively, the "Insurance Policies," and all premiums and other obligations related thereto, including without limitation, all deductibles, taxes and fees, collectively, the "Insurance Obligations") that are administered by various third-party insurance carriers (collectively, the "Insurance Carriers") in the Debtors' discretion to the extent they become due and payable during the pendency of these Chapter 11 Cases.

115.     The Debtors' Insurance Policies are crucial to the preservation of the value of the Debtors' business, properties, and assets.  I am advised by counsel that, in many cases, the insurance coverage provided by the Insurance Policies is required by diverse regulations, laws, and contracts, as well as the Office of the United States Trustee.  Therefore, I believe that it is essential for the Debtors to maintain the Insurance Policies, which provide a comprehensive range of coverage for the Debtors.  Moreover, if the Insurance Policies are allowed to lapse, the Debtors risk exposure to substantial liability for any damages resulting to persons or property of the Debtors and others, and the Debtors would have to bear the costs and expenses of defense litigation.

---

[20]    Defined terms used but not defined in this section shall have the meaning ascribed to them in the Insurance Motion.

116.    The Debtors' continued operations, combined with the Debtors' efforts to undertake an orderly sale process, require that the Insurance Policies be maintained on an ongoing and uninterrupted basis.  Specifically, it is crucial that the administrative fees paid to providers and the premiums paid for the Insurance Policies are continued and maintained.  For example, the risk that eligible claimants will not receive payments with respect to employment-related injuries may exact devastating effects on the financial well-being and morale of the Employees and their willingness to remain in the Debtors' employ.  At this critical time, Employee departures would trigger a severe disruption of the Debtors' business to the detriment of all parties in interest.

117.    To the extent that the Insurance Policies and related agreements may be deemed executory contracts, the Debtors do not at this time seek authority to assume these contracts.  Rather, the Debtors request only authorization to continue the programs, pay certain claims in accordance with the programs, and pay such premiums and administrative expenses as may be necessary to keep the Insurance Policies in force.

118.    I believe that the relief requested in the Insurance Motion will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption.

119.    For the reasons set forth in the Insurance Motion and herein, I believe that entry of an order approving the Insurance Motion will be in the best interests of the Debtors, their estates and creditors.

**H.    Debtors' Emergency Motion for an Order (i) Authorizing Payment of Certain Taxes and Fees and (ii) Granting Related Relief (the "Taxes Motion")[21]**

120.    Pursuant to the Taxes Motion concurrently filed herewith, the Debtors request authority to pay certain sales and use, fuel, franchise, property, and other taxes, as well as certain

---

[21]    Defined terms used but not defined in this section shall have the meaning ascribed to them in the Taxes Motion.

other annual fees that accrued or arose in the ordinary course of the Debtors' business prior to the Petition Date (the "Taxes and Fees"). The Debtors also request that the Court authorize the banks and other financial institutions at which the Debtors maintains disbursement accounts to receive, process, honor, and pay any and all checks drawn or electronic fund transfers requested related to payment of the Taxes and Fees.

121.    I understand that, as of the Petition Date, the Debtors have approximately $1,165.00 in unpaid Taxes and Fees due and outstanding. I understand that some of the Taxes and Fees collected prepetition may constitute "trust fund" taxes and are not property of the Debtors' estates.

122.    The Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid potential penalties and distractions during these Chapter 11 Cases. Specifically, it is my understanding that the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' business operations because governmental authorities may assert liens on the Debtors' property, assert penalties or interest on past-due taxes, or commence personal liability actions against directors, officers, and other Employees in connection with non-payment of the Taxes and Fees, all to the detriment of the Debtors' reorganization efforts, its estate, its Employees, and other parties in interest.

123.    Based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors, their estates, and all parties in interest and should be approved.

I.    **Debtors' Emergency Motion for an Order Authorizing (I) Payment of Prepetition Claims of Critical Vendors and (II) Financial Institutions to Honor and Process Related Checks and Transfers (the "Critical Vendor Motion")**[22]

124.    Pursuant to the Critical Vendor Motion filed concurrently herewith, the Debtors

---

[22]    Defined terms used but not defined in this section shall have the meaning ascribed to them in the Critical Vendor Motion.

seek (i) authority to pay some or all of the prepetition claims of certain vendors, suppliers, service providers, and other similar entities that are essential to maintaining the going concern value of the Debtors' enterprise (the "Critical Vendors" and whose prepetition claims are defined as the "Critical Vendor Claims") and (ii) approval of the procedures and conditions set forth in the Critical Vendors Motion. The Debtors also seek entry of an order authorizing and directing the banks and other financial institutions at which the Debtors maintain disbursement accounts, at the Debtors' direction, to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors relating to the Critical Vendor Claims. Further, the Debtors seek authority to issue new postpetition checks, or effect new electronic fund transfers, on account of the Critical Vendor Claims to replace any prepetition checks or electronic fund transfer requests that may be lost, dishonored, or rejected as a result of the commencement of these Chapter 11 Cases.

125.    The Debtors are independent primary care physicians providing access to high-quality health and wellness care to approximately 35,000 patients in Florida.  The Debtors' vendors and suppliers are critical to the Debtors' ability to maintain safe and effective medical facilities and continue to provide excellent care to their patients.  The medical facilities operated by the Debtors require a steady supply of goods and services from Critical Vendors to provide healthcare services and to maintain safe medical facilities.  Disruptions in the provision of such goods and services would have substantial adverse economic and operational impacts on the Debtors' business and could harm the health and well-being of the Debtors' patients.

126.    The Debtors are in the complex and highly regulated business of providing essential health and wellness care to patients across 26 primary care facilities.  The Debtors' ability to generate revenue and operate their businesses, and the success of these Chapter 11

44

Cases, relies on the Debtors' ability to manage the complex process through which their patients are treated and managed, which includes the patient onboarding, scheduling, billing services, managing care, and receiving payments from payors. The Debtors rely on a variety of goods and services provided by the Critical Vendors which enable the Debtors to effectively manage this complex process.

127.    Unlike vendors that may be easily and timely replaceable, the Critical Vendors are, by definition, irreplaceable absent extraordinary expense or extensive delay, and material disruption to the operations of the Debtors' business. The Critical Vendors are so important to the Debtors' businesses that the uninterrupted access to each of their particular services, even for a short duration, will likely cause irreparable harm to the Debtors' businesses and the Debtors' patients. The Debtors submit that this irreparable harm will far outweigh the cost of the Critical Vendor Claims.

128.    In general, the Critical Vendors fall into three categories: (i) Patient Care Vendors; (ii) Patient Transportation and Nutrition Vendors; and (iii) Information Technology and Administration Services.

129.    Pursuant to the Critical Vendors Motion, the Debtors are seeking authority to pay undisputed prepetition amounts to Critical Vendors in the ordinary course of the Debtors' business and on terms consistent with the Debtors' prepetition practices that the Debtors determine, in their business judgment, are in the best interests of the Debtors' business. I understand that the aggregate amount of prepetition obligations owed to Critical Vendors is approximately $1.65 million. Finally, to ensure that the Debtors' liquidity is preserved as it transitions into chapter 11, payments to Critical Vendors will be contingent on the Critical Vendors agreeing to continue to sell their goods or provide their services on terms at least as

favorable as those in effect before the Petition Date. The Lenders are providing the funds for the payment of the Critical Vendors and the Lenders support for the relief sought by the Critical Vendor Motion.

130.    Based on the foregoing, I believe that the relief requested in the Critical Vendor Motion is in the best interests of the Debtors, their estates and all parties in interest and should be approved.

**J.      Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Continue to (I) Maintain Their Cash Management System, (II) Honor Certain Prepetition and Post-Petition Obligations Related Thereto, (III) Use Existing Business Forms, and (IV) Perform Intercompany Transactions, and (B) Granting Related Relief filed concurrently herewith (the "Cash Management Motion")[23]**

131.    Pursuant to the Cash Management Motion filed concurrently herewith, the Debtors request authority to: (i) continue to maintain the Debtors' existing cash management system (the "Cash Management System"), including, without limitation, to continue to maintain the Debtors' existing bank accounts and business forms, (ii) honor certain prepetition and post-petition obligations related thereto, and (iii) perform certain intercompany transactions.

132.    I understand from counsel that the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases (the "UST Operating Guidelines"). These guidelines require Chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation "debtor-in-possession," the bankruptcy case number, and the type of account. These requirements are designed to provide a clear line of

---

[23]    Defined terms used but not defined in this section shall have the meaning ascribed to them in the Cash Management Motion.

13242847-18

demarcation between prepetition and post-petition transactions and operations and to prevent the inadvertent post-petition payment of prepetition claims.  In the Cash Management Motion, the Debtors seek a waiver of these requirements so that their operations are not further disrupted by the need to alter the Cash Management System.

133.    Prior to the commencement of the Chapter 11 Cases, and in the ordinary course of their business, the Debtors used a Cash Management System comprised of twenty-five (25) bank accounts (the "Bank Accounts") which are maintained at 4 separate banks – Bank of America, N.A., Capital One, N.A., Popular Bank, and T.D. Bank, N.A. (each a "Cash Management Bank," and collectively, the "Cash Management Banks").

134.    The Debtors maintain operating accounts which generally contain the Company's revenues and receipts from doing business and are also used as disbursement accounts to make payments in the ordinary course of business.  The main operating account to which substantially all receipts are funneled is Operating Account 6907 (as defined in the Cash Management Motion) which is held and maintained by Miami Beach Medical Consultants, LLC and maintained at Capital One.  A combination of automatic sweeps and manual transfers from Operating Account 6907 are transferred throughout the Cash Management System for use by the Debtors and certain third-party, non-debtors who provide dental services to patients at various clinics operated by the Debtors pursuant to one or more management services agreements.

135.    A list of the Debtors' Bank Accounts and the amount on deposit in each such Bank Account as of October 11, 2024, the last business day preceding the Petition Date, is set forth in the chart comprising paragraph 14 of the Cash Management Motion.

136.    The Bank Accounts are part of a carefully constructed and highly automated Cash Management System that ensures the Debtors' ability to efficiently monitor and control their cash position.

137.    The Cash Management System operates in accordance with ordinary, usual, and essential business practices.  It allows the Debtors to efficiently track and report the location and amount of funds, which, in turn, enables the Debtors to track and control such funds, ensure cash availability, and reduce administrative costs through a method of coordinating the collection and movement of funds.  The Debtors' existing Bank Accounts function smoothly and permit the efficient collections and disbursements of cash for the benefit of the Debtors and all parties in interest.  The Debtors' transition into Chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of these cases with the same account numbers.

138.    The Debtors' operations require the Cash Management System to continue during the pendency of these Chapter 11 Cases.  If the Debtors were required to create and implement a new cash management system, their operations would be severely disrupted, which would have an adverse impact on the Debtors.  Further, the establishment of new cash accounts and a new collection and disbursement system would result in substantial additional costs to the Debtors' bankruptcy estates.  Accordingly, the Debtors submit that the maintenance of the existing Cash Management System is essential and in the best interests of all creditors and other parties in interest.

139.    The Debtors seek a waiver of certain UST Operating Guidelines.  Specifically, the Debtors seek a waiver of the requirements that they: (i) close all existing Bank Accounts; (ii) open new debtor in possession bank accounts; (iii) establish one DIP account for all estate

48

monies required for the payment of taxes (including payroll taxes); (iv) maintain a separate DIP account for cash collateral; (v) obtain checks for all DIP accounts that bear the designation, "debtor in possession," the bankruptcy case number, and the type of account; and (vi) open a new set of books and records as of the Petition Date.  Closing and opening new bank accounts and books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay.  With the use of computer technology, it is now easy to differentiate between pre- and post-petition transactions by date. The Debtors, in the ordinary course of their businesses, use many checks, invoices, stationery, and other business forms.  By virtue of the nature and scope of the businesses in which the Debtors are engaged and the numerous other parties with whom the Debtors deal, the Debtors need to use their existing Bank Accounts and business forms without alteration or change.  A substantial amount of time and expense would be required in order to close and open new bank accounts and print new checks and other business forms.  Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations.  Accordingly, the Debtors request that they be authorized to continue to use their existing Bank Accounts and business forms and to maintain their existing business records.

140.    I further understand that section 345 of the Bankruptcy Code and the UST Operating Guidelines establishes certain requirements with respect to all deposit accounts and investments of money of the estate.  The Debtors understand that the Cash Management Banks are each FDIC insured and authorized depositories pursuant to 11 U.S.C. § 345(b).  Additionally, as explained above, the Debtors' Bank Accounts comprise an established and integrated Cash Management System that the Debtors need to maintain in order to ensure that collections and disbursements from the Bank Accounts are not disrupted.  The Debtors will note, in their

49

respective records, the date and times the Chapter 11 petitions were filed, and the records will reflect each post-petition receipt and disbursement. Therefore, a waiver of the section 345 deposit guidelines would not pose a risk to the Debtors' estates nor their creditors.

141.    The Debtors request further relief from the UST Operating Guidelines to the extent that they require the Debtors to make all disbursements by check. In particular, the UST Operating Guidelines require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement. Considering the complexity of the Debtors' operations, the Debtors must conduct transactions by debit, wire, or ACH payments and other similar methods, as discussed above. Denying the Debtors the opportunity to conduct transactions by debit, wire or ACH payments or other similar methods would interfere with the Debtors' performance of their contracts and unnecessarily disrupt the Debtors' business operations, as well as create additional costs to the Debtors. Therefore, the Debtors request a waiver of this requirement.

142.    The Debtors also request authority to continue to engage in Intercompany Transactions (as defined in the Cash Management Motion) post-petition. If the Court grants this relief, the Debtors will continue recording all such transactions in their books and records consistent with past practice prior to the Petition Date.

143.    As of the Petition Date, the Debtors estimate that approximately $8,000 in Bank Fees have accrued and remain unpaid, all of which will become due and payable within the first 30 days of these Chapter 11 Cases. The Debtors seek authorization to pay these bank fees and to continue paying the bank fees as they come due in the ordinary course in accordance with past practices on a post-petition basis.

13242847-18

144.    The Debtors seek authority to satisfy Bank Account Obligations (as defined in the Cash Management Motion) that arise in the ordinary course pre- and post-petition, if any.

145.    The Debtors and I have been advised by counsel that the similar relief as the relief requested in the Cash Management Motion has been granted in this and other Districts.

146.    For the reasons set forth in the Cash Management Motion and herein, I believe that entry of an order approving the Cash Management Motion will be in the best interests of the Debtors, their estates and creditors.  For purposes of the first day relief, the Debtors seek only an interim order granting the relief sought by the Cash Management Motion.

**K.    Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief (the "<u>DIP Financing Motion</u>")[24]**

147.    As described in the DIP Financing Motion filed concurrently herewith, the Debtors are in immediate need of debtor-in-possession financing to maintain ongoing business operations as the Debtors transition into these Chapter 11 Cases, which will ensure that the Debtors can continue to provide uninterrupted care to their approximately 35,000 patients and facilitate the Debtors' operations through to the proposed sale of their enterprise to the Buyer. Without such immediate financing, the Debtors project, after consultation with their advisors, that they will be unable to make payments essential to continue going concern operations—each as highlighted in the other first day pleadings as described herein— resulting in immediate and irreparable harm to the Debtors' businesses.  Accordingly, I believe that the proposed debtor-in-possession, senior secured postpetition financing on a superpriority basis under a delayed-draw term loan facility (the "<u>DIP Facility</u>"), pursuant to the terms of that certain *Senior Security*

---

[24]    Defined terms used but not defined in this section shall have the meaning ascribed to them in the DIP Financing Motion.

*Superpriority Priming Debtor-in-Possession Credit Agreement, dated as of October 13, 2024* (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Credit Agreement</u>" and such financing, the "<u>DIP Financing</u>") is critical to the Debtors ability to administer these Chapter 11 Cases.

148.    Prior to the commencement of the Chapter 11 Cases, the Debtors and their professionals and the Debtors' Prepetition Secured Lenders engaged in extensive discussions to structure and achieve consensus on a comprehensive restructuring transaction while ensuring the Debtors maintained liquidity to operate their businesses in the ordinary course. As part of these discussions and negotiations, the Prepetition Secured Lenders agreed to provide post-petition financing to the Debtors in the form of the DIP Facility.

149.    Over the course of the last few weeks, the Debtors and their advisors engaged in various good faith, arms-length negotiations with the Debtors' Prepetition Secured Lenders concerning the economics, milestones, covenants, and other provisions typical in debtor-in-possession financings and ultimately reached agreement on the terms set forth in the DIP Facility as highlighted in the DIP Financing Motion.

150.    As described in the DIP Financing Motion, the DIP Facility is a $10 million secured, superpriority delayed draw debtor-in-possession term loan credit facility. As described more fully in the DIP Financing Motion, the DIP Facility has customary terms, and other conditions, including, among others, certain milestones that the Debtors must meet throughout the Chapter 11 Cases that are an integral component of the DIP Facility. Ultimately, the DIP Facility is the Debtors' best and only available source of post-petition funding under the circumstances that will provide the Debtors with sufficient capital that the Debtors, in consultation with their advisors, believe is necessary to continue ongoing business operations, to

effectively and efficiently administer these Chapter 11 Cases. For the reasons set forth in the DIP

Financing Motion and herein, I believe that entry of an order granting the DIP Financing Motion

is in the best interests of the Debtors, their stakeholders and all parties in interest.

**L.    Debtors' Expedited Motion Requesting a Scheduling Order to Set the Date and Time of the Sale Hearing, the Objection Deadline, and Granting Related Relief (the "Scheduling Order Motion")[25]**

151.    Pursuant to the Scheduling Order Motion filed concurrently herewith, the Debtors

seek the entry of an order by the Court (the "Scheduling Order") scheduling the hearing on the

Sale Motion (the "Sale Hearing") on or before November 27, 2024, setting the deadline to object

to the proposed Sale, and granting related relief.  The DIP Credit Agreement includes certain

"bankruptcy milestones" which include the Debtors obtaining the entry of the Sale Order by the

Court not later than 45 days after the Petition Date (*i.e.*, November 27, 2024).  Thus, the relief

requested in the Scheduling Order Motion will enable the Debtors to comply with the

"bankruptcy milestones".  I am informed by counsel that the proposed Scheduling Order contains

the typical procedural information related to bankruptcy sales, including (i) the date and time of

the Sale Hearing, (ii) the date and time for parties to file and serve objections to the proposed

Sale, and (iii) the parties which should be served with objections.  Accordingly, I believe that the

entry of the Scheduling Order will move the Sale process forward in an expeditiously and

orderly manner.

**M.    Debtors' Expedited Motion for Entry of an Order (I) Authorizing the Debtors to File Under Seal Certain Schedules and an Exhibit to the Proposed Asset Purchase Agreement, and (II) Directing Parties to Redact Confidential Information (the "Motion to Seal Confidential Information")[26]**

152.    I am advised by counsel that section 107(b) of the Bankruptcy Code enables the

---

[25]    Defined terms used but not defined in this section shall have the meaning ascribed to them in the Scheduling Order Motion.

[26]    Defined terms used but not defined in this section shall have the meaning ascribed to them in the Motion to Seal Confidential Information.

Court to issue orders that protect parties from the potential harm that could result from disclosing confidential commercial information. As discussed in detail in the Motion to Seal Confidential Information, the Debtors request the Court's authorization, among other things, to file under seal a discrete set of Confidential Attachments to the proposed Purchase Agreement. I have reviewed the Confidential Attachments and believe the information contained thereon consists of private, commercial information with respect to the Debtors, their employees and employee-related issues, their contracts, litigation, and health care proceedings, which if disclosed publicly, could give a competitor a significant and unfair advantage to the detriment of the Debtors' business, the proposed going-concern sale, and all parties in interest in these Chapter 11 Cases. The Buyer has requested that the Confidential Attachments include its form of employment agreement which would be entered into by the Debtors' physicians identified on Schedule 2.5(a)(xi) of the Purchase Agreement and I am informed by the Buyer that it contains competitively sensitive information of the Buyer. For the reasons set forth in the Motion to Seal Confidential Information and herein, I believe that entry of an order approving it is in the best interests of the Debtors, their estates, and creditors.

**N.    Debtors' Expedited Motion (I) Establishing a General Bar Date to File Proofs of Claim, (II) Establishing a Bar Date to File Proofs of Claim by Governmental Units, (III) Establishing an Amended Schedules Bar Date, (IV) Establishing a Rejection Damages Bar Date, (V) Approving the Form of, and Procedures, of Notice of the Commencement the Chapter 11 Cases (a/k/a the Bar Date Notice), and (VII) Granting Related Relief (the "<u>Bar Date Motion</u>")[27]**

153.    As described in the Bar Date Motion filed concurrently herewith, the Debtors are seeking entry of an order, (i) establishing December 23, 2024, at 5:00 p.m. (Prevailing Eastern Time), as the general bar date for the filing of Proofs of Claim in respect of prepetition claims against any of the Debtors, including secured claims, unsecured priority claims, unsecured non-

---

[27] Defined terms used but not defined in this section shall have the meaning ascribed to them in the Bar Date Motion.

priority claims, and claims arising under section 503(b)(9) of the Bankruptcy Code; (ii) establishing April 11, 2025, at 5:00 p.m. (Prevailing Eastern Time), as the bar date for the filing of Proofs of Claim by Governmental Units in respect of prepetition claims against any of the Debtors; (iii) establishing a bar date for filing of Proofs of Claim following the amendment or supplement of the Debtors' schedules of assets and liabilities filed with the Court (collectively, the "Schedules"), as more fully described in the Bar Date Motion (the Amended Schedules Bar Date); (iv) establishing a bar date for filing of Proofs of Claim for damages arising from the Debtors' rejection of executory contracts or unexpired leases, as more fully described in the Bar Date Motion (the Rejection Damages Bar Date); (v) approving the form of, and procedures for filing, the Proofs of Claim; (vi) approving the form and manner of notice of the commencement of the Chapter 11 Cases (a/k/a the Bar Date Notice); and (vii) granting related relief.

154.    I am informed by counsel that: (i) Bankruptcy Rule 2002(a)(7) requires the Debtors provide claimants at least twenty-one (21) days' notice by mail of the Bar Dates pursuant to Bankruptcy Rule 3003(c); (ii) unless the Court orders otherwise for cause, Bankruptcy Rule 2002(p)(2) requires at least thirty (30) days' notice to creditors with a foreign address; (iii) Bankruptcy Rule 3003(c)(3) provides the Court shall fix the time within which Proofs of Claim may be filed; (iv) Local Rule 3003-1(A) provides that, unless the Court orders otherwise, the deadline for all creditors and interest holders, other than Governmental Units, to file proofs of claim is 70 days after the Petition Date; (v) Bankruptcy Rule 3003(c)(2) provides that any creditor whose claim (a) is not scheduled in the Debtors' Schedules[28] or (b) is scheduled as disputed, contingent, or unliquidated must file a Proof of Claim by a bar date fixed by the Court; and (vi) Bankruptcy Rule 3003(c)(2) also provides that "any creditor who fails to [file a

---

[28]    Contemporaneously with, or within a short period after, the filing of this Motion, the Debtors are filing their Schedules.

13242847-18

Proof of Claim by the bar date fixed by the court] shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution."

155.    In addition, I am informed by counsel that Local Rule 6006-1(A) provides that, unless otherwise ordered by the Court, that orders rejecting an executory contract or unexpired lease shall include the following bulletin at the conclusion of the body of the order, "[a]ny proof of claim for damages arising from the rejection must be filed with the court on or before the latest of: (i) the time for filing a proof of claim pursuant to Bankruptcy Rule 3002(c); (ii) 30 days after the entry of the order compelling or approving the rejection of the contract or lease; or (iii) 30 days after the effective date of the rejection of the contract or lease." Local Rule 6006-1(A).

156.    Moreover, I am informed by counsel that section 502(b)(9) of the Bankruptcy Code provides that Governmental Units shall have a minimum of 180 days after the Petition Date to file proofs of claim. *See* 11 U.S.C. § 502(b)(9)(A).

157.    Here, the Bar Date Motion proposes to allow at least sixty-one (61) days' notice of the General Bar Date and at least thirty (30) days' notice of each of the Amended Schedules Bar Date and the Rejection Damages Bar Date.[29] Additionally, the Debtors propose to allow approximately 180 days' notice of the Governmental Bar Date. I respectfully submit that the proposed Bar Dates and the Procedures (as such terms is defined in the Bar Date Motion) will give the Debtors' creditors more than adequate notice and an ample opportunity for preparing and filing Proofs of Claim in these Chapter 11 Cases.

---

[29]    The Debtors have calculated the 61-day notice period for the General Bar Date as follows: If the Court (i) holds a hearing to consider the relief in the Bar Date Motion not later than October 16, 2024, (ii) approves the relief requested in the Bar Date Motion at such hearing, and (iii) enters the Order granting the Bar Date Motion not later than October 16, 2024, Epiq will be provided until October 19, 2024 (*i.e.,* within four calendar days after entry of the order granting the Bar Date Motion) to mail the Bar Date Notice and Proof of Claim to recipients. Assuming a further three business days, or until October 23, 2024, for the U.S. Postal Service to deliver the Bar Date Notice and the Proof of Claim to the recipients, and a General Bar Date of December 23, 2024, the recipients will have 61 days to submit completed Proofs of Claim through Epiq's online portal or by mail.

O.   **Debtors' Emergency Motion for Entry of an Order Determining That the Appointment of a Consumer Privacy Ombudsman Is Not Required Under 11 U.S.C. § 332 or Local Rule 6004-1(B)(6) (the "Consumer Privacy Ombudsman Motion")[30]**

158.    As described in the Consumer Privacy Ombudsman Motion filed concurrently herewith, the Debtors are seeking entry of an order determining that the appointment of a consumer privacy ombudsman is not required under 11 U.S.C. § 332 or Loal Rule 6004-1(B)(6) of the Local Bankruptcy Rules for the Southern District of Florida.

159.    Under section 363(b)(1) of the Bankruptcy Code, I am informed by counsel that a debtor may sell or lease its personally identifiable information (*e.g.*, a consumer customer list) so long as it complies with the debtor's privacy policy. 11 U.S.C. § 363(b)(1)(A).  If a sale is inconsistent with the debtor's privacy policy, section 332 governs the appointment of a consumer privacy ombudsman. 11 U.S.C. § 363(b)(1).  The Sellers, as proposed sellers of substantially all of the Debtors' assets pursuant to the Purchase Agreement (the "Sale"), have internal policies prohibiting the disclosure of personally identifiable information (collectively, the "Privacy Policies") unless such disclosure is authorized pursuant to a court order.

160.    The proposed Sale is consistent with such Privacy Policies because the disclosure and transfer of personally identifiable information from the Sellers to the Buyer will be pursuant to an order of the Court granting the Sale Motion (if the Court is so inclined to approve the Sale). The terms of the Asset Purchase Agreement provide, among other things, that the Sellers have complied with all health care laws and the Sellers' Privacy Policies, that the Sellers have made available to the Buyer a correct and complete copy of each of the Seller's current Compliance Program[31] related to the Debtors' business, which includes compliance with all Health Care

---

[30]   Defined terms used but not defined in this section shall have the meaning ascribed to them in the Consumer Privacy Ombudsman Motion.

[31]   As such term is defined in the Purchase Agreement.

Laws,[32] that the Sellers shall, concurrently with the closing of the Sale, transfer all Patient Records[33] to the Buyer's designee in accordance with applicable state and federal laws, and that the Buyer and its affiliates (if any) have privacy policies in place which are as compliant with applicable law and at least as protective, in all material respects, as the privacy policies of the Debtors.

161.    In addition, the Debtors have filed this Motion on an emergency basis because the Debtors' debtor-in-possession financing requires the Debtors to obtain an order from the Court approving the Sale within 45 days of the Petition Date.  As explained in detail in the Sale Motion, the Debtors have already engaged in extensive prepetition marketing of the Debtors' business during the past year and have concluded that additional post-petition marketing would not provide any offer higher or otherwise better than the offer provided by Buyer in the Purchase Agreement.  As such, the Sale Motion contemplates a private sale of the Debtors' business to the Buyer to maximize the post-petition efficiency of the sale process.  Accordingly, the Debtors believe that the appointment of a consumer privacy ombudsman would not bring value to any interested parties in these Chapter 11 Cases, but rather, could result in the delay of the sale process and the Debtors inability to meet the 45-day deadline to obtain an order of this Court approving the Sale.  Thus, the Debtors respectfully submit that the appointment of a consumer privacy ombudsman is not required or warranted under section 332 of the Bankruptcy Code, Local Rule 6004-1(B)(6) or the facts of these Chapter 11 Cases.

**P.    Debtors' Emergency Motion for Entry of an Order Authorizing Implementation of Procedures to Protect Confidential Patient Information (the "Confidentiality Motion")**

162.    Through the Confidentiality Motion, the Debtors seek an order that will allow the

---

[32]    As such term is defined in the Purchase Agreement.

[33]    As such term is defined in the Purchase Agreement.

Debtors to protect confidential patient information while still complying with the requirements of the Bankruptcy Code. I am informed by counsel that the relief requested in the Confidentiality Motion appropriately balances the need to maintain confidential patient information under the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, and any amendments thereto ("HIPAA"), with the need for adequate disclosure under the Bankruptcy Code. Given the nature of any information that may reveal even the identity of the Debtors' current and former patients, whose information may be protected under HIPAA and/or state law. Counsel also informs that the Debtors could be subjected to significant monetary and criminal penalties for the unauthorized disclosure of individually identifiable health information or patient identifying information.

163.    I believe that it is critical that the patients' personally identifiable health information be protected, that the Debtors maintain compliance with their obligations under applicable law to protect such information, and that the procedures proposed in the Confidentiality Motion to maintain patient confidentiality during the pendency of these Chapter 11 Cases (collectively, the "Confidentiality Protection Procedures") are appropriate to facilitate that compliance. For the reasons set forth in the Confidentiality Motion and herein, I believe that entry of an Order approving the Confidentiality Motion will be in the best interests of the Debtors, their estates and creditors.

**Q.    Debtors' Emergency Omnibus Motion for Entry of an Order Authorizing, Effective as of the Petition Date, (I) Rejection of Certain Unexpired Leases of Non-Residential Real Property, (II) Abandonment of any Personal Property, and (III) Related Relief (the "Lease Rejection Motion")[34]**

164.    I am advised by counsel that a chapter 11 debtor can, pursuant to section 365(a) of the Bankruptcy Code, in the exercise of its business judgment, reject executory contracts and

---

[34]    Defined terms used but not defined in this section shall have the meaning ascribed to them in the Lease Rejection Motion.

unexpired leases if doing so will benefit the bankruptcy estate; that is, eliminate or reduce unnecessary administrative expenses. One of the Debtors, MB Medical Operations, LLC, is the lessee of non-residential real estate (collectively, the "Leasing Debtor"), which is not occupying or deriving any benefit from the use of three premises (collectively, the "Leases"). The Leases which the Debtors wish to reject are identified in Exhibit "A" to the Lease Rejection Motion.

165.    Rejection of the Leases will benefit the Leasing Debtor's estate by eliminating or reducing administrative expenses.  I submit that the decision to reject the Leases is one made well within the scope of the Leasing Debtors' business judgment which will benefit their estates and all parties in interest.

166.    For the reasons set forth in the Lease Rejection Motion and herein, I believe that entry of an order approving the Lease Rejection Motion will be in the best interests of the Debtors, their estates, and creditors.

**PART IV**
**CONCLUSION**

167.    This Declaration explains the circumstances that have led to the commencement of the Chapter 11 Cases and the need for the relief requested in the First Day Filings.  For the reasons described herein and in the First Day Filings which are incorporated herein by reference, I believe that the prospect for achieving the Debtors' objectives for their Chapter 11 Cases and the continued provision of essential health and medical care to their approximately 35,000 patients and the preservation of their enterprise for the benefit of their other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Filings.

13242847-18

## <u>28 U.S.C. § 1746 Declaration</u>

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this <u>13th</u> day of October, 2024 in Miami, Florida.

<i>/s/ Nicholas K. Campbell</i>
Nicholas K. Campbell
Chief Restructuring Officer

13242847-18

## Exhibit A

**Corporate Structure**

13242847-18

# Debtor Entities



** Miami Beach Medical Centers, Inc. was formerly known as Rodolfo Dumenigo, M.D., P.A